# Exhibit 1

# Exhibit 1

Gretchen M. Nelson (112566)
gnelson@kreindler.com
Nicole C. Andersen (281218)
nandersen@kreindler.com
KREINDLER & KREINDLER LLP
707 Wilshire Blvd., Suite 3600
Los Angeles, CA 90017
Tel.: (213) 622-6469
Fax: (213) 622-6019

Francis G. Fleming, *pro hac vice*
ffleming@kreindler.com
Robert J. Spragg, *pro hac vice*
rspragg@kreindler.com
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432
Attorneys for Plaintiff Linda Ann Baillie

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------x

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>Plaintiff,<br><br>v.<br><br>BRITISH AIRWAYS PLC,<br><br>Defendant. | Case No. 2:13-cv-04681-SVW-RZx<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BRITISH AIRWAYS PLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: March 10, 2014<br>Time: 1:30 p.m.<br>Courtroom: 6<br>Judge: Hon. Stephen V. Wilson |

Filed concurrently with a Separate Statement of Undisputed Facts; Declaration of Linda Ann Baillie; Declaration of Helen Zienkiewicz; Declaration of Robert J. Spragg; and Declaration of Francis G. Fleming, Jr.

------------------------------------------------x

Linda Ann Baillie, individually, as Personal Representative of the Estate of James Donald Baillie, II, and on behalf of all heirs and next of kin of James Donald Baillie, II, deceased, by her attorneys, respectfully submits this memorandum of law in opposition to the motion for summary judgment submitted by defendant British Airways PLC ("British Airways").

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................ii

INTRODUCTION.................................................................................1

STATEMENT OF FACTS....................................................................2

SUMMARY JUDGMENT STANDARD..............................................8

ARGUMENT.......................................................................................10

    1. The Montreal Convention Treaty governs plaintiff's claims against British Airway................................................................10

    2. British Airways' unreasonable failure to follow its own policies and industry standards in the treatment of a seriously ill passenger is an "accident" that can give rise to liability under the Montreal Convention......................................................12

    3. British Airways has failed to meet its initial burden of showing that there is no genuine dispute as to any material fact regarding causation........................................................................................23

    4. British Airways owed Mr. Baillie a heightened duty of care.....24

CONCLUSION ...................................................................................25

# MEMORANDUM OF POINTS AND AUTHORITIES
## INTRODUCTION

As explained below, the motion for summary judgment should be denied because the evidence demonstrates that there are genuine disputes of material fact regarding whether British Airways' response to Mr. Baillie's medical emergency was "unusual and unexpected" and therefore an "accident" under Article 17(1) of the Montreal Convention. Specifically, plaintiff's evidence shows that Mr. Baillie informed a flight attendant on two separate occasions *prior to take off* that he was experiencing chest pains and shortness of breath. Plaintiff's evidence also shows that rather than contacting MedAire to determine whether Mr. Baillie was medically "fit to fly" before the aircraft departed on the nearly 11-hour flight, as required by British Airways own procedures and by aviation industry standards, the flight attendant simply tried to reassure Mr. Baillie and told him to sit down in his seat. Plaintiff's evidence also shows that British Airways crewmembers didn't provide Mr. Baillie with any treatment for his life threatening condition or the associated pain other than providing him with supplemental oxygen for over nine hours and that they didn't divert the flight, even when Mr. Baillie's condition worsened.

Because British Airways' response to Mr. Baillie's medical emergency was not objectively reasonable under the circumstances and was an "unexpected or unusual" event, thus satisfying the definition of "accident" under the Montreal Convention, its summary judgment motion should be denied.

# STATEMENT OF FACTS

On March 23, 2012, James Donald Baillie, II ("Mr. Baillie"), a 61-year old senior executive, was traveling on British Airways flight 289 from London, England to his home in Phoenix, Arizona at the conclusion of a business trip. Defendant's Statement of Uncontroverted Facts (hereinafter "Def. Facts") No. 1. Mr. Baillie was traveling alone and was assigned to seat 4K in the First Class Cabin. *Id.* The flight to Phoenix was scheduled to depart at 15:05 GMT (Greenwich Mean Time) and take 10 hours 40 minutes. Plaintiff's Statement of Undisputed Material Facts (hereinafter "Pl. Facts) No. 42.

Mr. Baillie had flown from Munich, Germany to London, England, earlier in the day and had to hurry to make his connecting British Airways flight to Phoenix. Pl. Facts No. 43. When Mr. Baillie arrived at the departure gate for British Airways flight 289, he was short of breath and feeling discomfort in the center of his chest. Pl. Facts No. 44. Mr. Baillie had no prior history of heart problems. Pl. Facts No. 45.

By the time Mr. Baillie boarded the airplane a few minutes later, the discomfort in his chest had become painful, so he told a flight attendant that he wasn't feeling well and was experiencing chest pain and shortness of breath and that he wasn't sure he should be on the flight. Pl. Facts No. 46. The flight attendant told him that he should sit down in his seat and that they would take care of him, so he did. Pl. Facts No. 47. Mr. Baillie complied with the flight attendant's instruction to sit down and likely expected that the cabin crew would take care of him. Pl. Facts No. 48.

After sitting for a minute or two, the pain in Mr. Baillie's chest had not gone away so he told the flight attendant again that he was short of breath and experiencing chest pains and that he really did not feel well. Pl. Facts No. 49. He was reassured by the flight attendant and told to sit down in his seat. *Id.*

1   Shortly thereafter, the flight attendants closed the door of the aircraft. Decl.
2   of Linda Ann Baillie. Pl. Facts No. 50. At that moment, Mr. Baillie felt "imminent
3   doom." *Id.* He remembered the general advice that if you think you're having a
4   heart attack you should take aspirin, so he took one or two of the aspirins that he
5   had with him. Pl. Facts No. 51.

6   Even though Mr. Baillie repeatedly advised a British Airways flight attendant
7   of his chest pains and shortness of breath, British Airways never determined
8   whether he was medically "fit to fly," as required by the policies and procedures
9   contained in its Customer Service Manual and by aviation industry standards. Pl.
10  Facts No. 53. The British Airways Customer Service Manual states that where
11  British Airways Customer Services staff are "on station" and when a passenger
12  illness occurs 1) "during or after the check-in process and before the aircraft departs
13  the gate," or 2) "after departure from the gate," and "there is doubt concerning the
14  passenger's fitness to fly safely, Customer Services staff should: render all possible
15  immediate local assistance and contact Medlink for a decision on fitness to fly. *See*
16  Appendix A." Pl. Facts No. 54. British Airways had assigned its employee
17  Georgina Bolton to be the Customer Services Manager on Mr. Baillie's flight. Pl.
18  Facts No. 55.

19  British Airways never contacted Medlink to make a decision about whether
20  Mr. Baillie was medically "fit to fly" on an airplane for nearly eleven hours. Pl.
21  Facts No. 56. Instead, the flight taxied to the runway and took off at 15:46 GMT.
22  Def. Facts No. 6.

23  A short while after takeoff, the tightness and pressure in Mr. Baillie's chest
24  increased and he told the flight attendant that his central chest pain was getting
25  worse. Pl. Facts No. 58. Flight Attendant Ewa Van Den Berg described Mr. Baillie
26  as having pain in his central chest and noted that he felt hot, was looking pale and
27  was having difficulty breathing. Pl. Facts No. 59. Flight attendant Van Den Berg
28

-3-

also noted that Mr. Baillie described his level of chest pain as a "5" on a scale of 1 to 10, described Mr. Baillie's pulse as irregular and indicated that he appeared "confused." *Id.* The time of the incident listed on the Incident Report is 15:30 GMT, which is after the aircraft departed the gate at 15:12 GMT, but before the flight took off at 15:46 GMT. Pl. Facts No. 60. It is also approximately the time when Mr. Baillie took aspirin. *Id.* However, the British Airways' cabin crew never verified the dosage of aspirin taken by Mr. Baillie. Pl. Facts No. 52.

At 17:00 GMT, Mr. Baillie again told Flight Attendant Ewa Van Den Berg that he was experiencing chest pain. Pl. Facts No. 61. There were still approximately 9 hours 30 minutes left in the flight. At this time, the British Airways crew member should have initiated the Medical Action Plan outlined in British Airways' Initial Aviation Medical Cabin Crew Course, but they did not. Pl. Facts No. 62.

At 18:45 GMT, approximately three and one-half hours after the subject flight departed the gate at London Heathrow Airport, the British Airways flight crew contacted MedAire for the first time and spoke with a MedAire customer service representative. Pl. Facts No. 63. There were still approximately 7 hours 15 minutes left in the flight. *Id.* The British Airway pilot told the MedAire representative that "we've got a 61 year old male ... who was a little out of breath when he boarded," "has pain in the central chest and feels hot and ... is a bit pale," and "we've put him on therapeutic oxygen." Pl. Facts No. 64. A short time later, a MedAire physician named Dr. Reinhart joined the call. *Id.* Dr. Reinhart asked the flight crew about Mr. Baillie's medical history and the flight crew put Flight Attendant Van Den Berg on the call. *Id.* Flight Attendant Van Den Berg told Dr. Reinhart that Mr. Baillie said that he didn't have a "history of cardiac" problems and that he had taken an aspirin three hours twenty minutes ago, at 3:30 GMT. *Id.* Dr. Reinhart recommended that Mr. Baillie be kept on supplemental oxygen. *Id.*

1   He also indicated that he was concerned about Mr. Baillie's age, his pain and his
2   paleness so he asked crewmembers to find out if there were any medical
3   professionals on board the flight who could obtain Mr. Baillie vital signs to
4   determine whether he was stable enough to take a nitroglycerin tablet. *Id.*

5   According to British Airways, by this time Mr. Baillie's chest pain had been
6   ongoing for at least 1 hour 45 minutes, yet British Airways' cabin crew still were
7   not treating Mr. Baillie's condition as a heart attack contrary to British Airways'
8   training and procedures. Pl. Facts No. 65. They also did not provide Mr. Baillie
9   with any medication to relieve his chest pain and did not make the MedAire
10  physicians aware that they had medication in the onboard medical kits that would
11  relieve Mr. Baillie's prolonged pain or assist in the management of his heart attack.
12  *Id.*

13  Approximately twenty minutes later, at 19:12 GMT, the British Airways
14  flight crew again contacted MedAire. Pl. Facts No. 66. Flight Attendant Van Den
15  Berg reported that Mr. Baillie had an irregular pulse of 100, a blood pressure of
16  100/70 and that he was still experiencing chest pains. *Id.* Flight Attendant Van Den
17  Berg also told MedAire that an on-board doctor stated that Mr. Baillie had
18  "crackles on his left hand side." *Id.*[1] A short time later, Dr. Reinhart rejoined the
19  call and confirmed that he understood that there was a physician on board the flight
20  and that Mr. Baillie had "crackles in the left chest." *Id.* Dr. Reinhart stated that Mr.
21  Baillie's blood pressure was too low for nitroglycerin to be administered so "there
22  [was] not a great deal more that we can do" other than administer supplemental
23  oxygen. *Id.* He also asked if the on-board physician had any suggestions after his
24  evaluation. *Id.* The pilot told Dr. Reinhart that the on-board physician didn't have

---

26  [1] "Crackles" or "rales" are an abnormal respiratory sound heard with a stethoscope.
    They indicate some pathological condition. Dortland's Illustrated Medical
27  Dictionary, 27th Ed. (1988). Pulmonary edema secondary to left-sided congestive
28  heart failure is one of the causes of crackles.

-5-

any. *Id.* At this point, Dr. Reinhart noted that there were over 6 hours remaining in the flight and stated that he was hopeful that the supplemental oxygen would improve Mr. Baillie's condition. *Id.* Dr. Reinhart added that if Mr. Baillie's "condition appears to deteriorate, call us back and we would have to consider a diversion at that point." *Id.* In response, the pilot told Dr. Reinhart that the cabin crew "just said that he's slightly worse since he's been on oxygen." *Id.* Dr. Reinhart advised the pilot to let MedAire know if anything changed with Mr. Baillie's condition or if his blood pressure dropped further, his color deteriorated or if his chest pain worsened to the point where he was unable to tolerate it. *Id.*

Approximately three hours ten minutes later, at 22:34 GMT, the British Airways flight crew again contacted MedAire and Flight Attendant Van Den Berg briefed a different customer service representative on Mr. Baillie's condition. Pl. Facts No. 67. There were still approximately 4 hours left in the flight. Pl. Facts No. 67. Flight Attendant Van Den Berg reported that Mr. Baillie's blood pressure was 100/80 and his pulse was 110. *Id.* Also cite audio recording. She also told MedAire that Mr. Baillie had told her that he was feeling worse, still had pain in the center of his chest and was sweating, but that he didn't report having any pain in his left or right arm. *Id.* At this point, the MedAire representative advised her that Dr. Reinhart's work shift was over and that a new physician would have to be updated. *Id.* Shortly thereafter, the new MedAire physician, Dr. Monas, joined the call. *Id.* Flight Attendant Van Den Berg told Dr. Monas that Mr. Baillie had taken aspirin seven hours previously but had been given no other medication, he was complaining about pain in the center of his chest, his blood pressure was 100/80 and his pulse was 110. *Id.* Flight Attendant Van Den Berg also told Dr. Monas that Mr. Baillie was reporting that he was "feeling a bit worse." *Id.* At this point, Dr. Monas recommended that Mr. Baillie be given a single dose of nitroglycerin, even though the pilot pointed out to her that the previous MedAire physician had decided

-6-

against it. *Id.* The pilot also told Dr. Monas that the on-board physician stated that Mr. Baillie looked "considerably worse" at the last check and that his recommendation was to re-evaluate in 30 minutes and "suggested that at that time we might consider making a diversion." *Id.*

Ten minutes later, at 22:52 GMT, the flight crew contacted MedAire again and told Dr. Monas that the physician on board the flight did not want to administer the nitroglycerin to Mr. Baillie because his blood pressure was too low. Pl. Facts No. 68. Dr. Monas then asked to be rebriefed on Mr. Baillie's medical condition and Flight Attendant Van Den Berg told her that his blood pressure was 100/80, he had a pulse of 110, he was sweating and short of breath and that he still was experiencing chest pains. *Id.* Based on this information, Dr. Monas told the British Airways crew that if they felt that Mr. Baillie was not looking well then they could start to look for diversion airports. *Id.* She also decided to "hold off on the nitroglycerin." *Id.*[2]

Shortly thereafter, at 23:00 GMT, a representative from British Airways Operations Control was brought into the call and the pilot told her that there was a possibility of a diversion, that the nearest airport was Chicago, that they were going to get an update from the on-board physician in ten minutes and that they'd contact her if they decided that they had to divert. Pl. Facts No. 69. At this point, Dr. Monas asked the flight crew to make sure that Mr. Baillie was lying down with his legs elevated. *Id.* The pilot acknowledged Dr. Monas and told Operations Control that he'd update them within ten or fifteen minutes and if and when a decision was

---

[2] During this call, British Airways claims that Flight Attendant Van Den Berg "notified" MedAire of Mr. Baillie's alleged request not to divert the aircraft and also informed them of the on board physicians' opinions regarding diversion. Defendant's Memorandum of Law, p. 6. However, there is no record in either the transcript of the communications between MedAire and the British Airways crewmembers or in the audio recording of those communications that Flight Attendant Van Den Berg ever made those statements.

-7-

made regarding diversion. *Id.* The pilot did not provide any further updates to MedAire. *Id.*

The British Airways pilots did not divert the flight and continued to Phoenix Sky Harbor International Airport where they arrived at the gate at 01:53 GMT (local Phoenix time 6:53 p.m.), approximately 10 hours 41 minutes after departing the gate at London Heathrow Airport. Pl. Facts No. 70.

By the time the flight arrived in Phoenix, Mr. Baillie's medical condition was very serious. Pl. Facts No. 71. He was taken directly from the airplane by ambulance to the emergency room at St. Luke's Medical Center in Phoenix, where he arrived at 7:27 p.m., approximately thirty-five minutes after landing. Pl. Facts No. 72. Mr. Baillie was diagnosed as having suffered an acute myocardial infarction (heart attack) as well as acute respiratory failure, cardiogenic shock and acute systolic heart failure. Pl. Facts No. 73.

Mr. Baillie was admitted to St. Luke's Medical Center from the emergency room in critical condition. Pl. Facts No. 74. He was treated in the intensive care unit at St. Luke's Hospital until March 30, 2012, when he was transferred in guarded condition to The Mayo Clinic in Phoenix. Pl. Facts No. 75. He remained hospitalized at The Mayo Clinic until his death on July 1, 2012. Pl. Facts No. 76.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted only if there is no genuine dispute as to any material fact and the moving party is therefore entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); Fed. R. Civ. P. 56(c). The role of the court is to determine whether there are any genuine issues of material fact to be tried, while resolving ambiguities and drawing all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)(quoting *Anderson*, 477 U.S. at 255)("[I]n ruling on a motion for summary