# EXHIBIT 5

Scott D. Cunningham (State Bar No.: 200413)
Email: scunningham@condonlaw.com
Ivy L. Nowinski (State Bar No.: 268564)
Email: inowinski@condonlaw.com
CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030
Facsimile: (310) 557-1299

- and -

Anthony U. Battista (*admitted pro hac vice*)
Email: abattista@condonlaw.com
CONDON & FORSYTH LLP
7 Times Square
New York, New York 10036
Telephone: (212) 490-9100
Facsimile: (212) 370-4453

Attorneys for Defendant
BRITISH AIRWAYS, PLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>        Plaintiff,<br><br>    vs.<br><br>BRITISH AIRWAYS PLC,<br><br>        Defendant. | Case No. CV13-4681 SVW (RZx)<br><br>**DECLARATION OF EWA VAN DEN BERG**<br><br>Date:     March 10. 2014<br>Time:    1:30 p.m.<br>Courtroom: 6<br>Judge:   Hon. Stephen V. Wilson<br><br>[Filed concurrently with Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities in Support thereof; Separate Statement of Undisputed Material Facts; Declaration of Scott D. Cunningham; Declaration of Stephen Fowler; Declaration of Alastair Grant; Declaration of Georgina Bolton; Declaration of Nicola Sharrad; Declaration of Jacqueline Bowley; and [Proposed] Order] |

I, Ewa Van Den Berg, declare as follows:

1.     I am a Customer Service Manager for British Airways, PLC (hereinafter "British Airways"). I have been employed by British Airways since March of 2010, and I have held my current position since June of 2013. Prior to June of 2013, and at all times relevant to the incident that is the subject of this lawsuit, my job title was Cabin Crew Member. I was one of the cabin crew members assigned to British Airways flight BA 289 on March 23, 2012.

2.     I am submitting this declaration in support of British Airways' Motion for Summary Judgment, or, in the alternative, Partial Summary Judgment in this matter. I have personal knowledge of the facts attested to in this declaration and could competently testify to these facts if called as a witness.

3.     Prior to working for British Airways, I was employed as a cabin crew member by Ryanair for 13 months and Thomas Cook for 2 years. At the beginning of my employment with Ryanair in year 2005, I underwent training as a prerequisite to taking my position as a cabin crew member. I received training with respect to the handling and management of in-flight medical emergencies. I passed all of my tests for becoming a cabin crew member for Ryanair. After 13 months, I took a position with Thomas Cook in 2006. Upon taking the Thomas Cook position, I received additional training including training for handling in-flight medical emergencies.

4.     At the time I joined British Airways in March of 2010, I was required to complete a cabin crew training course during which I learned British Airways' policies and procedures relating to cabin crew duties, including British Airways' policies and procedures pertaining to the handling of in-flight medical emergencies. I passed the training courses.

5.     British Airways' Joint Procedures Manual contains British Airways' instructions to its crew members for dealing with in-flight medical emergencies. A true and correct copy of the portions of British Airways' Joint Procedures Manual

LONDON & FOX, LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1   which govern in-flight medical emergencies and, specifically, complaints of chest

2   pain, which was in effect on March 23, 2012, is attached hereto as Exhibit A.

3        6.      The British Airways Joint Procedures Manual contains a flow chart

4   with instructions for how to assist passengers who complain of chest pain.  This

5   document indicates that crew members should reassure the passenger, assess the

6   passenger's history, administer oxygen, aspirin, or temgesic (a painkiller), and keep

7   the passenger still.  The document also instructs crew members to provide the

8   passenger with buccastem for nausea if required.  The flow chart then instructs

9   crew members to contact MedLink.  (*See* Exhibit A [Joint Procedures Manual],

10  Appendix 3, pages 10-11).

11       7.      The British Airways Joint Procedures Manual states, in relevant part,

12  that British Airways crew members should contact MedLink when they "feel like

13  they need advice from a Health Care Professional."  (*See* Exhibit A [Joint

14  Procedures Manual], Section 6, p. 13).  MedLink (also referred to as MedAire) is a

15  company that provides remote health care services for many airlines, including

16  British Airways.

17       8.      The British Airways Joint Procedures Manual also states, in relevant

18  part, "[a] request for on-board assistance from a doctor of medicine, or other health

19  professional, may be made in the following circumstances: . . . At the suggestion of

20  MedLink."  (*See* Exhibit A [Joint Procedures Manual], Section 6, pp. 13-14).

21       9.      The British Airways Joint Procedures Manual states that MedLink

22  will "advise on medical options for diversion and assist in making arrangements

23  for medical assistance on the ground."  (*See* Exhibit A [Joint Procedures Manual],

24  Section 6, p. 14).

25       10.     Finally, the British Airways Joint Procedures Manual provides that

26  "the decision to divert rests with the Captain and should take into account

27  operational factors as well as the medical information available."  (*See* Exhibit A

28  [Joint Procedures Manual], Section 6, p. 14).

LONDON & FURSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1    11.    In the course of my employment with Ryanair, Thomas Cook

2 Airlines, and British Airways, I have become generally familiar with industry

3 standards and practices with respect to the handling of in-flight medical

4 emergencies. It is a common practice within the airline industry for cabin crew

5 and flight crew to rely on the advice and guidance of MedLink and similar

6 companies, in conjunction with the advice of passengers onboard the aircraft who

7 are physicians, when handling in-flight medical emergencies.

8    12.    I met Mr. James Donald Baillie, II (hereinafter "Mr. Baillie") onboard

9 British Airways flight BA 289 from London to Phoenix on March 23, 2012. On

10 that particular flight, I was assigned to the First Class cabin. Mr. Baillie was

11 seated in seat 4K in the First Class cabin.

12    13.    Mr. Baillie boarded the aircraft very late, just minutes before the

13 scheduled departure time.

14    14.    As Mr. Baillie boarded the aircraft , I greeted him, in accordance with

15 my custom and practice for First Class passengers, and directed him to his seat.

16    15.    Based on my review of the operational log for flight BA 289, flight

17 BA 289 was scheduled to depart the gate at London at 15:05 GMT and actually

18 departed the gate at 15:12 GMT.

19    16.    During the time I was securing the First Class cabin for takeoff, Mr.

20 Baillie requested a bottle of water and stated that he was thirsty after running to the

21 gate. I provided him with bottled water, and I asked him if he was doing alright.

22 Mr. Baillie responded to this question in the affirmative. Mr. Baillie did not

23 complain of chest pains or request to deplane the aircraft prior to the aircraft taking

24 off from London. I informed the cabin crew working with me about the situation.

25    17.    Flight 289 took off from London at 15:46 GMT. From just before

26 takeoff up until the time that the Captain indicated that it was safe for the cabin

27 crew to begin their service, I was seated in my assigned crew seat as required by

28 British Airways procedures.

---

DECLARATION OF EWA VAN DEN BERG
CASE NO.: CV13-4681 SVW (RZx)                    4                    LAOFFICE 55878V.1

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

18.     At approximately 16:20 GMT, I began my normal crew duties for a cabin crew member assigned to the First Class cabin.  One of my first actions was to check on the status of the First Class cabin and determine if any of the passengers needed any assistance.

19.     At about 16:30 GMT, when I checked on Mr. Baillie, he explained that he was still slightly out of breath and that he was not feeling well.  I made him comfortable in his seat and advised him that if he needed anything to let me know.

20.     At this time I notified my supervisor, British Airways Customer Service Manager ("CSM") Georgina Bolton that Mr. Baillie was not feeling well.

21.     Shortly thereafter, at around 17:00 GMT, during the first beverage service, Mr. Baillie advised me that he was experiencing pain in his chest.  I spoke with him for a few minutes and tried to once again make him comfortable.  Mr. Baillie answered all of my questions.  I helped him recline in his seat.

22.     Thereafter, I advised Ms. Bolton that Mr. Baillie was still not feeling well and that he was now experiencing chest pains.

23.     Following my conversation with Ms. Bolton, we set up the on-board oxygen system and explained to the flight crew that a First Class passenger was unwell and experiencing chest pains.  We informed the flight crew that we were in the process of assessing the situation.  We also requested that the flight crew to turn on the on-board oxygen system and stand-by for further information.

24.     At this point, probably another 15 minutes had elapsed.  Ms. Bolton instructed me to focus solely on Mr. Baillie and reassigned my other crew responsibilities to other crew members.

25.     By about 17:15 GMT, we were administering oxygen to Mr. Baillie, and I had assisted Mr. Baillie with putting his seat in a fully reclined position.  At this point, I began obtaining a medical history from Mr. Baillie.

26.     When speaking with Mr. Baillie, I asked him questions about his medical history, age, medications, prior health problems, and symptoms.  Mr.

1  Baillie responded well to my questions and told me that he had no history of

2  cardiac issues, and that he was not taking any prescription medications. Mr.

3  Baillie advised me that he had taken an aspirin at approximately 15:30 GMT Mr.

4  Baillie stated that the pain in his chest was approximately a 5 on a scale of 1-10.

5      27.    I wrote Mr. Baillie's responses to my questions on an incident form

6  called an "IFCE" form. A true and correct copy of the IFCE incident form that I

7  filled out, with input from Mr. Baillie, is attached hereto as Exhibit B.

8      28.    The process of reporting this incident to Ms. Bolton and the flight

9  crew, requesting the flight crew to turn on the oxygen, administering the oxygen to

10  Mr. Baillie, assisting him with his chair, and questioning Mr. Baillie regarding his

11  medical history, age, health problems, medications, etc., took approximately ninety

12  minutes.

13      29.    After recording Mr. Baillie's medical history and making him

14  comfortable, at approximately 18:30 GMT, I proceeded to the flight deck to brief

15  the flight crew, including Captain Stephen Fowler, on the situation and to call

16  MedLink to report Mr. Baillie's symptoms in order to request advice for how to

17  proceed.

18      30.    After I briefed him on the situation and Mr. Baillie's symptoms,

19  Captain Fowler placed a call to MedLink at approximately 18:45 GMT. The

20  MedLink personnel then asked me several questions about Mr. Baillie's reported

21  medical history, medications, and symptoms, which I answered based upon the

22  information provided to me by Mr. Baillie. The MedLink personnel advised us to

23  page for a physician or other healthcare provider onboard the aircraft and request

24  any such physicians or healthcare providers to evaluate Mr. Baillie's vital signs.

25  The MedLink personnel also stated that an onboard physician could administer

26  nitroglycerin to Mr. Baillie if they felt his vital signs were stable enough to do so.

27  The MedLink personnel advised me to report back once a health care provider had

28  evaluated Mr. Baillie's vital signs for further instructions. Attached hereto as

LONDON & FURST in ss
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF EWA VAN DEN BERG
CASE NO.: CV13-4681 SVW (RZx)

6

LAOFFICE 55878V.1

1    Exhibit C is a true and correct transcript of my communications with the MedLink

2    doctor (hereinafter "MedLink Transcript").

3      31.     Following my initial interaction with MedLink personnel, Ms. Bolton

4    used the aircraft public address system to ask for a physician's assistance. I recall

5    that four physicians responded to her page, and that Ms. Bolton selected one of the

6    four physicians to assist with Mr. Baillie.

7      32.     At about 19:00 GMT, the physician selected by Ms. Bolton then

8    proceeded to evaluate and assist Mr. Baillie. As the physician was assisting Mr.

9    Baillie, I explained to the physician and to Mr. Baillie what type of medical

10    equipment was onboard the aircraft and provided the physician with access to two

11    medical kits. I also advised the physician and Mr. Baillie that we had contacted

12    MedLink, and briefly described the services provided by MedLink.

13      33.     Upon examining Mr. Baillie, the physician informed me that Mr.

14    Baillie's pulse was 100, that Mr. Baillie's blood pressure was 100/70, and that he

15    could hear crackles on the left side of Mr. Baillie's chest. As the doctor examined

16    Mr. Baillie, I recorded the information obtained by the physician on the IFCE

17    form. I then returned to the flight deck with the IFCE form to brief MedLink and

18    the flight crew regarding the physician's evaluation of Mr. Baillie. We contacted

19    MedLink a second time at 19:12 GMT and reported Mr. Baillie's vital signs, as

20    taken by the onboard physician, to MedLink.

21      34.     During our second call, the MedLink doctor advised us that Mr.

22    Baillie's vital signs were too low to administer nitroglycerin. The MedLink doctor

23    advised us to proceed to Phoenix for the time being, and stated that Mr. Baillie's

24    condition would hopefully improve if he continued to lie down and receive

25    oxygen. MedLink advised us to continue to provide Mr. Baillie with oxygen and

26    to monitor his vital signs every 15 to 30 minutes. MedLink advised us to report

27    back if Mr. Baillie's condition deteriorated. (*See* Exhibit C [MedLink Transcript],

28    pp. 2-3).

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

LONDON & FULLER LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

35.    I remained with Mr. Baillie for the remainder of the flight, except for two hours when I was on break. Following British Airways' standard operating procedures, I took a break approximately five hours into the flight at 20:10 GMT. During my break, I took a two hour nap in the crew rest area in the tail of the aircraft. Upon information and belief, during this time period, Ms. Nicola Sharrad, another cabin crew member, assisted Mr. Baillie, in conjunction with the passenger physician. When I returned from my break, approximately seven hours into the flight at 22:10 GMT, I returned to assisting Mr. Baillie. The passenger physician advised me at that time that Mr. Baillie's condition was unchanged. At that point, approximately seven hours into the flight, Mr. Baillie was able to get up and use the toilet on his own.

36.    Just before 10:34 p.m. GMT, Mr. Baillie reported to the passenger physician that he felt worse, was sweating and experiencing chest pain. I went to the flight deck to notify the flight crew and MedLink. MedLink advised us to administer nitroglycerin to Mr. Baillie. (*See* Exhibit C [MedLink Transcript], pp. 3-4). I went back to the First Class cabin and informed the passenger physician of MedLink's recommendation.

37.    The physician attending Mr. Baillie summoned another onboard physician, whom he appeared to know personally, to assist with evaluating Mr. Baillie's vital signs. The two physicians observed that Mr. Baillie's vital signs were stable, at 100/80 and a pulse of 110. Mr. Baillie also reported to the physicians that he did not have any pain down his arm. The physicians were of the opinion that Mr. Baillie's blood pressure was still too low to administer nitroglycerin.

38.    At approximately 22:52 GMT, we contacted MedLink for a fourth and final time and reported that the passenger physicians had stated that Mr. Baillie's blood pressure was too low to administer nitroglycerin. (*See* Exhibit C [MedLink Transcript], p. 5). MedLink advised us to keep the passenger in a fully reclined

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1  position, to elevate his legs, to continue the administration of oxygen, and to report

2  back if we felt the need to divert.  MedLink stated that they would be monitoring

3  the flight and potential locations for diversion in the interim.  *See* Exhibit C

4  [MedLink Transcript], p. 6).

5      39.   I went back to assist Mr. Baillie and to discuss the possibility of

6  diversion with Mr. Baillie and the passenger physicians.  Mr. Baillie himself

7  specifically requested that the aircraft not be diverted to Chicago or Denver, and

8  requested that the aircraft continue to Phoenix.  Both of the physicians separately

9  told me that continuing to Phoenix would not worsen or exacerbate Mr. Baillie's

10  condition.  I reported this to Ms. Bolton and to the flight crew.  The Captain then

11  made a decision to continue to Phoenix.

12      40.   The first physician stayed with Mr. Baillie until landing, and the

13  second doctor assisted periodically.  The situation remained unchanged for the

14  remainder of the flight.  I placed Mr. Baillie on portable oxygen prior to landing in

15  Phoenix so that Mr. Baillie could continue to receive oxygen as he exited the

16  aircraft.

17      41.   On landing at Phoenix, Mr. Baillie walked off the aircraft and was met

18  by paramedics.  The paramedics placed him in a wheelchair on the jet bridge.  I

19  accompanied Mr. Baillie off the jet bridge and handed his hand baggage to the

20  paramedics.

21      42.   The cabin crew and flight crew followed the letter and spirit of all

22  British Airways policies and procedures with respect to the treatment we provided

23  to Mr. Baillie onboard British Airways flight BA 289 on March 23, 2012.  In

24  addition, we complied with industry standard and practice, which is to contact

25  MedLink and page for onboard physicians for assistance with a medical

26  emergency, and to defer to their opinions with respect to the treatment of any

27  passenger who becomes ill in-flight.  Neither the onboard physicians nor MedLink

28  ever recommended or suggested to me that flight BA 289 on March 23, 2012 be

DECLARATION OF EWA VAN DEN BERG
CASE NO.: CV13-4681 SVW (RZx)

9

LAOFFICE 55878V.1

1   diverted.

2       I declare under penalty of perjury under the laws of the United States of

3   America that the foregoing is true and correct. Executed this _15_ day of January,

4   2014, at _T5, Rondon Heathrow_ United Kingdom.

5

6

7                                  Ewa Van Den Berg

DECLARATION OF EWA VAN DEN BERG
CASE NO.: CV13-4681 SVW (RZx)

LAOFFICE 55878V.1

LONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030