# EXHIBIT 10



## KREINDLER & KREINDLER LLP

TRADITION OF EXCELLENCE

750 Third Avenue
New York, NY 10017-2703
(212) 687-8181
Fax: (212) 972-9432
www.kreindler.com

(212) 973-3478
ffleming@kreindler.com

December 4, 2013

*VIA ELECTRONIC AND FIRST CLASS MAIL*

Scott D. Cunningham, Esq.
Ivy L. Nowinski, Esq.
Condon & Forsyth LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, CA 90067

> Re:   *Baillie v. British Airways PLC*
>         **Case No. 13-cv-4681-SVW-RZx**
>         **Crew Depositions and Related Discovery**

Dear Counsel:

As indicated in my earlier email, and in the continuing spirit of cooperation, I undertake to respond to your inquiries concerning the scheduling of depositions of British Airways' crewmembers during the week of January 6, 2014 in London.

First, Rob Spragg and I have each cleared our calendars for that week and are prepared to travel to London in order to conduct those depositions, on separate tracks if necessary. However, as indicated below, we have concerns about the initial disclosure and discovery received from British Airways to date, which we believe must be addressed before we travel to London to take depositions. I also wish to raise additional discovery requirements stemming from the present Court ordered schedule in this case.

As a preliminary matter, however, I wish to note that I am extremely concerned about the Court Scheduling Order and its effect in this case as it drastically and unfairly restricts plaintiff's capacity to present her case. The idea that plaintiffs must submit a response to British Airways' potentially dispositive summary motion in five working days is patently unfair and unworkable.

California Office
707 Wilshire Boulevard, Los Angeles, CA 90017-3613   .
Tel: (213) 622-6469  Fax: (213) 622-6019

Massachusetts Office
277 Dartmouth Street, Boston, MA 02116-2805
Tel: (617) 424-9100  Fax: (617) 424-9120

December 4, 2013
Page 2

As you are aware, James Baillie was traveling alone on March 23, 2012 on a business trip from Europe, initially Munich to London, then to his home in Phoenix on British Airways Flight 289 when he became ill and needed emergency medical care. At or before 1530 GMT, he reported "severe" "constant" "central chest pain," "felt hot," looked "pale," had "difficulty breathing," had an "irregular pulse" (recorded at 100 per minute), a low blood pressure of 100/70, was "feverish," "anxious" and "weak".[1] Throughout the entire period of this flight, his condition did not improve, it worsened. Approximately eleven hours later, he was essentially delivered to a waiting ambulance when the flight arrived in Phoenix and he was immediately taken to St. Luke's Hospital. His condition was so serious from that time (*i.e.*, when he arrived at St. Luke's Hospital) at about 2:00 a.m. GMT on March 24, 2013 until his death on July 2, 2012 he was never able to engage in lengthy conversation again, and consequently unable to explain what had happened to him on the flight in detail due to his injuries and the life support equipment used in the hospital to assist his breathing and prevent further injury to his heart. As you must be aware, medical science has taught us that when an individual encounters heart attack symptoms of chest pain and difficulty breathing, and the kind of related symptoms presented by Mr. Baillie, there is what physicians refer to as a "golden hour" during which a person with these signals must be treated in order to prevent substantial damage to the heart. If not treated or arrested, the process can lead to severe heart damage and death. This well known principle of medical knowledge has obvious importance to international air carriers. It is beyond dispute that such events occur routinely and regularly in international transportation due to the duration of an in-flight environment and physical isolation from emergency medical care. Thus, British Airways must have encountered problems of this nature and is aware that its passengers who experience this difficulty in-flight might not have witnesses to provide testimony on their behalf. When viewed in that context, I am sure you can understand why Mrs. Baillie and her family are critical of British Airways' disclosure and discovery to date. While witnesses who will testify on British Airways' behalf are identified by name, the facts and circumstances they observed are not disclosed. I believe adequate disclosure should include the latter.

Based on an adversarial relationship with your firm that extends well in excess of 30 years and with you personally for at least 15 years, I am sure that with adequate time we could overcome all of the challenges and difficulties related to this situation and meet the need to ferret out the details of what happened. We have expressed to you our concern regarding the Court's reluctance to have approved the agreed schedule we jointly submitted which would have provided sufficient time for us to work through these problems amicably. Notwithstanding, while I am sure we could have worked this out as we have in the past had we been allowed adequate time, the limitations imposed by the Court have closed the window and removed our ability to work out the scheduling and other discovery issues in the case. I repeat that Rob Spragg and I are ready to proceed to London for depositions on January 6th insofar as our schedules and availability are concerned.[2] And, while I express in this letter

---

[1]*See e.g.*, British Airways' report BA 0451-55 and MedLink Patch Summary BA 0475-77.

[2] I assume in this regard that whenever we do depositions, British Airways would like to conduct them at the law offices of Gates and Partners.

December 4, 2013
Page 3

criticism of the disclosure and discovery to date, I also acknowledge that these differences are well within the kinds of problems that we have routinely and repeatedly resolved amicably in the past. Under the present timeline, however, I do not see that we as plaintiffs can afford to proceed in any way other than by motion.

In this context, I want to raise the following specific issues with you, request a meet and confer to address these and request that you provide us with British Airways' position on these requests as soon as possible so that we can present an appropriate motion to the Court.

A.    <u>Privilege Log.</u>

We believe that the information contained in the privilege log you have produced is inadequate for us to ascertain (much less for the Court to rule) whether British Airways' claims of privilege are valid or not; and, assuming the documents are entitled to some level of protection, whether the documents are likely discoverable under the well known "substantial need" exception to the work product privilege which almost certainly applies (because of the fact that the witnesses' statements for whom you claim privilege have information that is unavailable to plaintiff from any other source). Moreover, the log completely fails to describe how these materials came into existence and what the role of counsel was. We feel it is undisputable that after an in-flight medical emergency on a transatlantic flight such as James Baillie experienced, British Airways would conduct an investigation in the course of its ordinary business activity and record the facts, mostly its crews' observations. Yet, all we know from the privilege log is that British Airways simply had its crew members route information about what happened through an "insurance" individual employed by the company. This does not make the reports privileged. In any event, please immediately supplement your privilege log or confirm that you do not intend to supplement the log so that we can challenge British Airways' claims and seek a ruling based on what the log contains. Obviously, we need to do so before the crew depositions.

Additionally, I would like to point out that the law is clear that while communications themselves may be entitled to confidentiality under work product or attorney client privilege, the "facts" set forth in the communications are not privileged. Therefore, I request that you immediately provide the "factual" aspects of the materials as to which British Airways has claimed a privilege and therefore exempt from disclosure. We will shortly be serving formal interrogatories on some of these subjects and believe we need answers before the crew depositions.

December 4, 2013
Page 4

2.    Crew.

        While British Airways' disclosure identifies the names of several of the crew members, and that they are cabin crew and will testify about "activities and events," "facts and circumstances" and "decedent's condition" (*see* British Airways Disclosure witnesses 2-9) no details about the activities, events, facts, circumstances or Jim Baillie's condition are disclosed.  Please supplement your disclosure and/or provide discovery to describe the situation during the whole flight, the specific responsibilities of each crew member, either in terms of zones and/or other classification (*i.e.*, first class, business class, etc.), what the various acronyms in the training records mean for any of the crew members involved (or we will have to depose all of the assigned crew), particularly training having to do with medical issues, first aid, heart attacks and chest pain, and identify any crew member and event in their histories that involves pre-flight or in-flight contact with Medlink, Inc. or the possibility of in-flight diversion to offload a sick passenger, and/or providing care for individuals with undiagnosed chest pain and/or shortness of breath, and any other occasion which involved a passenger being removed from an aircraft to receive medical attention and/or be met by emergency medical technicians or ambulance.

        Additionally, please provide the crews' actual work schedule and where they will be flying to in January and February, 2014.  We will attempt to work around those commitments.

        Finally, on the subject of crew depositions, I note that British Airways has produced summary versions of what looks to be a form of incident report, and an occupational safety report, and I would like to receive copies of any manual and/or instructions that provide guidance to British Airways employees for the preparation of such reports, each report's author and/or the identity of any person who provided information for these documents, and any guidance for what goes into a so-called "eBasis" or "SITA" report or message, or in-flight emergency medical situation.

3.    **Other Disclosure/Performance of the Aircraft**.

        It is also important for us to have a comprehensive timeline for the entire flight (expressed in a constant time zone reference, most logically GMT).  Additionally, at a minimum we need to know how much time elapsed from gate departure until the aircraft was airborne, the flight time required to take off from Heathrow and climb to altitude, the elapsed time in cruise until it achieved its closest proximity to the western shore of Ireland, the elapsed time until it achieved its closest proximity to Iceland, Greenland, Newfoundland and Nova Scotia and how close the aircraft was, and the names of any city in North America having a population sufficient to sustain a hospital capable of providing emergency care to a heart attack victim and an airport at which a transatlantic Boeing 747 could land.  We would also like to know whether the flight traveled a great circle or rhumb line route or course and the ground speed of the aircraft during the subject flight, at least as it transited from the east coast of North America to Phoenix; the fuel on board expressed in terms of flight time; the

December 4, 2013
Page 5

quantity of fuel consumed and elapsed time and cost required to depart from cruise altitude, land, deplane an ill passenger and then re-launch pursuant to the flight plan route and climb to a cruise altitude again. These are all facts that are known to the flight crew and should be disclosed before we conduct depositions.

Additionally, we need to have the entire MedAire Inc. universe of documents regarding this flight and any recorded communication regarding the subject flight before the crew depositions. And, we intend to depose MedAire, Dr. Reinhart (or Raynold) and Dr. Monas as soon as possible.

## 4.    Passengers.

In addition to crew members, we need to know the name and address, phone number if available and/or email address of the persons assigned to the seats immediately next to, in front of and behind Mr. Baillie. This would probably include the persons assigned to 4J, 3I and J, 17I and H, 16I and J, and 18I and J. Additionally, in addition to Dr. Verma, we need the names and the seat assignment and addresses of any other passenger who was also a physician on board the aircraft, any passenger known to have spoken to Jim Baillie during the flight [and any empty seat accommodation available to Mr. Baillie so that he could have laid down and/or moved to a prone position during the flight (if this was not done].

## 5.    Disclosure.

To the extent Rule 26 is intended to provide factual information about a parties claims and defenses, I have to say that I don't quite understand very much about British Airways' factual claims in any respect, and I think these matters should be cleared up before we travel to take the crew depositions. For example:

a)    Is British Airways claiming factually that Jim Baillie would have died anyway even if he had been provided all appropriate and necessary medical care during the "golden hour" and the remaining flight following the initiation of chest pain and shortness of breath, etc. and/or diverted to a suitable facility, or that no level of care or medical attention on board the flight or diversion of the flight would have saved his life? If so, what facts does British Airways base this claim on?

b)    Secondly, what third-party fault known to British Airways caused or contributed to the failure to treat Jim Baillie? Is British Airways blaming MedAire or Medlink? If so, does British Airways oppose joinder of MedAire/Medlink in this litigation and/or consolidation with a separate litigation against MedAire/Medlink?

c)    What were the "necessary measures" taken by British Airways to assist Mr. Baillie after he encountered the symptoms of chest pain and shortness of breath, etc.?

December 4, 2013
Page 6

     d)     While one blood pressure reading of 100/70 is provided, there is no disclosure whatsoever about the time this measurement was taken, by whom or what Mr. Baillie's blood pressure was during the rest of the flight correlated to any given time; the same is true for his heart rate, whether he was sweating and/or had encountered other symptoms, etc.

     e)     There is no disclosure of what Medlink was told by British Airways or what British Airways told Medlink concerning Mr. Baillie's medical condition.

In our view, these matters need to be disclosed prior to taking the crew depositions in England.  And, as noted we believe it is necessary to conduct the depositions of MedAire personnel before the crew depositions.

Again, I wish to reiterate that I believe with adequate time, we could have calmly discussed and worked out all of these issues amicably.  I am extremely reluctant to couch the needs of plaintiffs in this case by using the term "demand".  However, owing to the difficult scheduling requirements imposed by the Court, I am afraid that if we are to proceed in early January, 2014 with crew depositions, we need to resolve these problems first.

I am prepared to meet and confer with you either in person or by phone at your earliest convenience, and look forward to attempting to resolve these matters amicably to the extent possible.  However, as a realist I am afraid that we are headed for a lengthy discovery motion and wish to avail myself of every opportunity to avoid the motion and/or narrow the issues.

Finally, please provide us with access to the originals or legible copies of BA 0449 and BA 464-65 and the "slides" referred to in the Cabin Crew Recurrent AvMed Course documents (see e.g., BA 0015).  As indicated above, we are contemplating suing MedAire.  If we elect to do so, would you oppose an amendment to the existing Complaint adding MedAire as a party defendant?  Or, if we have to sue MedAire in Arizona, would you consent to a 28 U.S.C. § 1404 transfer of the case since both the Baillie family and MedAire are located there, and/or a § 1406 transfer for pretrial proceedings?

Thank you for your time and attention to these matters.  I support the application for admission *pro hac vice* of Tony Battista and look forward to working with him once again.

Sincerely,

KREINDLER & KREINDLER LLP

By: _____
Francis G. Fleming

FGF:iv

December 4, 2013
Page 7


cc:    Anthony U. Battista, Esq.
       Robert J. Spragg, Esq.