Mark C. Dangerfield (Bar No. 010832)
Wm. Charles Thomson (Bar No. 004269)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
E-mails: mark.dangerfield@gknet.com
              wct@gknet.com
Attorneys for Defendants MedAire, Inc., Steven
Joe Reinhart, D.O., and Jessica Monas, M.D.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>MEDAIRE, INC.; STEVEN JOE REINHART, D.O.; and JESSICA MONAS, M.D.,<br><br>Defendants. | No. 2:14-cv-00420-DJH<br><br>**ANSWER OF DEFENDANTS MEDAIRE, INC., STEVEN JOE REINHART, D.O., AND JESSICA MONAS, M.D. TO PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>**(Demand for Jury Trial)**<br><br>(Corrected Caption) |

In answer to plaintiff's First Amended Complaint (the "FAC") in this matter, Defendants MedAire, Inc., Steven Joe Reinhart, D.O., and Jessica Monas, M.D. (sometimes collectively referred to as the "MedAire Defendants") admit, deny, and assert as follows:

## GENERAL ALLEGATIONS

### PARTIES

1.      Answering paragraph 1 of the FAC, the MedAire Defendants admit that this action seeks damages on behalf of Linda Ann Baillie, individually and as personal representative of the Estate of James Donald Baillie, II, and on behalf of all heirs and next of kin of James Donald Baillie, II, who died on July 1, 2012.  The MedAire Defendants deny the remaining allegations of the paragraph.

1        2.       The MedAire Defendants admit the allegations of paragraph 2 of the FAC.

2        3.       Answering paragraph 3 of the FAC, the MedAire Defendants admit that it is

3    a Nevada corporation, that MedAire has an office at 1250 West Washington Street, Suite

4    442, Tempe, Arizona  85281, and that MedAire conducts substantial business from its

5    office in Arizona.  The MedAire Defendants also admit that they sometimes refer to that

6    part of MedAire's business which provides in-flight medical advisory services as

7    "MedLink."

8        4.       Answering paragraph 4 of the FAC, the MedAire Defendants admit that

9    Defendant Drs. Reinhart and Monas are residents of Maricopa County, Arizona, that, at

10   all times relevant to the allegation of the FAC, they were licensed physicians, and that

11   during certain times on March 23, 2012 they were working at the Banner Good Samaritan

12   Hospital in Maricopa County, Arizona.  The MedAire Defendants deny that Drs. Reinhart

13   and Monas were ever employed by MedAire.  Whether they were "agents" for MedAire is

14   a legal conclusion that requires no response. The MedAire Defendants affirmatively assert

15   that both Drs. Reinhart and Monas were in fact employees of Emergency Professional

16   Services, P.C. or "EPS."

17       5.       Answering paragraph 5 of the FAC, the MedAire Defendants admit that

18   MedAire is qualified to do business in the State of Arizona and has been conducting

19   continuous and systematic business in the State of Arizona.  The MedAire Defendants

20   further admit that Drs. Reinhart and Monas are qualified to provide medical services and

21   have been providing medical services in the State of Arizona.

22       6.       Answering paragraph 6 of the FAC, the MedAire Defendants admit that,

23   under a ticket contract purchased in the United States, Plaintiff's decedent was a

24   passenger on board British Airways Flight 289 on March 23, 2012.  Based on his later

25   medical records, the MedAire Defendants also admit that, prior to or upon boarding the

26   said Flight 289, Mr. Baillie suffered injuries in that he experienced a myocardial

27   infarction, or what is commonly called a heart attack.  The MedAire Defendants

28

affirmatively deny, however, that their actions or omissions caused any part of Mr. Baillie's injuries.

7. Answering paragraph 7 of the FAC, the MedAire Defendants admit that this Court has jurisdiction of the action. The MedAire Defendants further admit that the action arises under the Convention for the Unification of Certain Rules for International Carriage by Air (entered into force in the United States on November 4, 2003), reprinted in S. Treaty Doc. No. 106-45 (the "Montreal Convention"), because Mr. Baillie was on an international flight, Flight 289 from London to Phoenix, and because Plaintiff alleges that Mr. Baillie sustained injuries either while on board Flight 289, or in the course of the operations of embarking or disembarking the flight.  The MedAire Defendants further admit that the final place of destination for Flight 289, according to the ticket, was in the State of Arizona, that Maricopa County, Arizona was the principal and permanent residence of Mr. Baillie, and that MedAire operates part of its business in Maricopa County, Arizona, and maintains facilities related to that business in Maricopa County, Arizona.

8. The MedAire Defendants admit the allegations of paragraph 8 of the FAC.

9. The MedAire Defendants deny the allegations of paragraph 9 of the FAC, except that they admit that they provide medical advisory services to many airlines, including British Airways, and that on March 23, 2012, the MedAire Defendants fielded calls in Phoenix, Arizona from a satellite telephone in the cockpit of British Airways Flight 289, flying from London to Phoenix, in connection with medical issues the airline crew said involved a 61-year old male passenger.  MedAire also admits that it has a commercial contract with British Airways, and that, on the referenced date, MedAire arranged for emergency room physicians employed by Emergency Professional Services to consult with members of the flight and cabin crew, via the cockpit satellite phone, in connection with medical issues involving the passenger.  The MedAire Defendants deny the remaining allegations of the paragraph.

/ / /

10.     The MedAire Defendants deny the allegations of paragraph 10 of the FAC. The MedAire Defendants specifically assert that British Airways operating procedures, standard industry practice, and FAA regulations, all mandate that only the pilot of an aircraft has the authority to decide to divert an aircraft to a different landing site.

11.     Answering paragraph 11 of the FAC, the MedAire Defendants admit that, on March 23, 2012, Mr. Baillie was a fare-paying passenger on board BA Flight 289 on a round-trip ticket with a final destination in the United States; they further admit that, prior to boarding the plane, Mr. Baillie had rushed to make the flight and experienced chest pain and shortness of breath; that upon boarding the plane at approximately 14:54 UTC he reported his difficulties and condition to a member of the British Airways cabin crew and advised that he did not feel well; that Mr. Baillie thereafter, prior to takeoff, took an aspirin; that the plane took off at 15:46 UTC; that after takeoff Mr. Baillie told a member of the British Airways cabin crew that he was experiencing central chest pain, and Mr. Baillie either told the crew member, or the crew member observed, that Mr. Baillie felt hot and had difficulty breathing, and the crew member observed that he looked pale; that the British Airways crew eventually gave Mr. Baillie supplemental oxygen and, at certain times during the flight, monitored his condition; and that, according to a British Airways cabin crew member, at some point approximately seven and one-half hours into the flight, an on-board physician advised that Mr. Baillie had begun to feel worse, although his "vitals" were the same and he looked the same.   The MedAire Defendants deny the remaining allegations of the paragraph.

12.     Answering paragraph 12 of the FAC, the MedAire Defendants admit that MedAire holds itself out to airlines as being able to provide crewmembers with ready access to an emergency department doctor who could provide remote medical advice when an in-flight medical situation arose, if the airline contacted MedAire through the aircraft's satellite phone.  The MedAire Defendants assert that whether and to whom they had a "duty" in the circumstances alleged in the paragraph are legal conclusions that

require no response.  The MedAire Defendants deny the remaining allegations of the paragraph.

13.     Answering paragraph 13 of the FAC, the MedAire Defendants admit that on March 23, 2012, the pilot of British Airways Flight 289 contacted MedAire four times regarding an in-flight medical situation being experienced by a passenger (now known to be Mr. Baillie), and that, pursuant to MedAire's contract with British Airways, MedAire arranged for emergency room physicians, first Dr. Reinhart and later Dr. Monas, to speak with the airline pilot and crew during those calls.  The MedAire Defendants further admit that, during the four calls, the British Airways crew provided MedAire and Defendant Drs. Reinhart and Monas with certain information about the ill passenger, and the MedAire Defendants assert that Drs. Reinhart and Monas provided the British Airways crew appropriate assessment and advice based on the information provided to them.  The MedAire Defendants deny that Mr. Baillie suffered injuries and experienced an "accident" under the Montreal Convention on account of the alleged failure of the defendants "to provide prompt appropriate medical assessment, advice, guidance, instructions, consultations, and options regarding appropriate treatment for Mr. Baillie," and further deny that Mr. Baillie's injuries and death were caused by any such alleged accident.

<u>**FIRST CAUSE OF ACTION**</u>
**FOR DAMAGES AGAINST DEFENDANTS**
**MEDAIRE, REINHART AND MONAS**
**BY PLAINTIFF'S DECEDENT JAMES DONALD BAILLIE, II**

14.     Answering the allegations in paragraph 14 of the FAC, the MedAire Defendants re-allege each and every answer contained in paragraphs 1-13 as if fully set forth herein.

15.     Answering FAC paragraph 15, the MedAire Defendants admit that Mr. Baillie experienced chest pain just prior to boarding BA Flight 289, that, according to the British Airways crew, his chest pain continued during the flight from London to Phoenix, and that, in hindsight based on his later medical records, Mr. Baillie's chest pain was caused by a heart attack or myocardial infarction.  The MedAire Defendants deny that Mr.

1    Baillie's condition "deteriorated and significantly worsened" during the flight.   The
2    MedAire Defendants admit that Mr. Baillie reported his condition to a member of the
3    British Airways cabin crew upon boarding the plane, and further admit that, about four
4    hours later (approximately three hours after takeoff), the British Airways crew first
5    contacted MedAire through the cockpit satellite phone, gave certain information about
6    Mr. Baillie's symptoms to MedAire, and thereafter received certain medical advice from
7    Defendant Dr. Reinhart. The MedAire Defendants further admit that, approximately seven
8    hours after takeoff, the British Airways crew contacted MedAire again, gave certain
9    information about Mr. Baillie's symptoms to MedAire, and thereafter received certain
10   medical advice from Dr. Monas.   The MedAire Defendants affirmatively assert that Dr.
11   Monas specifically advised that, in light of the crew's concern over the passenger's
12   medical condition, MedAire would "take a look at some diversion locations. . . ."   The
13   MedAire Defendants deny the remaining allegations of the paragraph.

14          16.      Answering FAC paragraph 16, the MedAire Defendants admit that, at
15   approximately 18:45 UTC, about three hours after takeoff, the pilot of BA Flight 289
16   contacted MedAire and sought advice about a 61-year old male passenger who, according
17   to the airline crew, was experiencing certain symptoms.  The MedAire Defendants also
18   admit that—unbeknownst to them—the passenger, Mr. Baillie, had been experiencing and
19   exhibiting pain and other symptoms as a result of having exerted himself to get onboard
20   the plane before takeoff, and had reported his difficulties and condition to the British
21   Airways crew before takeoff.  The MedAire Defendants deny that they failed to provide to
22   the British Airways crew informed, adequate, or appropriate medical advice under the
23   circumstances.   The MedAire Defendants further deny that they had any "authority
24   regarding the flight," and specifically deny that they had authority to cause the flight to be
25   diverted.  The MedAire Defendants affirmatively assert that Mr. Baillie requested that the
26   flight proceed to Phoenix and not divert, and further assert that diverting the flight at the
27   time of or after the satellite phone conversations with Defendant Drs. Reinhart or Monas

28

1  would have not saved Mr. Baillie's life.  The MedAire Defendants deny the remaining
2  allegations of the paragraph.

3       17.     Answering the allegations in paragraph 17 of the FAC, the MedAire
4  Defendants deny that the British Airways cabin crew provided Mr. Baillie with
5  supplemental oxygen during the first two hours of the subject Flight BA289. The MedAire
6  Defendants admit that Mr. Baillie reported that he had taken an aspirin prior to takeoff,
7  and admit that the British Airways crew provided Mr. Baillie with water. The MedAire
8  Defendants further admit that, although Mr. Baillie's pulse and blood pressure remained
9  stable, his chest pain did not go away as the flight progressed, and that, according to the
10  British Airways crew, at some point about seven hours into the flight, Mr. Baillie said that
11  he was feeling "a little worse."  The MedAire Defendants deny the remaining allegations
12  of the paragraph.

13       18.     Answering the allegations in paragraph 18 of the FAC, the MedAire
14  Defendants admit that, on March 23, 2012, approximately three hours after takeoff from
15  London, the British Airways pilot of BA 289, from the cockpit of the airplane, contacted a
16  MedAire communications specialist to discuss a passenger, and was eventually patched
17  through to Defendant Dr. Reinhart, who was located at the Banner Good Samaritan
18  Hospital emergency department in Phoenix, Arizona. The MedAire Defendants also admit
19  that the passenger's condition was described to Dr. Reinhart as involving a 61-year-old
20  male passenger onboard who was having some centralized chest pain and was pale.  The
21  MedAire Defendants further admit that the British Airways crew told Dr. Reinhart that the
22  passenger had been put on supplemental oxygen, and that he did not have any cardiac
23  history and was not taking any medications.  The MedAire Defendants deny the remaining
24  allegations of the paragraph.

25       19.     Answering the allegations in paragraph 19 of the FAC, the MedAire
26  Defendants deny that the description of Mr. Baillie's symptoms given to Dr. Reinhart by
27  the British Airways crew presented a "high likelihood" of an emergency cardiac situation.
28  The MedAire Defendants admit that Dr. Reinhart properly suggested that it would be

1   good to have a medical person on board the plane evaluate Mr. Baillie, including getting a

2   set of vital signs, and that those vital signs would, among other things, help determine

3   whether Mr. Baillie's blood pressure was stable enough to try a nitroglycerin.   The

4   MedAire Defendants deny the remaining allegations of the paragraph.

5        20.   The MedAire Defendants admit the allegations of FAC paragraph 20, except

6   that they deny that the onboard physician determined that Mr. Baillie "was experiencing

7   'crackles' in the left side of his chest."   The MedAire Defendants admit that the British

8   Airways crew reported that the onboard physician said that the passenger had "a crackle

9   down his left hand side."

10        21.   Answering FAC paragraph 21, the MedAire Defendants admit that the term

11   "crackles" is sometimes used as a medical term to refer to a characteristic clicking or

12   rattling sound that, in certain conditions, can be heard in the chest with a stethoscope

13   when a person has one of a variety of medical conditions, which may include chest

14   congestion, asthma, acute bronchitis, pneumonia, or pulmonary edema or fluid in the

15   lungs.   The MedAire Defendants deny the remaining allegations of the paragraph.   The

16   MedAire Defendants affirmatively assert that "crackles" in the medical sense are

17   extremely difficult to detect on an airplane because of all the ambient noise, including the

18   noise of the plane's engine.

19        22.   Answering paragraph 22 of the FAC, the MedAire Defendants admit that, at

20   19:00 UTC, Flight 289 had just under seven hours of flight time remaining to Phoenix.

21   The MedAire Defendants deny the remaining allegations of the paragraph.

22        23.   Answering FAC paragraph 23, the MedAire Defendants admit that Dr.

23   Reinhart asked the British Airways crew whether the onboard physician, following his

24   examination of Mr. Baillie, had any further suggestions, but they deny the remaining

25   allegations of the paragraph.

26        24.   Answering FAC paragraph 24, the MedAire Defendants admit that at

27   approximately 19:12 UTC, the pilot initiated another phone patch with the MedAire

28   communications specialist (which phone patch MedAire records refer to as "Repatch

8

No. 1"), and that Dr. Reinhart joined that call at approximately 19:18 UTC.  The MedAire Defendants further admit that the cabin crew then reported that, according to an onboard physician, the passenger (whom we now know to have been Mr. Baillie) had a pulse of 100, that his blood pressure was 100/70, that he was still complaining of chest pains, and that he had a crackle down his left hand side. The MedAire Defendants also admit that Dr. Reinhart determined that the blood pressure was too low to support giving the passenger nitroglycerin, and said there was "not a great deal more we can do other than continuing the supplemental oxygen."  The MedAire Defendants deny the remaining allegations of FAC paragraph 24.   The MedAire Defendants affirmatively assert, however, that Dr. Reinhart also asked whether the physician onboard had any further suggestions after his evaluation, and was told that the onboard doctor had none.   The MedAire Defendants further assert that, during this Repatch No. 1, Dr. Reinhart also advised that, "hopefully his condition will improve as he lies down and gets the oxygen," but "if not, if his condition appears to deteriorate," then the airline should call back and "we would have to consider a diversion at that point."   The MedAire Defendants also assert that during Repatch No. 1, Dr. Reinhart specifically asked the airline crew to monitor the passenger and let MedAire know if anything changed, or should the passenger become unstable. MedAire further asserts that Dr. Reinhart asked the crew to call back if the passenger's blood pressure dropped further or he became unresponsive, or his color deteriorated and became ashen or cyanotic, or if the chest pain seemed to worsen to where the passenger was unable to tolerate it.  The MedAire Defendants also assert that Dr. Reinhart asked the airline crew to monitor the passenger's blood pressure every 15 to 30 minutes at least.

25.   Answering the allegations in paragraph 25 of the FAC, the MedAire Defendants admit that Dr. Reinhart made the quoted statements, but deny that he was "negligent" in so stating, and also deny the remaining allegations in the paragraph.

26.   Answering the allegations in FAC paragraph 26, the MedAire Defendants admit that at approximately 22:34 UTC, over three hours after Repatch No. 1 (which plaintiff calls the second phone patch), the British Airways pilot initiated a second satellite

phone repatch from the cockpit, Repatch No. 2, to a MedAire communications specialist, in order to give MedAire an "update" on the condition of the passenger, Mr. Baillie.  The MedAire Defendants admit that, by the time of Repatch No. 2, and in full accord with standard EPS practice and MedAire practice, Dr. Reinhart had completed his shift at the Banner Good Samaritan emergency department, and had departed, so another emergency room physician, Dr. Monas, came to field the call from BA Flight 289.  The MedAire Defendants deny the remaining allegations of the paragraph.  The MedAire Defendants affirmatively assert, however, that during the more than three hours of time since Repatch No. 1, the British Airways crew and the onboard physician had not followed Dr. Reinhart's directions to monitor the passenger and check his blood pressure every 15 to 30 minutes.  In fact, the MedAire Defendants affirmatively assert that the British Airways crew member who had been tasked with monitoring the passenger took a two-hour nap during that period, and that the onboard physician, during the entire remainder of the flight to Phoenix, testified that he only assessed the passenger's vitals two or three more times after initially doing so at approximately 19:12 UTC.

27.    Answering FAC paragraph 27, the MedAire Defendants admit that at approximately 22:38 UTC, Defendant Dr. Monas joined Repatch No. 2.  The MedAire Defendants further admit that, during the prior 22:34 UTC conversation with the MedAire communications specialist, and in the ensuing conversation with Dr. Monas, a British Airways cabin crew member gave MedAire and Dr. Monas the following information about the passenger:  that he was a 61-year old male, with no history of any pain or problems and not taking any medication; that he had taken aspirin about 7 hours ago; that he had been on oxygen "for the last couple of hours," that the crew had been monitoring him and checking his vitals, and that his vitals were "the same" and "quite stable," with a blood pressure of 100/80 and a pulse of 100; that he was now sweating; that, though the passenger looks the same, he had just complained he was feeling "a bit worse," and that he was complaining about pain in the center of his chest, but had no pain down either arm or "in any other place."  The MedAire Defendants further admit that Dr. Monas initially

recommended giving the passenger a dose of nitroglycerin.  The MedAire Defendants also admit that Dr. Reinhart had previously advised the British Airways pilot that, if the passenger's conditioned worsened, diversion of the flight would have to be considered, and that Dr. Monas did not repeat that advice in Repatch No. 2.  The MedAire Defendants deny the remaining allegations of the paragraph.   The MedAire Defendants also affirmatively assert that, during Repatch No. 2, the British Airways pilot said that the onboard physician recommended re-evaluating the passenger (Mr. Baillie) in about 20 minutes "and suggested that at that time we might consider making a diversion."  The MedAire Defendants also affirmatively assert that, at approximately 22:52 UTC, the British Airways pilot initiated Repatch No. 3, and during that repatch, Dr. Monas asked if she could speak directly with one of the onboard doctors who were taking care of the passenger, but was told she could not, for security reasons.   The MedAire Defendants further affirmatively assert that Dr. Monas then stated:   "Yeah ok, I mean you know obviously we are here, you guys are in the air and evaluating the patient.  If you feel the patient is not looking well and that we need to divert we can start to take a look at diversion locations. . . .  [W]e'll take a look at some diversion locations if you guys feel he is concerning at this time," to which the British Airways pilot responded, "Yeah ok."  The MedAire Defendants further affirmatively assert that at approximately 23:00 UTC, MedAire contacted British Airways Operations Control ("Ops Control"), and joined it in the conversation, and that the British Airways pilot told BA Ops Control that he had already let someone from Ops Control know there "is a possibility of a diversion," once they received "an update from the doctor onboard in the next ten minutes or so," and the pilot would "let you what our decision is if we do have to divert."

28.     The MedAire Defendants deny the allegations of FAC paragraph 28.

29.     Answering FAC paragraph 29, the MedAire Defendants admit that, on March 23, 2012, BA Flight 289 did not divert but continued to Phoenix and landed approximately 10 hours and 41 minutes after takeoff in London. The MedAire Defendants further admit that, as arranged by MedAire, emergency medical technicians met Mr.

1   Baillie at the gate upon landing, and immediately took him by ambulance to St. Luke's
2   Medical Center in Phoenix.  The MedAire Defendants further admit that the report of an
3   ECG exam administered on board the ambulance, together with the reports of tests taken
4   in the St. Luke's emergency department, state or suggest that Mr. Baillie had suffered a
5   very serious heart attack at an unknown time, but hours earlier and likely before or when
6   he boarded the plane.  The MedAire Defendants also admit that, approximately one and
7   one-half hours after Mr. Baillie's arrival at St. Luke's, hospital medical records state that
8   medical personnel there succeeded in placing stents in Mr. Baillie that opened the blocked
9   coronary artery and allowed some blood to flow to the damaged heart.  The MedAire
10  Defendants also admit that Mr. Baillie's heart was badly injured and damaged.  In fact, the
11  MedAire Defendants affirmatively assert that, by the time the pilot first contacted
12  MedAire at approximately 18:45 UTC, Mr. Baillie's heart likely was too badly injured
13  and damaged to enable Mr. Baillie to survive the damage.  The MedAire Defendants
14  further admit that, after eventually being transferred to the Mayo Clinic, Mr. Baillie died
15  on July 1, 2012 after having experienced another heart attack in the Mayo Clinic and after
16  having experienced "multiple cerebrovascular accidents" or strokes.   The MedAire
17  Defendants deny any remaining allegations of the paragraph.

18          30.     The MedAire Defendants deny the allegations of FAC paragraph 30.

19          31.     The MedAire Defendants deny the allegations of FAC paragraph 31.

20          32.     The MedAire Defendants deny the allegations of FAC paragraph 32.

21          33.     The MedAire Defendants deny the allegations of FAC paragraph 33.

22          34.     The MedAire Defendants deny the allegations of FAC paragraph 34.

23          35.     The MedAire Defendants deny the allegations of FAC paragraph 35.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

**SECOND CAUSE OF ACTION**
**FOR DAMAGES AGAINST**
**DEFENDANTS MEDAIRE, REINHART AND MONAS**
**BY PLAINTIFF LINDA ANN BAILLIE**

36.   Answering the allegations in paragraph 36 of the FAC, the MedAire Defendants re-allege each and every answer contained in paragraphs 1-35 as if fully set forth herein.

37.   Answering the allegations of FAC paragraph 37, the MedAire Defendants admit that, on March 23, 2012, plaintiff Linda Ann Baillie was the legal spouse of James Donald Baillie, II, but deny the remaining allegations of the paragraph.

38.   The MedAire Defendants deny the allegations in paragraph 38 of the Complaint.

39.   The MedAire Defendants deny the allegations in FAC paragraph 39.

**ALLEGATIONS COMMON TO ALL COUNTS**

40.   The MedAire Defendants deny any relevant, material factual allegations in the FAC not specifically responded to above, if any.

**FIRST AFFIRMATIVE DEFENSE**

41.   Plaintiff's claims arise exclusively under the Montreal Convention, a treaty of the Unites States.

**SECOND AFFIRMATIVE DEFENSE**

42.   The MedAire Defendants are not liable to Plaintiff because the Defendants' alleged actions and omissions did not constitute an "accident" within the meaning of Article 17 of the Montreal Convention.  And even if the Defendants' alleged actions and omissions did constitute an "accident" within the meaning of Article 17 of the Montreal Convention, that "accident" did not cause the death or injury of Plaintiff's decedent.

**THIRD AFFIRMATIVE DEFENSE**

43.   The damages alleged in the Complaint were caused or contributed to by the negligence of Plaintiff's decedent, or by other wrongful acts or omissions, and the MedAire Defendants are entitled to be wholly or partly exonerated from liability in

proportion to the fault of Plaintiff's decedent, in accordance with Article 20 of the Montreal Convention.

### FOURTH AFFIRMATIVE DEFENSE

44.     The MedAire Defendants' liability, if any, for Plaintiff's alleged injuries and damages is limited by Article 21 of the Montreal Convention because Plaintiff's alleged injuries and damages were not due to the negligence or other wrongful acts or omissions of the MedAire Defendants or their servants or agents and/or were solely due to the negligence or other wrongful acts or omissions of a third-party.

### FIFTH AFFIRMATIVE DEFENSE

45.     The MedAire Defendants deny that Plaintiff is entitled to recover any damages from the MedAire Defendants arising from the death of Plaintiff's decedent, but to the extent that Plaintiff may be entitled to recover damages, the MedAire Defendants' liability for Plaintiff's damages is limited by Article 21 of the Montreal Convention to the sum of 113,100 SDRs.

### SIXTH AFFIRMATIVE DEFENSE

46.     The MedAire Defendants' liability, if any, with respect to Plaintiff's alleged damages is further limited or excluded in accordance with the conditions of carriage, conditions of contract, and tariffs.

### SEVENTH AFFIRMATIVE DEFENSE

47.     Plaintiff's alleged damages are limited, excluded, and/or preempted by federal law, including the Federal Aviation Act of 1958, as amended (Pub. L. No. 5-726, 72 Stat. 731, formerly codified at 49 U.S.C. §§ 1301, *et seq.*, now re-codified and incorporated into 49 U.S.C. §§ 40101, *et seq.*), the Aviation Medical Assistance Act of 1998 (Pub L. 105-170, 112 Stat. 47), the Death on the High Seas Act (Pub. L. 109-304, codified at 46 U.S.C. §§ 30301, *et seq.*), and provisions of the relevant regulations promulgated by the Federal Aviation Administration.

/ / /

/ / /

14

**EIGHTH AFFIRMATIVE DEFENSE**

48.     Plaintiff's alleged damages are limited, excluded, and/or preempted by federal law, including the Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 (codified as amended as 49 U.S.C. §§ 40101-44310 (1994)).  *See Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 128 S. Ct. 989, 169 L. Ed. 3d 933 (2008); *Air Transport Ass'n of America v. Cuomo*, 520 F.3d 218 (2d Cir. 2008).

**NINTH AFFIRMATIVE DEFENSE**

49.     The FAC and each and every cause of action alleged in the FAC are barred, in whole or in part, because the MedAire Defendants' conduct was in conformity with applicable industry standards expected of a reasonable practitioner in this community based upon the knowledge existing at the time of such conduct and acting in the same or similar circumstances.

**TENTH AFFIRMATIVE DEFENSE**

50.     The FAC is barred on the grounds that it fails to state a claim upon which relief can be granted.

**ELEVENTH AFFIRMATIVE DEFENSE**

51.     The accident alleged in the FAC, and the damages Plaintiff alleges that were sustained as a result of the accident, were due to the negligence or other wrongful acts or omissions of persons or entities other than the MedAire Defendants; however, in the event that a finding is made that liability exists on the part of the MedAire Defendants, which proximately contributed to the damages alleged in the FAC, the MedAire Defendants' share of damages, if any, should be reduced by an amount proportionate to the amount by which the comparative fault of such other persons or entities (including but not necessarily limited to British Airways and its employees) contributed to the happening of the alleged accident and the damages upon which Plaintiff seeks recovery.

**TWELFTH AFFIRMATIVE DEFENSE**

52.     In the event that a finding is made that liability exists on the part of the MedAire Defendants for the accident alleged in the FAC, the MedAire Defendants are

entitled to a reduction in any damages assessed in light of the proportionate fault of, or the amounts already paid Plaintiff by, British Airways, in order to settle Plaintiff's claims against British Airways.

### THIRTEENTH AFFIRMATIVE DEFENSE

53.     The accident alleged in the FAC, and the damages Plaintiff alleges were sustained as a result of the accident, were caused by intervening and superseding causes and were not caused by the MedAire Defendants.

### FOURTEENTH AFFIRMATIVE DEFENSE

54.     Plaintiff's alleged damages, if any, should be barred or limited as a result of the failure of Plaintiff and Plaintiff's decedent to take reasonable steps to mitigate the damages.

### FIFTHTEENTH AFFIRMATIVE DEFENSE

55.     The damages Plaintiff alleges were sustained as a result of the accident alleged by the FAC are attributable to the conduct of third persons or entities over which the MedAire Defendants had no control at any relevant time.

### SIXTEENTH AFFIRMATIVE DEFENSE

56.     The Estate of James Donald Baillie, II, and all heirs and next of kin, are not, on information and belief, proper claimants or parties, and therefore not entitled to recover in this action.

### SEVENTEENTH AFFIRMATIVE DEFENSE

57.     The injuries and damages alleged in the FAC were not proximately caused by any acts or omissions of the MedAire Defendants.

### EIGHTEENTH AFFIRMATIVE DEFENSE

58.     The FAC is barred because Plaintiff's decedent knowingly, voluntarily, and freely assumed the risk of hazard of all activities alleged in the FAC, and each alleged cause of action contained therein, which assumption of risk or hazard was the proximate cause of Plaintiff's alleged damages, if any.

/ / /

1

**NINETEENTH AFFIRMATIVE DEFENSE**

2      59.      Plaintiff's claims are barred because Plaintiff's decedent failed to exercise

3  reasonable and ordinary care to avoid an obvious danger to the extent such danger existed.

4

**TWENTIETH AFFIRMATIVE DEFENSE**

5      60.      Plaintiff's claims against the MedAire Defendants are barred because they

6  had no duty of care toward the Plaintiff or the Plaintiff's decedent.

7

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

8      61.      Plaintiff has no claims against Defendant Drs. Reinhart and Monas because

9  they had no physician-patient relationship with the Plaintiff or the Plaintiff's decedent,

10  and never saw, spoke with, or examined the decedent.

11

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

12      62.      Plaintiff has no claims against Defendant Drs. Reinhart and Monas because

13  they were never asked to diagnose the Plaintiff's decedent, and they had no ability to, and

14  never did, directly treat the Plaintiff's decedent.

15

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

16      63.      Plaintiff has no claims against the MedAire Defendants because, even if the

17  MedAire Defendants had a duty toward Plaintiff's decedent, their ability to diagnose or

18  recommend treatment for the Plaintiff's decedent was limited by the medical equipment

19  and facilities available onboard BA Flight 289.

20

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

21      64.      Plaintiff has no claims against the MedAire Defendants because Plaintiff's

22  decedent, while on board BA Flight 289, was at relevant times under the direct

23  observation and care of other doctors who were then on board the plane.  Defendant Drs.

24  Reinhart and Monas never spoke with, and were not permitted to speak with, the onboard

25  doctors who were directly observing Plaintiff's decedent.

26

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

27      65.      The MedAire Defendants have no liability stemming from the decision not

28  to divert BA Flight 289 to a location other than Phoenix, because only the pilot of

BA Flight 289, not the MedAire Defendants, was empowered to make, and did make, the decision whether to divert or to continue to Phoenix, without relying on any advice from the MedAire Defendants.  Defendant Dr. Monas advised the pilot of BA Flight 289 that, if the personnel on the plane felt that the Plaintiff's decedent was not looking well, MedAire could take a look at diversion locations.  The BA Flight 289 pilot then advised that he was going to get an update from the doctor on board and would then decide whether to divert, but said the flight was then closest to Chicago.  Defendant MedAire said it would call Chicago and advise personnel there that there was a possibility of a diversion.

66.     However, two doctors on board BA Flight 289, both of whom had directly observed and interacted with the Plaintiff's decedent, separately advised the BA crew that continuing to Phoenix would not worsen the condition of Plaintiff's decedent, and Plaintiff's decedent himself specifically asked that the aircraft continue to Phoenix and not be diverted to a closer location.  On information and belief, the pilot of BA Flight 289 was advised of this, and, having been so advised, and without further consultation with the MedAire Defendants, made the decision to continue to Phoenix.

**DEMAND FOR JURY TRIAL**

67.     Pursuant to Rule 38(b), F. R. Civ.P., Defendants hereby demand a trial by jury on any issue triable of right by a jury in this action.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1    **WHEREFORE**, Defendants MedAire, Inc., Steven Joe Reinhart, D.O., and Jessica

2  Monas, M.D. respectfully request that Plaintiff take nothing by this action against them,

3  that the action against them be dismissed with prejudice, and that the Court grant them

4  their costs and other relief as its deems just and proper.

5    RESPECTFULLY submitted this 24th day of February, 2015.

6                                              GALLAGHER & KENNEDY, P.A.

7

8                                              By: /s/ *Mark C. Dangerfield*
                                                   Mark C. Dangerfield
9                                                  Wm. Charles Thomson
                                                   2575 East Camelback Road
10                                                 Phoenix, Arizona  85016-9225
                                                   Attorneys for Defendants MedAire, Inc.;
11                                                 Steven Joe Reinhart, D.O.; and Jessica
                                                   Monas, M.D.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

I hereby certify that on the 24th day of February, 2015, a copy of the foregoing document was filed electronically via the Court's CM/ECF system and Notice of Electronic Filing served on all parties by operation of the Court's CM/ECF system.

4

5

Stephen M. Dichter, Esq.
Jeffrey O. Hutchins, Esq.

6

Christian Dichter & Sluga, P.C.
2700 North Central Avenue, Suite 1200

7

Phoenix, AZ  85004
        sdichter@cdslawfirm.com

8

        jhutchins@cdslawfirm.com

9

*Attorneys for Plaintiff*

10

Francis G. Fleming, Esq.

11

Robert J. Spragg, Esq.
Kreindler & Kreindler LLP

12

750 Third Avenue

13

New York, NY  10017
        ffleming@kreindler.com

14

        rspragg@kreindler.com

15

*Attorneys for Plaintiff*

16

By: */s/ Mark C. Dangerfield*

17

18

19

20

21

22

23

24

25

26

27

28