Francis G. Fleming, 004375
ffleming@kreindler.com
Robert J. Spragg
rspragg@kreindler.com
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Tel: (602) 792-1700
Fax: (602) 792-1710

*Attorneys for Plaintiff Linda Ann Baillie*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

-----------------------------------------------------x
LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,

          Plaintiff,

  v.

MEDAIRE, INC., STEVEN JOE REINHART, D.O., and JESSICA MONAS, M.D.,

          Defendants.
-----------------------------------------------------x

Case No.: 2:14-CV-00420-DJH

**JOINT CASE**
**MANAGEMENT REPORT**

Pursuant to the Order Setting Rule 16 Case Management Conference entered by this Court on February 20, 2015, the parties, by and through their undersigned counsel, hereby submit their Joint Case Management Report.

On March 17, 2015, the counsel listed below met and conferred pursuant to Fed. R. Civ. P. 26(f). All counsel assisted in the development of this Joint Case Management Report.

>     Francis G. Fleming, Esq.
>     Robert J. Spragg, Esq.
>     KREINDLER & KREINDLER LLP
>     750 Third Avenue, 32nd Floor
>     New York, NY 10017
>     *Attorneys for Plaintiff Linda Ann Baillie*
>
>     Mark C. Dangerfield, Esq.
>     GALLAGHER & KENNEDY, P.A.
>     2575 East Camelback Road
>     Phoenix, Arizona 85016-9225
>     *Attorneys for Defendants MedAire, Inc.;*
>     *Steven Joe Reinhart, D.O.; and Jessica Monas, M.D.*

**1. LIST OF ALL PARTIES IN THE CASE, INCLUDING ANY PARENT CORPORATIONS OR ENTITIES**

Plaintiff: Linda Ann Baillie, Individually, and as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, deceased, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased, including James Donald Baillie, III, Jacob Edward Baillie, Jonathan David Baillie and Laura Marie Baillie.

Defendant: MedAire, Inc. The parent company of MedAire is International SOS.

Defendant: Steven Joe Reinhart, D.O.

Defendant: Jessica Monas, M.D.

**2. A SHORT STATEMENT OF THE NATURE OF THE CASE**

**A. Plaintiffs' Claims**

On March 23, 2012, James Donald Baillie, II ("Mr. Baillie"), a citizen and resident

of Maricopa County and the State of Arizona, was traveling on British Airways Flight 289 from London, England to his home in Phoenix, Arizona. Immediately prior to and during the course of Flight 289, Mr. Baillie reported that he experienced chest pains and other signs of a medical condition. Based on information provided by defendant MedAire and its physicians, British Airways failed to adequately respond to Mr. Baillie's medical condition, which caused Mr. Baillie's condition to unnecessarily worsen. MedAire and its physicians, defendant Drs. Reinhart and Monas, failed to appropriately assess Mr. Baillie's condition or provide adequate in-flight guidance, ultimately resulting in his death because he didn't receive timely treatment.

Defendant MedAire and British Airways have a contractual arrangement by which defendant MedAire provides "medical advice and support" through its doctors to British Airways crew members "during medical incidents." Under the terms of the agreement, defendant MedAire's physicians are available "24 hours a day" to give "advice and instruction" to the airline's crews during medical incidents. MedAire's doctors are supposed to be "familiar with the flight environment" and work "to protocols and guidelines agreed with British Airways and have details of all medical equipment carried on board." MedAire also makes all "ground arrangements" for medical treatment of a passenger should "an aircraft need[] to be diverted."

Under the terms of the British Airways agreement, MedAire, doing business as MedLink, "assumes legal liability for medical incidents in which they are involved, so long as their advice is followed."

In further detail, Mr. Baillie, who had no prior history of heart problems, arrived at British Airways Flight 289 on March 23, 2012 feeling short of breath and experiencing discomfort in the center of his chest. After he boarded the airplane at 1454 GMT, feeling chest pains, Mr. Baillie alerted a flight attendant to his status, explaining that he wasn't sure he should be on the flight. Nevertheless, the cabin crew closed the aircraft doors and started to taxi. Remembering advice about what to do if one feels one is having a heart attack, Mr. Baillie took aspirin.

Shortly thereafter, the flight crew taxied to the runway and took off at 1546 GMT. Both prior to takeoff and during the initial portion of Flight 289, Mr. Baillie continued to

feel chest pains, which got worse after the aircraft took off, and continued to notify the British Airways flight crew of this. Mr. Baillie was hot, looked pale and was having difficulty breathing. His pulse was irregular and he appeared "confused." Over an hour into the flight, and with approximately 9 hours and 30 minutes to go, Mr. Baillie again told a British Airways flight attendant that he was experiencing chest pain. In light of his condition, the flight crew gave Mr. Baillie supplemental oxygen.

Approximately three hours into the flight, the British Airways flight crew contacted MedAire. The British Airways pilot told the MedAire representative that "we've got a 61 year old male … who was a little out of breath when he boarded," "has pain in the central chest and feels hot and … is a bit pale," and "we've put him on therapeutic oxygen." A short time later, a MedAire physician named Dr. Reinhart joined the call, which lasted only a few minutes. Dr. Reinhart advised the crew to continue with the supplemental oxygen and to try to find a physician on board who could take Mr. Baillie's vital signs. Dr. Reinhart advised the crew to contact him with the vital signs information at which point he would determine whether Mr. Baillie was stable enough for a dose of nitroglycerin.

Approximately twenty minutes later, the British Airways flight crew again contacted MedAire and was again connected with Dr. Reinhart. Dr. Reinhart confirmed that he understood that there was a physician on board the flight.[1] Dr. Reinhart was told that Mr. Baillie had "crackles" on the left side of his chest (a consequence of fluid buildup in the lungs and a sign of heart failure). After hearing Mr. Baillie's vital signs, Dr. Reinhart determined that his blood pressure was too low for nitroglycerin and recommended that the flight crew simply continue to provide him with supplemental oxygen. Because six hours remained in the flight, Dr. Reinhart advised the crew to contact MedAire again if Mr. Baillie's condition deteriorated, and noted that if the situation worsened they would have to consider a flight diversion.

Approximately three hours and ten minutes later, the British Airways flight crew again contacted MedAire and briefed a different customer service representative on Mr. Baillie's condition. The MedAire representative told the British Airways flight attendant

---

[1] The on-board physician was Dr. Verma, who is a resident of the United Kingdom.

4

that Dr. Reinhart's work shift was over and that a new physician would have to be updated. Shortly thereafter, the new MedAire physician, Dr. Monas, joined the call. The flight attendant provided Mr. Baillie's vital signs and told Dr. Monas that Mr. Baillie had taken aspirin seven hours previously but had been given no other medication; that he was complaining about pain in the center of his chest; that he said he was feeling worse; and that the on-board physician described him as looking "considerably worse." Dr. Monas recommended that Mr. Baillie be given a single dose of nitroglycerin. The pilot then explained that Dr. Reinhart had advised against doing so and had suggested that the flight might need to make a diversion, but agreed to administer the nitroglycerin and to check back with MedAire after doing so.

Ten minutes later, the flight crew contacted MedAire again and told Dr. Monas that the physician on board the flight, Dr. Verma, did not want to administer the nitroglycerin to Mr. Baillie because his blood pressure was too low. Dr. Monas then asked to be rebriefed on Mr. Baillie's medical condition and the flight crew told her that his blood pressure was 100/80, he had a pulse of 110, he was sweating and short of breath and that he still was experiencing chest pains. Based on this information, Dr. Monas told the British Airways crew that if they felt that Mr. Baillie was not looking well then they could start to look for diversion airports. She also decided to "hold off on the nitroglycerin."

Shortly thereafter, a representative from British Airways Operations Control was brought into the call and the pilot told her that there was a possibility of a diversion, that the nearest airport was Chicago, that they were going to get an update from the on-board physician in ten minutes and that they would contact her if they decided that they had to divert. At this point, Dr. Monas asked the flight crew to make sure that Mr. Baillie was lying down with his legs elevated. The pilot acknowledged Dr. Monas and told Operations Control that he'd update them within ten or fifteen minutes and if and when a decision was made regarding diversion. The pilot did not provide any further updates to MedAire.

The British Airways pilots did not divert the flight, defendant MedAire did not recommend, advise or direct British Airways to diver, and the flight continued to Phoenix Sky Harbor International Airport where they arrived at the gate, approximately 10 hours

41 minutes after departing the gate at London Heathrow Airport.

By the time the flight arrived in Phoenix, Mr. Baillie's medical condition was very serious. He was taken directly from the airplane by ambulance to the emergency room at St. Luke's Medical Center in Phoenix. Mr. Baillie was diagnosed as having suffered an acute myocardial infarction (heart attack) as well as acute respiratory failure, cardiogenic shock and acute systolic heart failure. He was admitted to St. Luke's Medical Center from the emergency room in critical condition and was then treated in the intensive care unit at St. Luke's Hospital until March 30, 2012, when he was transferred in guarded condition to The Mayo Clinic in Phoenix for heart transplant. He remained hospitalized at The Mayo Clinic until his death on July 1, 2012.

Plaintiff's claims against MedAire, Inc. and Drs. Reinhart and Monas are governed by an international treaty called The Convention for the Unification of Certain Rules for International Carriage by Air, 49 U.S.C. 40105, 1999 WL 33292734 (2000), commonly known as the Montreal Convention. Under Article 17 of the Montreal Convention, an airline and its agents and servants are liable for "damage sustained in case of death or bodily injury of a passenger upon condition only that the accident that caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." The term "accident" has been defined by the United States Supreme Court as "an unusual or unexpected event that is external to the passenger," *Air France v. Saks*, 470 U.S. 392, 405 (1985), and has been interpreted to include instances where an airline has failed to follow its own procedures and aviation industry standards when responding to a passenger's medical emergency, failed to render competent medical assistance to a passenger and/or failed to divert the flight to land at an airport where emergency medical treatment was available, adversely affecting the passenger's medical outcome.

Under the Montreal Convention, the defendants are strictly liable for proven damages up to 113,100 Special Drawing Rights (approximately $175,000). For amounts in excess of 113,100 SDRs, they are liable unless they establish the applicability of one of the two defenses available to them under the Convention.

**B. Defenses of Defendants MedAire, Inc., Steven Joe Reinhart, D.O. and Jessica Monas, M.D.:**

The MedAire Defendants do not adopt plaintiff's statement of the case, but do not believe this is the proper forum to argue the facts.

MedAire provides pre-flight assessments of a passenger's fitness to fly, as well as remote medical advice to airlines with a sick or injured passenger on board. MedAire uses a team of registered nurses to provide fitness-to-fly assessments, and contracts with emergency room doctors to provide remote medical advice once a flight is airborne.

Plaintiff has no proof that the defendants' actions or omissions constituted an onboard "accident" under the Montreal Convention, or in other words, proof that the defendants' actions or omissions amounted to "an unusual or unexpected event that was external to the passenger." Mr. Baillie's heart attack was clearly not "external to the passenger." Under applicable case law, plaintiff would thus need to prove that the defendants' response to Mr. Baillie's condition fell below applicable industry standards. But plaintiff has failed to provide any evidence of what, if any, industry standards governed the defendants' actions here, let alone any evidence that the defendants' actions fell below any such industry standards.

Plaintiff's primary claim seems to be that the doctor defendants failed to recommend that British Airways Flight 289 divert to a closer landing location. Only the pilot of a plane, however, has the authority to decide to divert an aircraft. And here, the pilot or pilots of that flight made the independent decision not to divert the aircraft, but rather to continue to the planned landing destination in Phoenix.

Moreover, there are no industry standards governing when, or under what circumstances, a provider of remote medical advice to airlines, such as MedAire, should recommend that an aircraft divert to a different location. In the absence of such standards, a doctor providing remote medical advice to an aircraft must therefore simply exercise his or her professional judgment in deciding whether or not to recommend or agree with a diversion, using his or her training, background, and experience, applied to all the unique circumstances of a given situation.

The defendant doctors did so here. When British Airways first contacted Defendant

Dr. Reinhart at approximately 18:50 UTC on March 23, 2012, and again at approximately 19:12 UTC, and provided him with certain limited information about Mr. Baillie's condition, diversion was not warranted based on Dr. Reinhart's professional judgment and experience applied to that limited information he received. As Dr. Reinhart understood from 30 years of experience in emergency medicine, the cause of chest pain is very difficult to diagnose, even in an emergency room stocked with all the appropriate medical equipment and devices, and a high percentage of people experiencing chest pain are not in fact having a heart attack. Furthermore, in contrast to an emergency room, almost all aircraft, including the British Airways Boeing 747-400 used in Flight 289, lack the medical equipment needed to confirm or rule out a heart attack diagnosis, such as an EKG machine. Based on his experience, Dr. Reinhart would also have understood that, at that point three and one-half hours into the flight and over the Atlantic Ocean, there were no readily accessible diversion locations with appropriate medical facilities to deal with a heart attack, if that's what Mr. Baillie was experiencing.

     Dr. Reinhart did, however, believe that diversion would need to be at least considered if Mr. Baillie's condition worsened, and so he asked the British Airways pilot to call MedAire back should that occur.  When, some three and a half hours later, the pilot of BA Flight 289 did finally call MedAire back and reported that Mr. Baillie's condition seemed to have worsened, Defendant Dr. Monas, using her professional judgment, agreed that, since the people on board the plane felt that Mr. Baillie was not looking well, diversion might be appropriate, and agreed to help locate an appropriate diversion location.

     Ultimately, though, the British Airways pilot, without further consultation with the defendants, independently made the decision not to divert the aircraft. The British Airways pilot apparently made that decision based on Mr. Baillie's own request that the flight continue to Phoenix, and based further on the advice of two onboard doctors, who after directly evaluating Mr. Baillie, advised the British Airways crew that they were of the opinion that continuing on to Phoenix would not worsen Mr. Bailie's condition.

     Not only does the plaintiff lack proof that the defendants' actions or omissions constituted an "accident" under the terms of the Montreal Convention, but the plaintiff

also lacks any proof, and has not offered any proof, that the defendants' actions or omissions were a cause of Mr. Baillie's death. To begin with, there is no dispute that MedAire did not cause Mr. Baillie's heart attack. Moreover, upon boarding British Airways Flight 289 at 14:54 UTC on March 23, 2012, Mr. Baillie is reported to have advised a member of the British Airways cabin crew that he was already experiencing chest pains and shortness of breath, and that he "wasn't sure he should be on the flight." In those circumstances, Mr. Baillie himself should have opted to seek immediate medical attention rather than remain onboard a more than ten-hour, non-stop flight across the Atlantic Ocean—particularly when, as he is reported to have said, he felt a sense of "imminent doom" once the plane's doors closed, at which time he still had 34 minutes before takeoff, during which he could have left the flight.

In addition, given what Mr. Baillie told the British Airways crew about his symptoms upon boarding the plane, the British Airways crew should have—but inexplicably failed to—called MedAire for a fitness-to-fly assessment before the flight took off. Had British Airways done so, MedAire would have recommended that Mr. Baillie not be permitted to fly.

Instead, British Airways failed to call MedAire until almost four hours later, at 18:45 UTC, at which time Flight 289 was approaching Greenland over the North Atlantic Ocean, with no readily accessible diversion location that would have had the necessary medical facilities, including a catheterization laboratory, to provide timely care to restore blood flow to Mr. Baillie's heart. Given what we now know in hindsight was the severity of Mr. Baillie's heart attack, it was vital for Mr. Baillie to have received medical care that could have restored blood flow to his heart muscle within 90 minutes after his symptoms first appeared, in order to have avoided the extensive damage to his heart caused by the heart attack. By the time British Airways first called MedAire, however, the damage to Mr. Baillie's heart had already irreversibly occurred.

At a minimum, plaintiff's damages would be limited to any additional injury, expense, or damage caused by the alleged further delay in getting treatment for Mr. Baillie.

Based on the information they had and the facilities available on the plane, the MedAire Defendants gave proper and competent medical advice. In any event, the plaintiff has offered no proof that that Mr. Baillie would have lived but for the MedAire Defendants' actions or omissions, or that Mr. Baillie's death was caused by an on-board "accident" within the meaning of the Montreal Convention.

### 3. **JURISDICTIONAL BASIS FOR THIS CASE**

This case was originally filed in the Superior Court for Maricopa County, Arizona and was subsequently removed to this Court by Defendant British Airways PLC, pursuant to 28 U.S.C. § 1441(a) and with the consent of Defendants MedAire, Inc., Steven Joe Reinhart, D.O. and Jessica Monas, M.D., based upon the existence of a federal question, pursuant to 28 U.S.C. § 1331, in that plaintiff's claims arise under the Montreal Convention Treaty.

### 4. **PARTIES THAT HAVE NOT YET APPEARED**

None.

### 5. **STATEMENT REGARDING ADDITION OF PARTIES TO THE CASE OR INTENT TO AMEND OR SUPPLEMENT PLEADINGS**

The plaintiff does not anticipate naming additional parties to this case or otherwise amending the pleadings.

Defendants MedAire, Dr. Reinhart, and Dr. Monas (the "MedAire Defendants") do not anticipate naming additional parties to the case. Defendants will, however, designate British Airways, a former party to this case, and possibly certain of its employees and others, as persons potentially at fault in the matter.

### 6. **A LIST OF CONTEMPLATED MOTIONS AND A STATEMENT OF ISSUES TO BE DECIDED BY THESE MOTIONS**

Plaintiff does not anticipate filing any dispositive motions.

The defendants generally anticipate filing dispositive motions on some or all of the

issues in the case, and specifically anticipate filing a motion for summary judgment on the issue of whether the defendants' actions or omissions constituted an "accident" within the terms of the Montreal Convention, and if so, whether that accident was a cause of Mr. Baillie's death.

Defendants also anticipate filing motions on various other legal issues that may arise, including the following:

- The doctor defendants are immune from liability under the Aviation Medical Assistance Act of 1998, Public Law 105-170.
- The "loss of chance" doctrine is not available under the Montreal Convention. (The "loss of chance" doctrine, which is available in some jurisdictions under some circumstances, can sometimes allow a case to go to a jury on the issue of causation with less definite evidence of probability than the ordinary tort case.)
- Available damages are not governed by the Montreal Convention, but by the applicable local law, which will limit any damages recoverable from these defendants based on their percentage of fault.
- To the extent plaintiff claims or proves that Mr. Baillie's death was caused by a a defendant's wrongful act or neglect occurring while BA Flight 289 was over the Atlantic Ocean, then plaintiff's damages would be limited to those available under the Death on the High Seas Act, 46 U.S.C. § 30301 *et seq*, (Under DOHSA, recovery is limited to "pecuniary losses," which thus excludes alleged losses for grief, bereavement, mental anguish, loss of society or consortium.)

**7. SUITABILITY OF REFERENCE TO UNITED STATES MAGISTRATE JUDGE FOR SETTLEMENT CONFERENCE OR TRIAL**

The parties do not believe this case should be referred to a United States Magistrate Judge for trial. Plaintiff is willing to participate in a settlement conference before a United States Magistrate Judge at any time.

**8. STATUS OF RELATED CASES PENDING BEFORE OTHER COURTS OR OTHER JUDGES OF THIS COURT**

There was a related case pending in the United States District Court for the Central

District of California, styled *Linda Ann Baillie v. British Airways PLC*, Case No. 2:13-cv-04681-SVW-RZ, which pertained to plaintiff's claims against British Airways PLC. Plaintiff's claims against British Airways PLC have now been resolved and that action has been dismissed with prejudice.

## 9. EXCHANGE OF FED.R.CIV.P. 26(1) INITIAL DISCLOSURES

The parties have agreed to exchange Rule 26(a) Initial Disclosures no later than April 24, 2015.

## 10. ELECTRONIC DISCOVERY

The parties agree to retain any pertinent electronic information in their possession and disclose such information in accordance with the Federal Rules of Civil Procedure. The parties anticipate preserving electronically stored information in its native format and producing documents initially in a searchable .pdf format, and will work together to determine the most efficient and cost effective form in which to produce electronically stored information when such information is requested.

## 11. ISSUES RELATING TO CLAIMS OF PRIVILEGE/WORK PRODUCT

The parties agree to provide detailed privilege logs in accordance with the Federal Rules of Civil Procedure, the Federal Rules of Evidence, Local Rules, the Court's Standing Order, and federal authority when documents are withheld from production on the basis of privilege or work product, including at the minimum the following information: (1) the grounds for and the bases of the privilege being asserted; (2) the nature of the documents, communications or tangible things not produced or disclosed; (3) who the communication is directed to and who it was from; (4) the date; (5) the Bates Number; and (6) any factual information contained in the privileged document.

## 12. DISCUSSION OF WHETHER AN ORDER UNDER FEDERAL RULE OF EVIDENCE 502(d) IS WARRANTED IN THIS CASE

At this time, the parties do not believe that an order under Fed. R. Evid. 502(d) is warranted in this case.

## 13. DISCUSSION OF NECESSARY DISCOVERY

   a. **Extent, Nature and Location of Discovery Anticipated by the Parties**

The parties anticipate taking discovery by initial disclosures, written interrogatories, requests for production of documents and document subpoenas, requests for admission and depositions.

### b. Scope of Discovery and Whether it Should be Conducted in Phases or Limited to Particular Issues

The parties anticipate taking discovery with respect to: the events which occurred on British Airways flight BA 289 on March 23, 2012, including Mr. Baillie's physical and mental condition and symptoms during the flight; the response of British Airways and MedAire and its physicians to Mr. Baillie's conditions and symptoms, including the sequence and timing of all events; British Airways and general aviation industry standards relating to "fitness-to-fly" assessments, inflight medical emergencies, aircraft diversions, and the use of remote medical consultants such as MedAire; Mr. Baillie's physical and mental condition before and after the flight; Mr. Baillie's pre-flight medical history and his medical treatment after the flight; and the damages suffered by Mr. Baillie's family as a result of his heart attack and subsequent death. The parties agree that discovery does not need to be conducted in phases or limited to certain issues. Plaintiff also wants to take discovery of MedAire's handling of other trans-Atlantic medical emergencies similar to that experienced by Mr. Baillie, and MedAire's reporting on other medical emergencies similar to that experienced by Mr. Baillie. The defendants agree that some such information may be potentially relevant or at least discoverable, but the parties may disagree on the scope of such discovery.

The parties also agree that a protective order should be entered by the Court to protect the confidentiality of certain information.

### c. Suggested Changes to Discovery Limitations Imposed by the Federal Rules of Civil Procedure

None.

### d. Number of Hours Permitted for Each Deposition, Unless Extended by Agreement of the Parties

Seven (7) hours.

**14.    PROPOSED DEADLINE DATES**

    **A.    Deadline for Completion of Fact Discovery:  November 6, 2015**

    **B.    Deadlines for Full and Complete Expert Disclosures:**

        i.    Plaintiff's expert disclosure pursuant to Rule 26(a)(2)(B): November 6, 2015

        ii.   Defendants' expert disclosure pursuant to Rule 26(a)(2)(B): January 8, 2016

        iii.  Rebuttal expert testimony disclosure: February 5, 2016

    **C.    Deadline for Completion of Expert Depositions:  March 18, 2016**

    **D.    Dispositive Motion Deadline:  April 1, 2016**

    **E.    Date by which Parties Will Engage in Good Faith Settlement Talks:  April 15, 2016**

**15.    JURY TRIAL**

Plaintiff has demanded a jury trial and defendants do not contest that plaintiff has properly requested and is entitled to a jury trial on the claims alleged in her complaint.

**16.    ESTIMATED LENGTH OF TRIAL**

The parties anticipate that trial in this matter will take between 9 and 12 trial days.

**17.    PROSPECTS FOR SETTLEMENT**

A mediation before United States District Judge Dickran Tevrizan (Ret.) was held in the related case on July 24, 2014.  As a result of the mediation, plaintiff resolved her claims against British Airways Plc and the on-board physician, Ratan K. Verma, M.D. The mediation of plaintiff's claims against defendants MedAire, Inc., Steven Joe Reinhart, D.O. and Jessica Monas, M.D. was unsuccessful.  Plaintiff is willing to continue settlement discussions with the defendants at any time.

Dated:  April 14, 2015

Respectfully submitted,

KREINDLER & KREINDLER LLP

By: */s/ Francis G. Fleming*
    Francis G. Fleming, 004375

CHRISTIAN DICHTER & SLUGA, P.C.

By*/s/ Stephen M. Dichter*
    Stephen M. Dichter, 004043

*Attorneys for Plaintiff Linda Ann Baillie*


GALLAGHER & KENNEDY, P.A.


By:*/s/ Mark C. Dangerfield*
Mark C. Dangerfield
Wm. Charles Thomson
2575 East Camelback Road
Phoenix, Arizona 85016-9225
mark.dangerfield@gknet.com
wct@gknet.com
Attorneys for Defendants MedAire, Inc.; Steven Joe Reinhart, D.O.; and Jessica Monas, M.D.

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2015, I electronically transmitted the attached document and exhibits to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Mark C. Dangerfield
Wm. Charles Thomson
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
mark.dangerfield@gknet.com
wct@gknet.com
*Attorneys for Defendants MedAire, Inc.; Steven Joe Reinhart, D.O.; and Jessica Monas, M.D.*

/s/ Francis G. Fleming