Francis G. Fleming, 004375
ffleming@kreindler.com
Robert J. Spragg, *pro hac vice*
rspragg@kreindler.com
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Tel: (602) 792-1700
Fax: (602) 792-1710

*Attorneys for Plaintiff Linda Ann Baillie*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

---------------------------------------------------------x

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>Plaintiff,<br><br>v.<br><br>MEDAIRE, INC., STEVEN JOE REINHART, D.O. and JESSICA MONAS, M.D.,<br><br>Defendants. | Case No.: 2:14-CV-00420-DJH<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' FED.R.CIV.P. 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br><u>**ORAL ARGUMENT REQUESTED**</u> |

---------------------------------------------------------x

Plaintiff Linda Ann Baillie ("Plaintiff"), by and through her attorneys, Kreindler & Kreindler LLP and Christian, Dichter and Sluga, P.C., opposes the motion for judgment on the pleadings made by defendants Steven Joe Reinhart, D.O. ("Reinhart") and Jessica Monas, M.D. ("Monas"), employees and/or agents of defendant MedAire, Inc. ("MedAire"), under Federal Rule of Civil Procedure 12(c) because the Aviation Medical Assistance Act of 1998 (a) does not apply to incidents on flights operated by foreign air carriers; (b) does not displace the terms of the Montreal Convention Treaty; and (c) is inapplicable to medical professionals paid for by an airline. For these reasons, explained more fully below, Plaintiff respectfully requests that this Court deny the motion.

## I.    Factual Background

Plaintiff Linda Ann Baillie is the widow of James Donald Baillie, II, and the Personal Representative of the Estate of James Donald Baillie, II ("Mr. Baillie"). *See* First Amended Complaint, Dkt. No. 45 ("FAC"), ¶¶ 6, 37.[1] Mr. Baillie died on July 1, 2012 as the result of an "accident" (under the terms of the Montreal Convention Treaty[2]), that he suffered while traveling as a passenger on British Airways Flight 289 ("Flight 289") from London to Phoenix on March 23, 2012, on a round-trip international ticket. *See* FAC, ¶¶ 1, 6, 7, 11, 15.

---

[1] Defendants have moved for a Rule 12(c) judgment on the pleadings and support for Plaintiff's opposition to the pending motion is therefore primarily based on the allegations in her complaint, which must be accepted as true. *See Knappenberger v. City of Phoenix*, 566 F.3d 936, 939 (9th Cir.2009)

[2] Convention for the Unification of Certain Rules Relating to International Carriage by Air, May 28, 1999 (entered into force on November 4, 2003), reprinted in S. Treaty Doc. No. 106-45 (hereinafter the "Montreal Convention").

-1-

Mrs. Baillie brought her wrongful death claims against defendants MedAire, Reinhart, and Monas under the Montreal Convention, an international treaty which governs the rights and liabilities of passengers and airlines during international transportation. *See* FAC, ¶¶ 1, 7.  Defendants MedAire, Reinhart and Monas do not dispute that this lawsuit is governed by the Montreal Convention. *See* Defendants' Answer to First Amended Complaint, Dkt. No. 46 ("Answer"), ¶ 7.

On March 23, 2012, defendant MedAire operated a business that held itself out as being able to reduce an airline's costs related to flight diversions as a result of in-flight passenger medical emergencies by providing informed medical knowledge and management assistance in evaluating the severity of medical conditions being experienced by passengers. *See* FAC, ¶ 9.  To perform its business, MedAire employed or hired medical professionals, including defendants Reinhart and Monas. *See* FAC, ¶¶ 4, 9.

Pursuant to a commercial contract with British Airways, defendants MedAire, Reinhart and Monas provided medical assessment, advice, guidance, consultation and options to the crew of Flight 289 regarding the chest pain and other medical conditions being experienced by Mr. Baillie on March 23, 2012. *See* FAC, ¶ 9.  The commercial contract between British Airways and defendants included a contractual mutual indemnity provision by which British Airways was obligated to abide by MedAire's medical assessment regarding passengers who became ill on its aircraft. *See* FAC, ¶ 10.

After hurrying to make Flight 289 in London on March 23, 2012, Mr. Baillie began to experience chest pain and shortness of breath. *See* FAC, ¶ 11.  Upon boarding the aircraft at 14:54 GMT, Mr. Baillie reported to the British Airways cabin crew that he

didn't feel well. *Id.* After the flight took off at 15:46 GMT, Mr. Baillie complained of central chest pain, feeling hot and having difficulty breathing. *Id.* Mr. Baillie was given oxygen by the British Airways cabin crew, took an aspirin and was monitored by cabin crewmembers, but his medical condition worsened as the flight progressed. *Id.*

Three hours after takeoff, at approximately 18:45 GMT, cabin crewmembers of Flight 289, following British Airways procedures, contacted defendants MedAire and Reinhart seeking medical advice and consultation regarding Mr. Baillie's worsening medical condition. *See* FAC, ¶¶ 16, 18.

After Flight 289's cabin crew contacted MedAire, they described Mr. Baillie's condition as involving "a 61 year old male passenger onboard, having some centralized chest pain" who was "pale" and had been "put on supplemental oxygen but did not have any prior cardiac history and was not taking cardiac medications." *See* FAC, ¶ 18. The flight crew initially spoke to MedAire employee and/or agent Reinhart, who failed to recognized the high likelihood that Mr. Baillie was presenting with an emergency cardiac condition. *See* FAC, ¶ 19. Reinhart instructed the British Airways flight crew to "find a physician" on board Flight 289 "who wants to go ahead and administer Nitroglycerin if he feels the vitals are stable and then call MedAire back." *See* FAC, ¶ 19. Then, although approximately seven hours of flight time remained and it was medically clear that Mr. Baillie was experiencing a complex cardiac emergency, defendant Reinhart, instead of recommended a flight diversion to allow for prompt medical intervention, asked the cabin crew whether the "onboard physicians had any ideas or suggestions." *See* FAC, ¶ 23. After following Reinhart's instructions and asking for help from passengers, a passenger

-3-

physician volunteered to assist. *See* FAC, ¶ 20.

The volunteer passenger-physician used a stethoscope and a sphygmomanometer provided by British Airways to check Mr. Baillie's blood pressure and pulse and by using the stethoscope determined that Mr. Baillie was experiencing "crackles" in his left chest. *See* FAC, ¶¶ 20 – 21.

"Crackles" are a clicking or rattling sound associated with pulmonary stress and difficulty related to diminished oxygenation of lung tissues and are evidence of pulmonary edema or fluid build-up in the lungs. *Id.* Crackles, along with chest pain like that being experienced by Mr. Baillie, can indicate that the patient is having a complicated heart attack and that he is in need of immediate medical intervention. *Id.*

Once they had this additional information, about thirty minutes after the first call, the flight crew made a second call to MedAire at 19:12 GMT and spoke to Reinhart again. *See* FAC, ¶ 24. At that time, Reinhart concluded that Mr. Baillie's blood pressure was too low to do anything "other than continuing the supplemental oxygen" – advising against administering Nitroglycerin – and again failed to even evaluate the need for a flight diversion. *See* FAC, ¶ 24. Reinhart offered no further medical guidance to the flight crew and directed them to "proceed on then to" Phoenix, though he knew the flight had at least six hours left and that "a lot can obviously happen in that time frame" but "hop[ing]" that Mr. Baillie's "condition will improve." *See* FAC, ¶ 24. Before hanging up, Reinhart told the crew to call back if Mr. Baillie's condition continued to deteriorate, at which time MedAire would "have to consider a diversion." *See* FAC, ¶ 24.

Mr. Baillie's condition did, indeed, worsen and at 22:34 GMT, three hours after the

-4-

second call to MedAire, British Airways contacted defendants again for additional medical assessment, advice, guidance, instructions and options – all of which defendants were contractually obligated to provide and for which they were receiving financial compensation. *See* FAC, ¶ 26. By the time of the third call, Reinhart had "gone off shift" but had not passed along information about Mr. Baillie's situation for other MedAire medical professionals in the case of further contact from British Airways. *See* FAC, ¶ 26.

Defendant Monas, another MedAire employee and/or agent, responded to Flight 289 crew's third request for medical assistance. *See* FAC, ¶ 27. She was briefed on Mr. Baillie's medical history, symptoms and vital signs, and then she told the crew to administer Nitroglycerin, despite the fact that Reinhart had previously rejected Nitroglycerin as a treatment option because of Mr. Baillie's low blood pressure. *See* FAC, ¶ 27. Monas failed to recognize that, based on the symptoms described to her, Mr. Baillie was *in extremis* and needed medical attention as quickly as possible, necessitating a flight diversion. *See* FAC, ¶ 27. Following defendants' medical advice and direction, Flight 289 continued to Phoenix, Arizona without making a flight diversion, where it landed 10 hours and 41 minutes after takeoff from London. *See* FAC, ¶ 29.

Mr. Baillie was taken off Flight 289 by emergency medical technicians and received emergency medical treatment at St. Luke's Hospital in Phoenix, where it was confirmed that he had suffered a heart attack at least six to eight hours before being seen at the hospital. *See* FAC, ¶ 29. While the hospital's medical team was able to open Mr. Baillie's closed coronary arteries, the six to eight hours of coronary damage suffered during the flight critically injured Mr. Baillie and he never fully recovered, dying on July

1, 2012 at the Mayo Clinic in Phoenix, where he was awaiting a heart transplant. *See* FAC, ¶ 29.

Mr. Baillie's widow Linda Ann Baillie filed this lawsuit alleging that the repeated failures of defendants MedAire, Reinhart and Monas to assess, recognize and respond appropriately to Mr. Baillie's worsening heart condition and failure to provide that information to the British Airways crew and adequately advise the crew, as they had been paid to do, caused Mr. Baillie to remain untreated for over six hours and sustain life threatening and ultimately fatal injuries and that these failures constituted an actionable accident within the meaning of the Montreal Convention. *See, e.g.,* FAC, ¶¶ 30 – 33.

## II.     The Aviation Medical Assistance Act of 1998

In 1998, responding to what it saw as growing concern about the adequacy of onboard medical kits carried by domestic airlines, Congress noted that "[s]ome question the current medical training of flight attendant personnel as well as the liability concerns of the airlines and their employees.  There are also debates about the level of medical training flight attendants should receive or be held responsible for during flights." H.R. 105-456, 2nd Sess. 1998, 1998 WL 125038, *5 (March 20, 1998).  After the Aviation Subcommittee of the Committee on Transportation and Infrastructure held a hearing on "Medical Kits aboard Commercial Aircraft," the subcommittee chairperson introduced the Aviation Medical Assistance Act. *Id.*  Most of the Congressional history about the Act concerned questions about whether to require major airlines to maintain defibrillators aboard passenger aircraft and whether the Federal Aviation Administration should require general upgrades to air carrier medical kits and training. *Id.*, at *5 – 7.

The final consideration had to do with Section 5, all of which was identified as the "Good Samaritan" provision. As the bill's sponsor explained, the

> Good Samaritan provision … would protect from legal liability the Good Samaritan, such as the doctor on board the flight who *volunteers* to help in a medical emergency. When a medical emergency happens during flight, the flight crew must often rely on the help of passengers who are medical professionals. Unfortunately, many doctors on board are often wary of *volunteering* their services for fear of being sued. *This Good Samaritan provision protects passengers who volunteer to help, unless, of course, they are grossly negligent or engaged in willful misconduct.* The Good Samaritan provision also generally protects the airlines from legal liability for the actions of their passengers.

144 Cong. Rec. H1403-03, 1998 WL 129723 (emphasis added).

The full Committee Report on the Aviation Medical Assistance Act of 1998 also confirmed that the entirety of Section 5 of the Act was a Good Samaritan provision. In the "Background" section of the Report, the Committee states that:

> *Finally, the bill includes a "Good Samaritan" provision to protect those who help in a medical emergency. The provision protects an individual (such as a passenger, pilot or flight attendant) from legal liability for helping in a medical emergency unless that individual is guilty of gross negligence or willful misconduct.* The provision also protects the airline from liability for the negligence of a passenger who volunteers to help in a medical emergency but only if (1) that passenger is not an employee of the airline and (2) the airline in good faith believed that the passenger was qualified to provide that help (such as where the crew believed that the passenger was a doctor, nurse or was otherwise experienced in medical emergencies).

H.R. 105-456, 2nd Sess. 1998, 1998 WL 125038, *6 (March 20, 1998) (emphasis added).

Also, in the "Section by Section Summary" part of the Report, the Committee confirmed that:

> *Section 5 is the Good Samaritan provision.* It protects the airline against liability for the actions of a passenger rendering assistance in an in-flight medical emergency if the passenger is not an employee or agent of the airline and if the airline in good faith believed that the passenger was

-7-

> qualified to render such assistance. *It also protects an individual (such as a passenger or member of the crew) from liability for rendering assistance unless that person engaged in gross negligence or willful misconduct.*

*Id.*, * 8 (emphasis added).

The Act therefore was intended to protect an individual volunteering to assist in an emergency, such as a passenger, pilot or flight attendant, from legal liability for acts of ordinary negligence, while expressly not affecting the liability of an air carrier, as the "airline is not a good Samaritan but rather is a common carrier that, by law, has a duty to provide safe transportation to those who have paid for it." *Id.*, *7.

The scope of the Good Samaritan provision, like the entire Aviation Medical Assistance Act, was, however, limited to domestic air carriers. The Act, including Section 5, expressly applies only to "air carriers." The definitional section of the Act explained that "the term[] 'air carrier' ... [has] the meaning[] such term[] [has] under section 40102 of title 49, United States Code" – that is, the meaning under the definitions section of the Federal Aviation Act. *See* Aviation Medical Assistance Act, § 6(1) (49 U.S.C. § 44701 (Sec. 6 "Definitions")). Under the Federal Aviation Act, an "'air carrier' means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." 49 U.S.C. § 40102(a)(2), (15).[3] A "foreign air carrier," on the other hand, "means a person, not a citizen of the United States, undertaking by any means, directly or indirectly, to provide foreign air transportation. 49 U.S.C. § 40102(21).

---

[3] Under the Federal Aviation Act, a "citizen of the United States" means a corporation or association organized under the laws of the United States, a state, the District of Columbia, or a territory or possession of the United States, along with other requirements. 49 U.S.C. § 40102(21).

-8-

Congress enacted the Aviation Medical Assistance Act, affecting domestic air carriers only, in 1998.

### III. Legal Argument

Plaintiff Linda Ann Baillie's suit is premised on defendants' failures to properly provide the remote health consultation services they were paid to provide, which included evaluating Mr. Baillie's medical condition and directing British Airways how to respond to the in-flight medical emergency presented by Mr. Baillie's coronary event. The only argument that defendants Reinhart and Monas have presented in support of their motion to dismiss is that the so-called "Good Samaritan" provision of the Aviation Medical Assistance Act of 1998 precludes lawsuits against them for their negligence. The Act, including its Good Samaritan section, however, applies only to incidents occurring on flights operated by domestic air carriers and thus does not apply to Flight 289, operated by the foreign-carrier British Airways Plc. Even if the Aviation Medical Assistance Act did apply to Flight 289, though, because the limitation on liability set forth in the Good Samaritan provision conflicts with the Montreal Convention's exclusive remedies and limitations of liability, the treaty which governs this lawsuit, Reinhart and Monas cannot invoke the federal statute to avoid liability here. Last, irrespective of the conflicting treaty provisions, and even were the Good Samaritan provision to apply to flights on a foreign air carrier, medical professionals paid by the airline for their medical assistance are not the "Good Samaritan" volunteers that the Aviation Medical Assistance Act intended to protect. For all of these reasons, the motion to dismiss must be denied.

## A. Standard of Review

Defendants Reinhart and Monas have moved for dismissal under Fed.R.Civ.P. 12(c), which provides for judgment on the pleadings.[4] *See Hal Roach Studios, Inc. v. Richard Feiner & Co. Inc.,* 896 F.2d 1542, 1550 (9th Cir.1990) (Rule 12(c) motion may look to all pleadings to resolve an issue). In considering a Rule 12(c) motion "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Id.* Judgment on the pleadings is proper only if the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law. *Id.; Marlyn Nutraceuticals, Inc. v. Improvita Health Products*, 663 F. Supp. 2d 841, 846 (D. Ariz. 2009) (in denying Rule 12(c) motion, stating "Judgment on the pleadings is proper, when, taking all of the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law. … [A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegation.") (internal citations omitted).

In this case, then, defendants Reinhart and Monas must establish, based only on the pleadings and assuming that all of the facts in the First Amended Complaint are true, that the Aviation Medical Assistance Act bars Plaintiff's suit against them. For the following reasons, they cannot do so and the motion to dismiss must therefore be denied.

---

[4] Reinhart and Monas may have moved under Rule 12(c) as opposed to Rule 12(b)(6), because they answered the complaint before considering making a Rule 12 motion. This court thus has before it not only those statements in Plaintiff's First Amended Complaint – which must be assumed to be true for purposes of this motion – but also certain admissions in defendants' answer – which, insofar as they support Plaintiff's opposition, should also be considered in weighing this motion.

-10-

**B. The Aviation Medial Assistance Act Does Not Apply to Foreign Carriers**

The Aviation Medical Assistance Act does not apply to flights operated by foreign air carriers such as British Airways and, therefore, cannot be invoked to limit liability in this case. As noted above, the legislation is limited to "air carriers" as that term is defined by the Federal Aviation Act. 49 U.S.C. § 44701 (Sec. 6 "definitions"). The Federal Aviation Act defines an "air carrier" as a citizen of the United States that undertakes to provide air transportation. 49 U.S.C. § 40102(a)(2), (15). It separately defines a "foreign air carrier" as a non-citizen of the United States that undertakes to provide foreign air transportation. 49 U.S.C. § 40102(a)(21). The Aviation Medical Assistance Act, adopting the Federal Aviation Act's definitions, expressly limited its reach to "air carriers" – that is, domestic airlines – and did not extend the act to foreign airlines.

Courts have uniformly and repeatedly held that a provision of law that expressly refers only to "air carrier" and omits "foreign air carrier" has purposefully excluded "foreign air carrier" from that provision's burdens, benefits and other coverage. *United States v. Keuylian*, 602 F.2d 1033, 1039 – 40 (2d Cir. 1979) (holding that specification only of "air carrier" in regard to pre-boarding searches excluded "foreign air carrier" from such requirement and burden); *Horvath v. Deutsch Lufthansa, AG*, 2004 WL 486976, *1 (S.D.N.Y. March 12, 2004) (in specifying that "air carriers" had certain exemptions from liability in Section 5(a) of the Aviation Medical Assistance Act of 1998, Congress omitted and therefore purposefully excluded "foreign air carriers" such as Lufthansa from those immunities); *see also Owolabi et al. v. Air France*, 2000 U.S. Dist. LEXIS 3208, *21(S.D.N.Y. March 31, 2000); *American Exp. Travel Related Services Co., Inc. v.*

-11-

*Marco*, 611 F.Supp. 938, 941 (S.D.N.Y. 1985).

Given the clear language of the Aviation Medical Assistance Act and the caselaw on the difference between a rule applying to an "air carrier" but not expressly also applying to a "foreign air carrier," as another district court has found, "the Aviation Medical Assistance Act of 1998" does not apply to incidents arising on flights operated by foreign airlines such as British Airways "because foreign carriers are excluded from its reach." *Horvath v. Deutsch Lufthansa, AG*, 2004 WL 486976, *1 (S.D.N.Y. March 12, 2004).[5] Thus, in this case, defendants cannot invoke the Aviation Medical Assistance Act of 1998 as a basis to dismiss Plaintiff's claims and their motion must therefore be denied.

**C. The Montreal Convention Treaty Provides the Exclusive Cause of Action and Cannot be Limited by the Aviation Medical Assistance Act**

All of Plaintiffs' claims are governed by the Montreal Convention Treaty, which provides the exclusive cause of action for damages relating to death or bodily injury resulting from an accident suffered by a passenger on board an aircraft – or in the course of embarking or disembarking the aircraft. *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 161 (1999) (for a personal injury suffered "on board [an] aircraft … if not allowed under the Convention, is not available at all.) Indeed, this Court's jurisdiction was invoked solely pursuant to 28 U.S.C. § 1331, by reason of a federal question concerning

---

[5] Should Reinhart and Monas argue that they are not "foreign air carriers" for purposes of the Aviation Medical Assistance Act, that argument must be rejected as Plaintiff sufficiently alleged in her complaint that defendants were acting as agents of the foreign air carrier British Airways and all allegations in the complaint must be accepted as true at this stage. *See* FAC, ¶¶ 9 – 10. If, however, this Court concludes that the facts as alleged would not establish agency and that agency is necessary, Plaintiff should be granted permission to file a Second Amended Complaint.

-12-

the Montreal Convention Treaty. FAC, ¶ 7.  All defendants "admit[ted] that this action arises under the … Montreal Convention, because Mr. Baillie was on an international flight, Flight 289 from London to Phoenix" when he sustained his injuries. Answer, ¶7. There is, therefore, no dispute that all of Plaintiff's claims – including those against Reinhart and Monas – are governed by the Montreal Convention.[6]

The Montreal Convention exclusively governs both Plaintiff's rights and Reinhart's and Monas's liability in this case.  Under Article VI of the Constitution, the Montreal Convention, as a federal treaty, is considered "the supreme Law of the Land …." U.S. Const. art. VI, cl. 2; *Tseng*, 525 U.S.155, 174 (1999).  Thus, valid treaties override any conflicting statutory law. *Missouri v. Holland,* 252 U.S. 416, 432 (1920); *see also In re World War II Era Japanese Forced Labor Litig.*, 164 F. Supp. 2d 1160, 1166 (N.D. Cal. 2001) *aff'd sub nom. Deutsch v. Turner Corp.*, 317 F.3d 1005 (9th Cir. 2003) *opinion amended and superseded on denial of reh'g,* 324 F.3d 692 (9th Cir. 2003).

The "supreme law" of the Montreal Convention provides that *"[i]n the carriage of passengers ... any action for damages, however founded, whether under this Convention or in contract or tort or other area, can only be brought subject to the conditions and such limits of liability as are set out in the Convention."* Montreal Convention, Art. 29

---

[6] It is well established that the Montreal Convention applies with equal force and effect to a contractor of an air carrier, when, as here, the contractor provides services "in furtherance of the carrier's contract of carriage." *See McCaskey v. Continental Airlines*, 159 F.Supp.2d 562, 579 (S.D. Tex. 2001) (in case involving MedAire, court found that "a service is performed in furtherance of the contract of carriage if it is flight related," and held that MedAire's medical services were given in furtherance of the contract of carriage.); *see also, e.g., Kabbani v. Int'l Total Services*, 805 F.Supp 1033, 1039 (D.D.C. 1992); *Waxman v. C.I.S. Mexican De Aviacion*, 13 F.Supp.2d 508, 515 (SDNY 1998).

(emphasis added). Defendants Reinhart and Monas, however, seek to displace the Montreal Convention's liability limits with the Good Samaritan provision in the Aviation Medical Assistance Act. Because that provision conflicts with the provisions of the treaty, which has no such limitation on liability as appears in the Aviation Medical Assistance Act's Good Samaritan section, the Montreal Convention treaty language overrides the Good Samaritan limitations.

A treaty preempts inconsistent state law and "Federal law must also be strictly construed to avoid conflict with treaty obligations." *Ventress v. Japan Airlines*, 486 F.3d 1111, 1115 (9th Cir. 2007), citing *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21, (1963). While the Supreme Court has not established a detailed framework for courts to employ when analyzing preemption by treaties, it has noted that treaties override conflicting statutory law. *See, e.g., United States v. Belmont,* 301 U.S. 324, 331 (1937) (noting, without any analysis, that "the external powers of the United States are to be exercised without regard to state laws or policies. The supremacy of a treaty in this respect has been recognized from the beginning"). And it has further observed that "the nation-state, not subdivisions within one nation, is the focus of the [Montreal] Convention and the perspective of our treaty partners." *See Tseng,* 525 U.S. at 175. In order to determine whether a treaty overrides statutory law, therefore, a court should assess the language of the treaty and "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Id.* at 167 (quoting *Air France v. Saks,* 470 U.S. 392, 399 (1985)).

A "cardinal purpose" of the Montreal Convention was to "achiev[e] uniformity of

rules governing claims arising from international air transportation." *Narayanan v. British Airways*, 747 F.3d 1125, 1131 (9th Cir. 2014). This goal is inherently incompatible with application of the Good Samaritan provision, which would insulate the defendants from liability even if established under the Convention. Accordingly, the Montreal Convention preempts the Good Samaritan provision and defendants Reinhart and Monas cannot benefit from its application in this case.

**D. Defendants Reinhart and Monas did not Act as "Good Samaritans" for Purposes of the Aviation Medical Assistance Act's Protection Against Liability**

As discussed above, the Aviation Medical Assistance Act includes a "Good Samaritan" provision to protect "volunteers" who offer to come to the assistance of a person experiencing an in-flight medical emergency. *See* 144 Cong. Rec. H1403-03, 1998 WL 129723. The legislation was intended to protect an individual such as a passenger, pilot or flight attendant for legal liability for ordinary negligence when that person gratuitously offers help, but not the airline, as the commercial enterprise is "not a good Samaritan." *Id.*, * 7.

Most Good Samaritan statutes require that the services that could form the basis of a liability suit be provided voluntarily. *See* Ariz. Rev. Stat. Ann. § 32-1471 (providing immunity for emergency care provided in public or at the scene of an emergency "gratuitously and in good faith"); *see also, e.g.,* Cal. Health & Safety Code § 1799.102; Mass. Gen. Law ch. 112 §12V; N.Y. Edu. Law. §§ 6611, 6527, 6909, 6547, 6737.

As alleged in Plaintiff's complaint, MedAire and its doctors, including Reinhart and Monas, provided their services, which form the basis of Plaintiff's claims, pursuant to

a paid, contractual relationship with British Airways. *See* FAC, ¶¶4, 9 – 10, 12 – 13.[7] They had a duty to render reasonable care to passengers on British Airways flights, including Mr. Baillie, and in exchange for taking on that duty (pursuant to the contractual relationship), Reinhart and Monas would be compensated monetarily. *See* FAC, ¶ 12; Answer, ¶ 4.  In failing to recognize that Mr. Baillie was suffering a critical coronary episode – which should have been evident to them given the information they had – and in failing to advise British Airways personnel that Mr. Baillie needed immediate medical attention, Reinhart and Monas breached their duty of care. FAC, ¶¶ 12 – 13, 30 – 33. They are no more entitled to immunity from liability under the Aviation Medical Assistance Act's Good Samaritan provision for their alleged breach of their duty of care than a paid physician would be entitled to immunity from a medical malpractice suit in connection with his or her purported negligence.  There is simply no basis to confer upon paid medical professionals immunity for their negligence in connection with the precise services for which they were paid.  Not only is defendants' motion unsupported by precedent, it is directly contrary to the public policy underlying Good Samaritan statutes, including that in the Aviation Medical Assistance Act, which is to encourage *volunteer* assistance in emergencies by reassuring those who gratuitously step forward to help in a crisis that they will not be held liable for any negligent acts.

     Even if the Good Samaritan provision applies to this flight and is not preempted by

---

[7] While all allegations in Plaintiff's complaint must be accepted as true for purposes of this motion, and, thus, it must be assumed that Reinhart and Monas were paid employees of MedAire.  Nevertheless, while the defendants answer denies that Reinhart and Monas were employed by MedAire, the defendants did admit that Reinhart and Monas were employed in connection with the medical services they provided in connection with Flight 289 and presumably were also compensated for their services. *See* Answer, ¶4.

the Montreal Convention, on the facts as set forth in the pleadings, Reinhart and Monas are not entitled to any immunity for their purported misconduct. [8]

**Conclusion**

This Court should deny the defendants' motion because the Medical Aviation Assistance Act of 1998 1) is preempted by the terms of the Montreal Convention Treaty; 2) does not apply to incidents occurring during flights on foreign airlines; and 3) is inapplicable to medical professionals being paid to provide remote medical consultation services to airlines.

Dated:  July 20, 2015                                  Respectfully submitted,

                                                       KREINDLER & KREINDLER LLP

                                                       By:   /s/ Francis G. Fleming
                                                       Francis G. Fleming, 004375
                                                       Robert J. Spragg, *pro hac vice*
                                                       750 Third Avenue, 32nd Floor
                                                       New York, NY 10017
                                                       Telephone: (212) 687-8181
                                                       Facsimile:  (212) 972-9432

                                                       -and-

                                                       Stephen M. Dichter, 004043
                                                       CHRISTIAN DICHTER & SLUGA, P.C.
                                                       2700 North Central Avenue, Suite 1200
                                                       Phoenix, AZ 85004
                                                       Telephone: (602) 253-5808
                                                       Facsimile:  (602) 792-1710
                                                       *Attorneys for Plaintiff Linda Ann Baillie*

---

[8] Should this Court conclude that the Good Samaritan provision could apply to Reinhart and Monas, the allegations in the complaint are sufficient to make out a case of gross negligence, thus taking their conduct outside of the protection of the provision.  If the claim of gross negligence needs to be more specifically stated (not having been expressly pleaded because exemplary damages are not available under the Montreal Convention), Plaintiff would ask for permission to amend her First Amended Complaint.

-17-

# PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of New York, State of New York. I am over the age of 18 and not a party to the within action; my business address is 750 Third Avenue, New York, NY 10017.

I hereby certify that on July 20, 2015, I electronically transmitted the attached document and exhibits to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants listed in the attached Service List.

On July 20, 2015, I also served the foregoing ***PLAINTIFF'S OPPOSITION TO MEDAIRE'S MOTION FOR JUDGMENT ON THE PLEADINGS*** on the interested parties as stated on the attached service list as follows:

__X__  BY MAIL:
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at New York, New York in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

____  BY FEDERAL EXPRESS OR OVERNIGHT COURIER

____  BY ELECTRONIC MAIL:
I served by electronic mail at the email address(es) on the attached Service List:

____  BY MESSENGER

__X__  (State) I declare under penalty of perjury under the laws of the State of New York that the above is true and correct.

Executed on July 20, 2015 at New York, NY.

Lisa Ranieri                                                              */s/ Lisa Ranieri*

(Type or Print Name)                                              (Signature)

-1-
PROOF OF SERVICE

**SERVICE LIST**
*Baillie v. MedAire, Inc. et al.*
Case No.: 2:14-cv-00420-DJH

Mark C. Dangerfield, Esq.
Wm. Charles Thomson, Esq.
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
mark.dangerfield@gknet.com
wct@gknet.com

*Attorneys for Defendants MedAire, Inc.; Steven Joe Reinhart, D.O.; and Jessica Monas, M.D.*

-2-

PROOF OF SERVICE