1  Mark C. Dangerfield (Bar No. 010832)
Wm. Charles Thomson (Bar No. 004269)
2  GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
3  Phoenix, Arizona  85016-9225
Telephone:    (602) 530-8000
4  Facsimile:    (602) 530-8500
E-mails: mark.dangerfield@gknet.com
5          wct@gknet.com
Attorneys for Defendants MedAire, Inc., Steven
6  Joe Reinhart, D.O., and Jessica Monas, M.D.

7                     UNITED STATES DISTRICT COURT

8                          DISTRICT OF ARIZONA

9  LINDA ANN BAILLIE, individually, as          No. 2:14-cv-00420-DJH
   Personal Representative of the Estate of
10 JAMES DONALD BAILLIE, II, and on
   behalf of all heirs and next of kin of
11 JAMES DONALD BAILLIE, II, deceased,

12               Plaintiff,                      **REPLY IN SUPPORT OF RULE 12(c)**
                                                 **MOTION FOR JUDGMENT ON THE**
13       vs.                                     **PLEADINGS AS TO DEFENDANTS**
                                                 **STEVEN JOE REINHART, D.O. AND**
14 MEDAIRE, INC.; STEVEN JOE                     **JESSICA MONAS, M.D.**
   REINHART, D.O.; JESSICA MONAS,
15 M.D.,

16               Defendants.

17          This Motion is based on the text of one section of a Federal statute, so it is both

18 remarkable and revealing that plaintiff's Response never once quotes or even refers to the

19 actual words of that section of the statute. Moreover, plaintiff argues that the section in

20 question conflicts with an international treaty—the Montreal Convention—yet the only

21 portion of the treaty that the Response quotes does not in fact conflict. And to make

22 matters worse, the only portion of the treaty the Response quotes misleads the Court by

23 (silently) omitting the last—and key—part of the full sentence.

24          In addition to disregarding the actual text of the operative enacted law, the

25 Response also fails to cite the operative, on-point, case law, instead referring the Court to

26 cases that have nothing to do with the issues at hand.

27          The plain meaning of Section 5(b) of the Medical Assistance Act bars the plaintiff

28 from recovering damages against the individual defendants, and the Court should so find.

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

4938928v3/24709-0001

I.      **SECTION 5(b) OF THE ACT IS NOT LIMITED TO INCIDENTS INVOLVING DOMESTIC AIR CARRIERS.**

We begin with plaintiff's argument that the Medical Assistance Act does not apply to "incidents on flights operated by foreign carriers." But the actual text of the Act contains no such limitation.  While Section 5(a) of the Act deals only with the "liability of air carriers"—defined in Section 6(a) to exclude foreign carriers—this lawsuit has nothing to do with the liability of any air carrier. The Response seems to think that British Airways is still a party, which of course it's not.

More to the point, this Motion deals with Section 5(b) of the Act, titled, "Liability of Individuals"—and that section does not refer to the liability of "air carriers" at all. Here is the entire text of section 5(b):

> (b) **Liability of Individuals.**  An individual shall not be liable for damages in any action brought in a Federal or State court arising out of the acts or omissions of the individual in providing or attempting to provide assistance in the case of an in-flight medical emergency unless the individual, while rendering such assistance, guilty of gross negligence or willful misconduct.

By its terms, then, Section 5(b) broadly protects all "individuals." It does not protect air carriers or other entities: just individuals. And the terms are not limited to incidents on domestic airlines.

Other Sections of the Act refer to other specific groups.  Thus, Section 2 gives the FAA one year to reevaluate its rules regarding medical kits "of aircraft operated by air carriers" and the training of flight attendants in the use of such equipment.

Section 3 requires "major air carrier[s]"—another defined term in the Act—to provide certain quarterly reports to the FAA, for one year, regarding people who die onboard their aircraft.

Section 4 requires the FAA to make a decision on whether or not to require automatic external defibrillators "on passenger aircraft operated by air carriers," among other things.

2

4938928v3/24709-0001

1    That those sections of the Act are limited to domestic aircraft makes perfect sense

2 because Congress generally does not have power to dictate how foreign airlines operate.[1]

3 But Congress certainly has the power to immunize *individuals*—particularly United States

4 citizens and residents such as Drs. Reinhart and Monas—from damages for lawsuits

5 brought in Federal court.

6    The plaintiff's disregard of the actual text of the Medical Assistance Act is well-

7 illustrated by the cases she relies on.  Plaintiff first cites *United States v. Keuylian*, 602

8 F.2d 1033, 1039 (2d Cir. 1979)—which does not even mention the Act. *Keuylian* stands

9 only for the non-controversial point that the Federal Aviation Act defines "air carrier" to

10 mean a domestic carrier, not a foreign carrier. But as already noted, Section 5(b) of the

11 Medical Assistance Act does not mention "air carrier," so the case is irrelevant.

12    Plaintiff also relies on the memorandum decision in *Horvath v. Deutsch Lufthansa,*

13 *AG*, 2004 WL 48976, *1 (S.D.N.Y. March 12, 2004).  As is clear from reading that case,

14 however, the only pertinent issue there was the liability *of the air carrier*, not the liability

15 of an individual.  Thus the case arose under Section 5(a) of the Act—not Section 5(b).

16    Ms. Horvath became ill on an international flight flown by the German airline,

17 Lufthansa.  Horvath alleged, among other things, that her condition was aggravated by

18 negligent medical help she received on the flight from an onboard doctor. The issue was

19 whether, under the Medical Assistance Act, Lufthansa was an "air carrier," and thus

20 (under Section 5(a) of the Act) immune from liability stemming from the onboard

21 doctor's alleged negligence. The court found that, as a foreign air carrier, Lufthansa was

22 not protected by the Act.[2]

23

24

25 [1] In addition to the Montreal Convention, the United States is a party to the International
Convention on Civil Aviation—the Chicago Convention—which provides that "each

26 country is responsible for the safety oversight of its own air carriers."  *See*
https://www.faa.gov/passengers/international_travel/

27
[2] While the case does not specify what section of the Act was at issue, Section 5(a), titled

28 "Liability of Air Carriers," is the only section dealing with that subject.

3

1    *Horvath* has nothing to do with the liability of an *individual*, under Section 5(b).[3]

2          As we noted in our Motion, judicial inquiry about the meaning of a statute "begins

3    with the statutory text, and ends there as well if the text is unambiguous." *Satterfield v.*

4    *Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (internal citation and quotations

5    marks omitted). Section 5(b) of the Act unambiguously states that, absent gross

6    negligence or willful misconduct, no "individual" shall be liable for damages in any

7    Federal court based on his or her "acts or omissions" during an in-flight medical

8    emergency.  That clause directly applies to Drs. Reinhart and Monas in this case.[4]

9   **II.    LOCAL LAW, NOT THE MONTREAL CONVENTION, GOVERNS WHAT, IF ANY, DAMAGES ARE "LEGALLY COGNIZABLE."**

10

11         Plaintiff next argues, citing *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S.

12   155 (1999) ("*Tseng*"), that, because the Montreal Convention is an international treaty, it

13   overrides conflicting provisions in a Federal statute.[5] While we may agree with this in

14   principle, the plaintiff still has to prove that there really is a conflict, and here there's not.

15         Plaintiff argues that Section 5(b) of the Act conflicts with Article 29 of the

16   Convention, which page 13 of the Response quotes as follows:

17

18   _____

19   [3] The Response also cites *Owolabi et al. v. Air France*, 2000 U.S. Dist. LEXIS 3208, *21 (S.D.N.Y. March 31, 2000), and *American Exp. Travel Related Services Co., Inc. v.*

20   *Marco*, 611 F. Supp. 938 (1985).  Neither of those cases, though, mentions the Medical Assistance Act.  They, too, stand only for the non-controversial point that if "air carrier" is

21   defined to mean only U.S. airlines, then the term does not include foreign airlines.

22   [4] The Response suggests in a footnote at p. 12 that Drs. Reinhart and Monas themselves are "foreign air carriers," because the FAC "sufficiently alleged" that they were "agents"

23   of British Airways.  The FAC never so alleges, but even if it did, it is absurd to suggest, without citation of any legal authority, that a statutory reference to "foreign air carriers"

24   would include American doctors living in the United States who don't operate an airline.

25   [5] The Montreal Convention is the successor to the Warsaw Convention of 1929.

26   *Narayanan v. British Airways,* 747 F.3d 1125, 1127, n. 2 (9th Cir. 2014). "Although designed to replace the Warsaw Convention, the Montreal Convention incorporates many

27   of its substantive provisions." *Id.* Hence, "in interpreting the Montreal Convention, courts have routinely relied upon Warsaw Convention precedent where the equivalent provision

28   in the Montreal Convention is substantively the same." *Id.*

4

4938928v3/24709-0001

1
2
3

> In the carriage of passengers . . . any action for damages, however, founded, whether under this Convention or in contract or tort or other area, can only be brought subject to the conditions and such limits of liability as are set out in the Convention.

4   As is apparent though, this provision only imposes limits on a *plaintiff's claim*,

5   stating that such a claim can only be brought "subject to the conditions and such limits of

6   liability as are set out in the Convention." The provision says nothing about what *defenses*

7   a *defendant* may assert, for *what harms* a plaintiff may be compensated, or what *damages*

8   a plaintiff may recover against a given defendant. Hence, Article 29, as quoted, does not

9   in fact conflict with the limitation imposed by Section 5(a) of the Medical Assistance Act.

10   More importantly, the quote from the Response silently omits a key part of the

11   sentence. The period which the Response puts after the word "Convention" in the above

12   quote from Article 29 is not found in the actual text; rather, the text continues as follows:

13
14

> without prejudice to the question as to who are the persons who have the right to bring suit and *what are their respective rights*. (emphasis added).

15   *See* excerpts from Montreal Convention, including Article 29, attached at Ex. 1
16   (1999 WL 33292734, *30, *34, *38).

17   As plaintiff should have disclosed to this Court, a unanimous Supreme Court years

18   ago found that the same language in the Warsaw Convention "confirmed" that a carrier is

19   only liable under the Convention for "legally cognizable harm," and that the Convention

20   "leaves it to the adjudicating court to specify what harm is cognizable" under *local law*—

21   not the law of the Convention.  *Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217,

22   224-225 (1996) (holding that a Federal statute limited the damages plaintiff could recover

23   under the Convention). The "law of the Convention," the Court said, "does not affect the

24   substantive questions of who may bring suit and what they may be compensated for."

25   Rather: "Those questions are to be answered by the domestic law selected by the courts of

26   the contracting states."  516 U.S. at 225.

27   Plaintiff's counsel certainly knows about the *Zicherman* case, because *Tseng*, a

28   case cited in the Response, mentions *Zicherman* and states its holding:

5

1
2
3
4

> [T]he Court in *Zicherman* determined that Warsaw drafters intended to resolve *whether there is liability*, but to leave to domestic law (the local law identified by the forum under its choice-of-law rules or approaches) determination of the compensatory damages available to the suitor.

5    525 U.S. at 170.  So it is curious that the Response does not even mention *Zicherman*.

6    The unanimous opinion in *Zicherman* goes on to note that this interpretation is

7    consistent with that applied by other countries that are party to the Convention.  For

8    example, as the *Zicherman* court notes, the Court of Appeals of Quebec "has rejected the

9    argument that Article 17 [of the Convention] permits damages unrecoverable under

10    domestic Quebec law."  516 U.S. at 228.  And the "expert commentators are virtually

11    unanimous that the type of harm compensable is to be determined by domestic law."  *Id.*

12    If the Convention doesn't override Quebec's local limitations on what damages are

13    recoverable, then it should not override U.S. limitations either, including those set out in

14    Section 5(b) of the Act.

15    Moreover, the issue in *Zicherman* was similar to that here: whether a Federal

16    statute—there, the Federal Death on the High Seas Act ("DOHSA"), 41 Stat. 537—

17    limited the plaintiff's ability to recover against a defendant. Specifically, if DOHSA

18    applied, it barred plaintiff's recovery of loss-of-society damages. The Supreme Court

19    found that DOHSA did apply, and did limit plaintiff's recoverable damages.

20    Interestingly, just as plaintiff does here, the *Zicherman* plaintiff also argued that

21    DOHSA should not apply "because of the concern" that "a uniform law should govern"

22    the Convention.  516 U.S. at 230.  But the high court rejected that argument, concluding

23    that "this is not an area in which the imposition of uniformity was found feasible."  *Id.*

24    Rather, the articles of the Convention dealing with recoverable damages "provide nothing

25    more than a pass-through, authorizing us to apply the law that would govern in absence of

26    the Warsaw Convention." 516 U.S. at 229. In short, the "Convention unquestionably

27    envisions the application of domestic law" to determine what damages may be

28    recoverable. 516 U.S. at 231.

6

4938928v3/24709-0001

1    Part of the applicable local law here is the Medical Assistance Act, Section 5(b) of

2    which emphatically states that an "individual shall not be liable for damages" in a Federal

3    court action based on his or her "acts or omissions" while helping in an inflight medical

4    emergency. Under *Zicherman*, that law applies to this case brought under the Convention.

5    **III.    BY ITS TERMS, SECTION 5(b) OF THE ACT APPLIES TO ALL**
     **"INDIVIDUALS" AND IS NOT LIMITED TO UNPAID VOLUNTEERS.**

6

7    Relying on the Act's legislative history, the Response also argues that Section 5(b)

8    of the Act "was intended to protect an individual . . . when that person gratuitously offers

9    help," and so it does not protect defendants Reinhart and Monas because they were not

10    "volunteers" or  traditional "Good Samaritans."  Resp. at 15.  But this argument again

11    wholly ignores the actual text of Section 5(b).

12    The actual terms of Section 5(b) of the Act are clear, and they are not limited to

13    services given "gratuitously." Thus, the Court has no reason to look at legislative history:

14    it's simply not pertinent. And even if the legislative history *were* pertinent, that history

15    doesn't in fact contradict the actual terms of Section 5(b). The legislative history never

16    says that protection under the statute is intended to be limited to "unpaid" or "gratuitous"

17    services—those are plaintiff's words.

18    And while the legislative history does mention "Good Samaritan" and "volunteer,"

19    those are both ambiguous terms that, absent a definition, can certainly apply to those who

20    are compensated for their services. As the Volunteer Protection Act of 1997 shows,

21    Congress knows how to write an act that immunizes only unpaid volunteers.

22    **A.    Because the Terms of the Statute Are Clear, the Court Does Not Look**
     **at Legislative History.**

23

24    By its plain terms, Section 5(b) of the Medical Assistance Act states that, absent

25    "gross negligence or willful misconduct," an "individual shall not be liable for damages in

26    any action brought in a Federal or State court arising out of the acts or omissions of the

27    individual in providing or attempting to provide assistance in the case of an in-flight

28

7

4938928v3/24709-0001

1    medical emergency. . . ."  The actual words of the statute do not limit protection only to

2    unpaid volunteers or to "gratuitous" actions, but broadly protect all "individuals."

3          As mentioned earlier, judicial inquiry into a statute "begins with the statutory text,

4    and ends there as well if the text is unambiguous." *Satterfield,* 569 F.3d at 951.  Indeed,

5    our Motion made that very point, and plaintiff's Response notably fails to contest the

6    issue, so the issue should be deemed conceded.  *See, e.g. Ardente, Inc. v. Shanley,* 2010

7    WL 546485, *6 (N.D. Calif. Feb. 10, 2010) ("Plaintiff fails to respond to this argument

8    and therefore concedes it through silence.").

9          Like the Ninth Circuit, the United States Supreme Court has regularly reiterated the

10   principle that it will not resort to legislative history to interpret the unambiguous terms of

11   a statute.  In *Ratzlaf v. U.S.*, 510 U.S. 135, 146-147 (1994), for example, the high court

12   found the meaning of the actual terms of a statue to be clear and unambiguous. And even

13   though, as the Court acknowledged, there were "contrary indications in the statute's

14   legislative history," the Court emphasized that "we do not resort to legislative history to

15   cloud a statutory text that is clear."  *Id.* at 147-148; *accord United States v. Gonzales*, 520

16   U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to

17   resort to legislative history.").

18         As the Supreme Court summed up the matter in *Connecticut Nat. Bank v. Germain*,

19   503 U.S. 249, 253-54 (1992) (citations and internal quotation marks omitted):

20
21   > We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  **When the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete**.
22

23   (emphasis added).

24         So too here.  Plaintiff notably never argues that Section 5(b) of the Act has the least

25   bit of ambiguity, because it does not.  The statutory text could not be clearer:  it protects

26   all "individuals."  The legislative history is thus wholly irrelevant, and may not be used to

27   "cloud the statutory text."

28

4938928v3/24709-0001

1

**B.**     **Even If the Legislative History Were Pertinent, It Does Not Contradict
the Plain Meaning of Section 5(a) of the Act.**

2

3          Plaintiff's resort to legislative history is misplaced because Section 5(a) the Act is

4     not ambiguous.  But even were the legislative history pertinent, it does not contradict the

5     terms of Section 5(a).

6                  **1.**     *A "Good Samaritan" provision may protect those who are
compensated for their service.*

7

8          The Response suggests that, since one part of the legislative history (but not the

9     Act itself) refers to Section 5 of the Act as a "Good Samaritan" provision, that means it

10    only protects "unpaid volunteers."  But as the Response indirectly acknowledges at page

11    15, not all "Good Samaritan" statutes limit protection just to "unpaid volunteers."  In

12    plaintiff's words:  "*Most* Good Samaritan statutes require that the services . . . be provided

13    voluntarily" (emphasis added).  But when a Good Samaritan statute *is* limited to unpaid

14    services, the statute says so explicitly.  For example, the Response refers to Arizona's

15    Good Samaritan statute, A.R.S. § 32-1471, and that statute expressly provides immunity

16    only for certain emergency services provided "gratuitously."

17          By contrast, Section 5(a) of the Medical Assistance Act applies to all

18    "individuals"—not just to services provided "gratuitously."  Likewise, part or all of the

19    Good Samaritan statutes in at least a dozen states "do not require that the action be

20    gratuitous."[6]  To assess the matter, one has to examine the actual words of the statute.

21          More generally, according to Black's Law Dictionary, the term "Good Samaritan

22    law" can apply "to a statutory provision that immunizes one from liability for accidental

23    damage caused by a good-faith attempt to protect another."  Black's Law Dict. at 809-810

24    (10th Ed. 2014).  As an example of such, the dictionary refers to § 230 of the

25    Communications Decency Act, 47 U.S.C § 230. Among other things, § 230(c)—titled,

26

27    [6] *Is There a Doctor (and a Lawyer) in the House? Why our Good Samaritan Laws Are
Doing More Harm than Good for a National Public Health Security Strategy: A Fifty-*

28    *State Survey*, p. 278, V. Sutton, Journal of Health & Biomedical Law, VI (2010).

4938928v3/24709-0001

1    "Protection for 'Good Samaritan' blocking and screening of offensive material"—

2    "protects cellphone-service providers that remove third-party applications under a good-

3    faith belief that the applications may be harmful to subscribers."  *Id.* at 810.  Such service

4    providers could hardly be viewed as "unpaid volunteers," but the statute's so-called,

5    "Good Samaritan" provision, nonetheless protects them from liability.

6          Hence, legislative history referring to Section 5 of the Act as a "Good Samaritan"

7    provision does not mean it applies only to those who are not paid for their services.

8                    **2.     *A "volunteer" is not necessarily an "unpaid" volunteer.***

9          The Response also cites to comments made in the Congressional Record about the

10   bill protecting passengers or doctors who "volunteer" to help in a medical emergency. But

11   the word "volunteer" or "voluntary" does not necessarily mean "unpaid."   Indeed, its

12   primary meaning is "undertaken of one's own accord or by free choice: a *voluntary*

13   *contribution*."  Random House Webster's College Dictionary at 1464 (2001).  Hence, a

14   store employee who needs extra money might "volunteer" to work weekends, knowing he

15   or she will get overtime pay.  The doctor defendants here certainly acted "voluntarily" in

16   that sense:  no one compelled them to give the medical guidance they gave BA Flight 289.

17         Moreover, when Congress wants to write a statute that limits liability to "unpaid"

18   volunteers, it knows how to do so: Congress not only uses the word "volunteer" in the

19   actual statute, it specifically defines the word. For example, Section 4 of the "Volunteer

20   Protection Act of 1997," Public Law 105-19, limits the liability of "volunteers" of a non-

21   profit organization or governmental entity in certain circumstances.  But since the word

22   "volunteer" is ambiguous, Congress in Section 6 specifically defined the word to mean an

23   individual "who does not receive" either (A) "compensation" (other than "reasonable

24   reimbursement" for expenses actually incurred; or (B) "any other thing of value in lieu of

25   compensation in excess of $500 per year. . . ."

26         In any event, the formal Report on the Medical Assistance Act by the Committee

27   on Transportation and Infrastructure, quoted at page 7 of the Response, does not even use

28   the word "volunteer" in referring to the protection offered by Section 5(b) of the Act.

                                              10

4938928v3/24709-0001

1   Rather, the Report says that the "provision protects an individual (such as a passenger,

2   pilot, or flight attendant) from legal liability for helping in a medical emergency unless

3   that individual is guilty of gross negligence or willful misconduct."  1998 WL 125038, *6

4   (March 20, 1998). That statement is consistent with the actual terms of Section 5(b), and

5   is not limited to unpaid or gratuitous service.  And essentially the same idea is repeated in

6   the "Section by Section" summary, quoted at Response pages 7-8.  *Id.* at *8.[7]

7                                        **CONCLUSION**

8          Under Section 5(b) of the Aviation Medical Assistance Act, Drs. Reinhart and

9   Monas cannot be liable for damages in this action. By the Act's terms, however, such

10  statutory immunity applies only to "individuals," not to Defendant MedAire.

11         For all the reasons set forth above and in the Motion, the Court should thus grant

12  judgment on the pleadings in favor of Defendant Drs. Reinhart and Monas, and enter final

13  judgment in their favor on plaintiff's claims against them.

14         RESPECTFULLY submitted this 30th day of July, 2015.

15                                          GALLAGHER & KENNEDY, P.A.

16

17                                          By: /s/ *Mark C. Dangerfield*
                                                Mark C. Dangerfield
18                                              Wm. Charles Thomson
                                                2575 East Camelback Road
19                                              Phoenix, Arizona  85016-9225
                                                Attorneys for Defendants MedAire, Inc.;
20                                              Steven Joe Reinhart, D.O.; and Jessica
                                                Monas, M.D.
21

22

23

24
    _____
25  [7] In a footnote at the end of the Response, plaintiff makes the throwaway argument that
    the allegations in the FAC "are sufficient to make out a case of gross negligence, thus
26  taking their conduct outside of the protection of the provision," but seeks leave to amend
    if need be.  The FAC plainly doesn't allege gross negligence, and under the Court's
27  4/16/15 scheduling order, the deadline for amending expired in mid-June. Moreover, in
    their answer to the FAC, the defendants specifically pled the Aviation Medical Assistance
28  Act as part of their Seventh Affirmative Defense, so plaintiff was fully aware of it.

                                              11

4938928v3/24709-0001

1

## **CERTIFICATE OF SERVICE**

2

3

I hereby certify that on the 30th day of July, 2015, a copy of the foregoing document was filed electronically via the Court's CM/ECF system and Notice of Electronic Filing served on all parties by operation of the Court's CM/ECF system.

4

5

Stephen M. Dichter, Esq. (sdichter@cdslawfirm.com)
Jeffrey O. Hutchins, Esq. (jhutchins@cdslawfirm.com

6

Christian Dichter & Sluga, P.C.
2700 North Central Avenue, Suite 1200

7

Phoenix, AZ  85004
*Attorneys for Plaintiff*

8

9

Francis G. Fleming, Esq. (ffleming@kreindler.com)
Robert J. Spragg, Esq. (rspragg@kreindler.com)

10

Kreindler & Kreindler LLP
750 Third Avenue

11

New York, NY  10017

12

*Attorneys for Plaintiff*

13

14

By: */s/ Christine C. Marsceill*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12