UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Linda Ann Baillie, | ) | |
| | ) | |
| Plaintiff, | ) | CV-14-00420-PHX-SMM |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 28, 2015 |
| MedAire Incorporated, et al., | ) | 10:59 a.m. |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC DISCOVERY DISPUTE HEARING


Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          A P P E A R A N C E S

2     For the Plaintiff:

3               KREINDLER & KREINDLER, LLP
                By:  Robert J. Spragg, ESQ.
4                    Megan W. Benett, ESQ.
                750 3rd Avenue
5               New York, New York  10017

6     For the Defendants:

7               GALLAGHER & KENNEDY, PA
                By: Mark C. Dangerfield, ESQ.
8                   William C. Thomson, ESQ.
                2575 E. Camelback, Ste. 1100
9               Phoenix, AZ  85016

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2           COURTROOM DEPUTY CLERK:  Civil case 14-420, Linda

3    Baillie versus MedAire Incorporated and others.  This is the

4    time set for telephonic discovery dispute hearing.

5           Please announce your presence for the record.

6           MR. SPRAGG:  Yes, Robert Spragg and Megan Benett of

7    the firm of Kreindler and Kreindler on behalf of Plaintiff

8    Linda Ann Baillie.

9           MR. DANGERFIELD:  Mark Dangerfield and Chuck Thomson

10   from Gallagher and Kennedy, representing the Defendants MedAire

11   and Drs. Reinhart and Monas.

12          THE COURT:  Okay.  Well, thank you all very much.  I

13   would appreciate it if when you are speaking, to let us know

14   who is speaking so the court reporter can attribute the right

15   statements to the right parties; that would be very helpful.

16   So who wants to lead this off?

17          MR. SPRAGG:  Your Honor, this is Robert Spragg, and

18   since I asked for the conference, I guess I will lead off.

19          Your Honor, we, along with our local counsel, Stephen

20   Dichter of the firm of Christian, Dichter and Sluga, represent

21   Plaintiff Linda Ann Baillie.  Unfortunately, Mr. Dichter is

22   involved in a deposition in another case today and he is unable

23   to appear, and that's why I am by myself on the phone.

24          THE COURT:  I don't think you need a whole host of

25   people to take care of this case, do you?

1            MR. SPRAGG:  No, Your Honor, we do not.

2            THE COURT:  Okay.  Let's get going then.

3            MR. SPRAGG:  All right, Your Honor.  Just as a way of

4   brief background, this wrongful death suit arises out of a

5   heart attack that plaintiff's husband suffered during an

6   international commercial airline flight that was improperly

7   handled by the defendants.

8            The defendants had been contracted by the airlines,

9   which was British Airways, to provide ground based medical

10  emergency advice and assistance to its crew members and failed

11  to adequately assess the magnitude of Mr. Baillie's medical

12  condition and improperly advised the flight crew.

13           It's plaintiff's position that that failure was a

14  proximate cause of Mr. Baillie's injuries and death, and the

15  present discovery dispute centers around plaintiff's demand for

16  factual documents that defendants created during other similar

17  medical emergencies, which plaintiff believes will shed light

18  on the issue of whether defendants' conduct in this case was

19  reasonable, of which defendants have to date refused to

20  produce.

21           As a way of an aside, Your Honor, I would like to say

22  that the parties have had numerous and sincere efforts, both

23  telephonically and via email to try to resolve the dispute

24  without judicial intervention.

25           Your Honor, the defendants in the case are MedAire,

1   Inc., Steven Joe Reinhart, DO, and Jessica Monas, MD.  MedAire

2   is a company that provides on demand medical advice for

3   in-flight medical emergencies through emergency care physicians

4   who are ground based.

5           British Airways has a contract with MedAire under

6   which MedAire provides British Airways with in-flight options

7   and medical guidance in the event of an ill passenger or a crew

8   member, and their physicians then recommend to British Airways

9   flight crew whether the flight should be diverted based upon

10  that person's medical condition.

11          One of MedAire's main selling points to its customers

12  is its advertised ability to help airlines avoid unnecessary

13  flight diversions.

14          Now, Dr. Reinhart and Dr. Monas, they are emergency

15  care physicians who provide services to MedAire through another

16  company called Emergency Professional Services Incorporated,

17  but that company is not a defendant in this case.

18          At the time of the heart attack, Mr. Baillie, who is a

19  61-year-old senior business executive, was traveling on a

20  British Airways flight from London to his home in Phoenix at

21  the end of a business trip, and the flight to Phoenix was

22  scheduled to take about 10 hours and 40 minutes.

23          Based on the blood tests that were performed at

24  St. Luke's Medical Center immediately after he was taken off of

25  the aircraft, it's medically certain that Mr. Baillie had been

1   having a heart attack on board the flight for at least 6 to 8

2   hours before he was brought to the emergency room.

3           And even though he had been complaining of chest pains

4   and shortness of breath from the time the MedAire physicians

5   were contacted over eight hours earlier, MedAire and its

6   physicians failed to recognize the symptoms of a heart attack

7   over that period and were still treating Mr. Baillie for

8   possible angina, even though he had been reporting constant

9   chest pain for hours.

10           The MedAire physicians also failed to recommend that

11   the flight be diverted, even though Mr. Baillie was exhibiting

12   all of the symptoms of a complex heart attack for most of the

13   flight.

14           Plaintiff contends that the MedAire defendants were

15   liable for Mr. Baillie's injuries and death because, among

16   other things, they failed to recommend that the British Airways

17   flight be diverted so that Mr. Baillie could receive the

18   necessary medical care.

19           In the earlier discovery in the case, Your Honor,

20   plaintiff received MedAire documents that described in general

21   terms the objectives of MedAire services, including with

22   respect to medical diversions, and the documents noted that

23   diversions have significant impacts on commercial carriers and

24   that they are very expensive for the airlines and that

25   reductions of diversions is one of the main selling points of

1    MedAire's MedLink service to commercial air carriers.

2         And while MedAire appears to have discouraged its

3    physicians from recommending medical diversions unless they are

4    absolutely necessary, it nevertheless had certain procedures

5    for when MedAire personnel were considering a diversion.

6         Its physicians were directed to use a MedLink

7    diversion worksheet when determining if such action was

8    necessary, and the company also had a form that set forth

9    specific procedures for handling the cases of people suffering

10   from cardiac-related symptoms on airplanes, but these forms

11   appear to have been rarely used by MedAire physicians.

12        Now, in this case, Your Honor, MedAire produced the

13   factual documents, including intake forms pertaining to

14   Mr. Baillie's cardiac event on March 23rd, 2012.  The intake

15   forms are the forms upon which the communication specialist and

16   the MedAire physicians write down their notes as to the

17   symptoms being suffered by the victim and their impressions as

18   to what they believed the problem might be, as well as their

19   recommendations.

20        MedAire also produced its summary of hundreds of other

21   in-flight cardiac events that its physicians had treated

22   between 2010 and 2014, but those summaries contain basic

23   overviews, I guess is the best way to put it, of the medical

24   problem on the flight.

25        The specific underlying factual information about the

1    emergencies themselves, such as details of the symptoms, the

2    physicians' impressions, their responses, and the ultimate

3    patient outcome, were not included or were undeveloped on those

4    summaries.

5           And no other MedAire documents included any policy

6    statements or bright-line procedures that physicians were to

7    follow when providing treatment to passengers suffering from a

8    midair cardiac event and considering whether to recommend a

9    flight diversion.

10          So in the light of the absence of clear information

11   about the practices, policies and procedures for treating

12   cardiac events and subsequent flight diversions, plaintiff, in

13   July of this year, 2015, submitted her first request for

14   production to MedAire and the two doctors, seeking information

15   in mainly two -- or in two requests.

16          And those two requests for production are numbers 22

17   and 23, and I will -- just for the record, I will read them to

18   the court.

19          Number 22 stated or requested, the complete record

20   including the transcript of any communications between MedAire

21   and the aircraft crew, communication notes and intake notations

22   of all patches between MedAire and any air carrier pertaining

23   to the MedAire patch summary medical categories of cardiac,

24   respiratory, vascular, or other, during calendar year 2012 and

25   the months of March 2010, 2011, 2013 and 2014.

1          And the term "patches," Your Honor, that is used in

2    the request refers to the individual communications between

3    MedAire and the air crews of the airlines that were its

4    customers.

5          The other request are substantially similar.  This is

6    number 23, it requested the complete record including the

7    transcript of any communications between MedAire and the

8    aircraft crew, communication notes and intake notations of all

9    patches between MedAire and any air carrier pertaining to the

10   medical condition of any passenger suffering from chest pain or

11   discomfort, crackles, low blood pressure, high pulse,

12   dizziness, angina and/or the use of supplemental oxygen or

13   aspirin during calendar year 2012 and the months of March,

14   2010, 2011, 2013, and 2014.

15          THE COURT:  Can I get clarification on that?

16          MR. SPRAGG:  Yes, Your Honor.

17          THE COURT:  When you say the months of March of 2010,

18   2011 and then '13 and '14, is that just for the month of March

19   or for the whole years of those?

20          MR. SPRAGG:  Just for the month of March, Your Honor.

21   In other words, a total of 16 months.  The entire year of 2012,

22   and then the four Marches on two years on either side of 2012.

23          And as you noticed, we requested those documents

24   pertaining to any air carrier during that time period, and we

25   also requested particular categories listed on the summaries

1    and the symptoms, which are essentially things that were

2    involved in Mr. Baillie's medical emergency on March 23rd,

3    2012.

4            And the reason we sought the documents was to

5    determine if and how the defendants had previously treated

6    medical emergencies similar to that suffered by Mr. Baillie.

7    All such information would tend to prove whether defendants

8    deviated from applicable standards of care by showing that when

9    treating other similar emergency medical events, they provided

10   different and possibly better medical advice and assistance.

11           We felt that these documents also were necessary

12   because MedAire appears to have no general policy or procedures

13   for its physicians to guide their treatment of cardiac events

14   and their decision as to whether to recommend a diversion, and

15   thus any pattern of practice can only be established from

16   documents generated during other similar in-flight emergencies.

17           A month later in August of 2015, MedAire provided us

18   with their response.  And they objected to both requests for

19   production and referred us, the plaintiff, to the MedAire patch

20   summaries that it had previously produced in the case.

21           They also objected to the request on the basis of a

22   number of general objections, which were more or less

23   boilerplate objections where they objected on the basis of the

24   demands being vague and ambiguous, requiring a legal

25   conclusion, by being unduly burdensome, harassing and annoying,

1  being overly broad and seeking information not relevant to the

2  case or claims.

3          After we received their responses, we made several

4  efforts to resolve the disagreements regarding the two

5  discovery requests.  And first of all, during an August 19th,

6  telephonic meet and confer, we explained to MedAire's attorney

7  that we were seeking the factual documents underlying each

8  medical communication between MedAire and British Airways and

9  not the summaries of those events that MedAire creates for its

10  clients for statistical purposes.

11          And after some discussion regarding the breadth and

12  burden of our document request, we agreed to reduce the time

13  period and limit the subject areas covered by the request so

14  that they only concerned cardiac events, were only related to

15  British Airways, and were only for the 2012 calendar year.

16          So we tried to be as reasonable as we could and

17  acknowledged that perhaps our requests were somewhat broad and

18  limited those requests by time frame, event, and by airline.

19          The attorney for MedAire, Mr. Dangerfield, said that

20  he would see if his client would agree to produce those

21  documents, which were associated with British Airways'

22  communications during -- with MedAire during 2012, that were

23  identified as cardiac.  He estimated that there were about 126

24  British Airways' cardiac events in 2012.

25          Thereafter on September 9th, he advised us that his

1    clients would not agree to produce the factual documents

2    related to the British Airways' cardiac events for 2012,

3    instead offered an accommodation and stated that MedAire would

4    be willing to produce copies of certain factual documents

5    pertaining to the total of 31 incidents identified as cardiac,

6    which MedAire handled for British Airways during the first

7    quarter of 2012.

8            And he also advises that subject to his objections, he

9    would be willing to produce, as to each of those 31 incidents,

10   the handwritten MedLink intake forms, the data entered into the

11   computer by the MedAire communication specialist at the time of

12   each incident, and the audio recording of the phone patches

13   since most communications were not actually transcribed, they

14   were recorded and preserved in that manner.

15           We responded to their proposal on September 10th,

16   saying that we were prepared to review the factual records

17   pertaining to the 31 incidents without prejudice to pursuing a

18   motion if we believed we still needed to, after taking a look

19   at the documents.

20           Thereafter, on September 18th, MedAire's attorney

21   provided us with some but unfortunately not all of the factual

22   documents pertaining to the 31 British Airways' cardiac events

23   that took place during the first quarter of 2012.

24           In fact, the intake forms are from nine of the 31

25   events, which is about 30 percent of the intake forms, and

1   which we consider probably the most important document, were

2   described as missing by MedAire's attorney.  His clients

3   weren't able to locate them and they were not therefore

4   produced.

5           So this is the beginning of the dispute here, Your

6   Honor, because we believe that we need all of the factual

7   information from a particular quarter, at the very least.  And

8   so what we did is we proposed -- this is plaintiff, proposed

9   that since the factual records for nine of the 31 British

10  Airways' cardiac events were incomplete, that MedAire should

11  provide us with a different quarter of factual data to show the

12  gap of information, and we suggested they provide us with the

13  factual documents for the second quarter of 2012, or the same

14  quarter for another year for which the record is complete.

15          At this time, we also advised MedAire's attorney that

16  we believe we were entitled to factual data on any patch that

17  involved defendant Drs. Reinhart and Monas as well, since that

18  would be part of the set that was described by the totality of

19  our original request.

20          On October 5th, MedAire's attorney responded and told

21  us that they believed MedAire satisfied its discovery

22  obligations and that we would have to seek the court's

23  assistance if we wanted any additional documents.

24          We agreed to have another meet and confer conference

25  with the MedAire folks on October 8th in which we reiterated

1    our request that we -- because there were documents missing,

2    that we wanted the British Airways' cardiac events from the

3    second quarter, 2012 to replace that, as well as patch records

4    for Drs. Reinhart and Monas related to British Airways' cardiac

5    events.

6          MedAire's attorney, again, refused our request, and so

7    in a final effort to try to be reasonable, we told them that we

8    would accept the factual documents related to 12 British

9    Airways' cardiac events in which Dr. Reinhart was involved and

10   also 12 for Dr. Monas if that would resolve the issue.

11         MedAire's attorney indicated he would go back to his

12   client and speak to them about it, but the next day advised us

13   that MedAire declined to produce any of these additional

14   documents in part because they believed they weren't relevant

15   to whether MedAire's actions or admissions on March 23rd, 2012,

16   in regard to Mr. Baillie constituted an accident on board the

17   airplane.

18         So, Your Honor, Rule 26 states that discovery can be

19   obtained on any matter not privileged that's relevant to the

20   claim or defense of any party and further states that for good

21   cause showing, the court may order discovery of any matter

22   relevant to the subject matter involved in the action.

23         And in this case, plaintiff believes that good cause

24   exists to order defendants to provide the requested discovery

25   that we seek.

1          One of plaintiff's liability theories against the

2     MedAire defendants is that they improperly failed to advise the

3     British Airways flight crew that a diversion was medically

4     necessary and that all of the evidence from MedAire documents,

5     the company promoted itself as helping airlines to prevent

6     unnecessary medical diversions and appears to have been under a

7     certain amount of business pressure to discourage its

8     physicians from recommending diversions.  And the question of

9     whether the failure to recommend a diversion in this case was

10     competent medical advice or was rather the product of a

11     business calculation is a major issue in dispute here.

12          So the documents the plaintiff now seeks, we believe

13     are directly probative of what MedAire's physicians and

14     communication specialists have done in other cases in which

15     passengers reported chest pain and cardiac symptoms, and those

16     documents will enable us to evaluate whether the MedAire

17     physicians involved in this case were motivated by medical

18     judgment or business pressure.

19          The patterns and its practices of following or failing

20     to follow sound medical decision-making are thus critical of

21     the plaintiff's claims in the case, and the MedAire intake and

22     diversion forms that its physicians and communication

23     specialists are supposed to complete, in which we seek, provide

24     insight into how MedAire physicians make medical decisions with

25     respect to in-flight medical treatment, including diversions.

1          What medical professions have done in the past, and

2  particularly what Drs. Reinhart and Monas have done in similar

3  situations in the past is relevant to whether their decision in

4  this case not to recommend diverting the flight was reasonable

5  medical advice.

6          And without MedAire's documents demonstrating how its

7  employees treated prior medical events, plaintiff can't

8  determine what its standard procedures were nor assess whether

9  those procedures were reasonable.

10          And because there's no formal manual or written

11  policy, plaintiff can only determine what the MedAire practices

12  are by reviewing the documents generated at the time of the

13  medical events themselves.

14          So, yes, the dispute, finally, Your Honor, is that

15  MedAire didn't provide plaintiff with all the factual documents

16  related to the 41 British Airways' cardiac events that are

17  promised under the compromised agreement, and that plaintiff

18  needs an entire quarter of factual information that is complete

19  in all respects, especially the intake sheets, which are the

20  most important document, so she can ascertain patterns of

21  behavior that will allow her to determine the MedAire standard

22  of care.

23          Plaintiff also believes she is entitled to examine the

24  factual reports pertaining to BA cardiac events, that's British

25  Airways, handled by Drs. Reinhart and Monas, so that she can

1    evaluate how those two doctors handled other in-flight cardiac

2    emergencies similar to that experienced by Mr. Baillie, and all

3    of these records fall within plaintiff's original request for

4    production of documents and should therefore be produced.

5            Thank you, Your Honor.

6            THE COURT:  Thank you.  Okay.  Let me hear from

7    Mr. Dangerfield or Mr. Thomson?

8            MR. DANGERFIELD:  Yes, this is Mr. Dangerfield, Your

9    Honor.

10           Let me start towards the end of Mr. Spragg's comments,

11   and then I am going to go back to the first.  Because what we

12   need to put in perspective here is what is really at issue in

13   the case.  But let me first comment on where we stand now.

14           Our most recent meet and confer took place on October

15   the 8th, not too long ago.  And that -- at that conference, the

16   plaintiff's counsel for the first time suggested that they

17   wanted specifically 12 intake forms or intake forms relating to

18   12 incidents in which Dr. Reinhart and 12 incidents in which

19   Dr. Monas had been involved in a British Airways in-flight

20   emergency involving cardiac.

21           And actually, contrary to what Mr. Spragg said, they

22   said they would be -- that they would be willing to resolve the

23   dispute if we produce just those 24 intake forms, 12 relating

24   to Reinhart, 12 relating to Monas.  We considered that.  The

25   reason we ultimately declined to do it is simply this, Your

UNITED STATES DISTRICT COURT

1    Honor.

2          Every time we produce something to the plaintiffs, it

3    never ends the dispute, they simply ask for more.  And so we

4    needed at some point to draw the line or else the plaintiffs

5    would keep asking forever.  And that is the problem we have

6    here.

7          If you were to issue an order saying, defendants

8    please produce the intake forms relating to these 12 cardiac

9    incidents that Dr. Reinhart and Dr. Monas were involved in, and

10   that's the end of it, that's the end of this type of discovery

11   so we knew that it was done, we would be happy to comply with

12   that order.  Obviously we will comply with whatever order Your

13   Honor enters.

14         But the problem is, we have given thousands, tens of

15   thousands of pages of relevant -- of documents we don't even

16   think are relevant, but we have produced them as an

17   accommodation to the plaintiff and then only to get that

18   followed up by some other request.  So with that in mind now,

19   let me go back to the beginning so that I can --

20         THE COURT:  Let me interject.

21         MR. DANGERFIELD:  -- at least from the defendants'

22   perspective set the stage here.

23         Yes, Your Honor, you had a question?

24         THE COURT:  Yes.  I was going to say, you know, in

25   litigation, to a certain extent, Mr. Dangerfield, we always

1    know that sometimes you produce things and that leads to

2    additional other inquiries that people want to make, so I mean

3    that's -- it's hard to say if I say we are going to do this

4    this time and that's the end of it, what happens if those

5    documents that you produce lead us to other inquiries?

6          I mean, that's the hard thing about discovery and the

7    relevance issues.  Where do you start and where do you stop?

8    So it is sort of a floating standard in some respects.  But I

9    understand your point of view, I mean, in light of what you

10   have produced already.  So I understand your position, but how

11   do you address the issue that I am concerned about?

12          MR. DANGERFIELD:  Well, and that's certainly an issue,

13   Judge, and I will address that in the context of some of my

14   other comments.

15          THE COURT:  Okay.

16          MR. DANGERFIELD:  But basically what I am going to

17   suggest to you is that none of these documents really are

18   relevant.  They don't really bear on the real issue, number

19   one.  And number two, we are now past the -- I mean, written

20   discovery is over in this case, and so all of this -- all of

21   these discussions are related only to this request for

22   production number 22 and number 23, which I am going to address

23   in more specificity here in just a minute.

24          THE COURT:  Okay.

25          MR. DANGERFIELD:  But if I may, Your Honor, one of the

**UNITED STATES DISTRICT COURT**

1    issues that we need to focus on here is, what are the

2    plaintiffs actually trying to prove?  Mr. Spragg has suggested

3    they are trying to prove the reasonableness of MedAire's

4    conduct and whether it was motivated by medical or --

5              THE COURT:  Just a minute.  They are not trying to

6    prove the reasonableness of your conduct.  That's what you are

7    defending on.  They are trying to show --

8              MR. DANGERFIELD:  I am sorry.  You are correct.  I

9    misstated it.  You are correct.  I misspoke.  They are trying

10   to prove that our clients' conduct was unreasonable.

11             THE COURT:  Correct.

12             MR. DANGERFIELD:  But this is -- this is not a

13   standard -- this is not a typical standard of care medical

14   malpractice case, Your Honor.  It's brought under the Montreal

15   Convention, which has a specific standard of its own.

16             And what that standard is, is the following, according

17   to the case law, the Montreal Convention itself says that a

18   defendant will have liability for an accident on board the

19   aircraft that causes death or injury to someone.  That's the

20   word the convention uses is an "accident."

21             And our supreme court had interpreted that accident to

22   mean, an unusual or expected -- an unusual or unexpected event,

23   now that is external to the passenger.  So, for example, a

24   passenger who has a heart attack on a plane, that is not an

25   accident, nor, the case was made clear, is it an accident if

1   the passenger who suffers a heart attack as the plane is

2   continuing suffers the normal and expected reaction to a heart

3   attack.  None of that is an accident.

4          But the courts have said, though, Your Honor, is that

5   if a plaintiff can prove in some instances that the way the

6   airline handled a plaintiff's medical -- or a defendant's

7   medical emergency, to the extent that departed from industry

8   standards or perhaps from the airline's own internal standards,

9   then that might be evidence that bore on whether an accident

10  had occurred within the meaning of the Montreal Convention.

11         Now, keeping that in mind, the only -- the possible

12  relevance of the plaintiff's request can only be to try and

13  determine if MedAire in its actions, if their actions departed

14  either from industry standards or from MedAire's own internal

15  standards.

16         Now, when -- how do you prove internal standards?

17  Well, you do that through the written protocols and training

18  materials and through witness testimony.  You don't try and

19  prove that, and it wouldn't be valid proof, to prove here's how

20  the defendant handled a related incident on another day.

21         Let me give you an example, Your Honor.  Suppose that

22  a patient with chest pain came to the Good Sam emergency room

23  where Dr. Reinhart works and presented to him with chest pain

24  and eventually he died under Dr. Reinhart's care in the

25  emergency room.  And suppose further that the patient's family

1   then brought a lawsuit and alleged in part that Dr. Reinhart

2   had violated Good Sam's standards for emergency room

3   procedures.

4           Now, in that case, they probably wouldn't ask, but if

5   they did, you wouldn't allow discovery of the records of how

6   Dr. Reinhart handled a dozen or 100 other patients presenting

7   to the ER with chest pain.

8           What you would do and what the proper procedure would

9   be is you would allow discovery of Good Sam's written protocol,

10  you would allow discovery of depositions of people that worked

11  at the ER and about how their -- what those standards were and

12  how they worked and practiced.  That's how you prove that.

13          You wouldn't prove it by trying to get discovery of

14  every other, or 50 other or 15 other instances of how it

15  handled chest pains for other patients.  For one reason,

16  although every single incident would be different, every

17  medical incident is going to stand on its own.  So that's what

18  we are dealing with here.

19          And we have, MedAire has produced, as Mr. Spragg

20  indicated, we have produced the documents that involve

21  MedAire's written training materials and protocols.

22          Now, Mr. Spragg doesn't believe that they are adequate

23  or that they say very much, and he may be right on that, but

24  they say what they say and they have been produced.

25          And the plaintiffs are free to depose MedAire

1   witnesses and they, in fact, have started doing so, to ask them

2   about what protocol applied and how the protocol applied and

3   what the internal standards were.  That's the proper way to go

4   about that.

5           Now, despite that, Your Honor, many months ago, we

6   agreed as an accommodation, that we would produce to the

7   plaintiffs all of the reports that MedAire had made to British

8   Air regarding its in-flight medical incidents for the period of

9   2010 through 2014.

10          During that period, Your Honor, there were about

11  10,000 incidents, in-flight medical emergencies, that MedAire

12  handled for British Airways, and for each of those incidents --

13  and so that what we produced was about 25,000 pages of

14  documents.  And for each of those cases, there's a document

15  called a patch summary, which summarizes the incident.

16          And Mr. Spragg complained during his remarks that that

17  summary really doesn't tell you much.  Well, we take issue with

18  that.  That summary presents a lot of detail.  For example, I

19  have sitting in front of me the patch summary relating to the

20  flight in question here, flight 289.

21          It has the flight number.  The date of the flight.

22  The destination of the flight.  How many hours were remaining

23  in the flight at the time MedAire was called.  The name of the

24  doctor handling it.  The age and gender of the patient.

25          It lists the medical situation of the patient, a

1    description that comes right out of the written intake form.

2    It says, the flight attendant reported an adult passenger with

3    central chest pain and appearing pale.

4           Then there's a paragraph that summarizes the MedLink's

5    physician recommendation.  Dr. Reinhart verified the medical

6    concern, confirmed the passenger has no cardiac history, on no

7    medication, confirmed he took an aspirin three hours ago,

8    recommended to keep the passenger on oxygen -- I won't bore you

9    with the entire thing, but it is quite detailed.  And it's

10   details that are taken from the intake forms that Mr. Spragg

11   thinks they desperately need.

12          Now, there's one of those patch summaries, as I say,

13   for 10,000 incidents relating to British Airways, and we felt

14   when we produced those, that that would be -- even though we

15   didn't really believe they were pertinent to the dispute, they

16   were relatively easy to produce since we had already -- these

17   were not forms made obviously in response to this litigation,

18   these were ones MedAire made in the normal course of its

19   relations with British Airways.

20          That's part of its protocol is to prepare a little

21   summary at the time, shortly after the incident, and we produce

22   them -- we give them to British Air.  And they have all of

23   those.

24          So when we got into further discussions, as I say,

25   that didn't satisfy them.  They determined that they wanted

1    some additional forms.

2            And after some negotiation, as Mr. Spragg accurately

3    described, MedAire agreed to produce the -- some other

4    documents related to the first quarter of 2012 incidents.  And

5    those other documents were the written intake form, the

6    computer data that the MedAire communication specialist inputs

7    into the computer at the same time as the call is going on, and

8    also the recording of the actual audio.

9            So that audio, we call it a phone patch, so it is an

10   audio recording of the phone patch, and that records everything

11   that was said.  Every bit of information that was exchanged

12   between MedAire and British Air is on those audio patches.  We

13   agreed that we would produce those, and we did.

14           Now, when we got around to producing them, MedAire

15   discovered that -- MedAire only retained -- as can you

16   appreciate, Your Honor, these are -- there are thousands and

17   thousands of these that MedAire has and keeps.

18           Just for your knowledge, MedAire handles about 25,000

19   cases every year of in-flight medical emergency.  In other

20   words, not just British Airways, but many other airlines as

21   well, 25,000 cases.  So they try to retain, not the originals,

22   but digital copies of all of the intake forms.  As it turned

23   out, there were nine of these written intake forms that no

24   longer existed for reasons no one can explain.  The digital

25   file had been corrupted or was just missing.

1          By the way, there's no indication that there was some

2     funny business here because none of the incidents were of any

3     significance as it relates to the issues in this lawsuit, but

4     they just weren't there.

5          So we produced the 31 sets of computer data, and the

6     31 audio patches, and we produced 22 -- yeah, if I have done

7     the math right, 22, the intake forms, all the ones we had.

8          Now, just so you are clear, Your Honor, the intake

9     forms that are missing, those nine, they couldn't possibly have

10    any additional information more than what's on the audio

11    patches, because every bit of information that a communication

12    specialist writes down can only come from that source.

13         He or she has no other -- there is no other source.

14    So the patch, the audio patch is a complete record of every

15    piece of information exchanged between British Airways and

16    MedAire, and all of that we produced.

17         Plaintiff complained though after that we had not

18    produced the nine intake forms, and then they didn't ask for

19    another nine intake forms, they asked for a whole other quarter

20    of intake forms -- not of intake forms.  They asked for a whole

21    additional quarter of documents.  So the intake forms, the

22    audio patches, the computer data.

23         And keeping in mind our view that none of this is

24    really pertinent to this dispute and all it does is focus on

25    incidents -- what it does when we produce them, is it requires

1    everyone to litigate a whole different incident, in effect.

2    Because then people have to evaluate when MedAire carried out

3    its procedures in this different incident, in that case, was it

4    operating according to its standards or was there some

5    violation of its standards there?

6           And why did MedAire do this as it relates to this

7    passenger when it didn't do that in relation to this passenger?

8    It simply gets them to a whole different set of issues that

9    aren't the core issues or even the issue of this case.

10          The issues in this case really are, did MedAire

11   violate some standards by not recommending that flight 289

12   divert on March 23rd, 2012?  And we produced -- there's no

13   disagreement that we produced MedAire's written protocols and

14   procedures however limited they may be.

15          Mr. Spragg is quite correct, Your Honor, that MedAire

16   has no bright-line procedure for how a doctor should handle a

17   case and when he or she should recommend diversion, because

18   there can't be any such bright-line procedure.

19          When someone gets on an airplane, that is not an

20   emergency room.  There's no equipment on an airplane that the

21   doctor can, let's say, hook up someone to an EKG and

22   immediately test his heart.

23          Just to give you, in your mind's eye, Your Honor, so

24   you can appreciate this, a MedAire doctor is sitting on the

25   ground in an office and he gets -- what happens is he gets a

1    phone call from the pilot of the airplane.  The MedAire doctor

2    cannot only not see the passenger who is experiencing medical

3    issues, he can't talk to that passenger either.

4         Most of the time there's an on-board doctor who can

5    talk to the passenger and report to the captain or the cabin

6    crew or flight crew, but that doctor can't speak directly to

7    MedAire either, because nowadays no one can go -- the phone in

8    British Airways planes are only in the cockpit and no one is

9    allowed in the cockpit except the pilot and cabin crew members

10   at the invitation of the pilot.

11        So a MedAire doctor, the only thing he or she has to

12   go on are what a cabin crew member or a pilot says that he or

13   she saw in this patient and what symptoms they noticed that's

14   relayed to the doctor, and based on that, he gives advice --

15   not to the patient or the passenger, but to the airlines in the

16   form of the pilot.  And it is only the pilot who can make a

17   decision to divert.  Doctor can only recommend or not recommend

18   diversion.

19        So you can understand why there are not bright-line

20   procedures for when a doctor should recommend diversion, for

21   the simple reason that the doctor is operating on hearsay

22   evidence that is relayed to him from other people.  He has very

23   little ability to assess the medical condition of a passenger,

24   but nevertheless, the doctors can be helpful, but there can't

25   be any bright-line procedures for what they recommend or how

1    they do it.

2          THE COURT:  Well, I -- I appreciate your position,

3    Mr. Dangerfield, that no one can have a bright-line procedure

4    and the protocols may be a little vague and I am going to

5    gather somewhere down the road we are going to hear some

6    experts commenting on that theory.  And I know what your

7    position is, but it wouldn't be the first time I have had a

8    case where the experts on the other side would differ from your

9    opinion.

10          MR. DANGERFIELD:  Sure.  I am sure there will be

11   experts.  Actually that's part of what I am arguing, Your

12   Honor, is the way these types of standards are determined are

13   not by trying to get discovery at every other or many other

14   incidents where a passenger might have, let's say, chest pains.

15          THE COURT:  Well, I appreciate that, because

16   everything could be a little different, depends on when the

17   cardiac event takes place from regard to take off, where you

18   are over the Atlantic ocean or over the polar cap.  All of

19   those things come into play about how you treat someone.  The

20   question is, what, if any, is sort of a standard or floating

21   standard that the doctors must abide by.

22          I am sure I am going to hear that down the road, but I

23   would like you to stick to what it is that they are asking for

24   and your objections to it.  I mean, I think I understand your

25   point of view, but I want to make sure we don't just keep

1    expanding outward on these topics.

2         MR. DANGERFIELD:  Okay.  So let me sum up then, Your

3    Honor, just with a couple of comments.

4         THE COURT:  Yeah.

5         MR. DANGERFIELD:  First of all, they've asked for, as

6    I said, our October 8th conference, they asked, for the first

7    time, for the intake forms.  At that time they just asked for

8    the intake forms for 12 cardiac incidents involving British

9    Airways that were handled by Dr. Reinhart and 12 that were

10   handled by Dr. Monas.

11        Let me speak specifically to that for just a minute.

12   I did some checking.  Those are all -- whatever cardiac

13   incidents were handled by Dr. Monas or Dr. Reinhart are

14   recorded and included in the materials we have given them, the

15   patch summaries and the reports from MedAire to British Airways

16   that I was already describing earlier that includes from 2010

17   to 2014.

18        So the patch summaries involving those have been given

19   them.  We've done some more detailed work on those, Your Honor,

20   as it turns out, Dr. Monas hasn't handled 12 British Airways'

21   cardiac cases.  She came on board only at the end of 2011, and

22   based on our analysis of the documents, she has only handled

23   four cardiac incidents for British Airways since that time, so

24   we couldn't produce 12 because they don't exist.

25        Dr. Reinhart has handled, I believe, 16 incidents

1    since 2011 that involved British Airways and cardiac, so we

2    could produce 12 of the intake forms that he was involved with.

3    The intake forms are relatively easy to produce and locate if

4    they are there, because they are digitally maintained, and they

5    don't take too long to evaluate.

6           What's more troublesome and troubling, Your Honor, are

7    the audio patches.  And the reason for that is the audio

8    patches themselves are harder to locate and gather, but it is

9    doable.  But before they can be produced, they have to be

10    reviewed by MedAire, and they have to be redacted for

11    passengers' names, which are sometimes, but not always,

12    mentioned in the patches.

13           And once they are reviewed by MedAire and redacted for

14    passenger names and produced, now you have a new set of data

15    that any expert is going to have to spend time and the lawyers

16    are going to have to spend time reviewing and analyzing, even

17    if you don't believe they're particularly pertinent, and that

18    takes additional hours to do.

19           THE COURT:  Well, I appreciate that.

20           MR. DANGERFIELD:  Just to give you an example --

21    pardon?

22           THE COURT:  I appreciate when you say, well, now you

23    have gotten more information, we all have to review it because

24    too often the parties do dumps on each other of voluminous

25    information that no one ever looks at, and I just -- I see that

1      all the time.

2              So it has been my standard order in these cases, if

3      somebody produces whatever they do to the other side, the other

4      side has to designate an attorney to read and file with the

5      Court an affidavit they've read every single page that has been

6      produced, and that way it put a little starch into these

7      requests all the time of producing everything.

8              And I realize now people can do computer searches of

9      data and information, which cuts down on that, to find out if

10     there's anything in that computer data run that would indicate

11     that the subject they are looking for is pertinent.

12             But it is unbelievable the amount of documents that

13     are produced that are never, ever, ever, looked at, at great

14     expense to the parties and great angst to the parties, for no

15     reason.  I am the lone, I guess, person in the wilderness

16     trying to put an end of that kind of abusive practice.

17             MR. DANGERFIELD:  Well, and bear in mind, Your Honor,

18     the audio patches, they are not transcribed.  They are not

19     documents.  They are recordings.

20             THE COURT:  I know that.

21             MR. DANGERFIELD:  I just wanted to make that clear.

22             There is -- as you know, the discovery rules, although

23     Rule 26 allows discovery of anything that's relevant in

24     general, there's also a proportionality test --

25             THE COURT:  I understand that.

1          MR. DANGERFIELD:  And that proportionality test --

2          THE COURT:  I understand that.  I mean, I do

3   understand the rules, and, you know, I appreciate your comments

4   if you were talking to a first year class in Rule 26, but you

5   might give me a little credit that after 25 years I might know

6   that standard.

7          MR. DANGERFIELD:  I didn't mean to suggest you didn't,

8   Your Honor.  I was only underscoring it.

9          But in any event, so here we are.  We don't -- we

10  believe they have 25,000 pages of materials that aren't

11  particularly relevant that we have given them.  But they, to

12  the extent they want to know about the basic facts of a

13  particular British Airways' cardiac incident, they have those.

14         We have also produced to them, as we have explained,

15  the entire first quarter of 2012 set of documents that MedAire

16  has relating to cardiac incidents, and they're -- we can't

17  possibly produce 12 additional forms relating to Dr. Monas'

18  handling of cardiac incidents for BA because they don't exist.

19         And we are concerned that if we are ordered to produce

20  another quarter of documents for the second quarter of 2012,

21  that number one, they are not really pertinent.  It simply

22  wastes additional time, and it will take additional time to

23  prepare and produce, and it will likely lead to -- to plaintiff

24  simply asking for more documents, as always happens whenever we

25  produce something, however marginally or completely irrelevant

1    it may be.

2            THE COURT:  Okay.  Do you have any brief remarks in

3    response, Mr. Spragg?  They must be brief, please.

4            MR. SPRAGG:  All right, sir.  Your Honor, just a

5    couple of quick remarks.  First of all, the Montreal Convention

6    standard that Mr. Dangerfield has described is exactly the

7    reason the plaintiff seeks these documents.

8            The reports that he is referring to, the summaries,

9    they are given to the airline clients for statistical purposes.

10   And if you look at the summary of Mr. Baillie's event, they

11   describe the medical situation very generally, adult passenger,

12   central chest pain, appearing pale.

13           But we know looking at the intake form and also

14   listening to the audios and reading the transcript, that there

15   was a lot more going on.  The pain was on a -- 5 on a scale of

16   10.  He had crackles in his lungs, which is indicative of

17   pulmonary edema.  He had low blood pressure, high pulse.  He

18   was sweating.

19           There was a number of other symptoms that were being

20   described.  These summaries do not contain really much in the

21   way of detail at all.  They are just very general and they are

22   categorized by very large descriptive words, vascular, cardiac,

23   things of that nature.

24           And we, at this point, are just seeking the factual

25   information pertaining to two groups.  One pertaining to the

1    British Airways' cardiac events handled by MedAire for the

2    second quarter of 2012, and the other, British Airways' cardiac

3    events, the factual information pertaining to those for both

4    Drs. Monas and Reinhart and it looks like there's only, or

5    sounds like there's only four for Dr. Monas.

6         So I think our request, the way that we have

7    compromised and whittled it down is very reasonable, and it

8    could be -- if I wanted to be unreasonable, which would be

9    foolish, I could go back to my original request, but I do

10   understand that that is a very broad request and that's why we

11   have tried to reach a compromise here.

12        And what we are seeking to replace the nine missing

13   intake forms, because we don't know what nine events they would

14   choose to replace those so we need more of a random sampling,

15   and we believe that that would be satisfied by just producing

16   the factual information pertaining to the cardiac events for BA

17   for the second quarter of 2012, and then specifically BA

18   cardiac events for Drs. Reinhart and Monas, and that's what we

19   are seeking, Your Honor.  Thank you.

20        THE COURT:  Thank you.  I have heard both sides now

21   and maybe -- let me make a couple of observations.  It should

22   be implicit in this.  One, let me ask a question, first.  Does

23   Montreal protocol and agreement, does that limit the damages in

24   a case?

25        MR. DANGERFIELD:  Your Honor, in regard to damages

1  under the Montreal Convention, the one area of damages that it

2  does prohibit are punitive damages.  There are no punitive

3  damages recoverable under Montreal, but Montreal doesn't set

4  forth specific elements of damages, what it is is a

5  pass-through that looks to the local law to fill in that gap as

6  to what damages are recoverable by a victim's family.

7  THE COURT:  Okay.  That's what I wanted to know.  We

8  all know that things that are produced, while they may have

9  some relevancy issue to discovery, that does not ipso facto

10 make them admissible in the case, and, therefore, that's an

11 interesting issue that I get into all the time.  Everybody

12 thinks if we have to disclose something, therefore it is

13 admissible, and it is not.

14 The other issues is that, Mr. Dangerfield, I would

15 assure you that when you suggested early on that if I would

16 please order you to produce something -- the orders don't read

17 that way, as you are probably aware.  If I order you to do

18 something, the word please will not be in there.

19 I want you to understand that's just the way it is.

20 This is not -- we want to be courteous and polite, but if you

21 are ordered to do something, it is "you will do," in case your

22 client doesn't do it, then we will have other discussions.

23 But I have heard what everyone has to say, and it

24 seems to me that what is the issue in this case is what

25 happened on that flight at this time.  And right now, given the

1  volume of cardiac incidents in all airlines and including

2  British Airways, it is more significant than I think what most

3  travelers could possibly imagine.

4      And there's a lot of different ways to handle this,

5  depending on if it's a national flight, an international

6  flight, the routes that are being taken, where it occurs, how

7  articulate the crew may be in expressing the concerns of what

8  they've observed and what's being told to the doctors on the

9  ground.  It is case specific.

10      Now, the incidents of the first quarter of the year of

11  2012, I think those are the 12 incidents we were talking about,

12  some of which Dr. Monas was involved in but there's only nine

13  of his available and there's 12 as it relates to Dr. Reinhart.

14      Those are the most relevant portions, and I am not

15  even sure those would be admissible or -- for someone to look

16  at because it is their activities, and -- because then you

17  might start opening up the issues of their care at, let's say,

18  whatever hospital they are involved with in Arizona, whether it

19  is Banner, Good Sam, or whoever, or whether they have ever been

20  sued for negligence or malpractice in the state of Arizona.  We

21  may get into that at some point, I don't know.

22      But those are the 12 that -- the 12 that you have and

23  the nine that you have.  You can do both the intake sheets, add

24  the audio recordings for those because in proportionality they

25  are not abusive to produce that.

1          I find that the other years that you have asked for

2     and the other time lines that you started out with, Mr. Spragg,

3     I think are outside and a little bit -- they are on the

4     unreasonable side and therefore, at this juncture, at this

5     time, we are going to limit ourselves to those 12 incidents

6     that occurred in the first, I think, it was the first quarter

7     of the year, is that correct, or was it the first month of the

8     year?  I mean, the first month of the month of March?

9          MR. DANGERFIELD:  Your Honor, the request -- the

10     original request that the parties had agreed on was for the

11     British Airways' cardiac events for the first quarter of 2012.

12     There were nine intake forms missing from that so then

13     plaintiff requested the factual documents for the second

14     quarter of 2012, and all these relate to British Airways'

15     cardiac events.

16          And then -- I understand that, Your Honor, I am just

17     trying to make sure we are all on the same page.  Then the

18     other request pertains specifically to Drs. Monas and Reinhart

19     and their involvement in British Airways' cardiac events, and

20     we would ask for 12 each for both of those doctors.

21          THE COURT:  And that's what we are going to deal with

22     because those are the ones being sued.  Because you can't have

23     trials within trials.  Because even if an expert were to come

24     in and say, well, there was one in the first quarter of the

25     year and the second quarter of the year and under these

1    circumstances -- you can't compare those and draw any

2    conclusions from that.

3            Because I agree with Mr. Dangerfield on this issue,

4    and that is, each one is unique to what goes on in the midair

5    situation, and, therefore, you get the ones that are -- the

6    intake sheets from the first quarter of the year and you get

7    the patches and the intake sheets for both Dr. Monas and

8    Dr. Reinhart for their activities during that time frame for

9    the 12, and then I guess there's less than that for Dr. Monas.

10   So that's what we have.  That's what is being ordered to

11   produce, and we will stand at recess at this time.

12           Thank you very much.

13           MR. DANGERFIELD:  Thank you very much, Your Honor.

14           MR. SPRAGG:  Thank you.

15        (Court adjourned at 11:59 a.m.)

16

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T E**

2

3         I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6         I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11        DATED at Phoenix, Arizona, this 12th day of November,

12   2015.

13

14                                    s/Elva Cruz-Lauer
                                 Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT