Mark C. Dangerfield (Bar No. 010832)
Wm. Charles Thomson (Bar No. 004269)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:    (602) 530-8500
E-mails: mark.dangerfield@gknet.com
         wct@gknet.com
Attorneys for Defendants MedAire, Inc., Steven
Joe Reinhart, D.O., and Jessica Monas, M.D.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>MEDAIRE, INC.; STEVEN JOE REINHART, D.O.; and JESSICA MONAS, M.D.,<br><br>Defendants. | No. 2:14-cv-00420-PHX-SMM<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Oral Argument Requested) |

Defendants move for summary judgment, supported by the accompanying Statement of Facts ("SOF") and referenced exhibits.

This case concerns whether the Defendants are responsible for the death of James Baillie, who died of injuries stemming from a massive heart attack that occurred on March 23, 2012 as he was rushing to board British Airways Flight 289 from London to Phoenix. Defendants were not consulted until four hours later. SOF ¶29.

Liability for events on international flights is controlled by Article 17.1 of what is commonly called the Montreal Convention.[1] To recover under that article, Plaintiff must prove: (1) that the Defendants were responsible for an "accident" on board the plane, and

---

[1] Convention for the Unification of Certain Rules for International Carriage by Air, Done at Montreal on 28 May 1999, ICAO Doc. No. 9750 (entered into force Nov. 4, 2003), *reprinted in* S. Treaty Doc. No. 106-45, 1999 WL 33292734. Copy attached at SOF Ex. 1.

that (2) the accident "caused" the death of Mr. Baillie. As interpreted by the Supreme Court, an "accident" is "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405 (1985).

On the undisputed facts here, however, Plaintiff can't prove either that the Defendants caused an "accident" or that the alleged accident caused Mr. Baillie's death.

## SUMMARY OF ARGUMENT

Mr. Baillie's problems surfaced on March 23, 2012, when he suffered chest pains and shortness of breath as he was rushing in London Heathrow airport to board British Airways ("BA") Flight 289. SOF ¶1. Though Baillie didn't know it, he had just suffered a serious heart attack that completely blocked a major coronary artery. SOF ¶¶2, 5. Due to its high mortality rate, this type of heart attack is known as "the widow maker." *Id.*

Defendant MedAire arranges for emergency physicians, such as Drs. Reinhart and Monas, to give remote medical advice to airlines dealing with an ill or injured passenger. SOF ¶¶12-13. Plaintiff's theory is that the "unexpected or unusual event" constituting the "accident" in this case was the failure of Drs. Reinhart and Monas to have recommended that BA 289 divert to an earlier landing to get quicker aid for Mr. Baillie. First Amd. Comp., ¶¶16, 30-31 (Dkt. 45). But under Ninth Circuit law, mere inaction is not an "event" unless it involves either a failure to heed a specific health-based request, or a failure "to comply with mandatory regulatory requirements." *Aziz v. Air India Ltd.*, 658 F.Supp.2d 1144, 1150 (C.D. Cal. 2009).

And even if the alleged failure to recommend diversion were an "event," Plaintiff offers no facts showing that Defendants acted in an "unusual or unexpected" manner. While Plaintiff does offer opinions from a cardiologist alleging that the Defendants fell below the medical standard of care, an allegation that a defendant didn't respond adequately "in a medical sense," can "not form the basis of a claim under the Montreal Convention." *Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F.Supp.3d 436 (E.D.N.Y. 2014). Indeed, under the Convention, "[q]uestions of negligence are not implicated or even relevant…." *Aziz,* 658 F. Supp. 2d at 1148. Rather, Plaintiff must offer

2

"evidence to raise a genuine issue of material fact as to whether there was either a clear industry standard or an airline policy at the time regarding" the alleged failure to act. *Rodriguez v. Ansett Australia Ltd.,* 383 F.3d 914, 918 (9th Cir. 2004) (affirming summary judgment in alleged failure to warn of DVT case). Plaintiff hasn't done so here.

In addition, medical studies accepted by Plaintiff's medical expert show that, by the time Dr. Reinhart was first consulted—four hours after the onset of Mr. Baillie's symptoms and two hours distant from any location with medical facilities needed to treat a heart attack—it was too late to salvage the heart muscle perfused by the blocked artery. SOF ¶¶ 7-11; 36. Such studies show that, after about six hours from the onset of symptoms, the benefits of opening the artery don't change with the passage of additional time, because essentially all of the salvageable heart muscle has been lost. SOF ¶ 9. And Dr. Monas wasn't contacted until nearly eight hours after the onset of Mr. Baillie's symptoms. SOF ¶38,

Hence, Plaintiff's own medical expert could not opine that Mr. Baillie would have survived but for Defendants' actions. SOF ¶51.

In short, as a matter of law, Plaintiff can't carry her burden of proving either an "accident" on board the plane, or that the alleged accident "caused" Mr. Baillie's death. The sad fact is that Mr. Baillie died from a serious heart attack brought on by the leading cause of death in both America and the world: coronary artery disease. The Court should thus grant summary judgment to all Defendants in this case.

## FACTUAL BACKGROUND

Although the parties dispute many things, the following basic facts are undisputed:

### A. Background on Defendant MedAire's MedLink Service.

MedAire, through its "MedLink" service, arranges for remote medical advice to be given to airlines dealing with passengers with medical problems. SOF ¶12. MedAire contracts with non-party Emergency Professional Services ("EPS") to supply physicians trained in emergency medicine to give such advice. SOF ¶13. If an airline desires help in dealing with an ill or injured passenger, the pilot can call the MedLink call center in

Phoenix, and a MedAire "Communications Specialist Executive," or "CSE" will connect the airline with an EPS emergency physician. SOF ¶¶14-15. The MedLink physician will speak to the aircraft through a ground to aircraft "phone patch" SOF ¶13. Typically, as was true in this case, the physician is not able to see or speak with the ill passenger. SOF ¶13. Because of that, and due to the lack of medical equipment and facilities on an airplane, the MedLink physician usually cannot diagnose or treat an illness, but based on his or her training and experience, the physician may suggest ways to deal with the passenger's symptoms. *Id.*

In some circumstances, the physician may recommend that the flight divert to an earlier landing so the ill or injured passenger can receive critically necessary emergency treatment. SOF ¶18. There are no industry or MedAire standards, however, stating either when an airline should divert to get emergency help for an ill passenger, or when a physician providing remote medical advice should recommend such a diversion. SOF ¶¶19-20. For its part, MedAire only suggests to EPS physicians things they may consider when evaluating diversion. SOF ¶¶21-22. But diversion recommendations are left to the clinical judgment of the individual physician. SOF ¶¶20, 22.

Though a MedLink physician may recommend diversion, only the pilot can decide whether to actually divert to a different airport. SOF ¶18. And as an article in the New England Journal of Medicine noted, a decision to divert is complicated:

> Unscheduled landings for medical purposes are a serious problem for commercial air carriers. Delays in reaching the final destination, inconvenience to passengers, added costs, and increased risks to safety make the decisions about diverting an aircraft complex and difficult.

SOF ¶23. Some of the difficulties inherent in a decision to divert are discussed in *Singh v. Caribbean Airlines Ltd.,* 49 F.Supp.3d 1108, 1112-1114 (S.D. Florida 2014)

MedAire statistics show that, overall, less than 2.5% of aircraft experiencing an inflight medical incident divert to an unscheduled airport, and less than 8% of flights involving passengers with chest pain result in a diversion. SOF ¶24.

4

**B.    Mr. Baillie's Heart Attack and BA Flight 289.**

On March 23, 2012, Plaintiff's husband James Baillie developed chest pain and shortness of breath while rushing to catch BA 289, a non-stop British Airways flight from London to Phoenix. SOF ¶1. He nevertheless boarded the Boeing 747 plane at 14:54 Universal Coordinated Time or "UTC,"[2] one of 335 passengers on the flight. SOF ¶25.

Before takeoff, at 15:30, Baillie took some aspirin, concerned he might be suffering a heart attack. SOF ¶27. The plane took off a little later, at 15:46 UTC. *Id.*

Not until 18:45, however—as the plane was over the North Atlantic Ocean near Greenland—did one of the three pilots call the MedLink service on the cockpit satellite phone. SOF ¶28. EPS physician Dr. Steven Reinhart first joined the call at 18:50, approximately four hours after the onset of Mr. Baillie's symptoms. SOF ¶29. Dr. Reinhart is board-certified in emergency medicine, and had been providing remote medical advice to airlines through the MedLink service for more than 25 years. SOF ¶17.

In that first phone call or satellite "patch," Dr. Reinhart was told there was a 61-year old male passenger who was pale and had central chest pain, but who had no cardiac history and was on no medications. SOF ¶29. Dr. Reinhart then asked the crew to see if there was an onboard doctor who could evaluate the passenger. SOF ¶30.

As Plaintiff's medical expert agreed, the symptoms Dr. Reinhart was advised of were consistent with many medical problems: one possibility might be a heart attack, but one could not conclude that Mr. Baillie was likely having a heart attack based on those symptoms. SOF ¶30. And Plaintiff's expert does not believe Dr. Reinhart should have recommended diversion at the end of this first satellite patch. *Id.*

At 19:12, the pilot called Dr. Reinhart back ("Repatch #1"), and Reinhart was told that an onboard doctor had examined the ill passenger, that his blood pressure was 100/70, his pulse 100, and that he had a "crackle" on his left side. SOF ¶33. The onboard doctor, however, had "no suggestions" for what might be going on. SOF ¶35.

---

[2] "UTC" is the successor to what used to be called Greenwich Mean Time or GMT, and is the 24-hour time standard used worldwide. It is also known as "Zulu Time."

5

1      In deciding whether or not to recommend diversion, MedAire physicians should, and do, take into account the location of the closest acceptable diversion point. SOF ¶36. When that point is more than one hour of flight time away, and it is not clear what is wrong with passenger, the physician will likely not recommend diversion because a lot of things can change in an hour or two. SOF ¶37. And at the time of Repatch #1, it would have taken two hours to land at the closest airport that was near a medical center with a heart catheterization laboratory—the needed facility for someone who might be having a heart attack. *Id.*

       Dr. Reinhart thus recommended that the crew continue providing the ill passenger with supplemental oxygen and suggested that the flight could continue on toward Phoenix, but recommended that an onboard doctor monitor the passenger every 15 to 30 minutes. SOF ¶38. If the ill passenger's condition appeared to deteriorate, Dr. Reinhart advised that the flight should call back and that they would need to consider diverting the plane at that point. *Id.*

       Despite Dr. Reinhart's recommendation, the onboard doctor did not monitor the passenger every 15 to 30 minutes. SOF ¶39. About three hours after the end of Repatch #1, though, one of the BA pilots called MedLink back to seek additional advice. SOF ¶40. By this time, Dr. Reinhart had gone off shift, and the BA pilot was put on the phone with Defendant Dr. Monas. *Id.* In two separate satellite patches, the pilot and a crew member gave Dr. Monas some information about the ill passenger and responded to Dr. Monas' questions. SOF ¶40-41. During the first of these two satellite patches, the pilot told Dr. Monas that an onboard physician had observed that the ill passenger looked considerably worse, and had recommended that the passenger be checked again in thirty minutes and "at that time we might consider making a diversion." SOF ¶40. The pilot then said he wanted to get Dr. Monas's "take" on that. *Id.*

       After asking some questions and learning additional information, Dr. Monas asked to speak directly with the onboard physician but was told she could not, for security reasons. SOF ¶41. Dr. Monas then said that "obviously we are here, you guys are in the

1  air and evaluating the patient," so "if you feel the patient is not looking well, and that uh
2  that we need to divert we can start to take a look at diversion locations." SOF ¶41. Dr.
3  Monas also suggested that the passenger be lying down and on oxygen, and "in the
4  meantime we'll take a look at some diversion locations if you guys feel he is uh
5  concerning at this time." SOF ¶41.

6  The pilot agreed: "Yeah ok." SOF ¶42. Thereupon, the MedAire CSE immediately
7  patched BA's London-based Operations Control Center into the conversation. SOF ¶42.
8  The BA pilot told BA Operations Control that he had already let someone else at BA
9  Operations Control know that there was "a possibility of a diversion," and they were
10 going to get an update from the doctor onboard in the next "ten minutes or so," and would
11 then let them know "what our decision is if we do have to divert." SOF ¶42. At that point,
12 the pilot said, Chicago would be the closest diversion location. *Id.*

13 The MedAire CSE then told the pilot that he would go ahead and call Chicago to
14 let them know of the possibility of diversion. SOF ¶42. The CSE also asked the pilot to
15 keep MedAire "updated," and "if you have an update please do call us right back, we'll
16 bring Dr. Monas back on the line." *Id.*

17 That was the last conversation between BA 289 and MedAire. SOF ¶43. Later,
18 though, the BA 289 pilots were advised that Baillie didn't want to divert, and that two
19 onboard doctors had given their opinion that it would not worsen Baillie's condition to
20 continue on to Phoenix. SOF ¶44. Based on that, the pilot decided not to divert the plane
21 to an alternate airport, though the pilot didn't call MedAire regarding this information. *Id.*

22 Following the last repatch, MedAire CSEs followed up with BA Ops Control in
23 multiple calls to determine whether the plane was diverting. SOF ¶43. When a CSE
24 learned from BA Ops that the plane wasn't diverting, the CSE called Phoenix to confirm
25 that EMTs would meet BA 289 upon landing. SOF ¶45.

26 Upon landing, EMTs took Mr. Baillie in an ambulance directly to St. Luke's
27 Medical Center. SOF ¶46. An EKG administered by the EMT's in the ambulance showed
28 that he was suffering from a serious heart attack known as an ST elevation myocardial

infarction, or "STEMI." SOF ¶46. According to the official guidelines for dealing with a STEMI, published jointly by the American College of Cardiology and the American Heart Association: "One third of patients who experience STEMI will die within 24 hours of the onset of ischemia, and many of the survivors will suffer significant morbidity." SOF ¶4.

In light of the STEMI diagnosis, Mr. Baillie was taken emergently to St. Luke's heart catheterization lab, where Dr. Candipan performed an angiogram which showed the complete blockage of Mr. Baillie's lateral anterior descending coronary artery ("LAD"). SOF ¶48. Dr. Candipan then opened the occluded artery and inserted three stents to keep it open. SOF ¶52. Significantly, by the time Mr. Baillie's occluded artery had been opened, just over two hours had elapsed after BA 289 landed in Phoenix. *Id.*

However, the angioplasty and stents only restored partial blood-flow through Mr. Baillie's LAD, and he remained in cardiogenic shock with an extremely low left ventricle ejection fraction. SOF ¶53. According to Plaintiff's expert, cardiogenic shock is a "very serious" condition with a high mortality rate. SOF ¶49. Mr. Baillie also had other coronary arteries that were seriously narrowed, but not totally blocked. SOF ¶48. Those arteries would also need to be taken care of as well, but Dr. Candipan decided to address the completely blocked LAD first. SOF ¶52.

Dr. Candipan felt that Mr. Baillie's heart was "in serious shape" and he was "not sure that it's going to sustain him." SOF ¶53. So on March 30 he arranged for Mr. Baillie to be transferred to the Mayo Clinic for possible evaluation for a heart transplant, if needed. *Id.* The Mayo Clinic eventually installed a total artificial heart in Mr. Baillie, but he thereafter suffered a series of small strokes. SOF ¶54. On July 1, 2012, the family thus elected to disconnect the artificial heart and allow Mr. Baillie to expire. SOF ¶55.

Mr. Baillie's official death certificate, prepared by one of the Mayo Clinic doctors who had attended him, identifies the immediate cause of his death as a "cerebral vascular accident"—the strokes—within a time interval of "days," due to or as a cause of a "myocardial infarction" within a time interval of "weeks," due to or as a consequence of "coronary artery disease" in existence for "years." SOF ¶56.

**ARGUMENT**

**I.     LIABILITY UNDER THE MONTREAL CONVENTION.**

The Montreal Convention (the "Convention") is an international treaty governing international flights. "Although designed to replace the Warsaw Convention, the Montreal Convention incorporates many of its substantive provisions." *Narayanan v. British Airways*, 747 F.3d 1125, 1127, n. 2 (9th Cir. 2014). Hence, "in interpreting the Montreal Convention, courts have routinely relied upon Warsaw Convention precedent where the equivalent provision in the Montreal Convention is substantively the same." *Id.*

Plaintiff's cause of action is based on Convention Article 17.1 (emphasis added):

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that *the accident which caused the death or injury* took place on board the aircraft or in the course of any of the operations of embarking or disembarking.[3]

Significantly, this clause requires "an inquiry into the nature of the event which *caused* the injury rather than the care taken by the airline to avert the injury." *Air France v. Saks,* 470 U.S. 392, 407 (1985) (emphasis in original). "It is," the Court said, the "*cause* of the injury that must satisfy the definition [of accident] rather than the occurrence of the injury alone." *Id.* at 399 (emphasis in original). Plaintiff's burden here, therefore, is to prove that it was a subsequent "accident"—not Mr. Baillie's initial heart attack—that caused his death three months after boarding BA 289. *See e.g. Rajcooar v. Air India, Ltd.,* 89 F.Supp.2d 324, 328 (E.D.N.Y. 2000) (holding that a heart attack is not "external to the passenger," so it is not an "accident" under the Convention.)

The Supreme Court interprets "accident" in Art. 17 to mean: "an *unexpected or unusual event* or happening that is external to the passenger. *Air France v. Saks*, 470 U.S. 392, 405 (1985) (emphasis added). Thus, "when the injury indisputably results from the

---

[3] By its terms, the Convention applies to "air carriers," but courts have construed that term to include those, such as MedAire, whose services are "in furtherance of the contract of carriage." *McCaskey v. Continental Airlines, Inc*., 159 F. Supp.2d 562, 580 (S.D. Tex. 2001) (finding MedAire's remote medical services were covered by the Convention).

9

passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Id.* 470 U.S. at 406 (finding no liability when a passenger became deaf due to normal pressure changes in an aircraft).

The Supreme Court has declined to adopt a "negligence-based approach" for determining whether conduct was "unexpected or unusual." *Olympic Airways v. Husain,* 540 U.S. 644, 657 (2004); *accord Sook Jung Lee v. Korean Air Lines Co., LTD,* 2012 WL 1076269, *6 (C.D. Calif. 2012). Hence, "[q]uestions of negligence are not implicated or even relevant"; instead, a plaintiff "must show that the asserted act or omission was unexpected or an unusual event, that was external to [the decedent], and that actually caused his death." *Aziz v. Air India Ltd.,* 658 F. Supp. 2d 1144 (C.D. Cal. 2009); *cf. Blansett v. Continental Airlines, Inc.,* 379 F.3d 177, 181 (5th Cir. 2004) (finding that the district court erred in considering whether the defendant's conduct was "unreasonable").[4]

When, as here, a defendant's alleged failure is mere inaction, Ninth Circuit cases first examine whether that inaction constituted an "event," and if so, whether the "event" was "unexpected or unusual." *E.g. Caman v. Continental Airlines, Inc.,* 455 F.3d 1087, 1092 (9th Cir. 2006). And a defendant's alleged *inaction*—such as the failure to recommend that BA 289 divert to an earlier landing—can only constitute an "event" if it involved either a refusal to abide by "specific, health-based requests for help," or a "refusal to comply with mandatory regulatory requirements." *Aziz v. Air India Ltd.,* 658 F. Supp.2d 1144, 1149-1150 (C. D. Calif. 2009).

Finally, to prove that an "event" was "unexpected or unusual," a plaintiff must at a minimum offer evidence of "either a clear industry standard or an airline policy at the time regarding" the failure in question. *Rodriguez v. Ansett Australia Ltd.,* 383 F.3d 914,

---

[4] Prior to the Supreme Court's decision in *Husain*, in which it declined to adopt a negligence standard, the Ninth Circuit arguably used such a standard in evaluating whether an "accident" occurred. But since then courts in the Ninth Circuit have not done so.

10

918 (9th Cir. 2004) (affirming summary judgment for failure to supply such).[5]

In *Caman v. Continental Airlines, Inc.*, 455 F.3d 1087, 1092 (9th Cir. 2006), for example, the court held that the airline's mere failure to warn a passenger about the risk of deep-veined thrombosis ("DVT") was not an "event" because it was merely an act of "omission"; it was "inaction that idly allows an unfolding series of events to reach their natural conclusion."

## II. THE MATERIAL FACTS DON'T PROVE THAT THE DEFENDANTS' ACTIONS CONSTITUTED AN "ACCIDENT."

### A. The Defendant's Decision Not to Recommend Diversion Was Not an "Event," and Hence Was Not an "Accident" Under the Convention.

Plaintiff alleges that the accident in this case was the Defendants' failure to recommend that BA 289 divert to an earlier landing to get medical help for Mr. Baillie. But under the just-discussed Ninth Circuit cases, that inaction would not constitute an "event" unless it was the rejection of a specific request for help, or a failure to follow a regulatory requirement. Here, it is undisputed that no applicable regulation governs when an aircraft must divert due to an ill passenger. It is also undisputed that neither Mr. Baillie nor anyone else asked that BA 289 divert to an earlier landing, so the Defendants' alleged failure to recommend such was not an "event." *See, e.g. Caman*, 455 F.3d at 1092; *cf. Aziz,* 658 F. Supp.2d at 1151 (finding no "event" because there was no evidence of a request for an AED being made).

In fact, Dr. Reinhart t himself recommended that, if Mr. Baillie's condition worsened, then the pilot would need to consider a diversion, SOF ¶38, but Mr. Baillie, when advised that the pilot was considering a diversion, asked that the plane land in Phoenix and not divert. SOF ¶44. And when Dr. Monas suggested MedAire look for diversion airports and notify such of a possible diversion, the pilot agreed and MedAire did so. SOF ¶¶41-42.

Contrast these facts with those in *Olympic Airlines v. Husain, supra.* There, the

---

[5] The Ninth Circuit has left open the question of whether, if a plaintiff produced evidence of a "clear industry standard" or internal "policy," that would suffice to show action that was "unexpected or unusual." *Id.*

passenger specifically requested that he be reseated, and the flight attendant refused to do so. The Court held that the "rejection of an explicit request for assistance" was an "event." 540 U.S. at 655. Likewise, in *Prescod v. AMR Inc.,* 383 F.3d 861, 868 (9th Cir. 2004), the defendant's "failure to comply with a healthbased request to ensure that [decedent's] bag travel with her was an 'event.'"

By contrast, in *Sook Jung Lee, supra,* the only specific request was the onboard doctor's request that the passenger receive specialized care within six hours, and the airline satisfied that request. Other alleged inaction by the crew was not an "event."

### B. Even If the Alleged Failure to Recommend Diversion Was an "Event," It Was Not "Unexpected or Unusual."

Even if Plaintiff could prove that the failure to recommend diversion in these circumstances was an "event," she has no evidence of any "unexpected or unusual" conduct by the Defendants that contributed to Mr. Baillie's death, as required to prove liability under the Convention.

Plaintiff will apparently contend that the opinion of her medical expert, Dr. Candipan, supplies such evidence, because Dr. Candipan thinks Drs. Reinhart and Monas acted in an "unusual and unexpected" manner by failing to sooner recommend diversion. But such an opinion has no evidential value, for at least two reasons.

First, Dr. Candipan admits that he is not an expert either in emergency medicine or in providing remote advice to airlines. SOF ¶47. Hence, he is not qualified to offer opinions on when an alleged failure to recommend that an aircraft divert is "unexpected or unusual."

Second, to prove what is "unexpected or unusual," one would first need to show what was expected or usual; that is, what the governing standard is. *E.g. Twardowski v. American Airlines*, 535 F.3d 952, 961 (9th Cir. 2008) (affirming summary judgment; noting that the plaintiffs "present no substantial evidence of an industry standard with respect to warning about the risks of DVT"). But Dr. Candipan offers no opinion on that subject, and he has no basis for doing so:

12

|   |   |
|---|---|
| 1 | Q. Well, can we agree that you have no background or basis for assessing what typically happens when an emergency physician gives remote medical advice to an airline? |
| 2 | |
| 3 | A. (By Dr. Candipan): I have no experience. |
| 4 | Q. Okay. So to put it plainly, you don't – you can't say what typically happens when a MedLink physician gives remote medical advice to an airline, correct? |
| 5 | |
| 6 | A. No, I do not—or cannot. |
| 7 | Q. So when you say "unusual or unexpected," you're not talking about what's unusual or unexpected in terms of a physician giving remote medical advice to an airline, correct? |
| 8 | |
| 9 | Q. Because you have no experience in that? |
| 10 | A. Correct. |

SOF Ex. 35 at 23:10-24:4 (Dep. of Robert Candipan, omitting objections by counsel).

Courts in the Ninth Circuit have held that, to prove that an event was "unexpected or unusual," a Plaintiff must, at minimum, offer "evidence to raise a genuine issue of material fact as to whether there was either a clear industry standard or an airline policy at the time regarding" the action in question, and that such a standard was violated. *Rodriguez v. Ansett Australia Ltd.,* 383 F.3d 914, 918 (9th Cir. 2004) (affirming summary judgment in alleged failure to warn of DVT case). Plaintiff can't do so here, and thus can't sustain her burden of proof.

Moreover, as Defendants' experts have opined, there is no industry standard as to when an airline should divert to an unplanned location, no standard for when a company providing remote medical advice should recommend diversion, and no standard for when an emergency physician employed by such a company should recommend diversion. SOF ¶19. As one study noted: "The commercial aviation industry has no published uniform standard for responding to an in-flight medical event." P. Hicks, *Liability of Air Carriers for Failure to Divert During Inflight Medical Emergencies*, ¶ 35,351 at p. 22,273, Issues in Aviation Law and Policy, CCH (Sept. 2003).

Furthermore, Plaintiff's experts have not provided any conflicting testimony on these issues. Indeed, Dr. Candipan admitted that he was not "aware of any published

1  standards relating to the provision of remote medical advice to airlines." SOF ¶47.

2  In fact, while MedAire offers EPS physicians some thoughts on things to consider in deciding whether to recommend a diversion or not, MedAire leaves such recommendations to the individual clinical judgment of each physician. SOF ¶¶19-22. And in practice, more than 90% of the time, EPS physicians *do not* recommend that a plane divert when a passenger is experiencing chest pain. SOF ¶24.

### III.  PLAINTIFF CANNOT PROVE CAUSATION BECAUSE SHE OFFERS NO EXPERT TESTIMONY THAT, BUT FOR DEFENDANTS' ACTIONS, BAILLIE WOULD HAVE SURVIVED.

#### A.  Proof of Causation-in Fact Is an Essential Element of Plaintiff's Case.

A defendant can only be liable under Article 17 of the Convention when there is an accident that "caused" the death or injury of passenger, and courts analyzing the issue have interpreted the term "cause" to mean proximate cause. *E.g. Prescod v. AMR, Inc.,* 383 F.3d 861, 866 (9th Cir. 2004) (applying "regular proximate cause analysis" to determine whether defendants' seizure of plaintiff's medicine "was a significant contributing factor in her death"; *Langadionos v. Am. Airlines, Inc.,* 199 F.3d 68, 71 (1st Cir. 2000) (noting that the plaintiff would have to prove that "American's service of alcohol to the assailant was a proximate cause of his injury"; *Shah v. Pan Am. World Servs., Inc.,* 148 F.3d 84, 97 (2d Cir. 1998) (explaining that "Article 17 requires proximate causation as between the 'accident' and plaintiffs' 'damage'"). And though proximate cause normally presents an issue for the trier of fact, "where causation cannot reasonably be established under the facts alleged by a plaintiff, the question of proximate cause is one for the court." *Benefiel v. Exxon Corp.,* 859 F.2d 805 (9th Cir. 1992) (affirming dismissal for failure to establish causation).

That is the situation here, because the Plaintiff has offered no proof of "causation in fact," sometimes called "but-for" cause, and "[c]ausation in fact is one necessary element of proximate cause." *USAir Inc. v. U.S. Dept. of Navy*, 14 F.3d 1410, 1413 (9th Cir. 1994). "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct." Restatement (Third) of Torts, § 26.

### B.     <u>Plaintiff Can't Prove that Mr. Baillie Would Have Survived But-For Defendants' Conduct.</u>

Plaintiff can't meet her burden of proving by a preponderance of the evidence that—had the Defendants only sooner recommended that BA 289 divert—Mr. Baillie would have survived. Indeed, Plaintiff's medical expert specifically declined to say this, and rightfully so because he agreed with each of the following undisputed facts:

- Mr. Baillie's symptoms began as he was rushing to board BA 289 at 14:54 UTC. SOF Ex. 13 at ¶9 (6/6/14 Decl. of Dr. Candipan).

- We now know his symptoms were the result of a serious heart attack—a STEMI involving the LAD. SOF Ex. 25 at JDB-12284 (3/30/12 Discharge Summary by Dr. Candipan).

- MedAire wasn't even consulted until four hours later, SOF ¶ 29, when the flight was in the middle of the North Atlantic Ocean, two hours away from the nearest diversion point with adequate medical facilities. SOF Ex. 35 at 94:8-16 (7/27/16 Dr. Candipan dep.).

- Even if MedAire had promptly recommended diversion, and the pilot agreed, it would have therefore been approximately eight hours from the onset of Mr. Baillie's symptoms until the blockage of his LAD could have been cleared. SOF Ex. 35 at 94:8-95:12 (7/27/16 Baillie dep.).

- By that time, Mr. Baillie's heart *had already suffered* all the serious damage Dr. Candipan later found when he treated Mr. Baillie at St. Luke's. SOF Ex. 35 at 92:14-21 (7/27/16 Dr. Candipan dep).

Knowing the above, Dr. Candipan properly declined to opine that, had the flight diverted, Baillie would have likely survived:

> Q.     But I'm not asking for certainty. I'm just saying, you have not arrived at an opinion within a reasonable degree of medical probability that Mr. Baillie would have survived –
>
> A. (By Dr. Candipan):     No.
>
> Q.     -- had his artery had been opened between six and eight hours after the onset of his symptoms?

1         A.    the answer is no.

2 SOF Ex. 35 at 114:14-21 (7/27/16 Candipan Dep.).

3       Given accepted medical knowledge as to how quickly heart muscle dies, Dr. Candipan couldn't in good conscience answer "yes" to that question. All Dr. Candipan was able to say was that, in his opinion, Baillie would have had an (unquantified) "improved chance for survival." *Id.* at 113:9-25. But without quantification, this opinion is wholly speculative and immaterial; for example, it could mean a one-percent improved chance.

      **C.**    **The "Lost Chance" Theory Doesn't Apply Under the Convention.**

      Plaintiff may claim that Dr. Candipan's "improved chance for survival" testimony satisfies causation under Arizona's "lost chance" doctrine, but the Court should reject such a claim if made. It is true that Arizona, and some other states, have relaxed the causation standard in medical malpractice cases to allow evidence of a "lost chance" of survival to suffice for causation. *E.g. Thompson v. Sun City Community Hosp., Inc.* 141 Ariz. 597, 688 P.2d 605 (1984). But causation in this case is determined under the Convention, not local Arizona law.

      Furthermore, this is not a medical malpractice case; an allegation that a defendant didn't respond adequately "in a medical sense," can "not form the basis of a claim under the Montreal Convention." *Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F.Supp.3d 436 (E.D.N.Y. 2014); *cf. Aziz,* 658 F. Supp. 2d at 1148 (noting that, under the Convention, "[q]uestions of negligence are not implicated or even relevant….")

      In any event, we are not aware of a single case under the Convention that has adopted such a "lost chance" standard. And cases applying general federal common law have rejected it. *Bach v. Trident Steamship Co., Inc.*, 920 F.2d 322 (5th Cir. 1991), *vacated on other grounds by* 500 U.S. 949 (1991), for example, involved a river boat pilot who died from a heart attack on board a vessel. His survivors sued for negligence, alleging that the crew failed to administer CPR. But the medical evidence showed that the decedent "had no more than a fifteen percent chance of surviving even if the crew had rendered

16

CPR and electrical defibrillation had been available." 920 F.2d at 327.

Based on that, the Fifth Circuit held: "From this uncontradicted evidence, no rational factfinder could conclude that the crew's failure to administer CPR more likely than not caused Bach's death." The court also declined to adopt "the loss of a chance of survival doctrine," which it noted "has been confined to medical malpractice cases," and which would allow "plaintiffs who cannot meet the ordinary standards of causation" to recover anyway. *Id.*

## CONCLUSION

For the foregoing reasons, and because Plaintiff cannot meet her burden to prove either that an "accident" occurred, or that any such accident "caused" Mr. Baillie's death, the Court should grant summary judgment in favor of all Defendants.

RESPECTFULLY submitted this 16th day of September 2016.

GALLAGHER & KENNEDY, P.A.

By: /s/ *Mark C. Dangerfield*
Mark C. Dangerfield
Wm. Charles Thomson
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Attorneys for Defendants MedAire, Inc.;
Steven Joe Reinhart, D.O.; and Jessica
Monas, M.D.

# **CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of September 2016, a copy of the foregoing document was filed electronically via the Court's CM/ECF system and Notice of Electronic Filing served on all parties by operation of the Court's CM/ECF system.

Stephen M. Dichter, Esq.
Jeffrey O. Hutchins, Esq.
Christian Dichter & Sluga, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, AZ  85004
 sdichter@cdslawfirm.com
 jhutchins@cdslawfirm.com
*Attorneys for Plaintiff*

Francis G. Fleming, Esq.
Robert J. Spragg, Esq.
Kreindler & Kreindler LLP
750 Third Avenue
New York, NY  10017
 ffleming@kreindler.com
 rspragg@kreindler.com
*Attorneys for Plaintiff*

By: /s/ *Mark C. Dangerfield*

5564483/24709-0001