Mark C. Dangerfield (Bar No. 010832)
Wm. Charles Thomson (Bar No. 004269)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:    (602) 530-8500
E-mails: mark.dangerfield@gknet.com
         wct@gknet.com
Attorneys for Defendants MedAire, Inc., Steven
Joe Reinhart, D.O., and Jessica Monas, M.D.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>MEDAIRE, INC.; STEVEN JOE REINHART, D.O.; and JESSICA MONAS, M.D.,<br><br>Defendants. | No. 2:14-cv-00420-PHX-SMM<br><br>**DEFENDANTS' LOCAL RULE 56.1(a) STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Under Local Rule 56.1(a), Defendants provide this Statement of Facts in support of their motion for summary judgment, together with the referenced exhibits.

**MR. BAILLIE'S FATAL HEART ATTACK**

1. On March 23, 2012, following a business trip to Europe, James Baillie was rushing in the London Heathrow airport to catch British Airways ("BA") Flight 289 to Phoenix. Ex. 14 at ¶8 (Decl. of Linda Baillie). "[W]hen he arrived at the gate he was having breathing problems and feeling discomfort in the center of his chest." *Id.* at ¶¶9-10; *cf.* Ex. 13 at ¶9 (Decl. of Dr. Robert Candipan) (Baillie "began to experience chest pain while running in the London airport to catch his plane."); Ex. 15 at ¶10 (Decl. of Francis Fleming) (Baillie "had the chest pains as he was rushing to make the flight…"); Ex. 33 at 31:1-33:11 (Laura Baillie dep.) (Laura was present at that conversation).

2. Though the cause of these symptoms was unknown at the time, the cause is now undisputed: Baillie suffered a very serious type of heart attack known as an ST elevation myocardial infarction, or STEMI. Ex. 6 at 6-7 (Dr. Budoff Expert Report); Ex.13 at ¶¶4-10 (Decl. of Dr. Candipan).

3. Experts for both sides in this case concur that Baillie's STEMI most likely coincided with the onset of his symptoms as he was rushing to catch the flight. Ex. 6 at 6-7 (Dr. Budoff); Ex. 35 at 49:1-50:15 (Dr. Candipan).

4. A STEMI has a very high mortality rate. Ex. 35 at 86:19-87:17 (Dr. Candipan). According to the American College of Cardiology and the American Heart Association, "one-third of patients who experience STEMI will die within 24 hours," and "many of the survivors will suffer significant morbidity." Ex. 27 at e91.

5. Not only did Baillie suffer a STEMI, but he suffered the most serious type of STEMI: one that involved the "total blockage of the proximal left anterior descending coronary" or "LAD." Ex. 13 at ¶6 (Dr. Candipan). A STEMI involving the LAD is sometimes referred to as the "widow maker" because of its high mortality rate. Ex. 30 at 21:24-22:17 (Dr. Candipan); Ex. 6 at 7-8 (Dr. Budoff). It generally affects a greater area of the heart muscle or "myocardium" than do other types of heart attacks. *Id.*

6. In addition, because Baillie suffered from multiple vessel disease, he had an even higher risk of dying following his STEMI. Ex. 35 at 88:4-17 (Dr. Candipan).

7. As Plaintiff's expert Dr. Candipan has testified: "It is very important for heart attack victims to receive treatment as soon as possible, preferably within the first hour after symptoms appear." Ex. 13 at ¶12. This is because, once a coronary artery is blocked, there is a "cessation of blood flow to heart muscle…." Ex. 30 at 35:14-36:3 (Dr. Candipan). The heart muscle that was formerly supplied with blood ("perfused") by the now blocked artery immediately starts to die. Ex. 6 at 8 (Dr. Budoff).

8. Thus, as Dr. Candipan has opined: "Had Mr. Baillie received treatment within an hour or two after the onset of his chest pain, the extensive damage to his heart caused by his heart attack would likely have been avoided." Ex. 13 at ¶12.

9. Studies have shown that the vast majority of the perfused myocardium is irreversibly destroyed within about 90 minutes following a heart attack, that by the time six hours have elapsed, there is an almost complete absence of salvageable myocardium, and that minimal or no benefit would be gained by moving the time to reperfusion from 12 hours back to 7 or 8 hours following symptom onset. Ex. 6 at 8 (Dr. Budoff).

10. Dr. Budoff attached a chart to his expert report that depicts these data. Ex. 8. The chart was taken from a medical article by a doctor at the Mayo Clinic—one of the "most well-regarded scientists" in the field—based on data from "thousands of patients." Ex. 36 at 36:24-37:13 (Dr. Budoff). The chart shows that moving the time to reperfusion from 12 hours back to 7 hours would produce only a small benefit in reducing mortality.

11. Dr. Candipan has read the article, and doesn't disagree with it. Ex. 35 at 89:13-92:11. In fact, he specifically agreed that the "benefits from reducing the time to reperfusion from twelve hours to six hours are small." Ex. 35 at 115:15-19.

**DEFENDANTS MEDAIRE, INC. AND DRS. REINHART AND MONAS**

12. Defendant MedAire, through its "MedLink" service, provides remote medical advice to commercial airlines dealing with an ill or injured passenger. MedAire has been providing this service for about 30 years. Ex. 10 at 7 (Dr. Alves Expert Report).

13. MedAire arranges for experienced emergency physicians employed by a separate company, Emergency Professional Services, PC ("EPS"), to speak with an airline crew about the ill passenger through a ground-to-aircraft phone patch. Ex. 34 at 13:4-14:10 (Dr. Streitweiser); Ex. 3 at 2 (Dr. Roth). Typically, the physicians are not able to see or speak with the passenger. *Id.* Because of that and the lack of medical equipment and facilities on an airplane, the MedLink physician usually cannot diagnose or treat an illness, but the physician may suggest ways to deal with the passenger's symptoms. *Id.*

14. The MedLink service operates out of a call center inside the Emergency Department of the Banner – University Medical Center in Phoenix (formerly "Banner Good Samaritan" Hospital). Ex. 3 at 21 (Dr. Roth). EPS doctors staff the hospital's Emergency Department. Ex. 34 at 13:4-14:10 (Dr. Streitweiser). Hence, EPS doctors are

3

1  available 24/7 to take calls in the MedLink call center. Ex. 3 at 21 (Dr. Roth).

2       15.  The MedLink call center has Communication Specialist Engineers or
3  "CSEs" employed by MedAire. Ex. 3 at 21 (Dr. Roth). The CSE's are trained to receive
4  calls and get an EPS emergency physician on the line to consult with the airline crew. *Id.*

5       16.  MedAire is one of two companies in the United States providing such
6  remote medical advice to airlines; the other company is STAT-MD, which operates out of
7  Pittsburgh, PA, using emergency physicians from the University of Pennsylvania Medical
8  Center, including Dr. Roth. Ex. 3 at 2 (Dr. Roth); Ex. 10 at 7-8 (Dr. Alves).

9       17.  Defendant doctors Steven Reinhart and Jessica Monas are experienced,
10 EPS-employed emergency physicians. Ex. 3 at 17-18 (Dr. Roth). Dr. Reinhart has
11 been board-certified in and practicing emergency medicine for over 25 years. *Id.*

12      18.  In providing remote medical advice to airlines, MedLink doctors may
13 recommend that an aircraft divert to an earlier landing spot in order to get emergency
14 medical help for a passenger. Ex. 10 at 5 (Dr. Alves). However, only the pilot of an
15 aircraft has the authority to decide to divert the plane to an unscheduled airport. *Id.*

16      19.  No industry standards dictate when a physician providing remote medical
17 advice should recommend that an aircraft divert to a different landing spot. Ex. 10 at 2-8
18 (Dr. Alves); Ex. 3 at 5-6 (Dr. Roth).

19      20.  No internal MedAire standards dictate when an EPS physician should
20 recommend that an aircraft divert to a different landing spot. Ex. 10 at 9 (Dr. Alves).
21 MedAire leaves such matters up to the clinical judgment of the individual EPS physician,
22 based on his or her background, training and experience. *Id.*

23      21.  MedAire only suggests that, in considering whether to recommend
24 diversion, an EPS physician might consider certain general issues, including the location
25 of the aircraft vis-à-vis a potential diversion location, Ex. 20 at MA027372 (Physician
26 Pearls for Remote Medical Care), and whether it would take more than one hour to reach
27 a diversion location, in which case it is recommended that the physician "consider
28 reassessing" diversion. Ex. 21 at MA027055 (Diversion Justification Checklist).

4

22. The "Physician Pearls" document also suggests that, if a passenger has shortness of breath and ongoing cardiac chest pain, which can't be relieved with onboard treatment, then this is a "strong case" for diverting. Ex. 20 at MA027364. But the real difficulty is determining, remotely, whether an unseen passenger's chest pain is of cardiac origin—since most often it isn't. Ex. 3 at 8-10 (Dr. Roth). So in the opinion of Defendants' expert, Dr. Roth, diversion recommendations should be left to the professional judgment of individual physicians.

23. Moreover, as an article in the New England Journal of Medicine noted, a decision to divert is "complex and difficult":

> Unscheduled landings for medical purposes are a serious problem for commercial air carriers. Delays in reaching the final destination, inconvenience to passengers, added costs, and increased risks to safety make the decisions about diverting an aircraft complex and difficult.

M. Gendreau at al., *Current Concepts: Responding to Medical Events during Commercial Airline Flights,* NEJM, Vol. 346, Issue 14 (2002).

24. Based on MedAire's experience between 2010 and 2014, less than 2.5% of flights experiencing an inflight medical incident divert to an unscheduled airport. Ex.10 at 10-100 (Dr. Alves). Based on MedAire's experience between 2010 and 2013, less than 8% of flights involving ill passengers with chest pain resulted in diversions. *Id.*

**DR. REINHART'S CONSULTATION WITH BA 289**

25. Baillie boarded BA 289 flight at 14:54 UTC (Coordinated Universal Time). Ex. 18 (BA Passenger Details). He was one of 335 passengers. Ex. 19 (BA OPNS Legs Report). And by the time he boarded, "the discomfort in his chest had become painful" and he "wasn't sure he should be on the flight." Ex. 14 at ¶11 (Linda Baillie).

26. At 15:03 UTC, just a few minutes after Baillie boarded, the doors on the plane were closed. Ex. 19 (BA OPNL Legs Report for BA 289). When the airplane doors were closed, Baillie "felt imminent doom." Ex. 14, ¶15 (Linda Baillie).

27. At 15:12, the plane began to taxi to the runway. Ex. 19 (OPNL Legs Report). Baillie—remembering the "general advice" of taking an aspirin if you feel you're

1   having a heart attack—then "took one or two of the aspirins he had with him." Ex. 14, ¶ 16 (Linda Baillie). According to the BA flight attendant, Baillie took the aspirin at about 15:30. Ex. 28 at 227:11-15 (Ms. Van Den Berg). The plane took off at 15:46. Ex. 19.

28.  The BA 289 pilot first called the MedLink service on the cockpit satellite phone at 18:45 UTC, and spoke with a CSE about Baillie. Ex. 17 (3/23/12 MedAire Transcript). The CSE understood the pilot to say that there was a 61-year old male on the plane with central chest pain and who appeared pale and was currently on oxygen. *Id.*

29.  The CSE arranged for Dr. Reinhart to join the call at 18:50 UTC, almost four hours after the onset of Baillie's symptoms. Ex. 17. Dr. Reinhart confirmed that there was a 61-year old male on board with centralized chest pain and who was pale and on supplemental oxygen. *Id.* Dr. Reinhart asked if the man had any cardiac history, and was told no, "nothing at all." *Id.* He was also told that the passenger had no medications with him, and that he had taken an aspirin at 3:30 GMT (15:30 UTC). *Id.*

30.  Chest pain is a common symptom of many maladies, including heart attacks, but the vast majority of people presenting with chest pain are not experiencing a heart attack. Ex. 3 at 10-13 (Dr. Roth). One could not conclude Baillie was likely having a heart attack at that point, as Dr. Candipan admitted, and he does not believe Dr. Reinhart should have recommended diversion at this point. Ex. 35 at 52:18-53:11.

31.  Identifying the cause of chest pain remotely is "difficult, necessarily imprecise, and requires the exercise of professional judgment…." Ex. 3 at 10 (Dr. Roth). On an airplane, there "is simply no way to confirm if the chest pain in question is being caused by what is commonly called a heart attack." Ex. 3 at12 (Dr. Roth).

32.  Dr. Reinhart then asked the airline crew to see if there was a doctor on board who could evaluate the passenger and "get a set of vital signs," and then to call back. *Id.*

33.  A short time later, the BA 289 pilot called back (the "First Repatch"), and at 19:18 Dr. Reinhart rejoined the call. *Id.* The pilot confirmed that an onboard physician had examined the passenger, and also confirmed that the passenger's blood pressure was 100/70, he had a pulse of 100, and had "crackles" in the left chest. Ex. 17.

34. Dr. Reinhart properly discounted the report of "crackles," because the ambient noise of a 747 would make it impossible to hear such, and published studies confirm the difficulty of auscultation on board an aircraft. Ex. 3 at 15 (Dr. Roth). And when Baillie was eventually examined by medical personnel on the ground, they recorded his breath sounds to be within normal limits, with no mention of crackles. *Id.*

35. Despite the onboard physician's examination of Baillie, however, he "did not have any suggestions" about what might be going on. Ex. 17.

36. In deciding whether to recommend that a plane divert to an earlier landing, physicians experienced in providing remote medical advice to airlines take into account the proximity of suitable landing sites. Ex. 3 at 7-9; 16 (Dr. Roth).

37. At the time of the First Repatch, 19:12 UTC, BA 289 was over the North Atlantic, and the closest landing spot with suitable medical facilities was approximately two hours to the west. Ex. 11 at 10 (Michael Fortune Expert Report); Ex. 3 at 16 (Dr. Roth). And when the "closest diversion point is hours away and the cause of a passenger's symptoms is not clear cut, a physician experienced in offering remote medical advice to airlines would not likely recommend immediate diversion." Ex. 3 at 16 (Dr. Roth).

38. Dr. Reinhart thus recommended continuing westward while keeping the passenger on supplemental oxygen and having the onboard doctor monitor him every 15-30 minutes. Ex. 17 at BA0490. If the passenger's condition appeared to deteriorate, the pilot was to call back and they would need to "consider a diversion at that point." *Id.*

39. The onboard physician, however—Dr. Verma—said he did not monitor Baillie every 15-30 minutes; he only recalled going back "probably three times more during the flight," and his colleague, Dr. Rajesh, went at least once. Ex. 29 at 76:9-77:14.

**DR. MONAS' CONSULTATION WITH BA 289**

40. At 22:34 UTC, about three hours after the 19:12 phone patch, and a little more than 7.5 hours after the onset of Baillie's symptoms, BA 289 called MedLink again. Ex. 17. By this time, Dr. Reinhart's shift was over so he was no longer available. Ex. 3 at 18 (Dr. Roth). At 22:38, Defendant Dr. Monas joined the call. Ex. 17. She was told that,

7

1 though Baillie's vitals were about the same, the onboard doctor felt Baillie looked
2 "considerably worse," and he had recommended that Baillie be reevaluated in "30 minutes
3 which is now about 20 minutes," and at that time "we might consider making a
4 diversion." *Id.* So the pilot wanted to get Dr. Monas's "take" on that. *Id.*

5      41. Dr. Monas asked to speak directly with the onboard physician, but was told
6 that, due to the plane's "security procedures," she could not. Ex. 17. Dr. Monas then said
7 that "we are here, you guys are in the air and evaluating the patient"; so "if you feel the
8 patient is not looking well, and that uh that we need to diver we can start to take a look at
9 diversion locations." *Id.* She also suggested that the passenger be kept lying down and on
10 oxygen. *Id.* Dr. Monas then stated that "in the meantime we'll take a look at some
11 diversion locations if you guys feel he is uh concerning at this time." *Id.*

12      42. The pilot agreed ("Yeah ok"), and the MedAire CSE patched BA's London
13 Operations Control Center into the call. Ex. 17. The pilot advised BA Operations that
14 they were considering a diversion to Chicago, but wanted to get an update from the doctor
15 onboard in the next "ten minutes or so," at which point they would let them know if they
16 did decide to divert. *Id.* The CSE then agreed to call Chicago to let them know of the
17 diversion possibility. *Id.* The CSE also asked the pilot to keep MedAire "updated": "if you
18 have an update please do call us right back, we'll bring Dr. Monas back on the line." *Id.*

19      43. Following this last repatch, MedAire CSEs followed up with
20 BA Ops Control in multiple calls to determine whether the plane was diverting. Ex. 3 at
21 23 (Dr. Roth).

22      44. Eventually, however, the BA 289 pilots were advised that Baillie didn't
23 want to divert, and that two onboard doctors had given their opinion that it would not
24 worsen Baillie's condition to continue on to Phoenix. Ex. 16 ¶¶18-19 (1/28/14 Alastair
25 Grant. Decl.). Based on that, the pilot decided not to divert the plane to an alternate
26 airport. *Id.*; *see also* Ex. 31 at 7:23-8:11 (10/22/15 Grant Dep.)

27      45. When the CSE learned from BA Ops that the plane wasn't diverting, she
28 arranged for EMTs to meet the flight when it landed in Phoenix. Ex. 3 at 23 (Dr. Roth)

1    The plane thus landed in Phoenix at 1:53 UTC, which was, in 24 hour time, 18:53 MST.
2    Ex. 19 (OPNL Legs Report).

### BAILLIE'S HOSPITALIZATION

46.    When the plane arrived at Sky Harbor, the paramedics took Baillie directly to the Emergency Department of St. Luke's Medical Center. Ex. 25 (Discharge Summary). An EKG done on the way showed that Baillie had ST elevations consistent with a STEMI. *Id.* After an examination by an emergency physician, Dr. Hess, Baillie was taken to the cardiac catheterization laboratory, where Dr. Candipan treated him. *Id.*

47.    Dr. Candipan is a cardiologist. Ex. 35 at 10:15-11:11 (Dr. Candipan). He is not an expert in emergency medicine, and has no experience in providing remote medical advice to airlines. *Id.* at 12:2-22. He can't say what typically happens when a MedLink physician give remote medical advice to an airline. *Id.* at 23:10-24:4. He does not claim any expertise on how MedAire should conduct its operations. *Id.* at 9:8-10:14. He is not "aware of any published standards relating to the provision of remote medical advice to airlines." *Id.* at 20:15-17.

48.    Dr. Candipan performed a cardiac catheterization of Baillie, which showed that Baillie not only had a total blockage of his LAD, but that, due to coronary artery disease, other coronary arteries also suffered from "diffuse stenosis" or narrowing by up to 80% to 90%, the result of coronary artery disease. Ex. 24 (Dr. Candipan OP Report).

49.    Baillie was also in cardiogenic shock, a "very serious" condition that has a "high mortality rate." Ex. 30 at 23:13-24:14 (9/22/15 Dr. Candipan Dep.) An initial echocardiogram of Baillie's heart showed an "ejection fraction"—a measurement of "how strong the heart is"—of just 10% to 15%, a reading that is "seriously low." Ex. 30 at 81:25-82:17 (Dr. Candipan).

50.    As Dr. Candipan agreed, the extensive damage to Baillie heart revealed by Dr. Candipan's angiogram had all likely occurred by the time eight hours had elapsed after the onset of Baillie's symptoms. Ex. 35 at 92:14-93:11. Hence, he couldn't say that Baillie likely would have survived had his artery been opened between six and eight hours

after the onset of his symptom. Ex. 35 at 114:14-21.

51.     And Dr. Candipan also agreed that, even if Dr. Reinhart had recommended diversion, Baillie's artery would not have been opened until approximately eight hours after the onset of his symptoms. Ex. 35 at 94:8-95:12.

52.     Using a balloon angioplasty, Dr. Candipan opened Baillie's blocked LAD—a procedure that was completed "just over two hours" after BA 289 landed at in Phoenix, Ex. 35 at 95:1-5 (Dr. Candipan)—and then inserted three stents in Baillie's LAD. Ex. 24 at JDB-12521-522. Dr. Candipan knew the other narrowed arteries would also need treatment, but elected to defer that treatment until later, in order to deal first with the blocked LAD. Ex. 30 at 62:20-64:1 (Dr. Candipan).

53.     Despite angioplasty and the stents, Baillie's heart still functioned poorly; in layman's terms, Dr. Candipan believed that Baillie's heart was "in serious shape" and he was "not sure that it's going to sustain him." Ex. 30 at 84:10-20. Baillie remained in cardiac shock with substandard blood flow. *Id.* at 58:17-59:5; Ex. 25. So on March 30, 2012, Baillie was transferred to the Mayo Clinic for possible evaluation for a heart transplant, if needed. Ex. 30 at 84:21-25 (Dr. Candipan).

54.     Upon arrival at the Mayo Clinic, Baillie was placed in an intensive care unit, where he remained until he died approximately three months later. Ex. 5 at 11 (Dr. Budoff). Shortly after Mayo Clinic surgeons installed a total artificial heart in Baillie's chest, it triggered internal bleeding and, on June 26, multiple "cerebral accidents" or small strokes in Baillie's brain, *Id.* at 16-17.

55.     The Baillie family subsequently determined not to mechanically keep him alive any longer, and on July 1 the artificial heart was discontinued and he expired. *Id.*

56.     Baillie's official death certificate, prepared by the Mayo Clinic's Dr. Pajero, identifies the immediate cause of Baillie's death as "cerebral vascular accident" within a time interval of "days," due to or as a cause of "myocardial infarction" within a time interval of "weeks," due to or as a consequence of "coronary artery disease" within a time interval of "years." Ex. 37.

RESPECTFULLY submitted this 16th day of September 2016.

                GALLAGHER & KENNEDY, P.A.

By: /s/ *Mark C. Dangerfield*
    Mark C. Dangerfield
    Wm. Charles Thomson
    2575 East Camelback Road
    Phoenix, Arizona  85016-9225
    Attorneys for Defendants MedAire, Inc.;
    Steven Joe Reinhart, D.O.; and Jessica
    Monas, M.D.

# CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of September 2016, a copy of the foregoing document was filed electronically via the Court's CM/ECF system and Notice of Electronic Filing served on all parties by operation of the Court's CM/ECF system.

Stephen M. Dichter, Esq.
Jeffrey O. Hutchins, Esq.
Christian Dichter & Sluga, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, AZ  85004
    sdichter@cdslawfirm.com
    jhutchins@cdslawfirm.com
*Attorneys for Plaintiff*

Francis G. Fleming, Esq.
Robert J. Spragg, Esq.
Kreindler & Kreindler LLP
750 Third Avenue
New York, NY  10017
    ffleming@kreindler.com
    rspragg@kreindler.com
*Attorneys for Plaintiff*

By: /s/ *Mark C. Dangerfield*

5577792/24709-0001