1  Mark C. Dangerfield (Bar No. 010832)
   Wm. Charles Thomson (Bar No. 004269)
2  GALLAGHER & KENNEDY, P.A.
   2575 East Camelback Road
3  Phoenix, Arizona  85016-9225
   Telephone:    (602) 530-8000
4  Facsimile:    (602) 530-8500
   E-mails: mark.dangerfield@gknet.com
5           wct@gknet.com
   Attorneys for Defendants MedAire, Inc., Steven
6  Joe Reinhart, D.O., and Jessica Monas, M.D.

7

8                   UNITED STATES DISTRICT COURT

9                       DISTRICT OF ARIZONA

10  LINDA ANN BAILLIE, individually, as        No. 2:14-cv-00420-PHX-SMM
    Personal Representative of the Estate of
11  JAMES DONALD BAILLIE, II, and on
    behalf of all heirs and next of kin of
12  JAMES DONALD BAILLIE, II, deceased,   **STATEMENT OF FACTS
                                          EXHIBIT LIST**
13                     Plaintiff,

14  vs.

15  MEDAIRE, INC.; STEVEN JOE
    REINHART, D.O.; and JESSICA
16  MONAS, M.D.,

17                     Defendants.

18      1.   Convention for the Unification of Certain Rules for International Carriage by Air

19      2.   9/13/2016 Declaration of Ronald Roth, M.D.

20      3.   5/26/2015 Expert report of Dr. Ronald Roth

21      4.   6/24/2016 expert rebuttal report of Dr. Ronald Roth

22      5.   9/15/2016 Declaration of Matthew Budoff, M.D.

23      6.   5/26/2016 Expert report of Dr. Matthew Budoff

24      7.   6/20/2016 Rebuttal report of Dr. Matthew Budoff

25      8.   Chart (Ex. 1 to 5/26/2016 expert report of Dr. Budoff)

26      9.   9/14/2016 Declaration of Paulo Alves, M.D.

27      10.  5/25/2016 Expert report of Dr. Paulo Alves

28      11.  9/14/2016 Declaration of Michael Fortune

12. 5/25/2016 Expert report of Michael Fortune

13. 6/6/2014 Declaration of Robert Candipan, M.D.

14. 2/10/2014 Declaration of Linda Baillie

15. 2/11/201 Declaration of Francis Fleming

16. 1/28/2015 Declaration of Alastair Grant

17. 3/23/2012 MedAire Patch Transcript

18. British Airways Passenger Details for James Baillie

19. British Airways OPNL Legs Report for 3/23/2012

20. Physician Pearls for Remote Medical Care

21. Diversion Justification Worksheet

22. EMT records produced by St. Luke's

23. St. Luke's Emergency Dep't Records (excerpts)

24. Dr. Candipan's OP Report regarding Mr. Baillie, and related documents

25. St. Luke's Discharge Summary for Mr. Baillie

26. Mayo Clinic H&P (History and Physical) for Mr. Baillie

27.     2004 ACC/AHA Guidelines for the Management of Patients with ST-Elevation
Myocardial Infarction, p.e91 (excerpt)

28. 5/29/2014 Ewa Van Den Berg deposition (excerpts)

29. 12/5/2014 Ratan Verma, M.D. deposition (excerpts)

30. 9/22/2015 Robert Candipan, M.D. deposition (excerpts)

31. 10/22/2015 Alastair Grant deposition (excerpts)

32. 1/4/2016 Linda Baillie deposition (excerpts)

33. 1/4/2016 Laura Baillie deposition (excerpts)

34. 1/7/2016 David Streitwieser, M.D. deposition (excerpts)

35. 7/27/2016 Robert Candipan, M.D. deposition (excerpts)

36. 8/16/2016 Matthew Budoff, M.D. deposition (excerpts)

37. Arizona Certificate of Death for James Donald Baillie II

38. 9/16/2016 Declaration of Mark Dangerfield

# EXHIBIT 1

Case 2:14-cv-00420-SMM Document 86-1 Filed 09/16/16 Page 4 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

*Done at Montreal on 28 May 1999*

### CONVENTION

### FOR THE UNIFICATION OF CERTAIN RULES FOR INTERNATIONAL CARRIAGE BY AIR

### THE STATES PARTIES TO THIS CONVENTION

RECOGNIZING the significant contribution of the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed in Warsaw on 12 October 1929, hereinafter referred to as the "Warsaw Convention", and other related instruments to the harmonization of private international air law;

RECOGNIZING the need to modernize and consolidate the Warsaw Convention and related instruments;

RECOGNIZING the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution;

REAFFIRMING the desirability of an orderly development of international air transport operations and the smooth flow of passengers, baggage and cargo in accordance with the principles and objectives of the Convention on International Civil Aviation, done at Chicago on 7 December 1944;

CONVINCED that collective State action for further harmonization and codification of certain rules governing international carriage by air through a new Convention is the most adequate means of achieving an equitable balance of interests;

HAVE AGREED AS FOLLOWS:

### Chapter I

### General Provisions

### Article 1 — Scope of Application

1. This Convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward. It applies equally to gratuitous carriage by aircraft performed by an air transport undertaking.

2. For the purposes of this Convention, the expression *international carriage* means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party. Carriage between two points within the territory of a single State Party without an agreed stopping place within the territory of another State is not international carriage for the purposes of this Convention.

**\*30** 3. Carriage to be performed by several successive carriers is deemed, for the purposes of this Convention, to be one undivided carriage if it has been regarded by the parties as a single operation, whether it had been agreed upon under the form of a single contract or of a series of contracts, and it does not lose its international character merely because one contract or a series of contracts is to be performed entirely within the territory of the same State.

4. This Convention applies also to carriage as set out in Chapter V, subject to the terms contained therein.

Case 2:14-cv-00420-SMM  Document 86-1  Filed 09/16/16  Page 5 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

### Article 2 — Carriage Performed by State and Carriage of Postal Items

1. This Convention applies to carriage performed by the State or by legally constituted public bodies provided it falls within the conditions laid down in Article 1.

2. In the carriage of postal items, the carrier shall be liable only to the relevant postal administration in accordance with the rules applicable to the relationship between the carriers and the postal administrations.

3. Except as provided in paragraph 2 of this Article, the provisions of this Convention shall not apply to the carriage of postal items.

### Chapter II

Documentation and Duties of the Parties Relating to the Carriage of Passengers, Baggage and Cargo

### Article 3 — Passengers and Baggage

1. In respect of carriage of passengers, an individual or collective document of carriage shall be delivered containing:
   (a) an indication of the places of departure and destination;

   (b) if the places of departure and destination are within the territory of a single State Party, one or more agreed stopping places being within the territory of another State, an indication of at least one such stopping place.

2. Any other means which preserves the information indicated in paragraph 1 may be substituted for the delivery of the document referred to in that paragraph. If any such other means is used, the carrier shall offer to deliver to the passenger a written statement of the information so preserved.

3. The carrier shall deliver to the passenger a baggage identification tag for each piece of checked baggage.

4. The passenger shall be given written notice to the effect that where this Convention is applicable it governs and may limit the liability of carriers in respect of death or injury and for destruction or loss of, or damage to, baggage, and for delay.

5. Non-compliance with the provisions of the foregoing paragraphs shall not affect the existence or the validity of the contract of carriage, which shall, nonetheless, be subject to the rules of this Convention including those relating to limitation of liability.

### Article 4 — Cargo

1. In respect of the carriage of cargo, an air waybill shall be delivered.

2. Any other means which preserves a record of the carriage to be performed may be substituted for the delivery of an air waybill. If such other means are used, the carrier shall, if so requested by the consignor, deliver to the consignor a cargo receipt permitting identification of the consignment and access to the information contained in the record preserved by such other means.

### Article 5 — Contents of Air Waybill or Cargo Receipt

\*31 The air waybill or the cargo receipt shall include:

Case 2:14-cv-00420-SMM Document 86-1 Filed 09/16/16 Page 6 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

(a) an indication of the places of departure and destination;

(b) if the places of departure and destination are within the territory of a single State Party, one or more agreed stopping places being within the territory of another State, an indication of at least one such stopping place; and

(c) an indication of the weight of the consignment.

### Article 6 -- Document Relating to the Nature of the Cargo

The consignor may be required, if necessary to meet the formalities of customs, police and similar public authorities, to deliver a document indicating the nature of the cargo. This provision creates for the carrier no duty, obligation or liability resulting therefrom.

### Article 7 -- Description of Air Waybill

1. The air waybill shall be made out by the consignor in three original parts.

2. The first part shall be marked "for the carrier"; it shall be signed by the consignor. The second part shall be marked "for the consignee"; it shall be signed by the consignor and by the carrier. The third part shall be signed by the carrier who shall hand it to the consignor after the cargo has been accepted.

3. The signature of the carrier and that of the consignor may be printed or stamped.

4. If, at the request of the consignor, the carrier makes out the air waybill, the carrier shall be deemed, subject to proof to the contrary, to have done so on behalf of the consignor.

### Article 8 -- Documentation for Multiple Packages

When there is more than one package:

(a) the carrier of cargo has the right to require the consignor to make out separate air waybills;

(b) the consignor has the right to require the carrier to deliver separate cargo receipts when the other means referred to in paragraph 2 of Article 4 are used.

### Article 9 -- Non-compliance with Documentary Requirements

Non-compliance with the provisions of Articles 4 to 8 shall not affect the existence or the validity of the contract of carriage, which shall, nonetheless, be subject to the rules of this Convention including those relating to limitation of liability.

### Article 10 -- Responsibility for Particulars of Documentation

1. The consignor is responsible for the correctness of the particulars and statements relating to the cargo inserted by it or on its behalf in the air waybill or furnished by it or on its behalf to the carrier for insertion in the cargo receipt or for insertion in the record preserved by the other means referred to in paragraph 2 of Article 4. The foregoing shall also apply where the person acting on behalf of the consignor is also the agent of the carrier.

2. The consignor shall indemnify the carrier against all damage suffered by it, or by any other person to whom the carrier is liable, by reason of the irregularity, incorrectness or incompleteness of the particulars and statements furnished by the consignor or on its behalf.

Case 2:14-cv-00420-SMM   Document 86-1   Filed 09/16/16   Page 7 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

**\*32**  3. Subject to the provisions of paragraphs 1 and 2 of this Article, the carrier shall indemnify the consignor against all damage suffered by it, or by any other person to whom the consignor is liable, by reason of the irregularity, incorrectness or incompleteness of the particulars and statements inserted by the carrier or on its behalf in the cargo receipt or in the record preserved by the other means referred to in paragraph 2 of Article 4.

### Article 11 — Evidentiary Value of Documentation

1. The air waybill or the cargo receipt is *prima facie* evidence of the conclusion of the contract, of the acceptance of the cargo and of the conditions of carriage mentioned therein.

2. Any statements in the air waybill or the cargo receipt relating to the weight, dimensions and packing of the cargo, as well as those relating to the number of packages, are *prima facie* evidence of the facts stated; those relating to the quantity, volume and condition of the cargo do not constitute evidence against the carrier except so far as they both have been, and are stated in the air waybill or the cargo receipt to have been, checked by it in the presence of the consignor, or relate to the apparent condition of the cargo.

### Article 12 — Right of Disposition of Cargo

1. Subject to its liability to carry out all its obligations under the contract of carriage, the consignor has the right to dispose of the cargo by withdrawing it at the airport of departure or destination, or by stopping it in the course of the journey on any landing, or by calling for it to be delivered at the place of destination or in the course of the journey to a person other than the consignee originally designated, or by requiring it to be returned to the airport of departure. The consignor must not exercise this right of disposition in such a way as to prejudice the carrier or other consignors and must reimburse any expenses occasioned by the exercise of this right.

2. If it is impossible to carry out the instructions of the consignor, the carrier must so inform the consignor forthwith.

3. If the carrier carries out the instructions of the consignor for the disposition of the cargo without requiring the production of the part of the air waybill or the cargo receipt delivered to the latter, the carrier will be liable, without prejudice to its right of recovery from the consignor, for any damage which may be caused thereby to any person who is lawfully in possession of that part of the air waybill or the cargo receipt.

4. The right conferred on the consignor ceases at the moment when that of the consignee begins in accordance with Article 13. Nevertheless, if the consignee declines to accept the cargo, or cannot be communicated with, the consignor resumes its right of disposition.

### Article 13 — Delivery of the Cargo

1. Except when the consignor has exercised its right under Article 12, the consignee is entitled, on arrival of the cargo at the place of destination, to require the carrier to deliver the cargo to it, on payment of the charges due and on complying with the conditions of carriage.

**\*33**  2. Unless it is otherwise agreed, it is the duty of the carrier to give notice to the consignee as soon as the cargo arrives.

3. If the carrier admits the loss of the cargo, or if the cargo has not arrived at the expiration of seven days after the date on which it ought to have arrived, the consignee is entitled to enforce against the carrier the rights which flow from the contract of carriage.

### Article 14 — Enforcement of the Rights of Consignor and Consignee

Case 2:14-cv-00420-SMM   Document 86-1   Filed 09/16/16   Page 8 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

The consignor and the consignee can respectively enforce all the rights given to them by Articles 12 and 13, each in its own name, whether it is acting in its own interest or in the interest of another, provided that it carries out the obligations imposed by the contract of carriage.

### Article 15 -- Relations of Consignor and Consignee or Mutual Relations of Third Parties

1. Articles 12, 13 and 14 do not affect either the relations of the consignor and the consignee with each other or the mutual relations of third parties whose rights are derived either from the consignor or from the consignee.

2. The provisions of Articles 12, 13 and 14 can only be varied by express provision in the air waybill or the cargo receipt.

### Article 16 -- Formalities of Customs, Police or Other Public Authorities

1. The consignor must furnish such information and such documents as are necessary to meet the formalities of customs, police and any other public authorities before the cargo can be delivered to the consignee. The consignor is liable to the carrier for any damage occasioned by the absence, insufficiency or irregularity of any such information or documents, unless the damage is due to the fault of the carrier, its servants or agents.

2. The carrier is under no obligation to enquire into the correctness or sufficiency of such information or documents.

### Chapter III

Liability of the Carrier and Extent of Compensation for Damage

### Article 17 -- Death and Injury of Passengers -- Damage to Baggage

1. The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

2. The carrier is liable for damage sustained in case of destruction or loss of, or of damage to, checked baggage upon condition only that the event which caused the destruction, loss or damage took place on board the aircraft or during any period within which the checked baggage was in the charge of the carrier. However, the carrier is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the baggage. In the case of unchecked baggage, including personal items, the carrier is liable if the damage resulted from its fault or that of its servants or agents.

3. If the carrier admits the loss of the checked baggage, or if the checked baggage has not arrived at the expiration of twenty-one days after the date on which it ought to have arrived, the passenger is entitled to enforce against the carrier the rights which flow from the contract of carriage.

**\*34** 4. Unless otherwise specified, in this Convention the term "baggage" means both checked baggage and unchecked baggage.

### Article 18 -- Damage to Cargo

1. The carrier is liable for damage sustained in the event of the destruction or loss of, or damage to, cargo upon condition only that the event which caused the damage so sustained took place during the carriage by air.

Case 2:14-cv-00420-SMM   Document 86-1   Filed 09/16/16   Page 9 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

2. However, the carrier is not liable if and to the extent it proves that the destruction, or loss of, or damage to, the cargo resulted from one or more of the following:

    (a) inherent defect, quality or vice of that cargo;

    (b) defective packing of that cargo performed by a person other than the carrier or its servants or agents;

    (c) an act of war or an armed conflict;

    (d) an act of public authority carried out in connection with the entry, exit or transit of the cargo.

3. The carriage by air within the meaning of paragraph 1 of this Article comprises the period during which the cargo is in the charge of the carrier.

4. The period of the carriage by air does not extend to any carriage by land, by sea or by inland waterway performed outside an airport. If, however, such carriage takes place in the performance of a contract for carriage by air, for the purpose of loading, delivery or transhipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the carriage by air. If a carrier, without the consent of the consignor, substitutes carriage by another mode of transport for the whole or part of a carriage intended by the agreement between the parties to be carriage by air, such carriage by another mode of transport is deemed to be within the period of carriage by air.

### Article 19 — Delay

The carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take such measures.

### Article 20 — Exoneration

If the carrier proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of the person claiming compensation, or the person from whom he or she derives his or her rights, the carrier shall be wholly or partly exonerated from its liability to the claimant to the extent that such negligence or wrongful act or omission caused or contributed to the damage. When by reason of death or injury of a passenger compensation is claimed by a person other than the passenger, the carrier shall likewise be wholly or partly exonerated from its liability to the extent that it proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of that passenger. This Article applies to all the liability provisions in this Convention, including paragraph 1 of Article 21.

### Article 21 — Compensation in Case of Death or Injury of Passengers

**\*35** 1. For damages arising under paragraph 1 of Article 17 not exceeding 100 000 Special Drawing Rights for each passenger, the carrier shall not be able to exclude or limit its liability.

2. The carrier shall not be liable for damages arising under paragraph 1 of Article 17 to the extent that they exceed for each passenger 100 000 Special Drawing Rights if the carrier proves that:

    (a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or

    (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

### Article 22 — Limits of Liability in Relation to Delay, Baggage and Cargo

1. In the case of damage caused by delay as specified in Article 19 in the carriage of persons, the liability of the carrier for each passenger is limited to 4 150 Special Drawing Rights.

2. In the carriage of baggage, the liability of the carrier in the case of destruction, loss, damage or delay is limited to 1 000 Special Drawing Rights for each passenger unless the passenger has made, at the time when the checked baggage was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the passenger's actual interest in delivery at destination.

3. In the carriage of cargo, the liability of the carrier in the case of destruction, loss, damage or delay is limited to a sum of 17 Special Drawing Rights per kilogramme, unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the consignor's actual interest in delivery at destination.

4. In the case of destruction, loss, damage or delay of part of the cargo, or of any object contained therein, the weight to be taken into consideration in determining the amount to which the carrier's liability is limited shall be only the total weight of the package or packages concerned. Nevertheless, when the destruction, loss, damage or delay of a part of the cargo, or of an object contained therein, affects the value of other packages covered by the same air waybill, or the same receipt or, if they were not issued, by the same record preserved by the other means referred to in paragraph 2 of Article 4, the total weight of such package or packages shall also be taken into consideration in determining the limit of liability.

5. The foregoing provisions of paragraphs 1 and 2 of this Article shall not apply if it is proved that the damage resulted from an act or omission of the carrier, its servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result; provided that, in the case of such act or omission of a servant or agent, it is also proved that such servant or agent was acting within the scope of its employment.

**\*36** 6. The limits prescribed in Article 21 and in this Article shall not prevent the court from awarding, in accordance with its own law, in addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff, including interest. The foregoing provision shall not apply if the amount of the damages awarded, excluding court costs and other expenses of the litigation, does not exceed the sum which the carrier has offered in writing to the plaintiff within a period of six months from the date of the occurrence causing the damage, or before the commencement of the action, if that is later.

### Article 23 — Conversion of Monetary Units

1. The sums mentioned in terms of Special Drawing Right in this Convention shall be deemed to refer to the Special Drawing Right as defined by the International Monetary Fund. Conversion of the sums into national currencies shall, in case of judicial proceedings, be made according to the value of such currencies in terms of the Special Drawing Right at the date of the judgement. The value of a national currency, in terms of the Special Drawing Right, of a State Party which is a Member of the International Monetary Fund, shall be calculated in accordance with the method of valuation applied by the International Monetary Fund, in effect at the date of the judgement, for its operations and transactions. The value of a national currency, in terms of the Special Drawing Right, of a State Party which is not a Member of the International Monetary Fund, shall be calculated in a manner determined by that State.

2. Nevertheless, those States which are not Members of the International Monetary Fund and whose law does not permit the application of the provisions of paragraph 1 of this Article may, at the time of ratification or accession or at any time thereafter, declare that the limit of liability of the carrier prescribed in Article 21 is fixed at a sum of 1 500 000 monetary units per passenger in judicial proceedings in their territories; 62 500 monetary units per passenger with respect to paragraph 1 of Article 22; 15 000 monetary units per passenger with respect to paragraph 2 of Article 22; and 250 monetary units per kilogramme with respect to paragraph 3 of Article 22. This monetary unit corresponds to sixty-five

Case 2:14-cv-00420-SMM   Document 86-1   Filed 09/16/16   Page 11 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

and a half milligrammes of gold of millesimal fineness nine hundred. These sums may be converted into the national currency concerned in round figures. The conversion of these sums into national currency shall be made according to the law of the State concerned.

3. The calculation mentioned in the last sentence of paragraph 1 of this Article and the conversion method mentioned in paragraph 2 of this Article shall be made in such manner as to express in the national currency of the State Party as far as possible the same real value for the amounts in Articles 21 and 22 as would result from the application of the first three sentences of paragraph 1 of this Article. States Parties shall communicate to the depositary the manner of calculation pursuant to paragraph 1 of this Article, or the result of the conversion in paragraph 2 of this Article as the case may be, when depositing an instrument of ratification, acceptance, approval of or accession to this Convention and whenever there is a change in either.

### Article 24 — Review of Limits

*37  1. Without prejudice to the provisions of Article 25 of this Convention and subject to paragraph 2 below, the limits of liability prescribed in Articles 21, 22 and 23 shall be reviewed by the Depositary at five-year intervals, the first such review to take place at the end of the fifth year following the date of entry into force of this Convention, or if the Convention does not enter into force within five years of the date it is first open for signature, within the first year of its entry into force, by reference to an inflation factor which corresponds to the accumulated rate of inflation since the previous revision or in the first instance since the date of entry into force of the Convention. The measure of the rate of inflation to be used in determining the inflation factor shall be the weighted average of the annual rates of increase or decrease in the Consumer Price Indices of the States whose currencies comprise the Special Drawing Right mentioned in paragraph 1 of Article 23.

2. If the review referred to in the preceding paragraph concludes that the inflation factor has exceeded 10 per cent, the Depositary shall notify States Parties of a revision of the limits of liability. Any such revision shall become effective six months after its notification to the States Parties. If within three months after its notification to the States Parties a majority of the States Parties register their disapproval, the revision shall not become effective and the Depositary shall refer the matter to a meeting of the States Parties. The Depositary shall immediately notify all States Parties of the coming into force of any revision.

3. Notwithstanding paragraph 1 of this Article, the procedure referred to in paragraph 2 of this Article shall be applied at any time provided that one-third of the States Parties express a desire to that effect and upon condition that the inflation factor referred to in paragraph 1 has exceeded 30 per cent since the previous revision or since the date of entry into force of this Convention if there has been no previous revision. Subsequent reviews using the procedure described in paragraph 1 of this Article will take place at five-year intervals starting at the end of the fifth year following the date of the reviews under the present paragraph.

### Article 25 — Stipulation on Limits

A carrier may stipulate that the contract of carriage shall be subject to higher limits of liability than those provided for in this Convention or to no limits of liability whatsoever.

### Article 26 — Invalidity of Contractual Provisions

Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this Convention shall be null and void, but the nullity of any such provision does not involve the nullity of the whole contract, which shall remain subject to the provisions of this Convention.

Case 2:14-cv-00420-SMM  Document 86-1  Filed 09/16/16  Page 12 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

### Article 27 — Freedom to Contract

Nothing contained in this Convention shall prevent the carrier from refusing to enter into any contract of carriage, from waiving any defences available under the Convention, or from laying down conditions which do not conflict with the provisions of this Convention.

### Article 28 — Advance Payments

 **\*38** In the case of aircraft accidents resulting in death or injury of passengers, the carrier shall, if required by its national law, make advance payments without delay to a natural person or persons who are entitled to claim compensation in order to meet the immediate economic needs of such persons. Such advance payments shall not constitute a recognition of liability and may be offset against any amounts subsequently paid as damages by the carrier.

### Article 29 — Basis of Claims

In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights. In any such action, punitive, exemplary or any other non-compensatory damages shall not be recoverable.

### Article 30 — Servants, Agents — Aggregation of Claims

1. If an action is brought against a servant or agent of the carrier arising out of damage to which the Convention relates, such servant or agent, if they prove that they acted within the scope of their employment, shall be entitled to avail themselves of the conditions and limits of liability which the carrier itself is entitled to invoke under this Convention.

2. The aggregate of the amounts recoverable from the carrier, its servants and agents, in that case, shall not exceed the said limits.

3. Save in respect of the carriage of cargo, the provisions of paragraphs 1 and 2 of this Article shall not apply if it is proved that the damage resulted from an act or omission of the servant or agent done with intent to cause damage or recklessly and with knowledge that damage would probably result.

### Article 31 — Timely Notice of Complaints

1. Receipt by the person entitled to delivery of checked baggage or cargo without complaint is *prima facie* evidence that the same has been delivered in good condition and in accordance with the document of carriage or with the record preserved by the other means referred to in paragraph 2 of Article 3 and paragraph 2 of Article 4.

2. In the case of damage, the person entitled to delivery must complain to the carrier forthwith after the discovery of the damage, and, at the latest, within seven days from the date of receipt in the case of checked baggage and fourteen days from the date of receipt in the case of cargo. In the case of delay, the complaint must be made at the latest within twenty-one days from the date on which the baggage or cargo have been placed at his or her disposal.

3. Every complaint must be made in writing and given or dispatched within the times aforesaid.

4. If no complaint is made within the times aforesaid, no action shall lie against the carrier, save in the case of fraud on its part.

### Article 32 — Death of Person Liable

**\*39**  In the case of the death of the person liable, an action for damages lies in accordance with the terms of this Convention against those legally representing his or her estate.

### Article 33 — Jurisdiction

1. An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made or before the court at the place of destination.

2. In respect of damage resulting from the death or injury of a passenger, an action may be brought before one of the courts mentioned in paragraph 1 of this Article, or in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence and to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft, or on another carrier's aircraft pursuant to a commercial agreement, and in which that carrier conduc?? its business of carriage of passengers by air from premises leased or owned by the carrier itself or b?? another carrier with which it has a commercial agreement.

3. For the purposes of paragraph 2,

(a) "commercial agreement" means an agreement, other than an agency agreement, mad?? between carriers and relating to the provision of their joint services for carriage ?? passengers by air;

(b) "principal and permanent residence" means the one fixed and permanent abode of th?? passenger at the time of the accident. The nationality of the passenger shall not be th?? determining factor in this regard.

4. Questions of procedure shall be governed by the law of the court seised of the case.

### Article 34 — Arbitration

1. Subject to the provisions of this Article, the parties to the contract of carriage for cargo ma?? stipulate that any dispute relating to the liability of the carrier under this Convention shall be settled b?? arbitration. Such agreement shall be in writing.

2. The arbitration proceedings shall, at the option of the claimant, take place within one of th?? jurisdictions referred to in Article 33.

3. The arbitrator or arbitration tribunal shall apply the provisions of this Convention.

4. The provisions of paragraphs 2 and 3 of this Article shall be deemed to be part of every arbitration clause or agreement, and any term of such clause or agreement which is inconsistent therewith shall be null and void.

### Article 35 — Limitation of Actions

1. The right to damages shall be extinguished if an action is not brought within a period of two years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ough?? to have arrived, or from the date on which the carriage stopped.

2. The method of calculating that period shall be determined by the law of the court seised of the case.

Case 2:14-cv-00420-SMM   Document 86-1   Filed 09/16/16   Page 14 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

### Article 36 — Successive Carriage

**\*40**  1. In the case of carriage to be performed by various successive carriers and falling within the definition set out in paragraph 3 of Article 1, each carrier which accepts passengers, baggage or cargo is subject to the rules set out in this Convention and is deemed to be one of the parties to the contract of carriage in so far as the contract deals with that part of the carriage which is performed under its supervision.

2. In the case of carriage of this nature, the passenger or any person entitled to compensation in respect of him or her can take action only against the carrier which performed the carriage during which the accident or the delay occurred, save in the case where, by express agreement, the first carrier has assumed liability for the whole journey.

3. As regards baggage or cargo, the passenger or consignor will have a right of action against the first carrier, and the passenger or consignee who is entitled to delivery will have a right of action against the last carrier, and further, each may take action against the carrier which performed the carriage during which the destruction, loss, damage or delay took place. These carriers will be jointly and severally liable to the passenger or to the consignor or consignee.

### Article 37 — Right of Recourse against Third Parties

Nothing in this Convention shall prejudice the question whether a person liable for damage in accordance with its provisions has a right of recourse against any other person.

### Chapter IV

Combined Carriage

### Article 38 — Combined Carriage

1. In the case of combined carriage performed partly by air and partly by any other mode of carriage, the provisions of this Convention shall, subject to paragraph 4 of Article 18, apply only to the carriage by air, provided that the carriage by air falls within the terms of Article 1.

2. Nothing in this Convention shall prevent the parties in the case of combined carriage from inserting in the document of air carriage conditions relating to other modes of carriage, provided that the provisions of this Convention are observed as regards the carriage by air.

### Chapter V

Carriage by Air Performed by a Person other than the Contracting Carrier

### Article 39 — Contracting Carrier — Actual Carrier

The provisions of this Chapter apply when a person (hereinafter referred to as "the contracting carrier") as a principal makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as "the actual carrier") performs, by virtue of authority from the contracting carrier, the whole or part of the carriage, but is not with respect to such part a successive carrier within the meaning of this Convention. Such authority shall be presumed in the absence of proof to the contrary.

### Article 40 — Respective Liability of Contracting and Actual Carriers

Case 2:14-cv-00420-SMM Document 86-1 Filed 09/16/16 Page 15 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

**\*41** If an actual carrier performs the whole or part of carriage which, according to the contract referred to in Article 39, is governed by this Convention, both the contracting carrier and the actual carrier shall, except as otherwise provided in this Chapter, be subject to the rules of this Convention, the former for the whole of the carriage contemplated in the contract, the latter solely for the carriage which it performs.

### Article 41 — Mutual Liability

1. The acts and omissions of the actual carrier and of its servants and agents acting within the scope of their employment shall, in relation to the carriage performed by the actual carrier, be deemed to be also those of the contracting carrier.

2. The acts and omissions of the contracting carrier and of its servants and agents acting within the scope of their employment shall, in relation to the carriage performed by the actual carrier, be deemed to be also those of the actual carrier. Nevertheless, no such act or omission shall subject the actual carrier to liability exceeding the amounts referred to in Articles 21, 22, 23 and 24. Any special agreement under which the contracting carrier assumes obligations not imposed by this Convention or any waiver of rights or defences conferred by this Convention or any special declaration of interest in delivery at destination contemplated in Article 22 shall not affect the actual carrier unless agreed to by it.

### Article 42 — Addressee of Complaints and Instructions

Any complaint to be made or instruction to be given under this Convention to the carrier shall have the same effect whether addressed to the contracting carrier or to the actual carrier. Nevertheless, instructions referred to in Article 12 shall only be effective if addressed to the contracting carrier.

### Article 43 — Servants and Agents

In relation to the carriage performed by the actual carrier, any servant or agent of that carrier or of the contracting carrier shall, if they prove that they acted within the scope of their employment, be entitled to avail themselves of the conditions and limits of liability which are applicable under this Convention to the carrier whose servant or agent they are, unless it is proved that they acted in a manner that prevents the limits of liability from being invoked in accordance with this Convention.

### Article 44 — Aggregation of Damages

In relation to the carriage performed by the actual carrier, the aggregate of the amounts recoverable from that carrier and the contracting carrier, and from their servants and agents acting within the scope of their employment, shall not exceed the highest amount which could be awarded against either the contracting carrier or the actual carrier under this Convention, but none of the persons mentioned shall be liable for a sum in excess of the limit applicable to that person.

### Article 45 — Addressee of Claims

**\*42** In relation to the carriage performed by the actual carrier, an action for damages may be brought, at the option of the plaintiff, against that carrier or the contracting carrier, or against both together or separately. If the action is brought against only one of those carriers, that carrier shall have the right to require the other carrier to be joined in the proceedings, the procedure and effects being governed by the law of the court seised of the case.

### Article 46 — Additional Jurisdiction

Any action for damages contemplated in Article 45 must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before a court in which an action may be brought against the contracting carrier, as

Case 2:14-cv-00420-SMM Document 86-1 Filed 09/16/16 Page 16 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

provided in Article 33, or before the court having jurisdiction at the place where the actual carrier has its domicile or its principal place of business.

### Article 47 -- Invalidity of Contractual Provisions

Any contractual provision tending to relieve the contracting carrier or the actual carrier of liability under this Chapter or to fix a lower limit than that which is applicable according to this Chapter shall be null and void, but the nullity of any such provision does not involve the nullity of the whole contract, which shall remain subject to the provisions of this Chapter.

### Article 48 -- Mutual Relations of Contracting and Actual Carriers

Except as provided in Article 45, nothing in this Chapter shall affect the rights and obligations of the carriers between themselves, including any right of recourse or indemnification.

### Chapter VI

### Other Provisions

### Article 49 -- Mandatory Application

Any clause contained in the contract of carriage and all special agreements entered into before the damage occurred by which the parties purport to infringe the rules laid down by this Convention, whether by deciding the law to be applied, or by altering the rules as to jurisdiction, shall be null and void.

### Article 50 -- Insurance

States Parties shall require their carriers to maintain adequate insurance covering their liability under this Convention. A carrier may be required by the State Party into which it operates to furnish evidence that it maintains adequate insurance covering its liability under this Convention.

### Article 51 -- Carriage Performed in Extraordinary Circumstances

The provisions of Articles 3 to 5, 7 and 8 relating to the documentation of carriage shall not apply in t?? case of carriage performed in extraordinary circumstances outside the normal scope of a carrier business.

### Article 52 -- Definition of Days

The expression "days" when used in this Convention means calendar days, not working days.

### Chapter VII

### Final Clauses

### Article 53 -- Signature, Ratification and Entry into Force

**\*43** 1. This Convention shall be open for signature in Montreal on 28 May 1999 by States participatin?? in the International Conference on Air Law held at Montreal from 10 to 28 May 1999. After 28 Ma?? 1999, the Convention shall

Case 2:14-cv-00420-SMM  Document 86-1  Filed 09/16/16  Page 17 of 345

CONVENTION FOR INTERNATIONAL CARRIAGE BY AIR, S. Treaty Doc. No. 106-45...

be open to all States for signature at the Headquarters of the Internationa?? Civil Aviation Organization in Montreal until it enters into force in accordance with paragraph 6 of thi?? Article.

2. This Convention shall similarly be open for signature by Regional Economic Integratio?? Organisations. For the purpose of this Convention, a "Regional Economic Integration Organisation" means any organisation which is constituted by sovereign States of a given region which has competence in respect of certain matters governed by this Convention and has been duly authorized to sign and to ratify, accept, approve or accede to this Convention. A reference to a "State Party" or "States Parties" in this Convention, otherwise than in paragraph 2 of Article 1, paragraph 1(b) of Article 3, paragraph (b) of Article 5, Articles 23, 33, 46 and paragraph (b) of Article 57, applies equally to a Regional Economic Integration Organisation. For the purpose of Article 24, the references to "a majority of the States Parties" and "one-third of the States Parties" shall not apply to a Regional Economic Integration Organisation.

3. This Convention shall be subject to ratification by States and by Regional Economic Integration Organisations which have signed it.

4. Any State or Regional Economic Integration Organisation which does not sign this Convention may accept, approve or accede to it at any time.

5. Instruments of ratification, acceptance, approval or accession shall be deposited with the International Civil Aviation Organization, which is hereby designated the Depositary.

6. This Convention shall enter into force on the sixtieth day following the date of deposit of the thirtieth instrument of ratification, acceptance, approval or accession with the Depositary between the States which have deposited such instrument. An instrument deposited by a Regional Economic Integration Organisation shall not be counted for the purpose of this paragraph.

7. For other States and for other Regional Economic Integration Organisations, this Convention shall take effect sixty days following the date of deposit of the instrument of ratification, acceptance, approval or accession.

8. The Depositary shall promptly notify all signatories and States Parties of:
   (a) each signature of this Convention and date thereof;
   (b) each deposit of an instrument of ratification, acceptance, approval or accession and date thereof;
   (c) the date of entry into force of this Convention;
   (d) the date of the coming into force of any revision of the limits of liability established under this Convention;
   (e) any denunciation under Article 54.

### Article 54 -- Denunciation

**\*44** 1. Any State Party may denounce this Convention by written notification to the Depositary.

2. Denunciation shall take effect one hundred and eighty days following the date on which notification is received by the Depositary.

### Article 55 -- Relationship with other Warsaw Convention Instruments

This Convention shall prevail over any rules which apply to international carriage by air:

1. between States Parties to this Convention by virtue of those States commonly being Party to

(a) the *Convention for the Unification of Certain Rules Relating to International Carriage by Air* Signed at Warsaw on 12 October 1929 (hereinafter called the Warsaw Convention);

(b) the *Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929,* Done at The Hague on 28 September 1955 (hereinafter called The Hague Protocol);

(c) the *Convention, Supplementary to the Warsaw Convention, for the Unification of Certain Rules Relating to International Carriage by Air Performed by a Person Other than the Contracting Carrier,* signed at Guadalajara on 18 September 1961 (hereinafter called the Guadalajara Convention);

(d) the *Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955* Signed at Guatemala City on 8 March 1971 (hereinafter called the Guatemala City Protocol);

(e) Additional Protocol Nos. 1 to 3 and Montreal Protocol No. 4 to amend the Warsaw Convention as amended by The Hague Protocol or the Warsaw Convention as amended by both The Hague Protocol and the Guatemala City Protocol Signed at Montreal on 25 September 1975 (hereinafter called the Montreal Protocols); or

2. within the territory of any single State Party to this Convention by virtue of that State being Party to one or more of the instruments referred to in sub-paragraphs (a) to (e) above.

### Article 56 -- States with more than one System of Law

1. If a State has two or more territorial units in which different systems of law are applicable in relation to matters dealt with in this Convention, it may at the time of signature, ratification, acceptance, approval or accession declare that this Convention shall extend to all its territorial units or only to one or more of them and may modify this declaration by submitting another declaration at any time.

2. Any such declaration shall be notified to the Depositary and shall state expressly the territorial units to which the Convention applies.

3. In relation to a State Party which has made such a declaration:

(a) references in Article 23 to "national currency" shall be construed as referring to the currency of the relevant territorial unit of that State; and

(b) the reference in Article 28 to "national law" shall be construed as referring to the law of the relevant territorial unit of that State.

### Article 57 -- Reservations

**\*45** No reservation may be made to this Convention except that a State Party may at any time declare by a notification addressed to the Depositary that this Convention shall not apply to:

(a) international carriage by air performed and operated directly by that State Party for non-commercial purposes in respect to its functions and duties as a sovereign State; and/or

(b) the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by that State Party, the whole capacity of which has been reserved by or on behalf of such authorities.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, having been duly authorized, have signed this Convention.

DONE at Montreal on the 28th day of May of the year one thousand nine hundred and ninety-nine in the English, Arabic, Chinese, French, Russian and Spanish languages, all texts being equally authentic. This Convention shall remain deposited in the archives of the International Civil Aviation Organization, and certified copies thereof shall be transmitted by the Depositary to all States Parties to this Convention, as well as to all States Parties to the Warsaw

Convention, The Hague Protocol, the Guadalajara Convention, the Guatemala City Protocol, and the Montreal Protocols.

S. Treaty Doc. No. 106-45

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

1   Mark C. Dangerfield (Bar No. 010832)
    Wm. Charles Thomson (Bar No. 004269)
2   GALLAGHER & KENNEDY, P.A.
    2575 East Camelback Road
3   Phoenix, Arizona 85016-9225
    Telephone:   (602) 530-8000
4   Facsimile:    (602) 530-8500
    E-mails: mark.dangerfield@gknet.com
5          wct@gknet.com
    Attorneys for Defendants MedAire, Inc., Steven
6   Joe Reinhart, D.O., and Jessica Monas, M.D.

7                   UNITED STATES DISTRICT COURT

8                        DISTRICT OF ARIZONA

9
    LINDA ANN BAILLIE, individually, as          No. 2:14-cv-00420-PHX-SMM
10  Personal Representative of the Estate of
    JAMES DONALD BAILLIE, II, and on
11  behalf of all heirs and next of kin of
    JAMES DONALD BAILLIE, II, deceased,          **DECLARATION OF RONALD N.**
12                                               **ROTH, M.D., FACEP**
                Plaintiff,
13
            vs.
14
    MEDAIRE, INC.; STEVEN JOE
15  REINHART, D.O.; and JESSICA MONAS,
    M.D.,
16
                Defendants.
17

18      I declare under penalty of perjury that the attached expert reports dated May 25,

19  2016, and June 24, 2016, contain true and correct statements of opinions I have offered in

20  connection with this action.

21      Executed this 13   day of September, 2016.

22

23

24                                        Ronald N. Roth, M.D., FACEP

25

26

27

28

5610637v1/24709-0001

# EXHIBIT 3



University of Pittsburgh

*School of Medicine*
*Department of Emergency Medicine*

Forbes Tower, Suite 10028
3600 Forbes at Meyran Avenue
Pittsburgh, PA 15260
412-647-8287
Fax: 412-864-3400

### EXPERT REPORT OF RONALD N. ROTH, M.D., FACEP
### IN THE MATTER OF
### *LINDA ANN BAILLIE V. MEDAIRE ET AL.*

I have been asked by counsel for the defendants in this matter to review the
evidence and provide my professional opinions on various matters that I understand may
be important to this case. For convenience, I have organized my opinions into seven
separate sections, set forth below. All my opinions are based on a reasonable degree of
medical probability.

#### Qualifications:

I have been a board certified emergency medicine physician since 1986. In 2014,
I also received board certification in Emergency Medical Services (EMS), a subspecialty
of Emergency Medicine. I currently serve as a Professor of Emergency Medicine and as
Chief of the Division of EMS at the University of Pittsburgh Department of Emergency
Medicine. I also participate as an emergency physician in the STAT-MD service offered
by the University of Pittsburgh Medical Center ("UPMC"), and in that role provide
medical consultation services to airlines for inflight passenger emergencies and pre-flight
screening.

In addition, I serve as the medical director for various organizations, including the
City of Pittsburgh Department of Public Safety and the Emergency Operations Center of
Allegheny County, Pennsylvania. I also serve as the team physician for the Pittsburgh
Steelers.

A copy of my CV is attached to this report.

1

**First Set of Opinions:**

Giving remote advice to the pilot or crew of an airline about an ill or injured passenger has the narrow goal of assessing the passenger's symptoms and discussing the limited treatment options available until the plane lands. This is very different than treating a patient in an emergency department.

I understand that MedAire was the first company in the United States to offer, on a commercial basis, the service of providing remote medical advice to airlines, and MedAire thus developed the model for doing so. UPMC's STAT-MD offers a similar service in which I participate, which began in 1998.

Both MedAire's "MedLink" service and UPMC's STAT-MD service make emergency medicine physicians available for airline crews to speak to, 24/7, in order to receive medical consultation about ill or injured passengers. Such services are not intended to, and do not, function as a way for an emergency physician to diagnose and treat a patient on board an aircraft as he or she would do in an emergency department.

Rather, the services simply enable an airline pilot or crew member to briefly confer with an emergency physician about an ill or injured passenger's symptoms, and to receive advice on how the pilot or crew might handle that situation. In some cases the physician may also offer his or her view as to whether diversion of the flight to an unscheduled location might be medically appropriate, though only the captain of an airline has the authority to divert a plane to an alternate landing site. Remote medical advice services such as MedLink and STAT-MD help airlines better deal with ill or injured passengers, and may also reduce unnecessary flight diversions, which not only impose hardships on hundreds of other passengers, but can be dangerous as well.

Although both MedLink and STAT-MD make use of physicians trained in emergency medicine, the services are nothing like examining and treating a patient in an emergency department. MedLink and STAT-MD doctors typically are not able to see or speak to an ill passenger, and they receive information about the passenger second, third

2

or even fourth hand. For example, the ill passenger may talk to an onboard medical provider about his or her condition, who then tells a flight attendant, who then talks to the pilot, who then calls the remote medical service. Moreover, when medical information is collected and communicated by lay people, it is not uncommon for information to be passed on imperfectly. In addition, communications between the airplane and the remote service are often difficult to understand due to the poor quality of the air-to-ground phone patch.

Some airlines have facilities that permit MedLink or STAT-MD physicians to speak directly with an onboard doctor located outside the cockpit, which can sometimes make communications about an ill passenger much easier. But I have been advised that the British Airways (BA) aircraft involved here had no such facilities.

There is also limited diagnostic equipment available onboard an aircraft (mainly, as in this case, just a stethoscope and blood pressure cuff), assuming there is onboard medical personnel who know how to use the equipment and the equipment is functioning. Moreover, an airplane in flight is very noisy, and because of the noise, stethoscopic examination of the heart, lungs, or abdomen is usually impossible. Aircraft typically have no ECG machine on board, and have no ability to evaluate blood or urine samples. An airplane in flight is not only very noisy, but lighting is dim and space is confined, further complicating both the evaluation and treatment of ill passengers. Each aircraft has a medical kit containing some drugs, but its contents are very limited.

Some airlines do have equipment on board that permit an ECG of a passenger to be taken, which is a key test that can sometimes confirm that a passenger is experiencing a serious heart attack. But, once again, I understand that BA aircraft have no such equipment.

Also, when patients present in the emergency department, various risk scores have been developed which can be helpful in stratifying patients who are at risk for ACS, but those risk scores rely in part on data that is not available onboard an airline. One such

3

score, for example, is the "Thrombolysis In Myocardial Infarction" or "TIMI" risk score. Based on 7 elements, that test yields a score of from 0 to 7. A score of 0 is the lowest risk, and a score of 7 is the highest. A person gets one risk point for each of the following characteristics:

1. Older than 65 years of age;

2. Documented prior cardiac catheterization with known disease, prior angioplasty or stent, prior bypass, or prior myocardial infarction;

3. Three or more conventional cardiac risk factors, which include hypertension, diabetes, cholesterol elevation, family history of CAD/MI, or history of tobacco use;

4. Use of aspirin in the preceding 7 days;

5. Two or more anginal events in the past 24 hours;

6. ST-segment elevation or depression greater than 1 mm;

7. Elevated cardiac biomarkers.

If one tried to apply these factors to Mr. Baillie, his taking of an aspirin is the sole risk factor of which Dr. Reinhart was made aware, and based on that the passenger would have had a TIMI risk score of only 1, a very low risk. The TIMI risk score, however, could not be properly used to evaluate someone on an airplane, because essential data points 6 and 7 would not be available.

Finally, I have been advised that the emergency medicine physicians who give remote medical advice for MedLink are not employed by MedLink or MedAire, but rather work for Emergency Professional Services or "EPS," the medical group that staffs the emergency department at the Banner – University Medical Center Phoenix. I have also been told that, in 2012, none of the EPS physicians were stationed in the MedLink call center; rather, when an airline call came in, MedLink would page the emergency department for a doctor to come to the MedLink call center to respond to a call from an aircraft.

4

Because of the limited ability to diagnose or treat an ill or injured passenger on an airplane, an important part of both MedAire's and STAT-MD's service model is to help an airline keep such passengers *off* the airplane to begin with. MedAire does this by offering a "fitness-to-fly" assessment for passengers who, during boarding or before takeoff, appear to be ill or injured, or who advise the airline that they are ill or injured. When such passengers are identified, the airline can call MedAire, 24/7, and an experienced nurse or doctor will evaluate the circumstances and advise the airline whether the passenger should be allowed to fly. STAT-MD offers a similar service.

In 2012, for example, I have been advised that MedAire fielded more "fitness-to-fly" calls from British Airways (2,254) than for inflight medical emergencies (2,035). As a result, in 2012 MedAire recommended that 452 apparently ill or injured British Airways passengers not be allowed to fly. Those 452 "no fly" recommendations not only enabled the affected passengers to get prompt evaluation on the ground in a fully-equipped medical facility, but also ensured that the other passengers on the flight would not be put at risk due to issues arising from the ill or injured passengers.

But I understand that BA did no fitness-to-fly assessment of Mr. Baillie.

**Second Set of Opinions:**

I am not aware of any standards or protocols promulgated by or for the airline industry, or by or for practitioners of emergency medicine, relating to the provision of remote medical assistance for an aircraft in flight, let alone standards or protocols specifying when an emergency medicine physician who is providing remote medical advice to a commercial airline should recommend that the aircraft divert to an unscheduled location. Based on that state of affairs, in my opinion the standard by which a physician providing remote medical assistance for an aircraft in flight should be judged is that of reasonableness in light of all the circumstances, taking into account the peculiar challenges inherent in providing such remote advice.

5

Providing remote medical advice to commercial airlines is still a relatively young service. I understand that MedAire pioneered such a service in the United States beginning about 30 years ago. I also understand that, in the United States, MedAire and STAT-MD are still the only two companies offering that service as a medical business. Presumably because of the relative youth of such a service, there are no medical or scientific journals or textbooks devoted to this type of service, and there is little medical or scientific literature or studies discussing such a service or subjects which relate to such a service. Nor are there any randomized controlled trials or "RCTs"—the gold standard of medicine and one source of medical standards—relating to such a service. It is from these types of sources that medical standards of care are often derived.

Though I understand that the airline industry is heavily regulated to ensure the safety of passengers, and that multiple organizations promulgate standards for the safe operation of an aircraft, I am not aware of any industry guidelines or protocols that have been published or disseminated relating to providing remote medical advice to airlines. Nor am I aware of any industry standards or protocols that have been published or disseminated stating when it is necessary or appropriate to divert an aircraft due to a medical emergency.

Furthermore, based on my background and experience, because every case is unique it would be difficult to establish a uniform protocol, in other than very general terms, for how a physician should deal with any particular inflight emergency. It would be even more difficult to specify a specific standard as to when a physician should recommend that a plane divert to an alternate landing spot. This is due in part to the inherent difficulties—mentioned above and discussed further regarding my Third Set of Opinions below—in remotely diagnosing and treating a medical condition for a passenger on board a plane. But establishing standards for recommending diversion is also made difficult by non-medical, operational issues, such as the amount of time to potential diversion locations, the availability of adequate medical facilities at diversion

6

sites, the local weather, the plane's weight, crew duty time, and other factors. While the pilot will be the one to assess some of these operational factors, the MedLink physician must certainly consider the amount of time to reach potential diversion locations that would have adequate medical facilities.

As a result, in my opinion, only a very general list of things to consider in evaluating a diversion could be offered, and it's not at all clear to me that such written lists would be helpful, given the unique circumstances of every call. Thus, for example, STAT-MD provides no written guidelines, checklists or protocols to its physicians providing remote medical advice.

I understand, however, that a MedLink doctor or doctors at one point developed some written materials titled, "MedLink Physician Pearls for Remote Medical Care" (the "Pearls"). I understand that the Pearls were used as talking points when new MedLink physicians—already trained in emergency medicine—were receiving initial training in aviation medicine and the handling of remote calls from airlines.

One section of the Pearls, for example, discusses "Considerations for diversion." That section counsels that diversions should only be done if "medically necessary," and offers the EPS physician some issues to at least consider in deciding whether or not to recommend diversion. Those include:

- The location of the flight: For example, is the aircraft in the "[m]iddle of the ocean" or is it "about to leave the mainland and heading toward water"?

- The available resources: What medical resources are onboard, such as doctors willing to help, what medical care the passenger might need, and are there potential diversion sites having those medical resources? Are the landing and aircraft servicing resources available at potential diversion sites sufficient to handle the size aircraft and number of passengers safely?

7

- The emergency situation: What medically justifies a diversion? What are possible complications if the plane doesn't divert? Is the passenger's condition likely to worsen and compromise life or limb? Is it time critical?
- Family or crew considerations: A physician may want to involve the passenger or his family in diversion decisions, but they should be informed that diversion may mean being in a foreign or unfamiliar city.

I understand that MedLink physicians also use a "Diversion Justification Worksheet," which EPS physicians are taught to use to review some of the diversion considerations as a final check when a decision to recommend diversion has been made. That worksheet identifies three "Diversion Factors to Consider":

- "Does the diversion location have adequate medical facilities to care for the ill/injured passenger?"
- "Is the time of arrival at original destination less than 1 hour? If yes, reconsider diversion recommendation."
- "Is the time of arrival at diversion location greater than 1 hour? If yes, consider reassessing the passenger for diversion necessity."

The Pearls document also addresses some common medical issues that occur in-flight, such as allergic reactions, burns, urological conditions, and cardiac issues, and sets forth in bullet points things the MedLink physician might consider with respect to such issues.

In the "Cardiac" section of the Pearls, for instance, there is a subsection for "Chest Pain," and one bullet point in that subsection states: "Discussion regarding the differences in presentation of angina among males/females/diabetics." "Angina" is chest pain caused by reduced blood flow to the heart muscle, and is a symptom of coronary artery disease. The quoted bullet point was apparently just intended to remind the presenter to discuss the matter, because the material itself says nothing about the different presentation of angina among different classes of people.

8

However, the next two bullet points mention some specific considerations relating to angina. First, the material suggests that if the pain can be relieved with the resources onboard, such as oxygen or nitrates, then the "position is stronger for continuing the flight rather than diverting."  But "if the chest pain is ongoing for more than 20 minutes and the chest pain and shortness of breath cannot be relieved with onboard resources," then the material suggests that "this is a strong case for diverting" due to "potential coronary syndrome."

In context, I understand this part of the Pearls is referring not to just generic chest pain, but to angina—chest pain caused by coronary artery disease. So these considerations assume the MedLink physician has already made an initial determination that a passenger's chest pain is likely caused by angina, as opposed to a dozen or more other possible causes. And if a passenger not only has angina, but that angina is coupled with shortness of breath and those symptoms cannot be relieved with onboard resources after a short while, then those circumstances would suggest "a strong case for diverting."

The real difficulty, though—discussed further below—is determining whether the chest pain caused by cardiac ischemia, since most often it's not.

Moreover, I am generally aware that unscheduled landings for medical purposes are a serious problem for commercial air carriers. Decisions about diverting an aircraft are complex and difficult, because diversions mean delays in reaching the final destination, inconvenience to passengers, added costs, and increased risks to the safety of all passengers. Thus, it is simply not feasible for a plane to divert to an earlier landing every time a passenger might feel ill—even when it is uncertain what medical problem the passenger may be having. As a result of these factors, it is my opinion that whether a MedLink or STAT-MD physician should recommend diversion—and, if so, when—should be left to the professional judgment of the individual physician, based on his or her background, training and experience, and taking account of all the relevant circumstances.

9

Medicine has sometimes been referred to as "an uncertain science"; in the words of one medical writer, the "laws of medicine" are "really laws of uncertainty, imprecision, and incompleteness."[1] In light of these uncertainties, it would not be unusual for different physicians to arrive at different recommendations when faced with the same general patient presentations.

Given the inherent difficulties of remotely assessing the nature of a passenger's illness on an airplane, this applies even more so to the medical advice and diversion evaluations of MedLink and STAT-MD physicians.

**Third Set of Opinions:**

Identifying the etiology of Mr. Baillie's chest pain remotely in the conditions presented by BA Flight 289 was difficult, necessarily imprecise, and required the exercise of professional judgment in light of all the circumstances.

Chest pain is a very common symptom, but reliably detecting patients suffering from acute coronary syndrome or "ACS"—an umbrella term for situations where the blood supplied to the heart muscle is suddenly reduced or blocked— remains a diagnostic dilemma, even if a patient is seen in a hospital's emergency department. As the authors of one study stated:

> "Early triage of patients presenting to the emergency department (ED ) with the chief complaint of chest pain suggestive of acute coronary syndrome (ACS) remains a diagnostic challenge."[2]

In part, this is because chest pain is a symptom of, or can be caused by, many different maladies other than ACS, including among others, psychogenic causes (e.g. anxiety disorder), as well as diseases of the respiratory system (e.g. asthma, hypoxia,

---

[1] Siddhartha Mukherjee, *The Laws of Medicine: Field Notes from an Uncertain Science* (2015), pp. 6-7.
[2] M. Ferencik, et al., *Comparison of Traditional Cardiovascular Risk Models and Coronary Atherosclerotic Plaque as Detected by Computed Tomography for Prediction of Acute Coronary Syndrome in Patients with Acute Chest Pain*, Academic Emergency Medicine, August 2012, Vol. 19, No 8.

pneumonia), gastrointestinal system (e.g. gastritis, esophageal diseases), and the musculoskeletal system (e.g. muscular strain, costochondritis). Chest pain can also stem from non-ischemic cardiac issues, such as pericarditis, which is an inflammation of a fluid-filled sac, the pericardium, which covers the outer surface of the heart. And the fact that chest pain has continued for some time does not make it more likely to be ischemic in nature. For example, pneumonia, reflux, and pneumothorax, among other conditions, may last for extended periods of time, and their symptoms may include chest pain and difficulty breathing.

In light of the above, an emergency physician considering what the cause of chest pain might be has to evaluate the probabilities. As one physician has expressed it: "Every diagnostic challenge in medicine can be imagined as a probability game"; thus one must consider how likely it is that chest pain is cardiac in origin, and then "summon the evidence to increase or decrease the probability."[3] That evidence may include, among others, a patient's medical history, findings from a physical examination, past experiences, and a physician's understanding and interpretation of the pertinent literature.

As regards the probabilities, studies show that the vast majority of patients presenting at the emergency department with chest pain are *not* experiencing a heart attack or other type of ACS. For example, in one study, only 31 of 368 patients (8%) presenting to an emergency department with the chief complaint of acute chest pain were ultimately diagnosed with ACS, and of those, only 8 of the 368 patients—just 2%—were found to have experienced a myocardial infarction or heart attack.[4] As the authors concluded, "In our study, chest pain characteristics in isolation did not predict ACS." *Id.*

_____

[3] Siddhartha Mukherjee, *The Laws of Medicine: Field Notes from an Uncertain Science* (2015), p. 26.
[4] M. Ferencik, et al., *Supra. Comparison of Traditional Cardiovascular Risk Models and Coronary Atherosclerotic Plaque as Detected by Computed Tomography for Prediction of Acute Coronary Syndrome in Patients with Acute Chest Pain*, Academic Emergency Medicine, August 2012, Vol. 19, No 8.

Another study analyzed 3,929 visits to a hospital ED of persons with chest pain or other related symptoms suggestive of myocardial ischemia.[5] In that study, only 5.7% of the patients were confirmed to have had an MI, while another 12% were found to have unstable angina. *Id.* Fully 82% of the patients were diagnosed as having no ACS. *Id.* As the authors of the study stated, "Risk stratification for patients who present to the emergency department (ED) with chest pain syndromes, in the absence of diagnostic electrocardiographic (ECG) findings, remains an inexact science."

In the emergency department, a physician would order a test to confirm or deny a preliminary assessment based on the probabilities and the evidence discussed above. But for a passenger experiencing chest pain onboard an inflight aircraft such as BA 289, where there are generally no diagnostic tools available, such as an ECG or blood tests for cardiac biomarkers, there is simply no way to confirm if the chest pain in question is being caused by what is commonly called a heart attack.

Thus, a MedLink physician giving remote advice concerning a passenger with chest pain as a symptom must make a clinical judgment—a judgment based on limited information with many uncertainties—as to whether the chest pain stems from cardiac ischemia. And making such a clinical judgment remotely is even more difficult when, as here, the MedLink doctor cannot speak with or observe the passenger.

This approach is not like addition or multiplication, in which the correct technique yields one clear, "right" answer. It is more like envisioning the cause of chest pain as a continuum that goes from "very unlikely to have been caused by cardiac ischemia," on the one end, to "quite likely to have been caused by cardiac ischemia" on the other end. The physician must consider the evidence—which for a MedLink physician operating remotely will almost always be indeterminate—and make a clinical judgment. Because of

---

[5] C. Pollack Jr., et al., *Application of the TIMI Risk Score for Unstable Angina and Non-ST Elevation Acute Coronary Syndrome to an Unselected Emergency Department Chest Pain Population,* Academic Emergency Medicine, January 2006, Vol. 13, No. 1.

the uncertainties, well-trained and experienced physicians considering the same set of evidence may disagree about what that evidence shows.

### Fourth Set of Opinions:

In my opinion, given his background and experience and in light of all the circumstances, Dr. Reinhart acted in a usual and reasonable manner in his interactions with and recommendations to BA 289, and thereby complied with the standard of care applicable to an emergency physician providing remote medical advice to the crew of an aircraft.

Here, Dr. Reinhart acted in a usual and reasonable manner in first confirming with the air crew the age, gender, medical complaint and symptoms of the passenger (61-year old male, chest pain, pale), then immediately asking whether the passenger had any cardiac history. Upon learning that the passenger had no history of any cardiac problems, "nothing at all," and that he was not on any medications, Dr. Reinhart asked about the passenger's aspirin use, and learned that he'd taken an aspirin a little more than three hours earlier.

That Mr. Baillie was on no medications and had no prior history of cardiac problems certainly lowered the probability of ACS as the source of the chest pain. The classic symptoms of ACS or a heart attack may include crushing chest pain, especially when it radiates to the arm or jaw, nausea, diaphoresis, and shortness of breath. But other than chest pain, the airline did not advise Dr. Reinhart of any such symptoms.[6]

The passenger's symptoms as first reported to Dr. Reinhart were thus at best ambiguous, and would not have immediately justified a conclusion that Mr. Baillie was

---

[6] The transcript of the first phone patch shows that the pilot told the MedAire CSE that the passenger was "a little out of breath when he boarded," and "feels a little hot," but doesn't indicate that he had any continuing breathing problems and doesn't say he was sweating. More importantly, the CSE didn't pick up the "out of breath" or "feels a little hot" comments—as is clear from her confirmation back to the pilot of the passenger's symptoms—and Dr. Reinhart himself was thus never given those bits of information.

likely suffering from an MI or other form of ACS. As discussed above, studies show that from 80 to 95% of the time, a person who comes to a hospital emergency department because of chest pain is not suffering from ACS, and chest pain in isolation does not predict ACS. Moreover, in the situation at issue here, the passenger's lack of any cardiac history or other problems that can predispose one to ACS, such as diabetes or high cholesterol (that he was on no medications shows this), in fact suggested that the passenger was at relatively low risk for ACS.

### *Dr. Reinhart's request for an onboard doctor to evaluate the passenger.*

But as already noted, the source of chest pain is hard to diagnose, and Dr. Reinhart couldn't rule out an MI or other form of ACS. Moreover, Dr. Reinhart would have understood that, in general, men are more apt to have heart disease as they get older. So, in Dr. Reinhart's words, he was "just a little bit concerned about with his age, the pain and the fact that he is pale," and he thus asked the aircraft crew to have an onboard doctor evaluate the passenger, and get a "set of vital signs" to determine whether nitroglycerine could be given him. This request is what I would expect a reasonable physician acting in the usual manner to make, in light of the passenger's symptoms.

The aircraft called back about 20 minutes after the end of the first phone patch. In this second call, Dr. Reinhart was told that there was a physician on board who had evaluated the passenger, that the passenger's blood pressure was 100/70, and that he had a pulse of 100 and crackles in the left chest.[7] This additional information was not helpful

---

[7] The transcript of the first repatch shows that a member of the BA cabin crew told the MedLink CSE that the passenger had "an irregular pulse" of 100 and that he was "confused still." The CSE heard the "irregular" comment, but not the comment about being "confused still," as her confirmation back to the cabin crew member demonstrates. The transcript shows that Dr. Reinhart, however, was not told about either symptom. In any event, "confusion" is not a recognized symptom of ACS. And without an ECG, there was no way to gauge whether the supposedly "irregular" pulse was benign or serious. Notably, though, when Mr. Baillie landed in Phoenix and was transported to St. Luke's medical center, the ECG taken by the EMTs while en route showed his heart having a normal sinus rhythm—it was not irregular.

14

in determining the cause of the chest pain. The passenger's blood pressure of 100/70 was within the normal range. However, it was a little lower than what many physicians prefer in order to administer nitroglycerin (which itself can lower someone's blood pressure), and Dr. Reinhart reasonably decided not to administer nitroglycerin. But blood pressure of 100/70 is not by itself a sign of a serious illness and is not a recognized feature of ACS. Similarly, a pulse of 100 is just at the top of the range that is generally accepted as normal, but it's not uncommon for pain or discomfort or anxiety to elevate one's pulse rate some.

Dr. Reinhart also acted reasonably in discounting the report of "crackles" based on his experience that the ambient noise of a 747 in flight would make it impossible to hear crackles, and in his quarter of a century of providing remote medical advice to aircraft, he had never had an onboard medical person claim to have heard crackles. Published studies have confirmed the difficulties of auscultation on board an aircraft. In any event, crackles are rarely heard on only one side of the chest, but if they were, it might be more indicative of a lung issue such as pneumonia, less likely congestive heart failure. And notably, when Mr. Baillie was examined on the ground, neither the EMTs, the emergency department physician, Dr. Hess, nor the cardiologist, Dr. Candipan, reported hearing any crackles; to the contrary, they all indicated that Mr. Baillie's breath sounds were within normal limits.

Dr. Reinhart also acted in a usual and reasonable manner in asking whether the onboard doctor had any further suggestions following his examination of the passenger. In response, Dr. Reinhart was told: "No no she [sic] did not have any suggestions. We have three onboard actually so we are OK." If the physician onboard who actually observed and examined Mr. Baillie was concerned that he might be suffering from ACS, I would expect him to have suggested as much, but he did not. Likewise, had the onboard doctor noted other symptoms, I would have expected him to have reported those (*e.g.* ongoing breathlessness or radiating pain or extreme pain). And had the onboard

15

doctor noted other ACS risk factors—such as that the passenger was a smoker, or that he was obese or overweight—I would have expected him to have reported those factors as well. But instead the onboard doctor, despite thinking he had heard "crackles" in Mr. Baillie's chest, reported nothing: he had "no suggestions" as to what was wrong with Mr. Baillie or what the source of the chest pain was.

*The location of the aircraft over the North Atlantic.*

I have been advised that, by the time of the first repatch with Dr. Reinhart, BA 289 was over the North Atlantic Ocean, just south of Greenland. At that point, the closest diversion locations with nearby medical facilities having a 24-hour cardiac catheterization laboratory were St. John's, Newfoundland, if the plane continued westward, or Keflavik, Iceland, if the plane turned around and headed back east—but according to MedAire's expert pilot Mr. Fortune, each of those diversion points was about two hours away. Based on my background and experience, when the closest diversion point is hours away and the cause of a passenger's symptoms is not clear cut, a physician experienced in offering remote medical advice to airlines would not likely recommend immediate diversion.

At this point, all reasonable diversion points were forward; it would not have made sense to turn the plane around and head back east to Keflavik, Iceland. In a two-hour time frame, symptoms will often change and the reasonable recommendation would be to have the aircraft continue toward the planned destination, which would also have the aircraft heading towards potential reasonable diversion points, if necessary. Even if ACS were a likely source of the chest pain, with the only diversion points greater than 2 hours away, declaring a diversion actually accomplishes very little, and diversions always carry risk.

Given all of the above facts, Dr. Reinhart acted in a usual and reasonable manner in recommending that the passenger remain on supplemental oxygen, and that the flight continue toward its original destination, with the provisos that (1) the onboard doctor monitor the passenger every 15-30 minutes; and (2) if the passenger's condition changed

or worsened, the flight should call back and at that point the pilot would have to consider a diversion.

*MedAire's use of a hand-written intake form.*

I have been advised that MedAire uses a hand-written "Intake Form" for the MedLink Communications Specialist Executive ("CSE") to record a few basic facts about each call, including the flight number, the destination and ETA, the time remaining, and the "Brief Medical Complaint." The form also has space for the physician to record any notes he or she may want to make for personal use. For BA 289, the CSE wrote in the "Brief Medical Complaint" box: "Central chest pain; pale." For his part, Dr. Reinhart checked the box indicating that an ALS ambulance should be arranged to meet the plane at the airport, as well as the box labeled "Repatch if conditions worsens."

The intake form is not a medical record, and there is no industry custom, standard or requirement that Dr. Reinhart record certain details on a written intake form. STAT-MD, for example, does not even use a written intake form, but simply has its communication specialists input information into a computer database. If a STAT-MD physician wants to make some notes about a call for his or her own use, the physician does so using his or her own note paper, and that is not retained.

While in the abstract one can theorize that putting more information on the form could be helpful if a repatch were needed, in the remote medical advice environment, during the few minutes Dr. Reinhart was on the satellite phone patch, he needed to pay careful attention to what he was being told by the air crew, and could not allow himself to be distracted from that task, as taking extensive notes might have done. On the other hand, the CSE has the greater opportunity to make notes, and in this case the CSE's computerized notes of the call reasonably covered the important points of the call.

*Dr. Reinhart exercised reasonable professional judgment.*

As stated above, in my opinion whether or not to recommend diversion is left to the professional judgment of the individual physician. At the time of BA 289 in March

2012, Dr. Reinhart had been board-certified in, and had been actively practicing, emergency medicine for more than 25 years. He had also been providing remote medical advice to airlines for 25 years. Dr. Reinhart's judgment was thus informed by substantial background and experience. And in the circumstances present with BA 289, he understood there were no available options for immediate diversion. Dr. Reinhart thus exercised reasonable professional judgment in not immediately recommending diversion, but also advising that, if the passenger's condition worsened, diversion "would have to be considered."

**Fifth Set of Opinions:**

In my opinion, given her background and experience, and in light of all the circumstances, Dr. Monas also acted in a usual and reasonable manner in her interactions with and recommendations to BA 289, and thereby complied with the standard of care applicable to an emergency physician providing remote medical advice to the crew of an aircraft.

Following the end of the first repatch involving Dr. Reinhart, more than three hours elapsed before the aircraft called MedLink again for a second repatch. By that time, Dr. Reinhart had completed his shift at the hospital, so another EPS physician, Dr. Monas, responded to MedLink's page of the emergency department.

*Prior to speaking with Dr. Monas, the pilot was already considering diversion because the onboard doctor reported that the passenger seemed worse.*

The pilot is in charge of an aircraft, and he or she is the only who can make a decision to divert for medical or other reasons. In making that decision, however, it is not unusual for the pilot to seek counsel from the airline crew, from onboard physicians, and from a remote medical service such as STAT-MD or MedAire, before deciding on a course of action.

According to the BA crew, the reason for the second repatch was that the passenger was feeling worse, although his vitals remained about the same. As a result—

and in keeping with Dr. Reinhart's earlier recommendation—the pilot told Dr. Monas that they were considering making a diversion. Specifically, the pilot told Dr. Monas that the onboard doctor had said that the passenger:

> "did look considerably worse and his [the onboard doctor's] recommendation was to re-evaluate in 30 minutes which is now about 20 minutes and suggested that at that time we might consider making a diversion."

The pilot also said that he "wanted to speak with you first and get your take." By the time of this call, the pilot had already notified BA Operations in London that the plane might divert to an earlier landing.

These facts put the patches with Dr. Monas in a rather different category than the initial patch with Dr. Reinhart. Before the call to Dr. Monas, the pilot was already considering diversion—presumably because Dr. Reinhart had specifically advised the pilot he would need to do so if the passenger's condition worsened—and had already advised BA Ops of the possibility of diversion. Before the patches with Dr. Monas, an onboard doctor had also recommended considering diversion, subject to evaluating the passenger's condition one more time in a few minutes. It thus appears that the pilot's intent in the call to Dr. Monas was simply to get one more point of view on the diversion issue.

*The cabin crew gives Dr. Monas additional facts about the passenger and Dr. Monas recommends looking for diversion locations.*

Dr. Monas initially suggested giving the passenger nitroglycerin and then reporting back the results. Following the second repatch, the flight then called back for a third repatch. In that repatch, the pilot said that, in light of the passenger's blood pressure (100/80), the onboard doctor was "not happy at all" with giving him nitroglycerin. A member of the flight crew then gave Dr. Monas some further details about the passenger's symptoms—including not only that he was having central chest pain, but that he was having difficulty breathing, that this was initially associated with "running toward the gate because he was in a rush," and that he was hot and looked sweaty. These

19

additional facts heightened the possibility on the chest pain continuum that ACS might be the source.

Based on all these facts, and noting that "obviously we are here, you guys are in the air and evaluating the patient," Dr. Monas agreed that "if you feel the patient is not looking well," and that "we need to divert, then MedLink would "start to take a look at diversion locations." As the CSE's contemporary notes of this call stated: "Dr. Monas Recommends to consider diversion locations and options."

The pilot then expressed his agreement ("Yeah ok,") and the MedLink CSE immediately called BA Operations Control in London to coordinate the diversion. This was in keeping with BA's written protocol with MedAire, which specifically stated that MedAire would:

> "Contact BA Ops only for patches involving a diversion, a death on board, or if EMS arrangements are made at any scheduled destination."

The pilot told BA Ops Control that the flight was "closest to Chicago at the moment," and "we're going to get an update from the doctor onboard in the next ten minutes or so," and then the pilot would "give you a call to let you know what our decision is if we do have to divert." This statement underscores that the pilot was in charge, and that he felt he now had the information from MedAire he needed for him to make his final decision.

The MedLink CSE and BA Ops Control then agreed that they would both notify Chicago of the possibility of a diversion to ORD. In addition, the MedLink CSE specifically asked the pilot: "If anything does come up or if you have an update please do call us right back, we'll bring Dr. Monas back on the line." And that ended the third repatch .

By the end of the third repatch, it appeared that the key people involved—the pilot, BA Operations Control, Dr. Monas and the MedLink CSE—all understood that the

plan was, subject to checking once more with the onboard doctor, for BA 289 to divert to ORD in Chicago, and that the pilot would call MedLink to update them within ten to fifteen minutes. Because BA 289 never called back, any evaluation of Dr. Monas's actions ends at that point.

Based on the above, it is my opinion that Dr. Monas acted reasonably in agreeing, based on the passenger's reported symptoms, that if the crew and onboard doctors felt that the passenger was not looking well, then diversion made sense, and in also advising that MedAire would thus look for diversion locations and notify ORD in Chicago of the possible diversion.

### Sixth Set of Opinions:

In my opinion, based on all the circumstances, MedAire's CSEs acted in a usual and reasonable manner in handling the medical emergency posed by BA 289, and in a way that was in all significant respects consistent with how STAT-MD communications specialists would handle such a situation.

I understand that MedLink operates a 24-hour call center in the emergency department of the Banner – University Medical Center Phoenix (formerly Banner Good Samaritan Medical Center). The call center is staffed 24/7 with MedLink CSEs who have been trained to communicate with many different airlines, and to interface between the airlines and the MedLink physicians. The MedLink call center is equipped with telephones and computers. The computers are able to show the physicians the exact contents of a particular airline's medical kit. Using Flight Aware, the MedLink call center computers are also capable of showing the physicians just where a particular airline is in flight. I have been advised that MedLink also maintains a large database of information as to the availability of medical facilities near thousands of airports around the world, and that database is accessible to the CSEs.

MedAire CSE Michelle Tyler answered the first phone patch from BA 289, and properly asked for the basic information about the situation, including the flight number,

21

ETA, and aircraft type. She then asked for the age, gender and medical concern of the affected passenger, and when the pilot responded, she properly repeated back her understanding of what the pilot had just said, to make sure she had it right. The pilot then affirmed the CSE's understanding—even though she had in fact omitted two pieces of information in her confirmation: that the passenger had been "a little out of breath when he boarded," and that the passenger "feels a little hot."

The CSE then paged for a physician, briefed Dr. Reinhart offline, and Dr. Reinhart joined the patch. During the initial phone patch and the first repatch, Ms. Tyler properly stayed on the line, listened to the conversation, and typed into what was then MedAire's proprietary DataLink 2000 ("DL2K") computer program a summary of the information communicated by the air crew and by Dr. Reinhart. The reverse side of the handwritten Intake Form had three blanks for information about repatches, and Ms. Tyler wrote in the first of those: "Pulse 100"; "BP 100/70"; "Chest pain, crackles left hand." Ms. Tyler's typed comments into the computer database included that: "The pilot reported that they have 3 physicians on board, and they have no suggestions as to what the cause." Her typed comments also noted Dr. Reinhart's advice to keep the passenger lying down and on oxygen, to continue to monitor him, and that if his condition worsened "then to repatch and a diversion would be the next step."

MedAire CSE Matt Whitley responded to the second repatch a few hours later, apparently because Ms. Tyler was busy on another phone patch. Since Dr. Reinhart had by then gone off shift, the new CSE properly paged the emergency department for another physician, and Dr. Monas responded to that page. Mr. Whitley briefed Dr. Monas on the main medical complaint of the passenger.

Ms. Tyler's computer notes recorded that Dr. Reinhart had recommended administering one nitroglycerin if the passenger's blood pressure was adequate, but her notes did not record Dr. Reinhart's decision not to administer the nitroglycerin in light of

the blood pressure reading. Mr. Whitley may have thus told Dr. Monas, initially, that the passenger had received a nitroglycerin. This error was corrected by the crew, however.

During the second and third repatches, Mr. Whitley properly stayed on the line and typed into MedAire's DL2K computer program a summary of the information communicated by the air crew and by Dr. Monas. Mr. Whitley also properly brought BA Ops Control on the line after both the pilot and Dr. Monas had agreed that the plane should consider diversion locations.

Following the end of the third repatch, MedAire CSEs followed up with BA Ops Control in multiple calls to determine whether the plane was diverting, and also lined up EMTs to meet BA 289 at Phoenix Sky Harbor when the plane landed.

In my opinion, MedAire's CSEs thus acted in a usual and reasonable manner in handling the situation at issue here.

### Seventh Set of Opinions:

In my opinion, BA acted unreasonably and in violation of industry norms by failing to seek a fitness-to-fly opinion, failing to provide MedAire with material information, and failing to seek MedAire's advice before deciding not to divert the plane after all.

#### *BA's failure to seek a fitness-to-fly assessment*

According to each of Dr. Candipan (the cardiologist who treated Mr. Baillie at St. Luke's), Dr. Adams (a resident Mayo Clinic doctor who examined and spoke with Mr. Baillie when he was admitted to the Mayo Clinic on 3/30/12), Mr. Frank Fleming (now one of Mrs. Baillie's lawyers), and Mrs. Baillie herself, Mr. Baillie told them that he first began to experience chest pains while rushing to catch his plane in London. Mr. Baillie further told Dr. Adams that, while awaiting takeoff, the pain got worse, and so he took four baby aspirin and notified the flight attendant, who "tried to reassure him" so that the flight "left the United Kingdom as scheduled."

23

Mr. Baillie also told his wife, Mrs. Baillie, that he "had to rush to make his flight from London to Phoenix," and that "when he arrived at the gate he was having breathing problems and feeling discomfort in the center of his chest." He further told his wife that, by the time "he got on board the airplane a few minutes later, the discomfort in his chest had become painful, so right away he told a flight attendant that he was not feeling well and had chest pains and was short of breath and that he wasn't sure he should be on the flight." According to Mr. Baillie, "the flight attendant told him to please sit down in his seat and that they would take care of him, so he did." Further, according to what Mr. Baillie told his wife, "after sitting for a minute or two, the pain in his chest had not gone away so he told the flight attendant again that he was short of breath and experiencing chest pains and that he really did not feel well."[8] But the flight attendant "again asked him to take his seat and told him that they would take care of him." Mr. Baillie also told his wife that, a short time later, "the airplane door was closed by the flight attendants, and that at that moment he felt imminent doom."

While Mr. Baillie was in the hospital he also told Mr. Frank Fleming—a lawyer who had been asked to consider representing Mr. Baillie in "a possible personal injury claim against BA"—that "he had the chest pains as he was rushing to make the flight, and as soon as he got onboard, he reported these pains to a flight attendant…." Mr. Baillie also told Mr. Fleming that he "expressed his concern about remaining on the flight for ten hours, and was directed to sit down." The flight attendant told him that "BA would take care of him and he would get better after resting a few moments."

---

[8] The flight attendant's deposition testimony in this case was somewhat different. According to her, shortly after boarding the plane, Mr. Baillie told her he had been running to the gate, and was very thirsty and a little out breath. He asked her whether he should get off the plane, and she told him no, and reassured him that if he sat down and relaxed, he may start to feel better and not be out of breath anymore. A short time later the airplane doors closed, and a while later the plane taxied and took off.

Based on my experience, when it appears to a gate agent or flight attendant that a passenger—who is either boarding a plane or already on board a flight awaiting takeoff—may not be feeling well, airline industry custom and practice require the agent or attendant to notify the pilot and/or seek the opinion of a medical professional as to whether that passenger is fit to fly, and this is particularly true for a lengthy transatlantic flight such as BA 289. However, the members of the BA 289 crew failed to do so.

Both STAT-MD and MedAire provide a service that allows an airline to call, 24/7, to inquire about a passenger's fitness to fly. And BA literature directs that MedAire be called in such instances: "Where there is doubt about a passenger's fitness to fly, advice should be sought from MedLink."[9]

Mr. Baillie's pre-flight symptoms as he described them to the BA flight attendant clearly raised a serious concern about his fitness to be aboard an almost-11-hour non-stop flight across the ocean. In my opinion, a medical professional involved in aviation medicine, who had been consulted about the matter and advised of Mr. Baillie's pre-flight symptoms, would have recommended that Mr. Baillie not be permitted to fly without first getting a medical evaluation from a doctor on the ground. I personally would have so recommended. But the BA 289 crew failed to call MedAire, or take any other steps, to assess Mr. Baillie's fitness to fly.

*BA's delay in contacting MedAire.*

In addition to BA's failure to conduct a fitness-to-fly assessment of Mr. Baillie before takeoff, BA also delayed contacting MedAire for the first time until 18:45 UTC, about three hours after takeoff. By that point, the aircraft was over the North Atlantic Ocean.

According to the testimony of the BA cabin crew, the captain was notified by about 17:15 UTC that there was a first class passenger experiencing chest pain. At that

---

[9] BA Cabin Crew Aviation Medical Manual, Ch. 2, p. 29.

point, I understand that it would have taken the aircraft less than an hour to land at an airport in Ireland. But the pilot still waited another hour and half until contacting MedAire, by which time there were no reasonable diversions locations.

In addition, following the end of the first repatch, the pilot waited another three hours until contacting MedAire again.

In my opinion, the long wait before calling MedAire for the first time, and the similar long wait before calling MedAire after the first repatch, was unusual and contrary to my experience at STAT-MD.

*BA's failure to provide MedAire with material information about Mr. Baillie.*

During the initial phone patch, Dr. Reinhart asked the flight to page for an onboard medical person to "evaluate" the passenger and get a set of vital signs. In response to the cabin crew's page, I have been advised that a few doctors came forward, and the crew selected one, Dr. Verma, to help.  According to Dr. Verma's deposition testimony, after he checked Mr. Baillie's vital signs, he felt that Mr. Baillie looked "very unwell" and "belonged in a hospital," and he says that both he and another doctor traveling with him who was present at the examination gave that information to the BA flight attendant.  But the flight attendant never passed on that piece of information to MedAire or Dr. Reinhart. Once again, based on my experience in the industry, it was contrary to usual custom and practice for the cabin crew and flight crew not to pass on that type of information to the MedLink doctor.

*BA's failure, once a preliminary decision to divert had been made, to seek MedAire's advice before ultimately deciding not to divert the plane.*

Following the third repatch, it appears from the transcript of the patch that the pilot, BA Operations, Dr. Monas, and the MedAire CSE all anticipated that BA 289 would divert to Chicago (subject to the pilot checking one more time with the onboard doctor), and that the pilot would update MedAire on the matter "within ten or fifteen" minutes. I understand, however, that after the end of the third repatch, the pilot was told

26

by the cabin crew that Mr. Baillie did not want to divert, and that two onboard doctors felt that continuing on to Phoenix at that point would not worsen Mr. Baillie's condition. Apparently based on those two factors, and without checking with MedLink, the pilot then decided not to divert the aircraft but to continue on to Phoenix. Based on my experience, the pilot should have contacted MedAire and solicited advice from a MedAire doctor regarding that decision, but the pilot did not.

In my opinion, the pilot failed to follow usual custom and practice in failing to consult with a MedLink doctor at that point regarding the pilot's decision to continue on to Phoenix and not divert the flight.

*Compensation*

I am being compensated at the rate of $300 an hour for my work on this case.

_____          ___5/25/2016_____

Ronald N. Roth, M.D., FACEP          Date

## APPENDICES

A.      Curriculum Vitae (including list of publications in the last 10 years)

B.      List of Materials Considered

C.      Recent Expert Testimony

27

# EXHIBIT 4

# University of Pittsburgh

*School of Medicine*
*Department of Emergency Medicine*

Forbes Tower, Suite 10028
3600 Forbes at Meyran Avenue
Pittsburgh, PA 15260
412-647-8287
Fax: 412-864-3400

**EXPERT REBUTTAL REPORT OF
RONALD N. ROTH, M.D., FACEP
IN THE MATTER OF**
*LINDA ANN BAILLIE V. MEDAIRE, ET AL.*

I have been asked to review the February 1, 2016 report of Dr. Robert Candipan, as well as the March 21, 2016 report of Captain Daniel Mesnard, and provide my professional opinions on issues they address that fall within my expertise. I base my opinions on my background, training and experience, as well as my review of the evidence made available to me in this case. My qualifications were previously set forth in my expert report dated May 25, 2016, to which was attached my CV.

All my opinions are based on a reasonable degree of medical probability.

In general, it is my opinion that:

• Dr. Candipan's report shows a lack of awareness or expertise for the manner in which remote medical advice can and should be provided to an aircraft. Many of his comments are more appropriate for a patient in a hospital or hospital emergency department.

• Dr. Candipan's conclusions about what the MedLink physicians should have done also rely on data that was not provided to them.

• Dr. Candipan's opinion that Dr. Reinhart should have recommended that BA 289 divert to another airport also fails to acknowledge that the flight was then in the middle of the North Atlantic Ocean, about two hours from any diversion point with

1

appropriate medical facilities. By continuing on, the aircraft was moving towards land, toward more potential diversion sites.

• Dr. Candipan's report also fails to acknowledge that Dr. Monas, the MedAire CSE, and BA Operations, all believed that BA 289 was diverting, and it was indeed the BA flight crew, based on additional information they received from the onboard physicians (which information was not given to Dr. Monas), who eventually decided not to divert.

• Captain Mesnard's report surprisingly fails to address the most significant error that occurred on the BA 289 flight with regards to Mr. Baillie: the failure of the flight crew to contact the pilot before takeoff and make him aware that there was an ill passenger on board. Captain Mesnard's report also expresses opinions for which he has no expertise relating to the inflight medical advice given by MedAire, and betrays a misunderstanding of the relationship between the flight crew and the remote medical advice service.

**First Rebuttal Opinion: Dr. Candipan's opinions are based on mistaken or misrepresented assumptions about key facts.**

In his February 1, 2016 report, Dr. Candipan sets forth the facts upon which his opinions are based. Unfortunately, many of the facts he relies upon are incorrect, and those inaccuracies in turn affect his medical opinions. I believe my initial report accurately sets forth the important facts, so I will not try and list here all the facts that Dr. Candipan's report misstates. A few instances make the point.

For example, Dr. Candipan says that it was "consistently made known that Mr. Baillie was having continuous chest pain and shortness of breath despite the administration of oxygen, had a low blood pressure and an irregular pulse, was pale, diaphoretic and confused." But as noted in my Fourth Set of Opinions in my 05/25/16 report, the only description Dr. Reinhart initially received was that the affected passenger was a 61-year old male who had chest pain and was pale. After an onboard doctor, Dr.

2

Verma, examined the passenger, Dr. Reinhart was given the additional information that the passenger's blood pressure was 100/70 and that he had a pulse of 100 and crackles in the left chest. Dr. Reinhart was not told that the passenger had shortness of breath or that he was "diaphoretic and confused."

Nor does the transcript of the phone patch support Dr. Candipan's statement that Dr. Verma indicated to the crew that "Mr. Baillie did not look well and needed to be in a hospital," and that the crew "relayed Dr. Verma's findings to Dr. Reinhart. . . ." Rather, and of importance, the transcript shows that Dr. Reinhart specifically asked the crew whether the passenger had any "cardiac history in the past," and was told, "He's got no medications with him and he doesn't have an history of any cardiac. No nothing at all." And after the passenger was evaluated by the onboard physician, Dr. Reinhart specifically asked whether that doctor had "any further suggestions after his evaluation," and he was told, no, the onboard doctor "did not have any suggestions."

Nor does the transcript support Dr. Candipan's statement that Dr. Reinhart was told of "the presence of shortness of breath continuing unabated for 3-4 hours. . . ."

Dr. Candipan's report also misstates some of the facts relating to the phone patches between Dr. Monas and the aircraft. Some of Dr. Candipan's misstatements may stem from his lack of understanding about the satellite patch process. It is not uncommon for satellite phone patches between an aircraft and a ground-based medical provider to be hard to hear. Although in this lawsuit we may for simplicity work from a written transcript of a phone patch, we must keep in mind that the actual phone patch was audio only and that it transpired in real time, with no ability to stop and re-read or to re-play what was just said.

To help cope with these inherent challenges to providing remote medical advice, MedAire CSEs are taught to repeat back to the caller what the CSE heard, to confirm the CSE heard it right. This means that the only things we can be sure the CSE heard are the things the CSE repeats back to the caller on the aircraft or records in his or her notes.

3

For example, at the beginning of Repatch # 2, a member of the cabin crew tells the CSE, according to the written transcript prepared later:

> "I got a little bit of update for you. We've just had uh a doctor checking our uh passenger a couple of minutes ago. Uh his vitals are the same. His B/P is 100/80 and [h]is pulse is 100. Um the doctor told us he looks the same but he says that he feels worse and he is sweating and so he's still complains [sic] about the pain in the center of his chest. The doctor did check um if had any pain down his arm, left or right or any other place and he said he didn't. That is all the update I've got so far."

For his part, the MedAire CSE then confirmed the details that he heard: "Understand ma'am and just to confirm so the vitals are the same although the passenger feels worse; negative for arm pain. *Is that correct?*" (emphasis added). The BA crew member then said, "That's correct."

Note that the MedAire CSE did not pick up the reference to sweating, and the BA crew member did not realize that the "sweating" reference had not been heard. These types of miscommunications are inherent in the system, and just happen; neither the BA crew member nor the MedAire CSE can be blamed for failing to fully communicate in these types of situations.

Dr. Candipan also states that, when Dr. Monas was brought onto the patch at 22:38 UTC, she "did not appear to be fully aware of what had previously transpired, as the worksheet (MedLink Intake Form) used by Dr. Reinhart to record notes of the prior conversations had minimal information." In so stating, Dr. Candipan incorrectly assumed (or perhaps had been incorrectly told) that the Intake Form was designed as the vehicle to educate a successor physician as to what had transpired in a prior patch with another physician. But that is not the purpose of that form.

Rather, during a patch, the CSE—who has more time than a physician to make notes during a phone patch—types notes into a computer program. Once typed into the system, those notes are then available for that CSE or a successor CSE to use to bring a new physician up-to-date on what has transpired. Here, for example, the CSE's computer

4

notes say that, at 19:18, the "flight attendant reported that the passenger's pulse is irregular, BP 100/70 with increased chest pain and crackles on the left side." Moreover, the Intake Form in this case does refer to the "crackles left hand."

In addition, the most important vehicle for a new physician to get up-to-date is to ask the aircraft crew directly, which is what Dr. Monas did. Though potentially frustrating for the cabin crew, this practice reduces the number of parties playing the "telephone game," and allows for confirmation of details and provision of updates. Dr. Monas' questions eventually brought out that the passenger was now sweating and had difficulty breathing, even though his vital signs had been "quite stable" throughout the flight. By this time, the pilot had already advised Dr. Monas that they were considering a diversion, and wanted her "take" on it. As the MedAire CSE's contemporaneous computer notes summarized Dr. Monas's eventual response, "Dr. Monas Recommends to consider diverson [sic] locations and options."

**Second Rebuttal Opinion: The actions of Drs. Reinhart and Monas were reasonable and not "unusual," and in any event Dr. Candipan does not have the background and experience to properly evaluate the matter.**

Based in significant part on mistaken facts, as discussed above, Dr. Candipan gives his opinion that Drs. Reinhart and Monas acted in ways that were not in line with what would be considered "standard and usual practice," and that their alleged "lapses" led to Mr. Baillie's treatment "being unusually and unexpectedly delayed." According to Dr. Candipan, the "outcome"—presumably meaning Mr. Baillie's demise—was "unexpected and accidental and represented a failure to follow procedures and protocol."

I have described in my 05/25/16 report why (contrary to Dr. Candipan), the actions of both MedAire and the MedLink doctors, Reinhart and Monas, were in fact reasonable and usual, and there is no need to repeat the grounds for that opinion here. But it is also my opinion that Dr. Candipan—as a cardiologist who is neither trained in emergency medicine nor, according to his CV, has any background in the provision of

5

remote medical advice to aircraft—lacks the necessary background and experience to know what the "procedures and protocol" are in those fields, and is therefore not qualified to give opinions in that area.

**Third Rebuttal Opinion: At the time of the phone patches with Dr. Reinhart, a recommendation of diversion was not reasonable, was not required by any applicable standards or protocol, and was not warranted in light of all the facts.**

At page 6 of his 02/01/16 report, Dr. Candipan offers his opinion that the "clinical information that was provided to the MedAire/MedLink physicians was more than adequate for the MedAire/MedLink physicians to come to a working diagnosis that would have placed a myocardial infarction high if not on top of a list of potential medical conditions." Dr. Candipan then opines that "[r]ecognizing that a myocardial infarction was a likely scenario should have prompted [the MedLink physicians] to make a recommendation for diversion."

This opinion seems to be based both on Dr. Candipan's misapprehension of some key facts as well as his lack of understanding of other key facts.

I pointed out in my first rebuttal opinion above, as well as in the Fourth Set of Opinions in my 05/25/16 report, the very limited clinical information that Dr. Reinhart was given about Mr. Baillie: 61-year old male with no history of cardiac problems and taking no medications, pale, with chest pain, blood pressure 100/70, pulse 100. Dr. Reinhart was also told that the onboard physician had heard a "crackle" on the passenger's left side.

While Dr. Candipan places significant emphasis on the presence of "crackles" with the other symptoms, Dr. Reinhart properly disregarded the "crackles" observation, knowing from his long experience that crackles cannot be accurately detected with an airline medical kit stethoscope onboard an inflight Boeing 747. And Dr. Reinhart was proven to be correct: after the plane landed, neither the paramedics, the nursing staff, the

6

Emergency Department physician, nor Dr. Candipan himself, heard any crackles when listening to Mr. Baillie's chest.

In isolation, the limited information provided Dr. Reinhart about the ill passenger was ambiguous as to the cause of the symptoms, and did not immediately justify a "diagnosis" of a heart attack—assuming that a MedLink physician were attempting to diagnose the passenger. As explained in my 05/25/16 report, however, it is not the role of MedLink or STAT-MD physicians giving remote advice to try and diagnose or treat the illness of a passenger whom they cannot see or speak with. Their role is rather limited to advising an airline crew on how best to deal with the symptoms of the ill or injured passenger.

In considering how best to deal with a passenger's symptoms, and whether to recommend a diversion to an earlier landing, one vital concern is the location of the plane. Is the plane still on the ground? Is the plane over land with easy and safe diversion sites right now, but about to cross to an area where there are no easy and safe diversion sites? Is the plane over an ocean where the nearest safe diversion site with medical facilities is hours away?

Dr. Candipan's report fails to consider the location of the aircraft at all, a fact that underscores his lack of knowledge and experience in providing remote medical advice to airlines. As set forth in my 05/25/16 report, at the time of the first phone patch and repatch #1 with Dr. Reinhart, BA 289 was over the North Atlantic, with the closest diversion sites that had appropriate medical facilities being about two hours away. In those circumstances, a recommendation of diversion based on the limited clinical information provided Dr. Reinhart was not justified.

Furthermore, I am unaware of any industry or MedAire standard or protocol that would require a MedLink or STAT-MD emergency physician in those circumstances to recommend diversion, and Dr. Candipan cites none.

7

Dr. Candipan does state that he reviewed MedAire "training materials" which "specify recommending diversion for chest pain that is persisting for over 20 minutes despite treatment." However, that appears to be a reference to the "Cardiac" section of the MedAire "Pearls" document, discussed in my Second Set of Opinions in my 05/25/16 report. As there explained, that section of the Pearls document only applies when a physician has already made an initial determination that a passenger's chest pain is likely caused by angina, and it is not referring just to generic chest pain.

Dr. Candipan's report also says that the depositions of Drs. Reinhart, Monas, and Streitwieser "all reflect that their personal threshold for recommending diversion would be chest pain not responding to treatment for 20-30 minutes." I have reviewed their depositions, and I disagree with Dr. Candipan's statement.

For example, when Dr. Reinhart was asked in a deposition whether he had learned by his 28 years of experience that he should recommend diversion if an ill passenger on a flight has "cardiac symptoms which persist for 20 to 30 minutes and cannot be relieved," he answered, "No, I haven't." 01/06/16 Reinhart dep. at 25:20-26:3. When Dr. Reinhart was later asked "what medically justifies a diversion" when a passenger is experiencing chest pain, he responded that "It's multifactorial" and it "would depend on the entire situation." 01/06/16 Reinhart dep. at 55:15-20. Dr. Reinhart was also asked what factors he would be considering if someone had the "symptoms as were presented to you in the initial patch and the first repatch" as to "whether you should be recommending a diversion or not?" Dr. Reinhart then answered:

> There are multiple factors. First of all, whether or not he is going to improve, and the location of the aircraft and where we could land the aircraft if we needed to, and what else could be going on with the individual.

01/06/16 Reinhart dep. at 56:3-10.

As Dr. Reinhart noted, the location of the aircraft is a significant factor in diversion considerations. Transcripts from the depositions of Dr. Reinhart show that he

possesses a good working knowledge of transatlantic flights and a familiarity with potential diversion locations. As his deposition testimony shows, there are reasons a MedAire physician would not recommend a diversion, even for an apparently serious medical condition, when there are no suitable options for diversion.

Dr. Reinhart's deposition testimony also suggests that he would have a flight continue on and delay a diversion recommendation until the flight was near a potential suitable diversion location. This is the same practice we follow at STAT-MD.

As Dr. Reinhart said in one of his depositions:

Q. What would you do?

A. I would continue the -- the treatment until we needed to make a decision as to whether to divert to where there was a close diverting location, which means like probably within about 30 minutes.

Q. Okay. So what you're saying is that there are areas over the Atlantic Ocean where you -- you would not recommend a diversion because it's not close -- there's no suitable medical facility close enough?

A. Well, what I'm saying is that there are some locations there that even if you make a decision to divert, it's going to be an hour or hour and a half before they can get the aircraft down on the ground.

07/07/14 Reinhart dep. at 72:8-20.

Even assuming some MedAire doctors had a sort of "personal threshold" for recommending diversion, their personal standard cannot be viewed as an industry standard. In fact I note that MedAire's Global Medical Director, Dr. Paulo Alves, said in his expert report that "MedAire leaves to the clinical judgment of each individual physician whether or not to recommend that a flight divert," and that "MedAire has no internal standard specifying when a diversion should be recommended." I would add that the same is true of STAT-MD.

**Fourth Rebuttal Opinion: Based on all the facts made known to her, Dr. Monas agreed that diversion was appropriate. But the pilot, without further**

9

**checking with any MedLink doctor, later decided not to divert, based on the recommendation of the same onboard physicians who felt that the passenger looked "considerably worse," and who had allegedly suggested that the passenger needed to be in the hospital.**

As discussed in the Fifth Set of Opinions in my 05/26/16 report, the pilot of BA 289 was already considering diversion, and had already advised BA Operations of such, before he ever spoke with Dr. Monas. After Dr. Monas learned that, in their last physical check of the passenger, the onboard doctors felt the passenger looked "considerably worse," and after having received additional information about the passenger's condition, she agreed that, particularly since those actually observing the passenger felt he was not looking well and that the plane should divert, MedAire would start looking for diversion locations. The pilot agreed with this, and BA Operations was brought on line and advised of the possibility of a diversion, subject to getting "an update from the doctor onboard in the next ten minutes or so. . . ."

That was the last conversation involving Dr. Monas. According to BA First Officer Alastair Grant, however, the flight crew was later informed by Ms. Van den Berg, the flight attendant charged to look after the passenger, that the passenger "had requested to continue to Phoenix and not to divert the aircraft." 01/28/14 Grant Declaration, ¶ 18. Ms. Van den Berg also advised the flight crew "that the two onboard physicians were of the opinion that continuing on to Phoenix would not worsen the passenger's condition." Based on that additional information, and without checking further with MedAire, the flight crew made the decision not to divert the aircraft.

**Fifth Rebuttal Opinion: Captain Mesnard's report fails to address the most significant error that occurred on BA 289 with regards to Mr. Baillie: the failure of the cabin crew to contact the pilot before takeoff and make him aware that there was an ill passenger on board. Captain Mesnard's report also expresses opinions for which he has no expertise relating to the inflight medical advice given by**

10

**MedAire, and betrays a misunderstanding of the relationship between the flight crew and the remote medical advice service.**

In his bullet 8.3, Capt. Mesnard acknowledges that, upon boarding, Mr. Baillie reported to a flight attendant that he was short of breath and "wasn't sure he should be on the flight." Capt. Mesnard was also provided the declaration of Mrs. Baillie, which states that Mr. Baillie developed "breathing problems and discomfort in the center of his chest" as he was rushing to catch BA 289. As further discussed in the Seventh Set of Opinions in my 05/25/16 report, Mr. Baillie, upon boarding BA 289, right away told a flight attendant that "he was not feeling well and had chest pains and was short of breath and that he wasn't sure he should be on the flight."

Captain Mesnard flies for Delta Airlines, which is one of the airlines for which STAT-MD provides remote medical consultation, including fitness-to-fly assessments. Fairly frequently, pilots call STAT-MD prior to take off with regards to a passenger who is not feeling well or is not looking well. Often they call STAT-MD on their cell phones just to get reassurance that a passenger is okay to fly, or to see if the passenger should get formal medical screening prior to take off. This is a common occurrence, and I am surprised Capt. Mesnard failed to suggest this option.

In my experience, commercial airline pilots understand that allowing an ill passenger to remain on a lengthy non-stop flight across the ocean, without requiring him to get a medical screening, would put both the ill passenger and all the passengers and crew at great risk for a diversion. As further discussed in my 05/25/16 report, BA standards required the flight attendant to seek a fitness-to-fly assessment in such circumstances, and had one been requested from MedAire for Mr. Baillie, it is my opinion that Mr. Baillie would not have been permitted to fly without getting a medical evaluation from a doctor on the ground.

At various points in his report, Capt. Mesnard is critical of the medical advice given by the MedLink physicians. For example, at bullet 8.11, Capt. Mesnard suggests

11

that the MedLink physicians should have told the BA 289 crew that Mr. Baillie could "potentially be experiencing a life threatening medical condition," and that they should have "recommended a diversion to seek life saving medical help. . . ." Captain Mesnard also gives his opinion that the MedLink doctors failed to give "accurate and comprehensive medical advice (bullet 8.16), that Dr. Reinhart wrongly took a "wait and see" approach when the plane was over the North Atlantic, when he should have "advised the Captain to divert to the nearest suitable airport (bullets 11.7 and 11.8), that Dr. Reinhart "did not present the flight crew with a proactive backup solution for Mr. Baillie's continuing chest pains" (bullet 11.9), and that Dr. Monas "abdicate[d] her position on the expanded team" because she "mentioned diversion as a possible solution" but "did not proactively advise the Captain to divert" (bullet 12.9).

As I have explained in my 05/25/16 report, based on my background and experience an emergency physician who has been providing remote medical advice to airlines for many years, both Drs. Reinhart and Monas acted in a usual and reasonable manner in their interactions with and recommendations to BA 289. Captain Mesnard himself acknowledges at bullet 11.8 that he is "not a medical professional," let alone one who has both specific experience in emergency medicine and in providing remote medical advice to airlines. He lacks the training and experience to give these types of opinions. Indeed, if it were within the general expertise of airline pilots to know, as Capt. Mesnard opines, that the symptoms Mr. Baillie was experiencing while BA 289 was over the North Atlantic Ocean were serious enough to warrant diversion, then BA Capt. Fowler himself should have recognized the need to divert at that time.

Medical emergencies on commercial airlines are a relatively rare occurrence, and despite his long career with Delta, Capt. Mesnard would likely have been involved with only a limited number of inflight medical emergencies, and only a small subset of those events would have involved Trans-Atlantic flights. Indeed, at bullet 6.3, Capt. Mesnard says only that, during his 41-years of flying experience, he has been involved with

12

"several" inflight medical emergencies which required coordinating with his company's contracted emergency medical facility (STAT-MD) while crossing the "North Atlantic Tracks." By contrast, Dr. Reinhart, in addition to his training in medicine and special additional training and experience in emergency medicine, has been involved in providing remote advice to airlines in connection with tens of thousands of medical emergencies.[1] Capt. Mesnard's very limited background in handling inflight medical emergencies provides no basis for critiquing the medical judgments of MedAire or the MedLink physicians.

Captain Mesnard's inexperience in such matters is also shown by his comment at bullet 11.11 that if the decision to divert had been made during the first repatch with Dr. Reinhart, "several suitable diversion fields were available: Sonderstrom, Greenland; Halifax Nova Scotia; or Keflavik, Iceland just to mention three." Captain Mesnard failed to even consider, however, whether suitable medical facilities existed in or near those locations. For a person potentially suffering from a heart attack, the needed facility is a heart catheterization laboratory that will be open and staffed at the time of the diversion. There is no such catheterization laboratory in or near Sonderstrom, Greenland, and had the plane diverted to that location it would not have helped Mr. Baillie but would have put at risk and delayed the plans of the more than 300 other passengers on board. While there are suitable medical facilities in Reykjavik, Iceland—about a 45-minute drive from the airport in Keflavik—it would have taken more than two hours from the time of the decision to divert at that point to get the passenger to the hospital in Reykjavik, and doing so would require turning the plane around and heading back east.

---

[1] I understand that in the year 2012 alone, for example, approximately 35-40 MedLink physicians gave advice in approximately 40,000 separate airline medical incidents, including both inflight and fitness-to-fly. That works out to an average of 1,000 or more calls per physician per year, and Dr. Reinhart has been working with MedAire for about 28 years.

In fact, following the first repatch with Dr. Reinhart, the closest diversion field with the necessary 24-hour catheterization laboratory was St. Johns, Newfoundland, but that was also about two hours distant. In light of all the circumstances, the better course, as Dr. Reinhart recognized, was to continue the plane's flight path westward, toward land and additional diversion locations, in the meantime continuing to frequently monitor the passenger.

At various points in his report, Capt. Mesnard is also critical of the MedLink physicians for not having provided the airline crew a more detailed medical analysis. For example, he says that, although Dr. Reinhart told the crew he was "just a bit concerned about with his age, the pain and the fact that he is pale," he "didn't tell the flight crew the reason why he was concerned about these factors" (bullet 11.3). Then at bullet 11.8.1, Capt. Mesnard says that, in light of the passenger's "crackles," as well as his "ongoing chest pain and the accompanying continuing symptoms as presented in Mr. Baillie's case," he as a pilot "would certainly want to be briefed about the severity of the possible medical conditions that Mr. Baillie could be suffering from" so he could "properly consider diverting."

But it is not the practice or protocol of MedLink or STAT-MD physicians—nor would it be practical or even possible in the short time frame of a satellite phone patch—to "brief" the pilot on technical medical details or possibilities. As discussed in the Third Set of Opinions in my 05/25/16 report, chest pain is a common symptom of many maladies, and reliably detecting patients suffering from ACS is a difficult diagnostic challenge. No purpose would be served, and valuable time would be lost, by attempting over the satellite phone to give the pilot a medical lecture about such things.

In any event, it is clear from Capt. Mesnard's report, the BA 289 audio patch transcript, and BA's training manuals, that airline crews receive sufficient medical training to know that a middle aged male with chest pain, to whom consultants on the ground were contemplating giving nitroglycerin, *could* be having a heart attack or other

14

serious medical problem. At bullet 6.2, for example, Capt. Mesnard relates a situation where, shortly after takeoff—and without the involvement of a medical professional—a flight attendant thought a passenger "appeared to be having a heart attack," so Capt. Mesnard thus turned the plane around and headed back to the runway.

In fact, during BA 289 itself, the BA crew showed its concern for the seriousness of Mr. Baillie's condition by advising BA Operations that they were considering a diversion, before the crew had ever spoken with Dr. Monas. And after the BA 289 crew had spoken with Dr. Monas, and she had recommended looking for diversion locations, the BA flight crew decided *not* to divert, after consulting just the onboard physicians, without seeking further advice from MedAire. That was a significant error in judgment by the flight crew.

Other than any additional materials referenced in this report, the list of materials considered, and my recent expert testimony, are attached to my May 25, 2016 report, and my compensation in this case is as stated in that report.

_____                          _6/24/2016_

Ronald N. Roth, M.D., FACEP                       Date

15

# EXHIBIT 5

1    Mark C. Dangerfield (Bar No. 010832)
     Wm. Charles Thomson (Bar No. 004269)
2    GALLAGHER & KENNEDY, P.A.
     2575 East Camelback Road
3    Phoenix, Arizona 85016-9225
     Telephone:  (602) 530-8000
4    Facsimile:   (602) 530-8500
     E-mails: mark.dangerfield@gknet.com
5           wct@gknet.com
     Attorneys for Defendants MedAire, Inc., Steven
6    Joe Reinhart, D.O., and Jessica Monas, M.D.

7                  UNITED STATES DISTRICT COURT

8                    DISTRICT OF ARIZONA

9

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>            Plaintiff,<br><br>    vs.<br><br>MEDAIRE, INC.; STEVEN JOE REINHART, D.O.; and JESSICA MONAS, M.D.,<br><br>         Defendants. | No. 2:14-cv-00420-PHX-SMM<br><br>**DECLARATION OF MATTHEW JAY BUDOFF, M.D., F.A.C.C., F.A.H.A** |

Gallagher & Kennedy, P.A
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

18          I declare under penalty of perjury that the attached expert reports dated May 25,

19    2016, and June 20. 2016, contain true and correct statements of opinions I have offered in

20    connection with this action.

21        Executed this ___ day of September, 2016.

22

23                                          _____

24                            Matthew Jay Budoff. M.D., F.A.C.C.,
                           F.A.H.A.

25

26

27

28

5616679v1 24709-0001

# EXHIBIT 6

## EXPERT REPORT OF MATTHEW JAY BUDOFF, M.D., F.A.C.C., F.A.H.A.
### IN THE MATTER OF
*LINDA ANN BAILLIE V. MEDAIRE ET AL.*

I have been asked to provide my professional opinions on various issues I understand may be important in this case, as set forth in the six sections below. I base my opinions on my background, training and experience, as well as my review of the evidence made available to me in this case.

All my opinions are based on a reasonable degree of medical probability.

### Qualifications:

I am a physician and board-certified in both cardiovascular disease and cardiovascular computed tomography. I have also been board-certified in internal medicine, but because I no longer practice in that area, I did not renew that certification when it expired in 2013.

I am a practicing cardiologist as well as professor of cardiology at the David Geffen School of Medicine at UCLA. In addition to teaching and practicing cardiology, I do considerable research and writing, particularly in the area of cardiovascular computed tomography. In 1999, I was elected a fellow of the American College of Cardiology, and in 2003 I was elected a fellow of the American Heart Association. I also serve on the editorial boards of the Journal of Invasive Cardiology, the Journal of Cardiovascular Imaging, the Journal of American College of Cardiology, and the Journal of Clinical Cardiology, among others. I also review articles for a number of other medical journals, such as Circulation, American Heart Journal, JAMA, Lancet, and the New England Journal of Medicine.

A copy of my CV is attached to this report.

### Section One:

In my opinion, although Mr. Baillie had no known history of heart disease prior to March 23, 2012, Mr. Baillie had in fact been suffering from serious, three-vessel,

1

coronary artery disease for some years before that, and that coronary artery disease was the ultimate cause of Mr. Baillie's death. Nothing MedAire or the MedLink physicians did, or didn't do, caused Mr. Baillie's coronary artery disease.

Coronary artery disease is the leading cause of death in the United States among both men and women. And the angiography performed by Dr. Candipan on March 23, 2012 showed that Mr. Baillie had serious, three-vessel, coronary artery disease ("CAD"), with a total occlusion of the proximal left anterior descending artery ("LAD"), 80% to 90% diffuse stenosis (narrowing) in the left circumflex and obtuse marginal artery, 40% to 50% proximal and mid-right coronary artery stenosis, and 50% to 60% stenosis of the distal right coronary artery.

CAD occurs gradually over time and can be caused or exacerbated by smoking, high blood pressure, high blood cholesterol levels, physical inactivity, and stress, among other factors. As a vice-president for a large, multi-national company (Freescale Semiconductor), who had to travel frequently both to Asia and Europe, Mr. Baillie may have had quite a stressful job. And at least as of March 2011, Mr. Baillie had no regular exercise program. As a young man, he smoked a pack of cigarettes a day for a few years before quitting. Also, several years before Mr. Baillie's death his doctor thought his blood pressure might have been a little high, and he was told to adjust his lifestyle; apparently after that his blood pressure normalized. At one point, too, Mr. Baillie's cholesterol was supposedly borderline, but as of March 2011, his levels were in the normal range. But while we cannot be sure of the exact reasons underlying Mr. Baillie's CAD, Dr. Candipan's March 23, 2012 angiography confirmed the serious and advanced nature of the disease. In addition, and as further discussed in Section Two, a treadmill stress test administered to Mr. Baillie in March 2011—about one year before he boarded British Airways (BA) Flight 289—also suggested Mr. Baillie had serious CAD.

2

It was Mr. Baillie's CAD that brought on his March 23, 2012 ST-segment elevation myocardial infarction or "STEMI," and CAD was the ultimate cause of Mr. Baillie's death, as his official death certificate accurately states.

**Section Two:**

In my opinion, when the Mayo Clinic performed a complete physical examination on Mr. Baillie in March 2011, including a stress ECG that showed he had serious CAD, Mayo Clinic doctors missed the diagnosis, wrongly advised Mr. Baillie that he had no CAD, and wrongly advised him that "no further evaluation [was] needed." Had the Mayo Clinic doctors properly advised Mr. Baillie of his serious heart disease, and properly followed up to treat that disease, Mr. Baillie would more likely than not be alive today.

In March 2011, Mr. Baillie received a complete physical examination through the Mayo Clinic's Executive Health Program. (Ex. 37) According to a description on a Mayo Clinic website, this exam included, among other things:

- "A comprehensive medical history review and physical exam by an internal medicine specialist and referrals to subspecialties, as necessary";

- "A full range of preventive screening tests for early detection of cancer, heart disease and other serious conditions"; and

- "A heart (cardiovascular) fitness evaluation." (Ex. 39.)

The Mayo Clinic website also states that its "executive health doctors" have "access to all of the resources of Mayo Clinic," and notes that "[m]any participants have been diagnosed with a previously undiscovered condition during an executive health exam." (Ex. 39)

Dr. Covalciuc was the Mayo Clinic doctor who oversaw Mr. Baillie's executive checkup. Dr. Covalciuc is an internist who practices mostly in the field of preventive medicine. On March 3, 2011, Dr. Covalciuc arranged for a treadmill exercise test to be given to Mr. Baillie, using a standard procedure known as the Bruce protocol. As part of the test, Mr. Baillie was hooked up to a 12-lead ECG machine to measure electrical

3

activity in his heart. According to the report issued by Dr. Russell Ruzich, a Mayo Clinic cardiologist, the test was "positive for myocardial ischemia at 6:50 minutes, with heart rate of 122 per minute." "Myocardial ischemia" occurs when blood flow to the heart is reduced, usually as a result of a partial or complete blockage of the coronary arteries. In addition, and significantly, the report stated: "At peak there was up to 1.5-2 mm of horizontal ST depression in the inferior leads, V4-6. Changes persisted beyond 3 minute(s) into recovery."

Dr. Covalciuc testified that he didn't know whether those results were suggestive of serious, high-grade coronary artery disease, because he was "not an expert in that." Nor is there any indication that Dr. Covalciuc discussed the test results with Dr. Ruzich, the cardiologist who issued the report of the treadmill stress test.

Mr. Baillie's treadmill stress test was highly concerning for multiple reasons. The ECG changes were significant (2 mm), occurred early in exercise (both by time and heart rate) and lasted minutes into recovery. Each of these is highly concerning for severe coronary artery disease, and combined, are highly specific for severe coronary artery disease. The results of this test should have prompted Dr. Covalciuc to have solicited a consult with a cardiologist, but he did not do so. Nor did Dr. Ruzich, the Mayo Clinic cardiologist who oversaw Mr. Baillie's treadmill stress test, advise Dr. Covalciuc of the serious nature of the results, nor consult with him about what follow up tests or procedures might be appropriate.

Instead, Dr. Covalciuc—without consulting a cardiologist—simply ordered another test, a stress echocardiogram, in order to verify whether the initial treadmill stress test was a "false positive." In Dr. Covalciuc's view, the stress echocardiogram was the "next best test," and so it was his practice "as a matter of routine" to order an echocardiogram when the initial stress ECG was positive. Dr. John Lynch, another Mayo Clinic cardiologist, oversaw the administration of the echocardiogram. There is no

4

evidence that Dr. Lynch discussed with Dr. Covalciuc why the echocardiogram was being administered or whether it was the appropriate test.

Dr. Covalciuc justified his decision to administer the echocardiogram as a follow up test by saying he understood that in "asymptomatic low risk people," standard stress ECGs like the one administered to Mr. Baillie "can often show false positive results."

It is true that some patients taking a stress exercise test will show a "false-positive" result—meaning the result will be falsely abnormal, because the patient really has no coronary artery disease. Thus, when, as with Mr. Baillie, a treadmill stress test is positive for myocardial ischemia, a physician will often follow up with a second test to confirm the diagnosis. Unfortunately for Mr. Baillie, the follow-up test that was chosen was the wrong test—a stress echocardiogram. That was error.

In my opinion, the actions and omissions of the Mayo Clinic summarized above fell below the standard of care in the circumstances.

A stress echocardiography has a low sensitivity for showing CAD, meaning that if the test result is negative, you can't have much confidence that the patient does not in fact have CAD. A stress echocardiography is thus not recommended for use with people, such as Mr. Baillie, who were asymptomatic. As stated in 2010 guidelines issued jointly by the American College of Cardiology Foundation ("ACCF") and the American Heart Association ("AHA"), of which I was one of the authors: "Stress echocardiography is not indicated for cardiovascular risk assessment in low- or intermediate-risk asymptomatic adults." But as Dr. Covalciuc admitted, he didn't know that it is relatively common for there to be a false negative in an echocardiogram—he said he had "no opinion on that" based on his experience.

Mr. Baillie's stress echocardiography showed no heart abnormalities. However, as studies show, due to its low sensitivity, a stress echocardiography picks up only one-half to two-thirds of obstructive CAD. The Mayo Clinic doctors instead should have followed up Mr. Baillie's abnormal stress ECG with a coronary angiography, or a coronary

5

computed tomographic angiography ("CCTA"). Coronary angiography has long been the reference standard for the evaluation of CAD, because a doctor is able to directly observe the presence of coronary artery disease. And studies, including my own studies, show that CCTAs have both high sensitivity and specificity in assessing the presence of CAD. A CCTA is also a cost-effective test to use in following up after an abnormal treadmill stress test.

Had the Mayo Clinic followed up Mr. Baillie's abnormal treadmill stress test with either a coronary angiography or a CCTA, either test would have shown, in my opinion, that Mr. Baillie suffered from serious CAD, and Mr. Baillie and the Mayo Clinic doctors could then have immediately taken steps to resolve that problem.

Instead, though, the Mayo Clinic told Mr. Baillie that his stress test was "a false positive," that there was "no evidence of significant coronary artery disease," and that "[n]o further evaluation is needed." All these statements proved to be fatally in error.

### Section Three:

In my opinion, while Mr. Baillie was rushing to catch BA 289 on March 23, 2012, he experienced, as a result of his CAD, a very serious heart attack, known as a STEMI, before he ever boarded the flight. Nothing MedAire or the MedLink physicians did or didn't do caused or contributed to causing Mr. Baillie's heart attack.

There is no dispute in this case that Mr. Baillie suffered a serious heart attack, a STEMI, on March 23, 2012. Based on my examination of the available evidence, I have concluded that Mr. Baillie's STEMI coincided with the onset of symptoms that developed while he was rushing to catch BA 289.

According to each of Dr. Candipan (the cardiologist who treated Mr. Baillie at St. Luke's), Dr. Adams (a resident Mayo Clinic doctor who examined and spoke with Mr. Baillie when he was admitted to the Mayo Clinic on 3/20/12), Mr. Frank Fleming (now one of Mrs. Baillie's lawyers), and Mrs. Baillie herself, Mr. Baillie told them that he first began to experience chest pains while rushing to catch his plane in London. Mr. Baillie

6

further told Dr. Adams that, while awaiting takeoff, the pain got worse, and so he took four baby aspirin and notified the flight attendant, who "tried to reassure him" so that the flight "left the United Kingdom as scheduled."

Mr. Baillie also told his wife, Mrs. Baillie, that he "had to rush to make his flight from London to Phoenix," and that "when he arrived at the gate he was having breathing problems and feeling discomfort in the center of his chest." He further told his wife that, by the time "he got on board the airplane a few minutes later, the discomfort in his chest had become painful, so right away he told a flight attendant that he was not feeling well and had chest pains and was short of breath and that he wasn't sure he should be on the flight." While Mr. Baillie was in the hospital he also told Mr. Frank Fleming—a lawyer who had been asked to consider representing Mr. Baillie in "a possible personal injury claim against BA"—that "he had the chest pains as he was rushing to make the flight, and as soon as he got onboard, he reported these pains to a flight attendant...."

Since Mr. Baillie had serious CAD, but had no prior history of angina or other related heart problems, and since it appears that, following onset, his chest pain did not stop and start, but was thereafter continuous, the onset of his symptoms while exerting himself to catch his flight, and the stress of possibly missing his international flight, make it highly probable that his symptoms were caused by the onset of his heart attack. I understand it to be undisputed that Mr. Baillie boarded BA 289 at 14:54 UTC. Thus, Mr. Baillie's heart attack began just shortly before 14:54 UTC.

### Section Four:

In my professional opinion, given the severity of Mr. Baillie's heart attack and BA's delay in contacting MedAire about the matter, nothing MedAire or the MedLink doctors did or could have done would have prolonged Mr. Baillie's life.

First, a STEMI involving the LAD is a very serious type of heart attack, sometimes colloquially known as the "widow maker," because of its relatively high

7

mortality rate. A STEMI involving the LAD generally affects a greater area of the heart muscle or "myocardium" than do other types of heart attacks.

Second, as medical studies have confirmed, it is very important for those suffering from a STEMI to receive treatment within the first hour after symptoms appear, sometimes called the "Golden Hour." This is because, once a coronary artery is blocked, the myocardium that was formerly supplied with blood or "perfused" by the (now blocked) artery, immediately starts to die. Studies have also shown that the vast majority of that perfused myocardium is irreversibly destroyed within about 90 minutes following a heart attack, that by the time six hours have elapsed, there is an almost complete absence of salvageable myocardium, and that minimal or no benefit would be gained by moving the time to reperfusion from 12 hours back to 7 or 8 hours following symptom onset. A chart depicting the relationship between time to reperfusion and mortality reduction is attached as Exhibit 1.

As a result, if Mr. Baillie's occluded LAD had, hypothetically, been opened *at any time* six hours or more after the approximate 14:54 UTC onset of his STEMI on March 23, 2012, it would not have saved Mr. Baillie. By the end of that six-hour period, almost all of the salvageable myocardium formerly perfused by Mr. Baillie's LAD would have already been lost, and he would by then already have suffered the serious and permanent damage to his heart muscle that, in turn, would have led to the same or similar complications as those Mr. Baillie actually suffered, and those complications would have been fatal.

The permanent loss of the myocardium perfused by Mr. Baillie's LAD, in combination with the 80-90% blockage of his circumflex and obtuse marginal artery, reduced his heart's ejection fraction to only 10%-15%. "Ejection fraction" measures how well your heart pumps with each beat, and the normal ejection fraction ranges from 55% to 70%, thus a reduction to only 10% to 15% is severe. Mr. Baillie's loss of myocardium also caused him to go into cardiogenic shock. Cardiogenic shock is a rare condition in

8

which the heart can't pump enough blood to meet the body's needs, and that condition has a very high mortality rate.

For Mr. Baillie, the loss of the vast majority of his affected myocardium that occurred within approximately the first one or two hours following his STEMI led to a cascading series of systemic problems that included pulmonary edema, persistent hypotension, and cardiogenic shock, but eventually led to another heart attack, acute renal failure, acute respiratory failure, and multisystem organ failure, as set forth in the Mayo Hospital Expiration Summary (Ex. 81). Although Mr. Baillie's STEMI initially affected only the left ventricle of his heart and the arteries supplying it with blood, his subsequent problems while in the hospital substantially impaired the functions of his right ventricle as well.

Mayo Clinic physicians tried vainly (and futilely) to stem these problems by first installing a left ventricle assist device, then a right ventricle assist device, and eventually a total artificial heart. Mr. Baillie never regained consciousness following the installation of the artificial heart, and the operation caused him to experience a number of cerebral accidents, commonly called strokes. In light of these strokes, the Mayo Clinic doctors advised the Baillie family that Mr. Baillie might not be able to function normally upon recovery, and the Baillie family then elected to discontinue the artificial heart. Once the artificial heart was disconnected, Mr. Baillie passed away.

Applying the six hour time limit mentioned above to the facts of this case, if a flight diversion would only have enabled Mr. Baillie's occluded LAD to have been opened by 20:54 UTC or later—six hours after the onset of his symptoms—the diversion could have made no difference, and would not have helped prolong Mr. Baillie's life. In that light, I understand that British Airways didn't even talk to Dr. Reinhart for the first time until 18:50 UTC, about *four hours* after the onset of Mr. Baillie's STEMI. By that time, the vast majority of the myocardium perfused by Mr. Baillie's LAD would have already been lost, so that it would likely have been too late to save Mr. Baillie even if—

9

through some presently unimaginable miracle—Dr. Reinhart could have instantly opened up Mr. Baillie's blocked LAD right then and there.

But at around 18:50 UTC, I understand that BA 289 was in the middle of the North Atlantic Ocean with no available, quick, diversion site with appropriate medical facilities. Indeed, I have been advised that, given BA 289's location at that time, it would have taken approximately an additional two hours just to land at a diversion sight and get Mr. Baillie to a medical facility with the needed cardiac catheterization lab. And then another hour or two would have been needed for a cardiologist to perform an angiography to open Mr. Baillie's occluded LAD.

In the actual case, for example, I understand that it took a full two hours and fifteen minutes *after* BA 289 landed at Phoenix Sky Harbor Airport before Mr. Baillie's LAD was opened. So even if Dr. Reinhart had promptly recommended diversion when first called, and the pilot immediately agreed and began diverting the flight, it would still have been at least seven and probably eight hours after the onset of Mr. Baillie's STEMI until a cardiologist could have opened his occluded LAD. Given the facts of this case, that would have been far too late to have saved Mr. Baillie.

**Section Five:**

Hypothetically, had British Airways prevented Mr. Baillie from boarding BA 289 because of his symptoms, and had Mr. Baillie then been immediately taken to a hospital to be evaluated and treated, and had he survived, he would have incurred substantial medical expenses for the treatment of his STEMI, as well as for the treatment of the serious CAD in his other vessels.

In addition, and again hypothetically, if Mr. Baillie's occluded LAD had been opened at any time six hours or more after the onset of his STEMI, and Mr. Baillie somehow did survive, he still, for the reasons set out above in the Section Four, would have suffered extensive, permanent damage to his heart muscle, which would have brought on similar if not identical systemic problems as those he actually sustained,

10

including cardiogenic shock and multisystem organ failure. And that cascade of problems would have required Mr. Baillie to need either some type of mechanical circulatory support to sustain his life, or to undergo a heart transplant, assuming he was able to meet the criteria for such.

As a consequence, Mr. Baillie would have incurred medical expenses that would have equaled or exceeded those expenses he actually incurred. In addition, Mr. Baillie would have been so physically compromised that he would not have been able to sustain gainful employment in a high-stress job requiring a lot of travel, and more likely than not would have had to retire from all gainful employment.

## Section Six:

In my opinion, in the circumstances present here, the Mayo Clinic's implantation of a right ventricular assist device and a total artificial heart were medically futile procedures that should not have been carried out. Hence, the expenses associated with those procedures, and with the aftermath of those procedures, were not reasonable, necessary or usual.

### *Events leading to the installation of the HeartMate II LVAD on April 26*

Mr. Baillie arrived at the Mayo Clinic on March 30, 2012 as a very sick man. He was placed in an intensive care unit, and he never got out of the intensive care unit until he died approximately three months later. During those three months, Mr. Baillie was subjected to numerous painful or uncomfortable medical procedures, including intubation and mechanical ventilation (on 4/1/12), a tracheostomy (on 4/10/12), at least four right heart catheterizations (on 3/30/12, 4/12/12, 4/18/12, and 4/22/12), an intra-aortic balloon pump placement (on 4/18/12), placement of a Swan-Ganz catether in a femoral artery (also on 4/13/12), a bronchoscopy with broncoalveolar lavage (on 4/19/12), surgery to install a left ventricular assist device (on 4/26/12), pericardiocentesis (on 5/13/12), thoracoscopic evaluation of hemothorax and placement of chest tube (5/15/12), surgery to install a right ventricular assist device (on 6/19/12), and—the very next day—surgery to

11

remove the (just installed) right ventricular device as well as the left ventricular assist device, to remove his heart, and to install a total artificial heart.

According to Mayo Clinic records, after arriving at the Mayo Clinic on March 30, 2012, Mr. Baillie "deteriorated to the point that on April 1, he developed respiratory failure, had to be intubated and ventilated." It appeared to Mayo Clinic personnel that Mr. Baillie "had congestive heart failure which then proceeded to volume overload and acute lung injury," so that "he ultimately was felt to have required a prolonged ventilator support and underwent a tracheostomy 04/10/12."

In light of Mr. Baillie's deteriorating condition, on April 13, 2012, Mayo Clinic medical personnel assessed Mr. Baillie as a possible candidate for mechanical circulatory support. However, it was determined that the risk of implanting a left ventricular assist device at that time carried "an enormous risk of a mediastinal contamination/infection," and it would be preferable to continue to manage him through drugs. At that point, Mrs. Baillie was advised that the cardiac surgeon thought there was "less than a 50% chance of successfully bridging him to a recovery...."

According to Mayo Clinic records, between about April 16 and April 23, Mr. Baillie experienced a gradual decrease in his blood platelets, and was diagnosed as having thrombocytopenia. A Mayo Clinic doctor concluded that the thrombocytopenia could most likely be attributed to "multiple medication exposures and critical illness and procedures."

On April 18, a Mayo Clinic doctor evaluated Mr. Baillie for pulmonary abnormalities. At that time, his respiratory status was described as "poor," and was not showing "signs of improvement." The evaluation concluded that the chest x-ray was rather different from the CT scan, the one suggesting AARDs or pulmonary edema, the other suggesting "a patchy picture that is not compatible with pulmonary edema." That doctor felt that "a second pulmonary process could be present," and so recommended a bronchoscopy and bronchoalveolar lavage.

12

On April 24, a Mayo Clinic medical team concluded that Mr. Baillie was not a transplant candidate because he was in a debilitated state, was not improving, and had poor pulmonary status. Such "significant acute illness" was "likely to contribute to a poor transplant outcome."

On April 25, Mr. Baillie was thought to be "in imminent risk of death, given his current clinical situation, and at that point the Mayo Clinic offered to install an LVAD as "destination therapy." However, Mayo medical records state that, because of his tracheostomy, "this will be an unconventional approach for left ventricular assist device with cannulation to the LV apex and grafting to the descending aorta through a left thoracotomy approach."

The LVAD device that would be implanted was a HeartMate II. But that device, as Mayo Clinic records state, was "not intended for use over the thoracotomy," but at that time, "there appear[ed] to be no good long-term options." Risks of installing the device included excessive bleeding, infection, stroke, heart attack, organ failure, right ventricle failure, and death, and the patient's risk "was very high."

Mayo Clinic surgeons installed the LVAD on April 26. During that operation, there was also a cardiopulmonary bypass via the left femoral vessels and the placement of a right-sided chest tube. The Mayo Clinic billed approximately $250,000 for this procedure and related care needed just on the day of installation, April 26.

*Events leading to the implantation of the CentriMag RVAD on June 19.*

In the days and weeks following the implantation of the LVAD, Mr. Baillie suffered a series of medical problems. During this time, he remained mechanically ventilated and could only take nourishment through a feeding tube. He initially also suffered bouts of ventricular tachyarrhythmias.

On April 28, it was also determined that Mr. Baillie may be suffering from acute renal failure and hypoxic respiratory failure, was in cardiogenic shock, and that he suffered from anemia and thrombocytopenia.

13

In early May, Mayo Hospital notes show that Mr. Baillie was not oriented to place or situation, and suffered from impaired cognition, attention, memory and executive function. He remained anxious, and his anxiety was managed with Ativan. On May 5, for example, hospital notes record that he "remained delirious throughout the shift, extremely agitated and insisting on going home..."

On May 11, he again suffered episodes of ventricular tachycardia.

On May 13, Mr. Baillie underwent pericardiocentesis under ultrasound guidance.

On May 15, he was taken to the operating room and underwent thoracoscopic evaluation of hemothorax and the placement of a chest tube. A May 19 chest x-ray of Mr. Baillie showed various devices in him, including the tracheostomy, NG tube, LVAD, surgical drains, and right PICC catheter.

By the end of the first week in June, Mr. Baillie, under rehab therapy, was showing some improvement and able to ambulate short distances with the help of a wheeled walker. On June 14 and 15, however, he declined rehab therapy due to fatigue. On June 16, he experienced "multiple runs" of ventricular tachycardia, likely related to an MI involving the right ventricle.

The next day, June 17, while being assisted out of his bed, Mr. Baillie fell and hit his head on the railing. He became nonresponsive, his heart rate dropped into the 30s, and he came into 3rd degree or complete heart block. Code Blue was called. He eventually became more responsive and was given atropine. It was felt that he had developed right ventricular failure. There were attempts to perform transvenous pacing but neither the right atrium nor right ventricle would capture reliably. He was sedated and defibrillation was performed. He had an echocardiogram which showed a large aortic root thrombus between the aortic and annulus and the sinotubular junction.

On June 18, the Mayo Clinic convened an emergency meeting of the Multidisciplinary Cardiac Transplant Selection Committee. Recall that just two months prior, on April 13, the Mayo Clinic had determined that, due to Mr. Baillie's problems

14

there was "an enormous risk" involved in implanting a left ventricular assist device. Recall further that on April 24, the Mayo Clinic concluded that Mr. Baillie was not a transplant candidate because of his "significant acute illness," which was "likely to contribute to a poor transplant outcome." Nevertheless on June 18 the Mayo Clinic reversed itself, and concluded that Mr. Baillie "meets selection criteria as defined by heart transplant policy." But he met the criteria, the Mayo Clinic said, because he "has very poor functional status with irreversible and refractory heart disease and a poor probability of long term survival." Hence, the group felt that "heart transplantation is the only option, as there are no other medical or surgical therapies from which the patient may benefit."

On June 18, Mr. Baillie remained in complete heart block with a rate of 40-50.

On June 19, Mayo Clinic surgeons again operated on Mr. Baillie. By this time, they had concluded that he now suffered from right ventricular failure (in addition to left ventricular failure); right ventricular failure is a known risk of installing an LVAD. The surgical notes also state that by this time Mr. Baillie had persistent tracheocutaneous fistula. In this operation, the Mayo Clinic surgeons first closed the tracheocutaneous fistula, and then installed a "CentriMag" right ventricular assist device, to go along with the previously-installed LVAD.

One known side-effect of Dr. Candipan's insertion of drug-eluting stents (as opposed to bare metal stents) in Mr. Baillie on March 23, was the necessity of keeping Mr. Baillie on medications to thin his blood to avoid clotting. But the effect of those medications exposed Mr. Baillie to increased risk of bleeding during an open heart operation. And that risk was manifest in the Mayo Clinic's operation to install the RVAD on June 19. The operation caused a significant amount of bleeding from Mr. Baillie's chest wall, the left lung and the pericardial edges. Mr. Baillie had to receive 4 units of packed red blood cells, 2 units FFP, 1 liter of albumin, and 3 liter of crystalloid, with only a urine output of 224 mL during the operation.

15

Following the operation, the surgeon solicited a consult for postoperative ventilator management, hemodynamic stabilization, neurologic assessment post RVAD placement, in the setting of acute bleeding and right heart failure. The impressions from that assessment included that Mr. Baillie was in cardiogenic shock, had acute blood loss anemia, and suffered from coagulopathy and thrombocytopenia.

Later in the day, a Mayo Clinic surgeon sedated Mr. Baillie in his room in the ICU, then performed a mediastinal re-exploration to try and control the bleeding.

The Mayo Clinic billed approximately $175,000 for the installation of the RVAD and related procedures and care incurred just on the day of installation, June 19.

In my opinion, the installation of the RVAD, in light of all the circumstances, was medically futile, because the likelihood of the operation benefiting the patient at all was exceedingly poor, and if there were some benefit, the quality of the benefit likely to be produced was also extremely small.

The futility of the operation was illustrated the very next day, June 20, when Mr. Baillie was returned to the operating room to remove thrombi from the ascending aorta and left ventricle, then to remove his heart, along with both the LVAD, RVAD, and to implant a SynCardia Total Artificial Heart. As with the installation of the RVAD the day before, the operation to install the TAH brought about a significant amount bleeding in Mr. Baillie's chest area.

The Mayo Clinic billed approximately $430,000 for the procedures involved in installing the TAH, and the related procedures and care incurred just on the day of installation, June 20.

Mr. Baillie never regained consciousness following the installation of the TAH.

In my opinion, the installation of the TAH, in light of all the circumstances, was also medically futile, because the likelihood of the operation benefiting the patient at all was exceedingly poor, and if there were some benefit, the quality of the benefit likely to be produced was also extremely small.

16

In the days following the installation of the TAH, Mr. Baillie's condition continued to demise. For example, mediastinal bleeding continued following the installation of the TAH. On June 21, Mayo Clinic surgeons again operated on Mr. Baillie to do a mediastinal exploration and wash out to try and stop his internal bleeding.

On June 22, it was determined that Mr. Baillie had acute kidney injury in the setting of cardiogenic shock and total artificial heart device placement, and it was determined that he would need continuous renal replacement therapy (CRRT) for "quite some time" to stabilize him..

On June 25, Mr. Baillie was again taken to the operating room and given general anesthesia in order to perform another mediastinal exploration, washout, and sternal closure. Hence, within the one week period between April 19 and April 25, Mr. Baillie had four different operations. By this time the Mayo Clinic nutritionist noted that Mr. Baillie had lost 23Kg since his admission on March 30, or 28% of his body weight, and further noted that he was suffering from severe (acute) malnutrition.

On June 26, multiple small strokes in the brain were seen on a CT scan of Mr. Baillie's brain. These were felt to be the result of embolus from the aortic thrombus that embolized to the brain during the TAH operation on June 20. It was noted that Mr. Baillie had not been conscious since the June 20 operation during which the TAH was installed.

The family subsequently determined not to mechanically keep Mr. Baillie alive any longer, and on July 1 the TAH was discontinued and Mr. Baillie expired.

In my opinion, the measures described above were not necessary or appropriate in light of the circumstances, and the expenses associated with those measures were thus not usual or necessary.

I am being compensated for my work in this case at the rate of $400 per hour, and $550 per hour for time spent testifying either in deposition or at trial.

_____          5-26-16
Matthew Jay Budoff, M.D., F.A.C.C., F.A.H.A.          Date

17

# EXHIBIT 7

**EXPERT REBUTTAL REPORT OF**
**MATTHEW JAY BUDOFF, M.D., F.A.C.C., F.A.H.A.**
**IN THE MATTER OF**
*LINDA ANN BAILLIE V. MEDAIRE ET AL.*

I have been asked to review the February 1, 2016 report of Dr. Robert Candipan and provide my professional opinions on issues he addresses that fall within my expertise. I base my opinions on my background, training and experience, as well as my review of the evidence made available to me in this case. My qualifications were previously set forth in my expert report dated May 26, 2016, to which was attached my CV.

All my opinions are based on a reasonable degree of medical probability.

**First: Mr. Baillie's massive MI occurred as he was rushing to catch BA 289, and neither MedAire nor the MedLink physicians had anything to do with that.**

In Section Three of my 5/26/16 report, I gave my opinion that Mr. Baillie suffered a serious heart attack, a STEMI, before he boarded British Airways Flight 289, as he was rushing to catch the plane. But according to Dr. Candipan, Mr. Baillie's myocardial infarction (MI) "started approximately 6-8 hours prior to his arrival at St. Luke's." Dr. Candipan based that conclusion on the level of cardiac enzymes in Mr. Baillie's blood after he arrived at the hospital, and on the "symptoms that occurred during the flight."

Cardiac enzyme levels in the blood, however, only give an approximate minimum time before which an MI likely occurred. Blood enzyme levels can't tell you when an MI occurred, only that it probably took place *at least* 4-8 hours before the blood test was taken. An MI causes the level of certain enzymes to rise in the blood, but it takes several hours before the enzyme levels rise. Once enzyme levels rise, however, the levels remain high for 24 hours or more. In other words, if Mr. Baillie's MI had occurred six hours or 20 hours before the blood tests were taken at St. Luke's, the enzyme levels would have been the same.

1

As for when Mr. Baillie's symptoms began, I note that Dr. Candipan's own, contemporaneous hospital notes state: "Prior to boarding his airplane in his departing city, he developed chest pain and continued to have chest pain throughout the flight, which was greater than 11 hours." *See* St. Luke's Medical Center OP Report, dictated on 3/24/12. According to Dr. Candipan, these notes were based on what he heard directly from Mr. Baillie, apparently the day after BA 289 landed. In a June 6, 2014 Declaration, Dr. Candipan states: "After his surgery, I spoke with Mr. Baillie, and he told me that he was travelling on a flight from London to Phoenix on March 23, 2012, and that he began to experience chest pain while running in the London airport to catch the plane." 6/6/14 Candipan Declaration, ¶ 9.

General stress or stress caused by exertion can trigger the rupture of arterial plaque, which can in turn occlude an artery and thus bring about a myocardial infarction (MI) or heart attack. As already expressed in my May 26, 2016 report, Mr. Baillie's MI very likely occurred coincident with the symptoms of chest pain and shortness of breath that began as he was rushing to catch BA 289.

**Second: Prior to his MI on March 23, 2012, Mr. Baillie was not a "healthy" man, but rather suffered from serious coronary artery disease.**

At page 3 of Dr. Candipan's report, he states: "Prior to Mr. Baillie's myocardial infarction, he was a healthy 61 year old man…." However, as set forth in Section Two of my 5/26/16 report, and for the reasons there stated, this is not accurate. For several years prior to his MI, Mr. Baillie had in fact suffered from serious, three-vessel, coronary artery disease (CAD). When the Mayo Clinic gave Mr. Baillie an executive check-up in March 2011, the Clinic missed the diagnosis and improperly concluded that Mr. Baillie had no CAD, but in fact he did.

As shown by Dr. Candipan's March 23, 2012 angiography of Mr. Baillie, at that time Mr. Baillie had one totally occluded vessel (the LAD), along with 80% to 90% diffuse stenosis (narrowing) in the left circumflex and obtuse marginal artery, 40% to

2

50% proximal and mid-right coronary artery stenosis, and 50% to 60% stenosis of the distal right coronary artery. This serious CAD was the ultimate cause of Mr. Baillie's death.

As also set forth in my May 26, 2016 report, CAD occurs gradually over time, over a period of many years. In addition, and as further discussed in Section Two of my prior report, the treadmill stress test the Mayo Clinic administered to Mr. Baillie in March 2011 also suggested Mr. Baillie had serious CAD.

**Third: Mr. Baillie did not suffer a "massive, complicated myocardial infarction" as a result of the MedLink physicians' failure to recommend diversion, and Mr. Baillie would not have "sustained significantly less damage to his heart muscle," nor would "the risk of development of heart failure been smaller," had the MedLink doctors recommended diversion.**

At page 7 of his 2/1/16 report, Dr. Candipan offers his opinion that, because of MedAire and the MedLink physicians' "unusual and unexpected response" to Mr. Baillie's condition, he "suffered a massive, complicated myocardial infarction extending over many hours that resulted in end stage heart failure." The medical facts don't justify this conclusion.

To begin with, Mr. Baillie's STEMI began while he was rushing to catch the plane, at least four hours before I understand that MedAire was even contacted for advice. Mr. Baillie's STEMI was indeed a "massive, complicated" MI, but it occurred long before MedAire was involved, so neither MedAire nor Drs. Reinhart nor Monas could have had anything to do with that.

And as discussed in Section Four of my May 26, 2016 report, even if Dr. Reinhart had immediately recommended diversion during the first phone patch, and the pilot had decided to divert right then, it still would have been at least seven and probably eight hours after the onset of his STEMI before Mr. Baillie could have had blood flow restored to his occluded LAD. For that to happen, I understand the plane would have first needed

3

about two hours to land at an alternative landing site accessible to an appropriate medical facility, and then additional time to get Mr. Baillie to a medical facility and have a doctor open his occluded artery.

For example, once BA 289 landed, I understand it took approximately an additional two hours and fifteen minutes to get Mr. Baillie to St. Luke's hospital and have Dr. Candipan do an angiography and open his LAD. If, as is reasonable, one assumes an equivalent amount of time, that means four hours to restore blood flow to Mr. Baillie's heart once the decision to divert was made, or at least a total of eight hours following the onset of his STEMI.

Myocardial salvage is the principal means by which MI patients benefit from reperfusion therapy. And as discussed in Section Four of my prior report, many medical studies have confirmed that, by the time six hours have elapsed following a STEMI, essentially all the salvageable myocardium has already been lost. Hence, no or minimal benefit would be gained by moving the time to reperfusion from 12 hours back to 7 or 8 hours following symptom onset. This is depicted in a chart I attached as Exhibit 1 to my prior report. That chart is taken directly from an article by B. Gersh et al., *Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute Myocardial Infarction; Is the Slope of the Curve the Shape of the Future*, JAMA, February 23, 2005 (Vol. 293, No. 8, 979-986).

Dr. Candipan does acknowledge that "reperfusion treatment to open an occlusion" should take place "as soon as possible, preferably within 90 minutes," and of course that goal had already long passed by the time MedAire was first called. Dr. Candipan then states: "Any significant delay results in increased myocardial necrosis and thus increasing mortality." I agree with this as regards the first approximately 90 minutes following a STEMI, but—as shown in the above-mentioned chart—after the first few hours, further delay in the time to reperfusion has no significant impact either on mortality or on the amount of myocardium that can be salvaged.

4

Apparently to support a claim that "[a]ny significant delay" in the time to reperfusion "results in increased myocardial necrosis and thus increasing mortality," Dr. Candipan relies on a study of patients with STEMI that, according to Dr. Candipan, showed that "a delay in the time to reperfusion was associated with a higher adjusted risk of in-hospital mortality in a continuous, nonlinear fashion (30 minutes 3.0%, 60 minutes 3.5%, 90 minutes 4.3%, 120 minutes 5.6%, 150 minutes 7.0%, and 180 minutes 8.4%; P<0.001)."

But this study does not relate to the facts of this case and is not helpful in determining whether a diversion of BA 289 to an earlier landing might have increased Mr. Baillie's chances of survival. Rather, the objective of this study was to evaluate, for STEMI patients who received PCI, "the association between door-to-balloon time and mortality in hospital," in order to "assess the incremental mortality benefit of reductions in door-to-balloon times of less than 90 minutes." S. Rathmore, et al., *Association of door-to-balloon time and mortality in patients admitted to hospital with ST elevation myocardial infarction: national cohort study*, BMJ 2009; 338: b1807 (published online May 19, 2009).

Here, Mr. Baillie's door-to-balloon time at St. Luke's was almost right at 90 minutes. The study done in this article only suggests that Mr. Baillie would have had a better chance of survival if *St. Luke's and Dr. Candipan* had treated Mr. Baillie more quickly once he arrived at the hospital. Assuming the results of the study applied to Mr. Baillie here, for example (though they really do not), the fact that St. Luke's and Dr. Candipan took 90 minutes to get Mr. Baillie from door-to-balloon, instead of 60 minutes, increased Mr. Baillie's adjusted mortality rate by about 23%, from 3.4 % to 4.3 %. Even so, that would only mean that, *on average*, approximately one more person in a hundred would survive if door-to-balloon time were shortened from 90 minutes to 60 minutes.

But the important issue in this case is the effect of *symptom onset time* to balloon or PCI time. And as noted, multiple studies confirm that, after about six hours following

symptom onset, no significant myocardium remains to be salvaged, so that waiting another few hours until PCI is obtained has little or no effect on mortality.

Moreover, the study Dr. Candipan relies on only considers door-to-balloon times of four hours (240 minutes) or less. And when one looks at the graph of the hospital mortality rates versus the door-to-balloon time, one sees a similar relationship as in graphs of symptom-onset time to balloon time; that is, the mortality curve begins to flatten out after a few hours. Of course, that study doesn't show the full extent of the flattening, because the study didn't consider anyone who received PCI more than six hours after arrival.

My curriculum vitae (including a list of publications in the last 10 years), along with the list of materials considered and recent expert testimony, are attached to my expert report dated May 26, 2016. My compensation for my work in this case is as stated in that report.

Matthew Jay Budoff, M.D., F.A.C.C., F.A.H.A.          Date

6-20-2016

# EXHIBIT 8

**Figure.** Hypothetical Construct of the Relationship Among the Duration of Symptoms of Acute MI Before Reperfusion Therapy, Mortality Reduction, and Extent of Myocardial Salvage



# EXHIBIT 9

1  Mark C. Dangerfield (Bar No. 010832)
   Wm. Charles Thomson (Bar No. 004269)
2  GALLAGHER & KENNEDY, P.A.
   2575 East Camelback Road
3  Phoenix, Arizona 85016-9225
   Telephone:   (602) 530-8000
4  Facsimile:    (602) 530-8500
   E-mails: mark.dangerfield@gknet.com
5           wct@gknet.com
   Attorneys for Defendants MedAire, Inc., Steven
6  Joe Reinhart, D.O., and Jessica Monas, M.D.

7                      UNITED STATES DISTRICT COURT

8                          DISTRICT OF ARIZONA

9
   LINDA ANN BAILLIE, individually, as          No. 2:14-cv-00420-PHX-SMM
10 Personal Representative of the Estate of
   JAMES DONALD BAILLIE, II, and on
11 behalf of all heirs and next of kin of
   JAMES DONALD BAILLIE, II, deceased,          **DECLARATION OF PAULO ALVES,**
12                                              **M.D.**
                    Plaintiff,
13
                 vs.
14
   MEDAIRE, INC.; STEVEN JOE
15 REINHART, D.O.; and JESSICA MONAS,
   M.D.,
16
                    Defendants.
17

18       I declare under penalty of perjury that the attached expert report dated May 25,

19 2016 contains true and correct statements of opinions I have offered in connection with

20 this action.

21       Executed this  $\underline{14}$  day of September, 2016.

22

23                                   ﾗ｡ヒﾊﾕﾉﾚ=ﾊ

24                                   Paulo Alves, M.D.

25

26

27

28

5612762v1/24709-0001

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

# EXHIBIT 10

## EXPERT REPORT OF PAULO ALVES, M.D., MSc, FAsMA
## IN THE MATTER OF
## *LINDA ANN BAILLIE V. MEDAIRE, INC. ET AL.*

As requested by MedAire, I am providing this report to summarize my
professional opinions on certain issues pertinent to this case. My opinions are based on
my background, training and experience, as well as my review of related documents and
information.

### Qualifications.

I currently serve as the Global Medical Director, Aviation Health, for MedAire. I
am a medical doctor and a cardiologist by training. I am a member and fellow of the
Aerospace Medical Association or AsMA. Currently, I am also the chair of AsMA's Air
Transport Medicine Committee. I am also a member of the International Academy of
Aviation and Space Medicine as well as the Airlines Medical Directors Association. Prior
to joining MedAire in 2007, I worked for 23 years for VARIG Brazilian Airlines, being
its Medical Director for 10 of those years. During part of that time I was also a member
of the Medical Advisory Group of the International Air Transport Association ("IATA") .

As the Global Medical Director for MedAire, I work as a link between the
different parts of MedAire—training, sales, marketing, and operations. In that capacity I
study and review cases and conduct research to help improve MedAire's services to our
client airlines. Because of my own background as a medical director for an airline, I also
work closely with medical directors of our client airlines.

A copy of my CV is attached as Appendix A to this report.

**First Opinion:**

Although the airline industry is heavily regulated, and several groups weigh in on safety standards, there are no airline industry standards governing the provision of remote medical advice to a commercial airline.

The aviation industry is regulated on different levels to ensure the safety of air operations. To begin with, the International Civil Aviation Organization (ICAO)—an entity under the jurisdiction of the United Nations (UN)—issues general minimum "Standards and Recommended Practices" or SARPs that all airlines from the UN Member States flying internationally must follow. As stated on the ICAO Website:

> These SARPs and policies are used by ICAO Member States to ensure that their local civil aviation operations and regulations conform to global norms, which in turn permits more than 100,000 daily flights in aviation's global network to operate safely and reliably in every region of the world.

Each country also has its own governing body responsible for aviation safety, including the Federal Aviation Association (FAA) in the United States, the Civil Aviation Authority (CAA) in Great Britain, and the Civil Aviation Safety Agency (CASA) in Australia, among others. Most recently, the European Aviation Safety Agency (EASA) became the agency for the European Union member states. Each of these organizations promulgates standards and guidelines intended to protect the safety of airline crews and passengers. Airlines registered in those countries are required to follow those standards.

There are also national and international trade associations that provide safety standards and guidelines for its members to follow. One of these is the International Air Transport Association (IATA), a trade group of which many international airlines are members, including British Airways. IATA publishes various standards and guidelines,

2

including those set forth in the IATA Medical Manual and the IATA Cabin Operations Safety Best Practice Guide, which its member are expected to follow.

The Aerospace Medical Association (AsMA) is another association concerned about maintaining the health and safety of persons involved in air and space travel, and much of its business is conducted through standing committees. One of those committees is the Air Transport Medicine Committee, of which I am the current chairman. The AsMA website describes the function of this committee as follows:

This committee is responsible for performing studies and preparing reports, resolutions, and recommendations on biomedical aspects of air transport operations. Its efforts concentrate on the promotion of international health, safety, and care through the mechanism of collecting information, analyzing data, and recommending solutions leading to improving health and safety in air transport operations.

AsMA from time to time issues publications containing suggestions intended to aid airlines in dealing with, among other things, fitness to fly issues and in-flight medical care. For example, AsMA has published its "Medical Guidelines for Airline Travel."

Another organization interested in flight safety is the International Academy of Aviation and Space Medicine. The object of the Academy is to promote and search for new knowledge in aerospace medicine, and to contribute to international co-operation among those devoted to education and research in aviation and space medicine. The Academy holds annual meetings where papers on aerospace medicine are presented, and from time to time publishes monographs and position papers on various topics.

The Airlines Medical Directors Association (AMDA), of which I am also a member, is a constituent group related to AsMA. As set forth on its Website, AMDA

3

"serves as an international forum for physicians who wish to exchange information on problems relating to airline medicine, both through our yearly meeting and through networking opportunities to facilitate communications among physicians with related interests." From time to time, AMDA also publishes materials dealing with various aspects of flight-related medical issues.

Some of the standards, policies, or suggestions promulgated or published by the above organizations relate to crew training in the handling of safety incidents, as well as the importance of pre-flight fitness to fly assessments of passengers.

For example, the ICAO-issued, "Operation of Aircraft," Annex 6 to the Convention on International Civil Aviation, Part 1, § 12.1, addresses cabin crew training, and states: "An [aircraft] operator shall establish and maintain a training programme, approved by the State of the Operator, to be completed by all persons before being assigned as a cabin crew member," and cabin crew members shall also "complete a recurrent training programme annually." In addition, § 1.6.5 of the IATA Medical Manual states that "[c]abin crew must be well trained in First Aid to enable them to assist a passenger, or fellow crew member who becomes unwell in-flight."

In addition, § 1.2 of the IATA Medical Manual states that the "airline is responsible for carrying its passengers safely and efficiently to the destination," including being responsible for ensuring "that there are adequate measures in place to deal with any unforeseen in-flight medical emergency." *Id.* That said, while "customers wish to travel quickly, cheaply and safely to their destination," the passengers themselves "have a responsibility to ensure that they are healthy enough to do so." *Id.* 1.2.3.

4

The IATA Medical Manual also acknowledges the role of ground-based medical advice: "Some airlines now have in-flight access to ground-based specialist medical services which the crew can contact using the aircraft satellite communications system." *Id.* § 1.6.5. "Such systems," the Manual says, "are invaluable as they not only provide experienced medical advice relevant to air travel, but also assist the captain of the aircraft in making decisions about a potential medical diversion." *Id.* Using such systems, the Manual goes on to say, "to minimize the risk of diversion will not only save the airline cost, the passengers inconvenience, but also helps the sick passenger, who, even if unwell, does not want to be hospitalized in a foreign place with all the problems and difficulties that entails." *Id.*

As regards the role of ground-based medical consultants in diversion decisions, the IATA Manual states: "Typically, the Captain is looking for a quick assessment as to whether or not the plane should divert for the medical situation." *Id.* § 6.2.3. However, the "ultimate diversion decision remains with the Captain, who also must account for fuel, weather, safety of landing site, and other operations factors beside the emergency."

Section 6 of the IATA Medical Manual deals with passenger care, and states that "Every airline should have a medical clearance procedure" to evaluate a passenger's fitness to fly before takeoff. *Id.* § 6.1. The IATA Manual recommends that a pre-flight medical clearance should be required by the airline's medical department if the passenger is, among other things, "considered to be a potential hazard to the safety or punctuality of the flight including the possibility of diversion of the flight or an unscheduled landing." *Id.* "[I]f in doubt," the Manual says, "medical advice should be obtained." *Id.*

5

The IATA Cabin Operations Safety Best Practice Guide also states that if the "Cabin Crew suspects that a passenger is not fit to travel, or may represent a danger to themselves or to passengers, they should inform the Pilot-in-Command and determine appropriate action in close co-ordination with ground staff."

The AsMA Air Transport Medicine Committee also publishes a "Guidance Document" for health professionals entitled: "Medical Emergencies: Managing In-flight Medical Events." That documents states, among other things:

- "It is the responsibility of the passenger to notify the airline in a timely manner, before flight, if he/she has a serious medical condition."

- "It is not feasible to provide on a commercial airliner the equivalent of a ground-based medical care facility."

- "Increased use of a medical 'clearance to fly' process by the treating physician would probably prevent many in-flight medical events that currently occur."

AsMA also publishes Medical Guidelines for Air Travel, including a section titled "Fitness to Fly and Medical Clearances." That document emphasizes that "an individual with an unstable medical condition should not fly. Instability combined with flight stresses could pose a serious threat to the health and well-being of the sick or injured traveler." In particular, "a lowered in-flight barometric pressure and oxygen partial pressure are of particular significance for passengers with cardiopulmonary disease."

In the document's conclusion, the authors further state that "experience of specialists working in the field indicates that most in-flight medical events are handled

6

appropriately," but that "[i]ncreased pre-flight use of existing guidelines by treating physicians, in collaboration with airline medical advisors, would prevent some in-flight medical emergencies."

While some of the material published by these various organizations acknowledges or encourages the use of ground-based, remote medical advice services, to date none of the standards, policies or suggestions promulgated or published by any of these organizations offer any guidance on how an entity providing such remote medical advice should be organized or what mechanisms, standards or practices should be used in providing such. In particular, none of the standards, policies, or suggestions promulgated or published by any of these organizations dictate or suggest when or in what circumstances the remote advice service should recommend that an aircraft divert to another location in order to assist an ill passenger.

## Second Opinion:

There is not yet a "remote medical advice to aircraft" industry, and hence industry customs or standards governing the provision of remote medical advice to a commercial airline have not yet been developed.

About 30 years ago, MedAire pioneered the idea of offering remote medical advice as a commercial service to airlines, and today MedAire provides such advice in response to more than 55,000 incidents a year (including both fitness-to-fly assessments and inflight medical events). In the United States, there is only one other commercial provider of such remote medical advice to airlines, and that is the STAT-MD service

7

operated by the University of Pittsburgh Medical Center in Pennsylvania. (A few airlines employ their own ground-based doctors directly for remote medical advice.)

MedAire and STAT-MD operate independently, and there is no interaction between them. Moreover, there are no trade groups or associations regarding the provision of remote medical advice. Nor are there any regular meetings or conventions held to discuss the provision of remote medical advice, nor any professional journals devoted to such. In addition, there are few scientific articles or studies, let alone randomized controlled trials, relating to the provision of remote medical advice to airlines.

Accepted medical customs and standards typically arise through scientific studies, professional journals, trade groups, and regular conventions of physicians in the same specialty. To date, though, none of these sources of standards exist for providing remote medical advice to airlines. Hence, no accepted medical customs or standards exist for such.

MedAire uses emergency physicians to provide remote medical advice to airlines, and there are certainly medical customs and standards that apply to the work of emergency physicians treating patients in the emergency department. But treating patients in the emergency department is vastly different than providing remote advice to an airline pilot about an ill passenger whom the physician cannot see or talk to, in an environment where even basic tests and procedures can't be carried out.

8

**Third Opinion:**

Because every in-flight medical event ("IFME") is unique, MedAire leaves to the clinical judgment of each individual physician whether or not to recommend that a flight divert. MedAire has no internal standard specifying when a diversion should be recommended.

A MedLink physician consulting about an IFME has numerous, sometimes complicated, variables to evaluate, including among other things:

- the passenger's current medical complaint and symptoms;
- the passenger's age;
- the passenger's gender;
- the passenger's medical history, including possible allergies;
- the passenger's medication use;
- the length of the flight and the time to arrival at the planned destination;
- the current location of the flight and the proximity to appropriate medical facilities;
- what medical equipment and drugs are available on board;
- whether there are onboard medical personnel who can assist;
- how the passenger's symptoms change over time;
- how the passenger reacts to the limited treatment options.

9

Moreover, the MedLink physician must assess these variables quickly, within a matter of seconds, and then make immediate recommendations; he or she does not have the luxury to sit back and ponder or reflect on the matter.

I understand that MedAire has produced data concerning (1) all the IFMEs involving British Airways that were identified as "cardiac" in the First Quarter of 2012, as well as (2) the IFMEs identified as "cardiac" involving Drs. Reinhart and Monas in 2011-2014. A review of the data underlying those IFMEs confirms the broad diversity of calls and some of the numerous call variations which MedLink physicians confront on a regular basis.

These data underscore why it is not feasible to come up with a scientifically or medically-backed standard for when a physician should recommend diversion, and why MedAire thus leaves such recommendations to the clinical judgment of each physician, as informed by his or her background and experience. And unless a physician completely ignores all the evidence, there is no basis to "second guess" or impose some post hoc criticism of that physician. Such after-the-fact criticism would necessarily be affected by outcome bias.

**Fourth Opinion:**

Diversion of an aircraft to an alternate airport, to enable an ill passenger to get medical treatment, is very unusual, even when an ill passenger has chest pain; in the vast majority of situations, diversion is not medically necessary or appropriate.

MedAire maintains a database of aircraft diversions over a lengthy period of time, a database that is very likely the largest and most complete of its kind. Those data show

10

that a plane diverts to an alternate airport, on average, in only about 2% of the medical emergencies MedAire handles. For example, MedAire records show the following:

- 2010: 471 diversions from 19,225 IFMEs, or 2.4%.

- 2011: 529 diversions from 22,637 IFMEs, or 2.3%.

- 2012: 532 diversions from 25,323 IFMEs, or 2.1%.

- 2013: 565 diversions from 28.954 IFMEs, or 2.0%

- 2014: 552 diversions from 34,475 IFMEs, or 1.6%.

While the percentage of diversions is higher for cardiac cases, including cases involving chest pain, even then, less than 8% of flights divert. For example, MedAire records show that, in the four-year period from 2010 through 2013, there were 369 diversions stemming from 6,093 IFMEs involving chest pain, or only about 7.58%.

And if we just look at diversions involving British Airways, the percentages are similar:

- 2010: 7 diversions from 111 BA IFMEs identified as cardiac, or 7.2%

- 2011: 12 diversions from 126 BA IFMEs identified as cardiac, or 9.6%.

- 2012: 8 diversions from 126 BA IFMEs identified as cardiac, or 6.3%.

- 2013: 7 diversions from 111 BA IFMEs identified as cardiac, or 6.4%.

In the course of my work for MedAire, I study the IFMEs, including diversions and IFMEs resulting in the death of a passenger, and I discuss those with client airlines when appropriate. Of course, because of privacy laws (such as HIPAA in the U.S.), it is often difficult to get complete follow up information on a passenger who was

11

hospitalized following a flight or diverted flight. Nevertheless, based on my research and discussions with the client airlines, I am of the opinion that it is not necessary, nor would it be helpful, to recommend that airlines adopt a policy of diverting more flights.

Every year, of course, a handful of airline passengers will die of a serious illness that either occurs or manifests itself inflight. Most such passenger deaths occur rather suddenly, from cardiac arrest, in situations where even immediate diversion would not have helped. And in any event, such situations present an obvious and serious medical emergency. Chest pain and breathing difficulties, on the other hand, are often quite ambiguous.

Neither my research nor my discussions with airline clients suggests that MedAire is routinely not recommending sufficient diversions, or that airline pilots are not diverting planes often enough in light of the IFMEs.

**Fifth Opinion:**

A vital part of MedAire's services to airlines is to offer a "fitness-to-fly" assessment of passengers who appear ill or have some symptoms when they are either boarding the plane, or while they are on the plane but before takeoff. Although this was one of the services MedAire provided BA, BA failed to take advantage of the service in the case of Mr. Baillie. In my opinion, had MedAire been asked to assess Mr. Baillie's fitness-to-fly, MedAire would have recommended that he not be allowed to stay on the flight.

According to Mrs. Baillie, when Mr. Baillie boarded BA 289, he advised a flight attendant that he wasn't sure he should be on the flight, because he was not feeling well

12

and had chest pains and was short of breath. According to Mr. Baillie, "the flight attendant told him to please sit down in his seat and that they would take care of him, so he did." Had a MedAire medical person been advised that a passenger had such symptoms, on a non-stop transatlantic flight scheduled to last more than 10 hours, it would have been an easy and obvious assessment: MedAire would have recommended that the passenger not be allowed to fly.

But BA didn't call MedAire about the matter, and the plane took off with no fitness-to-fly assessment.

In 2012, for example, MedAire's reports to British Airways show that MedAire handled 2,254 "fitness-to-fly" assessments for that airline (along with 2,035 IFMEs). As a result, in 2012 MedAire recommended that 452 apparently ill or injured British Airways passengers not be allowed to fly. When one looks at the patch summaries of just a selection of those 452 cases receiving a "no fly" recommendation, they make it clear that, had a pre-flight assessment of Mr. Baillie been done, MedAire would have recommended that he be offloaded.

Paulo Alves, M.D.

$\underline{05/25/2016}$
Date

**APPENDICES**

A.    Curriculum Vitae

B.    Materials Considered

13

# EXHIBIT 11

Mark C. Dangerfield (Bar No. 010832)
Wm. Charles Thomson (Bar No. 004269)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:   (602) 530-8500
E-mails:  mark.dangerfield@gknet.com
          wct@gknet.com
Attorneys for Defendants MedAire, Inc., Steven
Joe Reinhart, D.O., and Jessica Monas, M.D.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>MEDAIRE, INC.; STEVEN JOE REINHART, D.O.; and JESSICA MONAS, M.D.,<br><br>Defendants. | No. 2:14-cv-00420-PHX-SMM<br><br>**DECLARATION OF MICHAEL G. FORTUNE** |

I declare under penalty of perjury that the attached letter report dated May 25, 2016 contains true and correct statements of opinions I have offered in connection with this action.

Executed this _14th_ day of September, 2016.

_Michael G. Fortune_
Michael G. Fortune

5610652v1/24709-0001

# EXHIBIT 12

May 25, 2016

Mr. Mark Dangerfield
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016-9225

Re: Baillie / MedAire

Dear Mr. Dangerfield:

The following is my report under Rule 26 in the matter of *Linda Ann Baillie vs. MedAire, et al.*

## STATEMENT OF ALL OPINIONS, BASES, AND REASONS THEREFOR:

This report is based on my background and experience, as well as my review of the materials listed in this report. The information I read and my experiences as a Continental/United Airlines pilot provide me with a solid basis upon which to form an opinion on the expectations a pilot would have when coordinating an onboard medical situation with MedAire through their MedLink service. The use of the term MedLink throughout this document describes the service MedAire provides to its airline clients.

The opinions that follow are supported by my 43 years of professional aviation experience as a military, airline, and general aviation pilot during which I have logged 26,000 hours of flight time. I hold type certificate ratings in the B-707, B-720, B-727, B-737, B-747, B-757, B-767, B-777, and DC-9. I have flown all aircraft listed on my license as a captain in international operations. My airline career spanned nearly 30 years, of which approximately one-third was spent as an Aircrew Program Designee, Instructor Pilot, and Line Check Airman, training and administering flight checks on the B-737 and B-747 aircraft. My duties as an Aircrew Program Designee, Instructor Pilot, Line Check Airman, and wide-body aircraft captain flying international routes qualify me to express my opinions in this case. Over my 30 years as an airline pilot I have used MedLink services more than twenty times when evaluating ailing passengers.

I am not a doctor or medical professional, and so will not offer opinions on the quality of the medical advice proffered by Drs. Reinhart or Monas. Nor will I offer opinions on the quality of observations by passengers who were medical professionals volunteering to check on Mr. Baillie's condition.

1

## TERMS

- MedLink is the service provided to British Airways by the company MedAire;
- ICAO - International Civil Aviation Organization;
- CAA - Civil Aviation Authority - Responsible for safety and economic regulation of British aviation as well as consumer protection in commercial aviation;
- BA - British Airways;
- Speedbird - British Airways call sign used by air traffic control. Speedbird 289 in this case;
- Coordinated Universal Time (UTC) and Greenwich Mean Time (GMT) are interchangeable and written as 0900 UTC, 0900 GMT, or 0900 Zulu;
- EGLL - International Civil Aviation Organization Identifier (ICAO) for London's Heathrow Airport;
- KPHX - ICAO Identifier for Phoenix's Sky Harbor Airport;
- CRM - Crew Resource Management;
- References to "his aircraft" when discussing the captain are gender neutral and can apply to both male or female flight crew members;
- Flight Crew – Pilots;
- Cabin Crew - Flight Attendants;
- Ground Crew - BA Customer Service Agents.

## INCIDENT SUMMARY

British Airways (BA) Flight 289 boarded passengers at London's Heathrow (EGLL) airport on March 23, 2012, en route to Phoenix Sky Harbor Airport (KPHX). Mr. James D. Baillie II boarded the aircraft at 1454Z according to BA passenger records. According to Mrs. Baillie, her husband told her that he "had to rush to make his flight from London to Phoenix," and that "when he arrived at the gate he was having breathing problems and feeling discomfort in the center of his chest." He also told her that, by the time "he got on board the airplane a few minutes later, the discomfort in his chest had become painful, so right away he told a flight attendant that he was not feeling well and had chest pains and was short of breath and that he wasn't sure he should be on the flight." Mr. Baillie also said that "the flight attendant told him to please sit down in his seat and that they would take care of him, so he did." In addition, according to what Mr. Baillie told Mrs. Baillie, "after sitting for a minute or two, the pain in his chest had not gone away so he told the flight attendant again that he was short of breath and

2

experiencing chest pains and that he really did not feel well."[1] But the flight attendant "again asked him to take his seat and told him that they would take care of him."

The boarding process continued without a call to MedLink to assess Mr. Baillie's fitness to remain onboard BA 289 on the flight to KPHX. The boarding process was completed and BA 289 pushed back from the gate at EGLL at 1512Z. BA 289 was airborne at 1546Z, landing in KPHX at 0146Z and arriving at the gate at 0153Z.

According to the testimony of the BA cabin crew, the captain was notified by about 17:15Z that there was a first class passenger experiencing chest pain. Flight attendant Ewa van den Berg was assigned by Georgina Bolton, the Customer Service Manager on BA 289, to focus solely on Mr. Baillie. BA 289 continued on its flight planned route while the flight attendants attended to Mr. Baillie. Captain Fowler was advised of the situation in the cabin and the first call to MedLink was made at 1846Z. A MedLink physician, Dr. Reinhart, suggested supplemental oxygen and to query the passengers for a medical professional onboard the aircraft who could to evaluate the ill passenger and get a set of vital signs.

The second contact with MedLink began at 1912Z. Dr. Reinhart was still on duty at MedLink and handled the call. Mr. Baillie's vital signs were transmitted to Dr. Reinhart along with the observations of the volunteer physician who was a passenger on BA 289. Dr. Reinhart discouraged the use of nitroglycerin and suggested the crew keep Mr. Baillie on supplemental oxygen, monitor him, and call back if his condition deteriorated or he became unstable, in which case a diversion to a suitable alternate airport would have to be considered. When queried about what to watch for, Dr. Reinhart said *"...if his blood pressure drops further or he becomes unresponsive, his color deteriorates and becomes ashen or cyanotic or the chest pain seem tour worsen where uh uh he is unable to tolerate it."* [1] BA 289 was also advised to check his blood pressure every 15-30 minutes. The pilot handling the phone patch response was *"OK, that's understood."* [2] At

---

[1] Mrs. Baillie does not say the name of the flight attendant to whom her husband initially spoke. One flight attendant, Ms. Ewe van den Berg, gave a deposition in May 2014 in which she said that shortly after boarding the plane, Mr. Baillie told her he had been running to the gate, and was very thirsty and a little out breath. He asked her whether he should get off the plane, and she told him no, and reassured him that if he sat down and relaxed, he shouldn't be out of breath anymore. A short time later the airplane doors closed, and a while later the plane taxied and took off.

[2] 3/23/12 BA 289 MedLink patch transcript (BA0489-BA0494) Ex. 18, page 3.

3

this point the aircraft had approximately six hours to go before the scheduled arrival in Phoenix and was approaching the half-way point in the flight.

The third contact with MedLink began at 2238Z. Dr. Reinhart had gone off shift and was replaced by Dr. Monas. Mr. Baillie's vital signs were "...quite stable."[3] But Mr. Baillie reported feeling "a bit worse" and was observed to be sweating. A discussion of nitroglycerin use ensued with reference to his blood pressure readings and Dr. Monas wanted to speak to the onboard physician assessing Mr. Baillie. Due to security reasons, the onboard physician could not speak directly to the MedLink physician because entry to the cockpit would be required. Dr. Monas discussed the potential for a diversion to a suitable alternate airport and said that *"...we'll take a look at some diversion locations if you feel he is concerning at this time,"* and the pilot agreed.[4]

At 2300Z, British Airways Dispatch joined the phone patch between BA 289 and MedLink. The possibility of a diversion to Chicago was discussed and coordination proffered for the diversion. Dr. Monas said *"I just wanna make sure we have tried laying this gentleman down with his legs elevated. Um just to make sure that we do uh give him a little time in that position and recheck his blood pressure."[5]* The CSE at MedLink was also on the call and advised he would contact Chicago to let them know of the possibility of a diversion. Captain Fowler advised that he would call them back "to let you know what our decision is if we do have to divert."

Captain Fowler did not call MedLink back and BA 289 continued to KPHX, its original destination, where Mr. Baillie, with some assistance, walked off of the aircraft and was met by the paramedics.

---

[3] Ibid, page 3.
[4] Ibid, page 5.
[5] Ibid, page 5.

## **OPINIONS**

### **I. Boarding Process at London's Heathrow Airport (EGLL):**

Based on my background and experience as an international airline captain, and my review of BA manuals, BA personnel acted unreasonably, violated their company's protocol, and showed a lack of good crew resource management practices (CRM). BA personnel failed to contact MedLink to evaluate Mr. Baillie's fitness to fly before the aircraft departed the gate as per BA protocol outlined in the Customer Service Manual, Appendix A, Gate Clearance Medical Procedures.

- On boarding the plane at 14:54 UTC, Baillie told a flight attendant he was not feeling well, had chest pain, had difficulty breathing, and wasn't sure he should stay on the flight.
- The BA flight attendant knew it was more than a 10-hour non-stop flight and would have been trained on the need to seek a fitness-to-fly opinion from MedLink physicians before allowing Mr. Baillie to remain on the flight.
- Mr. Baillie reminded the flight attendant of those symptoms a while after he boarded and before takeoff.
- Flight attendants failed to notify the captain of Mr. Baillie's condition prior to departing the gate. Industry standards, as well as BA's own internal standards, required the flight attendant to bring the issue to the attention of the captain, and to seek medical clearance for Mr. Baillie before allowing him to remain on the plane but, the flight attendant failed to do so. This violates the basic tenants of crew resource management (CRM). In order for any flight to proceed with optimum safety, effective communication between the flight crew and cabin crew is imperative.
- Failing to coordinate with the BA ground crew responsible for the checking in and boarding of the passengers that Mr. Baillie may have a medical issue that needed to be evaluated.
- Failing to properly communicate to MedLink all the information BA had regarding Mr. Baillie's medical condition prior to departing the gate as per BA procedure in the Customer Service Manual. For example, IATA's Cabin Operations Safety Best Practice Guide states that a "medical clearance by the medical department/advisor of the Airline in contact with the passenger shall be required whenever the Airline...has received information that any passengers...can be considered to be a potential hazard to the safety of the flight or the punctuality thereof (including the possibility of a diversion of the flight and unscheduled landing)." The Guide also states that, "[i]n the

5

event Cabin Crew suspects that a passenger is not fit to travel, or may represent a danger to themselves or to passengers, they should inform the Pilot-in-Command and determine appropriate action in close co-ordination with ground staff."

## II. Phone Patches with Dr. Reinhart:

In my professional opinion based on many contacts with MedLink over my career as an international airline captain, Dr. Reinhart, the MedLink physician initially working with BA 289, asked questions and gave advice that a reasonable captain would expect from the MedLink physicians when dealing with an ailing passenger.

- Dr. Reinhart briefly confirmed the nature of the medical problem, which was chest pain, then immediately asked whether the passenger had any history of cardiac problems, and confirmed his medication use. He then asked to see if an onboard doctor could be found who could evaluate the passenger and examine his vital signs.
- When the pilot called MedLink back about 20 minutes later, Dr. Reinhart was again available to field the call, he confirmed the details about the passenger's vital signs, and gave advice specific to those details *("The blood pressure is too low to support us giving him a nitroglycerin at this point...")*[6]
- Dr. Reinhart also appropriately asked whether the onboard doctor had any further suggestions after his evaluation, and was told no, he—or apparently they—did not.
- Dr. Reinhart then gave the pilot some specific advice about how to handle the situation: for now, proceed on toward your destination, but if the passenger's *"...condition appears to deteriorate,"*[7] the pilot should call back and they would have *"...to consider a diversion at that point."*[8]

In response to the pilot's question about what they should be looking for regarding the passenger, Dr. Reinhart gave specific recommendations *("if his blood pressure drops further or he becomes unresponsive, his color deteriorates and becomes ashen or cyanotic or the chest pain seems to worsen where he is unable to tolerate it.").*[9] Dr. Reinhart also suggested they monitor the passenger's blood pressure every 15 to 30 minutes.

---

[6] Ibid, page 2.
[7] Ibid, page 2.
[8] Ibid, page 2.
[9] Ibid, pages 2-3.

6

- The pilot said he understood the advice, and terminated the phone patch.[10]

## III. Phone patches with Dr. Monas:

In my professional opinion based on many contacts with MedLink over my career as an international airline captain, Dr. Monas, the MedLink physician who came on duty when Dr. Reinhart's shift was over, asked questions and gave advice that a reasonable captain would expect from a MedLink physician when dealing with an ailing passenger. A competent flight crew would expect the physician taking over, Dr. Monas, to review the facts prior to making any recommendations. This is what Dr. Monas did.

- About three hours and fifteen minutes after the last conversation with Dr. Reinhart, the pilot called MedLink again.
- Once again, a MedLink CSE took the call, received a brief update from the BA pilot and cabin crew, advised them that Dr. Reinhart had gone off shift, and located another emergency room doctor to field the call, Dr. Monas.
- After being briefed by the CSE about the case, Dr. Monas got on the phone, concisely summarized her understanding of the medical situation, and appropriately asked for *"any other information"*[11] the pilot could provide about the ill passenger. This is typical of my contacts with MedLink in which one physician takes over for another. A confirmation of the situation between the MedLink physicians and the flight crew takes place prior to proceeding with any recommendations.
- The pilot and cabin crew told Dr. Monas that the passenger was not on any medication but took an aspirin about seven hours ago, had chest pain, had stable vital signs with blood pressure of 100/80 and pulse of 110, but had just complained he was feeling a bit worse.
- The pilot also told Dr. Monas that an onboard doctor was monitoring the passenger every half hour, and that the (onboard) doctor said that, after his last check, the passenger's pain looked *"considerably worse,"*[12] and recommended that the pilot re-evaluate in 30 more minutes and at that point consider a diversion, presumably if the passenger was still looking the same. But the pilot wanted to get Dr. Monas's take on that first.
- Dr. Monas initially asked that the passenger be given a single dose of nitroglycerin, and then to report back if he improved. The flight crew called back and reported that

---

[10] Ibid, page 3.
[11] Ibid, page 3.
[12] Ibid, page 4.

the onboard doctor felt the patient's blood pressure was too low to give him a nitroglycerin. Dr. Monas then requested and received more details about the passenger's symptoms, asked if she could speak directly with the onboard doctor about the matter but was told she could not due to *"security procedures,"[13]* and then observed that *"you guys are in the air and evaluating the patient,"* and *"if you feel the patient is not looking well, and that we need to divert we can start to take a look at diversion locations." So "we'll take a look at some diversion locations if you guys feel he is concerning at this time."[14]*

- The pilot quickly agreed: *"Yeah ok."[15]*

- In my professional opinion, the captain would have understood Dr. Monas's comments to mean that she was recommending a diversion if, as was communicated to her, the onboard doctor and the crew felt that the passenger did not look well and that the flight needed to divert. By ICAO regulation, however, the only individual with the authority to divert BA 289 was Captain Fowler.[16]

- Once the pilot agreed that MedLink should take a look at diversion locations, the MedLink CSE immediately called "Shebra" at BA Operations Control to coordinate the probable diversion.

- Once Shebra at BA Ops Control was on the line, the pilot told her that he had already advised "one of her colleagues" of the possible diversion, and that they expected to get an update from the onboard doctor concerning the passenger in about 10 minutes, and then he would *"give you a call to let you know what our decision is if we do have to divert."[17]*

- Dr. Monas then interjected, wanting to make sure that the crew had tried laying the passenger down with his legs elevated, giving him a little time in that position, and that they should also recheck his blood pressure. Once again, this type of communication is, in my personal experience, the usual and expected type of recommendations MedLink physicians offer flight crews dealing with ailing passengers.

- The pilot asked BA Ops to let Chicago know that they would need a *"flight plan on to Phoenix,"* after the diversion, and would need paramedics, and promised to *"call you and update you when and if we need to make a decision."[18]*

---

[13] Ibid, page 5.

[14] Ibid, page 5.

[15] Ibid, page 5.

[16] International Civil Aviation Organization, "Rules of the Air", Annex 2, 24/11/08.

[17] 3/23/12 BA 289 MedLink patch transcript (BA0489-BA0494) Ex. 18, page 5

[18] Ibid, page 5.

- BA Ops acknowledged this communication: *"OK excellent, thank you very much Speedbird 289."[19]*
- The MedLink CSE then said he would also call Chicago to *"let them know of the possibility"[20]* of diversion. MedLink also asked the pilot: *"If anything does come up or if you have an update please do call us right back, we'll bring Dr. Monas back on the line."[21]*
- Following the end of the third repatch, the MedLink CSE called BA Ops in Chicago, who had already been contacted by BA Ops in London and advised of a possible diversion.

Taking the call, asking about the medical complaint and any history, recapping her understanding of the situation, considering the opinions of the onboard physicians who felt the ill passenger was not looking well, and suggesting that MedLink should therefore start looking for diversion locations—were, in my professional experience, the type of services expected and provided by MedLink in similar situations throughout my aviation career. Captain Fowler, the ultimate authority as to the operation of BA 289, made the decision not to divert the aircraft to an alternate airfield..

## IV. Flight and Cabin Crew:

The flight crew and cabin crew experienced a number of breakdowns in communication which, in my professional opinion, allowed the ailing Mr. Baillie to remain on the aircraft after boarding without being medically evaluated by MedLink.

- The handling of Mr. Baillie by the flight attendants and ground crew has been addressed previously in this report. The entire situation could have easily been resolved at EGLL during the boarding process had the flight attendants and ground crew complied with British Airways procedures outlined in the BA Customer Service Manual for Gate Clearance Medical Procedures.
- According to the testimony of the lead flight attendant, she advised the flight crew by about 17:15 UTC that a passenger on board the plane was experiencing chest pains. At that time, the aircraft was closer to Ireland than Greenland, and could have diverted to a suitable airport in Ireland [Shannon or Dublin] in approximately one hour.

---

[19] Ibid, page 5.
[20] Ibid, page 5.
[21] Ibid, page 5.

9

- Not until 18:45, however, did the pilot finally call MedLink to seek advice regarding the ill passenger. In my professional opinion, it was unusual and unreasonable to wait so long to notify MedLink physicians of Mr. Baillie's condition.
- By the time the flight crew finally called MedLink, the aircraft was in the middle of the North Atlantic with no suitable, immediately available, alternate airport. At that point it would have taken approximately two hours to land the plane and get Mr. Baillie to a hospital that had a cardiac catheterization laboratory. I've done a more detailed analysis of this, which is set forth in exhibits attached to this report.
- When the pilot and flight crew finally did speak with Dr. Reinhart, they failed to make it clear that the passenger was not only suffering from chest pain, but that he also had difficulty breathing. Later, after the onboard doctors had examined Mr. Baillie, the pilot and flight crew also failed to advise the MedLink physicians that the onboard physicians felt Mr. Baillie did not look well and that he belonged in a hospital.
- Although Dr. Reinhart advised the pilot to have Mr. Baillie's vitals monitored at least every 15-30 minutes, according to the testimony of Dr. Verma, the cabin crew failed to make that happen.
- Dr. Verma, the onboard physician, testified that he only checked Baillie's vital signs a few times during the flight, not every 15-30 minutes as Dr. Reinhart suggested. In my professional opinion, this was a communication failure and breakdown of CRM practices between the BA 289 flight crew and cabin crew.
- Following the end of Repatch #3, it seemed clear that the pilot had at least provisionally decided to divert the aircraft, probably to Chicago, but that the pilot would make a final decision within about 10 minutes and call back to let them know of his decision.
- After the end of Repatch #3, the cabin crew advised Mr. Baillie that the plane was planning to divert to either Chicago of Denver, whereupon Mr. Baillie said he didn't want to divert to either place, but wanted to continue to Phoenix.
- The cabin crew then asked two of the onboard doctors whether, in their judgment, continuing to Phoenix would worsen Mr. Baillie's condition, and they both said it wouldn't. The cabin crew reported this information to the flight crew, and based on that a decision was made not to divert after all. The captain never called MedLink back to elicit the view of the MedLink physician regarding the above, or to advise that the plane had decided not to divert. In my professional opinion, based on 43 years of aviation experience, Captain Fowler acted in an unusual and unreasonable manner in not calling MedLink back to seek its view of the decision to change the expected plan and not divert.

## V. Diversion of Aircraft to Suitable Alternate Airfield:

Based on my professional background and experience as an airline captain, diversion decisions relating to an ailing passenger with ambiguous symptoms are difficult and require the captain to consider not only the medical circumstances of the ill passenger, but operational issues that could affect the safety and convenience of all people on board the aircraft, including the plane's current location, the proximity and suitability of alternate airfields, available medical facilities, weather issues, and crew time issues.

- The ICAO Rules of the Air designate the captain as the final authority in all aspects in the operation of his aircraft and, as such, is the only individual authorized to decide whether or not to divert his aircraft to a suitable alternate airport.[22]
- The captain of BA 289 was responsible for the safety and convenience of not only Mr. Baillie, but of all 335 people on board the aircraft, including crew members.
- In this case, for example, BA Operations Control advised the pilot through an ACARS message of a preference not to divert to Chicago. The message said: "As you are almost equidistant to DEN as ORD we would prefer you to divt DEN as your crew hours will be tight and ORD say due to a convention no HOTAC there...."
- Diversions, if not carefully planned and executed, can be both costly and dangerous.

## CONCLUSION

In my professional opinion, based on 43 years of aviation experience and a reasonable degree of certainty, Mr. Baillie would have been best served if BA personnel at the gate in EGLL would have identified him as a potential medical problem and enlisted the services of MedLink, as per their Civil Aviation Authority (CAA) approved manual, to determine if he was fit to fly as a passenger on BA 289. Once the aircraft departed EGLL, Mr. Baillie's options became extremely limited. Captain Fowler, the pilot-in-command of BA 289, had the option of a diversion to Shannon or Dublin, Ireland if he had received timely information as to the condition of Mr. Baillie. The cabin crew, however, delayed advising him of the situation as they worked to assist Mr. Baillie until the aircraft was established on its track, well away from both Shannon and Dublin. The opportunity to reverse course while in radar contact evaporated due to this delay. In my experience utilizing MedLink services, their physicians do an excellent job of communication with the flight crew while being as much as 12,000 miles away from aircraft in some cases.

---

[22] International Civil Aviation Organization, "Rules of the Air", Annex 2, 24/11/08.

MedLink physicians rely heavily upon onboard medical professionals, if they are available, to provide them with the medical details that the flight or cabin crew members have not been trained to evaluate.

The communication between the flight crew and the cabin crew did not, in my professional opinion, measure up to the industry standard of good crew resource management. Opportunities were missed, such as the potential for a diversion to Shannon or Dublin shortly after departing EGLL, because communications between the front and the back of the airplane were slow or incomplete.

In my professional opinion, MedAire provided the flight crew of BA 289 the expected type of advice from which the captain could make a determination to divert or continue to the scheduled destination. British Airways, however, fell short in their duty to comply with their CAA approved manuals for dealing with ground and inflight medical problems.

**MATERIALS CONSIDERED:**

1.  3/23/12 BA 289 MedLink audio patches
2.  3/23/12 BA 289 MedLink patch transcript
3.  ACARS messages to and from BA 289
4.  Flight Aware data showing flight path of BA 289
5.  Map showing route of BA 289
6.  BA OPNL Legs Report for 3/23/12 BA 289
7.  Passenger Details for James Baillie, 3/23/12 BA 289
8.  BA Customer Service Manual A12, Injury, Illness or Death of Passengers
9.  BA Joint Procedures Manual, Part A(2), 6.15
10. BA Joint Procedures Manual, Part A(2), 2.17.8
11. 2/10/14 Declaration of Linda Anne Baillie
12. 2/11/14 Declaration of Francis G. Fleming
13. 1/28/14 Declaration of Alastair Grant
14. 1/15/14 Declaration of Ewa van den Berg
15. 2/15/14 Supplemental Declaration of Ewa van den Berg
16. 1/28/14 Declaration of Georgina Bolton
17. 1/27/14 Declaration of Captain Stephen Fowler
18. 5/29/14 Deposition of Captain Stephen Fowler
19. 5/29/14 and 10/22/15 Depositions of First Officer Alastair Grant
20. 5/30/14 Deposition of First Officer Matthew Simmonds
21. 5/29/14 Deposition of Ewa Van den Berg
22. 2/11/14 Plaintiff's Memorandum of Law in Opposition to Defendant British Airways PLC's Motion for Summary Judgment
23. IATA Cabin Operations Safety Best Practice Guide
24. ICAO Rules of the Air

## EXHIBITS FOR DEPOSITION AND TRIAL TESTIMONY:

- Considerations When Planning A Diversion Document;
- North Atlantic Diversion Analysis;
- United States / Canadian Border Diversion Analysis;
- Flight Aware Data Depicting Flight Path of BA 289.

## PUBLICATIONS:

I have not authored any publications within the past ten years.

## COMPENSATION:

Fees for my time and expertise is $300.00 per hour. Travel related expenses are reimbursed at actual cost.

## TESTIMONY AT TRIAL OR DEPOSITION:

I have testified in the following matters:
- Venegas, et al vs. Southwest Airlines, Inc. for the defense as an expert witness in United States District Court, Los Angeles November 27th through December 6th, 2007.
- Comair 5121 for the United States Department of Justice for the defense as an expert witness in deposition, Lexington, KY, 2008.
- Regina Kessler, and Randy Ressler, et al vs. United States of America, for USDOJ as an expert witness in deposition, Dallas, TX, 2013.
- Sky Lease vs. MAS Air Cargo & Bluebird Leasing for the defense, 2014-2015

Additional relevant casework:
- Skylink vs. All Canada Express for the defense - 2007.
- Schlunt vs. United Air Lines, for the defense - 2008.
- Shaffey vs. United Airlines, for the defense - 2008.
- Almeras vs. Southwest Airlines, for the defense - 2008.
- Gabriel Brock vs. American Airlines, for the defense - 2009.
- United States vs. Cope, for the prosecution - 2011.

14

- Jo Ann Woodworth-Simpson vs. Mesaba Airlines (Northwest / Delta), for the defense - 2011 to 2012
- Regina Ressler, and Randy Ressler, et al vs. United States of America, for USDOJ - 2012-2013.
- Safa vs. Lufthansa for the defense, 2013.
- Sky Lease vs. MAS Air Cargo & Bluebird Leasing for the defense, 2013-2014

## DECLARATION:

I reserve the right to amend my report and file a supplemental report at a future date as new information or data becomes known to me.

Respectfully,

*Michael G. Fortune*

Michael G. Fortune
Captain, Continental Airlines (ret)
AVPRO Consulting, Inc.
27438 Loma Del Rey
Carmel, California 93923-8423

# EXHIBIT 13

Gretchen M. Nelson (112566)
gnelson@kreindler.com
Nicole C. Andersen (281218)
nandersen@kreindler.com
KREINDLER & KREINDLER LLP
707 Wilshire Blvd., Suite 3600
Los Angeles, CA 90017
Tel.: (213) 622-6469
Fax: (213) 622-6019

Francis G. Fleming, *pro hac vice*
ffleming@kreindler.com
Robert J. Spragg, *pro hac vice*
rspragg@kreindler.com
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

Attorneys for Plaintiff Linda Ann Baillie

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

----------------------------------------------------x

LINDA ANN BAILLIE, individually, as        Case No. 2:13-cv-04681-SVW- RZx
Personal Representative of the Estate of
JAMES DONALD BAILLIE, II, and on           **DECLARATION OF**
behalf of all heirs and next of kin of     **ROBERT C. CANDIPAN, M.D.**
JAMES DONALD BAILLIE, II,
deceased,

                    Plaintiff,

          v.

BRITISH AIRWAYS PLC,

                    Defendant.

----------------------------------------------------x

DECLARATION OF ROBERT C. CANDIPAN, M.D.

1
2          I, Robert C. Candipan, M.D., declare as follows:
3          1.    I am a licensed physician in the State of Arizona.  I am an
4    interventional cardiologist and am presently employed by the Physician Group of
5    Arizona, Inc.
6          2.    I have personal knowledge of the facts attested to in this Declaration
7    and could competently testify to these facts if called as a witness.
8          3.    On March 23, 2012, I was the on-call interventional cardiologist at St.
9    Luke's Medical Center in Phoenix, Arizona.  At approximately 7:30 p.m., Mr.
10   James Donald Baillie was brought to the St. Luke's Medical Center Emergency
11   Department from an aircraft that had landed at Phoenix Sky Harbor Airport.
12         4.    Mr. Baillie was initially evaluated by Emergency Department
13   physician Brian Hess, M.D. and was found to have ST segment elevations in the
14   anterior leads of his heart, meaning that he was in the process of suffering a
15   myocardial infarction (heart attack).  He was noted to have significant pulmonary
16   edema and was intubated.  A series of blood tests were performed on Mr. Baillie,
17   including a Point-of-Care Cardiac Panel with BNP.
18         5.    I was contacted and asked to report to St. Luke's Medical Center so
19   that I could treat Mr. Baillie.
20         6.    Mr. Baillie was admitted to St. Luke's Medical Center through the
21   Emergency Department and brought to the cardiac catheterization laboratory where
22   I performed a left heart cardiac catheterization which demonstrated a total blockage
23   of the proximal left anterior descending coronary artery ("LAD") with significant
24   thrombus burden.  I thereafter performed a balloon angioplasty, thrombectomy and
25   placed 3 drug-eluting stents in his LAD.  I also placed an intra-aortic balloon pump
26   in his LAD.
27         7.    After the surgery, Mr. Baillie was admitted to the Intensive Care Unit
28   at St. Luke's Medical Center for continued care.

                                       -2-
                    DECLARATION OF ROBERT C. CANDIPAN, M.D.

1       8.    I was Mr. Baillie's admitting and treating physician while he was at St.

2   Luke's Medical Center from March 23, 2012 until he was transferred to The Mayo

3   Clinic in Phoenix for further treatment on March 30, 2012.

4       9.    After his surgery, I spoke with Mr. Baillie and he told me that he was

5   traveling on a flight from London to Phoenix on March 23, 2012 and that he began

6   to experience chest pain while running in the London airport to catch his plane. He

7   told me that he continued to have chest pain throughout the flight, which lasted for

8   about 11 hours. I made a record of this conversation in my Operative Report, a

9   copy of which is attached as Exhibit 1.

10       10.    The panel of cardiac blood tests performed on Mr. Baillie at St. Luke's

11   indicated that Mr. Baillie had high levels of creatine kinase MB isoenzyme

12   (CKMB), troponin I (TnI), myoglobin and B-type natriuretic peptide (BNP) in his

13   blood when it was drawn at approximately 8:00 p.m. on March 23, 2012. A copy of

14   the results from Mr. Baillie's Point-of-Care Cardiac Panel with BNP is attached as

15   Exhibit 2. Based upon the levels of these cardiac enzymes in Mr. Baillie's blood,

16   which are only released after the heart has suffered muscle damage, Mr. Baillie's

17   heart attack had to have started at least six to eight hours before the 8:00 p.m. blood

18   test, which would be 12:00 noon - 2:00 p.m. local (Phoenix) time or 19:00 – 21:00

19   GMT (London time). There is no question that Mr. Baillie was having an active

20   heart attack during his flight from London to Phoenix.

21       11.    I have reviewed the transcript of the communications between the

22   airplane's crewmembers and the Medlink physicians they contacted to assist them

23   with Mr. Baillie's treatment on the flight. On page 2 of the transcript, at 19:12

24   UTC, the crewmembers tell the Medlink physician that one of the on-board

25   physicians can hear "crackles" in Mr. Baillie's left chest. Crackles, by themselves,

26   are an indication that the patient could be suffering from pulmonary edema or fluid

27   in the lungs. However, crackles, along with chest pain, can indicate that a patient is

28

-3-

DECLARATION OF ROBERT C. CANDIPAN, M.D.

1    having a complicated heart attack and that they are very sick. Clearly, Mr. Baillie
2    is already having a complicated heart attack by 19:12 UTC, when the crewmembers
3    report to Medlink that "crackles" were heard by the on-board physician while Mr.
4    Baillie was experiencing chest pain.

5        12.    It is very important for heart attack victims to receive treatment as
6    soon as possible, preferably within the first hour after symptoms appear. Medical
7    organizations have established a goal to restore the blood flow to the heart muscle
8    within 60 minutes of the patient presenting at the emergency room. This was not
9    done for Mr. Baillie, who received treatment only after he landed in Phoenix, more
10   than six to eight hours after the onset of his heart attack. Had Mr. Baillie received
11   treatment within an hour or two after the onset of his chest pain, the extensive
12   damage to his heart caused by his heart attack would likely have been avoided.

13       13.    In my medical opinion, Mr. Baillie should have been taken to an
14   emergency medical facility as soon as he complained of chest pain but certainly no
15   later than when the on-board physician determined that he had crackles and was
16   experiencing chest pain at the same time.

17       I declare under the penalty of perjury under the laws of the State of Arizona
18   that the foregoing is true and correct. Executed this ___ day of June, 2014 in Mesa,
19   Arizona.
20
21
22                                    _____
                                       Robert C. Candipan, M.D.
23
24
25
26
27
28
                                    -4-
_____
                  DECLARATION OF ROBERT C. CANDIPAN, M.D.

# EXHIBIT 1

ST. LUKES MEDICAL CENTER
OP Report

PATIENT NAME: BAILLIE, JAMES
ACCOUNT #: 1208300109
MR NUMBER: 771546
BIRTH DATE: 1950/07/20

PHYSICIAN: ROBERT S. CANDIPAN, M.D.
ADMITTED: 03/23/2012 00:00:00
DISCHARGED:

PROCEDURES PERFORMED:
1. Left heart catheterization.
2. Selective coronary angiography.
3. Thrombectomy of the left anterior descending coronary artery.
4. Stent x3 of the left anterior descending.
5. Intraaortic balloon pump placement.
6. Intracoronary administration of nicardipine.

OPERATOR: Robert S. Candipan, M.D.

INDICATIONS FOR PROCEDURE: This is a 61-year-old gentleman who
apparently just completed a transcontinental flight. Prior to
boarding his airplane in his departing city, he developed chest pain
and continued to have chest pain throughout the flight, which was
greater than 11 hours.

The patient now presents with an acute ST segment elevation MI as
indicated by ECG.

PROCEDURAL DETAIL: Prior to the procedure, informed consent was
obtained from his family. The patient had been intubated in the
emergency department.

The patient was brought to the cardiac catheterization laboratory
where he was prepped and draped in the usual sterile fashion.
Lidocaine was used as a local anesthetic in the right groin. Using
the modified Seldinger technique, a 6-French sheath was placed in the
right femoral artery.

Selective coronary angiography was then formed using 6-French JL4
coronary catheter for the left coronary artery. This was then
exchanged for a JR4 catheter, which was selectively engaged in the
right coronary artery.

Angiography revealed a total occlusion of the LAD. At that time,
decision was made to proceed with percutaneous coronary intervention.

The patient was given a bolus of Angiomax followed by an infusion.
The diagnostic catheter was then removed and a 6-French EBU 3.75
guiding catheter was used for the procedure and provided adequate
support. This was cannulated into the left main coronary artery.

A 0.014 BMW wire was advanced into the LAD and placed distally.
Initially, this apparently went into a diagonal. We used a Pronto
aspiration catheter and performed multiple passes with this aspiration
catheter with removal of visible thrombus.

Angiography following this revealed restoration of flow into the LAD
and it was obvious that the guidewire was in the diagonal. We then
redirected the guidewire into the distal LAD.

Patient Name: BAILLIE, JAMES                    Account Number: 1208300109

Using a 2.5 x 15 mm balloon, multiple inflations were performed in the

LAD itself up to 8 atmospheres.

Following this, additional thrombectomy was performed with an Export
catheter.   There was also removal of visible thrombus.

Distally, there was a focal stenosis in which a 3.5 x 22 mm Resolute
stent was placed.   This was deployed at 9 atmospheres.  A second
Resolute stent, a 3.5 x 22 mm stent, was placed proximally, but not
overlapping to the first stent.   Following this, there was good
improvement in the lesional diameter in the LAD but flow distally in
the LAD was still decreased.   We administered 200 mcg of Cardene with
slight improvement of flow.   At this time, we then gave the patient
double bolus of Integrilin followed by an infusion.

A third stent was then placed into the intervening segment _____
the first 2 stents.   This was a 3.5 x 8 mm stent.

Finally, a 3.5 x 15 mm NC balloon was then used to post-dilate the
stented areas.   Inflations _____ at 12 atmospheres were
performed.

Additional administration of Cardene 200 mcg was performed.   Guiding
wire was then withdrawn.   Angiography following this revealed an
excellent result within the stented area and there was TIMI grade 2
flow in the distal LAD.

The guiding catheter was then removed.   This was then exchanged for a
pigtail catheter, which was placed in the left ventricle.   Hemodynamic
measurements were obtained.   This demonstrated significant elevation
of the LVEDP at 40 mmHg.   We then decided to go ahead and place an
intraaortic balloon pump.

The pigtail catheter was removed.   A 6-French sheath was then
exchanged over a guidewire for a 7-French balloon pump sheath.   A 40
cm balloon pump was then advanced under fluoroscopic guidance into the
aorta.   This was placed at one-to-one pumping.   Finally, all sheaths
and the balloon pump were sewn in place.

The patient was then transported to the ICU in stable condition.

COMPLICATIONS:   None.

FINDINGS:

HEMODYNAMICS:

CONFIDENTIAL                                        JDB - 12522

Patient Name: BAILLIE, JAMES                    Account Number: 1208300109

1.  The aortic blood pressure was 100/60 with an LV pressure of 120/40
mmHg.  There was no significant transaortic gradient on pullback.
2.  LEFT CORONARY ANGIOGRAPHY:
LEFT MAIN CORONARY ARTERY:  Left main coronary artery is a large
artery of medium length.  This bifurcated across the LAD and the left
circumflex.  The left main itself was free of significant disease.
LEFT ANTERIOR DESCENDING CORONARY ARTERY:  Left anterior descending

coronary artery is a large artery, which extended around the apex of
the heart.  This gave rise to 2 medium-sized diagonals.  The LAD
itself was totally occluded proximally.
LEFT CIRCUMFLEX:  Left circumflex is a large nondominant artery.  This
gave rise to a large obtuse marginal.  The circumflex and the obtuse
marginal itself had up to 80% to 90% diffuse stenosis.
RIGHT CORONARY ARTERY:  The right coronary artery is a large dominant
artery.  This gave rise to a large PDA and a large posterolateral
branch.  There was a 40% to 50% proximal and mid RCA stenosis.  Distal
to the PDA was a 50% to 60% stenosis.

Following intervention with placement of stents in the LAD, the total
occlusion was reduced to 0% residual with TIMI grade 2 flow distally.

CONCLUSIONS:
1.  Normal systemic blood pressure.
2.  Markedly elevated left ventricular end-diastolic pressure.
3.  Coronary artery disease in a right dominant system with a total
occlusion in the proximal LAD.  This was felt to be infarct-related
artery.  There was an 80% to 90% stenosis of the circumflex/obtuse
marginal, 40% to 50% proximal and mid RCA stenosis, 50% to 60% distal
RCA stenosis.
4.  Successful PCI with placement of proximally to distally 3.5 x 22,
3.5 x 8, and 3.0 x 22 mm Resolute stents in the LAD with reduction of
the total occlusion to a 0% residual stenosis with TIMI grade 2 flow.

PLAN:  At this time,
1.  Admit to the ICU.
2.  Continue intraaortic balloon pump.
3.  Continue Integrilin for 12 hours.
4.  Plavix 75 mg a day.
5.  Echocardiography in the a.m.
6.  Pulmonary consultation for management of his ventilator.


_____
ROBERT S. CANDIPAN, M.D.

CONFIDENTIAL                              JDB - 12523

Patient Name: BAILLIE, JAMES                Account Number: 1208300109

cc:

DD: 03/24/2012 01:32:59 EST/DT: 03/24/2012 02:17:55 EST/18810174
IASISJob ID:704706/NTSJob ID:1231942/Doc ID: 11104338/Rev:
1/03/27/2012 10:58:33 EST/sg
Authenticated by Robert Candipan, MD On 03/27/2012 03:57:50 PM

CONFIDENTIAL                          JDB - 12524

# EXHIBIT 2

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85006    Phone: (602) 251-8183

| VISIT RECORD | | Page 8 |
|---|---|---|
| Name: **Ballie, James** | DOB: 07/20/1950  61y | Sex: M |
| Accnt.# 1208300109 | MR # A00771546 | |

## EMERGENCY DEPARTMENT VISIT RECORD

### ORDERS

| | | | | | |
|---|---|---|---|---|---|
| Basophil | 0.0 | | 0.0-2.0 | % | |
| Metamyelocyte | 1 | High | 0-0 | % | |
| RBC Morphology | 1+ Anisocytosis ,1+ Polychromasia | | | | |
| Platelet Est | Normal Platelet on Smear | | | | |

Test Name: UA MICROSCOPIC     Accession #: 12083036821     Status: Complete

Order Date/Time:    03/23/2012 21:19     Ordered By: Hess, Brian

Result Date/Time: | 03/23/2012 21:19

| Test | Result | | | Status | Site |
|---|---|---|---|---|---|
| WBC, Urine | 0-5 | | 0-5 | /HPF | |
| RBC, Urine | 0-5 | | 0-5 | /HPF | |
| Epi/Squa Cells | Few Squamous | Abnormal | None | | |
| Bacteria | Few | Abnormal | None | /HPF | |
| Casts | Rare Hyaline | | | /LPF | |

Test Name: POC-CARDIAC PANEL W BNP     Accession #: 4159759     Status: Complete

Order Date/Time:    03/23/2012 20:02     Ordered By: Hess, Brian

Result Date/Time: | 03/23/2012 20:02

| Test | Result | | | Status | Site |
|---|---|---|---|---|---|
| POC-CK MB | > 80.0 | High | <4.3 | ng/ml | |
| POC-Troponin I | 27.0 | High | <0.4 | ng/ml | |
| POC-Myoglobin | > 500 | High | <107 | ng/ml | |
| POC-BNP | 157 | High | <100 | ng/ml | |
| Comment | W | | | | |

Test Name: LIPASE     Accession #: 12083036664     Status: Complete

Order Date/Time:    03/23/2012 19:47     Ordered By: Hess, Brian

Specimen Source: Blood |

Result Date/Time: | 03/23/2012 20:43

| Test | Result | Status | Site |
|---|---|---|---|

| Signature/Initials | Signature/Initials |
|---|---|
| Signature/Initials | Signature/Initials |

| VISIT RECORD | | |
|---|---|---|
| Name: **Ballie, James** | DOB: 07/20/1950  61y | Sex: M |
| Accnt.# 1208300109 | MR # A00771546 | |

CONFIDENTIAL    JDB - 12276

# EXHIBIT 14



1    Gretchen M. Nelson (112566)
     gnelson@kreindler.com
2    Nicole C. Andersen (281218)
3    nandersen@kreindler.com
     KREINDLER & KREINDLER LLP
4    707 Wilshire Blvd., Suite 3600
5    Los Angeles, CA 90017
     Tel.: (213) 622-6469
6    Fax: (213) 622-6019
7
8    Francis G. Fleming, *pro hac vice*
     ffleming@kreindler.com
9    Robert J. Spragg, *pro hac vice*
10   rspragg@kreindler.com
     KREINDLER & KREINDLER LLP
11   750 Third Avenue, 32nd Floor
12   New York, NY 10017
     Tel.: (212) 687-8181
13   Fax: (212) 972-9432
14
     Attorneys for Plaintiff Linda Ann Baillie
15                  UNITED STATES DISTRICT COURT
16
                     CENTRAL DISTRICT OF CALIFORNIA
17
     ------------------------------------------------x
18   LINDA ANN BAILLIE, individually, as          Case No. 2:13-cv-04681-SVW- RZx
     Personal Representative of the Estate of
19   JAMES DONALD BAILLIE, II, and on             **DECLARATION OF LINDA ANN**
20   behalf of all heirs and next of kin of       **BAILLIE IN SUPPORT OF**
     JAMES DONALD BAILLIE, II,                    **PLAINTIFF'S OPPOSITION TO**
21   deceased,                                    **DEFENDANT BRITISH**
22                                                **AIRWAYS PLC'S MOTION FOR**
                                    Plaintiff,    **SUMMARY JUDGMENT**
23          v.
24
     BRITISH AIRWAYS PLC,
25
26                          Defendant.
     ------------------------------------------------x
27
28   I, Linda Ann Baillie, do hereby swear, certify and affirm that:

1. I am over the age of 18 and am a resident of the State of Arizona. I presently reside at 3445 East Indigo Circle, Mesa, Arizona 85213.

2. I have personal knowledge of the facts as set forth herein and if called as a witness, could testify competently thereto.

3. I was married to my husband, James Donald Baillie, II for 41 years before he died on July 1, 2012.

4. My husband, James Donald Baillie, II died in Phoenix, Arizona on July 1, 2012 after suffering a severe heart attack which went untreated on British Airways flight 289 on March 23, 2012.

5. I was appointed as the Personal Representative of the Estate of James Donald Baillie, II by the Clerk of the Superior Court of Maricopa County, Arizona on August 29, 2012.

6. My husband, James Donald Baillie, II, was taken directly from British Airways flight 289 to the hospital by ambulance on March 23, 2012 and remained hospitalized until his death on July 1, 2012.

7. Although my husband's condition was very grave while he was hospitalized, I asked him to give me his account of what happened to him before and during the British Airways flight.

-2-

8. On March 23, 2012, my husband was scheduled to return to Phoenix, Arizona from London, England on British Airways flight 289 after completing a business trip for his employer, Freescale Semiconductor, Inc.

9. My husband told me that on March 23, 2012, he had arrived at London Heathrow Airport on a flight from Munich, Germany and had to rush to make his flight from London to Phoenix.

10. He told me that he had to hurry to make British Airways flight 289 and that when he arrived at the gate he was having breathing problems and feeling discomfort in the center of his chest.

11. My husband told me that by time he got on board the airplane a few minutes later, the discomfort in his chest had become painful, so right away he told a flight attendant that he was not feeling well and had chest pains and was short of breath and that he wasn't sure he should be on the flight.

12. He told me that the flight attendant told him to please sit down in his seat and that they would take care of him, so he did.

13. My husband told me that after sitting for a minute or two, the pain in his chest had not gone away so he told the flight attendant again that he was short of breath and experiencing chest pains and that he really did not feel well.

-3-

14. He told me that the flight attendant again asked him to take his seat and told him that they would take care of him.

15. My husband told me that a short time later, the airplane door was closed by the flight attendants, and that at that moment he felt imminent doom.

16. He told me that he remembered the general advice of taking aspirin if you feel you're having a heart attack, so he took one or two of the aspirins that he had with him.

17. My husband told me that the airplane then taxied and took off.

18. He told me that shortly after the airplane took off, the pressure in his chest became very painful and that he felt terrible.

19. My husband told me that he remembered that there were some doctors on the airplane but that they weren't able to help him with the his pain and discomfort.

20. He told me that he remembered the flight attendants talking to him and that he overheard them speaking to the pilot.

21. He told me that the airplane didn't try to land at any other airport but instead continued all the way to Phoenix.

22. Once the airplane landed in Phoenix, my husband was taken by ambulance to St. Luke's Medical Center, where he had surgery to keep him alive. I wasn't able to speak with him until several days later.

-4-

1    23. My husband's heart was severely damaged because of the lack of treatment

2    he received for the heart attack that began as he was rushing to get on the

3

4    British Airways flight and his condition only grew worse. After a week, he

5    was transferred to the Mayo Clinic in Phoenix.

6    24. At the Mayo Clinic, his condition deteriorated even further. He needed to

7

8    have mechanical assistance in order to breathe and had surgery to install a

9    pump to assist his heart.

10   25. He eventually had surgery to replace his damaged heart with an artificial

11

12   heart but his condition just got worse and worse. He died on July 1, 2012.

13

14   I declare under the penalty of perjury under the laws of the United States of

15

16   American that the foregoing is true and correct. Executed this 10th day February,

17   2014 in Mesa, Arizona.

18

19

20                                        Linda Ann Baillie

21

22

23

24

25

26

27

28

-5-

23. My husband's heart was severely damaged because of the lack of treatment he received for the heart attack that began as he was rushing to get on the British Airways flight and his condition only grew worse. After a week, he was transferred to the Mayo Clinic in Phoenix.

24. At the Mayo Clinic, his condition deteriorated even further. He needed to have mechanical assistance in order to breathe and had surgery to install a pump to assist his heart.

25. He eventually had surgery to replace his damaged heart with an artificial heart but his condition just got worse and worse. He died on July 1, 2012.

I declare under the penalty of perjury under the laws of the United States of American that the foregoing is true and correct. Executed this 10th day February, 2014 in Mesa, Arizona.

Linda Ann Baillie
Linda Ann Baillie

-5-

## PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of New York, State of New York. I am over the age of 18 and not a party to the within action; my business address is 750 Third Avenue, New York, NY 10017.

On February 11, 2014, I served the foregoing documents described as follows: **DECLARATION OF LINDA ANN BAILLIE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT BRITISH AIRWAYS PLC'S MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action by filing with the Central District of California CM/ECF System.

_____ BY MAIL:
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at New York, New York in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ BY FEDERAL EXPRESS OR OVERNIGHT COURIER

_____ BY ELECTRONIC MAIL:
I served by electronic mail at the email address(es) below:

 X   COURT CM/ECF SYSTEM

_____ BY MESSENGER

 X   (State) I declare under penalty of perjury under the laws of the State of New York that the above is true and correct.

Executed on February 11, 2014 at New York, NY.

Lisa Ranieri                          (Signature)
(Type or Print Name)

1

**SERVICE LIST**
*Baillie v. British Airways PLC*

2

Case No.: 2:13-cv-04681-SVW- RZx

3

4   Scott D. Cunningham, Esq.
    Ivy L. Nowinski, Esq.

5   Condon & Forsyth LLP
    1901 Avenue of the Stars, Suite 850

6   Los Angeles, CA 90067

7   scunningham@condonlaw.com
    inowinski@condonlaw.com

8

9   and

10  Anthony U. Battista, Esq.

11  Condon & Forsyth LLP
    7 Times Square

12  New York, NY 10036

13  abattista@condonlaw.com

14  *Attorneys for Defendant British Airways PLC*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

# EXHIBIT 15

Gretchen M. Nelson (112566)
gnelson@kreindler.com
Nicole C. Andersen (281218)
nandersen@kreindler.com
KREINDLER & KREINDLER LLP
707 Wilshire Blvd., Suite 3600
Los Angeles, CA 90017
Tel.: (213) 622-6469
Fax: (213) 622-6019

Francis G. Fleming, *pro hac vice*
ffleming@kreindler.com
Robert J. Spragg, *pro hac vice*
rspragg@kreindler.com
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

Attorneys for Plaintiff Linda Ann Baillie

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------x

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased, <br><br> Plaintiff, <br><br> v. <br><br> BRITISH AIRWAYS PLC, <br><br> Defendant. | Case No. 2:13-cv-04681-SVW- RZx <br><br> **DECLARATION OF FRANCIS G. FLEMING IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** <br><br> Date: March 10, 2014 <br> Time: 1:30 p.m. <br> Courtroom: 6 <br> Judge: Hon. Stephen V. Wilson |

-------------------------------------------------x

1

2

3    Francis G. Fleming, being first duly sworn and placed upon his oath states as follows:

4

5    1.    I am counsel for plaintiff in this action, familiar with the file and discovery provided by British Airways PLC (hereafter "BA") in this case and make this declaration based on that familiarity.

6

7    2.    Attached are true and correct copies of the following relevant crew training materials produced by BA in this case, dealing with angina, heart attack, chest pain, MedAire, consulting with onboard physicians and Medical Action Plan:

8

9

10            a)  From the Aviation Training Manual (BA 000371-000432) dealing

11                with angina, heart attack, chest pain, MedAire, consulting with

12                onboard physicians and Medical Action Plan, marked as Exhibit

13                11 (pages BA 372-376);

14            b)  From the Initial Av Med Training Manual (BA 00099-0370),

15                dealing with angina, heart attack, chest pain, MedAire, consulting

16                with on board physicians, and Medical Action Plan, marked as

17                Exhibit 12 (pages BA 0119, 129, 0145-0150, BA 0157, BA 0195-

18                199, BA 0205-09, BA 0329, BA 0343, 0349, 0359-00360);

19            c)  From the recurrent Av Med Training Manual (BA 0002-0096)

20                dealing with angina, heart attack and chest pain, MedAire,

21                consulting with on board physicians, and pages BA 0016-0022,

22                BA 0033-34, BA 0039-40, BA 0086, marked as Exhibit 13;

23            d)  From the associated training slides produced by BA for use in

24                connection with the above training dealing with angina, heart

25                attack, chest pain, MedAire, consulting with on board physicians,

26                and Medical Action Plan, pages BA 0522-0523 to 0526 and 0534-

27                0538, marked as Exhibit 14;

28

-2-

1       e) From the Customer Service Manual (BA 00433-00440) dealing
2           with angina, heart attack, chest pain and Medical Action Plan,
3           page BA 0426 and BA 0437, marked as Exhibit 15; and
4       f) From the Cabin Crew Aviation Medical Manual pages BA 0383-
5           0386, BA 401-404 and BA 0409, marked as Exhibit 16.

6    3.    As these manuals make clear, the appropriate conduct for the BA cabin
7    crew of BA Flight 289 on March 23, 2012 requires activity significantly beyond the
8    general description of activity set forth in BA's papers and particularly its claimed
9    undisputed statement number 3. For example, Item 4 in that statement calls for the
10   administration of a drug called Temgesic; it was never offered or provided or even
11   discussed by BA. (*See* Air to Ground Transcript, Van Den Berg Exhibit C, BA
12   0489-92). Item 7 calls for contact with Medlink or MedAire; however, given the
13   medical emergency presented, BA wasted over three hours following takeoff to call
14   MedAire/Medlink as discussed further herein. This delay is not in compliance with
15   BA's policies and procedures. When in doubt, according to the BA training
16   manuals, the difficulties related to chest pain should be treated as heart attack and a
17   heart attack is a serious emergency related to blockage of coronary arteries and the
18   death of cells in the heart. *See* BA Exhibit 11 (BA 0374), Exhibit 12 (BA 0199). A
19   delay of three hours is completely unjustified, and a jury could deem that not to be
20   in compliance with BA's policies, procedures and training. Similarly, Item 8 calls
21   for a "request for onboard [medical] assistance," which in respect to this flight BA
22   did not occur until after the BA crew finally called Medlink/MedAire, at least three
23   hours following takeoff. *See* Air to Ground Transcript, Van Den Berg, Exhibit C.
24   Additionally, in respect to its part, MedAire/Medlink never "advised on the medical
25   options for diversions" (*id.*) as required and there are no "operational factors"
26   referred to by BA which weighed on the failure of the Captain to decide not to
27   divert for Baillie's medical care. Quite, simply, other than identifying the nearest

-3-

1  airport and medical facility, there were none. BA's papers simply ignore these
2  factors and therefore its summary judgment motion should be denied, or at least
3  more time allowed for discovery. *See* Plaintiff's Separate Motion to Extend the
4  Time Schedule.

5      4.    However, the most egregious failure of BA in respect to its training
6  and other requirements is the unambiguous instruction that BA develop what BA
7  refers to as a "Medical Action Plan" calling for the appointment of cabin crew
8  members to perform four specific "roles," namely "assessor, collector, supporter
9  and communicator." *See, e.g.* Exhibit 12, BA 0206-0209 and BA 00526. While Ms.
10  Eva Van Den Berg was clearly not up to the challenges of the problem presented by
11  Mr. Baillie's medical emergency (despite having "passed" her examinations), had
12  she involved other cabin members as required by her training, the outcome might
13  have been and indeed would likely have been different for Mr. Baillie. Rather than
14  "cope with" his emergency (*see* Exhibit 12, BA 0129), BA just let him experience
15  pain (and ultimately mortal injury) for 11 hours. The failure to develop a Medical
16  Action Plan and have cabin crew members fill these roles as required by BA policy,
17  procedures and training was undeniably an unexpected, unusual and external event
18  that caused Mr. Baillie to experience the death of his heart cells for many hours,
19  when medical intervention (removing the blockage), would have saved these cells
20  and given him a reasonable chance to survive. It is hard to imagine anything more
21  of an "accident" as that term has been construed than what occurred on this case.
22  Thus, while Baillie's initial of presentation to BA consisting of chest pains related
23  to exertion, shortness of breath and pale complexion might initially have been
24  wrongful characterized as angina (despite BA's caution that is very difficult to
25  distinguish between the symptoms and when in doubt treat it as a heart attack, after
26  the pain persisted for an hour and/or BA learned that Baillie had no prior
27  experience of angina and had no medication with him for angina, as to which BA's
28

-4-

1    motion papers admit (favorably) occurred by 1715 GMT, there was no doubt that
2    BA knew by then that Mr. Baillie was having a heart attack (not angina) meaning
3    his coronary arteries were "blocked" not "narrowed," downstream cells were dying
4    due to oxygen deprivation, and Mr. Baillie had a life threatening serious medical
5    condition and he was not fit to fly, much less fly for ten more hours and that
6    Nitroglycerin was not appropriate. The flight should have been immediately
7    diverted (assuming he had not been offloaded before takeoff). Additionally,
8    attached hereto are true and correct copies of the names of the fourteen crew
9    members assigned to BA Flight 289 on March 23, 2012, Exhibit 17 (BA 446 and
10   447) listing at least fourteen flight attendants, plus any dead reckoning crew
11   members not named but available for duty; additionally, there were three flying
12   crew members, one Captain and two first officers on board. (*See* Exhibit 17.)

13       5.    Moreover, if the jury accepts plaintiff's timeline, as the Court should
14   assume on summary judgment motion, plaintiff claims this relevant information
15   and unambiguous life threatening problem was known or knowable to BA not later
16   than 1454 when he first boarded the flight. *See* Exhibit 18, BA 0466. BA should
17   have then and there known how serious the situation was, called MedAire/Medlink
18   for a gate clearance or for similar medical advice as to whether or not it would be
19   safe for Mr. Baillie to stay with the flight. *See* Exhibit 11 at BA 0145-46 and
20   Exhibit 16, BA 0409. In other words, the jury could find that negligence, failure to
21   comply with procedures by BA and unexpected, unusual happenings in failing to
22   call MedAire occurred before the aircraft even left the gate. Moreover, even
23   assuming as Ms. Van Den Berg would have the Court believe that Mr. Baillie
24   "responded affirmatively" to her initial question about his well being, the report that
25   she states she filled out, called an IFCE (BA Exhibit attached to Mr. Cunningham
26   Declaration, BA 0464-5), shows the event or incident she is describing occurred at
27   1530, and a separate document called an OSR (Exhibit 8) also describes the time of
28

-5-

1    the event or incident to be 1530. Thus, at a minimum the record is in dispute
2    regarding when BA knew or should have known that Mr. Baillie started having a
3    heart attack, and this dispute alone precludes summary judgment.

4        6.     Moreover, clearly by "approximately 1700 GMT" (*see* BA Statement
5    number 9) when BA admits it knew about Baillie's chest pains (while Ms. Van Den
6    Berg disputedly claims it was the first she knew, her declaration does not even
7    address the other 16 crew members), according to the training which all crew
8    members were required to be familiar with, these chest pains, by then having
9    persisted for an hour, plus the other information she had (history of exertion,
10   difficulty breathing, etc.) unequivocally indicated heart attack. Note that this point
11   in time is at least 1 hour and 45 minutes before MedAire was even called for the
12   first time. Note also, that 1700 GMT when BA admits it knew Baillie was having
13   chest pains, was out of breath and not feeling well, the aircraft was still over land
14   near the cities of Glasgow or Edinburgh, and still close to an hour before it would
15   enter the middle over water portion of the flight. *See* Exhibit 19 and paragraph 11
16   herein. The only possible explanation for the failure to divert at this point is
17   economics and costs or failure of the training to have made any lasting impression
18   on the crew. A jury could infer that BA elected not to spend the money or consume
19   the resources necessary to save Baillie's life; instead, it took a risk and this kind of
20   "operational error" was unusual, unexpected and external to Baillie and caused him
21   grave injury. As medical science is well aware and BA's training materials reflect,
22   the failure to provide medical intervention at or close to the onset of symptoms of
23   heart attack meaning arterial blockage, documented and admitted as known to BA
24   by 1700 GMT (notwithstanding plaintiff's claims that BA knew it earlier upon
25   Baillie's boarding before takeoff) produced a progressive destructive process
26   causing death of cells in Baillie's heart, that cumulated heart beat by heart beat over
27   the ensuing 8 ½ hours, allowing his chances of recovery to diminish to effectively

28

-6-

1   zero because he did not get the medical care necessary to remove the blockage. By
2   1912 he had "crackles" indicating pulmonary edema (fluid in the lungs) and by
3   2238 the onboard physicians and MedAire were debating the seriousness of
4   Baillie's situation, but not acting to help him. Again, based on this evidence the
5   jury could conclude that Mr. Baillie experienced an unusual, unexpected, external
6   event or happening because BA chose to not divert, what the treaty instructs a jury
7   to be an "accident".

8       7.   Similarly, there were numerous later opportunities to get Mr. Baillie to
9   a medical facility to resolve the blockage as the aircraft bypassed Halifax, or flew
10  almost directly over Ottawa, Ontario, Toronto, Montreal, Chicago, Duluth,
11  Minneapolis and Denver. Ironically, each of these implicated less cost to BA than
12  diverting to Glasgow or Edinburgh because there would be little or no requirement
13  to dump fuel and consequently less replacement fuel required for the resumption of
14  the trip to Phoenix. But, having mishandled this emergency from the beginning,
15  BA refused to admit its error, instead compounded it and time after time repeated
16  the operational errors, again and again subjecting Baillie to a series of unexpected,
17  unusual and external happenings.

18      8.   Additionally, attached hereto are true and correct copies of
19  correspondence from BA concerning the identity of only one of the four physicians
20  on board, Dr. Ratan Verma (BA 448-450) (Exhibit 20). BA has yet to disclose the
21  names of the other physicians or anyone seated near 4K.

22      9.   Additionally, attached hereto are true and correct copies of the
23  MedAire "patch summary" showing indecision, MedAire's failure to provide
24  options, misdiagnosis, improper treatment and numerous other errors. (BA 0475-6,
25  Exhibit 21.) *See also* Air to Ground Transcript, Van Den Berg, Exhibit C. MedAire
26  has been sued and served, but has not appeared as yet.

27

28

-7-

DECLARATION OF FRANCIS G. FLEMING IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

10. Additionally, for the record I would like the Court to note that on or about June 13, 2012, declarant personally conducted an interview of James Baillie while he was in the hospital at Mayo Clinic waiting for a donor heart to be transplanted. I met with him because I was asked to consider representing him in respect to a possible personal injury claim against BA related to his failed expectations of adequate emergency care. I had essentially two questions I wanted answers to before I accepted the representation. Mr. Baillie was quite ill at the time and special medical preparations had to be taken for him to be able to speak with me, but those preparations and steps were taken. And, with his wife and daughter present I asked him two questions:

a) When did the chest pains begin; and

b) When did he report these chest pains to BA.

In their presence and in response to my questions, Mr. Baillie struggled to say that he had the chest pains as he was rushing to make the flight, and as soon as he got onboard, he reported these pains to a flight attendant (it may not have been a Ms. Eva Van Den Berg and there were at least 16 other crew members on that flight). He further stated to me that he had expressed his concern about remaining on the flight for ten hours, and was directed to sit down. He was told BA would take care of him and he would get better after resting a few moments. So he sat down as instructed.

11. Finally, I attach hereto an illustration I have prepared which correlates the geographical position of several events and diversion opportunities (the location of which the Court can take judicial notice) to the time references laid out by BA and plaintiff in this case showing the approximate likely position of the aircraft over the ground at various times. There are apparently no records of the March 23, 2012 BA 289 flight, at least none were produced, but BA did produce the records of similar template flight on 22 December 2013. BA produced these materials for the

-8-

1  day of December 22, 2013, and the attached correlation is based on this template
2  track. As is clear from this flight (and depicted as an illustration for the Court),
3  when the aircraft took off at 1546 after climbing to cruise altitude, it would have
4  traveled to the northwest in the approximate direction of 290° to 300° traveling
5  over land towards the northern tip of Scotland and then on toward the Arctic Circle
6  (the 60° north meridian). It then would have headed essentially west through the
7  intersection of the Arctic Circle and the 30th, 40th, 50th and 60th west longitude
8  meridians before heading generally west southwest (about 240°-260°) towards
9  Ontario, Canada. Upon entering the United States in the approximate area of
10 Duluth, Minnesota the aircraft would have flown through the midwest towards
11 Minneapolis, Denver and ultimately Phoenix. Assuming the aircraft traveled at
12 approximately 500 miles per hour (equating the total distance of 5,050 miles (of
13 which the Court can take judicial notice) to the flight time of ten and fraction
14 hours), the laws of physics would instruct us that this would represent an average
15 ground speed of about 500 miles for each hour traveled. Breaking down the
16 illustrative approximate track or course into correlated time segments, of which as
17 indicated the Court can judicial notice, allows some approximate indication of
18 where the BA 289 aircraft was in space when the various events set forth in the
19 parties' timelines occurred and plaintiff requests that the Court do so. The
20 illustration is attached as Exhibit 19.

21
22 Dated: February 11, 2014
23
24
25                                                     Francis G. Fleming, *pro hac vice*
26
27
28
                                          -9-

DECLARATION OF FRANCIS G. FLEMING IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Case 2:14-cv-00420-SMM   Document 86-1   Filed 09/16/16   Page 160 of 345
Case 2:13-cv-04681-SVW-RZ   Document 27-12   Filed 02/11/14   Page 10 of 11   Page ID
#:541

1

## PROOF OF SERVICE

2

3        I, the undersigned, declare:

4        I am employed in the County of New York, State of New York. I am over

5   the age of 18 and not a party to the within action; my business address is 750 Third

6   Avenue, New York, NY 10017.

7
         On February 11, 2014, I served the foregoing documents described as
8   follows:

9   **DECLARATION OF FRANCIS G. FLEMING IN OPPOSITION TO MOTION**
10  **FOR SUMMARY JUDGMENT**

11  on the interested parties in this action by filing with the Central District of
12  California CM/ECF System.

13  _____ BY MAIL:
         I am "readily familiar" with the firm's practice of collection and processing
14  correspondence for mailing. Under that practice, it would be deposited with the
     U.S. Postal Service on that same day with postage thereon fully prepaid at New
15  York, New York in the ordinary course of business. I am aware that on motion of
     the party served, service is presumed invalid if postal cancellation date or postage
16  meter date is more than one day after date of deposit for mailing in affidavit.

17  _____ BY FEDERAL EXPRESS OR OVERNIGHT COURIER

18  _____ BY ELECTRONIC MAIL:
         I served by electronic mail at the email address(es) below:
19

20  _X_ COURT CM/ECF SYSTEM

21  _____ BY MESSENGER

22  _X_ (State) I declare under penalty of perjury under the laws of the State of New
23              York that the above is true and correct.

24       Executed on February 11, 2014 at New York, NY.

25

26

27  __Lisa Ranieri_____                    _____
     (Type or Print Name)                          (Signature)
28

DECLARATION OF FRANCIS G. FLEMING IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Case 2:14-cv-00420-SMM   Document 86-1   Filed 09/16/16   Page 161 of 345
Case 2:13-cv-04681-SVW-RZ   Document 27-12   Filed 02/11/14   Page 11 of 11   Page ID
#:542

1

**SERVICE LIST**
*Baillie v. British Airways PLC*
Case No.: 2:13-cv-04681-SVW- RZx

2

3

4

5    Scott D. Cunningham, Esq.
     Ivy L. Nowinski, Esq.
6    Condon & Forsyth LLP
7    1901 Avenue of the Stars, Suite 850
     Los Angeles, CA 90067
8    scunningham@condonlaw.com
9    inowinski@condonlaw.com

10   and

11
     Anthony U. Battista, Esq.
12   Condon & Forsyth LLP
13   7 Times Square
     New York, NY 10036
14   abattista@condonlaw.com

15
     *Attorneys for Defendant British Airways PLC*
16

17

18

19

20

21

22

23

24

25

26

27

28
                                        -2-

# **EXHIBIT 16**

1 | Scott D. Cunningham (State Bar No.: 200413)
Email: scunningham@condonlaw.com
2 | Ivy L. Nowinski (State Bar No.: 268564)
Email: inowinski@condonlaw.com
3 | CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
4 | Los Angeles, California 90067-6010
Telephone: (310) 557-2030
5 | Facsimile:  (310) 557-1299

6 |   - and -

7 | Anthony U. Battista (*admitted pro hac vice*)
Email: abattista@condonlaw.com
8 | CONDON & FORSYTH LLP
9 | 7 Times Square
New York, New York 10036
10 | Telephone: (212) 490-9100
Facsimile:  (212) 370-4453
11 |
12 | Attorneys for Defendant
BRITISH AIRWAYS, PLC

13 |          UNITED STATES DISTRICT COURT

14 |          CENTRAL DISTRICT OF CALIFORNIA

15 |

16 | LINDA ANN BAILLIE, individually, as )
Personal Representative of the Estate of )
17 | JAMES DONALD BAILLIE, II, and on )
behalf of all heirs and next of kin of )
18 | JAMES DONALD BAILLIE, II, )
deceased, )
19 |                                         )
         Plaintiff, )
20 |                                         )
   vs.                                      )
21 |                                         )
   BRITISH AIRWAYS PLC, )
22 |                                         )
         Defendant. )
23 |                                         )
24 |                                         )
25 |                                         )
26 |                                         )
27 |                                         )
28 |                                         )

Case No. CV13-4681 SVW (RZx)

**DECLARATION OF ALASTAIR GRANT**

Date:        March 10. 2014
Time:        1:30 p.m.
Courtroom:   6
Judge:       Hon. Stephen V.
                 Wilson

[Filed concurrently with Notice of
Motion and Motion for Summary
Judgment; Memorandum of Points
and Authorities in Support thereof;
Separate Statement of Undisputed
Material Facts; Declaration of Scott
D. Cunningham; Declaration of
Stephen Fowler; Declaration of Ewa
Van Den Berg; Declaration of
Georgina Bolton; Declaration of
Nicola Sharrad; Declaration of
Jacqueline Bowley; and [Proposed]
Order]

1    I, Alastair Grant, declare as follows:

2    1.    I am a First Officer for British Airways, PLC (hereinafter "British
3 Airways"). I have been employed by British Airways since 2005, and I have held
4 my current position since December 2010. I was a reserve First Officer onboard
5 British Airways flight BA 289 from London, England to Phoenix, Arizona on
6 March 23, 2012.

7    2.    I am submitting this declaration in support of British Airways' Motion
8 for Summary Judgment, or, in the alternative, Partial Summary Judgment. This
9 declaration is based on my personal knowledge and upon my review of British
10 Airways' records and procedures.

11    3.    At the time I joined British Airways in 2005, I was required to
12 complete a certification process, by which I was made familiar with British
13 Airways' policies and procedures, including British Airways' policies and
14 procedures governing flight crew response to in-flight medical emergencies. I
15 passed all certification tests without incident.

16    4.    British Airways' Joint Procedures Manual contains British Airways'
17 instructions to its crew members for dealing with in-flight medical emergencies. A
18 true and correct copy of the portions of this document which govern in-flight
19 medical emergencies and, specifically, complaints of chest pain, which was in
20 effect on March 23, 2012, is attached hereto as Exhibit A.

21    5.    The British Airways Joint Procedures Manual states, in relevant part,
22 that British Airways crew members should contact MedLink when they "feel like
23 they need advice from a Health Care Professional." (*See* Exhibit A [Joint
24 Procedures Manual], Section 6, p. 13. MedLink (also referred to as MedAire) is a
25 company that provides remote health care services for many airlines, including
26 British Airways.

27    6.    The British Airways Joint Procedures Manual also states, in relevant
28 part, "[a] request for on-board assistance from a doctor of medicine, or other health

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF ALASTAIR GRANT
CASE NO  CV13-4681 SVW (RZx)
- 2 -
LAOFFICE 56907V.1

1 professional, may be made in the following circumstances: . . . At the suggestion of

2 MedLink."  (*See* Exhibit A [Joint Procedures Manual], Section 6, pp. 13-14).

3      7.      The British Airways Joint Procedures Manual states that MedLink

4 will "advise on medical options for diversion and assist in making arrangements

5 for medical assistance on the ground." (*See* Exhibit A [Joint Procedures Manual],

6 Section 6, p. 14).

7      8.      Finally, the British Airways Joint Procedures Manual provides that

8 "the decision to divert rests with the Captain and should take into account

9 operational factors as well as the medical information available." (*See* Exhibit A

10 [Joint Procedures Manual], Section 6, p. 14).

11      9.      In the course of my employment with British Airways, I have become

12 generally familiar with industry standards and practices with respect to the

13 handling of in-flight medical emergencies. It is a common practice within the

14 airline industry for cabin crew and flight crew to rely on the advice and guidance

15 of MedLink and similar companies, in conjunction with the advice of passengers

16 onboard the aircraft who are physicians, when handling in-flight medical

17 emergencies.

18      10.      On March 23, 2012, British Airways flight BA 289 left the gate at

19 London Heathrow Airport at 15:12 GMT, and arrived at the gate at Phoenix Sky

20 Harbor Airport at 01:53 GMT. The flight was 10 hours and 41 minutes long from

21 gate to gate. Attached hereto as Exhibit B is a true and correct copy of a template

22 flight plan and weather chart detailing the scheduled routing for flight BA 289

23 from London, England to Phoenix, Arizona.

24      11.      I first became aware of a medical incident involving Mr. James

25 Donald Baillie, II, a passenger onboard British Airways flight BA 289 from

26 London to Phoenix on March 23, 2012, at approximately 19:00 GMT, after

27 returning from my rest time and receiving a briefing from Captain Stephen Fowler.

28      12.      Shortly after my return to the flight deck, Cabin Crew Member Ms.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF ALASTAIR GRANT
CASE NO: CV13-4681 SVW (RZx)                    - 3 -                    LAOFFICE 56907V.1

1    Ewa Van Den Berg entered the flight deck and updated us (the flight crew) on Mr.
2    Baillie's condition.

3        13.    We then organized a call to MedLink. A true and correct copy of a
4    transcript of this call is attached hereto as Exhibit C. During this call, I remember
5    a discussion about MedLink advising us about how to administer nitroglycerin to
6    Mr. Baillie. I also recall MedLink advising us to proceed to Phoenix for the time
7    being, and stated that Mr. Baillie's condition would hopefully improve if he
8    continued to lie down and receive oxygen. (*See* Exhibit C [MedLink Transcript],
9    p. 2). MedLink advised us to continue to provide Mr. Baillie with oxygen and to
10   monitor his vital signs every 15 to 30 minutes. MedLink advised us to report back
11   if Mr. Baillie's condition deteriorated. (*See* Exhibit C [MedLink Transcript], p. 3).
12   MedLink specifically advised us to continue to Phoenix. (*See* Exhibit C [MedLink
13   Transcript], p. 2).

14       14.    Ms. Van Den Berg continued to report back to us with information
15   and updates regarding Mr. Baillie's condition throughout the flight.

16       15.    At approximately 22:34 GMT, Ms. Van Den Berg reported to us that
17   the passenger's condition had changed, and that he had reported increased chest
18   pain. We called MedLink a third time, and at this point, MedLink recommended
19   that we administer nitroglycerin to Mr. Baillie. (*See* Exhibit C [MedLink
20   Transcript], p. 3). Ms. Van Den Berg returned to the First Class Cabin to discuss
21   MedLink's recommendation with the passenger physicians.

22       16.    Because the passenger's condition had changed, we considered
23   diverting the flight to Chicago. In doing so, we contacted British Airways
24   Operations Control to alert them to our situation on board and the possibility of
25   having to divert the flight because of an in-flight medical emergency.

26       17.    At approximately 22:52 GMT, Ms. Van Den Berg and Ms. Bolton
27   returned to the flight deck and we called MedLink for a fourth time to report that
28   the passenger physician stated that Mr. Baillie's blood pressure was too low for the

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF ALASTAIR GRANT                    - 4 -
CASE NO. CV13-4681 SVW (RZx)                                            LAOFFICE 56907V.1

1  administration of nitroglycerin. MedLink advised us to keep the passenger in a
2  fully reclined position, to elevate his legs, continue the administration of oxygen,
3  and to report back if we felt the need to divert. MedLink stated that they would be
4  monitoring the flight and potential locations for diversions in the interim. (*See*
5  Exhibit C [MedLink Transcript], pp. 4-5). During this telephone call, MedLink
6  was able to patch in British Airways Operations Control in London to inform
7  Operations Control of the continued possibility of a diversion. (*See* Exhibit C
8  [MedLink Transcript], p. 5).

9      18.    Shortly thereafter, we were informed by Ms. Van Den Berg that the
10  passenger had requested to continue to Phoenix and not to divert the aircraft. We
11  were also informed by Ms. Van Den Berg that the two onboard physicians were of
12  the opinion that continuing on to Phoenix would not worsen the passenger's
13  condition.

14     19.    Accordingly, we continued to pilot British Airways flight BA 289 to
15  Phoenix and did not divert the aircraft. We instructed MedLink to have health care
16  personnel waiting at the jet way to assist the passenger immediately upon arrival in
17  Phoenix.

18     20.    The cabin crew and flight crew followed the letter and spirit of all
19  British Airways policies and procedures with respect to the treatment we provided
20  to Mr. Baillie onboard British Airways flight BA 289 on March 23, 2012. In
21  addition, we complied with industry standard and practice, which is to contact
22  MedLink and page for onboard physicians for assistance with a medical
23  emergency, and to defer to their opinions with respect to the treatment of any
24  passenger who becomes ill in-flight. Neither the onboard physicians nor MedLink
25  ever recommended or suggested to me that flight BA 289 on March 23, 2012 be
26  diverted.

27  //

28  //

DECLARATION OF ALASTAIR GRANT                           - 5 -
CASE NO  CV13-4681 SVW (RZx)                                              LAOFFICE 56907V.1

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1        I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct. Executed this $\underline{28}$ day of January,

3    2014, at _Heathrow Airport_____, United Kingdom.

Alastair Grant

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF ALASTAIR GRANT                    - 6 -
CASE NO  CV13-4681 SVW (RZx)                                      LAOFFICE 56907V.1

# EXHIBIT 17



**MedAire.**
An International SOS Company

| 2012-09578 | British Airways Flight 289    3/23/12 |
|---|---|
| | |

| **First Call: 18:45 UTC** | |
|---|---|
| **CSE** | Thank you for calling MedLink. This is Michelle; please state your company name. |
| **Pilot** | Hi MedLink it's British Airways |
| **CSE** | And your flight number? |
| **Pilot** | BA289 to Phoenix oddly enough. |
| **CSE** | Ok I do copy sir, and um can I have your ETA in Zulu into your final destination? |
| **Pilot** | Yeah it's zero one four one (01:41) and destination is Phoenix |
| **CSE** | OK I copy that sir, and can I have your aircraft type and registration? |
| **Pilot** | It is a 747-400 Gulf Charlie India Victor Delta |
| **CSE** | Thank you sir and go ahead with the age, gender and medical concern of your passenger. |
| **Pilot** | OK we've got a 61 year old male um who was a little out of breathe when he boarded but has pain in the central chest and feels little hot and he is a bit pale, and we've put him on therapeutic oxygen temporarily. |
| **CSE** | OK I copy 61 year old male, central chest pain, appears pale and is currently on oxygen. Is that correct? |
| **Pilot** | That's affirm |
| **CSE** | Ok, and um do we have a seat assignment on the passenger? |
| **Pilot** | He is in 4 Kilo in first class. |
| **CSE** | OK, I copy you sir. Standby for the MedLink physician |
| **Pilot** | (inaudible) |
| **MD** | Speedbird 289, Dr. Reinhart with MedLink. |
| **First Call – MedLink Doctor Joins the Call: 18:50 UTC** | |
| **Pilot** | Hello Dr. Reinhart, Speedbird 289 here. |
| **MD** | Yes, I understand that we have a uh 61 year old male passenger onboard that's having some centralized uh chest pain and is pale. We have him on supplemental oxygen. Do you know does he have any cardiac history? |
| **Pilot** | What I am going to do is hand you over to Eva, who's the crew member dealing with it. And he is 61…six one years old. |
| **MD** | Copy that. |
| **Pilot** | OK, here's Eva. |
| **Cabin Crew** | Hello Dr. Reinhart. Um Hello? |
| **MD** | Yes, uh I – go ahead |
| **Cabin Crew** | We've got a 61 year old uh male and uh he's  currently ????? |
| **MD** | OK  and do you know, does he have any uh cardiac history in the past? |
| **Cabin Crew** | We did ask him and he said that he's got no medications with him and he doesn't have any history of any cardiac. No nothing at all. |
| **MD** | OK, so he hasn't taken an aspirin today and I assume he is not allergic. |
| **Cabin Crew** | Um I don't know anything about him uh being allergic. He did take one aspirin at 3:30 UK. |
| **Pilot** | 3:30 GMT |
| **Cabin Crew** | 3:30 GMT |

| MD | OK, so that was quite some time ago, uh maybe uh 15 hours ago? |
|---|---|
| **Pilot** | Yeah 3:30pm. Sorry. 3 hours 20 ago |
| **MD** | Oh. Alright um so um I would uh continue the supplemental oxygen. Uh if it was only 3 hours ago that he had the aspirin we donot have to repeat that, but I'm just a little bit concerned about with his age, the pain and the fact that he is pale that maybe we should have a uh medical person evaluate him, get a set of vital signs and we can determine whether his uh blood pressure is stable enough that we can try a nitroglycerin. |
| **Cabin Crew** | OK. We will try to see if we can get medical help and get all the vitals like you said. |
| **MD** | OK, and then give us a call back (pilot attempting to speak at the same time). Yes Captain. |
| **Pilot** | You would like a call back with the vitals before we give him anything. |
| **MD** | Yeah, well they can uh assuming that you find a physician and uh he wants to go ahead and administer it. If his if he feels the vitals are stable he can go ahead and give a nitroglycerin and uh then call us back. |
| **Pilot** | Okee doke, yeah that sounds good, we'll call you back and see what happens. |
| **CSE** | And Speedbird if you have nothing further for MedLink at this time we'll go ahead and clear the line. |
|  | **Repatch #1: 19:12 UTC** |
| **CSE** | And 289 go ahead with the update on your passenger; over |
| **Pilot** | Say again |
| **CSE** | Do you have an update on your passenger? |
| **Pilot** | We do yeah |
| **CSE** | Ok, go ahead with that. |
| **Cabin Crew** | Ok, we checked his pulse. He's got an irregular pulse, like 100, and so we checked his blood pressure it is 100/70 and uh yeah his pulse is irregular. And then the uh health professional is a one of the doctors said he has a crackle down his left hand side and he is still complaining about his chest pains and he is confused still. |
| **CSE** | OK, you are coming through just a little bit faint. Um I copy a pulse of 100 irregular, B/P 100/70. You said he is still complaining of chest pains, and then can you please repeat what the medical professional advised? |
| **Cabin Crew** | Uh ilt was one of the doctors we we have onboard. He got a crackle on his left hand side and he is complaining of chest pains. |
| **CSE** | OK, I copy that. Standby one for Dr. Reinhart. |
|  | **Repatch #1 MedLink Doctor Rejoins the Call: 19:18 UTC** |
| **MD** | Hello Speedbird, it's Dr. Reinhart. I understand that there's a physician onboard. We copy a blood pressure is 100/70, a pulse of 100, and crackles in the uh left chest. |
| **Pilot** | Yeah, that's correct. |
| **MD** | The blood pressure is too low to uh support us giving him a nitroglycerin at this point, so uh there is not a great deal more we can do other than the uh continuing the supplemental oxygen. Did the uh physician onboard have any uh further suggestions after his evaluation? |
| **Pilot** | No, just ?????????????????? |
| **MD** | I'm sorry can you repeat? |
| **Pilot** | No no she did not have any suggestions. We have three onboard actually so we are OK. |
| **MD** | Ok, uh no I would uh proceed on then to your destination. looks like you have uh um us just over 6 hours remaining in the flight, so uh a lot can obviously happen in that time frame. Uh hopefully his condition will improve as he lies down and gets the oxygen. If not, if his condition appears to deteriorate, call us back and we would have to uh consider a diversion at that point. |
| **Pilot** | OK, that's great. Just monitor basically and if he gets any worse we'll call you back. |
| **MD** | Affirmative |
| **Pilot** | Ok, the crew just said he's gotten slightly worse since he's been on oxygen anyway, but we will will keep an eye on him anyway. |
| **MD** | Yes, please uh let us know if anything changes or should he becomes unstable. |
| **Pilot** | OK, anything we should look out for particularly? |
| **MD** | Well if his blood pressure drops further or he becomes unresponsive, his color deteriorates and becomes ashen or cyanotic or the chest pain seems to uh worsen where uh uh he is unable to |

BA0490

| | tolerate it. |
|---|---|
| **Pilot** | OK, yeah that sounds good. How often do you want us to monitor his blood pressure? |
| **MD** | I would probably do it every 15 to 30 minutes at least? |
| **Pilot** | OK, that's understood. |
| **MD** | We thank you. |
| **CSE** | And, Speedbird if you have nothing further MedLink will go ahead and clear. |
| **Pilot** | Thanks MedLink, Speedbird's clear…289 |
| **CSE** | Ok, Medlink clear |
| **Repatch #2: 22:34 UTC** ||
| **CSE** | Thank you for calling MedLink my name is Matt, may I have your company name? |
| **Pilot** | Uh It's British Airways the London to Phoenix service, the uh BA 289 |
| **CSE** | And Speedbird 289, I understand uh Gatwick for correction Heathrow for Phoenix. Go ahead with your update; over. |
| **Pilot** | Ok, I've got one of the cabin crew here to give you an update on an ongoing uh situation with uh one of our passengers. Standby |
| **CSE** | Very good sir. MedLink standing by. |
| **Cabin Crew** | Good evening. I got a little bit of update for you. We've just had uh a doctor checking our uh passenger a couple of minutes ago. Uh his vitals are the same. His B/P is 100/80 and is pulse is 100. Um the doctor told us he looks the same but he says that he feels worse and he is sweating and so he's still complains about the pain in the center of his chest The doctor did check um if he had any pain down his arm, left or right or any other place and he said he didn't. That is all the update I've got so far.. |
| **CSE** | Understand ma'am and just to confirm so the vitals are the same although the passenger feels worse; negative for arm pain. Is that correct? |
| **Cabin Crew** | That's correct |
| **CSE** | Very good. And ma'am, I'm going to go ahead and brief our MedLink physician. Dr. Rhinehart has gone off shift so I'll update our new physician. It will take me just one moment to do so. Please standby one. |
| **CSE** | And Speedbird it will be just one more moment uh or a MedLink physician. |
| **Pilot** | Uh Speedbird 289 |
| **Repatch #2 – MedLink Doctor Joins the call: 22:38 UTC** ||
| **MD** | Speedbird 289 this is Dr. Monas; over. |
| **Pilot** | Hello doctor Speedbird 289 go ahead. |
| **MD** | Ok, so I'm um just getting caught up here, my understanding there is a 61 year old male, um I am not sure what his past medical history is but had some chest pain, was given some supplemental oxygen and nitroglycerin. Uh and so if you can tell me any other information or an update I would appreciate that; over. |
| **Cabin Crew** | Uh good evening um we've got a 61 year old male. Uh he doesn't have any history of any pain or problems. He is not on any medication. He has taken aspirin at about um seven hours ago and he has not taken anything else. He hasn't been given anything else. And we have been monitoring him and checking his vitals. His vitals are quite stable. At the moment they are blood pressure is 100/80 and his pulse is 110. And he just complained that he is feeling a bit worse. He is complaining about uh pain in his chest in the central of his chest. |
| **MD** | OK, so he was complaining of a pain in his chest. He has received a an aspirin. I am assuming a full 325 mg aspirin. Um He is on oxygen currently. He received the nitroglycerin, and how is he after the treatment and how much nitroglycerin has he received?; over. |
| **Cabin Crew** | He's not received any nitroglycerin and he is on oxygen. He he he looks the same but he says he feels worse. He has been on oxygen for the last couple of hours. And he's taken aspirin himself just before take off about 7 hours ago. |
| **MD** | OK, I'm sorry I could not understand you. How many of the nitroglycerin um that was recommended that he be given, did he take?; over. |
| **Pilot** | Uh he he wasn't given any nitroglycerin at all because when we relayed the blood pressure we decided that it was too low. So he wasn't given any Nitroglycerin at all at this stage.. |
| **MD** | OK so why don't you go ahead and um try giving him a dose of the nitroglycerin, um if he is continuing to have chest pains. And why don't you give him a dose and then give us a call back |

CONFIDENTIAL

BA0491

| | afterwards and let us know how he's a feeling. Obviously we will certainly have an ambulance waiting for you at your arrival no matter what but why don't we see how he does after the nitroglycerin; over. |
|---|---|
| **Pilot** | OK, uh so you want us to administer a single dose of nitroglycerin and then inform you how he improves after that. |
| **MD** | That is correct and continue him on the oxygen; over. |
| **Pilot** | And continue on the oxygen yeah Ok standby one minute please. Ok, we were just confirming the information that we have. Uh apparently it was your colleague earlier who suggested not giving the nitroglycerin but uh I understand now that it is ok to do so. Uh also, I don't know if you have been advised but we have a doctor onboard monitoring the patient. And uh checking his blood pressure every half an hour. He actually did say over the last check that uh he pain did look considerably worse and his recommendation was to re-evaluate in uh 30 minutes which is now about 20 minutes and suggested that uh at that time we might consider making a diversion. Obviously I wanted to uh speak with you first and get your take. Uh we will now administer the nitroglycerin and uh come back to you once that has had some effect. |
| **MD** | OK, that sounds good. Thank you so much. Please give us a call back; Over |
| **Caller** | OK Uh Speedbird 289 is now out for now |
| **CSE** | OK Speedbird 289 this is Matt at MedLink we will go ahead and standby for your update um at this time we will go ahead and clear the line as well. Safe flight. |
|  | **Reptch #3: 22:52 UTC** |
| **CSE** | And Speedbird this is Matt, we spoke a few moments ago. I am gonna go ahead and bring Dr. Monas on the line. Standby one. |
| **Pilot** | OK, we're standing by here 289 |
| **Cabin Crew** | (Inaudible) |
| **MD** | Speedbird 289, Dr. Monas; Over |
| **Pilot** | Hello doctor, it's the uh Captain on 289. Yeah, I've got two of my cabin crew up here in the flight here with me yeah. Uh, after your uh after our last chat with you about administering the nitro, I went to uh the uh doctor that is monitoring the patient for us who is a radiologist apparently, and he said that the uh he is not happy at all with giving the patient uh nitro because his blood pressure is too low. So he just wanted your thoughts on that. |
| **MD** | What is the current blood pressure? Cus the last time…well what is the current blood pressure; Over. |
| **Pilot** | Uh its 100/80 |
| **MD** | And the patient is continuing to have chest pain?; Over |
| **Caller** | Yes, that's correct |
| **MD** | OK, um and is it and so there is a radiologist onboard. I heard there is another doctor onboard as well? Over |
| **Pilot** | Uh Standby. OK doctor, I I'm going to let one of my cabin crew talk to you directly because I am getting it relayed to me and uh she has been with the patient the entire time. Standby one. |
| **Cabin Crew** | Good evening, Um we've had the doctor the radiologist that's been monitoring the customer for the last couple of hours. He came in with his colleague originally, but I know from the my colleagues that there are other doctors onboard but I don't know what profession they are exactly but I know they came in forward when we made a PA for them. |
| **MD** | Ok and can you tell me a little bit because I came in at the end of this situation? Can you tell me the story of what this gentlemen is having, what kind of chest pain?; Over |
| **Cabin Crew** | OK, I am going to start from the very beginning. It started just after takeoff when he said that he's not feeling well and he's complaining of chest pain in the center of his chest. Um he did say that he had been uh was running towards the gate because he was in a rush, he seemed a bit rushed. Um, we put him on oxygen because he seems to be feeling worse and then we contacted you, and one of your colleagues told us to monitor and check his vitals. So we got the doctor to check his vitals. I have the last three updates. He didn't have any history of any pain. Uh he is not on any medication. And, he advised us that he had taken. Actually hold on a minute I have a bit of an update here. OK, I am sorry no that was not an update. So um he did advise us that he had taken an aspirin just before takeoff which was about 7 hours ago. And um he he told us he feels hot. He is quite pale. He was quite pale from the very beginning and he did have difficulty breathing. Um so we have been checking his vitals for the last couple of hours. They have been quite stable. At the moment the blood pressure is 100/80 and the pulse is 110. |
| **MD** | So just to…just to recap for a second. So the patient is pale?  Is he and he sounds like he is sweaty |

CONFIDENTIAL

BA0492

|  | and feeling short of breath with chest pains. And is the chest pain a pressure and if it is easier you can put me on with the doctor, I would be happy to talk with them as well but um I would just like the information; Over |
|---|---|
| **Cabin Crew** | We did ask him what kind of pain is it and he said it was quite difficult to describe so I don't have that information unfortunately. Um I don't think the pain is getting worse. I think the pain is quite stable because he didn't say it was. I did ask him in the beginning which was a couple of hours ago on a scale of 1 to 10 what how how heavy the pain is and he said about 5. That hasn't changed but I have to check that with him. And that's all the update I have so far. |
| **MD** | OK, does he look sweaty?; Over |
| **Cabin Crew** | Uh he does in my opinion and doctors opinion, he does. |
| **MD** | Ok, is it possible to speak with one of the doctors who are taking care of him?; Over |
| **Cabin Crew** | Apparently not now? |
| **CSE** | And Speedbird to confirm, the physician who is treating the patient is refusing to speak to the MedLink physician or he is just not available at this moment? |
| **Pilot** | He's not able to come on to the flight deck due to...due to our security procedures |
| **CSE** | Understand sir |
| **MD** | Yeah ok, I mean you know obviously we are here, you guys are in the air and evaluating the patient. If you feel the patient is not looking well, and that uh that we need to divert we can start to take a look at diversion locations. Um in the meantime if the patient's blood pressure is that low, I'm assuming he is lying down right now, um and if not I would lay him down, elevate his legs, um obviously continuing continue him on the oxygen. If his blood pressure is still 100 of the top number, I would hold off on the nitroglycerine. Obviously if we can get his blood pressure up we could go ahead and give it, but like I said in the meantime we'll take a look at some diversion locations if you guys feel he is uh concerning at this time; Over |
| **Pilot** | Yeah ok Speedbird 289 |
| **CSE** | And Speedbird, I'll go ahead and bring dispatch on the line. Standby one. |
| **Repatch #3 BA Dispatch Joins the Call: 23:00** | |
| **CSE** | And Speedbird 289 this is Matt at MedLink, how do you copy? Over |
| **Pilot** | Uh 289 we read you three and five. |
| **CSE** | And 289 on the line with us is uh Ops control. |
| **Dispatcher** | Good evening Speedbird 289 this is Shebra from Ops control. |
| **Pilot** | Uh hello is that uh, are you BA Ops control or are you is this someone else from MedLink? |
| **Dispatcher** | No, it's BA Ops Control |
| **Pilot** | Oh Ok, so we've already spoken to somebody, one of your colleagues, just letting them know there is a possibility of a diversion. Um ok we we're still um closest to Chicago at the moment and we're going to get an update from the doctor onboard in the next uh ten minutes or so I guess, and um we'll as I said earlier we'll give you a call to uh let you know what our decision is if we do have to divert. |
| **Dispatcher** | Excellent, thank you for that update Speedbird 289. Um I will just (MedLink Doctor interjects) Hello? |
| **MD** | Yes sorry this is one other thing just from the doctor over here that I just want to make sure we are doing. I just wanna make sure we have tried laying this gentleman down with his legs elevated. Um just to make sure that we do uh give him a little time in that position and recheck his blood pressure; Over |
| **Pilot** | Yeah copy that 289. |
| **Dispatcher** | Again uh Speedbird 289, we will ring Chicago just to let them know that there is a possibility |
| **Pilot** | Ok, we'll update you uh the next update within ten to fifteen and um yeah if you can let Chicago know that obviously we'll need a flight plan on to Phoenix and uh uh med....paramedics, and I'll call you and update you when and if we need to make a decision. |
| **Dispatch** | Ok excellent, thank you very much Speedbird 289. |
| **CSE** | Speedbird 289 this is Matt at MedLink. I'll go ahead and call Chicago as well, let them know of the possibility, keep them updated. If anything does come up or if you have an update please do call us right back, we'll bring Dr. Monas back on the line. Ops control thanks for your help and if there is nothing further for MedLink we'll go ahead and clear the line. |
| **Pilot** | Ok Medlink Speedbird 289 out. |

BA0493

| | |
|---|---|
| **CSE** | Have a good flight, Speedbird clear. |

# **EXHIBIT 18**

**PASSENGER DETAILS**

**BRITISH AIRWAYS**

24-OCT-2013 03:24

## Key Details

Opni Leg Id

| Flight Date | Pax On Seg Id | First | Last | Pnr Ref | Pnr Owner | Carrier Code | Flt No | Opnl Suffix |
|---|---|---|---|---|---|---|---|---|
| 23 MAR 2012 | 739546293 | 15327940 | 15327940 | 33K4PT | 1A | BA | 289 | |

| Stations | | | | | | | Cabin | | Pax | |
|---|---|---|---|---|---|---|---|---|---|---|
| Uplift | Disch | Est Dep Tm | Sched Dep Tm | Sched Arr Tm | Leg | No | Cd | Grp Cd Grp Qty | | |
| LHR | PHX | | 23-MAR-2012 15:05 | 24-MAR-2012 01:45 | S | 1 | F | | | |

| Title | First Nm | Initials Txt | Last Nm |
|---|---|---|---|
| MR | JAMESDONALD | J | BAILLIE |

## Seat Details

| Seat No | Orig Seat No | Protection | Preallocate | A Edit Sts | S Edit Sts | A Edit Cds | S Edit Cds | Medical | Priority | Pref Outstanding | Class Change |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04K | 17J | N | R | | | N | N | N | Y | N | |

| | Stn | Address | Typ | Term | Time |
|---|---|---|---|---|---|
| First Check in | MUC | 2D201B | M | 1 | 23-MAR-2012 07:07 |
| Last Check in | | | | | |
| Onload | | | | | |
| Offload | | | | | |
| First Boarding | LHR | 7B7A21 | I | 1 | 23-MAR-2012 14:54 |
| Last Boarding | LHR | 7B7A21 | I | 1 | 23-MAR-2012 14:54 |
| First Deboarding | | | | | |

## Transfer

| Leg Id | Carrier cd | Flight No | Suf | Stations Uplift | Disch | Departure Time | Terminal | Arrival Time | Terminal | Connec Typ No | Mins | Chk In Sts | Bkd Sec Cls | Typ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bkd Inb** 15327643 | BA | 949 | | MUC | LHR | 23-MAR-2012 09:35 | 1 | 23-MAR-2012 11:45 | 5 | S | 1 | | C | E |
| **Act Inb** 15327643 | BA | 949 | | MUC | LHR | 23-MAR-2012 09:35 | Pax Id | 739586260 | Flown Class | C | D | | | |
| **Bkd Onw** | | | | | | | | | | | | | | |
| **Act Onw** | | | | | | | Pax Id | | Flown Class | | | | | |

## Bag Details

Pool Ind N  Pool Code [ ]  Pax Count [ ]  No of Bags [ 0 ]  Bag Wts [ 0 ]  Hand Bag Wts [ 0 ]

**DCS Details**  Urp Ref 2115050031  Ticket No 0017038838544  CAA Ref 381060010630  Ticket Typ K  SPR Ref 031

Rebate N  Check In A  Booking Mtd P  Thru Checked Y  Booking Class D  Boarded Y

## Indicators

| | Rec Loc Value | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sex | Y R | M | Child N | Infant N | Unacc Minor N | VIP N | Self Service N | |
| Passport | Y R | 423798570 | Staff Travel Sts | Yield Sts | Airmiles Redem N | Industry Discount N | | |
| Passport Name | Y R | | Security No 225 | | | | | |
| Birth Date | Y R | 20 JUL 1950 | | Number | Carrier | Tier Code | | |
| Nationality | Y R | USA | FQTV Data | VY25980 | AA | RUBY | | |

Report generated by :  U691692  , Anu Ilwahdi  Pages : 1 of 1

CONFIDENTIAL

BA0466

# EXHIBIT 19

**OPNL Legs Report**

BRITISH AIRWAYS
29-OCT-2015 18:08

**Key Fields**

| Leg Id | 15327940 | Next Flight Leg Id | | Next Ac Leg Id | 15332202 |
|---|---|---|---|---|---|

| | Career | Number | Suffix | Dep Stn | Arr Stn | Dep No | Date |
|---|---|---|---|---|---|---|---|
| Flight Actual | BA | 289 | | LHR | PHX | 0 | 23-MAR-2012 |

Link [ ]   Link Reason Cd [ ]

**Indicators**

Cancelled | N | Chg Reason | Secondary Canc Cd | Cancel Tm | Cancel Src | No Go | N | Code Share | P | Tow | N

**ARR/DEP**

| | Planned | Delay Mins | Actual | Scheduled | Src | Stand | Term | On Pier | Loc | Sched Flew Hdl |
|---|---|---|---|---|---|---|---|---|---|---|
| Departure (GMT) | 23-MAR-2012 15:05 | 7 | 23-MAR-2012 15:12 | 23-MAR-2012 15:05 | Y | 565 | 5 | Y | * | Y | Y | Y |
| Local Time | 23-MAR-2012 15:05 | 7 | 23-MAR-2012 15:12 | | | | | | | | |
| Arrival (GMT) | 24-MAR-2012 01:45 | 8 | 24-MAR-2012 01:53 | 24-MAR-2012 01:45 | Y | | 4 | | * | Y | Y | Y |
| Local Time | 23-MAR-2012 18:45 | 8 | 23-MAR-2012 18:53 | | | | | | | | |

Types [ V4 ]   [ V4 ]   [ V4 ]   Iata Ac [ 744 ]   Service Type [ J ]   Type [ ]

Config [ V4K37 ]   [ V4K37 ]   [ V4K37 ]   F14J52W36M235   Sched Flt Ind [ Y ]   Flew Ind [ Y ]

Turnaround Mins [ 300 ]   [ 285 ]   DEP Delay Mins [ 7 ]   EET Mins [ 606 ]

Taxi Out Mins [ 34 ]   Airborne 23-MAR-2012 15:46   Slot Time 23-MAR-2012 15:25

Taxi In Mins [ 7 ]   Landing 24-MAR-2012 01:46   Door Closed 23-MAR-2012 15:03

**Passenger-Figures**

| | Stations | Cabin Codes | F | J | W | M | Best Est Iata | | Totals |
|---|---|---|---|---|---|---|---|---|---|
| Origin | LHR | Seat Counts | 14 | 52 | 36 | 235 | 337 | Adult | 308 |
| Destination | PHX | Pax Onboard | 14 | 52 | 35 | 232 | 333 | Child | 25 |
| Plnd Arr | PHX | Pad Onboard | 0 | 0 | 1 | 0 | | Infant | 6 |

Diverted To [ ]   Stand Return [ 0 ]

Tour No [ 15 ]   Basis Taxi Time [ 23-MAR-2012 15.11 ]   Deallocations [ 5 ]

Eng Txt [ ]   Brake Landings [ 1 ]

Additional Txt [ ]   Touch And Go [ 0 ]

Minor Txt [ ]   Flying Crew [ 3 ]

Sita Txt [ ]   Positioning Crew [ 0 ]

**Indicators/Code**

| | | | | |
|---|---|---|---|---|
| BA Flight Y | Commercial Y | Charter N | Mail N | Freight N | Definite Cancel N |
| Extra Flight N | Coaching N | Van N | Re-Route N | Tech Reliable Y | Tech Stop N |
| Push And Hold N | Night Flt N | | | Maint Feed N | Ops Plan N |
| Ldm Received Y | | Plnd Night Noise N | | Act Night Noise N | |

**Codes**

Leg Sequence [ S ]   Product [ 12 ]   Act Ac Rgsn [ GCIVD ]   Act Ac Rgsn 3 [ IVD ]   Ac Version [ 74JB ]

Diversion Reason [ ]   Slot Sts [ N ]   Erops Etops [ ]   Lhr Runway [ 27L ]   Dispatcher [ ]   Ldm Rejt [ ]

Pilot Cd [ FOWRS | SIMSX ]

Delay Codes [ GTZ / 6 . GT / 1 ]

Report generated by: U132648          Samantha McClelland          Pages: 1 of 2

BA0772

**OPNL Legs Report**

BRITISH AIRWAYS
29-OCT-2015 18:08

**Fuel-Details**

Dep fuel [ 0 ]          Arr fuel [ 0 ]          Remaining fuel [ 0 ]

**Disruption Data Report**

Carrier Code [          ]

Flight Number [          ]

Flight Date [          ]

OPNL Suffix [          ]

Dis Seg Id [          ]

Disruption Data Text

BA0773

# EXHIBIT 20

| | Global Services Training Module | Doc. No./Rev. No | |
|---|---|---|---|
|  | MedLink Physician Orientation Program | Revision Date | 9/12/2008 |
| | **Reference Material** | Page | Page 1 of 20 |
| | **MedLink Physician Pearls for** | | |
| | **Remote Medical Care** | | |

## Glossary of terms
- Aviation
- Maritime
- Security

## Anatomy of a Patch
- Initial Call
- Communication Specialist Contact
- Information Gathering
- Paging ML physician
- Information Report to ML physician
- ML physician confirming with caller the information/report
- ML physician –
  - History of current emergency/concern
  - Condition of patient now
  - Relevant past medical/surgical history
  - Medications
  - Allergies
  - Care rendered
  - Formulate a provisional diagnosis or primary symptoms that can be treated
  - Evaluate Medical Kit contents
  - Communicate to captain/crew
  - Evaluation of Situation
  - Every patch has three different – overlapping circles that must be evaluated and considered.
    - Type of emergency (medical emergency, symptoms, complaints, age)
    - Location of the aircraft/yacht (middle of ocean, just about to leave land, over hostile territory) Time to reach assistance much longer for vessels. Closest port may not have reasonable medical resources
    - Available resources (medical kits, medical volunteers, or trained crew – need to consider medical, security, aviation resources)

**CONFIDENTIAL**                    MA027355

## Anatomy of a Patch



## Crew Fit to Fly Issues

- Responsibility of FAA and Flight Physician
- Medication and flying
- Crew health
- Need to distinguish between being able to fly vs. being able to work at their job.  (I.e. flight attendant who is ill – unable to perform her duties – but able to fly deadhead back to base)
  - o Get all information and clarify
  - o Avoid crew/company politics
  - o Industrial heath issue

## Customer Service Tips

- Communication with Pilot
  - o Decision to divert is Pilot's
  - o Aircraft safety is ALWAYS primary concern
  - o MedLink physician is in an advisory role  - medical advisory to the pilot
  - o Maritime--ML doc may speak with different personnel throughout incident. Captain may initiate patch or "Medical Officer" may be Point of contact.  Captain (like pilot) has ultimate command of vessel and operational decisions.

**CONFIDENTIAL**                   MA027356

- Crew communication
  - Validate their concerns
  - Repeat what was initially reported to the communication specialist.
  - Ask if there is further information or update
  - How is the patient now
  - Thank them for calling/assistance
  - Provide reassurance that they are doing a good job
  - Tell them you are here anytime they need you and encourage them to call back if they have questions.
  - Provide assistance in locating a medication in the kit – spell it out, confirm that the crew has the right medication, dose and route of administration. Remember that medications may have different names in different countries so may have to clarify (IE. Valium/Diazepam). Also, some meds in other countries are not the same as meds by the same name in the US.
  - Never question the appropriateness of any call at the time. If you think it was not an appropriate use of ML advise Dr. Streitwieser that a quality assurance process should be done.
  - The role of the ML physician is to provide medical advice for clients who are NOT in their hometown and do not have access to their normal medical provider. ML physicians should not be giving medical advice to clients who are in their hometown. This could be challenged later as a conflict with an existing patient –physician relationship and should be avoided. You should explain why you cannot give advice to them when not traveling.
  - Communication with the flight attendants/patients/medical volunteers in-flight has changed since 911. The Captain is the filter for information – so be very clear about the information you need up front – so they don't have to keep running back and forth asking individual questions. Rarely, at the pilot's discretion – a medical volunteer may be allowed in the flight deck.
  - This is different for maritime. May be able to speak directly with patient or at least with primary caregiver. May also have access to patient's medical profile.
  - As in BGA (corporate clients), maritime clients are likely to be high profile individuals. May not be inclined to give name over SatCom or radio. Can give ID # from MLWW card for access to medical profile.

## Capabilities of Flight Crew to give medical assistance

- ML physicians must be aware that crews are very sensitive about performing duties beyond their ability and scope of training.
- Many airlines instruct crews NOT to perform medical duties beyond their training.
- Mistake could result in bad patient outcome and poor PR
- Asking a flight crewmember to administer i.e. epinephrine (or glucagon) in an emergency should only be done under extreme emergencies.

**CONFIDENTIAL**          MA027357

- Quite different for maritime. With exception of small vessels (under 24 meters), most vessels will have a crewperson with some medical training. This is well below the level of EMT but significantly higher than that of flight attendants. They will be able to give SC/IM injections. Some will have been shown how to start IVs (though they are probably not proficient at it). Foleys, needle Thoracostomy, NG tubes are some other invasive procedures they may have been exposed to.
- MSC (Military Sealift Command) will have medical officer aboard. Some are trained to the level of Physician Assistant but most are at a lower level

## Onboard Medical Volunteers

- MedLink does not "validates" medical credentials
- ML physicians must realize that they are working with a medical volunteer with no absolute verification of their credentials.
- Beware of imposters!
- Use onboard resources as appropriate – don't overlook pharmacists, veterinarians, pathologists, dentists, EMT's, medical/nursing students, etc.
- Responsibility of flight crew to do so according to airline policy
- Can get name of physician/nurse, etc and call hospital where they work if there is a question.
- If medical person is reluctant to assist – remind them they are covered under the MedAire insurance as long as they follow the advice of the ML physician.  There is also protection under the Aviation Good Samaritan Act. (Effective on US/domestic carriers/flights)
- Some doctors may have other motivation behind their assessment (not wanting to divert or delay their flight for personal reasons)
- ML physicians are in medical control and need to "stand their ground" if their advice differs from that of the on-board medical person – or at least give the captain both sides of the controversy.
- Possibility that there is a medical practitioner amongst the guest complement but not nearly as common as commercial aviation. Same approach applies though there are some international maritime laws that permit the vessel master (captain) considerable leeway for management offshore.

## Medical Kits/Equipment

### Medical Kits

- Refer to the aircraft/vessel specific kit
- Maritime has a number of kits. BE SURE TO REVIEW ALL KITS FOR ITEM YOU ARE LOOKING FOR. There is not complete duplication between kits.
- Walk them thru finding what they need
- Use the color coding system (MedAire EEMK)-or their medical kit locator number or location
- Use alphanumeric identifier (e.g. C-4) for drugs if available- saves trying to spell out drugs with long names.
- Remind the crew to check for allergies before administering any medication.

**CONFIDENTIAL**          MA027358

## Oxygen Systems

### Maritime

- Portable cylinders. Some vessels carry multiple cylinders.
- Ask each client what their capability is for oxygen administration if you anticipate prolonged oxygen use.
- Flow variable –0.25 liter – 25 liters
- Oxygen concentrator – Maritime utilization increasing.  Can deliver up to 10 lpm@92% - 94% FIO2
- Delivery devices include nasal cannula, simple face mask; non-rebreather mask and bag-valve mask (adult and peds).
- Manual suction (V-vac device) also available with replacement cylinder.
- Maritime oxygen can be very limited – so be aware of the limited resources when someone is placed on oxygen (i.e. hyperventilation).  Administer the flow that is appropriate for the condition of the patient (not just automatically high flow)
- Refilling of oxygen cylinders in the maritime environment can be difficult especially overseas – so use only as needed

### Aviation - Commercial

#### General Information

- Portable Oxygen Concentrators  (POC)
  - o It is the decision of the airline whether or not to allow the use of POCs onboard their aircraft.
  - o Equipment must have sufficient batteries and be in good condition.
  - o Passenger must have doctor's note stating oxygen flow, and which portions of the flight it must be used.

- Prescription oxygen – arranged preflight by prescription
  - o Installed in the overhead bin by maintenance preflight
  - o Flow is set according to prescription
  - o Tag with doctors order attached to unit.
  - o Calculations for amount of oxygen required for the duration of the flight are done preflight.  Changes in flow rate may compromise amount of oxygen available for duration of flight.

- Walk around bottles
  - o Small cylinders – "walk around" bottle
  - o Mask/nasal cannula
  - o Flow :
    - ▪ Low flow – 2 liters

**CONFIDENTIAL**                MA027359

- High flow – 4 liters
- o Drop down masks
  - Not used for medical emergency
  - Generally delivers 1.7 lpm oxygen

- o Flight Crew oxygen
  - Pressure demand system
  - Quick-don masks
  - Delivers 100% oxygen

#### Airline specific information

- **Virgin Atlantic** – on certain aircraft they have a seat that allows delivery of up to 6 liters for entire flight. This oxygen system is separate from the rest of the emergency oxygen systems.
- **Corporate**
  - o Therapeutic outlets –
  - o Allow for low flow/high flow oxygen while in the seat.
  - o Walk around bottles
    - Available for transport to and from aircraft
    - Use only if therapeutic outlet not available
  - o Humidifiers

### Altitude Physiology - addressed in the altitude physiology e-learning module
- Stresses of flight
- Gas laws
- Gas will expand by approximately 25% (Boyles law)
- Sudden decompression
- Hypoxia
- Arterial oxygen levels will fall – cabin altitudes are 6-8,000 ft. Studies show an average PO2 of an aircraft flying at 36,000 ft pressurized to 7,000 ft is about 75-for a healthy person.
- Fatigue

### Medical Issues – Prescreening

Prescreening Calls are done by the airline to determine if the passenger is "fit to fly". Most airlines have their own policies and procedures in place, but still request ML advice. The following are guidelines and considerations.

- Refer to the Medical Guidelines for Air Travel – Physician's and Nurses Reference Manual

- British Airways has "four absolutes" for prohibiting a passenger from flying –

**CONFIDENTIAL**          MA027360

- o Pregnancy of 36 weeks or more (some airlines deviate from this rule and allow flight up to 38 weeks)
- o Person exhibiting noticeably bizarre behavior
- o Very ill-appearing person
- o Persons who are obviously contagious (rash – cough??)

These are reasonable to use as general criteria for all carriers if they do not have their own guidelines.

## Seizures

- Generally not advised to fly if passenger has had a seizure within 24 hours.
    - o Known epileptic - Exceptions to consider might be if the passenger has a known pattern of seizures, this last seizure was well within his "normal" seizure pattern, required no medical intervention, and is essentially stable and at his baseline.
    - o First time seizure – unknown etiology – not had medical evaluation - Not advised to fly. Considerations of drug trafficking (i.e. mule) especially if flight originates in So. America, Caribbean, Mexico, Asia, Africa.

- If someone seizes in the boarding area - boarding should be denied until medically cleared. If medically released, attempts can be made to dissuade the patient from flying. Question is whether you can prevent him from boarding. American Epilepsy Foundation may protest. Mayo study with Northwest Airlines indicates seizures resulted in diversion 25% of the time
- Significant financial risk for airline.
    - o ML physician must know this is a very "hot topic"
    - o General rule – no flying within 24 hours of seizure
    - o Check for airline specific recommendations
    - o If situation falls within generic MA recommendations (above) consider special circumstances.
    - o Understand legal/political dynamics of ADA (American Disabilities Act)
    - o Be aware of your recommendation in the event of a legal battle.

## Medical Issues In-flight

- ALL ACCIDENTS THAT OCCUR IN THE AIRCRAFT MUST HAVE A MEDICAL EVALUATION **REQUESTED** UPON LANDING. The ML physician should order the EMS to meet the plane – the passenger can always refuse treatment – but the airline will be covered for having provided emergency evaluation and care.

- Focus history and chief complaint to determine if it is a life-threatening emergency. The most common life threatening events would include:
    - o Cardiopulmonary arrest/collapse (respiratory arrest, MI, dysarrythmais, CHF, PE)
    - o Loss of airway (severe asthma, inability of ventilate)
    - o Bleeding (GI, OB/GYN, severe epistaxis)

**CONFIDENTIAL**     MA027361

- o   Seizures – status – intractable seizures
- o   Decreased LOC – Coma

The ML physician must rule out life threatening signs and symptoms first.  Need to develop the basic questions for each disorder to isolate the life threatening events.

## Allergic Reaction

- Airway compromise
- Angioedema
- CV collapse/shock
- History of severe allergic reaction
- Significant likelihood in maritime given exposure to marine hazards/envenomations. Most vessels carry Epi-pens (adult and peds)

## Behavioral Disorders

- Is their behavior secondary to an underlying medical condition? I.e. hypoglycemia, substance abuse, hypoxia, seizure disorder (check glucose levels available on international flights – not domestic unless someone traveling with their personal glucometer)
- Be aware of potential for drug overdose due to intra-body transportation of drugs and inadvertent absorption.
- Some recreational drug use in maritime industry though this is decreasing with random drug screening.

## Aircraft/Crew safety issues
- Are they a threat to themselves or others?
- Restraint of passenger
- Physical restraints per airline protocol.  Plastic restraints, duck tape, some airlines have handcuffs, etc.
- Chemical restraints (not available domestically in US)
    - o   Diazapam – IM – poorly absorbed
    - o   Haldol IM (Cathay or Qantas)
- Ensure circulation and re-evaluation of passenger is done on regular intervals.

**CONFIDENTIAL**

MA027362

## Urological Conditions

- Urinary tract infections –
    - Not much to do in-flight.
    - This appears to be relatively common call for maritime clients (mostly female crew)
- Urinary retention –
    - NOT ALL AIRCRAFT KITS HAVE CATHETERS.
    - Foley catheters (included in some international kits) – some are self lubricating by using water
    - US kits contain catheters that need lubricant (i.e. viscose lidocaine)
    - Variety of Foley and straight cath arrangements. "MedLink kits" include standard 16fr Foley tray.
    - Increased possibility of urinary retention for older men (BPH) using Transderm-Scop patch for motion sickness in maritime
- Kidney stones
    - Younger, healthy person, previous history of stones, same kind of pain
        - Treat pain with onboard mediations (i.e. ibuprofen, morphine, etc)
    - Older person >60,ASVD risk factors( hypertension, smoker, first time (suspected) kidney stone
        - Blood in urine, acute flank pain
        - Could be an aortic aneurysm (rupturing)- Potential diversion

## Burns

Common onboard burn injuries are:
- Scalds from hot liquids (hot coffee, hot water)
- Pepper spray – no calls
- Treatment – rapid cooling, remove clothing – use the water gel in the kits.
- Occasional eye irritation from de-icing – flush with water (use bottled water or eye irrigation from the kits - as it is impossible to use the sinks and faucets for eye flushing)
- Less common – inhalation burns, eye burns, chemical burns
- All people will get an EMS evaluation.
- Also common in maritime. Thermal, friction, flame, chemical. Severe sunburn. Maritime also has equivalent of "snow blindness" though not as severe

## Cardiac

Cardiac Arrest
- Most airlines do not have intubation or advanced airway equipment
- Medications are very limited.  Some airlines have the kits with basic ACLS medications – i.e. epinephrine, lidocaine, atropine.  However, it is often difficult to determine what arrythmia you are treating

CONFIDENTIAL          MA027363

- The AED is not supposed to be used for monitoring purposes – however, if there is a healthcare provider who can read EKG's and medications are being considered – the AED may be used to evaluate the heart rhythm during drug administration.
- Few, if any, maritime clients are ACLS prepared or carry advanced airway equipment.

## Chest Pain

- RDT has capability of a 12 lead – physician who knows how to use the bio-log could get close to a 12 lead.
- Defibrillator should not be used as a monitor – not approved by the FDA and wears down the battery. Most airlines do not have an AED that has a workable screen. United is one of the only airlines with a screen – they are not a MA client)
- Discussion regarding the differences in presentation of angina among males/females/diabetics
- If the passengers pain can be relieved with the resources onboard (oxygen, nitrates, morphine, etc) position is stronger for continuing the flight rather than diverting.
- If the chest pain is ongoing for more than 20 minutes and the chest pain and shortness of breath cannot be relieved with onboard resources – this is a strong case for diverting (potential coronary syndrome).
- Involve the family and patient and pilot – discuss the facts regarding the onboard resources, possible risks of continuing, and how effective the onboard resources may or may not be. Cardiac situation are a high category of diversions and course of action is often not clearly defined – try to involve medical personnel who can get more detailed history and firsthand knowledge of physical symptoms. All medical kits contain ASA

## Palpitations

- Very few arrhythmias are diagnosed in-flight or onboard and even fewer have a definite course of action that can be taken.

## Circulatory

## DVT

- ASA has not been shown to prevent DVT – but often the ML physician will administer anyway for pain.
- Some British physicians think it may reduce the risk slightly and may recommend aspirin.
- Some maritime clients have low molecular weight heparin in their medical kit – None of the airlines have lovenox in their kits - so treatment options limited to comfort measures.

**CONFIDENTIAL**          MA027364

## Death in flight

General rule is that no one is pronounced dead in-flight – except under very unusual circumstances and it is medically appropriate to do so. (Rigor mortis, dependant levity, AED with monitor screen showing asystole) However, there are severe consequences (legal and logistical) that occur if someone is pronounced dead in-flight. If an onboard physician wants to pronounce a passenger dead – the ML physician must make him aware of the legal implications and serious repercussions that can ensue if he were to do that.

- If a death is pronounced, the FAA may consider it a crime scene.
- If international flight – the body cannot leave the borders of that country
- The plane and passengers can be held
- If an onboard physician wants to declare death – he must accompany the body to the hospital and complete the paper work, questioning, etc.
- The captain is required to report any death or infectious disease to the port authorities prior to landing. (see infectious disease/CDC)

Flight crews are trained to continue CPR until:
- The scene becomes unsafe
- Breathing and circulation resume
- CPR has continued for 30 minutes with no response and landing is not imminent.
- They are too exhausted to continue CPR (would be more common in corporate due to limited crew)
- Until directed to stop by the ML physician
- During long distance flights, if the AED and CPR are not effective, the ML physician may direct the crew to stop CPR – this does not mean that the patient has been pronounced
- The care of the patient has been turned over to the EMS upon landing.

### Crew support
- The crew needs to be commended for a job well done even when the person dies. They often feel they were lacking in their response and it is important to tell them that in spite of doing everything right, people still die.

Family support
- Family will need a lot of support from the crew
- ML physician can assist to make sure this is addressed and not overlooked.

Care of body
- Crews are to stop CPR,
- Make the passenger comfortable,
- Place body bag under the lower part of the body,
- Place a pillow under the head,
- Apply an oxygen mask (with oxygen turned off)
- Cover the body completely to the neck with a blanket.
- Seat family with the body – attempt to isolate from other passengers if possible.

**CONFIDENTIAL**          MA027365

## Do Not Resuscitate Orders/ DNR - Living Will

Generally – people do not bring their DNR papers on their flight with them. There is no legal enforcement for DNR in these situations. In general DNR orders are not valid.

- Are not recognized in flight
- No way to verify the orders
- Resuscitate the passenger

Possible exceptions

- The DNR orders were sent to the airlines legal department for approval prior to the flight and have determined that they will honor the order. I.e. Cathay Pacific has identified passengers who are DNR and have accepted them onboard with the understanding that they will not divert if anything happens to the passenger – ML puts the flight on a "Trip Watch – No divert" status.
- ML is able to contact the passenger's doctor and discuss the case and resuscitation directives with him. In this situation – resuscitation efforts may be halted. Or- the situation is hopeless-cachectic patient with massive hemoptysis/Gi Bleed. Be reasonable
- Issues upon landing

## Death on board – Maritime

- Crew support
- International legal issues
- Storage of body
- Can store a body in the freezer onboard if at sea.
- Body bags available on most large vessels
- International laws will be confusing (e.g. death of a South African crewmember on a Cayman-flagged vessel with an American owner chartering for a group of Germans while in Australia). Handle with input from vessel master and arrival port authorities.
- Post-mortem procedures detailed in Ship Captain's Medical Guide

## ENT

### Ear pain

- Decongestants
- Shouldn't fly with congestion/ear infection
- Pain medication
- Chew gum, yawn, val salva maneuver clearing ears
- Sometimes see the use of cups and hot towel over the ears. As the water cools, it will draw the TM out when you are descending. ML should encourage the use of decongestant nasal spray as an alternative to this.
- Should follow up with their doctor to check for infection or if the TM bursts.
- Ear squeeze for diving--consult DAN when necessary

CONFIDENTIAL    MA027366

### Nose bleeds
- Expel clots
- Hold pressure with head up
- Nasal decongestant may help to shrink tissues and use with pressure
- Uncontrolled and excessive epistaxis may require diversion.

### Sore throat
- Symptomatic care

### Foreign Body
- Common call is passenger thinks they swallowed glass in their drink
- Follow up with their doctor – nothing to do in-flight

### Gastrointestinal

Question is what can you treat?

Most airlines do not carry IV fluids or if they do they carry only a small amount that is not sufficient to rehydrate.

### Heart burn
- Treat with antacids
- Consider cardiac cause

### Abdominal pain/ surgical abdomen
- Evaluate the patient, resources, time, location etc to determine best course of action.  Some may be diverted while others may continue.
- Abdominal spasms/cramps – can treat with Hyoscine (injectable or oral) which many airlines carry
- Diarrhea :
    - treat with Imodium
    - Codeine/rehydration with ice chips and ginger ale.  The rehydration salts do not taste good.

### Nausea/vomiting
- Treat with antiemetic (many airlines have both oral and IV forms)
- Most airlines do not have IV fluids onboard
- Corporate clients may have the fluids but they are not taught to start IV's
- rehydration

**CONFIDENTIAL**          MA027367

### Hemorrhoids – bleeding
- Advise to pack rectum to stop bleeding
- Divert for excessive bleeding

### Infectious Disease

Resource: www.cdc.gov and www.who.int
- Universal Precautions
- SARS – certain airlines will prevent anyone with a fever of 38 ° or higher to fly during outbreaks of contagious disease
- Keep track of current information regarding infectious diseases worldwide.
- If someone develops symptoms of infectious respiratory illness in-flight the flight attendants should:
  - Offer a surgical mask to the passenger who is coughing/sneezing to prevent spread of infection.
  - If passenger unable to tolerate the mask – the FA should wear the mask when caring for the passenger.
  - Give passenger tissues, disposal container. Encourage frequent hand washing and use of hand gels.
  - Use universal precautions (gloves, hand washing)
  - Isolate from other passengers in an area of the plane where their air is less likely to be recirculated.
- Isolation/quarantine issues
  - Respiratory
  - Contact surface
  - Blood borne pathogens
  - Vector borne
    - Aircraft disinsection
- Treatment
- Cleaning aircraft/yacht – see CDC guidelines
- Reportable cases per CDC guidelines

### Neurological

**Seizures** – see prescreening
- First time seizure – Not advised to fly. Considerations of drug trafficking (i.e. mule) especially if flight originates in So. America, Caribbean, Mexico, Asia, Africa.
- Always consider an underlying medical cause (i.e. hypoglycemia, drug overdose, hypoxia, cardiac arrhythmia)
- Treat with valium or ativan – valium IM is absorbed very erratically.

**CONFIDENTIAL**     MA027368

## Vasovagal – most common complaint in-flight

- Often mistaken for a seizure
- Standard treatment
  - o Always place patient in supine position – recovery position
  - o Administer oxygen
  - o In the event of profound altered mental status (comatose) and condition cannot be reversed - diversion is required
  - o Give sweet liquids when fully awake and able to swallow
  - o Note age of patient
    - Young healthy patient – usually ok with prolonged period of hypotension and light-headedness
    - Older person with possible cardiac disease – could be cause for diversion if event is prolonged.
    - History of – pregnancy?, antihypertensives?, cardiovascular disease?  Diabetes?

## CVA

May be questioned about the need for immediate diversion for thrombolytics for treatment of stroke (AHA has big public information campaign)  ASA should only be given if sure that CVA is not a hemorrhage – no way to tell unless CT done!

- Involve passenger and family – this is essential
- Explain location, time constraints to divert, reach hospital, and complete evaluation/tests for safe administration of the drug.  The timeframe for thrombolytics may expire before the plane can land, transport to appropriate facility, do CT scan and give the medication IF it is even appropriate.
- Give option of diversion to family, patient – allow them to make the decision with you.

## OB/Gyn

### Preterm Labor

- Regardless of how advanced the pregnancy is – if pre-term labor begins – the rule of thumb is to administer terbutaline 0.25 mg s.c. may repeat q30min up to 1.0 mg (available on some international flights).
- Divert for all preterm labor – 18 weeks or greater

### Childbirth in-flight

- If the pregnancy is <36 weeks and delivery is imminent – consideration to diverting to the nearest hospital with a neonatal ICU for care of the infant.
- Divert for all laboring patients –
- Has not happened on a yacht or commercial ship in several decades. May be different for cruise industry but still extremely rare.
- Documentation
  - o Time of birth
  - o Note meconium staining

# CONFIDENTIAL

MA027369

- o  Note quality and strength of cry (APGARS) (see attached APGAR Scoring System)
  - o  Note overall color
- Birth certificate
  - o  Note time of birth
  - o  Sex
  - o  Birthplace is country of origin of parents (if parents are different nationality – would it be the mother?)
- Medical Care
  - o  Instruct crew in delivery process
  - o  After delivery care
  - o  Delivery of placenta
  - o  Uterine massage following delivery
  - o  Encourage breast-feeding to stimulate uterine contraction.
  - o  Some airlines (international carriers) carry ergotamine, pitocin

## Spontaneous AB

- Potential for severe bleeding
- If bleeding is severe – divert

## Possible tubal pregnancy

- Severe pain
- Evaluate the location, flight time, destination resources
- Diversion will be dependent upon the location, flight time, and destination resources.  Assess each case individually

## Orthopedic

Severe turbulence can result in severe orthopedic, spinal and back injuries and other severe trauma is possible

- Aviation – splint and seek medical assistance
- Maritime – if underway – may require ML physician to assist in relocation, splinting and stabilization for the long term until they can get medical assistance.
- Open fractures – maritime – should give antibiotics (oral and IV available)
- The ML physician may have to talk crew thru an orthopedic reduction if there is a dislocation.
- Maritime clients may have vacuum splints, backboard and HARE traction splint. Crew will likely need some direction for application and on-going assessment

**CONFIDENTIAL**            MA027370

•
## Pediatrics
- Many airlines do not carry meds that are appropriate or dosed for kids.
- Communications Specialists will request the weight of the child when getting the initial report.
- "The airline has the authority to provide care for unaccompanied minors".
- Some parents travel with pediatric medications.
- Very difficult to adapt adult meds for pediatric use.
- Pediatric kits are available to clients. Refer to individual kit lists.

## Substance Abuse
- Accidental drug overdose cases
  - not an automatic diversion
  - depends on patient condition, age, substance
  - Treatment
    - Naloxone if available by a medical person – can give sublingually, subcutaneous or IM
- Pearls for detecting possible "drug mule"
  - Flight originates from certain high risk locations (south America, Caribbean, Mexico, Africa)
  - Healthy person – first time seizure
  - Seizure is "real" as opposed to a Vasovagal or hypotensive event.
  - Secondary sign – history of not eating or drinking anything during the flight.

## Respiratory

### Asthma
- Treat with Albuterol or other beta agonist for bronchial dilation and oxygen
- All airlines carry the epi pen and an inhaler
- Personal "plug in" nebulizers are not functional in-flight due to the differences in electrical currents – not recommended to use these in-flight.
- There are oxygen concentrators available – battery pack – concentrates oxygen for personal use.

### Hypoxia
- Cabin altitudes are 6,000 – 8,000 ft.
- Normal for the respiratory rate to increase to accommodate for the decreased oxygen – reduced FiO2
- Refer to altitude physiology module

**CONFIDENTIAL**      MA027371

## Pulmonary Embolism – <u>HIGH PROFILE</u>

- Symptoms can be subtle or severe
- Risk factors (long flights, recent travel, smoker, obese, inactive, recent surgery, birth control pills)
- Tachypnea, tachycardia, chest pain, painful or swollen leg, shortness of breath.
- Divert if suspect PE – high profile legal cases. – error on the side of caution.

## <u>Trapped Gas Disorders</u> – see altitude physiology module

- Air embolism
- Bends
- Decompression Sickness
- Some vessels carry complete recompression facilities on-board

## <u>Diversion</u>

## Considerations for diversion

Diversions are very costly to the airline and should only be done if medically necessary.  Issues that concern airlines when a flight is diverted are (time, expenses, crew rest issues, aircraft maintenance, disruption of flight schedule, passengers who miss connecting flights, passengers/planes are late, may have delays on the ground if crew are out of duty time, etc)

## Authority to divert

- Ultimately the pilot in command – but he may ask ML directly for our recommendation.  If medical situation requires diversion – explain reasons why you recommend diversion (medical condition, deterioration if treatment delayed, lack of resources onboard, complications, what you think might be wrong with the passenger (SOB, tachycardia, calf pain – DVT/PE) communicate clearly your medical rationale for diversion or not to divert.

## Evaluation for Diversion

- Location –
  - o Where is the aircraft located now? (Middle of the ocean? Hostile/unsecure territory? Just about to leave the mainland and heading toward water?)  How long to the next appropriate destination?  Considerations for appropriate medical care at that location as well as aircraft landing/servicing capabilities.  Security concerns.
  - o Maritime may have similar security concerns but not as much activity in hostile areas. Weather is significant diversion factor. Must work with vessel master to determine most expedient port of refuge or diversion.

**CONFIDENTIAL**                    MA027372

- **Resources** – in-flight, at potential destination for diversion
  - o Medical – are there the medical resources onboard? (medical volunteers, first aid kits, EEMK, oxygen) What medical care does the patient need (CT, stroke team, cardiac team, OB etc) and do the potential diversion sites have those medical resources?
  - o Sometimes the medical resources at the destination are not as good as some enroute – passenger's medical condition indicates he will need hospitalization - the medical resources at the destination may not be appropriate – diversion may be necessary then.
  - o Security – Is it safe for passengers and aircraft to divert? How is security in the potential diversion sites? What are the security risks in the region? (i.e. Iraq, Middle East)
  - o Aviation – are there resources available to handle the size aircraft safely (runway length, landing support, emergency support, refueling, passenger handling etc) May need to dump fuel

- **Emergency situation –**
  - o What medically justifies a diversion?
  - o What is the medical emergency? Does it require immediate medical intervention – or can it be handled safely in-flight and have medical evaluation upon arrival. What are the complications if you don't divert? Is the medical condition likely to worsen and compromise life or limb? Is it time critical? And is diversion going to meet the time requirement?

- **Family/crew considerations.**
  - o Sometimes diversion is done for humane reasons – intractable pain from kidney stone, etc. and no one is onboard who can administer pain medication. Not a medical emergency. May want to involve passenger/family in decisions (time to destination, vs. diversion)
  - o Sometimes it might be necessary to divert if the family or crew is insistent and want to divert, even if there is no real need to divert.
  - o They need to be informed about what that means to them (they will be in a foreign or unfamiliar city, unknown healthcare, etc)

- **Bottom line for diversion decision –**
  - o If there are equal medical resources in several places – decision should be the location, which saves the most time/capable of landing the aircraft (runway size, fueling resources etc).
  - o Is patient stable enough to make destination – or is diversion required.

## Airline Specifics

### British Airways

- Does not like to involve onboard medical personnel
- Will always consult MedLink first
- If MedLink wants a medical professional to evaluate – must ask BA flight attendant to do so.

**CONFIDENTIAL**                    MA027373

## Ongoing Medical Care – Maritime

Maritime presents different set of concerns.  There are two phases of medical care:

1) Emergency/immediate situation

2) Ongoing care –

- Maritime emergencies that occur at sea – while underway – have to be managed after the initial first aid.  Unlike other calls, these situations are in the most remote place on earth – often there is no ability to evacuate – so ongoing care is essential.
- The ML physician must consider all the aspects of ongoing patient care that is required over several days.  Emergency care is often the same – but you can't leave someone on a backboard for several days – so the ML physician must recognize the remoteness of the situation and assist the crew in more in-depth patient assessment and management techniques.

## Ongoing Care Resources
- Nursing care (involve nursing for procedures i.e. Foley, insertion of NG, injections, ongoing nursing care for critically ill, etc)
- Physician specialists for ongoing care (i.e. managing a cardiac patient onboard while waiting for evacuation)

## Evacuation Resources
- **Helicopter evacuation**
  - Some vessels have embarked aircraft. Consider possibility of utilizing these airframes to perform evacuation.
  - Motor yachts MAY have ability to land SAR aircraft but this is unlikely. They will probably perform a basket-lift of the patient. Most crews are schooled in this procedure.
  - Sailing vessels will need to put patient in rescue boat or tender to do basket lift away from vessel (due to running and standing rigging supports of mast(s). Need consider potential hazards to patient/crew involved in this scenario.

- **Coast Guard evacuation**
  - May be able to evacuation to CG vessel instead of aircraft. However, if yacht is this close to shore, may be more expedient to continue to destination/diversion.
  - Possibility of mid-ocean evacuation to larger vessel (commercial ship, cruise ship, military ship, oil rig). Very hazardous undertaking but allows for larger platform to eventually land SAR helicopter.
  - Key is to coordinate all SAR evacuations with vessel master
  - Communication Specialists can determine appropriate global SAR region and contact numbers using database.

**CONFIDENTIAL**

MA027374

# EXHIBIT 21



| | **Global Services** | Doc. No./Rev. No | OPS 04-08 R1 |
|---|---|---|---|
| | **MedLink** | Revision Date | 07/22/2008 |
| | **Diversion Justification Worksheet** | Page | Page 1 of 2 |

| Case # | Zulu Date | Zulu Time | Company Name | Flight # |
|---|---|---|---|---|
| | | | | |

| PHYSICIAN SIGNATURE | PRINT NAME |
|---|---|
| | |

MedLink Doctor – complete this section **only** when notified that a diversion is **ALREADY** in progress.

### DIVERSION IN PROGRESS – INITIATED BY PILOT

☐ **AGREE** Check this box if you agree with pilot's decision to divert  (CS check "MedLink Recommended")   ☐ **DISAGREE** Check this box if you disagree with pilot's decision to divert  (CS check "Pilot Initiated")

Explain:

### MEDLINK PHYSICAN INITIATED DIVERSION

### STEP 1: Determine Diversion Necessity

**Factors to consider prior to recommending diversion:**

☐ **YES** ☐ **NO Medical personnel** onboard? If yes, request evaluation of passenger by medical personnel.

☐ **YES** ☐ **NO Telemedicine** (e.g.Tempus) device available?  If yes, request transmission of vital signs.

**Reason for Diversion / Initial evaluation:** (Check one)

☐ Passenger is unstable.

   Describe: _____

☐ Passenger potentially unstable, unable to rule out life threat (ex. possible ACS, PE etc.).

   Describe: _____

☐ Passenger in severe distress, not life-threatening (ex. renal colic, urinary retention etc.).

   Describe: _____

☐ Passenger not unstable currently, but too long to destination (ex. COPD exacerbation, pre-term labor, etc.).

   Describe: _____

☐ Passenger with potentially unstable condition (ex. possible miscarriage, recurrent seizures, etc.), leaving area with adequate medical facilities (ex. heading over water, Africa, Central Asia, Russia, Amazon, etc.).

   Describe: _____

☐ Other.

   Describe: _____

### STEP 2: Confirm Dispatch Online for Diversion Options

| Is Dispatch Online ☐ YES   ☐NO<br>If **No**, CS - conference in dispatch. | **CS** - if dispatch is not involved in call provide explanation: |
|---|---|

### STEP 3: Alert Pilot to Recommended Landing Timeframe

☐ **ASAP**, closest appropriate landing facility is required due to medical necessity.

☐ **Within** _____ **hrs/min.**, closest appropriate landing facility, medical necessity allows for a larger landing window.
   (timeframe)

This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 6/28/2016

# CONFIDENTIAL

MA027054

MedAire, Inc.   **MedLink Diversion Justification Worksheet**   OPS 04-08/R1
REV: 07/22/2008                                                   Page 2 of 2

## STEP 4: Determine Most Appropriate Diversion Points

| Diversion City, Country (IATA/ICAO) | Time to destination | Appropriate Medical Facilities |
|---|---|---|
| | | ☐ YES   ☐NO |
| | | ☐ YES   ☐NO |
| | | ☐ YES   ☐NO |

**Diversion Factors to Consider:**

☐ **YES** ☐ **NO** Does the diversion location have adequate medical facilities to care for the ill/injured passenger?

☐ **YES** ☐ **NO** Is the time of arrival at original destination **less than 1 hour?** If yes, reconsider diversion recommendation.

☐ **YES** ☐ **NO** Is the time of arrival at diversion location **greater** than **1 hour?** If yes, consider reassessing the passenger for diversion necessity.   ☐ **Repatch in:** _____

## STEP 5: Factors That Might Have Avoided This Diversion

☐ Personnel to administer parenteral medication.
   Describe: _____

☐ Medical personnel to better evaluate passenger condition.

☐ Medication not available in medical kit: **(name)**_____

☐ Supply or equipment issues (ex. oxygen, IV fluids, etc.)
   Describe: _____

☐ Additional medical information not available (oxymetry, 12 lead ECG, glucometer): _____

☐ Other factors that might have prevented this diversion?
   Describe: _____

MEDLINK PHYSICIAN NOTES

## STEP 6: EMS Arrangements

Authority: _____   Zulu time arranged: _____

Contact Name/Op ID#:_____   EMS Arranged: ☐ Yes

| COMMUNICATION SPECIALIST NOTES | |
|---|---|
| | |
| | |
| **COMMUNICATION SPECIALIST  SIGNATURE** | **PRINT NAME** |
| | |

This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 6/28/2016

# CONFIDENTIAL

MA027055

# EXHIBIT 22

| DATE 3 23 12 | TIME 1928 | MEDIC Drew | ☐ ALS UNIT 19 ☐ BLS | ETA 8 |

**NAME** | | | AGE 61 | SEX M | WT

**COMPLAINT** Running to catch flight.

CP 6/10 c̄ SOB

**PT MEDICATIONS**
☐ NO MEDS

**PMHX:** ☐ CARDIAC  ☐ HTN  ☐ DM  ☐ CVA  ☐ SEIZ  ☐ COPD  ☐ ASTHMA  ☒

| VS/TIME | | | | SKIN | CAP REFILL | EYES | PT. ALLERGIES |
|---|---|---|---|---|---|---|---|
| BP | 94/80 | 94/70 | | ☒ WARM & DRY | ☐ NORMAL | ☒ RERRL | ☐ NKA |
| PULSE | 98 | | | ☐ DIAPHORETIC | ☐ DELAYED | ☐ DL | |
| RESP | | | | ☐ COOL  ☐ HOT | | ☐ CONST | |
| O2 SAT | 84% → 88% | | | | | R  L | 0mm  4mm |

**MONITOR:** ☐ NSR  ☐ NO ECTOPY  ☐ PVC's  ☐ SINUS TACH  ☐ A. FIB  ☐ Other: V-leads S-T-elev

**PHYSICAL EXAM:** ☐ EXAM UNREMARKABLE

**NEURO:** ☐ A & O  ☐ UNCONSC  ☐ MOVES ALL EXT  ☐ RESPONDS TO PAIN

**LUNG SOUNDS:** ☐ CLEAR & EQUAL  ☐ WHEEZES  ☐ RALES

**ABD:** ☐ SOFT  ☐ RIGID  ☐ NONTENDER  ☐ TENDER

**GLUCOSE:** 108 ( N = 65mg/dl - 110mg/dl )

**ELD TREATMENT**

**BLS:** ☐ O2: _____ L NC or MASK  ☐ C-SPINE/BACKBOARD

**ALS:** ☐ IV:  ☐ TKO  ☐ BOLUS _____ ml  **SVN:** ☐ ALBUTEROL  ☐ OTHER: _____

**ACLS:** ☐ COMPRESSIONS  ☐ BVM  ☐ INTUBATED  ☐ DEFIB

**MEDS GIVEN:**

O2  324mg ASA  Nitro x1  Ø relief

**NOTES/ORDERS:** | ROOM #

CP now

**PHYSICIAN's SIGNATURE:**

**NURSE's SIGNATURE** | QA: ☐ YES  ☐ NO

A 1208300109  M EDA QEA
BAILLE, JAMES
07/20/50  61Y  S
03/23/12  77-15-46
HESS, BRIAN

EDRNAS

St. Luke's Medical Center
☐ St. Luke's Behavioral Health Center  Page 1 of 1
☐ Tempe St. Luke's Hospital
☐ Mesa General Hospital
☐ Mountain Vista Medical Center

**PREHOSPITAL MEDICAL DIRECTION**

MRCOM20368 (REV 3/08)

Baille, James

**WHITE** = Medical Records | **YELLOW** = Paramedic Coordinator

CONFIDENTIAL

Form # 142370 PHOENIX FIRE DEPARTMENT EMS INCIDENT REPORT    Supplement ☐.    Page # _____

| YEAR | INCIDENT NUMBER | COMPANY NUMBER | CITY | COMPANY REPORTING | SHIFT | ALARM DATE M | M | D | D | UNITS PROVIDING CARE | UNITS PROVIDING CARE | TRANS UNIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 2 | 0 9 8 3 8 4 | P | A | 4 5 | A | 0 | 3 | 2 | 3 | | | R25 |

ADDRESS 3600 E SKYHARBOR # 1525

| | EMT/CEP # | EMT/CEP # |
|---|---|---|
| | A: 35086 | B: 37077 |

TIMES APPROXIMATE

| DISP | PT CONTACT | LV HOSP | AT HOSP | PT TRANSFER | EMT/CEP # | EMT/CEP # |
|---|---|---|---|---|---|---|
| 1832 | 1850 | 1922 | 1932 | 1936 | C: | D: |

SERVICE DELIVERED:  NE☐  BLS☐  ALS☒  HOSPITAL 5☐ 7  REASON ☐  REFUSAL.  RELEASE☐

| NAME JAMES DONALD BAILLIE | AGE 61 | SEX M / WT | DOB 7/25/50 | SSN |
|---|---|---|---|---|

ADDRESS 3445 E INDIGO CIR.

| | |
|---|---|
| CITY MESA   STATE   ZIP 85213 | APPX TIME: |
| PMH CARDIAC☐ .HBP☐ CVA☐ RESP☐ SEIZ☐ DIAB☐ | BP 94/80 94/78 102/50 / |
| CA☐ PREG☐ G___ P___ DUE DATE / LMP: | PULSE 98 StR 99 StR 96 StR |
| DENIES☒ | RESP 18 54 20 54 20 54 |
| RX/S DENIES☒ | SKIN W/D/PK W/D/PK W/D/PK |
| | PUPILS PERL PERL PERL |
| | GCS / ETCO2 15/21 15/24 15/24 / |
| ALLERGIES DENIES☒ | CAP RFL NML NML NML |
| DR/GROUP · · | PULSE OX RA 79 88% 86% |

C/C CHEST TIGHTNESS C D/B    ONSET TIME    PAIN .NONE☐ MIN☐ MOD☐ SEVERE☐ 1:10 SCALE ____

HPI/MOI: PT WAS RUNNING TO CATCH HIS FLIGHT IN LONDON FOR X 10 MIN, UPON ARRIVAL ON AIRPLANE PT COMPLAINED OF 4/PRESSURE OF 7/10 C D/B. 2 DRS ON BOARD ADMINISTERED O2 + ASA ONLY, PT ON PLANE FOR X 11 HOURS BEFORE LANDING IN PHX.

**CLINICAL FINDINGS**   **REPORTED HISTORY OF**

LOC AWAKE☒ ALERT☒ ORIENTED PERSON☒ PLACE☒ TIME☒ EVENTS☒  UNCON YES☐ NO☒ UNK☐   NEAR SYNCOPE YES☐ NO☒ UNK☐

☐ NO CLINICAL FINDINGS  PT'S STATED NEEDS

HEAD/FACE

NECK:

CHEST MIO LINE PRESSURE 7/10 DOWN TO 3/10 UPON CONTACT, S.O.B NON RADIATING R S C + E

ABD: NAUSEA, NO VOMITING, SNT

PELVIS

EXT

BACK

| UNIT/EMT/ CEP # | APPX TIME | TREATMENT / PROCEDURE | RESPONSE TO TREATMENT | HOSPITAL COMMUNICATION @ ____ |
|---|---|---|---|---|
| A | | O2 @ 15 · l/m  NASAL CANNULA☐  OPA☐  FACE MASK☒  BVM☐ | | CN ☐ RF☒   PATCH ☐ AB☐ |
| R | | EKG: SINUS @ 98 C STT IN V, THRU V6 | | PATCH ☐ RF☐   CN ☐ PATCH☐ |
| A | | IV: 20 g (L) HAND 10w CC NS @ 30 cc/hr | | CONTACT PERSON CHELSEY  RN☐ DR☒ PDM☐ BASE |
| A | | ASA 324 mg PO | | HOSPITAL DIVERSION? YES☐ NO☒ |
| A | | NTG SPRAY 0.4 mg SC | | NFO☒  PHYSICIAN'S ORDERS☐ |
| B | | 250 CC FLUID BOLUS BP ↑ TO 102/50 | | |

| | | | | MISCELLANEOUS PROCEDURES |
|---|---|---|---|---|
| | | | | BLOOD GLUCOSE 108 mg/dl @ ____ |
| | | | | BLOOD GLUCOSE ____ mg/dl @ ____ |

| STATUS O/A HOSP: | CHANGED UNCHANGED☒ | EKG: | CHANGED☐ INTUBATION☐ UNCHANGED☒ INTACT☐ | YES☐ IV PATIENT☐ NO ☐ O/A HOSP? | YES☒ NO ☐ | TOTAL FLUIDS 350 | CCS |
|---|---|---|---|---|---|---|---|

| FU ____ BG ____ | A 1208300109   M EDA QEA |
|---|---|

(PRINT) 37077  EMT / CEP ACCEPTING PATIENT

EMT [ ]

CEP ☒ D. FREEMAN

CITY OF PHOENIX, ARIZONA

RN ADR ACCEPTING PATIENT

TO PATIENT MEDICAL RECORDS

BAILLIE,JAMES
07/20/50  61Y
03/23/12  77-15-46
HESS,BRIAN

## • ASSESSMENT AND DOCUMENTATION GUIDE SHEET •

When completing an EMS Incident Report, the **CLINICAL FINDINGS** of a patient can be documented in one of two ways:

1. Document pertinent positive and negative findings in a narrative form (This is our traditional past practice per Volume 12).
2. Place an "X" for NO CLINICAL FINDINGS next to those portions of the physical exam without signs or symptoms. When a positive finding is identified during the physical exam, it must be narrated on the form, along with any pertinent positive **or** negative findings in that section of the physical.

An "X" for **NO CLINICAL FINDINGS** means that a *complete* physical assessment has been conducted for that portion of the physical exam.

An "X" next to **HEAD / FACE** means that:

• Speech is clear and appropriate.
• There is *no* complaint of dizziness, headache or pain.
• Gaze is conjugate.
• Face is symmetrical without facial droop or drooling.
• Vision is normal.
• Upper airway is patent.
• Skull and face are intact with no sign of soft tissue injury.
• Ears and nose are clear of blood or CSF.
• There is *no* cyanosis of the lips.

An "X" next to **NECK** means that:

• There is *no* jugular venous distention.
• Trachea is midline.
• There are *no* soft tissue injuries or subcutaneous emphysema.
• There is *no* pain, tenderness or deformity on palpation.
• There is *no* reported weakness or paralysis.

An "X" next to **CHEST** means that:

• Lungs are clear and equal with good chest expansion.
• There is *no* evidence of shortness of breath such as stridor, supraclavicular, intercostal or sternal retractions, crackles, wheezing, inability to complete a sentence.
• There is *no* evidence of cardiac chest pain such as a stabbing or crushing substernal chest pain, pain radiation to the neck or upper arm, dizziness, or diaphoresis.
• There are *no* signs of trauma such as pain on palpation, tenderness, deformity, soft tissue injury, crepitus, subcutaneous air or the presence of a sucking chest wound.

An "X" next to **ABD** means that:

• The abdomen is soft, non-tender on palpation and without distension, pulsitile masses or rigidity.
• There is *no* report of nausea, vomiting or diarrhea.
• There is *no* guarding.
• There is *no* soft tissue injury.

An "X" next to **PELVIS** means that:

• There is *no* urine or fecal incontinence.
• Pelvis is stable to light pelvic squeeze and without pain, tenderness or crepitus.
• There is *no* blood from the urethra, vagina or rectum.
• There is *no* soft tissue injury.

An "X" next to **EXT** means that:

• Distal neurovascular function is present in all extremities.
• There is *no* pedal edema.
• There is *no* complaint of paralysis, weakness or pins and needles sensation.
• There is *no* pain, tenderness, deformity, crepitus or soft tissue injury.
• Grips, pushes and pulls are adequate and equal.

An "X" next to **BACK** may indicate that:

• Chest wall expansion of the back is symmetrical and without intercostal retractions.
• There is *no* evidence of trauma such as pain, tenderness, deformity, crepitus or soft tissue injury, or a sucking chest wound.

## • PHONE NUMBERS •

### CRISIS PHONE NUMBERS

| | |
|---|---|
| Adult Protective Services | 602-255-0996 |
| Alcoholism Info Ctr. | 602-264-6214 |
| Alternative Behavior Systems | 602-344-1945 |
| Child Crisis Center | 602-254-9000 |
| County Psych Annex thru ABS | 602-344-1945 |
| Empact (Crisis Team) | 602-222-9444 |

### OTHER PHONE NUMBERS

| | |
|---|---|
| Poison Control Center | 602-253-3334 |

### PFD PHONE NUMBERS

| | |
|---|---|
| AHQ Customer Service Rep. | 602-495-5555 |
| Alarm Room Supervisor | 602-262-7496 |
| Alarm Room | 602-262-6595 |
| Battalion 1 | 602-262-7339 |
| Battalion 2 | 602-261-8324 |
| Battalion 3 | 602-261-8446 |
| Battalion 5 | 602-495-0872 |
| Battalion 6 | 602-495-2090 |
| Battalion 8 | 602-262-4697 |
| Battalion 19 | 602-495-2090 |
| Central District | 602-256-3227 |
| East District | 602-262-6370 |
| North District | 602-261-8530 |
| Phx / Laveen District | 602-237-2083 |
| West District | 602-262-7589 |
| Aviation | 602-262-7155 |
| Car 614 | 602-261-8744 |
| ODFM | 602-262-7840 |

### HOSPITAL COMMUNICATION
(Patch or Courtesy Notification)

| | |
|---|---|
| Arizona Heart (AZ) | 602-532-2047 |
| Arrowhead Community (AH) | 623-561-1380 |
| Boswell (BP) | 623-974-3277 |
| Chandler Regional (CC) | 480-963-0771 |
| Del Webb (DW) | 623-214-4066 |
| Desert Samaritan (DS) | 480-834-0566 |
| Good Samaritan (GS) | 602-256-7747 |
| JCL — Deer Valley (GB) | 623-879-6203 |
| JCL — North Mtn (JC) | 602-997-7165 |
| Maricopa Medical Center (CH) | 602-344-5720 |
| Maryvale (MS) | 623-848-5204 |
| Paradise Valley (DV) | 602-923-5799 |
| St. Joseph's (SJ) | 602-406-3133 |
| St. Luke's (SL) | 602-252-2796 |
| Scottsdale – Osborn (SM) | 480-941-0973 |
| Scottsdale – Shea (SN) | 480-391-7718 |
| Tempe St. Luke's (TC) | 480-829-6998 |
| Thunderbird Samaritan (TS) | 602-588-5503 |
| AZ Heart Hospital (AZ) | 602-532-2047 |

**(Courtesy Notification Only)**

| | |
|---|---|
| Phoenix Baptist (BP) | 602-246-5999 |
| Mayo (MY) | 480-342-0112 |
| Mesa General (MG) | 480-844-6285 |
| Mesa Lutheran (MC) | 480-461-2701 |
| Phoenix Childrens (PC) | 602-546-1920 |
| Phoenix Indian Hospital | 602-263-1508 |
| V.A. Medical Center (VA) | 602-222-2753 |

A 1208300109   M  ICU  IPA
BAILLIE,JAMES
07/20/50   61Y  11-A   P
03/23/12   77-15-46
CANDIPAN,ROBERT

JDB - 12969

CITY OF PHOENIX, ARIZONA   **FIRE DEPARTMENT EMS INCIDENT REPORT**

INCIDENT NUMBER   NUMBER   ALARM DATE   M  M  D  D  DOW

PATIENT NAME

A 1208300109   M EDA QEA
BAILLE,JAMES
07/20/50   61Y         S
03/23/12   77-15-46
HESS,BRIAN

EKG SUPPLEMENT

JDB - 12970

CONFIDENTIAL

Event ID :1203231902503847 ID : 23-Mar-2012 19:07:14    PFD NINETEEN



Page 1 of 2        E=19  25 mm/sec  Limb 10mm/mV  Chest 10 mm/mV        0.05 Hz    0 Hz   PH100B P7

aVR  V1  V4
aVL  V2  V5
III  aVF  V3  V6

:TART MRx        REORDER NO: 989803138171 / 989803138181                                    108        **PHILIPS**

Event ID :1203231902503847 ID : 23-Mar-2012 19:07:14    61 years MALE



| HR | 98 | Sinus rhythm | normal P axis; V rate 50-99 |
| PR | 169 | Right bundle branch block | QRSd>120, terminal axis(90,270) |
| QRSD | 14 | Anterolateral infarct acute (LAD) | ST >0.20mV; V2-V6,I,aVL |
| QT | 370 | | |
| QTc | 484 | | |
| Axis | | | |
| P | 65 | | |
| QRS | 85 | | |
| T | 57 | | |

ABNORMAL ECG                    Unconfirmed diagnosis

Page 2 of 2        E=19                    PH100B P7

:TART MRx        REORDER NO: 989803138171 / 989803138181                                           **PHILIPS**

REMARK

92-45 8D Nov 8/91

CITY OF PHOENIX, ARIZONA   **FIRE DEPARTMENT EMS INCIDENT REPORT**

INCIDENT NUMBER

ALARM DATE
M M D D DOW

PATIENT NAME   JAMES

A  1208300109     M  EDA  QEA     JPPLEMENT
BAILLE, JAMES
07/20/50     61Y          S
03/23/12     77-15-46
HESS, BRIAN

JDB - 12971

CONFIDENTIAL



\MRx     REORDER NO: 989803138171 / 989803138181          108          **PHILIPS**     H E

REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE

REMARKS

REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE
REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE
REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE

REMARKS

92-45 8D New 8/91

**EMERGENCY TRANSPORTATION SERVICES**

INCIDENT # 2012 088384        RESCUE # 29        REPORTING EMS CO.: E19        DATE: 23-MARCH-2012

**PATIENT**
LAST NAME: BAILLE
(JR,SR,II,III)
FIRST NAME: JAMES
MID INITIAL:
D.O.B.: 7-20-50
ADDRESS: 3445 E INDIGO CIRCLE    APT #    AREA CODE  PHONE #
CITY: MESA    STATE: AZ    ZIP CODE:    GENDER: M    SS #

**RESP PARTY**
LAST NAME:    FIRST NAME:    AREA CODE  PHONE # ( )    EMPLOYER:
ADDRESS:    APT #    AREA CODE  PHONE # ( )
CITY:    STATE:    ZIP CODE:    (ETS USE)

**INSURER**
AHCCCS PLAN:    AHCCCS ID #:    RATE CODE:    OTHER INS:    ID #:
MEDICARE #:    OTHER MED INS:    ☐ RISK ☐ COMM    ID #:    GROUP #:

**INC INFO**
DISP TIME: 1901    ON SC TIME: 1907    LV TIME: 1920    HOSP TIME:    DRIVER: S CHECANI    ATTENDANT: M DUDZINSKI    ETS USE
ON SCENE ADDRESS: 3800 E SKY HARBOR    HOSPITAL CODE:    MILES:    ETS USE

☐ ALS 1   ☒ ALS 2   ☐ BLS    TX: ☒O2 ☒EKG ☒IV(successful)   ☐ IV ATTEMPT(unsuccessful)   ☐ INTUBATION

SPINAL IMMOBILIZATION
☐ full mech   ☐ vacuum   ☐ manual

C/C or REASON FOR ENCOUNTER: CHEST PAIN

HPI / MOI: ONSET DURING FLIGHT FROM LONDON

PERTINENT PMH: CARDIAC

VALUABLES TRANSFERRED: ∅    TO:

ETS USE

| | TIME | TIME |
|---|---|---|
| TRANSPORT | | |
| VITALS | 1922 | 1927 |
| BP | 94/76 | 96/72 |
| PULSE | 100 S/R | 96 S/R |
| RESP | 20 NL | 16 NL |
| SKIN | W DP | W DP |
| PUPILS | PERL | PERL |

**RESCUE**
__ 461 Sheets (set)
__ 442 Gloves (pair)

**ECG / DEFIB / PACE**
__ 427 Electrodes (set)
__ 429 Multi pads (set)

**C-SPINE / SPLINT**
__ 301 Headblock
__ 302 C-collar, adult
__ 303 C-collar, other
__ 305 Extremity splint
__ 310 Straps (10pt)

**SYRINGES**
__ 435 10 cc
__ 438 20 cc
__ 439 60 cc

**O2 / AIRWAY / SUCTION**
__ 101 Oxygen
__ 201 Cannula, adult
__ 202 Cannula, ped
__ 203 O2 mask, adult
__ 204 O2 mask, other
__ 206 OPA
__ 213 NPA
__ 218 BVM, adult
__ 219 BVM, pediatric
__ 233 ET kit (7.0 - 8.5)
__ 237 Endotrol ET
__ 223 ET (2.5-6.5, 9.0)
__ 240 ET holder, adult
__ 241 ET holder, ped
__ 277 Combitube
__ 251 Cricothyro kit
__ 253 Intubat detect
__ 254 BAAM
__ 449 SVN
__ 278 Filterline set
__ 279 Capnoline
__ 257 Yankauer tip
__ 265 Suction cath
__ 259 Suction canister
__ 264 Mecon aspirator
__ 270 NG tube

**IV / IO SUPPLIES**
__ 501 IV Start kit
__ 502 Catheter, 12g
__ 503 Catheter,14-24g
__ 512 IV tubing, micro
__ 513 IV tubing, macro
__ 518 Saline, 250 ml
__ 519 Saline, 1000 ml
__ 520 LR, 1000 ml
__ 517 Saline. 50 ml
__ 521 Dex5%, 250 ml
__ 509 Central line set
__ 510 IO needle, 15g
__ 511 IO holder
__ 527 Sternal IO device
__ 526 Pressure infuser

**BLOOD GLUCOSE**
__ 431 Test kit
__ 433 Test strip

**OTHER**
__ 416 Blanket
__ 424 Pulse ox probe
__ 422 OB kit
__ 406 Trauma dressing
__ 408 Petroleum gauze
__ 409 Chest seal
__ 419 Cold pack

**BURN**
__ 410 4"x4" dressing
__ 411 8"x8" dressing
__ 414 Burn sheet

**MEDICATIONS**
__ 603 Adenosine 6mg
__ 604 Albuterol 2.5mg
__ 606 Aspirin 81mg
__ 607 Atropine 1mg
__ 608 Atropine 8mg vial
__ 632 Atrovent .5mg
__ 610 Calcium Chlor 1g
__ 602 Charcoal 50g
__ 611 Dextrose 25g
__ 612 Diphenhyd 50mg
__ 613 Dopamine 400mg
__ 615 Epi 1:10k 1mg/10ml
__ 614 Epi 1:1k 1mg/1ml
__ 616 Epi 1:1k 30ml vial
__ 617 Furosemide 40mg
__ 618 Glucagon 1mg
__ 601 Glucose, oral 15g
__ 619 Lidocaine 100mg
__ 620 Lido premix bag
__ 621 Mag sulfate 1g
__ 622 Mthyl pred 125mg
__ 623 Naloxone 2mg
__ 626 Nitro .4mg
__ 628 Phenyleph 15ml
__ 625 Saline (inhal) 3ml
__ 629 Sdm Bicarb 50ml
__ 630 Thiamine 100mg
__ 631 Verapamil 5mg

A 1208300109
BAILLE,JAMES
07/20/50    61Y
03/23/12    77-15-46
M.R. / A#        HESS,BRIAN

M  EDA  QEA

S

| MED # | ROUTE | DOSE | MED # | ROUTE | DOSE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

(ROUTES):  IV- intravenous    R-rectal    SL- sublingual    I- inhalation (SVN)    SQ- subcutaneous
ET- endotracheel (tube)    PO- oral    N- nasal    IM- intramuscular    IO- intraosseous

I request that payment of authorized Medicare, Medicaid, or ... ance benefits be made on my behalf to City of Phoenix/Emergency Transportation Services ("COP/ETS") for any services provided to me by COP/ETS now or in the future. I understand that I am financially responsible for the services provided to me by COP/ETS, regardless of my insurance coverage, and in some cases, may be responsible for an amount in addition to that which was paid by my insurance. I agree to immediately remit to COP/ETS any payments that I receive directly from insurance or any source whatsoever for the services provided to me and I assign all rights to such payments to COP/ETS. I authorize COP/ETS to appeal payment denials or other adverse decisions on my behalf without further authorization. I authorize and direct any holder of medical information or documentation about me to release such information to COP/ETS and its billing agents, and/or the Centers for Medicare and Medicaid Services and its carriers and agents, and/or any other payers or insurers as may be necessary to determine these or other benefits payable for any services provided to me by COP/ETS, now or in the future. A copy of this form is as valid as an original. I acknowledge that I have been provided a copy of COP/ETS' Notice of Privacy Practices. **If PUTS and rep unable to sign, crewmember must sign at bottom-right and give reason here:**

_____ @ _____

Dr. / R.N. accepting patient        (time)        Signature of patient (or representative* - see below)        Signature of Crewmember (patient unable to sign)
Dist.: Original- ETS  Pink- Patient  Gold- Hospital        *relationship to pt: _____        92-14D Revised 01/08    61582505287-CP

CONFIDENTIAL        JDB - 12972

# EXHIBIT 23

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

Age: 61y   Race: Unknown
Name: JAMES BAILLE
Accnt.# 1208300109

Room:
DOB: 07/20/1950  Sex: M
MR # A00771546

## Nursing Documentation : Triage

| Date 03/23/2012 19:32 | Source: ☑ Patient ☐ EMS other: | Weight: | Height: |
|---|---|---|---|
| Tetanus vac.:   UNK | Immunizat.:      Head circumference: | Birth weight: | Birth height: |
| Pneumonia vacc.: Unknown   PMD: | | | |
| Influenza vacc.:   Unknown | | | |

| Chief Complaint / Reason for visit: | Chest Pain |
|---|---|
| Return visit same day | PT running to catch flight in London this AM. SUdden onset of midsternal cp 7/10. Flew to Phx w/ |
| Return visit within 72 hours | ongoing cp. PT rates pain 4-5/10 midsternal, sats on EMS arrival 75% and only reached 85% on non- |
| Workers compensation | rebreather. PT given 324 ASA x 2 and NTG 0.4mg x 1, ST elevation reported by EMS. |

**Treatment Prior to Arrival:**  none  CPR  Airway  (Medications)  ACLS Protocol  Decon  Intubation
(IV)  (O2 Therapy)  C-collar/Backboard  (Monitor)  Ice  Splint(s)  Dressing(s)  Glucose

**Pain Intensity Rate:** 3    @ rest: 3    Onset: 1    ☐ min ☐ hrs ☑ days ☐ weeks

Severity: ☐ none ☑ mild ☐ moderate ☐ severe  Location: Midsternal chest

Radiation of pain:  Denies

Precipitating factors: -

**MODE / METHOD OF ACCESS**
Arrival Mode:     Engine 19
Entered by:       Stretcher
Admitted from:    Airport
Exposure history: HIV AIDS SARS STD
symptoms:

| VITAL SIGNS TAKEN: | ☐ SITTING ☐ LAYING ☐ STANDING | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Time | Temp | Route | Pulse | Resp | SBP | DBP | Pulse Ox | O₂ |
| 03/23/2012 19:35 | | Oral | 98 | 20 | 103 | 73 | 83 | 15L |

**Orthostatic Vital Signs**

| | Lay | Sit | Stand |
|---|---|---|---|
| Pulse | | | |
| SBP | | | |
| DBP | | | |

| ALLERGIES | ☐ none |
|---|---|
| (NKDA) | |

| MEDICATIONS | ☑ none |
|---|---|

Airway:    (clear)  obstructed    intubated
Breathing: (WNL)
Neuro:     (oriented) ☑ x4 ☐ person ☐ place
           ☐ time ☐ situation
           dementia    decreased LOC
           unconscious/comatose
Skin:      (warm & dry) hot  cool    cold
           clammy    diaphoretic  pale

Trauma Assessment:    Trauma
☐ Assault  ☐ Stab  ☐ GSW  ☐ Fire
☐ Fall

| CONDITIONS | ☑ none |
|---|---|
| Alzheimer Anxiety Arthritis * Asthma Autism Back pain Bi-polar Blind * Bronchitis Cancer Cataract CHF Constipation COPD CVA Depression Diabetes * Diverticulitis Dysrhythmia Ectopic * GI bleed Glaucoma HTN Kidney stones MI Migraine Osteoporosis Parkinson's Pneumonia Prostate Schizophrenia Seizures Thyroid * TIA Ulcers UTI | |

☐ MVC Speed(mph):      Airbag  Restrained
☐ Driver ☐ Passenger ☐ Front ☐ Rear
☐ Motorcycle   ☐ Bicycle     Helmet
Impact:   ☐ Rear        ☐ Front ☐ T-Bone
☐ Other

**TRIAGE INTERVENTION(s):**
☐ None  ☐ Ice / Elevation  ☐ Dressing / Splint
☑ EKG  ☐ C-Collar ☐ Glucose
☐ Respiratory Precautions
☐ Visual Acuity

| PROCEDURES | ☑ none |
|---|---|
| Appendectomy Arthroplasty Back surgery/fusion CABG Cardiac catheterization Cholecystectomy Craniotomy Gastric bypass Gastric resection Hysterectomy Inguinal hernia repair Neck surgery/fusion Tonsillectomy Umbilical hernia repair | |

R20/        L20/        B20/

| FAMILY HISTORY | ☑ none |
|---|---|
| Asthma (CAD) Cancer COPD CVA Diabetes * DM HTN Seizures (MI) | |

Afraid at home      (Someone to care for you home)
Coughing up blood  Recent positive TB skin test
Currently being treated for TB
Night sweats in last 6 months

| SOCIAL HISTORY Lives: ☐ alone ☑ spouse ☐ family ☐ nursing home |
|---|
| Smoking          Alcohol          Drug abuse |

Unplanned weight loss >10 lbs in past 6 months
Travelled out of the country within last 30 days

| ADVANCE DIRECTIVES ☐ none | ☐ Living will | ☐ DNR | ☐ Information Given |
|---|---|---|---|
| Triage Category: | Triage Disposition Time: | Triage Nurse Signature: | Triage Nurse Initials: |
| I | 03/23/2012 19:32 | | CGC |

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85006    Phone: (602) 251-8183

Age: 61y  Race: Unknown          Room:
Name: JAMES BAILLE              DOB: 07/20/1950  Sex: M
Accnt.# 1208300109             MR # A00771546

## EMERGENCY PHYSICIAN RECORD: CRITICAL CARE

Time Seen: 03/23/2012 19:48  Historian: ☑ patient ☐ EMS ☐ caretaker    History limited by: _____  ☐ Translator

### CHIEF COMPLAINT
unresponsive   syncope   dyspnea   SOB
(chest pain)   GI bleed   seizure   drug overdose

### PROCEDURES    ☑ none

Note:

### HISTORY OF PRESENT ILLNESS
Arrival in ED: (via EMS)   via private car
Onset: 11 hours     (prior to arrival)  unknown
Activity at onset:  unknown   rest   light / (heavy activity)
Symptoms prior to arrival:  unknown  (SOB) (chest pain)
tightness  (general weakness)  malaise
Alleviating factors: nothing
Exacerbating factors: nothing

### FAMILY HISTORY    ☑ none
(CAD)(MI)

Note:

### SOCIAL HISTORY    unknown    Agree with nurse's notes
alcohol  tobacco  drug abuse
lives:  ☐ alone  ☐ spouse  ☐ family  ☐ nursing home
☐ occupation

### MEDICATIONS    ☑ none

### PREHOSPITAL COURSE
Initial EMS findings: (alert)  confused  unresponsive
Respirations:  NL  dyspneic  (shallow)  apneic
Management:  intubated  CPR  BVM ventilation
finger stick BS _____  ☐ IV epinephrine
oxygen          ☐ IV lidocaine
IV access established  ☐ IV atropine
defibrillated / cardioverted  ☐ IV amiodarone

### ALLERGIES    ☐ none
(NKDA)

### REVIEW OF SYSTEMS
☑ ROS: ALL SYSTEMS REVIEWED AND NEGATIVE EXCEPT AS INDICATE
☐ ROS can not be obtained; patient unable to answer questions

| | | |
|---|---|---|
|General:|NL fever chills sweats  weight loss||
|Eyes:|NL visual complaints||
|ENT:|NL sore throat|nasal congestion|
|Resp:|NL cough|wheeze  (SOB) DOE|
|CV:|NL (chest pain)|palpitations  syncope|
|GI:|NL nausea|vomiting  diarrhea|
||constipation|hematochezia  heart burn|
||melena|abdominal pain|
|GU:|NL flank pain|urgency  frequency|
||hematuria|dysuria|
|Skeletal:|NL calf pain|leg pain  back pain|
||arthralgia|myalgia|
|Skin:|NL rash||
|Neuro/Psych:|NL headache|anxiety  confusion|
||focal weakness||
|Endocrine:|NL weight change|polyuria  polydypsia|

CAD risk factors: smoker  HTN  (age)  diabetes  (family hx)
cocaine use  hyperlipidemia  previous CAD
AAA Risk Factors: PVD  HTN  family history  smoker
prior AAA  CTD (Marfan's)
Pulmonary embolus risk factors:  hx or risk of DVT/PE
recent surgery  post-partum  bedridden  fam hx of PE/DVT
prolonged travel  extremity injury  cancer  oral contraceptives
Sepsis:  immunocompromised  elderly  infant  nursing home

☐ unknown

### CONDITIONS    ☑ none

Note:

### ADDITIONAL HISTORY    Old records requested/reviewed

Note:

DOS: 03/23/2012 19:27 Provider: Hess, Brian    Name: JAMES BAILLE    DOB: 07/20/1950 Sex: M

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

Age: 61y   Race: Unknown                    Room:
Name: **JAMES BAILLE**                      DOB: 07/20/1950  Sex: M
Accnt.# 1208300109                          MR # A00771546

## EMERGENCY PHYSICIAN RECORD: CRITICAL CARE

### PHYSICAL EXAM   ☑ Vital signs reviewed   (VS stable)

HR _____ Bp _____ / _____ RR _____ T _____ SaO2% _____

**APPEARANCE**
(NL)
    unresponsive          Intubated
    cyanotic      pale      diaphoretic
    distressed   ☐ mild ☐ moderate ☐ severe
    CPR in progress on arrival in ED

**HEENT**
(NL)
(PERRL)
    evidence of trauma _____
    unequal pupils  R _____ mm  L _____ mm
    absent gag reflex
    papilledema  ☐ R ☐ L ☐ B

**NECK**
(NL)
    trachea shifted   ☐ R ☐ L
    stiff neck        meningismus

**PULMONARY**
(airway patent)
(spont breathing)
(breath sounds bilat)
(NL breath sounds)
    obstructed airway _____
    assisted ventilation    BVM    ET tube
    agonal      breath sounds unequal
    wheezing   ☐ R ☐ L ☐ B
    rales      ☐ R ☐ L ☐ B
    rhonchi    ☐ R ☐ L ☐ B
    decreased air movement   ☐ R ☐ L ☐ B
    retractions

**CARDIOVASCULAR**
(spontaneous pulse)
    no pulse          no heart sounds
    abnormal rate     slow / fast
    abnormal rhythm
    murmur _____ /6  systolic / diastolic
    S3 gallop   S4 gallop   JVD
    decreased peripheral pulses

**ABDOMEN - GI / GU**
(nontender)
(NL bowel sounds)
(soft)
    tenderness        pulsatile mass
    bowel sounds:   increased / decreased
    guarding          rebound
    incontinent:    urine     stool

**RECTAL**
    heme positive     trace positive
    decreased rectal tone

**SKIN**
(NL)
    lesions

**EXTREMITIES**
(NL)
    evidence of trauma     pedal edema

**NEUROLOGICAL**
(gait NL)
(follows commands)
(CN II-XII intact)
(corneal reflexes)
(spontaneous movement)
    unresponsive
    focal weakness
        face / RUE / RLE / LUE / LLE
    focal sensory deficit
        face / RUE / RLE / LUE / LLE
    Babinski reflex   ☐ R ☐ L ☐ B
    response to pain    none / purposeful /
        meaningless / flexor / extensor

Note:

---

### DDX
toxic/metabolic event      sepsis          CVA
myocardial infarction      valvular rupture   endocarditis
pulmonary embolus          AAA

### ED PROCEDURES
CPR   (intubated / continued in ED)
combitube inserted          LMA inserted
(Endotracheal intubation)   (by ED physician)   prehospital
by _____
tube size: 7.5 ___ mm    (orotracheal)      nasotracheal
               cricothyrotomy   adjunctive RSI
Tube confirmations:  (auscultation of bilateral breath sounds)
           (visual confirm tube through vocal cords)
           (color change on End-tidal CO2 monitor)
           confirm with aspiration device

Central Venous access       subclavian vein   femoral vein
                  internal jugular
Complications: _____
Temporary cardiac pacing          external     transvenous
                  capture of pacemaker
cardioversion          defibrillation
☐ ACLS protocols   (see code sheet for medications, dosage and times)
BIPAP / CPAP

Date/Time: 03/23/2012 19:51          Initials: HESS
close obs. spoke to candipan. stemi protocol.

Date/Time: __/__/__ __:__          Initials:

Date/Time: __/__/__ __:__          Initials:

Date/Time: __/__/__ __:__          Initials:

Date/Time: __/__/__ __:__          Initials:

Date/Time: __/__/__ __:__          Initials:

Time: __/__/__ __:__          Patient care is being transferred

to Dr. _____
all pertinent history, physical findings and diagnostic studies
have been communicated to the receiving physician.

CRITICAL CARE TIME: ☑ 30 - 74 minutes ☐ 75 - 104 minutes
(Time for other billable procedures or teaching not included)

---

DOS: 03/23/2012 19:27  Provider: Hess, Brian          Name: **JAMES BAILLE**          DOB: 07/20/1950  Sex: M

CONFIDENTIAL

JDB - 12256

ST. LUKE'S MEDICAL CENTER
1800 E. Van Buren Phoenix, AZ 85006 Phone: (602) 251-8183

Age: 61y Race: Unknown Room:
Name: JAMES BAILLE DOB: 07/20/1950 Sex: M
Accnt.# 1208300109 MR # A00771546

# EMERGENCY PHYSICIAN RECORD: CRITICAL CARE

## RADIOGRAPHS
(visualized/ interpreted by me)

CXR: ~~NL~~ pulm edema

CT head NL

Other Radiographic Studies:

INITIAL CARDIAC RHYTHM:
ventricular fibrillation atrial fibrillation
ventricular tachycardia supraventicular tachycardia
asytole idioventricular rhythm 3rd degree heart block
sinus rhythm ______ sinus rate ______

Cardiac monitor strip: NSR ectopy

EKG INTERPRETATION: Rate: ______ interpreted by me
Rhythm: ~~NSR~~ tachycardia bradycardia paced
atrial fib / atrial flutter
ectopy atrial / venticular
heart block 1st / 2nd / 3rd degree
Axis: (NL) axis deviation ☐ R ☐ L
Chambers: NL LVH RVH atrial enlargement ☐ R ☐ L ☐ B
QRS: NL IVCD RBBB LBBB PRWP
Q waves: none septal
ST/T: NL ~~nonspecific changes~~
(ST segments) (elevated) / depressed
T waves flat / inverted
Impression: ~~EKG NL~~
Compared to previous EKG: unchanged unavailable
date: __/__/____

Bedside glucose NL
CBC: NL

| WBC | HGB | HCT | PLT | Segs (%) | Bands (%) | Lymphs (%) | Mono | Eos |
|---|---|---|---|---|---|---|---|---|
| 11.6 | 16 | 50.5 | 212 | | | | | |

BMP: (NL)

| Na | K | Cl | CO2 | BUN | Glucose | Creatinine |
|---|---|---|---|---|---|---|
| | | | | | | |

Cardiac profile: ~~NL except~~
D-dimer NL
BNP ~~NL~~
PT/PTT: NL
LFT's NL
Amylase NL

ABG: 1. FiO2: ____ pH: ____ PaCO2: ____ PaO2: ____
2. FiO2: ____ pH: ____ PaCO2: ____ PaO2: ____
3. FiO2: ____ pH: ____ PaCO2: ____ PaO2: ____

## COMMENTS
blood cultures done in ED
antibiotics within 4 hrs of arrival for pneumonia/sepsis

Date/Time: 03/23/2012 19:56 Initials: HESS
will likely intubate

Date/Time: __/__/____ __:__ Initials:

old records reviewed admission orders written
(discussed with Dr.) candipan
Time: 03/23/2012 19:30
(counseled) ☑ family ☑ diagnosis ☑ follow-up
medical examiner notified police notified
organ donation discussed

## CLINICAL IMPRESSION
Diagnoses: Acute STEMI--anterior lateral
Acute pulmonary edema

## DISPOSITION
EMC: Continues
Disposition Type: Admitted ICU / CCU
Present on admission: vascular/urinary catheter associated infection
bed sores (decubiti)
Condition: Critical
Follow up with:
☐ ED ☐ PMD ☐ on-call ______ in ____ days
Special Instructions:

Discharge Instructions:

Rx:

☑ Ready for discharge 03/23/2012 19:56:11 Critical Care
Authenticated by ... On 04/05/2012 08:27:42 AM

☐ See Addendum Sheet 03/24/2012
Resident / NP / PA
MD / DO

DOS: 03/23/2012 19:27 Provider: Hess, Brian Name: JAMES BAILLE DOB: 07/20/1950 Sex: M

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

A 1208300109
BAILLE,JAMES
07/20/50      61Y
03/23/12      77-15-46
HESS,BRIAN

M  EDA  QEA
S

Room:  05
DB:                    Sex:  M
R #

**PHYSICIAN ORDER FORM - GENERAL**

## ALLERGIES
☐ NKDA

| LABORATORY ORDERS | | | RADIOLOGY ORDERS | | | NURSING PROCEDURES |
|---|---|---|---|---|---|---|
| Order Time | Lab Test | Time Order Sent | Order Time | X-Ray | Time Order Sent | |
| 945 | CBC w/diff | | | KUB | | ☑ Cardiac monitor |
| | BMP | | | Abd-flat/upright | | ☑ Pulse Oximetry |
| | CMP | | 945 | CXR-PA/lateral | | ☑ Continuous BP monitoring |
| | PT/PTT | | | IVP | | ☑ Oxygen : |
| | Liver profile | | | US :   ☐ GB   ☐ aorta | | ☐ Foley Catheter |
| | Amylase | | | ☐ kidney  ☐ pancreas | | ☐ NGT tube |
| | Lipase | | | CT scan: ☐ abdomen  ☐ pelvis | | ☐ Intravenous line |
| | Serum preg test | | | ☐ head | | ☐ hep lock   ☐ fluid : |
| | Urinalysis | | | contrast: ☐ IV ☐ po ☐ none | | RATE : |
| | Urine C and S | | | Radiology orders require clinical justification | | |
| | Urine preg test | | | (provide signs and symptoms or diagnosis): | | |
| | Blood cultures | | | | | |
| | Thyroid profile | | | | | |
| | drug levels: | | | CARDIOPULMONARY | | |
| | Hemoccult | | | Order Time | Test | Time Order Sent |
| | cardiac enzymes | | 945 | EKG | | |
| | | | | ABG | | |
| | | | | Sputum gm stain/CS | | |

| MEDICATION ORDERS | | | | |
|---|---|---|---|---|
| Order Time | Medication | Admin Time | Nurse | Re-Assessment |
| 945 | ASA   325 mg | gum | en | |
| | | | | A 1208300109    M EDA QEA |
| 2057 | | 22g | | BAILLE,JAMES |
| | | 2.0 | | 07/20/50   61Y           S |
| | | | | 03/23/12   77-15-46 |
| | | | 2020  12mg POC | HESS,BRIAN |

| DISCHARGE INSTRUCTIONS |
|---|
| |

| NURSE SIGNATURE | |
|---|---|
| PA / NP SIGNATURE | |
| PHYSICIAN SIGNATURE | 03/23/2012 |

DOS: 03/23/2012 19:27  Provider: Hess, Brian                    Name:  Rescue Phx fire                    DOB:                    Sex:  M

CONFIDENTIAL          JDB - 12258

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85006     Phone: (602) 251-8183

Age: 61y  Race: Unknown
Name: JAMES BAILLE
Accnt.# 1208300109

Room:
DOB: 07/20/1950  Sex: M
MR # A00771546

### Nursing Documentation : Assessment and Disposition

Triage : **I**   Complaint : **Chest Pain**
PMD :
RN / **Christ, Carolyn G**

Date / Time : **03/23/2012 19:27**  Mode of arrival : **Engine 19**

MD / **Hess, Brian**

| Airway and C-spine: | | | | | |
|---|---|---|---|---|---|
| (WNL) (Clear) | Obstructed | Intubated | size | @ lip | C-spine secured by ED staff |

| Breath Sounds: | Rales | Rhonchi | Wheezes | Diminished | Absent | |
|---|---|---|---|---|---|---|
| (WNL) Clear | ☐R ☐L | ☐R ☐L | ☐R ☐L | ☐R ☐L | ☐R ☐L | |

| Respiratory: | | | | | Home Oxygen | L/min |
|---|---|---|---|---|---|---|
| WNL | (Labored) | Apneic | | Expiratory Grunting | | |
| | Rapid | Retractions | | Cough ☐ Productive | | |
| | (Shallow) | Stridor | | ☐ Non-productive | | |
| | Nasal Flaring | Tracheal deviation | | Sputum color | | |

| Cardiovascular: | Thready / weak | (Chest Pain / Tightness) | Irregular | Monitor Rhythm |
|---|---|---|---|---|
| WNL | (Diaphoresis) | (Dizziness) | Cyanosis | ☐ See strips  ICD |
| | Pulses x4 | Edema | Arrhythmia | |

| Neurological: | LOC | Responds to Voice only | Moves all extremities | Seizure precautions |
|---|---|---|---|---|
| (WNL) | Headache | Responds to Pain only | Lethargic | Neuro vital signs (see NN) |
| | Disoriented | Combative | Tremors | CVA Protocol |
| | Speech difficulty | Syncope | Vertigo   Dizzy | Glasgow Coma Scale ____ |
| | Speech slurred | Seizures | Unresponsive | |
| | Change in mental status | Confusion | Follows commands | |

| GI: | Nausea | Cramping | Constipation | Rigid Abd | Nutritional risk |
|---|---|---|---|---|---|
| (WNL) | Diarrhea | Pain | Distension | Tender Abd | Dentures ☐ Upper ☐ Lower |
| | Vomiting  X | Bleeding | Weight Loss | Last BM: | Meal Given |
| | BS ☐+ ☐- | Indigestion | Weight Gain | __/__/____ | |

| GU/GYN: | | | | | Ostomy |
|---|---|---|---|---|---|
| (WNL) | Pregnant  G:   P: | A:   EDC | FHTs | | Foley   size |
| | Pain | Frequency  Urgency | Amenorrhea | | Urine description: |
| | Distention | Incontinent | Dysmenorrhea | | |
| | Hematuria | Flank Pain ☐R ☐L | Vaginal Bleeding | | |
| | Burning | Nocturia | Discharge | | |

| Musculoskeletal: | Pain | Unable to Assess Gait | Splinting | Gait Device: ☐R ☐L  Handed |
|---|---|---|---|---|
| (WNL) | Swelling | Unsteady Gait | Weakness | ☐ Prosthesis  ☐ Crutches |
| | Deformity | Assist Device | | ☐ Cane ☐ W/C ☐ Walker |

| Integumentary: | Bruises | Wound | Pale | Cyanotic | Jaundice | Exposure to Chemicals |
|---|---|---|---|---|---|---|
| (Intact) | Rash | Laceration | Fistula | Location: | | Burns |
| | Abrasions | Lesions | Bruit ☐+ ☐- | Thrill ☐+ ☐- | | |

| EENT: | Drainage ____ | Itching ____ | Hearing Aid ☐R ☐L | Visual Acuity: |
|---|---|---|---|---|
| (WNL) | Congestion ____ | Redness ____ | Pupil size  R    L | R20/   L20/ |
| | Pain ____ | | | Glasses   Contact Lenses |

| Psychiatric: | Memory Changes | Delusions | Calm | Homicidal ideations | Environment secured |
|---|---|---|---|---|---|
| (WNL) | Depression | Insomnia | Hostile | Suicidal Ideations | Restraints Present |
| | Anxiety | Hallucinations | Agitated | Suicidal Plan? | |

| Suspected: | Comunication Deficit: | Barriers to learning: | Support System: |
|---|---|---|---|
| Child / Elder Abuse | ~~Any Deficit~~ | ~~Any barriers~~ | ☐ Lives Alone |
| Sexual Assault | Language Barrier | Physical limits ____ | ☐ Family |
| Domestic Violence | Hearing Impairment | Emotional ____ | ☑ Significant Other |
| Victim of Violent Crime | Uses Sign Language | Cultural ____ | ☐ Minor w/Parent |
| Referrals / Reporting: | Visually Impaired | Religious/Spiritual ____ | ☐ Nursing Home |
| Social Services | Altered Mental Status | | ☐ Assisted Living Home |
| Behavioral Health | Translator | Suspected low literacy skills | |
| Police | Dominant Language: ____ | Developmental disability | |
| CPS / APS | | | Marital Status: |
| Animal Bite | Development Milestones | (Safety measures addressed) | ☐ Single  ☐ Married |
| Poison Control | ☑ Achieved ☐ Delayed | (Side rales up) (ID bracelet on) | ☐ Divorced  ☐ Widowed |
| | | ~~Risk of falls~~  Falls bracelet | |

DOS: 03/23/2012 19:27 Provider: Hess, Brian     Name: **JAMES BAILLE**     DOB: 07/20/1950  Sex: M

CONFIDENTIAL     JDB - 12259

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85006       Phone: (602) 251-8183

Age:  61y  Race:  Unknown
Name:  JAMES BAILLE
Accnt.#  1208300109

Room:
DOB:  07/20/1950  Sex:  M
MR #  A00771546

## Nursing Documentation : Assessment and Disposition

Triage :  *1*      Complaint :  *Chest Pain*                Date / Time :  *03/23/2012 19:27*  Mode of arrival :  *Engine 19*
PMD :
RN /  *Christ, Carolyn G*                                   MD /  *Hess, Brian*

### VITAL SIGNS     ☑ Continuous NIBP (strips attached)

| N | Time | Temp | Pulse | Resp | SBP | DBP | Pulse Ox | Glucose Checks | O / | Pain Scale |
|---|------|------|-------|------|-----|-----|----------|----------------|-----|------------|
| 1 | 03/23/2012 20:00 | | 98 | 18 | 101 | 75 | 85 | | 15L | |
| 2 | _/_/___ __:__ | | | | | | | | | |
| 3 | _/_/___ __:__ | | | | | | | | | |
| 4 | _/_/___ __:__ | | | | | | | | | |
| 5 | / / : | | | | | | | | | |
| 6 | _/_/___ __:__ | | | | | | | | | |
| 7 | _/_/___ __:__ | | | | | | | | | |
| 8 | _/_/___ __:__ | | | | | | | | | |
| 9 | _/_/___ __:__ | | | | | | | | | |
| 10 | _/_/___ __:__ | | | | | | | | | |
| 11 | _/_/___ __:__ | | | | | | | | | |
| 12 | _/_/___ __:__ | | | | | | | | | |

Time:  _/_/___ __:__      Patient care is being transferred to nurse  _____
all pertinent history, physical findings and diagnostic studies have been communicated to the receiving nurse.

☐ CODE  Time:  _/_/___ __:__      ☐ CPR:  ☐ Medical  ☐ Trauma  ☐ Pediatric   Trauma Team:  ☐ 1  ☐ 2  ☐ 3

### DISPOSITION / OUTCOME

| Teaching: | Instructions given to: | Discharge Mode: | Accompanied by: |
|-----------|------------------------|-----------------|-----------------|
| Smoking cessation advised          Extended patient education | ☐ Patient | ☐ Ambulatory | ☐ Self |
| Discharge instructions sheet provided | ☐ Parent | ☐ Ambulance | ☐ Spouse |
| Verbal understanding of discharge / RX | ☐ Family | ☐ Wheelchair | ☐ Parent |
| Meds dispensed by physician | ☐ Friend | ☐ Stretcher | ☐ Family  ☐ Friend |
| | ☐ Other | ☐ Carried  ☐ Crutches | ☐ Police  ☐ Other |

### Patient property

☐ none  ☐ Dentures  ☐ Glasses  ☐ Hearing device
☐ Cane  ☐ Walker  ☐ Crutches  ☑ Valuables  ☑ Clothing
☐ Other

☐ Patient retains / accepts responsibility      ☐ Secured / hospital safe
☐ Sent home          ☐ Sent with patient    ☑ Sent with family
☐ Other

### Disposition Vital Signs

| Time | Temp | Pulse | Resp | SBP | DBP | Pulse Ox | O₂ | Pain | FHT |
|------|------|-------|------|-----|-----|----------|-----|------|-----|
| 03/23/2012 20:26 | | 104 | ⊗ | 105 | 72 | 71 | | | |

Condition: ☐ improved  ☐ unchanged  ☑ other  Transfer to Cath Lab       ☐ Extended stay     ☐ Critical care - time:

Note:  2026-Pt taken on gurney to Cath Lab by Cath Lab Staff. PT intubated and RT bagging pt w/ B/V/M.

03/24/2012

| Signature / Emp ID number | Initials | Signature / Emp ID number | Initials |
|---------------------------|----------|---------------------------|----------|
| | CHARITY⊗ | | CGC |

DOS: 03/23/2012 19:27  Provider:  Hess, Brian              Name:   JAMES BAILLE              DOB:  07/20/1950  Sex:  M

CONFIDENTIAL                                                  JDB - 12260

|  | | Age:  61y   Race:  Unknown | Room: |
|---|---|---|---|
| **ST. LUKE'S MEDICAL CENTER** | | **Name:   JAMES BAILLE** | **DOB:  07/20/1950   Sex:  M** |
| 1800 E. Van Buren Phoenix, AZ 85006 | Phone: (602) 251-8183 | **Accnt.#  1208300109** | **MR #  A00771546** |

## Addendums

| Author:  Christ, Carolyn G | Date/Time: 03/23/2012 20:57 |
|---|---|
| Subject:  Discharge Assessment - Resp | |

Bagging w/ B/V/M

| Author:  Christ, Carolyn G | Date/Time: 03/23/2012 20:58 |
|---|---|
| Subject:  Discharge Condition - Initials | |

Charted under Charity H in error. C. Christ, RN

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

| VISIT RECORD | | | Page 1 |
|---|---|---|---|
| Name: **Baille, James** | | DOB: 07/20/1950  61y | Sex:  M |
| Accnt.# 1208300109 | | MR # A00771546 | |

## EMERGENCY DEPARTMENT VISIT RECORD

| Patient Name | BAILLE, JAMES | | | DOB | 07/20/1950 | Sex | M | Age | 61y | | Race | Unknown | | SSN | 000000000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Phone | (602)000-0000 | Address | UNKNOWN PHOENIX, AZ 85006 | | | | | | | | | | | | |
| PMD | | | | | | PMD Phone/Fax | | | | | | | Flag | | |
| MRN | A00771546 | Visit Number | 1208300109 | | | Mode of Arrival | | Engine 19 | | | | | Call In | Yes | |
| Triage | 1 | Arrived | 03/23/2012 19:27 | Registered | 03/23/2012 19:34 | | Discharge | | 03/23/2012 19:57 | | | | Type | | Admitted IC |
| Room | | RN | Christ, Carolyn G | TRN | | | MD | | Hess, Brian | | | NP/PA | | | |
| Complaints | | Chest Pain | | | | | | | | | | | | | |

### ELECTRONIC VISIT RECORD

Document Name:   APC / Charge Sheet (03 2010)                                          Status: Modified

Comment:

**Routine ED Services - Assessments**

Receipt of EMS/Ambulance Patient/Triage/Initial Assessment: 25  Simple: VS x 2 (does not include Triage VS): 15

**Routine ED Services - Interventions**

Application: ice pack : 10  Insertion of Catheter: simple foley, in/out, straight: 25  IV start used for hydration, treatment, prophylaxis, diagnosis, fluids, meds adm: 30  Simple Px: NG, edema, non-impacted cerumen, PEG reinsertion w/o removal: 25  Testing: ABG, Accucheck, CT, Culture, Doppler pulses, etc: 30

**APC Scores**

APC Level Critical Care (each additional 30 min): Y

**Special Procedures Performed by ED Staff**

IV Hydration Initial up to One Hour: 1

**ED PX Level 3**

ED PX Level 3: 1

**History of Changes**

| Date/Time | User Name | Action |
|---|---|---|
| 03/23/2012 20:14 | Morgan, Jess | Attach Visit Document |
| 03/23/2012 20:14 | Morgan, Jess | Edit Visit Document |
| 03/24/2012 18:32 | Vaca, Dora | Edit Visit Document |
| 03/24/2012 18:32 | Vaca, Dora | Print Visit Document |
| 03/24/2012 20:02 | Interface Manager, NWS System | Print Visit Document |

Document Name:   MDO General Medicine                                          Status: Added

Comment:

**Allergies**

Allergy: NKDA  Y

**History of Changes**

| Date/Time | User Name | Action |
|---|---|---|
| 03/23/2012 19:41 | Hess, Brian | Attach Visit Document |
| 03/23/2012 19:42 | Hess, Brian | Print Visit Document |

Document Name:   MDT Critical Care                                          Status: Modified

Comment:

| Signature/Initials | Signature/Initials | VISIT RECORD | | | |
|---|---|---|---|---|---|
| | | Name: **Baille, James** | | DOB: 07/20/1950  61y | Sex:  M |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | | MR # A00771546 | |

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

| VISIT RECORD | | | Page 2 |
|---|---|---|---|
| **Name:** Baille, James | DOB: 07/20/1950 | 61y | Sex: M |
| **Accnt.# 1208300109** | MR # A00771546 | | |

---

## EMERGENCY DEPARTMENT VISIT RECORD

**History Source**

Time Seen: 03/23/2012 19:48  Patient: Y

**Chief Complaint**

Chest pain: Y

**Arrival**

via EMS: Y

**History of Present Illness: Onset**

Prior to arrival to ED: Y  Onset more options: 11 hours

**History of Present Illness: Activity at onset**

Heavy activity: Y

**History of Present Illness: Symptoms Prior to Arrival**

Chest pain: Y  SOB: Y  General weakness: Y

**History of Present Illness: Alleviating Factors**

Comment: nothing

**History of Present Illness: Exacerbating Factors**

Info: nothing

**Prehospital Course: Initial EMS findings**

Alert: Y

**Prehospital Course: Respirations**

Shallow: Y

**CAD Risk Factors**

Smoker: N  Age: Y  DM: N  Family hx of CAD: Y  Cocaine use: N  Hyperlipidemia: N  Prior CAD: N

**PE Risk Factors**

Recent surgery: N  Post partum: N  Bedridden: N  Family history of PE/ DVT: N  Prolonged travel: N  Extremity injury: N  Cancer: N  Oral contraceptives: N  Hx or risk of DVT/ PE: N

**Sepsis Risk Factors**

Immunocompromised: N  Infant: N  Nursing home: N  Elderly: N

**Conditions**

None: Y

**Procedures**

None: Y

**Family History**

None: Y  Illness: CAD  Y  Illness: MI  Y

**Social History**

Alcohol: N  Tobacco Use: N  Substance Abuse: N

**Medications**

None: Y

**Allergies**

Allergy: NKDA  Y

**Review of Systems**

ROS. ALL SYSTEMS REVIEWED AND NEGATIVE EXCEPT AS INDICATED. Y

**Review of Systems: Resp**

SOB: Y

**Review of Systems: CV**

Chest Pain: Y

**Physical Exam: Vitals**

Vital signs reviewed: Y  VS stable: Y

**Physical Exam: Appearance**

Normal: Y

**Physical Exam: HEENT**

| Signature/Initials | Signature/Initials | VISIT RECORD | | | |
|---|---|---|---|---|---|
| | | **Name:** Baille, James | DOB: 07/20/1950 | 61y | Sex: M |
| **Signature/Initials** | **Signature/Initials** | Accnt.# 1208300109 | MR # A00771546 | | |

CONFIDENTIAL

JDB - 12270

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006     Phone: (602) 251-8183

| VISIT RECORD | | | Page 3 |
|---|---|---|---|
| Name:  Baille, James | DOB: 07/20/1950 | 61y | Sex:  M |
| Accnt.#  1208300109 | MR #   A00771546 | | |

## EMERGENCY DEPARTMENT VISIT RECORD

Normal: Y  PERRL: Y

**Physical Exam: Neck**

Normal: Y

**Physical Exam: Pulmonary**

Airway patient: Y  Spontaneous breathing: Y  Breath sounds bilateral: Y  Breath sounds normal: Y

**Physical Exam: Cardiovascular**

Spontaneous pulse: Y

**Physical Exam: Abdomen**

Non-tender: Y  Soft: Y  Nl. Bowel Sounds: Y

**Physical Exam: Extremities**

Normal: Y

**Physical Exam: Skin**

Normal: Y

**Physical Exam: Neurological**

Gait normal: Y  CN II-XII Intact: Y  Corneal reflexes: Y  Spontaneous movement: Y  Follows commands: Y

**ED Procedures**

Intubated/ continued in ED: Y  Endotracheal intubatin: Y  by ED physician: Y  Tube size: 7.5      mm
Orotracheal: Y  Auscultation of bilateral breath sounds: Y  Visual confirmation tube through vocal cords: Y
Color change on End-tidal CO2 monitor: Y

**Radiographs**

CXR normal: N  Radiographs visualized/interpreted by me: Y  Comments: pulm edema

**EKG Interpretation**

NSR: N  Axis normal: Y  Nonspecific changes: N  ST segments : Y  Elevated: Y  Normal EKG: N

**Labs**

BMP normal: Y  WBC: 11.6  Hemoglobin: 16  Hematocrit: 50.5  PLT: 212  Cardiac profile normal: N  BNP
normal: N

**Comments**

Critical Care Time: 30 - 74 minutes  ED Course Notes: close obs. spoke to candipan. stemi protocol.  Date / Time:
03/23/2012 19:51  ED course note user: Hess, Brian (HESS)

ED Course Notes: will likely intubate  Date / Time: 03/23/2012 19:56  ED course note user: Hess, Brian (HESS)

**Review of records**

Discussed with Dr.: Y  Dr. : candipan  Date / Time: 03/23/2012 19:30  Counseled: Y  Family: Y  About diagnosis:
Y  About follow-up: Y

**Clinical Impression**

Diagnosis: Acute STEMI---anterior lateral
Diagnosis: Acute pulmonary edema

**Disposition**

Disposition: Admitted ICU / CCU  Condition: Critical  EMC: Continues  Ready For Discharge: 03/23/2012
19:56:11

**History of Changes**

| Date/Time | User Name | Action |
|---|---|---|
| 03/23/2012 19:57 | Hess, Brian | Attach Visit Document |
| 03/23/2012 23:13 | Hess, Brian | Edit Visit Document |
| 03/24/2012 20:07 | Interface Manager, NWS System | Print Visit Document |

Document Name:  RNT Assessment and Disposition                    Status: Modified

Comment:

**Airway and C-spine**

WNL: Y  Clear: Y

| Signature/Initials | Signature/Initials | VISIT RECORD | | | |
|---|---|---|---|---|---|
| | | Name:  Baille, James | DOB: 07/20/1950 | 61y | Sex:  M |
| Signature/Initials | Signature/Initials | Accnt.#  1208300109 | MR #   A00771546 | | |

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006      Phone: (602) 251-8183

| VISIT RECORD | | | Page 4 |
|---|---|---|---|
| Name:   Baille, James | DOB: 07/20/1950 | 61y | Sex:  M |
| Accnt.# 1208300109 | MR #   A00771546 | | |

## EMERGENCY DEPARTMENT VISIT RECORD

**Breath Sounds**

WNL: Y

**Respiratory**

WNL: N Labored: Y Shallow: Y

**Cardiovascular**

WNL: N Diaphoresis: Y Chest Pain/Tightness: Y Dizziness: Y

**Neurological**

WNL: Y

**GI**

WNL: Y

**GU / GYN**

WNL: Y

**Musculo-skeletal**

WNL: Y

**Integumentary**

Intact: Y

**EENT**

WNL: Y

**Psychiatric**

WNL: Y

**Communication Deficit**

Any deficit: N

**Barriers to Learning**

Any barriers: N

**Safety Measures**

Safety measures addressed: Y Side rails up: Y ID bracelet on: Y Risk of falls: N

**Support System**

Lives with significant other: Y

**Development Milestones**

Development Milestones Achieved: Y

**Vital Signs**

Continuous NIBP (strips attached): Y Time Stamp: 03/23/2012 20:00 Pulse: 98 Resp: 18 SBP: 101 DBP: 75
Pulse Ox: 85 O2: 15L

**Patient Property**

Clothing: Y Valuables: Y

**Patient Property Status**

Sent with family: Y

**Discharge Assessment**

Time Stamp: 03/23/2012 20:26 Pulse: 104 SBP: 105 DBP: 72 Pulse Ox: 71 Note: 2026-Pt taken on gurney to
Cath Lab by Cath Lab Staff. PT intubated and RT bagging pt w/ B/V/M.
[03/23/2012 20:57:19 Christ, Carolyn G] Discharge Assessment - Resp
Bagging w/ B/V/M

**Discharge Condition**

Other: Y Description: Transfer to Cath Lab Initials: Hollywood, Charity Rose (CHARITY) Initials: Christ,
Carolyn G (CGC)
[03/23/2012 20:58:44 Christ, Carolyn G] Discharge Condition - Initials
Charted under Charity H in error. C. Christ, RN

| Author: | Christ, Carolyn G | | Date/Time: | 03/23/2012 20:57 |
|---|---|---|---|---|
| Subject: | Discharge Assessment - Resp | | | |

| Signature/Initials | Signature/Initials | VISIT RECORD | | | |
|---|---|---|---|---|---|
| | | Name:   Baille, James | DOB: 07/20/1950 | 61y | Sex:  M |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | MR #   A00771546 | | |

JDB - 12272

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006      Phone: (602) 251-8183

| VISIT RECORD | | Page 5 |
|---|---|---|
| Name: Baille, James | DOB: 07/20/1950  61y | Sex: M |
| Accnt.# 1208300109 | MR# A00771546 | |

## EMERGENCY DEPARTMENT VISIT RECORD

Bagging w/ B/V/M

| Author: | Christ, Carolyn G | Date/Time: | 03/23/2012 20:58 |
|---|---|---|---|
| Subject: | Discharge Condition - Initials | | |

Charted under Charity H in error. C. Christ, RN

### History of Changes

| Date/Time | User Name | Action |
|---|---|---|
| 03/23/2012 19:47 | Hollywood, Charity Rose | Attach Visit Document |
| 03/23/2012 19:47 | Hollywood, Charity Rose | Edit Visit Document |
| 03/23/2012 20:58 | Christ, Carolyn G | Edit Visit Document |
| 03/24/2012 20:04 | Interface Manager, NWS System | Print Visit Document |

Document Name: RNT Medications/ Infusions                                    Status: Modified

Comment:

### Medications

Time: 03/23/2012 20:03 Medication: Etomidate 20mg Route: IV Site: #2 Initials: Christ, Carolyn G (CGC)
Time: 03/23/2012 20:03 Medication: Succinylcholine 200mg Route: IV Site: #2 Initials: Christ, Carolyn G (CGC)
Time: 03/23/2012 20:20 Medication: Rocuronium 10mg (pushed by Carolyn S) Route: IV Site: #2 Initials: Christ, Carolyn G (CGC)

### Response to Medication

Resp Time: 03/23/2012 20:17 Response: Pt sedated for intubation Initials: Christ, Carolyn G (CGC)
Resp Time: 03/23/2012 20:20 Response: Paralysis initiated Initials: Christ, Carolyn G (CGC)

### Parenteral Therapy - IV Fluids

Site: RAC-Labs Drawn Time: 03/23/2012 19:48 IV gauge: 18 X: 1 Per Hr IV: Y Tolerated well, no adverse reaction noted: Y Catheter intact @: 03/23/2012 21:00
Site: LAC Time: 03/23/2012 19:48 IV gauge: 18 X: 1 Per Hr IV: Y Catheter intact @: 03/23/2012 21:00
Site: L hand/PTA IV gauge: 20 D/C @: 03/23/2012 19:49 Per Hr IV: Y Tolerated well, no adverse reaction noted: Y Catheter intact @: 03/23/2012 19:49
Start Time: 03/23/2012 19:48 Hydration or Medication: Hydration Medication: 1L NS Rate / Bolus: 150cc Initials: Christ, Carolyn G (CGC)
Start Time: 03/23/2012 19:48 End Time: 03/23/2012 20:17 Hydration or Medication: Hydration Medication: 1L NS Rate / Bolus: 150cc Initials: Christ, Carolyn G (CGC)
End Time: 03/23/2012 19:49 Hydration or Medication: Hydration Medication: 1L NS hung pta Initials: Christ, Carolyn G (CGC)

### Titrated Medications

Date/Time: 03/23/2012 20:17 Medication: Propofol 10mcg/kg/hr Initials: Christ, Carolyn G (CGC)

### History of Changes

| Date/Time | User Name | Action |
|---|---|---|
| 03/23/2012 19:49 | Christ, Carolyn G | Attach Visit Document |
| 03/23/2012 21:01 | Christ, Carolyn G | Edit Visit Document |
| 03/24/2012 20:06 | Interface Manager, NWS System | Print Visit Document |

Document Name: RNT Procedures                                    Status: Modified

Comment:

### Cardiology Procedures / Treatment Care

| Signature/Initials | Signature/Initials | VISIT RECORD | | |
|---|---|---|---|---|
| | | Name: Baille, James | DOB: 07/20/1950  61y | Sex: M |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | MR# A00771546 | |

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006       Phone: (602) 251-8183

| VISIT RECORD | | | Page 6 |
|---|---|---|---|
| Name: Baillie, James | DOB: 07/20/1950 | 61y | Sex: M |
| Accnt.# 1208300109 | MR # A00771546 | | |

## EMERGENCY DEPARTMENT VISIT RECORD

Cardiac monitor: Y  Pulse Ox-continuous: Y  EKG by ED Staff: Y

**GI / GU Procedures / Treatment Care**

Foley catheter: Y  Size: 16

**Radiology Procedures / Treatment Care**

X-ray prep: Y

**Labs**

Venipuncture (ED Staff): Y  Lab Test (any): Y  Specimen Collection: Y  Point of care test: Y

**Pulmonary Procedures / Treatment Care**

Airway: Y  Oxygen: Y  Mask: Y  Liters/min: 15  End-tidal CO2: Y +: Y  Tube: 7.5cm  Rapid sequence induction: Y

[03/23/2012 20:53:00 Christ, Carolyn G] Pulmonary Procedures / Treatment Care - Rapid sequence induction 2003-Rapid Sequence Intubation, 7.5 ET tube, taped 24cm at lip. Color change confirmed by Evis, RT, bilateral lung sounds confirmed by Dr. Hess. Pt bagged with b/v/m and 100% O2.

**Minor Ortho and Notes**

Initials: Morgan, Jess (JHM)

| Author: | Christ, Carolyn G | Date/Time: | 03/23/2012 20:53 |
|---|---|---|---|
| Subject: | Pulmonary Procedures / Treatment Care - Rapid sequence induction | | |

2003-Rapid Sequence Intubation, 7.5 ET tube, taped 24cm at lip. Color change confirmed by Evis, RT, bilateral lung sounds confirmed by Dr. Hess. Pt bagged with b/v/m and 100% O2.

**History of Changes**

| Date/Time | User Name | Action |
|---|---|---|
| 03/23/2012 20:15 | Morgan, Jess | Attach Visit Document |
| 03/23/2012 20:15 | Morgan, Jess | Edit Visit Document |
| 03/23/2012 20:53 | Christ, Carolyn G | Edit Visit Document |
| 03/24/2012 20:03 | Interface Manager, NWS System | Print Visit Document |

Document Name:  Triage Form                                                      Status: Modified

Comment:

**Historian / Immunization History**

Triage Date/Time: 03/23/2012 19:32  Patient: Y  Last Tetanus: UNK  Pneumonia: Unknown  Influenza: Unknown

**Chief Complaint / Reason for Visit**

Note: PT running to catch flight in London this AM. SUdden onset of midsternal cp 7/10. Flew to Phx w/ ongoing cp. PT rates pain 4-5/10 midsternal, sats on EMS arrival 75% and only reached 85% on non-rebreather. PT given 324 ASA x 2 and NTG 0.4mg x 1. ST elevation reported by EMS.

**Treatment Prior to Arrival**

O2 Therapy: Y  Monitor: Y  IV/HL: Y  Medications: Y

**Metod of Access: Entered by**

Entered By: Stretcher

**Metod of Access: Admitted from**

Admitted from: Airport

**Pain Assessment**

Pain (0-10): 3  Pain intensity at rest: 3  Onset: 1  Onset (days): Y  Location of Pain: Midsternal chest  Mild: Y
Pain radiation: Denies  Precipitating factors: -

**Vital Signs**

Time Stamp: 03/23/2012 19:35  Route: Oral  Pulse: 98  Resp: 20  SBP: 103  DBP: 73  Pulse Ox: 83  O2: 15L

**Allergies**

Allergy: NKDA  Y

| Signature/Initials | Signature/Initials | VISIT RECORD | | | |
|---|---|---|---|---|---|
| | | Name: Baillie, James | DOB: 07/20/1950 | 61y | Sex: M |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | MR # A00771546 | | |

JDB - 12274

| **ST. LUKE'S MEDICAL CENTER** | | **VISIT RECORD** | | | | **Page 7** |
|---|---|---|---|---|---|---|
| 1800 E. Van Buren Phoenix, AZ 85006 | Phone: (602) 251-8183 | Name: **Baille, James** | DOB: 07/20/1950 | 61y | Sex: M | |
| | | Accnt.# **1208300109** | MR # A00771546 | | | |

## EMERGENCY DEPARTMENT VISIT RECORD

**Current Medications**

None: Y

**Conditions**

None: Y

**Procedures**

None: Y

**Family History**

None: Y  Illness: CAD  Y

Illness: MI  Y

**Social History**

Lives with significant other: Y  Is there someone to care for you at home?: Y

**Airway**

Clear: Y

**Breathing**

WNL: Y

**Neuro**

Oriented: Y  x4: Y

**Skin**

Warm and dry: Y

**Trauma Assessment**

Trauma: N

**Triage Intervention(s)**

EKG: Y

**Triage Nurse**

Triage disposition time: 03/23/2012 19:32  Triage Nurse Initials: Christ, Carolyn G (CGC)

**History of Changes**

| Date/Time | User Name | Action |
|---|---|---|
| 03/23/2012 20:10 | Christ, Carolyn G | Attach Visit Document |
| 03/23/2012 20:55 | Christ, Carolyn G | Edit Visit Document |
| 03/23/2012 20:56 | Christ, Carolyn G | Print Visit Document |
| 03/24/2012 20:05 | Interface Manager, NWS System | Print Visit Document |

| **ORDERS** | | | |
|---|---|---|---|
| Test Name: DIFFERENTIAL | | Accession #: 12083036806 | Status: Complete |
| Order Date/Time: 03/23/2012 21:35 | | Ordered By: Hess, Brian | |

| Result Date/Time: | 03/23/2012 21:35 | | | | |
|---|---|---|---|---|---|
| Test | | | Result | Status | Site |
| Neutrophil | 87.0 | High | 46.0-66.0 | % | |
| Bands | 2 | | 0-10 | % | |
| Lymphocyte | 8.0 | Low | 24.0-44.0 | % | |
| Monocyte | 2.0 | | 0.0-10.0 | % | |
| Eosinophil | 0.0 | | 0.0-7.0 | % | |

| Signature/Initials | Signature/Initials | **VISIT RECORD** | | | | |
|---|---|---|---|---|---|---|
| Signature/Initials | Signature/Initials | Name: **Baille, James** | DOB: 07/20/1950 | 61y | Sex: M | |
| | | Accnt.# **1208300109** | MR # A00771546 | | | |

CONFIDENTIAL

JDB - 12275

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006     Phone: (602) 251-8183

Page 8

**VISIT RECORD**
Name: Baille, James
Accnt.# 1208300109
DOB: 07/20/1950  61y  Sex: M
MR # A00771546

# EMERGENCY DEPARTMENT VISIT RECORD

## ORDERS

| | | | |
|---|---|---|---|
| Basophil | 0.0 | 0.0-2.0 | % |
| Metamyelocyte | 2 | High 0-0 | % |
| RBC Morphology | 1+ Anisocytosis ,1+ Polychromasia | | |
| Platelet Est | Normal Platelet on Smear | | |

Test Name: UA MICROSCOPIC          Accession #: 12083036821          Status: Complete

Order Date/Time:  03/23/2012 21:19          Ordered By: Hess, Brian

Result Date/Time: 03/23/2012 21:19

| Test | Result | | Status | Site |
|---|---|---|---|---|
| WBC, Urine | 0-5 | 0-5 | /HPF | |
| RBC, Urine | 0-5 | 0-5 | /HPF | |
| Epi/Squa Cells | Few Squamous | Abnormal None | | |
| Bacteria | Few | Abnormal None | /HPF | |
| Casts | Rare Hyaline | | /LPF | |

Test Name: POC-CARDIAC PANEL W BNP          Accession #: 4159759          Status: Complete

Order Date/Time:  03/23/2012 20:02          Ordered By: Hess, Brian

Result Date/Time: 03/23/2012 20:02

| Test | Result | | | Status | Site |
|---|---|---|---|---|---|
| POC-CK MB | > 80.0 | High <4.3 | ng/ml | | |
| POC-Troponin I | 27.0 | High <0.4 | ng/ml | | |
| POC-Myoglobin | > 500 | High <107 | ng/ml | | |
| POC-BNP | 157 | High <100 | ng/ml | | |
| Comment | W | | | | |

Test Name: LIPASE          Accession #: 12083036664          Status: Complete

Order Date/Time:  03/23/2012 19:47          Ordered By: Hess, Brian

Specimen Source: Blood |

Result Date/Time: 03/23/2012 20:43

| Test | Result | Status | Site |
|---|---|---|---|

| Signature/Initials | Signature/Initials | | |
|---|---|---|---|
| Signature/Initials | Signature/Initials | | |

**VISIT RECORD**
Name: Baille, James
Accnt.# 1208300109
DOB: 07/20/1950  61y  Sex: M
MR # A00771546

  JDB - 12276

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

| VISIT RECORD | | | Page 9 |
|---|---|---|---|
| Name: **Baille, James** | DOB: 07/20/1950 | 61y | Sex: **M** |
| Accnt.# 1208300109 | MR # A00771546 | | |

# EMERGENCY DEPARTMENT VISIT RECORD

## ORDERS

| | | | |
|---|---|---|---|
| Lipase | 21 | 0-60 | U/L |

Test Name: URINALYSIS COMPLETE          Accession #: 12083036663          Status: Complete

Order Date/Time:     03/23/2012 19:47          Ordered By: Hess, Brian

Nurse Collect: Yes | Specimen Source: 2

| Result Date/Time: | 03/23/2012 20:37 | | | | |
|---|---|---|---|---|---|
| Test | | | Result | Status | Site |
| Color | Yellow | | Yellow,Sli | | |
| Clarity | Clear | | Clear,Slig | | |
| Glucose | Negative | | Negative | | |
| Bilirubin | Negative | | Negative | | |
| Ketone | Trace | Abnormal | Negative | | |
| Specific Gravity | 1.022 | | 1.005-1.03 | | |
| Occult Blood | Negative | | Negative | | |
| pH | 6.0 | | 5-9 | pH Units | |
| Protein | 1+ | Abnormal | Negative | | |
| Urobilinogen | 0.2 | | 0.2-1.0 | EU/dl | |
| Nitrite | Negative | | Negative | | |
| Leuk Esterase | Negative | | Negative | | |
| Micros Exam | Indicated | | | | |

Test Name: XR CHEST, PORTABLE          Accession #: 1365684          Status: Complete

Order Date/Time:     03/23/2012 19:45          Ordered By: Hess, Brian

Mode of Transportation: BEDSIDE/PORTABLE | Signs & Symptoms or Diagnosis: stemi |

| Result Date/Time: | 03/23/2012 20:03 | | |
|---|---|---|---|
| Test | | Result | Status | Site |
| Exam Room | ED | | | |
| Exam Start | 201203231951 | | | |
| Exam Stop | 201203231956 | | | |
| Films Used | | | | |

Comparison- None available

Technique- Single AP upright portable view

Findings- The heart is of normal size and shape. Pulmonary vascularity
is within normal limits. Extensive bilateral perihilar interstitial
infiltrates are identified, right greater than left. The pleural spaces

| Signature/Initials | Signature/Initials | VISIT RECORD | | | |
|---|---|---|---|---|---|
| | | Name: **Baille, James** | DOB: 07/20/1950 | 61y | Sex: **M** |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | MR # A00771546 | | |

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

| VISIT RECORD | | | | Page 10 |
|---|---|---|---|---|
| Name: **Baille, James** | | DOB: 07/20/1950 | 61y | Sex: **M** |
| Accnt.# 1208300109 | | MR # A00771546 | | |

## EMERGENCY DEPARTMENT VISIT RECORD

### ORDERS

are clear. Bony thorax is intact.

Impression-

Extensive bilateral perihilar interstitial infiltrates, right greater
than left.

Transcriptionist- TRANSCRIPTION OSI, Med Sec/Transcription
Reading Radiologist- ANDREW POHL M.D., Radiologist
Electronically Signed By- ANDREW POHL M.D., Radiologist
Released Date Time- 03/23/12 2003

-------------------------------------------------------------------------

Read By                 17638ANDREW POHL M.D. Radiologist
Released By             17638ANDREW POHL M.D. Radiologist

| Result Date/Time: | 03/23/2012 19:57 | | |
|---|---|---|---|
| Test | Result | Status | Site |
| Exam Room | ED | | |
| Exam Start | 201203231951 | | |
| Exam Stop | 201203231956 | | |
| Films Used | | | |
| Read By | | | |
| Released By | | | |

Test Name: EKG-12 LEAD          Accession #:          Status: Processing

Order Date/Time:    03/23/2012 19:45          Ordered By: Hess, Brian

HCPCS Code: 93005 | HCPCS Modifier1: REPEAT PROC BY SAME DOCTO |

| Result Date/Time: | | | |
|---|---|---|---|
| Test | Result | Status | Site |

Test Name: CK TOTAL          Accession #: 12083036662          Status: Complete

Order Date/Time:    03/23/2012 19:45          Ordered By: Hess, Brian

| Result Date/Time: | 03/23/2012 20:43 | | | |
|---|---|---|---|---|
| Test | Result | | Status | Site |
| CK | 2860 | High     51-224 | U/L | |

| Signature/Initials | Signature/Initials | VISIT RECORD | | | | |
|---|---|---|---|---|---|---|
| | | Name: **Baille, James** | | DOB: 07/20/1950 | 61y | Sex: **M** |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | | MR # A00771546 | | |

CONFIDENTIAL

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

| VISIT RECORD | | Page 11 |
|---|---|---|
| Name: **Baille, James** | DOB: 07/20/1950  61y | Sex: **M** |
| Accnt.# 1208300109 | MR # A00771546 | |

## EMERGENCY DEPARTMENT VISIT RECORD

### ORDERS

Test Name: PROTHROMBIN TIME          Accession #: 12083036661          Status: Processing

Order Date/Time:     03/23/2012 19:45          Ordered By: Hess, Brian

| Result Date/Time: | | | | | | |
|---|---|---|---|---|---|---|
| Test | | | Result | | Status | Site |

Test Name: COMPREHENSIVE METABOLIC          Accession #: 12083036660          Status: Complete
               INPATI

Order Date/Time:     03/23/2012 19:45          Ordered By: Hess, Brian

| Result Date/Time: | 03/23/2012 20:52 | | | | | |
|---|---|---|---|---|---|---|
| Test | | | Result | | Status | Site |
| Sodium | 133 | Low | 138-148 | mmol/L | | |
| Potassium | 4.7 | | 3.5-5.3 | mmol/L | | |
| Chloride | 100 | | 95-110 | mmol/L | | |
| Carbon Dioxide | 22 | | 21-33 | mmol/L | | |
| Anion Gap | 11 | | 6-11 | | | |
| Glucose | 142 | High | 65-100 | mg/dL | | |
| Blood Urea Nitrogen | 21 | | 6-25 | mg/dL | | |
| Creatinine | 1.1 | | 0.5-1.3 | mg/dL | | |
| BUN/Creatinine Ratio | 19.1 | | | | | |
| Calcium | 9.1 | | 8.7-10.7 | mg/dL | | |
| Prot Total | 7.5 | | 6.0-8.5 | gm/dL | | |
| Albumin | 4.4 | | 3.2-5.6 | gm/dL | | |
| Globulin | 3.1 | | | gm/dL | | |
| Bili Total | 0.6 | | 0.0-1.5 | mg/dL | | |
| Alk Phos | 75 | | 37-107 | U/L | | |
| AST | 344 | High | 12-45 | U/L | | |
| ALT | 66 | High | 7-40 | U/L | | |

| Result Date/Time: | 03/23/2012 20:48 | | | | | |
|---|---|---|---|---|---|---|
| Test | | | Result | | Status | Site |
| Sodium | 133 | Low | 138-148 | mmol/L | | |
| Potassium | 4.7 | | 3.5-5.3 | mmol/L | | |
| Chloride | 100 | | 95-110 | mmol/L | | |
| Carbon Dioxide | 22 | | 21-33 | mmol/L | | |
| Anion Gap | 11 | | 6-11 | | | |

| Signature/Initials | Signature/Initials |
|---|---|
| Signature/Initials | Signature/Initials |

| VISIT RECORD | | |
|---|---|---|
| Name: **Baille, James** | DOB: 07/20/1950  61y | Sex: **M** |
| Accnt.# 1208300109 | MR # A00771546 | |

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

| VISIT RECORD | | | |
|---|---|---|---|
| Name: Baille, James | | DOB: 07/20/1950 61y | Sex: M |
| Accnt.# 1208300109 | | MR # A00771546 | |

---

## EMERGENCY DEPARTMENT VISIT RECORD

### ORDERS

| | | | | | |
|---|---|---|---|---|---|
| Glucose | 142 | High | 65-100 | mg/dL | |
| Blood Urea Nitrogen | 21 | | 6-25 | mg/dL | |
| Creatinine | 1.1 | | 0.5-1.3 | mg/dL | |
| Calcium | 9.1 | | 8.7-10.7 | mg/dL | |
| Prot Total | 7.5 | | 6.0-8.5 | gm/dL | |
| Albumin | 4.4 | | 3.2-5.6 | gm/dL | |
| Globulin | 3.1 | | | gm/dL | |
| Bili Total | 0.6 | | 0.0-1.5 | mg/dL | |
| Alk Phos | 75 | | 37-107 | U/L | |
| AST | 344 | High | 12-45 | U/L | |
| ALT | 66 | High | 7-40 | U/L | |

| Result Date/Time: | 03/23/2012 20:43 | | | |
|---|---|---|---|---|
| Test | Result | | Status | Site |
| Blood Urea Nitrogen | 21 | 6-25 | mg/dL | |

Test Name: CBC WITH DIFFERENTIAL          Accession #: 12083036659          Status: Complete

Order Date/Time:     03/23/2012 19:45          Ordered By: Hess, Brian

| Result Date/Time: | 03/23/2012 20:30 | | | | |
|---|---|---|---|---|---|
| Test | | Result | | Status | Site |
| WBC | 11.60 | High | 5-11 | K/cumm | |
| RBC | 5.54 | | 4.70-6.00 | M/cumm | |
| Hemoglobin | 16.0 | | 14.0-17.0 | gm/dL | |
| Hematocrit | 50.5 | | 43-52 | % | |
| MCV | 91.1 | | 80.0-100.0 | fl | |
| MCH | 28.9 | | 27.0-32.0 | pg | |
| MCHC | 31.8 | Low | 32.0-36.0 | % | |
| RDW | 13.7 | | 11.9-15.7 | % | |
| Platelet Count | 212 | | 150-450 | K/cumm | |

### TASKS

| Status | Cardiopulmonary Orders | Priority |
|---|---|---|
| In Progress | EKG | Critical |

Comment:

Note:

Outcome:

| Event Name | Expected Date/Time | Actual Date/Time | | User Name |
|---|---|---|---|---|
| Placed | | 03/23/2012 19:44:44 | Fenno, Stephanie | |
| Started | | 03/23/2012 19:45:54 | Fenno, Stephanie | |
| Closed | 03/23/2012 19:44:44 | | | |

| Status | Lab Orders | Priority |
|---|---|---|

| Signature/Initials | Signature/Initials | VISIT RECORD | | | |
|---|---|---|---|---|---|
| | | Name: Baille, James | | DOB: 07/20/1950 61y | Sex: M |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | | MR # A00771546 | |

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

**VISIT RECORD**

| | | | |
|---|---|---|---|
| Name: | Baille, James | DOB: 07/20/1950 | 61y | Sex: M |
| Accnt.# 1208300109 | | MR # A00771546 | |

# EMERGENCY DEPARTMENT VISIT RECORD

## TASKS

In Progress :CBC — Critical

Comment:
Note:
Outcome:

| Event Name | Expected Date/Time | Actual Date/Time | | User Name |
|---|---|---|---|---|
| Placed | | 03/23/2012 19:44:44 | Fenno, Stephanie | |
| Started | | 03/23/2012 19:45:53 | Fenno, Stephanie | |
| Closed | 03/23/2012 19:44:44 | | | |

In Progress :CMP — Critical

Comment:
Note:
Outcome:

| Event Name | Expected Date/Time | Actual Date/Time | | User Name |
|---|---|---|---|---|
| Placed | | 03/23/2012 19:44:44 | Fenno, Stephanie | |
| Started | | 03/23/2012 19:45:53 | Fenno, Stephanie | |
| Closed | 03/23/2012 19:44:44 | | | |

In Progress :PT — Critical

Comment:
Note:
Outcome:

| Event Name | Expected Date/Time | Actual Date/Time | | User Name |
|---|---|---|---|---|
| Placed | | 03/23/2012 19:44:44 | Fenno, Stephanie | |
| Started | | 03/23/2012 19:45:53 | Fenno, Stephanie | |
| Closed | 03/23/2012 19:44:44 | | | |

In Progress :CK — Critical

Comment:
Note:
Outcome:

| Event Name | Expected Date/Time | Actual Date/Time | | User Name |
|---|---|---|---|---|
| Placed | | 03/23/2012 19:44:44 | Fenno, Stephanie | |
| Started | | 03/23/2012 19:45:54 | Fenno, Stephanie | |
| Closed | 03/23/2012 19:44:44 | | | |

## NOTES

| Type | Post-Discharge | Date/Time | 03/23/2012 20:48 | Author | Christ, Carolyn G |
|---|---|---|---|---|---|
| Subject | Nursing Note | | | | |

| Signature/Initials | Signature/Initials | **VISIT RECORD** | | |
|---|---|---|---|---|
| | | Name: | Baille, James | DOB: 07/20/1950  61y | Sex: M |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | MR # A00771546 | |

**ST. LUKE'S MEDICAL CENTER**

1800 E. Van Buren Phoenix, AZ 85006     Phone: (602) 251-8183

| VISIT RECORD | | | Page 14 |
|---|---|---|---|
| Name: Baille, James | DOB: 07/20/1950 | 61y | Sex: M |
| Accnt.# 1208300109 | MR # A00771546 | | |

## EMERGENCY DEPARTMENT VISIT RECORD

**NOTES**

1924-Cath Lab Paged prior to pt arrival.
1932-Pt arrived to ED
1937- EKG completed and given to Dr. Hess
1940-IV established blood drawn and sent to lab, Biosite run
1943-Second IV established.
1947-Groin shaved bilaterally.
1955-Cath Lab Nurse at pt bedside, informed cath lab nurse that pt is to be intubated prior to cath lab transfer. Nurse states she is going back to cath lab to see if anyone has arrived.
2003- Rapid Sequence Intubation begun. (Intubated w/ 7.5 ET tube, taped 24 at the lips, positive color change confirmed by Elvis, RT, bilat lung sounds confirmed by Dr. Hess)
2015-Call made to cath lab inquiring their pick up of patient. Cath Nurse stated that second Cath Nurse is on her way to ED. Cath Nurse stated scrub tech was not called in but was contacted and on his way. Cath Nurse stated she was prepping lab.
2018-Cath nurse at bedside.
2020- Dr. Candipan and second cath nurse at bedside.
2026-Pt taken off unit to Cath Lab.

**QUALITY CONTROL**

Orders

| Done | Priority | Name |
|---|---|---|
| ✓ | Extra | CBC WITH DIFFERENTIAL |
| ✓ | Extra | CK TOTAL |
| ✓ | Extra | COMPREHENSIVE METABOLIC INPATI |
| ✓ | Extra | DIFFERENTIAL |
| ✓ | Extra | EKG-12 LEAD |
| ✓ | Extra | LIPASE |
| ✓ | Extra | POC-CARDIAC PANEL W BNP |
| ✓ | Extra | PROTHROMBIN TIME |
| ✓ | Extra | UA MICROSCOPIC |
| ✓ | Extra | URINALYSIS COMPLETE |
| ✓ | Extra | XR CHEST, PORTABLE |

Documents

| Done | Priority | Name |
|---|---|---|
| | Required | Main Discharge Form(EN) |
| ✓ | Required | Triage Form |
| ✓ | Optional | APC / Charge Sheet (03 2010) |
| ✓ | Optional | MDO General Medicine |
| | Optional | MDO Order Form |
| | Optional | MDT Behavioral Episode / Overdose |
| | Optional | MDT Chest Pain |
| ✓ | Optional | MDT Critical Care |
| | Optional | MDT General Adult Illness |

| Signature/Initials | Signature/Initials | VISIT RECORD | | | |
|---|---|---|---|---|---|
| | | Name: Baille, James | DOB: 07/20/1950 | 61y | Sex: M |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109 | MR # A00771546 | | |

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85006          Phone: (602) 251-8183

**VISIT RECORD**                                                          Page 15
Name: Baille, James          DOB: 07/20/1950  61y     Sex: M
Accnt.# 1208300109           MR # A00771546

# EMERGENCY DEPARTMENT VISIT RECORD

## QUALITY CONTROL

|   |          |                                      |
|---|----------|--------------------------------------|
|   | Optional | MDT Medical Screening evaluation     |
|   | Optional | MDT Pediatric Illness                |
|   | Optional | Medication Reconciliation            |
| ✓ | Optional | RNT Assessment and Disposition       |
|   | Optional | RNT Fast Track                       |
|   | Optional | RNT Medication Order Form            |
| ✓ | Optional | RNT Medications/ Infusions           |
| ✓ | Optional | RNT Procedures                       |
|   | Optional | RNT Psychiatric / Behavioral Episode |
|   | Optional | RNT Suicide Risk Screening           |

| Signature/Initials | Signature/Initials | VISIT RECORD |
|---|---|---|
| | | Name: Baille, James    DOB: 07/20/1950  61y     Sex: M |
| Signature/Initials | Signature/Initials | Accnt.# 1208300109     MR # A00771546 |

# EXHIBIT 24

ST. LUKES MEDICAL CENTER
OP Report

PATIENT NAME: BAILLIE, JAMES           PHYSICIAN: ROBERT S. CANDIPAN, M.D.
ACCOUNT #: 1208300109                  ADMITTED: 03/23/2012 00:00:00
MR NUMBER: 771546                      DISCHARGED:
BIRTH DATE: 1950/07/20

PROCEDURES PERFORMED:
1.  Left heart catheterization.
2.  Selective coronary angiography.
3.  Thrombectomy of the left anterior descending coronary artery.
4.  Stent x3 of the left anterior descending.
5.  Intraaortic balloon pump placement.
6.  Intracoronary administration of nicardipine.

OPERATOR:  Robert S. Candipan, M.D.

INDICATIONS FOR PROCEDURE:  This is a 61-year-old gentleman who
apparently just completed a transcontinental flight.  Prior to
boarding his airplane in his departing city, he developed chest pain
and continued to have chest pain throughout the flight, which was
greater than 11 hours.

The patient now presents with an acute ST segment elevation MI as
indicated by ECG.

PROCEDURAL DETAIL:  Prior to the procedure, informed consent was
obtained from his family.  The patient had been intubated in the
emergency department.

The patient was brought to the cardiac catheterization laboratory
where he was prepped and draped in the usual sterile fashion.
Lidocaine was used as a local anesthetic in the right groin.  Using
the modified Seldinger technique, a 6-French sheath was placed in the
right femoral artery.

Selective coronary angiography was then formed using 6-French JL4
coronary catheter for the left coronary artery.  This was then
exchanged for a JR4 catheter, which was selectively engaged in the
right coronary artery.

Angiography revealed a total occlusion of the LAD.  At that time,
decision was made to proceed with percutaneous coronary intervention.

The patient was given a bolus of Angiomax followed by an infusion.
The diagnostic catheter was then removed and a 6-French EBU 3.75
guiding catheter was used for the procedure and provided adequate
support.  This was cannulated into the left main coronary artery.

A 0.014 BMW wire was advanced into the LAD and placed distally.
Initially, this apparently went into a diagonal.  We used a Pronto
aspiration catheter and performed multiple passes with this aspiration
catheter with removal of visible thrombus.

Angiography following this revealed restoration of flow into the LAD
and it was obvious that the guidewire was in the diagonal.  We then
redirected the guidewire into the distal LAD.

Patient Name: BAILLIE, JAMES               Account Number: 1208300109

Using a 2.5 x 15 mm balloon, multiple inflations were performed in the

LAD itself up to 8 atmospheres.

Following this, additional thrombectomy was performed with an Export
catheter.  There was also removal of visible thrombus.

Distally, there was a focal stenosis in which a 3.5 x 22 mm Resolute
stent was placed.  This was deployed at 9 atmospheres.  A second
Resolute stent, a 3.5 x 22 mm stent, was placed proximally, but not
overlapping to the first stent.  Following this, there was good
improvement in the lesional diameter in the LAD but flow distally in
the LAD was still decreased.  We administered 200 mcg of Cardene with
slight improvement of flow.  At this time, we then gave the patient
double bolus of Integrilin followed by an infusion.

A third stent was then placed into the intervening segment _____
the first 2 stents.  This was a 3.5 x 8 mm stent.

Finally, a 3.5 x 15 mm NC balloon was then used to post-dilate the
stented areas.  Inflations _____ at 12 atmospheres were
performed.

Additional administration of Cardene 200 mcg was performed.  Guiding
wire was then withdrawn.  Angiography following this revealed an
excellent result within the stented area and there was TIMI grade 2
flow in the distal LAD.

The guiding catheter was then removed.  This was then exchanged for a
pigtail catheter, which was placed in the left ventricle.  Hemodynamic
measurements were obtained.  This demonstrated significant elevation
of the LVEDP at 40 mmHg.  We then decided to go ahead and place an
intraaortic balloon pump.

The pigtail catheter was removed.  A 6-French sheath was then
exchanged over a guidewire for a 7-French balloon pump sheath.  A 40
cm balloon pump was then advanced under fluoroscopic guidance into the
aorta.  This was placed at one-to-one pumping.  Finally, all sheaths
and the balloon pump were sewn in place.

The patient was then transported to the ICU in stable condition.

COMPLICATIONS:   None.

FINDINGS:

HEMODYNAMICS:

Patient Name: BAILLIE, JAMES                    Account Number: 1208300109

1.   The aortic blood pressure was 100/60 with an LV pressure of 120/40
mmHg.   There was no significant transaortic gradient on pullback.
2.   LEFT CORONARY ANGIOGRAPHY:
LEFT MAIN CORONARY ARTERY:  Left main coronary artery is a large
artery of medium length.   This bifurcated across the LAD and the left
circumflex.   The left main itself was free of significant disease.
LEFT ANTERIOR DESCENDING CORONARY ARTERY:   Left anterior descending

coronary artery is a large artery, which extended around the apex of
the heart.   This gave rise to 2 medium-sized diagonals.   The LAD
itself was totally occluded proximally.
LEFT CIRCUMFLEX:   Left circumflex is a large nondominant artery.   This
gave rise to a large obtuse marginal.   The circumflex and the obtuse
marginal itself had up to 80% to 90% diffuse stenosis.
RIGHT CORONARY ARTERY:   The right coronary artery is a large dominant
artery.   This gave rise to a large PDA and a large posterolateral
branch.   There was a 40% to 50% proximal and mid RCA stenosis.   Distal
to the PDA was a 50% to 60% stenosis.

Following intervention with placement of stents in the LAD, the total
occlusion was reduced to 0% residual with TIMI grade 2 flow distally.

CONCLUSIONS:
1.   Normal systemic blood pressure.
2.   Markedly elevated left ventricular end-diastolic pressure.
3.   Coronary artery disease in a right dominant system with a total
occlusion in the proximal LAD.   This was felt to be infarct-related
artery.   There was an 80% to 90% stenosis of the circumflex/obtuse
marginal, 40% to 50% proximal and mid RCA stenosis, 50% to 60% distal
RCA stenosis.
4.   Successful PCI with placement of proximally to distally 3.5 x 22,
3.5 x 8, and 3.0 x 22 mm Resolute stents in the LAD with reduction of
the total occlusion to a 0% residual stenosis with TIMI grade 2 flow.

PLAN:   At this time,
1.   Admit to the ICU.
2.   Continue intraaortic balloon pump.
3.   Continue Integrilin for 12 hours.
4.   Plavix 75 mg a day.
5.   Echocardiography in the a.m.
6.   Pulmonary consultation for management of his ventilator.


_____
ROBERT S. CANDIPAN, M.D.

Patient Name: BAILLIE, JAMES                  Account Number: 1208300109

cc:

DD: 03/24/2012 01:32:59 EST/DT: 03/24/2012 02:17:55 EST/18810174
IASISJob ID:704706/NTSJob ID:1231942/Doc ID: 11104338/Rev:
1/03/27/2012 10:58:33 EST/sg
Authenticated by Robert Candipan, MD On 03/27/2012 03:57:50 PM

CONFIDENTIAL                  JDB - 12524

1. Pre-Procedure Diagnosis or Complaint:
2. Pertinent H&P on chart [ ] Yes    Updated within 24 hours [ ] Yes [ ] No
3. Previous Reactions to Sedation/Analgesia?  ☒ No   [ ] Yes:
4. Review of current MAR or Medication Reconciliation form ☒ [ ] Yes Comments:
5. Pertinent labs / radiology films reviewed  ☒ Yes  [ ] No
6. History of substance abuse?  ☒ No  [ ] Yes:
7. Comments:
8. Planned Procedure:

## Physical Status Classification of American Society of Anesthesia (CIRCLE NUMBER)

| ASA Score | .1. | .2. | .3. | .4. | .5. | .6. |
|---|---|---|---|---|---|---|
| Definition | Healthy Patient: No physical or psychological disturbances. | Mild Systematic Disease Asthma, obesity, diabetes mellitus. | Severe Systematic Disease (No incapacitation): CV or pulmonary disease that limits activity; diabetes with systemic complications. | Severe Systemic Disease (Constant Threat to Life): Severe cardiac, pulmonary, renal, hepatic or endocrine dysfunction | Moribund: Not Expected to Live 24 Hours Irrespective of Operation/Procedure: Procedure is a resuscitative effort only; multi system trauma | Emergency |

## AIRWAY EVALUATION

| Ability to Extend Neck | Ability to Open Mouth | Dentition | Mallampati Score | Plan for Moderate Sedation: |
|---|---|---|---|---|
| [ ] Normal [ ] Abnormal | [✓] > 2cm [ ] < 2cm | [✓] Normal [ ] Calories [ ] Loose [ ] Dentures [ ] Other | Class Direct Visualization, Patient Seated with Tongue Extended [ ] I Soft palate, fauces, uvula, pillars [ ] II Soft palate, fauces, uvula [ ] III Soft palate, uvular base [ ] IV Hard palate only | [ ] Versed [ ] Demerol [ ] Morphine [ ] Valium [ ] Ativan [ ] Fentanyl [ ] Other: |

INFORMED CONSENT: I have discussed risks, benefits, alternatives and other required elements of informed consent related to the sedation/anesthesia to be used and the procedure to be performed with this *patient and I believe he/she understands them.
(*If not discussed with patient, name of person provided with information:_____ )
REASSESSMENT
Time_____ AM/PM - Patient reassessed immediately prior to administration/indiction of sedation (BP, P, RR, O2, LOC) and I feel the patient is still an appropriate candidate for planned sedation.
OR:
Plan changed to:

### NOTES MUST BE SIGNED BY THE PHYSICIAN

Pre-procedure diagnosis: At STISMA

Post-procedure diagnosis: Sprain

Procedure: LX, Cur Anus, PTG, Stir + J VM, Transreverony TSRBP

Physician: Arain           Assistant: [ ] NA or:

Findings: LW Pnws, M, 801 Lie, 801 Rln

Estimated Blood Loss (EBL): ☒ NA  or  Amount:
Complications: ☒ NA  [ ] YES:

### ENDOSCOPY PROCEDURES ONLY



Physician Signature:                         Date: 3/23/12

| | Account Number: 1208300109 | MR Number: 00-77-15-46 |

Patient Name: BAILLE, JAMES
Admit Date: 03/23/12

## St. Luke's Medical Center
1800 E. Van Buren St. - Phoenix, Arizona 85006

| DOB 07/20/50 | Age 61Y | Sex M | HT 0'0.0" | WT 0lbs | RM-BD - | PT EDA | SVC EDA | FC S |

Allergies:
Attending Physician Name: HESS, BRIAN

PHYSICIAN/LIP MODERATE SEDATION FORM

OAAORMODER.DCL · 1154 03/23/12 Cn 823

CONFIDENTIAL                          JDB - 12525

# St. Luke's Medical Center

## INVASIVE PROCEDURE REPORT

### PATIENT DATA

| DATE | ACCOUNT | MRN# | ROOM# |
|------|---------|------|-------|
| 03-23-2012 | 77-15-46 | 1208300109 | Lab2 |

| ACCESSION | EMPI | | ADMIT DATE |
|-----------|------|---|-----------|
| | | | |

| PATIENT | SSN# | RACE |
|---------|------|------|
| BAILLE, JAMES | | |

| ADDRESS 1 | ZIP | PHONE |
|-----------|-----|-------|
| | | |

| ADDRESS 2 | INSURANCE |
|-----------|-----------|
| | |

| GENDER | HEIGHT (IN) | HEIGHT (CM) | PID |
|--------|-------------|-------------|-----|
| Male | 70.0 | 178 | |

| DOB | AGE (YRS) | BSA (M2) | WEIGHT (LB) | WEIGHT (KG) | FLUORO (MIN) |
|-----|-----------|----------|-------------|-------------|--------------|
| 07-20-1950 | 61 | 1.93 | 165.0 | 75.0 | 14.0 |

### LAB VALUES

| HGB | HCT | WBC | PLT | PT | INR | PTT | GLU | K- | NA- | BUN | CREAT |
|-----|-----|-----|-----|----|----|-----|-----|----|----|-----|-------|
| | | | | | | | | | | | |

### EVENT TIMES

| PATIENT IN | READY | PHYS PAGED | BEGIN TIME | END TIME | PATIENT OUT |
|-----------|-------|------------|------------|----------|-------------|
| 20:37:13 | 20:37:17 | | 20:37:22 | 22:05:18 | 22:35:00 |

### PHYSICIAN/PROCEDURE

| PHYSICIAN #1 | PROCEDURE #1 |
|--------------|--------------|
| Candipan, Robert MD | +++++CODE STEMI+++++ |

| PHYSICIAN #2 | PROCEDURE #2 |
|--------------|--------------|
| | |

| PHYSICIAN #3 | PROCEDURE #3 |
|--------------|--------------|
| | |

| REFERRING | Authenticated by<br>Robert Candipan, MD<br>On 04/05/2012 11.56.52 AM |
|-----------|---|
| | |

| KNOWN ALLERGIES |
|-----------------|
| NKA |

| CONTRAST #1 | USED #1 (ML) | CONTRAST #2 | USED #2 (ML) | TOTAL (ML) | CREAT CLR. |
|-------------|--------------|-------------|--------------|------------|------------|
| Isovue300 | 290 | | | 290.0 | |

| FELLOW I | FELLOW II | FELLOW III | FELLOW IV |
|----------|-----------|------------|-----------|
| | | | |

### STAFF

| SCRUB #1 | CIRCULATE #1 | RECORDER #1 | NURSE #1 | X-RAY #1 |
|----------|--------------|-------------|----------|----------|
| Skinner, Patrick CVT | Naastad, Karen RN | Naastad, Karen RN | Naastad, Karen RN | Marriott, Robin RT |

| SCRUB #2 | CIRCULATE #2 | RECORDER #2 | NURSE #2 | X-RAY #2 |
|----------|--------------|-------------|----------|----------|
| | | | | |

BAILLE, JAMES 1208300109 DOB: 07-20-1950
Attending: Candipan, Robert MD
St. Luke's Medical Center,



# HEMODYNAMICS

| **Name: BAILLE, JAMES** | | **Date: 03-23-2012** |
|---|---|---|
| **MRN: 1208300109** | **Proc: +++++CODE STEMI+++++** | |
| **Cond(0) REST** | BSA: 1.93m² Hgb: | K₀: 133  Est O₂: 256.69 ml |

Heart Rate: 103

AO 125 / 93 (108)

LV 87 / 24, 38

| Samples | | | |
|---|---|---|---|
| ECG> (7 Chan) | | | 20:41:36 |
| AO | 125 /93 | (108) SA | 20:48:22 |
| AO | 157 /112 | (134) | 20:57:45 |
| LV | 87 /24, | 38 | 21:47:24 |
| LV | 87 /24, | 38 | 21:47:32 |
| LVp | 83 /64, | 69 | 21:47:40 |
| AOp | 170 /0 | (71) | 21:47:47 |

Morphology: NORMAL HEART

| Resistance (D/S) (D/DI) | | O2 Content(ml/l) | O2 Difference(ml/l) | Flows (l/min) | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| CO(l/min) | SV(ml) | CO | CI | Valve | p-p | mean | msec | HR | cm² | index | Angio LV | RV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

BAILLE JAMES 1208300109 DOB: 07/20/1950
Attending: Candipan, Robert MD
St Luke's Medical Center;

Printed On: 03-23-2012 23:23:07
Case ID: 1208300109
SERIES IV - WITT BIOMEDICAL

# CASE SYNOPSIS

| **Name: BAILLE, JAMES** | **Date: 03-23-2012** |
| --- | --- |
| **MRN: 1208300109** | **Proc: +++++CODE STEMI+++++** |

## History and Indications

Admission Status: Emergency Department
Patient Admission Type >> Inpatient
Cath Status: Emergency
PCI Status: Emergency
Hx/Risk Factors: BP Problems: Hypertension
Previous Procedures: NONE 03-23-2012
ALLERGIES: NKA
PCI Indication: Acute Vessel Closure
Diag Indication: Chest Pain/Angina

## Medication(s)

| | |
| --- | --- |
| 20:51:28 | Lasix 40 mg IV  {by Naastad, Karen RN} |
| 20:52:23 | Angiomax Bolus 11.25 ml IV Push  {by Naastad, Karen RN} |
| 20:52:36 | Angiomax 250 mg/50ml NS @ 26.26 ml/hr IV started  {by Naastad, Karen RN} |
| 21:13:55 | {Narcs/Sedation/Paralytics} Versed 2 mg IV  {by Naastad, Karen RN} |
| 21:27:58 | Nicardipine 200 mcg/cc 1C  {by Candipan, Robert MD} |
| 21:37:00 | Integrilin Bolus: 6.8 mg IV Push  {by Naastad, Karen RN} |
| 21:38:00 | Integrilin 75mg/100ml D5W: 10 ml/hr IV started  {by Naastad, Karen RN} |
| 21:43:07 | {Narcs/Sedation/Paralytics} Versed 2 mg IV  {by Naastad, Karen RN} |
| 21:43:11 | {Narcs/Sedation/Paralytics} Versed 3 mg IV  {by Naastad, Karen RN} |
| 21:43:38 | Nicardipine 200 mcg/cc 1C {by Candipan, Robert MD} |
| 21:45:04 | Nicardipine 100 mcg/cc 1C  {by Candipan, Robert MD} |
| 21:47:00 | Integrilin Bolus: 6.8 mg IV Push  {by Naastad, Karen RN} |
| 22:25:00 | Angiomax 250 mg/50ml NS @ DC ml/hr DC'd  {by Naastad, Karen RN} |
| 22:55:59 | {Narcs/Sedation/Paralytics} Versed3 mg IV  {by Naastad, Karen RN} |
| 22:56:58 | PLAVIX 600MG GIVEN TO ICU NURSE ACCEPTING PATIENT. STATED TO HER AN NG WAS |
| 22:56:59 | PRIORITY TO GET DOWN PLAVIX ASAP |
| 22:57:18 | ASA GIVEN PRIOR TO ER |

## D-Equipment

{Contrast} ISOVUE 300
{Sheath} Cordis 6 Fr
{Wire} Daig Fixed Core Hep/PTFE 3mm J Wire 183cm
{C. Cath} MEDTRONIC 6 FR ANGIO-KIT

## I-Equipment

| | |
| --- | --- |
| 20:58:27 | {C. Wire} BMW Univ .014 |
| 23:13:21 | {C. Drug Eluting Stent} RESOLUTE3.0 X 22 |
| 23:14:07 | {C. Drug Eluting Stent} RESOLUTE 3.5 X 9 |
| 23:14:38 | {C. Balloon} MEDTRONIC SPRINTER  OTW |

BAILLE, JAMES 1208300109 DOB: 07-20-1950
Attending: Candipan, Robert MD
St. Luke's Medical Center

Printed On: 03-23-2012 23:13:59
CaseID: 1208000710
By: 03301 INV: INV RIGHT/FMCAL

```
23:14:41        {C. Balloon} MEDTRONIC LEGEND RX
23:18:48        {C. Wire} Whisper
23:20:18        C. Guide EBU 3.75 Medtronic
23:20:45        Pronto
23:20:51        Export
23:22:05        IABP
00:00:00        {C. Drug Eluting Stent} RESOLUTE 3.5 X 22
```

## Procedures Performed

ACC-> Heart Cath, Approach LHC w/cors +\- Lt. vgram
93458
Coro Intervention: 228        Drug eluting stent, 1st vessel
G0290 LAD
174      IABP Insertion                      33967

BAILLE, JAMES 1208300109 DOB: 07-20-1950
Attending: Candipan, Robert MD
St. Luke's Medical Center,
Printed On: 03-23-2012 22:33:08
CaseID: HB008710.
SERIES IV - W177 BIOMEDICAL

# PROCEDURE LOG

| Name: BAILLE, JAMES | | Date: 03-23-2012 |
|---|---|---|
| MRN: 1208300109 | Proc: +++++CODE STEMI+++++ | |

| | |
|---|---|
| 20:37:13 | Patient In Room |
| 20:37:13 | Pt Arrived to Procedure Lab |
| 20:37:17 | Pt Prepped w/Chloroprep. Bilateral groin |
| 20:37:17 | Setup Completed |
| 20:37:18 | Cloroprep dry and pt draped and ready |
| 20:37:19 | Physician arrived in room for start of case |
| 20:37:22 | Begin Procedure |
| 20:37:22 | C. Time Out performed with entire team involved in case present at time of time out. |
| 20:37:22 | D. Patient verified using two identifiers. |
| 20:37:22 | E. Patient verbalizes right procedure and physician. |
| 20:37:22 | F. Patient agrees to the presence of authorized visitors during procedure. |
| 20:37:22 | G. All staff involved in case including physician are wearing radiation badges. |
| 20:41:36 | 7 LEAD |
| 20:42:44 | Local Anesthetic to right groin region with Lidocaine 2% |
| 20:44:04 | Access: 6 fr standard sheath into Rt femoral artery |
| 20:47:28 | JL4 6F inserted over the wire |
| 20:47:30 | LCA Angiography performed in mutiple views. |
| 20:48:22 | AO      125/93    (108)                                      (REST) |
| 20:50:23 | Catheter removed. |
| 20:50:26 | JR4 6F inserted over the wire |
| **20:51:28** | **Lasix 40 mg IV {by Naastad, Karen RN}** |
| **20:52:23** | **Angiomax Bolus 11.25 ml IV Push {by Naastad, Karen RN}** |
| **20:52:36** | **Angiomax 250 mg/50ml NS @ 26.26 ml/hr IV started {by Naastad, Karen RN}** |
| 20:52:43 | RCA Angiography performed in multiple view. |
| 20:54:55 | Guide Catheter advanced |
| 20:54:58 | Guide Wire advanced |
| 20:57:45 | AO       157/112   (134)                                     (REST) |
| 20:58:27 | (C. Wire) BMW Univ .014 |
| 20:58:40 | PRONTO ADVANCED LAD |
| 21:00:10 | PRONTO REMOVED |
| 21:02:52 | REPERFUSION DATE/TIME: 03-23-2012 @ 21:00:00 |
| 21:03:14 | PRONTO ADVANCED, THEN REMOVED |
| 21:03:55 | Angiography performed |
| 21:04:17 | PRONTO ADVANCED |
| 21:05:46 | PRONTO REMOVED |
| 21:06:24 | Balloon catheter advanced |
| 21:07:29 | PTCA Balloon Inflated @ 8 Atm for 14 Secs |
| 21:11:00 | Stent catheter advanced to target vessel |
| 21:12:29 | 3.5 X 22Coro Stent Deployed @ 9 Atm for 18 Secs |
| 21:12:56 | Stent Delivery System removed |
| **21:13:55** | **{Narcs/Sedation/Paralytics} Versed 2 mg IV {by Naastad, Karen RN}** |
| 21:14:24 | Stent catheter advanced to target vessel |
| 21:14:59 | 3.0 X 22Coro Stent Deployed @ 9 Atm for 18 Secs |
| 21:15:05 | Stent Delivery System removed |
| 21:15:42 | Angiography performed |
| 21:20:31 | EXPORT CATHETER ADVANCED |
| 21:22:25 | Angiography performed |
| **21:27:58** | **Nicardipine 200 mcg/cc IC {by Candipan, Robert MD}** |

| Time | Event |
|---|---|
| 21:30:00 | JR4 6F removed |
| 21:35:33 | EXPORT OUT |
| 21:35:42 | Coro Stent Deployed @ |
| 21:35:50 | Coro Stent Balloon Re-inflated @ 12 Atm for 10 Secs |
| 21:37:00 | Integrilin Bolus: 6.8 mg IV Push {by Naastad, Karen RN} |
| 21:38:00 | Integrilin 75mg/100ml D5W: 10 ml/hr IV started {by Naastad, Karen RN} |
| 21:42:09 | STENT Balloon Inflated @ 12 Atm for 11 Secs |
| 21:43:07 | {Narcs/Sedation/Paralytics} Versed 2 mg IV {by Naastad, Karen RN} |
| 21:43:11 | {Narcs/Sedation/Paralytics} Versed 3 mg IV {by Naastad, Karen RN} |
| 21:43:38 | Nicardipine 200 mcg/cc IC{by Candipan, Robert MD} |
| 21:45:04 | Nicardipine 100 mcg/cc IC {by Candipan, Robert MD} |
| 21:46:48 | Pigtail angled 6F inserted over the wire |
| 21:47:00 | Integrilin Bolus: 6.8 mg IV Push {by Naastad, Karen RN} |
| 21:47:24 | LV        87/ 24,     38                              (REST) |
| 21:47:32 | LV        87/ 24,     38                              (REST) |
| 21:47:40 | LVp       83/ 64,     69                              (REST) |
| 21:47:47 | AOp       170/ 0     (71)                             (REST) |
| 21:48:50 | Catheter removed. |
| 21:50:24 | Angiography performed |
| 21:50:39 | SETTING UP FOR IABP |
| 21:51:00 | Stent Delivery System removed |
| 22:04:27 | IABP 1:1 |
| 22:05:18 | Procedure Complete. |
| 22:05:18 | Procedure End |
| 22:05:19 | Physician remained in constant attendance during procedure. |
| 22:05:25 | Total Fluoro Time: 14.0 minutes |
| 22:05:33 | Total Contrast 1: Isovue300 290 mls |
| 22:05:42 | Total Fluid intake: 300 ml IV |
| 22:05:47 | Total Output: 800 ml |
| 22:05:53 | Sheath(s) Sutured in w/ NS under pressure to RFA |
| 22:06:00 | Site Status: No Bleeding/Hematoma - Rt groin. Opsite applied. |
| 22:06:03 | Activity: Moves 4 extremities on command (2) |
| 22:06:03 | Color: Pink (2) |
| 22:06:03 | Consciousness: Fully awake (2) |
| 22:06:03 | Pressure: BP +/- 20% preanesthetic level (2) |
| 22:06:03 | Respirations: Deep breathes and coughs freely (2) |
| 22:06:03 | Total Aldrete Score: 10 |
| 22:06:15 | Post ECG Rhythm: Unchanged from pre-assessment |
| 22:06:24 | Post ECG Rhythm: Sinus Rhythm w/o ectopy |
| 22:09:34 | Report given to ICU RN: _____MEERA, RN           Knaastad RN |
| 22:25:00 | Angiomax 250 mg/50ml NS @ DC ml/hr DC'd {by Naastad, Karen RN} |
| 22:30:18 | Pt out of room: |
| 22:35:00 | Patient Out Of Room |
| 22:35:00 | Pt transferred to ICU |
| 22:55:59 | {Narcs/Sedation/Paralytics} Versed3 mg IV {by Naastad, Karen RN} |
| 22:56:58 | PLAVIX 600MG GIVEN TO ICU NURSE ACCEPTING PATIENT. STATED TO HER AN NG WAS |
| 22:56:59 | PRIORITY TO GET DOWN PLAVIX ASAP |
| 22:57:18 | ASA GIVEN PRIOR TO ER |
| 23:13:21 | {C. Drug Eluting Stent} RESOLUTE3.0 X 22 |
| 23:14:07 | {C. Drug Eluting Stent} RESOLUTE  3.5 X 9 |
| 23:14:38 | {C. Balloon} MEDTRONIC SPRINTER  OTW |
| 23:14:41 | {C. Balloon} MEDTRONIC LEGEND RX |

BAILLE, JAMES 1208300109 DOB: 07-20-1950
Attending: Candipan, Robert MD
St. Luke's Medical Center

Printed On: 07-22-2012 13:33:09
ConfID: H0000370
SERIES IV - WITT BIOMEDICAL

CONFIDENTIAL                                   JDB - 12531

| | |
|---|---|
| 23:18:48 | {C. Wire} Whisper |
| 23:20:18 | C. Guide EBU  3.75 Medtronic |
| 23:20:45 | Pronto |
| 23:20:51 | Export |
| 23:22:05 | IABP |
| 23:22:35 | Patient comfort level: |
| 23:26:29 | PT VENTED. VENTILATOR SETTING NOT AVAILABLE |
| 23:30:51 | DR CANDIPAN TALKED WITH FAMILY. |
| 00:00:00 | {C. Drug Eluting Stent} RESOLUTE  3.5 X 22 |

Nurse Signature:Naastad, Karen RN_____

BAILLIE, JAMES 1208300109 DOB: 07-20-1950
Attending: Candipan Roger MD
St. Luke's Medical Center,

Attention:      **A 1208300109   M  ICU  IPA**
                **BAILLIE,JAMES**
                **07/20/50   61Y  11-A     P**
Re: Acct # __     **03/23/12    77-15-46**
                **CANDIPAN,ROBERT**

The following page number(s) are missing from this Cath Lab record _____ 8 _____.

These pages consist of the Cath Lab charge sheet and have been scanned under the

"Charge Sheet" document type.

Thank you
HIMS Dept.

CONFIDENTIAL

# vitals flow sheet

**Name: BAILLE, JAMES**  **Date: 03-23-2012**

**MRN: 1208300109**  |  **Proc: ++++CODE STEMI++++**

PERTINENT HISTORY
BP Problems: Hypertension

## vitals flow sheet

| AGENT | DOSE | ROUTE | DATE | TIME | INITIALS |
|---|---|---|---|---|---|
| See Case Synopsis | | | 03-23-2012 | | |

## Reversing Agents

| AGENT | DOSE | ROUTE | DATE | TIME | INITIALS |
|---|---|---|---|---|---|
| See Case Synopsis | | | 03-23-2012 | | |

| DATE\TIME | HR | SEQUENCE | NIBP | TEMP | SPO2 | ETCO2 | RESP | LOC | LOP | RHYTHM |
|---|---|---|---|---|---|---|---|---|---|---|
| 03-23-12\20:33:01 | 165 | PRE | | | | | *** | 2 | 0 | |
| 03-23-12\20:28:00 | 127 | PRE | | | | | *** | 0 | | |
| 03-23-12\20:23:01 | 71 | PRE | | | NO PROBE | | 132 | | | |
| 03-23-12\20:18:00 | 203 | PRE | | | NO PROBE | | *** | | | |
| 03-23-12\20:13:00 | 275 | PRE | | | NO PROBE | | 11 | | | |
| 03-23-12\20:38:01 | 87 | DURING | | | 82 | | 18 | 12 | 0 | |
| 03-23-12\20:42:22 | 106 | DURING | 127 / 90 | | 82 | | 16 | | | Manual |
| 03-23-12\20:47:01 | 99 | DURING | 129 / 94 | | 84 | | 53 | 1 | 0 | |
| 03-23-12\20:52:00 | 120 | DURING | 167 / 114 | | 92 | | 24 | 1 | 0 | |
| 03-23-12\20:57:01 | 122 | DURING | 159 / 118 | | 94 | | 18 | 1 | 0 | |
| 03-23-12\21:02:01 | 121 | DURING | 163 / 121 | | 93 | | 23 | 1 | 0 | |
| 03-23-12\21:07:00 | 90 | DURING | 160 / 122 | | 92 | | 18 | 1 | | |
| 03-23-12\21:12:01 | 109 | DURING | 134 / 108 | | 91 | | 26 | 1 | 0 | |
| 03-23-12\21:15:59 | 97 | DURING | 114 / 84 | | 93 | | 25 | | | Manual |
| 03-23-12\21:20:00 | 102 | DURING | 112 / 82 | | 94 | | 96 | 0 | 0 | |
| 03-23-12\21:21:59 | 104 | DURING | 108 / 81 | | 92 | | 10 | 0 | 0 | Manual |
| 03-23-12\21:26:00 | 107 | DURING | 110 / 80 | | 93 | | 28 | 0 | 0 | |
| 03-23-12\21:31:01 | 80 | DURING | 98 / 64 | | 90 | | 24 | 0 | 0 | |
| 03-23-12\21:36:00 | 100 | DURING | 99 / 70 | | 91 | | 65 | 0 | 0 | |
| 03-23-12\21:41:01 | 84 | DURING | 111 / 83 | | 88 | | 52 | 0 | 0 | |
| 03-23-12\21:46:01 | 101 | DURING | 105 / 77 | | 85 | | 8 | 0 | 0 | |
| 03-23-12\21:50:56 | 90 | DURING | 89 / 64 | | 89 | | 5 | 0 | 0 | Manual |
| 03-23-12\21:55:00 | 92 | DURING | 89 / 64 | | 89 | | 27 | 0 | 0 | |
| 03-23-12\22:00:01 | 88 | DURING | 89 / 62 | | 88 | | 31 | 0 | 0 | |
| 03-23-12\22:04:52 | 77 | DURING | 89 / 61 | | 89 | | 27 | 0 | 0 | Manual |
| 03-23-12\22:09:01 | 76 | POST | 103 / 72 | | 90 | | 26 | 0 | 0 | |
| 03-23-12\22:14:00 | 61 | POST | 112 / 70 | | 89 | | *** | 0 | 0 | |
| 03-23-12\22:19:01 | 61 | POST | 101 / 70 | | 92 | | 46 | 0 | 0 | |
| 03-23-12\22:29:01 | 94 | POST | Pump T/O | | 92 | | 61 | 0 | 0 | |
| 03-23-12\22:24:00 | 67 | POST | 115 / 69 | | 92 | | 16 | 0 | 0 | |
| 03-23-12\22:58:01 | 68 | POST | | | NO PROBE | | *** | 0 | 0 | |
| 03-23-12\23:08:01 | 68 | POST | | | NO PROBE | | *** | 0 | 0 | |
| 03-23-12\23:03:01 | 61 | POST | | | NO PROBE | | *** | 0 | 0 | |
| 03-23-12\23:13:00 | 73 | POST | | | NO PROBE | | *** | 0 | 0 | |
| 03-23-12\23:18:01 | 56 | POST | | | NO PROBE | | *** | 0 | 0 | |
| 03-23-12\23:23:00 | | POST | | | | | *** | 0 | 0 | |
| 03-23-12\23:28:00 | 67 | POST | | | NO PROBE | | 96 | 0 | | |

Level Of Consciousness Scale
0 = Unresponsive
~ Arousable
~ Fully Awake

0 = No Pain
1-2 = Minimal Pain
3-4 = Minimal to Moderate Pain
5-6 = Moderate Pain
7-8 = Moderate to Severe Pain
9-10 = Severe Pain

Printed On: 03-23-2012 23:33:11

BAILLE, JAMES 1208300109 DOB: 07-28-1950
Attending: Cundipan, Robert MD
St. Luke's Medical Center,

JDB - 12535

CONFIDENTIAL

**BAILLE, JAMES**
1208300109

03-23-2012 20:41:36
REST

**103** bpm
Monitor

R-R: 582 ms
1000x=10cm/mV
REVIEW
Wave #: 1
Length: 7 sec





BAILLE, JAMES
1208300109

03-23-2012 20:48:22
REST

110
bpm
Monitor

R-R: 545 ms
1000x=10cm/mV
REVIEW
Wave #: 2
Length: 7 sec

AO    125/ 93 (108)

JDB - 12536

CONFIDENTIAL

**BAILLE, JAMES**
1208300109

03-23-2012 20:57:45
REST

**120** bpm
Monitor

R-R: 500 ms
1000x=10cm/mV
REVIEW
Wave #: 3
Length: 7 sec

**AO** 157/ 112 (134)

I
II
aL

200

100

0

25 mm/s
[ -12- ]

JDB - 12537

CONFIDENTIAL



BAILLE, JAMES
1208300109

03-23-2012 21:47:24
REST

99
bpm
Monitor

R-R: 606 ms
1000x=10cm/mV
REVIEW
Wave #: 4
Length: 7 sec

LV 87/ 24, 38

JDB - 12538

CONFIDENTIAL



JDB - 12539



BAILLE, JAMES
1208300109

03-23-2012 21:47:40
REST

99
bpm
Monitor

R-R: 606 ms
1000x=10cm/mV
REVIEW (P/B)
Wave #: 6
Length: 7 sec

LVp 83/ 64, 69
AOp 170/ 0 (71)

JDB - 12540

CONFIDENTIAL

# EXHIBIT 25

ST. LUKES MEDICAL CENTER
Discharge Summary

PATIENT NAME: BAILLIE, JAMES
ACCOUNT #: 1208300109
MR NUMBER: 771546
BIRTH DATE: 1950/07/20

PHYSICIAN: ROBERT S. CANDIPAN, M.D.
ADMITTED: 03/23/2012 00:00:00
DISCHARGED: 03/30/2012 00:00:00

DISMISSAL NOTE

ADMITTING DIAGNOSES:
1. ST segment elevation myocardial infarction.
2. Cardiogenic shock.
3. Acute pulmonary edema, requiring intubation.
4. History of hyperlipidemia.

HOSPITAL COURSE:  This is a 61-year-old gentleman who had no prior
cardiac history.  He was admitted here on the evening of 03/23/2012
with a diagnosis of an ST segment elevation MI.  Briefly, he had been
in a hurry to catch a plane in London when he developed chest
discomfort.  Unfortunately, his chest discomfort continued on his
flight here to Phoenix and on arrival here, he was met by the
paramedics and an EKG demonstrated ST segment elevations in the
anterior leads.  He was then transported here and taken emergently to
the cardiac catheterization laboratory.  Prior to that, in the
emergency room, he was noted to have significant pulmonary edema and
was intubated.

Cardiac catheterization demonstrated a total occlusion of the proximal
LAD with significant thrombus burden.  He underwent balloon
angioplasty, thrombectomy, and placement of 3 drug-eluting stents in
the LAD itself.  Flow ultimately was approximately TIMI grade 2. He
had disease of the left circumflex as well as the right coronary
artery.

The patient was admitted to the ICU for further care.  He had a
balloon pump placed following his cardiac catheterization.  Following
that, it was noted that he became hypotensive and he was started on
both Neo-Synephrine and Levophed.

He remained in the ICU during his entire hospital stay.  On
03/25/2012, we were able to start to wean off his pressors.  On
03/26/2012, pressors were weaned completely off, his balloon pump was
removed and he was extubated all in the same day.

On 03/27/2012, he was noted to have good mental status.  He denied any
further episodes of chest pain throughout his hospital course.  We got
him up and ambulated him.  We attempted to start him on small doses of
beta-blockers and captopril; however, due to persistent hypotension,
we were never able to do this.  On the evening of 03/27/2012, he did
have episodes of increasing hypoxemia and a chest x-ray demonstrated
pulmonary edema.  This happened again the following day.  Both these
episodes were treated with intravenous diuretics.  He had a good
response with the diuretics, but was associated with significant
hypertension with blood pressures down in the 70s and 80s.

On 03/29/2012, because of persistent hypotension and hypoxemia, we
went ahead and did an echocardiogram.  He had an echocardiogram done

Patient Name: BAILLIE, JAMES              Account Number: 1208300109

initially, which demonstrated an ejection fraction of 10% to 15%.
This repeat echocardiogram demonstrated similar findings with moderate

mitral valve regurgitation and tricuspid valve regurgitation.   There
was a localized pericardial effusion non-hemodynamically significant.

The patient was started on low-dose dobutamine at 2.5 mcg/min/kg.   He
was able to tolerate this, but not a higher dose due to hypotension.
That evening, he was able to make it through the night without
significant hypoxemia.   On the morning of 03/30/2012, he was doing
better.   He was ambulating around the unit and in good spirits.   He
was, however, persistently hypotensive.   His blood pressure was in the
70 to 80 range systolic, and his heart rate was greater than 100.   Of
note, he had no significant arrhythmias throughout his hospital
course.

Because of the persistent hypotension, LV dysfunction and requirement
for inotropic therapy, we felt that it would be best if he were to be
evaluated in a center that could perform cardiac transplant if needed.
The Mayo Clinic was contacted, Dr. Eric Steidley.   Discussed the
patient with us and ultimately decided to transfer the patient there
for further evaluation.   The patient is now being transported to that
facility.   His condition is guarded.

DISMISSAL MEDICATIONS:   Continuing on dobutamine 2.5 mcg/kg/min.   He
is also on Plavix 75 mg a day as well as aspirin.

Final disposition will be determined by the physicians at the Mayo
Clinic.

All of the findings and decisions were discussed with the patient, the
family, including his wife and daughters.

CONSULTATIONS OBTAINED DURING THE HOSPITALIZATION:   Dr. Shahryar from
pulmonary as well as Dr. Noori from internal medicine.   Also Dr.
Tasset, cardiothoracic surgery.

_____
ROBERT S. CANDIPAN, M.D.

cc: ROBERT S. CANDIPAN, M.D., <Dictator>
,, <Referring Physician>

DD: 03/30/2012 15:30:40 EST/DT: 03/30/2012 18:44:19 EST/18810073

Patient Name: BAILLIE, JAMES                    Account Number: 1208300109

IASISJob ID:706011/NTSJob ID:1273971/Doc ID: 11143583/Rev:
0/03/30/2012 18:44:19 EST/sn
Authenticated by Robert Candipan, MD On 04/05/2012 11:56:35 AM

ST. LUKES MEDICAL CENTER
Discharge Summary

PATIENT NAME: BAILLIE, JAMES          PHYSICIAN: ROBERT S. CANDIPAN, M.D.
ACCOUNT #: 1208300109                ADMITTED: 03/23/2012 00:00:00
MR NUMBER: 771546                    DISCHARGED: 03/30/2012 00:00:00
BIRTH DATE: 1950/07/20

ADDENDUM

This is an addendum to the discharge note that was for 03/30/2012 and
the addendum includes:

DISMISSAL DIAGNOSES:
1.   ST segment elevation myocardial infarction, anterior wall.
2.   Status post percutaneous coronary intervention with placement of 3
drug-eluting stents in the proximal to mid left anterior descending
coronary.
3.   Status post intraaortic balloon pump placement.
4.   Cardiogenic shock.
5.   Acute pulmonary edema, respiratory failure, resolved.
6.   Hyperlipidemia.
7.   Ischemic cardiomyopathy. _____


_____
ROBERT S. CANDIPAN, M.D.


cc: ROBERT S. CANDIPAN, M.D., <Dictator>
,, <Referring Physician>

DD: 04/13/2012 19:04:05 EST/DT: 04/14/2012 06:57:37 EST/18810122
IASISJob ID:709241/NTSJob ID:1360518/Doc ID: 11223882/Rev:
0/04/14/2012 06:57:37 EST/dn
Authenticated by Robert Candipan, MD On 04/23/2012 11:01:22 AM

# **EXHIBIT 26**

Hosp H&P                                    BAILLIE, JAMES - 7-524-848-4

| | |
|---|---|
| Result Type: | Hosp H&P |
| Result Date: | 30-Mar-2012 00:00 MST |
| Result Status: | Auth (Verified) |
| Result Title: | Hosp H&P |
| Performed By: | Adams (Fellow), Jonathon on 30-Mar-2012 15:43 MST |
| Verified By: | Adams (Fellow), Jonathon on 30-Mar-2012 18:14 MST |
| Encounter info: | 3210590, Mayo Clinic Hospital in Arizona, Inpatient, 30-Mar-2012 - 01-Jul-2012 |

Mayo Clinic in Arizona
HOSPITAL REPORT

Patient Name: Baillie, James       Service Date: 03/30/2012
Medical Record Number: 75248484     Facility Name: MCA
DOB: July 20, 1950             Provider Name: Jonathon Adams, M.D.
Age: 61                Account Number: 3210590
Service: CV Diseases         Visit Type: Hosp H&P

REFERRAL SOURCE:
St. Luke's Hospital.

ADMITTING SERVICE:
Congestive Heart Failure Service.

STAFF:
Dr. Steidley.

CHIEF COMPLAINT / REASON FOR VISIT:
Congestive heart failure after suffering anterior ST elevation myocardial
infarction.

HISTORY OF PRESENT ILLNESS:
The patient is a 61-year-old gentleman who was transferred from St. Luke's
Hospital for further evaluation and management for congestive heart failure
after suffering an anterior ST elevation myocardial infarction one week ago.

Patient states that he was previously healthy with no prior knowledge of
coronary artery disease, diabetes, hypertension, or hyperlipidemia. He has
actually been seen in the Mayo Executive Health Clinic and had a negative
exercise echocardiogram one year ago. He had recently traveled to the United
Kingdom on business. As he was in the airport, running a bit late, he was
walking rapidly to try to catch his flight. He began to notice substernal
chest tightness and mild dyspnea. There was no radiation of the discomfort.

Printed by:   Cable, Nicole M                          Page 1 of 4
Printed on:   14-Nov-2012 13:50 MST                     (Continued)

CONFIDENTIAL                    JDB - 00566

He had no nausea or diaphoresis. He was able to catch his flight and he noted
that despite sitting down for a few minutes, the discomfort was actually
worsening. He took four baby aspirin and notified the flight attendant. The
flight attendant apparently tried to reassure him and the flight left the
United Kingdom as scheduled. He continued to feel worse and again notified
the flight attendant, who was able to involve two physicians who were aboard
the plane. Unfortunately, there was very little that the physicians could do aside from
administer oxygen. The flight ended up continuing from the United Kingdom to Phoenix (11 hours)
per the schedule.

Upon landing, he was taken to St. Luke's Medical Center by ambulance where ECG
showed sinus rhythm with a right bundle-branch
block pattern and anterolateral ST elevation. Cardiac biomarkers
were elevated. He was taken to the cath lab on 03/23/2012 where he was found
to have an occluded proximal LAD. Two drug-eluting stents were placed, but only TIMI-2
flow was achieved. He was intubated, a balloon pump was inserted, and he was
placed on inotropic support. Unfortunately, he remained dependent on
inotropes and transfer to Mayo Clinic was arranged earlier today.

Upon arrival, the patient states that he is no longer experiencing a chest
pressure. He does, however, have significant orthopnea. Right heart
catheterization was performed where he was found to have a cardiac index of
2.2 with elevated biventricular filling pressures.

CURRENT MEDICATIONS:
Home Medications: None.

Current Medications:
1. Dobutamine 2.5 mcg/kg/minute.
2. Aspirin 325 mg daily.
3. Plavix 75 mg daily.
4. Zosyn.

ALLERGIES:
No known drug allergies.

PAST MEDICAL/SURGICAL HISTORY:
1. Anterior ST elevation myocardial infarction, 03/23/2012 with placement of
two Resolute drug-eluting stents to the proximal LAD (3.5 x 9, 3.0 x 22).
2. Benign vocal cord nodule, status post removal, 2005.
3. Closed head injury when he was in his 30s.

SOCIAL HISTORY:
The patient is married. His daughter is employed as a nurse at Mayo Clinic

Printed by:     Cable, Nicole M
Printed on:     14-Nov-2012 13:50 MST

Page 2 of 4
(Continued)

Hospital. Patient is a vice president of a semiconductor company that
recently went public. He had been exercising on a treadmill for 30 minutes
several times per week, but has not been able to exercise as much over the
past few months due to demands from his job. He smoked for a brief period of
time when he was in his 20s. He has not used any tobacco for over 30 years.
No history of alcohol abuse.

FAMILY HISTORY:
His mother passed away from a myocardial infarction at age 66. He has a
paternal grandfather who died from a myocardial infarction in his 60s. His
father is alive at age 85.

REVIEW OF SYSTEMS:
According to the records available, the patient was being treated for
pneumonia at St. Luke's Medical Center. Otherwise, as per HPI. All other
systems were reviewed and were negative.

PHYSICAL EXAM:
Vital Signs: Blood pressure 104/78 (mean 88), heart rate 105, respiratory
rate 30, oxygen saturation 87% on 6 L nasal oxygen.
General: Well developed, well nourished, appears fit. Appears younger than
his stated age. He is breathing heavily with the head of bed elevated.
HEENT: Head atraumatic. Sclerae white. Mucous membranes moist.
Neck: Supple. No thyromegaly. Jugular veins are not distended.
Lungs: Diffuse rales.
Heart: Regular rate and rhythm. S1 and S2 are normal. S3 is present. I do not
hear any significant murmurs.
Vessels: Carotid upstroke is normal. Peripheral pulses 2+.
Extremities: Warm. 1-2+ edema.

IMPRESSION/REPORT/PLAN:
I have reviewed approximately 60-70 pages of outside material and I reviewed
his angiogram performed at St. Luke's Hospital. His angiogram demonstrates
proximal occlusion of the left anterior descending. Revascularization was
achieved with TIMI-2 flow. He has disease in the circumflex artery as well.
The RCA is a large vessel with mild coronary artery disease.

Impression:
1. Congestive heart failure, NYHA class IV.

2. Anterior ST elevation myocardial infarction, 03/23/2012, status post
drug-eluting stent placement to the proximal LAD.

3. Hospital-acquired pneumonia.

Printed by:    Cable, Nicole M                                    Page 3 of 4
Printed on:    14-Nov-2012 13:50 MST                              (Continued)

CONFIDENTIAL                                    JDB - 00568

BAILLIE, JAMES - 7-524-848-4

Initial evaluation is consistent with NYHA class IV congestive heart failure.
He appears volume overloaded on physical exam and his right heart
catheterization is consistent with reduced cardiac index with volume overload
on inotropic support.

We will plan to admit the patient to the Intensive Care Unit where we will
continue dobutamine at the current dose and initiate IV diuresis with
scheduled IV Lasix. He will be placed on a stable dose of nitroglycerin for
relief of his dyspnea. Will begin gathering more information about the
patient, specifically with labs, ECG, chest x-ray, and echocardiography.

FINAL DIAGNOSIS:
1. Congestive heart failure, New York Heart Association class IV.
2. Anterior ST elevation myocardial infarction, 03/23/2012, status post
drug-eluting stent placement to the proximal left anterior descending.
3. Hospital-acquired pneumonia.

CC: D. Eric Steidley, M.D.

D: 03/30/2012 15:43
T: 03/30/2012 16:24

**Completed Action List:**
* Perform by Adams (Fellow), Jonathon on 30-Mar-2012 15:43 MST
* Transcribe by Perleberg, Heather M on 30-Mar-2012 16:24 MST
* Sign by Adams (Fellow), Jonathon on 30-Mar-2012 18:14 MSTRequested on 30-Mar-2012 16:58 MST
* Modify by Adams (Fellow), Jonathon on 30-Mar-2012 18:14 MST
* Verify by Adams (Fellow), Jonathon on 30-Mar-2012 18:14 MST
* Sign by Steidley MD, D on 16-Jul-2012 09:07 MST Requested by Rhodes, Natalie M on 06-Jul-2012 07:48
MST

CONFIDENTIAL                                        JDB - 00569

# EXHIBIT 27

© 2004 by the American College of Cardiology Foundation and the American Heart Association, Inc.

**ACC/AHA PRACTICE GUIDELINES—FULL TEXT**

# ACC/AHA Guidelines for the Management of Patients With ST-Elevation Myocardial Infarction

A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee to Revise the 1999 Guidelines for the Management of Patients With Acute Myocardial Infarction)

*Developed in Collaboration With the Canadian Cardiovascular Society*

## WRITING COMMITTEE MEMBERS

Elliott M. Antman, MD, FACC, FAHA, *Chair*

Daniel T. Anbe, MD, FACC, FAHA
Paul Wayne Armstrong, MD, FACC, FAHA
Eric R. Bates, MD, FACC, FAHA
Lee A. Green, MD, MPH
Mary Hand, MSPH, RN, FAHA
Judith S. Hochman, MD, FACC, FAHA
Harlan M. Krumholz, MD, FACC, FAHA

Frederick G. Kushner, MD, FACC, FAHA
Gervasio A. Lamas, MD, FACC
Charles J. Mullany, MB, MS, FACC
Joseph P. Ornato, MD, FACC, FAHA
David L. Pearle, MD, FACC, FAHA
Michael A. Sloan, MD, FACC
Sidney C. Smith, Jr., MD, FACC, FAHA

## TASK FORCE MEMBERS

Elliott M. Antman, MD, FACC, FAHA, *Chair*
Sidney C. Smith, Jr., MD, FACC, FAHA, *Vice Chair*

Joseph S. Alpert, MD, FACC, FAHA*
Jeffrey L. Anderson, MD, FACC, FAHA
David P. Faxon, MD, FACC, FAHA
Valentin Fuster, MD, PhD, FACC, FAHA
Raymond J. Gibbons, MD, FACC, FAHA*†

Gabriel Gregoratos, MD, FACC, FAHA*
Jonathan L. Halperin, MD, FACC, FAHA
Loren F. Hiratzka, MD, FACC, FAHA
Sharon Ann Hunt, MD, FACC, FAHA
Alice K. Jacobs, MD, FACC, FAHA

Joseph P. Ornato, MD, FACC, FAHA

*Former Task Force Member
†Immediate Past Chair

This document was approved by the American College of Cardiology Foundation Board of Trustees on May 7, 2004 and by the American Heart Association Science Advisory and Coordinating Committee on May 5, 2004.

The ACC/AHA Task Force on Practice Guidelines makes every effort to avoid any actual or potential conflicts of interest that might arise as a result of an outside relationship or personal interest of a member of the writing panel. Specifically, all members of the writing panel are asked to provide disclosure statements of all such relationships that might be perceived as real or potential conflicts of interest. These statements are reviewed by the parent task force, reported orally to all members of the writing panel at the first meeting, and updated and reviewed by the writing committee as changes occur. See Appendix 1 for relationship with industry information for writing committee members; see Appendix 2 for peer reviewer names and relationships with industry for this document.

When citing this document, the American College of Cardiology Foundation and the American Heart Association would appreciate the following citation format: Antman EM, Anbe DT, Armstrong PW, Bates ER, Green LA, Hand M, Hochman JS, Krumholz HM, Kushner FG, Lamas GA, Mullany CJ, Ornato JP, Pearle DL, Sloan MA, Smith SC Jr. ACC/AHA guidelines for the management

of patients with ST-elevation myocardial infarction: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee to Revise the 1999 Guidelines for the Management of Patients With Acute Myocardial Infarction). *Circulation.* 2004;110;e82-e293.

Copies: This full-text guideline and its executive summary are available on the World Wide Web sites of the American College of Cardiology (www.acc.org) and the American Heart Association (www.americanheart.org). Single copies of the executive summary published in the August 4, 2004, issue of the Journal of the American College of Cardiology or the August 3, 2004, issue of Circulation or the companion full-text guideline are available for $10.00 each by calling 1-800-253-4636 or writing to the American College of Cardiology Foundation, Resource Center, 9111 Old Georgetown Road, Bethesda, MD 20814-1699. To purchase bulk reprints (specify version and reprint number—71-0294 for the executive summary; 71-0293 for the full-text guideline): up to 999 copies, call 1-800-611-6083 (US only) or fax 413-665-2671; 1000 or more copies, call 214-706-1789, fax 214-691-6342, or e-mail pubauth@heart.org.

Permissions: Multiple copies, modification, alteration, enhancement, and/or distribution of this document are not permitted without the express permission of the American College of Cardiology Foundation. Please direct requests to copyright_permissions@acc.org.

Downloaded from http://circ.ahajournals.org/ by guest on July 26, 2016

incidence of and fatality from STEMI in the future. These include the following: 1) recognition of diabetes mellitus and chronic kidney disease as "risk equivalents" to coronary heart disease (CHD) and therefore recommendation for more aggressive attempts at control of other risk factors (50,51); 2) recognition of the importance of dyslipidemia as a major risk factor for CHD and recommendation for aggressive attempts at cholesterol reduction and treatment of the metabolic syndrome (50); 3) aggressive primary prevention efforts at smoking cessation as emphasized by the World Health Organization; 4) patient education campaigns regarding the signs and symptoms of MI and the appropriate courses of action to be taken (52,53); and 5) implementation at a professional level of quality assurance projects such as the ACC's "Guidelines Applied in Practice" (54) and the AHA's "Get with the Guidelines" (55) to improve compliance with established treatment strategies when caring for patients with MI. A proposal that holds great promise for reducing the morbidity and mortality associated with STEMI is the regionalization of care for patients with acute coronary syndromes using centers of excellence (56-58).

## 3. MANAGEMENT BEFORE STEMI

One third of patients who experience STEMI will die within 24 hours of the onset of ischemia, and many of the survivors will suffer significant morbidity (24). For many patients, the first manifestation of CHD will be sudden death. The major risk factors for development of CHD and STEMI are well established. Clinical trials have demonstrated that modification of those risk factors can prevent the development of CHD (primary prevention) or reduce the risk of experiencing STEMI in patients who have CHD (secondary prevention). All practitioners should emphasize prevention and refer patients to primary care providers for appropriate long-term preventive care. In addition to internists and family physicians, cardiologists have an important leadership role in primary (and secondary) prevention efforts.

### 3.1. Identification of Patients at Risk of STEMI

**Class I**

1. **Primary care providers should evaluate the presence and status of control of major risk factors for CHD for all patients at regular intervals (approximately every 3 to 5 years). *(Level of Evidence: C)***
2. **Ten-year risk (National Cholesterol Education Program [NCEP] global risk) of developing symptomatic CHD should be calculated for all patients who have 2 or more major risk factors to assess the need for primary prevention strategies (59). *(Level of Evidence: B)***
3. **Patients with established CHD should be identified for secondary prevention, and patients with a CHD risk equivalent (e.g., diabetes mellitus, chronic kidney disease, or 10-year risk greater than 20% as calculated by Framingham should) receive equally intensive risk factor intervention as those with clinically apparent CHD. *(Level of Evidence: A)***

Major risk factors for developing CHD (i.e., smoking, family history, adverse lipid profiles, and elevated blood pressure) have been established from large long-term epidemiological studies (59,60). These risk factors are predictive for most populations in the United States. Primary prevention interventions aimed at these risk factors are effective when used properly. They can also be costly in terms of primary care physician time, diversion of attention from other competing and important healthcare needs, and expense, and they may not be effective unless targeted at higher-risk patients (61). It is therefore important for primary care providers to make identifying patients at risk, who are most likely to benefit from primary prevention, a routine part of everyone's health care. The Third Report of the NCEP provides guidance on identifying such patients (59).

Patients with 2 or more risk factors who are at increased 10-year risk will have the greatest benefit from primary prevention, but any individual with a single elevated risk factor is a candidate for primary prevention. Waiting until the patient develops multiple risk factors and increased 10-year risk contributes to the high prevalence of CHD in the United States (59,62). Such patients should have their risk specifically calculated, by any of the several available valid prognostic tools available in print (59,63), on the internet (64), or for use on a personal computer or PDA (Personal Digital Assistant) (59). Patients' specific risk levels determine the absolute risk reductions they can obtain from preventive interventions and guide selection and prioritization of those interventions. For example, target levels for lipid lowering and for antihypertensive therapy vary by patients' baseline risk. A specific risk number can also serve as a powerful educational intervention to motivate lifestyle changes (65).

### 3.2. Interventions to Reduce Risk of STEMI

The benefits of prevention of STEMI in patients with CHD are well documented and of large magnitude (62,66-68). Patients with established CHD should be identified for secondary prevention, and patients with a CHD risk equivalent (e.g., diabetes mellitus, chronic kidney disease, or 10-year risk greater than 20% as calculated by Framingham equations) should receive equally intensive risk factor intervention for high-risk primary prevention regardless of sex (69). Patients with diabetes and peripheral vascular disease have baseline risks of STEMI similar to patients with known CHD, as do patients with multiple risk factors predicting calculated risk of greater than 20% over 10 years as estimated by the Framingham equations (59). Such patients should be considered to have the risk equivalents of CHD, and they can be expected to have an absolute benefit similar to those with established CHD.

All patients who smoke should be encouraged to quit and should be provided with help in quitting at every opportunity. Even a single recommendation by a clinician to quit smoking can have a meaningful impact on the rate of cessation of smoking. The most effective strategies for encouraging quitting are those that identify patients' level or stage of readiness and provide information, support, and, if neces-

Downloaded from http: circ.ahajournals.org by guest on July 26, 2016

# EXHIBIT 28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CASE NO.: CV13-4681 SVW (RZx)

LINDA ANN BAILLIE, individually    )
as Personal Representative of      )
the Estate of JAMES DONALD         )
BILLIE, II, and on behalf of all   )
heirs and next of kin of JAMES     )
DONALD BAILLIE II, deceased,       )
                                   )
          Plaintiff,               )
                                   )
    vs.                            )
                                   )
BRITISH AIRWAYS PLC,               )
                                   )
          Defendant.               )

VIDEO DEPOSITION

DEPONENT:   EWA VAN DEN BERG

DATE:       Thursday, May 29th, 2014

TIME:       9:07 a.m.

LOCATION:   London Heathrow Marriott Hotel,
            Bath Road, Harlington, Hayes
            UB3 5AN England

COURT REPORTER:  Audrey Shirley, MBIVR-407, CAT QRR

1          Q.    Okay.  And did you at this stage?  At

2     this stage in the flight, did you now treat his -- the

3     chest pains he was having as a heart attack?

4          A.    Well I started treating the symptoms

5     of the heart attack, yes.

6          Q.    Heart attack.  You were treating the

7     symptoms --

8          A.    Symptoms.

9          Q.    -- of a heart attack, correct?

10         A.    Yes.

11         Q.    Okay.  In paragraph 26 you also state

12    that Mr. Baillie told you that he had taken an aspirin

13    at approximately 1530 GMT and that the pain in his

14    chest was a five on a scale of one to ten.  Correct?

15         A.    Yes, that's correct.  I asked

16    Mr. Baillie -- well, let me explain.

17               In order to get all the history and

18    all the signs and symptom -- symptoms from

19    Mr. Baillie, I took the form, IFCE incident form, with

20    me.  That is just -- just easier for me to get all the

21    answers from Mr. Baillie, so I had all the questions

22    with me, what I wanted to speak to MedLink.  So I took

23    the form with me and I asked -- I started asking

24    Mr. Baillie following the actual form.

# EXHIBIT 29

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


LINDA ANN BAILLIE, Individually,      Case No:
and as personal Representative
of the Estate of JAMES DONALD         2:14-cv-00420-DJH
BAILLIE, II, deceased, and on
behalf of all heirs and next of
kin of JAMES DONALD BAILLIE, II,
deceased,

        Plaintiff,

    vs.

MEDAIRE, INC., STEVEN JOE REINHART,
D.O., JESSICA MONAS, M.D., RATAN K.
VERMA, M.D., and BRITISH AIRWAYS PLC,

        Defendants.

_____/



VIDEO DEPOSITION



DEPONENT:   RATAN K. VERMA, MBBS BSc MRCP FRCR

DATE:       Friday, December 5, 2014

TIME:       9:56 a.m.

LOCATION:   Marriott Leicester Hotel

            Grove Park

            5 Smith Way, Enderby

            Leicester LE19 1SW England

REPORTER:   Michele E. French, CSR-3091, RMR, CRR

Page 76

1    that could we monitor his blood pressure and pulse

2    rate at regular intervals, and that would be given as

3    per advice from the doctors on the ground.

4              Q.    From the doctors on the ground?

5              A.    On the ground.

6              Q.    Okay.  And this was both you and

7    Dr. Rajesh?

8              A.    Correct.

9              Q.    Okay.  So she told you that the

10   MedLink physicians on the ground had asked that

11   someone take Mr. Baillie's blood pressure and pulse on

12   regular intervals?

13             A.    Correct.

14             Q.    Do you remember or recall what

15   intervals they recommended those things be checked at?

16             A.    I think hourly.

17             Q.    Okay.  Hourly.

18                   If I told you that it may have been

19   every 15 to 30 minutes, would that refresh your

20   recollection on that or no?

21             A.    No.

22             Q.    Okay.  All you knew was you had to

23   take it on a regular interval?

24             A.    Right, yeah.

Q. Okay. And did you -- did you, for the remainder of the flight, then, take Mr. Baillie's pulse and blood pressure at regular intervals?
A. It was not every 30 to 15 minutes. I recall going back probably three times more during the flight.
Q. Okay.
A. And then I don't know how often my colleague went and checked his blood pressure and pulse.
Q. So there were times when Dr. Rajesh went up by himself to take --
A. Yeah, I think he told me he went up at least once.
Q. When you went to check Mr. Baillie's blood pressure and pulse for the rest of the flight, did you at any time also listen to his chest with the stethoscope again?
A. I did not.
Q. Okay. So you only listened to his chest the one time to hear the crackles?
A. Correct.
Q. Okay. But would you expect crackles in someone's chest to persist until treated in some

# EXHIBIT 30

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually, as )No.2:14-cv-00420-SMM

Personal Representative of the      )

Estate of JAMES DONALD BAILLIE, II, )

and on behalf of all heirs and next )

of kin of JAMES DONALD BAILLIE, II, )

deceased,                           )

                                    )

                                    )

         Plaintiffs,                 )

                                    )

     vs.                             )

                                    )

MEDAIRE, INC.; STEVEN JOE REINHART, )

D.O.; and JESSICA MONAS, M.D.,      )

                                    )

         Defendants.                 )

_____)

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D.

Scottsdale, Arizona

September 22, 2015

9:03 a.m.

Reported by:

Jennifer Honn, RPR

Arizona CR No. 50885

2

1    LAD; correct?

2        A.    Yes.

3        Q.    And then you also placed an intra-aortic balloon

4    pump in his LAD; correct?

5        A.    Incorrect.

6        Q.    Okay.   That's what it says, but that -- you may

7    have anticipated my question which was going to be you

8    don't actually put the intra-aortic balloon pump in the

9    LAD itself, do you?

10       A.    No.

11       Q.    Okay.   Where does it go?

12       A.    As its name implies, in the aorta.

13       Q.    Okay.   What was the purpose of placing the

14    balloon pump?

15       A.    For hemodynamic stabilization.   The patient was

16    having a significant myocardial infarction, was

17    hypotensive, and was felt to be in cardiogenic shock upon

18    arrival.

19       Q.    What does the balloon pump do?

20       A.    It is a counterpulsation technique.   And what

21    that means is that during systole, which is when the

22    heart contracts, the balloon is deflated.   And during

23    diastole, when the heart is relaxing, the balloon

24    inflates.

25             The reason for that is that coronary arteries

1  fill during diastole, so it gives additional flow into

2  coronary arteries during diastole.  And it is also an

3  afterload reducing device, so it makes the heart, which

4  is weakened, work more efficiently.

5      Q.    What is cardiogenic shock?

6      A.    That is a type of shock which -- all shocks are

7  associated with hypotension, low blood pressure.  And

8  this is shock related to a heart source.

9      Q.    Is cardiogenic shock following a STEMI a serious

10  condition?

11      A.    Very serious.

12      Q.    Is there a high mortality rate for patients

13  suffering cardiogenic shock?

14      A.    Yes.

15      Q.    You indicate in paragraph 7 that following your

16  surgery he was admitted -- Mr. Baillie was admitted to

17  the intensive care unit at St. Luke's for continued care.

18          In paragraph 8, you say you were the admitting

19  and treating physician while Mr. Baillie was there at

20  St. Luke's.  Is that right?

21      A.    Yes.

22      Q.    And then you relayed in paragraph 9 that after

23  the surgery you did have the occasion to speak with

24  Mr. Baillie, and he told you that he was traveling on a

25  flight from London to Phoenix on March 23rd of 2012, and

Page 35

1        A.    That's the extent of my memory.

2        Q.    Okay.  I've seen references in -- somewhere in

3   the medical records also to another kind of sound called

4   I think it's rhonchi.  I'm not sure if I'm pronouncing it

5   right.  Rhonchi?

6        A.    Rhonchi.

7        Q.    Rhonchi.  What are rhonchi?

8        A.    They tend to be course breath sounds.

9        Q.    So, again, a different type of sound --

10       A.    Yes.

11       Q.    -- than crackles?

12             And what can cause rhonchi?

13       A.    Infections, chronic lung disease.

14       Q.    Let me move now to paragraph, let's see,

15   paragraph 12 of your declaration.  You say, "It's very

16   important for heart attack victims to receive treatment

17   as soon as possible preferably within the first hour

18   after symptoms appear."

19             Is that right?

20       A.    Yes.

21       Q.    And why is that very important?

22       A.    It's important because a heart attack represents

23   cessation of the blood flow to heart muscle, and

24   cessation of blood flow to heart muscle can lead to

25   permanent damage of heart muscle.  The idiom that's used

1    is "Time is muscle." So in heart attack victims, the

2    sooner that blood flow can be restored to muscle, the

3    amount of damage can be limited.

4        Q.   And is there -- let me start that question over.

5             Is there a significance in what happens during

6    the first hour?

7                  MR. STRUBLE:  Form.

8                  MR. FLEMING:  Objection.

9        Q.   (By Mr. Dangerfield) After the symptoms appear?

10       A.   The significance is that the sooner the heart

11   attack is treated, the less damage is done.

12       Q.   Have you seen studies showing that most of the

13   myocardium is -- let me rephrase that again.

14            Have you seen studies indicating that the loss

15   of the myocardium in the heart attack, most of it occurs

16   within the first few hours?

17                 MR. STRUBLE:  Form.

18                 MR. FLEMING:  Objection.

19       A.   I don't recall.

20       Q.   (By Mr. Dangerfield) Okay. When you say that

21   it's important to receive treatment within the first hour

22   after symptoms appear, is that because the onset of the

23   symptoms is typically when the heart attack starts?

24       A.   Yes.

25       Q.   And you say, "Medical organizations have

1  coronary artery which will then branch into two arteries,
2  the LAD and the circumflex.
3       And when I say "proximal occlusion" or "occluded
4  proximally," it means that the stenosis or the occlusion
5  was just after it comes off of the left main coronary
6  artery.
7  Q.  Okay.
8       MR. FLEMING:  Upstream.  Or actually
9  downstream of the division.
10       MR. DANGERFIELD:  That's all relative.
11       MR. FLEMING:  It's -- I'll withdraw.  Not
12  proper.  I'm sorry.
13       MR. DANGERFIELD:  Yeah, that was improper.
14  Q.  (By Mr. Dangerfield) So the left main artery
15  splits into the LAD and the circumflex artery; right?
16       MR. STRUBLE:  Form.
17  Q.  (By Mr. Dangerfield) Did I understand that
18  correctly?
19  A.  Yes.
20  Q.  And in this report, you go on to say that in
21  addition to the LAD being totally occluded, the
22  circumflex and the obtuse marginal artery had up to
23  80 percent to 90 percent diffuse stenosis; correct?
24  A.  Correct.
25  Q.  Does "stenosis" just mean "narrowing"?

1       A.    Yes.

2       Q.    So in other words, those arteries were not

3   totally blocked, but they were 80 to 90 percent blocked?

4       A.    Yes.

5       Q.    And the word "diffuse," does that mean that it

6   was over a large area, or what does that mean?

7       A.    Yes.

8       Q.    So over a large area.

9             Now, did you determine that something should be

10  done eventually, if not right then, about the 80 to

11  90 percent stenosis of those other two arteries?

12      A.    Yes.

13      Q.    And what did you determine?

14      A.    At the time of the cardiac catheterization,

15  these were felt to be significant lesions but not causing

16  the heart attack.  So in general practice, the heart

17  attack or the infarcted-related artery, which was the

18  LAD, was treated, and the noninfarcted-related arteries

19  such as the circumflex and the obtuse marginal, even

20  though diseased, would be treated at a later time.

21      Q.    And that's because the most important thing here

22  is first to treat the one that caused the heart attack?

23      A.    Yes.

24      Q.    But eventually, Mr. Baillie was going to need

25  treatment of those arteries as well had he survived?

1    A.    Yes.

2    Q.    Then you say -- you talked about then the right

3    coronary arteries on this same page just below that, and

4    you say that there was a 40 to 50 percent proximal and

5    mid RCA stenosis.  And distal to the PDA was a 50 to

6    60 percent stenosis.  Do you see that?

7    A.    Yes.

8    Q.    And, again, is what you're saying here is that

9    those arteries you're referring to were narrowed to those

10   percentages from coronary artery disease?

11   A.    Yes.

12   Q.    By the way, coronary artery disease, I take it

13   that's not something that happens over night?

14   A.    No.

15   Q.    Is it your experience that coronary artery

16   disease develops over a period of years?

17   A.    Yes.

18   Q.    So, for example, if you had done an angiography

19   of Mr. Baillie's vessels, let's say, a year before this,

20   is it likely that you would have observed some very

21   similar serious --

22          MR. FLEMING:  Objection.

23   Q.    (By Mr. Dangerfield) -- coronary artery disease?

24   A.    You would likely have seen disease.

25   Q.    You're just not able to say how serious it would

1    attack.

2           So often will help to improve -- the two drugs

3    often will help to improve the contractility, or the

4    ejection fraction, of a heart after a heart attack.

5    Q.    But you indicate that due to persistent

6    hypotension you weren't able to do that.  What's the

7    relationship between the hypotension and these

8    beta-blockers and captopril?

9    A.    Both cause low blood pressure.  So if the

10   patient is -- already has a low blood pressure, it's

11   difficult to give them these medicines.

12   Q.    I see.

13          And you discuss how on the evening of 3-27 he

14   had episodes of increasing hypoxemia and a chest X-ray

15   demonstrated pulmonary edema.  Do you see that?

16   A.    Yes.

17   Q.    But you say that those episodes were able to be

18   treated with intravenous diuretics and had a good

19   response, but was associated with significant

20   hypertension with blood pressures down in the 70s and

21   80s.  Do you see that?

22   A.    Yes.

23   Q.    Should that say "hypotension" there?

24   A.    It should.  That's a typo.

25   Q.    Okay.  Now, on March 29th, you indicate at the

1    bottom of the page because of his persistent hypotension

2    and hypoxemia you had an echocardiogram done; correct?

3        A.    Yes.

4        Q.    And that on the next page, it says it showed an

5    ejection fraction 10 to 15 percent?  Do you see that?

6        A.    Yes.

7        Q.    What is the ejection fraction?

8        A.    Ejection fraction is a way to put a number on

9    how strong the heart is.  The normal ejection fraction

10   for an adult is going to be between 50 and 70 percent.

11   The higher the number, the stronger the heart.

12       Q.    So a reading of -- an ejection fraction reading

13   of 10 to 15 percent is seriously low?

14       A.    Yes.

15       Q.    And is that part of the evidence that he's still

16   in cardiogenic shock?

17       A.    Yes.

18       Q.    With an ejection fraction of 10 to 15 percent --

19   well, strike that.

20             You go on to say that the echocardiogram

21   demonstrated similar findings with moderate mitral valve

22   regurgitation and tricuspid valve regurgitation.  What is

23   that, or what are those?

24       A.    The mitral valve and the tricuspid valve are

25   both valves that separate the top chamber, the atrium,

1    from the ventricle.  And the mitral valve is on the left

2    side of the heart, so it involves the valve that goes

3    between the left atrium and the left ventricle, the main

4    pumping chamber.

5           Regurgitation is leak.  So it means that for

6    every -- every stroke of the heart or every contraction

7    of the heart, there's a certain amount of blood that's

8    going the wrong way.  It's going backwards.

9    Q.    So is that a significant issue here?

10   A.    It is part of the issue.  It's not the -- it's

11   certainly worth noting.

12   Q.    In culmination with the other things --

13   A.    Yes.

14   Q.    -- it's part of the reason why he's not doing

15   well at that point?

16   A.    It's contributing to his overall clinical

17   situation.

18   Q.    You started him then on low dose dobutamine.  Is

19   that how you pronounce that?

20   A.    Yes.

21   Q.    And what is that intended to accomplish?

22   A.    It's an inotropic agent.  It is a class of

23   agents that will improve contractility of the heart.  So

24   it may improve his ejection fraction.

25   Q.    But I take it you were limited in what you could

1   give him because it also can contribute to hypotension?

2        A.   Sometimes it will.

3        Q.   Hypoxemia, am I pronouncing that word right?

4        A.   Yes.

5        Q.   And what is hypoxemia?

6        A.   Low oxygen in the blood.

7        Q.   And what would cause that in Mr. Baillie's case

8   here?

9        A.   The pulmonary edema.

10       Q.   Then you say about halfway down the page 12285

11  that, "Because of the persistent hypotension, LV

12  dysfunction, and requirement for inotropic therapy, we

13  felt it would be best if he were to be evaluated in a

14  center that could perform cardiac transplant if needed."

15            Do you see that?

16       A.   Yes.

17       Q.   So are you saying there in layman's term --

18  layman's terms that Mr. Baillie's heart is in serious

19  shape and you're not sure that it's going to sustain him?

20       A.   Yes.

21       Q.   And so you, as indicated in these notes on

22  12285, you contacted Dr. Steidley at the Mayo Clinic to

23  discuss a transfer, and he was, in fact, transferred to

24  the Mayo Clinic; is that right?

25       A.   Yes.

# EXHIBIT 31

1                          UNITED STATES DISTRICT COURT
                           CENTRAL DISTRICT OF CALIFORNIA

                    CASE NO.: CV13-4681 SVW (RZX)

LINDA ANN BAILLIE, individually )
as Personal Representative of   )
the Estate of JAMES DONALD      )
BILLIE, II, and on behalf of all)
heirs and next of kin of JAMES  )
DONALD BAILLIE II, deceased,    )
                                )
            Plaintiff,           )
                                )
   vs.                          )
                                )
BRITISH AIRWAYS PLC,            )
                                )
            Defendant.           )

                    VIDEOTAPED DEPOSITION

DEPONENT:  ALASTAIR GRANT

DATE:       Thursday, October 22nd, 2015

TIME:       3:59 p.m.

LOCATION:   Gatwick Sofitel Hotel,
            Gatwick Airport North Terminal,
            Crawley, West Sussex RH6 0PH

COURT REPORTER:  Audrey Shirley, MBIVR-407, CAT QRR

| | | | |
|---|---|---|---|
| 00:04:02.788 | 1 | A. | I don't believe I did, no. |
| 00:04:11.119 | 2 | | MR. DANGERFIELD: Okay. Well, this |
| 00:04:14.641 | 3 | | case concerns generally what happened on board British |
| 00:04:18.512 | 4 | | Airways' Flight 289 on March 23rd of 2012 and you've |
| 00:04:24.639 | 5 | | previously given a declaration about that that I would |
| 00:04:28.759 | 6 | | like to introduce as our first exhibit here. |
| 00:04:32.800 | 7 | | And so, Audrey, could you mark |
| 00:04:38.043 | 8 | | Mr. Grant's declaration as Exhibit 58? |
| 00:04:46.668 | 9 | | MS. ROSE: And, Mark, just to be |
| 00:04:48.378 | 10 | | clear, you'll also the -- the exhibits that were |
| 00:04:51.108 | 11 | | attached to that declaration will all be within |
| 00:04:53.184 | 12 | | Exhibit 58? |
| 00:05:04.720 | 13 | | MR. DANGERFIELD: Correct. |
| 00:05:10.488 | 14 | | MS. ROSE: Okay. |
| 00:05:16.256 | 15 | | (Exhibits 58, 58A, 58B and 58C |
| 00:05:16.256 | 16 | | were marked for identification.) |
| 00:05:16.256 | 17 | | BY MR. DANGERFIELD: |
| 00:05:16.256 | 18 | Q. | By the way, as we're going here I'm -- |
| 00:05:47.191 | 19 | | I'm not sure of the exact protocol; do you prefer to |
| 00:05:50.483 | 20 | | be addressed as First Officer Grant, Officer Grant or |
| 00:05:53.816 | 21 | | just Mr. Grant? |
| 00:05:57.767 | 22 | A. | Mr. Grant is fine, thank you. |
| 00:06:00.377 | 23 | Q. | All right. Mr. Grant, if I could just |
| 00:06:03.825 | 24 | | ask you to look at what's been marked as Exhibit 58 |

| | | | |
|---|---|---|---|
| 00:06:03.825 | 1 | | along with 58A, B and C and can you confirm that |
| 00:06:15.034 | 2 | | that's a declaration that you signed? |
| 00:06:19.864 | 3 | A. | I can confirm that this is my |
| 00:06:23.169 | 4 | | declaration, yes. |
| 00:06:28.876 | 5 | Q. | And you just -- I believe you just |
| 00:06:32.413 | 6 | | testified you reviewed that declaration prior to this |
| 00:06:35.651 | 7 | | deposition, did you not? |
| 00:06:38.824 | 8 | A. | I did just say that, yes. |
| 00:06:42.385 | 9 | Q. | And can you affirm that the statements |
| 00:06:44.351 | 10 | | in the declaration are true and correct? |
| 00:06:48.581 | 11 | A. | Yes, they are. |
| 00:06:51.764 | 12 | Q. | I want to ask you about a few |
| 00:06:53.640 | 13 | | paragraphs of the declaration. And to start with, |
| 00:06:57.751 | 14 | | let's take a look at paragraph 10. In that |
| 00:07:04.545 | 15 | | paragraph you state that Flight 289 left the gate at |
| 00:07:08.756 | 16 | | London Heathrow at 15:12 GMT, and arrived at Phoenix |
| 00:07:14.622 | 17 | | Sky Harbor at 1:35 GMT. Do you see that? |
| 00:07:18.733 | 18 | A. | I do see -- I see that, yes. |
| 00:07:21.078 | 19 | Q. | I assume that you reviewed some |
| 00:07:23.670 | 20 | | British Airways' records to confirm those details |
| 00:07:27.453 | 21 | | before you put those in the -- in the declaration? |
| 00:07:30.758 | 22 | A. | Yes, initially when the declaration |
| 00:07:34.013 | 23 | | was put together, yes. |
| 00:07:36.617 | 24 | Q. | All right. And then if we -- well, |

# EXHIBIT 32

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually,       )
as Personal Representative of the  )No.2:14-cv-00420-SMM
Estate of JAMES DONALD BAILLIE,       )
II, and on behalf of all heirs and )
next of kin of JAMES DONALD               )
BAILLIE, II, deceased,                        )
                                                              )
          Plaintiff,                               )
                                                              )
          vs.                                          )
                                                              )
MEDAIRE, INC.; STEVEN JOE REINHART,)
D.O.; and JESSICA MONAS, M.D.,        )
                                                              )
          Defendants.                          )
_____)


VIDEO RECORDED DEPOSITION OF LINDA ANN BAILLIE

Phoenix, Arizona
January 4, 2016
10:36 a.m.


REPORTED BY:
STEPHANIE WINTERS, RPR
Certified Reporter, No. 50067

Page 84

1      A.    Yes.

2      Q.    Okay.  Now, the reason I went over these trips

3   that started earlier in 2012 and right at the end of January

4   up to the time of the incident, is that generally consistent

5   with how much your husband traveled for work or was that out

6   of the ordinary?

7      A.    That one probably was a little bit more.  Looking

8   back on it, it seemed like he was gone for three months.

9   But he did travel a lot.  But I -- again, I would say the

10  out-of-the-country ones -- this happened like this and then

11  it would be a long time before he would go out of the

12  country again.  It would just be back and forth to Austin

13  and whatever.

14          So I would say he traveled a lot, but this seemed

15  like a little bit more during that time frame.  I don't know

16  what was going on in the business or what the meetings were

17  about and what was going on, but --

18     Q.    Okay.  Exhibit 134, Mrs. Baillie, is your

19  Declaration filed in the lawsuit over in California.  And if

20  you turn to the fifth page of the Declaration.  They're

21  numbered at the bottom.  I think you've gone one too far.

22     A.    It says five, page five?

23     Q.    It should look like this.

24          MR. SPRAGG:  The next page.

25          THE WITNESS:  Oh, yes.

1    BY MR. THOMSON:

2         Q.    The second number five.  Could you confirm that

3    that is your signature?

4         A.    Yes.

5         Q.    And it says here that you declare under the

6    penalty of perjury under the laws of the United States of

7    America that the foregoing is true and correct.  And you

8    understand that to be sort of basically the same oath you

9    took before you testified today?

10        A.    Yes.

11        Q.    Okay.  If you would, turn to the second page of

12   Exhibit 134.  At paragraph seven it says this, and I'm

13   quoting now, "Although my husband's condition was very grave

14   while he was hospitalized, I asked him to give me his

15   account of what happened to him before and during the

16   British Airways flight," end quote.

17             As best you can, how many times did you speak to

18   your husband while he in the hospital about the British

19   Airways flight from London to Phoenix?

20        A.    Probably only maybe three times.

21        Q.    Okay.  Does this Declaration recount, as best you

22   could recall, what he told you about that flight?

23        A.    Yes.

24        Q.    Is the Declaration accurate, to the best of your

25   ability to recall those conversations?

1       A.    Yes.

2       Q.    I don't know when it is that -- the last time you

3   looked at this Declaration, but is there anything in here

4   you would want to change?

5       A.    No, I did actually read this recently and it is

6   correct.

7              (Interruption in proceedings.)

8              THE VIDEOGRAPHER:  Sorry about that.  I don't know

9   why it's doing that.  I shut it off.  Sorry about that.  Go

10  ahead.

11  BY MR. THOMSON:

12      Q.    Turn to the next page, which is page three of the

13  Declaration.  And if you would, let's just start with

14  paragraph nine.  And since it's your Declaration, let me ask

15  you to read that paragraph into the record, please.

16      A.    "My husband told me that on March 23, 2012, he had

17  arrived at London Heathrow airport on a flight from Munich,

18  Germany and had to rush to make his flight from London to

19  Phoenix."

20      Q.    Does that accurately recount what your husband

21  told you?

22      A.    Yes.

23             MR. SPRAGG:  Objection.  Hearsay.  You can answer.

24             THE WITNESS:  Yes.

25

1   BY MR. THOMSON:

2          Q.   Same question for paragraph 10.  Please read that.

3          A.   "He told me that he had to hurry to make British

4   Airways Flight 289 and that when he arrived at the gate he

5   was having breathing problems and feeling discomfort in the

6   center of his chest."

7          Q.   Does that accurately recount what your husband

8   told you?

9              MR. SPRAGG:  Objection.  Hearsay.  You can answer.

10             THE WITNESS:  Yes.

11  BY MR. THOMSON:

12         Q.   Please read paragraph 11.

13         A.   "My husband told me that by the time he got on

14  board the airplane a few minutes later, the discomfort in

15  his chest had become painful.  So right away he told the

16  flight attendant that he was not feeling well and had chest

17  pains and was short of breath and that he wasn't sure he

18  should be on the flight."

19         Q.   Does that accurately recount what your husband

20  told you?

21         A.   Yes.

22             MR. SPRAGG:  Objection.  Hearsay.

23             THE WITNESS:  Yes.

24  BY MR. THOMSON:

25         Q.   Please read paragraph 12.

1        A.    "He told me that the flight attendant told him to

2   please sit down in his seat and that they would take care of

3   him, so he did."

4        Q.    Does that accurately recount what your husband

5   told you?

6               MR. SPRAGG:  Objection.  Hearsay.  You can answer.

7               THE WITNESS:  Yes.

8   BY MR. THOMSON:

9        Q.    Please read paragraph 13.

10       A.    "My husband told me that after sitting for a

11  minute or two, the pain in his chest had not gone away, so

12  he told the flight attendant again that he was short of

13  breath and experienced chest pains and that he really did

14  not feel well."

15       Q.    Does that accurately recount what your husband

16  told you?

17              MR. SPRAGG:  Objection, hearsay.  You can answer.

18              THE WITNESS:  Yes.

19  BY MR. THOMSON:

20       Q.    Please turn to the next page and read

21  paragraph 14.

22       A.    "He told me that the flight attendant again asked

23  him to take his seat and told him that they would take care

24  of him."

25       Q.    Does that accurately recount what your husband

1    told you?

2         MR. SPRAGG:  Objection.  Hearsay.  You can answer.

3    BY MR. THOMSON:

4         Q.  Please read paragraph 15.

5         A.  "My husband told me that a short time later, the

6    airplane door was closed by the flight attendants and that

7    at that moment he felt imminent doom."

8         Q.  Does that accurately recount what your husband

9    told you?

10        MR. SPRAGG:  Objection.  Hearsay.  You can answer.

11             THE WITNESS:  Yes.

12   BY MR. THOMSON:

13        Q.  All right.  Please read paragraph 16.

14        A.  "He told me that he remembered the general advice

15   of taking aspirin if you feel you're having a heart attack,

16   so he took one or two of the aspirins that he had with him."

17        Q.  Does that accurately recount what your husband

18   told you?

19             MR. SPRAGG:  Objection.  Hearsay.  You can answer.

20             THE WITNESS:  Yes.

21   BY MR. THOMSON:

22        Q.  Please read paragraph 17.

23        A.  "My husband told me that the airplane then taxied

24   and took off."

25        Q.  Does that accurately recount what your husband

Page 90

1   told you?

2            MR. SPRAGG:  Objection.  Hearsay.  You can answer.

3            THE WITNESS:  Yes.

4   BY MR. THOMSON:

5       Q.   Please read paragraph 18.

6       A.   "He told me that shortly after the plane" --

7   "airplane took off, the pressure in his chest became very

8   painful and that he felt terrible."

9       Q.   Does that accurately recount what your husband

10  told you?

11           MR. SPRAGG:  Objection.  Hearsay.  You can answer.

12           THE WITNESS:  Yes.

13  BY MR. THOMSON:

14      Q.   Please read paragraph 19.

15      A.   "My husband told me that he remembered that there

16  were some doctors on the airplane but they weren't able to

17  help him with his pain and discomfort."

18      Q.   Does that accurately recount what your husband

19  told you?

20           MR. SPRAGG:  Objection.  Hearsay.  You can answer.

21           THE WITNESS:  Yes.

22  BY MR. THOMSON:

23      Q.   Please read paragraph 20.

24      A.   "He told me that he remembered the flight

25  attendants talking to him and that he overheard them

1    speaking to the pilot."

2         Q.    Does that accurately recount what your husband

3    told you?

4              MR. SPRAGG:  Objection.  Hearsay.  You can answer.

5              THE WITNESS:  Yes.

6    BY MR. THOMSON:

7         Q.    Please read paragraph 21.

8         A.    "He told me that the airplane didn't try to land

9    at any other airport, but instead continued all the way to

10   Phoenix."

11        Q.    Does that accurately recount what your husband

12   told you?

13             MR. SPRAGG:  Objection.  Hearsay.  You can answer

14   the question.

15             THE WITNESS:  Yes.

16   BY MR. THOMSON:

17        Q.    Other than the things we have just had you read

18   out of the Declaration, Mrs. Baillie, did -- when you spoke

19   to your husband in the hospital about the flight, did he

20   tell you anything else that happened during the flight?

21        A.    No.

22        Q.    Did he say anything about any kind of treatment he

23   received on the airplane?

24             MR. SPRAGG:  Objection.  Hearsay, but you can

25   answer.

# EXHIBIT 33

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually,  )
as Personal Representative of the  )No.2:14-cv-00420-SMM
Estate of JAMES DONALD BAILLIE,  )
II, and on behalf of all heirs and )
next of kin of JAMES DONALD  )
BAILLIE, II, deceased,  )
  )
     Plaintiff,  )
  )
    vs.  )
  )
MEDAIRE, INC.; STEVEN JOE REINHART,)
D.O.; and JESSICA MONAS, M.D.,  )
  )
     Defendants.  )
_____)


VIDEO RECORDED DEPOSITION OF LAURA BAILLIE

Phoenix, Arizona
January  4, 2016
9:00 a.m.


REPORTED BY:
STEPHANIE WINTERS, RPR
Certified Reporter, No. 50067

Page 31

1    Q.    Okay.  Laura let me show you Exhibit 135.  For the

2    record, it is the Declaration of Francis G. Fleming in

3    Opposition to Motion for Summary Judgment.  The Declaration

4    is dated February 11, 2014.

5          You understand, do you not, that Mr. Fleming is

6    one of the attorneys representing your mother?

7    A.    Is that -- oh, Frank.  Yes.  Yes, I do understand

8    that.

9    Q.    Let me ask you to turn to page eight, if you

10   would, please.

11   A.    All right.

12   Q.    And if you would, please read paragraph 10 to

13   yourself and let me know when you're done, okay?

14   A.    Okay.  Oh, wait.  I didn't finish.  I'm sorry.

15   Okay.

16   Q.    According to Mr. Fleming's declaration, at

17   paragraph 10 he says that you and your mother were present

18   in the hospital when he asked your father several questions.

19   Do you recall that?

20   A.    I remember Frank coming in.

21   Q.    Okay.  And according to this Declaration,

22   Mr. Fleming says that he asked your father, when did the

23   chest pains begin and when did he report these chest pain to

24   BA, or British Air.  Do you recall those questions being

25   asked?

1    A.   Yeah.

2         Q.   Okay.  Then Mr. Fleming goes on to say that, "In

3    their presence and in response to my questions, Mr. Baillie

4    struggled to say that he had the chest pains as he was

5    rushing to make the flight and as soon as he got onboard, he

6    reported these pains to a flight attendant."  And then in

7    parentheses it says, "(It may have been Ms. Eva Van Den

8    Berg, and there were at least 16 other crew members on that

9    flight.)"

10        Do you recall your father saying that in response

11   to one of the questions asked by Mr. Fleming?

12        MR. SPRAGG:  Objection.  Foundation.  You can

13   answer.

14        THE WITNESS:  Okay.  Can you -- I'm sorry, can you

15   repeat the question, please?

16   BY MR. THOMSON:

17        Q.   Yes.  According to Mr. Fleming's Declaration, he

18   says, "In their presence," meaning you and your mother.

19        A.   Uh-huh.

20        Q.   "And in response to my questions," meaning his

21   questions, "Mr. Baillie struggled to say that he had the

22   chest pains as he was rushing to make the flight and as soon

23   as he got onboard, he reported these pains to a flight

24   attendant."  Do you recall your father saying that?

25        A.   Yes.

1          MR. SPRAGG:  Same objection.

2     BY MR. THOMSON:

3          Q.   Now, Mr. Fleming's Declaration at paragraph 10

4     goes on to say, "He," meaning your father, "further stated

5     to me," meaning Mr. Fleming, "that he had expressed his

6     concern about remaining on the flight for 10 hours and was

7     directed to sit down.  He was told BA would take care of him

8     and he would get better after resting a few moments, so he

9     sat down as instructed."  Do you recall your father saying

10    that?

11         A.   Yes.

12         MR. SPRAGG:  Objection.  Foundation.

13    BY MR. THOMSON:

14         Q.   Laura, are you claiming damages for yourself in

15    this lawsuit?

16         MR. SPRAGG:  Well, she's a beneficiary.  She's not

17    a direct plaintiff in the case.  So are you just -- are you

18    asking her it's her understanding that there are damages

19    being claimed on her behalf?

20         MR. THOMSON:  Well, I'll start with that.  I'm

21    just trying to find out who all is claiming damages and what

22    they are.

23         MR. SPRAGG:  You can answer it if you -- do you

24    understand the question?

25         THE WITNESS:  I don't understand what that --

# EXHIBIT 34

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually, as )

Personal Representative of the       )

Estate of JAMES DONALD BAILLIE, II, )No. 2:14-cv-00420-SMM

and on behalf of all heirs and next )

of kin of JAMES DONALD BAILLIE, II, )

deceased,                            )

                                     )

                                     )

          Plaintiffs,                )

                                     )

     vs.                             )

                                     )

MEDAIRE, INC.; STEVEN JOE REINHART, )

D.O.; and JESSICA MONAS, M.D.,       )

                                     )

          Defendants.                )

_____)

VIDEO RECORDED DEPOSITION OF DAVID ROY STREITWIESER, M.D.

Phoenix, Arizona

January 7, 2016

9:04 a.m.

Reported by:

Jennifer Honn, RPR

Arizona CR No. 50885

1    EPS, did you hold any other positions within the company?

2        A.    We had what we called co-directors, so there

3    were three senior directors.  I was one of those three.

4        Q.    What is the primary business of EPS, Doctor?

5        A.    We provide emergency services to currently five

6    emergency departments in the state of Arizona run by the

7    Banner Health Corporation.

8        Q.    Okay.  When you say you supply emergency

9    services, are you supplying the physicians who provide

10   those emergency medicine services?

11       A.    The physicians and any allied health providers.

12       Q.    Okay.  What do you mean by the term "allied

13   health providers"?

14       A.    Well, that means nurse practitioners and PAs,

15   physicians' assistants.

16       Q.    All right.  Does EPS also provide emergency

17   medicine physicians to MedAire?

18       A.    We have a separate contract to provide emergency

19   physicians for the MedLink service.

20       Q.    And that contract is with MedAire?

21       A.    Yes.

22       Q.    All right.  So EPS has a contract with the

23   Banner Health System, I believe you called it, in regard

24   to providing emergency medical services in their

25   emergency departments at their hospitals; correct?

1    A.    Yes.

2    Q.    Okay.  And EPS also has a contract with MedAire

3    to supply emergency physicians for the MedLink call

4    service; correct?

5    A.    Yes.

6    Q.    All right.  What is MedLink, Doctor?

7    A.    MedLink is a service provided by MedAire which

8    provides medical advice to a variety of clients.  The

9    majority, at least of our services, are for commercial

10   airlines.

11   Q.    All right.  And, Doctor, are you personally

12   compensated in any way by MedAire?

13   A.    Yes.

14   Q.    All right.  Do you have a -- what position -- do

15   you have a separate contract with MedAire personally?

16   A.    Yes.

17   Q.    All right.  Do you have a title in regard to the

18   work that you do for MedAire?

19   A.    Currently, they call me the MedLink medical

20   director.

21   Q.    All right.  So as the MedLink medical director,

22   do you have any responsibilities for the training of the

23   MedLink physicians?

24   A.    I am one of the physicians who helps train the

25   different physicians for MedLink.

# EXIBIT 35

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually,      )
as Personal Representative of the    )No.2:14-cv-00420-SMM
Estate of JAMES DONALD BAILLIE,       )
II, and on behalf of all heirs and   )
next of kin of JAMES DONALD           )
BAILLIE, II, deceased,                )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )
                                      )
MEDAIRE, INC.; STEVEN JOE REINHART,   )
D.O.; and JESSICA MONAS, M.D.,        )
                                      )
          Defendants.                 )
_____)


VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D.

Phoenix, Arizona
July 27, 2016
9:32 a.m.




REPORTED BY:
STEPHANIE WINTERS, RPR
Certified Reporter, No. 50067

1    that some of the MedAire protocols were somehow bad or
2    improper or something like that?

3         A.    Well, when I talk about MedAire protocols, I guess
4    I'm referring to some of the -- and again, whether that's
5    MedAire or that's the physicians and other contracted
6    agents, so -- and whether or not there are some, as we get
7    into it, there are issues that I had with the documentation
8    and the transfer from one physician to another.  Now,
9    whether that's a MedAire protocol or whether that's a
10   physician protocol, I'm not entirely sure.

11        Q.    But in any event, you don't claim -- I think you
12   just testified, you don't claim any expertise on how MedAire
13   should conduct its business?

14        A.    Correct.

15        Q.    Now, according to your expert report in
16   Exhibit 175, you're currently an interventional cardiologist
17   and you've been practicing that continuously since 1997; is
18   that right?

19        A.    Yes.

20        Q.    And since 1997, have you regularly practiced
21   medicine in any specialty other than interventional
22   cardiology?

23        A.    Just general cardiology and interventional
24   cardiology.  So that would be the limits of my practice.

25        Q.    Okay.  So I take it you hold yourself out as an

1   expert in interventional cardiology?

2        A.    Yes.

3        Q.    And you're board certified, I believe, in

4   interventional cardiology?

5        A.    Yes.

6        Q.    And I believe you're also board certified in

7   cardiology?

8        A.    Yes.

9        Q.    And you hold yourself out as an expert in general

10  cardiology as well?

11       A.    Yes.

12       Q.    Okay.  Now, as I understand it, cardiology is a

13  subspeciality of internal medicine; is it not?

14       A.    Yes.

15       Q.    Other than holding yourself out as an expert in

16  cardiology and interventional cardiology, do you hold

17  yourself out as an expert in any other medical specialties?

18       A.    I would say that I'm an expert in vascular

19  medicine as well, but I'm not board certified.

20       Q.    And vascular medicine involves what?

21       A.    It involves arterial diseases of other beds other

22  than the heart, such as legs and carotid arteries and aortas

23  and other circulatory diseases.

24       Q.    Any other areas that you hold yourself out as

25  expert in?

Page 23

1    that's unusual -- when you use that language, you're giving

2    an opinion that the MedLink physicians fell below the

3    medical standard of care in what they did?

4              MR. SPRAGG:  Objection.  You can answer.

5              THE WITNESS:  I would say that in my opinion, when

6    I qualify something as an unusual or unexpected event, I

7    would say that what I would consider the expected response

8    or what would typically happen, that it was not met.

9    BY MR. DANGERFIELD:

10        Q.   Well, can we agree that you have no background or

11   basis for assessing what typically happens when an emergency

12   physician gives remote medical advice to an airline?

13             MR. SPRAGG:  Objection.

14             THE WITNESS:  I have no experience.

15   BY MR. DANGERFIELD:

16        Q.   Okay.  So to put it plainly, you don't -- you

17   can't say what typically happens when a MedLink physician

18   gives remote medical advice to an airline, correct?

19        A.   No, I do not -- or cannot.

20        Q.   So when you say "unusual or unexpected," you're

21   not talking about what's unusual or unexpected in terms of a

22   physician giving remote medical advice to an airline,

23   correct?

24             MR. SPRAGG:  Objection.  Foundation.

25

1    BY MR. DANGERFIELD:

2        Q.   Because you have no experience in that?

3             MR. SPRAGG:   Same.

4             THE WITNESS:   Correct.

5    BY MR. DANGERFIELD:

6        Q.   But if I understand you, what you're saying is

7    that you as a cardiologist would have expected the doctors

8    to have done something different?

9        A.   That's correct.

10       Q.   So it's based on what you view as the standards

11   you would have employed in their position?

12       A.   It's what I would view as the standards that I see

13   most emergency room physicians employ.

14       Q.   But you're not an emergency room physician.  We

15   have already agreed to that?

16       A.   That's correct.

17       Q.   And you don't claim to be an expert in that,

18   right?

19       A.   I do not claim to be an expert.

20       Q.   So to the extent you're basing your unusual and

21   unexpected on anything you've participated in, it's based on

22   what you've seen -- well, let me start that over.

23            MR. SPRAGG:   Objection.  Form.

24            MR. DANGERFIELD:   That's why I'm starting it

25   over.

1      A.    You'll have to refresh my memory.

2      Q.    Okay.  I'm handing you a copy of your deposition

3    given on September 22nd, 2015.

4      A.    Okay.

5      Q.    For the moment, we won't mark it as an exhibit

6    since it's pretty big.  But let me just first of all have

7    you look at it, Doctor and let me know if that appears to be

8    a copy of your deposition transcript.

9      A.    It does.

10     Q.    Okay.  So let me have you turn to page 170.

11     A.    170?

12     Q.    Yes, uh-huh.  And this testimony goes over to --

13   starts at the bottom of 170 and goes over to 171.  But let

14   me start off at line 18 on page 170.  I say, "I'm just --

15   what I'm really asking, Doctor, is if someone were to ask

16   you, gee, Doctor, based on everything you know, do you think

17   it more probable than not that his heart attack coincided

18   with the onset of his symptoms when he was running to catch

19   the plane?"  And there's some objections by counsel and you

20   then ask, at line five of page 171, "And the question as I

21   understand it, is it likely that's when it occurred?"  And

22   then your counsel, Mr. Struble, says, "Well that's the

23   question he asked before.  This time he's getting close to

24   getting it correctly, which is" -- "which is, is it within a

25   reasonable degree of probability, more likely than not,

Page 50

1   that's when it occurred."  And your answer to that is "Yes,"
2   correct?
3        A.   Yes.
4             MR. SPRAGG:  Foundation.  Objection.  Foundation.
5   BY MR. DANGERFIELD:
6        Q.   And you still agree with that testimony?
7        A.   Yes.
8             MR. SPRAGG:  Objection.
9   BY MR. DANGERFIELD:
10       Q.   So we can agree that, based on everything you
11  know, within a reasonable degree of probability, more likely
12  than not, Mr. Baillie's heart attack began as he was rushing
13  to catch the plane?
14            MR. SPRAGG:  Objection.
15            THE WITNESS:  Yes.
16  BY MR. DANGERFIELD:
17       Q.   Okay.  All right.  Let's shift to a slightly
18  different subject matter now, Doctor.
19            Do you still have in front of you the transcript
20  of the patch, the audio patch between British Airways
21  Flight 289 and the MedLink physicians?
22       A.   Yes.
23       Q.   I want to focus here for the next few questions on
24  what Mr. -- excuse me -- about what Dr. Reinhart was told
25  about Mr. Baillie's symptoms, and explore that with you for

1    just a few minutes.

2              You were just referring to, a few minutes ago, the

3    first time Dr. Reinhart gets on the line, which is in the

4    middle of the first page of Exhibit 18, the transcript,

5    where he says, "Hello, Dr. Reinhart" -- the pilot says,

6    "Hello, Dr. Reinhart, Speedbird 289 here." Are you looking

7    at that section?

8         A.   Yes.

9         Q.   All right. And then Dr. Reinhart states that he

10   understands "We have a 61-year-old male passenger that's

11   having some centralized chest pain and is pale. We have him

12   on supplemental oxygen." Do you see that?

13        A.   Yes.

14        Q.   So at that point, the only thing Dr. Reinhart has

15   been advised about is that the passenger is a 61-year-old

16   male, correct?

17             MR. SPRAGG:  Objection.  Foundation.

18             THE WITNESS:  Yes.

19   BY MR. DANGERFIELD:

20        Q.   That's one thing.  That has centralized chest pain

21   and is pale.

22        A.   Yes.

23        Q.   All right. And then he asks whether he has any

24   cardiac history. And the pilot says, "I'm going to" --

25   "What I'm going to do is hand you over to Eva, who's the

1    crew member dealing with him."  And then Eva gets on the

2    satellite phone, it appears.  Do you see that?

3         A.    Yes.

4         Q.    And in response to Dr. Reinhart's questions about

5    does she know if he has any cardiac history, Eva reports,

6    "We did ask him and he said that he's got no medications

7    with him and he doesn't have any history of any cardiac,

8    nothing at all.  No, nothing at all."  Do you see that?

9         A.    Yes.

10        Q.    So that's another fact Dr. Reinhart knows.

11   61-year-old male.  He's pale.  Centralized chest pain.  No

12   cardiac history.  Has no medications with him, correct?

13        A.    Correct.

14        Q.    And then he's advised that he took an aspirin a

15   few hours ago, about three hours and 20 minutes ago,

16   correct?

17        A.    Yes.

18        Q.    Now, let's stop right there for just a minute.

19   Based solely on that information that he's been provided,

20   61-year-old male, centralized chest pain, pale, no cardiac

21   history, no medications, do you believe that at that point

22   Dr. Reinhart should have immediately recommended that the

23   plane divert for an emergency landing?

24              MR. SPRAGG:  Objection.  Foundation.

25              THE WITNESS:  No.

1   BY MR. DANGERFIELD:

2       Q.   And those -- those indicia that we have just

3   mentioned, those symptoms, they could be consistent with any

4   number of medical problems, couldn't they?

5       A.   Yes.

6       Q.   One possibility would be a heart attack, correct?

7       A.   Yes.

8       Q.   But at that point in time, knowing only those few

9   facts, you wouldn't be able to conclude that Mr. Baillie was

10  likely having a heart attack, would you?

11      A.   No.

12      Q.   Okay.  And so the next thing that Dr. Reinhart

13  does is to express his concern.  He says -- in the top of the

14  the page you see he says, "I'm just a little bit concerned

15  about with his age, the pain and the fact that he's pale,

16  that maybe we should have a medical person evaluate him, get

17  a set of vital signs and we can determine whether his blood

18  pressure is stable enough that we can try a nitrogylcerin."

19  Do you see that?

20      A.   Yes.

21      Q.   I take it you don't disagree with what Mr. -- with

22  what Dr. Reinhart did there, do you?

23      A.   No.

24      Q.   And so then they hang up and they go and they call

25  for a doctor on board.  And so far, at this point, is it --

1    Q.   Okay.  So you see, you say here, "Prior to

2    Mr. Baillie's myocardial infarction, he was a healthy

3    61-year-old man who was employed as a vice president of a

4    semiconductor company."  Do you see that?

5         A.   Yes.

6         Q.   Now, although it appeared on the outside that

7    Mr. Baillie was a healthy 61-year-old man, can we agree that

8    prior to his boarding the plane he, in fact, suffered from

9    some serious coronary artery disease?

10        A.   Yes.

11        Q.   And I believe you testified in your prior

12   deposition that coronary artery disease develops over a

13   period of years?

14        A.   Yes.

15        Q.   When you did your angiogram on Mr. Baillie, you

16   concluded that he had not only an occluded LAD, but also

17   multi-vessel coronary artery disease, correct?

18        A.   Correct.

19        Q.   And let me just talk first of all about the heart

20   attack itself that he had.  I believe you agreed in your

21   prior deposition, but let me just ask you again now.  A

22   what's called a STEMI, or an ST Elevated Myocardial

23   Infarction, is a very serious type of heart attack, correct?

24        A.   Correct.

25        Q.   And it's a heart attack that has a high mortality

1    rate, is it not?

2         A.    Correct.

3         Q.    As a matter of fact, let me have you look at the

4    ACC, AHA Guidelines that we marked as Exhibit 177.  A few

5    pages from the start, I believe it's page E91 in that copy

6    that we marked as an exhibit, there's a section that --

7    section number three, "Management Before STEMI."  Do you see

8    that section?

9         A.    Yes.

10        Q.    And it says, "One third of patients who experience

11   STEMI will die within 24 hours of the onset of ischemia, and

12   many of the survivors will suffer significant morbidity."

13   Do you see that?

14        A.    Yes.

15        Q.    And that's a reflection of how serious it is to

16   suffer this type of heart attack, correct?

17        A.    Yes.

18        Q.    And in fact, it's my understanding, but I'll ask

19   you to confirm this, that a number of patients, a

20   significant percentage of patients who die from a STEMI die

21   before they ever get to the hospital.  Would that be

22   consistent with your experience?

23        A.    Yes.

24        Q.    Now, as to those -- once someone has suffered a

25   STEMI, assuming he or she survives, would you agree that

1  that person will have a higher overall mortality rate than

2  someone who has never suffered such a heart attack?

3       A.   Yes.

4       Q.   And for patients who have suffered a -- not only

5  suffered a STEMI, but also suffer from multiple vessel

6  disease, as did Mr. Baillie, they will have a higher rate of

7  mortality than someone that just presented with a single

8  impaired artery, correct?

9       A.   Yes.

10           MR. SPRAGG:  Objection.  Foundation.

11           THE WITNESS:  Yes.

12  BY MR. DANGERFIELD:

13       Q.   So even if -- assuming that Mr. Baillie had

14  survived his STEMI, can we agree that he would have had --

15  he had a shortened normal life expectancy based on the fact

16  that he suffered a STEMI and had multiple vessel CAD?

17       A.   Yes.

18       Q.   Would you be able to quantify that shortened life

19  expectancy?

20       A.   No.

21       Q.   Okay.  In your rebuttal report, which -- let's

22  turn to that now for just a minute.  There's a discussion on

23  the second page, in the bottom half of the page about --

24  generally about the effect of delay in treatment on the

25  ability to salvage myocardium when someone has a heart

1 attack. Do you see that?

2      A.   Yes.

3      Q.   And you had read Dr. Budoff's report that attached

4 to it a chart at the end of it. And I think you were

5 responding to that chart in these comments on page two?

6      A.   Yes.

7      Q.   And you say, "Dr. Budoff states that treatment

8 must occur within a six-hour window. However, analysis of

9 the chart does depict a benefit, albeit diminished, with

10 interventional treatment later than six hours after the

11 onset of the infarction." Did I read that correctly?

12      A.   Yes.

13      Q.   So I want to talk about the effect of delays and

14 reperfusion on myocardial salvage. And I want to start by

15 introducing the article from which that chart attached to

16 Dr. Budoff's opinion was taken, and we can maybe chat about

17 that.

18            MR. DANGERFIELD: What number was that?

19            THE COURT REPORTER: 179.

20            (Exhibit Number 179 was marked for

21 identification.)

22 BY MR. DANGERFIELD:

23      Q.   Showing you what we have marked as Exhibit 179.

24 This is an article from the February 23rd, 2005, Journal of

25 the American Medical Association, correct?

1     A.    Yes.

2         Q.    Do you know if you've ever read that article,

3     Doctor?

4     A.    Yes.

5         Q.    Yes, you have?

6     A.    Yes.

7         Q.    Okay. And did you read in it connection with this

8     case or just in connection with your normal practice?

9     A.    I had read it in the past, but reread it in

10    connection with this case.

11        Q.    All right. And if you turn to page two of the

12    article, in the left-hand corner, that's the chart that was

13    attached to Dr. Budoff's opinion, correct?

14    A.    Yes.

15        Q.    And looking at that chart, you'll see that it

16    says -- there's a little box on the chart that says "Shifts

17    in Potential Outcomes With Different Treatment Strategies."

18    Do you see that?

19    A.    Yes.

20        Q.    And then toward the -- or right underneath the

21    chart is a little explanation. And let me just read the

22    first sentence of that. It says, "Mortality reduction as a

23    benefit of reperfusion therapy is greatest in the first two

24    to three hours of the onset of symptoms of acute myocardial

25    infarction, most likely a consequence of myocardial

1    salvage." Do you see that?

2         A.    Yes.

3         Q.    And based on your training and experience, do you

4    agree with that statement?

5         A.    Yes.

6         Q.    And in fact, in your own Declaration that we have

7    talked about in this case, you say that that treatment

8    should preferably have been made within the first hour after

9    symptoms appear, correct?

10        A.    Correct.

11        Q.    Now, we can agree -- well, let me rephrase that

12   question.

13             The data that is reflected in this chart on page

14   two of the article, do you have any reason to disagree with

15   the information being presented there?

16        A.    No.

17        Q.    And what it shows is that after about four hours

18   of elapsed time following the onset of symptoms, the rate of

19   mortality reduction that can be accomplished with PCI

20   flattens out considerably, correct?

21        A.    Yes.

22        Q.    And so the chart says that if you shift the

23   treatment from the time period of A to the time period of B,

24   there's no benefit that would be received by -- by doing

25   that, correct?

1      A.     That's what the chart says.  What the text says is

2   that the benefit of a shift from point A to B would be

3   small.

4      Q.     Okay.  And you don't disagree with that, I take

5   it?

6      A.     No.

7      Q.     And if you -- the points at A and B appear to be

8   at about 11 hours at A, and B appears to be about at

9   six-and-a-half hours, it looks like.  Would you agree with

10  that?

11     A.     Yes.

12     Q.     Now, in this case -- well, strike that.  Let me

13  ask a different question.

14            In your prior deposition, Doctor, you testified

15  that had Mr. Baillie not been able to get his artery opened

16  up until eight hours after his heart attack began, it's

17  likely that the extensive damage to his heart revealed by

18  your angiogram would have already occurred.

19     A.     Yes.

20     Q.     And you still agree with that today?

21     A.     Yes.

22     Q.     Would your answer be the same if I ask you whether

23  Mr. Baillie had not been able to get his artery opened up

24  until six hours after his heart attack began, whether it's

25  likely that the extensive damage to his heart would have

1    already occurred?

2         A.    My answer always is going to be that the earlier

3    treatment is going to be associated with less -- less

4    damage; so --

5         Q.    But in the case of eight hours, if -- once eight

6    hours have elapsed, you've testified that by that point the

7    damage -- referring to Mr. Baillie's heart, by the time

8    eight hours had elapsed following the onset of his heart

9    attack, it's likely that the extensive damage to his heart

10   had already occurred?

11        A.    Yes.

12        Q.    And we have agreed that the heart attack, to a

13   reasonable degree of medical probability, likely began as he

14   was rushing to catch the plane.

15             MR. SPRAGG:  Objection.  Foundation.

16             THE WITNESS:  We've -- I'm not sure what we've

17   agreed to, but --

18   BY MR. DANGERFIELD:

19        Q.    Okay.  That was your testimony.

20             MR. SPRAGG:  Objection.  Foundation.

21   BY MR. DANGERFIELD:

22        Q.    Is it still your testimony?

23        A.    I think I've said that the likelihood was that

24   his -- his onset of chest pain was when his onset of

25   infarction was.

1    Q.   To a reasonable degree of medical probability?

2    A.   Yes.

3    Q.   Okay.  And that onset was roughly four hours

4  before British Airways ever called MedAire, correct?

5         MR. SPRAGG:  Objection.  Foundation.

6         THE WITNESS:  Yes.

7  BY MR. DANGERFIELD:

8    Q.   You've read in Dr. Roth's report, I assume, that

9  at the time the airline called MedAire, the plane was over

10  the north Atlantic Ocean and that the closest diversion

11  point that would have had adequate medical facilities was

12  two hours away, have you not?

13   A.   Yes.

14   Q.   And you don't have any reason to disagree with

15  that, do you?

16   A.   No.

17   Q.   So that would mean that assuming Dr. Reinhart had

18  recommended that the plane divert, the earliest the plane

19  would have even gotten to a hospital would have been about

20  six hours after the heart attack likely occurred, correct?

21        MR. SPRAGG:  Objection.  Foundation.

22        THE WITNESS:  Yes.

23  BY MR. DANGERFIELD:

24   Q.   And would you agree with me that -- let me ask a

25  different question.

Page 95

1        In the actual facts of this case, it's true, isn't

2   it, that it took just over two hours from the time the plane

3   landed until Mr. Baillie was able to have his artery opened

4   up through your intervention?

5        A.   Yes.

6        Q.   And so if we assume a similar two-hour time

7   period, had the plane diverted over the north Atlantic

8   Ocean, that means it would have been six hours until the

9   plane got on the ground, and eight hours until Mr. Baillie's

10  artery was opened up, correct?

11            MR. SPRAGG:  Objection.  Foundation.

12            THE WITNESS:  Approximately.

13  BY MR. DANGERFIELD:

14       Q.   Approximately.  Let me go back to this article

15  again that we were looking at.  If you look at the second

16  page of the article, about in the middle of the page to the

17  bottom, there's a heading "Rationale for Facilitated PCI."

18  Do you see that?

19       A.   Yes.

20       Q.   It says that -- ignoring -- overlooking the first

21  sentence and looking at the second sentence -- the curve

22  describing -- well, let me do it again.  We better read the

23  first sentence to keep it in perspective.

24            The first sentence says, "A fundamental tenet of

25  reperfusion therapy is that time is of the essence, because

Page 113

1    quote "cardiac symptoms which persist for 20 to 30 minutes

2    and cannot be relieved," close quote.  And he answered, "No,

3    I haven't."  Do you recall that?

4         A.   Yes.

5         Q.   And do you recall that when he was later asked

6    what medically justifies a diversion, he responded that it's

7    multifactorial and depends on the entire situation?

8         A.   That's correct.

9         Q.   Dr. Candipan, do you have -- have you formed an

10   opinion in this case within a reasonable degree of medical

11   probability as to whether Mr. Baillie would have survived if

12   his artery had been opened between six and eight hours after

13   the onset of his symptoms?

14        A.   I believe that he would have had a better

15   survival.  Ultimately we can't tell if he would have

16   survived, but I think it would have improved his chances for

17   survival.

18        Q.   So just to repeat my question, maybe refocus it

19   slightly, I take it then you have not formed an opinion

20   within a reasonable degree of medical probability that

21   Mr. Baillie would have survived if his artery had been

22   opened between six and eight hours after the onset of his

23   symptoms?

24        A.   My opinion is that he would have had an improved

25   chance for survival.

1        Q.    He would have had an improved chance of survival,

2   but I take it you're not able to --

3        A.    Determine whether he would survive ultimately or

4   not.

5        Q.    Okay.  Correct.  So you have not determined within

6   a reasonable degree of medical probability that Mr. Baillie

7   would have survived if his artery had been opened between

8   six and eight hours after the onset of his symptoms.

9        A.    One cannot --

10            MR. SPRAGG:  His answer stands.  But you can go

11  ahead and answer.

12            THE WITNESS:  One cannot be certain.

13  BY MR. DANGERFIELD:

14       Q.    But I'm not asking for certainty.  I'm just

15  saying, you have not arrived at an opinion within a

16  reasonable degree of medical probability that Mr. Baillie

17  would have survived --

18       A.    No.

19       Q.    -- had his artery had been opened between six and

20  eight hours after the onset of his symptoms?

21       A.    The answer is no.

22       Q.    Okay.  Would it be the same response if I asked --

23  if I changed the time period from four to six hours after

24  the onset of his symptoms?

25            MR. SPRAGG:  Objection.

1          THE WITNESS:  Again, same answer.  The chance of

2    survival would have improved.  However, as with any

3    myocardial infarction, as we established early on, that

4    there's a high degree of mortality, even with treatment.

5    BY MR. DANGERFIELD:

6          Q.    And I believe we have also agreed, based on a

7    variety of studies, that the benefits are small in reducing

8    the time from, say, twelve hours to six hours?

9               MR. SPRAGG:  Objection.

10              THE WITNESS:  We have -- we have -- the chances

11   of -- let's see.  Say that again.

12   BY MR. DANGERFIELD:

13         Q.    All right.  Yeah.  Would you agree with me that

14   the benefits from PCI are small -- let me try one more time.

15              Would you agree with me that the benefits from

16   reducing the time to reperfusion from twelve hours to six

17   hours are small?

18              MR. SPRAGG:  Objection.

19              THE WITNESS:  Yes.

20   BY MR. DANGERFIELD:

21         Q.    In your rebuttal report, you have a section on --

22   responding to Dr. Budoff's comments about the futility of

23   implanting the left ventricular -- or excuse me, the right

24   ventricular assist device in the total artificial heart.  Do

25   you recall that part of your report?

# EXHIBIT 36

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


LINDA ANN BAILLIE, individually,)
as Personal Representative of  )
the Estate of JAMES DONALD     )
BAILLIE, II, and on behalf of  )
all heirs and next of kin of   )
JAMES DONALD BAILLIE, II,      )
deceased,                      )
                               )
            Plaintiff,         )
                               )
       v.                      ) No. 2:14-CV-00420-SMM
                               )
MEDAIRE, INC., STEVEN JOE      )
REINHART, D.O. and JESSICA     )
MONAS, M.D.,                   )
                               )
            Defendants.        )
_____)




VIDEOTAPED DEPOSITION OF MATTHEW J. BUDOFF, M.D.

Friday, August 16, 2016

Torrance, California




Reported by:  Cheryl Sletta, CSR, RPR



Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax

Page 36

1    which you've described for me, but that would tend

2    to make someone's time between onset of symptoms and

3    injury to the myocardium greater?

4         A    Yes.  And that's why we use drugs like

5    beta blockers during angina or a heart attack to --

6    to prolong that time, because you can lower the

7    oxygen demands by decreasing the heart rate,

8    decreasing the blood pressure.  And we provide

9    oxygen to them as well to try to decrease the demand

10   and increase the supply.

11        Q    And the last factor in this sentence is

12   sustained ischemia?

13        A    So yeah.  So the concept that it's just

14   continued ischemia the whole time, that they didn't

15   have a break in the chest pain, that the chest pain

16   or ischemia as we know it was continuous.

17        Q    All right.  Which would tend to extend the

18   time between onset of symptoms and necrosis of the

19   myocardium?

20        A    I think that one would be the -- a

21   worsening one.  The more -- the more constant the

22   burden on the heart, the worse it would be.

23        Q    Okay.  I see.

24             So the thrust of the sentence, taking into

25   account all of the factors mentioned, is that the

Page 37

1    curve by definition is not all that accurate?

2              MR. DANGERFIELD:  Object as to form.

3              THE WITNESS:  Well, I mean, I think the

4    curve is accurate.  It's based on thousands of

5    patients, and Dr. Gersh at the Mayo Clinic is one of

6    the most well-regarded scientists in our field.

7              So I would say that to his benefit and

8    to -- to our understanding that it is an accurate

9    curve.  I would say that it can be modified by

10   individual factors, but I think the curve is

11   accurate and I think that -- that he's trying to

12   imply that there are factors that can shift the

13   curve in an individual patient.

14   BY MR. FLEMING:

15        Q    I see.  Okay.  Thank you very much.

16             I didn't mean to impugn his work either,

17   but what it means is that when you use this kind of

18   a curve to predict the outcome of an individual, the

19   curve may have to be modified for any or all of

20   those factors, correct?

21        A    Absolutely.

22        Q    Okay.  And by the way, you mentioned you

23   treat some patients with oxygen who are in the

24   critical period between onset of symptoms and

25   removal of blockage.

# EXHIBIT 37

CERTIFICATION OF VITAL RECORD

# STATE OF ARIZONA

STATE OF ARIZONA
DEPARTMENT OF HEALTH SERVICES - OFFICE OF VITAL RECORDS
CERTIFICATE OF DEATH

State File NO. 102-2012-027123

| 1. DECEDENT'S LEGAL NAME (FIRST, MIDDLE, LAST) | | 2. AKA'S (IF ANY) | | | | 3. DATE OF DEATH |
|---|---|---|---|---|---|---|
| JAMES DONALD BAILLIE II | | | | | | JULY 01, 2012 |

| 4. SEX | 5. SOCIAL SECURITY NUMBER: | 6. DATE OF BIRTH | 7. AGE | UNDER 1 YEAR | | UNDER 1 DAY | |
|---|---|---|---|---|---|---|---|
| | | | | 8. MONTHS | 9. DAYS | 10. HOURS | 11. MINUTES |
| MALE | 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 | 08-20-1950 | 61 | | | | |

| 12. PLACE OF DEATH - HOSPITAL: | 13. PLACE OF DEATH - OTHER THAN HOSPITAL: |
|---|---|
| ☒ INPATIENT  ☐ E.R./OUTPATIENT  ☐ DEAD ON ARRIVAL | ☐ NURSING HOME OR LONG TERM CARE FACILITY  ☐ RESIDENCE  ☐ HOSPICE FACILITY  ☐ OTHER |

| 14. FACILITY NAME (OR STREET ADDRESS IF NOT A FACILITY): | 15. CITY, TOWN & ZIP CODE OR LOCATION OF DEATH. | 16. COUNTY OF DEATH. |
|---|---|---|
| MAYO CLINIC HOSPITAL | PHOENIX 85054 | MARICOPA |

| 17. BIRTHPLACE (CITY AND STATE OR FOREIGN COUNTRY) | 18. MARITAL STATUS AT TIME OF DEATH: | 19. NAME OF SURVIVING SPOUSE (MAIDEN NAME IF WIFE) |
|---|---|---|
| CORPUS CHRISTI, TEXAS | MARRIED | LINDA ANN GONZALEZ |

| 20. DECEDENT'S USUAL RESIDENCE STREET ADDRESS: | 21. CITY AND COUNTY: | 22. STATE | 23. ZIP CODE | 24. EVER IN THE ARMED FORCES |
|---|---|---|---|---|
| 3445 E INDIGO CIR, | MESA, MARICOPA | ARIZONA | 85213 | YES |

| 25. WAS DECEDENT OF HISPANIC ORIGIN? | 26. DECEDENT'S RACE(S): | 27. IF AMERICAN INDIAN OR ALASKA NATIVE SPECIFY UP TO 4 TRIBES. |
|---|---|---|
| ☒ NO, NOT SPANISH, HISPANIC OR LATINO<br>☐ YES, MEXICAN, MEXICAN AMERICAN, CHICANO<br>☐ YES, PUERTO RICAN<br>☐ YES, CUBAN<br>☐ YES, OTHER (SPECIFY)<br>☐ UNKNOWN | ☒ WHITE<br>☐ BLACK, AFRICAN AMERICAN<br>☐ NATIVE HAWAIIAN<br>☐ ASIAN INDIAN<br>☐ CHINESE<br>☐ FILIPINO<br>☐ JAPANESE<br>☐ GUAMANIAN OR CHAMORRO<br>☐ KOREAN<br>☐ VIETNAMESE<br>☐ SAMOAN<br>☐ AMERICAN INDIAN OR ALASKA NATIVE<br>☐ OTHER ASIAN (SPECIFY)<br>☐ OTHER PACIFIC ISLANDER (SPECIFY)<br>☐ OTHER (SPECIFY)<br>☐ UNKNOWN | PRIMARY OR ENROLLED TRIBE:<br><br>ADDITIONAL TRIBE:<br><br>ADDITIONAL TRIBE:<br><br>ADDITIONAL TRIBE: |

| 28. OCCUPATION | 29. FATHER'S NAME (FIRST, MIDDLE, LAST) | 30. MOTHER'S NAME (FIRST, MIDDLE, & LAST NAME PRIOR TO FIRST MARRIAGE) |
|---|---|---|
| MANAGER | JAMES DONALD BAILLIE | ERNESTINE DOBNEY |

| 31. INFORMANT'S NAME | 32. RELATIONSHIP | 33. INFORMANT'S MAILING ADDRESS: |
|---|---|---|
| LINDA ANN BAILLIE | SPOUSE | 3445 E INDIGO CIR , MESA, ARIZONA 85213 |

| 34. NAME AND ADDRESS OF FUNERAL FACILITY: | 35. FUNERAL DIRECTOR: | 36. LICENSE NUMBER: |
|---|---|---|
| GREEN ACRES MORTUARY & CEMETERY 401 N. HAYDEN ROAD<br>SCOTTSDALE, AZ | TIMOTHY H FALCONER , FUNERAL DIRECTOR | F0511 |

| 37. METHOD(S) OF DISPOSITION: | 38. NAME AND LOCATION OF 1st DISPOSITION FACILITY: | 39. NAME AND LOCATION OF 2nd DISPOSITION FACILITY: |
|---|---|---|
| CREMATION | GREEN ACRES MORTUARY & CREMATORY, SCOTTSDALE, ARIZONA | NONE |

**MEDICAL CERTIFICATION SECTION CAUSE OF DEATH PART I**

| IMMEDIATE CAUSE OF DEATH | 40. A | 41. APPROXIMATE INTERVAL: |
|---|---|---|
| | CEREBRAL VASCULAR ACCIDENT | DAYS |
| DUE TO OR AS A CONSEQUENCE OF: | 42. B | 43. APPROXIMATE INTERVAL: |
| | MYOCARDIAL INFARCTION | WEEKS |
| DUE TO OR AS A CONSEQUENCE OF: | 44. C | 45. APPROXIMATE INTERVAL: |
| | CORONARY ARTERY DISEASE | YEARS |
| DUE TO OR AS A CONSEQUENCE OF | 46. D | 47. APPROXIMATE INTERVAL: |

**CAUSE OF DEATH PART II**

| 48. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSES GIVEN ABOVE: | 49. INJURY? | 50. INJURY AT WORK? | 51. MANNER OF DEATH | 52. TIME OF DEATH |
|---|---|---|---|---|
| | NO | NO | NATURAL DEATH | 1010 |
| | 53. WAS AN AUTOPSY PERFORMED? | | 54. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? | |
| CARDIOGENIC SHOCK, CONGESTIVE HEART FAILURE | NO | | NO | |

**CAUSE AND MANNER OF DEATH CERTIFICATION**

| 49.<br>☒ Certifying Physician/Nurse Practitioner/Physician's Assistant - To the best of my knowledge, death occurred due to the cause(s) and manner stated<br>☐ Medical Examiner/Tribal Law Enforcement Authority - On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner stated. | 55. NAME OF PERSON COMPLETING CAUSE OF DEATH: | 56. DATE CERTIFIED. |
|---|---|---|
| | OCTAVIO ENRIQUE PAJARO, M.D. | 07-05-2012 |
| 57. CERTIFIER'S ADDRESS: | 58. NAME OF REGISTRAR: | 59. DATE REGISTERED |
| 5777 E MAYO BLVD PHOENIX, AZ 85054 | MICHELE CASTANEDA-MARTINEZ | 07-20-2012 |

Date Issued: 07-25-2012

This is a true certification of the facts on file with the OFFICE OF VITAL RECORDS,
ARIZONA DEPARTMENT OF HEALTH SERVICES, PHOENIX, ARIZONA.
Revised 04/2010

This copy not valid unless prepared on a form displaying the State Seal and impressed with the raised seal of the issuing agency.

*Patricia Adams*

PATRICIA ADAMS
ASSISTANT STATE REGISTRAR

Arizona
Department of
Health Services

# EXHIBIT 38

1  Mark C. Dangerfield (Bar No. 010832)
   Wm. Charles Thomson (Bar No. 004269)
2  GALLAGHER & KENNEDY, P.A.
   2575 East Camelback Road
3  Phoenix, Arizona 85016-9225
   Telephone: (602) 530-8000
4  Facsimile:  (602) 530-8500
   E-mails: mark.dangerfield@gknet.com
5          wct@gknet.com
   Attorneys for Defendants MedAire, Inc., Steven
6  Joe Reinhart, D.O., and Jessica Monas, M.D.

7                    UNITED STATES DISTRICT COURT

8                         DISTRICT OF ARIZONA

9
   LINDA ANN BAILLIE, individually, as          No. 2:14-cv-00420-PHX-SMM
10 Personal Representative of the Estate of
   JAMES DONALD BAILLIE, II, and on
11 behalf of all heirs and next of kin of
   JAMES DONALD BAILLIE, II, deceased,          **DECLARATION OF MARK C.**
12                                              **DANGERFIELD IN SUPPORT OF**
                  Plaintiff,                    **DEFENDANTS' MOTION FOR**
13                                              **SUMMARY JUDGMENT**
              vs.
14
   MEDAIRE, INC.; STEVEN JOE
15 REINHART, D.O.; and JESSICA MONAS,
   M.D.,
16
                  Defendants.
17

18      1.      I am a member of Gallagher & Kennedy, P.A., counsel for Defendants in

19 this action.  I make this Declaration to the best of my belief based on my personal

20 knowledge and my access to and review of documents in this case.

21      2.      Statement of Fact Exhibits 2 through 12 are true and correct copies of expert

22 reports submitted in this matter by Defendants' expert witnesses, along with declarations

23 from each expert attesting to the same.  Appendices were omitted as unnecessary.

24      3.      Statement of Fact Exhibits 13 through 16 are true and correct copies of

25 declarations submitted in the prior California district court case. Some exhibits or

26 appendices to the declarations have been omitted as unnecessary.

27      4.      Statement of Fact Exhibits 17 through 19 are true and correct copies of

28 documents that were produced by former defendant British Airways in the regular course

1  of business in this case or in the prior California district court case, and are identified by

2  Bates-stamp numbers beginning with the "BA" prefix.

3      5.     Statement of Fact Exhibits 22 through 26 and 37 are true and correct copies

4  of documents that were produced by Plaintiff Linda Ann Baillie in the regular course of

5  business in this case or in the prior California district court action, and are identified by

6  Bates-stamp numbers beginning with the "JDB" prefix.

7      6.     Statement of Fact Exhibits 20 and 21 are true and correct copies of

8  documents that were produced by Defendants in the regular course of business in this

9  case, and are identified by Bates-stamp numbers beginning with the "MA" prefix.

10     7.     Statement of Fact Exhibit 27 is a true and correct copy of an excerpt from a

11  document that was marked as an exhibit at the 7/27/16 deposition of Dr. Robert Candipan.

12     8.     Statement of Fact Exhibits 28-36 are true and correct copies of excerpts

13  from depositions taken either in this case or the prior California district court case.

14     9.     I declare under penalty of perjury that the foregoing is true and correct to the

15  best of my knowledge and belief.

16         Executed this 16th day of September, 2016.

17

18                                           Mark C. Dangerfield

19

20

21

22

23

24

25

26

27

28  5616723/24709-0001

2