Francis G. Fleming, 004375
ffleming@kreindler.com
Robert J. Spragg, *pro hac vice*
rspragg@kreindler.com
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Tel: (602) 792-1700
Fax: (602) 792-1710
*Attorneys for Plaintiff Linda Ann Baillie*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

-----------------------------------------------------x

LINDA ANN BAILLIE, individually, as
Personal Representative of the Estate of
JAMES DONALD BAILLIE, II, and on
behalf of all heirs and next of kin of
JAMES DONALD BAILLIE, II,
deceased,

Plaintiff,

v.

MEDAIRE, INC., STEVEN JOE
REINHART, D.O. and JESSICA MONAS,
M.D.,

Defendants.

-----------------------------------------------------x

No.: 2:14-CV-00420-SMM

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

Article 17 of the Montreal Convention imposes liability for damages sustained during a commercial aviation flight as a result of an "accident." Under the Montreal Convention an "accident" is any unusual or unexpected event or happening – including failures to act – that are "external to a passenger" and that constitute but one "link" in the "chain of causes." *Olympic Airways v. Husain*, 540 U.S. 644, 652 – 53 (2004.) As distinguished from a common law negligence regime, so long as one of the "often multiple interrelated factual events that combine[d] to cause [a] given injury" is unusual or unexpected, there is liability under the Convention. *Id.*

Defendant MedAire, Inc. ("MedAire") has a contract with British Airways ("BA") to provide in-flight medical emergency advice. The services MedAire is required to provide include assessing the severity of medical situations and making medical recommendations, including recommendations that a pilot divert the aircraft when necessary. Plaintiff's late husband James Baillie was on a trans-Atlantic BA flight when he suffered a heart attack. Upon becoming concerned about his condition, the flight crew contacted MedAire which, in turn, patched through the MedAire physicians on duty at the time, defendants Steven Joe Reinhart, D.O. and Jennifer Monas, M.D. Those physicians, however, inadequately assessed the information they were provided, failing to recognize the seriousness of the situation and, as a result, did not recommend a flight diversion. At the time the defendants had the information necessary to determine the severity of Mr. Baillie's medical condition, the aircraft was in a location where a diversion would have allowed Mr. Baillie to receive treatment at least five hours before he ultimately was treated. The time Mr. Baillie spent suffering from the heart attack as a result of the

MedAire physicians' inadequate assessment of the medical emergency contributed to his ultimate heart failure and death.[1]  Defendants' errors in this case constitute an "unusual or unexpected event or happening" that was a link in the multi-factorial causal chain leading to Mr. Baillie's death and the motion for summary judgment must therefore be denied.

## I.    Factual Summary[2]

MedAire and BA have a contract under which MedAire's Medlink service makes emergency medicine physicians available on-call to provide airline crews with advice. Pl. Facts, ¶ 23.[3]  Medlink doctors are required to assess the severity of a medical emergency, offer step-by-step instructions to the flight crew and make medical recommendations. Pl. Facts, ¶¶ 24 – 25.  MedAire is contractually obligated to determine whether "the medical situation is serious enough to warrant a diversion," in which case the Medlink doctor "will make that recommendation to the pilot." Pl. Facts, ¶¶ 25 – 26.  The Medlink doctors must exercise "the highest professional standard … in accordance with the best practices of [emergency medicine.]" Pl. Facts, ¶ 27.  To facilitate communication between flight crew and physicians, MedAire has a call center employing communication specialist executives

---

[1] Plaintiff does not allege that the heart attack was an "accident."  Rather, it was the tragedy of errors – the series of unusual and unexpected mistakes committed by the MedAire defendants – following the onset of the heart attack, unnecessarily subjecting Mr. Baillie to hours of diminished blood flow to the heart and progressive heart tissue necrosis and leading to his death, that are the "accident" under the Montreal Convention.

[2] References to Plaintiff's Rule 56.1 Controverting Statement of Facts and Rule 56.1 Separate Statement of Facts are referred to as "Pl. Cont. Facts" and "Pl. Facts," respectively, followed by the relevant paragraph number.

[3] MedAire contracted with Emergency Professional Services ("EPS") to provide physicians to give the Medlink medical advice to MedAire's clients. Pl. Facts, ¶¶ 28 – 30.

("CSE"s). Pl. Cont. Facts, ¶ 15.  The CSEs are to monitor and answer all incoming calls, to collect specific information from those calls and to document all communications between the CSE, the Medlink physician and the commercial aircrew or flight crew, as well as to obtain certain initial information and then to brief the Medlink doctor about the medical situation that is the subject of the call. Pl. Cont. Facts, ¶ 15.  MedAire specifically instructs its CSEs that "reduction of diversion rates is one of the main selling points of the Medlink service to commercial carriers." Pl. Facts, ¶ 33.  Consistent with the business goal of reducing diversions, MedAire requires its Medlink physicians to complete a "Diversion Justification Worksheet" demonstrating "the medical diversion decision making process" and documenting the doctor's "justification for recommending a medical diversion." Pl. Facts, ¶ 39.  Despite its interest in limiting diversions, MedAire provides the Medlink physicians with reference material stating that when "chest pain is ongoing for more than 20 minutes and the chest pain and shortness of breath cannot be relieved with onboard resources – this is a strong case for diverting (potential coronary syndrome.") Pl. Facts, ¶ 43.

On March 23, 2012, James Baillie was traveling from London to Phoenix on British Airways Flight 289 ("BA 289"). Pl. Facts, ¶ 1.  Though slightly out of breath from running to catch the flight, upon boarding Mr. Baillie reported to a flight attendant that he felt generally fine. Pl. Facts, ¶¶ 4-6.  Over an hour into the flight, at 17:00 Greenwich Mean Time ("GMT"), Mr. Baillie for the first time told the flight crew that he was "experiencing pain in his chest." Pl. Facts, ¶ 12.  Soon thereafter, the crew gave him supplemental oxygen and had him describe his medical history and symptoms. Pl. Facts, ¶

16.  After a briefing on the situation, the crew contacted MedAire. Pl. Facts, ¶¶ 19 – 20.

Over the course of the flight, two Medlink physicians provided medical advice during four telephone consultations with the BA 289 crew.  Defendant Steven Joe Reinhart, D.O. ("Dr. Reinhart") was on-call for the first two consultations and defendant Jennifer Monas, M.D. ("Dr. Monas) for the second two. Pl. Facts, ¶¶ 49, 99.

The flight crew first contacted Medlink at 18:45 GMT. Pl. Facts, ¶ 47.  The pilot explained that Mr. Baillie had been "a little out of breath when he boarded," was experiencing "pain in the central chest," felt "hot," was "a bit pale" and was on supplemental oxygen. Pl. Facts, ¶ 47.  Dr. Reinhart obtained Mr. Baillie's medical history and was told that he had taken an aspirin a few hours earlier. Pl. Facts, ¶¶ 50 – 51.  Dr. Reinhart never asked when Mr. Baillie's symptoms started or how severe they were. Pl. Facts, ¶ 54. The only recommendation Dr. Reinhart made was to keep Mr. Baillie on oxygen; concerned about Mr. Baillie's age and condition, however, the physician also asked the crew to see if a medical professional on board could take vital signs and determine if Mr. Baillie was stable enough for nitroglycerin. Pl. Facts, ¶¶ 52 -53.

Less than thirty minutes later, at 19:12 GMT, the crew again contacted Medlink and again spoke with Dr. Reinhart. Pl. Facts, ¶¶ 55, 58.  At that time, the crew advised Medlink that Mr. Baillie's pulse was an irregular 100 beats per minute, that his blood pressure was 100/70, that he was still experiencing chest pains and that, critically, an on-board physician had reported that Mr. Baillie had "crackles in the left chest." Pl. Facts, ¶¶ 56 – 58.  This last piece of information was of significance because "crackles, along with chest pain, can indicate that a patient is having a complicated heart attack and that they are

very sick." Pl. Facts, ¶ 61.  Despite being told about the crackles, Dr. Reinhart discounted that information, believing that the on-board physician would not have been easily able to hear them during a flight, but never asking the crew to confirm that the on-board doctor reported crackles. Pl. Facts, ¶¶ 62 – 64.  Contrary to Dr. Reinhart's assumption, however, the on-board physician testified that the crackles had been "easy to hear with a stethoscope in the airplane environment." Pl. Facts, ¶ 66.[4]  Had he believed that Mr. Baillie was experiencing crackles, Dr. Reinhart would have assessed the medical situation as being more serious. Pl. Facts, ¶ 65.  Indeed, once he was told of the crackles, Dr. Reinhart "should have concluded that [Mr. Baillie] was likely having a heart attack." Pl. Facts, ¶ 68.  Though the pilot also told Dr. Reinhart that Mr. Baillie's condition worsened with the supplemental oxygen, Dr. Reinhart simply advised the pilot to let Medlink know if Mr. Baillie's condition changed, his blood pressure dropped further, his color deteriorated or his chest pain became intolerable. Pl. Facts, ¶ 74.  Dr. Reinhart believed that Mr. Baillie might have been experiencing a heart attack, but during the 19:12 GMT call did not share that information with the crew. Pl. Facts, ¶ 76.  Instead, he simply hoped that the supplemental oxygen would improve Mr. Baillie's condition – despite information from the flight crew that it was doing the opposite. Pl. Facts, ¶¶ 71 – 74. Only if Mr. Baillie's condition deteriorated even further did Dr. Reinhart advise the crew that he would consider a diversion. Pl. Facts, ¶ 72.

   At the time of the 19:12 GMT call, six hours remained in the flight. Pl. Facts, ¶ 71.

---

[4] Plaintiff's expert also testified that he has used a stethoscope on commercial airliners "two or three" times and agreed that an aircraft's ambient noise does not make it harder to hear crackles than it would be under other circumstances. Pl. Facts¶ 66.

When Dr. Reinhart had the information about the crackles and the other indicators of a heart attack, the aircraft was less than two hours from two different possible diversion locations. Pl. Facts, ¶¶ 80, 81; Pl. Cont. Facts, ¶ 37.  Had the aircraft diverted following the 19:12 GMT call, it would have been on the ground about four hours after Mr. Baillie first notified the flight crew of his chest pain. Pl. Cont. Facts, ¶ 51.  Even if it took an additional two hours to transport Mr. Baillie to a medical facility, he would have arrived for surgery no more than six hours after the onset of his heart attack. Pl. Cont. Facts, ¶ 51.

Three hours later, at 22:34 GMT, the BA 289 crew again contacted MedAire. Pl. Facts, ¶ 93.  At that point, three hours and twenty minutes remained in the flight. Pl. Facts, ¶ 94.  After providing updated information – including a report that Mr. Baillie felt worse, that he still had central chest pain, that he was sweating and that he was not experiencing pain in his left or right arms – the crew was patched through to a different Medlink physician, Dr. Monas. Pl. Facts, ¶¶ 96 – 98.  Dr. Reinhart had not memorialized any information about his two consultations and so Dr. Monas joined the call with no details about Mr. Baillie's condition or treatment over the previous five hours. Pl. Facts, ¶¶ 85 – 88, 101.  She had no information about the crackles, nor did she know that Dr. Reinhart had previously told the crew that if Mr. Baillie's condition did not improve or got worse that they would need to consider a diversion. Pl. Facts, ¶¶ 101 – 103.  Indeed, Dr. Monas was not even advised by the CSE who put her onto the call with the BA 289 crew that Mr. Baillie had, at that point, been experiencing chest pain for approximately seven and a half hours. Pl. Facts, ¶ 104.  After directing the crew to administer nitroglycerin, Dr. Monas's call ended. Pl. Facts, ¶ 110.  About ten minutes later, the BA 289 crew contacted Medlink

again to say that the on-flight physician believed Mr. Baillie's blood pressure was too low to administer nitroglycerin. Pl. Facts, ¶ 111.  Dr. Monas, flustered, just said "I mean you know obviously we are here, you guys are in the air and evaluating the patient.  If you feel the patient is not looking well, and that uh we need to divert we can start to take a look at diversion locations." Pl. Facts, ¶ 115.  She had no idea about the location of the flight; she did not advise the crew that Mr. Baillie could have been suffering from a heart attack; and she did not recommend a flight diversion. Pl. Facts, ¶¶ 116 – 118.

As the BA 289 pilot stated under oath, given that neither Dr. Reinhart nor Dr. Monas identified that Mr. Baillie was having a heart attack or other life-threatening medical event, and "in the absence of medical advice to divert, I made the decision to continue to [Phoenix.]" Pl. Facts, ¶ 119.

Mr. Baillie's heart attack likely began at the time he started experiencing chest pain, around 17:00 GMT. Pl. Cont. Facts, ¶ 50.  Within two hours of that time, Dr. Reinhart had the information that should have alerted him to the seriousness of the medical situation, particularly in light of the information not only about the chest pain but also about the crackles. Pl. Facts, ¶¶ 14, 61, 65; Pl. Cont. Facts, ¶ 3.  Having been told of the crackles by the on-board physician, Dr. Reinhart "should have concluded that [Mr. Baillie] was likely having a heart attack." Pl. Facts, ¶ 68.  Dr. Reinhart's advice was below the standard of care of his profession. Pl. Facts, ¶ 90.  It was likewise below the standard of care expected of Medlink physicians. Pl. Facts, ¶ 45.

Plaintiff's expert Dr. Robert Candipan testified that Mr. Baillie would have had an improved chance of recovery and survival if Dr. Reinhart had recommended that BA 289

be diverted. Pl. Facts, ¶ 83.  Even defendants' medical expert acknowledged that if Mr. Baillie received medical treatment at the time he likely would have been operated on had the flight been diverted, he would have seen "long term benefits" such as "not developing heart failure." Pl. Cont. Facts, ¶ 8.

Repeatedly during BA 289, the crew turned to MedAire for the in-flight emergency advice the company had contracted to provide.  Over the course of four hours, MedAire physicians provided conflicting, inadequate and medically improper advice to the crew. As a result, by the time the flight landed, Mr. Baillie was in critical condition, his heart had needlessly suffered irreversible damage and, as a result, he died three months later.

**II.     Standard of Review**

If there are genuine disputes as to any material facts exist, a motion for summary judgment must be denied. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); FRCP 56(c).  When determining the motion, all ambiguities must be resolved and reasonable inferences made in favor of the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  Where divergent inferences may reasonably be drawn from disputed facts, summary judgment is improper. *Braxton-Secret v. A.H. Robins*, 769 F.2d 528, 531 (9th Cir. 1985).  The multiple genuine disputes of material fact in this case preclude summary judgment and the defendants' motion must be denied.

**III.    Argument**

This Court previously ruled that plaintiff's claim against the MedAire defendants is governed by the Montreal Convention treaty. *See* Doc. No. 74, Filed 12/08/2015.  The Montreal Convention explicitly recognizes "the importance of ensuring protection of the

interests of consumers in international carriage by air and the need for equitable

compensation based on the principle of restitution." Montreal Convention Preamble;

*Sompo Japan Ins. v. Nippon Cargo Airlines*, 522 F.3d 776, 780 (7th Cir. 2008); *Ehrlich v.*

*American Airlines*, 360 F.3d 366, 371 n. 4 (2nd Cir. 2004).  Under Article 17 of the

Convention, an air carrier is

> liable for damage sustained in the event of death or bodily injury of a
> passenger upon condition *only* that the accident which caused the death or
> injury took place on board the aircraft or in the course of any of the
> operations of embarking or disembarking.

*Id.*[5]  Thus, if the conduct – and failures – of MedAire and its physicians constitutes an

"accident" under the Montreal Convention, the company and doctors are liable for all

damages arising out of Mr. Baillie's death.[6]

The Supreme Court held in *Air France v. Saks,* 470 U.S. 392, 405-06  (1985), that

an "accident" under Article 17 of the Warsaw Convention is "an unexpected or unusual

event or happening that is external to the passenger" and not "the passenger's own internal

reaction to the usual, normal and expected operation of the aircraft."  The Court

emphasized that the definition of "accident" in Article 17 "should be flexibly applied after

---

[5] The Montreal Convention modernized and replaced the Convention for the Unification
of Certain Rules Relating to International Transportation by Air (Oct. 12, 1929), 49 Stat.
3000 (1934), reprinted in 49 U.S.C. §1502 note (1976) ("Warsaw Convention"). Case law
interpreting provisions of the Warsaw Convention has been applied to cases interpreting
"substantively similar" provisions of the Montreal Convention, such as the liability
provision in Art. 17. *Kruger v. United Air Lines*, 481 F.Supp.2d 1005, 1008 (N.D. Cal.
2007); *Baah v. Virgin Atlantic Airways*, 473 F.Supp.2d 591, 596-97 (S.D.N.Y 2007).

[6] This is so even if the conduct of the pilot and the flight attendants may have been
considered unusual or unexpected, as liability under the Montreal Convention is joint and
several. *See In re Air Crash Near Cali, Colom., Dec. 20 1995*, 24 F.Supp.2d 1340, 1348 –
49 (S.D.Fla. 1998.)

assessment of all the circumstances surrounding a passenger's injuries." *Saks,* at 405.  In this regard, the Supreme Court cited with approval an array of lower court cases which had "broadly" interpreted the "accident" requirement. *Saks*, 470 U.S. at 405.  Thus, stated the Court, "in cases where there is contradictory evidence, it is for the trier of fact to decide whether an 'accident' caused the passenger's injury." *Id.*

The *Saks* Court focused its analysis on determining "what causes can be considered as accidents," and observed that Article 17 "embraces causes of injuries" that are "unexpected and unusual." *Saks,* at 404-05.  The Court did not suggest that only one event could constitute the "accident," recognizing that "any injury is the product of a chain of causes." *Saks,* at 406.  Thus, for the purposes of the Montreal Convention "accident" inquiry, a plaintiff need only be able to prove that "some link in the chain [of injury causation] was an unusual or unexpected event external to the passenger." *Saks,* at 406.

Subsequently, in *Olympic Airways v. Husain*, 540 U.S. 644, the Supreme Court held that a failure to act or an inaction can constitute an "accident" so long as the failure or inaction is "unexpected or unusual" under the circumstances.  In that case, a passenger who was severely allergic to tobacco smoke suffered a fatal asthma attack after a flight attendant repeatedly refused requests to seat him away from the airplane's smoking section. *Id.* at 653.  Rejecting the airline's argument that only affirmative conduct can constitute an event under Article 17, the Supreme Court concluded that the air crew's failure to assist a passenger can constitute an Article 17 "event." *Id.* at 654-57.  Further, the Supreme Court explained that the claimed "accident" need not be the sole or even the primary causative event, noting that "multiple events will necessarily combine and

interrelate to cause any particular injury," and thus no single event could likely be considered "*the* injury producing event." *Id.* at 643.  An "accident" had therefore occurred within the meaning of the Convention because of the airline crew member's unusual and unexpected refusal to assist the passenger, which led to the passenger's pre-existing medical condition being aggravated by exposure to tobacco smoke, which, in turn, resulted in his death. *Id.* at 646; *see also Prescod v. AMR, Inc.*, 383 F.3d 861, 867 – 68 (9th Cir. 2004) (while delayed delivery of luggage was "routine in air travel," because airline employees knew the passenger had a health-based need for the bag's contents and represented that it would not be taken nor would its return be delayed, removing the bag from passenger was "unusual or unexpected.")

Following *Saks* and *Husain*, lower courts have routinely held that when a Montreal Convention defendant has inadequately responded to a passenger's medical emergency and the inadequate response contributes to or aggravates an injury, the defendant's conduct can be an "accident" under the Warsaw and Montreal Conventions.  This is so even if the passenger's medical condition, standing alone, would not be considered an accident. *See, e.g., Fulop v. Malev Hungarian Airlines*, 175 F.Supp.2d  651, 670 (S.D.N.Y. 2001); *McCaskey v. Continental Airlines*, 159 F.Supp.2d 562 (S.D. Tex. 2001).

In *Fulop*, a passenger suffered a heart attack shortly after his flight departed Budapest for New York. 175 F.Supp.2d at 652.  The passenger claimed that the captain refused to divert to a European airport, but instead continued to New York, resulting in delayed medical care and permanent heart damage. *Id.*  The airline moved for summary judgment on the grounds that a heart attack was not an "accident" under the Warsaw

Convention.  In denying the motion, the district court ruled that:

> the unusual or unexpected event or happening that occurred here which caused the accident was not [the passenger's] heart attack, or his internal reaction to the normal operation of the aircraft.  Rather, it may be viewed as the alleged aberrant conduct of [the airline's] employees in handling the occurrence, the failures of which aggravated [the passenger's] heart attack.

*Id.*, pp. 663, 673.

Similarly, in *McCaskey*, a passenger suffered a stroke while in flight. 159 F.Supp.2d at 565, 569.  There was some confusion in the communications between the flight crew and a ground-based physician working for MedAire, Inc. (the same defendant service provider in the instant case), and the aircraft was not diverted.  Upon landing, the passenger was taken by ambulance to a hospital, but died two weeks later from complications related to the stroke. *Id.*, p. 568.  The passenger's family sued and the airline moved for summary judgment on the grounds that the passenger had not been injured by an "accident" under the Warsaw Convention.  The district court concluded that the acts of the flight crew and the ground-based MedAire personnel could be construed as an "accident" and that the final decision should be left to a jury. *Id.*, p. 572-74.

Other courts also recognize that the unreasonable response of airline personnel or agents to a medical crisis constitutes an "accident" under the Warsaw or Montreal Convention. *See, e.g., Fishman v. Delta Air Lines*, 132 F.3d 138, 142 (2nd Cir. 1998) (application of scalding water to a passenger's earache caused by change in air pressure constituted an "accident"); *Kemelman v. Delta Air Lines*, 293 A.D.2d 576, 578 (N.Y. App. Div. 2002) (unreasonable response to a heart attack may constitute an "accident"); *Gupta v. Austrian Airlines*, 211 F.Supp.2d 1078, 1083 – 1085 (N.D. Ill. 2002) (failure to properly

aid a passenger after his heart attack can be an "accident" under the Convention); *Cheng v. United Airlines*, 1995 WL 42157, at *4 (N.D. Ill. Jan. 31, 1995) (flight attendant's failure to provide adequate first aid after passenger was unconscious and bleeding as a result of turbulence was an "accident"); *Seguritan v. Northwest Airlines*, 86 A.D.2d 658, 658 (N.Y. App. Div. 1982) (crew's alleged failure to provide medical assistance after passenger suffered a heart attack aggravated the decedent's condition and thus was an "accident"); *Watts v. American Airlines*, 2007 WL 3019344 (S.D. Ind. 2007) (airline's "unusual or unexpected failure to recognize and/or respond to [passenger's] heart attack, and its failure to conform to industry custom and practices by responding to his medical emergency, could constitute a link in the chain of events causing the ill-fated "accident…."); *Yahya v. Yemenia-Yemen Airways*, No. 08-14789, 2009 WL 2711955 at *6 (E.D. Mich. Aug. 25, 2009) (crew's decision not to divert the airplane to a nearby airport, after request by ill passenger, could constitute an "accident"); *Bintz v. Continental Airlines*, Case No. 13-cv-566 (S.D. Tex. March 3, 2016) (denying summary judgment motions of MedAire and EPS after finding disputed issues of material fact as to whether the defendants' failure to recommend diversion and other aspects of their response to the plaintiff's inflight heart attack were an "accident" and ruling that "a fact intensive inquiry into the incident should be conducted by the trier of fact.").

Defendants argue that their failure to recommend a diversion was not an "event" and thus not an "accident" because it did not "involve[] either a refusal to abide by 'specific, health-based requests for help, or 'a refusal to comply with mandatory regulatory requirements.'" Def. Memo. of Law, p. 10.

-13-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   As a legal matter, the Ninth Circuit has noted that under controlling Supreme Court

precedent "a *per se* rule requiring a regulatory violation would be improper." *Phifer v.*

*Icelandair*, 652 F.3d 1222, 1224 (9th Cir. 2011), *as amended on denial of reh'g* (Sept. 1,

2011) (citing *Saks,* 470 U.S. at 405); *see also Wallace v. Korean Air,* 214 F.3d 293, 299

(2d Cir. 2000) (in which despite no regulatory or rule violation, an assault by a fellow

passenger was a compensable injury under the Warsaw Convention).

   Factually, too, this argument is unavailing.  First, it fails to appreciate that

plaintiff's claim is not premised on the injuries sustained as a result of her husband's heart

attack but, rather, on the injuries sustained as a result of the MedAire defendants'

unexpected and unusual failure to perform the professional services they were obligated to

provide under the terms of their contract.  MedAire had a duty to advise BA flight crews

as to medical emergencies; the BA 289 pilot was relying on the defendants to tell him

whether a diversion was medically necessary; the Medlink physicians had information

demonstrating that Mr. Baillie was experiencing a heart attack that warranted diversion;

the Medlink doctors failed to follow the company's "Pearls for Remote Medical Care"

protocol under the circumstances; if they had, they would have recommended a diversion;

and the pilot's decision not to divert the aircraft rested entirely on the MedAire

physicians' decision not to recommend such a diversion.  Second, absolving the alleged

wrong-doers here because of the absence of guidance would only encourage parties to

avoid creating any internal standards, given that without an express rule or standards

violation, they would be protected from liability. Doing so would wholly controvert the

purpose of Article 17, which was to focus on the passenger's experience, not on the defendant's conduct, protect air travelers and facilitate recovery for their injuries.

In support of their motion, defendants misguidedly rely on a series of cases in which plaintiffs developed deep vein thrombosis and asserted failure to warn claims. *See Twardowski v. American Airlines*, 535 F.3d 952, 961 (9th Cir. 2008); *Caman v. Continental Airlines, Inc.*, 455 F.3d 1087 (9th Cir. 2006); *Rodriguez v. Ansett Australia Ltd.*, 383 F.3d 914 (9th Cir. 2004); *Blansett v. Continental Airlines, Inc.*, 379 F.3d 177 (5th Cir. 2004).  In those cases, the Circuit Courts repeatedly rejected allegations that a failure to follow "[g]eneralized requests by public agencies to warn" constituted an "event" or an "accident" under the Montreal Convention. *Twardowski*, 535 F.3d at 960.  As the Ninth Circuit explained, however, the failure to warn generally of a risk associated with flying is wholly distinct from "injuries … stem[ming] from specific health-based requests for help that were unheeded" and that give rise to liability under the Montreal Convention. *Id.*

Defendants can cite no controlling precedent to support their position that the aggravation of a medical emergency as the result of incompetent medical advice is not an "unexpected or unusual" event "external to the passenger" and therefore not a Montreal Convention accident.  While in *Safa v. Deutsche Lufthansa A.G.*, 42 F.Supp.3d 436 (E.D.N.Y. 2014), a passenger's claim that the flight should have diverted was unavailing, in that case there was no evidence that a diversion would have conferred any medical benefit on the passenger, and thus the air carrier's conduct was ultimately not a link in the causal chain leading to the ultimate injury.  Similarly, in *Lee v. Korean Air Lines Co., Ltd.*, 2012 WL 1076269 (C.D.Cal. March 21, 2012), the crew had responded in the usual

and expected fashion upon discovering that a passenger had suffered a stroke – they

followed the advice of the medical expert, whom the passenger's family did not allege had

been incompetent, and diverted the flight appropriately.[7]

   Further, to the extent that the defendants rely on the causation argument in their

summary judgment motion, in light of the ample evidence here that the defendants'

actions aggravated Mr. Baillie's condition, and that had the defendants acted differently

Mr. Baillie would have received the necessary treatment in a timely fashion instead of

unnecessarily suffering the additional hours of heart damage that contributed to his death,

that argument is one to be made to the jury.  The various errors by MedAire, its

communication specialists and Drs. Reinhart and Monas include:

   a.  Not asking basic questions regarding Mr. Baillie's symptoms (such as how long
       he had been experiencing chest pain and how severe the pain was);

   b.  Failing to recognize symptoms of a complicated heart attack despite the clinical
       information of symptoms highly indicative of a myocardial infarction;

   c.  The decisions by Drs. Reinhart and Monas not to credit the symptoms, vital
       signs and observations provided by the crew and the on-flight physician;

   d.  Drs. Reinhart's and Monas's failure to explain to the flight crew the potential
       severity and life threatening and progressive nature of Mr. Baillie's condition;

   e.  Dr. Reinhart's decision to disregard the report of the onboard physician that he
       could hear "crackles" in Mr. Baillie's lungs, indicating that Mr. Baillie was
       having a complicated heart attack needing emergency surgerical attention;

---

[7] Neither *Rajcooar v. Air India, Ltd.*, 89 F.Supp.2d 324 (E.D.N.Y. 2000), nor *Singh v. Caribbean Airlines Limited*, 49 F.Supp. 3d 1108 (S.D.Fla. 2014) are instructive here. The decision in *Singh* was a post-trial ruling – the district court having allowed the case to proceed to trial – and thus has no bearing on the summary judgment decision here.  In *Rajcooar*, the court ruled against plaintiff, holding that the Warsaw Convention applied given that the decedent was sufficiently close to boarding as to be considered within the airline's control and is thus wholly distinguishable from this case.

   f.   The failure of MedAire CSEs to record and provide Drs. Reinhart and Monas with important medical information given to them by the BA crew;

   g.   Dr. Reinhart's decision not to record any important information about Mr. Baillie's condition, such as having "crackles", or his treatment advice to the BA crew, on the Medlink Intake Form that Dr. Monas would later rely on for information regarding what had previously been communicated to the BA crew;

   h.   The failure of Dr. Reinhart and the CSEs to advise Dr. Monas that the onboard physician had earlier report hearing "crackles" in Mr. Baillie's chest; and

   i.   Drs. Reinhart and Monas violations of standards expected of emergency medicine physicians as contractually required.

These unusual and unexpected acts, as well as the failure to recommend diversion, were links in the causal chain that unnecessarily aggravated Mr. Baillie's medical condition, causing severe injury to the muscle and tissue of his heart and his eventual death.

## IV.   Conclusion

The BA Flight 289 crew, consistent with the contractual duties delegated to the parties, relied on defendants for advice about Mr. Baillie's medical emergency, including whether to divert the flight.  The Medlink doctors inadequately responded to the information presented to them.  As a result, Mr. Baillie unnecessarily suffered five additional hours of an extreme medical crisis that inexorably led to his heart failure and, ultimately, his death.  Ample admissible evidence in the record supports plaintiff's claim that the defendants' unusual and unexpected conduct was a link in the causal chain resulting in James Baillie's death and the motion for summary judgment must, therefore, be denied.

Dated:  November 1, 2016          Respectfully submitted,

KREINDLER & KREINDLER LLP

By: ___/s/ Francis G. Fleming_____
Francis G. Fleming, 004375
Robert J. Spragg, *pro hac vice*
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

-and-

Steven M. Dichter, 004042
CHRISTIAN DICHTER & SLUGA, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, AZ 85004
Tel.: (602) 792-1700
Fax: (602) 792-1710

*Attorneys for Plaintiff*
*Linda Ann Baillie*

1

<u>**PROOF OF SERVICE**</u>

2

I, the undersigned, declare:

3

I am employed in the County of New York, State of New York.  I am over the age

4

of 18 and not a party to the within action; my business address is 750 Third Avenue, New York, NY 10017.

5

On September 16, 2016, I served the foregoing documents described as follows

6

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as

7

8

1. Plaintiff's Opposition to Defendants' Motion for Summary Judgment;

9

2. Plaintiff's Local Rule 56.1 (b) Controverting Statement of Facts and Separate Statement of Facts in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment; and

10

11

3. Plaintiff's Exhibit List for Controverting Statement of Facts and Separate Statement of Facts, with exhibits.

12

13

__**X**___ **BY MAIL:**  I am "readily familiar" with the firm's practice of collection and

14

processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at New York,

15

New York in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is

16

more than one day after date of deposit for mailing in affidavit.

17

_____  BY FEDERAL EXPRESS OR OVERNIGHT COURIER

18

__**X**___ **BY ELECTRONIC MAIL**:  I served by electronic mail at the email address(es) below:

19

mark.dangerfield@gknet.com

20

wct@gknet.com

_____  BY MESSENGER

21

22

__X___  (State)  I declare under penalty of perjury under the laws of the State of New York

23

that the above is true and correct.

24

Executed on November 1, 2016 at New York, NY.

25

26

____Francis G. Fleming_____                    _____/s/ Francis G. Fleming_____

(Type or Print Name)                                  (Signature)

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SERVICE LIST**
**Baillie v. MedAire, Inc., et al.**
**Case No.: 2:14-cv-00420-SMM**

Mark C. Dangerfield
Wm. Charles Thomson
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
mark.dangerfield@gknet.com
wct@gknet.com
*Attorneys for Defendants MedAire, Inc.; Steven Joe Reinhart, D.O.;*
*and Jessica Monas, M.D.*

PROOF OF SERVICE