Francis G. Fleming, 004375
ffleming@kreindler.com
Robert J. Spragg, *pro hac vice*
rspragg@kreindler.com
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Tel: (602) 792-1700
Fax: (602) 792-1710
*Attorneys for Plaintiff Linda Ann Baillie*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

-----------------------------------------------------x

LINDA ANN BAILLIE, individually, as
Personal Representative of the Estate of
JAMES DONALD BAILLIE, II, and on
behalf of all heirs and next of kin of
JAMES DONALD BAILLIE, II,
deceased,

                                    Plaintiff,

        v.

MEDAIRE, INC., STEVEN JOE
REINHART, D.O. and JESSICA MONAS,
M.D.,

                                    Defendants.

-----------------------------------------------------x

No.: 2:14-CV-00420-SMM

**PLAINTIFF'S LOCAL RULE
56.1(b) CONTROVERTING
STATEMENT OF FACTS AND
SEPARATE STATEMENT OF
FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

1

## PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS

2

3

4

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule

56.1 (b) of the United States District Court for the District of Arizona, plaintiff Linda Ann

5

Baillie hereby submits her controverting statement of facts in support of her opposition to

6

defendants' motion for summary judgment (Doc. No. 85).

7

8

To facilitate review of plaintiff's Controverting Statement of Facts, plaintiff

9

includes the individual paragraphs from defendants' Statement of Facts, which have been

10

italicized.

11

*MR. BAILLIE'S FATAL HEART ATTACK*

12

13

14

15

16

17

*1.     On March 23, 2012, following a business trip to Europe, James Baillie was rushing in the London Heathrow airport to catch British Airways ("BA") Flight 289 to Phoenix. Ex. 14 at ¶8 (Decl. of Linda Baillie). "[W]hen he arrived at the gate he was having breathing problems and feeling discomfort in the center of his chest." Id. at ¶9-10; cf. Ex. 13 at ¶9 (Decl. of Dr. Robert Candipan) (Baillie "began to experience chest pain while running in the London airport to catch his plane."); Ex. 15 at ¶10 (Decl. of Francis Fleming) (Baillie "had the chest pains as he was rushing to make the flight..."); Ex. 33 at 31:1-33:11 (Laura Baillie Dep.) (Laura was present at that conversation).*

18

19

20

21

22

23

24

25

26

27

28

1.     **Objection**.  Plaintiff objects to the admissibility of the Declarations of

Linda Baillie and Francis Fleming.  Fed. R. Civ. P. 56(c)(4) requires that declarations

submitted to support or oppose summary judgment "must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated."  Plaintiff does not dispute that Mr.

Baillie made these statements to his wife and Mr. Fleming.  However, the parts of their

Declarations that retell Mr. Baillie's account of what happened before and during the

British Airways flight cannot be used as evidence by defendants to support their motion

for summary judgment because they are not based on personal knowledge and contain

inadmissible hearsay. *See Blair Foods v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir. 1980) (hearsay statements are inadmissible and may not be considered by this Court on review of a summary judgment), citing *Janich Bros. v. American Distilling*, 570 F.2d 848, 859 (9th Cir 1977), *cert. denied*, 439 U.S. 829 (1978).

Defendants are proffering these hearsay statement as evidence establishing the timeline of events that took place onboard British Airways Flight 289 ("BA 289"). These statements are classic hearsay without exception (*Nat'l Center v. Goldman*, 943 F.Supp. 113, 118 (D. Mass. 1996) (finding that statements in a widow's affidavit that started with "my husband told me" is "classic hearsay" without exception and could not be considered on a motion for summary judgment), and accordingly should be stricken from the record. *See Deere v. Cullen*, 718 F.3d 1124, 1150 – 51 (9th Cir. 2013).

Plaintiff also objects to the admissibility of the pages from the transcript of the deposition of Laura Baillie that are relied upon by defendants (Def. Ex. 33). The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). In addition, the citation to Laura Baillie's deposition transcript ignores the foundational objection made by plaintiff's counsel.

**Disputed in part**. Plaintiff does not dispute that Mr. Baillie had been rushing to catch his London to Phoenix flight on March 23, 2012. However, plaintiff disputes that Mr. Baillie was experiencing chest pain, chest discomfort or breathing problems at the time he boarded the British Airways ("BA") flight. According to Ewa Van Den Berg, the British Airways flight attendant ("F/A") who spoke to Mr. Baillie as he was boarding the aircraft, "Mr. Baillie did not complain of chest pains … prior to the aircraft taking off

from London." Pl. Ex. 1, Declaration of Ewa Van Den Berg ("Van Den Berg Decl."), at ¶ 16; Pl. Ex. 2, Supplemental Declaration of Ewa Van Den Berg ("Van Den Berg Supp. Decl."), at ¶ 2; Pl. Ex. 3, Deposition of Ewa Van Den Berg ("Van Den Berg Dep."), at 200:1 – 201:10.  Mr. Baillie told F/A Van Den Berg for the first time that "he was feeling unwell" about 45 minutes after takeoff (16:30 GMT) and "did not complain of chest pains" until approximately one half hour later (17:00 GMT). Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 4; Pl. Ex. 3 (Van Den Berg Dep.), at 204:24 – 207:18.  Georgina Bolton, the British Airways Customer Service Manager on BA 289 confirmed that "at some point after takeoff" F/A Van Den Berg notified her that Mr. Baillie was "not feeling well" and shortly thereafter advised her "that Mr. Baillie's condition had worsened and that he was experiencing chest pains." Pl. Ex. 4, Declaration of Georgina Bolton ("Bolton Decl."), at ¶¶ 11 – 12; Pl. Ex. 3 (Van Den Berg Dep.), at 206:17 – 207:3; Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 18 – 22.

According to F/A Van Den Berg, the first time she spoke with Mr. Baillie was when she brought him a bottle of water immediately after he boarded. *Id.* at 164:21 – 165:21; 166:14 - 18.  When she gave him the bottle of water, she asked him if he was okay and he told her "he was fine" and that he was thirsty and slightly out of breath because he was running to the gate. *Id.* at 200:1 – 201:4.  Mr. Baillie also asked F/A Van Den Berg, "do you think I should get off" and she told him that "if you sit down and relax, you shouldn't be out of breath anymore." *Id.* at 167:12 – 168:16; 200:1 – 201:6.  F/A Van Den Berg testified that Mr. Baillie did not tell her that he was experiencing chest pains at that point. *Id.* at 200:12 – 201:10.

In addition, Medlink's own Client Patch Summary for British Airways describes Mr. Baillie's "Medical Situation" on BA 289 as "The flight attendant reported an adult passenger who was a little out of breath when he boarded <u>now</u> has central chest pain and appearing pale." (emphasis added). Pl. Ex. 5, Medlink Client Patch Summary for British Airways ("Medlink Client Patch Summary"), at 1.

*2.    Though the cause of these symptoms was unknown at the time, the cause is now undisputed: Baillie suffered a very serious type of heart attack known as an ST elevation myocardial infarction, or STEMI. Ex. 6 at 6-7 (Dr. Budoff Expert Report); Ex.13 at ¶¶4-10 (Decl. of Dr. Candipan).*

2.    **Disputed in part.**  Plaintiff does not dispute that Mr. Baillie suffered a heart attack on March 23, 2012 at least 6 – 8 hours before his blood was drawn after the flight at St. Luke's Hospital in Phoenix, Pl. Ex. 6, Declaration of Robert C. Candipan, Ph.D., M.D. ("Dr. Candipan Decl."), at ¶ 10, or that the type of heart attack he suffered is sometimes called a STEMI.  However, plaintiff disputes that Mr. Baillie was experiencing symptoms of a heart attack, such as chest pain or chest discomfort, at the time that he boarded the British Airways flight. Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 16, 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶¶ 2, 4; Pl. Ex. 3 ("Van Den Berg Dep."), at 200:1 – 201:10; Pl. Ex. 7, Transcript of Communications between Medlink and BA 289 on March 23 2012 ("Transcript of Communications"), at BA 0489 ("we've got a 61 year old male um who was a little out of breathe when he boarded"); Pl. Ex. 8, CD containing the Audio Recording of the Communications between Medlink and BA 289 on March 23, 2012 ("Audio Recording of Communications"), at BA 0579; Pl. Ex. 5 (Medlink Client Patch Summary), at 1.

Rather, Mr. Baillie's heart attack likely began at the time he started experiencing

chest pain. Pl. Ex. 9, Deposition of Robert C. Candipan, Ph.D., M.D. dated July 27, 2016 ("Dr. Candipan Dep. 2016"), at 93:12 – 94:2 (the likelihood was that "his onset of chest pain was when his onset of infarction was.").  Defendants' expert cardiologist, Dr. Budoff, agreed; he testified that the most common expression of the onset of a heart attack is chest pain and that the "cardinal symptom" which indicated the beginning of Mr. Baillie's heart attack was his "chest pain." Pl. Ex. 10, Deposition of Matthew J. Budoff, M.D. ("Dr. Budoff Dep."), at 15:1 – 14; 15:24 – 18:4.

Plaintiff also disputes that Paragraphs 4 – 10 of Dr. Candipan's Declaration support defendants' statement that Mr. Baillie suffered a "heart attack known as an ST elevation myocardial infarction, or STEMI"; that language is not contained in paragraphs 4 – 10 of Dr. Candipan's Declaration. Pl. Ex. 6 (Dr. Candipan Decl.), at ¶¶ 4 – 10.

*3.     Experts for both sides in this case concur that Baillie's STEMI most likely coincided with the onset of his symptoms as he was rushing to catch the flight. Ex. 6 at 6¬7 (Dr. Budoff Expert Report); Ex. 35 at 49:1-50:15 (Dr. Candipan Dep).*

3.     **Objection.**   Plaintiff objects to the admissibility of the pages from the transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Exh. 35).  The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).   In addition, the citation to Dr. Candipan's deposition transcript ignores the foundational objection made by plaintiff's counsel.

**Disputed**.  Both Dr. Candipan and Dr. Budoff testified that Mr. Baillie's heart attack likely started when he first started experiencing chest pain.  Dr. Candipan, plaintiff's expert cardiologist, testified that Mr. Baillie's "onset of chest pain

was when his onset of infarction was." Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 93:12 –

94:2.  Defendants' expert cardiologist, Dr. Budoff, testified that the "cardinal symptom"

which indicated the beginning of Mr. Baillie's heart attack was his "chest pain." Pl. Ex. 10

(Dr. Budoff Dep.), at 15:1 – 14; 15:24 – 18:4. ("if he has chest pain, that would be the

symptom we would use."; "So in this case I think the chest pain would be where I would

focus my timing on.").

   *4.     A STEMI has a very high mortality rate. Ex. 35 at 86:19-87:17 (Dr.
Candipan Dep.). According to the American College of Cardiology and the American
Heart Association, "one-third of patients who experience STEMI will die within 24
hours," and "many of the survivors will suffer significant morbidity." Ex. 27 at e91 (2004
ACC/AHA Guidelines for the Management of Patients with ST-Elevation Myocardial
Infarction).*

   4.    **Objection.**  Plaintiff objects to the admissibility of the pages from the

transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex.

35).  The exhibit is not properly authenticated because the reporter's certification is

missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

   Plaintiff also objects to the admissibility of the ACC/AHA Guidelines for the

Management of Patients with ST-Elevation Myocardial Infarction.  The ACC/AHA

Guidelines should not be admitted into evidence for purpose of defendants' summary

judgment motion because it is inadmissible hearsay and a proper foundation has not been

made.  Medical literature cannot be admitted as substantive evidence because of the

prohibition against hearsay.

   **Disputed in part**.  Plaintiff does not dispute that a STEMI is "a heart attack that

has a high mortality rate." Dr. Candipan, however, did not state that a STEMI has a "very"

high mortality rate, as defendants claim. Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 86:25 –

87:2. And, contrary to the statistics cited by defendants, Mr. Baillie lived for 100 days after his heart attack, until July 1, 2012. Pl. Ex. 11, Mayo Clinic in Arizona, Hospital Expiration Summary ("Mayo Clinic Expiration Summary"), at JDB 00573.

5. *Not only did Baillie suffer a STEMI, but he suffered the most serious type of STEMI: one that involved the "total blockage of the proximal left anterior descending coronary" or "LAD." Ex. 13 at ¶6 (Decl. of Dr. Candipan). A STEMI involving the LAD is sometimes referred to as the "widow maker" because of its high mortality rate. Ex. 30 at 21:24-22:17 (Dr. Candipan Dep.); Ex. 6 at 7-8 (Dr. Budoff Expert Report). It generally affects a greater area of the heart muscle or "myocardium" than do other types of heart attacks. Id.*

5. **Objection**. Plaintiff objects to the admissibility of the pages from the transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex. 35). The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Disputed in part**. Plaintiff does not dispute that Mr. Baillie suffered a heart attack caused by the total blockage of the proximal left anterior descending coronary artery or that the type of heart attack he suffered is sometimes colloquially called a "widow maker." However, plaintiff disputes that Paragraph 6 of Dr. Candipan's Declaration supports defendants' statement that Mr. Baillie "suffered the most serious type of STEMI"; that language is not contained in paragraph 6 of Dr. Candipan's Declaration. Pl. Ex. 6 (Dr. Candipan Decl.), at ¶ 6. In addition, although Mr. Baillie suffered a serious heart attack, he lived for another 100 days, until July 1, 2016. Pl. Ex. 11 (Mayo Clinic Expiration Summary), at JDB 00573.

6. *In addition, because Baillie suffered from multiple vessel disease, he had an even higher risk of dying following his STEMI. Ex. 35 at 88:4-17 (Dr. Candipan Dep.).*

6. **Objection**. Plaintiff objects to the admissibility of the pages from the

transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex.

35).  The exhibit is not properly authenticated because the reporter's certification is

missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

   **Disputed in part**.  Plaintiff does not dispute that Mr. Baillie had multi-vessel

coronary artery disease.  However, plaintiff is unable to discern what defendants mean

when they state that "he had an even higher risk of dying following his STEMI."

   *7.     As Plaintiff's expert Dr. Candipan has testified: "It is very important for heart attack victims to receive treatment as soon as possible, preferably within the first hour after symptoms appear." Ex. 13 at ¶12 (Decl. of Dr. Candipan). This is because, once a coronary artery is blocked, there is a "cessation of blood flow to heart muscle...." Ex. 30 at 35:14-36:3 (Dr. Candipan Dep.). The heart muscle that was formerly supplied with blood ("perfused") by the now blocked artery immediately starts to die. Ex. 6 at 8 (Dr. Budoff Expert Report).*

   7.     **Objection**.  Plaintiff objects to the admissibility of the pages from the

transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex.

35).  The exhibit is not properly authenticated because the reporter's certification is

missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

   **Undisputed**.

   *8.     Thus, as Dr. Candipan has opined: "Had Mr. Baillie received treatment within an hour or two after the onset of his chest pain, the extensive damage to his heart caused by his heart attack would likely have been avoided." Ex. 13 at ¶12 (Decl. of Dr. Candipan).*

   8.     **Disputed in part**.  While plaintiff does not dispute that the damage to Mr.

Baillie's heart would likely have been avoided had he received treatment within two hours

after his chest pain started, there still would have been some benefit to Mr. Baillie had he

received treatment within 6 – 8 hours after the onset of his chest pain. Defendants' expert

cardiologist, Dr. Budoff, testified that if doctors are able to open the artery at 7 hours after

the onset of the heart attack instead of 11 hours, there are still going to be "long term

benefits" for the patient such as "not developing heart failure." Pl. Ex. 10 (Dr. Budoff

Dep.), at 46:8 – 48:8.  Unfortunately, Mr. Baillie did not receive any treatment until

approximately 11 hours after he began experiencing chest pain.

        9.     *Studies have shown that the vast majority of the perfused myocardium is irreversibly destroyed within about 90 minutes following a heart attack, that by the time six hours have elapsed, there is an almost complete absence of salvageable myocardium, and that minimal or no benefit would be gained by moving the time to reperfusion from 12 hours back to 7 or 8 hours following symptom onset. Ex. 6 at 8 (Dr. Budoff Expert Report).*

        9.     **Objection.**  This statement is taken from Dr. Budoff's Expert Report and

cites a chart entitled, "Hypothetical Construct of the Relationship among the Duration of

Symptoms of Acute MI before Reperfusion Therapy, Mortality Reduction, and Extent of

Myocardial Salvage," taken from the Journal of the American Medical Association article

entitled, "Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for

Acute Myocardial Infarction: Is the Slope of the Curve the Shape of the Future?" This

chart and the article from which it is taken should not be admitted into evidence for

purpose of defendants' summary judgment motion because it is inadmissible hearsay and

a proper foundation has not been made.  Medical literature cannot be admitted as

substantive evidence because of the prohibition against hearsay.

     Furthermore, defendants attempt to introduce an incomplete version of the

"Hypothetical Construct" chart that omits the chart's explanatory paragraph. The

complete version of the chart taken from the original article is attached as Pl. Ex. 12,

Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute

Myocardial Infarction: Is the Slope of the Curve the Shape of the Future? Bernard J.

Gersh, et al., Journal of the American Medical Association, Vol. 293, No. 8

("Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute

Myocardial Infarction"), at 980.  The "Hypothetical Construct" chart's explanatory

paragraph states that "The exact duration of this critical early period may be modified by

several factors, including the presence of functioning collateral coronary arteries, ischemic

preconditioning, myocardial oxygen demands and duration of sustained ischemia." *Id.*

Defendants' expert Dr. Budoff agrees that "there are factors that can shift the curve in an

individual patient"). Pl. Ex. 10 (Dr. Budoff Dep.), at 36:24 – 37:21.  Defendants have

produced no evidence to show that Mr. Baillie's curve was not affected by these factors

and that the chart applies to his particular situation; therefore, it is inadmissible summary

judgment evidence.

**Disputed**.  Defendant's expert cardiologist, Dr. Budoff, testified that the

period between 2 ½ and 3 hours after the onset of heart attack symptoms is the critical

time-dependent period for saving heart muscle. *Id.* at 45:10 – 46:7.  The 90 - minute

figure cited by defendants is also inconsistent with the "Hypothetical Construct" chart

relied upon by defendants, which indicates that opening the infarct-related artery within

2.5 to 3 hours salvages approximately 50% of the myocardium. Pl. Ex. 12

("Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute

Myocardial Infarction"), at 980.   Indeed, the chart's explanatory paragraph states that

"[m]ortality reduction as a benefit of reperfusion therapy is greatest in the first 2 to 3

hours after the onset of symptoms of acute myocardial infarction (MI), most likely a

consequence of myocardial salvage."). *Id.*; Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 105:12

1   – 106:9 ("there is still benefit up to 3 ½ to 4 hours"); Pl. Ex. 10, (Dr. Budoff Dep.), at 46:1

2   – 7 ("most of the literature talks about three hours").

3
4          Furthermore, the "Hypothetical Construct" chart submitted by defendants in

5   support of their motion indicates that even 6 hours after the start of a heart attack, at least

6   15% of the myocardium can still be salvaged.  Pl. Ex. 12, (Pharmacological Facilitation of

7   Primary Percutaneous Coronary Intervention for Acute Myocardial Infarction), at 980;

8   Def. Exh. 8.

9
10         In addition, Dr. Budoff testified that if doctors are able to open the artery at 7 hours

11  after the onset of the heart attack instead of 11 hours, there are still going to be "long term

12  benefits" for the patient such as "not developing heart failure." Pl. Ex. __ (Dr. Budoff

13  Dep.), at 46:8 – 48:8.

14
15         *10.     Dr. Budoff attached a chart to his expert report that depicts these data. Ex.*
    *8. The chart was taken from a medical article by a doctor at the Mayo Clinic—one of the*
16  *"most well-regarded scientists" in the field—based on data from "thousands of patients."*
    *Ex. 36 at 36:24-37:13 (Dr. Budoff Dep.). The chart shows that moving the time to*
17  *reperfusion from 12 hours back to 7 hours would produce only a small benefit in reducing*
18  *mortality.*

19         10.     **Objection.**  The chart entitled, "Hypothetical Construct of the Relationship

20  among the Duration of Symptoms of Acute MI before Reperfusion Therapy, Mortality

21  Reduction, and Extent of Myocardial Salvage," taken from the American Medical

22
23  Association article entitled, "Pharmacological Facilitation of Primary Percutaneous

24  Coronary Intervention for Acute Myocardial Infarction: Is the Slope of the Curve the

25  Shape of the Future?" should not be admitted into evidence for purpose of defendants'

26
27  summary judgment motion because it is inadmissible hearsay and a proper foundation has

28  not been made.  Medical literature cannot be admitted as substantive evidence because of

1  the prohibition against hearsay.

2       Furthermore, defendants attempt to introduce an incomplete version of the

3  "Hypothetical Construct" chart that omits the chart's explanatory paragraph. The

4  complete version of the chart taken from the original article is attached as Pl. Ex. 12

5  (Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute

6  Myocardial Infarction), at 980.  The "Hypothetical Construct" chart's explanatory

7  paragraph states that "The exact duration of this critical early period may be modified by

8  several factors, including the presence of functioning collateral coronary arteries, ischemic

9  preconditioning, myocardial oxygen demands and duration of sustained ischemia." *Id.*

10  Defendants' expert Dr. Budoff agrees that "there are factors that can shift the curve in an

11  individual patient"). Pl. Ex. 10 (Dr. Budoff Dep.), at 36:24 – 37:21.  Defendants have

12  produced no evidence to show that Mr. Baillie's curve was not affected by these factors

13  and that the chart applies to his particular situation; therefore, it is inadmissible summary

14  judgment evidence.

15       Plaintiff also objects to the admissibility of the pages from the transcript of the

16  deposition of Dr. Budoff that are relied upon by defendants (Def. Ex. 36).  The exhibit is

17  not properly authenticated because the reporter's certification is missing. *Orr v. Bank of

18  America*, 285 F.3d 764, 773 (9th Cir. 2002).

19       **Disputed in part**.  Plaintiff does not dispute that Dr. Budoff attached a chart

20  entitled, "Hypothetical Construct of the Relationship among the Duration of Symptoms of

21  Acute MI before Reperfusion Therapy, Mortality Reduction, and Extent of Myocardial

22  Salvage" to his expert report.  However, the chart as presented is incomplete since

-12-

defendants have omitted the chart's explanatory paragraph.  Plaintiff does not dispute that the chart shows that moving the time when a patient's artery is opened following a heart attack from 12 to 7 hours produces a small mortality benefit.  However, the explanatory paragraph attached to the chart clearly states that the chart does not show "[t]he possible contribution to mortality reduction of opening the infarct-related artery, independe[nt] of myocardial salvage." Pl. Ex. 12 (Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute Myocardial Infarction), at 980.  Indeed, defendants' expert cardiologist, Dr. Budoff, testified that if doctors are able to open the artery at 7 hours after the onset of the heart attack instead of 11 hours, there are still going to be "long term benefits" for the patient such as "not developing heart failure." Pl. Ex.10, (Dr. Budoff Dep.), at 46:8 – 48:8.  In his rebuttal expert report, Dr. Candipan noted that "analysis of the chart does depict a benefit, albeit diminished, with interventional treatment later than 6 hours after the onset of the infarction. Pl. Ex. 15, Expert Rebuttal Report of Robert C. Candipan, Ph.D., M.D. ("Dr. Candipan Expert Rebuttal Report"), at 2.

   *11.    Dr. Candipan has read the article, and doesn't disagree with it. Ex. 35 at 89:13-92:11 (Dr. Candipan Dep.). In fact, he specifically agreed that the "benefits from reducing the time to reperfusion from twelve hours to six hours are small." Ex. 35 at 115:15-19 (Dr. Candipan Dep.).*

   11.    **Objection.**  The article entitled, "Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute Myocardial Infarction: Is the Slope of the Curve the Shape of the Future?" should not be admitted into evidence for purpose of defendants' summary judgment motion because it is inadmissible hearsay and a proper foundation has not been made.  Medical literature cannot be admitted as substantive

evidence because of the prohibition against hearsay.

Furthermore, defendants attempt to introduce an incomplete version of the "Hypothetical Construct" chart that omits the chart's explanatory paragraph. The complete version of the chart taken from the original article is attached as Pl. Ex. 12 (Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute Myocardial Infarction), at 980.  The "Hypothetical Construct" chart's explanatory paragraph states that "The exact duration of this critical early period may be modified by several factors, including the presence of functioning collateral coronary arteries, ischemic preconditioning, myocardial oxygen demands and duration of sustained ischemia." *Id.* Defendants' expert Dr. Budoff agrees that "there are factors that can shift the curve in an individual patient"). Pl. Ex. 10 (Dr. Budoff Dep.), at 36:24 – 37:21.  Defendants have produced no evidence to show that Mr. Baillie's curve was not affected by these factors and that the chart applies to his particular situation; therefore, it is inadmissible summary judgment evidence.

Plaintiff also objects to the admissibility of the pages from the transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex. 35).  The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Disputed in part**.  Plaintiff does not dispute that Dr. Candipan read the article entitled, "Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute Myocardial Infarction: Is the Slope of the Curve the Shape of the Future?" Pl. Ex. 12.  However, plaintiff disputes that Dr. Candipan "doesn't disagree" with the article.  Dr.

Candipan testified that he did not have any reason to disagree with the information

presented in the chart on page 980; he was not asked whether he disagreed with the

article, as defendants claim. Pl. Ex. 9, (Dr. Candipan Dep. 2016), at 89:23 – 92:13.

Notably, defendants' expert cardiologist, Dr. Budoff, testified that if doctors are

able to open the artery at 7 hours after the onset of the heart attack instead of 11 hours,

there are still going to be "long term benefits" for the patient such as "not developing

heart failure." Pl. Ex. 10 (Dr. Budoff Dep.), at 46:8 – 48:8. And, in his rebuttal expert

report, Dr. Candipan noted that "analysis of the chart does depict a benefit, albeit

diminished, with interventional treatment later than 6 hours after the onset of the

infarction. Pl. Ex. 15 (Dr. Candipan Expert Rebuttal Report), at 2.

### *DEFENDANTS MEDAIRE, INC. AND DRS. REINHART AND MONAS*

*12.     Defendant MedAire, through its "MedLink" service, provides remote medical advice to commercial airlines dealing with an ill or injured passenger. MedAire has been providing this service for about 30 years. Ex. 10 at 7 (Dr. Alves Expert Report).*

12.     **Disputed in part**.  Plaintiff does not dispute that MedAire's has been

offering the Medlink service to commercial airlines for about 30 years.  However, plaintiff

disputes defendants' characterization that the Medlink service only provides "remote

medical advice."  MedAire's contract with British Airways states that MedAire is engaged

in the business of "offering Inflight Medical Emergency advisory services" and requires

Medlink to "access the severity of any inflight injury or illness and guide the flight and/or

cabin crew by providing step-by-step treatment instructions.  The captain will be advised

if a diversion is medically warranted." Pl. Ex.16, British Airways/MedAire Service

Agreement ("BA/MedAire Contract"), at BA 0750, BA 0735.

13.     *MedAire arranges for experienced emergency physicians employed by a separate company, Emergency Professional Services, PC ("EPS"), to speak with an airline crew about the ill passenger through a ground-to-aircraft phone patch. Ex. 34 at 13:4¬14:10 (Dr. Streitwieser Dep.); Ex. 3 at 2 (Dr. Roth Expert Report). Typically, the physicians are not able to see or speak with the passenger. Id. Because of that and the lack of medical equipment and facilities on an airplane, the MedLink physician usually cannot diagnose or treat an illness, but the physician may suggest ways to deal with the passenger's symptoms. Id.*

13.     **Objection**.  Plaintiff objects to the admissibility of the pages from the transcript of the deposition of Dr. Streitwieser that are relied upon by defendants (Def. Exh. 34).  The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Disputed in part**.  Plaintiff does not dispute that MedAire has a contract with EPS to provide emergency medicine physicians to provide Inflight Medical Emergency Advisory Services to commercial airlines or that the EPS physicians are not usually able to see or speak with the ill passenger.  However, plaintiff disputes defendants' claim that Medlink physicians usually cannot diagnose or treat an ill passenger on an aircraft.  MedAire's contract with British Airways requires Medlink to "access the severity of any inflight injury or illness and guide the flight and/or cabin crew by providing step-by-step treatment instructions." Pl. Ex. 16 (BA/MedAire Contract), at BA 0750.  Here, the Medlink doctors provided treatment instructions for Mr. Baillie; they made sure that he had been given aspirin and supplemental oxygen and considered giving him nitroglycerin.  Pl. Ex. 7 (Transcript of Communications), at BA 0489 – 93; Pl. Ex. 8 (Audio Recording of Communications), at BA 0579 - 85.

Plaintiff also disputes defendants' characterization that commercial aircraft don't carry medical equipment on board.  BA 289 was carrying two different Medical Kits, the

-16-

M2 basic first aid kit and the M5 Medical Kit, which includes prescription medicines and equipment to be used by a "health care professional", as well as a defibrillator and resuscitation kit. Pl. Ex. 17, British Airways Cabin Crew Aviation Medical Manual ("BA Cabin Crew Medical Manual"), at BA 0386 – 409.

    *14.    The MedLink service operates out of a call center inside the Emergency Department of the Banner — University Medical Center in Phoenix (formerly "Banner Good Samaritan" Hospital). Ex. 3 at 21 (Dr. Roth Expert Report). EPS doctors staff the hospital's Emergency Department. Ex. 34 at 13:4-14:10 (Dr. Streitwieser Dep.). Hence, EPS doctors are available 24/7 to take calls in the MedLink call center. Ex. 3 at 21 (Dr. Roth Expert Report).*

    14.    **Objection**.  Plaintiff objects to the admissibility of the pages from the transcript of the deposition of Dr. Streitwieser that are relied upon by defendants (Def. Ex. 34).  The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

    **Undisputed**.

    *15.    The MedLink call center has Communication Specialist Engineers or "CSEs" employed by MedAire. Ex. 3 at 21 (Dr. Roth Expert Report). The CSE's are trained to receive calls and get an EPS emergency physician on the line to consult with the airline crew. Id.*

    15.    **Disputed in part**.  Plaintiff does not dispute that MedAire CSE's staff the Medlink call center.  However, plaintiff disputes defendants' characterization of CSE's duties as merely receiving calls and getting a Medlink physician "on the line."  MedAire CSEs actually have a number of important responsibilities when handling a call from a commercial airline regarding an inflight medical emergency.  Michelle Tyler, the MedAire CSE who took the initial call from BA 289, and who now trains other MedAire CSEs, testified that the CSE's job duties and responsibilities were to monitor and answer

incoming MedAire calls, to collect specific information from those calls, and then

document all the communications between the CSE, the Medlink physician and the

commercial aircrew or flight crew. Pl. Ex. 18, Deposition of Michelle R. Tyler ("Tyler

Dep."), at 33:22 – 34:8.  When a MedAire CSE receives a Medlink call from a

commercial airline regarding an in-flight medical emergency, the CSE is required to

obtain certain initial information, including the airline company name, the flight number,

the origination airport, the destination airport, the estimated time of arrival, how much

time is remaining in the flight, the passenger details and record it on the Medlink Intake

Form. *Id.* at 41:23 – 42:17.  When the Medlink physician comes to the call center after

being paged, the CSE provides them with the Medlink Intake Form and gives them a

verbal briefing regarding the information about the flight and the passenger. *Id.* at 42:18 –

43:7.  The CSE is also required to document the conversation between the Medlink

physician and flight crew, and any recommendations made by the physician, on

MedAire's computerized information system. *Id.* at 90:18 – 92:22.

Plaintiff also disputes Dr. Roth's description of the MedAire CSEs as

Communication Specialist Engineers.  They are Communication Specialist Executives. Pl.

Ex. 44, MedAire Medlink Client Patch Process ("Medlink Client Patch Process"), at

MA027020.

*16.     MedAire is one of two companies in the United States providing such remote
medical advice to airlines; the other company is STAT-MD, which operates out of
Pittsburgh, PA, using emergency physicians from the University of Pennsylvania Medical
Center, including Dr. Roth. Ex. 3 at 2 (Dr. Roth Expert Report); Ex. 10 at 7-8 (Dr. Alves
Expert Report).*

16.     **Undisputed**.

-18-

17.    *Defendant doctors Steven Reinhart and Jessica Monas are experienced, EPS-employed emergency physicians. Ex. 3 at 17-18 (Dr. Roth Expert Report). Dr. Reinhart has been board-certified in and practicing emergency medicine for over 25 years. Id.*

17.    **Disputed in part**.  Plaintiff does not dispute that Drs. Reinhart and Monas were emergency medicine physicians employed by EPS or that Dr. Reinhart had been practicing emergency medicine for more than 25 years.  However, plaintiff disputes that Dr. Monas was an "experienced" physician on March 23, 2012.  Dr. Monas graduated from her medical school residency in 2011 before moving to Phoenix to take a position with Emergency Professional Services ("EPS"). Pl. Ex. 19, Deposition of Jessica Monas, M.D. dated July 22, 2014 ("Dr. Monas Dep. 2014"), at 16:24 – 17:16.  Dr. Monas had been working as a Medlink physician for only 7 months when she took the BA 289 call pertaining to Mr. Baillie (started working as a Medlink physician in August 2011). Pl. Ex. 20, Deposition of Jessica Monas M.D. dated December 16, 2015 ("Dr. Monas Dep. 2015), at 10: 5 – 13.  She wasn't Board certified in emergency medicine until 2012 or 2013. Pl. Ex. 19 (Dr. Monas Dep. 2014), at 18:22 – 19:9.

18.    *In providing remote medical advice to airlines, MedLink doctors may recommend that an aircraft divert to an earlier landing spot in order to get emergency medical help for a passenger. Ex. 10 at 5 (Dr. Alves Expert Report). However, only the pilot of an aircraft has the authority to decide to divert the plane to an unscheduled airport. Id.*

18.    **Undisputed**.

19.    *No industry standards dictate when a physician providing remote medical advice should recommend that an aircraft divert to a different landing spot. Ex. 10 at 2-8 (Dr. Alves Expert Report); Ex. 3 at 5-6 (Dr. Roth Expert Report).*

19.    **Disputed**.  Defendants' statement is misleading.  <u>There are no industry standards of any kind</u> that apply to MedAire's "inflight medical emergency advisory

-19-

service." Pl. Ex. 21, Expert Report of Paulo M. Alves, M.D. ("Dr. Alves Expert Report"), at ("[t]here is not yet a 'remote medical advice to aircraft' industry, and hence industry customs and standards governing the provision of remote medical advice to a commercial airline have not been developed."); Pl. Ex. 22, Deposition of Paulo M. Alves, M.D. dated January 5, 2016 ("Dr. Alves Dep. January 2016"), at 27:15 – 28:15 (after 30 years, the business of providing remote medical advice to commercial airlines is still completely unregulated; there are no standards that govern MedAire's business of providing remote medical advice.).

20.     *No internal MedAire standards dictate when an EPS physician should recommend that an aircraft divert to a different landing spot. Ex. 10 at 9 (Dr. Alves Expert Report).  MedAire leaves such matters up to the clinical judgment of the individual EPS physician, based on his or her background, training and experience. Id.*

20.     **Disputed in part**.  Plaintiff does not dispute that Medlink physicians are allowed to use their clinical judgment when deciding whether to recommend that a commercial aircraft divert because of an inflight medical emergency.  However, plaintiff disputes defendants' statement that MedAire provides no standards or guidance for Medlink physicians to follow when deciding whether to recommend diversion.  MedAire provides the Medlink physicians with a "Diversion Justification Worksheet "to work through the medical diversion decision making process and document his/her justification for recommending a medical diversion." Pl. Ex. 23, MedAire's Medlink Diversion Justification Worksheet Process ("Diversion Justification Worksheet Process"), at MA027047.  The Diversion Justification Worksheet provides Medlink doctors with "factors to consider prior to recommending diversion" and lists a number of "reasons for diversion" including a) "passenger is unstable"; b) "passenger is potentially unstable,

-20-

unable to rule out life threat ((ex. possible ACS (acute coronary syndrome), PE (pulmonary embolism), etc.))"; c) "passenger in severe distress, not life threatening (ex. renal colic, urinary retention, etc.)"; d) "passenger not unstable currently, but too long to destination (ex. COPD exacerbation, pre-term labor, etc.)"; and e) "passenger with potentially unstable condition (ex. possible miscarriage, recurrent seizures, etc.), leaving area with adequate medical facilities (ex. heading over water, Africa, Central Asia, Russia, Amazon, etc.)." Pl. Ex. 24, MedAire's Medlink Diversion Justification Worksheet ("Diversion Justification Worksheet"), at MA027054.  MedAire also provides the Medlink physicians with "Evaluation for Diversion" factors in its Physician Pearls for Remote Medical Care document, including a) "location" of the aircraft; b) "resources", both "in-flight" and "at potential destination for diversion"; c) the "emergency situation" ("What medically justifies a diversion? What is the medical emergency? Does it require immediate medical intervention – or can it be handled safely in-flight and have medical evaluation upon arrival.  What are the complications if you don't divert?  Is the medical condition likely to worsen and compromise life or limb?  Is it time critical?  And is diversion going to meet the time requirement."); d) "family/crew considerations"; and e) "bottom line for diversion decision" (is patient stable enough to make destination – or is diversion required."). Pl. Ex. 25, MedAire Physician Pearls for Remote Medical Care ("MedAire Physician Pearls"), at MA027372 – 73.

21. *MedAire only suggests that, in considering whether to recommend diversion, an EPS physician might consider certain general issues, including the location of the aircraft vis-a-vis a potential diversion location, Ex. 20 at MA027372 (Physician Pearls for Remote Medical Care), and whether it would take more than one hour to reach a diversion location, in which case it is recommended that the physician "consider reassessing" diversion. Ex. 21 at MA027055 (Diversion Justification Checklist).*

1

2      21.    **Disputed**.  Defendants' statement is misleading. MedAire provides the

3   Medlink physicians with a "Diversion Justification Worksheet "to work through the

4   medical diversion decision making process and document his/her justification for

5   recommending a medical diversion." Pl. Ex. 23 (Diversion Justification Worksheet

6   Process), at MA027047.  The Diversion Justification Worksheet provides Medlink doctors

7   with "factors to consider prior to recommending diversion" and lists a number of "reasons

8   for diversion" including a) "passenger is unstable"; b) "passenger is potentially unstable,

9   unable to rule out life threat ((ex. possible ACS (acute coronary syndrome), PE

10   (pulmonary embolism), etc.))"; c) "passenger in severe distress, not life threatening (ex.

11   renal colic, urinary retention, etc.)"; d) "passenger not unstable currently, but too long to

12   destination (ex. COPD exacerbation, pre-term labor, etc.)"; and e) "passenger with

13   potentially unstable condition (ex. possible miscarriage, recurrent seizures, etc.), leaving

14   area with adequate medical facilities (ex. heading over water, Africa, Central Asia,

15   Russia, Amazon, etc.)." Pl. Ex. 24 (Diversion Justification Worksheet), at MA027054.

16   MedAire also provides the Medlink physicians with "Evaluation for Diversion" factors in

17   its Physician Pearls for Remote Medical Care document, including a) "location" of the

18   aircraft; b) "resources", both "in-flight" and "at potential destination for diversion"; c) the

19   "emergency situation" ("What medically justifies a diversion? What is the medical

20   emergency? Does it require immediate medical intervention – or can it be handled safely

21   in-flight and have medical evaluation upon arrival.  What are the complications if you

22

23

24

25

26   don't divert?  Is the medical condition likely to worsen and compromise life or limb?  Is it

27   time critical?  And is diversion going to meet the time requirement."); d) "family/crew

28

considerations"; and e) "bottom line for diversion decision" (is patient stable enough to make destination – or is diversion required."). Pl. Ex. 25 (MedAire Physician Pearls), at MA027372 – 73.

Defendants' quote from page MA027055 of the Diversion Justification Worksheet is also misleading.  That section asks, "Is the time of arrival at diversion location greater than 1 hour?  If yes, consider reassessing the passenger for diversion necessity" and "repatch". Pl. Ex. 24 (Diversion Justification Worksheet), at MA027055.  In other words, if it's going to take more than an hour to get to the diversion location, the Medlink physician should follow up on the passenger's condition to make sure that they haven't improved and diversion is no longer necessary.

22.   *The "Physician Pearls" document also suggests that, if a passenger has shortness of breath and ongoing cardiac chest pain, which can't be relieved with onboard treatment, then this is a "strong case" for diverting. Ex. 20 at MA027364. But the real difficulty is determining, remotely, whether an unseen passenger's chest pain is of cardiac origin—since most often it isn't. Ex. 3 at 8-10 (Dr. Roth Expert Report). So in the opinion of Defendants' expert, Dr. Roth, diversion recommendations should be left to the professional judgment of individual physicians.*

22.   **Disputed**.  The MedAire Reference Material entitled, "Physician Pearls for Remote Medical Care" provides guidance to Medlink physicians who are contacted when a passenger complains of chest pain, not "cardiac" chest pain, as defendants claim.  The Physician Pearls document states that "if the chest pain is ongoing for more than 20 minutes and the chest pain and shortness of breath cannot be relieved with onboard resources – this is a strong case for diverting (potential coronary syndrome)." Pl. Ex. 25 (MedAire Physician Pearls), at MA027364.

David Streitwieser, M.D., the president of EPS, testified that his personal standard

-23-

when contacted about an ill passenger on a commercial flight who's experiencing a

potential coronary event is "[i]f I am unable to relieve the pain with a reasonable period of

time, say, and actively treating it 20 to 30 minutes, and I'm strongly convinced that it's

[acute coronary syndrome], then I will look at diversion options." Pl. Ex. 26, Deposition

of David R. Streitwieser, M.D. ("Dr. Streitwieser Dep."), at 58:10 – 22.  Dr. Streitwieser

believes "all Medlink physicians would operate under that same basic standard when

handling a Medlink call involving a passenger with chest pain because it's basic

knowledge that comes with their training." *Id.* at 67:20 – 68:9.

23.    *Moreover, as an article in the New England Journal of Medicine noted, a decision to divert is "complex and difficult":*

> *Unscheduled landings for medical purposes are a serious problem for commercial air carriers. Delays in reaching the final destination, inconvenience to passengers, added costs, and increased risks to safety make the decisions about diverting an aircraft complex and difficult.*

*M. Gendreau at al., Current Concepts: Responding to Medical Events during Commercial Airline Flights, NEJM, Vol. 346, Issue 14 (2002).*

23.    **Objection.**  The article entitled, "Current Concepts: Responding to Medical

Events during Commercial Airline Flights," taken from the New England Journal of

Medicine, should not be admitted into evidence for purpose of defendants' summary

judgment motion because it is inadmissible hearsay and a proper foundation has not been

made.  Medical literature cannot be admitted as substantive evidence because of the

prohibition against hearsay.

24.    *Based on MedAire's experience between 2010 and 2014, less than 2.5% of flights experiencing an inflight medical incident divert to an unscheduled airport. Ex.10 at 10-100 (Dr. Alves Expert Report). Based on MedAire's experience between 2010 and 2013, less than 8% of flights involving ill passengers with chest pain resulted in*

1    *diversions. Id.*

2        24.   **Objection** to the admissibility of the statistics cited by Dr. Alves.  This

3    information is unreliable and untrustworthy because it is based on Dr. Alves's personal

4

5    search of the MedAire database.  This data only pertains to MedAire's customer airlines

6    and does not represent the airline industry as a whole.  Also, the category of symptoms

7    that Dr. Alves searched for on the MedAire database was "cardiac", which includes

8
     arrhythmia, sudden cardiac arrest and palpitations, as well as chest pain. Pl. Ex. 27,
9

10   Deposition of Paulo M. Alves, M.D. dated July 29, 2016 ("Dr. Alves Dep. July 2016"), at

11   91:4 – 10.  Therefore, the statistical inferences drawn by Dr. Alves are unreliable and the

12   statistics are inadmissible for purposes of defendants' summary judgment motion.

13   *DR. REINHART'S CONSULTATION WITH BA 289*

14
         25.   *Baillie boarded BA 289 flight at 14:54 UTC (Coordinated Universal Time).*
15   *Ex. 18 (BA Passenger Details). He was one of 335 passengers. Ex. 19 (BA OPNS Legs*
     *Report). And by the time he boarded, "the discomfort in his chest had become painful"*
16   *and he "wasn't sure he should be on the flight." Ex. 14 at ¶11 (Decl. of Linda Baillie).*
17

18       25.   **Objection**.  Plaintiff objects to the admissibility of the Declaration of Linda

19   Baillie.  Fed. R. Civ. P. 56(c)(4) requires that declarations submitted to support or oppose

20   summary judgment "must be made on personal knowledge, set out facts that would be
21
     admissible in evidence, and show that the affiant or declarant is competent to testify on
22

23   the matters stated."  Plaintiff does not dispute that Mr. Baillie made these statements to his

24   wife.  However, the parts of her Declaration that retell Mr. Baillie's account of what

25   happened before and during the British Airways flight cannot be used as evidence by
26

27   defendants to support their motion for summary judgment because they are not based on

28   personal knowledge and contain inadmissible hearsay. *See Blair Foods v. Ranchers*

-25-

*Cotton Oil*, 610 F.2d 665, 667 (9th Cir. 1980) (hearsay statements are inadmissible and may not be considered by this Court on review of a summary judgment), citing *Janich Bros. v. American Distilling*, 570 F.2d 848, 859 (9th Cir 1977), *cert. denied*, 439 U.S. 829 (1978).

Defendants are proffering these hearsay statement as evidence establishing the timeline of events that took place onboard BA 289.  These statements are classic hearsay without exception (*Nat'l Center v. Goldman*, 943 F.Supp. 113, 118 (D. Mass. 1996) (finding that statements in a widow's affidavit that started with "my husband told me" is "classic hearsay" without exception and could not be considered on a motion for summary judgment), and accordingly should be stricken from the record. *See Deere v. Cullen*, 718 F.3d 1124, 1150 – 51 (9th Cir. 2013).

**Disputed in part**.  Plaintiff does not dispute that Mr. Baillie boarded BA 289 at approximately 14:54 GMT.  However, plaintiff disputes that BA 289 was carrying 335 passengers.  The BA OPNS Legs Report indicates that there were 339 passengers on board ("308 adult, 25 child and 6 infant").

Plaintiff also disputes that Mr. Baillie was experiencing chest pain, chest discomfort or breathing problems at the time he boarded the British Airways flight.  According to Ewa Van Den Berg, the British Airways flight attendant ("F/A") who spoke to Mr. Baillie as he was boarding the aircraft, "Mr. Baillie did not complain of chest pains … prior to the aircraft taking off from London." Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 16; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 2; Pl. Ex. 3 (Van Den Berg Dep.), at 200:1 – 201:10.  Mr. Baillie told F/A Van Den Berg for the first time that "he was feeling unwell"

about 45 minutes after takeoff (16:30 GMT) and "did not complain of chest pains" until approximately one half hour later (17:00 GMT). Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 4; Pl. Ex. 3 (Van Den Berg Dep.), at 204:24 – 207:18.  Georgina Bolton, the British Airways Customer Service Manager on BA 289 confirmed that "at some point after takeoff" F/A Van Den Berg notified her that Mr. Baillie was "not feeling well" and shortly thereafter advised her "that Mr. Baillie's condition had worsened and that he was experiencing chest pains." Pl. Ex. 4 (Bolton Decl.), at ¶¶ 11 – 12; Pl. Ex. 3 (Van Den Berg Dep.), at 206:17 – 207:3; Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 18 – 22.

According to F/A Van Den Berg, the first time she spoke with Mr. Baillie was when she brought him a bottle of water immediately after he boarded. Pl. Ex. 3 (Van Den Berg Dep.), at 164:21 – 165:21; 166:14 - 18.  When she gave him the bottle of water, she asked him if he was okay and he told her "he was fine" and that he was thirsty and slightly out of breath because he was running to the gate. *Id.* at 200:1 – 201:4.  Mr. Baillie also asked F/A Van Den Berg, "do you think I should get off" and she told him that "if you sit down and relax, you shouldn't be out of breath anymore." *Id.* at 167:12 – 168:16; 200:1 – 201:6.  F/A Van Den Berg testified that Mr. Baillie did not tell her that he was experiencing chest pains at that point. *Id.* at 200:12 – 201:10.

In addition, Medlink's own Client Patch Summary for British Airways describes Mr. Baillie's "Medical Situation" on BA 289 as "The flight attendant reported an adult passenger who was a little out of breath when he boarded now has central chest pain and appearing pale." (emphasis added). Pl. Ex. 5 (Medlink Client Patch Summary), at 1.

1
2

    *26.    At 15:03 UTC, just a few minutes after Baillie boarded, the doors on the plane were closed. Ex. 19 (BA OPNL Legs Report for BA 289). When the airplane doors were closed, Baillie "felt imminent doom." Ex. 14, ¶15 (Decl. of Linda Baillie).*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

    26.    **Objection**.  Plaintiff objects to the admissibility of the Declaration of Linda Baillie.  Fed. R. Civ. P. 56(c)(4) requires that declarations submitted to support or oppose summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Plaintiff does not dispute that Mr. Baillie made this statement to his wife.  However, the parts of her Declaration that retell Mr. Baillie's account of what happened before and during the British Airways flight cannot be used as evidence by defendants to support their motion for summary judgment because they are not based on personal knowledge and contain inadmissible hearsay. *See Blair Foods v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir. 1980) (hearsay statements are inadmissible and may not be considered by this Court on review of a summary judgment), citing *Janich Bros. v. American Distilling*, 570 F.2d 848, 859 (9th Cir 1977), *cert. denied*, 439 U.S. 829 (1978).

20

21

22

23

24

25

26

27

    Defendants are proffering this hearsay statement as evidence establishing the timeline of events that took place onboard BA 289.  These statements are classic hearsay without exception (*Nat'l Center v. Goldman*, 943 F.Supp. 113, 118 (D. Mass. 1996) (finding that statements in a widow's affidavit that started with "my husband told me" is "classic hearsay" without exception and could not be considered on a motion for summary judgment), and accordingly should be stricken from the record. *See Deere v. Cullen*, 718 F.3d 1124, 1150 – 51 (9th Cir. 2013).

28

1   Plaintiff does not dispute that the BA OPNL Report indicates that the cabin doors

2   on BA 289 were closed at 15:03 GMT.

3       27.     At 15:12, the plane began to taxi to the runway. Ex. 19 (OPNL Legs

4   *Report). Baillie—remembering the "general advice" of taking an aspirin if you're*

5   *having a heart attack—then "took one or two of the aspirins he had with him." Ex. 14, ¶*

6   *16 (Decl. of Linda Baillie). According to the BA flight attendant, Baillie took the aspirin*

7   *at about 15:30. Ex. 28 at 227:11-15 (Ms. Van Den Berg Dep.). The plane took off at*
    *15:46. Ex. 19 (BA OPNL Report).*

8       27.     **Objection**.  Plaintiff objects to the admissibility of the Declaration of Linda

9   Baillie.  Fed. R. Civ. P. 56(c)(4) requires that declarations submitted to support or oppose

10  summary judgment "must be made on personal knowledge, set out facts that would be

11  admissible in evidence, and show that the affiant or declarant is competent to testify on

12  the matters stated."  Plaintiff does not dispute that Mr. Baillie made these statements to his

13

14  wife.  However, the parts of her Declaration that retells Mr. Baillie's account of what

15  happened before and during the British Airways flight cannot be used as evidence by

16  defendants to support their motion for summary judgment because they are not based on

17  personal knowledge and contain inadmissible hearsay. *See Blair Foods v. Ranchers*

18  *Cotton Oil*, 610 F.2d 665, 667 (9th Cir. 1980) (hearsay statements are inadmissible and

19  may not be considered by this Court on review of a summary judgment), citing *Janich*

20  *Bros. v. American Distilling*, 570 F.2d 848, 859 (9th Cir 1977), *cert. denied*, 439 U.S. 829

21  (1978).

22

23      Defendants are proffering these hearsay statement as evidence establishing the

24  timeline of events that took place onboard BA 289.  These statements are classic hearsay

25

26  without exception (*Nat'l Center v. Goldman*, 943 F.Supp. 113, 118 (D. Mass. 1996)

27  (finding that statements in a widow's affidavit that started with "my husband told me" is

28

-29-

"classic hearsay" without exception and could not be considered on a motion for summary judgment), and accordingly should be stricken from the record. *See Deere v. Cullen*, 718 F.3d 1124, 1150 – 51 (9th Cir. 2013).

Plaintiff also objects to the admissibility of the pages from the transcript of the deposition of Laura Baillie that are relied upon by defendants (Def. Exh. 33).  The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Disputed in part**.  Plaintiff disputes that Mr. Baillie took an aspirin because he believed he was having a heart attack.  According to F/A Van Den Berg, Mr. Baillie told her that he took an aspirin "around the time of take off" which she estimated at the time to be 15:30 GMT. Pl. Ex. 3 (Van Den Berg Dep.), at 229:2 - 14, 238:6 - 15. F/A Van Den Berg also testified that Mr. Baillie told her he took the aspirin "because he wasn't feeling well." *Id.* at 229:2 - 19.  Plaintiff does not dispute that BA 289 took off at 15:46 GMT.

*28.    The BA 289 pilot first called the MedLink service on the cockpit satellite phone at 18:45 UTC, and spoke with a CSE about Baillie. Ex. 17 (3/23/12 MedAire Transcript). The CSE understood the pilot to say that there was a 61-year old male on the plane with central chest pain and who appeared pale and was currently on oxygen. Id.*

28.    **Disputed in part**.  Plaintiff does not dispute that the BA 289 flight crew contacted Medlink at 18:45 GMT.  However, plaintiff disputes what defendants claim the MedAire CSE understood from her conversation with the flight crew.  The transcript of the communication shows that the BA flight crew told the CSE, "OK we've got a 61 year old male um who was a little out of breathe when he boarded but has pain in the central chest and feels little hot and his is a bit pale, and we've put him on therapeutic oxygen temporarily" and that the MedAire CSE responded, "OK, I copy 61 year old male, central

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

chest pain, appears pale and is currently on oxygen, is that correct?" Pl. Ex. 7 (Transcript

of Communications), at BA0489; Pl. Ex. 8 (Audio Recording of Communications), at BA

0579.  The transcript indicates that the MedAire CSE failed to repeat the flight crew's

report that Mr. Baillie felt a "little hot," but it doesn't indicate what the CSE understood.

Pl. Ex. 7 (Transcript of Communications), at BA 0489; Pl. Ex. 8 (Audio Recording of

Communications), at BA 0579.

> *29.     The CSE arranged for Dr. Reinhart to join the call at 18:50 UTC, almost*
> *four hours after the onset of Baillie's symptoms. Ex. 17 (Transcript). Dr. Reinhart*
> *confirmed that there was a 61-year old male on board with centralized chest pain and*
> *who was pale and on supplemental oxygen. Id. Dr. Reinhart asked if the man had any*
> *cardiac history, and was told no, "nothing at all." Id. He was also told that the passenger*
> *had no medications with him, and that he had taken an aspirin at 3:30 GMT (15:30 UTC).*
> *Id.*

29.     **Disputed in part**.  Plaintiff does not dispute that Dr. Reinhart joined the call

at 18:50 GMT or defendants' summary of portion of the conversation between Dr.

Reinhart and the BA 289 crew.  However, plaintiff disputes the timing of the call relative

to the onset of Mr. Baillie's heart attack.  Dr. Reinhart joined the call about 1 hour 50

minutes after Mr. Baillie told F/A Van Den Berg that he was experiencing chest pains.

Mr. Baillie told F/A Van Den Berg for the first time that "he was feeling unwell" about 45

minutes after takeoff (16:30 GMT) and "did not complain of chest pains" until

approximately one half hour later (17:00 GMT). Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 18

– 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 4; Pl. Ex. 3 (Van Den Berg Dep.), at

204:24 – 207:18.  Importantly, Dr. Reinhart never asked questions about Mr. Baillie's

chest pain that would be "typically" asked by a doctor – "when the symptoms started, how

severe the symptoms are and the nature of the symptoms." Pl. Ex. 10 (Dr. Budoff Dep.), at

-31-

15: 2 – 14; Pl. Ex. 7 (Transcript of Communications), at BA 0489 - 91; Pl. Ex. 8 (Audio

Recording of Communications), at BA 0579 - 82.

30.     *Chest pain is a common symptom of many maladies, including heart attacks, but the vast majority of people presenting with chest pain are not experiencing a heart attack. Ex. 3 at 10-13 (Dr. Roth Expert Report). One could not conclude Baillie was likely having a heart attack at that point, as Dr. Candipan admitted, and he does not believe Dr. Reinhart should have recommended diversion at this point. Ex. 35 at 52:18-53:11 (Dr. Candipan Dep.)*

30.     **Objection**.  Plaintiff objects to the admissibility of the pages from the

transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Exh.

35).  The exhibit is not properly authenticated because the reporter's certification is

missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Disputed in part**.  Plaintiff does not dispute that multiple causes exist for chest

pain and that most patients who go to the emergency room with chest pain are not

experiencing a heart attack.  However, this statistic is misleading.  Based on one study

examined by Dr. Roth, defendant's expert, 18% of the patients that went to an emergency

department with chest pain had acute coronary syndrome and 6% were found to have

suffered a heart attack. Pl. Ex. 28, Expert Report of Ronald N. Roth, M.D. ("Dr. Roth

Expert Report"), at 12.  Dr. Candipan reviewed Dr. Roth's report and stated that "based

on those studies, acute coronary syndrome is a common medical diagnosis that should

have been given careful consideration in Mr. Baillie's case." Pl. Ex. 15 (Dr. Candipan's

Expert Rebuttal Report), at 1.  It is Dr. Candipan's opinion that Dr. Reinhart should have

concluded that Mr. Baillie was likely having a heart attack after he was told that the on

board physician could hear crackles in Mr. Baillie's left chest and that after a short

defined period of observation by the crew, if the symptoms continued, Dr. Reinhart should

-32-

have recommended diversion. Pl. Ex. 9 (Dr. Candipan Dep.), at 61:22 – 65:14.

*31.   Identifying the cause of chest pain remotely is "difficult, necessarily imprecise, and requires the exercise of professional judgment...." Ex. 3 at 10 (Dr. Roth Expert Report). On an airplane, there "is simply no way to confirm if the chest pain in question is being caused by what is commonly called a heart attack." Ex. 3 at 12 (Dr. Roth Expert Report).*

31.   **Disputed in part**.  Plaintiff does not dispute that identifying the cause of a patient's chest pain requires the exercise of professional judgment by a physician. However, plaintiff disputes defendants' statement that there is no way for a doctor to confirm a heart attack on an airplane.  Some airlines carry electrocardiographs (ECGs) on board their aircraft that can transmit a signal to a ground facility and can be used to determine if a passenger is experiencing a heart attack. Pl. Ex. 18 (Tyler Dep.), at 78:22 – 79:20.

*32.   Dr. Reinhart then asked the airline crew to see if there was a doctor on board who could evaluate the passenger and "get a set of vital signs," and then to call back. Id.*

32.   **Undisputed**.

*33.   A short time later, the BA 289 pilot called back (the "First Repatch"), and at 19:18 Dr. Reinhart rejoined the call. Id. The pilot confirmed that an onboard physician had examined the passenger, and also confirmed that the passenger's blood pressure was 100/70, he had a pulse of 100, and had "crackles" in the left chest. Ex. 17 (Transcript).*

33.   **Undisputed**.

*34.   Dr. Reinhart properly discounted the report of "crackles," because the ambient noise of a 747 would make it impossible to hear such, and published studies confirm the difficulty of auscultation on board an aircraft. Ex. 3 at 15 (Dr. Roth Expert Report). And when Baillie was eventually examined by medical personnel on the ground, they recorded his breath sounds to be within normal limits, with no mention of crackles. Id.*

34.   **Objection.**  Plaintiff objects to the admissibility of the Phoenix Fire

Department EMS Incident Report (Def. Ex. 22), apparently relied upon by Dr. Roth to support his opinion that medical personnel on the ground recorded that Mr. Baillie's breath sounds were "within normal limits, with no mention of crackles." Def. Ex. 3 (Dr. Roth Expert Report), at 3.  The EMS Incident Report is not authenticated because defendants' have not submitted an affidavit or deposition from the emergency medicine technician stating that he or she wrote the report. *Orr v. Bank of America*, 285 F.3d 764, 777 - 78 (9th Cir. 2002). That fact that the EMS Incident Report was included in the documents produced by St. Luke's Medical Center in this action does not satisfy the authentication requirement because it is not a St. Luke's Medical Center document.

   **Disputed in part**.  Plaintiff does not dispute that when Mr. Baillie was examined after disembarking BA 289, the emergency medical technicians did not record that they heard crackles.  However, plaintiff disputes that Dr. Reinhart properly disregarded the onboard physician's report of crackles or that crackles are impossible to hear on a 747 aircraft.  Ratan K. Verma, M.D., the physician on board BA 289, testified that Mr. Baillie's crackles were "easy to hear with a stethoscope in the airplane environment" and that "he could hear them in spite of the ambient noise in the cabin." Pl. Ex. 29, Deposition of Ratan K. Verma, M.D. ("Dr. Verma Dep."), at 64:17 – 20; 65:2 - 4.  Dr. Candipan, who has used a stethoscope to listen to the chests of ill passengers on commercial airliners "two or three" times, agrees that the ambient noise does not make it harder to hear than it normally would be. Pl. Ex. 31, Deposition of Robert C. Candipan, Ph.D., M.D. dated September 22, 2015 ("Dr. Candipan Dep. 2015"), at 30:8 – 19.  In addition, defendants' pilot expert, Captain Fortune, testified that he had flown in the first class cabin on the 747

aircraft and he "found it to be quiet." Pl. Ex. 30, Deposition of Captain Michael G.

Fortune ("Captain Fortune Dep."), at 18:13 - 22.

Dr. Verma also testified that crackles sound "like someone walking on glass"; it's a "very distinct" sound. Pl. Ex. 29 (Dr. Verma Dep.), at 63:9 – 64:16.

Despite his uncertainty, Dr. Reinhart never asked the BA 289 crew to ask the on board physician to confirm that he could hear crackles in Mr. Baillie's chest. Pl. Ex. 7 (Transcript of Communications), at BA 0489 – 91; Pl. Ex. 8 (Audio Recording of Communications), at BA 0579 - 82; Pl. Ex. 26 (Dr. Streitwieser Dep.), at 65:13 – 18.

Furthermore, this is the point at which Dr. Reinhart "should have concluded that [Mr. Baillie] was likely having a heart attack." Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 62:6 - 9. "Crackles, by themselves, are an indication that the patient could be suffering from pulmonary edema or fluid in the lungs.  However, crackles, along with chest pain, can indicate that a patient is having a complicated heart attack and that they are very sick."  Pl. Ex. 6 (Dr. Candipan Decl.), at ¶ 11.

*35.     Despite the onboard physician's examination of Baillie, however, he "did not have any suggestions" about what might be going on. Ex. 17 (Transcript).*

35.     **Disputed**.  The transcript indicates that Dr. Reinhart asked the flight crew of BA 289 whether the onboard physician had "any further suggestions after his evaluation" and F/A Van Den Berg, not Dr. Verma, responded that he "did not have any suggestions." Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA 0582.

*36.     In deciding whether to recommend that a plane divert to an earlier landing, physicians experienced in providing remote medical advice to airlines take into account the proximity of suitable landing sites. Ex. 3 at 7-9; 16 (Dr. Roth Expert Report).*

1

2

36.     **Undisputed**.

3

37.     *At the time of the First Repatch, 19:12 UTC, BA 289 was over the North*
4   *Atlantic, and the closest landing spot with suitable medical facilities was approximately*
*two hours to the west. Ex. 11 at 10 (Michael Fortune Expert Report); Ex. 3 at 16 (Dr.*
5   *Roth Expert Report). And when the "closest diversion point is hours away and the cause*
*of a passenger's symptoms is not clear cut, a physician experienced in offering remote*
6   *medical advice to airlines would not likely recommend immediate diversion." Ex. 3 at 16*
*(Dr. Roth Expert Report).*
7

8

37.     **Disputed in part**.  Plaintiff does not dispute that at 19:12 GMT, BA 289

9   was over the north Atlantic Ocean.  However, plaintiff disputes that the closest airport

10   with suitable landing facilities was 2 hours west.  Captain Fortune testified that if BA 289

11   had diverted at 19:12 GMT, it would have taken it 1 hour 45 minutes to land at Keflavik,

12

13   Iceland, which was east of the aircraft's position. Pl. Ex. 30 (Captain Fortune Dep.), at

14   83:6 -15; Pl. Ex. 32, Diversion Time Calculation Map prepared by Captain Michael G.

15   Fortune:  Minimum Time Required for BA 289 to Divert to Keflavik Airport, Reykjavik,

16   Iceland from its Positions at 18:45 GMT and 19:12 GMT on March 23, 2012 ("Diversion

17   Time Calculation Map: Minimum Time to Keflavik Airport, Iceland").  He also testified

18   that it would have taken BA 289 1 hour 54 minutes to divert to St. Johns, Newfoundland,

19

20   Canada, from the same position. Pl. Ex. 30 (Captain Fortune Dep.), at 84:9- 17; Pl. Ex. 33,

21   Diversion Time Calculation Map prepared by Captain Michael G. Fortune:  Minimum

22   Time Required for BA 289 to Divert to St. Johns International Airport, Newfoundland,

23   Canada from its Positions at 18:45 GMT and 19:12 GMT on March 23, 2012 ("Diversion

24

25   Time Calculation Map: Minimum Time to St. Johns Airport, Canada").  However, in this

26   case, Dr. Reinhart and the Captain of BA 289 never discussed the location of the aircraft

27   and the only thing that Dr. Reinhart could discern from the information provided on the
28

Medlink Intake Form for BA 289 was that the flight was about three and one-half hours

out of Heathrow Airport and was most likely over the Atlantic Ocean. Pl. Ex. 34,

Deposition of Steven Joe Reinhart, D.O. dated July 7, 2014 ("Dr. Reinhart Dep."), at

63:25 – 64:12; Pl. Ex. 7 (Transcript of Communications), at BA 0489 – 91; Pl. Ex. 8

(Audio Recording of Communications), at BA 0580 - 82.

*38.    Dr. Reinhart thus recommended continuing westward while keeping the*
*passenger on supplemental oxygen and having the onboard doctor monitor him every*
*15¬30 minutes. Ex. 17 at BA0490 (Transcript). If the passenger's condition appeared to*
*deteriorate, the pilot was to call back and they would need to "consider a diversion at that*
*point." Id.*

38.    **Disputed in part**.  Plaintiff does not dispute that Dr. Reinhart told the BA

289 crew, among other things, to keep Mr. Baillie on supplemental oxygen, have the

onboard physician monitor his blood pressure every 15 – 30 minutes, and if his condition

appears to deteriorate, call us back and we would have to consider diversion at that point."

Pl. Ex. 7 (Transcript of Communications), at BA0490; Pl. Ex. 8 (Audio Recording of

Communications), at BA 0582.  However, plaintiff disputes that Dr. Reinhart

recommended that the flight continue "westward."  The transcript of communications

indicates that Dr. Reinhart told the BA 289 flight crew that they should "proceed on then

to your destination" and noted that there were "just over six hours remaining in the flight.

Pl. Ex. 7 (Transcript of Communications), at BA0490; Pl. Ex. 8 (Audio Recording of

Communications), at BA 0582.

*39.    The onboard physician, however—Dr. Verma—said he did not monitor*
*Baillie every 15-30 minutes; he only recalled going back "probably three times more*
*during the flight," and his colleague, Dr. Rajesh, went at least once. Ex. 29 at 76:9-77:14*
*(Dr. Verma Dep.)*

39.    **Objection**.  Plaintiff objects to the admissibility of the pages from the

transcript of the deposition of Dr. Verma that are relied upon by defendants (Def. Ex. 29).

The exhibit is not properly authenticated because the reporter's certification is missing.

*Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Disputed**.  Dr. Verma testified that he and Dr. Rajesh, another onboard physician,

were asked to monitor Mr. Baillie's blood pressure and pulse at regular intervals and he

thinks they did it hourly. Pl. Ex. 29 (Dr. Verma Dep.), at 75:15 – 76:24.  He only recalled

taking Mr. Baillie's blood pressure and pulse three more times during the flight and that

Dr. Rajesh also took Mr. Baillie's pulse and blood pressure. *Id*. at 77:1 - 14.  However, the

BA F/As testified that Dr. Verma would come back from his own seat to check Mr.

Baillie's vital signs approximately "every 15, 20 minutes." Pl. Ex. 3 (Van Den Berg

Dep.), at 295:1 – 296:2; Pl. Ex. 35, Deposition of Nicola Sharrad ("Sharrad Dep."), at

196:9 – 197:1 (the doctor came to check on Mr. Baillie "I believe every half an hour.").

### DR. MONAS' CONSULTATION WITH BA 289

*40.      At 22:34 UTC, about three hours after the 19:12 phone patch, and a little
more than 7.5 hours after the onset of Baillie's symptoms, BA 289 called MedLink again.
Ex. 17 (Transcript).  By this time, Dr. Reinhart's shift was over so he was no longer
available. Ex. 3 at 18 (Dr. Roth Expert Report). At 22:38, Defendant Dr. Monas joined
the call.  Ex. 17 (Transcript).  She was told that though Baillie's vitals were about the
same, the onboard doctor felt Baillie looked "considerably worse," and he had
recommended that Baillie be reevaluated in "30 minutes which is now about 20 minutes,"
and at that time "we might consider making a diversion." Id. So the pilot wanted to get
Dr. Monas's "take" on that. Id.*

40.      **Disputed in part**.  Plaintiff does not dispute defendants' summary of the

22:34 GMT communication between MedAire and the crew of BA 289, except to point

out that it is incomplete and oversimplified. See Transcript, p. BA0491 – 93.

However, plaintiff disputes that Mr. Baillie was experiencing symptoms of a heart

attack, such as chest pain or chest discomfort, at the time that he boarded the British Airways flight. Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 16, 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶¶ 2, 4; Pl. Ex. 3 (Van Den Berg Dep.), at 167: 12 – 168:16; 200:1 – 201:6 (Mr. Baillie told her he was thirsty and that he'd been running to the gate so he was slightly out of breath; he also told her that he was fine when she asked him if he was okay).  Pl. Ex. 7 (Transcript of Communications), at BA 0489; Pl. Ex. 8 (Audio Recording of Communications), at BA 0579; Pl. Ex. 5 (MedAire Client Patch Summary), at 1.

Rather, Mr. Baillie's heart attack likely began at the time he started experiencing chest pain. Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 93:12 – 94:2 (the likelihood was that "his onset of chest pain was when his onset of infarction was."); Defendants' expert cardiologist, Dr. Budoff, confirmed this when he testified that the most common expression of the onset of a heart attack is chest pain and that the "cardinal symptom" which indicated the beginning of Mr. Baillie's heart attack was his "chest pain." Pl. Ex. 10 (Dr. Budoff Dep.), at 15:1 – 14: 15:24 – 18:4.

According to Ewa Van Den Berg, the British Airways flight attendant ("F/A") who spoke to Mr. Baillie as he was boarding the aircraft, "Mr. Baillie did not complain of chest pains … prior to the aircraft taking off from London." Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 16: Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 2; Pl. Ex. 3 (Van Den Berg Dep.), at 200:1 – 201:10.  Mr. Baillie told F/A Van Den Berg for the first time that "he was feeling unwell" about 45 minutes after takeoff (16:30 GMT) and "did not complain of chest pains" until approximately one half hour later (17:00 GMT). Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 4; Pl. Ex. 3 (Van Den

1  Berg Dep.), at 204:24 – 207:18.

2       The 22:34 GMT communication would therefore have occurred about 5½ hours

3
4  after Mr. Baillie told F/A Van Den Berg that he was experiencing chest pain.

5       Importantly, like Dr. Reinhart, Dr. Monas never asked questions about Mr.

6  Baillie's chest pain that would be "typically" asked by a doctor – "when the symptoms

7  started, how severe the symptoms are and the nature of the symptoms." Pl. Ex. 10 (Dr.

8
9  Budoff Dep.), at 15:2 – 14; Pl. Ex. 7 (Transcript of Communications), at BA0491 – 93; Pl.

10  Ex. 8 (Audio Recording of Communications), at BA 0580 - 82.

11       *41.    Dr. Monas asked to speak directly with the onboard physician, but was told*
12  *that, due to the plane's "security procedures," she could not. Ex. 17 (Transcript).  Dr.*
    *Monas then said that "we are here, you guys are in the air and evaluating the patient"; so*
13  *"if you feel the patient is not looking well, and that uh that we need to divert we can start*
14  *to take a look at diversion locations." Id. She also suggested that the passenger be kept*
    *lying down and on oxygen. Id. Dr. Monas then stated that "in the meantime we'll take a*
15  *look at some diversion locations if you guys feel he is uh concerning at this time." Id.*

16       41.    **Undisputed**.  However, defendants' summary of the 22:34 GMT

17  communication between MedAire and the crew of BA 289 is incomplete and

18
19  oversimplified. Pl. Ex. 7 (Transcript of Communications), at BA0491 – 93; Pl. Ex. 8

20  (Audio Recording of Communications), at BA 0583.

21       *42.    The pilot agreed ("Yeah ok"), and the MedAire CSE patched BA's London*
22  *Operations Control Center into the call. Ex. 17 (Transcript). The pilot advised BA*
    *Operations that they were considering a diversion to Chicago, but wanted to get an*
23  *update from the doctor onboard in the next "ten minutes or so," at which point they would*
24  *let them know if they did decide to divert. Id. The CSE then agreed to call Chicago to let*
    *them know of the diversion possibility. Id. The CSE also asked the pilot to keep MedAire*
25  *"updated": "if you have an update please do call us right back, we'll bring Dr. Monas*
    *back on the line." Id.*

26
27       42.    **Undisputed**.  However, defendants' summary of the 22:52 GMT

28  communication between MedAire and the crew of BA 289 is incomplete and

-40-

oversimplified. Pl. Ex. 7 (Transcript of Communications), at BA0492 – 93; Pl. Ex. 8 (Audio Recording of Communications), at BA 0584.

43. *Following this last repatch, MedAire CSEs followed up with BA Ops Control in multiple calls to determine whether the plane was diverting. Ex. 3 at 23 (Dr. Roth Expert Report).*

43. **Disputed in part**. Plaintiff does not dispute that the MedAire CSE's called BA Ops, but disputes the number and purpose of the calls. The record indicates that MedAire CSEs made only two calls to BA Operations Control following the last communication between Medlink and BA 289. The purpose of both of these calls was to provide BA Operations Control with the information that Medlink had about the flight. In the first call, MedAire CSE Matthew Whitley, MedAire CSE Whitley contacted British Airways Operations Control to provide them with information on Mr. Baillie's condition and the status of the flight. Pl. Ex. 8 (Audio Recording of Communications), at BA 0587. Later, MedAire CSE Michelle Tyler contacted British Airways' local operations at Sky Harbor Airport in Phoenix to advise them BA 289 would need to be met by paramedics upon arrival. *Id.* at BA 0588.

44. *Eventually, however, the BA 289 pilots were advised that Baillie didn't want to divert, and that two onboard doctors had given their opinion that it would not worsen Baillie's condition to continue on to Phoenix. Ex. 16 ¶¶18-19 (1/28/14 Alastair Grant. Decl.). Based on that, the pilot decided not to divert the plane to an alternate airport. Id.; see also Ex. 31 at 7:23-8:11 (10/22/15 Grant Dep.)*

44. **Objection**. This paragraph presents a statement about what Mr. Baillie and two onboard doctors allegedly said to F/A Van Den Berg who then allegedly told First Officer Grant. It is being offered to prove the truth of what Mr. Baillie and the two onboard doctors allegedly said to F/A Van Den Berg and is double hearsay without

exception.  It is therefore inadmissible. *Orr v. Bank of America*, 285 F.3d 764, 778 – 79 (9th Cir. 2002).

**Disputed**.  Dr. Verma testified that he didn't recall at any time ever telling the BA crewmembers that he didn't think that continuing the flight to Phoenix would make Mr. Baillie's condition any worse. Pl. Ex. 29 (Dr. Verma Dep.), at 97:10 – 14.  And, according to the testimony of Stephen Fowler, the Captain in charge of BA 289, he made the decision to continue the flight to Phoenix because the Medlink and onboard doctors did not recommend diversion. Pl. Ex. 36, Declaration of Captain Stephen Fowler ("Captain Fowler Decl."), at ¶¶ 1, 16 -17 ("I recall that, in the absence of medical advice to divert, I made the decision to continue to [Phoenix].  That was as decision I kept under review for the rest of the flight."); Pl. Ex.  37, Deposition of Captain Stephen Fowler ("Captain Fowler Dep."), at 200:22 – 201:11 (he didn't divert to Chicago because "there was no instruction from Medlink or the doctors on board, to divert the aircraft or to tell me that the passenger's safety or well-being [required] me to divert the aircraft.").

45.    *When the CSE learned from BA Ops that the plane wasn't diverting, she arranged for EMTs to meet the flight when it landed in Phoenix. Ex. 3 at 23 (Dr. Roth Expert Report).  The plane thus landed in Phoenix at 1:53 UTC, which was, in 24 hour time, 18:53 MST.  Ex. 19 (OPNL Legs Report).*

45.    **Disputed in part**.  Plaintiff disputes that CSE Tyler learned from BA Ops that BA 289 was not diverting.  There is nothing in the record that indicates that MedAire CSE Michelle Tyler learned from BA ops that BA 289 did not divert.  Plaintiff does not dispute that MedAire CSE Michelle Tyler contacted Airport Emergency Services at Sky Harbor Airport in Phoenix or that BA 289 landed in Phoenix at 01:53 GMT or 18:53 local time.

1

*BAILLIE'S HOSPITALIZATION*

2

3

4

5

*46.     When the plane arrived at Sky Harbor, the paramedics took Baillie directly to the Emergency Department of St. Luke's Medical Center. Ex. 25 (Discharge Summary). An EKG done on the way showed that Baillie had ST elevations consistent with a STEMI. Id. After an examination by an emergency physician, Dr. Hess, Baillie was taken to the cardiac catheterization laboratory, where Dr. Candipan treated him. Id.*

6

7

46.     **Undisputed**.  However, much of the information in this paragraph is not stated in the St. Luke's Medical Center's Discharge Summary.

8

9

10

11

12

*47.     Dr. Candipan is a cardiologist. Ex. 35 at 10:15-11:11 (Dr. Candipan Dep.). He is not an expert in emergency medicine, and has no experience in providing remote medical advice to airlines. Id. at 12:2-22. He can't say what typically happens when a MedLink physician give remote medical advice to an airline. Id. at 23:10-24:4. He does not claim any expertise on how MedAire should conduct its operations. Id. at 9:8-10:14. He is not "aware of any published standards relating to the provision of remote medical advice to airlines." Id. at 20:15-17.*

13

14

15

16

17

47.     **Objection**.  Plaintiff objects to the admissibility of the pages from the transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex. 35).  The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

18

19

20

21

22

23

24

25

26

27

**Disputed in part**. Plaintiff doesn't dispute that Dr. Candipan is a cardiologist who is board certified in both cardiology and interventional cardiology.  He is also an expert in vascular medicine, but has not been board certified in that medical specialty.  However, plaintiff disputes defendants' statement that Dr. Candipan is not an expert in emergency medicine.  Although Dr. Candipan is not board certified in emergency medicine, he received training in emergency medicine in medical school and works in the emergency room interacting with emergency medicine physicians on an almost daily basis and has observed how emergency physicians treat and ask for opinions in regard to patients

28

experiencing chest pain. Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 24:6 – 25:20.  While Dr.

Candipan hasn't given remote medical advice to airlines regarding sick passengers, he

often gives remote medical advice to other physicians regarding medical issues they may

be having with a patient. *Id*. at 12:23 – 13:13.

*48.     Dr. Candipan performed a cardiac catheterization of Baillie, which showed that Baillie not only had a total blockage of his LAD, but that, due to coronary artery disease, other coronary arteries also suffered from "diffuse stenosis" or narrowing by up to 80% to 90%, the result of coronary artery disease. Ex. 24 (Dr. Candipan OP Report).*

48.     **Disputed in part and misleading**.  Plaintiff does not dispute that Dr.

Candipan performed a cardiac catheterization on Mr. Baillie or that Mr. Baillie's left

anterior descending artery was totally blocked.  However, plaintiff disputes defendants'

characterization of the condition of Mr. Baillie's other coronary arteries.  The St. Luke's

Medical Center operation report pertaining to Mr. Baillie indicates that Dr. Candipan

found that Mr. Baillie's left main coronary artery "was free of significant disease," his left

anterior descending coronary artery was totally blocked, his left circumflex artery had up

to 80% to 90% narrowing and his right coronary artery had 40% to 50% narrowing in the

proximal and mid sections and 50% to 60% narrowing distally.  Def. Ex. 24 (St. Luke's

Op Report), at 12523.

*49.     Baillie was also in cardiogenic shock, a "very serious" condition that has a "high mortality rate." Ex. 30 at 23:13-24:14 (9/22/15 Dr. Candipan Dep.) An initial echocardiogram of Baillie's heart showed an "ejection fraction"—a measurement of "how strong the heart is"—of just 10% to 15%, a reading that is "seriously low." Ex. 30 at 81:25-82:17 (Dr. Candipan Dep.).*

49.     **Objection**.  Plaintiff objects to the admissibility of the pages from the

transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex.

30).  The exhibit is not properly authenticated because the reporter's certification is

missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Undisputed**.

50.    *As Dr. Candipan agreed, the extensive damage to Baillie heart revealed by Dr. Candipan's angiogram had all likely occurred by the time eight hours had elapsed after the onset of Baillie's symptoms. Ex. 35 at 92:14-93:11 (Dr. Candipan Dep.).  Hence, he couldn't say that Baillie likely would have survived had his artery been opened between six and eight hours after the onset of his symptom. Ex. 35 at 114:14-21 (Dr. Candipan Dep.).*

50.    **Objection**.  Plaintiff objects to the admissibility of the pages from the transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex. 35).  The exhibit is not properly authenticated because the reporter's certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Disputed in part**.  Plaintiff does not dispute that most of the damage to Mr. Baillie's heart occurred within 8 hours of the start of his heart attack. However, plaintiff disputes that Mr. Baillie was experiencing symptoms of a heart attack, such as chest pain or chest discomfort, at the time that he boarded the British Airways flight. Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 16, 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶¶ 2, 4; Pl. Ex. 3 (Van Den Berg Dep.), at 167: 12 – 168:16; 200:1 – 201:6 (Mr. Baillie told her he was thirsty and that he'd been running to the gate so he was slightly out of breath; he also told her that he was fine when she asked him if he was okay).  Pl. Ex. 7 (Transcript of Communications), at BA 0489; Pl. Ex. 8 (Audio Recording of Communications), at BA 0579; Pl. Ex. 5 (MedAire Client Patch Summary), at 1.

Rather, Mr. Baillie's heart attack likely began at the time he started experiencing chest pain. Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 93:12 – 94:2 (the likelihood was that "his onset of chest pain was when his onset of infarction was."); Defendants' expert

cardiologist, Dr. Budoff, confirmed this when he testified that the most common

expression of the onset of a heart attack is chest pain and that the "cardinal symptom"

which indicated the beginning of Mr. Baillie's heart attack was his "chest pain." Pl. Ex. 10

(Dr. Budoff Dep.), at 15:1 – 14: 15:24 – 18:4.

According to Ewa Van Den Berg, the British Airways flight attendant ("F/A") who

spoke to Mr. Baillie as he was boarding the aircraft, "Mr. Baillie did not complain of chest

pains … prior to the aircraft taking off from London." Pl. Ex. 1 (Van Den Berg Decl.), at

¶ 16; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 2; Pl. Ex. 3 (Van Den Berg Dep.), at

200:1 – 201:10.  Mr. Baillie told F/A Van Den Berg for the first time that "he was feeling

unwell" about 45 minutes after takeoff (16:30 GMT) and "did not complain of chest

pains" until approximately one half hour later (17:00 GMT). Pl. Ex. 1 (Van Den Berg

Decl.), at ¶¶ 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 4; Pl. Ex. 3 (Van Den

Berg Dep.), at 204:24 – 207:18.

Dr. Candipan testified that Mr. Baillie "would have had an improved chance of

survival" if Dr. Reinhart had recommended that BA 289 be diverted. Pl. Ex. 9 (Dr.

Candipan Dep. 2016), at 113:9 – 114:12.

51.    *And Dr. Candipan also agreed that, even if Dr. Reinhart had recommended
diversion, Baillie's artery would not have been opened until approximately eight hours
after the onset of his symptoms. Ex. 35 at 94:8-95:12 (Dr. Candipan Dep.).*

51.    **Objection**.  Plaintiff objects to the admissibility of the pages from the

transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex.

35).  The exhibit is not properly authenticated because the reporter's certification is

missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Disputed**. Plaintiff disputes that Mr. Baillie was experiencing symptoms of a heart attack, such as chest pain or chest discomfort, at the time that he boarded the British Airways flight. Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 16, 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶¶ 2, 4; Pl. Ex. 3 (Van Den Berg Dep.), at 167: 12 – 168:16; 200:1 – 201:6 (Mr. Baillie told her he was thirsty and that he'd been running to the gate so he was slightly out of breath; he also told her that he was fine when she asked him if he was okay).  Pl. Ex. 7 (Transcript of Communications), at BA 0489; Pl. Ex. 8 (Audio Recording of Communications), at BA 0579; Pl. Ex. 5 (MedAire Client Patch Summary), at 1.

Rather, Mr. Baillie's heart attack likely began at the time he started experiencing chest pain. Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 93:12 – 94:2 (the likelihood was that "his onset of chest pain was when his onset of infarction was."); Defendants' expert cardiologist, Dr. Budoff, confirmed this when he testified that the most common expression of the onset of a heart attack is chest pain and that the "cardinal symptom" which indicated the beginning of Mr. Baillie's heart attack was his "chest pain." Pl. Ex. 10 (Dr. Budoff Dep.), at 15:1 – 14: 15:24 – 18:4.

According to Ewa Van Den Berg, the British Airways flight attendant ("F/A") who spoke to Mr. Baillie as he was boarding the aircraft, "Mr. Baillie did not complain of chest pains … prior to the aircraft taking off from London." Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 16: Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 2; Pl. Ex. 3 (Van Den Berg Dep.), at 200:1 – 201:10.  Mr. Baillie told F/A Van Den Berg for the first time that "he was feeling unwell" about 45 minutes after takeoff (16:30 GMT) and "did not complain of chest pains" until approximately one half hour later (17:00 GMT). Pl. Ex. 1 (Van Den Berg

Decl.), at ¶¶ 18 – 22; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶ 4; Pl. Ex. 3 (Van Den

Berg Dep.), at 204:24 – 207:18.

Therefore, had Dr. Reinhart recommended diversion at 19:12 GMT, the time of the

first repatch, and diverted to St. Johns, Canada or Keflavik, Iceland, BA 289 would have

been on the ground at approximately 21:00 GMT, which is approximately 4 hours after

Mr. Baillie notified F/A Van Den Berg that he was experiencing chest pain. Pl. Ex. 30

(Captain Fortune Dep.), at 83:6 – 84:17.  Assuming, for the purpose of this calculation,

that it would take another 2 hours for Mr. Baillie to be taken to the hospital and have the

cardiac catheterization procedure, Mr. Baillie's artery would have been opened

approximately 6 hours from the onset of his heart attack.

52.     *Using a balloon angioplasty, Dr. Candipan opened Baillie's blocked LAD—*
*a procedure that was completed "just over two hours" after BA 289 landed at in Phoenix,*
*Ex. 35 at 95:1-5 (Dr. Candipan Dep.)—and then inserted three stents in Baillie's LAD.*
*Ex. 24 at JDB-12521-522 (St. Luke's Discharge Summary). Dr. Candipan knew the other*
*narrowed arteries would also need treatment, but elected to defer that treatment until*
*later, in order to deal first with the blocked LAD. Ex. 30 at 62:20-64:1 (Dr. Candipan*
*Dep.).*

52.     **Objection**.  Plaintiff objects to the admissibility of the pages from the

transcripts of the depositions of Dr. Candipan that are relied upon by defendants (Def.

Exs. 35 and 30).  The exhibit is not properly authenticated because the reporter's

certification is missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**Undisputed**.

53.     *Despite angioplasty and the stents, Baillie's heart still functioned poorly; in*
*layman's terms, Dr. Candipan believed that Baillie's heart was "in serious shape" and he*
*was "not sure that it's going to sustain him." Ex. 30 at 84:10-20 (Dr. Candipan Dep.).*
*Baillie remained in cardiac shock with substandard blood flow. Id. at 58:17-59:5; Ex. 25.*
*So on March 30, 2012, Baillie was transferred to the Mayo Clinic for possible evaluation*
*for a heart transplant, if needed. Ex. 30 at 84:21-25 (Dr. Candipan Dep.).*

1

2    53.   **Objection**.  Plaintiff objects to the admissibility of the pages from the

3    transcript of the deposition of Dr. Candipan that are relied upon by defendants (Def. Ex.

4    30).  The exhibit is not properly authenticated because the reporter's certification is

5    missing. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

6
      **Undisputed**.
7

8        *54.   Upon arrival at the Mayo Clinic, Baillie was placed in an intensive care*
     *unit, where he remained until he died approximately three months later. Ex. 5 at 11 (Decl.*
9    *of Dr. Budoff). Shortly after Mayo Clinic surgeons installed a total artificial heart in*
     *Baillie's chest, it triggered internal bleeding and, on June 26, multiple "cerebral*
10   *accidents" or small strokes in Baillie's brain, Id. at 16-17.*

11
      54.   **Disputed in part**.  Plaintiff does not dispute that Mr. Baillie remained in
12

13   intensive care at Mayo Clinic in Arizona until his death or that Mr. Baillie was given a

14   total artificial heart and suffered multiple cerebrovascular accidents after the procedure.

15   However, plaintiff disputes the defendants' incomplete and oversimplified description of
16
     the treatment received by Mr. Baillie at Mayo Clinic.  Between the date of his admission
17
18   to the Mayo Clinic in Arizona on March 30, 2012 and his death on July 1, 2012, Mr.

19   Baillie underwent a number of procedures and operations, including a tracheostomy,

20   installation of a left ventricular assist device, the installation of a right ventricular assist
21
22   device, the removal of his left and right ventricular assist devices and his own heart and

23   the implantation of a total artificial heart. Pl. Ex. 11 (Mayo Clinic Expiration Summary),

24   at JDB00573.  Shortly thereafter, Mr. Baillie was found to have suffered multiple

25   cerebrovascular accidents (strokes) from which full neurological recovery was unlikely.
26
27   *Id*. (Mayo Clinic Expiration Summary), at JDB00573.

28       55.   *The Baillie family subsequently determined not to mechanically keep him*

-49-

*alive any longer, and on July 1 the artificial heart was discontinued and he expired. Id.*

55.   **Disputed in part**.  Plaintiff does not dispute that Mr. Baillie's wife and children eventually decided to discontinue his total artificial heart on July 1, 2012. However, plaintiff disputes the defendants' incomplete and oversimplified description of the events that ultimately led to their decision.  Rather, Mr. Baillie's family, after discussions with his doctors, felt that Mr. Baillie would not want to continue with his life in such a diminished state and that Mr. Baillie's preadmission wishes were not to continue his life with a total artificial heart and expectations of a poor outcome, so on July 1, 2012, Mr. Baillie's family decided to remove life support and discontinue his total artificial heart and he died shortly thereafter. *Id*. at JDB00573.

56.   *Baillie's official death certificate, prepared by the Mayo Clinic's Dr. Pajero, identifies the immediate cause of Baillie's death as "cerebral vascular accident" within a time interval of "days," due to or as a cause of "myocardial infarction" within a time interval of "weeks," due to or as a consequence of "coronary artery disease" within a time interval of "years." Ex. 37 (Death Certificate).*

56.   **Disputed in part**.  Plaintiff does not dispute that Mr. Baillie's typewritten death certificate lists the causes of death set forth in this paragraph.  However, plaintiff disputes that Dr. Pajero prepared the typewritten death certificate.  Dr. Pajero testified that he didn't prepare or complete the computer generated typewritten Death Certificate cited by defendants. Pl. Ex. 38, Deposition of Octavio E. Pajaro, M.D. ("Dr. Pajaro Dep.), at 70:14 – 71:5.  He testified that the death certificate that he prepared for Mr. Baillie was hand written. *Id*. at 70:14 – 71:1.  Dr. Pajaro had no independent recollection of completing the cause of death section of Mr. Baillie's death certificate. *Id*. at 71:13 – 17.

1
2

**PLAINTIFF'S SEPARATE STATEMENT OF FACTS**

3
4       Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule

56.1 (b) of the United States District Court for the District of Arizona, plaintiff Linda Ann
5
6   Baillie hereby submits her separate statement of facts in support of her opposition to
7
    defendants' motion for summary judgment (Doc. No. 85).

8              **Mr. Baillie Boards British Airways Flight 289**

9       1.      James Donald Baillie, II ("Mr. Baillie") was a first class passenger traveling
10
    on British Airways Flight 289 ("BA 289") from London to Phoenix on March 23, 2012.
11
12  Pl. Exh. 1 (Van Den Berg Decl.), at ¶ 12; Pl. Ex. 39, FlightAware flight path map for BA
13  289 on March 23, 2012.

14      2.      BA 289 was scheduled to depart London Heathrow Airport at 15:05 GMT
15
    (Greenwich Mean Time) and take 10 hours 40 minutes. Pl. Ex. 1 (Van Den Berg Decl., at
16
17  ¶ 15; Pl. Ex. 40, Travel Itinerary for Mr. Baillie ("Travel Itinerary"), at JDB 00139.

18      3.      Mr. Baillie had flown from Munich, Germany to London earlier in the day
19  on March 23, 2012. *Id.* at JDB 00138-39.

20      4.      When Mr. Baillie boarded the BA 289 aircraft at 14:54 GMT, he was
21
22  "slightly out of breath" from rushing through the airport. Pl. Ex. 3 (Van Den Berg Dep.),
23  at 200:1 – 24; Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 16.

24      5.      British Airways Flight Attendant ("F/A") Ewa Van Den Berg spoke with
25
    Mr. Baillie immediately after he boarded the aircraft when she brought him a bottle of
26
27  water. Pl. Ex. 3 (Van Den Berg Dep.), at 164:21 – 165:21; 166:14 -18.

28      6.      When F/A Van Den Berg gave him the bottle of water, she asked him if he

was okay and he told her "he was fine" and that he was thirsty and slightly out of breath

because he was running to the gate. *Id.* at 200:1 – 201:4; Pl. Ex. 1 (Van Den Berg Decl.),

at ¶ 16.

7.      Mr. Baillie asked F/A Van Den Berg, "do you think I should get off" and

she told him that "if you sit down and relax, you shouldn't be out of breath anymore." Pl.

Ex. 3 (Van Den Berg Dep.), at 167:12 – 168:16; 200:1 – 201:6.

8.      "Mr. Baillie did not complain of chest pains … prior to the aircraft taking

off from London." Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 16; Pl. Ex. 2 (Van Den Berg Supp.

Decl.), at ¶ 2: Pl Ex. 3 (Van Den Berg Dep.), at 200:1 – 201:10.

9.      BA 289 left the gate at London Heathrow Airport at 15:12 GMT on March

23, 2012 and took off at 15:46 GMT. Pl. Ex. 36 (Fowler Decl.), at ¶ 11; Pl. Ex. 1 (Van

Den Berg Decl.), at ¶¶ 15, 17.

10.      Forty-five minutes after takeoff, at about 16:30 GMT, Mr. Baillie told F/A

Van Den Berg "that he was still slightly out of breath and that he was not feeling well." 

Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 19; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶¶ 4,

("Mr. Baillie first complained that he did not feel well at about 16:30 GMT"); Pl. Ex. 3

(Van Den Berg Dep.), at 204:24 – 206:16.

11.      F/A Van Den Berg notified her supervisor, BA Customer Service Manager

("CSM") Georgina Bolton that Mr. Baillie was not feeling well. Pl. Ex. 1 (Van Den Berg

Decl.), at ¶ 20; Pl. Ex. 4 (Bolton Decl.), at ¶¶ 11 - 12; Pl. Ex. 3 (Van Den Berg Dep.), at

206:17 – 24.

12.      Approximately one half hour later, at 17:00 GMT, Mr. Baillie told F/A Van

Den Berg that he was "experiencing pain in his chest." Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 21; Pl. Ex. 2 (Van Den Berg Supp. Decl.), at ¶¶ 4, 9 ("Mr. Baillie did not complain of chest pains until approximately 17:00 GMT"); Pl Ex. 3 (Van Den Berg Dep.), at 207:4 - 18.

13.    The most common expression of the onset of a heart attack is chest pain. Pl. Ex. 10_ (Dr. Budoff Dep.), at 15:1 – 14; 15:24 – 18:4.

14.    The "cardinal symptom" which indicated the beginning of Mr. Baillie's heart attack was his "chest pain." *Id.* at 15:1 – 14; 15:24 – 18:4; Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 93:12 – 94:2 (the likelihood was that "his onset of chest pain was when his onset of infarction was.")

15.    Shortly thereafter, F/A Van Den Berg notified CSM Bolton that Mr. Baillie was still not feeling well and was experiencing chest pains. Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 22; Pl. Ex. 4 (Bolton Decl.), at ¶ 12 (F/A "Van Den Berg notified me that Mr. Baillie's condition had worsened and that he was experiencing chest pains."); Pl. Ex. 3 (Van Den Berg Dep.), at 213:23 – 214:7.  At 17:00 GMT, there were still about 9 hours left in the flight. Pl. Ex. 36 (Captain Fowler Decl.), at ¶ 11 (BA 289 "arrived at the gate at Phoenix Sky Harbor Airport at 01:53 GMT.").

16.    By 17:15 GMT, F/A Van Den Berg and CSM Bolton had set up the on-board oxygen system and were administering supplemental oxygen to Mr. Baillie. Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 23, 25; Pl. Ex. 4 (Bolton Decl.), at ¶ 12; Pl. Ex. 3 (Van Den Berg Dep.), at 214:8 – 215:16.

17.    F/A Van Den Berg then obtained information from Mr. Baillie about his

medical history, age, medications, prior health problems and symptoms. Pl. Ex. 1 (Van Den Berg Decl.), at ¶¶ 25 – 26; Pl. Ex. 4 (Bolton Decl.), at ¶ 13.

18.     Mr. Baillie told F/A Van Den Berg that he had no history of cardiac issues and that he had taken an aspirin "around the time of take off," which she estimated to be 15:30 GMT. Pl. Ex. 1 (Van Den Berg Decl.), at ¶ 26; Pl. Ex. 3 (Van Den Berg Dep.), at 229:2 -14; 238:6 – 15.

19.     At approximately 18:30 GMT, F/A Van Den Berg and CSM Bolton went to the flight deck and briefed the flight crew on Mr. Baillie's condition. Pl. Exh. 1 (Van Den Berg Decl.), at ¶ 29; Pl. Ex. 4 (Bolton Decl.), at ¶ 13.

20.     At 18:45 GMT, the BA 289 flight crew contacted Medlink and spoke with a MedAire Communication Specialist ("CSE"). Pl. Ex. 7 (Transcript of Communications), at BA 0489; Pl. Ex. 8 (Audio Recording of Communications), at BA 0579.

21.     There were still approximately 7 hours left in the flight. Pl. Ex. 34 (Dr. Reinhart Dep.), at 63:18 – 24.

**MedAire's Medlink Service**

22.     MedAire is an Arizona company that provides inflight medical emergency advisory services to many airlines, including BA, through a service called "Medlink." Pl. Ex. 16 (BA/MedAire Contract), at BA 0735.

23.     MedAire's Medlink service makes emergency medicine physicians available 24 hours a day to provide airline crews with medical consultation and advice on how to deal with passengers and crew suffering inflight medical emergencies. *Id.* at BA 0750.

24.     Pursuant to MedAire's contract with BA, the Medlink emergency medicine physicians are required to assess "the severity of any inflight injury or illness and guide the flight [crew] and/or cabin crew by providing step by step treatment instructions." *Id*. at BA 0750.

25.     Under the contract, "once the Medlink physician has assessed the medical situation, he or she will make medical recommendations.  If the medical situation is serious enough to warrant a diversion, the Medlink physician will make that recommendation to the pilot." *Id*. at BA 0751.

26.     The Medlink physician will also advise the captain "if a diversion is medically warranted." *Id*.

27.     The MedAire contract with British Airways requires the Medlink emergency medicine physicians to provide their services "to the highest professional standard using the techniques and standards and applying the care, skill and diligence required in accordance with the best practices of [emergency medicine]. *Id*. at BA 0737.

28.     In turn, MedAire contracted with Emergency Professional Services ("EPS"), a medical group that staffs the emergency room at Banner – University Medical Center Phoenix, to provide the physicians who would give the emergency medical treatment advice to its airline customers. Pl. Ex. 42, MedAire/EPS Professional Services Agreement ("MedAire/EPS Contract"), at MA027008; Pl. Ex. 26 (Dr. Streitwieser Dep.), at 13:22 – 14:5.

29.     EPS is comprised of about 50 certified emergency medicine physicians, including Drs. Reinhart and Monas. *Id*. at 96:16 – 24.

30.     The MedAire/EPS contract requires the EPS physicians to perform their duties under the contract "at all times in strict conformance with currently approved methods and practices in [emergency medicine] in a competent, ethical and professional manner." Pl. Ex. 42 (MedAire/EPS Contract), at MA027009.

31.     Dr. Streitwieser, the President of EPS, testified that when Drs. Reinhart and Monas were fulfilling the contractual obligations of EPS to MedAire in regard to Mr. Baillie, they were required to perform their duties in strict conformance with currently approved methods and practices in emergency medicine in a competent, ethical and professional manner. Pl. Ex. 26 (Dr. Streitwieser Dep.), at 38:23 – 40:16.

32.     MedAire teaches its Medlink physicians that diversions should only be recommended if "medically necessary." Pl. Ex. 25 (MedAire Physician Pearls), at MA027372 ("Diversions are very costly to the airlines and should only be done if medically necessary.").

33.     MedAire teaches its CSEs that "reduction of diversion rates is one of the main selling points of the Medlink service to commercial carriers." Pl Ex. 43 (MedAire Medlink Commericial In Flight – EMS Required with Diversion), at MA027042.

34.     MedAire CSEs are required to document all casework in the electronic case management system and on the Medlink Intake Form. Pl. Ex. 18 (Tyler Dep.), at 57:21 – 59:4; Pl. Ex. 44 (Medlink Client Patch Process), at MA027020; Pl. Ex. 41, Medlink Intake Form for BA 289 ("Medlink Intake Form").

35.     MedAire CSEs are required to monitor and answer incoming MedAire calls, to collect specific information from those calls, and then document all the

communications between the CSE, the Medlink physician and the commercial aircrew or flight crew. Pl. Ex. 18 (Tyler Dep.), at 33:22 – 34:8.

36.     When a MedAire CSE receives a Medlink call from a commercial airline regarding an in-flight medical emergency, he or she is required to obtain certain initial information, including the airline company name, the flight number, the origination airport, the destination airport, the estimated time of arrival, how much time is remaining in the flight, the passenger details and record it on the Medlink Intake Form. *Id.* at 41:23 – 42:17.

37.     When the Medlink physician comes to the call center after being paged, the MedAire CSE provides them with the Medlink Intake Form and gives them a verbal briefing regarding the information about the flight and the passenger. *Id.* at 42:18 – 43:7. Medlink physicians "typically" record additional information provided by the aircrew on the Medlink Intake Form. *Id.* at 43:9 – 44:18.

38.     The MedAire CSE is also required to document the conversation between the Medlink physician and flight crew, and any recommendations made by the physician, on MedAire's computerized information system. Pl. Ex. 18 (Tyler Dep.), at 90:18 – 92:22. All casework is required to be documented in the electronic case management system and on the appropriate intake form. Pl. Ex. 44 (Medlink Client Patch Process), at MA027020.

39.     MedAire provides the Medlink physicians with a "Diversion Justification Worksheet "to work through the medical diversion decision making process and document his/her justification for recommending a medical diversion." Pl. Ex. 23 (Medlink Diversion Justification Worksheet Process), at MA027047.

40.     The Diversion Justification Worksheet provides Medlink doctors with "factors to consider prior to recommending diversion" and lists a number of "reasons for diversion" including a) "passenger is unstable"; b) "passenger is potentially unstable, unable to rule out life threat ((ex. possible ACS (acute coronary syndrome), PE (pulmonary embolism), etc.))"; c) "passenger in severe distress, not life threatening (ex. renal colic, urinary retention, etc.)"; d) "passenger not unstable currently, but too long to destination (ex. COPD exacerbation, pre-term labor, etc.)"; and e) "passenger with potentially unstable condition (ex. possible miscarriage, recurrent seizures, etc.), leaving area with adequate medical facilities (ex. heading over water, Africa, Central Asia, Russia, Amazon, etc.)." Pl. Ex. 24 (Diversion Justification Worksheet), at MA027054.

41.     MedAire also provides the Medlink physicians with "Evaluation for Diversion" factors in its Physician Pearls for Remote Medical Care document, including a) "location" of the aircraft; b) "resources", both "in-flight" and "at potential destination for diversion"; c) the "emergency situation" ("What medically justifies a diversion? What is the medical emergency? Does it require immediate medical intervention – or can it be handled safely in-flight and have medical evaluation upon arrival.  What are the complications if you don't divert?  Is the medical condition likely to worsen and compromise life or limb?  Is it time critical?  And is diversion going to meet the time requirement."); d) "family/crew considerations"; and e) "bottom line for diversion decision" (is patient stable enough to make destination – or is diversion required."). Pl. Ex. 25 (MedAire Physician Pearls), at MA027372 – 73.

42.     The MedAire Reference Material entitled, "Physician Pearls for Remote

Medical Care" provides guidance to Medlink physicians who are contacted when a passenger complains of "chest pain." *Id.* at MA027364.

43.     The MedAire Physician Pearls document states that "if the chest pain is ongoing for more than 20 minutes and the chest pain and shortness of breath cannot be relieved with onboard resources – this is a strong case for diverting (potential coronary syndrome)." *Id.* at MA027364.

44.     David Streitwieser, M.D. is the President of EPS and the Medical Director of Medlink and trains Medlink physicians. Pl. Ex. 26 (Dr. Streitwieser Dep.), at 11:19 – 22; 14:11 – 25.  Dr. Streitwieser testified that his personal standard when contacted about an ill passenger on a commercial flight who's experiencing a potential coronary event is "[i]f I am unable to relieve the pain with a reasonable period of time, say, and actively treating it 20 to 30 minutes, and I'm strongly convinced that it's [acute coronary syndrome], then I will look at diversion options." *Id.* at 58:10 – 22.

45.     Dr. Streitwieser believes "all Medlink physicians would operate under that same basic standard when handling a Medlink call involving a passenger with chest pain because it's basic knowledge that comes with their training." *Id.* at 68:4 - 9.

46.     The MedAire Physician Pearls document also advises Medlink physicians presented with a passenger suffering "chest pain" to "involve the … patient and pilot and discuss the facts regarding the … possible risks of continuing and how effective the onboard resources may or may not be." Pl. Ex. 25 (MedAire Physician Pearls), at MA027364.

1

## Communications between BA 289 and MedAire/Medlink

2

### The First Call – 18:45 GMT

3

4

47.     At 18:45 GMT, the BA pilot told the MedAire CSE that "we've got a 61

5

year old male … who was a little out of breath when he boarded," "has pain in the central

6

chest and feels hot and … is a bit pale," and "we've put him on therapeutic oxygen." Pl.

7

Ex. 7 (Transcript of Communications), at BA 0489; Pl. Ex. 8 (Audio Recording of

8

Communications), at BA 0579.

9

10

48.     The MedAire CSE recorded the BA 289 "Medical Situation" at 18:45 GMT

11

as "The flight attendant reported an adult passenger who was a little out of breath when he

12

boarded now has central chest pain and appearing pale." (emphasis added). Pl. Ex. 5

13

(Medlink Client Patch Summary), at 1.

14

15

49.     A short time later, a Medlink physician, Dr. Reinhart, joined the call. Pl. Ex.

16

7 (Transcript of Communications), at BA 0489; Pl. Ex. 8 (Audio Recording of

17

Communications), at BA 0580.

18

19

50.     Dr. Reinhart asked the flight crew about Mr. Baillie's medical history and

20

the flight crew put F/A Van Den Berg on the call. Pl. Ex. 7 (Transcript of

21

Communications), at BA 0489; Pl. Ex. 8 (Audio Recording of Communications), at BA

22

0580.

23

24

51.     F/A Van Den Berg told Dr. Reinhart that Mr. Baillie said that he didn't have

25

a "history of cardiac" problems and that he had taken an aspirin three hours twenty

26

minutes earlier, at 15:30 GMT. Pl. Ex. 7 (Transcript of Communications), at BA 0489; Pl.

27

Ex. 8 (Audio Recording of Communications), at BA 0580.

28

52.     Dr. Reinhart recommended that Mr. Baillie be kept on supplemental oxygen. Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA 0580.

53.     Dr. Reinhart also indicated that he was concerned about Mr. Baillie's age, his pain and his paleness so he asked crewmembers to find out if there were any medical professionals on board the flight who could obtain Mr. Baillie's vital signs to determine whether he was stable enough to take nitroglycerin. Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA 0580.

54.     Dr. Reinhart never asked the BA 289 crew "when the symptoms started" or "how severe the symptoms are," questions that would be "typically" asked by a doctor. Pl. Ex. 10 (Dr. Budoff Dep.), at 15:2 – 14 ("when the symptoms started, how severe the symptoms are and the nature of the symptoms."); Pl. Ex. 7 (Transcript of Communications), at BA 0489 - 91; Pl. Ex. 8 (Audio Recording of Communications), at BA 0580 - 82.

### The Second Call – 19:12 GMT

55.     Approximately twenty minutes later, at 19:12 GMT, the BA flight crew again contacted Medlink. Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA 0581.

56.     F/A Van Den Berg reported that an onboard physician had determined that Mr. Baillie had an irregular pulse of 100 beats per minute, a blood pressure of 100/70 and that he was still experiencing chest pains. Pl. Ex. 7 (Transcript of Communications), at

BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA 0581.

57.     F/A Van Den Berg also told Medlink that the on-board doctor stated that Mr. Baillie had "crackles on his left hand side." Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA 0581.

58.     A short time later, Dr. Reinhart rejoined the call and confirmed that he understood that there was a physician on board the flight and that Mr. Baillie had "crackles in the left chest." Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA 0582.

59.     "Crackles" are an abnormal respiratory sound heard with a stethoscope. They indicate some pathological condition. Dortland's Illustrated Medical Dictionary, 27th Ed. (1988).

60.     Crackles sound "like someone walking on glass"; it's a "very distinct" sound. Pl. Ex. 29 (Dr. Verma Dep.), at 63:9 – 64:16; Pl. Ex. 34 (Dr. Reinhart Dep. 2014), at 80:11 – 22 (crackles sound like cereal and milk or like "breaking glass").

61.     "Crackles, by themselves, are an indication that the patient could be suffering from pulmonary edema or fluid in the lungs.  However, crackles, along with chest pain, can indicate that a patient is having a complicated heart attack and that they are very sick." Pl. Ex. 6 (Dr. Candipan Decl.), at ¶ 11.

62.     Dr. Reinhart admitted at his deposition that he gave very little credence to the on board physician's report of hearing "crackles" in Mr. Baillie's chest and did not use the information about "crackles" in making any determination. Pl. Ex. 34 (Dr. Reinhart Dep. 2014), at 107:5 – 14.

63.     Dr. Reinhart explained that the reason he discounted the onboard physician's report of hearing "crackles" was that he didn't think it would be very easy to hear them with a stethoscope on an airplane because of the noise in the cabin. *Id.* at 107:15 – 108:2.

64.     Dr. Reinhart never asked the BA 289 crew to ask the on board physician if he was certain that he could hear crackles in Mr. Baillie's chest. Pl. Ex. 7 (Transcript of Communications), at BA 0489 - 91; Pl. Ex. 8 (Audio Recording of Communications), at BA 0580 - 82; Pl. Ex. 26 (Dr. Streitwieser Dep.), at 65:13 – 18.

65.     Dr. Reinhart admitted that if Mr. Baillie had indeed been experiencing "crackles," he would have considered his condition to be more serious. Pl. Ex. 34 (Dr. Reinhart Dep. 2014), at 108:15 – 109:7.

66.     Ratan K. Verma, M.D., the physician on board BA 289, testified that Mr. Baillie's crackles were "easy to hear with a stethoscope in the airplane environment" and that "he could hear them in spite of the ambient noise in the cabin." Pl. Ex. 29 (Dr. Verma Dep.), at 64:17 – 20; 65:2-4.  Dr. Candipan, who has used a stethoscope to listen to the chests of ill passengers on commercial airliners "two or three" times, agrees that the ambient noise does not make it harder to hear than it normally would be. Pl. Ex. 31 (Dr. Candipan Dep. 2015), at 30:8 – 19.

67.     The first class cabin on the 747 aircraft is "quiet." Pl. Ex. 30 (Captain Fortune Dep.), at 18:13 - 22.

68.     Once Dr. Reinhart was told that the on board physician could hear crackles in Mr. Baillie's chest, Dr. Reinhart "should have concluded that [Mr. Baillie] was likely

having a heart attack." Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 62:6-9; Pl. Ex. 14, Expert

Report of Robert C. Candipan, Ph.D., M.D. ("Dr. Candipan Expert Report"), at 6 ("the

clinical information that was provided to the MedAire/Medlink physicians was more than

adequate for [them] to come to a working diagnosis that would have placed myocardial

infarction high if not on top of a list of potential medical conditions.").

69.     Dr. Reinhart then asked if the on-board physician had any suggestions after

his evaluation. Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio

Recording of Communications), at BA 0582.

70.     The pilot told Dr. Reinhart that the on-board physician didn't have any

suggestions. Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio

Recording of Communications), at BA 0582.

71.     Dr. Reinhart then noted that there were over 6 hours remaining in the flight

and stated that he was hopeful that the supplemental oxygen would improve Mr. Baillie's

condition. Pl. Ex. 7 (Transcript of Communications), at BA 0490; Pl. Ex. 8 (Audio

Recording of Communications), at BA 0582.

72.     Dr. Reinhart added that if Mr. Baillie's "condition appears to deteriorate,

call us back and we would have to consider a diversion at that point." Pl. Ex. 7 (Transcript

of Communications), at BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA

0582.

73.     In response, the pilot told Dr. Reinhart that the cabin crew "just said [Mr.

Baillie's] gotten slightly worse since he's been on oxygen." Pl. Ex. 7 (Transcript of

Communications), at BA 0490; Pl. Ex. 8 (Audio Recording of Communications), at BA

0582.

74.     Dr. Reinhart advised the pilot to let Medlink know if anything changed with Mr. Baillie's condition or if his blood pressure dropped further, his color deteriorated or his chest pain worsened to the point where he was unable to tolerate it. Pl. Ex. 7 (Transcript of Communications), at BA 0490 - 91; Pl. Ex. 8 (Audio Recording of Communications), at BA 0582.

75.     Dr. Reinhart did not recommend to the flight crew of BA 289 that they divert the aircraft to a city where Mr. Baillie could receive emergency medical treatment. Pl. Ex. 7 (Transcript of Communications), at BA 0490 - 91; Pl. Ex. 8 (Audio Recording of Communications), at BA 0582.

76.     Even though Dr. Reinhart believed that a heart attack could be one of the possible ailments affecting Mr. Baillie, Dr. Reinhart did not tell the BA 289 crew that Mr. Baillie could have been having a heart attack or suffering from a potentially life threatening condition. Pl. Ex. 7 (Transcript of Communications), at BA 0489 - 91; Pl. Ex. 8 (Audio Recording of Communications), at BA 0580 - 82; Pl. Ex. 34 (Dr. Reinhart Dep. 2014), at 140:1 – 14 (heart attack is "in my differential"); Pl. Ex. 14 (Dr. Candipan Expert Report), at 2 ("there were no direct communications by the MedAire/Medlink physicians with the Captain or Co-Pilots as to the potential that Mr. Baillie was suffering from a life threatening condition."); Pl. Ex. 46, Captain Daniel Mesnard Expert Report ("Captain Mesnard Expert Report"), at 23 ("Dr[]. Reinhart … failed to advise the flight crew that Mr. Baillie was suffering from a potentially life threatening condition.").

77.     Dr. Streitwieser, the President of EPS, testified that, at the very least, the

symptoms provided to the MedAire CSE and Dr. Reinhart indicated that there was a

potential for Mr. Baillie to be experiencing acute coronary syndrome. Pl. Ex. 26 (Dr.

Streitwieser Dep.), at 61:2 – 7.

78.     Dr. Streitwieser also testified that based on all the symptoms presented to

Dr. Reinhart regarding Mr. Baillie, he would have considered Mr. Baillie to be potentially

unstable because "he's got the potential to deteriorate or worsen." *Id.* at 141:4 – 14: 144:2

- 17.

79.     A short time later, Dr. Reinhart's shift ended and he went off duty. *Id.*  at

88:21 – 89:3; 149:21 – 24.

80.     Had BA 289 diverted at 19:12 GMT, the time of the second BA 289

communication with Medlink, it would have taken it 1 hour 45 minutes to land at

Keflavik, Iceland, which was east of the aircraft's position. Pl. Ex. 30 (Captain Fortune

Dep.), at 83:6 -15; Pl. Ex. 32, Diversion Time Calculation Map Prepared by Captain

Michael G. Fortune: Minimum Time Required for BA 289 to Divert to Keflavik Airport,

Reykjavik, Iceland from its Positions at 18:45 GMT and 19:12 GMT on March 23, 2012.

81.      Had BA 289 diverted at 19:12 GMT, the time of the second BA 289

communication with Medlink, it would have taken BA 289 1 hour 54 minutes to divert to

St. Johns, Newfoundland, Canada, which was west of the aircraft's position the same

position. Pl. Ex. 30 (Captain Fortune Dep.), at 84:9 – 17; Pl. Ex. 33, Diversion Time

Calculation Map Prepared by Captain Michael G. Fortune: Minimum Time Required for

BA 289 to Divert to St. Johns International Airport, Newfoundland, Canada from its

Positions at 18:45 GMT and 19:12 GMT on March 23, 2012.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

82.     Dr. Reinhart and the flight crew of BA 289 never discussed the location of the aircraft. Pl. Ex. 7 (Transcript of Communications), at BA 0489 - 91; Pl. Ex. 8 (Audio Recording of Communications), at BA 0580 - 82.

83.     Mr. Baillie "would have had an improved chance of survival" if Dr. Reinhart had recommended that BA 289 be diverted.  Pl. Ex. 9 (Dr. Candipan Dep. 2016), at 113:9 – 114:12.  Mr. Baillie would also have had an improved chance of recovery if he had been treated 5 hours earlier than he actually was. Pl. Ex. 31 (Dr. Candipan Dep. 2015), at 159: 1 – 12.

84.     The only thing Dr. Reinhart could discern from the information provided on the Medlink Intake Form for BA 289 was that the flight was about three and one-half hours out of Heathrow Airport and was most likely over the Atlantic Ocean. Pl. Ex. 34 (Dr. Reinhart Dep. No. 2014), at 63:25 – 64:12.

85.     Dr. Reinhart did not record any handwritten notes on the Medlink Intake Form pertaining to Mr. Baillie. Pl. Ex. 48, Deposition of Steven Joe Reinhart, D.O. dated January 6, 2016 (Dr. Reinhart Dep. 2016), at 111:5 - 8; Pl. Ex. 41 (Medlink Intake Form); Pl. Ex. 26 (Dr. Streitwieser Dep.), at 49:1 – 7; 172, line 22 – p. 173, line 5 (Mr. Baillie's chest pain, other symptoms and instructions to the BA crew were "undocumented.").

86.     The Medlink Intake Form was the only form that Dr. Reinhart would have used to record notes regarding symptoms and conditions of a passenger and the medical advice that he had given to a flight crew. Pl. Ex. 48 (Dr. Reinhart Dep. 2016), at 82:13 – 83:12.

87.     Dr. Reinhart didn't do anything to communicate to the next doctor who

might have to take over Mr. Baillie's case after he went off shift that he told the flight crew to consider diversion if Mr. Baillie's condition got worse. Pl. Ex. 34 (Dr. Reinhart Dep. 2014), at 152:7 – 11.

88.     The poor communication and documentation made in the handoff of clinical responsibility for Mr. Baillie from Dr. Reinhart to Dr. Monas was not in line with usual and standard practice for physicians. Pl. Ex. 14 (Dr. Candipan Expert Report), at 6.

89.     Dr. Reinhart testified that his usual practice when presented with a passenger with a differential diagnosis that includes a heart attack while over the Atlantic Ocean is to do "serial evaluations." Pl. Ex. 34 (Dr. Reinhart Dep. 2014), at 73:2 – 74:6. He would continue the treatment and ask for an observation in 30 minutes. *Id.* at 72:3 – 12. If the passenger has gotten better then he would tell the flight to continue to its destination; but if the passenger has not gotten better, he'd find a place to divert to. *Id.* at 73:2 – 74:6.

90.     Dr. Reinhart's decision to allow Mr. Baillie's chest pain to continue unabated without giving the BA 289 crew a timeframe after which, if the chest pain continued, a diversion should be considered, was below the standard of care for an emergency room physician. Pl. Ex.9 (Dr. Candipan Dep. 2016), at 63:17 – 65:14.

91.     Dr. Reinhart never received any training in regard to his Medlink doctor duties while working at EPS and never received any direct one-on-one training from another experienced Medlink doctor or anyone at MedAire. Pl. Ex. 48 (Dr. Reinhart Dep. 2016), at 13:14 – 22: 16:14 – 23: 20:13 – 23.

92.     Had Dr. Reinhart remained on duty and received all the updated

communications from the BA crew regarding Mr. Baillie's worsening medical condition,
he would have "most likely" diverted the flight to the nearest city with an available
emergency medical facility. Pl. Ex. 34 (Dr. Reinhart Dep. 2014), at 160:2 – 11.

The Third Call – 22:34 GMT

93.     Approximately three hours ten minutes later, at 22:34 GMT, the BA crew
again contacted MedAire because Mr. Baillie was reporting that he was feeling worse. Pl.
Ex. 7 (Transcript of Communications), at BA 0491; Pl. Ex. 8 (Audio Recording of
Communications), at BA 583.

94.     Approximately 3 hours 20 minutes remained in the flight. Pl. Ex. 36
(Captain Fowler Decl.), at ¶ 11 (BA 289 "arrived at the gate at Phoenix Sky Harbor
Airport at 01:53 GMT.").

95.     This time, F/A Van Den Berg briefed a different MedAire CSE on Mr.
Baillie's condition. Pl. Ex. 7 (Transcript of Communications), at BA 0491; Pl. Ex. 8
(Audio Recording of Communications), at BA 0583.

96.     F/A Van Den Berg reported to the new MedAire CSE that Mr. Baillie's
blood pressure was 100/80 and his pulse was 100. Pl. Ex. 7 (Transcript of
Communications), at BA 0491; Pl. Ex. 8 (Audio Recording of Communications), at BA
0583.

97.     F/A Van Den Berg also told the new MedAire CSE that Mr. Baillie had
reported feeling worse, still had pain in the center of his chest, was sweating and that he
indicated that he didn't have any pain in his left or right arm. Pl. Ex. 7 (Transcript of
Communications), at BA 0491; Pl. Ex. 8 (Audio Recording of Communications), at BA

0583.

98.     At this point, the new MedAire CSE advised F/A Van Den Berg that Dr.

Reinhart's work shift was over and that a new physician would have to be updated. Pl. Ex.

7 (Transcript of Communications), at BA 0491; Pl. Ex. 8 (Audio Recording of

Communications), at BA 0583.

99.     Shortly thereafter, the new Medlink physician, Dr. Monas, joined the call.

Pl. Ex. 7 (Transcript of Communications), at BA 0491; Pl. Ex. 8 (Audio Recording of

Communications), at BA 0583.

100.    When Dr. Monas joined the 22:34 GMT call, the only document she was

given was the incomplete Medlink Intake Form. Pl. Ex. 19 (Dr. Monas Dep. 2014), at

33:15 – 34:16.

101.    When the form was given to Dr. Monas, there were no notes on page 2

indicating that the onboard physician heard "crackles" in Mr. Baillie's chest. *Id.* at 39:13 –

21; 45:7 – 46:16.

102.    When Dr. Monas started the 22:34 GMT call she knew nothing about the

passenger experiencing "crackles" and never learned about the report of "crackles" during

her entire involvement with the BA flight. *Id.* at 49:5 – 14.

103.    Dr. Monas was not told when she took the 22:34 GMT call that Dr. Reinhart

had advised the BA crew that if Mr. Baillie's condition did not improve or appeared to

deteriorate the airline should call Medlink back and a diversion would have to be

considered. *Id.* at 101:13 – 102:5.

104.    Dr. Monas was not told by the MedAire CSE that Mr. Baillie had been

experiencing chest pain for approximately 7.5 hours. *Id.* at 104:4 – 10.

105.   F/A Van Den Berg repeated to Dr. Monas that Mr. Baillie had taken aspirin seven hours previously but had been given no other medication, was complaining about pain in the center of his chest, had a blood pressure of 100/80 and a pulse of 110. Pl. Ex. 7 (Transcript of Communications), at BA 0491; Pl. Ex. 8 (Audio Recording of Communications), at BA 0583.

106.   F/A Van Den Berg also told Dr. Monas that Mr. Baillie was reporting that he was "feeling a bit worse." Pl. Ex. 7 (Transcript of Communications), at BA 0491; Pl. Ex. 8 (Audio Recording of Communications), at BA 0583.

107.   Dr. Monas never asked the BA 289 crew "when the symptoms started" or "how severe the symptoms are," questions that would be "typically" asked by a doctor. Pl. Ex. 10 (Dr. Budoff Dep.), at 15:2 – 14 ("when the symptoms started, how severe the symptoms are and the nature of the symptoms."); Pl. Ex. 7 (Transcript of Communications), at BA 0492 - 931; Pl. Ex. 8 (Audio Recording of Communications), at BA 0583 - 85.

108.   Dr. Monas recommended that Mr. Baillie be given a single dose of nitroglycerin, even though the pilot pointed out to her that the previous Medlink physician had decided against it. Pl. Ex. 7 (Transcript of Communications), at BA 0491 - 92; Pl. Ex. 8 (Audio Recording of Communications), at BA 0583.

109.    The BA 289 pilot then told Dr. Monas that the on-board physician stated that Mr. Baillie looked "considerably worse" and that [the on board physician's] recommendation was to re-evaluate in 30 minutes and "suggested that at that time we

might consider making a diversion." Pl. Ex. 7 (Transcript of Communications), at BA

0492; Pl. Ex. 8 (Audio Recording of Communications), at BA 0583.

110.    The BA 289 pilot confirmed Dr. Monas's instruction to administer

nitroglycerin to Mr. Baillie and the third communication ended. Pl. Ex. 7 (Transcript of

Communications), at BA 0492; Pl. Ex. 8 (Audio Recording of Communications), at BA

0583.

<u>The Fourth and Last Call – 22:52 GMT</u>

111.    Ten minutes later, at 22:52 GMT, the flight crew contacted Medlink for the

fourth time and told Dr. Monas that the physician on board the flight did not want to

administer the nitroglycerin to Mr. Baillie because his blood pressure was too low. Pl. Ex.

7 (Transcript of Communications), at BA 0492; Pl. Ex. 8 (Audio Recording of

Communications), at BA 0584.

112.    Dr. Monas then asked to be rebriefed on Mr. Baillie's medical condition and

F/A Van Den Berg again told her that his blood pressure was 100/80, he had a pulse of

110, he was sweating and short of breath and that he still was experiencing chest pains. Pl.

Ex. 7 (Transcript of Communications), at BA 0492; Pl. Ex. 8 (Audio Recording of

Communications), at BA 0584.

113.    F/A Van Den Berg did not mention the previous report of crackles to Dr.

Monas. Pl. Ex. 7 (Transcript of Communications), at BA 0492; Pl. Ex. 8 (Audio

Recording of Communications), at BA 0584.

114.    Based on the information provided by the BA 289 crew to Dr. Monas and

the MedAire CSEs, Dr. Monas should have been able "to recognize the likelihood that

Mr. Baillie's chest pain and associated symptoms were indicative of a myocardial

infarction and/or acute coronary syndrome. Pl. Ex. 14 (Dr. Candipan Expert Report), at 2.

115.    Based on this information, Dr. Monas told the BA crew, "I mean you know

obviously we are here, you guys are in the air and evaluating the patient.  If you feel the

patient is not looking well, and that uh we need to divert we can start to take a look at

diversion locations." Pl. Ex. 7 (Transcript of Communications), at BA 0493; Pl. Ex. 8

(Audio Recording of Communications), at BA 0584.

116.    Dr. Monas was not aware of the location of BA 289 when she was speaking

with the crew about Mr. Baillie. Pl. Ex. 19 (Dr. Monas Dep. 2014), at 73:8 – 74:10.

117.    Dr. Monas did not recommend to the flight crew of BA 289 that they divert

the aircraft to a city where Mr. Baillie could receive emergency medical treatment even

though "the clinical information that was provided to [her] was more than adequate for

[her] to come to a working diagnosis that would have placed myocardial infarction high if

not on the top of a list of potential medical conditions." Pl. Ex. 14 (Dr. Candipan Expert

Report), at 6; Pl. Ex. 7 (Transcript of Communications), at BA 0491 - 93; Pl. Ex. 8 (Audio

Recording of Communications), at BA 0583 - 85.

118.    Dr. Monas did not tell the BA 289 crew that Mr. Baillie could have been

having a heart attack or suffering from a potentially life threatening condition. Pl. Ex. 7

(Transcript of Communications), at BA 0491 - 93; Pl. Ex. 8 (Audio Recording of

Communications), at BA 0583 - 85; Pl. Ex. 14 (Dr. Candipan Expert Report), at 2 ("there

were no direct communications by the MedAire/Medlink physicians with the Captain or

Co-Pilots as to the potential that Mr. Baillie was suffering from a life threatening

condition."; Pl. Ex. 46 (Captain Daniel Mesnard Expert Report), at 23 ("Dr[]. Monas …

failed to advise the flight crew that Mr. Baillie was suffering from a potentially life

threatening condition.").

119.    Stephen Fowler, the Captain in charge of BA 289, made the decision to

continue the flight to Phoenix because the Medlink and onboard doctors did not

recommend diversion. Pl. Ex. 36 (Captain Fowler Decl.), at ¶¶ 1, 16 -17 ("I recall that, in

the absence of medical advice to divert, I made the decision to continue to [Phoenix].

That was as decision I kept under review for the rest of the flight."); Pl. Ex. 37 (Captain

Fowler Dep.), at 200:22 – 201:11 (he didn't divert to Chicago because "there was no

instruction from Medlink or the doctors on board, to divert the aircraft or to tell me that

the passenger's safety or well-being [required] me to divert the aircraft.").

120.    The BA pilots did not divert the flight and continued to Phoenix Sky Harbor

International Airport where they arrived at the gate at 01:53 GMT (local Phoenix time

6:53 p.m.), approximately 10 hours 41 minutes after departing the gate at London

Heathrow Airport. Pl. Ex. 36 (Captain Fowler Decl.), at ¶¶ 11, 17.

121.    By the time the flight arrived in Phoenix, Mr. Baillie's medical condition

was very serious. Pl. Exh. 49, St. Luke's Medical Center Records for Mr. Baillie ("St.

Luke's Medical Records"), at JDB-12284, JDB-12292.

122.    He was taken directly from the airplane by ambulance to the emergency

room at St. Luke's Medical Center in Phoenix, where he arrived at 7:27 p.m.,

approximately thirty-five minutes after landing. *Id.* at JDB-12254, JDB-12269, JDB-

12292.

123.    Mr. Baillie was diagnosed as having suffered an acute myocardial infarction (heart attack) as well as acute respiratory failure, cardiogenic shock and acute systolic heart failure. *Id.* at JDB-12250, JDB-12284, JDB-12292.

124.    Mr. Baillie was admitted to St. Luke's Medical Center from the emergency room in critical condition. *Id.* at JDB-12271.

125.    Approximately 11 hours after Mr. Baillie first reported experiencing chest pain to F/A Van Den Berg, Robert C. Candipan, M.D., an interventional cardiologist, performed a left heart catheterization which demonstrated a total blockage of the proximal left anterior descending coronary artery. Pl. Ex. 6 (Dr. Candipan Decl.), at ¶ 6.

126.    As a result, Dr. Candipan performed a balloon angioplasty, thrombectomy and placed three drug-eluting stents and an intra-aortic balloon pump in Mr. Baillie's blocked coronary artery. *Id.*

127.    Mr. Baillie was treated in the intensive care unit at St. Luke's Hospital until March 30, 2012, when he was transferred in guarded condition to The Mayo Clinic in Phoenix. Pl. Ex. 49 (St. Luke's Medical Records), at JDB-12284 – 85.

128.    Mr. Baillie remained hospitalized at The Mayo Clinic until his death on July 1, 2012, 100 days after his heart attack. Pl. Ex. 11 (Mayo Clinic Expiration Summary), at JDB00573 – 76.

1   Dated:  November 1, 2016

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KREINDLER & KREINDLER LLP


By: /s/ Francis G. Fleming
Francis G. Fleming, 004375
Robert J. Spragg, *pro hac vice*
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

-and-

Steven M. Dichter, 004042
CHRISTIAN DICHTER & SLUGA, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, AZ 85004
Tel.: (602) 792-1700
Fax: (602) 792-1710

*Attorneys for Plaintiff*
*Linda Ann Baillie*