EXHIBIT 1

1   Scott D. Cunningham (State Bar No.: 200413)
    Email: scunningham@condonlaw.com
2   Ivy L. Nowinski (State Bar No.: 268564)
    Email: inowinski@condonlaw.com
3   CONDON & FORSYTH LLP
    1901 Avenue of the Stars, Suite 850
4   Los Angeles, California 90067-6010
    Telephone: (310) 557-2030
5   Facsimile: (310) 557-1299

6      - and -

7   Anthony U. Battista (*admitted pro hac vice*)
    Email: abattista@condonlaw.com
8   CONDON & FORSYTH LLP
9   7 Times Square
    New York, New York 10036
10  Telephone: (212) 490-9100
11  Facsimile: (212) 370-4453

12  Attorneys for Defendant
    BRITISH AIRWAYS, PLC

13              UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15

16  LINDA ANN BAILLIE, individually, as      )   Case No. CV13-4681 SVW (RZx)
17  Personal Representative of the Estate of  )
    JAMES DONALD BAILLIE, II, and on          )   DECLARATION OF EWA VAN
18  behalf of all heirs and next of kin of    )   DEN BERG
    JAMES DONALD BAILLIE, II,                 )
19  deceased,                                 )   Date:      March 10. 2014
                                              )   Time:      1:30 p.m.
20              Plaintiff,                     )   Courtroom: 6
                                              )   Judge:     Hon. Stephen V.
21         vs.                                )              Wilson
                                              )
22  BRITISH AIRWAYS PLC,                      )   [Filed concurrently with Notice of
                                              )   Motion and Motion for Summary
23              Defendant.                     )   Judgment; Memorandum of Points
                                              )   and Authorities in Support thereof;
24                                            )   Separate Statement of Undisputed
                                              )   Material Facts; Declaration of Scott
25                                            )   D. Cunningham; Declaration of
                                              )   Stephen Fowler; Declaration of
26                                            )   Alastair Grant; Declaration of
                                              )   Georgina Bolton; Declaration of
27                                            )   Nicola Sharrad; Declaration of
                                              )   Jacqueline Bowley; and [Proposed]
28                                            )   Order]

DECLARATION OF EWA VAN DEN BERG
CASE NO.: CV13-4681 SVW (RZx)                                    LAOFFICE 55878V.1

EXHIBIT
22
5/29/14

1   I, Ewa Van Den Berg, declare as follows:

2    1. I am a Customer Service Manager for British Airways, PLC

3 (hereinafter "British Airways"). I have been employed by British Airways since

4 March of 2010, and I have held my current position since June of 2013. Prior to

5 June of 2013, and at all times relevant to the incident that is the subject of this

6 lawsuit, my job title was Cabin Crew Member. I was one of the cabin crew

7 members assigned to British Airways flight BA 289 on March 23, 2012.

8    2. I am submitting this declaration in support of British Airways' Motion

9 for Summary Judgment, or, in the alternative, Partial Summary Judgment in this

10 matter. I have personal knowledge of the facts attested to in this declaration and

11 could competently testify to these facts if called as a witness.

12    3. Prior to working for British Airways, I was employed as a cabin crew

13 member by Ryanair for 13 months and Thomas Cook for 2 years. At the beginning

14 of my employment with Ryanair in year 2005, I underwent training as a

15 prerequisite to taking my position as a cabin crew member. I received training

16 with respect to the handling and management of in-flight medical emergencies. I

17 passed all of my tests for becoming a cabin crew member for Ryanair. After 13

18 months, I took a position with Thomas Cook in 2006. Upon taking the Thomas

19 Cook position, I received additional training including training for handling in-

20 flight medical emergencies.

21    4. At the time I joined British Airways in March of 2010, I was required

22 to complete a cabin crew training course during which I learned British Airways'

23 policies and procedures relating to cabin crew duties, including British Airways'

24 policies and procedures pertaining to the handling of in-flight medical

25 emergencies. I passed the training courses.

26    5. British Airways' Joint Procedures Manual contains British Airways'

27 instructions to its crew members for dealing with in-flight medical emergencies. A

28 true and correct copy of the portions of British Airways' Joint Procedures Manual

DECLARATION OF EWA VAN DEN BERG       2
CASE NO.: CV13-4681 SVW (RZx)                 LAOFFICE 55878V.1

1  which govern in-flight medical emergencies and, specifically, complaints of chest
2  pain, which was in effect on March 23, 2012, is attached hereto as Exhibit A.
3      6.    The British Airways Joint Procedures Manual contains a flow chart
4  with instructions for how to assist passengers who complain of chest pain. This
5  document indicates that crew members should reassure the passenger, assess the
6  passenger's history, administer oxygen, aspirin, or temgesic (a painkiller), and keep
7  the passenger still. The document also instructs crew members to provide the
8  passenger with buccastem for nausea if required. The flow chart then instructs
9  crew members to contact MedLink. (*See* Exhibit A [Joint Procedures Manual],
10  Appendix 3, pages 10-11).
11      7.    The British Airways Joint Procedures Manual states, in relevant part,
12  that British Airways crew members should contact MedLink when they "feel like
13  they need advice from a Health Care Professional." (*See* Exhibit A [Joint
14  Procedures Manual], Section 6, p. 13). MedLink (also referred to as MedAire) is a
15  company that provides remote health care services for many airlines, including
16  British Airways.
17      8.    The British Airways Joint Procedures Manual also states, in relevant
18  part, "[a] request for on-board assistance from a doctor of medicine, or other health
19  professional, may be made in the following circumstances: . . . At the suggestion of
20  MedLink." (*See* Exhibit A [Joint Procedures Manual], Section 6, pp. 13-14).
21      9.    The British Airways Joint Procedures Manual states that MedLink
22  will "advise on medical options for diversion and assist in making arrangements
23  for medical assistance on the ground." (*See* Exhibit A [Joint Procedures Manual],
24  Section 6, p. 14).
25      10.    Finally, the British Airways Joint Procedures Manual provides that
26  "the decision to divert rests with the Captain and should take into account
27  operational factors as well as the medical information available." (*See* Exhibit A
28  [Joint Procedures Manual], Section 6, p. 14).

LONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF EWA VAN DEN BERG
CASE NO.: CV13-4681 SVW (RZx)

3

LAOFFICE 55878V.1

LONDON & FURLEY LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

11.     In the course of my employment with Ryanair, Thomas Cook Airlines, and British Airways, I have become generally familiar with industry standards and practices with respect to the handling of in-flight medical emergencies.  It is a common practice within the airline industry for cabin crew and flight crew to rely on the advice and guidance of MedLink and similar companies, in conjunction with the advice of passengers onboard the aircraft who are physicians, when handling in-flight medical emergencies.

12.     I met Mr. James Donald Baillie, II (hereinafter "Mr. Baillie") onboard British Airways flight BA 289 from London to Phoenix on March 23, 2012.  On that particular flight, I was assigned to the First Class cabin.  Mr. Baillie was seated in seat 4K in the First Class cabin.

13.     Mr. Baillie boarded the aircraft very late, just minutes before the scheduled departure time.

14.     As Mr. Baillie boarded the aircraft , I greeted him, in accordance with my custom and practice for First Class passengers, and directed him to his seat.

15.     Based on my review of the operational log for flight BA 289, flight BA 289 was scheduled to depart the gate at London at 15:05 GMT and actually departed the gate at 15:12 GMT.

16.     During the time I was securing the First Class cabin for takeoff, Mr. Baillie requested a bottle of water and stated that he was thirsty after running to the gate.  I provided him with bottled water, and I asked him if he was doing alright.  Mr. Baillie responded to this question in the affirmative.  Mr. Baillie did not complain of chest pains or request to deplane the aircraft prior to the aircraft taking off from London. I informed the cabin crew working with me about the situation.

17.     Flight 289 took off from London at 15:46 GMT.  From just before takeoff up until the time that the Captain indicated that it was safe for the cabin crew to begin their service, I was seated in my assigned crew seat as required by British Airways procedures.

18.   At approximately 16:20 GMT, I began my normal crew duties for a cabin crew member assigned to the First Class cabin. One of my first actions was to check on the status of the First Class cabin and determine if any of the passengers needed any assistance.

19.   At about 16:30 GMT, when I checked on Mr. Baillie, he explained that he was still slightly out of breath and that he was not feeling well. I made him comfortable in his seat and advised him that if he needed anything to let me know.

20.   At this time I notified my supervisor, British Airways Customer Service Manager ("CSM") Georgina Bolton that Mr. Baillie was not feeling well.

21.   Shortly thereafter, at around 17:00 GMT, during the first beverage service, Mr. Baillie advised me that he was experiencing pain in his chest. I spoke with him for a few minutes and tried to once again make him comfortable. Mr. Baillie answered all of my questions. I helped him recline in his seat.

22.   Thereafter, I advised Ms. Bolton that Mr. Baillie was still not feeling well and that he was now experiencing chest pains.

23.   Following my conversation with Ms. Bolton, we set up the on-board oxygen system and explained to the flight crew that a First Class passenger was unwell and experiencing chest pains. We informed the flight crew that we were in the process of assessing the situation. We also requested that the flight crew to turn on the on-board oxygen system and stand-by for further information.

24.   At this point, probably another 15 minutes had elapsed. Ms. Bolton instructed me to focus solely on Mr. Baillie and reassigned my other crew responsibilities to other crew members.

25.   By about 17:15 GMT, we were administering oxygen to Mr. Baillie, and I had assisted Mr. Baillie with putting his seat in a fully reclined position. At this point, I began obtaining a medical history from Mr. Baillie.

26.   When speaking with Mr. Baillie, I asked him questions about his medical history, age, medications, prior health problems, and symptoms. Mr.

LONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1 Baillie responded well to my questions and told me that he had no history of

2 cardiac issues, and that he was not taking any prescription medications. Mr.

3 Baillie advised me that he had taken an aspirin at approximately 15:30 GMT  Mr.

4 Baillie stated that the pain in his chest was approximately a 5 on a scale of 1-10.

5   27.   I wrote Mr. Baillie's responses to my questions on an incident form

6 called an "IFCE" form.  A true and correct copy of the IFCE incident form that I

7 filled out, with input from Mr. Baillie, is attached hereto as Exhibit B.

8   28.   The process of reporting this incident to Ms. Bolton and the flight

9 crew, requesting the flight crew to turn on the oxygen, administering the oxygen to

10 Mr. Baillie, assisting him with his chair, and questioning Mr. Baillie regarding his

11 medical history, age, health problems, medications, etc., took approximately ninety

12 minutes.

13   29.   After recording Mr. Baillie's medical history and making him

14 comfortable, at approximately 18:30 GMT, I proceeded to the flight deck to brief

15 the flight crew, including Captain Stephen Fowler, on the situation and to call

16 MedLink to report Mr. Baillie's symptoms in order to request advice for how to

17 proceed.

18   30.   After I briefed him on the situation and Mr. Baillie's symptoms,

19 Captain Fowler placed a call to MedLink at approximately 18:45 GMT.  The

20 MedLink personnel then asked me several questions about Mr. Baillie's reported

21 medical history, medications, and symptoms, which I answered based upon the

22 information provided to me by Mr. Baillie.  The MedLink personnel advised us to

23 page for a physician or other healthcare provider onboard the aircraft and request

24 any such physicians or healthcare providers to evaluate Mr. Baillie's vital signs.

25 The MedLink personnel also stated that an onboard physician could administer

26 nitroglycerin to Mr. Baillie if they felt his vital signs were stable enough to do so.

27 The MedLink personnel advised me to report back once a health care provider had

28 evaluated Mr. Baillie's vital signs for further instructions.  Attached hereto as

LANDMAN & FOUST LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF EWA VAN DEN BERG                    6
CASE NO.: CV13-4681 SVW (RZx)                                              LAOFFICE 55878V.1

1   Exhibit C is a true and correct transcript of my communications with the MedLink

2   doctor (hereinafter "MedLink Transcript").

3       31.     Following my initial interaction with MedLink personnel, Ms. Bolton

4   used the aircraft public address system to ask for a physician's assistance. I recall

5   that four physicians responded to her page, and that Ms. Bolton selected one of the

6   four physicians to assist with Mr. Baillie.

7       32.     At about 19:00 GMT, the physician selected by Ms. Bolton then

8   proceeded to evaluate and assist Mr. Baillie. As the physician was assisting Mr.

9   Baillie, I explained to the physician and to Mr. Baillie what type of medical

10  equipment was onboard the aircraft and provided the physician with access to two

11  medical kits. I also advised the physician and Mr. Baillie that we had contacted

12  MedLink, and briefly described the services provided by MedLink.

13      33.     Upon examining Mr. Baillie, the physician informed me that Mr.

14  Baillie's pulse was 100, that Mr. Baillie's blood pressure was 100/70, and that he

15  could hear crackles on the left side of Mr. Baillie's chest. As the doctor examined

16  Mr. Baillie, I recorded the information obtained by the physician on the IFCE

17  form. I then returned to the flight deck with the IFCE form to brief MedLink and

18  the flight crew regarding the physician's evaluation of Mr. Baillie. We contacted

19  MedLink a second time at 19:12 GMT and reported Mr. Baillie's vital signs, as

20  taken by the onboard physician, to MedLink.

21      34.     During our second call, the MedLink doctor advised us that Mr.

22  Baillie's vital signs were too low to administer nitroglycerin. The MedLink doctor

23  advised us to proceed to Phoenix for the time being, and stated that Mr. Baillie's

24  condition would hopefully improve if he continued to lie down and receive

25  oxygen. MedLink advised us to continue to provide Mr. Baillie with oxygen and

26  to monitor his vital signs every 15 to 30 minutes. MedLink advised us to report

27  back if Mr. Baillie's condition deteriorated. (*See* Exhibit C [MedLink Transcript],

28  pp. 2-3).

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

LONDON & FORD'S LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

35.     I remained with Mr. Baillie for the remainder of the flight, except for two hours when I was on break.  Following British Airways' standard operating procedures, I took a break approximately five hours into the flight at 20:10 GMT. During my break, I took a two hour nap in the crew rest area in the tail of the aircraft.  Upon information and belief, during this time period, Ms. Nicola Sharrad, another cabin crew member, assisted Mr. Baillie, in conjunction with the passenger physician.  When I returned from my break, approximately seven hours into the flight at 22:10 GMT, I returned to assisting Mr. Baillie.  The passenger physician advised me at that time that Mr. Baillie's condition was unchanged.  At that point, approximately seven hours into the flight, Mr. Baillie was able to get up and use the toilet on his own.

36.     Just before 10:34 p.m. GMT, Mr. Baillie reported to the passenger physician that he felt worse, was sweating and experiencing chest pain.  I went to the flight deck to notify the flight crew and MedLink.  MedLink advised us to administer nitroglycerin to Mr. Baillie.  (*See* Exhibit C [MedLink Transcript], pp. 3-4).  I went back to the First Class cabin and informed the passenger physician of MedLink's recommendation.

37.     The physician attending Mr. Baillie summoned another onboard physician, whom he appeared to know personally, to assist with evaluating Mr. Baillie's vital signs.   The two physicians observed that Mr. Baillie's vital signs were stable, at 100/80 and a pulse of 110.  Mr. Baillie also reported to the physicians that he did not have any pain down his arm.  The physicians were of the opinion that Mr. Baillie's blood pressure was still too low to administer nitroglycerin.

38.     At approximately 22:52 GMT, we contacted MedLink for a fourth and final time and reported that the passenger physicians had stated that Mr. Baillie's blood pressure was too low to administer nitroglycerin.  (*See* Exhibit C [MedLink Transcript], p. 5).  MedLink advised us to keep the passenger in a fully reclined

LONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1  position, to elevate his legs, to continue the administration of oxygen, and to report
2  back if we felt the need to divert. MedLink stated that they would be monitoring
3  the flight and potential locations for diversion in the interim. *See* Exhibit C
4  [MedLink Transcript], p. 6).

5      39.    I went back to assist Mr. Baillie and to discuss the possibility of
6  diversion with Mr. Baillie and the passenger physicians. Mr. Baillie himself
7  specifically requested that the aircraft not be diverted to Chicago or Denver, and
8  requested that the aircraft continue to Phoenix. Both of the physicians separately
9  told me that continuing to Phoenix would not worsen or exacerbate Mr. Baillie's
10 condition. I reported this to Ms. Bolton and to the flight crew. The Captain then
11 made a decision to continue to Phoenix.

12     40.    The first physician stayed with Mr. Baillie until landing, and the
13 second doctor assisted periodically. The situation remained unchanged for the
14 remainder of the flight. I placed Mr. Baillie on portable oxygen prior to landing in
15 Phoenix so that Mr. Baillie could continue to receive oxygen as he exited the
16 aircraft.

17     41.    On landing at Phoenix, Mr. Baillie walked off the aircraft and was met
18 by paramedics. The paramedics placed him in a wheelchair on the jet bridge. I
19 accompanied Mr. Baillie off the jet bridge and handed his hand baggage to the
20 paramedics.

21     42.    The cabin crew and flight crew followed the letter and spirit of all
22 British Airways policies and procedures with respect to the treatment we provided
23 to Mr. Baillie onboard British Airways flight BA 289 on March 23, 2012. In
24 addition, we complied with industry standard and practice, which is to contact
25 MedLink and page for onboard physicians for assistance with a medical
26 emergency, and to defer to their opinions with respect to the treatment of any
27 passenger who becomes ill in-flight. Neither the onboard physicians nor MedLink
28 ever recommended or suggested to me that flight BA 289 on March 23, 2012 be

DECLARATION OF EWA VAN DEN BERG
CASE NO.: CV13-4681 SVW (RZx)

9

1    diverted.

2      I declare under penalty of perjury under the laws of the United States of

3 America that the foregoing is true and correct. Executed this _15_ day of January,

4 2014, at T5, London Heathrow United Kingdom.

5

6

7                            Ewa Van Den Berg

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LONDON & FURST LLP
1801 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF EWA VAN DEN BERG
CASE NO.: CV13-4681 SVW (RZx)

10

LAOFFICE 55878V.1

EXHIBIT 2

Scott D. Cunningham (State Bar No.: 200413)
Email: scunningham@condonlaw.com
Ivy L. Nowinski (State Bar No.: 268564)
Email: inowinski@condonlaw.com
CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030
Facsimile: (310) 557-1299

- and -

Anthony U. Battista (*admitted pro hac vice*)
Email: abattista@condonlaw.com
CONDON & FORSYTH LLP
7 Times Square
New York, New York 10036
Telephone: (212) 490-9100
Facsimile: (212) 370-4453

Attorneys for Defendant
BRITISH AIRWAYS, PLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>BRITISH AIRWAYS PLC,<br><br>Defendant. | Case No. CV13-4681 SVW (RZx)<br><br>SUPPLEMENTAL DECLARATION OF EWA VAN DEN BERG<br><br>Date: March 10, 2014<br>Time: 1:30 p.m.<br>Courtroom: 6<br>Judge: Hon. Stephen V. Wilson<br><br>[Filed concurrently with Reply Memorandum of Points and Authorities and Evidentiary Objections of British Airways] |

**EXHIBIT**

24

5/29/14

I, Ewa Van Den Berg, declare as follows:

1.   I am submitting this supplemental declaration in support of British Airways' Motion for Summary Judgment. I have personal knowledge of the facts attested to in this declaration and could competently testify to these facts if called as a witness.

2.   As a follow-up to my original declaration, I wish to confirm that prior to the aircraft taking off from London, Mr. Baillie never asked to disembark the aircraft and never complained of chest pains.

3.   If Mr. Baillie had notified me or any other British Airways flight attendant that he was experiencing chest pains or that he wished to deplane the aircraft due to a health issue prior to takeoff from London, which he did not, I would have taken such a request very seriously, and taken all appropriate steps in compliance with British Airways' policies and procedures to determine that Mr. Baillie was "fit to fly." It goes without saying that we would rather deplane an ill passenger rather than run the risk of experiencing an in-flight medical emergency during a long haul flight. British Airways crew members are always vigilant with respect to determining whether its customers are "fit to fly," and take all reports of ill health by its passengers seriously. If Mr. Baillie had told me that he was experiencing chest pains prior to takeoff, I would have taken steps to make sure he received all appropriate medical evaluation and treatment in London, prior to takeoff. In fact, in the past, a passenger has complained to me of feeling unwell and I arranged for the passenger to be offloaded for health reasons prior to takeoff.

4.   With respect to flight BA 289, the aircraft took off from London at 1546 GMT. Mr. Baillie told me that he was feeling unwell at around 1630 GMT, at which time I was checking on the First Class Passengers following takeoff. Mr. Baillie did not complain of chest pains until approximately 1700 GMT.

5.   After administering supplemental oxygen to Mr. Baillie shortly after 1700 GMT, I took a medical history from Mr. Baillie as part of completing the

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

CONDL... FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1  IFCE Incident Report form. One of the questions I asked Mr. Baillie was if he was

2  on any medication. Mr. Baillie informed me that he had taken an aspirin at

3  approximately 1530 GMT.

4       6.    Based upon the information provided to me by Mr. Baillie while we

5  were completing the IFCE Incident Report together, I wrote the time 1530 GMT

6  on the IFCE Incident Report as the time he first started experiencing chest pains.

7       7.    1530 GMT is not the time at which Mr. Baillie first notified the cabin

8  crew that he did not feel well.

9       8.    Mr. Baillie first complained that he did not feel well at about 1630

10  GMT.

11       9.    Mr. Baillie first notified the British Airways cabin crew that he was

12  experiencing chest pains at approximately 1700 GMT.

13       I declare under penalty of perjury under the laws of the United States of

14  America that the foregoing is true and correct. Executed this _15_ day of

15  February, 2014, at _Egham_____, United Kingdom.

16

17

18                                   Ewa Van Den Berg

19

20

21

22

23

24

25

26

27

28

EXHIBIT 3

# EUROPEAN DEPOSITION MANAGEMENT

TOLL-FREE FROM THE US:
1 866 EU DEPOS
(1 866 383 3676)
TEL/FAX 331 44 67 04 56
CELL 336 08 48 16 67
INFO@EUDEPOS.COM

In The Matter Of:

**LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,**

Plaintiff,

vs.

BRITISH AIRWAYS PLC,

Defendant.

## VIDEOTAPE DEPOSITION OF
## EWA VAN DEN BERG
## MAY 29, 2014

ORIGINAL

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CASE NO.: CV13-4681 SVW (RZx)

LINDA ANN BAILLIE, individually    )
as Personal Representative of      )
the Estate of JAMES DONALD         )
BILLIE, II, and on behalf of all   )
heirs and next of kin of JAMES     )
DONALD BAILLIE II, deceased,       )
                                   )
            Plaintiff,             )
                                   )
    vs.                            )
                                   )
BRITISH AIRWAYS PLC,               )
                                   )
            Defendant.             )

VIDEO DEPOSITION

DEPONENT:   EWA VAN DEN BERG

DATE:       Thursday, May 29th, 2014

TIME:       9:07 a.m.

LOCATION:   London Heathrow Marriott Hotel,
            Bath Road, Harlington, Hayes
            UB3 5AN England

COURT REPORTER:  Audrey Shirley, MBIVR-407, CAT QRR

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

2

1                    A P P E A R A N C E S

2    COUNSEL FOR PLAINTIFFS:

3           KREINDLER & KREINDLER, LLP
            750 Third Avenue, 32nd Floor
4           New York, New York  10017

5    BY:    ROBERT J. SPRAGG, ESQUIRE
            Tel: 212-973-3435
6           Email: rspragg@kreindler.com

7

8    COUNSEL FOR DEFENDANT BRITISH AIRWAYS PLC:

9           CONDON & FORSYTH, LLP
            7 Times Square
10          New York, New York  10036

11   BY:    ANTHONY U. BATTISTA, ESQUIRE
            Tel: 212-490-9100
12          Email:  abattista@condonlaw.com

13
     COUNSEL FOR DEFENDANTS MEDAIRE, INC.; STEVEN JOE
14   REINHART, D.O.; AND JESSICA MONAS, M.D.:

15          GALLAGHER & KENNEDY, P.A.
            2575 East Camelback Road
16          Phoenix, Arizona  85016-9225

17   BY :   MARK C. DANGERFIELD, ESQUIRE
            Tel:  602-530-8054
18          Email: mark.dangerfield@gknet.com

19

20   ALSO PRESENT:

21   Stephen Faigenbaum   -   Videographer

22

23

24

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

3

1                           I N D E X

2       WITNESS                  EXAMINATION              PAGE

3       Ewa van den Berg        (by Mr. Spragg)            4

4

5

6

7                        E X H I B I T S

8       NO                  DESCRIPTION                    PAGE

9       Exhibit No. 19    Plaintiff's second              10
                          amended Notice of
10                        Deposition of CSM Ewa van
                          den Berg
11
        Exhibit No. 20    British Airways Joint            52
12                        Procedures Manual Part
                          A(2) Appendix 3 - First Aid
13                        Handbook

14      Exhibit No. 21    Document bearing Bates Nos.     147
                          BA0426 - BA0432
15
        Exhibit No. 22    Declaration of Ewa van den      170
16                        Berg

17      Exhibit No. 23    Document bearing Bates Nos.     230
                          BA0464 - BA0465
18
        Exhibit No. 18    Document bearing Bates Nos.     268
19                        BA0489 - BA0494

20      Exhibit No. 24    Supplemental Declaration of     355
                          Ewa van den Berg
21
        Exhibit No. 25    Document bearing Bates Nos.
22                        BA0451 -BA0455                   368

23

24

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

4

1          THE VIDEOGRAPHER:  Good morning, we

2     are on the record.  The time is 9:07 a.m. on the 29th

3     of May in the year 2014.  My name is Stephen

4     Faigenbaum, I am the videographer.  The court reporter

5     today is Mrs Audrey Shirley.  We both for work

6     European Deposition Management located in Paris,

7     France.  We are today located at the Renaissance (sic)

8     Hotel in London, England.

9          The witness today is Ms. Ewa van den

10    Berg appearing in the matter of Baillie versus British

11    Airways PLC.

12          Would the reporter please swear the

13    witness and then would the counsel please identify

14    themselves for the record?

15

16    EWA VAN DEN BERG, having been duly sworn was

17          examined and testified as follows:

18

19    ▆▆ ▆▆    ▆▆  MR. SPRAGG:  Good morning, Ms van den

20    Berg.  My name's Robert Spragg, I'm from a firm in the

21    United States called Kreindler & Kreindler and I'll be

22    asking you questions today on the behalf of the family

23    of Mr. James Baillie.

24          THE WITNESS:  Okay.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

5

1               MR. BATTISTA:  Good morning, my name

2       is Anthony Battista.  I'm an attorney with the law

3       firm of Condon & Forsyth, and we represent British

4       Airways in this matter.

5               MR. DANGERFIELD:  My name is Mark

6       Dangerfield and I'm with Gallagher & Kennedy and we

7       represent MedAire and Drs. Reinhart and Monas.

8               EXAMINATION

9       BY MR. SPRAGG:

10          Q.   Good morning.

11          A.   Good morning.

12          Q.   Would you please state your full name

13      for the record?

14          A.   My name's Ewa van den Berg.

15          Q.   And Ewa is spelled?

16          A.   E-w-a.

17          Q.   W-a, okay.  And what is your date of

18      birth, Ms. van den Berg?

19          A.   It's the ███ of ██████ ████.

20          Q.   And where were you born?

21          A.   I was born in Czestochowa, which is in

22      Poland.

23          Q.   In Poland.

24          A.   Yes.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

164

1       Q.    And that's Mr. Baillie?

2       A.    I think so, yes.

3       Q.    Okay, you're not 100 percent sure

4  though?

5       A.    No.

6       Q.    Okay.

7       A.    It's been some time ago.

8       Q.    Did you meet Mr. Baillie for the first

9  time when he first got on board the aircraft?

10      A.    I would --

11      Q.    You can put that back.

12      A.    Sorry.

13      Q.    Yeah, I don't -- just put that over

14  here so that you're not looking at it the whole time.

15      A.    Thank you.  Sorry, can you repeat that

16  then?  I missed that.

17      Q.    Yes, do you recall whether you -- when

18  you first met Mr. Baillie?

19      A.    I don't recall exactly.

20      Q.    Okay.  Do you recall -- strike that.

21            Do you recall whether you spoke with

22  Mr. Baillie when he first boarded the aircraft?

23      A.    I spoke with Mr. Baillie when I took

24  him a bottle of water.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

165

1          Q.    Okay.  So that was the first time you

2   spoke with him?

3          A.    That's what I remember, yes.

4          Q.    And do you recall what you said to Mr.

5   Baillie when you took him a bottle of water?

6          A.    Not the exact words.

7          Q.    Okay.  Were you taking all First Class

8   passengers water at the time?

9          A.    No.

10         Q.    Okay.  So you were actually bringing

11  a bottle of water to Mr. Baillie?

12         A.    Yes.

13         Q.    Okay.

14         A.    That's correct.

15         Q.    Is there a reason that you were

16  bringing him a bottle of water?

17         A.    Because one of the crew members told

18  me that Mr. Baillie asked for a bottle of water.

19         Q.    Okay.

20         A.    Actually he asked for a drink of

21  water.

22         Q.    Okay.

23               (Interruption.)

24               MR. BATTISTA:  Shall we take a break

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

166

1        here and do lunch?

2                    MR. SPRAGG:  Yes.  We'll take our

3        break.

4                    MR. BATTISTA:  Let's go off the

5        record.

6                    THE WITNESS:  Okay.

7                    THE VIDEOGRAPHER:  Okay, we're going

8        off the video record.  The time is 1302.

9            (Lunch recess taken 1.02 p.m. - 1.41 p.m.)

10                    THE VIDEOGRAPHER:  All right, we are

11        back on the record, the time is 12:41 -- I'm sorry,

12        1:41.

13                    BY MR. SPRAGG:

14            Q.    Ms. van den Berg, going back to the

15        conversation we were having before we broke, so the

16        first time that you spoke to Mr. Baillie on Flight 289

17        was when you brought him a bottle of water.  Correct?

18            A.    That's correct.

19            Q.    Okay.  And do you remember what you

20        said to Mr. Baillie when you brought him a bottle of

21        water?

22            A.    I walked up to him, and I gave him

23        a bottle of water.  That's when he said that he's very

24        thirsty.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

167

1        Q.    Okay.

2        A.    I mean I don't remember the exact

3    words but I remember he mentioned that he was thirsty.

4        Q.    All right.

5        A.    He also told me that he's been running

6    to the gate so he's slightly --

7             THE COURT REPORTER:  I'm sorry, "He

8    also told me …"

9             THE WITNESS:  That he was running to

10   the gate, sorry.  So he is slightly out of breath.

11            BY MR. SPRAGG:

12       Q.    Okay.  Do you recall anything else

13   about the conversation that you had with him when you

14   brought him the bottle of water?

15       A.    I asked him if he was okay and he said

16   that he was okay and he also asked me, "Do you think I

17   should get off?"  Which I replied to, "No, I think, if

18   you sit down and relax, you shouldn't be out of breath

19   anymore."

20       Q.    Okay.  So he asked you whether you

21   thought he should get off the airplane because he was

22   out of breath from running to the gate?

23       A.    I -- he asked me, "Do you think I

24   should …" -- I don't remember the exact words.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

168

1          Q.    Okay.

2          A.    But he said, "Do you think I should

3     get off?" or, "Should I get off?" or --

4          Q.    Mm-hmm.

5          A.    -- something like that.

6          Q.    Okay.  And you reassured him and told

7     him that perhaps he'll feel better if he sits for

8     a while?

9          A.    That's correct, yes.

10         Q.    Okay.  And did he say anything back to

11    you in response to that?

12         A.    No, I don't remember anything else at

13    the time.

14         Q.    Okay, so that was pretty much the

15    conversation you had with him?

16         A.    It was very short, yes.

17         Q.    Okay.  On the flight, Flight 289 on

18    March 23rd, 2012, did you have any responsibilities

19    for closing the cabin doors before the aircraft left

20    the gate?

21         A.    No.

22         Q.    No?

23         A.    No.

24         Q.    Okay.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

200

1          Q.     Okay.  Now, you previously testified

2    that when you gave Mr. Baillie the bottle of water

3    that he told you that he had been running to the gate

4    and asked you whether he should get off the aircraft.

5    Correct?

6                 A.     I did, yes, that's correct.

7                 Q.     Okay.  And at that point you testified

8    that you reassured him and suggested that if he sits

9    down for a while he may start to feel better.

10   Correct?

11                A.     Yes, I did.

12                Q.     Okay.  Do you recall anything else

13   about the conversation that you had with Mr. Baillie

14   at that point?

15                A.     Like I've mentioned he did tell me

16   that he was running to the gate so he was out of --

17   slightly out of breath.

18                Q.     Mm-hmm.

19                A.     I did ask him if he was okay when I --

20   when I actually -- let me start from the beginning.

21   When I actually came with the bottle of water, I asked

22   him if he was okay, and I don't remember exactly his

23   words but he said he was fine, that he was slightly

24   out of breath because he was running to the gate.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

201

1    Once again I don't remember the exact words, but that

2    was what I got from it.  And then's when he asked,

3    "Should I get off?" or, "Shall I get off?" or, "Do you

4    think I should get off?"

5         Q.    Mm-hmm.

6         A.    And that's when I reassured him.

7         Q.    All right.  At that point, did

8    Mr. Baillie tell you that he was experiencing chest

9    pains?

10        A.    No, he didn't.

11        Q.    Okay.  And looking at paragraph 16, at

12   the very last section, you state that you afterwards

13   informed the cabin crew working with you about the

14   situation.  You see that?

15        A.    Yes, I see that, yes.

16        Q.    Okay.  Do you remember who you told

17   about -- strike that.

18              What did you -- what situation are you

19   referring to in that sentence?

20        A.    The situation is the conversation I

21   just had with Mr. Baillie, that he'd mentioned that he

22   was running to the gate and he was slightly out of

23   breath.

24        Q.    Okay.  And that he'd asked you whether

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

202

1      he should get off the airplane or not?

2                A.    I don't remember if I said that.

3                Q.    Okay.  You don't remember if you told

4      the others about that?

5                A.    Yes, that -- that's correct.

6                Q.    Okay.  Do you remember who you told?

7                A.    I don't remember exactly who was

8      there.

9                Q.    Would it be the other cabin crew

10     members who were assigned to the First Class cabin?

11               A.    That was probably them.  But, again, I

12     don't --

13               Q.    You don't remember?

14               A.    -- know exactly.

15               Q.    Okay.  Now in flight -- strike that.

16                     In paragraph 17 you state that Flight

17     289 took off at 1546 GMT.  Correct?

18               A.    That's correct.

19               Q.    Okay.  And what is the basis for this

20     information, the operational log once again?

21               A.    That's the operational log that we

22     looked at.

23               Q.    You also state in paragraph 17 that

24     from just before takeoff until the time that the cabin

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

203

1          (sic) indicated that it was safe for the cabin crew to

2          begin their services you were seated in your assigned

3          crew seat.  Correct?

4               A.     That's what it states there, correct.

5               Q.     And is that in fact true?  Is that

6          your recollection?

7               A.     That's true, yes.

8               Q.     And you previously told me that you

9          were assigned cabin seat, it would be the No. 6 seat,

10         which would be one of the two seats next to door one

11         right.  Correct?

12              A.     That's correct, sir.

13              Q.     Okay.  From your seat at number one

14         right door, could you see Mr. Baillie?

15              A.     No.

16              Q.     No?  Okay.  And do you recall what

17         time it was that the Captain indicated that it was

18         safe for the cabin crew to begin their service?

19              A.     Can you -- sorry, can I just …

20              Q.     Hmm?  Yeah, no, I can ask you again.

21              A.     Thank you.

22              Q.     You state that: "From just before

23         takeoff up until the time that the Captain indicated

24         that that it was safe for the cabin crew to begin

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

204

1      their service, I was seated in my assigned crew

2      seat …" Do you see that?

3              A.     Yes, I do, yes.

4              Q.     So the question I have is do you

5      recall what time it was when the Captain actually

6      indicated over the intercom, or some other

7      communication device, that it was safe for you to

8      begin the service?

9              A.     I don't recall, no.

10             Q.     Okay.  And when you use the term

11     "service", what are you referring to there?

12             A.     Starting the actual service on the

13     flight.  So starting distributing hot towels, starting

14     distributing drinks.

15             Q.     Okay, all right.  So it's service that

16     you're performing for the First Class --

17             A.     First Class passengers.

18             Q.     -- cabin passengers?

19             A.     That's correct, sir.

20             Q.     Okay.  In paragraph 18 on the next

21     page, if you would kindly turn Ms. van den Berg.  Do

22     you have it?

23             A.     Yes, I do.

24             Q.     Okay.  In paragraph 18 you state that

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

205

1     you began to check on the First Class cabin at about

2     1620 GMT.  Correct?

3              A.    It says: "At approximately 16:20 GMT,

4     I began my normal crew duties."

5              Q.    Okay.

6              A.    Is that the correct --

7              Q.    Yes, that's it.  And then it says:

8     "One of my first actions was to check on the status of

9     the First Class cabin and determine if any of the

10    passengers needed assistance."  Do you see that?

11             A.    I see that, yes, that's correct.

12             Q.    Okay.  So, 1620 is approximately

13    35 minutes after takeoff, if you take a look back at

14    paragraph 17 on the prior page.  Correct?

15             A.    That's correct, sir.

16             Q.    Okay.  In paragraph 19, you state that

17    you checked on Mr. Baillie about ten minutes later and

18    he told you that he was still slightly out of breath

19    and not feeling well.  Correct?

20             A.    Yes, that's correct.

21             Q.    Okay.  Do you remember exactly what he

22    said to you?

23             A.    I don't remember the exact words.

24             Q.    Okay.  Did he say to you that he was

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

206

1      still slightly out of breath or did you see visually

2      that he was still slightly out of breath?

3              A.      I don't remember the exact words.  I

4      don't remember exactly what he said, no.

5              Q.      Okay.  In paragraph 19 you also state

6      that you made him comfortable in his seat and told him

7      to let you know if he needed anything.  Correct?

8              A.      That's correct.

9              Q.      Okay.  What did you do to make him

10     comfortable?

11             A.      Well, I just made sure that he was sat

12     comfortably, that he wasn't slouching or laying or

13     just in an uncomfortable position.

14             Q.      All right.  And did Mr. Baillie say

15     anything to you in response?

16             A.      I don't remember.

17             Q.      All right.  In paragraph 20, you state

18     that you then notified the flight's cabin -- Customer

19     Service Manager, Georgina Bolton, that Mr. Bailey was

20     not feeling well.  Correct?

21             A.      That's correct.

22             Q.      Okay.  And this is about 45 minutes

23     after takeoff.  Correct?

24             A.      That's about that much, yes.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

207

1          Q.    Okay.  And do you recall exactly what

2     you told Ms. Bolton?

3          A.    I don't recall the exact words, no.

4          Q.    Okay.  In paragraph 21, you state that

5     during the first beverage service at approximately

6     1700 GMT, Mr. Baillie told you that he was

7     experiencing chest pain.  Correct?

8          A.    That's correct.  That was

9     approximately around that time.

10         Q.    Okay.  And 1700 GMT is about one hour

11     and 15 minutes after takeoff.  Correct?

12         A.    That's approximately, yes.

13         Q.    Okay.  What exactly did Mr. Baillie

14     say to you?  Do you recall?

15         A.    I don't remember the exact words, no.

16         Q.    But it was -- he was having chest

17     pains?

18         A.    That's what he told me, yes.

19         Q.    Okay.  How many beverages -- beverage

20     services -- strike that.

21               How many beverage services are there

22     in First Class during the course of a normal flight?

23         A.    First Class service is eat and drink

24     on demand, so it could vary.  It could be we could be

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

213

1      see that Mr. Baillie's seat was in the full lying down

2      position.   Correct?

3                 A.    Yes, he wasn't lying down.

4                 Q.    And that's because you know, according

5      to British Airways' procedures for treating somebody

6      with a heart attack, you're not supposed to let them

7      -- you're supposed to have them sitting upright.

8      Correct?

9                 A.    Well, at that point I was treating

10     Mr. Baillie for chest pain --

11                Q.    Correct.

12                A.    -- because that's all I've been told

13     so far.

14                Q.    Mm-hmm.

15                A.    And any chest pain I would ensure that

16     the casualty is not laying -- so is sitting.

17                Q.    Right.

18                A.    Right.

19                Q.    For both angina and heart attack, the

20     procedures indicate that you're supposed to keep the

21     casualty sitting upright.   Correct?

22                A.    Sit -- sit still, yes.

23                Q.    Okay.   In paragraph 22, you state that

24     you told CSM Bolton that Mr. Baillie was now

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

214

1          experiencing chest pains.  Correct?

2                    A.    Yes, I did.

3                    Q.    Okay.  What exactly did you tell

4          Ms. Bolton, do you recall?

5                    A.    I don't remember exact words but I

6          told her that Mr. Baillie was experiencing chest

7          pains.

8                    Q.    Okay.  And do you recall what

9          Ms. Bolton said to you in response to that?

10                   A.    Once again I don't remember the exact

11         wording but she advised me that we should put

12         Mr. Baillie on oxygen straightaway.

13                   Q.    Okay.  In paragraph 23 you state that:

14         "We" then set up the onboard oxygen system and told

15         the flight crew that one of the First Class passengers

16         was unwell and having chest pains.  Correct?

17                   A.    That's correct.

18                   Q.    Okay.  You used the word "we" there

19         when you referred to setting up the onboard oxygen

20         system.  Do you see that?

21                   A.    I do, yes.

22                   Q.    Okay.  Do you recall who set up the

23         onboard oxygen system for Mr. Baillie?

24                   A.    I don't recall.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

229

1        gave you for when he approximately -- strike that.

2                        And 1530 which was the time that he

3        gave you that he took the aspirin, that was back when

4        the aircraft was taxiing to the runway for its 1546

5        GMT takeoff.   Correct?

6                A.   I don't remember Mr. Baillie saying

7        exactly 1530 or 3.30, he just told me around takeoff,

8        before takeoff, around takeoff, I don't remember

9        exactly, and well that's what I've got in my head that

10       we took off around this time.   So I've written 1530 on

11       the form.

12               Q.   Okay.   You don't recall Mr. Baillie

13       specifically saying, "I took an aspirin at 3.30"?

14               A.   I don't remember that, no.

15               Q.   Okay.   Do you ask Mr. Baillie why he

16       had taken the aspirin?

17               A.   He told me because he wasn't feeling

18       well.   I don't remember asking him why, I don't

19       remember that, no.

20               Q.   You don't remember, okay.   And what

21       does a pain level of five on a scale of one to ten

22       mean to you?   What level of pain is that to you, if

23       you could describe it?

24               A.   In my opinion that's -- that's quite

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

238

1          "Date of Incident".  Correct?

2                    A.    That's correct.

3                    Q.    All right.  And that's 23/03/12.

4     Correct?

5                    A.    That's correct, sir.

6                    Q.    And the next box to the right of that

7     says "Time (GMT)" and it states "1530".  Correct?

8                    A.    That's what it states, that's correct.

9                    Q.    Okay.  And that's the time when you

10    told us that Mr. Baillie had said approximately that

11    he'd taken an aspirin.  Correct?

12                   A.    That's the time that Mr. Baillie --

13    well, Mr. -- like I did mention Mr. Baillie told me

14    he'd -- he took an aspirin around the time we took

15    off, which, from my calculations, was around 1530.

16                   Q.    All right.  To the right of that box

17    there's a "Flight No." box and that looks like "BA

18    289".  Correct?

19                   A.    That's correct.

20                   Q.    Okay.  Moving down to the next line

21    "A/C Reg" which I assume is aircraft registration.

22    Correct?

23                   A.    That's correct.

24                   Q.    And the aircraft registration number

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

295

1          Q.     Okay.  And did you know that

2    Dr. Verma, according to Ms. Sharrad, did not remain

3    with Mr. Baillie either during that two-hour period

4    and only went to attend to him every half an hour or

5    so in order to take his blood pressure and pulse?

6          A.     I -- I didn't know that.  Well, we

7    didn't expect Dr. Verma to stay with Mr. Baillie the

8    whole time.  We did ask him if it would be okay if he

9    could keep coming back to keep checking the vitals,

10   because that's what we were advised by MedLink.  So I

11   didn't expect Mr. -- Dr. Verma to stay with

12   Mr. Baillie.

13         Q.     Okay.  And is -- while you were

14   assisting Mr. Baillie, did Dr. Verma remain with you

15   and Mr. Baillie the entire time or did he go back to

16   his seat and then return every half hour or so?

17         A.     I don't remember exactly how long he

18   stayed, for how long he stayed at each time, but he

19   didn't stay for the whole time, no.

20         Q.     Okay, so he would go back and forth to

21   his seat and then come back to Mr. Baillie from time

22   to time to check his vital signs?

23         A.     That's correct.  He would come back

24   every 15, 20 minutes --

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

296

1          Q.    Okay.

2          A.    -- approximately.

3          Q.    And if -- after seven, what was it --

4     strike that.

5                After 1912 pm I believe there were two

6     other calls made to MedLink in which you participated.

7     Correct?

8          A.    I would have to refer to that, but if

9     you let me have a look I'll let you know.

10          Q.    Okay, yeah.

11          A.    (The witness reviewed the document.)

12     That appears to be correct.

13          Q.    Okay.  And during those other

14     conversations that you had with MedLink, if Dr. Verma

15     was not with Mr. Baillie, then who was?  Because you

16     would be in the -- on the flight deck correct?

17          A.    (The witness nodded.)

18          Q.    So do you have an understanding as to

19     who was watching and assisting Mr. Baillie at those

20     times if Dr. Verma was not present with Mr. Baillie as

21     well?

22          A.    I don't know who was the crew member

23     exactly.

24          Q.    Mm-hmm.

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

385

1            CERTIFICATE OF COURT REPORTER.

2

3                I, Audrey Shirley, Accredited Court

4    Reporter, Member of the British Institute of Verbatim

5    Reporters, Qualified Real-time Reporter, hereby

6    certify that the foregoing testimony was recorded by

7    me stenographically and thereafter transcribed by me;

8    and that the foregoing transcript is a true and

9    accurate verbatim record of the said testimony, to the

10   best of my skill and ability.

11               I further certify that I am not

12   a relative, employee or counsel of any of the parties

13   of the within cause, nor am I an employee or relative

14   of any counsel for the parties, nor am I in any way

15   interested in the outcome of the within cause.

16

17

18   Signed ...*Audrey Shirley*...........

19   Audrey Shirley, CAT, MBIVR, QRR

20   Date    June 1st, 2014

21

22

23

24

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

386

```
1                        CERTIFICATE OF WITNESS

2

3                    I, EWA VAN DEN BERG, hereby certify

4       that I have read the foregoing pages of my deposition

5       of testimony taken in these proceedings on Thursday,

6       May 29th, 2014, and with the exception of the changes

7       listed on the next page, and/or corrections, if any,

8       find them to be a true and accurate transcription

9       thereof.

10

11

12

13       Signed ...Ewa/Mww............

14       Date   ..26/06/.14...............

15

16

17

18

19

20

21

22

23

24
```

European Deposition Management 1 866 383 3767   info@eudepos.com

Deposition of EWA VAN DEN BERG taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

387

1                           ERRATA

2

3        Page/Line    Change            Reason for change

4        28/14     business studying        mistake
                    → distance studying

5        153/2     CCM ⇒ SCCM               mistake

6        173/24    S&P ⇒ SEP               mistake

7        189/7        —              I don't understand
                                        that answer.
8        224/14    taking → tacking        mistake

9        240/10    crew mumber
                    → crew member          mistake
10       243/9     'advice'
                                    I don't know what
11                                 I meant by use of
                                    that word.
12       260/24    everything →  e        mistake
                    every single
13       272/13    'IFC → IFCE            mistake
14                 incident form
15

16

17

18

19

20

21

22       EWA VAN DEN BERG   Ewanberg   26/06/14

23

24

European Deposition Management 1 866 383 3767    info@eudepos.com

EXHIBIT 4

1   Scott D. Cunningham (State Bar No.: 200413)
    Email: scunningham@condonlaw.com
2   Ivy L. Nowinski (State Bar No.: 268564)
    Email: inowinski@condonlaw.com
3   CONDON & FORSYTH LLP
    1901 Avenue of the Stars, Suite 850
4   Los Angeles, California 90067-6010
    Telephone: (310) 557-2030
5   Facsimile: (310) 557-1299

6       - and -

7   Anthony U. Battista (*admitted pro hac vice*)
    Email: abattista@condonlaw.com
8   CONDON & FORSYTH LLP
    7 Times Square
9   New York, New York 10036
    Telephone: (212) 490-9100
10  Facsimile: (212) 370-4453

11
12  Attorneys for Defendant
    BRITISH AIRWAYS, PLC

13              UNITED STATES DISTRICT COURT

14             CENTRAL DISTRICT OF CALIFORNIA

15

16  LINDA ANN BAILLIE, individually, as          Case No. CV13-4681 SVW (RZx)
17  Personal Representative of the Estate of
    JAMES DONALD BAILLIE, II, and on             **DECLARATION OF GEORGINA**
18  behalf of all heirs and next of kin of       **BOLTON**
    JAMES DONALD BAILLIE, II,
19  deceased,                                     Date:       March 10. 2014
                                                  Time:       1:30 p.m.
20            Plaintiff,                          Courtroom:  6
                                                  Judge:      Hon. Stephen V.
21       vs.                                                  Wilson

22  BRITISH AIRWAYS PLC,                          [Filed concurrently with Notice of
                                                  Motion and Motion for Summary
23            Defendant.                          Judgment; Memorandum of Points
                                                  and Authorities in Support thereof;
24                                                Separate Statement of Undisputed
                                                  Material Facts; Declaration of Scott
25                                                D. Cunningham; Declaration of
                                                  Stephen Fowler; Declaration of
26                                                Alastair Grant; Declaration of Ewa
                                                  Van Den Berg; Declaration of Nicola
27                                                Sharrad; Declaration of Jacqueline
                                                  Bowley; and [Proposed] Order]
28

DECLARATION OF GEORGINA BOLTON
CASE NO.: CV13-4681 SVW (RZx)                                         LAOFFICE 55883V.1

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

I, Georgina Bolton, declare as follows:

1.      I am a Customer Service Manager for British Airways, PLC (hereinafter "British Airways"). I have been employed by British Airways since 2010, and I have held my current position since 2011. I was the Customer Service Manager assigned to British Airways flight BA 289 from London, England to Phoenix, Arizona, on March 23, 2012.

2.      I am submitting this declaration in support of British Airways' Motion for Summary Judgment in this matter. I have personal knowledge of the facts attested to in this declaration. Prior to working for British Airways, I was employed as a Cabin Crew Manager by EasyJet for three years. At the beginning of my employment with EasyJet I completed the required training for becoming a Cabin Crew Manager. The training included instruction regarding the handling of in-flight medical emergencies.

3.      At the time I joined British Airways in 2010, I was required once again to complete training before working as a British Airways Cabin Crew member. During this training I learned British Airways' policies and procedures, including British Airways' policies and procedures governing in-flight medical emergencies. I completed all required training .

4.      British Airways' Joint Procedures Manual contains British Airways' instructions to its cabin crew members for dealing with in-flight medical emergencies. A true and correct copy of the portions of this document which govern in-flight medical emergencies and, specifically, complaints of chest pain, which was in effect on March 23, 2012, is attached hereto as Exhibit A.

5.      The British Airways Joint Procedures Manual contains a flow chart with instructions for how to assist passengers who complain of chest pain. This document indicates that crew members should reassure the passenger, assess the passenger's history, administer oxygen, aspirin, or tempgesic, and keep the passenger still. The document also instructs crew members to provide the

1    passenger with buccastem for nausea if required.  The flow chart then instructs

2    crew members to contact MedLink.  (*See* Exhibit A [Joint Procedures Manual],

3    Appendix 3, pages 10-11).

4         6.    The British Airways Joint Procedures Manual states, in relevant part,

5    that British Airways crew members should contact MedLink when they "feel like

6    they need advice from a Health Care Professional."  (*See* Exhibit A [Joint

7    Procedures Manual], Section 6, p. 13).  MedLink (also referred to as MedAire) is a

8    company that provides remote health care services for many airlines, including

9    British Airways.

10        7.    The British Airways Joint Procedures Manual also states, in relevant

11   part, "[a] request for on-board assistance from a doctor of medicine, or other health

12   professional, may be made in the following circumstances: . . . At the suggestion of

13   MedLink."  (*See* Exhibit A [Joint Procedures Manual], Section 6, pp. 13-14).

14        8.    The British Airways Joint Procedures Manual states that MedLink

15   will "advise on medical options for diversion and assist in making arrangements

16   for medical assistance on the ground."  (*See* Exhibit A [Joint Procedures Manual],

17   Section 6, p. 14).

18        9.    Finally, the British Airways Joint Procedures Manual provides that

19   "the decision to divert rests with the Captain and should take into account

20   operational factors as well as the medical information available."  (*See* Exhibit A

21   [Joint Procedures Manual], Section 6, p. 14).

22        10.   In the course of my employment with EasyJet and British Airways, I

23   have become generally familiar with industry standards and practices with respect

24   to the handling of in-flight medical emergencies.  It is a common practice within

25   the airline industry for cabin crew and flight crew to rely on the advice and

26   guidance of MedLink and similar companies, in conjunction with the advice of on-

27   board passengers who are physicians, when handling in-flight medical

28   emergencies.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF GEORGINA BOLTON
CASE NO.: CV13-4681 SVW (RZx)                              3                              LAOFFICE 55883V.1

1    11.    I first met Mr. James Donald Baillie, II onboard British Airways flight

2   BA 289 from London to Phoenix on March 23, 2012.  On that particular flight, I

3   was the Customer Service Manager in charge of supervising all of the cabin crew

4   members onboard the aircraft.

5    12.    I recall that I was notified at some point after takeoff by Cabin Crew

6   Member Ewa Van Den Berg that Mr. Baillie was not feeling well.  Thereafter, Ms.

7   Van Den Berg notified me that Mr. Baillie's condition had worsened and that he

8   was experiencing chest pains.  I assisted Ms. Van Den Berg in organizing and

9   providing Mr. Baillie with oxygen and reassigned Ms. Van Den Berg to care for

10  Mr. Baillie.  I reassigned Ms. Van Den Berg's other responsibilities to other crew

11  members.  At this time we advised the Captain that we had a First Class passenger

12  experiencing chest pains.

13   13.    I instructed Ms. Van Den Berg to continue with the protocol for

14  assessing a passenger complaining of chest pain.  Ms. Van Den Berg proceeded

15  and obtained a full medical history from Mr. Baillie, including answers to

16  questions concerning his symptoms, medical history, medications, etc.  At

17  approximately 18:30 GMT, Ms. Van Den Berg and I briefed the flight crew on the

18  situation and the flight crew and Ms. Van Den Berg spoke with MedLink.  A true

19  and correct transcript of the conversation with MedLink is attached hereto as

20  Exhibit B.

21   14.    Following the initial call to MedLink, I used the aircraft public

22  address system to page for any medical doctors onboard the aircraft.  Four

23  physicians responded to my page.  I checked the medical credentials of all four

24  physicians, and selected the physician most willing to assist.

25   15.    The physician assessed Mr. Baillie's vital signs, but could not

26  determine what his precise ailment was.  The physician checked Mr. Baillie's

27  pulse, temperature, blood pressure, and listened to his chest.  The physician agreed

28  with the actions already taken by Ms. Van Den Berg, and instructed us to pass

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF GEORGINA BOLTON
CASE NO.: CV13-4681 SVW (RZx)

4

LAOFFICE 55883V.1

1    along his findings to MedLink.

2        16.    I continued to supervise the situation with Mr. Baillie, although Ms.

3 Van Den Berg assumed primary responsibility for assisting Mr. Baillie during the

4 flight.

5        17.    Ms. Van Den Berg and the onboard physician continued to check Mr.

6 Baillie's vital signs throughout the flight. Ms. Van Den Berg kept the flight crew

7 and MedLink apprised of Mr. Baillie's status for the remainder of the flight. To the

8 best of my recollection, Mr. Baillie's condition appeared to be stable throughout

9 the flight.

10        18.    On landing at Phoenix, Mr. Baillie walked off the aircraft with

11 assistance and was met by paramedics.

12        19.    The British Airways crew followed the letter and spirit of all British

13 Airways policies and procedures with respect to the treatment we provided to Mr.

14 Baillie onboard British Airways flight BA 289 on March 23, 2012. In addition, we

15 complied with industry standard and practice, which is to contact MedLink and

16 page for onboard physicians for assistance with a medical emergency, and to defer

17 to their opinions with respect to the treatment of any passenger who becomes ill in-

18 flight. Neither the onboard physicians nor MedLink ever recommended or

19 suggested to me that flight BA 289 on March 23, 2012 be diverted.

20       I declare under penalty of perjury under the laws of the United States of

21 America that the foregoing is true and correct. Executed this 28ᵗʰ day of January,

22 2014, at ___Heathrow___, United Kingdom.

23

24

25                                Georgina Bolton

26

27

28

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF GEORGINA BOLTON
CASE NO.: CV13-4681 SVW (RZx)           5                        LAOFFICE 55883V.1

EXHIBIT 5

MedLink Client Patch Summary For

**British Airways**

Flight # 289

MedLink Ref #:   2012-09578

## Flight Information

| | | | |
|---|---|---|---|
| *Zulu Date of Patch:* | 03/23/2012 | *Type of Patch:* | Inflight |
| *Zulu Time of Patch:* | 18:47 | *Zulu ETA:* | 01:41 |
| *Destination:*<br>*(ICAO / IATA)* | KPHX / PHX<br>Phoenix, Arizona, USA | *Origination:*<br>*(ICAO / IATA)* | EGLL / LHR<br>London, Middlesex, United Kingdom |

## Diversion Status

No diversion was necessary

*Diversion Location:*
*(ICAO / IATA)*

*Zulu ETA:*

## Medical Provider Assistance

*Medical Personnel in Attendance:*  The Physician assisted the patient but did not speak directly to the MedLink physician.

*MedLink Physician:*  Dr. Reinhart

## Patient Condition / Outcome

| | | | |
|---|---|---|---|
| *Age / Sex of Patient:* | 61 Yrs. | *Mental Status:* | Conscious and Appropriate |
| *Outcome:* | Patient transported to local medical facility | | |
| *Receiving Hospital:* | St . Luke's Hospital | | |
| *Discharge Date:* | | *Medical Category:* | |

## Medical Situation:

The flight attendant reported an adult passenger who was a little out of breath when he boarded now has central chest pain and appearing pale.

## MedLink Physician's recommendations:

Dr. Reinhart verified the medical concern and confirmed the passenger has no cardiac history in the past and is on no medication. Dr. Reinhart confirmed the passenger has taken an aspirin at 330pm GMT ( 3 hours ago ) Dr. Reinhart recommended to keep the passenger on oxygen and page for medical persons and obtain vitals to determine if they are stable to administer a nitro tablet. If there is a physician onboard and the vitals are stable they can administer 1 nitro tablet and repatch .

## Summary Comments:

1918 repatch - The flight attendant reported the passengers pulse is irregular, BP 100/70 with increased chest pain and crackles on the left side.  Dr. Reinhart recommended to keep the passenger on oxygen and continue to monitor. The pilot reported they have 3 physicians onboard and they have no suggestions as to what the cause. Dr, Reinhart recommended, to continue with the oxygen and keep the passenger laying down. He advised if the condition worsens then to repatch and a diversion would be the next step. Dr. Reinhart advised to watch if blood pressure drops further, the color deteriorated, chest pain worsens or he becomes unresponsive.

Repatch 2239z

The Flight attendant reported the passenger's vitals are unchanged but he feels worse. Dr. Monas confirmed the medical condition. The passenger still has the pain in his chest, has taken an aspirin and has been on oxygen. The passenger was not given nitro. Dr. Monas recommends 1 tablet of nitro continue oxygen and the flight will repatch.

EXHIBIT NO. 2
5-16-14
Susan A. Grenz CCR 50722

MedLink Client Patch Summary For

**British Airways**

Flight # 289

MedLink Ref #:   2012-09578

## Contact Information:

*Contact Date (Zulu):*   23-Mar-2012        *Contact Time (Zulu):*   19:27

1918 repatch - The flight attendant reported the passengers pulse is irregular, BP 100/70 with increased chest pain and crackles o
the left side.   Dr. Reinhart recommended to keep the passenger on oxygen and continue to monitor. The pilot reported they have
physicians onboard and they have no suggestions as to what the cause. Dr. Reinhart recommended to continue with the oxygen an
keep the passenger laying down. He advised if the condition worsens then to repatch and a diversion would be the next step. Dr.
Reinhart advised to watch if blood pressure drops further, the color deteriorated, chest pain worsens or he becomes unresponsive

*Contact Date (Zulu):*   23-Mar-2012        *Contact Time (Zulu):*   22:39

Repatch 2239z

The Flight attendant reported the passenger's vitals are unchanged but he feels worse. Dr. Monas confirmed the medical condition
The passenger still has the pain in his chest, has taken an aspirin and has been on oxygen. The passenger was not given nitro. Dr
Monas recommends 1 tablet of nitro continue oxygen and the flight will repatch.

*Contact Date (Zulu):*   23-Mar-2012        *Contact Time (Zulu):*   22:53

Repatch 2254z

The pilot reported the onboard doctor is not happy to give the nitro as the blood pressure is 100/80/p110. Dr. Monas confirmed the
concerns and the recent medical history. The passenger is still feeling ill and worse but the pain is stable at 5/10. The Passenger
appears sweaty and pale. Dr. Monas recommends to consider diversion locations and options.   Conferenced in Dispatch at
011-44-208-513-0980, spoke with Hebber, Dr. Monas recommends to lay the passenger flat and Ops control offered the best
location would be ORD, the flight will repatch in 10 min with an update

*Contact Date (Zulu):*   23-Mar-2012        *Contact Time (Zulu):*   23:08

KORD/ORD - Called British Airways Ops (Contact) at 773-894-4060/40/01. Spoke with Tony, he has been in communication with
LON OPS, and is awaiting the update from MedLink

*Contact Date (Zulu):*   23-Mar-2012        *Contact Time (Zulu):*   23:55

Spoke with Jen in BA OPS Control, confirmed the patch Number, the flight has passed over ORD and the next on line destination i:
DEN.   We will maintain communications with the flight and keep OPS updated.

*Contact Date (Zulu):*   24-Mar-2012        *Contact Time (Zulu):*   00:48

KPHX/PHX - Called British Airways Station Control (Contact) at 602-306-4870 - Susan she advised of the passenger details. She
advised B25 at 1850

*Contact Date (Zulu):*   24-Mar-2012        *Contact Time (Zulu):*   00:52

KPHX/PHX - Called Emergency Services (Contact) at 602-273-3311. - Spoke with EMS and advised of the passenger and flight
details

*Contact Date (Zulu):*   24-Mar-2012        *Contact Time (Zulu):*   02:37

KPHX/PHX - Called British Airways Station Control (Contact) at 602-306-4870 Susan, St Luke's Hospital

EXHIBIT 6

2014-Jun-06 10:04 AM ENDOCRINOLOGY ASSOCIATES 480-306-5645                    2/5

1  Gretchen M. Nelson (112566)
2  gnelson@kreindler.com
   Nicole C. Andersen (281218)
3  nandersen@kreindler.com
4  KREINDLER & KREINDLER LLP
   707 Wilshire Blvd., Suite 3600
5  Los Angeles, CA 90017
6  Tel.: (213) 622-6469
   Fax: (213) 622-6019
7
8  Francis G. Fleming, *pro hac vice*
   ffleming@kreindler.com
9  Robert J. Spragg, *pro hac vice*
10 rspragg@kreindler.com
   KREINDLER & KREINDLER LLP
11 750 Third Avenue, 32nd Floor
12 New York, NY 10017
   Tel.: (212) 687-8181
13 Fax: (212) 972-9432
14
15 Attorneys for Plaintiff Linda Ann Baillie

16             UNITED STATES DISTRICT COURT

17             CENTRAL DISTRICT OF CALIFORNIA

18 -------------------------------------x
19 LINDA ANN BAILLIE, individually, as      Case No. 2:13-cv-04681-SVW- RZx
   Personal Representative of the Estate of
20 JAMES DONALD BAILLIE, II, and on         DECLARATION OF
   behalf of all heirs and next of kin of   ROBERT C. CANDIPAN, M.D.
21 JAMES DONALD BAILLIE, II,
22 deceased,
23
                               Plaintiff,
24          v.
25 BRITISH AIRWAYS PLC,
26
                               Defendant.
27
28 -------------------------------------x

       DECLARATION OF ROBERT C. CANDIPAN, M.D.



Jennifer Honn
RPR
AZ Cert 50885
EXHIBIT # 43
Candipan
9-22-15

06/06/2014 FRI 12:35 [TX/RX NO 7585] ☑002

2014-Jun-06 10:04 AM ENDOCRINOLOGY ASSOCIATES 480-306-5645                    3/5

1
2        I, Robert C. Candipan, M.D., declare as follows:
3        1.    I am a licensed physician in the State of Arizona.  I am an
4    interventional cardiologist and am presently employed by the Physician Group of
5    Arizona, Inc.
6        2.    I have personal knowledge of the facts attested to in this Declaration
7    and could competently testify to these facts if called as a witness.
8        3.    On March 23, 2012, I was the on-call interventional cardiologist at St.
9    Luke's Medical Center in Phoenix, Arizona.  At approximately 7:30 p.m., Mr.
10   James Donald Baillie was brought to the St. Luke's Medical Center Emergency
11   Department from an aircraft that had landed at Phoenix Sky Harbor Airport.
12       4.    Mr. Baillie was initially evaluated by Emergency Department
13   physician Brian Hess, M.D. and was found to have ST segment elevations in the
14   anterior leads of his heart, meaning that he was in the process of suffering a
15   myocardial infarction (heart attack).  He was noted to have significant pulmonary
16   edema and was intubated.  A series of blood tests were performed on Mr. Baillie,
17   including a Point-of-Care Cardiac Panel with BNP.
18       5.    I was contacted and asked to report to St. Luke's Medical Center so
19   that I could treat Mr. Baillie.
20       6.    Mr. Baillie was admitted to St. Luke's Medical Center through the
21   Emergency Department and brought to the cardiac catheterization laboratory where
22   I performed a left heart cardiac catheterization which demonstrated a total blockage
23   of the proximal left anterior descending coronary artery ("LAD") with significant
24   thrombus burden.  I thereafter performed a balloon angioplasty, thrombectomy and
25   placed 3 drug-eluting stents in his LAD.  I also placed an intra-aortic balloon pump
26   in his LAD.
27       7.    After the surgery, Mr. Baillie was admitted to the Intensive Care Unit
28   at St. Luke's Medical Center for continued care.

-2-
DECLARATION OF ROBERT C. CANDIPAN, M.D.

8.   I was Mr. Baillie's admitting and treating physician while he was at St. Luke's Medical Center from March 23, 2012 until he was transferred to The Mayo Clinic in Phoenix for further treatment on March 30, 2012.

9.   After his surgery, I spoke with Mr. Baillie and he told me that he was traveling on a flight from London to Phoenix on March 23, 2012 and that he began to experience chest pain while running in the London airport to catch his plane. He told me that he continued to have chest pain throughout the flight, which lasted for about 11 hours. I made a record of this conversation in my Operative Report, a copy of which is attached as Exhibit 1.

10.   The panel of cardiac blood tests performed on Mr. Baillie at St. Luke's indicated that Mr. Baillie had high levels of creatine kinase MB isoenzyme (CKMB), troponin I (TnI), myoglobin and B-type natriuretic peptide (BNP) in his blood when it was drawn at approximately 8:00 p.m. on March 23, 2012. A copy of the results from Mr. Baillie's Point-of-Care Cardiac Panel with BNP is attached as Exhibit 2. Based upon the levels of these cardiac enzymes in Mr. Baillie's blood, which are only released after the heart has suffered muscle damage, Mr. Baillie's heart attack had to have started at least six to eight hours before the 8:00 p.m. blood test, which would be 12:00 noon - 2:00 p.m. local (Phoenix) time or 19:00 – 21:00 GMT (London time). There is no question that Mr. Baillie was having an active heart attack during his flight from London to Phoenix.

11.   I have reviewed the transcript of the communications between the airplane's crewmembers and the Medlink physicians they contacted to assist them with Mr. Baillie's treatment on the flight. On page 2 of the transcript, at 19:12 UTC, the crewmembers tell the Medlink physician that one of the on-board physicians can hear "crackles" in Mr. Baillie's left chest. Crackles, by themselves, are an indication that the patient could be suffering from pulmonary edema or fluid in the lungs. However, crackles, along with chest pain, can indicate that a patient is

-3-

DECLARATION OF ROBERT C. CANDIPAN, M.D.

2014-Jun-06 10:04 AM ENDOCRINOLOGY ASSOCIATES 480-306-5645                                5/5

1  having a complicated heart attack and that they are very sick. Clearly, Mr. Baillie
2  is already having a complicated heart attack by 19:12 UTC, when the crewmembers
3  report to Medlink that "crackles" were heard by the on-board physician while Mr.
4  Baillie was experiencing chest pain.

5      12.   It is very important for heart attack victims to receive treatment as
6  soon as possible, preferably within the first hour after symptoms appear. Medical
7  organizations have established a goal to restore the blood flow to the heart muscle
8  within 60 minutes of the patient presenting at the emergency room. This was not
9  done for Mr. Baillie, who received treatment only after he landed in Phoenix, more
10 than six to eight hours after the onset of his heart attack. Had Mr. Baillie received
11 treatment within an hour or two after the onset of his chest pain, the extensive
12 damage to his heart caused by his heart attack would likely have been avoided.

13     13.   In my medical opinion, Mr. Baillie should have been taken to an
14 emergency medical facility as soon as he complained of chest pain but certainly no
15 later than when the on-board physician determined that he had crackles and was
16 experiencing chest pain at the same time.

17     I declare under the penalty of perjury under the laws of the State of Arizona
18 that the foregoing is true and correct. Executed this 6ᵗʰ day of June, 2014 in Mesa,
19 Arizona.

20
21
22                                        Robert C. Candipan, M.D.
23
24
25
26
27
28

                                   -4-
                   DECLARATION OF ROBERT C. CANDIPAN, M.D.

06/06/2014 FRI 12:35 [TX/RX NO 7585] ☑005

EXHIBIT 1

ST. LUKES MEDICAL CENTER
OP Report

PATIENT NAME: BAILLIE, JAMES
ACCOUNT #: 1208300109
MR NUMBER: 771546
BIRTH DATE:

PHYSICIAN: ROBERT S. CANDIPAN, M.D.
ADMITTED: 03/23/2012 00:00:00
DISCHARGED:

---

PROCEDURES PERFORMED:
1. Left heart catheterization.
2. Selective coronary angiography.
3. Thrombectomy of the left anterior descending coronary artery.
4. Stent x3 of the left anterior descending.
5. Intraaortic balloon pump placement.
6. Intracoronary administration of nicardipine.

OPERATOR:  Robert S. Candipan, M.D.

INDICATIONS FOR PROCEDURE:  This is a 61-year-old gentleman who apparently just completed a transcontinental flight.  Prior to boarding his airplane in his departing city, he developed chest pain and continued to have chest pain throughout the flight, which was greater than 11 hours.

The patient now presents with an acute ST segment elevation MI as indicated by ECG.

PROCEDURAL DETAIL:  Prior to the procedure, informed consent was obtained from his family.  The patient had been intubated in the emergency department.

The patient was brought to the cardiac catheterization laboratory where he was prepped and draped in the usual sterile fashion. Lidocaine was used as a local anesthetic in the right groin.  Using the modified Seldinger technique, a 6-French sheath was placed in the right femoral artery.

Selective coronary angiography was then formed using 6-French JL4 coronary catheter for the left coronary artery.  This was then exchanged for a JR4 catheter, which was selectively engaged in the right coronary artery.

Angiography revealed a total occlusion of the LAD.  At that time, decision was made to proceed with percutaneous coronary intervention.

The patient was given a bolus of Angiomax followed by an infusion. The diagnostic catheter was then removed and a 6-French EBU 3.75 guiding catheter was used for the procedure and provided adequate support.  This was cannulated into the left main coronary artery.

A 0.014 BMW wire was advanced into the LAD and placed distally. Initially, this apparently went into a diagonal.  We used a Pronto aspiration catheter and performed multiple passes with this aspiration catheter with removal of visible thrombus.

Angiography following this revealed restoration of flow into the LAD and it was obvious that the guidewire was in the diagonal.  We then redirected the guidewire into the distal LAD.

CONFIDENTIAL

JDB - 12521

Patient Name: BAILLIE, JAMES          Account Number: 1208300109

Using a 2.5 x 15 mm balloon, multiple inflations were performed in the LAD itself up to 8 atmospheres.

Following this, additional thrombectomy was performed with an Export catheter. There was also removal of visible thrombus.

Distally, there was a focal stenosis in which a 3.5 x 22 mm Resolute stent was placed. This was deployed at 9 atmospheres. A second Resolute stent, a 3.5 x 22 mm stent, was placed proximally, but not overlapping to the first stent. Following this, there was good improvement in the lesional diameter in the LAD but flow distally in the LAD was still decreased. We administered 200 mcg of Cardene with slight improvement of flow. At this time, we then gave the patient double bolus of Integrilin followed by an infusion.

A third stent was then placed into the intervening segment _____ the first 2 stents. This was a 3.5 x 8 mm stent.

Finally, a 3.5 x 15 mm NC balloon was then used to post-dilate the stented areas. Inflations _____ at 12 atmospheres were performed.

Additional administration of Cardene 200 mcg was performed. Guiding wire was then withdrawn. Angiography following this revealed an excellent result within the stented area and there was TIMI grade 2 flow in the distal LAD.

The guiding catheter was then removed. This was then exchanged for a pigtail catheter, which was placed in the left ventricle. Hemodynamic measurements were obtained. This demonstrated significant elevation of the LVEDP at 40 mmHg. We then decided to go ahead and place an intraaortic balloon pump.

The pigtail catheter was removed. A 6-French sheath was then exchanged over a guidewire for a 7-French balloon pump sheath. A 40 cm balloon pump was then advanced under fluoroscopic guidance into the aorta. This was placed at one-to-one pumping. Finally, all sheaths and the balloon pump were sewn in place.

The patient was then transported to the ICU in stable condition.

COMPLICATIONS: None.

FINDINGS:

HEMODYNAMICS:

CONFIDENTIAL

JDB - 12522

Patient Name: BAILLIE, JAMES               Account Number: 1208300109

1.  The aortic blood pressure was 100/60 with an LV pressure of 120/40 mmHg.  There was no significant transaortic gradient on pullback.
2.  LEFT CORONARY ANGIOGRAPHY:
LEFT MAIN CORONARY ARTERY:  Left main coronary artery is a large artery of medium length.  This bifurcated across the LAD and the left circumflex.  The left main itself was free of significant disease.
LEFT ANTERIOR DESCENDING CORONARY ARTERY:  Left anterior descending

coronary artery is a large artery, which extended around the apex of the heart.  This gave rise to 2 medium-sized diagonals.  The LAD itself was totally occluded proximally.
LEFT CIRCUMFLEX:  Left circumflex is a large nondominant artery.  This gave rise to a large obtuse marginal.  The circumflex and the obtuse marginal itself had up to 80% to 90% diffuse stenosis.
RIGHT CORONARY ARTERY:  The right coronary artery is a large dominant artery.  This gave rise to a large PDA and a large posterolateral branch.  There was a 40% to 50% proximal and mid RCA stenosis.  Distal to the PDA was a 50% to 60% stenosis.

Following intervention with placement of stents in the LAD, the total occlusion was reduced to 0% residual with TIMI grade 2 flow distally.

CONCLUSIONS:
1.  Normal systemic blood pressure.
2.  Markedly elevated left ventricular end-diastolic pressure.
3.  Coronary artery disease in a right dominant system with a total occlusion in the proximal LAD.  This was felt to be infarct-related artery.  There was an 80% to 90% stenosis of the circumflex/obtuse marginal, 40% to 50% proximal and mid RCA stenosis, 50% to 60% distal RCA stenosis.
4.  Successful PCI with placement of proximally to distally 3.5 x 22, 3.5 x 8, and 3.0 x 22 mm Resolute stents in the LAD with reduction of the total occlusion to a 0% residual stenosis with TIMI grade 2 flow.

PLAN:  At this time,
1.  Admit to the ICU.
2.  Continue intraaortic balloon pump.
3.  Continue Integrilin for 12 hours.
4.  Plavix 75 mg a day.
5.  Echocardiography in the a.m.
6.  Pulmonary consultation for management of his ventilator.

_____
ROBERT S. CANDIPAN, M.D.

CONFIDENTIAL                                    JDB - 12523

Patient Name: BAILLIE, JAMES          Account Number: 1208300109


cc:

DD: 03/24/2012 01:32:59 EST/DT: 03/24/2012 02:17:55 EST/18810174
IASISJob ID:704706/NTSJob ID:1231942/Doc ID: 11104338/Rev:
1/03/27/2012 10:58:33 EST/sg
Authenticated by Robert Candipan, MD On 03/27/2012 03:57:50 PM

CONFIDENTIAL

JDB - 12524

EXHIBIT 2

**ST. LUKE'S MEDICAL CENTER**
1800 E. Van Buren Phoenix, AZ 85086    Phone: (602) 251-8183

| VISIT RECORD | | | Page B |
|---|---|---|---|
| Name:   Baille, James | DOB:       61y | Sex:  M | |
| Accnt.#  1208300109 | MR #   A00771546 | | |

## EMERGENCY DEPARTMENT VISIT RECORD

### ORDERS

| Basophil | 0.0 | | 0.0-2.0 | | % |
|---|---|---|---|---|---|
| Metamyelocyte | 1 | High | 0-0 | | % |
| RBC Morphology | 1+ Anisocytosis ,1+ Polychromasia | | | | |
| Platelet Est | Normal Platelet on Smear | | | | |

Test Name:   UA MICROSCOPIC          Accession #: 12083036821        Status:  Complete

Order Date/Time:   03/23/2012 21:19      Ordered By:  Hess, Brian

| Result Date/Time: | 03/23/2012 21:19 | | | |
|---|---|---|---|---|
| **Test** | | **Result** | **Status** | **Site** |
| WBC, Urine | 0-5 | 0-5 | /HPF | |
| RBC, Urine | 0-5 | 0-5 | /HPF | |
| Epi/Squa Cells | Few Squamous | Abnormal   None | | |
| Bacteria | Few | Abnormal   None | /HPF | |
| Casts | Rare Hyaline | | /LPF | |

Test Name:   POC-CARDIAC PANEL W BNP      Accession #: 4159759        Status:  Complete

Order Date/Time:   03/23/2012 20:02      Ordered By:  Hess, Brian

| Result Date/Time: | 03/23/2012 20:02 | | | |
|---|---|---|---|---|
| **Test** | | **Result** | **Status** | **Site** |
| POC-CK-MB | > 80.0 | High | <4.5 | ng/ml |
| POC-Troponin I | 27.0 | High | <0.4 | ng/ml |
| POC-Myoglobin | > 500 | High | <107 | ng/ml |
| POC-BNP | 157 | High | <100 | ng/ml |
| Comment | w | | | |

Test Name:   LIPASE          Accession #: 12083036664        Status:  Complete

Order Date/Time:   03/23/2012 19:47      Ordered By:  Hess, Brian

Specimen Source: Blood |

| Result Date/Time: | 03/23/2012 20:43 | | | |
|---|---|---|---|---|
| **Test** | | **Result** | **Status** | **Site** |
| Signature/Initials | Signature/Initials | | | |
| Signature/Initials | Signature/Initials | | | |

| VISIT RECORD | | | |
|---|---|---|---|
| Name:   Baille, James | DOB:      61y | Sex:  M | |
| Accnt.#  1208300109 | MR #   A00771546 | | |

CONFIDENTIAL

JDB - 12276

EXHIBIT 7





EXHIBIT
18
5/29/14

| 2012-09578 | British Airways Flight 289   3/23/12 | |
|---|---|---|
| | **First Call: 18:45 UTC** | |
| CSE | Thank you for calling MedLink. This is Michelle; please state your company name. | |
| Pilot | Hi MedLink it's British Airways | |
| CSE | And your flight number? | |
| Pilot | BA289 to Phoenix oddly enough. | |
| CSE | Ok I do copy sir, and um can I have your ETA in Zulu into your final destination? | |
| Pilot | Yeah it's zero one four one (01:41) and destination is Phoenix | |
| CSE | OK I copy that sir, and can I have your aircraft type and registration? | |
| Pilot | It is a 747-400 Gulf Charlie India Victor Delta | |
| CSE | Thank you sir and go ahead with the age, gender and medical concern of your passenger. | |
| Pilot | OK we've got a 61 year old male um who was a little out of breathe when he boarded but has pain in the central chest and feels little hot and he is a bit pale, and we've put him on therapeutic oxygen temporarily. | |
| CSE | OK I copy you 61 year old male, central chest pain, appears pale and is currently on oxygen. Is that correct? | |
| Pilot | That's affirm | |
| CSE | Ok, and um do we have a seat assignment on the passenger? | |
| Pilot | He is in 4 Kilo in first class. | |
| CSE | OK, I copy you sir. Standby for the MedLink physician | |
| Pilot | (inaudible) | |
| MD | Speedbird 289, Dr. Reinhart with MedLink. | |
| | **First Call – MedLink Doctor Joins the Call: 18:50 UTC** | |
| Pilot | Hello Dr. Reinhart, Speedbird 289 here. | |
| MD | Yes, I understand that we have a uh 61 year old male passenger onboard that's having some centralized uh chest pain and is pale. We have him on supplemental oxygen. Do you know does he have any cardiac history? | |
| Pilot | What I am going to do is hand you over to Eva, who's the crew member dealing with it. And he is 61...six one years old. | |
| MD | Copy that. | |
| Pilot | OK, here's Eva. | |
| Cabin Crew | Hello Dr. Reinhart. Um Hello? | |
| MD | Yes, uh I – go ahead | |
| Cabin Crew | We've got a 61 year old uh male and uh he's  currently ????? | |
| MD | OK  and do you know, does he have any uh cardiac history in the past? | |
| Cabin Crew | We did ask him and he said that he's got no medications with him and he doesn't have any history of any cardiac. No nothing at all. | |
| MD | OK, so he hasn't taken an aspirin today and I assume he is not allergic. | |
| Cabin Crew | Um I don't know anything about him uh being allergic. He did take one aspirin at 3:30 UK. | |
| Pilot | 3:30 GMT | |
| Cabin Crew | 3:30 GMT | |

1250 West Washington Street, Suite 442  |  Tempe, Arizona, USA 85281

**Tel:** +1 480 333 3700 | **Fax:** +1 480 333 3592

www.medaire.com          *Americas    Asia Pacific, Middle East, Africa    Europe          EXPERT CARE Anywhere*



BA0489

| MD | OK, so that was quite some time ago, uh maybe uh 15 hours ago? |
|---|---|
| Pilot | Yeah 3:30pm. Sorry. 3 hours 20 ago |
| MD | Oh. Alright um so um I would uh continue the supplemental oxygen. Uh if it was only 3 hours ago that he had the aspirin we donot have to repeat that, but I'm just a little bit concerned about with his age, the pain and the fact that he is pale that maybe we should have a uh medical person evaluate him, get a set of vital signs and we can determine whether his uh blood pressure is stable enough that we can try a nitroglycerin. |
| Cabin Crew | OK. We will try to see if we can get medical help and get all the vitals like you said. |
| MD | OK, and then give us a call back (pilot attempting to speak at the same time). Yes Captain. |
| Pilot | You would like a call back with the vitals before we give him anything. |
| MD | Yeah, well they can uh assuming that you find a physician and uh he wants to go ahead and administer it. If his if he feels the vitals are stable he can go ahead and give a nitroglycerin and uh then call us back. |
| Pilot | Okee doke, yeah that sounds good, we'll call you back and see what happens. |
| CSE | And Speedbird if you have nothing further for MedLink at this time we'll go ahead and clear the line. |
| | **Repatch #1: 19:12 UTC** |
| CSE | And 289 go ahead with the update on your passenger; over |
| Pilot | Say again |
| CSE | Do you have an update on your passenger? |
| Pilot | We do yeah |
| CSE | Ok, go ahead with that. |
| Cabin Crew | OK, we checked his pulse. He's got an irregular pulse, like 100, and so we checked his blood pressure it is 100/70 and uh yeah his pulse is irregular. And then the uh health professional is a one of the doctors said he has a crackle down his left hand side and he is still complaining about his chest pains and he is confused still. |
| CSE | OK, you are coming through just a little bit faint. Um I copy a pulse of 100 irregular, B/P 100/70. You said he is still complaining of chest pains, and then can you please repeat what the medical professional advised? |
| Cabin Crew | Uh ill was one of the doctors we we have onboard. He got a crackle on his left hand side and he is complaining of chest pains. |
| CSE | OK, I copy that. Standby one for Dr. Reinhart. |
| | **Repatch #1 MedLink Doctor Rejoins the Call: 19:18 UTC** |
| MD | Hello Speedbird, it's Dr. Reinhart. I understand that there's a physician onboard. We copy a blood pressure is 100/70, a pulse of 100, and crackles in the uh left chest. |
| Pilot | Yeah, that's correct. |
| MD | The blood pressure is too low to uh support us giving him a nitroglycerin at this point, so uh there is not a great deal more we can do other than the uh continuing the supplemental oxygen. Did the uh physician onboard have any uh further suggestions after his evaluation? |
| Pilot | No, just ??????????????????? |
| MD | I'm sorry can you repeat? |
| Pilot | No no she did not have any suggestions. We have three onboard actually so we are OK. |
| MD | Ok, uh no I would uh proceed on then to your destination. looks like you have uh um us just over 6 hours remaining in the flight, so uh a lot can obviously happen in that time frame. Uh hopefully his condition will improve as he lies down and gets the oxygen. If not, if his condition appears to deteriorate, call us back and we would have to uh consider a diversion at that point. |
| Pilot | OK, that's great. Just monitor basically and if he gets any worse we'll call you back. |
| MD | Affirmative |
| Pilot | Ok, the crew just said he's gotten slightly worse since he's been on oxygen anyway, but we will will keep an eye on him anyway. |
| MD | Yes, please uh let us know if anything changes or should he becomes unstable. |
| Pilot | OK, anything we should look out for particularly? |
| MD | Well if his blood pressure drops further or he becomes unresponsive, his color deteriorates and becomes ashen or cyanotic or the chest pain seems to uh worsen where uh uh he is unable to |

CONFIDENTIAL

BA0490

| | tolerate it. |
|---|---|
| Pilot | OK, yeah that sounds good.  How often do you want us to monitor his blood pressure? |
| MD | I would probably do it every 15 to 30 minutes at least? |
| Pilot | OK, that's understood. |
| MD | We thank you. |
| CSE | And, Speedbird if you have nothing further MedLink will go ahead and clear. |
| Pilot | Thanks MedLink, Speedbird's clear…289 |
| CSE | Ok, Medlink clear |
| **Repatch #2: 22:34 UTC** | |
| CSE | Thank you for calling MedLink my name is Matt, may I have your company name? |
| Pilot | Uh It's British Airways the London to Phoenix service, the uh BA 289 |
| CSE | And Speedbird 289, I understand uh Gatwick for correction Heathrow for Phoenix. Go ahead with your update; over. |
| Pilot | Ok, I've got one of the cabin crew here to give you an update on an ongoing uh situation with uh one of our passengers. Standby |
| CSE | Very good sir. MedLink standing by. |
| Cabin Crew | Good evening. I got a little bit of update for you. We've just had uh a doctor checking our uh passenger a couple of minutes ago. Uh his vitals are the same. His B/P is 100/80 and is pulse is 100. Um the doctor told us he looks the same but he says that he feels worse and he is sweating and so he's still complains about the pain in the center of his chest The doctor did check um if he had any pain down his arm, left or right or any other place and he said he didn't. That is all the update I've got so far.. |
| CSE | Understand ma'am and just to confirm so the vitals are the same although the passenger feels worse; negative for arm pain. Is that correct? |
| Cabin Crew | That's correct |
| CSE | Very good. And ma'am, I'm going to go ahead and brief our MedLink physician. Dr. Rhinehart has gone off shift so I'll update our new physician. It will take me just one moment to do so. Please standby one. |
| CSE | And Speedbird it will be just one more moment uh or a MedLink physician. |
| Pilot | Uh Speedbird 289 |
| **Repatch #2 – MedLink Doctor Joins the call: 22:38 UTC** | |
| MD | Speedbird 289 this is Dr. Monas; over. |
| Pilot | Hello doctor Speedbird 289 go ahead. |
| MD | Ok, so I'm um just getting caught up here, my understanding is a 61 year old male, um I am not sure what his past medical history is but had some chest pain, was given some supplemental oxygen and nitroglycerin. Uh and so If you can tell me any other information or an update I would appreciate that; over. |
| Cabin Crew | Uh good evening um we've got a 61 year old male. Uh he doesn't have any history of any pain or problems. He is not on any medication. He has taken aspirin at about um seven hours ago and he has not taken anything else. He hasn't been given anything else. And we have been monitoring him and checking his vitals. His vitals are quite stable.  At the moment they are blood pressure is 110/80 and his pulse is 110. And he just complained that he is feeling a bit worse. He is complaining about uh pain in his chest in the central of his chest. |
| MD | OK, so he was complaining of a pain in his chest. He has received a an aspirin. I am assuming a full 325 mg aspirin. Um He is on oxygen currently. He received the nitroglycerin, and how is he after the treatment and how much nitroglycerin has he received?; over. |
| Cabin Crew | He's not received any nitroglycerin and he is on oxygen. He he he looks the same but he says he feels worse. He has been on oxygen for the last couple of hours. And he's taken aspirin himself just before take off about 7 hours ago. |
| MD | OK, I'm sorry I could not understand you. How many of the nitroglycerin um that was recommended that he be given, did he take?; over. |
| Pilot | Uh he he wasn't given any nitroglycerin at all because when we relayed the blood pressure we decided that it was too low. So he wasn't given any Nitroglycerin at all at this stage.. |
| MD | OK so why don't you go ahead and um try giving him a dose of the nitroglycerin, um if he is continuing to have chest pains. And why don't you give him a dose and then give us a call back |

CONFIDENTIAL

BA0491

| | |
|---|---|
| | afterwards and let us know how he's a feeling. Obviously we will certainly have an ambulance waiting for you at your arrival no matter what but why don't we see how he does after the nitroglycerin; over. |
| Pilot | OK, uh so you want us to administer a single dose of nitroglycerin and then inform you how he improves after that. |
| MD | That is correct and continue him on the oxygen; over. |
| Pilot | And continue on the oxygen yeah Ok standby one minute please. Ok, we were just confirming the information that we have. Uh apparently it was your colleague earlier who suggested not giving the nitroglycerin but uh I understand now that it is ok to do so. Uh also, I don't know if you have been advised but we have a doctor onboard monitoring the patient. And uh checking his blood pressure every half an hour. He actually did say over the last check that uh he pain did look considerably worse and his recommendation was to re-evaluate in uh 30 minutes which is now about 20 minutes and suggested that uh at that time we might consider making a diversion. Obviously I wanted to uh speak with you first and get your take. Uh we will now administer the nitroglycerin and uh come back to you once that has had some effect. |
| MD | OK, that sounds good. Thank you so much. Please give us a call back; Over |
| Caller | OK Uh Speedbird 289 is now out for now |
| CSE | OK Speedbird 289 this is Matt at MedLink we will go ahead and standby for your update um at this time we will go ahead and clear the line as well. Safe flight. |
| | **Reptch #3: 22:52 UTC** |
| CSE | And Speedbird this is Matt, we spoke a few moments ago. I am gonna go ahead and bring Dr. Monas on the line. Standby one. |
| Pilot | OK, we're standing by here 289 |
| Cabin Crew | (Inaudible) |
| MD | Speedbird 289, Dr. Monas; Over |
| Pilot | Hello doctor, it's the uh Captain on 289. Yeah, I've got two of my cabin crew up here in the flight here with me yeah. Uh, after your uh after our last chat with you about administering the nitro, I went to uh the uh doctor that is monitoring the patient for us who is a radiologist apparently, and he said that uh he is not happy at all with giving the patient uh nitro because his blood pressure is too low. So he just wanted your thoughts on that. |
| MD | What is the current blood pressure? Cus the last time…well what is the current blood pressure; Over. |
| Pilot | Uh its 100/80 |
| MD | And the patient is continuing to have chest pain?; Over |
| Caller | Yes, that's correct |
| MD | OK, um and is it and so there is a radiologist onboard. I heard there is another doctor onboard as well? Over |
| Pilot | Uh Standby. OK doctor, I I'm going to let one of my cabin crew talk to you directly because I am getting it relayed to me and uh she has been with the patient the entire time. Standby one. |
| Cabin Crew | Good evening, Um we've had the doctor the radiologist that's been monitoring the customer for the last couple of hours. He came in with his colleague originally, but I know from the my colleagues that there are other doctors onboard but I don't know what profession they are exactly but I know they came in forward when we made a PA for them. |
| MD | Ok and can you tell me a little bit because I came in at the end of this situation? Can you tell me the story of what this gentlemen is having, what kind of chest pain; Over |
| Cabin Crew | OK, I am going to start from the very beginning. It started just after takeoff when he said that he's not feeling well and he's complaining of chest pain in the center of his chest. Um he did say that he had been uh was running towards the gate because he was in a rush, he seemed a bit rushed. Um, we put him on oxygen because he seems to be feeling worse and then we contacted you, and one of your colleagues told us to monitor and check his vitals. So we got the doctor to check his vitals. I have the last three updates. He didn't have any history of any pain. Uh he is not on any medication. And, he advised us that he had taken. Actually hold on a minute I have a bit of an update here. OK, I am sorry no that was not an update. So um he did advise us that he had taken an aspirin just before takeoff which was about 7 hours ago. And um he he told us he feels hot. He is quite pale. He was quite pale from the very beginning and he did have difficulty breathing. Um so we have been checking his vitals for the last couple of hours. They have been quite stable. At the moment the blood pressure is 100/80 and the pulse is 110. |
| MD | So just to…just to recap for a second. So the patient is pale? Is he and he sounds like he is sweaty |

CONFIDENTIAL

BA0492

| | |
|---|---|
| | and feeling short of breath with chest pains. And is the chest pain a pressure and if it is easier you can put me on with the doctor, I would be happy to talk with them as well but um I would just like the information; Over |
| Cabin Crew | We did ask him what kind of pain is it and he said it was quite difficult to describe so I don't have that information unfortunately. Um I don't think the pain is getting worse. I think the pain is quite stable because he didn't say it was. I did ask him in the beginning which was a couple of hours ago on a scale of 1 to 10 what how how heavy the pain is and he said about 5. That hasn't changed but I have to check that with him. And that's all the update I have so far. |
| MD | OK, does he look sweaty?; Over |
| Cabin Crew | Uh he does in my opinion and doctors opinion, he does. |
| MD | Ok, is it possible to speak with one of the doctors who are taking care of him?; Over |
| Cabin Crew | Apparently not now? |
| CSE | And Speedbird to confirm, the physician who is treating the patient is refusing to speak to the MedLink physician or he is just not available at this moment? |
| Pilot | He's not able to come on to the flight deck due to...due to our security procedures |
| CSE | Understand sir |
| MD | Yeah ok, I mean you know obviously we are here, you guys are in the air and evaluating the patient. If you feel the patient is not looking well, and that uh that we need to divert we can start to take a look at diversion locations. Um in the meantime if the patient's blood pressure is that low, I'm assuming he is lying down right now, um and if not I would lay him down, elevate his legs, um obviously continuing continue him on the oxygen.  If his blood pressure is still 100 of the top number, I would hold off on the nitroglycerine.  Obviously if we can get his blood pressure up we could go ahead and give it, but like I said in the meantime we'll take a look at some diversion locations if you guys feel he is uh concerning at this time; Over |
| Pilot | Yeah ok Speedbird 289 |
| CSE | And Speedbird, I'll go ahead and bring dispatch on the line.  Standby one. |
| | Repatch #3 BA Dispatch Joins the Call: 23:00 |
| CSE | And Speedbird 289 this is Matt at MedLink, how do you copy? Over |
| Pilot | Uh 289 we read you three and five. |
| CSE | And 289 on the line with us is uh Ops control. |
| Dispatcher | Good evening Speedbird 289 this is Shebra from Ops control. |
| Pilot | Uh hello is that uh, are you BA Ops control or are you is this someone else from MedLink? |
| Dispatcher | No, it's BA Ops Control |
| Pilot | Oh Ok, so we've already spoken to somebody, one of your colleagues, just letting them know there is a possibility of a diversion.  Um ok we we're still um closest to Chicago at the moment and we're going to get an update from the doctor onboard in the next uh ten minutes or so I guess, and um we'll as I said earlier we'll give you a call to uh let you know what our decision is if we do have to divert. |
| Dispatcher | Excellent, thank you for that update Speedbird 289. Um I will just (MedLink Doctor interjects) Hello? |
| MD | Yes sorry this is one other thing just from the doctor over here that I just want to make sure we are doing.  I just wanna make sure we have tried laying this gentleman down with his legs elevated. Um just to make sure that we do uh give him a little time in that position and recheck his blood pressure; Over |
| Pilot | Yeah copy that 289. |
| Dispatcher | Again uh Speedbird 289, we will ring Chicago just to let them know that there is a possibility |
| Pilot | Ok, we'll update you uh the next update within ten to fifteen and um yeah if you can let Chicago know that obviously we'll need a flight plan on to Phoenix and uh uh med....paramedics, and I'll call you and update you when and if we need to make a decision. |
| Dispatch | Ok excellent, thank you very much Speedbird 289. |
| CSE | Speedbird 289 this is Matt at MedLink.  I'll go ahead and call Chicago as well, let them know of the possibility, keep them updated. If anything does come up or if you have an update please do call us right back, we'll bring Dr. Monas back on the line.  Ops control thanks for your help and if there is nothing further for MedLink we'll go ahead and clear the line. |
| Pilot | Ok Medlink Speedbird 289 out. |

CONFIDENTIAL

BA0493

| CSE | Have a good flight, Speedbird clear. |

CONFIDENTIAL

BA0494

EXHIBIT 8



CONDON & FORSYTH LLP

This CD contains
Confidential Information
Baillie v. British Airways
2:13-cv-04681

Medlink audio recording &
call transcript

BA0579 - BA0595