# EXHIBIT 9

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually,     )
as Personal Representative of the    )No.2:14-cv-00420-SMM
Estate of JAMES DONALD BAILLIE,      )
II, and on behalf of all heirs and   )
next of kin of JAMES DONALD          )
BAILLIE, II, deceased,               )
                                     )
            Plaintiff,               )
                                     )
        vs.                          )
                                     )
MEDAIRE, INC.; STEVEN JOE REINHART,  )
D.O.; and JESSICA MONAS, M.D.,       )
                                     )
            Defendants.              )
_____)

VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D.

Phoenix, Arizona
July 27, 2016
9:32 a.m.

REPORTED BY:

STEPHANIE WINTERS, RPR
Certified Reporter, No. 50067

```
 1                     I N D E X

 2   EXAMINATION                                    PAGE

 3   ROBERT C. CANDIPAN, M.D.

 4      Mr. Dangerfield                              6

 5

 6           (Deposition Exhibit Number 3 was marked for

 7   identification and attached to Dr. Reinhart's deposition

 8   transcript.  Deposition Exhibit Number 18 was marked for

 9   identification and attached to Stephen Fowler's deposition

10   transcript.  Deposition Exhibit Number 43 was marked for

11   identification and attached to Dr. Candipan's prior

12   deposition transcript.  Deposition Exhibit Number 134 was

13   marked for identification and attached to Linda Baillie's

14   deposition transcript, and Deposition Exhibit Number 135 was

15   marked for identification and attached to Laura Baillie's

16   deposition transcript.)

17

18                    E X H I B I T S

19

20   EXHIBIT NO.            DESCRIPTION              PAGE

21      3  -   British Airways document, BA0733-BA0758   109

22     18  -   Transcript of communications between     35
                the MedLink physicians and the air
23              crew of British Airways Flight 289
                on March 23rd, 2012
24     43  -   Declaration of Dr. Candipan              27

25
```

VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D. - 7/27/2016

| EXHIBIT NO. | | DESCRIPTION | PAGE |
|---|---|---|---|
| 134 | - | Declaration of Linda Ann Baillie | 28 |
| 135 | - | Declaration of Francis G. Fleming in Opposition to Motion for Summary Judgment | 32 |
| 175 | - | Report of Dr. Candipan, dated 2/1/16 | 10 |
| 176 | - | Rebuttal Report of Dr. Candipan, dated 6/22/16 | 43 |
| 177 | - | ACC/AHA Guidelines for the Management of Patients With ST-Elevation Myocardial Infarction | 19 |
| 178 | - | Hospital H&P, JDB-00566 through 00569 | 37 |
| 179 | - | Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute Myocardial Infarction | 89 |
| 180 | - | WITHDRAWN | 98 |
| 181 | - | Time is Muscle, Translation Into Practice | 99 |
| 182 | - | Impact of Primary Coronary Angioplasty Delay on Myocardial Salvage, Infarct Size, and Microvascular Damage in Patients with ST-Segment Elevation Myocardial Infarction | 100 |
| 183 | - | Ischemic Time, The New Gold Standard for ST-Segment Elevation Myocardial Infarction Care | 106 |

1      VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D.

2

3    was taken on July 27, 2016, at 9:32 a.m. at Gallagher &

4    Kennedy, P.A., 2575 East Camelback Rd., Phoenix, Arizona,

5    before STEPHANIE WINTERS, Certified Reporter Number 50067,

6    in and for the State of Arizona.

7                           * * * *

8
     COUNSEL APPEARING
9
             ON BEHALF OF PLAINTIFF:
10
                 ROBERT J. SPRAGG, ESQ.
11               KREINDLER & KREINDLER LLP
                 750 Third Avenue
12               New York, NY 10017
                 (212)687-8181
13               rspragg@kreindler.com

14
             ON BEHALF OF DEFENDANTS:
15
                 MARK C. DANGERFIELD, ESQ.
16               GALLAGHER & KENNEDY, P.A.
                 2575 E. Camelback Road
17               Phoenix, AZ 85016-9225
                 602-530-8000
18               mark.dangerfield@gknet.com

19
     ALSO PRESENT:
20
                 Alex Marinakis, Videographer
21               VideoDep, Inc.

22

23

24

25

```
 1                                      Phoenix, Arizona
                                        July 27, 2016
 2                                      9:32 a.m.

 3

 4          THE VIDEOGRAPHER:  We're on the record.  Today's

 5   date is Wednesday, July 27th, 2016.  The time on the video

 6   monitor is 9:32 a.m.  This is the video-recorded deposition

 7   of Robert C. Candipan, M.D., noticed by counsel for the

 8   defendants in the matter of Linda Ann Baillie et al. versus

 9   MedAire, Inc., et al.

10          This matter is being held in the United States

11   District Court, District of Arizona.  The Case Number is

12   2:14-CV-00420-SMM.  Our location is the law offices of

13   Gallagher & Kennedy, located in Phoenix, Arizona.  The

14   certified court reporter is Stephanie Winters of

15   Morris-Crowe Court Reporting, located at 7650 S. McClintock

16   Drive, Tempe, Arizona, 85284.  My name is Alex Marinakis.

17   I'm the certified legal video specialist for the firm of

18   VideoDep, Incorporated, located at 7776 S. Pointe Parkway

19   West, Suite 170, Phoenix, Arizona, 85044.

20          Counsel, would you please identify yourselves and

21   whom you represent, starting with the plaintiff's counsel,

22   please.

23          MR. SPRAGG:  Robert Spragg, Kreindler & Kreindler,

24   representing Mrs. Baillie.

25          MR. DANGERFIELD:  And Mark Dangerfield from
```

1  Gallagher & Kennedy representing MedAire, Inc. and Drs.

2  Steven Reinhart and Jessica Monas.

3           THE VIDEOGRAPHER:  Thank you, Counsel.  The court

4  reporter may swear in the witness at this time, please.

5

6                 ROBERT C. CANDIPAN, M.D.,

7  called as a witness herein, having been first duly

8  sworn, was examined and testified as follows:

9

10                E X A M I N A T I O N

11  BY MR. DANGERFIELD:

12     Q.   Good morning, Doctor.

13     A.   Good morning.

14     Q.   What did you do to prepare for your deposition

15  this morning?

16     A.   I reread some of the materials that I was given,

17  testimonies of Dr. Reinhart, Dr. Monas, re-reviewed the

18  expert witness report that I prepared, as well as the

19  rebuttal to expert witnesses.  I reread the expert witness

20  reports of Dr. Roth and Dr. Budoff, and the rebuttal that

21  they provided as well.

22           In addition, I met with Mr. Spragg to go over some

23  points about giving depositions and those types of matters.

24     Q.   And when did you meet with Mr. Spragg?

25     A.   I did meet with him yesterday evening -- or

1   actually afternoon.  And then just before coming here.

2        Q.   And about how long did you spend with him last

3   evening?

4        A.   I think yesterday about one hour and then this

5   morning, actually discussing, discussing the testimony,

6   probably about 30 minutes or so.

7        Q.   Is there anything that might affect your ability

8   to testify truthfully and accurately today?

9        A.   No.

10       Q.   Let me start by just asking you, what were you

11   asked to do in this case?

12       A.   As an expert witness, to review the testimonies of

13   Drs. Reinhart and Monas, to assess their response to the

14   medical emergency that occurred on board the British Airways

15   flight, and to provide opinions about those medical

16   treatments?

17       Q.   I want to mark as exhibits your two reports that

18   you've issued in this case, Doctor, so that we can discuss

19   them.  So these will be 75 and 76.

20            MR. SPRAGG:  One.

21            MR. DANGERFIELD:  Pardon?

22            MR. SPRAGG:  175, 176.

23            MR. DANGERFIELD:  Yeah, 175 and 176.

24            (Exhibit Numbers 175 and 176 were marked for

25   identification.)

VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D. - 7/27/2016

1        A.    No.

2        Q.    You don't hold yourself out as an expert in

3   emergency medicine, do you?

4        A.    No.

5        Q.    And beyond some general training in medical

6   school, I take it you've never been specially trained in

7   emergency medicine?

8        A.    No.

9        Q.    And you've never practiced as an emergency

10  physician?

11       A.    Years ago while in training, I moonlighted in

12  urgent care.  So that is somewhat of an emergency medicine

13  specialty, but not since then.  So that would have been over

14  20 years ago.

15       Q.    Okay.  That was for a short period of time?

16       A.    A short period of time.

17       Q.    Okay.  And Doctor, you don't claim to be an expert

18  in giving remote medical advice to airlines, do you?

19       A.    No.

20       Q.    And you've never been employed to give remote

21  medical advice to airlines, have you?

22       A.    No.

23       Q.    In your practice today, do you ever have occasion

24  to give remote medical advice to patients?

25       A.    Yes.

1    Q.    And in what context is that, typically?

2    A.    If there are patients that are at outlying

3  facilities, for instance, if a cardio -- if a physician or

4  physician extender, such as a nurse practitioner or

5  physician's assistant will call about a patient, for

6  instance they might ask about a patient they have in their

7  office with chest pain or with an abnormal EKG or some other

8  cardiac issue, we do the best we can to provide them with

9  advice on what to do with the patient.

10   Q.    So you would consult via telephone --

11   A.    That's correct.

12   Q.    -- in response to their request for advice?

13   A.    Yes.

14   Q.    Were you asked to give any opinions in this case

15  that you declined to give?

16   A.    No.

17   Q.    How are you being compensated for your work in

18  this case?

19   A.    I believe my compensation fee is on the report

20  here, but for reports and -- expert witness reports, $400

21  per hour.  For deposition, $500 per hour.

22   Q.    And do you know how much -- how many hours you

23  have spent to date on your report?

24   A.    I looked at that number last night.  About 23 to

25  24 hours.

1   BY MR. DANGERFIELD:

2       Q.   Because you have no experience in that?

3            MR. SPRAGG:  Same.

4            THE WITNESS:  Correct.

5   BY MR. DANGERFIELD:

6       Q.   But if I understand you, what you're saying is

7   that you as a cardiologist would have expected the doctors

8   to have done something different?

9       A.   That's correct.

10      Q.   So it's based on what you view as the standards

11  you would have employed in their position?

12      A.   It's what I would view as the standards that I see

13  most emergency room physicians employ.

14      Q.   But you're not an emergency room physician.  We

15  have already agreed to that?

16      A.   That's correct.

17      Q.   And you don't claim to be an expert in that,

18  right?

19      A.   I do not claim to be an expert.

20      Q.   So to the extent you're basing your unusual and

21  unexpected on anything you've participated in, it's based on

22  what you've seen -- well, let me start that over.

23           MR. SPRAGG:  Objection.  Form.

24           MR. DANGERFIELD:  That's why I'm starting it

25  over.

VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D. - 7/27/2016

```
 1   BY MR. DANGERFIELD:
 2        Q.   I want to probe that last answer, because I want
 3   to make sure I understand it.  I believe you're saying that,
 4   in part, when you arrived at the opinion that what the
 5   doctors did was unusual or unexpected, in part that was
 6   based on what you, yourself, would have done as a
 7   cardiologist?
 8        A.   Not entirely correct.
 9        Q.   Okay.  That played no part in it?
10        A.   I would say that when I formed these opinions, in
11   terms of the response of the emergency room physician, I can
12   say that I am in the emergency room interacting with ER
13   physicians on an almost daily basis, or on the phone with
14   them on an almost daily basis, and would formulate these
15   opinions based upon my observations as to how they treat,
16   how they will ask for opinions from us about patients with
17   chest pain.
18        Q.   But that's in the emergency room, not remotely on
19   an airline, correct?
20        A.   That's correct.
21        Q.   And so your testimony that the actions were
22   unusual or unexpected is based on your view of what you
23   would have expected and what would have been usual for an
24   emergency room doctor in an emergency room to have done
25   based on your observations of that; is that fair?
```

1   plane divert at this point?"

2           MR. SPRAGG:  Same objection.

3           THE WITNESS:  No.

4   BY MR. DANGERFIELD:

5       Q.   Okay.  The -- the blood pressure of 100 over 70,

6   that doesn't give any indication that he's having a heart

7   attack, does it?

8       A.   No.

9       Q.   And the pulse of 100, that doesn't give any

10  indication that the passenger is having a heart attack

11  either, does it?

12      A.   No.

13      Q.   And even in combination, those two things wouldn't

14  give any indication that this gentleman might be having a

15  heart attack, correct?

16      A.   By themselves, no.

17      Q.   Okay.  So now let's talk about the crackles.  Is

18  it the feature of crackles in this case that are the reason

19  why you believe Dr. Reinhart at this point should have

20  concluded that Mr. Baillie was likely having a heart attack?

21  Let me withdraw that question and ask it a different way.

22           In the actual facts of this case, Dr. Reinhart, at

23  this point in time, was advised that there was a 61-year-old

24  man with chest pains who was pale, and who had a blood

25  pressure of 100 over 70, a pulse of 100, and crackles on the

1  left side, correct?

2          MR. SPRAGG:  Objection.  Foundation.  You can

3  answer.

4          THE WITNESS:  Yes.

5  BY MR. DANGERFIELD:

6      Q.   Based on that information, do you believe that

7  Dr. Reinhart should have concluded that the passenger was

8  likely having a heart attack?

9      A.   Yes.

10     Q.   And do you believe that Dr. Reinhart should have

11 therefore recommended that the plane divert to an emergency

12 landing?

13     A.   At this point in time?

14     Q.   Yes.

15     A.   No.

16     Q.   At what point in time do you believe -- let me

17 start over.

18          At what point in time do you believe that

19 Dr. Reinhart should have recommended that the plane divert

20 to an earlier landing?

21     A.   Well, I believe that a period of observation would

22 have been okay, whether that's 20 minutes or 30 minutes or

23 45 minutes.  But that if the symptoms were ongoing -- and I

24 believe he says that also in his suggestions to the crew,

25 that, you know, that if the symptoms would continue, then at

1    that point, consideration for diversion should be made.

2         Q.    So looking at the transcript, Exhibit 18, on page

3    490, the Bates stamp ending in 490, toward the bottom of the

4    page where -- let's focus on the section where Dr. Reinhart

5    says, "Okay.  No, I would proceed on then to your

6    destination.  Looks like you have just over six hours

7    remaining in the flight, so a lot can obviously happen in

8    that time frame.  Hopefully his condition will improve if he

9    lies down and gets the oxygen.  If not, if his condition

10   appears to deteriorate, call us back and we would have to

11   consider a diversion at that point."  Do you see that?

12        A.    Yes.

13        Q.    And would you agree with Dr. Reinhart that if his

14   condition appeared to deteriorate, that at that point a

15   diversion should be considered?

16        A.    Yes.

17        Q.    So are you critical of Dr. Reinhart for advising

18   them to continue to monitor the patient and to call us back

19   if there was any deterioration.  Are you critical of him for

20   that or is that what you would have expected him to do?

21        A.    I would have expected him to advise to continue to

22   monitor, to advise if deteriorated.  But I would have also

23   expected him to say -- give a time frame.

24        Q.    Okay.

25        A.    If his chest pain continues for another 20

1    minutes, 30 minutes, 40 minutes, however long, that we

2    should be, you know, notified and, you know, make a decision

3    at that point.

4        Q.   So at this point, the only thing different you

5    believe Dr. Reinhart should have done was put a time frame

6    and said, "Please call me back in 30 minutes," or something

7    like that?

8        A.   Well, I would have expected that.  I would have

9    expected that instead of saying, "Well, you've got six hours

10   left" -- if his chest pain continues for six hours, that's

11   fine, but if it gets worse, then we need to consider

12   diversion.  That's -- yeah, I wouldn't expect that.  I would

13   expect him to say, "Well, if it continues for, you know, a

14   time, again 20 minutes, 30 minutes, 40 minutes longer, then

15   at that point we should consider diversion."

16       Q.   Assuming that there had been no report of

17   crackles, Dr. Candipan, go back to that hypothetical, would

18   you still -- well, let me start that question over.

19            Hypothetically, if we exclude any reference to

20   crackles in the information provided to Dr. Reinhart, would

21   it have been appropriate, given the other limited symptoms

22   he was told about, for Dr. Reinhart to do what he did here,

23   namely to say at this point continue on to your destination,

24   but if his condition appears to deteriorate, call us back?

25            MR. SPRAGG:  Objection.  Foundation.  You can

1   answer.

2           THE WITNESS:  I would have expected the same as I

3   stated before, that there should have been some

4   recommendation as to a time frame as to how long the

5   symptoms were continuing.

6   BY MR. DANGERFIELD:

7       Q.   And do you -- is it your view he would -- that

8   that would fall below the standard of care for an emergency

9   room physician giving remote medical advice to an airline,

10  to have failed to give a time frame within which to call

11  back?

12      A.   I would expect that to let the chest pain continue

13  unabated would -- would be below the standard of care or an

14  unexpected recommendation.

15      Q.   And did you investigate at all where the flight

16  was when these communications with Dr. Reinhart were taking

17  place?

18      A.   No.

19      Q.   If the plane, in fact, was over the north Atlantic

20  Ocean and there was no place to readily divert to, would

21  that have any effect on your view of what Dr. Reinhart

22  should have done?

23      A.   I would have expected Dr. Reinhart to make a

24  decision based upon medical knowledge and medical -- medical

25  facts.  To recommend diversion, ultimately whether that

1      Q.    Okay.  So you see, you say here, "Prior to

2  Mr. Baillie's myocardial infarction, he was a healthy

3  61-year-old man who was employed as a vice president of a

4  semiconductor company."  Do you see that?

5      A.    Yes.

6      Q.    Now, although it appeared on the outside that

7  Mr. Baillie was a healthy 61-year-old man, can we agree that

8  prior to his boarding the plane he, in fact, suffered from

9  some serious coronary artery disease?

10      A.    Yes.

11      Q.    And I believe you testified in your prior

12  deposition that coronary artery disease develops over a

13  period of years?

14      A.    Yes.

15      Q.    When you did your angiogram on Mr. Baillie, you

16  concluded that he had not only an occluded LAD, but also

17  multi-vessel coronary artery disease, correct?

18      A.    Correct.

19      Q.    And let me just talk first of all about the heart

20  attack itself that he had.  I believe you agreed in your

21  prior deposition, but let me just ask you again now.  A

22  what's called a STEMI, or an ST Elevated Myocardial

23  Infarction, is a very serious type of heart attack, correct?

24      A.    Correct.

25      Q.    And it's a heart attack that has a high mortality

VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D. - 7/27/2016

1  rate, is it not?

2       A.   Correct.

3       Q.   As a matter of fact, let me have you look at the

4  ACC, AHA Guidelines that we marked as Exhibit 177.  A few

5  pages from the start, I believe it's page E91 in that copy

6  that we marked as an exhibit, there's a section that --

7  section number three, "Management Before STEMI."  Do you see

8  that section?

9       A.   Yes.

10      Q.   And it says, "One third of patients who experience

11  STEMI will die within 24 hours of the onset of ischemia, and

12  many of the survivors will suffer significant morbidity."

13  Do you see that?

14      A.   Yes.

15      Q.   And that's a reflection of how serious it is to

16  suffer this type of heart attack, correct?

17      A.   Yes.

18      Q.   And in fact, it's my understanding, but I'll ask

19  you to confirm this, that a number of patients, a

20  significant percentage of patients who die from a STEMI die

21  before they ever get to the hospital.  Would that be

22  consistent with your experience?

23      A.   Yes.

24      Q.   Now, as to those -- once someone has suffered a

25  STEMI, assuming he or she survives, would you agree that

1    attack.  Do you see that?

2        A.   Yes.

3        Q.   And you had read Dr. Budoff's report that attached

4    to it a chart at the end of it.  And I think you were

5    responding to that chart in these comments on page two?

6        A.   Yes.

7        Q.   And you say, "Dr. Budoff states that treatment

8    must occur within a six-hour window.  However, analysis of

9    the chart does depict a benefit, albeit diminished, with

10   interventional treatment later than six hours after the

11   onset of the infarction."  Did I read that correctly?

12       A.   Yes.

13       Q.   So I want to talk about the effect of delays and

14   reperfusion on myocardial salvage.  And I want to start by

15   introducing the article from which that chart attached to

16   Dr. Budoff's opinion was taken, and we can maybe chat about

17   that.

18            MR. DANGERFIELD:  What number was that?

19            THE COURT REPORTER:  179.

20               (Exhibit Number 179 was marked for

21   identification.)

22   BY MR. DANGERFIELD:

23       Q.   Showing you what we have marked as Exhibit 179.

24   This is an article from the February 23rd, 2005, Journal of

25   the American Medical Association, correct?

1      A.   Yes.

2      Q.   Do you know if you've ever read that article,

3  Doctor?

4      A.   Yes.

5      Q.   Yes, you have?

6      A.   Yes.

7      Q.   Okay.  And did you read in it connection with this

8  case or just in connection with your normal practice?

9      A.   I had read it in the past, but reread it in

10 connection with this case.

11     Q.   All right.  And if you turn to page two of the

12 article, in the left-hand corner, that's the chart that was

13 attached to Dr. Budoff's opinion, correct?

14     A.   Yes.

15     Q.   And looking at that chart, you'll see that it

16 says -- there's a little box on the chart that says "Shifts

17 in Potential Outcomes With Different Treatment Strategies."

18 Do you see that?

19     A.   Yes.

20     Q.   And then toward the -- or right underneath the

21 chart is a little explanation.  And let me just read the

22 first sentence of that.  It says, "Mortality reduction as a

23 benefit of reperfusion therapy is greatest in the first two

24 to three hours of the onset of symptoms of acute myocardial

25 infarction, most likely a consequence of myocardial

1  salvage."  Do you see that?

2      A.   Yes.

3      Q.   And based on your training and experience, do you

4  agree with that statement?

5      A.   Yes.

6      Q.   And in fact, in your own Declaration that we have

7  talked about in this case, you say that that treatment

8  should preferably have been made within the first hour after

9  symptoms appear, correct?

10     A.   Correct.

11     Q.   Now, we can agree -- well, let me rephrase that

12  question.

13          The data that is reflected in this chart on page

14  two of the article, do you have any reason to disagree with

15  the information being presented there?

16     A.   No.

17     Q.   And what it shows is that after about four hours

18  of elapsed time following the onset of symptoms, the rate of

19  mortality reduction that can be accomplished with PCI

20  flattens out considerably, correct?

21     A.   Yes.

22     Q.   And so the chart says that if you shift the

23  treatment from the time period of A to the time period of B,

24  there's no benefit that would be received by -- by doing

25  that, correct?

1      A.    That's what the chart says.  What the text says is

2  that the benefit of a shift from point A to B would be

3  small.

4      Q.    Okay.  And you don't disagree with that, I take

5  it?

6      A.    No.

7      Q.    And if you -- the points at A and B appear to be

8  at about 11 hours at A, and B appears to be about at

9  six-and-a-half hours, it looks like.  Would you agree with

10  that?

11      A.    Yes.

12      Q.    Now, in this case -- well, strike that.  Let me

13  ask a different question.

14          In your prior deposition, Doctor, you testified

15  that had Mr. Baillie not been able to get his artery opened

16  up until eight hours after his heart attack began, it's

17  likely that the extensive damage to his heart revealed by

18  your angiogram would have already occurred.

19      A.    Yes.

20      Q.    And you still agree with that today?

21      A.    Yes.

22      Q.    Would your answer be the same if I ask you whether

23  Mr. Baillie had not been able to get his artery opened up

24  until six hours after his heart attack began, whether it's

25  likely that the extensive damage to his heart would have

VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D. - 7/27/2016

1   already occurred?

2       A.   My answer always is going to be that the earlier

3   treatment is going to be associated with less -- less

4   damage; so --

5       Q.   But in the case of eight hours, if -- once eight

6   hours have elapsed, you've testified that by that point the

7   damage -- referring to Mr. Baillie's heart, by the time

8   eight hours had elapsed following the onset of his heart

9   attack, it's likely that the extensive damage to his heart

10  had already occurred?

11      A.   Yes.

12      Q.   And we have agreed that the heart attack, to a

13  reasonable degree of medical probability, likely began as he

14  was rushing to catch the plane.

15          MR. SPRAGG:  Objection.  Foundation.

16          THE WITNESS:  We've -- I'm not sure what we've

17  agreed to, but --

18  BY MR. DANGERFIELD:

19      Q.   Okay.  That was your testimony.

20          MR. SPRAGG:  Objection.  Foundation.

21  BY MR. DANGERFIELD:

22      Q.   Is it still your testimony?

23      A.   I think I've said that the likelihood was that

24  his -- his onset of chest pain was when his onset of

25  infarction was.

1        Q.    To a reasonable degree of medical probability?

2        A.    Yes.

3        Q.    Okay.  And that onset was roughly four hours

4    before British Airways ever called MedAire, correct?

5              MR. SPRAGG:  Objection.  Foundation.

6              THE WITNESS:  Yes.

7    BY MR. DANGERFIELD:

8        Q.    You've read in Dr. Roth's report, I assume, that

9    at the time the airline called MedAire, the plane was over

10   the north Atlantic Ocean and that the closest diversion

11   point that would have had adequate medical facilities was

12   two hours away, have you not?

13       A.    Yes.

14       Q.    And you don't have any reason to disagree with

15   that, do you?

16       A.    No.

17       Q.    So that would mean that assuming Dr. Reinhart had

18   recommended that the plane divert, the earliest the plane

19   would have even gotten to a hospital would have been about

20   six hours after the heart attack likely occurred, correct?

21             MR. SPRAGG:  Objection.  Foundation.

22             THE WITNESS:  Yes.

23   BY MR. DANGERFIELD:

24       Q.    And would you agree with me that -- let me ask a

25   different question.

1   that the process of myocardial necrosis is complete after

2   six hours after the onset of coronary occlusion"?

3        A.   Yes.

4        Q.   And then they go on to say that, "Our" -- in the

5   next column over, "Our CMR data confirm this experimental

6   and clinical evidence by demonstrating a progressive

7   increase over time in IS and MVO extent.  By using CMR, we

8   were able to observe for the first time that salvaged

9   myocardium consistently reduces after 90 minutes of coronary

10  occlusion," right?

11       A.   Yes.

12       Q.   And then turning to the next page, 2151, on the

13  left-hand side of the page, the first partial paragraph.

14  Let me direct you to the last sentence.  And it says, "The

15  amount of myocardium successfully salvaged dramatically

16  reduces after 90 minutes of coronary occlusion.  Thus,

17  clinical benefits of IRA reopening are, after this period

18  are largely not attributable to myocardial salvage."  Do you

19  see that?

20       A.   Yes.

21            MR. SPRAGG:  Objection.

22  BY MR. DANGERFIELD:

23       Q.   You don't have any reason to disagree with that

24  conclusion, do you?

25            MR. SPRAGG:  Foundation.

1            THE WITNESS:  It goes against some of the other

2    conclusions of the papers that we have already reviewed.

3    BY MR. DANGERFIELD:

4         Q.   In what respect?

5         A.   That there's still benefit, even if you look at

6    the first Gersh article that you brought up, if you look at

7    the bell curve, there is still benefit up to

8    three-and-a-half to four hours.  So the two studies are

9    divergent in that regard.

10        Q.   Right.  And the significance of this study is, as

11   opposed to the Gersh study, was that this study was actually

12   observing damage to the heart through the magnetic --

13        A.   Structural information.

14        Q.   I'm sorry?

15        A.   It's, yeah, structural information based on

16   magnetic resonance.

17        Q.   As opposed to?

18        A.   Function.

19        Q.   Studies?

20        A.   Right.

21        Q.   Okay.  Let me show you one more article.

22             (Exhibit Number 183 was marked for

23   identification.)

24   BY MR. DANGERFIELD:

25        Q.   Exhibit 183 is an editorial comment in the Journal

 1   quote "cardiac symptoms which persist for 20 to 30 minutes

 2   and cannot be relieved," close quote.  And he answered, "No,

 3   I haven't."  Do you recall that?

 4        A.    Yes.

 5        Q.    And do you recall that when he was later asked

 6   what medically justifies a diversion, he responded that it's

 7   multifactorial and depends on the entire situation?

 8        A.    That's correct.

 9        Q.    Dr. Candipan, do you have -- have you formed an

10   opinion in this case within a reasonable degree of medical

11   probability as to whether Mr. Baillie would have survived if

12   his artery had been opened between six and eight hours after

13   the onset of his symptoms?

14        A.    I believe that he would have had a better

15   survival.  Ultimately we can't tell if he would have

16   survived, but I think it would have improved his chances for

17   survival.

18        Q.    So just to repeat my question, maybe refocus it

19   slightly, I take it then you have not formed an opinion

20   within a reasonable degree of medical probability that

21   Mr. Baillie would have survived if his artery had been

22   opened between six and eight hours after the onset of his

23   symptoms?

24        A.    My opinion is that he would have had an improved

25   chance for survival.

1      Q.    He would have had an improved chance of survival,

2  but I take it you're not able to --

3      A.    Determine whether he would survive ultimately or

4  not.

5      Q.    Okay.  Correct.  So you have not determined within

6  a reasonable degree of medical probability that Mr. Baillie

7  would have survived if his artery had been opened between

8  six and eight hours after the onset of his symptoms.

9      A.    One cannot --

10         MR. SPRAGG:  His answer stands.  But you can go

11  ahead and answer.

12         THE WITNESS:  One cannot be certain.

13  BY MR. DANGERFIELD:

14     Q.    But I'm not asking for certainty.  I'm just

15  saying, you have not arrived at an opinion within a

16  reasonable degree of medical probability that Mr. Baillie

17  would have survived --

18     A.    No.

19     Q.    -- had his artery had been opened between six and

20  eight hours after the onset of his symptoms?

21     A.    The answer is no.

22     Q.    Okay.  Would it be the same response if I asked --

23  if I changed the time period from four to six hours after

24  the onset of his symptoms?

25         MR. SPRAGG:  Objection.

VIDEO-RECORDED DEPOSITION OF ROBERT C. CANDIPAN, M.D. - 7/27/2016

1

2

3

4

5

6

7              I, the undersigned, say that I have read the

8     foregoing transcript of testimony taken July 27, 2016, and I

9     declare, under penalty of perjury, that the foregoing is a

10    true and correct transcript of my testimony contained

11    therein.

12              EXECUTED this __31st__ day of __August__ ,

13    __2016__ .

14

15

16              _____

17              ROBERT C. CANDIPAN, M.D.

18

19    SAOWANIT HEALEY          STATE OF ARIZONA
      NOTARY PUBLIC - ARIZONA  COUNTY OF __Maricopa__
20    Maricopa County          The foregoing instrument was acknowledged
      My Commission Expires    before me this 31 day of August 20 16
21    September 29, 2019        By SAOWANIT HEALEY
                                Notary Public _____
22                             My Commission Expires: Sept 29, 2019

23

24

25

## STATEMENT OF CHANGES AND/OR CORRECTIONS

*Re:* BAILLIE VS. MEDAIRE, INC.
*Video-Recorded Deposition of:* ROBERT C. CANDIPAN, M.D. *Taken*: 07/27/16

| Page | Line | Changes and/or Corrections | Reason |
|------|------|---------------------------|--------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | NO CHANGES | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_____          9/9/2016
**Signature of Deponent**                 **Date**

State of Arizona
County of Maricopa
Sworn and subscribed before me on  9·9·16  (date)

_____
Krystal Soloman, Notary Public, NMLSR 1014040
My commission expires 1/22/2018



KRYSTAL SOLOMAN
Notary Public - Arizona
Maricopa County
My Commission Expires
January 22, 2018

```
 1   STATE OF ARIZONA      )
                           )ss.
 2   COUNTY OF MARICOPA    )

 3        BE IT KNOWN that the foregoing proceedings were taken
     before me, STEPHANIE WINTERS, Certified Reporter No. 50067,
 4   that the witness before testifying was duly sworn by me to
     testify to the whole truth; that the foregoing pages are a
 5   full, true and accurate record of the proceedings, all done
     to the best of my skill and ability; that the proceedings
 6   were taken down by me in shorthand and thereafter reduced to
     print under my direction.

 7

 8              [X]   Review and signature was requested.
                [ ]   Review and signature was waived.
 9              [ ]   Review and signature was not required.

10

          I CERTIFY that I am in no way related to any of the
11   parties hereto, nor am I in any way interested in the
     outcome thereof.

12

          I FURTHER CERTIFY that I have complied with the
13   requirements set forth in ACJA 7-206.  Dated at Phoenix,
     Arizona, this 8th day of August, 2016.

14

15
     Stephanie Winters, RPR
16   Certified Reporter No. 50067

17
                      *       *       *
18

          I CERTIFY that Morris-Crowe Court Reporting, LLC, has
19   complied with the requirements set forth in ACJA 7-206.
     Dated at Tempe, Arizona, this 8th day of August, 2016.

20

21

22   Morris-Crowe Court Reporting, LLC
     Arizona RRF No. R1001

23

24

25
```

EXHIBIT 10

Matthew J. Budoff, M.D.

ORIGINAL

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually,)
as Personal Representative of    )
the Estate of JAMES DONALD       )
BAILLIE, II, and on behalf of    )
all heirs and next of kin of     )
JAMES DONALD BAILLIE, II,        )
deceased,                        )
                                 )
                Plaintiff,       )
                                 )
        v.                       ) No. 2:14-CV-00420-SMM
                                 )
MEDAIRE, INC., STEVEN JOE        )
REINHART, D.O. and JESSICA       )
MONAS, M.D.,                     )
                                 )
                Defendants.      )
_____ )

VIDEOTAPED DEPOSITION OF MATTHEW J. BUDOFF, M.D.

Friday, August 16, 2016

Torrance, California

Reported by:  Cheryl Sletta, CSR, RPR

Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax

Matthew J. Budoff, M.D.

Page 2

1             VIDEOTAPED DEPOSITION OF MATTHEW J. BUDOFF,

2    M.D., a witness in the above-entitled action, taken on

3    behalf of Plaintiff, before CHERYL SLETTA, a Certified

4    Shorthand Reporter and Registered Professional Reporter,

5    at 1124 West 220th Street, CDRC Building, RB-2, Torrance,

6    California, the 16th day of August, 2016, at 11:12 a.m.

7

8    APPEARANCES:

9    FOR PLAINTIFF LINDA ANN BAILLIE:

10        KREINDLER & KREINDLER LLP
          BY:  FRANCIS G. FLEMING, ESQ.
11        750 Third Avenue
          32nd Floor
12        New York, New York 10017
          (212) 687-8181
13        ffleming@kreindler.com

14
     FOR DEFENDANTS MEDAIRE, INC., STEVEN JOE REINHARD, D.O.,
15   AND JESSICA MONAS, M.D.:

16        GALLAGHER & KENNEDY, P.A.
          BY:  MARK C. DANGERFIELD, ESQ.
17        2575 East Camelback Road
          Suite 1100
18        Phoenix, Arizona 85016-9225
          (602) 530-8054
19        mark.dangerfield@gknet.com

20

21   THE VIDEOGRAPHER:

22        TROY JOHNSON

23

24

25

Matthew J. Budoff, M.D.

Page 3

```
1                          EXAMINATION

2
    MATTHEW J. BUDOFF, M.D.                        PAGE
3
        BY MR. FLEMING                               6
4

5

6

7

8                           EXHIBITS

9
    BUDOFF                    DESCRIPTION          PAGE
10
    BUDOFF 203      Figure:  Hypothetical Construct    9
11                  of the Relationship Among the
                    Duration of Symptoms of Acute MI
12                  Before Reperfusion Therapy,
                    Mortality Reduction and Extent
13                  of Myocardial Salvage

14  BUDOFF 204      Article Entitled "Thrombolysis    43
                    and Myocardial Salvage"
15

16

17

18

19

20

21

22

23

24

25
```

Matthew J. Budoff, M.D.

Page 4

1                    DEPOSITION SUPPORT INDEX

2

3

4

5            DIRECTION TO WITNESS NOT TO ANSWER

6                           (None)

7

8

9

10         REQUEST FOR PRODUCTION OF DOCUMENTS

11                          (None)

12

13

14

                          STIPULATIONS
15                          (None)

16

17

18

19                    QUESTIONS MARKED

20                          (None)

21

22

23

24

25

Matthew J. Budoff, M.D.

Page 5

1           FRIDAY, AUGUST 16, 2016

2             TORRANCE, CALIFORNIA

3           P R O C E E D I N G S

4                 -oOo-

5           THE VIDEOGRAPHER:  We are now on the

6    record.

7           My name is Troy Johnson, and I am a

8    videographer for Golkow Technologies.

9           Today's date is August 16th, 2016.  The

10   time is 11:12 a.m.

11          This video deposition is being held in

12   Torrance, California, in the matter of Baillie

13   versus MedAire, Inc., et al., for the U.S. District

14   Court of Arizona.

15          The deponent today is Matthew J. Budoff,

16   M.D., FACC.

17          Counsel, will you please identify

18   yourselves for the record.

19          MR. FLEMING:  Good morning, sir.  My name

20   is Frank Fleming.  We've met very briefly off the

21   record.  I'm here on behalf of the Baillie family.

22   I'm with Kreindler & Kreindler in New York City.

23          MR. DANGERFIELD:  Mark Dangerfield here on

24   behalf of the defendants MedAire and Dr. Steven

25   Reinhart and Dr. Monas.

Matthew J. Budoff, M.D.

Page 6

```
 1              THE VIDEOGRAPHER:  The court reporter is
 2   Cheryl Sletta, and now she will swear in the
 3   witness.
 4              MATTHEW J. BUDOFF, M.D.,
 5   called as a witness on behalf of the Plaintiff, having
 6   been first duly placed under oath, was examined and
 7   testified as follows:
 8
 9                   EXAMINATION
10   BY MR. FLEMING:
11       Q    Good morning, sir.  How you are today?
12       A    Well, thank you.
13       Q    Good.  Thank you.
14            I assume you've had your deposition taken
15   on numerous occasions before.  We needn't spend a
16   lot of time on the rules of the road here, but it's
17   important to me to mention one point with you and
18   make sure we're on the same page.
19            And that is that I will ask you questions
20   on behalf of the Baillie family.  If I give you a
21   question that's unclear to you and you can't
22   respond, if you simply tell me that, I'll do my best
23   to solve whatever the problem is.  If, however, I
24   put a question to you and you answer it, I will
25   assume it's your best effort to be responsive to my
```

Matthew J. Budoff, M.D.

Page 15

1      A      Yes.

2      Q      Okay.  So would you not expect in the

3  context of this case, the Baillie versus MedAire

4  case, that the physicians with whom the airline crew

5  communicated would want to know the time of the

6  onset of symptoms for Mr. Baillie?

7      A      I think that's typically one of the

8  questions that would be asked, would be when the

9  symptoms started, how severe the symptoms are and

10  the nature of the symptoms.

11      Q      Indeed.  That would be the kind of

12  information that someone dealing with an assessment

13  of the extent of the problem would want to know?

14      A      Typically.

15      Q      Typically, okay.  So in this -- in the

16  title on Exhibit 179, and repeated I believe in

17  Exhibit 203, the word "symptom," or "symptoms"

18  expressly appears in the plural form, does it not?

19      A      "Symptom onset."  I think that could be

20  singular.

21      Q      Singular?

22      A      I -- I think "symptom" is a singular

23  version.  "Symptom" is -- is not the plural.

24      Q      Okay.  So could you tell me what the

25  symptom is that would set this timeline in motion?

Matthew J. Budoff, M.D.

Page 16

1       A    Most -- most commonly, it's chest pain.

2  There are what we call cardiac or anginal

3  equivalents.  That could be things like shortness of

4  breath or neck pain or pressure, or even left arm

5  pain.  But it's the -- whatever in that person is

6  the cardinal symptom that we're attributing the

7  heart attack to.

8       Q    Okay.  Could you tell me what you mean by

9  "cardinal symptom"?

10      A    So when patients present with a heart

11 attack, and again, this is in the context of me as a

12 cardiologist seeing the patient and not -- I'm not

13 in any way an expert in, you know, talking to

14 airplanes from the ground and communicating as an

15 emergency physician.

16           But when I see a patient, we try to derive

17 what was the -- when did the symptoms start.  And

18 for many patients it's chest pressure or chest pain.

19 But in some patients, they don't have that.  They

20 might say, "Oh, I -- my shortness of breath started

21 at 2:00 a.m."

22           So that would be the symptom onset, would

23 be 2:00 a.m.  It doesn't have to be chest pain or

24 pressure.  It just most commonly is.

25      Q    Okay.  Thank you, sir.

Matthew J. Budoff, M.D.

Page 17

1              Have you made any assessment in the

2     Baillie case as to what the cardinal symptom was?

3         A     I think he had chest pain or chest

4     pressure, as he described, from when he started --

5     either when he was running to the plane or when he

6     boarded the plane.  There's a couple different

7     descriptions there.

8              But somewhere early in the -- either when

9     he arrived at his seat or when he was running to the

10    plane, he had chest pain.  So that would be the

11    symptom that I would use in this case.

12        Q     Okay.  How about the shortness of breath?

13        A     Yeah, that -- there was I guess a little

14    discrepancy about his shortness of breath at

15    different points, but I think at some point he

16    did -- at least when he was running for the plane,

17    he did develop shortness of breath as well.

18             But if he has chest pain, that would be

19    the symptom that we would use.  That would trump

20    other -- other symptoms if he has that.

21        Q     Okay.

22        A     So in this case I think the chest pain

23    would be where I would focus my timing on.

24        Q     Okay.  Thank you, sir.  That's an

25    interesting timely choice of verbs in today's world.

Matthew J. Budoff, M.D.

Page 18

1          But so for purposes of your assessment and

2     evaluation, the time of the onset of pain is the

3     cardinal symptom?

4          A    Yes.

5          Q    Fair enough.

6               Is there a link in terms of pain between

7     angina and infarction?

8          A    Yes.  I mean, angina's the symptom that

9     if -- you know, as it progresses it can cause an

10    infarction.  They're not always related.

11              But angina is chest pain of cardiac

12    nature, and an infarction is death of the heart

13    cells.  So they're often related, but they don't

14    have to be.  People can have a silent infarction

15    with no angina, or they can have angina and never

16    have an infarction.

17         Q    Right.  And they can have both together,

18    correct, or --

19         A    And they most commonly have both together.

20    They have --

21         Q    And one --

22         A    I'm sorry.

23         Q    I'm sorry, I cut you off.

24         A    No, no --

25         Q    Are you from New York?

Matthew J. Budoff, M.D.

Page 36

1    which you've described for me, but that would tend

2    to make someone's time between onset of symptoms and

3    injury to the myocardium greater?

4         A    Yes.  And that's why we use drugs like

5    beta blockers during angina or a heart attack to --

6    to prolong that time, because you can lower the

7    oxygen demands by decreasing the heart rate,

8    decreasing the blood pressure.  And we provide

9    oxygen to them as well to try to decrease the demand

10   and increase the supply.

11        Q    And the last factor in this sentence is

12   sustained ischemia?

13        A    So yeah.  So the concept that it's just

14   continued ischemia the whole time, that they didn't

15   have a break in the chest pain, that the chest pain

16   or ischemia as we know it was continuous.

17        Q    All right.  Which would tend to extend the

18   time between onset of symptoms and necrosis of the

19   myocardium?

20        A    I think that one would be the -- a

21   worsening one.  The more -- the more constant the

22   burden on the heart, the worse it would be.

23        Q    Okay.  I see.

24             So the thrust of the sentence, taking into

25   account all of the factors mentioned, is that the

Matthew J. Budoff, M.D.

Page 37

1    curve by definition is not all that accurate?

2              MR. DANGERFIELD:  Object as to form.

3              THE WITNESS:  Well, I mean, I think the

4    curve is accurate.  It's based on thousands of

5    patients, and Dr. Gersh at the Mayo Clinic is one of

6    the most well-regarded scientists in our field.

7              So I would say that to his benefit and

8    to -- to our understanding that it is an accurate

9    curve.  I would say that it can be modified by

10   individual factors, but I think the curve is

11   accurate and I think that -- that he's trying to

12   imply that there are factors that can shift the

13   curve in an individual patient.

14   BY MR. FLEMING:

15       Q    I see.  Okay.  Thank you very much.

16            I didn't mean to impugn his work either,

17   but what it means is that when you use this kind of

18   a curve to predict the outcome of an individual, the

19   curve may have to be modified for any or all of

20   those factors, correct?

21       A    Absolutely.

22       Q    Okay.  And by the way, you mentioned you

23   treat some patients with oxygen who are in the

24   critical period between onset of symptoms and

25   removal of blockage.

Matthew J. Budoff, M.D.

Page 45

1    benefit.

2            So going from A, which is out at about 11

3    hours, and going up to C, if you can do the same

4    procedure at three hours, that would impart benefit

5    to the patient.  Conversely, if you went from D,

6    which is about two hours, and you went down to even

7    C at three hours, you would be causing harm because

8    more people would die if the procedure was done

9    later.

10      Q    Okay.  In the abscissa portion of this

11   graph, there's a 24-hour timeline laid out.  I see

12   that.  The first left-most, closest to the ordinate

13   axis, two and a half boxes are colored in with, I'll

14   call it dark pink.

15           What -- do you have any understanding of

16   the significance of that coloration?

17      A    So they -- they describe that in the

18   legend as "Critical Time-Dependent Period" with a

19   goal of myocardial salvage.

20           So the concept here is that time is

21   muscle, and that every minute that goes by, a little

22   bit more muscle is lost.  And once it's lost, it's

23   permanent.  Once the heart tissue dies, it does not

24   recover.  So you're trying to save muscle early on

25   and prevent the tissue from actually infarcting.

Matthew J. Budoff, M.D.

Page 46

1        Q      Okay.  And that's essentially the first

2    two and a half hours after onset of symptoms?

3        A      Yeah, I think most -- most of the

4    literature talks about three hours, up to three

5    hours, just to round it off, I guess.  But, yeah,

6    he -- he clearly shows it as two and a half hours in

7    this -- in this construct.

8        Q      Okay.  And then on the center of the

9    abscissa, between the numbers -- well, there's no

10   number there, but between what would be the 6th hour

11   and the 12th hour, there's another coloration that's

12   also pink but slightly less intensity.

13            What's the author trying to communicate

14   there?

15       A      Yeah, so now the goal shifts from saving

16   muscle to trying to get the artery open, the concept

17   being that an open artery will prevent negative

18   remodeling, will help the heart not -- not suffer

19   more consequences like dilating and becoming heart

20   failure if you can open it up.  But the muscle

21   damage is already done.  So they talk about the --

22   the slope being very flat.

23            He describes A to B as no benefit,

24   changing the timeline from 11 hours to about seven

25   hours going from A to B, because you're in the time

Matthew J. Budoff, M.D.

Page 47

1   when most of the muscle is already gone, and now

2   you're just trying to open the artery for long-term

3   changes.  So you're not really changing the

4   mortality of the patient, you're changing the

5   long-term shape of the heart and maybe helping with

6   long-term remodeling.

7        Q    Okay.  But if you -- if you're thinking

8   long-term, you're not thinking about a patient that

9   dies, correct?

10       A    Right, yeah.  You're --

11            MR. DANGERFIELD:  Object as to form.

12            THE WITNESS:  Yeah, I mean, you're --

13   you're talking about now less heart failure.  You're

14   not -- mortality is not always the end point.

15   Sometimes it's hospitalizations and -- and not

16   having heart failure, not developing heart failure.

17   BY MR. FLEMING:

18       Q    Okay.  And that period of time starts at

19   about six hours and runs till about 12 hours,

20   roughly?

21       A    Yeah, and that's consistent with the

22   general teachings in cardiology, that after the

23   first six hours, acute urgent revascularization is

24   going to have less of an effect, and the emphasis

25   shifts to long-term -- long-term benefits by -- by

Matthew J. Budoff, M.D.

Page 48

1  getting the artery open, so the timeliness is not as

2  critical.

3          So basically what they're saying here is

4  doing it at -- if you could shift the curve from 11

5  hours and do it four hours earlier, that's not

6  really where the big win is.  You want to get it --

7  you want to get it in the first 90 minutes or 60

8  minutes.

9      Q    Okay.  Now, there's an area between two

10  and a half or three hours and six hours that is

11  white.  What does that communicate?

12      A    Yeah, I think that's just as you're

13  shifting from one -- one goal to another.  I

14  think -- I mean, I don't know what the authors were

15  thinking because they didn't put any legend there

16  for the white area, so I think they're just trying

17  to show -- personally, my interpretation would be

18  that the greatest benefit is in the first two and a

19  half hours to save the muscle, and then there's a

20  window after six hours where you can still open the

21  artery and have some -- some benefit.

22      Q    And prevent death?

23      A    In -- in the long term to prevent

24  remodeling and not as much mortality, because they

25  talk about no benefit in that time zone.  That's how

Page 92

1

2                ACKNOWLEDGMENT OF DEPONENT

3

4            I, _Matthew J. Budoff_ , do

5    hereby certify that I have read the

6    foregoing pages, and that the same is

7    a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any,

11   noted in the attached Errata Sheet.

12

13

14   _Matt J Budoff_                    9/24/16

15   MATTHEW J. BUDOFF, M.D.            DATE

16

17

18   Subscribed and sworn
     to before me this
19   _24TH_ day of _SEPTEMBER_ , 20_16_ .

20   My commission expires: _12/13/7_

21

22   Notary Public

23                        COREY PROVENGHI
                          NOTARY PUBLIC - CALIFORNIA
24                        COMMISSION # 2049173
                          LOS ANGELES COUNTY
                          My Comm. Exp. December 13, 2017
25

Page 94

```
1                            - - - -
2                          ERRATA
3                            - - - -
4     PAGE   LINE   |   CHANGE/REASON
5      86     6     |   Seacreest  is  "Sechrist"
6      87     5     |   Seacrest   is  "Sechrist"
7      13     6     |   circulation is  Circulation
8      13     8     |   circulation is  Circulation
9      13    20     |   circulation is  Circulation
10     73    11     |   Clarification - "That was in response
11    ___   ___    |    to the second question, Section
12    ___   ___    |    Six of my report discusses my
13    ___   ___    |    view that some of the
14    ___   ___    |    expenses associated with Mayo
15    ___   ___    |    Clinic procedures were not
16    ___   ___    |    reasonable, necessary or useful
17    ___   ___    |    in this case."
18    ___   ___    |   _____
19    ___   ___    |   _____
20    ___   ___    |   _____
21    ___   ___    |   _____
22    ___   ___    |   _____
23    ___   ___    |   _____
24    ___   ___    |   _____
25    ___   ___    |   _____
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4          I, the undersigned, a Certified Shorthand

 5    Reporter of the State of California, do hereby certify:

 6          That the foregoing proceedings were taken

 7    before me at the time and place herein set forth; that

 8    any witnesses in the foregoing proceedings, prior to

 9    testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is an accurate

13    transcription thereof.

14          I further certify that I am neither

15    financially interested in the action nor a relative or

16    employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18    subscribed my name.

19

20    Dated:  8/23/16

21

22

23

24                              Cheryl Sletta
                                CHERYL SLETTA
25                              CSR No. 7354
```

93

EXHIBIT 11

Hosp Expiration Summary                    BAILLIE, JAMES - 7-524-848-4

Result Type:        Hosp Expiration Summary
Result Date:        01-Jul-2012 00:00 MST
Result Status:      Auth (Verified)
Result Title:       Hosp Expiration Summary
Performed By:       Zimmerman PA, Daniel J on 03-Jul-2012 20:58 MST
Verified By:        Zimmerman PA, Daniel J on 04-Jul-2012 07:21 MST
Encounter info:     3210590, Mayo Clinic Hospital in Arizona, Inpatient, 30-Mar-2012 - 01-Jul-2012

                    Mayo Clinic in Arizona
                 HOSPITAL EXPIRATION SUMMARY

Patient Name: Baillie, James Mr.     Provider Name: Daniel J. Zimmerman,
                                     P.A.-C.
Medical Record Number: 75248484      Account Number: 3210590
DOB: ~~July 20, 1950~~               Attending Phys: Francisco A. Arabia,
                                     M.D.
Age: 61              Admit Date: 03/30/2012
Facility Name: MCA       Expiration Date: 07/01/2012
Service: CV Surgery      Visit Type: Hosp Expiration Summary

DATE OF EXPIRATION: July 1, 2012, at 10:10 a.m.


PRINCIPAL DIAGNOSIS:
1. Acute Myocardial infarction

SECONDARY DIAGNOSIS

 2. Acute-on-chronic combined systolic and diastolic left heart failure status post
acute myocardial infarction.
3. Vasodilatory shock.
4. Cardiogenic shock.
5. Respiratory shock.
6. Multisystem organ failure.
7. Acute renal failure requiring hemodialysis.
8. Acute-on-chronic respiratory failure with prolonged ventilation and
tracheostomy.
9. Hyperkalemia.
10 . Hyperglycemia.
11. Hypoglycemia.
12. Chronic atelectasis.
13. Chronic pleural effusions with recurrent thoracenteses.
14. Severe Malnutrition requiring hyperalimentation and oral tube feeding.


Printed by:     Cable, Nicole M                           Page 1 of 4
Printed on:     14-Nov-2012 13:50 MST                      (Continued)

Hosp Expiration Summary                    BAILLIE, JAMES - 7-524-848-4

15. Hyperbilirubinemia.
16. Acute-on-chronic leukocytosis with multiple infections.
17. Chronic anticoagulation induced by Coumadin and heparin.
18. Acute blood loss anemia.
19. Pneumonia multiple etiologies requiring antibiotics.
20.Encephalopathy hepatic
21 Stoke


HOSPITAL COURSE:
The patient on 03/30/12 was transferred from St. Luke's Hospital for further
evaluation and management of congestive heart failure after suffering an
anterior ST-elevation myocardial infarction.  The patient had no previous
history of coronary artery disease, hypertension, or hyperlipidemia.  He was
traveling from Europe to the United States when he was rushed and catching
his flights to the United States when he began having sudden onset of
shortness of breath and chest pressure. The patient presented to the airline
with significant shortness of breath and symptoms consistent of chest
pressure and patient admitted as such at that time.  The patient then boarded
plane and then transferred by commercial airplane to the United States.
During his flight he continued to have difficulties with shortness of breath
and chest pain.  The patient upon arrival to Phoenix, Arizona, was
transferred to St. Luke's Hospital and then eventually transferred to Mayo
Clinic Hospital where he was evaluated for his acute anterior wall myocardial
infarction.  The patient showed signs of ischemia and further diastolic
workup was performed at that time.  The patient over the next 2 days
continued to demise to where he eventually required intubation and was on
inotropic support for severe congestive heart failure and cardiogenic shock
and respiratory failure. The patient was maintained on mechanical ventilation
over the next several days and eventually was weaned from inotropic support
and ventilatory support.  The patient required consultation with ENT where a
tracheostomy was performed.  The patient was seen by resident, Sharon H.
Gnagi, for a need of prolonged ventilation support and tracheostomy.  A
tracheostomy was performed on April 10, 2012.  The patient was maintained on
this mechanical support over the next several days. He was then eventually
referred to Cardiology for further diagnostic workup, and patient underwent a
pulmonary bronchioalveolar lavage for his prolonged event by Dr. Vaszar on
April 19, 2012, where it was found that patient had no infiltrative disease.
The patient was eventually referred to Cardiac Surgery where Dr. Francisco A.
Arabia saw the patient in respect to his ischemic cardiomyopathy and
congestive heart failure.  The patient was evaluated for potential
ventricular-assist device. It was felt that the patient would be a good
candidate, but suffered from multiple system organ failure and most difficult
was patient had tracheostomy and would cause complications with potential in

CONFIDENTIAL                          JDB - 00574

Hosp Expiration Summary                    BAILLIE, JAMES - 7-524-848-4

a left ventricular-assist device secondary to his respiratory-dependence with
tracheostomy. The patient was then felt to be a good candidate for a left
ventricular-assist device. This was performed on June 19, 2012. The patient
tolerated this procedure well. The patient underwent left thoracotomy and
patient had placement of left ventricular-assist device. Over the next
several weeks the patient recovered, and patient intermittently required
hemodialysis for renal insufficiency and this eventually recovered. The
patient had issues with multiple infections and chronic azotemia and
eventually was weaned from his mechanical ventilatory support. The patient
was extubated from his tracheostomy over the next several weeks, and patient
was doing well and eventually got to where he had his tracheostomy removed.
ENT continued to follow patient, Cardiac Surgery continued to follow patient.
The patient was recovering from his malnutrition and his overall
decompensated cardiogenic shock where eventually on 06/25/12 the patient had
an acute myocardial infarction and required inotropic support. It was felt
that patient potentially needed further device placement. On 06/20/12 he was
preoped for removal of his left heart assist device. The HeartMate II was
then removed and a total artificial heart was then placed. At that time the
patient had known thrombus in his aorta and had complications intraoperative
with loss of perfusion to his one extremity. The patient was then continued
on the HeartMate II and life support. The patient was then awakened and found
to be neurologically stable. The next postoperative day the patient was taken
back to the Operating Room where a total artificial heart was placed. Y had
his HeartMate II and his heart removed and total artificial heart was placed.
The patient tolerated this well. He had numerous reoperations and
explorations for postoperative bleeding. The patient had minimal sedation and
continued to demise. Eventually on his postoperative day #4 a neurological
consultation was performed. The patient failed to respond to verbal and
painful stimuli after several days of sedation removed and a computer
tomography indicated patient had multiple cerebrovascular accidents.
Neurology was evaluating patient and voiced that patient would require
extensive rehabilitation and potentially not have full recovery from his
neurological event. The family in discussion with Dr. Arabia and Critical
Care felt that this was not in the patient's decision to continue with this
type of life, and his preadmission to hospital indicated that patient's
wishes were not to continue with this type of device and expectations with
poor outcome. Dr Pajaro was at the patients side when the family decided to removeand discontinue
 support and the total artificial heart was discontinued on July 1st at 10 a.m., and patient then became apneic
and pulseless at 10:10 a.m. on July 1, 2012.

CONFIDENTIAL

JDB - 00575

Hosp Expiration Summary                    BAILLIE, JAMES - 7-524-848-4


D: 07/03/2012 20:58
T: 07/03/2012 21:15


**Completed Action List:**
* Perform by Zimmerman PA, Daniel J on  03-Jul-2012  20:58 MST
* Transcribe by Sixbey, Eileen A on  03-Jul-2012  21:15 MST
* Modify by Zimmerman PA, Daniel J on  04-Jul-2012  07:21 MST
* Sign by Zimmerman PA, Daniel J on  04-Jul-2012  07:21 MSTRequested on  03-Jul-2012  21:41 MST
* Verify by Zimmerman PA, Daniel J on  04-Jul-2012  07:21 MST
* Sign by Arabia MD, Francisco on  06-Jul-2012  08:16 MST Requested by Rhodes, Natalie M on  06-Jul-2012
07:59 MST

CONFIDENTIAL                              JDB - 00576



**MAYO CLINIC**

## AFFIDAVIT OF CUSTODIAN OF MEDICAL RECORDS

STATE OF ARIZONA     )
                           ) ss.
County of Maricopa     )

Carol Iverson being first duly sworn upon her oath, deposes and says that:

1. I am the Custodian of Records in the Health Information Management Services Department of Mayo Clinic in Arizona ("MCA") and I make this Affidavit in such capacity and with the authority to certify MCA's medical records as such.

2. I hereby certify that the attached copy of medical records of
     Patient: James Baillie     Mayo Clinic #: 75248484
is a true and accurate copy of the permanent medical record as requested and comprises 11,877 pages.

3. To the best of my knowledge, these medical records were prepared by staff physicians or other personnel of MCA or persons acting under their control, in the ordinary course of business for MCA, at or near the time of treatment.

Dated this _____ 28 _____ day of ___ April _____ 2014.

_____
Carol Iverson
Custodian of Medical Records
Health Information Management Services
Mayo Clinic in Arizona

SUBSCRIBED AND SWORN to before me
this _____ 28 _____ day of ___ April _____ 2014 by

**MARY M. SEIBAL**
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires June 18, 2016

_____
Notary Public

My commission Expires:

6 | 15 | 16

MEB06225.aff.L.MCA

CONFIDENTIAL

JDB - 13319

EXHIBIT 12

**SPECIAL COMMUNICATION**

# Pharmacological Facilitation of Primary Percutaneous Coronary Intervention for Acute Myocardial Infarction
## Is the Slope of the Curve the Shape of the Future?

Bernard J. Gersh, MB, ChB, FRCP

Gregg W. Stone, MD

Harvey D. White, DSc

David R. Holmes, Jr, MD

I N THE CURRENT ERA, THERE IS GENeral consensus that primary percutaneous coronary intervention (PCI) is the preferred approach to reperfusion therapy when delivered expeditiously in centers with requisite facilities and documented expertise and outcomes.[1] Nonetheless, in patients presenting very early (within 2 hours) after symptom onset, rapid administration of fibrinolytic therapy is associated with excellent outcomes and may be preferred, particularly in centers without facilities for primary PCI[2] or when primary PCI is likely to be delayed, causing first balloon inflation to occur more than 60 minutes after initiation of thrombolytics.[3] Moreover, the logistics of delivering primary PCI at all times are complex and variable among different regions and centers.[4]

Options for patients admitted to community hospitals include administration of fibrinolytics followed by watchful waiting, primary PCI without on-site cardiac surgery, transfer to a tertiary care center for primary PCI, or a strategy of facilitated PCI.[5] Facilitated PCI involves administration of fibrinolytics and glycoprotein IIb/IIIa inhibitors (alone or in combination) in an attempt to restore partial infarct-related artery blood flow early (before

Current options for reperfusion therapy in patients admitted to a community hospital without cardiac catheterization facilities include administration of fibrinolytic drugs followed by observation, with referral to angiography driven by symptoms and signs of ischemia; transfer to a tertiary care center for primary percutaneous coronary intervention (PCI); or a strategy of facilitated PCI in which administration of fibrinolytics and platelet glycoprotein IIb/IIIa inhibitors (alone or in combination) is followed by transfer for immediate angiography and PCI if appropriate. We systematically analyzed multiple randomized and nonrandomized trials to review the pathophysiology of reperfusion therapy in acute myocardial infarction to derive insights about the likelihood of success of a strategy of facilitated PCI compared with transfer only or fibrinolysis only. The basis for the recommendations made herein is a hypothetical curve relating the duration of symptoms before reperfusion to reduction in mortality and extent of myocardial salvage. During the first 2 to 3 hours after symptom onset, a striking benefit of reperfusion is present; within this period, time to treatment is critical. Subsequently, a mortality benefit is still present but of decreasing magnitude over time. In this situation, the priority is to open the artery, and time to treatment is less critical. Results of facilitated PCI may depend largely on timing of presentation. If presentation is late after symptom onset (ie, on the "flat" part of the curve), there will be little mortality benefit from earlier patency and patients will be subject to the bleeding risks of fibrinolytic drugs. In contrast, among patients presenting very early (60-90 minutes after symptom onset), outcomes with fibrinolytic therapy alone are excellent, and it will be difficult for any other strategy to result in a significant improvement. But in patients presenting 2 to 3 hours after onset of symptoms, a strategy of facilitated PCI may move patients from the plateau to the descending limb of the curve, with a substantial improvement in myocardial salvage and mortality. Two large ongoing trials may provide definitive answers to these issues.

*JAMA. 2005;293:979-986* www.jama.com

Author Affiliations: Division of Cardiovascular Diseases, Mayo Clinic, Rochester, Minn (Drs Gersh and Holmes); Department of Cardiology, Columbia University, and Cardiovascular Research Foundation, New York, NY (Dr Stone); and Coronary Care and Cardiovascular Research, Green Lane Cardiology, Auckland City Hospital, Auckland, New Zealand (Dr White).
Corresponding Author: Bernard J. Gersh, MB, ChB, FRCP, Division of Cardiovascular Diseases, Mayo Clinic, 200 First St SW, Rochester, MN 55905.

©2005 American Medical Association. All rights reserved.



PHARMACOLOGICAL FACILITATION OF PRIMARY ANGIOPLASTY



**Figure.** Hypothetical Construct of the Relationship Among the Duration of Symptoms of Acute MI Before Reperfusion Therapy, Mortality Reduction, and Extent of Myocardial Salvage

| Shifts in Potential Outcomes With Different Treatment Strategies | |
|---|---|
| A to B | No Benefit |
| A to C | Benefit |
| B to C | Benefit |
| D to B | Harm |
| D to C | Harm |

Mortality reduction as a benefit of reperfusion therapy is greatest in the first 2 to 3 hours after the onset of symptoms of acute myocardial infarction (MI), most likely a consequence of myocardial salvage. The exact duration of this critical early period may be modified by several factors, including the presence of functioning collateral coronary arteries, ischemic preconditioning, myocardial oxygen demands, and duration of sustained ischemia. After this early period, the magnitude of the mortality benefit is much reduced, and as the mortality reduction curve flattens, time to reperfusion therapy is less critical. If a treatment strategy, such as facilitated percutaneous coronary intervention (PCI), is able to move patients back up the curve, a benefit would be expected. The magnitude of the benefit will depend on how far up the curve the patient can be shifted. The benefit of a shift from point A or B to point C would be substantial, but the benefit of a shift from point A to point B would be small. A treatment strategy that delays therapy during the early critical period, such as patient transfer for PCI, would be harmful (shift from point D to point C or point B). Between 6 and 12 hours after the onset of symptoms, opening the infarct-related artery is the primary goal of reperfusion therapy, and primary PCI is preferred over fibrinolytic therapy. The possible contribution to mortality reduction of opening the infarct-related artery, independed of myocardial salvage, is not shown. Modified from Gersh and Anderson.[6]

PCI is possible), followed by early transfer for immediate (as opposed to elective) PCI for reperfusion in patients in whom pharmacological therapy has failed and for definitive revascularization.[5] In this context, transfer for proposed PCI with adjunctive antithrombotic therapy, but in the absence of thrombolytics or glycoprotein IIb/IIIa inhibitors (or both), does not fall under the rubric of facilitated angioplasty. Crucial to these options is an understanding of the dynamic evolving relationship among reperfusion, myocardial salvage, and mortality reduction.[6]

The purpose of this review of the pathophysiology of reperfusion therapy is to derive insights about the likelihood of success of facilitated PCI compared with transfer-only or fibrinolysis-only strategies. The feasibility and safety of primary PCI without on-site cardiac surgery in patients with acute coronary syndromes has been demonstrated.[7-9]

Successful performance of PCI in centers without cardiac surgery is facilitated by the establishment of algorithms, training of personnel, meticulous documentation of outcomes, and regular audits, but *not* reliance on published results of other centers.

## Rationale for Facilitated PCI

**Theoretical Considerations of Time Dependence of Reperfusion Therapy.** A fundamental tenet of reperfusion therapy is that time is of the essence because ischemia leading to necrosis is a progressive process.[6,10,11] The curve describing this relationship shows a striking benefit within the first 2 to 3 hours, emphasizing the narrowness of the "golden window of opportunity," followed by a continued mortality benefit of decreasing magnitude over time (FIGURE).[6] Whereas the major mechanism of early benefit is likely a consequence of myocardial salvage, the extent

to which the "open artery" exerts a beneficial impact independent of any effect on salvage remains controversial, awaiting results of ongoing trials.[12-15] Moreover, the specific time period for reperfusion in humans during which salvage occurs is unknown and subject to modifying influences, including presence of functioning collaterals, myocardial oxygen demands, ischemic preconditioning, and the duration of sustained ischemia (Figure).

**Time to Treatment.** Despite recent advances, the goal of optimal reperfusion remains enticing but distant. The ability of fibrinolytic therapy to achieve TIMI (Thrombolysis in Myocardial Infarction) grade 3 flow and reduce mortality without increasing bleeding complications appears to have plateaued. Moreover, the risk-benefit ratio of adjunctive antithrombotic strategies is narrowing, and the achievement of overall "myocardial" perfusion is disappointing.

Previously, the metric of reperfusion therapy was the achievement of TIMI grade 3 flow. Multiple recent studies have documented, however, a discrepancy between the establishment of TIMI grade 3 flow and optimal myocardial perfusion.[16-19] Several new grading schemes, including ST-segment resolution and angiographic myocardial blush, have been developed as surrogates of myocardial perfusion and have been shown to provide powerful incremental prognostic information.[18,20,21] In addition, these surrogate markers appear to correlate strongly with time to treatment. The concept that "time is muscle" is well accepted but should be expanded to include the microvasculature and myocyte perfusion.

The superiority of primary PCI over thrombolytics alone may be reduced by transport delays.[22-27] A meta-analysis of trials of transfer for primary angioplasty vs thrombolysis suggested that primary PCI is superior,[28] but this conclusion may be weighted heavily by the prolonged duration of symptoms before admission or randomization in many patients. Patient transfer times in the United States are far longer than in

©2005 American Medical Association. All rights reserved.

European trials such as the Danish Multicenter Randomized Study on Fibrinolytic Therapy vs Acute Coronary Angioplasty in Acute Myocardial Infarction (DANAMI) 2.[28] Obstacles to rapid transfer include greater distances between community and tertiary hospitals in the United States, lack of integrated medical services, inclement weather, and limited experience with centralized myocardial infarction networks.[29]

A meta-analysis of trials of primary PCI vs thrombolytics suggested that the benefits of primary PCI are lost once delay between balloon inflation and administration of fibrinolytics exceeds 1 hour.[3] Moreover, patients with some modicum of flow in the infarction-related artery before intervention have improved outcomes.[30-32] This led to the logical strategy of "facilitated angioplasty" for expanding the benefits of primary PCI to community hospitals without on-site catheterization laboratories.

The impetus driving an approach of facilitated PCI is multifactorial. First, the correlation between symptom onset–to–balloon time and outcomes is strong. In contrast, the relation between door-to-balloon time and outcomes is controversial, but in patients considered at higher risk, mortality has been shown to increase substantially among those treated more than 4 hours after symptom onset[25,26] and more than 3 hours afterward in another trial.[24] Another study demonstrated that after multivariable adjustment, each 30 minutes of delay was associated with a relative risk of 1-year mortality of 1.075 (95% confidence interval [CI], 1.008-1.15; P=.04).[33] However, the National Registry of Myocardial Infarction (NRMI) demonstrated discordance between symptom onset–to–balloon time, which did not correlate with mortality, in contrast with the strong relationship between door-to-balloon time and mortality (especially with >2-hour delays).[22] In large multicenter studies, door-to-balloon time possibly is a surrogate for quality of care, and the time between symptom onset and start of therapy is the major determinant of the duration of ischemia and extent of salvage. An alternative explanation is that door-to-balloon times are dependent on the severity of illness, in that "sicker" patients may have longer door-to-balloon times because of the need for additional procedures and a prolonged time to reperfusion.

Logically, the impact of shorter door-to-balloon times is likely to be greatest in patients presenting early after onset of symptoms (<1-2 hours), as was the case in the Controlled Abciximab and Device Investigation to Lower Late Angioplasty Complications (CADILLAC) trial.[24]

Impact of Preprocedure TIMI Flow. Restoration of infarction-related artery blood flow, particularly TIMI grade 3 flow, is associated with improved outcome whether reperfusion is spontaneous or follows pretreatment with fibrinolytics.[34]

Previous Studies of Immediate Angioplasty After Thrombolytic Therapy. Various strategies of facilitated PCI are the subject of ongoing trials. Between 1987 and 1997, trials comparing angiography, with routine angioplasty performed early after thrombolytic therapy, and a conservative, ischemia-driven approach demonstrated variable differences in death and myocardial infarction and ejection fraction (TABLE 1).[35-38] Recurrent ischemic events, however, were significantly reduced by the use of an aggressive approach. However, these trials occurred in an era reflecting a mechanical and pharmacological "learning curve" of PCI.[42] These trials antedated the use of steerable wires, low-profile guiding catheters, stents, distal protection and thrombectomy devices, low osmolar contrast agents, and high-resolution imaging. Moreover, the adjunctive pharmacological therapy used in these earlier trials is obsolete in that platelet inhibitors, thienopyridines, direct thrombin inhibitors, and liberal use of statins had not been adopted; indeed, some trials did not routinely administer aspirin or its use was delayed for 24 hours.[35] Other advances, including use of smaller sheaths, lower doses of heparin, vascular closure devices, and point-of-care monitoring of activated clotting times will likely reduce bleeding. Two recent nonrandomized analyses of early angiography after fibrinolytic therapy showed safety and a trend toward efficacy and suggest that contemporary outcomes are substantially better.[43,44] The results of several recently presented small randomized trials are described below and in Table 1 and TABLE 2.

Pilot Studies of Facilitated Angioplasty. Several pilot studies of facilitated PCI used reduced-dose thrombolytic agents (Table 2). In the Plasminogen-Activator Angioplasty Compatibility Trial (PACT), patients were assigned to reduced-dose tissue plasminogen activator (50 mg) vs placebo in addition to aspirin and heparin, followed by early angiography.[34] Patients in the tissue plasminogen activator arm had a higher rate of TIMI grade 3 flow at angiography (33% vs 18%; P<.001), and the discharge ejection fraction was highest among patients with preintervention TIMI grade 3 flow in contrast with those in whom this was achieved only after intervention. Clinical outcomes were similar in the 2 groups on an intention-to-treat basis.

A trend toward less favorable outcomes with facilitated PCI compared with primary percutaneous transluminal coronary angiography was noted in 2 trials using intravenous streptokinase[47,48] and in 1 arm of a small trial using alteplase.[49] Combination therapy with a fibrinolytic and glycoprotein IIb/IIIa inhibitor produced a modest increase in TIMI grade 3 flow rates in 2 small trials.[50] In the Bavarian Reperfusion Alternatives Evaluation (BRAVE), 253 patients were assigned before referral for primary PCI to half-dose reteplase plus abciximab vs abciximab alone.[45] Initial TIMI grade 3 flow rates were higher with combination therapy (40% vs 18%; P<.001), but there was no difference in final infarction size, and bleeding complications were significantly increased in the combination group. Lack of reduction in infarction size may reflect that although drugs were administered approximately 2.5 hours after symptom onset, flow may not be restored until 30 to 45

©2005 American Medical Association. All rights reserved.

PHARMACOLOGICAL FACILITATION OF PRIMARY ANGIOPLASTY

**Table 1.** Studies of Early Angioplasty After Thrombolytic Therapy

| Source | No. of Patients | Strategies | Results |
|---|---|---|---|
| Rogers et al,[33] 1990 | 586 | Immediate angiography vs deferred angiography/PTCA (18-48 h) vs ischemia-driven angiography (either spontaneous or positive stress test) | No difference in EF Increased rate of CABG and transfusion requirements in immediate angiography group Similar 1-y mortality |
| Simoons et al,[35] 1988 | 367 | Invasive strategy (angiography 6-155 min after thrombolysis) vs noninvasive strategy (tissue plasminogen activator, aspirin, and heparin) | Trend toward increased mortality, recurrent ischemia and bleeding in noninvasive group |
| SWIFT Trial Study Group,[37] 1991 | 800 | Early angiography in all, followed by randomization to revascularization vs conservative care | No difference in mortality, reinfarction, angina, rest pain, or EF at 12 mo |
| Barbash et al,[38] 1990 | 201 | Invasive angiography at 5 d (SD, 2 d) vs conservative (ischemia-driven) approach | No difference in reinfarction No difference in reinfarction or ventricular function at discharge and at 8 wk No difference in 10-mo mortality |
| Topol et al,[15] 1987 | 386 | Immediate angiography vs elective angioplasty at 7 to 10 d after initially successful thrombolysis (patients with occluded vessels were excluded) | In immediate arm, increased bleeding No difference in left ventricular function, reocclusion, and recurrent ischemia |
| LeMay,[39] 2004 | 170 | Tenecteplase in all patients, followed by randomization to immediate angiography (facilitated PCI) vs standard care | No difference in bleeding In facilitated PCI arm, decreased incidence of new-onset ischemia and trend toward decrease in recurrent myocardial infarction |
| Scheller et al,[40] 2003 | 197 | Fibrinolytics in all patients, followed by randomization to angiography <6 h vs elective angiography at 2 wk | Decrease in ischemic events, reinfarction, death, and target vessel revascularization at 6 mo in early stenting group |
| Fernandez-Aviles et al,[41] 2004 | 500 | Thrombolysis in all followed by angiography (<24 h) vs ischemia-guided angiography | No difference in bleeding Reduction in 30-d combined end point of death, reinfarction, and coronary revascularization in early angiography group |

Abbreviations: CABG, coronary artery bypass graft surgery; EF, ejection fraction; PCI, percutaneous coronary intervention; PTCA, percutaneous transluminal coronary angioplasty.

minutes after drug administration, a time at which opening the artery is more important than the time it takes to achieve reperfusion (Figure).

Another recently reported trial compared 2 approaches: namely, primary PCI alone vs tenecteplase and enoxaparin followed by PCI within 3 to 12 hours (facilitated PCI). The latter approach appeared feasible, safe, and superior to PCI alone regarding complete ST-segment resolution at 6 hours (43% vs 61%, respectively; $P=.03$), although clinical outcomes were unchanged.[51]

Several trials evaluated glycoprotein IIb/IIIa inhibitors before PCI and demonstrated a modest benefit at best.[25,52-54] In the large, multicenter Ongoing Tirofiban in Myocardial Infarction Evaluation (ON-TIME) trial, administering tirofiban before transfer for primary PCI had no clinical advantage.[46]

Potential Outcomes of Facilitated PCI. The choice of pharmacological strategies for the facilitation of PCI is complex, with several logical candidates, including fibrinolytics in either full or reduced dose, glycoprotein IIb/IIIa inhibitors alone or in combination, unfractionated heparin, low-molecular-weight heparins, and direct thrombin inhibitors. The combination of fibrinolytics with platelet glycoprotein IIb/IIIa inhibitors has raised concerns about bleeding risks of subsequent "rescue" angioplasty, but there is a paucity of data. In this setting, aspirin and intravenous $\beta$-blockers would be considered standard-of-care adjunctive therapy.[55] Irrespective of the method of facilitation, it should be stressed that the concept of facilitated PCI, while logical, is unproven. Critical to the results of facilitated PCI is the slope of the curve in the Figure; specifically, the region of the curve occupied by the patient population being studied. Using this hypothetical construct, 3 different scenarios can be envisioned.

*Patient Presentation Early After Onset of Symptoms.* With patients presenting early (within 60-90 minutes) after onset of symptoms, the primary objective is to initiate reperfusion therapy as urgently as possible with minimal delay. In the National Registry of Myocardial Infarction (NRMI), approximately 60% of patients treated with reperfusion therapy presented within 2 hours after symptom onset.[56] The data from the Assessment of the Safety and Efficacy of a New Thrombolytic Regimen (ASSENT) 3 trial are less salutary in that the time from symptom onset to treatment was less than 2 hours for only 27% of patients and was within 1 hour for 3.2%.[57]

Whether the therapy given is primary PCI or fibrinolytics depends on the policy of an individual institution, but speed is of the essence. In this respect, the results of the Comparison of Angioplasty and Prehospital Thrombolysis in Acute Myocardial Infarction (CAPTIM) trial of prehospital thrombolytic therapy (plus rescue PCI in approximately 26% of patients) vs primary PCI are relevant. In patients treated within 2 hours, mortality ($P=.06$) and development of cardiogenic shock were reduced by prehospital thrombolytics, but thereafter, the mortality trend favored primary PCI ($P=.47$).[58] The Myocar-

©2005 American Medical Association. All rights reserved.

PHARMACOLOGICAL FACILITATION OF PRIMARY ANGIOPLASTY

**Table 2.** Pilot Studies of Facilitated PCI

| Source | No. of Patients | Strategies | Results |
|---|---|---|---|
| Ross et al,[34] 1999 | 606 | 50 mg tPA vs placebo, followed by immediate angiography<br>Unfractionated heparin in all patients | Increased patency on initial angiography in tPA arm<br>Patent infarction-related artery at initial angiography associated with increased discharge ejection fraction<br>No difference in bleeding |
| Kastrati et al,[45] 2004 | 253 | Half-dose tPA and abciximab (facilitated PCI) vs abciximab alone, followed by immediate angiography | Increased rate of TIMI 3 flow in combination arm<br>No difference in infarction size |
| Van't Hof,[46] 2003 | 507 | Transfer for PPCI in all patients<br>Randomization to tirofiban before transport vs tirofiban on arrival in laboratory | Lower rate of thrombus on initial angiography in pretreatment group<br>No difference in clinical events |
| LeMay,[39] 2004 | 170 | Tenecteplase in all patients, followed by randomization to immediate angiography (facilitated PCI) vs standard care | No difference in bleeding<br>In facilitated PCI arm, decreased incidence of new-onset ischemia and trend toward decrease in recurrent myocardial infarction |
| O'Neil et al,[47] 1992 | 122 | Randomized to streptokinase vs placebo, followed by angiography/PCI in all | No difference in mortality and left ventricular function<br>In streptokinase arm, increased costs and duration, transfusion needs<br>Increased emergency CABG<br>Increased cost and duration of hospital stay |
| Widimský et al,[48] 2000 | 300 | Randomization to streptokinase at community hospital vs streptokinase during transport vs PPCI (no lytics) | Trend in favor of facilitated PCI vs lytics alone in regard to death/reinfarction and stroke<br>Better outcomes with PPCI alone |
| Vermeer et al,[49] 1999 | 224 | Randomized to tPA alone vs tPA and transfer for PCI (facilitated PCI) vs PPCI alone | Trend toward better outcomes with PPCI alone |

Abbreviations: CABG, coronary artery bypass graft; PCI, percutaneous coronary intervention; PPCI, primary percutaneous coronary intervention; TIMI, Thrombolysis in Myocardial Infarction; tPA, tissue plasminogen activator.

dial Infarction Triage Intervention (MITI) trial also demonstrated the striking benefits of very early thrombolytic reperfusion therapy within 70 minutes after symptom onset.[2] Mortality in patients treated early vs later was 1.2% vs 8.7%, infarction size was 4.9% vs 11.2% of the left ventricle, and the predischarge ejection fraction was 53% vs 40%, respectively. Of patients treated with fibrinolytics in another trial, 13.3% had an "aborted" myocardial infarction; this was a remarkable 25% for patients treated within 1 hour of symptom onset.[37]

This observation is consistent with the 50% mortality reduction in the Gruppo Italiano per lo Studio della Streptochinasi nell'Infarto Miocardico (GISSI) 1 trial.[11,59] Moreover, in the Primary Angioplasty in Acute Myocardial Infarction Patients From General Community Hospitals Transported for Percutaneous Transluminal Coronary Angioplasty Units vs Emergency Thrombolysis (PRAGUE) 2 trial, transfer for PCI was superior to fibrinolytic therapy only in the group treated 3 hours after symptom onset.[60] Nonethe-

less, these data must be interpreted cautiously because there is a paucity of comparative data within the first 90 to 120 minutes.

*Patient Presentation After 2 Hours.* In the Global Use of Strategies to Open Occluded Coronary Arteries (GUSTO) 1 and 3 trials, the average time from symptom onset to hospital arrival was 84 minutes. This did not change between 1990 and 1997,[61] during which door-to-needle time shortened from 66 to 48 minutes; thus, symptom-to-treatment time ranged from 132 to 150 minutes. In the NRMI 3 study in 1999, the median door-to-needle time was 34 minutes.[62] This translated into a delay of approximately 2 hours between symptom onset and treatment. In the NRMI 2 study, the mean time from symptom onset to hospital arrival was 114 to 126 minutes (median, 90-102 minutes).[63] Thus, many patients may present at points A and B (Figure), when time dependence of the extent of myocardial salvage is less important. In patients presenting more than 2 hours after symptom onset, Schomig et al[64] demonstrated the superiority of

primary PCI over tissue plasminogen activator therapy for myocardial salvage and infarction size, a finding explicable on the basis of thrombus resistance to fibrinolytics over time, in contrast with sustained efficacy of the mechanical approach.[65]

Moreover, the benefits of thrombolytics late after symptom onset are decreased and the risk of myocardial rupture may be increased.[66,67] In other words, at points A and B on the curve, the emphasis is on restoring arterial patency even though time to treatment is longer. This concept is supported by data from the CADILLAC trial of patients undergoing primary PCI. Survival was greatest when reperfusion was obtained within 3 hours after symptom onset, whereas incremental delays thereafter had little additional mortality effect.[24] Because thrombolytic therapy requires, on average, 45 to 60 minutes before reperfusion occurs,[68] a case can be made for transfer for PCI without preceding fibrinolytic therapy in patients presenting relatively late (ie, ≥3 hours after symptom onset).[38]

©2005 American Medical Association. All rights reserved.

PHARMACOLOGICAL FACILITATION OF PRIMARY ANGIOPLASTY

The crucial question is whether facilitation affects the results of primary PCI in patients presenting 2 to 3 hours after symptom onset. If facilitation moves patients from the plateau to the descending limb of the curve (eg, a shift from point B to point C and from point A to point C in the Figure), a benefit can be expected. The magnitude of benefit and its clinical relevance depends on how far up the curve the population can be shifted. Thus, a shift from point A to point B is unlikely to manifest as a change in any clinically relevant end point. This may explain the results of the BRAVE trial, because the median time from symptom onset to drug administration was 160 to 164 minutes.[45] Modifying factors such as myocardial oxygen demands, ischemic preconditioning, collateral circulation, and the dynamics of thrombosis and intermittent lysis may be important.

Facilitated PCI may improve reperfusion therapy, but not without risk, and there are pitfalls. Whether benefit outweighs risk depends largely on the duration of symptoms or ischemia and the nature of adjunctive therapy (ie, full- or reduced-dose fibrinolytics, platelet inhibitors, or heparin alone). The risk of intracranial bleeding must be considered, particularly among elderly persons, women, patients with hypertension, and those with low body weight.[69] The sequelae of access-site hemorrhage following femoral angiography shortly after fibrinolytic therapy are not minor issues. Moreover, early reperfusion (TIMI grade 3 flow) is unlikely to occur in more than 60% of patients with thrombolysis before PCI, compared with approximately 10% to 20% of patients who achieve TIMI grade 3 flow before angioplasty from endogenous thrombolysis.

Conversely, transfer for PCI without preceding fibrinolytic therapy could be harmful if the delays resulted in a shift in the curve from point D to point C or point B (Figure)—a situation applicable to patients presenting within 1 to 2 hours after symptom onset. For patients presenting more than 2 to 3 hours after symptom onset, in whom the likelihood of facilitation with fibrinolytics

resulting in beneficial outcomes is slim, administration of glycoprotein IIb/IIIa inhibitors before transfer is reasonable because the risk of intracranial hemorrhage is small and the early safety profile of primary PCI is enhanced.[70] However, more data are needed. Crucial components of the clinical evaluation include an assessment of the risk of bleeding with fibrinolytic agents, the hemodynamic stability of the patient, and a realistic estimation of the delay incurred by transfer.

*Alternative Approach to Facilitated PCI.* An alternative approach to facilitated PCI is to treat all patients in community hospitals without facilities for primary PCI with a fibrinolytic or prehospital fibrinolytic strategy, followed by transfer to a referral hospital. A case may be made for direct transfer without prior administration of fibrinolytics in patients presenting more than 2 or 3 hours after symptom onset, as discussed previously. Moreover, in elderly persons, the risk of intracranial hemorrhage is a major factor underlying the risk-benefit ratio of fibrinolytics vs primary PCI.

Whether age 75 to 80 years or older might itself be an indication for transfer without preceding fibrinolytic therapy is a reasonable question for which definitive answers are lacking.[71] For cardiogenic shock, which is characteristically a dynamic and evolving process, the prognosis is so ominous that it is reasonable to attempt some degree of reperfusion using fibrinolytics before transfer.[72] Other factors warranting consideration are whether myocardial infarction is anterior or inferior and the presence of hemodynamic and electrical stability.[73]

Following fibrinolytic therapy, the next step after transfer would be "rescue" PCI in selected patients, as demonstrated in the CAPTIM trial.[58] Transfer for rescue PCI should not be delayed until treatment failure is obvious and the patient is hemodynamically compromised. A high index of suspicion for fibrinolytic failure needs to be maintained, and, when in doubt, transfer should occur earlier. Percutaneous coronary intervention is

logical, but proof of the concept has long been elusive.[74,75] For the majority of stable patients, whether subsequent management should be invasive or conservative is controversial. The Combined Angioplasty and Pharmacological Intervention vs Thrombolysis Alone in Acute Myocardial Infarction (CAPITAL AMI) trial addressed one version of such an approach and suggested that early angiography following fibrinolytics was safe and effective.[39] Similar results were obtained in a German trial that compared early vs delayed angiography after fibrinolytics.[40] The Grupo de Analisis de la Cardiopatia Isquemica Aguda (GRACIA) 1 trial documented the feasibility and safety of routine angiography within 24 hours after symptoms, which resulted in a significant reduction in the duration of hospitalization and in the primary combined end point of death, reinfarction, and revascularization at 12 months.[41,76] Given the frequency and negative impact of reinfarction in addition to data that suggest that this is more likely to occur in patients with severe grades of residual stenosis,[77] predischarge angiography is appropriate; however, the cost implications of the procedure itself and the need for interhospital transfer justify additional randomized trials. If transfer is contemplated, logically, it should be to a hospital with interventional facilities, although such an approach appears to be highly variable within the United States.[78]

These different approaches to reperfusion therapies need to be placed within the context of the debate on the regionalization of acute myocardial infarction care, both in the United States and in other countries. The preferred strategy, whether to transfer to an interventional facility or to the nearest hospital in a particular region, depends heavily on logistical constraints, including transfer times.

## Conclusions

Two key concepts discussed in this review are of profound importance: (1) the Reimer and Jennings wavefront hypothesis of evolving infarction, which has driven the entire field of reperfu-

©2005 American Medical Association. All rights reserved.

sion therapy for almost 3 decades[10]; and (2) the curve of the relationship between time to treatment and extent of myocardial salvage in the clinical arena. These issues should give pause for thought as new strategies are developed. It is the intersection of these 2 concepts that gives rise to the current controversies surrounding reperfusion and forms the basis for the question, "Is the slope of the curve the shape of the future?"

Facilitated PCI is a logical concept that requires rigorous scrutiny of randomized controlled trials encompassing a wide spectrum of patients who present within 2 to 3 hours after symptom onset. Hopefully, the 2 large ongoing trials, Facilitated Intervention With Enhanced Reperfusion Speed to Stop Events (FINESSE)[79] and Assessment of the Safety and Efficacy of a New Thrombolytic Regimen (ASSENT) 4 (Allan Ross, MD, oral communication, June 2004), will result in another step up on the ladder of progress in reperfusion therapy. Nonetheless, to place this potential advance in perspective, the results of recent large registry studies are sobering and disconcerting.[80] Approximately 25% to 30% of eligible patients in the Global Registry of Acute Coronary Events (GRACE) do not receive any form of reperfusion therapy; time to presentation appears to have plateaued, and door-to-treatment times remain disappointingly prolonged.

The issue of facilitated PCI is important and worthy of effort and further study, and the cardiology community eagerly awaits the results in the justifiable expectation that we may have definitive answers to important new questions. The clinical impact of these trials will be enhanced if the patient population enrolled encompasses a wide spectrum of risk. What is unknown is whether novel therapies will be discovered with the ability to shift the curve to enhance the degree of myocardial salvage at any given time of reperfusion.

Nonetheless, the major goal from a societal perspective remains as true today as at the start of the reperfusion era and will not be changed by the results

of trials of facilitated PCI. This goal is to reperfuse an occluded coronary artery in as many eligible patients as possible, as rapidly and safely as possible. The focus must not be only on the nature of the therapy but also on the efficacy and safety of its delivery.

Author Contributions: Dr Gersh had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
Study concept and design: Gersh, Stone, White, Holmes.
Acquisition of data: Holmes.
Analysis and interpretation of data: Stone, White, Holmes.
Drafting of the manuscript: Gersh, Stone, White, Holmes.
Critical revision of the manuscript for important intellectual content: Gersh, Stone, White, Holmes.
Study supervision: Gersh, Stone, Holmes.
Financial Disclosures: None reported.
Funding/Support: Dr White received partial salary funding from the Green Lane Hospital Research and Educational Fund, Auckland, New Zealand.

## REFERENCES

1. Keeley EC, Boura JA, Grines CL. Primary angioplasty versus intravenous thrombolytic therapy for acute myocardial infarction: a quantitative review of 23 randomised trials. Lancet. 2003;361:13-20.
2. Weaver WD, Cerqueira M, Hallstrom AP, et al. Pre-hospital-initiated vs hospital-initiated thrombolytic therapy. JAMA. 1993;270:1211-1216.
3. Nallamothu BK, Bates ER. Percutaneous coronary intervention versus fibrinolytic therapy in acute myocardial infarction. Am J Cardiol. 2003;92:824-826.
4. Angeja BG, Gibson CM, Chin R, et al; National Registry of Myocardial Infarction 2-3. Predictors of door-to-balloon delay in primary angioplasty. Am J Cardiol. 2002;89:1156-1161.
5. Giugliano RP, Braunwald E. Selecting the best reperfusion strategy in ST-elevation myocardial infarction: it's all a matter of time. Circulation. 2003;108:2828-2830.
6. Gersh BJ, Anderson JL. Thrombolysis and myocardial salvage: results of clinical trials and the animal paradigm—paradoxic or predictable? Circulation. 1993;88:296-306.
7. Singh M, Ting HH, Berger PB, Garratt KN, Holmes DR Jr, Gersh BJ. Rationale for on-site cardiac surgery for primary angioplasty: a time for reappraisal. J Am Coll Cardiol. 2002;39:1881-1889.
8. Singh M, Ting HH, Gersh BJ, et al. Percutaneous coronary intervention for ST-segment and non-ST-segment elevation myocardial infarction at hospitals with and without on-site cardiac surgical capability. Mayo Clin Proc. 2004;79:738-744.
9. Wennberg DE, Lucas FL, Siewers AE, et al. Outcomes of percutaneous coronary interventions performed at centers without and with onsite coronary artery bypass graft surgery. JAMA. 2004;292:1961-1968.
10. Reimer KA, Jennings RB. The "wavefront phenomenon" of myocardial ischemic cell death, II: transmural progression of necrosis within the framework of ischemic bed size (myocardium at risk) and collateral flow. Lab Invest. 1979;40:633-644.
11. Boersma E, Maas AC, Deckers JW, Simoons ML. Early thrombolytic treatment in acute myocardial infarction. Lancet. 1996;348:771-775.
12. Braunwald E. Myocardial reperfusion, limitation of infarct size, reduction of left ventricular dysfunc-

tion, and improved survival: should the paradigm be expanded? Circulation. 1989;79:441-444.
13. Califf RM, Topol EJ, Gersh BJ. From myocardial salvage to patient salvage in acute myocardial infarction. J Am Coll Cardiol. 1989;14:1382-1388.
14. Sadanandan S, Buller C, Menon V, et al. The late open artery hypothesis—a decade later. Am Heart J. 2001;142:411-421.
15. Topol EJ, Califf RM, George BS, et al. A randomized trial of immediate versus delayed elective angioplasty after intravenous tissue plasminogen activator in acute myocardial infarction. N Engl J Med. 1987;317:581-588.
16. Roe MT, Ohman EM, Maas AC, et al. Shifting the open-artery hypothesis downstream: the quest for optimal reperfusion. J Am Coll Cardiol. 2001;37:9-18.
17. Steg PG, Thuaire C, Himbert D, et al; DECOPI Investigators. DECOPI (Desobstruction Coronaire en Post-Infarctus): a randomized multi-centre trial of occluded artery angioplasty after acute myocardial infarction. Eur Heart J. 2004;25:2187-2194.
18. Gibson CM, Cannon CP, Murphy SA, et al. Relationship of TIMI myocardial perfusion grade to mortality after administration of thrombolytic drugs. Circulation. 2000;101:125-130.
19. Mathew V, Gersh BJ. To open or not to open: that remains the question. Eur Heart J. 2004;25:2177-2179.
20. Bax M, de Winter RJ, Schotborgh CE, et al. Short-and long-term recovery of left ventricular function predicted at the time of primary percutaneous coronary intervention in anterior myocardial infarction. J Am Coll Cardiol. 2004;43:534-541.
21. Prasad A, Stone GW, Aymong E, et al. Impact of ST-segment resolution following primary angioplasty on outcomes after myocardial infarction in elderly patients. Am Heart J. 2004;147:669-675.
22. Cannon CP, Gibson CM, Lambrew CT, et al. Relationship of symptom-onset-to-balloon time and door-to-balloon time with mortality in patients undergoing angioplasty for acute myocardial infarction. JAMA. 2000;283:2941-2947.
23. Berger PB, Ellis SG, Holmes DR Jr, et al. Relationship between delay in performing direct coronary angioplasty and early clinical outcome in patients with acute myocardial infarction. Circulation. 1999;100:14-20.
24. Brodie BR, Cox DA, Stuckey TD, et al. How important is time to treatment with primary percutaneous coronary intervention for acute myocardial infarction? results from the CADILLAC trial [abstract]. J Am Coll Cardiol. 2003;41(suppl A):368A.
25. Antoniucci D, Valenti R, Migliorini A, et al. Relation of time to treatment and mortality in patients with acute myocardial infarction undergoing primary coronary angioplasty. Am J Cardiol. 2002;89:1248-1252.
26. De Luca G, Suryapranata H, Zijlstra F, et al; ZWOLLE Myocardial Infarction Study Group. Symptom-onset-to-balloon time and mortality in patients with acute myocardial infarction treated by primary angioplasty. J Am Coll Cardiol. 2003;42:991-997.
27. Brodie BR, Stone GW, Morice M-C, et al; Stent Primary Angioplasty in Myocardial Infarction Study Group. Importance of time to reperfusion on outcomes with primary coronary angioplasty for acute myocardial infarction. Am J Cardiol. 2001;88:1085-1090.
28. Dalby M, Bouzamondo A, Lechat P, Montalescot G. Transfer for primary angioplasty versus immediate thrombolysis in acute myocardial infarction: a meta-analysis. Circulation. 2003;108:1809-1814.
29. Waters RE II, Singh KP, Roe MT, et al. Rationale and strategies for implementing community-based transfer protocols for primary percutaneous coronary intervention for acute ST-segment elevation myocardial infarction. J Am Coll Cardiol. 2004;43:2153-2159.
30. Brodie BR, Stuckey TD, Hansen C, Muncy D. Benefit of coronary reperfusion before intervention on outcomes after primary angioplasty for acute myocardial infarction. Am J Cardiol. 2000;85:13-18.

©2005 American Medical Association. All rights reserved.

31. Stone GW, Cox D, Garcia E, et al. Normal flow (TIMI-3) before mechanical reperfusion therapy is an independent determinant of survival in acute myocardial infarction. *Circulation.* 2001;104:636-641.

32. De Luca G, Ernst N, Zijlstra F, et al. Preprocedural TIMI flow and mortality in patients with acute myocardial infarction treated by primary angioplasty. *J Am Coll Cardiol.* 2004;43:1363-1367.

33. De Luca G, Suryapranata H, Ottervanger JP, Antman EM. Time delay to treatment and mortality in primary angioplasty for acute myocardial infarction. *Circulation.* 2004;109:1223-1225.

34. Ross AM, Coyne KS, Reiner JS, et al; PACT Investigators. A randomized trial comparing primary angioplasty with a strategy of short-acting thrombolysis and immediate planned rescue angioplasty in acute myocardial infarction: the PACT trial. *J Am Coll Cardiol.* 1999;34:1954-1962.

35. Rogers WJ, Baim DS, Gore JM, et al; TIMI II-A Investigators. Comparison of immediate invasive, delayed invasive, and conservative strategies after tissue-type plasminogen activator. *Circulation.* 1990;81:1457-1476.

36. Simoons ML, Arnold AER, Betriu A, et al; European Cooperative Study Group for Recombinant Tissue-Type Plasminogen Activator (rTPA). Thrombolysis with tissue plasminogen activator in acute myocardial infarction. *Lancet.* 1988;1:197-203.

37. SWIFT Trial Study Group. SWIFT trial of delayed elective intervention v conservative treatment after thrombolysis with anistreplase in acute myocardial infarction. *BMJ.* 1991;302:555-560.

38. Barbash GI, Roth A, Hod H, et al. Randomized controlled trial of late in-hospital angiography and angioplasty versus conservative management after treatment with recombinant tissue-type plasminogen activator in acute myocardial infarction. *Am J Cardiol.* 1990;66:538-545.

39. LeMay M. Combined Angioplasty and Pharmacological Intervention versus Thrombolysis Alone in Acute Myocardial Infarction (CAPITAL AMI trial). Paper presented at: Annual Scientific Sessions of the American College of Cardiology; March 7, 2004; New Orleans, La.

40. Scheller B, Hennen B, Hammer B, et al; SIAM III Study Group. Beneficial effects of immediate stenting after thrombolysis in acute myocardial infarction. *J Am Coll Cardiol.* 2003;42:634-641.

41. Fernandez-Aviles F, Alonso JJ, Castro-Beiras A, et al; GRACIA Group. Routine invasive strategy within 24 hours of thrombolysis versus ischaemia-guided conservative approach for acute myocardial infarction with ST-segment elevation (GRACIA-1): a randomised controlled trial. *Lancet.* 2004;364:1045-1053.

42. O'Neill WW. "Watchful waiting" after thrombolysis. *J Am Coll Cardiol.* 2003;42:17-19.

43. Schweiger MJ, Cannon CP, Murphy SA, et al; TIMI 10B and TIMI 14 Investigators. Early coronary intervention following pharmacologic therapy for acute myocardial infarction (the combined TIMI 10B-TIMI 14 experience). *Am J Cardiol.* 2001;88:831-836.

44. Herrmann HC, Moliterno DJ, Ohman EM, et al. Facilitation of early percutaneous coronary intervention after reteplase with or without abciximab in acute myocardial infarction: results from the SPEED (GUSTO-4 Pilot) trial. *J Am Coll Cardiol.* 2000;36:1489-1496.

45. Kastrati A, Mehilli J, Schlotterbeck K, et al; Bavarian Reperfusion Alternatives Evaluation (BRAVE) Study Investigators. Early administration of reteplase plus abciximab vs abciximab alone in patients with acute myocardial infarction referred for percutaneous coronary intervention: a randomized controlled trial. *JAMA.* 2004;291:947-954.

46. Van't Hof A. ON-TIME: Ongoing Tirofiban in Myocardial Infarction Evaluation. Paper presented at: Annual Scientific Sessions of the American College of Cardiology; March 30-April 2, 2003; Chicago, Ill.

47. O'Neill WW, Weintraub R, Grines CL, et al. A prospective, placebo-controlled, randomized trial of intravenous streptokinase and angioplasty versus lone angioplasty therapy of acute myocardial infarction. *Circulation.* 1992;86:1710-1717.

48. Widimský P, Groch L, Zelizko M, Aschermann M, Bednár F, Suryapranata H; PRAGUE Study Group Investigators. Multicentre randomized trial comparing transport to primary angioplasty vs immediate thrombolysis vs combined strategy for patients with acute myocardial infarction presenting to a community hospital without a catheterization laboratory. *Eur Heart J.* 2000;21:823-831.

49. Vermeer F, Oude Ophuis AJ, van den Berg EJ, et al. Prospective randomised comparison between thrombolysis, rescue PTCA, and primary PTCA in patients with extensive myocardial infarction admitted to a hospital without PTCA facilities: a safety and feasibility study. *Heart.* 1999;82:426-431.

50. Eisenberg MJ, Jamal S. Glycoprotein IIb/IIIa inhibition in the setting of acute ST-segment elevation myocardial infarction. *J Am Coll Cardiol.* 2003;42:1-6.

51. Fernandez-Aviles F, Alonso JJ, Castro-Beiras A, et al; GRACIA-2 Investigators. Primary optimal PCI versus facilitated intervention (tenecteplase plus stenting) in patients with ST-elevated acute myocardial infarction: the GRACIA-2 randomised trial [abstract]. *Circulation.* 2003;108(suppl):IV468.

52. Topol EJ, Neumann FJ, Montalescot G. A preferred reperfusion strategy for acute myocardial infarction. *J Am Coll Cardiol.* 2003;42:1886-1889.

53. Stone GW, Grines CL, Cox DA, et al; Controlled Abciximab and Device Investigation to Lower Late Angioplasty Complications (CADILLAC) Investigators. Comparison of angioplasty with stenting, with or without abciximab, in acute myocardial infarction. *N Engl J Med.* 2002;346:957-966.

54. Moliterno DJ, Chan AW. Glycoprotein IIb/IIIa inhibition in early intent-to-stent treatment of acute coronary syndromes: EPISENT, ADMIRAL, CADILLAC, and TARGET. *J Am Coll Cardiol.* 2003;41(suppl S):49S-54S.

55. Halkin A, Grines CL, Cox DA, et al. Impact of intravenous beta-blockade before primary angioplasty on survival in patients undergoing mechanical reperfusion therapy for acute myocardial infarction. *J Am Coll Cardiol.* 2004;43:1780-1787.

56. Magid DJ, Calonge BN, Rumsfeld JS, et al; National Registry of Myocardial Infarction 2 and 3 Investigators. Relation between hospital primary angioplasty volume and mortality for patients with acute MI treated with primary angioplasty vs thrombolytic therapy. *JAMA.* 2000;284:3131-3138.

57. Taher T, Fu Y, Wagner GS, et al. Aborted myocardial infarction in patients with ST-segment elevation. *J Am Coll Cardiol.* 2004;44:38-43.

58. Steg PG, Bonnefoy E, Chabaud S, et al; Comparison of Angioplasty and Prehospital Thrombolysis in Acute Myocardial Infarction (CAPTIM) Investigators. Impact of time to treatment on mortality after prehospital fibrinolysis or primary angioplasty. *Circulation.* 2003;108:2851-2856.

59. Gruppo Italiano per lo Studio della Streptochinasi nell'Infarto Miocardico (GISSI). Effectiveness of intravenous thrombolytic treatment in acute myocardial infarction. *Lancet.* 1986;1:397-402.

60. Widimský P, Budešínský T, Vorác D, et al; 'PRAGUE' Study Group Investigators. Long distance transport for primary angioplasty vs immediate thrombolysis in acute myocardial infarction *Eur Heart J.* 2003;24:94-104.

61. Welsh RC, Ornato J, Armstrong PW. Prehospital management of acute ST-elevation myocardial infarction. *Am Heart J.* 2003;145:1-8.

62. Rogers WJ, Canto JG, Lambrew CT, et al. Temporal trends in the treatment of over 1.5 million patients with myocardial infarction in the US from 1990 through 1999. *J Am Coll Cardiol.* 2000;36:2056-2063.

63. Canto JG, Zalenski RJ, Ornato JP, et al; National Registry of Myocardial Infarction 2 Investigators. Use of emergency medical services in acute myocardial infarction and subsequent quality of care. *Circulation.* 2002;106:3018-3023.

64. Schomig A, Ndrepepa G, Mehilli J, et al. Therapy-dependent influence of time-to-treatment interval on myocardial salvage in patients with acute myocardial infarction treated with coronary artery stenting or thrombolysis. *Circulation.* 2003;108:1084-1088.

65. Zeymer U, Tebbe U, Essen R, et al; ALKK-Study Group. Influence of time to treatment on early infarct-related artery patency after different thrombolytic regimens. *Am Heart J.* 1999;137:34-38.

66. Becker RC, Charlesworth A, Wilcox RG, et al. Cardiac rupture associated with thrombolytic therapy: impact of time to treatment in the Late Assessment of Thrombolytic Efficacy (LATE) study. *J Am Coll Cardiol.* 1995;25:1063-1068.

67. Honan MB, Harrell FE Jr, Reimer KA, et al. Cardiac rupture, mortality and the timing of thrombolytic therapy: a meta-analysis. *J Am Coll Cardiol.* 1990;16:359-367.

68. Lew AS, Laramee P, Cercek B, et al. The effects of the rate of intravenous infusion of streptokinase and the duration of symptoms on the time interval to reperfusion in patients with acute myocardial infarction. *Circulation.* 1985;72:1053-1058.

69. Van de Werf F, Barron HV, Armstrong PW, et al; ASSENT-2 Investigators. Incidence and predictors of bleeding events after fibrinolytic therapy with fibrin-specific agents: a comparison of TNK-tPA and rt-PA. *Eur Heart J.* 2001;22:2253-2261.

70. Tcheng JE, Kandzari DE, Grines CL, et al; CADILLAC Investigators. Benefits and risks of abciximab use in primary angioplasty for acute myocardial infarction. *Circulation.* 2003;108:1316-1323.

71. White HD. Thrombolytic therapy in the elderly. *Lancet.* 2000;356:2028-2030.

72. French JK, Feldman HA, Assmann SF, et al. Influence of thrombolytic therapy, with or without intra-aortic balloon counterpulsation, on 12-month survival in the SHOCK trial. *Am Heart J.* 2003;146:804-810.

73. Berger PB, Ryan TJ. Inferior myocardial infarction: high-risk subgroups. *Circulation.* 1990;81:401-411.

74. Schomig A, Ndrepepa G, Mehilli J, et al; STOPAMI-4 Study Investigators. A randomized trial of coronary stenting versus balloon angioplasty as a rescue intervention after failed thrombolysis in patients with acute myocardial infarction. *J Am Coll Cardiol.* 2004;44:2073-2079.

75. Sutton AG, Campbell PG, Graham R, et al. A randomized trial of rescue angioplasty versus a conservative approach for failed fibrinolysis in ST-segment elevation myocardial infarction. *J Am Coll Cardiol.* 2004;44:287-296.

76. Verheugt FW. Lyse now, stent later: the grace of GRACIA. *Lancet.* 2004;364:1014-1015.

77. Grech ED, Sutton AG, Campbell PG, et al. Reappraising the role of immediate intervention following thrombolytic recanalization in acute myocardial infarction. *Am J Cardiol.* 2000;86:400-405.

78. Canto JG, Rogers WJ, Zhang Y, et al; National Registry of Myocardial Infarction 2 Investigators. The association between the on-site availability of cardiac procedures and the utilization of those services for acute myocardial infarction by payer group. *Clin Cardiol.* 1999;22:519-524.

79. Ellis SG, Armstrong P, Betriu A, et al; FINESSE Investigators. Facilitated percutaneous coronary intervention versus primary percutaneous coronary intervention. *Am Heart J.* 2004;147:e16.

80. Eagle KA, Goodman SG, Avezum A, Budaj A, Sullivan CM, López-Sendón J; GRACE Investigators. Practice variation and missed opportunities for reperfusion in ST-segment-elevation myocardial infarction. *Lancet.* 2002;359:373-377.

  ©2005 American Medical Association. All rights reserved.

EXHIBIT 13

1    Francis G. Fleming, 004375
2    ffleming@kreindler.com
    Robert J. Spragg, *pro hac vice*
3    rspragg@kreindler.com
    KREINDLER & KREINDLER LLP
4    750 Third Avenue, 32nd Floor
5    New York, NY 10017
    Tel.: (212) 687-8181
6    Fax: (212) 972-9432

7
8    Stephen M. Dichter, 004043
    sdichter@cdslawfirm.com
9    CHRISTIAN DICHTER & SLUGA, P.C.
    2700 North Central Avenue, Suite 1200
10    Phoenix, Arizona 85004
    Tel: (602) 792-1700
11    Fax: (602) 792-1710

12
    *Attorneys for Plaintiff Linda Ann Baillie*
13

14             UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ARIZONA
15
    ----------------------------------------------------------x
16    LINDA ANN BAILLIE, individually, as      Case No.: 2:14-CV-00420-SMM
    Personal Representative of the Estate of
17    JAMES DONALD BAILLIE, II, and on
    behalf of all heirs and next of kin of      **DECLARATION OF ROBERT C.**
18    JAMES DONALD BAILLIE, II,        **CANDIPAN, PH.D., M.D.**
19    deceased,

20
                  Plaintiff,
21       v.

22
23    MEDAIRE, INC., STEVEN JOE
    REINHART, D.O. and JESSICA
24    MONAS, M.D.,

25
                Defendants.
26     ----------------------------------------------------------x

27

28

              DECLARATION OF ROBERT C. CANDIPAN, PH.D., M.D.

1    I, Robert C. Candipan, Ph.D., M.D., declare as follows:

2

3    1.    I declare under penalty of perjury that the attached expert reports dated

4    February 1, 2016 and June 22, 2016 are true and correct copies of my reports in this case

5    and contain true and correct statements of the opinions that I have offered in connection

6    with this action.

7    Executed this 13ᵗʰ day of October, 2016.

8

9

10    _____

11    ROBERT C. CANDIPAN, PH.D., M.D.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

DECLARATION OF ROBERT C. CANDIPAN, PH.D., M.D.