EXHIBIT 14

Robert C. Candipan, Ph.D., M.D., FSCAI, FACC
HonorHealth Heart Institute
9250 N Third Street, Suite 3010
Phoenix, AZ 85020
(602) 861-1169
(480) 253-7233 cell
candipanmd@yahoo.com

Robert J. Spragg
Francis G. Fleming
Kreindler and Kreindler LLP
750 Third Avenue
New York, NY 10017-2703
(212) 687-8181
Fax  (212) 972-9432

Dear Mr. Spragg and Mr. Fleming:

You have asked me to review the records and documents pertaining to this matter and
deliver objective opinions relating to my review and provide you a report with an
overview of those opinions and the basis of those opinions. I have done so in this letter
report.

Expert Qualifications

I am qualified to provide expert opinions on this case as I have over 20 years of
experience in cardiology. In my current position I actively practice general and
interventional cardiology. On a routine basis I take care of patients with ST segment
myocardial infarctions, acute coronary syndrome, congestive heart failure, vascular
disease and arrhythmias. In addition, I interact and perform consultations requested by
physicians in Emergency Departments.

I am currently an interventional cardiologist in Phoenix, Arizona and have practiced on a
continuous basis since 1997. I completed medical school at the University of Miami
Miller School of Medicine in 1987. My residency in Internal Medicine was at the
University of Southern California School of Medicine/Los Angeles County Hospital. I
completed a fellowship in Cardiovascular Disease at Stanford University in 1993 and
then spent an additional 2 years as a research fellow in Vascular Biology and Medicine
also at Stanford. My final year of training was in Interventional Cardiology at Sequoia
Hospital in Redwood City, California from 1995-1996. In my career I have held several
academic appointments. I was an Assistant Professor of Medicine at the University of
Utah School of Medicine. At the University of Illinois at Chicago I was also an Assistant
Professor of Medicine. While at that Institution I was also the Director of the Cardiac
Catheterization Laboratory, the Director of the Cardiac Intensive Care Unit and the

2

Director of the Chest pain unit. In addition, I was the founding Director of the Interventional Cardiology Fellowship program At the University of Kansas School of Medicine I served as the Co-Director of the STEMI program and was the founding Director of the Interventional Cardiology fellowship.

My current day to day activities include performing clinical consultations in cardiology, routine management of cardiac conditions in outpatient and hospital settings, reading echocardiograms and stress tests, and performing cardiac catheterizations, peripheral vascular angiograms as well as coronary and peripheral interventions. I am active in taking STEMI call for the hospital and treat on a daily basis patients suffering from myocardial infarctions. During my career I have performed approximately 10,000 cardiac catheterization lab procedures.

Overview

Mr. Baillie was a 61 year old man who suffered an extensive myocardial infarction while traveling on British Airways flight 289 on March 23 2102 ("BA289"). This was a lengthy nonstop flight from London to Phoenix. He began to experience chest pain after takeoff and had unrelenting chest pain for the duration of his flight despite treatment with supplemental oxygen and self-administering aspirin. He was cared for by the BA289 crew as well as a physician traveling on the flight. The physician, Dr. Verma, assessed Mr. Baillie at various points during the flight and observed that he did not look well and noted at least once that he should be in a hospital. Four communications with two different MedAire/MedLink physicians were made. In these communications observations were made known to the MedAire/MedLink physicians as to Mr. Baillie's condition including persistent chest pain and shortness of breath, however there were no direct communications by the MedAire/MedLink physicians with the Captain or Co-Pilots as to the potential that Mr. Baillie was facing a life threatening condition. In addition, no recommendation for diversion of the flight was made so that he could have treatment of this condition. The nearly 11 hour flight continued as planned to Phoenix without diversion. Shortly after arrival in Phoenix Mr. Baillie was taken from the aircraft to St. Luke's Medical Center in Phoenix, where the diagnosis of a myocardial infarction was promptly made, he was intubated and placed on mechanical ventilation and underwent an emergent cardiac catheterization procedure. This confirmed an acute occlusion of the Left Anterior Descending Coronary artery (LAD). He underwent angioplasty and stenting of the LAD with alleviation of the occlusion and restoration of blood flow. Unfortunately he had already suffered significant necrosis of his myocardium and he was in cardiogenic shock on initial presentation at the hospital. He required vasopressor drug therapy and an intra-aortic balloon pump because of his hemodynamic instability. A review of his initial cardiac enzymes obtained show that the levels were all greater than 20 times the upper limit of normal. Based on this data as well as the symptoms that occurred during the flight, it is apparent that his infarction started approximately 6-8 hours prior to his arrival at St. Luke's.

It is readily apparent that at multiple points during the flight the MedAire /MedLink physicians were provided with ample clinical information to consider that Mr. Baillie's

3

symptoms were highly indicative of a myocardial infarction. However, it does not appear that his symptoms, vital signs and observations by the crew and Dr. Verma were given enough weight by the MedAire/MedLink physicians to conclude that a myocardial infarction was a likely diagnosis, and if it was considered, the potential severity was not made clear to the pilot or crew of the aircraft. Given this unexpected and unusual response to his medical condition by the MedAire/MedLink physicians, a lengthy delay in allowing Mr. Baillie to be properly treated occurred and he suffered large and extensive myocardial necrosis as a result.

<u>Summary and Discussion</u>

Prior to Mr. Baillie's myocardial infarction, he was a healthy 61 year old man who was employed as a Vice President of a semiconductor company. His medical history was minimal and remarkable for a remote history of closed head trauma as a result of a motor vehicle accident while in his 30's and the removal of a benign nodule on his vocal cord in 2005.

In March 2011 he underwent an executive physical examination at the Mayo Clinic in Arizona. This included a colonoscopy that was unremarkable and an exercise treadmill test that was interpreted to be consistent with possible ischemia. This was followed in short time by a stress echocardiogram that was interpreted to be negative for ischemia. His echo images revealed a left ventricular ejection fraction (EF) to be 50-55%, which is in the normal range. Based on these findings he was felt to be in good health.

While traveling for business on March 23, 2012, Mr. Baillie took a British Airways flight from London to Phoenix. He had hurried to make this flight and shortly after boarding had asked a flight attendant for water and indicated that he was feeling short of breath. At that time he asked that flight attendant if he was all right to fly and it was indicated to him that he should sit back and relax and that be should be feeling better with some rest. The flight departed the gate at 1512 UTC, shortly after the scheduled time, and took off at about 1546 UTC. Approximately 45 minutes after takeoff, Mr. Baillie told a flight attendant that he was not feeling well and was continuing to feel short of breath. A short time later, about 1700 UTC, Mr. Baillie told the flight attendant that he was having pain in his chest. He was advised to sit in a reclined position and he was administered oxygen. His symptoms did not resolve and he continued to experience central chest pain and shortness of breath.

A review of the transcript of the communications between the flight crew and MedAire/MedLink revealed that given his continuing symptoms, at 1845 UTC, approximately 3 hours after takeoff, MedAire/MedLink was contacted by the crew of BA289. The flight crew provided a description of a passenger, 61 year old male, with central chest pain and shortness of breath feeling hot and looking pale. At 1850 UTC, Dr. Reinhart, the MedAire/MedLink physician, spoke with a crew member. Dr. Reinhart was told that Mr. Baillie was a 61 year old male with central chest pain and is pale. He was informed that Mr. Baillie had taken an aspirin about 3 hours 20 minutes prior. At that point, Dr. Reinhart advised the crew to continue oxygen and have a medical person

4

evaluate him and obtain vital signs. A physician (Dr. Verma, a radiologist) was identified on board and was asked to assist in evaluating Mr. Baillie. His assessment included talking with Mr. Baillie who per his observation was not very communicative. Dr. Verma obtained a blood pressure that was 100/70, felt that Mr. Baillie's pulse was irregular, heard crackles in his chest and observed that he looked pale. He also indicated that to the crew that Mr. Baillie did not look well and needed to be in a hospital. His findings were communicated to the crew and the crew relayed Dr. Verma's findings to Dr. Reinhart at 1912 UTC, including observations that his pulse was irregular and at about 100, his blood pressure was 100/70 and he had crackles in the left chest. He was still having chest pain and was confused. Dr. Reinhart stated Mr. Baillie's blood pressure was too low for nitroglycerin, and there was not a great deal more other than providing oxygen that could be done. Dr. Reinhart advised the crew to proceed to the planned destination, which he noted was 6 hours away. He stated that the passenger would hopefully improve with oxygen. Dr. Reinhart advised the crew to observe Mr. Baillie for signs of deterioration which he explained would be a drop in the blood pressure, if he becomes unresponsive, has color deterioration, becomes ashen or cyanotic, or his chest pain worsens and if so, to call back. Based on the clinical information provided including the symptoms, patient appearance, vital signs and examination remarkable for crackles, a potentially life threatening condition should have been considered by Dr. Reinhart. The finding of crackles in the setting of chest pain should have increased the clinical suspicion that Mr. Baillie was suffering an infarction or an episode of heart failure. It appears that Dr. Reinhart discounted at least some of the information provided by the crew and Dr. Verma. As he stated in his deposition, Dr. Reinhart did not give much "credence" to the crews' report that the on board physician heard crackles. Also it does not appear that the presence of shortness of breath continuing unabated for 3-4 hours was considered by Dr. Reinhart to be indicative of a life threatening illness, and if it was considered it was not discussed with the crew.

Afterwards, Mr. Baillie continued to have symptoms and did not appear to be improving. Dr. Verma and another physician monitored his blood pressure periodically about once per half hour. At 2234 UTC, over three hours after the last contact with Dr. Reinhart, another patch to MedAire /MedLink was made by the crew of BA289 with an update on Mr. Baillie's condition.  It was communicated to MedAire/MedLink that Mr. Baillie's blood pressure was 100/80 and he had a pulse of 100. Dr. Verma informed the crew that the patient was diaphoretic, and having chest pain. Mr. Baillie stated he felt worse. By this time, Dr.Reinhart had gone off shift and was not available to take the call so a different MedAire/MedLink physician had to be involved in the communications with BA289.

At 2238 UTC Dr. Monas, another MedAire /MedLink physician, was brought onto the line to speak with the BA289 crew. Dr. Monas did not appear to be fully aware of what had previously transpired, as the worksheet (MedLink Intake Form) used by Dr. Reinhart to record notes of the prior conversations had minimal information. For instance, the finding of the lung crackles was not documented on the MedLink Intake form and it does not appear that Dr. Monas was aware of this finding. There was also no indication on the Intake Form of the time that the initial call from BA289 was received by

5

MedAire/MedLink, which would have provided Dr. Monas with a clear measure of how long Mr. Baillie's chest pain had been ongoing. Dr. Monas then obtained a new history and she ascertained that Mr. Baillie was having chest pain, had received an aspirin, was on oxygen and did not receive nitroglycerin. Dr. Monas then made a recommendation to give Mr. Baillie nitroglycerin but ultimately it was not given on the advice of Dr. Verma because of Mr. Baillie's low blood pressure. Dr. Monas asked for more history and was informed that Mr. Baillie was not feeling well and having central chest pain and has been on oxygen. There was an observation that he appeared pale. Dr. Monas asked to speak with the on board physician and was told that was not possible due to security procedures. Dr. Monas told the crew of BA289 that MedAire/MedLink would start to look at possible diversion locations but did not actually advise that the flight be diverted, only to continue oxygen. There were no further communications with MedAire /MedLink after this point. It does not appear that at this point that Dr. Monas realized that Mr. Baillie had been having unrelenting chest pain for nearly 7 hours. Again, at this point there was ample clinical data to at least consider that a myocardial infarction was occurring. If she had come to this conclusion the usual and expected response would be to inform the crew of the potentially life threatening condition and recommend a diversion. This did not happen.

The flight continued to Phoenix and landed at 0141UTC. Mr. Baillie was transported from the plane via EMS to St Luke's Medical Center and arrived in the Emergency Department (ED) at 0222 UTC (1922 local time). His evaluation in the Emergency Department included a 12 lead ECG which demonstrated anterior ST elevation consistent with a myocardial infarction, and a CXR demonstrating extensive perihilar infiltrates consistent with pulmonary edema. Point of care blood testing demonstrated elevated cardiac enzymes. Mr. Baillie was intubated by the ED physician, Dr. Hess. He underwent emergent cardiac catheterization and was found to have a thrombotic occlusion in the Left Anterior Descending coronary artery. He subsequently underwent PTCA and stent placement to the LAD. Because of hypotension, he required vasopressor drugs as well as the placement on an intra-aortic balloon pump. He was admitted to the Coronary Care Unit (CCU). An echocardiogram after admission demonstrated that his myocardium had suffered extensive damage with his ejection fraction (EF) dropping from 50-55% in 2011 to an EF of 20% after his myocardial infarction.

Mr. Baillie was mechanically ventilated but was able to be extubated after several days in the CCU. However, he had persistent hypotension and a recurrence of congestive heart failure symptoms and became dependent on IV vasopressor support and was ultimately accepted and transferred to the Mayo Clinic for consideration of a possible heart transplant. His Mayo clinic course was prolonged and difficult. He did have an extensive transplant evaluation. His hospital course was remarkable for re-intubation and eventual tracheostomy, continued dependence on inotropic support, eventual placement of a ventricular assist device and ultimately a total artificial heart in anticipation of a transplant. He required intermittent dialysis, and had multiple infections, and due to multiple complications including thrombosis of the aorta and multiple strokes the artificial heart was removed and Mr. Baillie died on July 1, 2012.

6

From the transcript of the communications between MedAire/MedLink and the BA289 crew, it is apparent that the clinical information that was provided to the MedAire/MedLink physicians was more than adequate for the MedAire/MedLink physicians to come to a working diagnosis that would have placed a myocardial infarction high if not on top of a list of potential medical conditions. It was consistently made known that Mr. Baillie was having continuous chest pain and shortness of breath despite the administration of oxygen, had a low blood pressure and an irregular pulse, was pale, diaphoretic and confused. Both Dr. Reinhart and Dr. Monas are trained Emergency Medicine specialists and encounter patients with chest pain as part of their daily routine and would be expected to consider that this constellation of findings could be and is likely to be a myocardial infarction. Recognizing that a myocardial infarction was a likely scenario should have prompted them to make a recommendation for diversion. In fact, a review of MedAire /MedLink training materials shows that they specify recommending diversion for chest pain that is persisting for over 20 minutes despite treatment. The depositions of Drs. Reinhart, Monas and Streitwieser all reflect that their personal threshold for recommending diversion would be chest pain not responding to treatment for 20-30 minutes. In this case, it was made clear to the MedAire/MedLink physicians that Mr. Baillie's chest pain was continuing for many hours despite oxygen. It is also apparent that there was in this case poor communication /documentation made in the "handoff" from Dr. Reinhart to Dr. Monas. When Dr. Monas took her call from BA289 she was unaware of the findings and events (such as crackles and not being able to administer nitroglycerin to Mr. Baillie) that transpired several hours earlier. This was not in line with what would be considered standard and usual practice in handing off clinical responsibility for an active patient from one physician to another.

Any myocardial infarction is serious, poses significant risks and is potentially life threatening. The risks can be limited with effective and early treatment consisting of alleviating the occlusion that is causing the infarction. Any delay in treatment can increase the potential complications. It is known that in a myocardial infarction "time is muscle". Because of this there are guidelines in place developed by the American Heart Association and the American College of Cardiology that mandate reperfusion treatment to open an occlusion as soon as possible, preferably within 90 minutes. Any significant delay results in increased myocardial necrosis and thus increasing mortality. As an example, as seen in the National Cardiovascular Data Registry, which was a study of 43,801 patients with STEMI, a delay in the time to reperfusion was associated with a higher adjusted risk of in-hospital mortality in a continuous, nonlinear fashion (30 minutes 3.0%, 60minutes 3.5%, 90 minutes 4.3%, 120 minutes 5.6%, 150 minutes 7.0%, and 180 minutes 8.4%; P<0.001). Because of the delay in receiving the expected necessary treatment for his myocardial infarction, Mr. Baillie suffered a significant loss of heart muscle which in turn led to acute and chronic heart failure. Mr. Baillie's was left with a cardiac condition that could only be treated with a heart transplant, which ultimately he was too sick to receive.

Conclusion

In summary, multiple lapses by MedAire/MedLink and its associated physicians, Dr.

7

Reinhart and Dr. Monas, were made. First was the failure by Dr. Reinhart and Dr. Monas to recognize the likelihood that Mr. Baillie's chest pain and associated symptoms were indicative of a myocardial infarction and/or acute coronary syndrome. Secondly, the symptoms and observations made by the BA289 crew and Dr. Verma were not well documented on the MedLink intake form which resulted in a poor handoff from Dr. Reinhart to Dr. Monas. Finally, there was failure of MedAire/MedLink physicians to communicate the potential life threatening nature of Mr. Baillie's conditions to the BA289 crew and pilots. All of the lapses led to Mr. Baillie's treatment being unusually and unexpectedly delayed. Had the diagnosis of a myocardial infarction been suspected, the recommendation of diversion of the flight should have been made and Mr. Baillie would have received earlier treatment of his condition and he would have likely sustained significantly less damage to his heart muscle, and the risk of development of heart failure would have been smaller. The MedAire/MedLink physicians failed to adequately and appropriately respond to Mr. Baillie's life threatening condition. Because of this unusual and unexpected response, Mr. Baillie suffered a massive, complicated myocardial infarction extending over many hours that resulted in end stage heart failure. He was hospitalized for over three months, endured multiple costly procedures including placement of a total artificial heart, and suffered multiple morbid events with resultant multi-organ system failure prior to his untimely death. In my opinion, the Medire/MedLink physicians and staff are responsible for this outcome which was unexpected and accidental and represented a failure to follow procedures and protocol.

I base and render my opinions in this report on reasonable medical probability.

I reserve the right to amend this expert testimony should additional information pertinent to this case become available in the future.

I have reviewed the following documents in the preparation of this report.

Depositions and Transcripts

Deposition of BA Captain Stephen Fowler
Deposition of BA First Officer Alastair Grant
Deposition of BA First Officer Matthew Simmonds
Deposition of BA Customer Service Manager Georgina Bolton
Deposition of BA Flight Attendant Ewa Van Den Berg
Deposition of BA Flight Attendant Nicola Sherrod
Deposition and exhibits of Stephen Joe Reinhart, DO
Deposition and exhibits of Jessica Monas MD
Depositon and exhibits of MedAire CSE Matthew Whitley
Deposition and exhibits of MedAire CSE Michele Tyler
Deposition and exhibits of David Streitwieser MD
Deposition and exhibits of Paulo Alves, MD
Deposition of Ratan K. Verma MD
Deposition and exhibits of Brian Hess MD
Deposition and exhibits of Michael Covalciuc MD

8

<u>Medical Records</u>

Mayo Clinic Annual Physical Exam report for James Donald Baillie II
Mayo Clinic Medical records for James Donald Baillie II
St. Luke's Medical records for James Donald Baillie II

<u>Other Documents</u>
MedAire/Medlink Patch Summary regarding M. Baillie's in-flight medical emergency
MedAire transcript of communications with the subject flight pertaining to Mr. Baillie
Physician and Nurse Reference Manual-MedAire Medical guidelines for air travel
MedAire MedLink Physician Training, The Role of the MedLink Physician
MedLink Physician Orientation Program Reference Manual entitled, "MedLink
Physician Pearls for Remote Clinical Care.
MedLink Physician Orientation Handout dated October 2010
Plaintiff's First Amended Complaint for Wrongful Death and Personal Injuries
Defendants' Answer to Plaintiff's First Amended Complaint

Robert C. Candipan, Ph.D., M.D., FSCAI, FACC
February 1, 2016

EXHIBIT 15

Robert C. Candipan, Ph.D., M.D., FSCAI, FACC
HonorHealth Heart Institute
9250 N Third Street, Suite 3010
Phoenix, AZ 85020
(602) 861-1169
(480) 253-7233 cell
candipanmd@yahoo.com

Robert J. Spragg
Francis G. Fleming
Kreindler and Kreindler LLP
750 Third Avenue
New York, NY 10017-2703
(212) 687-8181
Fax  (212) 972-9432

Dear Mr. Spragg and Mr. Fleming:

I have reviewed the expert opinions of Dr. Roth and Dr. Budoff.

I agree with the statement from Dr. Roth that "chest pain is a common symptom, but reliably detecting patients suffering from acute coronary syndrome (ACS) remains a diagnostic dilemma."

I also concur that multiple causes exist for chest pain and that the approach to a patient with chest pain should consider causes that include, but are not limited to, ACS.

Dr. Roth refers to studies in which up to 1 in 5 patients that present to the emergency department (ED) with chest pain will be found to have ACS.  Therefore, based on these studies, ACS is a common diagnosis that should have been given careful consideration in the case of Mr. Baillie. In addition to ACS, other serious and potentially life threatening conditions that would need to be considered include a pulmonary embolism or an aortic dissection.  The possibility that Mr. Baillie was suffering from one or more of these potentially life threatening conditions should have been communicated to the Captain by Dr. Reinhart and Dr. Monas.

Dr. Roth discussed that in patients that present to an emergency department, it is customary to utilize diagnostic tools to narrow down the potential diagnosis.  It is the norm to take this approach to "rule out" these potentially life threatening conditions prior to assigning a less serious diagnosis.  In the ED, diagnostic tools assist that diagnosis.  However, in Mr. Baillie's case, these tools were not available.  The fact that these tools and their results were not available to the MedAire physicians does not change the fact that Mr. Baillie could have been suffering from a potentially life threatening illness such as a myocardial infarction.  In my opinion, the potential for Mr. Baillie to be experiencing a myocardial infarction should not have been ignored.  The possibility that Mr. Baillie was suffering from a potentially life threatening "malady" should not have been discounted and should have been communicated to the Captain by Dr. Reinhart and Dr. Monas.

In the case of the MedAire physicians, Dr. Roth is of the opinion that Dr. Reinhart and Dr. Monas acted in an appropriate and customary manner when they discounted the findings that were made available to them, including the observations that Mr. Baillie had chest pain, was 61 years old, was pale, looked unwell, and had crackles as reported by a physician. In my opinion, these reported findings should have prompted a concern in both doctors that Mr. Baillie was suffering from a life-threatening illness, including a myocardial infarction.

As to Dr. Budoff's report, I agree with his opinion that Mr. Baillie suffered a serious heart attack; however, I do not agree with his opinion that an earlier interventional treatment of his closed artery would not have changed Mr. Baillie's eventual outcome.

Dr. Budoff concludes that Mr. Baillie's myocardial infarction began as he was rushing to catch his flight in London. Contrary to this, the cardiac enzymes that were obtained on presentation at St. Luke's Medical Center, the hospital where Mr. Baillie was initially treated, support the conclusion that the timing of the start of the myocardial infarction would be 6 - 8 hours prior to his presentation at that hospital. Dr. Budoff states that if Mr. Baillie's artery were to be opened any time greater than 6 hours after the start of the MI, that intervention would not have "saved" Mr. Baillie. However, if the myocardial infarction did start 6 - 8 hours prior to Mr. Baillie's arrival at the hospital, as indicated by the cardiac enzyme analysis, then a diversion would have allowed the treatment to occur within this theoretical 6 hour time-frame.

The chart provided with Dr. Budoff's report depicts the timing of the reperfusion treatment (opening the artery) after an MI and shows that the extent of myocardium salvage after the onset of the infarction diminishes with time. Dr. Budoff states that treatment must occur within a 6 hour window. However, analysis of the chart does depict a benefit, albeit diminished, with interventional treatment later than 6 hours after the onset of the infarction. In my opinion, if the MedAire physicians had performed their duties in a reasonable and expected manner, and considered the diagnosis of a myocardial infarction along with other potentially life threatening conditions and reported those potential life threatening conditions to the Captain, then earlier treatment of Mr. Baillie could have led to a different outcome.

Dr. Budoff also raises concern about the medical necessity of the implantation of the left ventricular assist device (LVAD) in Mr. Baillie, and labeled the implantation of the right ventricular assist device (RVAD) and total artificial heart in Mr. Baillie as medically futile. However, in reviewing the records from the Mayo Clinic, it is clear that the Mayo physicians had felt that these procedures were medically necessary in an attempt to save Mr. Baillie's life. The decisions were based on sound medical judgment and the procedures were only performed after numerous discussions between members of the transplant team and the consulting physicians involved, as well as with Mr. Baillie's family.

Robert C. Candipan, Ph.D., M.D., FSCAI, FACC
June 22, 2016

EXHIBIT 16

ORIGINAL
APRIL 01-2001 — 31/03/04

DATED  August 01.          2001

(1)BRITISH AIRWAYS Plc
(2)MEDAIRE INC

C H-b.

_____

SERVICE AGREEMENT
NUMBER   F12w 00 104   (S12W00908 - POPL)

Document  406831 MedAire Inc  Agreement v 5  of 29.01.01

CONFIDENTIAL

BA 0733



EXHIBIT NO. 29
S. Reinhart
7.7.14
Kate E. Roundy, RPR, CR 50582

INDEX

1. DEFINITIONS AND INTERPRETATION
2. OBLIGATIONS OF MEDAIRE
3. OBLIGATIONS OF BRITISH AIRWAYS
4. SERVICING TEAM
5. TIME FOR PERFORMANCE
6. FEES
7. PAYMENT
8. SET-OFF AND COUNTERCLAIM
9. RIGHT TO AUDIT
10. TERM
11. TERMINATION AND CANCELLATION
12. LIABILITY AND INDEMNITY
13. INSURANCE
14. ASSIGNMENT AND SUB-CONTRACTING
15. INTELLECTUAL PROPERTY
16. CONFIDENTIAL INFORMATION
17. ADVERTISING
18. *NON- SOLICITATION*
19. DATA PROTECTION
20. THIRD PARTIES
21. NO AGENCY OR PARTNERSHIP
22. FORCE MAJEURE
23. ASSIGNMENT
24. ENTIRE AGREEMENT
25. RELIANCE
26. NOTICES
27. SEVERABILITY
28. GENERAL
29. GOVERNING LAW

APPENDIX "A"   THE SERVICES
APPENDIX "B"   SERVICE LEVELAGREEMENT
APPENDIX "C"   FEES
APPENDIX "D"   CHANGE ORDER

Document 406831

# CONFIDENTIAL

BA 0734

THIS AGREEMENT is made this  first. day of August . 2001

**BETWEEN:**

(1)    BRITISH AIRWAYS PLC a company registered in England under number 1777777 and whose registered office is at Waterside. PO Box 365. Harmondsworth. West Drayton, UB7 0GB ("**BA**"): and

(2)    MEDAIRE INC. a company registered in Phoenix Arizona and whose registered office is at 1301 E.McDowell Road. Suite 204 Phoenix AZ 85066 (MedAire Inc)

**WHEREAS:**

(A) MEDAIRE INC. is engaged in business offering Inflight Medical Emergency advisory services and it employs personnel with considerable skill. knowledge and experience in that field.

(B) In reliance upon that skill, knowledge and experience BA wishes to engage MedAire Inc. to provide those services on the terms and conditions set out in this Agreement.

**IT IS AGREED AS FOLLOWS :**

**1.   DEFINITIONS AND INTERPRETATION**

1.1    In this Agreement (except where the context otherwise requires). the following words have the following meanings:

| | |
|---|---|
| "BA Affiliates" | any company which is a parent or subsidiary. associate or affiliate undertaking of BA from time to time. "parent undertaking" and "subsidiary. associate or affiliate undertaking" bearing for this purpose the meaning attributed to them in the Companies Act 1985. together with any BA Franchisees or any of the above and any other parties that may be included in any of BA's insurance policies from time to time: |
| "BA Franchisee" | any body corporate which is from time to time a party to a franchise agreement between it and BA: |
| "BA Procurement" | the designated representative of British Airways Procurement department. namely: |
| | Purchasing Manager. Corporate Services. Waterside (HE3B). |

CONFIDENTIAL

BA 0735

|  |  |
|---|---|
|  | PO Box 365, Harmondsworth, UB7 0GB; |
| "BA Representative" | the designated representative of the BA Medical Services Management department, namely: |
|  | Head of Medical Services British Airways Plc Waterside (HMAG) PO Box 365 Harmondsworth UB7 0GB |
| "Fees" | means the fees payable to MedAire Inc. under this Agreement and specified in Appendix C; |
| "Purchase Order" | a purchase order issued by BA, quoting the contract number and date of this Agreement |
| "Services" | The Services to be undertaken and completed by MedAire Inc. pursuant to this Agreement as described in Appendix A hereto, and any other Services subsequently agreed by the parties and described in a Purchase Order issued by BA |
| "MedAire Inc." | means any member company owned by or associated or affiliated with MedAire Inc. |
| "Term" | The fixed period of this Agreement as defined in Clause 10. |
| "The Consultant(s)" | The employees or any subcontractor of MedAire Inc., approved by British Airways Representative, and designated by MedAire Inc. to undertake the services. |

1.2   In the case of any Services which are described in a Purchase Order rather than in Appendix A, references to Appendix A in this Agreement shall be read as references to the relevant Purchase Order.

1.3   Use of the singular includes the plural and vice versa and the use of any gender includes the other genders;

1.4   Any reference to a statute, statutory provision or subordinate legislation ("legislation") will (except where the context otherwise requires) be construed as referring to such legislation as amended and in force from time to time and to

Document  106823

CONFIDENTIAL

BA 0736

any legislation which re-enacts or consolidates (with or without modification) any such legislation;

1.5    Any phrase introduced by the terms "including", "include", "in particular" or any similar expression will be construed as illustrative and will not limit the sense of the words preceding those terms.

## 2.    OBLIGATIONS OF MedAire Inc.

2.1    MedAire Inc. shall provide the Services specified in Appendix A.

2.2    MedAire Inc. will provide prompt, accurate and comprehensive advice at regular intervals and as and when requested by BA

2.3    MedAire Inc. will provide and perform the Services promptly and efficiently and to the highest professional standard using the techniques and standards and applying the care, skill and diligence required in accordance with best practice in the service provider's industry, profession or trade.

2.4    MedAire Inc. undertakes that:

   2.4.1    it will keep detailed records of all activities undertaken in respect of the Services and will at BA's request make them available for inspection and / or provide copies to BA for the duration of this Agreement and for a minimum of 5 years thereafter, provided no violation of patient confidentiality of ethical standards is involved.

   2.42    it will use its best endeavours to protect the interests of BA in all respects in the provision of the Services.

   2.4.3    it will use its best endeavors to comply with the instructions of BA which may be given from time to time and confirm that it has done so.

## 3    OBLIGATIONS OF BRITISH AIRWAYS

3.1    BA will act upon all reasonable requests made by MedAire Inc. in order to enable it to provide the Services in an efficient manner subject to the requests being normal to BA practice and not involving BA in additional cost.

3.2    BA undertakes to use all reasonable endeavours to:

   3.2.1    provide such other reasonable co-operation as MedAire Inc. may request in order to enable MedAire Inc. to discharge its obligations under this Agreement.

Document 406831

## CONFIDENTIAL

BA 0737

4.    **SERVICING TEAM**

4.1    MedAire Inc. will provide an account servicing team to carry out the Services, headed by an account director responsible for co-ordinating the activities to the servicing team and any other personnel of MedAire Inc. and MedAire Inc. Associates who may be involved in providing the Services. All personnel, whether members of the servicing team or not, shall be fully and sufficiently qualified, proficient and experienced to provide the Services to the standards referred to in Clause 2. The account director shall be responsible for the conduct and control of the work and the timeliness and quality of the Services.

4.2    In the event that BA is not satisfied with the servicing team or any member thereof, BA shall have the right to require MedAire Inc. to replace the servicing team or any member thereof with another satisfactory to BA. Prior to appointing any one to the servicing team for any reason, MedAire Inc. will submit to BA the names and full curricula vitae of the proposed appointee(s) and will permit BA to interview the proposed appointee(s) if deemed necessary by BA.  MedAire Inc. shall not appoint anyone to the servicing team who BA considers unacceptable

4.3    In addition to the above, MedAire Inc. will procure that one of its senior executives is available at all times to assist BA as required in the event of a significant incident or accident involving BA or BA Affiliates or BA Franchisees.

5      **TIME FOR PERFORMANCE**

Time is of the essence in the performance of the Services and MedAire Inc. shall use its best endeavours to ensure such timely performance. In particular, MedAire Inc. shall comply with the Service Level Agreement detailed in Appendix B

6.     **FEES**

6.1    In consideration of MedAire Inc. providing the Services under this Agreement, BA will pay MedAire Inc. the Fees, which for the avoidance of doubt, exclude VAT.

6.2    In any event BA shall not be obliged to pay to MedAire Inc. more than any maximum price which may be specified for the Services in Appendix C or any Purchase Order, [excluding any expenses payable under clause 6.3 below].

6.3    BA shall reimburse MedAire Inc. any additional *exceptional* expenses incurred by MedAire Inc. which may be proper to the provision of such Services providing that such Services have been agreed in advance in writing with the BA Representative. BA shall not be obliged to pay any expenses which are not agreed in advance.

7      **PAYMENT**

Document  406831

CONFIDENTIAL

BA 0738

7.1   MedAire Inc. shall be entitled to submit invoices to BA in respect of the Fees and payment of any sum shall be made within 30 days from the end of the month in which British Airways receives MedAire's invoices and any other appropriate documentation provided that the sums specified in the invoice raised are due and the invoice is correctly addressed.. MedAire Inc. shall also be entitled to submit invoices to BA in respect of sums specified in any Purchase Orders or any other charges or expenses agreed by the BA Representative upon completion of the work specified therein to BA's satisfaction.

7.2   Invoices and credit notes should be clearly marked with the Agreement and /or the Purchase Order number and sent to the BA Representative or other nominee from BA's Medical Department as advised from time to time, together with simultaneous copies to UK Payables Executive or such other person as BA may advise from time, at the following address:

> Payables (R72)
> British Airways Plc
> 1st Floor Athene
> Odyssey Business Park
> West End Road
> Ruislip HA4 6QF

7.3   Payment by BA shall be without prejudice to any claims or rights which BA may have against MedAire Inc. and shall not constitute any admission by BA as to the performance by MedAire Inc. of its obligations under this Agreement.

## 8.   SET-OFF AND COUNTERCLAIM

BA shall have the right to deduct from any sums due or which may become due to MedAire Inc. any sums due or recoverable from MedAire Inc. in respect of any claim whatsoever. MedAire Inc. shall not be entitled to set off against any sums payable to BA any sums which it may be owed or are payable to it by BA.

## 9.   RIGHT TO AUDIT

Without prejudice to clause 2.5.1, MedAire Inc. shall permit access to and provide such assistance as BA may require to the duly authorised representative of BA to inspect, audit and take copies of all books, time-sheets, records, computer records, correspondence, instructions, receipts and memoranda in relation to this Agreement.

## 10   TERM

10.1   Notwithstanding the date of signature hereof, this Agreement shall commence on 1st April 2001 and, subject to Clause 11 (Termination), shall operate on a fixed fee basis for a term of three (3) year(s) (the "Term").

Document 406831

## CONFIDENTIAL

BA 0739

10.2  The Term may be extended by agreement between BA and MedAire Inc., no later than one month prior to expiry. The parties agree to negotiate in good faith to reach such an agreement, including any amendment to the Fees

## 11.  TERMINATION AND CANCELLATION

11.1  The parties may terminate this Agreement or any part hereof by mutual agreement at any time.

11.2  This Agreement or any part hereof may be terminated by BA on giving at least 90 days' notice to MedAire Inc. to expire at any time. In the event that under this clause 11.2 this Agreement is terminated, BA shall be liable to pay reasonable remuneration having regard to the time spent  prior to termination and not previously invoiced. Subject only to the foregoing, BA shall have no liability for any expenses, losses, claims, liabilities or damage whatsoever, whether direct, indirect, or consequential, incurred or suffered by MedAire Inc. as a result of termination under this clause 11.2

11.3  This Agreement may be terminated immediately by British Airways giving written notice to MedAire Inc if MedAire Inc:

11.3.1  breaches any term of this Agreement and the breach is not capable of remedy: or

11.3.2  breaches any term of this Agreement which is capable of remedy MedAire Inc. fails to remedy the breach within seven days after notice from BA specifying the breach and requiring it to be remedied; or

11.3.3  commits a breach of this Agreement which is capable of remedy on more than two occasions in any six month period irrespective of whether the breaches are remedied; or

11.3.4  suspends payment of or becomes unable to pay its debts, or a petition or resolution for the making of an administration order or the winding up of MedAire Inc. is presented or passed, or a liquidator, trustee, supervisor, receiver, administrator, administrative receiver or encumbrancer takes possession of or is appointed over the whole or any part of MedAire Inc.'S assets.

11.4  On termination howsoever arising of this Agreement or any part hereof, MedAire Inc. shall immediately return to BA any BA documents and all copies of such documents in the possession or control of MedAire Inc. or MedAire Inc. Associates. MedAire Inc. will co-operate in good faith with BA and any third party nominated by BA for as long as is required to effect a timely and efficient handing over of MedAire Inc.'s responsibilities under this Agreement.

## 12.  LIABILITY AND INDEMNITY

Document - 4no831

CONFIDENTIAL

BA 0740

MedAire Inc. shall defend, hold harmless and indemnify BA, its directors, officers, employees and agents and BA Affiliates, their directors, officers, employees and agents from and against any loss, claims, costs, (including reasonable legal fees), liabilities, damages and expenses, whether direct, indirect or consequential (including but without limitation loss of profit, loss of goodwill, loss of opportunity and loss of contract) suffered or incurred by BA, its directors, officers, employees or agents or BA Affiliates, their directors, officers, employees and agents arising from or in any way connected with this agreement. BA shall hold harmless and indemnify Medaire Inc. for negligence or wrongful act or omission by BA or its directors, officers, employees, sub-contractors, agents or representatives.

## 13.   INSURANCE

13.1   MedAire Inc. agrees to effect, and maintain throughout the term of this agreement annually and to demonstrate such to BA if so requested. Public Liability Insurance for an amount of not less than one million US dollars ($1.0million) per event in respect of loss, damage or injury to property or persons.

13.2   MedAire Inc. also agrees to effect and maintain Professional Indemnity Insurance for an amount of not less than five million US dollars ($5.0million) per event and demonstrate such to the satisfaction of BA.

13.3   Neither inspection nor receipt of copies of insurance documents shall constitute acceptance by BA of the terms thereof nor waiver of MedAire Inc.'s responsibility hereunder.

## 14.   ASSIGNMENT AND SUB-CONTRACTING

14.1   Neither party may assign this Agreement or any interest therein without the prior written consent of the other party.

14.2   MedAire Inc. may not sub-contract the whole or any part of this Agreement to any company which falls outside of MedAire Inc. without the prior written consent of BA and in the event that such consent is given MedAire Inc. undertakes:

14.2.1   To enter into an agreement with the sub-contractor in substantially the same form as this Agreement

14.2.2   To procure that the sub-contractor complies with its obligations under the said agreement so as to ensure that all the obligations of MedAire Inc. under this Agreement are fully satisfied; and

14.2.3   To ensure that any agent or sub-contractor engaged by MedAire Inc. effects and maintains all insurances required by law and all other insurances as the Services may consider necessary. Any deficiencies in the cover or policy limits of insurances of agents and sub-contractors shall be the sole responsibility of MedAire Inc..

Document 4068.31

## CONFIDENTIAL

BA 0741

## 15  INTELLECTUAL PROPERTY

15.1  BA acknowledges and understands that MedAire is a service provider. and that MedAire has not been hired to develop products, services or technology for BA. but rather has been hired to provide existing MedAire services and products to BA. BA further acknowledges and understands that MedAire has designed and developed its services and products, including its telemedicine, training and emergency medical services, and related products, over many years, and that all intellectual property rights (including patent, copyright, trademark, service mark and trade secret rights) in such services and products belong to MedAire and are not subject to Sections 15.2-15.12 of this Agreement, regardless of whether they are used in the course of, in anticipation of, or for the purpose of the performance of the Services.  Among the intellectual property owned by MedAire and not subject to provisions 15.2-15.12 of this Agreement are (a) the following trademarks and/or service marks, and all related registrations and applications for registration: MedAire: MedLink. MedSpace. MedLink Lifeline, MedAire Europe. the air. sea and land logo. the MedAire "Cross" logo. Expert Care. Everywhere. and all other existing and future trademarks or service marks owned by MedAire. (b) all existing and future copyrights owned by MedAire. including those associated with its website and printed materials. and (c) all technology (whether or not patented or protected by trade secret) owned or licensed by MedAire. including technology related to MedAire's telemedicine, training and emergency medical services. Sections 15.2-15.12 of this Agreement shall only apply to intellectual property specifically developed by MedAire for BA upon BA's written request and according to BA's written specifications.

15.2  All copyright. design rights and other intellectual property rights in any reports, plans. drawings. specifications. other documents. material or methodology produced by MedAire Inc., its directors. employees. agents or sub-contractors in the course of. in anticipation of. for the purpose of the performance of the Services. or pursuant to this Agreement howsoever will belong to and vest in BA.  In the event that any of the above mentioned documents. materials or methods are in whole or part produced by an agent or sub-contractor of MedAire Inc.. MedAire Inc. will procure that the agent or sub-contractor assigns to BA all its copyright. design rights and other intellectual property rights therein.

15.3  Without prejudice to clause 15.2. MedAire Inc. will at the request of BA take all such steps and execute all such assignments and other documents as BA may require to ensure that full title to all intellectual property rights covered by clause 15.1 vests in BA or for the purpose of registering or protecting those rights.

15.4  MedAire Inc. will at BA's request at any time provide to BA the original of all reports, plans. drawings. specifications or other documents or material referred to in clause 15.2. and in any event will provide such originals on the completion of the Service to which they relate.  MedAire Inc. will make no use of such documents or material other than for the purpose of performing the Services.

15.5  All copyright. design rights and other intellectual property rights in documents, material or methods produced by MedAire Inc.. its directors. its employees.

CONFIDENTIAL

agents or sub-contractors (including, for the avoidance of doubt, the Consultants), other than in the course of, in anticipation of or for the purpose of the performance of the Services or pursuant to this Agreement, will vest and remain vested in MedAire Inc., its agents or sub-contractors. Where any such documents or material are provided to BA under this Agreement MedAire Inc. grants to BA a non-exclusive, perpetual, irrevocable, world-wide, royalty free license to use the same for the purposes of its business, such license including the right for BA to make copies and to grant sub-licenses to any third party for any purpose. In the event that in the course of, in anticipation of, for the purpose of the performance of the Services or pursuant to this Agreement, MedAire Inc. its directors, its employees, agents or sub-contractors (including, for the avoidance of doubt, the Consultants) modify or revise any pre-existing document or material all copyright, design rights and other intellectual property rights in the document or material as modified or revised will belong to and vest in BA and clauses 15.2, 15.3 and 15.4 will apply, without prejudice to the rights in the pre-existing document or material and without limiting the ability of MedAire Inc., its agents or sub-contractors to use the pre-existing document or material.

15.6   MedAire Inc. warrants and represents that any reports, plans, drawings, specifications or other documents or material produced by MedAire Inc., its directors, employees, agents or sub-contractors (including, for the avoidance of doubt, the Consultants) in the course of, in anticipation of or for the purpose of the performance of the Services or under this Agreement and the use of the same by BA will not infringe any intellectual property rights of any third party.

15.7   MedAire Inc. warrants and undertakes that the exercise by BA of the rights vested in BA by this clause 15 will not infringe the rights of any third party.

15.8   Without prejudice to clause 15.2 MedAire Inc. warrants and undertakes that MedAire Inc. is the sole legal and beneficial owner of all copyright, design rights and other intellectual property rights which arise out of or in the course of work carried out by, on behalf of or for MedAire Inc. in anticipation of this Agreement and that MedAire Inc. is free to assign all rights in and title to the said intellectual property rights to BA in accordance with clause 15.1 without any third party claims, liens, charges or encumbrances of any kind.

15.9   MedAire Inc. agrees to and will indemnify BA against any and all liability, claims, proceedings, loss, damage, cost and expense (including without limitation legal expenses) which may be incurred or suffered by BA or a third party, whether direct or consequential (including without limitation any economic loss or loss of goodwill) as a result of or in connection with any breach by MedAire Inc. of the warranties contained in this clause 15.

15.10. Title to all intellectual property rights in all drawings, specifications or other material supplied by BA to MedAire Inc. for or in connection with this Agreement will remain vested in BA or any third party which is entitled to such intellectual property rights. On demand and in any event on termination of this Agreement for whatever reason MedAire Inc. will return all originals and copies of such drawings, specifications or other material in its possession and in the possession of its sub-contractors or agents to BA.

Document    46683]

CONFIDENTIAL

BA 0743

15.11  BA grants a non-exclusive license to MedAire Inc. to utilise such of BA's intellectual property rights as are necessary to allow MedAire Inc. to fulfil its obligations under this Agreement and not for any other purpose. This license will terminate automatically on the termination of this Agreement. MedAire Inc. may sub-license those intellectual property rights to its sub-contractors appointed in accordance with this Agreement only to the extent necessary to allow MedAire Inc. to fulfil its obligations under this Agreement.

15.12  In the event that MedAire Inc. becomes aware of any possible, actual or threatened infringement of BA's intellectual property rights which arise out of, in anticipation of or in the course of MedAire Inc.'s performance of this Agreement, MedAire Inc. will immediately notify BA in writing and provide full particulars. BA will in its sole discretion decide what action, if any, to take. Any action taken by BA will be at BA' cost (except for where the action arises as a consequence of MedAire Inc. or Consultant's negligent act or omission in which case the cost of any action will be borne by MedAire Inc.) and in BA' name and MedAire Inc. will give such assistance as BA may reasonably require.

## 16.  CONFIDENTIAL INFORMATION

16.1  This Agreement and all information regarding the technology or business activities of either party made available to the other party under or as a result of this Agreement will at all times be treated by the other party as confidential (unless the same is manifestly within the public domain through no breach of this Agreement) and will not be used for any purpose other than a purpose contemplated by this Agreement, or published or disclosed except with the prior written consent of the other party.  This provision shall survive the termination or expiration of this Agreement.

## 17.  ADVERTISING

Neither MedAire Inc. nor any of its directors, employees, agents or subsidiaries shall, without the written permission of BA Procurement, mention the name of BA in any advertisement or publicity or promotional material.  Such permission shall not be unreasonably withheld.

## 18.  NON-SOLICITATION.

## 19.  DATA PROTECTION

19.1  For the purpose of this Clause 19 the following terms shall have the following definitions:

'the Act' shall mean the UK Data Protection Act 1998 as amended from time to time and any orders and regulations made thereunder;

'Data' shall mean any data held by BA which is transferred or disclosed by or on behalf of BA under this Agreement and any data which is obtained or collected on behalf of BA under this Agreement;

Document 406831

CONFIDENTIAL

BA 0744

'Personal Data' shall mean any Data which consists of information relating to an identified or identifiable natural person (a 'Data Subject'): an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his identity:

'Processing' shall mean obtaining, recording or holding Personal Data or carrying out any operation or set of operations on Personal Data (whether or not by automated means) including organisation, adaptation, alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment, combination, blocking, erasure or destruction, and 'Process' and 'Processed' shall be construed accordingly.

19.2   Where Personal Data is Processed by MedAire Inc., its agents, subcontractors or employees under or in connection with this Agreement, MedAire Inc., its agents, subcontractors and employees shall:-

19.2.1   Process the Personal Data only on behalf of BA, only for the purposes of performing this Agreement and only in accordance with instructions contained in this Agreement or received from BA from time to time;

19.2.2   not otherwise modify, amend or alter the contents of the Personal Data or disclose or permit the disclosure of any of the Personal Data to any third party unless specifically authorised in writing by BA;

19.2.3   at all times comply with the provisions of the seventh principle (the 'Seventh Principle') set out in Part 1 of Schedule 1 to the Act (which provides that appropriate technical and organisational measures shall be taken against unauthorised or unlawful Processing of Personal Data and against accidental loss or destruction of, or damage to, Personal Data) and will ensure that its agents, subcontractors and employees so comply;

19.2.4   upon request from BA inform BA of the measures it has taken to comply with Clause 19.2.3 and take such other measures as BA may require to ensure that it does so comply;

19.2.5   Process the Personal Data in accordance with the rights of Data Subjects under the Act and not do or permit anything to be done which might cause BA in any way to be in breach of the Act;

19.2.6   co-operate as requested by BA to enable BA to comply with any exercise of rights by a Data Subject under the Act in respect of Personal Data Processed by MedAire Inc. under this Agreement or comply with any assessment, enquiry, notice or investigation by the UK Data Protection Commissioner which shall include the provision of all Data requested by BA within the time-scale specified by BA in each case, *provided no violation of patient confidentiality of ethical standards is involved* ;

19.2.7   appoint and identify to BA a named individual within MedAire Inc.'s organisation to act as a point of contact for any enquiries from BA or the UK Data Protection Commissioner relating to Personal Data;

Document 466831

## CONFIDENTIAL

BA 0745

19.2.8 not process the Personal Data in any country other than the United States, outside the European Economic Area without the prior written consent of BA;

19.2.9 cease processing the Personal Data immediately upon the termination or expiry of this Agreement or, if sooner, of the contractual activity to which it relates and as soon as possible thereafter return the Personal Data and any copies of it or of the information it contains where this action does not contravene the laws relating to the protection of patient confidentiality, or the requirement to safely maintain records of such Personal Data for 7 (seven) years. MedAire Inc. shall confirm in writing that this Clause 19.2.9 has been complied with in full;

19.2.10 defend, hold harmless and indemnify BA against all loss, liability, damages, costs (including legal costs), fees, claims and expenses which BA may incur or suffer by reason of any breach of this Clause 19 by MedAire Inc. or any breach of the Act by BA which is attributable to or caused, directly or indirectly, by MedAire Inc., its agents, subcontractors or employees.

19.3 MedAire Inc. warrants that it and its agents, subcontractors and employees have the necessary legal authority in any country where any Processing of Personal Data will take place under this Agreement in order to carry out the Processing, and undertakes to comply with any data protection laws applicable in such country.

19.4 MedAire Inc. shall permit BA at any time upon seven days' written notice to have escorted access to the appropriate parts of MedAire Inc.'s premises, systems and equipment to enable BA to inspect the same and to inspect procedures, data files and documentation for the purposes of monitoring compliance with this Clause 19, *provided no violation of patient confidentiality of ethical standards is involved.* Such inspection shall not relieve MedAire Inc. of any of its obligations under this Clause 19.

19.5 MedAire Inc. shall not subcontract to any third party (including any associated company of the MedAire Inc.) any Processing of Personal Data on behalf of BA unless all of the following have first been complied with:-

19.5.1 MedAire Inc. has supplied to BA such information as BA may require to ascertain that the subcontractor has the ability to comply with the provisions of the Seventh Principle; and

19.5.2 MedAire Inc. has obtained the prior written consent of BA; and

19.5.3 the proposed subcontractor has undertaken to BA in a written contract to be bound by the terms of this Clause 19.

## 20. THIRD PARTIES

CONFIDENTIAL

20.1   The parties agree that the Contracts (Rights of Third Parties) Act 1999 shall apply to the extent that MedAire Inc. shall be liable not just for the losses damages and expenses (arising in contract, tort or otherwise) suffered or incurred by BA but also for any such losses, damages and expenses suffered or incurred by a BA Affiliate.

20.2   Subject to Clause 20.1 above, a person who is not a party to this Agreement (including without limitation any employee, officer, agent, representative or sub-contractor of either party) shall not have any right to enforce any Term of this Agreement which expressly or by implication confers a benefit on that person without the express prior agreement in writing of BA and the Company, referring expressly to this Clause 20.2. It is expressly agreed that a BA Affiliate shall have the right to enforce any Term of this Agreement.

20.3   Even if a person who is not a party to this Agreement (including without limitation any employee, officer, agent, representative or sub-contractor of either party or a BA Affiliate) has a right to enforce any terms of this Agreement by virtue of Section 1 of the Contracts (Rights of Third Parties) Act 1999, the parties may, notwithstanding Section 2(1) of the Contracts (Rights of Third Parties) Act 1999, vary or cancel this Agreement by agreement between them without requiring the consent of such third parties.

## 21.   NO AGENCY OR PARTNERSHIP

Nothing in this Agreement shall constitute or be deemed to constitute a partnership between the parties and MedAire Inc. shall have no authority to act as agent of BA, to contract on behalf of BA or to create a liability against BA in any way or for any purpose without express written instruction from BA.

## 22.   FORCE MAJEURE

Neither party will have any liability whatsoever or be deemed to be in default for any delays or failure in performance under this Agreement resulting from acts beyond the control of that party, including but not limited to acts of God, acts or regulations of any governmental or supranational authority, war or national emergency, terrorist activities, accident or fire except that any party seeking to rely upon this provision shall take all actions possible to mitigate the effects of such act upon the other party. However, if MedAire Inc. is unable to perform its obligations under the Agreement for any such reason for a period exceeding 30 (thirty) days then BA will be entitled to terminate this Agreement, or any part hereof, forthwith by giving notice to MedAire Inc..

## 23.   ASSIGNMENT

Neither party may assign this Agreement or any interest herein without the prior written consent of the other party.

CONFIDENTIAL

## 24.  ENTIRE AGREEMENT

24.1  This Agreement supersedes any previous agreement between MedAire Inc. and BA in relation to the matters dealt with herein.

24.2  This Agreement will not affect any previous agreement between MedAire Inc. and BA on any matter not dealt with herein, which will remain in full force and effect.

24.3  Each of the parties acknowledges and agrees that in entering into this Agreement, and the documents referred to in it, it does not rely on, and will have no remedy in respect of, any statement, representation, warranty or understanding (whether negligently or innocently made) of any person (whether party to this Agreement or not) other than as expressly set out in this Agreement. Nothing in this clause will, however, operate to limit liability for fraud.

## 25.  RELIANCE

The parties acknowledge and agree that they have not entered into this Agreement in reliance on any representation, warranty or undertaking which is not expressly set out or referred to in this Agreement.

## 26.  NOTICES

Notices by either party must be given in writing quoting both the Purchase Order number (if applicable) and the contract number of this Agreement and may be delivered personally or sent by letter (or transmitted by facsimile message) addressed to the other party at its address set out below. Any notice given by letter will be deemed to have been given at the time at which the letter would have been delivered in the ordinary course of the post if sent by post, and on the date of delivery if delivered personally or at the date of receipt if transmitted by facsimile message.

BA                                              MedAire Inc.

Corporate Services                              1301 E.McDowell Road
Procurement Department                          Suite 204
British Airways Plc                             Phoenix
Waterside (HEA3)                                Arizona 85006
PO Box 365
Harmondsworth UB7 0GB                           Fax No.  +001(602) 252 8404
Fax No. 020 8738 9638

with a copy to the BA Representative at the address below:-

Head of Medical Services
British Airways Plc
Waterside (HMAG)
PO Box 365
Harmondsworth UB7 0GB

Document 406831

## CONFIDENTIAL

BA 0748

## 27.   SEVERABILITY

If any provision of this Agreement will be held to be illegal or unenforceable under English law, in whole or in part, that provision will, to that extent, be deemed not to form part of this Agreement, and the enforceability of the remainder of this Agreement will not be affected.

## 28   GENERAL

28.1   No waiver or forbearance by BA in enforcing any of its rights hereunder shall prejudice the ability of BA to enforce such rights or any of its other rights hereunder in the future. No waiver shall be effective unless in writing and signed by BA Procurement.

28.2   No variation or alteration to this Agreement shall be effective unless a change order in the form set out at Appendix X is entered into by MedAire Inc. and BA Procurement.

28.3   In the event that any Purchase Order is issued by BA in respect of a Service, the terms and conditions contained in this Agreement shall apply and any standard terms and conditions which may be printed on the Purchase Order shall not apply in the event of any conflict.

## 29.   GOVERNING LAW

This Agreement will be governed by and construed in accordance with English law and each of the parties agrees to submit to the exclusive jurisdiction of the English courts as regards any claim or matter arising under this Agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be signed and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is, on the date of this Agreement, duly authorised by all necessary and appropriate corporate action to sign this Agreement.

APPROVED FOR AND ON BEHALF OF BRITISH AIRWAYS Plc

SIGNED ................................

NAME J. TOKE

TITLE Purchasing Manager

DATE 3/8/00

APPROVED FOR AND ON BEHALF OF MedAire Inc. Ltd

SIGNED ................................

NAME Kjell C. Andreassen

TITLE C.OO

DATE 8/23/01

**APPENDIX A**

## CONFIDENTIAL

## THE SERVICES

MedLink Services and Survivor Management Program shall be provided for:

*Covered Aircraft:*
British Airways  *AND FRANCHISEES from time & time As Advised*
 *by BRITISH AIRWAYS PROCUREMENT*

## APPENDIX B:  SERVICE LEVEL AGREEMENT

1.   INFLIGHT MEDICAL EMERGENCY ADVISORY SERVICES

   MedLink shall provide twenty four (24) hour a day medical emergency advisory services of an emergency physician if MedLink is notified of an inflight medical emergency. These physicians will also work with volunteer on board medical professionals to ensure the care is appropriate for the passenger. They will access the severity of any inflight injury or illness and guide the flight and/or cabin crew by providing step-by-step treatment instructions. The captain will be advised if a diversion is medically warranted. The MedLink inflight service is also available to gate agents during the boarding process.

   MedLink shall make such inflight medical emergency advisory services available to BA by way of a communications network accessible by radio/telephone, or by way of any other method as may be established by industry practice or written agreement between the parties; provided, however, BA shall bear the responsibility for installing and maintaining the proper communications equipment necessary to contact MedLink, for notifying MedLink of the inflight medical emergency and for maintaining the duration and quality of the communication.

   MedLink shall provide BA with additional information concerning hospital services and referral telephone numbers for emergency medical services, as such

Document 40684

## CONFIDENTIAL

BA 0750

additional information becomes available to MedLink and is related to MedLink's inflight medical emergency advisory services. MedLink shall assist BA in coordinating the transportation of the patient to an appropriate receiving health care facility at the final destination.

MedLink maintains complete record keeping associated with each inflight medical emergency. Based upon the airline's direction, this can include immediate verbal reporting to flight operations or dispatch, the airline's medical director, etc. Subsequent written reports which support this quality assurance process contain available information concerning:

- the who, what, when, where and why of the call (except confidential patient information)
- the inflight treatment provided
- the medical care facilities accessed and any expert specialties
- the ground/air emergency transport services employed
- the final disposition of the passenger/patient

(Note: MedLink records and stores all calls for seven years.)

## 2.   DESCRIPTION OF MEDLINK SERVICES

- MedLink will provide BA with twenty-four hour-a-day access to emergency physicians to direct medical care on board aircraft where passengers or crew become ill or injured.
- The aircraft will contact MedLink through its air to ground communications system. This will be a 3-way call to include Airline Operations, the flight and MedLink.
- The MedLink Communication Specialist will immediately answer the call and obtain brief information including the location of the aircraft, its destination with ETA, and the nature of the medical incident.
- The MedLink physician will then speak directly with the pilot. If there is a medical provider on board, the MedLink physician may ask to speak directly to the medical provider.
- Once the MedLink physician has assessed the medical situation, he or she will make medical recommendations. If the medical situation is serious enough to warrant a diversion, the MedLink physician will make that recommendation to the pilot.
- If the pilot agrees that a diversion is warranted, MedLink will talk with the pilot and Airline Operations to identify the most appropriate diversion destination. The pilot and Airline Operations will look at possible diversion sites related to flying into the sites. MedLink will look at the possible diversion points to assess appropriateness of the medical facilities.

The following steps in the process will occur for non-diversions as well as diversions:

- MedLink will contact BA' local operations at the selected airport to notify them of the incoming medical situation. MedLink will also notify the appropriate authorities at the airport.
- MedLink will arrange for an ambulance to meet the flight at the airport unless the MedLink physician states that no medical response at the gate is required. MedLink will notify the local hospital of what treatment was rendered on board the aircraft.

Document 406831

CONFIDENTIAL

BA 0751

- MedLink will follow-up with the emergency responders to confirm outcome, if the passenger is evaluated and released at the gate. If the passenger is transported to the hospital, MedLink will contact the hospital to determine the passenger's condition. If the passenger is admitted, MedLink will follow the case until the passenger is released.
- MedLink will provide BA with immediate notification of the outcome of the passenger after the passenger is taken off the flight. This information is reported to Airline Operation and/or the corporate designee.
- MedLink will send monthly reports to the corporate designee which provide complete detail of each patch received that month.
- MedLink will store a record of all calls for seven (7) years.
- MedLink will send the corporate designee a complete annual report at the end of the year including company specific statistics.

Document 406831

## CONFIDENTIAL

BA 0752

## 3.  SURVIVOR MANAGEMENT PROGRAM PROCEDURE APPENDIX

This Procedure Appendix is subject to each of the terms and conditions of the primary Agreement.

**A.  Activation Process.**

1. Once an accident or incident (collectively "incident") has occurred and the nature of the incident has been determined, BA shall have the option to activate MedAire's Survivor Management Program ("SMP").
2. The SMP is activated by an authorized representative of BA ("Representative"), who is pre-identified to MedAire, notifying MedAire's MedLink Emergency Telemedicine Center ("MTC") of the incident via the 24-hour telephone number, 1-602-239-3627.
3. At the time SMP is activated, the following information will be provided to MTC (as available):
   a) Description of the incident.
   b) Location of the incident.
   c) Number injured/total passengers.
   d) Time of the incident.
   e) Primary and alternative contact number for BA and MTC liaison representative.
4. Relevant situation information (local contacts, known details of the incident, local medical facilities, etc.) and background shall be faxed to MTC on a fax line confirmed by MTC at the time the SMP is activated.

**B. Communication System.**

1. After activation of SMP, BA shall decide upon the manner, subject to approval by MedAire, of maintaining continued communications with MTC.
2. MTC shall assess, based upon information provided by BA, the medical resources necessary to respond to the incident and shall assemble a Medical Assessment Team ("MAT").
3. MAT shall travel to the airport nearest the incident, if possible, or to a pre-arranged site mutually determined by BA and MedAire.
4. MAT shall be met by BA's Representative or designee and taken to (a) the incident site, (b) a center at which injured or sick (i) passengers of BA, or (ii) crew of BA (collectively "patients"), are being treated, or (c) another site determined by BA.
5. MedAire shall use reasonable efforts to establish liaison between each of the following:
   a.  MAT and MTC.
   b.  Representative and MAT and Representative and MTC.
   c.  On-site (if any) representatives of BA and MAT and MTC.
6. Injured survivor information will be put on Injured Monitoring forms, to be provided by MedAire, at least once per day as information becomes known to MedAire, and sent to BA for tracking purposes via e-mail or via fax to a number designated by BA.
7. BA shall promptly provide advice to MedAire, at MedAire's request, regarding policy, procedural and financial issues related to the incident.

Document : 406831

CONFIDENTIAL

BA 0753

**C. Medical Assessment Team (MAT).**

1.  MAT members will be prepared to board a commercial airline (or other mode of transportation when specified by BA) for travel to the incident or designated site, preferably within three (3) hours of being notified of an incident.

2.  The MAT members will make their own travel arrangements, unless BA makes other arrangements, and will be met by BA's Representative at the site of the incident or other designated site.

3.  The MAT shall provide names and travel document details to Representative if BA can help facilitate visa/entry issues with relevant authorities/Embassies.

4.  Members of the MAT staff shall be identifiable by uniforms and/or ID cards.

5.  BA shall provide each MAT member with a letter on BA's letterhead acknowledging his/her association with BA. This letter may be shown to relevant authorities to assist the MAT members in traveling to the incident or designated site and in performance of their duties on behalf of BA.

6.  MAT shall consist of nurses and/or doctors with the specific composition to be determined by MedAire according to the nature and scope of the incident as reported to MedAire by BA.

7.  The location, assessment and movement of all injured survivors shall be recorded by one or more MAT members.

**D. Medical Evacuation.**

1.  MTC shall coordinate air medical transportation through third party providers of such services on approval by Representative.

2.  BA shall pay for any such air medical transportation and shall immediately provide any up-front payments related to same.

3.  MTC shall keep a record of all transported/transferred patients, the record indicating to where each was transported/transferred.

**E. Local Medical Support.**

1.  MAT shall provide medical assistance where necessary and appropriate to local emergency response agency(ies) or other medical facility or personnel.

2.  If necessary, following assessment of the incident, MTC shall use reasonable efforts to facilitate the provision of medical equipment and supplies required to the incident site.

3.  MAT members shall work under the direction of local doctors.

**F. Patient Monitoring.**

1.  MTC shall provide monitoring for all patients transported or cared for locally, as previously explained.

2.  MTC shall send a Summary Status Report for each patient every 24 hours to Representative. The Summary Status Report shall include a brief summary of the medical status of the patient as is then known to MTC.

3.  Individual Patient Monitoring forms shall be sent to MTC from MAT and subsequently when there is a change in patient status or location, said forms including a summary of the new status and/or the new location.

CONFIDENTIAL

4. All queries regarding patient monitoring issues shall be discussed with Representative who will coordinate with BA for communication with families and/or friends of the patient.

5. Following the close of individual cases BA will be notified and MAT shall prepare and send a final report to BA (excluding confidential patient summaries), and BA shall have the responsibility of transferring the report to the patient's treating physician.

## G. Incident Stand Down.

1.     BA's representative shall state stand down from Acute Phase of incident to MTC. This will generally be after 48 hours after activation of SMP. "Acute Phase" means the time from activation of SMP until BA notifies MAT that it can return home. "Stand Down" means the notification from BA that MAT can return home.

2. An initial post-incident debriefing by MTC shall be organized by BA one to two days after MAT has returned home. A full debriefing shall be organized by BA one week after MAT has returned home.

## APPENDIX C:  FEES

Unless otherwise specified, fees shall be payable within thirty (30) days of invoice date. BA shall pay MedAire, Inc. at the following rates in respect of this Agreement:

1.     **MedLink InFlight**

Fees are based upon documented Revenue Passenger Kilometers (RPKs) for the covered aircraft for the preceding year. Fees will be calculated and agreed and the total amount will be split into monthly invoices.

Fees for the first twelve (12) months of this Agreement (April 1, 2001 – March 31, 2002) shall be $3.00 (US) per million 2000 RPKs.

Fees for the second year (April 1, 2002 – March 31, 2003) shall be $3.30 per million 2001 RPKs.

Fees for the third year (Arpril 1, 2003 – March 31, 2004) shall be $3.99 per million 2002 RPKs.

Document 406831

## CONFIDENTIAL

BA 0755

2.    **MedLink Maritime**
Fees shall be at the rate of $3,500 per vessel per year for the term of this agreement.

3.    **Orientation**
MedAire, Inc. shall provide one annual on-site orientation to BA at no charge.
Additional orientation as may be requested by BA and/or its Affiliates or
Franchisees shall be at the rate of $1,000 per day.

4.    **Transportation**
BA shall reimburse MedAire, Inc. for travel expenses, provided that such expenses
are properly and necessarily incurred in the performance of the duties as described in
this Agreement and have been agreed in advance by the BA Representative. Any
invoice for such expenses shall have attached detailed bills supporting the claim.

5.    **Survivor Management Program**
MedAire will submit weekly invoices to BA for services rendered, goods furnished
and third party incidental charges in the event of activation of the Survivor
Management Program. Payment is due upon receipt via wire transfer or check. The
following fees shall apply:

Annual Retainer Fee – US $10,000.
1.      This fee covers ongoing administration costs related to database
maintenance, training and preparedness.

MTC Per Incident Fee.
1. Acute Phase – US $300 per labor hour.
   a. Acute Phase beings on the initial notification of the incident by BA to
      MedAire and continues until BA notifies MedAire of Incident Stand
      Down. This period will be approximately 48 hours.
2. Follow Up Phase – US $150 per labor hour.
   a. Includes period after Acute Phase to time when MTC assumes full
      control of patient monitoring.
   b. Only those hours actually spent working on patient monitoring shall be
      billed.
   c. The number of MedAire personnel required to handle monitoring will be
      determined by MedAire in relation to the number of patients being
      monitored, and may increase or decrease depending upon need.
   d. Monitoring time will be documented on a time sheet for invoice purposes.

Medical Assessment Team Fees.
1. Each MAT Physician................................US $2,500/per 24 hour
   period.
2. Each MAT Nurse....................................US $1,500/per 24 hour
   period.

Document  406831

## CONFIDENTIAL

BA 0756

Incidental Charges/Expenses.

1.     MedAire will be reimbursed for all reasonable travel expenses and subsistence expenses related to the performance of the SMP within the following limits:

    a.  Air Travel --standard ticket rate for flights of 4 hours. 59 minutes or less. Business class ticket rate for flights of 5 hours or more.

    b.  Rail Travel – Standard Class.

    c.  Hotel Accommodation – At the rate booked by the MedAire corporate travel agent based upon availability of accommodations nearest to the incident site.

    d.  Meals – At reasonable levels approved in advance as per diem. and no less than US $50 per day.

    e.  Car Travel- Based on availability and location requirements.

Air Medical Transportation.

1.     As previously stated. BA will provide expedited funds to accommodate any air medical transportation companies requiring up-front payments.

2.   A reasonable attempt will be made by MTC and/or the MAT to locate providers who would be willing to delay billing for 30 to 60 days.

3.   A flat fee for coordination of air medical transportation will range between $500 and $2.500 per event (air ambulance vs. commercial).

Document 466831

## CONFIDENTIAL

BA 0757

## APPENDIX D

TO AGREEMENT NUMBER
CHANGE ORDER

CHANGE ORDER NUMBER: DATE:

1. DESCRIPTION OF PROPOSAL

2. ORIGIN & REASON FOR PROPOSAL

3. EFFECT ON CONTRACT PRICE

4. REMARKS

APPROVED FOR AND ON BEHALF     APPROVED FOR AND ON BEHALF
BRITISH AIRWAYS Plc            MedAire Inc. Ltd.

SIGNED ...............................................   SIGNED ...............................................

NAME ...............................................   NAME ...............................................

TITLE ...............................................   TITLE ...............................................

DATE ...............................................   DATE ...............................................

Document   Page 14

CONFIDENTIAL

BA 0758