EXHIBIT 19

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LINDA ANN BAILLIE,                    )
individually, as Personal            )
Representative of the Estate         )
of JAMES DONALD BAILLIE, II,         )
and on behalf of all heirs and       )
next of kin of JAMES DONALD          )
BAILLIE, deceased,                   )
                                     )
                 Plaintiffs,         )
                                     )
        vs.                          )  No. 2:13-cv-04681-SVW-RZx
                                     )
BRITISH AIRWAYS PLC,                 )
                                     )
                 Defendant.          )
                                     )
_____)

VIDEOTAPED DEPOSITION OF JESSICA MONAS, M.D.

Phoenix, Arizona
July 22, 2014
10:07 a.m.

**PREPARED FOR:**

DISTRICT COURT

(Original)

**PREPARED BY:**

AZ Litigation Support
Susan A. Grenz, CCR, RPR
Certified Court Reporter
AZ Certificate No. 50720

AZ LITIGATION SUPPORT    480.481.0649

Jessica Monas, M.D.  Baillie vs British   July 22, 2014

```
 1          THE VIDEOTAPED DEPOSITION OF JESSICA MONAS, M.D.,

 2   taken at 10:07 a.m. on July 22, 2014, at the Law Offices of

 3   Gallagher & Kennedy, P.A., 2575 East Camelback Road, Suite

 4   1100, Phoenix, Arizona 85016, before Susan A. Grenz,

 5   Certified Court Reporter.

 6

 7   PRESENT:

 8   For the Plaintiff Linda Ann Baillie:

 9              KREINDLER & KREINDLER, LLP
                BY:  Francis G. Fleming, Esq.
10              750 Third Avenue
                32nd Floor
11              New York, New York  10017

12   For the Defendant British Airways PLC:

13              CONDON & FORSYTH, LLP
                BY: Ivy L. Nowinski, Esq.
14              1901 Avenue of the Stars
                Los Angeles, California 90067
15
     For the Defendants MedAire, Inc.; Steven Joe Reinhart, D.O.;
16   and Jessica Monas, M.D.:

17              GALLAGHER & KENNEDY, P.A.
                BY:  Mark C. Dangerfield, Esq.
18              2575 East Camelback Road
                Suite 1100
19              Phoenix, Arizona 85016

20   Also Present:

21              Jonathan Williams, CLVS

22

23

24

25
```

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

1                          I   N   D   E   X

2

3   EXAMINATION                                    PAGE NUMBER

4   JESSICA MONAS, M.D.

5        By Mr. Fleming                                 5

6

7   EXHIBITS                  DESCRIPTION              MARKED

8

9                        NO EXHIBITS MARKED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

```
 1              THE VIDEOGRAPHER:  Good morning.  My name is
 2      Jonathan Williams, certified legal video specialist with
 3      K-Video Productions.  Our court reporter is Sue Grenz
 4      representing Arizona Litigation Support.  Their address is
 5      One East Washington Street, Phoenix, Arizona.
 6              We're at the Law Offices of Gallagher & Kennedy,
 7      2575 East Camelback Road, Phoenix, Arizona to take the
 8      deposition of Dr. Jessica Monas on behalf of the plaintiff
 9      in the United States District Court, Central District of
10      California, case of Baillie versus British Airways PLC, Case
11      Number 2:13-cv-04681-SVW-RZx.
12              The date is July 22, 2014, and the time is 10:07
13      a.m.
14              The attorneys will now introduce themselves,
15      plaintiffs first, please.
16              MR. FLEMING:  Good morning.  Frank Fleming,
17      Kreindler & Kreindler, New York City, for Linda Baillie and
18      family.
19              MR. DANGERFIELD:  Mark Dangerfield, Gallagher &
20      Kennedy, representing MedAire and Drs. Monas and Reinhart.
21              MS. NOWINSKI:  Ivy Nowinski of Condon & Forsyth
22      representing British Airways.
23              THE VIDEOGRAPHER:  Thank you.
24              Please swear in the witness.
25
```

Jessica Monas, M.D.  Baillie vs British  July 22, 2014

```
1                    JESSICA MONAS, M.D.,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4                E X A M I N A T I O N

5    BY MR. FLEMING:

6         Q.    Good morning, Doctor.  It's very nice to meet

7    you.  We've been introduced to each other off the record.

8    And I hope we can get through this with as little difficulty

9    as possible.

10               You understand, of course, that I represent Linda

11   Baillie, who is the surviving spouse of James Baillie,

12   deceased, whose death brings us to this action and to this

13   particular deposition.

14               You're shaking your -- you're nod --

15        A.    Yes.

16        Q.    You're nodding your head yes.  You understand, I

17   assume, that we have to get oral answers to the questions

18   that are put to you either by me or by anyone else here?

19        A.    Yes.

20        Q.    Okay.  Now, I assume you've had a chance to

21   discuss depositions generally with Mr. Dangerfield or one of

22   his colleagues so I'm not going to spend too much time on

23   the procedures that we're going to be dealing with here.

24               But there is one aspect of a deposition that's

25   very important to me.  I'd like to cover that with you.  All
```

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

1               And that's the same individual you spoke to?

2     A.      Correct.

3     Q.      All right.   Thank you.

4               Did he tell you anything about the claim?

5     A.      No.

6     Q.      Did he know anything about it?

7               MR. DANGERFIELD:   Object as to form.

8               MR. FLEMING:   That's a good objection.

9     BY MR. FLEMING:

10    Q.      Did he tell you he knew anything about the case?

11    A.      No.

12    Q.      Do you know the sequence?   Were you served before

13    Dr. Reinhart or after?

14    A.      I don't know.

15    Q.      Okay.   And you never had a conversation with

16    Dr. Reinhart about this claim or your deposition?

17    A.      No.

18    Q.      Okay.   Have you been shown any memos or statement

19    of factual background or anything of that nature other than

20    what's in the transcript, which we'll talk about in a little

21    while?

22    A.      No.

23    Q.      Okay.   Thank you very much for that.

24               Now, would you describe for me your educational

25    background?

Jessica Monas, M.D.    Baillie vs British    July 22, 2014

1      A.    Sure.    Starting with medical school?

2      Q.    Well, you told me you grew up in New York so I'm

3  interested in what high school you went to.

4      A.    Well, I grew up in -- born in Brooklyn, moved to

5  Long Island, and there I went to Roslyn High School.    Went

6  on to college at -- in Upstate New York at Binghamton State

7  University.

8         At that -- after that point I did medical school

9  at George Washington University in Washington, D.C.    I

10  graduated in 2007.    I went on to do a residency at the

11  Harvard Affiliated Emergency Medicine Program, residency

12  program in Boston, and I worked at Massachusetts General

13  Hospital and Brigham and Women's Hospital, and I graduated

14  there in 2011.

15         At that point we moved to Phoenix, and I took up

16  employment with Emergency Professional Services.

17      Q.    Do you have a specialty in women's medicine of

18  some sort from Brigham and Women's?

19      A.    No.    It's a historic name, but they treat all

20  adults.

21      Q.    Okay.    In fact, Mass Gen is fairly well-known for

22  its cardiology, isn't it?

23      A.    They're very well-known for many fields.

24      Q.    Okay.    Fair enough.    One of the best hospitals in

25  the country actually.

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

1             But that includes cardiology?

2    A.    Again, yes.  They are well-known in many fields.

3    Q.    Did you run into Dr. Benson there?

4    A.    I did not.

5    Q.    Do you know who I'm talking about?

6    A.    No, I do not.

7    Q.    Robert Benson?  Okay.

8          So that gets you down here in Phoenix around

9  2010?

10    A.    '11.

11    Q.    2011.  Okay.

12          When you started your work with EPS, did you get

13  any training -- special training related to EPS or Banner?

14    A.    Briefly, just in terms of how to use systems,

15  computer systems, things of that nature.

16    Q.    Okay.  Nothing in cardiology?

17    A.    No.

18    Q.    Were you -- withdrawn.

19          Are you a board-certified emergency room

20  physician?

21    A.    Yes.

22    Q.    Were you board-certified at the completion of

23  your residency?

24    A.    When you finish residency, you are

25  board-eligible, and then you have to sit for your test,

Jessica Monas, M.D.   Baillie vs British    July 22, 2014

1    which is always taken after graduation.

2         Q.    Right after, within a year or so, or after a

3    couple years of practice?

4         A.    I mean, it's usually within the first two years.

5         Q.    Okay.  So that would get you board-certified

6    somewhere around 2012, 2013?

7         A.    Yes.

8         Q.    Do you remember when?

9         A.    I don't have the date offhand.

10        Q.    Did you have staff privileges at Banner or Good

11   Sam before you were board-certified?

12        A.    Yes.

13        Q.    That would go back to 2011, then, right?

14        A.    Correct.

15        Q.    Okay.  Now, I want to ask you some questions

16   about how things work in the emergency room and with one

17   particular focus.

18             I assume that there, on occasion, is a situation

19   that arises where you're dealing with an emergency room

20   patient at some level of evaluation or assessment or

21   something like that, and for some other reason having to do

22   with priorities -- let's say, for example, another patient

23   comes under your purview who has a more acute, more critical

24   situation -- you have to hand off the patient that in my

25   description you started with and go to the one that's more

Jessica Monas, M.D.   Baillie vs British    July 22, 2014

1   it -- it's a five-page -- four-and-a-half page document or

2   so.  It's got a lot in there, and it is now a couple of

3   years subsequent to when the -- two-and-a-half years,

4   actually, to when the event occurred.

5           But I'd like you to tell me as best you can

6   recall, first of all, how you got involved in Mr. Baillie's

7   situation and the British Airways flight 289 on March 23,

8   2012.

9           MR. DANGERFIELD:  Object as to form.

10          MR. FLEMING:  Okay.

11      A.   I was working in the emergency department and

12  there was a call overhead for a MedLink physician, and I was

13  available at that time, and I responded to the call.

14  BY MR. FLEMING:

15      Q.   Okay.  When you responded to the call, what did

16  you do?

17      A.   I came into the MedLink room, I sat down, I was

18  given information by the MedLink specialist, and I got on to

19  the call.

20      Q.   The MedLink specialist you're talking about, is

21  that the communication specialist?

22      A.   Yes.

23      Q.   Okay.  Can you tell me what information you were

24  given?

25      A.   Yes.  I was told that there was a sixty --

Jessica Monas, M.D.  Baillie vs British   July 22, 2014

1      Q.    I don't want you to read now, but I want you to

2  go from memory.  If you can't recall, we'll refresh your

3  memory with documents and all that.  But just what you were

4  told.

5      A.    Okay.  I was told that there was a 61-year-old

6  man who was complaining of chest pain.  I was told he was

7  given an aspirin, he was given oxygen, he was given

8  nitroglycerin, and that there were at least three physicians

9  on board assisting him.

10      Q.    Okay.

11      A.    And I was also told that it was a repeat patch.

12  I did know that.

13      Q.    All right.  Thank you.

14            Were you given any documents to review?

15      A.    The only document that I was given once I was on

16  the call was this piece of paper, the intake form.

17      Q.    Okay.  And do you have a copy of that document

18  marked as an exhibit in this case?

19      A.    This is the -- this should be the exhibit that

20  you have.

21      Q.    Yeah.  No.  I do have it.  I'm just trying to get

22  the number -- let's see -- before we remark it or something.

23  I think it's Exhibit 2 or 3.  Exhibit 3.

24            MR. DANGERFIELD:  It's Exhibit 3.

25

1       A.     I did not make that mark.

2       Q.     Okay.  Thank you.

3              But do you know whether it was on there when you

4   first saw this document?

5       A.     I believe it was not on there.

6       Q.     Okay.  So just to put this in context now,

7   Dr. Reinhart's, we know from his deposition which we did

8   maybe a week, two weeks ago, shift ended and he had left.

9   That's why the repatch went to another physician.

10             You're aware of that, I take it?

11      A.     Yes.

12      Q.     Okay.  And the box on -- withdrawn.

13             The boxes on the first line of page 2 of 2 on

14  Exhibit 3 associated with the time 1918 are related to

15  Dr. Reinhart's activity, correct?

16             MR. DANGERFIELD:  Object as to form.

17      A.     I don't know when that was put on the sheet.

18  BY MR. FLEMING:

19      Q.     Okay.  But was it on there when you first saw

20  this page?

21      A.     No, I don't believe it was.

22      Q.     Oh, I see.  Okay.  Misunderstood.  I

23  misunderstood the record, not your answer.

24             Okay.  So this 1918 notation was not on the page

25  when you first saw what is marked today as Exhibit --

1   notation -- and I assume it would be "No past medical

2   history," fair enough?

3   A.   No.

4   Q.   No?

5   What the first notation you made here?

6   A.   "61-year-old male," that was the first notation.

7   Q.   Okay.  Now, I had asked you earlier about whether

8   this line 1 where it starts off pulse 100, BP/blank, 100

9   over 70 -- do you see that line?

10   A.   I do.

11   Q.   -- whether that was on this page when you first

12   saw it, and you indicated no.

13   A.   I do not recall that being there.

14   Q.   Okay.  When you made your notation -- first

15   notation, 61 male complains of chest pain, had that notation

16   in the first box starting with "pulse 100, BP," was that

17   added in the interim?

18   A.   Again, when I had this piece of paper, I do not

19   recall that ever being there.

20   Q.   Okay.  Thank you.

21   So the first -- when you first saw this piece of

22   paper, Exhibit 3, page 2, you have no recollection of

23   anything being on the top series of boxes.

24   In the middle box I take it you would recall the

25   time notation, the numbers, although you don't recall

1   whether it's Zulu or local.   And was the "Vitals increased

2   some, feels worse" there?

3       A.   I believe it was --

4       Q.   Okay.

5       A.   -- because I started writing under there.

6       Q.   Okay.   That's what I'm trying to get at.

7            So you wrote 61 male with complaints of chest

8   pain; the pulse 100, BP 100 over 70, chest pain, crackles

9   left hand, to your recollection was not there; and somehow

10   no prior history -- medical history was not there either?

11       A.   I wrote that.

12       Q.   Yes, but not -- you wrote it after you wrote

13   61-year-old male?

14       A.   That is correct.   That was some information I got

15   during the patch so I put that up in the corner there to add

16   it.

17       Q.   Now, continuing again, you read this to me, and

18   I'm sorry, but I have to break it down.

19            Given O2, given oxygen, and then it says not NTG.

20            First of all, NTG is an abbreviation for

21   nitroglycerin, I take it?

22       A.   Correct.

23       Q.   When was that "not" added?

24       A.   It was added later during the conversation

25   because the information I was given that the gentleman,

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

1      A.      After my signature there is -- would be --

2   the time would be around that first call.

3           Yes, I would say that the line likely is the

4   cut-off, yeah.

5      Q.      Okay.  Now, I take it from your answer about what

6   you knew when you started the initial repatch call at

7   approximately 2236, whether local or Zulu, does not include

8   anything about the crackles.

9      A.      Correct.

10      Q.      Did you ever learn about the crackles?

11      A.      I did not.

12      Q.      You first were aware of the report of crackles

13   when you saw this document as completely filled out after

14   you were sued in this litigation, I take it?

15      A.      Correct.

16      Q.      That's an important detail, isn't it?

17           MR. DANGERFIELD:  Object as to form.

18      A.      I can tell you that when I get on a call, I recap

19   the information that I have with the flight.  So I did not

20   have that information available.

21   BY MR. FLEMING:

22      Q.      No.  I understand that.  I accept that.  I'm not

23   quarreling with it.

24           But it would seem to me that as an emergency room

25   physician providing information and suggestions, given the

1      A.      Yes.   It may not be unusual for British Air.

2   That might be their policy.   I cannot comment on that.   But

3   in the past I have been able to speak with physicians on

4   board.

5      Q.      For chest pain-type trans-Atlantic flights?

6      A.      For any situation.   And I can't comment on

7   whether it was trans-Atlantic or not.

8      Q.      By the way, that brings up a point I have to ask

9   you about.   Were you aware of where this airplane was in

10  space when you received the patch?

11     A.      No.

12     Q.      Patches?

13     A.      No.

14     Q.      No?

15     A.      Uh-uh.

16     Q.      Is there a chart or something that's given to you

17  to say, you know, they're up there by the North Pole or down

18  by Florida or something like that?

19     A.      There is nothing that is handed to me.   Maybe

20  that information is available.   I'm not sure.

21     Q.      So if it's not in the transcript about a

22  communication back and forth of where the aircraft would be

23  at any given point in time, you don't know?

24     A.      Correct.   I mean, unless I ask specifically,

25  right, or, you know, if we're looking at diversion points

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

1   and they may be over a body of water, they may say there's

2   no possible location for X number of hours, at which point I

3   would say:  Okay.  Well, once we are at a point where we can

4   make that decision, let's call us back, reassess the

5   situation.

6            So that has come up many times.

7       Q.    Yeah.  But it didn't come up on this flight, did

8   it?

9       A.    For me, at the point that I got into the

10   conversation, no.

11      Q.    Well, and you read the part where Dr. Reinhart

12   was involved as well, correct?

13      A.    I glanced over it.

14      Q.    Yeah.  It didn't come up when he was talking to

15   them either?

16      A.    I can't comment on -- you know, Dr. Reinhart has

17   been doing this for over 30 years, I'm guessing, and has a

18   lot of experience that I wouldn't be able to say.

19      Q.    Yeah.  Well, he knew about diversion points in

20   Greenland and Iceland, in the Northeast Coast of Canada, in

21   other words, Halifax, Gander, places -- St. Johns I think he

22   mentioned.  He's been through all of that.  He knows -- he

23   knew where you could go.

24            That's not a question.  I'll withdraw it.

25            But when you spoke to this airplane, you know it

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

1      Q.      And then about three-quarters of the way down it
2  says, "Pilot:  No," just a series of question marks.  Do you
3  see that?
4      A.      Yes, I do.
5      Q.      And then following that, the doctor says, repeat,
6  and the pilot says, referring to the onboard physician, she
7  did not have any suggestions.  We have three on board
8  actually.
9          Do you see that?
10     A.      "So we are okay"?
11     Q.      Yeah.
12     A.      Yes, I see that.
13     Q.      So the next line, which I'll represent to you is
14  Dr. Reinhart -- and we've examined him on this -- he says,
15  "Looks like you have just over six hours remaining in the
16  flight so a lot can obviously happen in that time frame.
17  Hopefully his condition will improve as he lies down and
18  gets the oxygen.  If not, if his condition appears to
19  deteriorate, call us back and we would have to consider a
20  diversion at that point."
21          Do you see that?
22     A.      Uh-huh, yes.
23     Q.      Did anybody tell you when you took the repatch at
24  2236 that Dr. Reinhart gave that advice and suggestion to
25  the crew, if his condition does not improve or if his

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

1    condition appears to deteriorate, the airline should call

2    MedAire back and we would have to consider a diversion at

3    that point?

4        A.    I was not given that information before I got on

5    the call.

6        Q.    Okay.   Thank you.

7           Now, we talked a little while ago about the

8    unintended consequences, if I may use that overused term,

9    about a diversion and particularly how it would affect the

10    nonill passengers, 300 passengers as you pointed out, if you

11    have to divert.

12           Are there reasons to delay any of these brief

13    periods of treatment related to the impact on other

14    passengers?

15        A.    I don't understand.

16        Q.    Okay.   If you have a call from an airline

17    indicating that a passenger has chest pains, sweaty, pale,

18    confused, and you decide that it would be prudent to try

19    some brief periods of therapy before you make a decision

20    about diverting or not diverting, do any of those

21    contemplated brief periods of therapy affect other

22    passengers?

23           For example, if you give -- if you recommend to

24    give the ill passenger oxygen, that doesn't affect anybody

25    else, does it?

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

1       A.      So if you want -- you know, if you're talking

2   about a theoretical passenger, then, you know, taking those

3   pieces of information I don't think would affect.

4       Q.      Well, you don't know what Mr. Baillie had by way

5   of symptoms other than what you were told, correct?

6       A.      Correct.

7       Q.      For example, you don't know that his pain at 2236

8   had lasted for the seven and a half approximate hours that

9   it did, correct?

10      A.      Correct.

11      Q.      And I think, if I understand your testimony

12  correctly, you didn't know about the crackles either?

13      A.      Correct.

14      Q.      You were initially mistaken about whether

15  nitroglycerin had been tried or not tried, correct?

16      A.      Correct.  I was told that it had been given.

17      Q.      Right.  And that was erroneous, correct?

18      A.      Correct, that he was not given that.

19      Q.      And then you recommended that he be given

20  nitroglycerin, but you changed your mind on that in

21  deference to what the input of the onboard physicians were,

22  correct?

23      A.      I deferred to the onboard physician, correct.

24      Q.      Now, I assume we can take it as a given that by

25  the time an airline calls MedAire or MedLink for information

Jessica Monas, M.D.   Baillie vs British   July 22, 2014

134

1        MR. DANGERFIELD:  I have no questions.

2        MS. NOWINSKI:  I have no questions.

3        THE VIDEOGRAPHER:  This concludes the deposition

4   of Dr. Jessica Monas.  Off the record at 2:39 p.m.

5        (Deposition concluded at 2:39 p.m.)

6

7        _____   09/05/14

8               JESSICA MONAS, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of: _____

Date of Deposition: _____

Case: _____ vs. _____

| Page/Line No. | Change/Correction | Reason |
|---|---|---|
| | N/A | |

Witness Signature: _____  Date: 09|05|14

AZ LITIGATION SUPPORT, LLC   (480) 481-0649
www.CourtReportersAz.com

```
 1    STATE OF ARIZONA      )
                            ) SS
 2    COUNTY OF MARICOPA    )

 3           BE IT KNOWN that the foregoing deposition was

 4    taken before me, Susan A. Grenz, a Certified Court Reporter,

 5    CCR No. 50720, State of Arizona; that the witness before

 6    testifying was duly sworn by me to testify to the whole

 7    truth; that the questions propounded to the witness and the

 8    answers of the witness thereto were reduced to typewriting

 9    under my direction; that the witness elected to read and

10    sign the deposition transcript; that the foregoing pages

11    constitute a true and accurate transcript of all proceedings

12    had upon the taking of said deposition, all done to the best

13    of my skill and ability.

14           I FURTHER CERTIFY that I am in no way related to

15    any of the parties hereto, nor am I in any way interested in

16    the outcome hereof.

17           DATED at Phoenix, Arizona, this 30th day of July,

18    2014.

19
                             _____
20                           SUSAN A. GRENZ
                             Certified Court Reporter
21                           Certificate No. 50720

22

23

24

25
```

EXHIBIT 20

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually,    )
as Personal Representative of the  )No.2:14-cv-00420-SMM
Estate of JAMES DONALD BAILLIE,    )
II, and on behalf of all heirs and )
next of kin of JAMES DONALD        )
BAILLIE, II, deceased,             )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
MEDAIRE, INC.; STEVEN JOE REINHART,)
D.O.; and JESSICA MONAS, M.D.,     )
                                   )
          Defendants.              )
_____)

VIDEO RECORDED DEPOSITION OF JESSICA MONAS, M.D.,
VOLUME II

Phoenix, Arizona
December 16, 2015
9:01 a.m.

REPORTED BY:

STEPHANIE WINTERS, RPR
Certified Reporter, No. 50067

```
 1                        I N D E X

 2  EXAMINATION                                      PAGE

 3  JESSICA MONAS, M.D.

 4     Mr. Spragg                                      6

 5

 6           (Deposition Exhibit Number 3 was marked for

 7  identification and attached to Dr. Reinhart's deposition

 8  transcript.  Deposition Exhibit Number 18 was marked for

 9  identification and attached to Stephen Fowler's deposition

10  transcript.  Deposition Exhibit Number 55-A was marked for

11  identification and attached to Matthew Whitley's deposition

12  transcript and deposition Exhibit Numbers 84 through 88 and

13  90 were marked for identification and attached to Dr.

14  Oscislawski's deposition.)

15

16                       E X H I B I T S

17
    EXHIBIT NO.             DESCRIPTION               PAGE
18
       3  -  British Airways document, BA0733-BA0758    28
19
      18  -  Transcript of communications between      104
20            the MedLink physicians and the air
              crew of British Airways Flight 289
21            on March 23rd, 2012

22    55A -  Intake Form, MedLink, MA027383-MA027384    29

23    84  -  MedAire MedLink Physician Orientation      39
              Program Agenda, MA027339
24
      85  -  MedAire MedLink Physician Training,        58
25            MA027349-MA027354
```

| | EXHIBIT NO. | | DESCRIPTION | PAGE |
|---|---|---|---|---|
| 1 | EXHIBIT NO. | | DESCRIPTION | PAGE |
| 2 | | | | |
| 3 | 86 | - | MedLink Doctor Training Manual, MA027210-MA027338 | 59 |
| 4 | 87 | - | MedAire's Medical Guidelines for Air Travel, MA027079-MA027103 | 61 |
| 5 | | | | |
| 6 | 88 | - | MedAire MedLink Physician Pearls for Remote Medical Care, MA027355-MA027374 | 64 |
| 7 | 90 | - | MedAire MedLink Diversion Justification Worksheet, MA027054-MA027055 | 96 |
| 8 | | | | |
| 9 | 109 | - | Notice of Deposition of Jessica Monas, M.D. | 7 |
| 10 | 110 | - | Global Services E-learning Report, MA02734 | 42 |
| 11 | 111 | - | PowerPoint slides, MedLink Physician Orientation, MA027901-MA027907 | 45 |
| 12 | 112 | - | MedLink Intake Form, Patch Number 13857 | 120 |
| 13 | 113 | - | MedLink Intake Form, MA027843-MA027844 | 122 |
| 14 | 114 | - | MedLink Intake Form, MA027834-MA027835 | 124 |
| 15 | 115 | - | MedLink Intake Form, MA027841-MA027842 | 124 |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1          VIDEO RECORDED DEPOSITION OF JESSICA MONAS, M.D.,

2                          VOLUME II

3

4   was taken on December 16, 2015, at 9:01 a.m. at Gallagher &

5   Kennedy, P.A., 2575 East Camelback Rd., Phoenix, Arizona,

6   before STEPHANIE WINTERS, Certified Reporter Number 50067,

7   in and for the State of Arizona.

8                            * * * *

9

10  COUNSEL APPEARING

            ON BEHALF OF PLAINTIFF:
11

                ROBERT J. SPRAGG, ESQ.
12              KREINDLER & KREINDLER LLP
                750 Third Avenue
13              New York, NY 10017
                (212)687-8181
14              rspragg@kreindler.com

15          ON BEHALF OF DEFENDANTS:

16              MARK C. DANGERFIELD, ESQ.
                GALLAGHER & KENNEDY, P.A.
17              2575 E. Camelback Road
                Phoenix, AZ 85016-9225
18              602-530-8000
                mark.dangerfield@gknet.com
19

20  ALSO PRESENT:

21              William Marinakis, Videographer
                VideoDep, Inc.
22

23

24

25

```
 1                                    Phoenix, Arizona
                                      December 16, 2015
 2                                    9:01 a.m.

 3

 4          THE VIDEOGRAPHER:  We are on the record.  Today's

 5   date is Wednesday, December 16th, 2015.  The time on the

 6   video monitor is 9:01 a.m.  This is volume number two of the

 7   video recorded deposition of Jessica Monas, MD.D. noticed by

 8   counsel for the plaintiffs in the matter of Linda Ann

 9   Baillie, et al. versus MedAire, Incorporated, et al.

10          This matter is being held in United States

11   District Court, District of Arizona, Case Number

12   2:14-CV-00420-SMM.  Our location today is the law offices of

13   Gallagher & Kennedy in Phoenix, Arizona.  The certified

14   court reporter is Stephanie Winters of Morris-Crowe

15   Reporting, located at 7650 South McClintock Drive, Suite

16   103, Tempe, Arizona, 85284.  My name is William Marinakis.

17   I'm the certified legal video specialist for the firm of

18   VideoDep, Incorporated, located at 7776 S. Pointe Parkway

19   West, Suite 170, Phoenix, Arizona, 85044.

20          Counsel, will you please identify yourselves and

21   state whom you represent for the record at this time,

22   please, starting with plaintiff's counsel.

23          MR. SPRAGG:  Robert Spragg with the firm of

24   Kreindler & Kreindler in New York and I represent Linda

25   Baillie, who's the plaintiff in this case.
```

1           MR. DANGERFIELD:  Mark Dangerfield with

2   Gallagher & Kennedy.   I represent defendants MedAire and

3   Dr. Steven Reinhart and Dr. Jessica Monas.

4           THE VIDEOGRAPHER:  Thank you, counsel.  The

5   witness may be been sworn at this time.

6

7                   JESSICA MONAS, M.D.,

8   called as a witness herein, having been first duly

9   sworn, was examined and testified as follows:

10

11                E X A M I N A T I O N

12  BY MR. SPRAGG:

13      Q.   Good morning, Dr. Monas.  My name is Robert

14  Spragg.  I previously introduced myself.  Today I'm going to

15  be asking you some additional questions about your training

16  as a MedLink physician and also some questions about your

17  role in the MedLink response to the in-flight medical

18  emergency that was suffered by Mr. James Baillie on British

19  Airways Flight 289 on March 23rd, 2012, okay?

20      A.   Okay.

21      Q.   Do you understand that you're still under oath

22  here today?

23      A.   Yes.

24      Q.   Okay.  And obviously the process has been

25  explained to you.  The only thing I want to remind you is if

VIDEO RECORDED DEPOSITION OF JESSICA MONAS, M.D., VOL. II - 12/16/2015

1      A.    They involved chest pain.

2      Q.    Chest pain, okay.  Other than your attorney, have

3   you discussed today's deposition with anyone else?

4      A.    No.

5      Q.    All right.  And now you became a MedLink physician

6   in 2011, correct?

7      A.    Correct.

8      Q.    Okay.  Do you recall the month that you became a

9   MedLink physician?

10     A.    I can tell you I started in August, I believe, of

11  2011.

12     Q.    Okay.

13     A.    So it would have been around that time.

14     Q.    All right.  And what training did MedAire provide

15  you so that you could work as a MedLink physician?  Do you

16  remember?

17     A.    Yes.  Well, in addition to the four years of

18  medical school, four years of residency, the additional

19  training that they provided was to meet at the MedLink

20  facility and to do a training day over there, which we went

21  over materials mostly relating to aviation medicine.  And

22  then I also did a shadow shift with one of the physicians,

23  listening to calls that they took to help gain familiarity

24  with the process.

25     Q.    All right.  Okay.  Do you recall the name of the

1

2

3

4

5

6

7            I, the undersigned, say that I have read the

8    foregoing transcript of testimony taken December 16, 2015,

9    and I declare, under penalty of perjury, that the foregoing

10   is a true and correct transcript of my testimony contained

11   therein.

12            EXECUTED this _____ day of _____,

13   20____.

14

15

16                      _____

17                      JESSICA MONAS, M.D.

18

19

20

21

22

23

24

25

```
 1   STATE OF ARIZONA      )
                           )ss.
 2   COUNTY OF MARICOPA    )

 3        BE IT KNOWN that the foregoing proceedings were taken
     before me, STEPHANIE WINTERS, Certified Reporter No. 50067,
 4   that the witness before testifying was duly sworn by me to
     testify to the whole truth; that the foregoing pages are a
 5   full, true and accurate record of the proceedings, all done
     to the best of my skill and ability; that the proceedings
 6   were taken down by me in shorthand and thereafter reduced to
     print under my direction.

 7

 8            [X]   Review and signature was requested.
              [ ]   Review and signature was waived.
 9            [ ]   Review and signature was not required.

10

11        I CERTIFY that I am in no way related to any of the
     parties hereto, nor am I in any way interested in the
12   outcome thereof.

13        I FURTHER CERTIFY that I have complied with the
     requirements set forth in ACJA 7-206.  Dated at Phoenix,
14   Arizona, this 29th day of December, 2015.

15
16        Stephanie Winters, RPR
          Certified Reporter No. 50067

17

18                    *      *      *

19        I CERTIFY that Morris-Crowe Court Reporting, LLC, has
     complied with the requirements set forth in ACJA 7-206.
20   Dated at Tempe, Arizona, this 29th day of December, 2015.

21
22        Morris-Crowe Court Reporting, LLC
          Arizona RRF No. R1001

23

24

25
```

STATE OF ARIZONA          )          **AFFIDAVIT**
                                     )               **OF**
COUNTY OF MARICOPA        )          **NON-SIGNATURE**

      BE IT KNOWN that the foregoing deposition was taken before a Certified

Reporter in the State of Arizona, Stephanie Winters, Certificate Number 50067, and

that the witness elected to, or counsel to the action requested that the witness read and

sign said deposition within 30 days.

      IN VIEW of the fact that the witness did not sign within 30 days, nor ask for

an extension of time, pursuant to Rule 30 (e) of the Rules of Civil Procedure, I am

hereby signing said deposition for filing.

DATED in Phoenix, Arizona, this 26th day of February, 2016.

Stephanie Winters
Certified Reporter Certificate No. 50067

EXHIBIT 21

## EXPERT REPORT OF PAULO ALVES, M.D., MSc, FAsMA
## IN THE MATTER OF
### *LINDA ANN BAILLIE V. MEDAIRE, INC. ET AL.*

As requested by MedAire, I am providing this report to summarize my professional opinions on certain issues pertinent to this case. My opinions are based on my background, training and experience, as well as my review of related documents and information.

**Qualifications.**

I currently serve as the Global Medical Director, Aviation Health, for MedAire. I am a medical doctor and a cardiologist by training. I am a member and fellow of the Aerospace Medical Association or AsMA. Currently, I am also the chair of AsMA's Air Transport Medicine Committee. I am also a member of the International Academy of Aviation and Space Medicine as well as the Airlines Medical Directors Association. Prior to joining MedAire in 2007, I worked for 23 years for VARIG Brazilian Airlines, being its Medical Director for 10 of those years. During part of that time I was also a member of the Medical Advisory Group of the International Air Transport Association ("IATA") .

As the Global Medical Director for MedAire, I work as a link between the different parts of MedAire—training, sales, marketing, and operations. In that capacity I study and review cases and conduct research to help improve MedAire's services to our client airlines. Because of my own background as a medical director for an airline, I also work closely with medical directors of our client airlines.

A copy of my CV is attached as Appendix A to this report.

**First Opinion**:

Although the airline industry is heavily regulated, and several groups weigh in on safety standards, there are no airline industry standards governing the provision of remote medical advice to a commercial airline.

The aviation industry is regulated on different levels to ensure the safety of air operations. To begin with, the International Civil Aviation Organization (ICAO)—an entity under the jurisdiction of the United Nations (UN)—issues general minimum "Standards and Recommended Practices" or SARPs that all airlines from the UN Member States flying internationally must follow. As stated on the ICAO Website:

> These SARPs and policies are used by ICAO Member States to ensure that their local civil aviation operations and regulations conform to global norms, which in turn permits more than 100,000 daily flights in aviation's global network to operate safely and reliably in every region of the world.

Each country also has its own governing body responsible for aviation safety, including the Federal Aviation Association (FAA) in the United States, the Civil Aviation Authority (CAA) in Great Britain, and the Civil Aviation Safety Agency (CASA) in Australia, among others. Most recently, the European Aviation Safety Agency (EASA) became the agency for the European Union member states. Each of these organizations promulgates standards and guidelines intended to protect the safety of airline crews and passengers. Airlines registered in those countries are required to follow those standards.

There are also national and international trade associations that provide safety standards and guidelines for its members to follow. One of these is the International Air Transport Association (IATA), a trade group of which many international airlines are members, including British Airways. IATA publishes various standards and guidelines,

2

including those set forth in the IATA Medical Manual and the IATA Cabin Operations

Safety Best Practice Guide, which its member are expected to follow.

The Aerospace Medical Association (AsMA) is another association concerned

about maintaining the health and safety of persons involved in air and space travel, and

much of its business is conducted through standing committees.  One of those committees

is the Air Transport Medicine Committee, of which I am the current chairman.  The

AsMA website describes the function of this committee as follows:

> This committee is responsible for performing studies and preparing reports,
> resolutions, and recommendations on biomedical aspects of air transport
> operations. Its efforts concentrate on the promotion of international health,
> safety, and care through the mechanism of collecting information,
> analyzing data, and recommending solutions leading to improving health
> and safety in air transport operations.

AsMA from time to time issues publications containing suggestions intended to

aid airlines in dealing with, among other things, fitness to fly issues and in-flight medical

care. For example, AsMA has published its "Medical Guidelines for Airline Travel."

Another organization interested in flight safety is the International Academy of

Aviation and Space Medicine. The object of the Academy is to promote and search for

new knowledge in aerospace medicine, and to contribute to international co-operation

among those devoted to education and research in aviation and space medicine. The

Academy holds annual meetings where papers on aerospace medicine are presented, and

from time to time publishes monographs and position papers on various topics.

The Airlines Medical Directors Association (AMDA), of which I am also a

member, is a constituent group related to AsMA. As set forth on its Website, AMDA

3

"serves as an international forum for physicians who wish to exchange information on problems relating to airline medicine, both through our yearly meeting and through networking opportunities to facilitate communications among physicians with related interests." From time to time, AMDA also publishes materials dealing with various aspects of flight-related medical issues.

Some of the standards, policies, or suggestions promulgated or published by the above organizations relate to crew training in the handling of safety incidents, as well as the importance of pre-flight fitness to fly assessments of passengers.

For example, the ICAO-issued, "Operation of Aircraft," Annex 6 to the Convention on International Civil Aviation, Part 1, § 12.1, addresses cabin crew training, and states: "An [aircraft] operator shall establish and maintain a training programme, approved by the State of the Operator, to be completed by all persons before being assigned as a cabin crew member," and cabin crew members shall also "complete a recurrent training programme annually." In addition, § 1.6.5 of the IATA Medical Manual states that "[c]abin crew must be well trained in First Aid to enable them to assist a passenger, or fellow crew member who becomes unwell in-flight."

In addition, § 1.2 of the IATA Medical Manual states that the "airline is responsible for carrying its passengers safely and efficiently to the destination," including being responsible for ensuring "that there are adequate measures in place to deal with any unforeseen in-flight medical emergency." *Id.* That said, while "customers wish to travel quickly, cheaply and safely to their destination," the passengers themselves "have a responsibility to ensure that they are healthy enough to do so." *Id.* 1.2.3.

4

The IATA Medical Manual also acknowledges the role of ground-based medical advice: "Some airlines now have in-flight access to ground-based specialist medical services which the crew can contact using the aircraft satellite communications system." *Id.* § 1.6.5. "Such systems," the Manual says, "are invaluable as they not only provide experienced medical advice relevant to air travel, but also assist the captain of the aircraft in making decisions about a potential medical diversion." *Id.* Using such systems, the Manual goes on to say, "to minimize the risk of diversion will not only save the airline cost, the passengers inconvenience, but also helps the sick passenger, who, even if unwell, does not want to be hospitalized in a foreign place with all the problems and difficulties that entails." *Id.*

As regards the role of ground-based medical consultants in diversion decisions, the IATA Manual states: "Typically, the Captain is looking for a quick assessment as to whether or not the plane should divert for the medical situation." *Id.* § 6.2.3. However, the "ultimate diversion decision remains with the Captain, who also must account for fuel, weather, safety of landing site, and other operations factors beside the emergency."

Section 6 of the IATA Medical Manual deals with passenger care, and states that "Every airline should have a medical clearance procedure" to evaluate a passenger's fitness to fly before takeoff. *Id.* § 6.1. The IATA Manual recommends that a pre-flight medical clearance should be required by the airline's medical department if the passenger is, among other things, "considered to be a potential hazard to the safety or punctuality of the flight including the possibility of diversion of the flight or an unscheduled landing." *Id.* "[I]f in doubt," the Manual says, "medical advice should be obtained." *Id.*

5

The IATA Cabin Operations Safety Best Practice Guide also states that if the "Cabin Crew suspects that a passenger is not fit to travel, or may represent a danger to themselves or to passengers, they should inform the Pilot-in-Command and determine appropriate action in close co-ordination with ground staff."

The AsMA Air Transport Medicine Committee also publishes a "Guidance Document" for health professionals entitled: "Medical Emergencies: Managing In-flight Medical Events." That documents states, among other things:

- "It is the responsibility of the passenger to notify the airline in a timely manner, before flight, if he/she has a serious medical condition."

- "It is not feasible to provide on a commercial airliner the equivalent of a ground-based medical care facility."

- "Increased use of a medical 'clearance to fly' process by the treating physician would probably prevent many in-flight medical events that currently occur."

AsMA also publishes Medical Guidelines for Air Travel, including a section titled "Fitness to Fly and Medical Clearances." That document emphasizes that "an individual with an unstable medical condition should not fly. Instability combined with flight stresses could pose a serious threat to the health and well-being of the sick or injured traveler." In particular, "a lowered in-flight barometric pressure and oxygen partial pressure are of particular significance for passengers with cardiopulmonary disease."

In the document's conclusion, the authors further state that "experience of specialists working in the field indicates that most in-flight medical events are handled

6

appropriately," but that "[i]ncreased pre-flight use of existing guidelines by treating physicians, in collaboration with airline medical advisors, would prevent some in-flight medical emergencies."

While some of the material published by these various organizations acknowledges or encourages the use of ground-based, remote medical advice services, to date none of the standards, policies or suggestions promulgated or published by any of these organizations offer any guidance on how an entity providing such remote medical advice should be organized or what mechanisms, standards or practices should be used in providing such. In particular, none of the standards, policies, or suggestions promulgated or published by any of these organizations dictate or suggest when or in what circumstances the remote advice service should recommend that an aircraft divert to another location in order to assist an ill passenger.

**Second Opinion:**

There is not yet a "remote medical advice to aircraft" industry, and hence industry customs or standards governing the provision of remote medical advice to a commercial airline have not yet been developed.

About 30 years ago, MedAire pioneered the idea of offering remote medical advice as a commercial service to airlines, and today MedAire provides such advice in response to more than 55,000 incidents a year (including both fitness-to-fly assessments and inflight medical events). In the United States, there is only one other commercial provider of such remote medical advice to airlines, and that is the STAT-MD service

operated by the University of Pittsburgh Medical Center in Pennsylvania. (A few airlines employ their own ground-based doctors directly for remote medical advice.)

MedAire and STAT-MD operate independently, and there is no interaction between them. Moreover, there are no trade groups or associations regarding the provision of remote medical advice. Nor are there any regular meetings or conventions held to discuss the provision of remote medical advice, nor any professional journals devoted to such. In addition, there are few scientific articles or studies, let alone randomized controlled trials, relating to the provision of remote medical advice to airlines.

Accepted medical customs and standards typically arise through scientific studies, professional journals, trade groups, and regular conventions of physicians in the same specialty. To date, though, none of these sources of standards exist for providing remote medical advice to airlines. Hence, no accepted medical customs or standards exist for such.

MedAire uses emergency physicians to provide remote medical advice to airlines, and there are certainly medical customs and standards that apply to the work of emergency physicians treating patients in the emergency department. But treating patients in the emergency department is vastly different than providing remote advice to an airline pilot about an ill passenger whom the physician cannot see or talk to, in an environment where even basic tests and procedures can't be carried out.

**Third Opinion:**

Because every in-flight medical event ("IFME") is unique, MedAire leaves to the clinical judgment of each individual physician whether or not to recommend that a flight divert. MedAire has no internal standard specifying when a diversion should be recommended.

A MedLink physician consulting about an IFME has numerous, sometimes complicated, variables to evaluate, including among other things:

- the passenger's current medical complaint and symptoms;

- the passenger's age;

- the passenger's gender;

- the passenger's medical history, including possible allergies;

- the passenger's medication use;

- the length of the flight and the time to arrival at the planned destination;

- the current location of the flight and the proximity to appropriate medical facilities;

- what medical equipment and drugs are available on board;

- whether there are onboard medical personnel who can assist;

- how the passenger's symptoms change over time;

- how the passenger reacts to the limited treatment options.

9

Moreover, the MedLink physician must assess these variables quickly, within a matter of seconds, and then make immediate recommendations; he or she does not have the luxury to sit back and ponder or reflect on the matter.

I understand that MedAire has produced data concerning (1) all the IFMEs involving British Airways that were identified as "cardiac" in the First Quarter of 2012, as well as (2) the IFMEs identified as "cardiac" involving Drs. Reinhart and Monas in 2011-2014. A review of the data underlying those IFMEs confirms the broad diversity of calls and some of the numerous call variations which MedLink physicians confront on a regular basis.

These data underscore why it is not feasible to come up with a scientifically or medically-backed standard for when a physician should recommend diversion, and why MedAire thus leaves such recommendations to the clinical judgment of each physician, as informed by his or her background and experience. And unless a physician completely ignores all the evidence, there is no basis to "second guess" or impose some post hoc criticism of that physician. Such after-the-fact criticism would necessarily be affected by outcome bias.

**Fourth Opinion:**

Diversion of an aircraft to an alternate airport, to enable an ill passenger to get medical treatment, is very unusual, even when an ill passenger has chest pain; in the vast majority of situations, diversion is not medically necessary or appropriate.

MedAire maintains a database of aircraft diversions over a lengthy period of time, a database that is very likely the largest and most complete of its kind. Those data show

10

that a plane diverts to an alternate airport, on average, in only about 2% of the medical emergencies MedAire handles.  For example, MedAire records show the following:

- 2010: 471 diversions from 19,225 IFMEs, or 2.4%.

- 2011: 529 diversions from 22,637 IFMEs, or 2.3%.

- 2012: 532 diversions from 25,323 IFMEs, or 2.1%.

- 2013:  565 diversions from 28.954 IFMEs, or 2.0%

- 2014: 552 diversions from 34,475 IFMEs, or 1.6%.

While the percentage of diversions is higher for cardiac cases, including cases involving chest pain, even then, less than 8% of flights divert. For example, MedAire records show that, in the four-year period from 2010 through 2013, there were 369 diversions stemming from 6,093 IFMEs involving chest pain, or only about 7.58%.

And if we just look at diversions involving British Airways, the percentages are similar:

- 2010: 7 diversions from 111 BA IFMEs identified as cardiac, or 7.2%

- 2011:  12 diversions from 126 BA IFMEs identified as cardiac, or 9.6%.

- 2012: 8 diversions from 126 BA IFMEs identified as cardiac, or 6.3%.

- 2013: 7 diversions from 111 BA IFMEs identified as cardiac, or 6.4%.

In the course of my work for MedAire, I study the IFMEs, including diversions and IFMEs resulting in the death of a passenger, and I discuss those with client airlines when appropriate. Of course, because of privacy laws (such as HIPAA in the U.S.), it is often difficult to get complete follow up information on a passenger who was

11

hospitalized following a flight or diverted flight.  Nevertheless, based on my research and discussions with the client airlines, I am of the opinion that it is not necessary, nor would it be helpful, to recommend that airlines adopt a policy of diverting more flights.

Every year, of course, a handful of airline passengers will die of a serious illness that either occurs or manifests itself inflight.  Most such passenger deaths occur rather suddenly, from cardiac arrest, in situations where even immediate diversion would not have helped.  And in any event, such situations present an obvious and serious medical emergency. Chest pain and breathing difficulties, on the other hand, are often quite ambiguous.

Neither my research nor my discussions with airline clients suggests that MedAire is routinely not recommending sufficient diversions, or that airline pilots are not diverting planes often enough in light of the IFMEs.

**Fifth Opinion**:

A vital part of MedAire's services to airlines is to offer a "fitness-to-fly" assessment of passengers who appear ill or have some symptoms when they are either boarding the plane, or while they are on the plane but before takeoff. Although this was one of the services MedAire provided BA, BA failed to take advantage of the service in the case of Mr. Baillie. In my opinion, had MedAire been asked to assess Mr. Baillie's fitness-to-fly, MedAire would have recommended that he not be allowed to stay on the flight.

According to Mrs. Baillie, when Mr. Baillie boarded BA 289, he advised a flight attendant that he wasn't sure he should be on the flight, because he was not feeling well

and had chest pains and was short of breath. According to Mr. Baillie, "the flight attendant told him to please sit down in his seat and that they would take care of him, so he did." Had a MedAire medical person been advised that a passenger had such symptoms, on a non-stop transatlantic flight scheduled to last more than 10 hours, it would have been an easy and obvious assessment: MedAire would have recommended that the passenger not be allowed to fly.

But BA didn't call MedAire about the matter, and the plane took off with no fitness-to-fly assessment.

In 2012, for example, MedAire's reports to British Airways show that MedAire handled 2,254 "fitness-to-fly" assessments for that airline (along with 2,035 IFMEs). As a result, in 2012 MedAire recommended that 452 apparently ill or injured British Airways passengers not be allowed to fly. When one looks at the patch summaries of just a selection of those 452 cases receiving a "no fly" recommendation, they make it clear that, had a pre-flight assessment of Mr. Baillie been done, MedAire would have recommended that he be offloaded.

Paulo Alves, M.D.                    05/25/2016
                                     Date

## APPENDICES

A.    Curriculum Vitae

B.    Materials Considered

13

EXHIBIT 22

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


LINDA ANN BAILLIE, individually, as )
Personal Representative of the       )
Estate of JAMES DONALD BAILLIE, II, )No. 2:14-cv-00420-SMM
and on behalf of all heirs and next )
of kin of JAMES DONALD BAILLIE, II, )
deceased,                            )
                                     )
                                     )
             Plaintiffs,             )
                                     )
     vs.                             )
                                     )
MEDAIRE, INC.; STEVEN JOE REINHART, )
D.O.; and JESSICA MONAS, M.D.,       )
                                     )
             Defendants.             )
_____)


 VIDEO RECORDED DEPOSITION OF PAULO MAGALHAES ALVES, M.D.


                  Phoenix, Arizona
                  January 5, 2016
                     9:07 a.m.


Reported by:

Jennifer Honn, RPR

Arizona CR No. 50885

```
 1                    I N D E X

 2  WITNESS                                      PAGE

 3  PAULO MAGALHAES ALVES, M.D.

 4      Examination by Mr. Spragg                 5

 5

 6

 7                INDEX TO EXHIBITS

 8  Description                                  Page

 9  Exhibit 140   Plaintiff's Notice of Deposition    8
                  of Paulo M. Alves, M.D.
10

11

12                    *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  VIDEO RECORDED DEPOSITION OF PAULO MAGALHAES ALVES, M.D.,

2

3  was taken on January 5, 2016, commencing at 9:07 a.m., at

4  the law office of GALLAGHER & KENNEDY, 2575 East

5  Camelback Road, Suite 1100, Phoenix, Arizona, before

6  JENNIFER HONN, a Certified Reporter, Certificate No.

7  50885, for the State of Arizona.

8                          * * * * *

9
   COUNSEL APPEARING:
10

11        ON BEHALF OF PLAINTIFFS:

12            KREINDLER & KREINDLER LLP
             Robert J. Spragg, Esq.
13            750 Third Avenue, 32nd Floor
             New York, New York 10017
14            rspragg@kreindler.com

15        ON BEHALF OF DEFENDANTS:

16            GALLAGHER & KENNEDY, P.A.
             Mark C. Dangerfield, Esq.
17            2575 East Camelback Road
             Phoenix, Arizona 85016
18            mark.dangerfield@gknet.com

19

20  ALSO PRESENT:

21     Alex Marinakis, Videographer

22

23

24

25

```
 1                                    Phoenix, Arizona
                                      January 5, 2016
 2                                    9:07 a.m.

 3

 4              THE VIDEOGRAPHER:  We're on the record.

 5              Today's date is Tuesday, January 5th, 2016.

 6   The time on the video monitor is 9:07 a.m.

 7              This is the video-recorded deposition of

 8   Paulo M. Alves -- Alves, excuse me, M.D., noticed by

 9   counsel for the plaintiff in the matter of Linda Ann

10   Baillie, et al. versus MedAire Incorporated, et al.  This

11   matter is being held in the United States District Court

12   of the District of Arizona.  The case number is

13   2:14-CV-00420-SMM.  Our location is the law offices of

14   Gallagher & Kennedy located in Phoenix, Arizona.

15              The certified court reporter is Jennifer

16   Honn of Morris-Crowe Court Reporting located at 7650

17   South McClintock Drive, Suite 103, Tempe, Arizona 85284.

18              My name is Alex Marinakis.  I'm the

19   certified legal video specialist for the firm of

20   VideoDep, Incorporated, located at 7776 South Pointe

21   Parkway West, Suite 170, Phoenix, Arizona 85044.

22              Counsel, would you please identify

23   yourselves and whom you represent, starting with the

24   plaintiff's counsel, please.

25              MR. SPRAGG:  Robert Spragg, firm of
```

1   Kreindler & Kreindler.  I represent the plaintiff, Linda

2   Ann Baillie.

3                   MR. DANGERFIELD:  And Mark Dangerfield from

4   Gallagher & Kennedy representing MedAire, Inc., as well

5   as Drs. Reinhart and Monas.

6                   THE VIDEOGRAPHER:  Thank you, Counsel.

7                   The court reporter may swear in the witness

8   at this time, please.

9

10                  PAULO MAGALHAES ALVES, M.D.,

11  called as a witness herein, having been first duly sworn

12  by the Certified Reporter to speak the whole truth and

13  nothing but the truth, was examined and testified as

14  follows:

15

16                          EXAMINATION

17  BY MR. SPRAGG:

18     Q.   All right.  Good morning, Dr. Alves.  My name is

19  Robert Spragg.  As I stated, I represent plaintiff Linda

20  Ann Baillie in this lawsuit.

21          Today I'm going to be asking you questions about

22  MedAire, the telemedicine services that MedAire provides,

23  and the events of March 23rd, 2012, involving

24  Mr. Baillie.  Okay?

25          Would you please state your full name for the

```
 1   record.

 2        A.    My name is Paulo Magalhaes Alves.

 3        Q.    All right.  Could you spell your middle name?

 4        A.    Yes.  M-a-g-a-l-a -- sorry -- l-h-a-e-s.

 5        Q.    All right.  How do you pronounce that again?

 6        A.    Magalhaes.

 7        Q.    All right.  Thank you, sir.

 8              What's your birthday?

 9        A.    ████████ ████, ███.

10        Q.    Where were you born, sir?

11        A.    In the city of Natal, state of Rio Grande do

12   Norte, Brazil.

13        Q.    All right.  And does the court reporter need us

14   to have those spelled?

15              Okay.  What is your present home address, sir?

16        A.    It's ████ ████ ███ █████ █████, that's

17   █████████, ███████.

18        Q.    Dr. Alves, have you been deposed before?

19        A.    No.

20        Q.    Okay.  Since you -- I imagine your lawyer has

21   gone over the rules of a deposition with you, but I'll

22   just go ahead and do that again myself.

23              Today, I'm going to ask you a series of verbal

24   questions.  You'll be required to give me verbal answers

25   to those questions.  My questions and your answers will
```

 1   is that which is performed by MedLink; correct?

 2        A.   Not also that -- not only that, but also the

 3   what we call the GRC, so the passenger fit-to-fly

 4   assessments, for example, that is conducted at our

 5   headquarters, so it's not MedLink but it's the same

 6   thing, so we provide expertise in medical advice, medical

 7   recommendation on passenger fit to fly, fitness to fly.

 8        Q.   And GRC stands for Global Response Center?

 9        A.   Global Response Center.

10        Q.   All right.  And the Global Response Center

11   handles passenger fitness-to-fly inquiries from

12   commercial airlines; correct?

13        A.   That's correct.

14        Q.   Okay.  Do they handle any other type of medical

15   inquiry from commercial airlines?

16        A.   Yes.  They coordinate medical attention for crew

17   members while they are abroad, so overnight, and if they

18   are in a remote location, another country, and they need

19   medical attention.  So we can coordinate -- evaluate the

20   situation and coordinate the best form of attention for

21   those crew members.

22        Q.   Okay.  So you're talking about providing remote

23   medical advice for the employees of commercial airlines

24   when they're stationed abroad?

25        A.   That's correct, but mainly coordinating medical

1  attention, right, so we understand the situation and then

2  we'll recommend, well, this case will require an ER

3  evaluation because we need an X-ray, or no, this case can

4  go to, you know, to a medical office or, you know, we

5  need to bring a doctor to your hotel room or something

6  like that.  So we do this sort of coordination and all

7  the results around that.

8      Q.   Okay.  What is MedLink?

9      A.   MedLink is the service of medical advice mainly

10  for in-flight calls, although we also handle yacht calls

11  as well.

12      Q.   Okay.  Is the vast majority of the

13  communications handled by MedLink, is that -- do those

14  communications deal with commercial airlines?

15      A.   That's correct.

16      Q.   Vast majority?

17      A.   Yes.

18      Q.   Okay.  And MedLink is part of MedAire; correct?

19      A.   MedLink is a service of MedAire, yes.

20      Q.   And is MedAire responsible for the operation of

21  the MedLink communication center?

22      A.   Yes.

23      Q.   All right.  What is Emergency Professional

24  Services?

25      A.   It's the group that is contracted by MedAire to

173

VIDEO RECORDED DEPOSITION OF PAULO MAGALHAES ALVES, M.D. - 1/5/2016

1

2

3

4

5

6

7            I, the undersigned, say that I have read

8   the foregoing transcript of testimony taken January 5,

9   2016, and I declare, under penalty of perjury, that the

10  foregoing is a true and correct transcript of my

11  testimony contained therein.

12

13            EXECUTED this __17th__ day of __FEBRUARY__ , 2016.

14

15

16

17            

18            _____
             PAULO MAGALHAES ALVES, M.D.

19

20

21

22

23

24

25

## STATEMENT OF CHANGES AND/OR CORRECTIONS

*Re:* BAILLIE VS. MEDAIRE, INC.                    *Taken:* 01/05/16
*Video Recorded Deposition of:* PAULO MAGALHAES ALVES, M.D.

| Page | Line | Correction and/or Change | Reason |
|------|------|--------------------------|--------|
| 19 | 21 | 'KNOWN REVENUE' SHOULD READ 'NON-REVENUE' | TRANSCRIPTION ERROR |
| 22 | 2 | ALTHOUGH I AM ADMITTED TO | TRANSCRIPTION ERROR |
| 31 | 13 | THE NAME OF DR. STREITWIESER IS MISPELLED THROUGHOUT THE DOCUMENT | TRANSCRIPTION ERROR |
| 36 | 20 | NO, NOT BY THAT NAME, BUT MEDAIRE IS AN ISO 9001 CERTIFIED COMPANY | CLARIFICATION |
| 36 | 23 | FORMALIZED AS SUCH BY THAT NAME, NO, | |
| | 24 | BUT WE ARE AN ISO 9001 CERTIFIED COMPANY | CLARIFICATION |
| 54 | 22 | ... DOCUMENT, ASSUMING THE DOCTOR BELIEVES THE CHEST PAIN IS CARDIAC IN ORIGIN | CLARIFICATION |
| 55 | 14 | THAT'S CORRECT, ASSUMING THE DOCTOR BELIEVES THE CHEST PAIN IS CARDIAC IN NATURE, BUT... | CLARIFICATION |
| 68 | 18 | JUST SO YOU KNOW | TRANSCRIPTION ERROR |
| 68 | 19 | ... YOU KNOW, TRAINED IN AUSCULTATING | TRANSCRIPTION ERROR |

_____          02/17/2016
**Signature of Deponent**                    **Date**

## STATEMENT OF CHANGES AND/OR CORRECTIONS

*Re:* BAILLIE VS. MEDAIRE, INC.                    *Taken:* 01/05/16
*Video Recorded Deposition of:* PAULO MAGALHAES ALVES, M.D.

| Page | Line | Correction and/or Change | Reason |
|------|------|--------------------------|--------|
| 79 | 24 | THAT'S CORRECT, AS A CHECK-LIST USED AFTER THE DOCTOR HAS DECIDED TO RECOMMEND A DIVERSION. | CLARIFICATION |
| 87 | 1 | PRESENCE OF CHEST PAIN | TRANSCRIPTION ERROR |
| 93 | 4 | OPINION ON THAT | TRANSCRIPTION ERROR |

**Signature of Deponent**

02/17/2016
**Date**

```
 1   STATE OF ARIZONA    ) SS.
                         )
 2   COUNTY OF MARICOPA  )

 3           BE IT KNOWN that the foregoing proceedings were
     taken before me, JENNIFER HONN, certified Reporter No.
 4   50885, that the witness before testifying was duly sworn
     by me to testify to the whole truth; that the foregoing
 5   pages are a full, true and accurate record of the
     proceedings, all done to the best of my skill and
 6   ability; that the proceedings were taken down by me in
     shorthand and thereafter reduced to print under my
 7   direction.

 8
             [X] Review and signature was requested.
 9           [ ] Review and signature was waived.
             [ ] Review and signature not required.
10

11           I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in the
12   outcome hereof.

13           I FURTHER CERTIFY that I have complied with the
     ethical obligations set forth in ACJA 7-206. Dated at
14   Phoenix, Arizona, this 13th day of January, 2016.

15

16           Jennifer Honn, Certified Reporter
             Arizona CR No. 50885

17

18                       *   *   *

19

20           I CERTIFY that Morris-Crowe Court Reporting, LLC,
     has complied with the requirements set forth in ACJA
21   7-206.  Dated at Tempe, Arizona, this 14th day of
     January, 2016.

22

23

24

25           Morris-Crowe Court Reporting, LLC
             Arizona RRF No. R1001
```