EXHIBIT 26

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


LINDA ANN BAILLIE, individually, as )
Personal Representative of the       )
Estate of JAMES DONALD BAILLIE, II,  )No. 2:14-cv-00420-SMM
and on behalf of all heirs and next  )
of kin of JAMES DONALD BAILLIE, II,  )
deceased,                            )
                                     )
                                     )
            Plaintiffs,              )
                                     )
        vs.                          )
                                     )
MEDAIRE, INC.; STEVEN JOE REINHART,  )
D.O.; and JESSICA MONAS, M.D.,       )
                                     )
            Defendants.              )
_____)


VIDEO RECORDED DEPOSITION OF DAVID ROY STREITWIESER, M.D.


Phoenix, Arizona
January 7, 2016
9:04 a.m.


Reported by:

Jennifer Honn, RPR

Arizona CR No. 50885

1                          I N D E X

2    WITNESS                                            PAGE

3    DAVID ROY STREITWIESER, M.D.

4        Examination by Mr. Spragg                          5

5

6

7                    INDEX TO EXHIBITS

8    Description                                        Page

9    Exhibit 163   Plaintiff's Notice of Deposition        10
                   of David Roy Streitwieser, M.D.
10
     Exhibit 164   4/29/15 Videotaped 30(b)(6) Deposition  73
11                 of Emergency Professional Services, P.C.
                   by and through David Streitwieser, M.D.
12                 Case No. 4:13-cv-00566, Houston, Texas

13   Exhibit 165   MedAire Intake Form - MedLink          174
                   MA027908-MA027909
14
     Exhibit 166   British Airways Standard Change Order  189
15                 MedAire, Inc., Change Order No. 7

16                        * * * * *

17

18

19

20

21

22

23

24

25

1            DEPOSITION OF DAVID ROY STREITWIESER, M.D.,

2

3    was taken on January 7, 2016, commencing at 9:04 a.m., at

4    the law office of GALLAGHER & KENNEDY, 2575 East

5    Camelback Road, Suite 1100, Phoenix, Arizona, before

6    JENNIFER HONN, a Certified Reporter, Certificate No.

7    50885, for the State of Arizona.

8                        * * * * *

9
     COUNSEL APPEARING:
10

11           ON BEHALF OF PLAINTIFFS:

12               KREINDLER & KREINDLER LLP
                 Robert J. Spragg, Esq.
13               750 Third Avenue, 32nd Floor
                 New York, New York 10017
14               rspragg@kreindler.com

15           ON BEHALF OF DEFENDANTS:

16               GALLAGHER & KENNEDY, P.A.
                 Mark C. Dangerfield, Esq.
17               2575 East Camelback Road
                 Phoenix, Arizona 85016
18               mark.dangerfield@gknet.com

19

20   ALSO PRESENT:

21       Alex Marinakis, Videographer

22

23

24

25

1                                    Phoenix, Arizona
                                     January 7, 2016
2                                    9:04 a.m.

3

4             THE VIDEOGRAPHER:  We're on the record.

5             Today's date is Thursday, January 7, 2016.

6   The time on the video monitor is 9:04 a.m.

7             This is the video-recorded deposition of

8   David R. Streitwieser, M.D., noticed by counsel for the

9   plaintiff in the matter of Linda Ann Baillie, et al.

10  versus MedAire, Incorporated, et al.  This matter is

11  being held in the United States District Court, District

12  of Arizona.  The case number is 2:14-CV-00420-SMM.

13            Our location is the law offices of

14  Gallagher & Kennedy located in Phoenix, Arizona.

15            The certified court reporter is Jennifer

16  Honn of Morris-Crowe Court Reporting located at 7650

17  South McClintock Drive, Suite 103, Tempe, Arizona 85284.

18            My name is Alex Marinakis.  I'm the

19  certified legal specialist from the firm of VideoDep,

20  Incorporated, located at 7776 South Pointe Parkway West,

21  Suite 170, Phoenix, Arizona, 85044.

22            Counsel, would you please identify

23  yourselves and whom you represent, starting with the

24  plaintiff's counsel.

25            MR. SPRAGG:  My name is Robert Spragg of

VIDEO RECORDED DEPOSITION OF DAVID ROY STREITWIESER, M.D. - 1/7/2016

```
 1  the law firm of Kreindler & Kreindler in New York.  I
 2  represent plaintiff Linda Ann Baillie.
 3              MR. DANGERFIELD:  I'm Mark Dangerfield,
 4  Gallagher & Kennedy, representing the defendants,
 5  MedAire, Inc., and Dr. Reinhart and Dr. Monas.
 6              THE VIDEOGRAPHER:  Thank you, Counsel.
 7              The court reporter may swear in the witness
 8  at this time, please.
 9
10              DAVID ROY STREITWIESER, M.D.,
11  Called as a witness herein, having been first duly sworn
12  by the Certified Reporter to speak the whole truth and
13  nothing but the truth, was examined and testified as
14  follows:
15                        EXAMINATION
16  BY MR. SPRAGG:
17      Q.   Good morning, Dr. Streitwieser.
18      A.   Good morning.
19      Q.   My name is Robert Spragg.  I'll be asking you
20  questions today about MedAire, EPS, MedLink, and the
21  events on board British Airways Flight 289 on March 23rd,
22  2012.
23              Would you please state your full name for the
24  record?
25      A.   David Roy Streitwieser.
```

VIDEO RECORDED DEPOSITION OF DAVID ROY STREITWIESER, M.D. - 1/7/2016

1    Q.   And what is your birth date?

2    A.   October 12th, 1953.

3    Q.   Where were you born, sir?

4    A.   Oakland, California.

5    Q.   And what is your present home address?

6    A.   10150 East Wethersfield, which is W-e-t-h-e-r-s-

7    field, it's all one word, Road, Scottsdale, Arizona.

8    Q.   Doctor, have you ever been deposed before?

9    A.   Yes.

10   Q.   Okay.  On how many occasions?

11   A.   Over a dozen.

12   Q.   All right.  And in regard to what subjects in

13   general?

14   A.   Usually emergency medicine, either as a

15   defendant in a case on two occasions, and expert witness,

16   been on other emergency medicine cases, primarily.

17   Q.   All right.  And the cases in which you were a

18   defendant, were those medical malpractice cases or a

19   different a type of case?

20   A.   Medical mal cases.

21   Q.   Okay.  And have you ever been deposed in regard

22   to cases being brought against MedAire, for example?

23   A.   Yes.

24   Q.   Okay.  And how about in cases being brought

25   against EPS?

VIDEO RECORDED DEPOSITION OF DAVID ROY STREITWIESER, M.D. - 1/7/2016

1     A.   Yes.

2     Q.   Okay.  And is it your understanding you're

3  appearing today pursuant to that notice?

4     A.   Yes.

5     Q.   Doctor, what is you current occupation?

6     A.   I am an emergency physician with a corporation

7  called Emergency Professional Services, PC.

8     Q.   Are you presently employed by Emergency

9  Professional Services, PC?

10    A.   Yes.

11    Q.   Okay.  Today, while we're speaking, if I use the

12  acronym "EPS," will you understand that to mean Emergency

13  Professional Services, PC?

14    A.   Yes.

15    Q.   All right.  That should shorten some of the

16  questions and answers, I expect.

17         Doctor, how long have you been employed by EPS?

18    A.   33 and a half years.

19    Q.   All right.  And what position or positions do

20  you presently hold at EPS?

21    A.   Currently, I am the president of EPS as well as

22  being an emergency physician, provider.

23    Q.   All right.  So you're the president of EPS, but

24  then you're also one of the emergency medicine physicians

25  who works for EPS as well?

1    EPS, did you hold any other positions within the company?

2        A.    We had what we called co-directors, so there

3    were three senior directors.  I was one of those three.

4        Q.    What is the primary business of EPS, Doctor?

5        A.    We provide emergency services to currently five

6    emergency departments in the state of Arizona run by the

7    Banner Health Corporation.

8        Q.    Okay.  When you say you supply emergency

9    services, are you supplying the physicians who provide

10   those emergency medicine services?

11       A.    The physicians and any allied health providers.

12       Q.    Okay.  What do you mean by the term "allied

13   health providers"?

14       A.    Well, that means nurse practitioners and PAs,

15   physicians' assistants.

16       Q.    All right.  Does EPS also provide emergency

17   medicine physicians to MedAire?

18       A.    We have a separate contract to provide emergency

19   physicians for the MedLink service.

20       Q.    And that contract is with MedAire?

21       A.    Yes.

22       Q.    All right.  So EPS has a contract with the

23   Banner Health System, I believe you called it, in regard

24   to providing emergency medical services in their

25   emergency departments at their hospitals; correct?

1       A.   Yes.

2       Q.   Okay.  And EPS also has a contract with MedAire

3   to supply emergency physicians for the MedLink call

4   service; correct?

5       A.   Yes.

6       Q.   All right.  What is MedLink, Doctor?

7       A.   MedLink is a service provided by MedAire which

8   provides medical advice to a variety of clients.  The

9   majority, at least of our services, are for commercial

10  airlines.

11      Q.   All right.  And, Doctor, are you personally

12  compensated in any way by MedAire?

13      A.   Yes.

14      Q.   All right.  Do you have a -- what position -- do

15  you have a separate contract with MedAire personally?

16      A.   Yes.

17      Q.   All right.  Do you have a title in regard to the

18  work that you do for MedAire?

19      A.   Currently, they call me the MedLink medical

20  director.

21      Q.   All right.  So as the MedLink medical director,

22  do you have any responsibilities for the training of the

23  MedLink physicians?

24      A.   I am one of the physicians who helps train the

25  different physicians for MedLink.

 1   of -- the MedLink policies themselves for the EPS

 2   physicians.  Do they have anything that differs that you

 3   know of?

 4              MR. DANGERFIELD:  Object to form.

 5              THE WITNESS:  I'm not aware of the MedLink

 6   policies for the physicians.  We have an expected

 7   response when physicians go to MedLink and how they

 8   handle cases, and all the physicians understand that.

 9      Q.    (By Mr. Spragg) Because they're trained to

10   understand it; correct?

11      A.    And -- yes.

12      Q.    Okay.  So the MedAire-EPS agreement, then,

13   requires EPS doctors that are working in the MedLink call

14   center to perform their duties in conformance with the

15   currently approved methods and practices in emergency

16   medicine; correct?

17      A.    Well --

18      Q.    Based on that sentence?

19      A.    You can read the sentence that way.

20      Q.    Okay.

21      A.    It's an application of emergency medicine that's

22   different than standard practice.

23      Q.    All right.  But they're supposed to be -- the

24   contract requires that the duties they perform at all

25   times under this contract have to be performed in strict

VIDEO RECORDED DEPOSITION OF DAVID ROY STREITWIESER, M.D. - 1/7/2016

1      Q.    In regard to all the information that the

2    MedAire CSE and Dr. Reinhart were provided by the crew of

3    Flight 289, is it fair to say that none of that

4    information was recorded by Dr. Reinhart in the MedLink

5    notes section of the MedLink intake form, at least in

6    handwritten form?

7      A.    Correct.

8      Q.    Now, if you'd be so kind, Doctor, as to return

9    to the transcript, and we're going to look at repatch

10   number one, which begins in the top third of page BA490

11   and starts at 19:12 UTC, and then also continues later on

12   that page in repatch number one, MedLink doctor rejoins

13   the call at 19:18 UTC, and then carries over just to the

14   top of the next page before the second repatch begins.

15          If you could read that first repatch and the

16   repatch when the doctor rejoins the call to yourself, I

17   will have a couple of questions for you about that, sir.

18     A.    Okay.

19          Okay.

20     Q.    Doctor, you've read the information pertaining

21   to first repatch, starting at 19:12 UTC?

22     A.    Yes.

23     Q.    Okay.  So from the transcript it appears that

24   the crew of British Airways Flight 289 called back at

25   19:12 UTC, which is about 22 minutes after the initial

1   deterioration or no change in regard to the condition of

2   the ill patient?

3       A.    There's that, and to help me make diversion

4   planning.

5       Q.    Okay.  It appears from the transcript that the

6   only information that is discussed is the fact that there

7   are six hours, approximately, still left in the flight;

8   correct?

9       A.    Correct.

10      Q.    All right.  Doctor, as a MedLink doctor, do you

11  have a standard that you use when you have an ill

12  passenger on a commercial flight who's experiencing a

13  potential coronary event?

14              MR. DANGERFIELD:  Object as to form.

15              THE WITNESS:  I have a personal standard.

16      Q.    (By Mr. Spragg) Okay.

17      A.    Yes.

18      Q.    And can you tell me what that is, Doctor?

19      A.    If I am unable to relieve the pain within a

20  reasonable period of time, say, and actively treating it

21  20 to 30 minutes, and I'm strongly convinced that it's

22  ACS, then I will look at diversion options.

23      Q.    Okay.  So your personal standard is if you have

24  a potential ACS case -- okay.

25      A.    Okay.  You can finish, but --

1   diagnosis, but in this particular case, I can't tell.

2        Q.   Okay.  Well, would you agree that the symptoms

3   that have been provided to the MedLink and CSE and

4   Dr. Reinhart would indicate that at least there's a

5   potential for the ill patient to be experiencing ECS --

6   ACS-related symptoms?

7        A.   Yes.

8        Q.   All right.  And based on what the -- based on

9   the treatment options that a MedLink doctor would have

10  available to him on board a British Airways flight, the

11  MedLink doctor would not be able to eliminate ACS from

12  the possible things that the ill patient could be

13  suffering from; correct?

14       A.   You can never eliminate ACS.

15       Q.   Correct, unless you get somebody into an

16  emergency department facility and actually run blood

17  tests and do an EKG and things of that nature; correct?

18       A.   Correct.

19       Q.   Okay.  But I'm talking about up in the aircraft

20  environment, we know that British Airways does not carry

21  ECG devices on board; correct?

22       A.   Correct.

23       Q.   They don't carry Tempus ICs, and they don't

24  carry Tempus 2000s; correct?

25       A.   Correct.

1  aircraft and with thousands of calls is that the

2  stethoscopes available are such poor quality, they would

3  not be able to tell that with any reliability.

4  　　Q.　Okay.  You didn't review the transcript of

5  Dr. Verma, which is the name of the fellow who was the

6  onboard physician on the aircraft?

7  　　A.　No.

8  　　Q.　Okay.

9  　　　　MR. DANGERFIELD:  When it's convenient, I'd

10  like to take a break.

11  　　　　MR. SPRAGG:  Okay.  Let me just finish this

12  area of questioning, and then we'll move on.

13  　　Q.　(By Mr. Spragg) And from the transcript, do you

14  see anywhere where Dr. Reinhart ever asks the British

15  Airways Flight 289 crew if they could go back to that

16  doctor and ask him if he was sure that he heard crackles

17  in the ill passenger's chest?

18  　　A.　That's correct, I don't see that.

19  　　Q.　All right.  Doctor, do you -- you told us that

20  you do personal one-on-one sessions -- strike that.

21  　　　　You told us you do personal one-on-one training

22  sessions with MedLink physicians; correct?

23  　　A.　Correct.

24  　　Q.　Okay.  When you do those personal one-on-one

25  training sessions, do you teach your MedLink chest pain

1   standard that we've just discussed to other MedLink

2   physicians?

3               MR. DANGERFIELD:  Object as to form.

4               THE WITNESS:  I don't recall mentioning

5   that specifically.

6       Q.   (By Mr. Spragg) Okay.  And is there a reason why

7   you don't?

8       A.   Well, just that there's a lot of material to

9   cover, and that's material that most emergency physicians

10  would understand.  And so there's a great deal of other

11  points to review during that hour-and-a-half --

12      Q.   Okay.

13      A.   -- time.  So I don't know that that's a specific

14  point.

15      Q.   All right.  Is that MedLink chest pain standard

16  that you previously described for me, is that

17  incorporated into the MedLink training of the doctors?

18              MR. DANGERFIELD:  Object as to form.

19              THE WITNESS:  Yeah, and actually, you

20  called it a MedLink standard.

21      Q.   (By Mr. Spragg) Yeah.  If you want to call it

22  something else, we can.  I just want to -- I need --

23      A.   That's my personal standard.

24      Q.   Okay.  So it's your personal chest pain

25  standard?

1    A.    Correct.

2    Q.    Can we use that term?

3    A.    Yes.

4    Q.    All right.  Do you know if your personal chest

5  pain standard is incorporated anywhere into the training

6  that's provided to MedLink doctors?

7    A.    I don't know if it's provided on the MedAire

8  side.

9    Q.    Okay.  I'm asking --

10    A.    I don't know if it's provided specifically in

11  the MedLink side either.

12              MR. SPRAGG:  Okay.  We can stop and take a

13  short break.

14              MR. DANGERFIELD:  Let's take a break.

15              THE VIDEOGRAPHER:  We're going off the

16  record.  The time is approximately 10:24 a.m.

17              (Recess from 10:24 a.m. to 10:32 a.m.)

18              THE VIDEOGRAPHER:  We're back on the

19  record.  The time is approximately 10:32 a.m.

20    Q.    (By Mr. Spragg) Now, Doctor, going back to your

21  personal chest pain standard, would it be fair to say

22  that your chest pain standard is basic knowledge that's

23  incorporated into the MedLink training of all the MedLink

24  doctors?

25              MR. DANGERFIELD:  Object as to form.

1                    THE WITNESS:  I can't say that.

2        Q.   (By Mr. Spragg) You can't say?

3        A.   I cannot say that.

4        Q.   Okay.  How about this question:  Do you believe

5   that all MedLink physicians would operate under that same

6   basic standard when handling a MedLink call involving a

7   passenger with chest pain because it's basic knowledge

8   that comes with their training?

9        A.   I tend to believe that statement.

10       Q.   Okay.  It's true?

11       A.   Yeah.  But, you know, again, qualifying the

12   chest pain is --

13       Q.   Correct.

14       A.   -- really the key.

15       Q.   Right.

16       A.   And as I mentioned, there's that continuum, high

17   risk, low risk, where are they on that spectrum.  You

18   have to just put that all together.  But yeah, serious,

19   concerning chest pain, it's reasonable.

20       Q.   So you believe that when an ill passenger on an

21   airplane has serious, concerning chest pain, that all the

22   MedLink physicians would operate under your chest pain

23   standard when analyzing and dealing with that ill

24   passenger's problem?

25       A.   I would hope they would --

1  this airline, it says this and this and this, or there's

2  nothing in here about whether they should fly or not,

3  what do you think.

4      Q.   Uh-huh.

5      A.   So these are just points.  But what you have to

6  realize is that nowadays the gate screens that doctors

7  make are so rare that I doubt any of the MedLink doctors,

8  other than a handful of us who take a lot of calls, would

9  know these.

10     Q.   All right.

11     A.   Even consider them.  So calling it a guideline

12  is a stretch.

13     Q.   All right.  Okay.  So we won't call the

14  guideline in the medical issues -- we won't call the

15  medical issues prescreening section a guideline here.

16          Today, how many MedLink doctors are there?

17     A.   About 50.

18     Q.   Okay.  Back in 2012, how many were there,

19  approximately?

20     A.   35.

21     Q.   Okay.  So there's more today than there was

22  in 2012; is that a fair statement?

23     A.   Maybe not 15 more.  Maybe 40 back then.  There's

24  more now, yes.

25     Q.   Okay.  And is that because the number of calls

1      Q.    Okay.   And that would not have been Mr. Baillie

2   based on the information received by Dr. --

3      A.    I would not have checked him off as this.

4      Q.    Right.   Would you have considered Mr. Baillie's

5   condition -- based on all the symptoms provided to

6   Dr. Reinhart in the initial patch and the first repatch,

7   would you have considered Mr. Baillie to be potentially

8   unstable, unable to rule out life threat?

9      A.    If I'm checking off where he would fit on this

10   form, I think that's the -- that's the category I would

11   choose.

12      Q.    Okay.   And, in fact, within the parenthetical

13   there it says "possible ACS."   Correct?

14      A.    Correct.

15      Q.    All right.   I don't know if I asked you this

16   already:   If Mr. Baillie presented to you in the

17   emergency department at Banner Good Samaritan Hospital

18   with the symptoms that were described to the MedLink

19   doctor on March 23rd, 2012, would you have -- what would

20   you have done?

21            MR. DANGERFIELD:   Object to form.

22            THE WITNESS:   That's an unfair question.

23   That's a completely different scenario.

24      Q.    (By Mr. Spragg) How about if I put it this way:

25   Would you have ordered an ECG on Mr. Baillie?

1    reason for diversion section.

2              So it's fair to say that Mr. Baillie, if you had

3    to choose one of these items, was potentially unstable at

4    the time his symptoms were presented to the MedLink call

5    center during the initial and first repatches on that

6    date; correct?

7         A.   Correct.

8         Q.   All right.  And he would be considered

9    potentially unstable because you're unable to rule out a

10   life threat; correct?

11        A.   Well --

12        Q.   Or is that all one characterization?

13        A.   He's got the potential to deteriorate or worsen.

14        Q.   Mr. Baillie did?

15        A.   Mr. Baillie.

16        Q.   Okay.

17        A.   If -- that's what this category means to me.

18        Q.   Okay.  Doctor, we're going to go back to

19   Exhibit 18, which is the transcript of communications

20   between the MedLink call center and British Airways

21   Flight 289 on March 23rd, 2012.

22              If you would, turn to page BA491.  And at the

23   top quarter of the page, there's repatch number two which

24   begins at 22:34 UTC, and that's followed by repatch

25   number two MedLink doctor joins the call at 22:38 UTC.

 1    onboard providers.

 2            Those are -- so whoever put that statement in, I

 3    don't agree with it, and I don't know, again, the intent

 4    of this document, since CSEs can't really tell us whether

 5    to divert or not.

 6       Q.   Okay.  Well, would you then modify that

 7    statement so that it would say reduction of medically

 8    unnecessary diversions is one of the main selling points

 9    of the MedLink service?

10       A.   Possible.

11            MR. DANGERFIELD:   Object as to form.

12       Q.   (By Mr. Spragg) Okay.

13       A.   Possible reduction of medically unnecessary

14    diversions, I said, could be a main selling point.

15       Q.   Okay.

16       A.   But I don't do the sales.

17       Q.   No, you don't -- this is obviously -- you didn't

18    write this document; correct?

19            And if you did, you probably wouldn't include

20    that statement; correct?

21       A.   Correct.

22       Q.   Going back to Exhibit No. 3, which is the intake

23    form pertaining to Mr. Baillie's in-flight medical

24    emergency on March 23rd, 2012.

25            Looking at that first page, how would you

1  characterize Dr. Reinhart's MedLink intake form notes

2  regarding Mr. Baillie's chest pain and other symptoms and

3  his instructions to the British Airways crew?

4            MR. DANGERFIELD:  Object as to form.

5            THE WITNESS:  Undocumented.

6  Q.    (By Mr. Spragg) Now, MedAire CSEs are required

7  to fill out certain portions of the MedAire intake form

8  when they first receive a call from a commercial airline

9  regarding an in-flight medical emergency; correct?

10  A.    Correct.

11  Q.    And then when they do receive that information

12  from an airline, there are -- do you have an

13  understanding as to whether there are certain required

14  items of information that they should be obtaining so

15  they can provide those to the MedLink doctor?

16  A.    Yes.

17  Q.    Okay.  And we previously discussed this, but the

18  information on the MedLink intake form that's supposed to

19  be provided to the MedLink doctor when they first join

20  the call is the information that would be included in one

21  of the two top sections of the first page; correct?

22            That's where the MedAire CSE puts their info,

23  information?

24  A.    The form is currently different, but this is

25  similar.

VIDEO RECORDED DEPOSITION OF DAVID ROY STREITWIESER, M.D. - 1/7/2016

1

2

3

4

5

6

7          I, the undersigned, say that I have read

8    the foregoing transcript of testimony taken January 7,

9    2016, and I declare, under penalty of perjury, that the

10   foregoing is a true and correct transcript of my

11   testimony contained therein.

12

13          EXECUTED this ___9+4___ day of ___FEB___, 2016.

14

15

16

17                    _____

18                    DAVID ROY STREITWIESER, M.D.

19

20

21

22

23

24

25

## STATEMENT OF CHANGES AND/OR CORRECTIONS

*Re:* BAILLIE VS. MEDAIRE, INC.                    *Taken:* 01/07/16
*Video Recorded Deposition of:* DAVID ROY STREITWIESER, M.D.

| Page | Line | Correction and/or Change | Reason |
|------|------|--------------------------|--------|
| 62 | 18 | Add "if I am strongly convinced that it's ACS, as I said earlier." P. 58 lines 21-22 | Consistancy clarification |
| 76 | 13 | Add "again, if I am strongly convinced that it's ACS" | Consistancy clarificat |
| 110 | 13 | Add "if you are strongly convinced that it's ACS" | consistancy clarificat |
| 135 | 15 | Add "after the patch is over" | clarification |

_Signature of Deponent_          2/9/16
                                 _Date_

```
 1   STATE OF ARIZONA    ) SS.
                         )
 2   COUNTY OF MARICOPA  )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me, the JENNIFER HONN, certified Reporter No.
 4   50885, that the witness before testifying was duly sworn
     by me to testify to the whole truth; that the foregoing
 5   pages are a full, true and accurate record of the
     proceedings, all done to the best of my skill and
 6   ability; that the proceedings were taken down by me in
     shorthand and thereafter reduced to print under my
 7   direction.

 8
          [X] Review and signature was requested.
 9        [ ] Review and signature was waived.
          [ ] Review and signature not required.
10

11        I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in the
12   outcome hereof.

13        I FURTHER CERTIFY that I have complied with the
     ethical obligations set forth in ACJA 7-206. Dated at
14   Phoenix, Arizona, this 14th day of January, 2016.

15

16        Jennifer Honn, Certified Reporter
          Arizona CR No. 50885

17

18                   *   *   *

19
          I CERTIFY that Morris-Crowe Court Reporting, LLC,
20   has complied with the requirements set forth in ACJA
     7-206.  Dated at Tempe, Arizona, this 14th day of
21   January, 2016.

22

23

24
          Morris-Crowe Court Reporting, LLC
25        Arizona RRF No. R1001
```

EXHIBIT 27

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually,  )
as Personal Representative of the )No.2:14-CV-00420-SMM
Estate of JAMES DONALD BAILLIE,   )
II, and on behalf of all heirs and )
next of kin of JAMES DONALD       )
BAILLIE, II, deceased,            )
                                  )
            Plaintiff,            )
                                  )
        vs.                       )
                                  )
MEDAIRE, INC.; STEVEN JOE REINHART,)
D.O.; and JESSICA MONAS, M.D.,    )
                                  )
            Defendants.           )
_____)

VIDEO-RECORDED DEPOSITION OF PAULO M. ALVES, M.D.

Phoenix, Arizona
July 29, 2016
8:55 a.m.

REPORTED BY:

STEPHANIE WINTERS, RPR
Certified Reporter, No. 50067

1                          I N D E X

2   EXAMINATION                                          PAGE

3   PAULO M. ALVES, M.D.

4       Mr. Spragg                                         6

5

6                          E X H I B I T S

7

    EXHIBIT NO.              DESCRIPTION                  PAGE
8
        184  -   Expert Report of Paulo Alves, M.D.        6
9
        185  -   Statement of Changes And/Or Corrections  12
10               to Dr. Alves' Deposition, Taken
                 1/5/16
11
        186  -   Aerospace Medical Association, Medical    35
12               Guidelines for Airline Travel

13      187  -   IATA Medical Manual, April 2016,          39
                 8th Edition
14
        188  -   IATA Cabin Operations Safety, Best        52
15               Practices Guide 2015

16      189  -   Guidance Document, Medical Emergencies:   52
                 Managing In-Flight Medical Events
17

18

19

20

21

22

23

24

25

1        VIDEO-RECORDED DEPOSITION OF PAULO M. ALVES, M.D.

2

3  was taken on July 29, 2016, at 8:55 a.m. at Gallagher &

4  Kennedy, P.A., 2575 East Camelback Rd., Phoenix, Arizona,

5  before STEPHANIE WINTERS, Certified Reporter Number 50067,

6  in and for the State of Arizona.

7                          * * * *

8
   COUNSEL APPEARING
9
           ON BEHALF OF PLAINTIFF:
10
               ROBERT J. SPRAGG, ESQ.
11             KREINDLER & KREINDLER LLP
               750 Third Avenue
12             New York, NY 10017
               (212)687-8181
13             rspragg@kreindler.com

14
           ON BEHALF OF DEFENDANTS:
15
               MARK C. DANGERFIELD, ESQ.
16             GALLAGHER & KENNEDY, P.A.
               2575 E. Camelback Road
17             Phoenix, AZ 85016-9225
               602-530-8000
18             mark.dangerfield@gknet.com

19
   ALSO PRESENT:
20
               Alex Marinakis, Videographer
21             VideoDep, Inc.

22

23

24

25

```
 1                                    Phoenix, Arizona
                                      July 29, 2016
 2                                    8:55 a.m.

 3

 4

 5            THE VIDEOGRAPHER:  We're on the record.  Today's

 6   date is Friday, July 29th, 2016.  The time on the video

 7   monitor is 8:55 a.m.  This is the video-recorded deposition

 8   of Paulo M. -- excuse me, Paulo M. Alves, M.D., noticed by

 9   counsel for the plaintiff in the matter of Linda Ann

10   Baillie, et al. versus MedAire, Incorporated, et al.

11            This matter is being held in the United States

12   District Court, District of Arizona.  The case number is

13   2:14-CV-00420-SMM.  Our location is the law offices of

14   Gallagher & Kennedy located in Phoenix, Arizona.  The

15   certified court reporter is Stephanie Winters of

16   Morris-Crowe Court Reporting, located at 7650 S. McClintock

17   Drive, Tempe, Arizona 85284.  My name is Alex Marinakis.

18   I'm the certified legal video specialist for the firm of

19   VideoDep, Incorporated, which is located at 7776 S. Pointe

20   Parkway West, Suite 170, Phoenix, Arizona, 85044.

21            Counsel, would you please introduce yourselves and

22   whom you represent, starting with the plaintiff's counsel,

23   please.

24            MR. SPRAGG:  Robert Spragg of Kreindler &

25   Kreindler in New York representing Linda Ann Baillie.
```

1              MR. DANGERFIELD:  And Mark Dangerfield

2    representing MedAire, Inc. and Drs. Steven Reinhart and

3    Jessica Monas.

4              THE VIDEOGRAPHER:  Thank you, counsel.  The court

5    reporter may swear in the witness at this time, please.

6

7                    PAULO M. ALVES, M.D.,

8    called as a witness herein, having been first duly

9    sworn, was examined and testified as follows:

10

11                 E X A M I N A T I O N

12   BY MR. SPRAGG:

13        Q.   Good morning, Dr. Alves.

14        A.   Good morning.

15        Q.   You and I have previously met when we had your

16   deposition back in January of this year.

17             Doctor, are you providing an expert opinion in

18   this case in your capacity as the Global Director for

19   Aviation Health at MedAire?

20        A.   Correct.

21        Q.   Okay.  Are you being paid for your expert work

22   above and beyond what your salary is at that position at

23   MedAire?

24        A.   No.

25        Q.   Okay.  Doctor, what is your role in this case, as

1      Q.   Sure.  Let me just ask a -- sure, a couple more

2   questions and then we can take a break.

3      A.   Okay.

4      Q.   So when you talk about in-fight medical events

5   identified as "cardiac," what does the cardiac category

6   include?

7      A.   It could include arrhythmia, chest pain, sudden

8   cardiac arrest, palpitations, some -- you know, some

9   symptoms sometimes.  Yeah, I think those are the most common

10  among -- or within this category.

11     Q.   All right.  Thank you.

12          MR. DANGERFIELD:  Good time for a break?

13          MR. SPRAGG:  Yeah.  I was just going to finish the

14  last little paragraph on this page, so we can be done with

15  the page.  We have already actually discussed that point

16  earlier, so we'll take a break and go off the record.

17          THE VIDEOGRAPHER:  We're going off the record.

18  The time is approximately 10:48 a.m.

19              (Break taken.)

20          THE VIDEOGRAPHER:  We are back on the record.  The

21  time is approximately 10:50 -- excuse me, 10:57 a.m.

22  BY MR. DANGERFIELD:

23     Q.   All right, Doctor, continuing with your report.

24  We're now on page 12, and I will refer you to the first full

25  paragraph on page 12.

VIDEO-RECORDED DEPOSITION OF PAULO M. ALVES, M.D. - 7/29/2016

1

2

3

4

5

6

7           I, the undersigned, say that I have read the

8   foregoing transcript of testimony taken July 29, 2016, and I

9   declare, under penalty of perjury, that the foregoing is a

10  true and correct transcript of my testimony contained

11  therein.

12           EXECUTED this ___O1___ day of ___SEPTEMBER___,

13  ___2016___.

14

15

16           _____
                 PAULO M. ALVES, M.D.
17

18

19

20

21

22

23

24

25

## <u>STATEMENT OF CHANGES AND/OR CORRECTIONS</u>

*Re:* BAILLIE VS. MEDAIRE, INC.
*Video-Recorded Deposition of:* PAULO M. ALVES, M.D.     *Taken:* 07/29/16

| <u>Page</u> | <u>Line</u> | <u>Correction and/or Change</u> | <u>Reason</u> |
|---|---|---|---|
| 10 | 18 | SHOULD READ: "YES. EDITED. MADE SOME COMMENTS AND ADJUSTMENTS AND SIGNED IT. | CORRECTION |
| 15 | 17 | SHOULD READ: "PROCESSES, YOU KNOW, WIDE OPEN, IF YOU..." | CORRECTION |
| 22 | 12 | SHOULD READ: "KIND OF SCIENCE" | CORRECTION |
| 25 | 16 | SHOULD READ: "REPATCH" NOT "REPORT" IN BOTH INSTANCES | CORRECTION |
| 39 | 19 | SHOULD READ: "YES, EXCEPT THAT MY REPORT REFERRED TO A PRIOR EDITION WHICH HAS SOME MINOR DIFFERENCES IN WORDING." | CHANGE |
| 61 | 16 | THERE IS NO "IT'S", SHOULD READ: "TO MY KNOWLEDGE, STRUCTURED AS SUCH, THERE..." | CORRECTION |

_____
**Signature of Deponent**

09 / 01 / 2016
**Date**

## STATEMENT OF CHANGES AND/OR CORRECTIONS

*Re:* BAILLIE VS. MEDAIRE, INC.
*Video-Recorded Deposition of:* PAULO M. ALVES, M.D.    *Taken:* 07/29/16

| Page | Line | Correction and/or Change | Reason |
|------|------|--------------------------|--------|
| 97 | 8 | SHOULD READ: " ONE STORY OF STAIRS, OR WALKING FOR 50 METERS OR SO... " | CONFUSION |
| 104 | 18 | SHOULD READ: " SAME YEAR FOR ASMA... " NOT "ASTHMA" IN BOTH INSTANCES | CORRECTION |
| 106 | 21 | SHOULD READ: " DIVERSION" NOT "DIVISION" | CORRECTION |
| 110 | 11 | SHOULD READ: "... TO BE PRESIDENT... " NOT "PRESENT" | CORRECTION. |

**Signature of Deponent**

09/01/2016
**Date**

```
 1   STATE OF ARIZONA        )
                             )ss.
 2   COUNTY OF MARICOPA      )

 3          BE IT KNOWN that the foregoing proceedings were taken
     before me, STEPHANIE WINTERS, Certified Reporter No. 50067,
 4   that the witness before testifying was duly sworn by me to
     testify to the whole truth; that the foregoing pages are a
 5   full, true and accurate record of the proceedings, all done
     to the best of my skill and ability; that the proceedings
 6   were taken down by me in shorthand and thereafter reduced to
     print under my direction.

 7

 8          [X]   Review and signature was requested.
            [ ]   Review and signature was waived.
 9          [ ]   Review and signature was not required.

10

           I CERTIFY that I am in no way related to any of the
11   parties hereto, nor am I in any way interested in the
     outcome thereof.

12

           I FURTHER CERTIFY that I have complied with the
13   requirements set forth in ACJA 7-206.  Dated at Phoenix,
     Arizona, this 10th day of August, 2016.

14

15

     Stephanie Winters, RPR
16   Certified Reporter No. 50067

17

                        *        *        *

18

           I CERTIFY that Morris-Crowe Court Reporting, LLC, has
19   complied with the requirements set forth in ACJA 7-206.
     Dated at Tempe, Arizona, this 10th day of August, 2016.

20

21

22   Morris-Crowe Court Reporting, LLC
     Arizona RRF No. R1001

23

24

25
```