EXHIBIT 28



# University of Pittsburgh

*School of Medicine*
*Department of Emergency Medicine*

Forbes Tower, Suite 10028
3600 Forbes at Meyran Avenue
Pittsburgh, PA 15260
412-647-8287
Fax: 412-864-3400

## EXPERT REPORT OF RONALD N. ROTH, M.D., FACEP
### IN THE MATTER OF
*LINDA ANN BAILLIE V. MEDAIRE ET AL.*

I have been asked by counsel for the defendants in this matter to review the evidence and provide my professional opinions on various matters that I understand may be important to this case. For convenience, I have organized my opinions into seven separate sections, set forth below. All my opinions are based on a reasonable degree of medical probability.

**Qualifications:**

I have been a board certified emergency medicine physician since 1986. In 2014, I also received board certification in Emergency Medical Services (EMS), a subspecialty of Emergency Medicine. I currently serve as a Professor of Emergency Medicine and as Chief of the Division of EMS at the University of Pittsburgh Department of Emergency Medicine. I also participate as an emergency physician in the STAT-MD service offered by the University of Pittsburgh Medical Center ("UPMC"), and in that role provide medical consultation services to airlines for inflight passenger emergencies and pre-flight screening.

In addition, I serve as the medical director for various organizations, including the City of Pittsburgh Department of Public Safety and the Emergency Operations Center of Allegheny County, Pennsylvania. I also serve as the team physician for the Pittsburgh Steelers.

A copy of my CV is attached to this report.

1

**First Set of Opinions:**

Giving remote advice to the pilot or crew of an airline about an ill or injured passenger has the narrow goal of assessing the passenger's symptoms and discussing the limited treatment options available until the plane lands. This is very different than treating a patient in an emergency department.

I understand that MedAire was the first company in the United States to offer, on a commercial basis, the service of providing remote medical advice to airlines, and MedAire thus developed the model for doing so.  UPMC's STAT-MD offers a similar service in which I participate, which began in 1998.

Both MedAire's "MedLink" service and UPMC's STAT-MD service make emergency medicine physicians available for airline crews to speak to, 24/7, in order to receive medical consultation about ill or injured passengers. Such services are not intended to, and do not, function as a way for an emergency physician to diagnose and treat a patient on board an aircraft as he or she would do in an emergency department.

Rather, the services simply enable an airline pilot or crew member to briefly confer with an emergency physician about an ill or injured passenger's symptoms, and to receive advice on how the pilot or crew might handle that situation. In some cases the physician may also offer his or her view as to whether diversion of the flight to an unscheduled location might be medically appropriate, though only the captain of an airline has the authority to divert a plane to an alternate landing site. Remote medical advice services such as MedLink and STAT-MD help airlines better deal with ill or injured passengers, and may also reduce unnecessary flight diversions, which not only impose hardships on hundreds of other passengers, but can be dangerous as well.

Although both MedLink and STAT-MD make use of physicians trained in emergency medicine, the services are nothing like examining and treating a patient in an emergency department.  MedLink and STAT-MD doctors typically are not able to see or speak to an ill passenger, and they receive information about the passenger second, third

2

or even fourth hand. For example, the ill passenger may talk to an onboard medical provider about his or her condition, who then tells a flight attendant, who then talks to the pilot, who then calls the remote medical service. Moreover, when medical information is collected and communicated by lay people, it is not uncommon for information to be passed on imperfectly. In addition, communications between the airplane and the remote service are often difficult to understand due to the poor quality of the air-to-ground phone patch.

Some airlines have facilities that permit MedLink or STAT-MD physicians to speak directly with an onboard doctor located outside the cockpit, which can sometimes make communications about an ill passenger much easier. But I have been advised that the British Airways (BA) aircraft involved here had no such facilities.

There is also limited diagnostic equipment available onboard an aircraft (mainly, as in this case, just a stethoscope and blood pressure cuff), assuming there is onboard medical personnel who know how to use the equipment and the equipment is functioning. Moreover, an airplane in flight is very noisy, and because of the noise, stethoscopic examination of the heart, lungs, or abdomen is usually impossible. Aircraft typically have no ECG machine on board, and have no ability to evaluate blood or urine samples. An airplane in flight is not only very noisy, but lighting is dim and space is confined, further complicating both the evaluation and treatment of ill passengers. Each aircraft has a medical kit containing some drugs, but its contents are very limited.

Some airlines do have equipment on board that permit an ECG of a passenger to be taken, which is a key test that can sometimes confirm that a passenger is experiencing a serious heart attack. But, once again, I understand that BA aircraft have no such equipment.

Also, when patients present in the emergency department, various risk scores have been developed which can be helpful in stratifying patients who are at risk for ACS, but those risk scores rely in part on data that is not available onboard an airline. One such

score, for example, is the "Thrombolysis In Myocardial Infarction" or "TIMI" risk score. Based on 7 elements, that test yields a score of from 0 to 7. A score of 0 is the lowest risk, and a score of 7 is the highest. A person gets one risk point for each of the following characteristics:

1.    Older than 65 years of age;

2.    Documented prior cardiac catheterization with known disease, prior angioplasty or stent, prior bypass, or prior myocardial infarction;

3.    Three or more conventional cardiac risk factors, which include hypertension, diabetes, cholesterol elevation, family history of CAD/MI, or history of tobacco use;

4.    Use of aspirin in the preceding 7 days;

5.    Two or more anginal events in the past 24 hours;

6.    ST-segment elevation or depression greater than 1 mm;

7.    Elevated cardiac biomarkers.

If one tried to apply these factors to Mr. Baillie, his taking of an aspirin is the sole risk factor of which Dr. Reinhart was made aware, and based on that the passenger would have had a TIMI risk score of only 1, a very low risk. The TIMI risk score, however, could not be properly used to evaluate someone on an airplane, because essential data points 6 and 7 would not be available.

Finally, I have been advised that the emergency medicine physicians who give remote medical advice for MedLink are not employed by MedLink or MedAire, but rather work for Emergency Professional Services or "EPS," the medical group that staffs the emergency department at the Banner – University Medical Center Phoenix. I have also been told that, in 2012, none of the EPS physicians were stationed in the MedLink call center; rather, when an airline call came in, MedLink would page the emergency department for a doctor to come to the MedLink call center to respond to a call from an aircraft.

Because of the limited ability to diagnose or treat an ill or injured passenger on an airplane, an important part of both MedAire's and STAT-MD's service model is to help an airline keep such passengers *off* the airplane to begin with. MedAire does this by offering a "fitness-to-fly" assessment for passengers who, during boarding or before takeoff, appear to be ill or injured, or who advise the airline that they are ill or injured. When such passengers are identified, the airline can call MedAire, 24/7, and an experienced nurse or doctor will evaluate the circumstances and advise the airline whether the passenger should be allowed to fly.  STAT-MD offers a similar service.

In 2012, for example, I have been advised that MedAire fielded more "fitness-to-fly" calls from British Airways (2,254) than for inflight medical emergencies (2,035). As a result, in 2012 MedAire recommended that 452 apparently ill or injured British Airways passengers not be allowed to fly. Those 452 "no fly" recommendations not only enabled the affected passengers to get prompt evaluation on the ground in a fully-equipped medical facility, but also ensured that the other passengers on the flight would not be put at risk due to issues arising from the ill or injured passengers.

But I understand that BA did no fitness-to-fly assessment of Mr. Baillie.

**<u>Second Set of Opinions</u>:**

I am not aware of any standards or protocols promulgated by or for the airline industry, or by or for practitioners of emergency medicine, relating to the provision of remote medical assistance for an aircraft in flight, let alone standards or protocols specifying when an emergency medicine physician who is providing remote medical advice to a commercial airline should recommend that the aircraft divert to an unscheduled location. Based on that state of affairs, in my opinion the standard by which a physician providing remote medical assistance for an aircraft in flight should be judged is that of reasonableness in light of all the circumstances, taking into account the peculiar challenges inherent in providing such remote advice.

Providing remote medical advice to commercial airlines is still a relatively young service. I understand that MedAire pioneered such a service in the United States beginning about 30 years ago. I also understand that, in the United States, MedAire and STAT-MD are still the only two companies offering that service as a medical business. Presumably because of the relative youth of such a service, there are no medical or scientific journals or textbooks devoted to this type of service, and there is little medical or scientific literature or studies discussing such a service or subjects which relate to such a service. Nor are there any randomized controlled trials or "RCTs"—the gold standard of medicine and one source of medical standards—relating to such a service. It is from these types of sources that medical standards of care are often derived.

Though I understand that the airline industry is heavily regulated to ensure the safety of passengers, and that multiple organizations promulgate standards for the safe operation of an aircraft, I am not aware of any industry guidelines or protocols that have been published or disseminated relating to providing remote medical advice to airlines. Nor am I aware of any industry standards or protocols that have been published or disseminated stating when it is necessary or appropriate to divert an aircraft due to a medical emergency.

Furthermore, based on my background and experience, because every case is unique it would be difficult to establish a uniform protocol, in other than very general terms, for how a physician should deal with any particular inflight emergency. It would be even more difficult to specify a specific standard as to when a physician should recommend that a plane divert to an alternate landing spot. This is due in part to the inherent difficulties—mentioned above and discussed further regarding my Third Set of Opinions below—in remotely diagnosing and treating a medical condition for a passenger on board a plane. But establishing standards for recommending diversion is also made difficult by non-medical, operational issues, such as the amount of time to potential diversion locations, the availability of adequate medical facilities at diversion

sites, the local weather, the plane's weight, crew duty time, and other factors.  While the pilot will be the one to assess some of these operational factors, the MedLink physician must certainly consider the amount of time to reach potential diversion locations that would have adequate medical facilities.

As a result, in my opinion, only a very general list of things to consider in evaluating a diversion could be offered, and it's not at all clear to me that such written lists would be helpful, given the unique circumstances of every call. Thus, for example, STAT-MD provides no written guidelines, checklists or protocols to its physicians providing remote medical advice.

I understand, however, that a MedLink doctor or doctors at one point developed some written materials titled, "MedLink Physician Pearls for Remote Medical Care" (the "Pearls"). I understand that the Pearls were used as talking points when new MedLink physicians—already trained in emergency medicine—were receiving initial training in aviation medicine and the handling of remote calls from airlines.

One section of the Pearls, for example, discusses "Considerations for diversion." That section counsels that diversions should only be done if "medically necessary," and offers the EPS physician some issues to at least consider in deciding whether or not to recommend diversion.  Those include:

- The location of the flight: For example, is the aircraft in the "[m]iddle of the ocean" or is it "about to leave the mainland and heading toward water"?

- The available resources: What medical resources are onboard, such as doctors willing to help, what medical care the passenger might need, and are there potential diversion sites having those medical resources? Are the landing and aircraft servicing resources available at potential diversion sites sufficient to handle the size aircraft and number of passengers safely?

- <u>The emergency situation</u>: What medically justifies a diversion? What are possible complications if the plane doesn't divert? Is the passenger's condition likely to worsen and compromise life or limb? Is it time critical?

- <u>Family or crew considerations</u>: A physician may want to involve the passenger or his family in diversion decisions, but they should be informed that diversion may mean being in a foreign or unfamiliar city.

I understand that MedLink physicians also use a "Diversion Justification Worksheet," which EPS physicians are taught to use to review some of the diversion considerations as a final check when a decision to recommend diversion has been made. That worksheet identifies three "Diversion Factors to Consider":

- "Does the diversion location have adequate medical facilities to care for the ill/injured passenger?"

- "Is the time of arrival at original destination less than 1 hour? If yes, reconsider diversion recommendation."

- "Is the time of arrival at diversion location greater than 1 hour? If yes, consider reassessing the passenger for diversion necessity."

The Pearls document also addresses some common medical issues that occur in-flight, such as allergic reactions, burns, urological conditions, and cardiac issues, and sets forth in bullet points things the MedLink physician might consider with respect to such issues.

In the "Cardiac" section of the Pearls, for instance, there is a subsection for "Chest Pain," and one bullet point in that subsection states: "Discussion regarding the differences in presentation of angina among males/females/diabetics." "Angina" is chest pain caused by reduced blood flow to the heart muscle, and is a symptom of coronary artery disease. The quoted bullet point was apparently just intended to remind the presenter to discuss the matter, because the material itself says nothing about the different presentation of angina among different classes of people.

8

However, the next two bullet points mention some specific considerations relating to angina. First, the material suggests that if the pain can be relieved with the resources onboard, such as oxygen or nitrates, then the "position is stronger for continuing the flight rather than diverting." But "if the chest pain is ongoing for more than 20 minutes and the chest pain and shortness of breath cannot be relieved with onboard resources," then the material suggests that "this is a strong case for diverting" due to "potential coronary syndrome."

In context, I understand this part of the Pearls is referring not to just generic chest pain, but to angina—chest pain caused by coronary artery disease. So these considerations assume the MedLink physician has already made an initial determination that a passenger's chest pain is likely caused by angina, as opposed to a dozen or more other possible causes. And if a passenger not only has angina, but that angina is coupled with shortness of breath and those symptoms cannot be relieved with onboard resources after a short while, then those circumstances would suggest "a strong case for diverting."

The real difficulty, though—discussed further below—is determining whether the chest pain caused by cardiac ischemia, since most often it's not.

Moreover, I am generally aware that unscheduled landings for medical purposes are a serious problem for commercial air carriers. Decisions about diverting an aircraft are complex and difficult, because diversions mean delays in reaching the final destination, inconvenience to passengers, added costs, and increased risks to the safety of all passengers. Thus, it is simply not feasible for a plane to divert to an earlier landing every time a passenger might feel ill—even when it is uncertain what medical problem the passenger may be having. As a result of these factors, it is my opinion that whether a MedLink or STAT-MD physician should recommend diversion—and, if so, when—should be left to the professional judgment of the individual physician, based on his or her background, training and experience, and taking account of all the relevant circumstances.

9

Medicine has sometimes been referred to as "an uncertain science"; in the words of one medical writer, the "laws of medicine" are "really laws of uncertainty, imprecision, and incompleteness."[1] In light of these uncertainties, it would not be unusual for different physicians to arrive at different recommendations when faced with the same general patient presentations.

Given the inherent difficulties of remotely assessing the nature of a passenger's illness on an airplane, this applies even more so to the medical advice and diversion evaluations of MedLink and STAT-MD physicians.

**Third Set of Opinions:**

Identifying the etiology of Mr. Baillie's chest pain remotely in the conditions presented by BA Flight 289 was difficult, necessarily imprecise, and required the exercise of professional judgment in light of all the circumstances.

Chest pain is a very common symptom, but reliably detecting patients suffering from acute coronary syndrome or "ACS"—an umbrella term for situations where the blood supplied to the heart muscle is suddenly reduced or blocked— remains a diagnostic dilemma, even if a patient is seen in a hospital's emergency department.  As the authors of one study stated:

> "Early triage of patients presenting to the emergency department (ED ) with the chief complaint of chest pain suggestive of acute coronary syndrome (ACS) remains a diagnostic challenge."[2]

In part, this is because chest pain is a symptom of, or can be caused by, many different maladies other than ACS, including among others, psychogenic causes (e.g. anxiety disorder), as well as diseases of the respiratory system (e.g. asthma, hypoxia,

---

[1] Siddhartha Mukherjee, *The Laws of Medicine: Field Notes from an Uncertain Science* (2015), pp. 6-7.
[2] M. Ferencik, et al., *Comparison of Traditional Cardiovascular Risk Models and Coronary Atherosclerotic Plaque as Detected by Computed Tomography for Prediction of Acute Coronary Syndrome in Patients with Acute Chest Pain*, Academic Emergency Medicine, August 2012, Vol. 19, No 8.

pneumonia), gastrointestinal system (e.g. gastritis, esophageal diseases), and the musculoskeletal system (e.g. muscular strain, costochondritis). Chest pain can also stem from non-ischemic cardiac issues, such as pericarditis, which is an inflammation of a fluid-filled sac, the pericardium, which covers the outer surface of the heart. And the fact that chest pain has continued for some time does not make it more likely to be ischemic in nature. For example, pneumonia, reflux, and pneumothorax, among other conditions, may last for extended periods of time, and their symptoms may include chest pain and difficulty breathing.

In light of the above, an emergency physician considering what the cause of chest pain might be has to evaluate the probabilities. As one physician has expressed it: "Every diagnostic challenge in medicine can be imagined as a probability game"; thus one must consider how likely it is that chest pain is cardiac in origin, and then "summon the evidence to increase or decrease the probability."[3] That evidence may include, among others, a patient's medical history, findings from a physical examination, past experiences, and a physician's understanding and interpretation of the pertinent literature.

As regards the probabilities, studies show that the vast majority of patients presenting at the emergency department with chest pain are *not* experiencing a heart attack or other type of ACS. For example, in one study, only 31 of 368 patients (8%) presenting to an emergency department with the chief complaint of acute chest pain were ultimately diagnosed with ACS, and of those, only 8 of the 368 patients—just 2%—were found to have experienced a myocardial infarction or heart attack.[4] As the authors concluded, "In our study, chest pain characteristics in isolation did not predict ACS." *Id.*

---

[3] Siddhartha Mukherjee, *The Laws of Medicine: Field Notes from an Uncertain Science* (2015), p. 26.
[4] M. Ferencik, et al., *Supra. Comparison of Traditional Cardiovascular Risk Models and Coronary Atherosclerotic Plaque as Detected by Computed Tomography for Prediction of Acute Coronary Syndrome in Patients with Acute Chest Pain*, Academic Emergency Medicine, August 2012, Vol. 19, No 8.

Another study analyzed 3,929 visits to a hospital ED of persons with chest pain or other related symptoms suggestive of myocardial ischemia.[5] In that study, only 5.7% of the patients were confirmed to have had an MI, while another 12% were found to have unstable angina. *Id.* Fully 82% of the patients were diagnosed as having no ACS. *Id.* As the authors of the study stated, "Risk stratification for patients who present to the emergency department (ED) with chest pain syndromes, in the absence of diagnostic electrocardiographic (ECG) findings, remains an inexact science."

In the emergency department, a physician would order a test to confirm or deny a preliminary assessment based on the probabilities and the evidence discussed above. But for a passenger experiencing chest pain onboard an inflight aircraft such as BA 289, where there are generally no diagnostic tools available, such as an ECG or blood tests for cardiac biomarkers, there is simply no way to confirm if the chest pain in question is being caused by what is commonly called a heart attack.

Thus, a MedLink physician giving remote advice concerning a passenger with chest pain as a symptom must make a clinical judgment—a judgment based on limited information with many uncertainties—as to whether the chest pain stems from cardiac ischemia. And making such a clinical judgment remotely is even more difficult when, as here, the MedLink doctor cannot speak with or observe the passenger.

This approach is not like addition or multiplication, in which the correct technique yields one clear, "right" answer. It is more like envisioning the cause of chest pain as a continuum that goes from "very unlikely to have been caused by cardiac ischemia," on the one end, to "quite likely to have been caused by cardiac ischemia" on the other end. The physician must consider the evidence—which for a MedLink physician operating remotely will almost always be indeterminate—and make a clinical judgment. Because of

---

[5] C. Pollack Jr., et al., *Application of the TIMI Risk Score for Unstable Angina and Non-ST Elevation Acute Coronary Syndrome to an Unselected Emergency Department Chest Pain Population,* Academic Emergency Medicine, January 2006, Vol. 13, No. 1.

the uncertainties, well-trained and experienced physicians considering the same set of evidence may disagree about what that evidence shows.

**Fourth Set of Opinions:**

In my opinion, given his background and experience and in light of all the circumstances, Dr. Reinhart acted in a usual and reasonable manner in his interactions with and recommendations to BA 289, and thereby complied with the standard of care applicable to an emergency physician providing remote medical advice to the crew of an aircraft.

Here, Dr. Reinhart acted in a usual and reasonable manner in first confirming with the air crew the age, gender, medical complaint and symptoms of the passenger (61-year old male, chest pain, pale), then immediately asking whether the passenger had any cardiac history. Upon learning that the passenger had no history of any cardiac problems, "nothing at all," and that he was not on any medications, Dr. Reinhart asked about the passenger's aspirin use, and learned that he'd taken an aspirin a little more than three hours earlier.

That Mr. Baillie was on no medications and had no prior history of cardiac problems certainly lowered the probability of ACS as the source of the chest pain. The classic symptoms of ACS or a heart attack may include crushing chest pain, especially when it radiates to the arm or jaw, nausea, diaphoresis, and shortness of breath. But other than chest pain, the airline did not advise Dr. Reinhart of any such symptoms.[6]

The passenger's symptoms as first reported to Dr. Reinhart were thus at best ambiguous, and would not have immediately justified a conclusion that Mr. Baillie was

---

[6] The transcript of the first phone patch shows that the pilot told the MedAire CSE that the passenger was "a little out of breath when he boarded," and "feels a little hot," but doesn't indicate that he had any continuing breathing problems and doesn't say he was sweating. More importantly, the CSE didn't pick up the "out of breath" or "feels a little hot" comments—as is clear from her confirmation back to the pilot of the passenger's symptoms—and Dr. Reinhart himself was thus never given those bits of information.

likely suffering from an MI or other form of ACS. As discussed above, studies show that from 80 to 95% of the time, a person who comes to a hospital emergency department because of chest pain is not suffering from ACS, and chest pain in isolation does not predict ACS. Moreover, in the situation at issue here, the passenger's lack of any cardiac history or other problems that can predispose one to ACS, such as diabetes or high cholesterol (that he was on no medications shows this), in fact suggested that the passenger was at relatively low risk for ACS.

*Dr. Reinhart's request for an onboard doctor to evaluate the passenger.*

But as already noted, the source of chest pain is hard to diagnose, and Dr. Reinhart couldn't rule out an MI or other form of ACS. Moreover, Dr. Reinhart would have understood that, in general, men are more apt to have heart disease as they get older. So, in Dr. Reinhart's words, he was "just a little bit concerned about with his age, the pain and the fact that he is pale," and he thus asked the aircraft crew to have an onboard doctor evaluate the passenger, and get a "set of vital signs" to determine whether nitroglycerine could be given him. This request is what I would expect a reasonable physician acting in the usual manner to make, in light of the passenger's symptoms.

The aircraft called back about 20 minutes after the end of the first phone patch. In this second call, Dr. Reinhart was told that there was a physician on board who had evaluated the passenger, that the passenger's blood pressure was 100/70, and that he had a pulse of 100 and crackles in the left chest.[7] This additional information was not helpful

---

[7] The transcript of the first repatch shows that a member of the BA cabin crew told the MedLink CSE that the passenger had "an irregular pulse" of 100 and that he was "confused still." The CSE heard the "irregular" comment, but not the comment about being "confused still," as her confirmation back to the cabin crew member demonstrates. The transcript shows that Dr. Reinhart, however, was not told about either symptom. In any event, "confusion" is not a recognized symptom of ACS. And without an ECG, there was no way to gauge whether the supposedly "irregular" pulse was benign or serious. Notably, though, when Mr. Baillie landed in Phoenix and was transported to St. Luke's medical center, the ECG taken by the EMTs while en route showed his heart having a normal sinus rhythm—it was not irregular.

in determining the cause of the chest pain. The passenger's blood pressure of 100/70 was within the normal range. However, it was a little lower than what many physicians prefer in order to administer nitroglycerin (which itself can lower someone's blood pressure), and Dr. Reinhart reasonably decided not to administer nitroglycerin. But blood pressure of 100/70 is not by itself a sign of a serious illness and is not a recognized feature of ACS. Similarly, a pulse of 100 is just at the top of the range that is generally accepted as normal, but it's not uncommon for pain or discomfort or anxiety to elevate one's pulse rate some.

Dr. Reinhart also acted reasonably in discounting the report of "crackles" based on his experience that the ambient noise of a 747 in flight would make it impossible to hear crackles, and in his quarter of a century of providing remote medical advice to aircraft, he had never had an onboard medical person claim to have heard crackles. Published studies have confirmed the difficulties of auscultation on board an aircraft. In any event, crackles are rarely heard on only one side of the chest, but if they were, it might be more indicative of a lung issue such as pneumonia, less likely congestive heart failure. And notably, when Mr. Baillie was examined on the ground, neither the EMTs, the emergency department physician, Dr. Hess, nor the cardiologist, Dr. Candipan, reported hearing any crackles; to the contrary, they all indicated that Mr. Baillie's breath sounds were within normal limits.

Dr. Reinhart also acted in a usual and reasonable manner in asking whether the onboard doctor had any further suggestions following his examination of the passenger. In response, Dr. Reinhart was told: "No no she [sic] did not have any suggestions. We have three onboard actually so we are OK." If the physician onboard who actually observed and examined Mr. Baillie was concerned that he might be suffering from ACS, I would expect him to have suggested as much, but he did not.   Likewise, had the onboard doctor noted other symptoms, I would have expected him to have reported those (*e.g.* ongoing breathlessness or radiating pain or extreme pain). And had the onboard

15

doctor noted other ACS risk factors—such as that the passenger was a smoker, or that he was obese or overweight—I would have expected him to have reported those factors as well. But instead the onboard doctor, despite thinking he had heard "crackles" in Mr. Baillie's chest, reported nothing: he had "no suggestions" as to what was wrong with Mr. Baillie or what the source of the chest pain was.

> *The location of the aircraft over the North Atlantic.*

I have been advised that, by the time of the first repatch with Dr. Reinhart, BA 289 was over the North Atlantic Ocean, just south of Greenland. At that point, the closest diversion locations with nearby medical facilities having a 24-hour cardiac catheterization laboratory were St. John's, Newfoundland, if the plane continued westward, or Keflavik, Iceland, if the plane turned around and headed back east—but according to MedAire's expert pilot Mr. Fortune, each of those diversion points was about two hours away. Based on my background and experience, when the closest diversion point is hours away and the cause of a passenger's symptoms is not clear cut, a physician experienced in offering remote medical advice to airlines would not likely recommend immediate diversion.

At this point, all reasonable diversion points were forward; it would not have made sense to turn the plane around and head back east to Keflavik, Iceland. In a two-hour time frame, symptoms will often change and the reasonable recommendation would be to have the aircraft continue toward the planned destination, which would also have the aircraft heading towards potential reasonable diversion points, if necessary. Even if ACS were a likely source of the chest pain, with the only diversion points greater than 2 hours away, declaring a diversion actually accomplishes very little, and diversions always carry risk.

Given all of the above facts, Dr. Reinhart acted in a usual and reasonable manner in recommending that the passenger remain on supplemental oxygen, and that the flight continue toward its original destination, with the provisos that (1) the onboard doctor monitor the passenger every 15-30 minutes; and (2) if the passenger's condition changed

or worsened, the flight should call back and at that point the pilot would have to consider a diversion.

*MedAire's use of a hand-written intake form.*

I have been advised that MedAire uses a hand-written "Intake Form" for the MedLink Communications Specialist Executive ("CSE") to record a few basic facts about each call, including the flight number, the destination and ETA, the time remaining, and the "Brief Medical Complaint." The form also has space for the physician to record any notes he or she may want to make for personal use. For BA 289, the CSE wrote in the "Brief Medical Complaint" box: "Central chest pain; pale." For his part, Dr. Reinhart checked the box indicating that an ALS ambulance should be arranged to meet the plane at the airport, as well as the box labeled "Repatch if conditions worsens."

The intake form is not a medical record, and there is no industry custom, standard or requirement that Dr. Reinhart record certain details on a written intake form. STAT-MD, for example, does not even use a written intake form, but simply has its communication specialists input information into a computer database. If a STAT-MD physician wants to make some notes about a call for his or her own use, the physician does so using his or her own note paper, and that is not retained.

While in the abstract one can theorize that putting more information on the form could be helpful if a repatch were needed, in the remote medical advice environment, during the few minutes Dr. Reinhart was on the satellite phone patch, he needed to pay careful attention to what he was being told by the air crew, and could not allow himself to be distracted from that task, as taking extensive notes might have done. On the other hand, the CSE has the greater opportunity to make notes, and in this case the CSE's computerized notes of the call reasonably covered the important points of the call.

*Dr. Reinhart exercised reasonable professional judgment.*

As stated above, in my opinion whether or not to recommend diversion is left to the professional judgment of the individual physician. At the time of BA 289 in March

17

2012, Dr. Reinhart had been board-certified in, and had been actively practicing, emergency medicine for more than 25 years. He had also been providing remote medical advice to airlines for 25 years. Dr. Reinhart's judgment was thus informed by substantial background and experience. And in the circumstances present with BA 289, he understood there were no available options for immediate diversion. Dr. Reinhart thus exercised reasonable professional judgment in not immediately recommending diversion, but also advising that, if the passenger's condition worsened, diversion "would have to be considered."

### Fifth Set of Opinions:

In my opinion, given her background and experience, and in light of all the circumstances, Dr. Monas also acted in a usual and reasonable manner in her interactions with and recommendations to BA 289, and thereby complied with the standard of care applicable to an emergency physician providing remote medical advice to the crew of an aircraft.

Following the end of the first repatch involving Dr. Reinhart, more than three hours elapsed before the aircraft called MedLink again for a second repatch. By that time, Dr. Reinhart had completed his shift at the hospital, so another EPS physician, Dr. Monas, responded to MedLink's page of the emergency department.

*Prior to speaking with Dr. Monas, the pilot was already considering diversion because the onboard doctor reported that the passenger seemed worse.*

The pilot is in charge of an aircraft, and he or she is the only who can make a decision to divert for medical or other reasons. In making that decision, however, it is not unusual for the pilot to seek counsel from the airline crew, from onboard physicians, and from a remote medical service such as STAT-MD or MedAire, before deciding on a course of action.

According to the BA crew, the reason for the second repatch was that the passenger was feeling worse, although his vitals remained about the same. As a result—

18

and in keeping with Dr. Reinhart's earlier recommendation—the pilot told Dr. Monas that they were considering making a diversion. Specifically, the pilot told Dr. Monas that the onboard doctor had said that the passenger:

> "did look considerably worse and his [the onboard doctor's] recommendation was to re-evaluate in 30 minutes which is now about 20 minutes and suggested that at that time we might consider making a diversion."

The pilot also said that he "wanted to speak with you first and get your take." By the time of this call, the pilot had already notified BA Operations in London that the plane might divert to an earlier landing.

These facts put the patches with Dr. Monas in a rather different category than the initial patch with Dr. Reinhart. Before the call to Dr. Monas, the pilot was already considering diversion—presumably because Dr. Reinhart had specifically advised the pilot he would need to do so if the passenger's condition worsened—and had already advised BA Ops of the possibility of diversion. Before the patches with Dr. Monas, an onboard doctor had also recommended considering diversion, subject to evaluating the passenger's condition one more time in a few minutes. It thus appears that the pilot's intent in the call to Dr. Monas was simply to get one more point of view on the diversion issue.

> *The cabin crew gives Dr. Monas additional facts about the passenger and Dr. Monas recommends looking for diversion locations.*

Dr. Monas initially suggested giving the passenger nitroglycerin and then reporting back the results. Following the second repatch, the flight then called back for a third repatch. In that repatch, the pilot said that, in light of the passenger's blood pressure (100/80), the onboard doctor was "not happy at all" with giving him nitroglycerin. A member of the flight crew then gave Dr. Monas some further details about the passenger's symptoms—including not only that he was having central chest pain, but that he was having difficulty breathing, that this was initially associated with "running toward the gate because he was in a rush," and that he was hot and looked sweaty. These

additional facts heightened the possibility on the chest pain continuum that ACS might be the source.

Based on all these facts, and noting that "obviously we are here, you guys are in the air and evaluating the patient," Dr. Monas agreed that "if you feel the patient is not looking well," and that "we need to divert, then MedLink would "start to take a look at diversion locations." As the CSE's contemporary notes of this call stated: "Dr. Monas Recommends to consider diversion locations and options."

The pilot then expressed his agreement ("Yeah ok,") and the MedLink CSE immediately called BA Operations Control in London to coordinate the diversion. This was in keeping with BA's written protocol with MedAire, which specifically stated that MedAire would:

> "Contact BA Ops only for patches involving a diversion, a death on board, or if EMS arrangements are made at any scheduled destination."

The pilot told BA Ops Control that the flight was "closest to Chicago at the moment," and "we're going to get an update from the doctor onboard in the next ten minutes or so," and then the pilot would "give you a call to let you know what our decision is if we do have to divert." This statement underscores that the pilot was in charge, and that he felt he now had the information from MedAire he needed for him to make his final decision.

The MedLink CSE and BA Ops Control then agreed that they would both notify Chicago of the possibility of a diversion to ORD. In addition, the MedLink CSE specifically asked the pilot: "If anything does come up or if you have an update please do call us right back, we'll bring Dr. Monas back on the line." And that ended the third repatch .

By the end of the third repatch, it appeared that the key people involved—the pilot, BA Operations Control, Dr. Monas and the MedLink CSE—all understood that the

plan was, subject to checking once more with the onboard doctor, for BA 289 to divert to ORD in Chicago, and that the pilot would call MedLink to update them within ten to fifteen minutes.  Because BA 289 never called back, any evaluation of Dr. Monas's actions ends at that point.

Based on the above, it is my opinion that Dr. Monas acted reasonably in agreeing, based on the passenger's reported symptoms, that if the crew and onboard doctors felt that the passenger was not looking well, then diversion made sense, and in also advising that MedAire would thus look for diversion locations and notify ORD in Chicago of the possible diversion.

### Sixth Set of Opinions:

In my opinion, based on all the circumstances, MedAire's CSEs acted in a usual and reasonable manner in handling the medical emergency posed by BA 289, and in a way that was in all significant respects consistent with how STAT-MD communications specialists would handle such a situation.

I understand that MedLink operates a 24-hour call center in the emergency department of the Banner – University Medical Center Phoenix (formerly Banner Good Samaritan Medical Center). The call center is staffed 24/7 with MedLink CSEs who have been trained to communicate with many different airlines, and to interface between the airlines and the MedLink physicians. The MedLink call center is equipped with telephones and computers. The computers are able to show the physicians the exact contents of a particular airline's medical kit. Using Flight Aware, the MedLink call center computers are also capable of showing the physicians just where a particular airline is in flight. I have been advised that MedLink also maintains a large database of information as to the availability of medical facilities near thousands of airports around the world, and that database is accessible to the CSEs.

MedAire CSE Michelle Tyler answered the first phone patch from BA 289, and properly asked for the basic information about the situation, including the flight number,

ETA, and aircraft type. She then asked for the age, gender and medical concern of the affected passenger, and when the pilot responded, she properly repeated back her understanding of what the pilot had just said, to make sure she had it right. The pilot then affirmed the CSE's understanding—even though she had in fact omitted two pieces of information in her confirmation: that the passenger had been "a little out of breath when he boarded," and that the passenger "feels a little hot."

The CSE then paged for a physician, briefed Dr. Reinhart offline, and Dr. Reinhart joined the patch. During the initial phone patch and the first repatch, Ms. Tyler properly stayed on the line, listened to the conversation, and typed into what was then MedAire's proprietary DataLink 2000 ("DL2K") computer program a summary of the information communicated by the air crew and by Dr. Reinhart. The reverse side of the handwritten Intake Form had three blanks for information about repatches, and Ms. Tyler wrote in the first of those: "Pulse 100"; "BP 100/70"; "Chest pain, crackles left hand." Ms. Tyler's typed comments into the computer database included that: "The pilot reported that they have 3 physicians on board, and they have no suggestions as to what the cause." Her typed comments also noted Dr. Reinhart's advice to keep the passenger lying down and on oxygen, to continue to monitor him, and that if his condition worsened "then to repatch and a diversion would be the next step."

MedAire CSE Matt Whitley responded to the second repatch a few hours later, apparently because Ms. Tyler was busy on another phone patch. Since Dr. Reinhart had by then gone off shift, the new CSE properly paged the emergency department for another physician, and Dr. Monas responded to that page. Mr. Whitley briefed Dr. Monas on the main medical complaint of the passenger.

Ms. Tyler's computer notes recorded that Dr. Reinhart had recommended administering one nitroglycerin if the passenger's blood pressure was adequate, but her notes did not record Dr. Reinhart's decision not to administer the nitroglycerin in light of

22

the blood pressure reading. Mr. Whitley may have thus told Dr. Monas, initially, that the passenger had received a nitroglycerin. This error was corrected by the crew, however.

During the second and third repatches, Mr. Whitley properly stayed on the line and typed into MedAire's DL2K computer program a summary of the information communicated by the air crew and by Dr. Monas. Mr. Whitley also properly brought BA Ops Control on the line after both the pilot and Dr. Monas had agreed that the plane should consider diversion locations.

Following the end of the third repatch, MedAire CSEs followed up with BA Ops Control in multiple calls to determine whether the plane was diverting, and also lined up EMTs to meet BA 289 at Phoenix Sky Harbor when the plane landed.

In my opinion, MedAire's CSEs thus acted in a usual and reasonable manner in handling the situation at issue here.

### Seventh Set of Opinions:

In my opinion, BA acted unreasonably and in violation of industry norms by failing to seek a fitness-to-fly opinion, failing to provide MedAire with material information, and failing to seek MedAire's advice before deciding not to divert the plane after all.

*BA's failure to seek a fitness-to-fly assessment*

According to each of Dr. Candipan (the cardiologist who treated Mr. Baillie at St. Luke's), Dr. Adams (a resident Mayo Clinic doctor who examined and spoke with Mr. Baillie when he was admitted to the Mayo Clinic on 3/30/12), Mr. Frank Fleming (now one of Mrs. Baillie's lawyers), and Mrs. Baillie herself, Mr. Baillie told them that he first began to experience chest pains while rushing to catch his plane in London. Mr. Baillie further told Dr. Adams that, while awaiting takeoff, the pain got worse, and so he took four baby aspirin and notified the flight attendant, who "tried to reassure him" so that the flight "left the United Kingdom as scheduled."

23

Mr. Baillie also told his wife, Mrs. Baillie, that he "had to rush to make his flight from London to Phoenix," and that "when he arrived at the gate he was having breathing problems and feeling discomfort in the center of his chest." He further told his wife that, by the time "he got on board the airplane a few minutes later, the discomfort in his chest had become painful, so right away he told a flight attendant that he was not feeling well and had chest pains and was short of breath and that he wasn't sure he should be on the flight." According to Mr. Baillie, "the flight attendant told him to please sit down in his seat and that they would take care of him, so he did." Further, according to what Mr. Baillie told his wife, "after sitting for a minute or two, the pain in his chest had not gone away so he told the flight attendant again that he was short of breath and experiencing chest pains and that he really did not feel well."[8] But the flight attendant "again asked him to take his seat and told him that they would take care of him." Mr. Baillie also told his wife that, a short time later, "the airplane door was closed by the flight attendants, and that at that moment he felt imminent doom."

While Mr. Baillie was in the hospital he also told Mr. Frank Fleming—a lawyer who had been asked to consider representing Mr. Baillie in "a possible personal injury claim against BA"—that "he had the chest pains as he was rushing to make the flight, and as soon as he got onboard, he reported these pains to a flight attendant…." Mr. Baillie also told Mr. Fleming that he "expressed his concern about remaining on the flight for ten hours, and was directed to sit down." The flight attendant told him that "BA would take care of him and he would get better after resting a few moments."

---

[8] The flight attendant's deposition testimony in this case was somewhat different. According to her, shortly after boarding the plane, Mr. Baillie told her he had been running to the gate, and was very thirsty and a little out breath. He asked her whether he should get off the plane, and she told him no, and reassured him that if he sat down and relaxed, he may start to feel better and not be out of breath anymore. A short time later the airplane doors closed, and a while later the plane taxied and took off.

Based on my experience, when it appears to a gate agent or flight attendant that a passenger—who is either boarding a plane or already on board a flight awaiting takeoff—may not be feeling well, airline industry custom and practice require the agent or attendant to notify the pilot and/or seek the opinion of a medical professional as to whether that passenger is fit to fly, and this is particularly true for a lengthy transatlantic flight such as BA 289. However, the members of the BA 289 crew failed to do so.

Both STAT-MD and MedAire provide a service that allows an airline to call, 24/7, to inquire about a passenger's fitness to fly. And BA literature directs that MedAire be called in such instances: "Where there is doubt about a passenger's fitness to fly, advice should be sought from MedLink."[9]

Mr. Baillie's pre-flight symptoms as he described them to the BA flight attendant clearly raised a serious concern about his fitness to be aboard an almost-11-hour non-stop flight across the ocean. In my opinion, a medical professional involved in aviation medicine, who had been consulted about the matter and advised of Mr. Baillie's pre-flight symptoms, would have recommended that Mr. Baillie not be permitted to fly without first getting a medical evaluation from a doctor on the ground. I personally would have so recommended. But the BA 289 crew failed to call MedAire, or take any other steps, to assess Mr. Baillie's fitness to fly.

*BA's delay in contacting MedAire.*

In addition to BA's failure to conduct a fitness-to-fly assessment of Mr. Baillie before takeoff, BA also delayed contacting MedAire for the first time until 18:45 UTC, about three hours after takeoff. By that point, the aircraft was over the North Atlantic Ocean.

According to the testimony of the BA cabin crew, the captain was notified by about 17:15 UTC that there was a first class passenger experiencing chest pain. At that

---

[9] BA Cabin Crew Aviation Medical Manual, Ch. 2, p. 29.

point, I understand that it would have taken the aircraft less than an hour to land at an airport in Ireland. But the pilot still waited another hour and half until contacting MedAire, by which time there were no reasonable diversions locations.

In addition, following the end of the first repatch, the pilot waited another three hours until contacting MedAire again.

In my opinion, the long wait before calling MedAire for the first time, and the similar long wait before calling MedAire after the first repatch, was unusual and contrary to my experience at STAT-MD.

*BA's failure to provide MedAire with material information about Mr. Baillie.*

During the initial phone patch, Dr. Reinhart asked the flight to page for an onboard medical person to "evaluate" the passenger and get a set of vital signs. In response to the cabin crew's page, I have been advised that a few doctors came forward, and the crew selected one, Dr. Verma, to help. According to Dr. Verma's deposition testimony, after he checked Mr. Baillie's vital signs, he felt that Mr. Baillie looked "very unwell" and "belonged in a hospital," and he says that both he and another doctor traveling with him who was present at the examination gave that information to the BA flight attendant. But the flight attendant never passed on that piece of information to MedAire or Dr. Reinhart. Once again, based on my experience in the industry, it was contrary to usual custom and practice for the cabin crew and flight crew not to pass on that type of information to the MedLink doctor.

*BA's failure, once a preliminary decision to divert had been made, to seek MedAire's advice before ultimately deciding not to divert the plane.*

Following the third repatch, it appears from the transcript of the patch that the pilot, BA Operations, Dr. Monas, and the MedAire CSE all anticipated that BA 289 would divert to Chicago (subject to the pilot checking one more time with the onboard doctor), and that the pilot would update MedAire on the matter "within ten or fifteen" minutes. I understand, however, that after the end of the third repatch, the pilot was told

26

by the cabin crew that Mr. Baillie did not want to divert, and that two onboard doctors felt that continuing on to Phoenix at that point would not worsen Mr. Baillie's condition. Apparently based on those two factors, and without checking with MedLink, the pilot then decided not to divert the aircraft but to continue on to Phoenix. Based on my experience, the pilot should have contacted MedAire and solicited advice from a MedAire doctor regarding that decision, but the pilot did not.

In my opinion, the pilot failed to follow usual custom and practice in failing to consult with a MedLink doctor at that point regarding the pilot's decision to continue on to Phoenix and not divert the flight.

*Compensation*

I am being compensated at the rate of $300 an hour for my work on this case.

_____     _____5/25/2016_____

Ronald N. Roth, M.D., FACEP            Date

## APPENDICES

A.    Curriculum Vitae (including list of publications in the last 10 years)

B.    List of Materials Considered

C.    Recent Expert Testimony

27

# EXHIBIT 29

# EUROPEAN DEPOSITION MANAGEMENT

TOLL-FREE FROM THE US:
1 866 EU DEPOS
(1 866 383 3676)
TEL/FAX 331 44 87 04 56
CELL 336 08 48 16 67
INFO@EUDEPOS.COM

**In The Matter Of:**

**LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,**

**Plaintiff,**

**vs.**

**MEDAIRE, INC., STEVEN JOE RENHART, D.O., JESSICA MONAS, M.D., RATAN K. VERMA, M.D., and BRITISH AIRWAYS PLC,**

**Defendants.**

## VIDEOTAPE DEPOSITION OF
## RATAN K. VERMA, M.D.
## DECEMBER 5, 2014

ORIGINAL

1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


LINDA ANN BAILLIE, Individually,   Case No:
and as personal Representative
of the Estate of JAMES DONALD    2:14-cv-00420-DJH
BAILLIE, II, deceased, and on
behalf of all heirs and next of
kin of JAMES DONALD BAILLIE, II,
deceased,

        Plaintiff,

  vs.

MEDAIRE, INC., STEVEN JOE REINHART,
D.O., JESSICA MONAS, M.D., RATAN K.
VERMA, M.D., and BRITISH AIRWAYS PLC,

       Defendants.

_____/


VIDEO DEPOSITION


DEPONENT:  RATAN K. VERMA, MBBS BSc MRCP FRCR

DATE:     Friday, December 5, 2014

TIME:     9:56 a.m.

LOCATION:  Marriott Leicester Hotel

          Grove Park

          5 Smith Way, Enderby

          Leicester LE19 1SW England

REPORTER:  Michele E. French, CSR-3091, RMR, CRR

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

2

1    APPEARANCES:

2

3        On behalf of the Plaintiff:

4            KREINDLER & KREINDLER LLP

5            BY:  ROBERT J. SPRAGG, ESQUIRE

6            750 Third Avenue, 32nd Floor

7            New York, New York 10017-2703

8            (212) 973-3435

9            rspragg@kreindler.com

10

11       On behalf of Defendants British Airways PLC

12       and Ratan K. Verma, M.D.:

13           CONDON & FORSYTH LLP

14           BY:  ANTHONY U. BATTISTA, ESQUIRE

15           7 Times Square

16           New York, New York  10036

17           (212) 490-9100

18           abattista@condonlaw.com

19

20

21

22

23

24                                   -- continued --

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

3

1    APPEARANCES:

2

3        On behalf of Defendants MedAire, Inc.; Steven Joe

4        Reinhart, D.O.; and Jessica Monas, M.D.:

5            GALLAGHER & KENNEDY, P.A.

6            BY:  MARK C. DANGERFIELD, ESQUIRE

7            2575 East Camelback Road, Suite 1100

8            Phoenix, Arizona  85016-9225

9            (602) 530-8054

10           mark.dangerfield@gknet.com

11

12

13   Also Present:  Stephen Faigenbaum, Videographer

14

15

16

17

18

19

20

21

22

23

24

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

4

1                     TABLE OF CONTENTS

2   WITNESS                                           PAGE

3   RATAN K. VERMA, MBBS BSc MRCP FRCR

4       Examination by Mr. Spragg                       6

5       Recess - 11:15 a.m. to 11:17 a.m.              86

6       Recess - 11:41 a.m. to 11:57 a.m.             109

7       Examination by Mr. Dangerfield               109

8       Examination by Mr. Battista                  126

9       Recess - 12:25 p.m. to 12:26 p.m.            129

10      Re-Examination by Mr. Spragg                 129

11

12                     INDEX OF EXHIBITS

13   EXHIBIT            DESCRIPTION                  PAGE

14     33    Plaintiff's Notice of Deposition of      11

15           Ratan K. Verma, M.D.

16     34    Customer Claims Record.  Case 9833226     34

17           BA0448 - BA0450.  CONFIDENTIAL

18     35    Booking:  ZS8LSX.  BA0458 - BA0463        35

19           CONFIDENTIAL

20

21           INDEX OF PREVIOUSLY MARKED EXHIBITS

22   EXHIBIT  PAGE    EXHIBIT  PAGE    EXHIBIT  PAGE

23     16      47       23      68       22      114

24     30      55       18      87

European Deposition Management  US:1 866 383 3767  FR: 331 44 87 04 56  info@eudepos.com

Deposition of RATAN VERMA, M.D. taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

5

1                          Leicester, England

2                          Friday, December 5, 2014

3                          9:56 a.m.

4              * * * * *

5              THE VIDEOGRAPHER:  Good morning.  We

6    are on the record.  The time is 9:56 a.m., on the 5th

7    of December, in the year 2014.  My name is Stephen

8    Faigenbaum.  I'm the video operator.  The court

9    reporter today is Miss Michele French.

10             We are here today to take the

11   deposition of Dr. Ratan K. Verma, M.D., in the matter

12   of Linda Ann Baillie, et al., Plaintiff, versus

13   MedAire Incorporated, et al., Defendants.  This case

14   is being adjudicated in the United States District

15   Court, District of Arizona.  We are located today in

16   Leicester, England.

17             Would the reporters [sic] please

18   identify themselves for the record, and then would the

19   -- I'm sorry.

20             Would the attorneys please identify

21   themselves for the record and then would the reporter

22   please swear the witness.

23             MR. SPRAGG:  Robert Spragg, from the

24   firm of Kreindler & Kreindler in New York,

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

6

1    representing Plaintiff Linda Ann Baillie.

2                    MR. DANGERFIELD:  Mark Dangerfield,

3    from Gallagher & Kennedy, in Phoenix, Arizona,

4    representing Defendants MedAire Inc. and Dr. Reinhart

5    and Dr. Monas.

6                    MR. BATTISTA:  Anthony Battista, from

7    the law firm of Condon & Forsyth, representing

8    Dr. Ratan Verma and British Airways.

9                    RATAN K. VERMA, MBBS BSc MRCP FRCR,

10   was thereupon called as a witness herein, and after

11   having first been duly sworn to testify to the truth,

12   the whole truth and nothing but the truth, was

13   examined and testified as follows:

14                         EXAMINATION

15             BY MR. SPRAGG:

16             Q.    Good morning, Doctor.

17             A.    Good morning.

18             Q.    Before we begin, would you please

19   state your full name for the record.

20             A.    Dr. Ratan Kumar Verma.

21             Q.    Okay.  And could you spell your middle

22   name, sir.

23             A.    K-u-m-a-r.

24             Q.    And what is your date of birth?

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

63

1              And then you used the term "crackles."

2         A.   Crackles.

3         Q.   First of all, what equipment did you

4    use to determine whether Mr. Baillie had crackles?

5         A.   The stethoscope.

6         Q.   Stethoscope.  So you were listening to

7    his breathing?

8         A.   Correct, his chest.

9         Q.   Doctor, what are crackles?

10        A.   So we used to get taught at medical

11   school it's almost like someone walking on glass, so

12   when it cracks, it crackles.

13        Q.   So is it more of a crunch sound or is

14   it a -- I'm just trying to -- I don't know what they

15   would sound like, so I'm just trying to get a mental

16   picture.

17        A.   Or would it be what you call in the

18   U.S. a nougat, where something cracks, like that.

19        Q.   Nougat?

20        A.   Nougat.

21        Q.   Yeah.

22        A.   Toffee --

23        Q.   Yes.

24        A.   -- and it cracks.

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

64

1          Q.     Right.

2          A.     It's like a crack.

3          Q.     But there's a lot of them all

4    occurring at one time or is it -- like if someone --

5    do you hear it as someone takes a breath, inhales, or

6    is it -- do you hear it as they exhale, or is it both?

7          A.     I can't remember now.

8          Q.     Okay.

9          A.     But it's a crackly -- crackling sound.

10         Q.     Okay.  And is it very distinct, in

11   your mind?  When you hear it, that's obviously what it

12   is?

13         A.     Yeah.

14         Q.     Okay.  And were you taught about

15   crackles when you had your medical training?

16         A.     Those years ago, yes.

17         Q.     Okay.  And were the crackles easy to

18   hear with the stethoscope in the airplane environment?

19         A.     Yeah.  I remember telling -- or

20   documenting that, so, yes --

21         Q.     Okay.  Yes.

22         A.     -- they would have been.

23         Q.     All right.  Yeah, the information

24   regarding crackles was given by the crew members in

65

1      the cockpit to the MedLink people on the ground.

2                        So you could hear them in spite of the

3      noise, the ambient noise in the cabin; correct?

4              A.      Correct.

5              Q.      Okay.  When you were making your

6      initial -- when you were -- strike that.

7                        When you were performing your initial

8      examination of Mr. Baillie, were you stating your

9      findings aloud so that someone else could write them

10     down?  Do you recall?

11             A.      I can't remember.

12             Q.      Okay.  Do you remember if any of the

13     British Airways cabin crew members were writing down

14     what you said regarding Mr. Baillie's symptoms or his

15     blood pressure or --

16             A.      The lady who was in First Class, the

17     air stewardess, I recall that she was writing some

18     information down.

19             Q.      Okay.  And this would be the British

20     Airways cabin crew member with the accent?

21             A.      Correct.

22             Q.      Okay.  So she was recording some of

23     the information that --

24             A.      Correct.

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

75

1    asked, you said you believed his blood pressure was

2    too low for the administration of that medicine?

3              A.    Yeah.   I mean, there were two things.

4    One was, (A), if it wasn't a cardiac event, it was

5    something else, then I felt it was inappropriate.   And

6    even if it was -- and, again, it's, you know, out of

7    my area of expertise, but still I was not happy to

8    administer the sublingual nitrate.

9              Q.    And you also thought his blood

10   pressure was too low --

11             A.    Correct.

12             Q.    -- as you stated?

13             Okay.   When Miss van den Berg -- when

14   the -- strike that.

15             When the British Airways cabin crew

16   member who seemed to have primary responsibility for

17   Mr. Baillie returned from the cockpit, other than

18   talking to you about giving Mr. Baillie the

19   nitroglycerin medicine, do you recall what else she

20   told you?

21             A.    No, I don't.

22             Q.    Okay.   Did she ask you to continue to

23   help her with Mr. Baillie?

24             A.    The information that we were given was

76

1    that could we monitor his blood pressure and pulse

2    rate at regular intervals, and that would be given as

3    per advice from the doctors on the ground.

4              Q.    From the doctors on the ground?

5              A.    On the ground.

6              Q.    Okay.  And this was both you and

7    Dr. Rajesh?

8              A.    Correct.

9              Q.    Okay.  So she told you that the

10   MedLink physicians on the ground had asked that

11   someone take Mr. Baillie's blood pressure and pulse on

12   regular intervals?

13             A.    Correct.

14             Q.    Do you remember or recall what

15   intervals they recommended those things be checked at?

16             A.    I think hourly.

17             Q.    Okay.  Hourly.

18                   If I told you that it may have been

19   every 15 to 30 minutes, would that refresh your

20   recollection on that or no?

21             A.    No.

22             Q.    Okay.  All you knew was you had to

23   take it on a regular interval?

24             A.    Right, yeah.

Deposition of RATAN VERMA, M.D. taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

77

1          Q.      Okay.  And did you -- did you, for the

2    remainder of the flight, then, take Mr. Baillie's

3    pulse and blood pressure at regular intervals?

4          A.      It was not every 30 to 15 minutes.  I

5    recall going back probably three times more during the

6    flight.

7          Q.      Okay.

8          A.      And then I don't know how often my

9    colleague went and checked his blood pressure and

10   pulse.

11         Q.      So there were times when Dr. Rajesh

12   went up by himself to take --

13         A.      Yeah, I think he told me he went up at

14   least once.

15         Q.      When you went to check Mr. Baillie's

16   blood pressure and pulse for the rest of the flight,

17   did you at any time also listen to his chest with the

18   stethoscope again?

19         A.      I did not.

20         Q.      Okay.  So you only listened to his

21   chest the one time to hear the crackles?

22         A.      Correct.

23         Q.      Okay.  But would you expect crackles

24   in someone's chest to persist until treated in some

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

134

1

2

3              SIGNATURE OF WITNESS

4

5

6              I, RATAN K. VERMA, MBBS BSc MRCP FRCR,

7    certify that I have read my deposition given on

8    Friday, December 5, 2014, in the case of Baillie v.

9    MedAire, et al., and have attached my corrections

10   hereto.

11

12   _____

13              RATAN K. VERMA, MBBS BSc MRCP FRCR

14

15

16

17

18

19

20

21

22

23

24

Deposition of RATAN VERMA, M.D.  taken December 5, 2014 in Leceister, England
BAILLE, et.al. versus MEDAIRE, INC , et.al.

135

1                    CERTIFICATE OF NOTARY

2

3     STATE OF MICHIGAN           )

4                                 ) SS

5     COUNTY OF INGHAM            )

6

7     I, MICHELE E. FRENCH, a Notary Public in and for the

8     above county and state, do hereby certify that the

9     above deposition was taken before me at the time and

10    place hereinbefore set forth; that the witness was by

11    me first duly sworn to testify to the truth, and

12    nothing but the truth; that the foregoing questions

13    asked and answers made by the witness were duly

14    recorded by me stenographically and reduced to

15    computer transcription; that this is a true, full and

16    correct transcript of my stenographic notes so taken;

17    and that I am not related to, nor of counsel to either

18    party nor interested in the event of this cause.

19

20    Dated:  December 16, 2014

21    _____

22           Michele E. French, CSR-3091, RMR, CRR

23           Notary Public, Ingham County, Michigan

24           My Commission Expires:  December 2, 2017

# EXHIBIT 30

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3                    - - - - -

4    LINDA ANN BAILLIE, individually,

     as Personal Representative of

5    the Estate of JAMES DONALD

     BAILLIE, II, et al.,

6                                    Case No.

                  Plaintiff,         2:14-CV-00420-SMM

7

          vs.

8

     MEDAIRE, INC., STEVEN JOE

9    REINHART, D.O., and JESSICA

     MONAS, M.D.,

10

                  Defendants.

11

12    _____/

13                   - - - - -

14

15           VIDEOTAPED DEPOSITION OF

16        CAPTAIN MICHAEL G. FORTUNE (RET.)

17

18

19         FRIDAY, AUGUST 12, 2016

20

21

22

23         GOLKOW TECHNOLOGIES, INC.

24    877.370.3377 ph | 917.591.5672 fax

25           deps@golkow.com

```
 1              VIDEOTAPED DEPOSITION OF
 2           CAPTAIN MICHAEL G. FORTUNE (RET.),
 3    the deponent herein, called by the Plaintiff for
 4    examination, taken pursuant to the Federal Rules of
 5    Civil Procedure, by and before Kelli Rinaudo, a
 6    Certified Shorthand Reporter, License No. 6411, RPR,
 7    RMR, CRR, CCRR, and RDR, in and for the State of
 8    California, at the Intercontinental The Clement
 9    Monterey, 750 Cannery Row, Cannery Row Board Room,
10    Monterey, California, on Friday, August 12, 2016, at
11    8:23 a.m.
12                        -----
13    COUNSEL PRESENT:
      For the Plaintiff:
14         KREINDLER & KREINDLER, LLP
           By:  Francis G. Fleming, Esquire
15         750 Third Avenue, 32nd Floor
           New York, NY 10017
16         T:  212.687.8181
           E:  ffleming@kreindler.com
17
18    For the Defendants:
           GALLAGHER & KENNEDY, P.A.
19         By:  William Charles Thomson, Esquire
           2575 East Camelback Road, Suite 1100
20         Phoenix, AZ 85016
           T:  602.530.8513
21         E:  wct@gknet.com
22    ALSO PRESENT:  Wayne Marien, CLVS, Videographer
23
24
25
```

Captain Michael G. Fortune (Ret.)

```
 1                    I N D E X

 2                      -----

 3       WITNESS:  CAPTAIN MICHAEL G. FORTUNE (RET.)

 4

 5                E X A M I N A T I O N

 6                                            PAGE

 7   BY MR. FLEMING                             5

 8

 9

10                E X H I B I T S

11

12   CAPTAIN MICHAEL FORTUNE NO. 199

13           IATA Section 6.12               51

14   CAPTAIN MICHAEL FORTUNE NO. 200

15           A map from Captain Fortune's

16           report marked as Exhibit 2,

17           Page 20                         77

18   CAPTAIN MICHAEL FORTUNE NO. 201

19           A map from Captain Fortune's

20           report marked as Exhibit 3,

21           Page 21                         77

22   CAPTAIN MICHAEL FORTUNE NO. 202

23           A map from Captain Fortune's

24           report marked as Exhibit 4,

25           Page 22                         77
```

 1      FRIDAY, AUGUST 12, 2016; 8:23 A.M.; MONTEREY, CA

 2             P R O C E E D I N G S

 3                  - - - - -

 4             THE VIDEOGRAPHER:   We are now on the

 5   record.

 6             My name is Wayne Marien.   I am a

 7   videographer with Golkow Technologies.   Today's date

 8   is August 12, 2016, and the time is 8:23 a.m.

 9             This videoed deposition is being held in

10   Monterey, California, in the matter of Linda Ann

11   Baillie, et al., versus MedAire, Incorporated, et

12   al., in the United States District Court, District

13   of Arizona.   The deponent is Captain Michael G.

14   Fortune, Retired.

15             Counsel, please identify yourselves for the

16   stenographic record.

17             MR. FLEMING:   Good morning.   Frank Fleming,

18   Kreindler & Kreindler, for Baillie.

19             MR. THOMSON:   Charles Thomson with

20   Gallagher & Kennedy in Phoenix for the defendants.

21             THE VIDEOGRAPHER:   The court reporter is

22   Kelli Rinaudo, and she will now swear in the

23   witness.

24             CAPTAIN MICHAEL G. FORTUNE (RET.),

25    the deponent herein, having been first duly sworn,

Captain Michael G. Fortune (Ret.)

```
 1      was examined and testified as follows:

 2                        EXAMINATION

 3   BY MR. FLEMING:

 4       Q.  Good morning, sir.  How are you today?

 5       A.  Good morning.

 6       Q.  I take it you have been deposed on several

 7   occasions before today?

 8       A.  Yes, I have.

 9       Q.  Okay.  So you're familiar with the rules.

10   I don't need to spend a lot of time on that,

11   apparently --

12       A.  I'm familiar.

13       Q.  -- you'd agree?  Okay.

14           The one rule that I want to emphasize and

15   mention at every deposition is the one about my

16   questions will be put to you, if you understand

17   them, I would appreciate an answer unless Counsel

18   instructs you otherwise.  If you don't understand

19   the question, if you let me know, I'll try to

20   resolve whatever the problem is.  If you give me an

21   answer, I assume you understood the question and you

22   are doing your best to respond to it.

23           Okay?  Are we on the same page there?

24       A.  Yes.

25       Q.  Okay.  Good.
```

Captain Michael G. Fortune (Ret.)

```
 1   depends on the weather and the winds, and it is

 2   entirely up to someone else.  It could, but rarely

 3   did.  It was rarely up that high and it was a lot

 4   lower normally.

 5        Q.  Okay.  Thank you, sir.

 6        A.  Okay.

 7        Q.  And I take it since you have never flown

 8   the 74-400, you can't compare for me the ambient

 9   noise level in the first-class cabin configuration

10   as adopted by British Air between the various dash

11   numbers of that equipment, correct?

12        A.  I cannot.

13        Q.  It's a pretty quiet airplane up front,

14   though, isn't it?

15        A.  The 747 --

16        Q.  Right.

17        A.  -- in the cockpit, it's quite noisy.

18        Q.  Well, in the passenger area.

19        A.  Oh, passenger area.  I had flown in first

20   class, yes.

21        Q.  It was quiet?

22        A.  I found it to be quiet, yes.  The cockpit,

23   however, was quite noisy.

24        Q.  That's because the engines are

25   essentially -- I don't know what the dimension is --
```

Captain Michael G. Fortune (Ret.)

1    about --

2        A.  Yes.

3        Q.  -- significant movement over the ground?

4        A.  I had in my mind to choose a time, and

5    those are the ones I chose.

6        Q.  Okay.  Thank you.  So from divert point

7    1912, had the captain of BA 289 been recommended to

8    divert and he accepted the recommendation, a

9    reasonable estimate of when he could have gotten on

10   the ground at Keflavik, excuse me, would be 1 hour

11   and 45 minutes later?

12       A.  Approximately.

13       Q.  Approximately.  Which would be 2000

14   hours -- no, 2100 hours straight up, approximately?

15       A.  Approximately.

16       Q.  All right.  Thank you.

17       A.  Approximately.

18       Q.  Now Exhibit 3, which we have marked as

19   Exhibit 201, shows the same kind of data if the

20   aircraft had diverted not back to Keflavik but to

21   Gander?

22       A.  No.  That is Saint John's.

23       Q.  Saint John's.  Okay.  Pardon me.  It's cut

24   off on my map, I think, but I see Gander

25   International.  Okay.  I see Saint John's

Captain Michael G. Fortune (Ret.)

1    International too.  Very good.  Thank you, sir.

2            And the divert point, the first one on the

3    upper left hand corner if you put Exhibit 201 on its

4    side, would be that same 1853 point, correct?

5        A.  Yeah, 60 degrees north, 40 west would be

6    the 1853 time; that is correct.

7        Q.  The other one would be approximately 1912?

8        A.  1912; that is correct.

9        Q.  So had the captain been given a

10   recommendation to divert to Saint John's at the time

11   of the second repatch -- I'm sorry, it's the first

12   repatch, the second contact -- the reasonable

13   estimate of when he would have gotten the aircraft

14   on the ground would be 2110, 2105, that time frame?

15       A.  Yeah.  I would have to do the math, but --

16       Q.  Yeah, I could be wrong on the math too.

17       A.  Approximately.

18       Q.  But logically the sequence is as I have

19   described?

20       A.  Yes.

21       Q.  Okay.  Thank you very much, sir.

22           Now, the last exhibit which we have marked

23   as Exhibit 202 at your deposition, do you have that

24   in front of you, sir?

25       A.  Yes.

Captain Michael G. Fortune (Ret.)

1    STATE OF CALIFORNIA          )

2                                 )  ss.

3    COUNTY OF MONTEREY.          )

4

5            I, KELLI A. RINAUDO, do hereby certify:

6            That I am a duly qualified Certified

7    Shorthand Reporter, in and for the State of

8    California, holder of certificate number 6411, RMR,

9    CRR, CCRR, and RDR, which is in full force and

10   effect, and that I am authorized to administer oaths

11   and affirmations;

12           That the foregoing deposition testimony of

13   the deponent,

14

15           CAPTAIN MICHAEL G. FORTUNE (RET.),

16

17   was taken before me at the time and place herein set

18   forth.

19           That prior to being examined, the witness

20   named in the foregoing deposition was duly sworn or

21   affirmed by me, to testify the truth, the whole

22   truth, and nothing but the truth;

23           That the testimony of the witness and all

24   objections made at the time of the examination were

25   recorded stenographically by me, and were thereafter

Captain Michael G. Fortune (Ret.)

1    transcribed under my direction and supervision;

2          That prior to the completion of the

3    foregoing deposition, review of the transcript

4              X     was requested;

5                    was not requested;

6          I further certify that I am not a relative

7    or employee or attorney or counsel of any of the

8    parties, nor am I a relative or employee of such

9    attorney or counsel, nor am I financially interested

10   in the outcome of this action.

11         IN WITNESS WHEREOF, I have hereunto

12   subscribed my name this 22nd day of August, 2016.

13

14

15

16

17         _____

18         KELLI A. RINAUDO CALIF. CSR NO. 6411

19         RMR, CRR, CCRR, RDR

20

21

22

23

24

25

Captain Michael G. Fortune (Ret.)

Page 110

1                              E R R A T A

2

3        I, CAPTAIN MICHAEL G. FORTUNE (RET.), do
  hereby certify under penalty of perjury that the
  foregoing deposition was read by or to me and that I
4 approve of same as a true and correct record of my
  testimony with changes herein below.

5

6  PAGE/LINE    ANSWER CHANGED TO (OR ADD OR DELETE

7  WORDS):

8   25 / 24      CHANGE: "2011" to "2010"

9   68 / 8       ADD CLARIFICATION: "In this case, however, according to Ms.

10  ___ / ___    Van Den Berg at least, Mr. Baillie specifically asked her whether she

11  ___ / ___    thought he should get off the airplane.  That statement, in addition to

12  ___ / ___    sweating and being out of breath, would necessitate an evaluation of

13  ___ / ___    Mr. Baillie's fitness to fly as per British Airways protocol."

14  98 / 11      ADD: "..., but that is off the top of my head."

15  ___ / ___

16  ___ / ___

17  ___ / ___

18  ___ / ___

19  ___ / ___

20

21   _Michael G Fortune_                         9/23/2016

22  CAPTAIN MICHAEL G. FORTUNE (RET.)      DATE
    Subscribed and sworn to before me this  23rd  day
23  of _September_  , 20 16.

24  My commission expires:

    09/17/2017
25  Date            Notary Public

                    IRIS SMITH
                    Commission # 2041744
                    Notary Public - California
                    Monterey County
                    My Comm. Expires Sep 17, 2017

EXHIBIT 31

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


LINDA ANN BAILLIE, individually, as ) No.2:14-cv-00420-SMM
Personal Representative of the )
Estate of JAMES DONALD BAILLIE, II, )
and on behalf of all heirs and next )
of kin of JAMES DONALD BAILLIE, II, )
deceased, )
)
)
Plaintiffs, )
)
vs. )
)
MEDAIRE, INC.; STEVEN JOE REINHART, )
D.O.; and JESSICA MONAS, M.D., )
)
Defendants. )
_____ )


VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D.


Scottsdale, Arizona
September 22, 2015
9:03 a.m.


Reported by:

Jennifer Honn, RPR

Arizona CR No. 50885

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D. - 9/22/2015

```
 1                    I N D E X

 2  WITNESS                                    PAGE

 3  ROBERT C. CANDIPAN, Ph.D., M.D.

 4      Examination by Mr. Dangerfield           6
        Examination by Mr. Fleming             151
 5      Examination by Mr. Dangerfield         163
        Examination by Mr. Fleming             172
 6      Examination by Mr. Dangerfield         174
        Examination by Mr. Struble             175
 7

 8                  INDEX TO EXHIBITS

 9  Description                                Page

10  Exhibit 42    C.V. Of Robert C.              *
                  Candipan, Ph.D., M.D
11
    Exhibit 43    Declaration of Robert C.      12
12                Candipan, M.D

13  Exhibit 44    St. Luke's Medical Records    44
                  JDB-12521-12542
14
    Exhibit 45    Emergency Medical Service Records  48
15                JDB-12967-12972

16  Exhibit 46    St. Luke's Emergency Department Records 48
                  JDB-12254-12283
17
    Exhibit 47    Discharge Summary             76
18                JDB-12284-12289

19  Exhibit 48    Billing Records               91

20  Exhibit 49    Consult by Dr. Candipan       97
                  JDB-12292-12293
21
    Exhibit 50    History & Physical by Dr. McConnell  103
22                JDB-12290-12291

23  Exhibit 51    Consult by Dr. Shahryar      110
                  JDB-12294-12296
24
    Exhibit 52    Consult by Dr. Tasset        122
25                JDB-12297-12300
```

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D. - 9/22/2015

```
 1                  INDEX TO EXHIBITS CONTINUED

 2   Description                                      Page

 3   Exhibit 53     Progress Notes                     129
                    JDB-12487-12515
 4
     Exhibit 54     Chest X-Rays                        148
 5                  JDB-12574-12585

 6   Exhibit 55     Abstract Summary Form               150
                    JDB-12250
 7
     *Exhibit marked previous to deposition.
 8
                          *  *  *  *  *
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D.,

2

3   was taken on September 22, 2015, commencing at 9:03 a.m.,

4   at the law office of THE CHECKETT LAW FIRM, PLLC, 4835

5   East Cactus Road, Suite 345, Scottsdale, Arizona, before

6   JENNIFER HONN, a Certified Reporter, Certificate No.

7   50885, for the State of Arizona.

8                           * * * * *

9   COUNSEL APPEARING:

10

            ON BEHALF OF PLAINTIFFS:
11

                KREINDLER & KREINDLER LLP
12              Francis G. Fleming, Esq.
                750 Third Avenue
13              New York, New York 10017
                ffleming@kreindler.com
14

            ON BEHALF OF DEFENDANTS:
15

                GALLAGHER & KENNEDY, P.A.
16              Mark C. Dangerfield, Esq.
                2575 East Camelback Road
17              Phoenix, Arizona 85016
                mark.dangerfield@gknet.com
18

            ON BEHALF OF DEPONENT:
19

                THE CHECKETT LAW FIRM, PLLC
20              Charles A. Struble, Esq.
                4835 East Cactus Road
21              Suite 345
                Scottsdale, Arizona 85254
22              CStruble@checkett-law.com

23

    ALSO PRESENT:
24

        Alex Marinakis, Videographer
25

```
1                                      Scottsdale, Arizona
                                       September 22, 2015
2                                      9:03 a.m.

3

4              THE VIDEOGRAPHER:  We're on the record.

5  Today's date is Tuesday, September 22nd, 2015.

6              The time on the video monitor is 9:03 a.m.

7              This is the videorecorded deposition of

8  Robert C. Candipan, M.D., noticed by counsel for the

9  defendants in the matter of Linda Ann Baillie, et al.,

10 versus Medaire, Incorporated, et al.

11             This matter is being held in the United

12 States District Court, District of Arizona.  The case

13 number is 2:14-CV-00420-SMM.

14             Our location is the Checkett Law Firm

15 located in Scottsdale, Arizona.  The certified court

16 reporter is Jennifer Honn of Morris-Crowe Court Reporting

17 located at 7650 South McClintock Drive, Suite 103-398,

18 Tempe, Arizona 85284.  My name is Alex Marinakis.  I'm

19 the certified legal video specialist for the firm of

20 VideoDep, Incorporated, located at 7776 South Pointe

21 Parkway West, Suite 170, Phoenix, Arizona 85044.

22             Counsel, would you please identify

23 yourselves and whom you represent starting with the

24 plaintiff's Counsel, please.

25             MR. FLEMING:  Good morning.  My name is
```

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D. - 9/22/2015

1   Frank Fleming.  I'm here on behalf of Linda Baillie and

2   family.

3              MR. DANGERFIELD:  My name is Mark

4   Dangerfield.  I'm representing the defendants Medaire,

5   Inc., as well as Dr. Steven Reinhart and Dr. Jessica

6   Monas.

7              MR. STRUBLE:  And Charles Struble on behalf

8   of Dr. Candipan.

9              THE VIDEOGRAPHER:  Thank you, Counsel.

10             The court reporter may swear in the witness

11  at this time, please.

12

13             ROBERT C. CANDIPAN, Ph.D., M.D.

14  called as a witness herein, having been first duly sworn

15  by the Certified Reporter to speak the whole truth and

16  nothing but the truth, was examined and testified as

17  follows:

18

19                    EXAMINATION

20  BY MR. DANGERFIELD:

21     Q.   Good morning, Dr. Candipan.

22     A.   Good morning.

23     Q.   And I mentioned just a minute ago, I represent

24  the defendants in this case to include a company called

25  Medaire, Inc., as well as Drs. Steven Reinhart and

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D. - 9/22/2015

1  breathing, and they had pulmonary edema, you still might

2  not hear any crackles; correct?

3       A.    Yes.

4       Q.    Okay.  Now, the on-board doctor, of course, was

5  listening to Mr. Baillie's heart on board a 747 in

6  flight.  There's a lot of ambient noise on those types of

7  planes, as I'm sure you've experienced.

8             Have you ever had the experience of listening to

9  someone's chest during a 747 flight?

10      A.    I have listened to somebody's chest on a jet

11  flight, but not a 747.

12      Q.    Okay.  And would you agree with me that the

13  ambient noise makes it harder to hear than it would

14  normally be?

15      A.    I would not agree with that.

16      Q.    Okay.  And tell me the -- have you had more than

17  one experience listening to someone's chest through a

18  stethoscope on a jet flight?

19      A.    Two or three.

20      Q.    Okay.  And in any of those experiences, did you

21  hear crackles?

22      A.    No.  I did not.

23      Q.    Did any of those involve passengers that were

24  potentially suffering a heart attack?

25      A.    Yes.

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D. - 9/22/2015

1    Q.   Tell me which one or ones did.

2             MR. STRUBLE:   Form.

3    A.   Again, I don't know if any of them had heart

4  attacks ultimately.  Patients that I have been asked to

5  see on board an airplane flight that complained of chest

6  pain, upon landing, they were taken to -- off the plane

7  by paramedics, and I don't know what happened with them.

8    Q.   (By Mr. Dangerfield) Did any of those -- and

9  during any of those -- start that over.

10            In any of those flights, did the plane divert to

11 a different landing place to get emergency treatment for

12 the passenger?

13   A.   Not that I can recall, no.

14   Q.   Now, you said that you had that experience two

15 or three times.  I'd like to exhaust your memory of those

16 for just a minute.

17            What's the last time you remember being on a

18 plane and being asked as a doctor to help a passenger?

19   A.   About five years ago.

20   Q.   Okay.  And in that experience, do you remember

21 the flight it was?

22   A.   It was a flight from Kansas City to Phoenix.

23   Q.   And do you remember what you were asked to do?

24   A.   I was asked to see a woman who was having

25 contractions.  She was in her third trimester of

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D. - 9/22/2015

1      Q.    (By Mr. Fleming) Based on the understanding that

2   the MI occurred six to eight hours before the blood was

3   taken at St. Luke's, based on what you saw and what you

4   learned when you treated him and assisted him, can you

5   tell us if you had seen him five hours earlier whether it

6   would have made a difference or would likely made a

7   difference in his chances of recovery?

8      A.    Yes.

9      Q.    It would have made a difference?

10     A.    Yes.

11     Q.    And his chances would have improved?

12     A.    Yes.

13     Q.    Can you quantify that in any sense of the term?

14     A.    I cannot put it in numbers, but if we're talking

15  about the difference in treating him at six hours versus

16  one hour, then the amount of myocardium would have been

17  substantially -- the amount of myocardium that had been

18  damaged or infarcted would have been substantially less.

19     Q.    Okay.  When Doctor --

20         MR. DANGERFIELD:  Excuse me.  Would you

21  read that answer back?

22         (The reporter read back the requested

23  portion of the record.)

24     Q.    (By Mr. Fleming) To put it in the terms that

25  Dr. Tasset used, the damaged cardiac territory would have

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D. - 9/22/2015

```
1

2

3

4

5

6

7              I, the undersigned, say that I have read

8   the foregoing transcript of testimony taken September 22,

9   2015, and I declare, under penalty of perjury, that the

10  foregoing is a true and correct transcript of my

11  testimony contained therein.

12

13              EXECUTED this _____ day of _____, 2015.

14

15

16

17                      _____

18                      ROBERT C. CANDIPAN, Ph.D., M.D.

19

20

21

22

23

24

25
```

VIDEOTAPED DEPOSITION OF ROBERT C. CANDIPAN, Ph.D., M.D. - 9/22/2015

```
1   STATE OF ARIZONA    ) SS.
                        )
2   COUNTY OF MARICOPA  )

3           BE IT KNOWN that the foregoing proceedings were
    taken before me, JENNIFER HONN, certified Reporter No.
4   50885, that the witness before testifying was duly sworn
    by me to testify to the whole truth; that the foregoing
5   pages are a full, true and accurate record of the
    proceedings, all done to the best of my skill and
6   ability; that the proceedings were taken down by me in
    shorthand and thereafter reduced to print under my
7   direction.

8
                [x] Review and signature was requested.
9               [ ] Review and signature was waived.
                [ ] Review and signature not required.
10

11          I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in the
12  outcome hereof.

13          I FURTHER CERTIFY that I have complied with the
    ethical obligations set forth in ACJA 7-206. Dated at
14  Phoenix, Arizona, this 6th day of October, 2015.

15
16          Jennifer Honn, Certified Reporter
            Arizona CR No. 50885

17

18                    *   *   *

19

20          I CERTIFY that Morris-Crowe Court Reporting, LLC,
    has complied with the requirements set forth in ACJA
21  7-206.  Dated at Tempe, Arizona, this 6th day of
    October, 2015.

22

23
24          Morris-Crowe Court Reporting, LLC
            Arizona RRF No. R1001
25
```

EXHIBIT 32

**EXHIBIT 2**





EXHIBIT 200

Michael Fortune

8/12/16

Reported by:  Kelli Rinaudo
CSR 6411, RMR, CRR, CCRR, RDR

EXHIBIT 33

**EXHIBIT 3**





EXHIBIT 201

Michael Fortune

8/12/16

Reported by: Kelli Rinaudo
CSR 6411, RMR, CRR, CCRR, RDR