EXHIBIT 34

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>    Plaintiff,<br><br>v.<br><br>BRITISH AIRWAYS PLC,<br><br>    Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.<br>) 2:13-cv-04681-SVW-RZx<br>)<br>)<br>)<br>) |

VIDEOTAPED DEPOSITION OF STEVEN JOE REINHART, D.O.

VOLUME II
(Pages 40 through 170, inclusive.)

Phoenix, Arizona
July 7, 2014
10:05 a.m.

(**ORIGINAL**)

PREPARED FOR:
THE COURT

**PREPARED BY:**

AZ Litigation Support, LLC
Kate E. Roundy, RPR
Certified Reporter
CR No. 50582

1                         I N D E X

2    WITNESS                                          PAGE

3    STEVEN JOE REINHART, D.O.

4         Examination (Continued) by Mr. Fleming      43

5

6

7

8

9                        E X H I B I T S

10   NO.              DESCRIPTION                      PAGE

11   Exhibit 29       Service Agreement between British     121
                      Airways and MedAire, Bates Nos.
12                    BA 0733 through 0758

13   Exhibit 30       Indemnity Statement documents,        135
                      Bates Nos. BA 0759 through 0762
14
     Exhibit 31       Wikipedia article on acute            163
15                    coronary syndrome

16   Exhibit 32       Mayo Clinic Proceedings article       162
                      entitled Acute Coronary Syndromes:
17                    Diagnosis and Management, Part 1

18

19

20        (The exhibits referenced below were previously

21   marked for identification.)

22

23                         NO.              PAGE
                           Exhibit 2        111
                           Exhibit 3         63
24                         Exhibit 18       137

25

42

1      THE VIDEOTAPED DEPOSITION OF STEVEN JOE REINHART, D.O.,

2  was taken on July 7, 2014, commencing at 10:05 a.m., at

3  Gallagher & Kennedy, 2575 East Camelback Road, Phoenix,

4  Arizona 85016, before KATE E. ROUNDY, RPR, a Certified

5  Court Reporter, Certificate No. 50582, for the State of

6  Arizona.

7

8  **APPEARANCES**:

9  For the Plaintiff:

10         KREINDLER & KREINDLER LLP
           Francis G. Fleming, Esq.
11         750 Third Avenue, 32nd Floor
           New York, New York 10017
12         212.687.8181
           ffleming@kreindler.com
13

14  For the Defendants MedAire, Inc., Steven Joe Reinhart,
    D.O., and Jessica Monas, M.D.:
15
           GALLAGHER & KENNEDY, P.A.
16         Mark C. Dangerfield, Esq.
           2575 East Camelback Road
17         Phoenix, Arizona 85016-9225
           602.530.8000
18         mark.dangerfield@gknet.com

19
    For the Defendant British Airways PLC:
20
           CONDON & FORSYTH LLP
21         Ivy L. Nowinski, Esq.
           1901 Avenue of the Stars, Suite 850
22         Los Angeles, California 90067
           310.557.2030
23         inowinski@condonlaw.com

24  Also present:

25         Jonathan Williams, Videographer

|       |    |                                                    |
|-------|----|----------------------------------------------------|
|       | 1  | Phoenix, Arizona                                   |
|       |    | July 7, 2014                                       |
|       | 2  | 10:05 a.m.                                          |
| 10:05 | 3  |                                                    |
| 10:05 | 4  | THE VIDEOGRAPHER:  Good morning.  Today's date is  |
| 10:05 | 5  | July 7, 2014.  This begins tape 1 in the Volume II |
| 10:05 | 6  | deposition of Dr. Steven Reinhart.  We are on the record |
| 10:05 | 7  | at 10:05 a.m. and may proceed.                     |
| 10:05 | 8  | MR. FLEMING:  Good morning.  Frank Fleming for     |
| 10:05 | 9  | plaintiff, Linda Baillie and family.               |
| 10:05 | 10 | MR. DANGERFIELD:  Mark Dangerfield for MedAire     |
| 10:05 | 11 | and Drs. Reinhart and Monas.                       |
| 10:05 | 12 | MS. NOWINSKI:  Ivy Nowinski for British Airways.   |
| 10:05 | 13 |                                                    |
| 10:05 | 14 | EXAMINATION (CONTINUED)                            |
| 10:05 | 15 |                                                    |
| 10:05 | 16 | BY MR. FLEMING:                                    |
| 10:06 | 17 | Q.   Well, good morning, sir.  Nice to see you again. |
| 10:06 | 18 | A.   Good morning.                                 |
| 10:06 | 19 | Q.   Would you start our deposition today by telling |
| 10:06 | 20 | me what you've done since the last session in terms of |
| 10:06 | 21 | preparing yourself for today's continuing deposition. |
| 10:06 | 22 | A.   I read over the earlier deposition.            |
| 10:06 | 23 | Q.   Anything else?                                |
| 10:06 | 24 | A.   No, sir.                                       |
| 10:06 | 25 | Q.   Have you had occasion to speak to Dr. Monas?  |

10:06  1        A.     I did.   Not about the case, but I've spoken with

10:06  2    her.

10:06  3        Q.     Okay.   Have you read any materials, read any

10:06  4    materials?

10:06  5        A.     Read any materials?

10:06  6        Q.     Yes, sir.

10:06  7        A.     Such as?

10:06  8        Q.     Well, such as transcripts of some other witnesses

10:06  9    who have been deposed?

10:06  10        A.     I have not.

10:06  11        Q.     Or a memo about what the case is about legally or

10:06  12    factually?

10:07  13        A.     Nothing other than what I had before.   I haven't

10:07  14    read anything else other than my deposition.

10:07  15        Q.     Okay.   As I recall your last session, you said

10:07  16    you had not read anything other than your transcript, or

10:07  17    the transcript of communication between British Air and

10:07  18    MedLink.

10:07  19               Was there anything else that you read that --

10:07  20        A.     No.

10:07  21        Q.     -- I don't recall?

10:07  22        A.     I think I -- I believe that I had looked over the

10:07  23    discharge summary from St. Luke's --

10:07  24        Q.     Indeed.

10:07  25        A.     -- as I recall.

10:37 1   me if they thought there was anything particular going on

10:37 2   or that we needed to do.

10:37 3       Q.   Okay.  Now, could you tell me what you mean --

10:38 4   well, first of all -- withdrawn.

10:38 5            I take it that the particular location of the

10:38 6   aircraft in space is a very important consideration for

10:38 7   you when you are contacted on a MedAire patch?

10:38 8       A.   It is.

10:38 9       Q.   And how do you know the location of the aircraft?

10:38 10      A.   It depends.  The -- the flight specialist many

10:38 11  times will have it up on a screen to show us the -- the

10:38 12  location of the aircraft by flight tracker.

10:38 13      Q.   By what?

10:38 14      A.   By a type of flight tracker.

10:38 15      Q.   Tracker.  Okay.  Thank you.

10:38 16           Anything else?

10:38 17      A.   No.

10:39 18      Q.   Okay.  On the intake form that you -- you

10:39 19  provided to us at your last session -- we marked it as

10:39 20  Exhibit 3 -- is there anything here that tells you about

10:39 21  the position of the aircraft at any time when you were

10:39 22  dealing with BA Flight 289 on March 23rd, 2012?

10:39 23      A.   Only the -- the time remaining in the -- the

10:39 24  flight is just under seven hours.

10:39 25      Q.   All right.  So what does that tell you about the

64

10:39 1    location?

10:39 2        *A.*    So that they're probably about three and a half

10:39 3    hours out of London, Heathrow.

10:40 4        *Q.*    Okay.   And -- and what does that tell you about

10:40 5    the location of the aircraft?

10:40 6        *A.*    That they're most likely over the Atlantic.

10:40 7        *Q.*    Okay.   That's it?

10:40 8            We're going to get to the transcript in -- in

10:40 9    time.   I don't want to jump ahead because it's quite

10:40 10   lengthy, but did you and the captain of BA Flight 289 ever

10:40 11   discuss the location of the aircraft?

10:40 12       *A.*    I don't believe so.

10:40 13       *Q.*    Did you ever conduct any research, or do you know

10:41 14   where the closest suitable hospital with appropriate

10:41 15   emergency room facilities was at any time during this

10:41 16   flight?

10:41 17       *A.*    I don't recall.

10:41 18       *Q.*    If you had conducted -- withdrawn.

10:41 19           I assume you don't know off the top of your head

10:41 20   where the closest emergency room that would be appropriate

10:41 21   to an evaluation of Mr. Baillie's condition was over the

10:41 22   North Atlantic; correct?

10:41 23       *A.*    I don't know.

10:41 24       *Q.*    You'd have to look that up somehow; correct?

10:41 25       *A.*    Well, if I knew the location, I probably would

10:53  1       *A.*     It depends.   I'm not sure what we're going back

10:53  2   to here.

10:53  3       *Q.*     Well, we're going back to a condition where the

10:53  4   passenger has a heart attack -- has chest pain, pardon me,

10:53  5   a differential diagnosis of -- could include heart attack,

10:53  6   and the aircraft is over the Atlantic Ocean.

10:54  7       *A.*     Okay.

10:54  8       *Q.*     What would you do?

10:54  9       *A.*     I would continue the -- the treatment until we

10:54 10   needed to make a decision as to whether to divert to where

10:54 11   there was a close diverting location, which means like

10:54 12   probably within about 30 minutes.

10:54 13       *Q.*     Okay.   So what you're saying is that there are

10:54 14   areas over the Atlantic Ocean where you -- you would not

10:54 15   recommend a diversion because it's not close -- there's no

10:54 16   suitable medical facility close enough?

10:54 17       *A.*     Well, what I'm saying is that there are some

10:54 18   locations there that even if you make a decision to

10:54 19   divert, it's going to be an hour or hour and a half before

10:54 20   they can get the aircraft down on the ground.

10:54 21       *Q.*     Okay.   That's still better than -- than keeping

10:54 22   the sick passenger cooped up on an airplane for seven

10:54 23   hours, isn't it?

10:54 24              MR. DANGERFIELD:   Object as to form.

10:55 25              THE WITNESS:   I'm not sure I can answer that.

10:55  1   BY MR. FLEMING:

10:55  2       Q.   Okay.  Well, if -- if you come to the conclusion

10:55  3   that a passenger has a differential diagnosis that could

10:55  4   include heart attack, or it could be indigestion, I mean,

10:55  5   to be fair, and you can't tell because you don't have

10:55  6   assess to the test results, blood, EKG, the onboard

10:55  7   physician doesn't give you any particularly helpful

10:55  8   observations for one reason or another, and the closest

10:55  9   point is two hours away but the destination is seven hours

10:55  10  away, wouldn't you recommend to the pilot that he go to

10:55  11  the -- divert to the two-hour place so that the passenger

10:55  12  could get treated as soon as possible?

10:55  13      A.   Well, a lot can happen in two hours.  And what I

10:55  14  would do would be serial evaluations.  If in 30 minutes

10:56  15  the passenger was sitting up and laughing and conversing

10:56  16  with his spouse or feeling pain -- no pain and looking

10:56  17  good, then we could proceed on.

10:56  18           If his condition became unstable or deteriorated,

10:56  19  then I think then we would make a diversion.  That's the

10:56  20  reason to continue the serial exams.

10:56  21      Q.   Okay.  So what you're saying is that the first

10:56  22  call you got on a patch about an ill passenger -- and I

10:56  23  won't go through the symptoms again; you know what I'm

10:56  24  talking about, I think -- you would not make a decision to

10:56  25  divert on the first call, you'd want a serial observation,

10:56 1    30 minutes plus or minus, about whether he had gotten
10:56 2    better.  And if he had gotten better, you would continue
10:56 3    to the destination.  If he had not gotten better, you'd
10:56 4    find a place to divert to.
10:57 5           Is that it?
10:57 6    A.    That's -- that's close, yes.
10:57 7    Q.    Okay.  So if you're over the North Atlantic and
10:57 8    an hour away from Reykjavik -- by that I mean west of
10:57 9    Reykjavik -- that 30 minutes would continue in the
10:57 10   westerly direction.  So you're not going to return to
10:57 11   Reykjavik; correct?
10:57 12   A.    Correct.
10:57 13   Q.    You would go to Greenland; correct?
10:57 14   A.    I'm not sure that there are any good locations to
10:57 15   divert in Greenland with medical facilities that have a
10:57 16   cardiac cath lab.  I haven't diverted a cardiac patient to
10:57 17   Greenland before, in my knowledge.
10:57 18   Q.    Okay.  You do know that they have adequate
10:57 19   facilities at Iceland but not Greenland?
10:57 20   A.    Correct.
10:57 21   Q.    All right.  And you've never diverted an aircraft
10:57 22   with a sick passenger of the type we're talking about to
10:58 23   Greenland, so you don't know?
10:58 24   A.    Not that I recall --
10:58 25   Q.    Okay.

11:05  1      Q.      Well, does the term crackles have any meaning to

11:05  2  you?

11:05  3      A.      Oh, and what are you referring to?

11:05  4      Q.      I'm happy to be examined.  I'm not being

11:05  5  facetious, but I'm trying to get your answers.

11:05  6              If I've given you a question you don't

11:05  7  understand, if you let me know, I'll --

11:05  8      A.      Okay.

11:05  9      Q.      -- restate it, but --

11:05  10      A.      Right.

11:05  11      Q.      -- what -- what I want to know at this point is,

11:05  12  does the word crackles mean anything to you?

11:05  13      A.      And I assume you're -- you're meaning in regards

11:05  14  to a physical exam and listening to lungs?  Is that what

11:05  15  you're saying?

11:05  16              Crackles is a sound.

11:05  17      Q.      Okay.  I think that answers my question.

11:05  18              And could you describe the sound?

11:06  19      A.      It's a crackling sound.  I think most people know

11:06  20  what a crackling sound sounds like.

11:06  21      Q.      Okay.  Like cereal and moisture and milk?

11:06  22      A.      Yes.  Breaking glass, maybe.

11:06  23      Q.      Okay.  And you have heard crackles in patients

11:06  24  that you've seen over the years, I assume?

11:06  25      A.      I have.

11:15 1  presumably correlated to a time that is illegible, but

11:15 2  some time after 19:00 hours Greenwich Mean Time, that

11:15 3  actually reflects something other than your first contact

11:15 4  with the flight; is that correct?

11:15 5  *A.*  Correct.

11:15 6  *Q.*  It would be probably the second or the serial

11:15 7  contact, as you call it?

11:15 8  *A.*  Probably, yes.

11:15 9  *Q.*  Okay.  And so what we know from this form is that

11:15 10 as of the time of the second contact, you were aware of a

11:16 11 high pulse, low blood pressure, chest pain and crackles;

11:16 12 correct?

11:16 13 *A.*  Correct.

11:16 14 *Q.*  All right.  Thank you, sir.

11:16 15      Now, what's the significance of crackles left

11:16 16 hand versus right?

11:16 17 *A.*  I'm not sure there is.

11:16 18 *Q.*  Okay.  Now, the -- the later lines of boxes, one

11:16 19 being at 22:36 and one being at 22:54, are made by

11:16 20 doctor -- withdrawn.  Poor question.

11:16 21      The later lines of boxes denominated 22:36 and

11:16 22 22:54 occurred after you had signed off on this flight;

11:16 23 correct?

11:16 24 *A.*  Correct.

11:16 25 *Q.*  And I take it your shift ended?  I think that's

11:16 1   what the transcript said, and you were gone for the

11:17 2   evening; correct?

11:17 3       A.   Correct.

11:17 4       Q.   And so these notes that are on this form

11:17 5   correlated to 22:36 and 22:54 are not your notes?

11:17 6       A.   They're not.

11:17 7       Q.   Okay.  Just for the sake of understanding -- and

11:17 8   we will do Dr. Monas's deposition in time, but could you

11:17 9   read for me what you think these notes indicate, starting

11:17 10  at 22:36?

11:17 11      A.   Looks like vitals are increased some, feels

11:17 12  worse, no past medical history.  A 61-year-old male with

11:17 13  complaint of chest pain, given O2, not nitroglycerin.  I'm

11:18 14  not sure.  Let's see.

11:18 15      Q.   PNUS, would that be passenger nationality

11:18 16  American U.S.?

11:18 17      A.   No.

11:18 18      Q.   No?

11:18 19      A.   Well, maybe it could be physicians onboard.  It

11:18 20  could be.

11:18 21      Q.   Okay.

11:18 22      A.   Took aspirin, and then I believe that's her name

11:18 23  and signature, and then it says three hour ETA.

11:18 24      Q.   Okay.  Thank you very much, sir.

11:18 25           And then could you read Dr. Monas's notes at

11:58  1   ambiguous.

11:58  2   BY MR. FLEMING:

11:58  3       Q.   Can we agree, sir?

11:58  4       A.   Yes.

11:58  5       Q.   Okay.  Now, once you get to the point of having a

11:58  6   sick passenger with the various cardiac symptoms that

11:58  7   we've talked about and also make an observation about

11:58  8   crackles, meaning fluid in the lungs or congestion in the

11:58  9   upper lungs, now you have a different kind of a problem,

11:58  10  don't you?

11:58  11      A.   Well, I am -- I'm not sure how to answer that.

11:58  12           I gave very little credence to the -- the

11:59  13  information about the crackles, so I didn't use that

11:59  14  specifically in making any determination.

11:59  15      Q.   Okay.  Why not?

11:59  16      A.   From -- from past experience, it is very

11:59  17  difficult to hear anything on an aircraft because of the

11:59  18  ambient noise and the engine.  And the majority of people

11:59  19  can't even hear blood pressures when you try and take them

11:59  20  with a stethoscope because of the noise.

11:59  21           I was, like, amazed that anyone could even

11:59  22  possibly hear any crackles in a chest.  And it doesn't

11:59  23  mean that they couldn't.  It's just that I've never had

11:59  24  anyone relay information specifically like that to me.

12:00  25           So I just wasn't sure how to use that information

12:00  1    because hearing crackles on an aircraft is very, very

12:00  2    difficult.

12:00  3         Q.    All right.   But this was a physician who heard

12:00  4    them; correct?

12:00  5         A.    I'm not sure who heard them.

12:00  6         Q.    You don't know that?

12:00  7         A.    I don't know.

12:00  8         Q.    Okay.   Well, the combination of indications of a

12:00  9    cardiac problem on the one hand and fluid buildup in the

12:00  10   lungs or upper -- congestion in the upper lungs are really

12:00  11   two different problems, aren't they?

12:00  12        A.    They -- they could go together.

12:01  13        Q.    Okay.

12:01  14        A.    They could be separate problems.

12:01  15        Q.    All right.   But it makes the matter of a

12:01  16   differential diagnosis which might include heart attack

12:01  17   worse with crackles than if there are no crackles.

12:01  18              Can we agree with that?

12:01  19        A.    Yes, if we knew that they really were crackles.

12:01  20        Q.    Okay.   I'm asking you to assume that.

12:01  21        A.    Okay.

12:01  22        Q.    That whoever it was who made the observation that

12:01  23   was relayed to you could actually hear what he or she

12:01  24   thought he heard and they were, in fact, crackling sounds.

12:01  25   Okay.

12:01   1        That would indicate to you a level of emergency

12:01   2   that was greater than merely a differential diagnosis that

12:01   3   might include heart attack?

12:01   4        A.   It would -- it would be more concerning.

12:01   5        Q.   Okay.   That's -- we laymen are -- if I can speak

12:02   6   for other laymen, that would be more serious?

12:02   7        A.   Correct.

12:02   8        Q.   Certainly if you had a patient who showed up in

12:02   9   an emergency room at Good Sam who had essentially the

12:02  10   presentation that Mr. Baillie presented, exertion, chest

12:02  11   pain, et cetera, and in your examination you heard

12:02  12   crackles in his lungs, you would not send that passenger

12:02  13   home; agreed?

12:02  14        A.   I would not.

12:02  15        Q.   You would admit him to the hospital, you would

12:02  16   have a cardiac specialist or a cardiologist look at him,

12:03  17   and you'd probably involve a pulmonologist as well;

12:03  18   correct?

12:03  19        A.   I -- I can't say as much as a pulmonologist.   A

12:03  20   lot would depend on chest x-ray, the blood work, the rest

12:03  21   of the --

12:03  22        Q.   Okay.

12:03  23        A.   -- picture.

12:03  24        Q.   Fair enough.

12:03  25        But you would direct the resources at your

01:46 1    Q.    Now, that implies that you are not of a mind to

01:46 2    think that Baillie is having a heart attack at that

01:46 3    particular moment; correct?

01:46 4    A.    Correct.  I'm -- it's, again, in my differential,

01:46 5    but I'm still wondering what is going on here and wanting

01:46 6    to collect more information and observation.

01:46 7    Q.    Okay.  It is in your differential?  I didn't

01:46 8    quite hear that.  Is that what you said?

01:46 9    A.    With chest pain, it's -- it's very frequently in

01:46 10   the differential.

01:46 11   Q.    Okay.

01:46 12   A.    Not always, but in someone this age --

01:46 13   Q.    Yeah.

01:46 14   A.    -- it would be.

01:46 15   Q.    I wasn't challenging you.  I just didn't hear it.

01:47 16   I'm sorry, but...

01:47 17   A.    That's okay.

01:47 18   Q.    Okay.  So the point is that nitroglycerin is not

01:47 19   recommended for a heart attack.  It's recommended for

01:47 20   angina; correct?

01:47 21   A.    Well, yeah, but they sometimes go hand in hand.

01:47 22   Q.    Indeed.  Indeed.

01:47 23   A.    Right.

01:47 24   Q.    But as we learn in the next series of

01:47 25   communications, when his blood pressure and pulse were

01:59  1    the crew to let you know; correct?

01:59  2        A.    Correct.

01:59  3        Q.    And they say, is there anything we should look

01:59  4    out for particularly?  And you -- your answer is, if his

01:59  5    blood pressure drops further or he becomes unresponsive or

01:59  6    his color deteriorates and he becomes ashen or cyanotic,

01:59  7    which was blue, or the chest pain seems to worsen where he

01:59  8    is unable to tolerate it, any of those are things to look

01:59  9    for; correct?

01:59  10       A.    Correct.

01:59  11       Q.    That's what you told them?

01:59  12       A.    Uh-huh.

01:59  13       Q.    And they asked, how often do you want us to

01:59  14   monitor the blood pressure?  You told them 15 to

01:59  15   30 minutes.

01:59  16       A.    At least.

01:59  17       Q.    Correct?

01:59  18       A.    At least.

01:59  19       Q.    Okay.  At least.  Fair enough.

01:59  20             And that was it.

02:00  21             And then you concluded your shift at Good Sam,

02:00  22   and that was the last you had to do with this particular

02:00  23   individual and this particular problem; correct?

02:00  24       A.    Correct.

02:00  25       Q.    Now, you have had a chance to read the rest of

02:03 1   including nitroglycerin.  His vitals still a hundred over

02:03 2   80 and pulse now 110, a little higher, and he complains

02:03 3   he's feeling a bit worse.  Pain in his chest, in the

02:03 4   central part of his chest, presumably; correct?

02:03 5        *A.*   Correct.

02:03 6        *Q.*   So he had worsened; correct?

02:04 7             Did you do anything to communicate to the next

02:04 8   doctor who would take over after your shift was over that

02:04 9   you had told the crew if he got worse, to divert?

02:04 10       *A.*   No, I did not.  I wasn't sure who -- if they

02:04 11  called back, who would be taking the call.

02:04 12            MS. NOWINSKI:  I'd like to object to that

02:04 13  question too -- sorry I didn't get a chance -- on the

02:04 14  grounds that it assumes facts not in evidence.

02:04 15            MR. FLEMING:  Okay.

02:04 16            MS. NOWINSKI:  The doctor didn't testify that if

02:04 17  his condition got worse, a diversion would necessarily be

02:04 18  warranted.  He said it may be.

02:04 19            MR. FLEMING:  Okay.  I'm sorry I didn't hear

02:04 20  that, Ivy.  But I may need to comment on that, so I have

02:04 21  to --

02:04 22            MS. NOWINSKI:  That's okay.

02:04 23            MR. FLEMING:  -- ask you to repeat.

02:04 24            MS. NOWINSKI:  The doctor didn't earlier testify

02:04 25  that a diversion would be warranted if Mr. Baillie

160

02:15 1          And then Dr. Monas undertakes to repeat all that.

02:15 2          If you had been able to take this particular

02:15 3  call, the third and the fourth, I take it from what you've

02:16 4  said, that you would have diverted the aircraft to the

02:16 5  closest airport with a medical facility that could address

02:16 6  that problem as quickly as possible.

02:16 7          Is that true?

02:16 8     *A.*   I certainly would have considered it.

02:16 9     *Q.*   Well, you would have done it; correct?  That's my

02:16 10 question.

02:16 11    *A.*   Most likely.

02:16 12    *Q.*   Now, Dr. Monas continues with her recap, which I

02:16 13 don't need to read.

02:16 14         And Dr. Monas, to her credit, does wish to speak

02:16 15 to the onboard physician, but the security requirements or

02:16 16 rules prohibit it; correct?

02:17 17    *A.*   Correct.

02:17 18    *Q.*   So given the difference of opinion between

02:17 19 Dr. Monas and the onboard physician or physicians, if it's

02:17 20 more than one, the decision is made to take a look at some

02:17 21 diversion locations; correct?

02:17 22         MR. DANGERFIELD:  Object as to form.

02:17 23         THE WITNESS:  It looks like she suggests that

02:17 24 they do take a look at some diversion locations.

     25

02:36  1              MS. NOWINSKI:  Okay.  All right.  That's fine.

02:36  2              THE VIDEOGRAPHER:  This concludes the deposition

02:36  3      of Dr. Steven Reinhart.

02:36  4              Off the record at 2:36 p.m.

02:36  5              THE COURT REPORTER:  Would you like him to read

02:36  6      and sign?

02:36  7              MR. DANGERFIELD:  Yes.

02:36  8              THE COURT REPORTER:  And then do you need a copy?

02:36  9              MR. DANGERFIELD:  Yes, I would like -- I just

02:36  10     need a -- electronic copy's fine.

02:36  11             THE COURT REPORTER:  Okay.  And you're getting

02:37  12     one?

02:37  13             MS. NOWINSKI:  Yes.

02:37  14             MR. FLEMING:  I'll have a regular copy plus a

02:37  15     rough, if you don't mind, so we can...

02:37  16             (The videotaped deposition concluded at

       17     2:37 p.m.)

       18

       19

       20

       21     _____

              STEPHEN JOE REINHART, D.O.
       22

       23

       24

       25

1  STATE OF ARIZONA    )
                       )  ss.
2  COUNTY OF MARICOPA  )

3       BE IT KNOWN that the foregoing deposition was taken

4  before me, Kate E. Roundy, RPR, a Certified Reporter,

5  Certificate #50582, for the State of Arizona, and by

6  virtue thereof authorized to administer an oath; that the

7  witness before testifying was duly sworn by me to testify

8  to the whole truth; that the questions propounded to the

9  witness and the answers of the witness thereto were taken

10  down by me in shorthand and thereafter reduced to print by

11  computer-aided transcription under my direction; that

12  pursuant to request, notification was provided that the

13  deposition is available for review and signature; that the

14  transcript consisting of 170 pages is a full, true and

15  accurate transcript of all proceedings and testimony had

16  and adduced upon the taking of said deposition, all done

17  to the best of my skill and ability.

18       I FURTHER CERTIFY that I am in no way related to nor

19  employed by any of the parties hereto nor am I in any way

20  interested in the outcome hereof.

21       DATED at Phoenix, Arizona, July 13, 2014.

22

23                          _____
                            Kate E. Roundy, RPR
24                          Certified Reporter #50582

25

EXHIBIT 35

# EUROPEAN DEPOSITION MANAGEMENT

TOLL-FREE FROM THE US:
1 866 EU DEPOS
(1 866 383 3676)
TEL/FAX 331 44 87 04 56
CELL 336 08 48 16 67
INFO@EUDEPOS.COM

In The Matter Of:

**LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,**

Plaintiff,

vs.

**BRITISH AIRWAYS PLC,**

Defendant.

## VIDEOTAPE DEPOSITION OF
## NICOLA SHARRAD
## MAY 27, 2014

ORIGINAL

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


CASE NO.:   2:13-cv-04681-SVW-RZx


LINDA ANN BAILLIE,
individually, as Personal
Representative of the Estate of
JAMES DONALD BAILLIE, II, and
on behalf of all heirs and next
of kin of JAMES DONALD BAILLIE,
II, deceased,

     Plaintiff,

vs.

BRITISH AIRWAYS PLC,

     Defendant.


VIDEOTAPE DEPOSITION OF NICOLA SHARRAD

Taken on Behalf of Plaintiff


| | |
|---|---|
| DATE TAKEN: | May 27, 2014 |
| TIME: | 9:09 A.M. - 2:25 P.M. |
| PLACE: | London Heathrow Marriott Hotel<br>Bath Road, Harlington, Hayes<br>UB3 5AN England |

Examination of the witness taken before:

Trina B. Wellslager
Registered Professional Reporter

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

2

1          APPEARANCES

2

3          Counsel for Plaintiff:

           ROBERT J. SPRAGG, ESQUIRE
4          FRANCIS G. FLEMING, ESQUIRE
           Kreindler & Kreindler, LLP
5          750 Third Avenue, 32nd Floor
           New York, New York  10017
6          (212) 687-8181

7          Counsel for Defendant British Airways PLC:

8          ANTHONY U. BATTISTA, ESQUIRE
           Condon & Forsyth, LLP
9          7 Times Square
           New York, New York  10036
10         (212) 490-9100
           and
11         SCOTT D. CUNNINGHAM, ESQUIRE
           IVY NOWINSKI, ESQUIRE
12         Condon & Forsyth, LLP
           1901 Avenue of the Stars, Suite 850
13         Los Angeles, California  90067

14         Counsel for Defendants MedAire, Inc.; Steven Joe
           Reinhart, D.O.; and Jessica Monas, M.D.:
15
           MARK C. DANGERFIELD, ESQUIRE
16         Gallagher & Kennedy, P.A.
           2575 East Camelback Road
17         Phoenix, Arizona  85016-9225

18         Also Present:

19         Stephen Faigenbaum, Videographer

20

21

22

23

24

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

3

1                        I N D E X

2     WITNESS                                          PAGE

3     CALLED BY THE PLAINTIFF:

4     NICOLA SHARRAD

5        DIRECT EXAMINATION BY MR. SPRAGG.............   5

6                     DEPOSITION EXHIBITS
                 (Nos. 1-3 Not Marked in This Deposition)
7     No. 4 (Notice of Taking Deposition).............   11
      No. 5 (Training Record, Bates Nos. BA 477-
8     BA 488)........................................   37
      No. 6 (British Airways Aviation Medical Training
9     Cabin Crew Recurrent Course, Bates Nos. BA 519-BA
      578)...........................................   46
10    No. 7 (Aviation Medical Training Manual, Bates
      Nos. BA 371-BA 380)............................   61
11    No. 8 (Training Notes, Bates Nos. BA 1-BA 96)....   97
      No. 9 (Cabin Crew Initial Aviation Medical
12    Course A, Bates Nos. BA 99-BA 370).............   99
      No. 10 (Section of Joint Procedures Manual, Bates
13    Nos. BA 441-BA 445)............................  105
      No. 11 (Section of Joint Procedures Manual, Bates
14    Nos. BA 516-BA 517)............................  118
      No. 12 (Customer Service Manager Manual, Bates
15    Nos. 433-440)..................................  132
      No. 13 (Cabin Crew Aviation Medical Manual,
16    Section 2, Bates Nos. 381-425).................  141
      No. 14 (Passenger Details, Bates No. 466)........  160
17    No. 15 (Declaration, Bates Nos. BA 441-445 and BA
      516-BA 517)....................................  172
18    No. 16 (Copy of Photograph, Bates No. JDP 406)...  172
      No. 17 (Cabin Crew Operating List, Bates
19    No. BA 446)....................................  223

20
      CERTIFICATE OF REPORTER OATH...................  228
21    CERTIFICATE OF REPORTER........................  229
      ERRATA SHEET...................................  231
22

23

24

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

4

1          THEREUPON, the following proceedings

2     were had and taken at 9:09 a.m.:

3          THE VIDEOGRAPHER:  Good morning.  We

4     are on the record.  The time is 9:09 on the 27th of

5     May in the year 2014.  My name is Stephen Faigenbaum.

6     I'm the videographer.  The court reporter's name is

7     Ms. Trina Wellslager.

8          We are here today to take the

9     deposition of Nicola Sharrad in the matter of Baillie,

10    et al., versus British Airways PLC.  We are located at

11    the London Marriott Hotel in London, England.

12          Would the counsel please identify

13    themselves for the record, and then would the reporter

14    please swear the witness.

15          MR. SPRAGG:  Robert Spragg, Kreindler

16    & Kreindler, representing Mr. Baillie's family.

17          MR. FLEMING:  And Frank Fleming,

18    Kreindler & Kreindler, representing Plaintiff Baillie.

19          MR. BATTISTA:  Anthony Battista,

20    Condon & Forsyth, along with Scott Cunningham and

21    Ivy Nowinski, representing British Airways.

22          MR. DANGERFIELD:  And Mark

23    Dangerfield, representing MedAire and Drs. Reinhart

24    and Monas.

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

5

1               NICOLA SHARRAD, called as a witness by

2       the Plaintiffs, having been first duly sworn,

3       testified as follows:

4                       THE WITNESS:  I do.

5                       DIRECT EXAMINATION

6       BY MR. SPRAGG:

7               Q.   Good morning, Ms. Sharrad.

8               A.   Good morning.

9               Q.   Would you please state your full name,

10      for the record?

11              A.   It's Nicola Sharrad, Eva Sharrad.

12              Q.   Okay.  Pronounce the first name again.

13              A.   Nicola.

14              Q.   Nicola, okay.

15                   What is your date of birth, ma'am?

16              A.   It's the ███ of the ██████ month,

17      ██.

18                   MR. FLEMING:  Could I ask you to keep

19      your voice up, please?

20                   THE WITNESS:  (Witness nodding head.)

21                   MR. FLEMING:  Thank you.

22      BY MR. SPRAGG:

23              Q.   Where were you born?

24              A.   I was born in Frambaugh in Kent.

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

196

1    doctors were needed.

2              Q.    And what did you do to check on

3    Mr. Baillie over the two-hour period that you were

4    responsible for his condition?

5              A.    Asked if he was okay; took the doctor

6    to him to take his vital signs.

7              Q.    You said you took the doctor to him?

8              A.    Yes.

9              Q.    Okay.  So during that two-hour period

10   the doctor was not by Mr. Baillie's side the entire

11   time, correct?

12             A.    No.  That's correct, yes.

13             Q.    And where was the doctor sitting, do

14   you remember?

15             A.    I don't remember.

16             Q.    Was he sitting in first-class cabin?

17             A.    I don't remember.

18             Q.    Do you remember where you had to go to

19   retrieve the doctor to bring him back to Mr. Baillie?

20             A.    From memory the doctor came to first

21   when he needed to.

22             Q.    Okay.  All right.  And do you recall

23   how often or with what frequency the doctor came to

24   first class to check on Mr. Baillie?

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

197

1           A.    I believe every half an hour.

2           Q.    Okay.  And do you recall about how

3    long it took the doctor to check Mr. Baillie while he

4    was in his seat in first class --

5           A.    No.

6           Q.    -- during the time period you were

7    responsible for his -- monitoring his condition?

8           A.    I don't know how long it was.

9           Q.    Do you recall what the doctor did when

10   he came to check on Mr. Baillie approximately every

11   half hour during the two-hour period you were

12   responsible for Mr. Baillie's monitoring?

13          A.    He took his blood pressure; but apart

14   from that, I can't remember what else he did.

15          Q.    Is it fair to say the doctor was

16   probably there less than five minutes each time he

17   came to check --

18          A.    I don't know.

19          Q.    -- Mr. Baillie's condition?

20          A.    I don't know.

21          Q.    You don't remember one way or the

22   other?

23          A.    No.

24          Q.    When the doctor was not with

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

228

1                    CERTIFICATE OF REPORTER OATH

2

3       STATE OF FLORIDA

4       COUNTY OF POLK

5

6                    I, Trina B. Wellslager, Registered

7       Professional Reporter and Notary Public, hereby

8       certify that the witness named herein appeared before

9       me on this 27th day of May, 2014, and was duly sworn.

10

11                   WITNESS my hand and official seal

12       this 27th day of May, 2014.

13

14

15       _____

16          TRINA B. WELLSLAGER, RPR

17          NOTARY PUBLIC - STATE OF FLORIDA

18          MY COMMISSION NO. EE178576

19          EXPIRES:  4-12-16

20

21

22

23

24

European Deposition Management 1 866 383 3767    info@eudepos.com

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

229

1                    CERTIFICATE OF REPORTER

2        STATE OF FLORIDA

3        COUNTY OF POLK

4

5                    I, Trina B. Wellslager, Registered

6        Professional Reporter, and Notary Public, do hereby

7        certify that I was authorized to and did

8        stenographically report the examination of the witness

9        named herein; that a review of the transcript was

10       requested; and that the foregoing transcript is a true

11       record of my stenographic notes.

12

13                   I FURTHER CERTIFY that I am not a

14       relative, employee, or attorney, or counsel for any of

15       the parties, nor am I a relative or employee of any of

16       the parties' attorney or counsel connected with the

17       action, nor am I financially interested in the outcome

18       of this action.

19

20                   DATED THIS 2nd day of June, 2014, at

21       Lakeland, Polk County, Florida.

22

23       _____
         TRINA B. WELLSLAGER, RPR

24

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

230

1      Baillie, etc., vs. British Airways, PLC

2      IN RE:   DEPOSITION OF NICOLA SHARRAD
                TAKEN MAY 27, 2014
3
       TO:      Anthony U. Battista
4               Condon & Forsyth, LLP
                7 Times Square
5               New York, NY  10036

6

7              The referenced transcript has been
       completed and awaits review and signing of the errata
8      sheet.

9              Thank you for agreeing to handle the
       reading and signing process.  Today's date is June 2,
10     2014.  Please complete the reading and signing by
       July 2, 2014.

11

12             The original transcript of this deposition
       has been delivered to Robert J. Spragg, Esq., and the
13     errata sheet, once completed, should be forwarded to
       all ordering parties as listed below.

14

15             Thank you.

16             _____
               Trina B. Wellslager, RPR
17

18     cc:     Robert J. Spragg, Esq.
               Anthony U. Battista, Esq.
19             Mark C. Dangerfield, Esq.

20

21

22

23

24

Deposition of NICOLA SHARRAD taken May 27, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

231

| | | | |
|---|---|---|---|
1 | | ERRATA SHEET | |
2 | | DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE | |

3   IN RE: BAILLIE VS. BRITISH AIRLINES PLC
    CASE NO.: 2:13-cv-04681-SVW-RZK
4   DEPOSITION OF NICOLA SHARRAD
    TAKEN MAY 27, 2014
5

|   | PAGE #/LINE # | CHANGE | REASON |
|---|---|---|---|
| 6 | 5 / 11 | Sarah | Should be Nicola Sarah |
| 7 | 5 / 24 | Farnbragh | Incorrect Spelling |
| 8 | 6 / 5 | Nest Malling | Incorrect Spelling |
| 9 | 6 / 6 | WEST MALLING | INCORRECT SPELLING |
| 10 | 21 / 8 | MACIVER | INCORRECT SPELLING |
| 11 | 21 / 9 | MACIVER | INCORRECT SPELLING |
| 12 | 23 / 22 | CABOT | INCORRECT SPELLING |
| 13 | 27 / 6 | NVQ | INCORRECT SPELLING |
| 14 | 27 / 7 | NVQ | INCORRECT SPELLING |
| 15 | 38 / 4 | SCORE | WRONG WORD NOT SCHOOL |
| 16 | 204 / 16 | CREW | CREW NOT FREE |

17

18

19   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
20   are true.

21

_____                    22 July 2014
22   NICOLA SHARRAD                                  DATE

23   cc:   Anthony Battista, Esq.
           Robert Spragg, Esq.
24         Mark C. Dangerfield, Esq.

EXHIBIT 36

Scott D. Cunningham (State Bar No.: 200413)
Email: scunningham@condonlaw.com
Ivy L. Nowinski (State Bar No.: 268564)
Email: inowinski@condonlaw.com
CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030
Facsimile:  (310) 557-1299

   - and -

Anthony U. Battista (*admitted pro hac vice*)
Email: abattista@condonlaw.com
CONDON & FORSYTH LLP
7 Times Square
New York, New York 10036
Telephone: (212) 490-9100
Facsimile:  (212) 370-4453

Attorneys for Defendant
BRITISH AIRWAYS, PLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>       Plaintiff,<br><br>   vs.<br><br>BRITISH AIRWAYS PLC,<br><br>       Defendant. | Case No. CV13-4681 SVW (RZx)<br><br>**DECLARATION OF STEPHEN FOWLER**<br><br>Date:     March 10, 2014<br>Time:    1:30 p.m.<br>Courtroom: 6<br>Judge:   Hon. Stephen V. Wilson<br><br>[Filed concurrently with Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities in Support thereof; Separate Statement of Undisputed Material Facts; Declaration of Scott D. Cunningham; Declaration of Stephen Fowler; Declaration of Ewa Van Den Berg; Declaration of Georgina Bolton; Declaration of Nicola Sharrad; Declaration of Jacqueline Bowley; and [Proposed] Order] |

1      I, Stephen Fowler, declare as follows:

2      1.     I am a Captain for British Airways, PLC (hereinafter "British

3  Airways"). I have been employed by British Airways since 7th April 1988, and I

4  have held my current position since August 2001. I was the Captain in charge of

5  British Airways flight BA 289 from London, England to Phoenix, Arizona on

6  March 23, 2012.

7      2.     I am submitting this declaration in support of British Airways' Motion

8  for Summary Judgment, or, in the alternative, Partial Summary Judgment. This

9  declaration is based on my personal knowledge and upon my review of British

10  Airways' records and procedures.

11     3.     I joined British Airways in April 1988 and have been a captain on the

12  Boeing B747 long haul fleet since 2003.

13     4.     At the time I joined British Airways in 1988, I was required to

14  complete a certification process, by which I was made familiar with British

15  Airways' policies and procedures, including British Airways' policies and

16  procedures governing flight crew response to in-flight medical emergencies. I

17  passed all certification tests without incident.

18     5.     British Airways' Joint Procedures Manual contains British Airways'

19  instructions to its crew members for dealing with in-flight medical emergencies. A

20  true and correct copy of the portions of this document which govern in-flight

21  medical emergencies and, specifically, complaints of chest pain, which was in

22  effect on March 23, 2012, is attached hereto as Exhibit A.

23     6.     The British Airways Joint Procedures Manual states, in relevant part,

24  that British Airways crew members should contact MedLink when they "feel like

25  they need advice from a Health Care Professional." (*See* Exhibit A [Joint

26  Procedures Manual], Section 6, p. 13. MedLink (also referred to as MedAire) is a

27  company that provides remote health care services for many airlines, including

28  British Airways.

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1      7.      The British Airways Joint Procedures Manual also states, in relevant

2  part, "[a] request for on-board assistance from a doctor of medicine, or other health

3  professional, may be made in the following circumstances: . . . At the suggestion of

4  MedLink."  (*See* Exhibit A [Joint Procedures Manual], Section 6, pp. 13-14).

5      8.      The British Airways Joint Procedures Manual states that MedLink

6  will "advise on medical options for diversion and assist in making arrangements

7  for medical assistance on the ground."  (*See* Exhibit A [Joint Procedures Manual],

8  Section 6, p. 14).

9      9.      Finally, the British Airways Joint Procedures Manual provides that

10  "the decision to divert rests with the Captain and should take into account

11  operational factors as well as the medical information available."  (*See* Exhibit A

12  [Joint Procedures Manual], Section 6, p. 14).

13      10.      In the course of my employment with British Airways, I have become

14  generally familiar with industry standards and practices with respect to the

15  handling of in-flight medical emergencies.  It is a common practice for some

16  airlines within the airline industry for cabin crew and flight crew to rely on the

17  advice and guidance of MedLink and similar companies, in conjunction with the

18  advice of passengers onboard the aircraft who are physicians, when handling in-

19  flight medical emergencies.

20      11.      On March 23, 2012, British Airways flight BA 289 left the gate at

21  London Heathrow Airport at 15:12 GMT, and arrived at the gate at Phoenix Sky

22  Harbor Airport at 01:53 GMT.  The flight was 10 hours and 41 minutes long from

23  gate to gate.  Attached hereto as Exhibit B is a true and correct copy of a template

24  flight plan and weather chart detailing the scheduled routing for flight BA 289

25  from London, England to Phoenix, Arizona.

26      12.      I was the Captain of flight BA 289 from London to Phoenix on March

27  23, 2012.  I do recall a medical incident involving Mr. James Donald Baillie, II, a

28  passenger onboard flight BA 289, however, given the passage of time my

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

1  recollection of the detail varies.

2      13.   I can confirm that I have listened to the audio recordings of various

3  conversations between my crew on that day, various representatives from Medlink

4  (British Airways' inflight medical consultant), and British Airways Operations

5  Control Staff in London.

6      14.   I can confirm that one of the voices from the audio recording is mine

7  and that I participated in communicating information regarding Mr. Baillie's

8  condition onboard BA289.

9      15.   I remember that a doctor on board was involved and, after listening to

10  the recordings attached to this Declaration, I can confirm that we enlisted the

11  services of onboard doctors who were traveling on the flight as passengers,

12  MedLink doctors and our crew members to assist Mr. Baillie.

13      16.   To the best of my recollection, at no time during the flight did anyone,

14  doctor, crew member or Mr. Baillie, suggest to me that a diversion was necessary

15  or that Mr. Baillie's condition would worsen if we failed to divert the aircraft.

16  Notwithstanding this, in keeping with standard contingency planning, my co-pilots

17  and I discussed suitable airports for any possible diversion.  We also informed BA

18  operations control of the possibility of diversion, subject to medical advice from

19  Medlink or physicians on board. I recall that, in the absence of medical advice to

20  divert, I made the decision to continue to PHX. That was a decision that I kept

21  under review for the rest of the flight.

22      17.   Accordingly, I continued to pilot British Airways flight BA 289 to

23  Phoenix and I did not divert the aircraft.  I understand that MedLink arranged to

24  have health care personnel waiting at the jet way to assist the passenger

25  immediately upon arrival in Phoenix.

26      18.   To the best of my recollection, the cabin crew and flight crew

27  followed the letter and spirit of all British Airways policies and procedures with

28

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

DECLARATION OF STEPHEN FOWLER                    - 4 -
CASE NO.: CV13-4681 SVW (RZx)                                          LAOFFICE 57377V.1

1  respect to the treatment we provided to Mr. Baillie onboard British Airways flight

2  BA 289 on March 23, 2012.  We had contacted MedLink and made use of onboard

3  physicians, whose opinions we obtained and followed. Neither the onboard

4  physicians nor MedLink ever advised me that flight BA 289 on March 23, 2012 be

5  diverted.

6      I declare under penalty of perjury under the laws of the United States of

7  America that the foregoing is true and correct.  Executed this _____ day of January,

8  2014, at _____, United Kingdom.

9

10

11                                    _____

                                      Stephen Fowler

CONDON & FORSYTH LLP
1901 Avenue of the Stars, Suite 850
Los Angeles, California 90067-6010
Telephone: (310) 557-2030

respect to the treatment we provided to Mr. Baillie onboard British Airways flight BA 289 on March 23, 2012. We had contacted Medlink and made use of onboard physicians, whose opinions we obtained and followed. Neither the onboard physicians nor MedLink ever advised me that flight BA 289 on March 23, 2012 be diverted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this __27__ day of January, 2014, at ___Heathrow Airport___, United Kingdom.

Stephen Fowler

EXHIBIT 37

# EUROPEAN DEPOSITION MANAGEMENT

TOLL-FREE FROM THE US:
1 866 EU DEPOS
(1 866 383 3676)
TEL/FAX 331 44 87 04 56
CELL 336 08 48 16 67
INFO@EUDEPOS.COM

**In The Matter Of:**

**LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,**

**Plaintiff,**

**vs.**

**BRITISH AIRWAYS PLC,**

**Defendant.**

## VIDEOTAPE DEPOSITION OF
## CAPTAIN STEPHEN FOWLER
## MAY 29, 2014

# ORIGINAL

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


CASE NO.:   2:13-cv-04681-SVW-RZx


LINDA ANN BAILLIE,
individually, as Personal
Representative of the Estate of
JAMES DONALD BAILLIE, II, and
on behalf of all heirs and next
of kin of JAMES DONALD BAILLIE,
II, deceased,

     Plaintiff,

vs.

BRITISH AIRWAYS PLC,

     Defendant.


VIDEOTAPE DEPOSITION OF CAPTAIN STEPHEN FOWLER

Taken on Behalf of Plaintiff


DATE TAKEN:     MAY 29, 2014

TIME:     9:06 A.M. - 3:25 P.M.

PLACE:     London Heathrow Marriott Hotel
     Bath Road, Harlington, Hayes
     UB3 5AN England

Examination of the witness taken before:

Trina B. Wellslager
Registered Professional Reporter

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

2

1        APPEARANCES

2        Counsel for Plaintiff:

3           FRANCIS G. FLEMING, ESQUIRE
4           Kreindler & Kreindler, LLP
            750 Third Avenue, 32nd Floor
5           New York, New York  10017
            (212) 687-8181

6

        Counsel for Defendant British Airways PLC:

7           SCOTT D. CUNNINGHAM, ESQUIRE
8           Condon & Forsyth, LLP
            1901 Avenue of the Stars, Suite 850
9           Los Angeles, California  90067

10

11       Also Present:

12          Andrew Hammond, 'Balpa' Pilots' Union
            Guillaume Pallat, Videographer
13

14

15

16

17

18

19

20

21

22

23

24

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

3

1                          I   N   D   E   X

2    WITNESS                                        PAGE

3    CALLED BY THE PLAINTIFF:

4    CAPTAIN STEPHEN FOWLER

5

6        DIRECT EXAMINATION BY MR. FLEMING............   5

7

8    CERTIFICATE OF REPORTER OATH................... 215
     CERTIFICATE OF REPORTER....................... 216
9    ERRATA SHEET.................................. 218

10

11
                       DEPOSITION EXHIBITS
12
     No. 18 (MedAire Transcript, Bates Nos.
13   BA 490-BA 494)................................   19
     No. 19-19B (Significant Weather Chart, Bates
14   No. BA 0515).................................   81
     No. 20 (Diagram of Probably Course of Flight)...  90
15

16

17

18

19

20

21

22

23

24

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

4

1                    THEREUPON, the following proceedings

2       were had and taken at 9:06 a.m.:

3                    THE VIDEOGRAPHER:  All right.  Good

4       morning.  We are now on the record.  My name is

5       Guillaume Pallat.  I'm the videographer for European

6       Deposition Management today.  Today's date is May the

7       29th, 2014, and the time is 9:06.

8                    This deposition is being held in

9       London in the matter of Linda M. Baillie, et al.,

10      versus British Airways PLC, for the United States

11      District Court, Central District of California.  The

12      deponent is Captain Stephen Fowler, and will counsel

13      please identify yourselves.

14                   MR. FLEMING:  Good morning.  My name

15      is Frank Fleming.  I'm here for Plaintiff Baillie.

16                   MR. CUNNINGHAM:  Scott Cunningham, of

17      Condon & Forsyth, on behalf of Defendant British

18      Airways.

19                   MR. HAMMOND:  My name is Andrew

20      Hammond, and I'm here from the British Pilots' Union,

21      'Balpa'.

22                   THE VIDEOGRAPHER:  The court reporter

23      is Trina Wellslager, and will now swear in the

24      witness.

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

5

1                    STEPHEN FOWLER, called as a witness

2       by the Plaintiff, having been first duly sworn,

3       testified as follows:

4                    THE WITNESS:   I do.

5                         DIRECT EXAMINATION

6       BY MR. FLEMING:

7                    Q.    Good morning, sir.  My name is Frank

8       Fleming.  We met briefly off the record.  I'm very

9       pleased to meet you.

10                   I'm going to be asking you some

11      questions today about British Airways Flight 289 on

12      March 23rd, 2012.  If I make reference to "the

13      flight," that's what I'm talking about.  Do you

14      understand that to be the case, sir?

15                   A.    Good morning.  I do, sir.

16                   Q.    Okay.  Have you ever had your

17      deposition taken before, sir?

18                   A.    A deposition?  Only the statement I

19      already made a short while ago, a written statement.

20                   Q.    Okay.  Have you ever given sworn

21      testimony in a court or in a lawyer's office or a

22      conference room such as this in any case in any

23      context prior to today?

24                   A.    No, sir.

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

200

1     possibility that MedLink might say to us, we actually

2     now think you should get this person on the ground.

3          Q.    Okay.  It says that we are closest to

4     Chicago at the moment.  Do you see that in that same

5     box?  Does that help you locate us where the aircraft

6     is?

7          A.    Yes.

8          Q.    Okay.  Could you give me some idea of

9     where it is?  Here's the estimate, Exhibit 18.

10         A.    Well, given that we're following a

11    track similar to that, it's hard to say.  I suspect we

12    would be slightly north of Chicago, somewhere around

13    here.

14         Q.    Maybe I could ask you to make another

15    mark on that one and call it mark B, or C, for

16    Chicago.

17         A.    Okay.  It's a stab in the dark, but

18    probably in this area.  Should I call it C?

19         Q.    Yeah, that would be great.  Thank you.

20    Just let me look at it to see if I have a good picture

21    of what you're talking about.

22               Okay.  Now, you did not divert to

23    Chicago, correct?

24         A.    Correct.

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

201

1          Q.     Why?

2          A.     There was no instruction from MedLink,

3     or the doctors on board, to divert the aircraft or to

4     tell me that the passenger's safety or well-being was

5     -- was requiring me to divert the aircraft.

6          Q.     Okay.  So nobody told you to divert so

7     you didn't divert.

8          A.     Nobody told me to divert and they told

9     me that -- to -- they actually told us I think to

10    monitor the passenger, report back, and to expect to

11    be met by paramedics in Phoenix.

12         Q.     Okay.  In this particular exhibit you

13    said, "I will give you a call to let you know what our

14    decision is if we have to divert."  Dispatcher says

15    "Excellent.  Thank you for that."  And the doctor

16    says, "There's just one other thing.  I want to make

17    sure we have tried laying this gentleman down, legs

18    elevated.  Give him a little time in that position and

19    recheck his blood pressure."  Did you do that?

20         A.     I don't recall, but I would be certain

21    that it would have been done if it was an instruction

22    from the MedLink doctor.

23         Q.     Okay.  Then you say, "This is the

24    pilot again," and I think it's you speaking as you

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

215

1                     CERTIFICATE OF REPORTER OATH

2

3     STATE OF FLORIDA

4     COUNTY OF POLK

5

6                     I, Trina B. Wellslager, Registered

7     Professional Reporter, and Notary Public in and for

8     the State of Florida at large, hereby certify that the

9     witness named herein appeared before me on this 29th

10    day of May, 2014, and was duly sworn.

11

12                    WITNESS my hand and official seal

13    this 29th day of May, 2014.

14

15

16    _____

17    TRINA B. WELLSLAGER, RPR

18    NOTARY PUBLIC - STATE OF FLORIDA

19    MY COMMISSION NO. EE178576

20    EXPIRES:  4-12-16

21

22

23

24

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

216

1                    CERTIFICATE OF REPORTER

2      STATE OF FLORIDA

3      COUNTY OF POLK

4              I, Trina B. Wellslager, Registered

5      Professional Reporter, and Notary Public, do hereby

6      certify that I was authorized to and did

7      stenographically report the examination of the witness

8      named herein; that a review of the transcript was

9      requested; and that the foregoing transcript is a true

10     record of my stenographic notes.

11

12             I FURTHER CERTIFY that I am not a

13     relative, employee, or attorney, or counsel for any of

14     the parties, nor am I a relative or employee of any of

15     the parties' attorney or counsel connected with the

16     action, nor am I financially interested in the outcome

17     of this action.

18

19             DATED THIS 2nd day of June, 2014, at

20     Lakeland, Polk County, Florida.

21

22     _____
       TRINA B. WELLSLAGER, RPR

23

24

Deposition of CAPTAIN STEPHEN FOWLER taken May 29, 2014
BAILLE, et.al. v BRITISH AIRWAYS PLC

217

1     BAILLIE VS. BRITISH AIRWAYS PLC

2

3     IN RE:   DEPOSITION OF CAPTAIN STEPHEN FOWLER

4              TAKEN MAY 29, 2014

5

6     TO:   Scott D. Cunningham, Esq.
            Condon & Forsyth, LLP
7           1901 Avenue of the Stars, Suite 850
            Los Angeles, California  90067
8

9              The referenced transcript has been completed
      and awaits review and signing of the errata sheet.
10

11             Thank you for agreeing to handle the reading
      and signing process.  Today's date is June 2, 2014.
12    Please complete the reading and signing by June 2,
      2014.
13

14             The original transcript of this deposition has
      been delivered to Francis G. Fleming, Esq., and the
15    errata sheet, once completed, should be forwarded to
      all ordering parties as listed below.
16

17             Thank you.

18             _Trina B. Wellslager_____
               Trina B. Wellslager, RPR
19

20    cc:   Francis G. Fleming, Esq.
            Scott D. Cunningham, Esq.
21          Mark C. Dangerfield, Esq.

22

23

24

EXHIBIT 38

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


LINDA ANN BAILLIE, individually,    )
as Personal Representative of the   )No.2:14-cv-00420-SMM
Estate of JAMES DONALD BAILLIE,     )
II, and on behalf of all heirs and  )
next of kin of JAMES DONALD         )
BAILLIE, II, deceased,              )
                                    )
          Plaintiff,                )
                                    )
      vs.                           )
                                    )
MEDAIRE, INC.; STEVEN JOE REINHART, )
D.O.; and JESSICA MONAS, M.D.,      )
                                    )
          Defendants.               )
_____ )



        VIDEOTAPED DEPOSITION OF OCTAVIO E. PAJARO, M.D.


                   Phoenix, Arizona
                   November 2, 2015
                     2:59 p.m.








REPORTED BY:

STEPHANIE WINTERS, RPR
Certified Reporter, No. 50067

1                          I N D E X

2    EXAMINATION                                        PAGE

3    OCTAVIO E. PAJARO, M.D.

4       Mr. Dangerfield                               7, 83

5       Mr. Spragg                                   70, 86

6

7           (Deposition Exhibit Number 41 was marked for

8    identification and attached to Dr. Covalciuc's deposition

9    transcript.)

10

11                        E X H I B I T S

12

13   EXHIBIT NO.              DESCRIPTION                PAGE

14      41  -   State of Arizona Certificate of Death,    13
                 for James Donald Baillie II
15
        61  -   Curriculum Vitae of Dr. Pajaro             7
16
        62  -   Hospital H&P, JDB00566 through JDB00569   17
17
        63  -   TxCard Miscellaneous Note, JDB00798       20
18
        64  -   Hospital Cardiology Consult, JDB00770     22
19               through JDB00773

20      65  -   Hospital Interdisciplinary Conference,    26
                 JDB01319
21
        66  -   Hospital Nurse Note, JDB01145             28
22
        67  -   Mayo Clinic records, JDB07272, JDB07310,  30
23               JDB07313, JDB07706 and JDB07710

24      68  -   Hospital Nurse Note, JDB01144             33

25

| 1 | EXHIBIT NO. | | DESCRIPTION | PAGE |
|---|---|---|---|---|
| 2 | | | | |
| 3 | 69 | - | Hospital TxNeph Consult, JDB00878 through JDB00881 | 36 |
| 4 | 70 | - | Mayo Clinic records, JDB02782, JDB02797, JDB02825, JDB02826, | 40 |
| 5 | | | JDB02827, JDB02833, JDB02995 | |
| 6 | 71 | - | Anesthesiology Miscellaneous Note, JDB00738 through JDB00739 | 42 |
| 7 | | | | |
| 8 | 72 | - | Mayo Clinic Records, JDB02996, JDB03005, JDB03015, JDB03016, | 44 |
| 9 | | | JDB03061, JDB03148 | |
| 10 | 73 | - | Discharge Record Documentation, JDB06051 through JDB06052 | 47 |
| 11 | 74 | - | Discharge Record Documentation, JDB06263 | 49 |
| 12 | | | | |
| 13 | 75 | - | Hospital CVSurg Operative Note, JDB00831 through JDB00834 | 49 |
| 14 | 76 | - | Hospital CVSurg Operative Note, JDB00827 through JDB00830 | 51 |
| 15 | | | | |
| 16 | 77 | - | Hospital Nurse Note, JDB00917 | 52 |
| 17 | 78 | - | Hospital Nurse Note, JDB00914 | 54 |
| 18 | 79 | - | Mayo Clinic record, JDB03301 | 55 |
| 19 | 80 | - | Transplant UNOS List, JDB10964 | 57 |
| 20 | 81 | - | Hospital Expiration Summary, JDB00573 through JDB00576 | 60 |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

```
 1          VIDEOTAPED DEPOSITION OF OCTAVIO E. PAJARO, M.D.

 2

 3    was taken on November 2, 2015, at 2:59 p.m. at Mayo Clinic,

 4    Phoenix Campus, Support Services Building, Conference Room

 5    SSB 01-107, 5777 E. Mayo Blvd, Phoenix, Arizona, before

 6    STEPHANIE WINTERS, Certified Reporter Number 50067, in and

 7    for the State of Arizona.

 8                              * * * *

 9

10    COUNSEL APPEARING

11             ON BEHALF OF PLAINTIFF:
                  (Appearing telephonically)

12                ROBERT J. SPRAGG, ESQ.
                  KREINDLER & KREINDLER LLP
13                750 Third Avenue
                  New York, NY 10017
14                (212)687-8181
                  rspragg@kreindler.com
15
                 ON BEHALF OF DEFENDANTS:
16
                  MARK C. DANGERFIELD, ESQ.
17                GALLAGHER & KENNEDY, P.A.
                  2575 E. Camelback Road
18                Phoenix, AZ 85016-9225
                  602-530-8000
19                mark.dangerfield@gknet.com

20
                 ON BEHALF OF DR. PAJARO:
21
                  BARRY D. HALPERN, ESQ.
22                SNELL & WILMER L.L.P.
                  One Arizona Center
23                400 East Van Buren St., Suite 1900
                  Phoenix, AZ 85016-9225
24                602-382-6345
                  bhalpern@swlaw.com
25
```

VIDEOTAPED DEPOSITION OF OCTAVIO E. PAJARO, M.D. - 11/2/2015

1   ALSO PRESENT:

2               Robert Sonne, Counsel for Mayo Clinic
                Janelle Wright, Paralegal, Mayo Clinic
3               Holly Rye, Videographer, VideoDep, Inc.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                          Phoenix, Arizona
                                           November 2, 2015
2                                          2:59 p.m.

3

4

5              THE VIDEOGRAPHER:  We're on the record.  Today's

6    date is November 2, 2015.  The time on the video monitor is

7    2:59 p.m.

8              This is the videorecorded deposition of Octavio E.

9    Pajaro, M.D. noticed by counsel for the defendant in the

10   matter of Baillie, et al. versus MedAire, Incorporated, et

11   al. in the United States District Court, District of

12   Arizona.  The case number is 2:14-cv-00420-SMM.

13             Our location is the offices of the Mayo Clinic,

14   located at 5777 East Mayo Boulevard, Phoenix, Arizona.  The

15   certified court reporter is Stephanie Winters of

16   Morris-Crowe Reporting, LLC, located at 7650 South

17   McClintock Drive, Tempe, Arizona, 85281.  My name is Holly

18   Rye and I'm the certified legal video specialist for the

19   firm of VideoDep, Incorporated, 7776 South Point Parkway

20   West, Phoenix, Arizona, 85044.

21             Counsel, please identify yourselves and state whom

22   you represent for the record at this time, starting with

23   plaintiff's counsel, please.

24             MR. SPRAGG:  Yes.  Good afternoon.  My name is

25   Robert Spragg with the law firm of Kreindler and Kreindler,

1  LLP, and I represent the family of James Baillie, and

2  specifically his wife, Linda Ann Baillie.

3         MR. DANGERFIELD:  And my name is Mark Dangerfield.

4  I represent the defendants in this case, MedAire, Inc. and

5  Dr. Steven Reinhart and Dr. Jessica Monas.

6         MR. HALPERN:  And I'm Barry Halpern.  I represent

7  the Mayo Clinic and its staff.  And Rob Sonne, also with the

8  Mayo Clinic is present.

9         THE VIDEOGRAPHER:  Thank you, counsel.  The court

10  reporter may swear in the witness at this time, please.

11

12              OCTAVIO E. PAJARO, M.D.

13  called as a witness herein, having been first duly

14  sworn, was examined and testified as follows:

15

16         (Exhibit Number 61 was marked for

17  identification.)

18

19              E X A M I N A T I O N

20  BY MR. DANGERFIELD:

21     Q.   Could you start by just stating your name for the

22  record.

23     A.   Octavio Pajaro.

24     Q.   And Dr. Pajaro, we have marked as Exhibit 61 in

25  this case a copy of what I understand is your CV.  I'm going

VIDEOTAPED DEPOSITION OF OCTAVIO E. PAJARO, M.D. - 11/2/2015

1  yourself that what you were writing in there was accurate,

2  correct?

3      A.   Yes.

4      Q.   All right.  Those complete my questions, Doctor.

5          MR. SPRAGG:  My turn?

6          MR. DANGERFIELD:  Your turn.

7

8                    E X A M I N A T I O N

9  BY MR. SPRAGG:

10     Q.   All right.  Thank you.  Dr. Pajaro, my name is

11 Robert Spragg.  Again, I represent Mrs. Baillie in this

12 case.

13     A.   Yes.

14     Q.   In responding to Mr. Dangerfield's earlier

15 questions, you indicated that the death certificate that you

16 filled out was actually done in handwriting, correct?

17     A.   Yes.

18     Q.   Okay.  And you also indicated that your secretary

19 usually keeps a copy of any death certificate that you

20 complete; is that correct?

21     A.   Yes.

22     Q.   Okay.  But you also testified that she looked and

23 she, for some reason, does not have a copy of the

24 handwritten death certificate that you completed in

25 Mr. Baillie's case, correct?

VIDEOTAPED DEPOSITION OF OCTAVIO E. PAJARO, M.D. - 11/2/2015

1      A.    Yes.

2      Q.    Okay.  And the document that has been identified

3  as Exhibit 41 is not a document that you prepared or

4  completed, correct?

5      A.    Correct.

6            MR. DANGERFIELD:  Objection.

7  BY MR. SPRAGG:

8      Q.    Okay.  Do you know how this document is created,

9  Exhibit 41?

10     A.    No.  I presume she faxes the handwritten copy to

11 the appropriate office and they type it.

12     Q.    Okay.  In regard to the -- your -- strike that.

13           In regard to the original handwritten death

14 certificate that you completed, do you have an independent

15 recollection of completing the cause of death section of

16 that death certificate?

17     A.    No.

18     Q.    Okay.  And Dr. --

19     A.    Unfortunately, I fill too many out.

20     Q.    Pardon me, I'm sorry?

21     A.    I said unfortunately over four years, or

22 however -- this three-and-a-half years, we fill out many of

23 them.

24     Q.    All right.  But after reviewing the State Death

25 Certificate, Exhibit 41, does that refresh your recollection

1

2

3

4

5

6

7              I, the undersigned, say that I have read the

8    foregoing transcript of testimony taken November 2, 2015,

9    and I declare, under penalty of perjury, that the foregoing

10   is a true and correct transcript of my testimony contained

11   therein.

12              EXECUTED this _____ day of _____,

13   _____.

14

15

16              _____

17                   OCTAVIO E. PAJARO, M.D.

18

19

20

21

22

23

24

25

```
 1   STATE OF ARIZONA      )
                           )ss.
 2   COUNTY OF MARICOPA    )

 3        BE IT KNOWN that the foregoing proceedings were taken
     before me, STEPHANIE WINTERS, Certified Reporter No. 50067,
 4   that the witness before testifying was duly sworn by me to
     testify to the whole truth; that the foregoing pages are a
 5   full, true and accurate record of the proceedings, all done
     to the best of my skill and ability; that the proceedings
 6   were taken down by me in shorthand and thereafter reduced to
     print under my direction.

 7

 8             [X]  Review and signature was requested.
               [ ]  Review and signature was waived.
 9             [ ]  Review and signature was not required.

10

          I CERTIFY that I am in no way related to any of the
11   parties hereto, nor am I in any way interested in the
     outcome thereof.

12

          I FURTHER CERTIFY that I have complied with the
13   requirements set forth in ACJA 7-206.  Dated at Phoenix,
     Arizona, this 12th day of November, 2015.

14

15

     Stephanie Winters, RPR
16   Certified Reporter No. 50067

17

18                    *      *      *

          I CERTIFY that Morris-Crowe Court Reporting, LLC, has
19   complied with the requirements set forth in ACJA 7-206.
     Dated at Tempe, Arizona, this 12th day of November, 2015.

20

21

22   Morris-Crowe Court Reporting, LLC
     Arizona RRF No. R1001

23

24

25
```

EXHIBIT 39



FlightAware Plot with map for BA 289 — March 23, 2012

EXHIBIT 40

**18 MAR 2012** ▶ **23 MAR 2012**  TRIP TO **MUNICH, GERMANY**

PREPARED FOR
**MR JAMES DONALD BAILLIE**



RESERVATION CODE  NMSCDZ
AIRLINE RESERVATION CODE   NMSCDZ (AA), 3273U5 (LH)
**Travel Arranger Priority Comments**
LUFTHANSA TICKET PRICE 1136.00
AMERICAN TICKET PRICE 9334.50

---

 **DEPARTURE: SUNDAY 18 MAR** ▶ ARRIVAL: **MONDAY 19 MAR**
Please verify flight times prior to departure

| AMERICAN AIRLINES **AA 6191** | PHX PHOENIX, AZ | LHR ▶ LONDON HEATHROW, UNITED KINGDOM | Aircraft: BOEING 744 JET |
|---|---|---|---|
| Operated by: BRITISH AIRWAYS | Departing At: **9:10pm** (Sun, Mar 18) | Arriving At: **1:55pm** (Mon, Mar 19) | Distance (in Miles): 5266 |
| Duration: 09hr(s) 45min(s) | | | Stop(s): 0 |
| | Terminal: TERMINAL 4 | Terminal: TERMINAL 5 | Notes: SEATING SUBJECT TO AIRPORT OR ONLINE CHECK IN |

| Passenger Name: | Seats | Class | Status | Frequent Flyer #: | eTicket Receipt(s): | Meals: |
|---|---|---|---|---|---|---|
| » MR JAMES DONALD BAILLIE | 19B / Confirmed | Business | Confirmed | VY25980 / AMERICAN AIRLINES | 0017038838543/44 2207038838545 | Served |

---

 **DEPARTURE: MONDAY 19 MAR** Please verify flight times prior to departure

| AMERICAN AIRLINES **AA 6273** | LHR LONDON HEATHROW, UNITED KINGDOM | TLS ▶ TOULOUSE, FRANCE | Aircraft: AIRBUS INDUSTRIE A319 JET |
|---|---|---|---|
| Operated by: BRITISH AIRWAYS | Departing At: **6:35pm** | Arriving At: **9:20pm** | Distance (in Miles): 0554 |
| Duration: 01hr(s) :45min(s) | | | Stop(s): 0 |
| | Terminal: TERMINAL 5 | Terminal: Not Available | Notes: SEATING SUBJECT TO AIRPORT OR ONLINE CHECK IN |

| Passenger Name: | Seats: | Class: | Status | Frequent Flyer # | eTicket Receipt(s): | Meals. |
|---|---|---|---|---|---|---|
| » MR JAMES DONALD BAILLIE | 04D / Confirmed | Business | Confirmed | VY25980 / AMERICAN AIRLINES | 0017038838543/44 2207038838545 | Served |

---

 **DEPARTURE: TUESDAY 20 MAR** Please verify flight times prior to departure

| LUFTHANSA **LH 2219** | TLS TOULOUSE, FRANCE | ▶ MUC MUNICH, GERMANY | Aircraft: CANADAIR REGIONAL JET |
|---|---|---|---|
| Operated by LUFTH CITYLINE | Departing At: **6:25pm** | Arriving At: **8:10pm** | Distance (in Miles): 0598 |
| Duration: 01hr(s) :45min(s) | | | Stop(s): 0 |
| | Terminal: Not Available | Terminal: TERMINAL 2 | Notes: SEATING SUBJECT TO AIRPORT OR ONLINE CHECK IN |

| Passenger Name: | Seats: | Class | Status | Frequent Flyer # | eTicket Receipt(s). | Meals: |
|---|---|---|---|---|---|---|
| » MR JAMES DONALD BAILLIE | 03D / Confirmed | Business | Confirmed | 03158482559 / UNITED AIRLINES | 0017038838543/44 2207038838545 | Snack |

 CHECK IN: **TUESDAY 20 MAR** ▶ CHECK OUT: **FRIDAY 23 MAR** ▶ 3 NIGHT(S)

SHERATON MUNICH
ARA (SHERATON
HOTELS)
49-89-92320

ARABELLASTRASSE 5
MUNICH DE 81925

Confirmation:
C535277299

Status:
Confirmed

Room Details:
1K TPG: CHAINWIDE
DISCOUNT
CLUB ROOM NON
SMOKING:CLUB LOU
CONTINENTAL BRKFST
IN CLUB LNG

Room(s): 1  Guest(s): 1

Rate:
215.10 EUR / night

Corporate Discount:
260173

Cancellation Information:
Cancel by 4:00pm on day
of arrival to avoid a penalty

Guarantee:
Room is guaranteed for
late arrival

---

✈ DEPARTURE: **FRIDAY 23 MAR** Please verify flight times prior to departure

AMERICAN AIRLINES
AA 6476

Operated by:
BRITISH AIRWAYS

Duration:
02hr(s) :10min(s)

MUC
MUNICH,
GERMANY

Departing At:
10:35am

Terminal:
TERMINAL 1

LHR
LONDON HEATHROW, UNITED
KINGDOM

Arriving At:
11:45am

Terminal:
TERMINAL 5

Aircraft:
AIRBUS INDUSTRIE A319
JET

Distance (in Miles): 0575

Stop(s): 0

Notes:
SEATING SUBJECT TO
AIRPORT OR ONLINE
CHECK IN

| Passenger Name: | Seats: | Class: | Status: | Frequent Flyer #: | eTicket Receipt(s): | Meals: |
|---|---|---|---|---|---|---|
| » MR JAMES DONALD BAILLIE | 04A / Confirmed | Business | Confirmed | VY25980 / AMERICAN AIRLINES | 0017038838543/44 2207038838545 | Served |

---

✈ DEPARTURE: **FRIDAY 23 MAR** Please verify flight times prior to departure

AMERICAN AIRLINES
AA 6198

Operated by:
BRITISH AIRWAYS

Duration:
10hr(s) :40min(s)

LHR
LONDON HEATHROW, UNITED
KINGDOM

Departing At:
3:05pm

Terminal:
TERMINAL 5

PHX
PHOENIX,
AZ

Arriving At:
6:45pm

Terminal:
TERMINAL 4

Aircraft:
BOEING 744 JET

Distance (in Miles)  5266

Stop(s): 0

Notes:
SEATING SUBJECT TO
AIRPORT OR ONLINE
CHECK IN

| Passenger Name: | Seats: | Class: | Status | Frequent Flyer # | eTicket Receipt(s): | Meals: |
|---|---|---|---|---|---|---|
| » MR JAMES DONALD BAILLIE | 17J / Confirmed | Business | Confirmed | VY25980 / AMERICAN AIRLINES | 0017038838543/44 2207038838545 | Served |

---

◻ OTHER: **FRIDAY 23 MAR**

OTHER

Status:
Confirmed

Information:
35.00 NON REFUNDABLE SERVICE FEE PER TICKET

CONFIDENTIAL

EXHIBIT 41



**MedAire.**
An International SOS Company

**Global Services**
## Intake Form - MedLink

| Doc. No./Rev. No | OPS 04-02 R16 |
|---|---|
| Revision Date | 04/27/2011 |
| Page | Page 1 of 2 |

### THANK YOU FOR CALLING MEDLINK. THIS IS _____. PLEASE STATE YOUR COMPANY NAME

| Patch #: 0578 | Zulu Date: 3/03 | Zulu Time: | Patch Type: |
|---|---|---|---|
| Company: BA | Flight #: 800 | Dispatch: ☐ N ☐ Y If required, conf-in dispatch | Transmitted By: ☐ Tempus (EK/EY/VA/AM/AU) |
| Origination / ICAO / IATA: LIMA | Destination / ICAO / IATA: DFX | ETA(z): 0141 | Time Remaining: 6:54 |
| Age: 61 | Gender: ☒ M ☐ F | Time Aware: ___ min | Brief Medical Complaint: Central Chest Pain PAX |

Tempus on board? ☐ No ☐ IC ☐ 2000
Initial call through Tempus? ☐ N ☐ Y

Tempus connected to patient? ☐ N ☐ Y
Tempus connected to ML? ☐ N ☐ Y

Photo received? ☐ N ☐ Y
ECG required for: ☐ chest pain ☐ SOB

ECG received? ☐ N ☐ Y
☐ unconscious / altered

### PLEASE STANDBY WHILE I BRIEF THE MEDLINK PHYSICIAN

| Registration / Tail / Call Sign: GCIVD | AC/ Vessel Type: | Seat #: 4K | Current Location: |
|---|---|---|---|
| Patient Type: ☐ PAX ☐ Crew ☐ Principal ☐ Guest | | Caller's Name: | Caller's Position: |
| Medical Personnel? ☐ N ☐ Y Spoke w/ ML MD? ☐ N ☐ Y | Profession: | Medical Personnel's Name: | |
| Patient Name: | Medical Profile / Member / Staff #: | Contact Info: | |

EXTENSION #

CSE SIGNATURE

CSE PRINT NAME

### MEDLINK PHYSICIAN'S NOTES

**CURRENT MENTAL STATUS:** ☐ Conscious & appropriate ☒ Conscious & confused ☐ Unconscious ☐ Other (specify):

**PAST MEDICAL HISTORY** ☐ N/R

Allergies: ☐ N/R

AED used:
☐ N ☐ Y: #Shocks delivered ___ or ☐ monitoring purposes only
Medication: ☐ N/R

Care Initiated by Crew: ☐ N/R ☒ Oxygen

| Vital Signs: | TEMP | RESP | BP | PULSE |
|---|---|---|---|---|
| Time ___ | | | | ☐ N/R |

Patient response to care:
☐ Improved ☐ Unchanged ☐ Worsened ☐ N/R

Patient Expired: If "yes," location at time of death:
☐ No ☐ Yes

**MEDLINK PHYSICIAN NOTES**

**MEDLINK PHYSICIAN ORDERS**

EMS @ destination: ☐ Standard ☒ ALS ambulance ☐ Not required ☐ Repatch in: ___ ☒ Repatch if conditions worsens ☐ Repatch using Tempus

PHYSICIAN SIGNATURE

PRINT NAME   Reinhart

| Diversion Location / ICAO / IATA ☐ N/A | Initiated by: ☐ ML Dr. ☐ Pilot | Div. ETA In Zulu | Div Time Remaining |
|---|---|---|---|
| EMS Terminal | Gate | ETA In Local | Client Notified: ☐ Yes ☐ Not Req'd |

This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 4/28/2011

Reinhart

EXHIBIT NO. 3
5-16-14

MedAire, Inc.
REV: 04/27/2011

**Intake Form - MedLink**

OPS 04-02/R16
Page 2 of 2

# DOCUMENTATION CONTINUATION

| Date | Time | CH# | In/Out | Initial | Documentation |
|---|---|---|---|---|---|
| 19:18 | | | ☑ In ☐ Out | MED | Pulse 100 - BP/ 100/70 Chest PAIN & CRACKLES LEFT HAND |
| | 22:36 | | ☐ In ☐ Out | | Vitals ↑ same  Feels worse / NO PMHX 61M c̄ c/o CP. Given O₂ ↑ NTG. pt us on board. Took ASA. MONA ↑ Div 3 HR ETA. |
| | 22:54 | | ☐ In ☐ Out | | Per captain, after NTG, Radiologist on board. Not comfort & c/f giving NTG. Given 2↑↑↑ BP 100/80 continued chest pain. After take-off, started funny substernal CP. Started ↑ shortness of breath, pain was 5/10. Also with diaphoresis. Not able to talk to physician. Due to SFWLTS, per crew & MD patient working w/a and not doing well. |

## PHYSICIAN ONLY

**Diagnostic Impression Category** (please check **ONE**)

**ALLERGY/IMMUNOLOGY**
- ☐ Acute allergic reaction
- ☐ Hives
- ☐ Angioedema
- ☐ Food Allergy

Other:

**DENTAL**
- ☐ Dental pain

Other:

**ENVENOMATION**
- ☐ Insect bite

Other:

**NEUROLOGICAL**
- ☐ Syncope, Vasovagal
- ☐ Syncope, Orthostatic
- ☐ Headache
- ☐ Seizure – chronic
- ☐ Seizure – initial

**ORTHOPEDIC**
- ☐ Acute Back Pain
- ☐ Sprain, Strain, Hematoma
- ☐ Back Injury
- ☐ Muscle Spasm

Other:

**SUBSTANCE ABUSE**
- ☐ ETOH Intoxication
- ☐ Substance Abuse
- ☐ Overdose

Other:

**BURN**
- ☐ Scald
- ☐ Non-scald

Other:

**DERMATOLOGY**
- ☐ Rash, non-allergic
- ☐ Cellulitis

Other:

**GASTROINTESTINAL**
- ☐ Nausea/vomiting
- ☐ Abdominal pain, non-specific
- ☐ Gastroenteritis
- ☐ Diarrhea

Other:

- ☐ Weakness, non-specific
- ☐ CVA (Stroke) / TIA
- ☐ Altered LOC

Other:

**PHARMACOLOGICAL**
- ☐ Drug adverse effect, rxn
- ☐ Pharmaceutical question

Other:

**TRAUMA**
- ☐ Laceration
- ☐ Fall
- ☐ Contusion

Other:

**CARDIAC**
- ☑ Chest pain – Cardiac
- ☐ Chest pain – atypical
- ☐ Cardiac Arrest
- ☐ Palpitations/Rapid HR

Other:

**ENDOCRINE**
- ☐ Hypoglycemia
- ☐ Hyperglycemia
- ☐ Diabetes Mellitus –Type 2
- ☐ Diabetes Mellitus – Type 1

Other:

**HEMATOLOGY/ONCOLOGY**
- ☐ Sickle Cell Anemia
- ☐ Cancer

Other:

**OB/GYN**
- ☐ Vaginal bleeding
- ☐ Threatened abortion
- ☐ Pregnancy

Other:

**PSYCHIATRIC**
- ☐ Anxiety/Panic
- ☐ Aggressive behavior
- ☐ Mental Illness

Other:

**UROLOGICAL**
- ☐ Urinary Tract Infection
- ☐ Dysuria
- ☐ Renal Colic/Flank Pain

Other:

**COMMUNICABLE/INFECTIOUS**
- ☐ Acute febrile illness
- ☐ Varicella (chicken pox)
- ☐ Acute viral illness

Other:

**ENT**
- ☐ Ear pain
- ☐ Epistaxis
- ☐ TM Rupture
- ☐ Sinusitis

Other:

**MEDICAL EQUIPMENT**
- ☐ Oxygen – portable
- ☐ Oxygen concentrator

Other:

**OPHTHALMOLOGIC**
- ☐ Acute vision loss
- ☐ Conjunctivitis
- ☐ Foreign body

Other:

**RESPIRATORY**
- ☐ Acute Dyspnea
- ☐ Acute Asthma Exacerbation
- ☐ COPD, Emphysema

Other:

**VASCULAR**
- ☐ DVT
- ☐ Edema/Pedal Edema

Other:

☐ **OTHER CATEGORY AND IMPRESSION (IF NOT LISTED):**

This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 4/28/2011

EXHIBIT 42

## PROFESSIONAL SERVICES AGREEMENT

This PROFESSIONAL SERVICES AGREEMENT ("Agreement") is entered into as of the 1st day of June, 2000 by and between EMERGENCY PROFESSIONAL SERVICES, P.C., an Arizona professional corporation ("EPS") and MEDAIRE, INCORPORATED, An Arizona corporation ("MedAire").

### R E C I T A L S:

A.   MedAire was established to develop and market services and products to meet requirements for in-flight medical emergency care aboard aircraft, maritime vessels and remote locations.

B.   EPS presently is contracted with Banner Health System to render emergency physician services at Good Samaritan Regional Medical Center.

C.   EPS is comprised of certified emergency physicians available to provide emergency medical advice incident to MedAire's business of providing medical emergency advisory services to its customers.

D.   MedAire wishes to engage EPS to provide such emergency medical advice to its customers, and and EPS desires to be so engaged in accordance with the terms and conditions hereinafter set forth.

WHEREFORE, in consideration of the foregoing and the mutual covenants contained herein, the parties agree as follows:

### A G R E E M E N T S:

1.   **Effective Date and Term.**   The effective date of this Agreement shall be the date first set forth above. The initial term of this Agreement shall commence on the effective date and shall continue for a period of two (2) years. Thereafter, this Agreement will automatically renew for successive two (2) year periods unless terminated in accordance with Paragraph (7) herein.

2.   **Description of Services.**   EPS shall provide emergency medical advice to customers of MedAire at such times as an EPS physician is notified through MedAire's communication specialists of a medical emergency. EPS shall also provide medical advice to MedAire in connection with the other medical services provided to customers of MedAire, including but not limited to repatriation/evacuation, pre-travel screenings, fitness to fly and other such actions that may be necessary or appropriate in connection with the performance of EPS' services as outlined herein. All non-medical aspects of operating and maintaining such communications network and maintenance of customer files, including the

1



Exhibit 83
Usipslausda
12-1-15
Stephanie Winters

manning of the lines of communication and clerical support assistance shall be the responsibility of MedAire or such persons or entities other than EPS as may have assumed such responsibility by contract or otherwise.

3.   **Compensation.**   During the term of this Agreement, MedAire shall pay EPS a fee as outlined in Exhibit A.

4.   **Relationship of the Parties.**     The parties intend that an independent contractor-principal relationship will be created by this Agreement. The sole interest and responsibility of MedAire is to assure the quality of services provided to its customers receiving emergency medical advice. However, EPS shall perform its duties hereunder at all times in strict conformance with currently approved methods and practices in its professional specialty in a competent, ethical and professional manner. MedAire shall neither have nor exercise any control over the professional judgment or methods used by EPS in the practice of its specialty. It is not intended that an employer-employee relationship, joint venture or partnership be established hereby, expressly or by implication. EPS shall be responsible for the payment of income tax withholding, social security taxes, and any and all other expenses arising from compensation received from MedAire for professional services rendered hereunder, and EPS shall hold MedAire harmless from any liability, cost or expense on account thereof.

5.   **Insurance.**   During the term of this Agreement, MedAire shall maintain professional liability insurance covering the services rendered by EPS (which will include coverage for EPS and each physician employee or independent contractor of EPS) in the minimum amounts of $1 million per claim with an aggregate $3 million per year and shall provide EPS with certificates evidencing such coverage upon request.   In the event that such insurance coverage is of a claims-made type, MedAire further agrees to obtain tail insurance coverage in the same minimum amounts as the time of termination of such claims-made policy.

6.   **Indemnification.**   Each party to this Agreement hereby indemnifies and holds the other, its officers, directors, employees and agents, harmless from and against any and all claims, losses, damages, lawsuits (including reasonable attorneys' fees) arising out of or relating in any way to any acts or omissions not directly related to the rendering of the services agreed to by each party in accordance with the terms and conditions of this Agreement.

7.   **Termination.**   During the term of this Agreement or any renewal hereof, either party may give written notice of termination to the other party, and this Agreement shall immediately and automatically be terminated six months (180) days thereafter. Notwithstanding the foregoing, this Agreement shall be terminated immediately without further action by either party if EPS becomes disqualified to perform its services as outlined in this Agreement or if either party fails to perform its obligation under this Agreement and such failure is not cured within fifteen (15) days after notice thereof from the other party.

2

CONFIDENTIAL                                    MA027009

8.   <u>Miscellaneous Provisions.</u>
   (a)   <u>Controlling Law.</u>   This Agreement and all questions related to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of the State of Arizona, notwithstanding any Arizona or conflict of laws to the contrary.
   (b)   <u>Notices.</u>   All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, when personally delivered or two (2) days after being deposited in the United States mail, registered or certified mail, postage prepaid, return receipt requested, addressed as set forth below:

   (1) If to MedAire:   1301 E. McDowell Rd., Suite 204
                        Phoenix, AZ 85006
   (2) If to EPS:       1300 N. 12th Street, Suite 301
                        Phoenix, AZ 85006

Any party may alter the address to which communications are to be sent by giving notice of the change of address in conformity with the provisions of this subparagraph (b).

9.   <u>Binding Nature of Agreement.</u>   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors in interest of any kind whatsoever.

10.   <u>No Assignment.</u>   This Agreement is entered into because of the professional qualifications of EPS. Nothing in this Agreement shall be construed to permit assignments by EPS of any rights or delegation of any duties under this Agreement, and any such purported assignment or delegation is expressly prohibited and void unless otherwise agreed to in writing by MedAire.

11.   <u>Execution in Counterparts.</u>   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears hereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

12.   <u>Provisions Severable.</u>   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

13.   <u>Paragraph Headings.</u>   The paragraph and subparagraph headings in this Agreement are for convenience only; they form no part of this Agreement and shall not affect its interpretation.

3

CONFIDENTIAL

MA027010

14. **Gender.**    Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the text requires.

15. **Number of Days.**   In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and recognized holidays in the State of Arizona; provided, however, that if the final day of any time period falls on a Saturday, Sunday or recognized holiday in the State of Arizona, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or recognized holiday in the State of Arizona.

16. **Attorney's Fees.**    In the event suit is brought or an attorney is retained by any party to this Agreement to enforce the terms hereof, or to collect any monies due hereunder, to collect money damages for a breach hereof, the prevailing party shall be entitled to recover, in addition to any other remedy, reimbursement for reasonable attorney's fees, court costs or investigation and other related expenses incurred in connection therewith, as determined by the court and a jury.

17. **Arbitration.**    Any differences, claims or matters in dispute arising between the parties hereto out of this Agreement or connected herewith, except for claims seeking specific performance or other equitable relief, shall be submitted to binding arbitration by an arbitrator mutually agreed upon by the parties.  In the event of failure to agree upon a single arbitrator, one arbitrator shall be selected by each of the parties and the two arbitrators shall appoint a third arbitrator.  The decision of the majority of the three arbitrators on such matters shall be final and conclusive.

4

CONFIDENTIAL

MA027011

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

MEDAIRE, INCORPORATED, an Arizona corporation

By: _____

Jean Sullivan Garrett,
President

EMERGENCY PROFESSIONAL SERVICES,
P.C., an Arizona professional corporation

By: _____
Stephen Murphey, M.D.

Its: _____

By: _____
Robert Baron, M.D.

Its: _____

By: _____
David Streitwieser, M.D.

Its: _____

5

CONFIDENTIAL

MA027012

## EXHIBIT A

### Fee schedule

First 175 patches per month:  $75.00 each

The additional patches in excess of 175 per month:  $50.00 each

Test patches:  $ 25.00 each

CONFIDENTIAL

MA027013

**EXHIBIT A**
**EFFECTIVE 1/01/02**

**Amendment to**
**PROFESSIONAL SERVICES AGREEMENT DATED 6/1/00**
**BETWEEN EMERGENCY PROFESSIONAL SERVICES AND MEDAIRE, INC.**

**Fee Schedule**

$45.00 per patch (including test patches) subject to a minimum of $35,000.00 per month if patch volume falls between 700 to 800 per month.

$50.00 per patch if the patch volume falls below 700 per month.

**Agreement:**

**Emergency Professional Services**              MedAire, Inc.

Date ___3/28/02___                Kjell Andreassen, C.O.O.

                          Date ___3/28/02___

**CONFIDENTIAL**

MA027014

**EXHIBIT A**
**EFFECTIVE 1/01/02**


**Amendment to**
**PROFESSIONAL SERVICES AGREEMENT DATED 6/1/00**
**BETWEEN EMERGENCY PROFESSIONAL SERVICES AND MEDAIRE, INC.**


<u>Fee Schedule</u>

$45.00 per patch (including test patches) subject to a minimum of $35,000.00 per month if patch volume falls between 700 to 800 per month.

$50.00 per patch if the patch volume falls below 700 per month.


<u>Agreement:</u>

**Emergency Professional Services**            **MedAire, Inc.**

_____            _____
                                                                          **Kjell Andreassen, C.O.O.**

**Date**_____3/29/02_____            **Date**_____3/28/02_____

**CONFIDENTIAL**

MA027015

EXHIBIT A
EFFECTIVE 1/01/01

PROFESSIONAL SERVICES AGREEMENT DATED 6/19/01
BETWEEN EMERGENCY PHYSICIANS SERVICES AND MEDAIRE, INC.

**Fee Schedule**

$45.00 per patch (including test patches), subject to a minimum of $35,000.00 per month if patch volume falls between 700 to 800 per month.

$50.00 per patch if the patch volume falls below 700 per month.

Agreement:

Emergency Physician Services

Date _____

MedAire, Inc.

Kjell Andreassen, C.O.O.

Date _____

**CONFIDENTIAL**

MA027016

EXHIBIT 43



| | *Global Services Training Module* | Doc. No./Rev. No | ML 2 |
|---|---|---|---|
| | **MedLink** | Revision Date | 1/20/2012 |
| | **Commercial In Flight – EMS Required** | Page | Page 1 of 5 |
| | **with Diversion** | | |

**Objective:** This module will provide the Customer Service Executive (CSE) with a process flow for handling commercial aviation in flight cases that require emergency medical assistance and a diversion. Remember that each case is different so the CSE may be required to work outside of the normal process flow depending on the situation. Diversions also tend to have severe time constraints and can be complex so assistance from other associates on duty is generally warranted.

**Diversions:**

Diversions have significant impacts on commercial carriers. They are extremely expensive for our clients because of the cost associated with: dumped fuel, crew and passenger hotel arrangements if needed as well as the loss of on-time performance due to scheduling issues. Reduction of diversion rates is one of the main selling points of the MedLink service to commercial carriers.

For purposes of documentation in our electronic database, there are two types of diversions defined by Global Services:

1. <u>MedLink recommended diversion</u> – this type of diversion is indicated when:
   - The MedLink physician recommends diversion
   - The MedLink physician agrees with the decision to divert regardless of whether he/she actually recommended the diversion.
   - The MedLink physician neither agrees or disagrees

2. <u>Pilot initiated diversion</u> – this diversion is indicated when:
   - Pilot diverts against the medical advice of the MedLink physician
   - Pilot diverts without speaking to a MedLink physician. On occasion, a pilot may indicate they are diverting and do not want to speak with a MedLink physician.

In either case, the documentation in DataLink 2000 should clearly demonstrate the reason for diversion as well as whether it was MedLink physician recommended or pilot initiated. To assist the MedLink physician in determining if a division is required and where the aircraft will divert to, the MedLink Diversion Worksheet is to be used.

**MedLink's role:**

Our role in the process of a diversion is to guide the pilot as to which diversion locations would be appropriate based on the medical situation on board as well as the medical facilities available in that location. The MedLink physician will make this recommendation based on the information the CSE presents from DataLink 2000. To aid in the process a Diversion Justification Worksheet has been developed to ensure both medical capability and client requirements are being met for the aircraft. This worksheet is to be used for all diversion cases where the MedLink physician is brought onto the call.

Generally, the pilot along with Dispatch/Ops Control will advise MedLink of the available diversion locations based on where, operationally, it is most advantageous to land. MedLink will recommend one or more of those locations based on appropriate medical facilities.

This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 5/28/2015

Exhibit 96
Ossislawski
12-1-15
Stephanie Winters

**CONFIDENTIAL**

MA027042

Also, if Dispatch/Ops Control is not initially on the patch at the beginning of the call, **it is imperative that they be conference in on all diversions**. They will also be responsible for advising MedLink of who will handle the flight at the diversion destination if the carrier does not have regularly scheduled flights at that airport.

A notification email is to be sent to Global Services Supervisors as soon as possible after the call where a diversion has been initiated.  Remember patient priority comes first so be sure to handle any logistical arrangements for medical personnel first if ETA is short.  Also, if your diversion involves an A-380 aircraft a call to the manager on duty or ROC is required.

Please include the following information in your email:

- Case Number
- Client
- Origion/Destination
- Diversion Location
- Situation
- Who recommended the diversion and what was the reasoning behind it

**All diversions are considered risk management.  Be sure to mark your case appropriately as well as look at the MedLink Protocol for notification requirements.

# Documentation:
# Memo 2010-18



**CUSTOMER SERVICE EXECUTIVES**

**DL2K Documentation: Diversions**

If an aircraft is diverting for non-medical reasons (weather, mechanical), even if EMS arrangements are required at the new destination.  **Do not** document the case as a diversion.

The Diversion Location, Diversion ETA and Diversion Explanation boxes are still to be completed to assist in case management and case progress, however, the Pilot Initiated Diversion, MedLink Recommended Diversion and Diverted box are only to be used when a flight is diverted due to the medical condition of the passenger.

This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 5/28/2016

CONFIDENTIAL

MA027043

## Memo 2009 – 75

| ML CUSTOMER SERVICE EXECUTIVES |
|---|

**DL2K Documentation: Diversions**

We are finding an increasing number of diversion cases that are not being marked correctly. Please check the appropriate boxes to indicate if the flight was "Diverted" or "Not Diverted" and whether the diversion was "Pilot Initiated" or "MedLink Recommended". As a refresher on diversion documentation:

- Even if the pilot has already made the decision to divert or the diversion is in process, if the ML MD concurs with the pilot's action, document the case as "ML Recommended".

- If there is more than one medical situation onboard a flight, it is important to document the diversion only in the applicable case (i.e. only check "diversion" in the case for which the aircraft was diverted, not in all of them).

- **Do not** document the case as a diversion if the aircraft is diverting for non-medical reasons (weather, mechanical), even if EMS arrangements are required at the new destination.

**This document is UNCONTROLLED when printed.**
**Verify currency of document against QMS**
**Print Date 5/28/2015**

CONFIDENTIAL

MA027044

MedAire, Inc.
REV: 00/000/000

**MedLink – COMMERCIAL IN FLIGHT – EMS REQUIRED WITH DIVERSION**

OPS -00/R00
Page 4 of 5

## PROCESSFLOW:



This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 6/28/2015

## CONFIDENTIAL

MA027045

Continued here...
CSE arranges emergency medical assistance per the diversion airport's protocol
CSE contacts destination airline operations/handler to determine if patient was transported to the hospital
*1 hour after landing
"Check passenger status at gate"
Was patient transported?
Yes
No
CSE obtains name of patient and hospital
CSE closes case and files completed intake form in patch number order in top right drawer at back of MedLink
"Follow-up Complete"