# EXHIBIT 44



| | *Global Services Training Module* **MedLink** **General Client Patch Process** | Doc. No./Rev. No | ML 1 |
|---|---|---|---|
| | | Revision Date | 1/20/2012 |
| | | Page | Page 1 of 2 |

**Objective:** This module outlines the general process of case handling at the MedLink Response Center. All Communication Specialist Executives (CSE) must follow a triage system to ensure that the client, case type and client specific protocol is identified for each call.

Initially, the CSE will always ask three questions:

1. Who are you?
2. Where are you?
3. What is the concern/request?

The general process is:

### Client Initiates Call to MedLink

MedAire's clients initiate cases with MedLink by various means including:
- Radio (HF and VHF) via an intermediary
- Satellite phone (InMarsat, Satcom)
- Landline telephone
- Text messaging (ACARS, e-mail, fax)

**The CSE must first determine the client type:**
**Commercial Airline, Business Aviation (BGA), Maritime or Non-client.**

---

### Commercial Airline

**Client types:**
- Commercial airlines
- Commercial charter and vacation package airlines

**MedLink Case types:**
- Inflight
- Gate / Onboard Screen
- No Flight in Progress
- Crisis Management

CSE is responsible for utilizing the correct case type process and correct client protocol for **each** case. All casework is documented in the electronic case management system and on the appropriate intake form.

### Business Aviation

**Client types:**
- Corporate/private jets
- Jet management companies
- Original Equipment Manufacturers (OEMs)

**MedLink Case types:**
- Inflight
- No Flight in Progress
- Crisis Management
- Trip Watch

CSE is responsible for utilizing the correct case type process and correct client protocol for **each** case. All casework is documented in the electronic case management system and on the appropriate intake form.

### Commercial Maritime Luxury Yacht

**Client types:**
- Private yachts
- Yacht management companies
- Commercial shipping (MAS)
- Military Sea Lift Command (MSC)
- Private Islands

**MedLink Case types:**
- Cruising in Progress
- Cruising not in Progress
- Trip Watch
- Maritime Global Response Center (MGRC)

CSE is responsible for utilizing the correct case type process and correct client protocol for **each** case. All casework is documented in the electronic case management system and on the appropriate intake form.

---

This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 5/28/2015



Exhibit 91
Oscislawski
12-1-15
Stephanie Winters

**CONFIDENTIAL**

MA027020

MedAire, Inc.            **MedLink - GENERAL CLIENT PATCH PROCESS**

Occasionally non-clients or non-subscribers contact MedLink for assistance.  CSE's are to assist and follow the same procedures at MedLink depending on the caller's business line and case type. As soon as possible upon completion of the call, send an e-mail notification to Global Services Supervisors distribution list.

Refer to the Work Instructions related to non-client calls at MedLink.

**W:\ISO_DOCUMENT LIBRARY\GLOBAL SERVICES\Work Instructions and Resources\Services – Other\Non-Client and Non-Subscriber Cases WI OPS 40-11**

Once the ML CSE identifies the client type and the request for service, the CSE must identify the resources required to meet the caller's needs. The primary resource at MedLink is the **MedLink Physician**, who responds to a page generated from MedLink for case assistance.

MedLink Physicians are staff members of Emergency Professional Services (EPS) which provides services to the Emergency Department of Banner Good Samaritan Hospital.

**Other resources for the ML CSE:**

- GRC CN Case Managers
- Emergency Medical Services at any location
- Physicians and hospitals in the same location as the patient
- GAN
- Sales Team
- Global Services Leadership Team

There is a significant amount of "thinking on your feet" that an associate must be prepared for at MedLink. This includes the ability to use the internet to source providers for clients or overcome case management obstacles in order to meet the needs of clients.

This document is UNCONTROLLED when printed.
Verify currency of document against QMS
Print Date 5/28/2015

**CONFIDENTIAL**

EXHIBIT 45

Francis G. Fleming, 004375
ffleming@kreindler.com
Robert J. Spragg, *pro hac vice*
rspragg@kreindler.com
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel.: (212) 687-8181
Fax: (212) 972-9432

Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Tel: (602) 792-1700
Fax: (602) 792-1710

*Attorneys for Plaintiff Linda Ann Baillie*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

-------------------------------------------------------x

LINDA ANN BAILLIE, individually, as
Personal Representative of the Estate of
JAMES DONALD BAILLIE, II, and on
behalf of all heirs and next of kin of
JAMES DONALD BAILLIE, II,
deceased,

                      Plaintiff,

        v.

MEDAIRE, INC., STEVEN JOE
REINHART, D.O. and JESSICA
MONAS, M.D.,

                      Defendants.

-------------------------------------------------------x

Case No.: 2:14-CV-00420-SMM

**DECLARATION OF CAPTAIN
DANIEL J. MESNARD**

DECLARATION OF DANIEL J. MESNARD

1    I, Daniel J. Mesnard, declare as follows:

2

3    1.    I declare under penalty of perjury that the attached expert reports dated

4    March 21, 2016 and June 20, 2016 are true and correct copies of my reports in this case

5    and contain true and correct statements of the opinions that I have offered in connection

6    with this action.

7    Executed this 13 day of October, 2016.

8

9

10   _____

11   DANIEL J. MESNARD

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

DECLARATION OF DANIEL J. MESNARD

EXHIBIT 46



**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**                    Case No. 14-cv-0420-SMM (D. Az.)

LINDA ANN BAILLIE,
individually, as Personal Representative of the Estate of
JAMES DONALD BAILLIE, II, and on
behalf of all heirs and next of kin of
JAMES DONALD BAILLIE, II, deceased,

                                                                    **Plaintiff**

**versus**

MedAire Inc., Steven Joe Reinhart, D.O. and Jessica Monas, M.D.
                                                                    **Defendants**

---

**AVIATION REPORT OF**

**CAPTAIN DANIEL J MESNARD**

**DATED 21 MARCH 2016**

---

| | |
|---|---|
| **On instruction of:** | KREINDLER & KREINDLER LLP<br>750 Third Avenue, 32nd Floor<br>New York, NY 10017 |
| **On behalf of:** | Plaintiff |
| **Specialist field:** | Aviation |
| **Subject matter:** | The response of MedAire/MedLink to the inflight chest pains suffered by Mr. James Baillie while a passenger on board British Airways flight BA 289 on 23 March 2012. |

---

**GMR Consulting**
**2255 Glades Road**
**Suite 324A**
**Boca Raton, Florida 33431**
**Tel: 561 988 8717**
**Email: info@gmrconsulting.com**

Report of:          Captain Daniel J Mesnard
Specialist field:  Aviation
On behalf of:      Plaintiff Linda Ann Baillie
Dated:             21 March 2016

**CONTENTS**

| SECTION | ITEM | PAGE NO. |
|---|---|---|
| 1. | Introduction | 3 |
| 2. | Instructions | 3 |
| 3. | Documents disclosed/reviewed | 4 |
| 4. | Report headings | 4 |
| 5. | Professional experience | 4 |
| 6. | Relevant experience | 6 |
| 7. | Background | 8 |
| 8. | Executive summary | 9 |
| 9. | The Responsibilities of the Captain, Crew and the Expanded Team | 11 |
| 10. | The Expanded Team: Mr. Baillie's Medical Needs | 12 |
| 11. | The Expanded Team: MedAire/MedLink's Response to Mr. Baillie's Medical Condition - Dr Reinhart | 14 |
| 12. | The Expanded Team: MedAire/MedLink's Response to Mr. Baillie's Medical Condition - Dr. Monas | 18 |
| 13. | Conclusion | 21 |
| 14. | Glossary of technical terms | 24 |
| 15. | Appendices | 26 |

| | |
|---|---|
| **Report of:** | **Captain Daniel J Mesnard** |
| **Specialist field:** | **Aviation** |
| **On behalf of:** | **Plaintiff Linda Ann Baillie** |
| **Dated:** | **21 March 2016** |

## REPORT

### 1.   INTRODUCTION

1.1   My name is Daniel Joseph Mesnard and I am an Aviation Consultant for GMR Consulting LLC. The Company's address is 2255 Glades Road, Boca Raton, Florida 33431.

1.2   A copy of my Resume, which includes all my qualifications, is set out in Appendix 1. I confirm that I have been not been deposed or given evidence at a trial in the United States in the past four years and have not authored any publications.

1.3   My services are provided through GMR Consulting LLC. Fees are $395 per hour plus expenses for reviewing all materials, preparing this report and any deposition/trial time. No invoices have yet been rendered for my services.

### 2.   INSTRUCTIONS

2.1   I have been instructed by Kreindler and Kreindler LLP to prepare an aviation report in the case of Linda Ann Baillie, et al. against MedAire, Inc., Dr. Reinhart and Dr. Monas.

2.2   My specific instructions are:

2.2.1   To provide my opinion on the adequacy of the response of MedAire and its MedLink doctors to the request for medical advice by the flight crew of BA 289 on 23 March 2012 in regard to the prolonged in-flight chest pain suffered by Mr. Baillie, and

2.2.2   To provide my opinion on what information MedAire and its MedLink doctors should have provided to BA 289 so that the aircrew could make an informed operational decision about what to do with a passenger experiencing prolonged chest pain on a lengthy international flight.

2.2.3   To provide my opinion on whether the circumstances of this case constituted an "accident" under the Montreal Convention Treaty, that is, whether any aspect of MedAire/MedLink's response to Mr. Baillie's in-flight chest pain was an "unusual or unexpected event or happening" external to Mr. Baillie.

Report of:      **Captain Daniel J Mesnard**
**Specialist field:** Aviation
**On behalf of:**   **Plaintiff Linda Ann Baillie**
**Dated:**          **21 March 2016**

## 3.    DOCUMENTS DISCLOSED/REVIEWED

3.1    I have set out in Appendix 2 a complete list of all the documents disclosed and reviewed.

3.2    Other documents / websites I have relied upon while preparing this report are listed at Appendix 3.

## 4.    REPORT HEADINGS

My report is set out under the following key headings:

4.1    A description of my professional experiences and their relevance to the issues which I deal with in this report;

4.2    The background regarding this claim;

4.3    An executive summary;

4.4    The responsibilities of the Captain, Crew and any expanded team members;

4.5    Mr. Baillie's medical needs;

4.6    Dr. Reinhart and Dr. Monas's response to Mr. Baillie's medical condition, and;

4.7    My conclusions.

## 5.    PROFESSIONAL EXPERIENCE

5.1    My aviation experience began at the United States Air Force Academy (AFA) in June of 1975. I began flying gliders during summer training and finished my Glider Aero Tow FAA rating.  At the end of the training I was selected to enter the instructor program.  I earned my Commercial and Instructor rating and for the next three years I trained other cadets the basics of soaring.

5.2    During my senior year at the Air Force Academy I completed the Cessna T-41 program and was selected to attend Undergraduate Pilot Training (UPT) at Vance Air Force Base (AFB), OK, after graduation.

Report of:        **Captain Daniel J Mesnard**
Specialist field: Aviation
On behalf of:     **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

5.3  I graduated from the AFA with an undergraduate degree in Aeronautical Engineering in 1978 and while waiting to enter UPT, I was assigned temporary duty at the Air Force Test and Evaluation Center at Kirkland AFB, NM.  While there I was involved in the procurement of two fighter weapon systems, the EF-111A Raven and the F-4G Wild Weasel.

5.4  In January of 1979 I began the Air Force UPT program.  During these 11 months of training I learned to fly the T-37 and the T-38 aircraft and completed the requirements to be awarded my Air Force wings. Finishing top in my class, I was Fighter, Attack, or Reconnaissance (FAR) recommended by the instructor core. This recommendation is required in order to be assigned FAR aircraft. My first assignment after pilot training was the F-4 Phantom II at MacDill AFB, FL.  After completing UPT I enrolled in a local flight school and earned my FAA Single-Engine and Multi-Engine Land commercial and Instructor ratings.

5.5  After completing Lead-In Fighter Training (LIFT) at Holloman AFB, NM and graduating "Top Gun" in my class, I headed to Tampa, FL to begin my F-4 training. Upon graduation from F-4 training I was assigned to Torrejon AB, Spain. After completing my overseas tour I was selected to return to Holloman AFB, NM to instruct new fighter pilots in the basics of fighter maneuvering in the LIFT program.  While a LIFT Instructor I received numerous awards, including Junior Officer of the Quarter and Instructor of the Quarter on several occasions. I was selected as a "Red Dot" Instructor (see glossary) and was assigned Foreign Students as well as students who were struggling in one or more of the training phases. It was during this assignment that I sat on several Flight Evaluation Boards, assessing whether to allow a student to progress to the next level of fighter training, to be retained as a transport pilot, or to be eliminated from the Air Force flying program.

5.6  I separated from active duty in 1985 and took a job briefly as an Air Reserve Technician with the Kansas Air Guard as an F-4 Instructor Pilot. I completed my FAA Airline Transport Pilot rating and in September of 1985 my airline career began with Delta Air Lines.  I remained an active flyer in the Air Force Guard and Reserve program until my retirement in 1998.

5.7  I completed a Masters in Business Administration in 1988.

5.8  From 1985 to present I have been employed by Delta Air Lines. I was initially assigned as a Second Officer on the Boeing 727 and became a new-hire Second Officer Line Check (see glossary) Instructor, giving line-checks to new Second Officers as they completed their Delta training. As

Report of:       **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:    **Plaintiff Linda Ann Baillie**
Dated:           **21 March 2016**

my career continued, I progressed through the ranks as a DC-9/MD-82/MD-88 Co-pilot, B-757/B-767 Co-pilot and L-1011 Co-pilot.

5.9    In April of 1990 I completed Captain training and received a Type Rating in the DC-9/MD-88. I became a Line Check Airman on the MD-88 and gave line check evaluations and initial operating experience (IOE, see glossary) to newly assigned MD-88 Captains and Co-pilots.

5.10   My next assignment as a Captain was on the B-757/B-767 and I received a Type Rating on those aircraft. I later became a Line Check Pilot on the B-757/B-767 and gave line evaluation check rides and IOE to newly assigned B-757/B-767 Captains and Co-pilots.

5.11   I upgraded to international B-767 flying and became an International Line Check Pilot, giving newly assigned international pilots line evaluation check rides and IOE.

5.12   In April 2006 I completed training as a B-777 Captain and received my FAA Type Rating in the B-777. I have been flying "Ultra Long Haul" passenger flights since that time.

5.13   In my 41 years of flying experience, in both military and civilian aircraft and over 20,000+ flight hours, I have been confronted with numerous challenges. As Pilot in Command (PIC) I have faced engine failures, system failures, severe weather, passenger behavioral issues and passenger health issues. I have instructed countless pilots along their aviation career. I have managed millions of dollars of government and airline assets without accident or loss of life.

5.14   Since 2013 I have worked for GMR Consulting, who provides expert witness services worldwide. My duties include in-depth research and reconstruction of aviation accidents and incidents. Using my extensive experience I provide expert testimony where needed, for lawyers acting on behalf of plaintiffs and defendants.

6.     **RELEVANT EXPERIENCE**

6.1    Over the past 39 years I have flown over 20,000 hours in various aircraft. I have flown gliders, single and multi engine light aircraft, several fighter aircraft and in my 30 year career in the airline industry I have flown

Report of:         **Captain Daniel J Mesnard**
Specialist field:  **Aviation**
On behalf of:      **Plaintiff Linda Ann Baillie**
Dated:             **21 March 2016**

numerous commercial aircraft.  As Pilot in Command I have flown over 18,000 hours and have been exposed to various abnormal situations, including medical emergencies. In my airline career, I have had to deal with numerous medical issues involving passengers and crew, prior to and after takeoff that required my immediate attention. At times I have used my Captain's Authority (see glossary) to bring the emergency to a safe and proper conclusion.

6.2    On one occasion shortly after takeoff (approximately 15 minutes) a Flight Attendant (FA) called the flight deck to inform me that a passenger had stood up and collapsed in the aisle and was in distress.  She relayed that he appeared to be having a heart attack. I made the decision that the possibility of a passenger with a heart attack took priority over our scheduled flight plan and I turned the aircraft directly back toward the runway. With no time to spare and knowing how important it is for a heart attack victim to receive treatment as soon as possible I coordinated an immediate return to LaGuardia airport and requested Paramedics be standing by at the gate.  I declared an emergency, flew as fast as I safely could and landed. The passenger was examined by the Paramedics and taken to a hospital.

6.3    On several occasions crossing the North Atlantic Tracks (NAT) it became necessary to coordinate with my company's contracted emergency medical facility.  Each time a SATCOM (see glossary) call was made, a medical dispatcher put us in contact with an emergency medical physician. This is my company's standard procedure if any medical situation arises during the operation of a commercial flight.

6.3.1    For example, on one occasion a Flight Attendant member of my crew had gashed her forehead on a metal galley cart and she had significant bleeding.  The other FAs were attending her and a call was made to our emergency medical facility. The doctor advised step by step how to stop the bleeding, check for concussion and patient shock. He advised to continue unless the patient exhibited signs of a concussion. We continued to our destination.

6.4    I have extensive knowledge of most major airports in the Atlantic, Pacific and Middle Eastern theater. I was based in New York (JFK, LGA and EWR), Dallas Ft. Worth (DFW), Cincinnati (CVG) and Atlanta (ATL) and am familiar with airports in all 50 states, Canada and Central America. I have flown many flights to and from Phoenix Sky Harbor International

Report of:        Captain Daniel J Mesnard
Specialist field: Aviation
On behalf of:     Plaintiff Linda Ann Baillie
Dated:            21 March 2016

---

Airport (PHX). I have flown from many international airports in Europe (including London Heathrow), Asia, South America and the Middle East.

6.4.1   Ultra Long Haul flights in B777 and B767ER aircraft require familiarization with most available alternate airports. My company requires that I review these special airport procedures annually.

## 7.   BACKGROUND

7.1   Prior to being assigned this case I never met nor had knowledge of Mr. James D. Baillie II.

7.2   I have never met nor had knowledge of anyone at MedAire, Inc., including the two doctors involved in this case.

7.3   Mr. James D. Baillie II was a passenger on British Airways (BA) flight 289 from London Heathrow enroute to Phoenix Sky Harbor Airport. The flight departed on 23 March 2012 at 1546 GMT and arrived at its destination at 0250 GMT (1850 local Phoenix time).

7.4   During the flight, Mr. Baillie complained to the cabin crew that he was experiencing chest pains.

7.5   British Airways has an ongoing contract with MedAire/MedLink for the purpose of providing airborne medical assistance. MedAire/MedLink was contacted by the flight crew and on duty doctors at MedAire/MedLink were apprised of Mr. Baillie's condition.

7.6   At the request of the MedAire/MedLink doctors, the cabin crew called for assistance from any medical personnel onboard the flight and two MDs responded. They assessed that Mr. Baillie was experiencing chest pains, was having trouble breathing and presented with low blood pressure, irregular pulse and "crackles" in the left side of his chest.

7.7   Despite Mr. Baillie's on-going chest pain, two different MedAire/MedLink doctors did not recommend that BA 289 divert to a suitable airport.

7.8   BA flight 289 continued on to its destination and Mr. Baillie was immediately hospitalized and later placed in intensive care and remained there until his death on 01 July 2012.

Report of:        **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:     **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

8.    **EXECUTIVE SUMMARY**

8.1   It is for the Court and Jury to determine the facts of the case but based on the information disclosed to date, I understand the facts to be as follows:

8.2   Mr. James Baillie was a 61 year old passenger on board British Airways flight 289 from London Heathrow to Phoenix Sky Harbor Airport on 23 March, 2012.

8.3   During the boarding process, Mr. Baillie reported to a Flight Attendant that he was feeling short of breath and that he wasn't sure he should be on the flight.  The Flight Attendant reassured him and told him that perhaps he would feel better if he sat down for a while.

8.4   After takeoff, Mr. Baillie spoke again to the Flight Attendant and told her he was still slightly out of breath and wasn't feeling well.

8.5   A short time later, Mr. Baillie told the Flight Attendant that he was experiencing chest pain.  The Flight Attendant told her supervisor about Mr. Baillie's condition and he was given supplemental oxygen.

8.6   Mr. Baillie's chest pain and other symptoms continued throughout the flight.

8.7   Approximately 3 hours after takeoff, the decision was made by the Captain to contact MedAire/MedLink to seek medical advice for Mr. Baillie.

8.8   At the request of the MedAire/MedLink doctor, the cabin crew paged for a medical doctor via the passenger address system and a passenger doctor, Dr. Ratan Verma, volunteered to obtain Mr. Baillie's vital signs and other medical information.   Mr. Baillie was later attended by two doctors who were travelling as passengers, Dr. Verma and Dr. Arumugam Rajesh, both of whom are medical doctors specializing in Radiology.

8.9   Phone patches were made to MedAire at 1845, 1912, 2234 and 2252 <u>Greenwich Mean Time</u> (GMT) or Universal Coordinated Time ("UTC").  GMT or UTC is used to keep all concerned parties on the same time reference.

8.10  Despite being told by the on board doctors that Mr. Baillie's vital signs revealed an irregular pulse, low blood pressure and "crackles" on the left side of his chest and that Mr. Baillie was complaining of chest pains, Dr. Reinhart (the doctor initially on duty with MedAire/MedLink) and

Report of:        **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:    **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

---

subsequently Dr. Monas (the doctor who relieved Dr. Reinhart) did not recommend a diversion.

8.11   With each phone patch, the MedAire/MedLink doctors were told that Mr. Baillie's condition persisted or had worsened, yet Dr. Reinhart and later, Dr. Monas, never told the BA 289 aircrew that Mr. Baillie could potentially be experiencing a life threatening medical condition and never recommended a diversion to seek life saving medical help, despite overflying numerous suitable airports along their route of flight.

8.12   Mr. Baillie's medical condition never improved, however the aircraft continued to and landed at Phoenix Sky Harbor Airport approximately 11 hours after takeoff, whereupon MedAire/MedLink made arrangements for transporting Mr. Baillie to a hospital.

8.13   Mr. Baillie was transported from the aircraft to St. Luke's Medical Center Emergency Room (Phoenix, AZ) in a critical condition. Mr. Baillie was attended by Cardiologist Robert Candipan, MD who determined that Mr. Baillie had suffered a heart attack six to eight hours prior to arriving at St. Luke's Medical Center in Phoenix.

8.14   Mr. Baillie remained at St. Luke's Medical Center until 30 March 2012 when he was transferred to the Mayo Clinic (Phoenix, AZ) which afforded more specialized care.

8.15   Mr. Baillie remained at the Mayo Clinic (Phoenix, AZ) until his death on 01 July 2012.

8.16   Having considered all the issues, it is my view that MedAire/MedLink failed to offer the crew of British Airways flight 289 the prompt, accurate and comprehensive medical advice which they were expected to provide pursuant to their agreement with the airline.  MedAire/MedLink also failed to provide the Captain and flight crew of British Airways flight 289 with the necessary information regarding the possible medical conditions being suffered by Mr. Baillie, specifically that he was potentially experiencing a life threatening condition that may require immediate emergency medical care and failed to recommend to the aircrew that they divert the flight so that Mr. Baillie could obtain emergency medical treatment. These unusual and unexpected failures on the part of MedAire/MedLink caused Mr. Baillie's chest pain to go untreated for the remainder of the 11 hour flight and resulted in severe, aggravated damage to Mr. Baillie's heart.

Report of:      **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:   **Plaintiff Linda Ann Baillie**
Dated:          **21 March 2016**

8.17   The severe aggravated damage to Mr Baillie's heart sustained during the flight, according to the attending Cardiologist, ultimately led to his death.

## 9.   THE RESPONSIBILITIES OF THE CAPTAIN, CREW AND THE EXPANDED TEAM

9.1   Today's airline Captain is responsible for managing a myriad of functions surrounding every phase of flight.  Not only are they in command of transporting aircraft, passengers and crew from point A to point B, he or she must apply situational awareness (see glossary) and expertise in all areas of flight.  The Captain must also rely on the expertise of the members of his or her team, including the other cockpit crew members, Purser, cabin crew, Dispatcher and the company's own operational control center.

9.2   When an abnormal situation arises, such as a medical emergency, it is imperative that the Captain expand his team to include other individuals who will be helpful in resolving the abnormal situation.  In the case of a potential medical emergency, the industry standard is to use the cabin crew, usually the Purser, to request the assistance of a volunteer medical professional from among the passengers.  This first step allows quick assessment of the medical situation by a qualified professional.

9.3   The second step in the expansion of the team is to contact ground medical personnel via radio or SATCOM.  If a medical professional is onboard, they will relay pertinent medical information to the ground medical professionals for an in-depth assessment and a recommended plan of action. While the ground medical professional is discussing options with the Captain, the Dispatcher is monitoring the satellite communications and looking for suitable landing fields; one that has appropriate medical facilities, weather conditions and a suitable runway for the type of aircraft. The cabin crew will continue to attend to the passenger and lend aid to the onboard medical professional.

9.4   This aircrew/ground medical team will function using the expertise of each member towards an agreed and appropriate plan of action for the benefit of the passenger. It is incumbent upon each member of the expanded team to work together using their individual expertise to bring about swift resolution to the situation.  If any member of this team is not qualified for the task, or does not properly assess the situation and give the best qualified advice to the Captain so that he can manage the emergency, a chain of events can result in damage and loss of life. Each member of the

Report of:        Captain Daniel J Mesnard
Specialist field: Aviation
On behalf of:     Plaintiff Linda Ann Baillie
Dated:            21 March 2016

team is in place to prevent that chain of events from leading to a catastrophe.

9.5 The decision to divert ultimately rests with the Captain who is managing the situation; however, the Captain must receive competent advice from his team in order to make an informed decision.

## 10.   THE EXPANDED TEAM: MR. BAILLIE'S MEDICAL NEEDS

10.1 In reviewing the recorded calls and depositions disclosed, as listed in Appendix 2 below, it is my opinion that the Captain of BA 289 was properly employing Cockpit Resource Management (CRM) principles and had correctly expanded his team to include: the cabin crew, the Dispatcher and MedAire/Medlink doctors on the ground.

10.2 It is my opinion the cabin crew carried out their duties as described in their training manuals (Exhibits 6-13). They made Mr. Baillie comfortable, called for medical assistance from the passengers on board, administered oxygen to Mr. Baillie and apprised the Captain of the medical situation.

10.3 On board medical professionals, Dr. Ratan K. Verma and Dr. Arumugam Rajesh answered the cabin crew's request for assistance. Dr. Verma and Dr. Rajesh attended Mr. Baillie, along with FA Ewa Van Den Berg and FA Nicola Sharrod (Deposition Transcripts of Dr. Verma, FA Van Den Berg and FA Sharrod).

10.4 Approximately 3 hours into the flight Mr. Baillie's condition had not improved so the Captain further expanded his team by calling MedAire/MedLink (MedAire transcript 2012-09578 British Airways 289).

10.5 MedAire CSE (see glossary) Michelle Tyler answered the 1845 GMT call from BA 289. She was briefed by the flight crew and summoned a MedAire doctor as per MedAire procedures (Work Instruction Accessing MedLink Physicians MA027035-027041) and Dr. Steven J. Reinhart, the physician on duty, joined the expanded team.

10.5.1 British Airways has a longstanding relationship with MedAire/MedLink (Service Agreement between MedAire/MedLink and British Airways MA-026966). MedAire/MedLink is charged with providing an air to ground link with a medical professional at their Phoenix medical facility. Trained communication operators CSEs gather the initial flight

Report of:         Captain Daniel J Mesnard
Specialist field: Aviation
On behalf of:     Plaintiff Linda Ann Baillie
Dated:            21 March 2016

information, medical situation and connect the flight crew with an appropriate physician.

10.5.2   According to the service agreement between British Airways and MedAire Inc (MA-026953, Paragraph 2) MedAire will provide "prompt, accurate, and comprehensive advice at regular intervals..." and "...perform the Services promptly and efficiently and to the highest professional standards ...with best practices in the service provider's industry, profession or trade." "...it will keep detailed records of all activities undertaken in respect of the Services..." The Service Agreement also states in Appendix B, Paragraph 1 "MedLink (AKA MedAire) shall provide twenty four (24) hour a day medical emergency advisory services of an emergency physician if MedLink is notified of an in-flight medical emergency. These physicians will also work with volunteer on board medical professionals to ensure care is appropriate for the passenger. They will assess the severity of any in-flight injury or illness and guide the flight and/or cabin crew by providing step-by-step treatment instructions. The captain will be advised if a diversion is medically warranted..." (Service Agreement between British Airways and MedAire/MedLink MA026953 and MA026966).

10.5.3   The above paragraph will be used to evaluate the performance of MedAire as a member of the expanded team.

10.6   CSE Tyler took the first call from BA 289 and was briefed by the flight crew and given basic information concerning the flight and Mr. Baillie's medical situation. CSE Tyler recorded the basic information received from the BA 289 flight crew on a MedLink Intake Form at the time of the initial patch. However, she noticeably failed to write down the time that the call was received from BA 289 on the form This omission would later contribute to the failure of Dr. Monas, the second MedAire/MedLink doctor to be involved with BA 289, to understand the severity of Mr. Baillie's medical condition and how long he had been experiencing chest pains. In my opinion, CSE Tyler's basic lapse in recording this information on the MedLink Intake Form was an unexpected and unusual event that contributed to Dr. Monas's apparent confusion and the poor response of MedAire/MedLink to Mr. Baillie's in-flight chest pains.

10.7   Shortly thereafter, CSE Tyler summoned Dr Steven J. Reinhart into the Medlink center.

13 of 26

Report of:        **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:     **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

---

**11.    THE EXPANDED TEAM: MEDAIRE/MEDLINK'S REPONSE TO MR. BAILLIE'S MEDICAL CONDITION - DR. REINHART**

11.1    The MedAire/Medlink physician Dr. Steven J. Reinhart was briefed on Mr. Baillie's condition at 1850 GMT. He reiterated to the Captain that he understood that there was a 61 year old male who was having some centralized chest pain and was pale. He acknowledged that the patient was on supplemental oxygen and asked if the patient had any cardiac history (MedAire transcript 2012-09578 British Airways 289).

   11.1.1    Steven J. Reinhart is a Doctor of Osteopathy licensed in the state of Arizona since 1979 and in the state of Oklahoma since 1981. He is a licensed emergency physician from 1986 to present and was an Advanced Cardiac Life Support Instructor from 1982-2010. (Exhibit 1, page 6).

11.2    Again using his CRM skills, the Captain facilitated communication between the FA Ewa Van Den Berg, who was attending to the passenger and Dr. Reinhart. The conversation continued and Dr. Reinhart was informed that Mr. Baillie had no medication with him and did not have a cardiac history but had taken an aspirin just before takeoff, approximately 3 hours 20 minutes prior to the call (MedAire transcript 2012-09578 British Airways 289).

11.3    In the transcript of the SATCOM communication Dr. Reinhart stated, "...I'm just a bit concerned about with his age, the pain and the fact that he is pale", although he didn't tell the flight crew the reason why he was concerned about these factors. At this point Dr. Reinhart requested that a medical person on board should evaluate his vital signs to determine if he was stable enough to try nitroglycerin (NTG).   (MedAire transcript 2012-09578 British Airways 289). In my opinion this was a reasonable course of action and although it delayed the decision process a short while, it allowed Dr. Reinhart to gather a clearer picture of the medical situation.

11.4    At 1912 GMT BA 289 made a second SATCOM patch to MedAire (SATCOM BA-0581, BA-0582). A few minutes later Dr. Reinhart re-joined the call and was apprised of Mr. Baillie's condition. Dr. Reinhart was told that there was physician on board; the blood pressure is 100/70 with a pulse of 100.   Additionally, he is informed and acknowledges that Mr. Baillie has "crackles" in the left chest (MedAire transcript 2012-09578 British Airways 289). Dr. Reinhart did not record any information on the MedLink Intake Form (Exhibit 3).

Report of:    **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:  **Plaintiff Linda Ann Baillie**
Dated:        **21 March 2016**

---

11.5    From the transcript, Dr. Reinhart acknowledges that Mr. Baillie's blood pressure is too low to administer a dosage of NTG. He states that, "...there is not a great deal more that we can do other than continue the supplemental oxygen." At this point Dr. Reinhart asked the Captain if the physician on board had any suggestions. The Captain responded, "No just... expressed his concerns." (SATCOM BA-0582). Again, Dr. Reinhart did not record any of this information on the MedLink Intake Form (Exhibit 3).

      11.5.1    In his deposition, Dr. Verma confirmed Mr. Baillie's irregular and high heart rate, that his blood pressure was low and that he heard "crackles" in Mr. Baillie's chest (Ratan K. Verma Deposition Transcript Page 51-53).

11.6    Dr. Reinhart advised the flight crew at this point that they should continue on to their destination, acknowledging that there was over 6 hours remaining in the flight. He advised the Captain to continue supplemental oxygen and monitor. Dr. Reinhart stated, "Uh hopefully his condition will improve as he lies down and gets oxygen." Dr. Reinhart does mention that a diversion may have to be considered but never goes so far as to advise the Captain that it is critical that he make that decision (MedAire transcript 2012-09578 British Airways 289). Dr. Reinhart did not record any information on this course of action on the MedLink Intake Form nor write down on the form that he had advised the flight crew that they should consider diverting if Mr. Baillie's condition deteriorated (Exhibit 3).

      11.6.1    This is the first time the idea of a diversion was mentioned. Dr. Reinhart mentioned diversion as an alternative in case Mr. Baillie's condition deteriorated. The Captain acknowledges the suggested course of action and mentions to Dr. Reinhart that Mr. Baillie's condition had become slightly worse. In my opinion the Captain was attempting to communicate to Dr. Reinhart that the situation was worsening. (MedAire transcript 2012-09578 British Airways 289).

      11.6.2    The Captain, not being a medical professional, was in my opinion likely trying to establish what he and the crew should be aware of regarding the deterioration of Mr. Baillie's medical symptoms. Dr. Reinhart explained his criteria as: blood pressure drop, unresponsive, ashen or cyanotic or the pain worsens to the point Mr. Baillie cannot tolerate it (MedAire transcript 2012-09578

Report of:        **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:     **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

British Airways 289). Once again, none of these criteria were recorded by Dr. Reinhart on the MedLink Intake Form (exhibit 3).

11.7   As part of the Captain's expanded team, Dr. Reinhart's input to the Captain was to continue the flight, wait and see, monitor and call him back. In my view, if Mr. Baillie was in a hospital environment this would most likely be an appropriate course of action as an immediate response is available. However, based on my experience, being at 32,000 feet and Mach .84 over the tip of Greenland, the "wait and see" approach in my opinion was not appropriate (see FlightAware Map BAW289, 23 March 2012).

11.8   According to the MedAire and British Airways Service Agreement, Appendix B: Service Level Agreement, section 1, paragraph 1 states "The Captain will be advised if a diversion is medically warranted." The same paragraph mentions "They will assess the severity of any in-flight injury or illness and guide the flight and/or crew by providing step-by-step treatment instructions." (MA026966). While I am not a medical professional, I do know from my professional experience that heart issues occurring in-flight are time critical. Dr. Candipan referred to how critical time is to the survival of a heart patient in his statement, "It is very important for heart attack victims to receive treatment as soon as possible, preferably within the first hour after symptoms appear. Medical organizations have established a goal to restore blood flow to the heart muscle within 60 minutes of the patient presenting at the emergency room" (Exhibit 43, Declaration of Robert C. Candipan, MD; page 5, section 12). In this statement he makes it clear that time is extremely important to patient survival; therefore, it is my opinion based on my training that due to Mr. Baillie's current and worsening conditions, Dr. Reinhart should have advised the Captain to divert to the nearest suitable airport.

11.8.1   In my view, once the standard nitroglycerin (NTG) protocol was ruled out it appeared from the transcript that Dr. Reinhart was at a loss for what the next appropriate step should be. He simply chose a passive "wait and see" approach to a potentially severe medical situation. As an airline Captain, if I were informed that a passenger with a medical issue had "crackles" in their chest, ongoing chest pain and the accompanying continuing symptoms as presented in Mr. Baillie's case, I would certainly want to be briefed about the severity of the possible medical conditions that

Report of:         **Captain Daniel J Mesnard**
Specialist field: Aviation
On behalf of:      Plaintiff Linda Ann Baillie
Dated:             21 March 2016

Mr. Baillie could be suffering from so that I could properly consider diverting. However, I also understand the magnitude of the decision to divert.

11.8.2   The Captain did attempt to clarify what his team should be looking for in these circumstances. In this scenario, a Captain must trust the members of his expanded team with the most medical knowledge to provide him with an accurate and complete picture of the medical emergency and to advise him of his options.

11.9   With regard to the Obligations Of MedAire, Inc., paragraph 2.2 (MA026953) "MedAire, Inc. will provide prompt, accurate and comprehensive advice at regular intervals and as when requested by BA." It is my opinion that Dr. Reinhart's advice to the Captain was neither accurate nor comprehensive enough for him to make an informed decision. There was no medicine that could be given to Mr. Baillie due to his low blood pressure, but Dr. Reinhart did not present the flight crew with a proactive backup solution for Mr. Baillie's continuing chest pains.

11.9.1   Further, there is no evidence that Dr. Reinhart considered the MedAire/MedLink Work Instructions procedures set forth in the MedLink "Diversion Justification Worksheet Process" (MA027047-027053.) STEP 1 "Determine Diversion Necessity" clearly shows a checklist that the MedAire/MedLink physician can follow to determine if a diversion is required. "In this step the ML physician ensures they have exhausted onboard resources, such as medical personnel or the use of telemedicine devices, and determines if the medical emergency necessitates a diversion" (MA027049).

11.10   This likely was the first opportunity to save Mr. Baillie's life (see Exhibit 34, section 10).

11.10.1   Upon landing at Phoenix Sky Harbor International Airport (PHX), Mr. Baillie was examined and treated by Robert C. Candipan, MD at St. Luke's Medical Center. Dr. Candipan states in his deposition that Mr. Baillie's heart attack started six to eight hours before the 8:00 PM (PHX time) blood test. This would equate to 1900-2100 GMT. This is the same time frame that BA 289 was communicating with MedAire and Dr. Reinhart. (Transcript of Deposition Dr. Candipan, Exhibit 43, section 10).

Report of:        **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:     **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

11.11 If the decision had been made at this point in the flight, several suitable diversion fields were available: Sonderstrom, Greenland; Halifax Nova Scotia; or Keflavik, Iceland just to mention three. As the flight progressed along its route of flight, Goose Bay Labrador, Gander Newfoundland, Quebec, Montreal, Bangor, Boston, Toronto, Detroit, Chicago, Minneapolis were all suitable airports depending upon the weather at each.

12.    **THE EXPANDED TEAM: MEDAIRE/MEDLINK'S REPONSE TO MR. BAILLIE'S MEDICAL CONDITION - DR. MONAS**

12.1   At 2234 GMT (approximately 3 hours after the last call ended) another SATCOM call was made between BA 289 and MedAire (MedAire transcript 2012-09578 British Airways 289).

12.2   At this point a different CSE answered the SATCOM patch. CSE Matthew Whitley took the updated information and stated that Dr. Reinhart had gone off shift and that he would brief a different MedLink physician (MedAire transcript 2012-09578 British Airways 289).

12.3   At 2238 GMT Dr. Jessica Monas joined the Captain's expanded team.

       12.3.1   Dr. Monas is an MD who had between one and two years experience as a Board Certified Emergency Room Physician at the time of this incident (transcript of Deposition Dr. Jessica Monas, Page 18, line 12 through page 19, line 14).

12.4   Dr. Monas stated that she was just getting caught up and relayed back to the crew what she understood their situation to be (MedAire transcript 2012-09578 British Airways 289). Dr. Monas was provided with the MedLink Intake Form pertaining to BA 289. Unfortunately, the Intake Form did not contain the time that the initial patch had been received from BA 289 so that Dr. Monas could immediately understand how long Mr. Baillie's chest pains had been going on. Nor did it contain any information about Dr. Reinhart's intention to administer NTG to Mr. Baillie or Dr. Reinhart's recommended course of action if Mr. Baillie's condition appeared to deteriorate. In her deposition, Dr. Monas stated that the Intake Form didn't even indicate that Mr. Baillie had "crackles." In my opinion, these MedAire/MedLink failures to record basic information on the Intake Form resulted in Dr. Monas being unable to provide the BA 289 flight crew with the information they needed to make an informed operational decision in response to Mr. Baillie's medical situation and were unusual and unexpected events that resulted in Mr. Baillie not receiving

Report of:        **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:    **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

---

proper medical treatment until he'd been having a heart attack for at least 6 – 8 hours.

12.4.1   It is clear from Dr. Monas's deposition that the Intake Form (Exhibit 3) used by Dr. Reinhart to record Mr. Baillie's condition gave her very little information and very little urgency concerning the situation.

12.4.2   As stated previously, Dr. Reinhart made no mention of the condition of Mr. Baillie on the Intake Form (Exhibit 3). He only checked the "oxygen" box in the "care initiated" section. The first CSE had written the words "central chest pain; pale" on the form but had not written down the time that the initial call from flight 289 had been received. Neither CSE Tyler nor Dr. Reinhart made any record on the Intake Form that Dr. Reinhart stated that the flight crew should consider diversion if Mr. Baillie's condition deteriorated.

12.5   It is clear from the evidence presented (Exhibit 3 and the Transcript of Deposition of Dr. Jessica Monas, MD) Dr. Monas was armed with very little crossover information from Dr. Reinhart and was ill informed. Dr. Monas issues the statement, "OK so why don't you go ahead and um try giving him a dose of NTG, um if he is continuing to have chest pains...then give us a call back afterwards and let us know how he's feeling..." (MedAire transcript 2012-09578 British Airways 289).

12.6   The Captain confirms the instructions that he has just been given by Dr. Monas. Realizing he has been given conflicting instructions, the Captain confirms with Dr. Monas that she understands that her "colleague" (Dr. Reinhart) had suggested not giving the NTG but understands that his crew is now instructed to administer the NTG (MedAire transcript 2012-09578 British Airways 289).

12.7   During this exchange the Captain mentions he was considering a diversion and indicated that he was waiting for Dr. Monas's input (MedAire transcript 2012-09578 British Airways 289).

12.7.1   The Captain had been instructed by both doctors to monitor and call back. It is my opinion based upon the lack of urgency displayed, that neither Dr. Reinhart nor Dr. Monas truly grasped the severity of Mr. Baillie's condition and their input to the Captain communicated a false sense of security. Since the Captain was not a medical professional, he had no choice but to

Report of:        **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:     **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

rely upon his expanded team. This facilitated a delayed decision to divert the aircraft.

12.8   At 2252 GMT the Captain of BA 289 made another SATCOM patch to MedAire and Dr. Monas was standing by. The Captain relayed to Dr. Monas that the doctor who was attending Mr. Baillie "...is not happy at all with giving the patient nitro because his blood pressure is too low." With a conflict between the onboard physician and Dr. Monas, the Captain again asked for Dr. Monas's thoughts (MedAire transcript 2012-09578 British Airways 289).

   12.8.1   At this point it appears from her response that Dr. Monas becomes flustered with the fact that Mr. Baillie had not been given the NTG. She asks again for his blood pressure and requests that he is having chest pain. Upon discovering that the onboard physician is a Radiologist, she tries to confirm that there is another doctor onboard (MedAire transcript 2012-09578 British Airways 289).

   12.8.2   This conversation again prompts the Captain to facilitate direct communication with FA Van Den Berg who proceeds to recap the entire scenario with Dr. Monas.

   12.8.3   Dr. Monas requests to speak directly to the physician and is unable to do so due to security procedures that preclude a non crew member from entering the flight deck.

12.9   After the lengthy discussion recapping Mr. Baillie's condition, the refusal of the onboard physician to administer the NTG and her inability to speak directly with the onboard physician, Dr. Monas in my view appears to abdicate her position on the expanded team (MedAire transcript 2012-09578 British Airways 289).

   12.9.1   In my opinion, the last input that Dr. Monas makes to the Captain in this medical crisis is resignation. She says, "Yea ok, I mean you know obviously we are here, you guys are in the air and evaluating the patient. If you feel the patient is not looking well, and we need to divert we can start to take a look at diversion locations... if you guys feel he is uh concerning at this time." (MedAire transcript 2012-09578 British Airways 289).

Report of:        **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:     **Plaintiff Linda Ann Baillie**
Dated:            **21 March 2016**

12.9.2   Using the expectations delineated in Obligations of MedAire Inc, paragraph 2.2, "MedAire Inc. will provide prompt, accurate and comprehensive advice at regular intervals..." (BA026953) Dr. Monas clearly, in my opinion, did not provide this service.

12.9.3   Appendix B: Service Level Agreement; 1. Inflight Medical Emergency Advisory Services, first paragraph states, "The Captain will be advised if a diversion is medically warranted." Although she mentioned diversion as a possible solution, Dr. Monas did not proactively advise the Captain to divert (MedAire transcript 2012-09578 British Airways 289).

12.9.4   In order to advise the Captain properly as to the necessity of diversion, Dr. Monas could have followed MedAire/MedLink Work Instructions procedures set forth in the MedLink "Diversion Justification Worksheet Process" (MA027047-027053.) STEP 1-" Determine Diversion Necessity" clearly shows a checklist that the MedAire/MedLink physician could follow to determine if a diversion is required. "In this step the ML physician ensures they have exhausted onboard resources, such as medical personnel or the use of telemedicine devices, and determines if the medical emergency necessitates a diversion." (MA027049)

12.10   In my opinion, Dr. Monas failure to provide the flight crew with proactive advice when confronted with the constraints of Mr. Baillie's condition was unexpected and unusual and further delayed a decision that may have saved his life (see paragraph 11.10.1 above).

## 13.   CONCLUSION

13.1   The current airline environment is extremely complex. The airline Captain is not only responsible for safety of flight but for passenger comfort, fuel management, management of aircraft systems and all the while moving passengers from point A to point B on schedule.   Even the most experienced Captain must use the assets at his disposal in order to safely complete each flight.   As a Captain who has dealt with numerous types of adverse conditions and emergencies, I rely heavily on the principles of Crew Recourse Management (CRM). CRM requires that during an abnormal situation or emergency I must expand my flight team in order to utilize all available resources. No Captain of an airline transport aircraft

Report of:       **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:    **Plaintiff Linda Ann Baillie**
Dated:           **21 March 2016**

_____

can be an expert in all areas. During an abnormal situation the Dispatcher, Maintenance Coordinator and the Weather Man all become part of the expanded team. During a medical emergency, services such as MedAire/MedLink and its doctors become part of the expanded team in order to provide the crew with the information needed so that they can understand the nature and severity of the potential medical condition suffered by an ill passenger. Safety is job number one for the airline Captain; not just safety with regard to the operation of the aircraft but safety of each and every passenger on board. In a medical emergency the Captain must rely heavily upon the recommendations of the ground medical professionals who have become part of the expanded team.

13.2    The Captain of BA 289 was confronted with a medical emergency. He expanded his team to include assigning a Flight Attendant to the sick passenger, making a call to MedAire/MedLink, and at the request of the MedAire/MedLink doctor, making a PA call requesting assistance from onboard medical personnel. The flight crew of BA 289 adhered to their standard operating procedures (SOP – see glossary) in doing so. MedAire/MedLink in my opinion and as discussed in sections 10-12 above, failed to provide the British Airways Captain and flight crew with the prompt, accurate and comprehensive medical advice and recommendations they needed, so that they understood the potential seriousness of Mr. Baillie's medical condition and could respond appropriately to save his life.

13.3    It is my opinion that when Mr. Baillie's symptoms were relayed to the MedAire/MedLink doctors, they should have apprised the Captain and flight crew of the potential seriousness of his condition. They should have informed the Captain that Mr. Baillie could be suffering a heart attack and the consequences of extended flight without direct medical attention. It is my opinion that both Dr. Reinhart and Dr. Monas were more concerned with administering the NTG and lost sight of the bigger picture: that this man could be experiencing a major cardiac event. The failure of Dr. Reinhart and Dr. Monas to advise the flight crew that Mr. Baillie could possibly be suffering from a life threatening condition was an unusual and unexpected response to Mr. Baillie's medical emergency. Additionally, both Doctors could have advised BA 289 to divert to the nearest suitable airport and immediately have him hospitalized if they had used the procedures set forth in MedAire/MedLink Work Instructions procedures, MedLink "Diversion Justification Worksheet Process" (MA027047-027053). It is my opinion, based on the evidence above and my prior experience of using the services of in-flight medical providers, that the MedAire/MedLink communications with BA 289 were unusual and unexpected and likely

Report of:          **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:      **Plaintiff Linda Ann Baillie**
Dated:             **21 March 2016**

caused confusion in the mind of the Captain and the flight crew. Here they had a passenger who had been suffering chest pains and related symptoms for several hours and for whom the onboard medical treatment provided no relief. Yet the MedAire/MedLink doctors neither told the Captain and flight crew about the potential seriousness of the passenger's medical condition nor recommend that they divert the flight. Furthermore, having listened to other disclosed MedAire/MedLink SATCOM communications between BA and MedAire/MedLink, the communications between Dr. Reinhart and Dr. Monas and BA 289 were not in line with what other MedAire/MedLink doctors have recommended in similar situations. Based on the medical evidence disclosed, it appears that Mr. Baillie's medical outcome might have been significantly different had either of the MedAire/MedLink doctors recommended to the Captain of BA 289 that he immediately divert the flight.

13.4   I was asked in Section 2.2 to offer my opinion as to the adequacy of the response and advice that was offered to the Captain and crew of BA 289. It is my opinion that MedAire/MedLink offered very little advice. Despite all of Mr. Baillie's warning signs which were communicated several times to the doctors, two different MedAire/MedLink physicians seemingly ignored Mr. Baillie's deteriorating health and continuing chest pains. Doctors Reinhart and Monas failed to advise the flight crew that Mr. Baillie was suffering from a potentially life threatening condition, failed to recognize that Mr. Baillie was potentially suffering a cardiac event and failed to recommend a diversion to provide him with life saving medical help. It is therefore my opinion and experience that in this instance MedAire/MedLink, Dr. Reinhart and Dr. Monas all departed from the usual and expected MedAire/MedLink practice of offering proper advice, information, care and treatment recommendations to flight crews for passengers suffering from persistent chest pain. Furthermore, both Dr. Reinhart and Dr. Monas failed to consider the MedAire/MedLink procedures available to them in the MedLink "Diversion Justification Worksheet Process."

13.5   A diversion from a scheduled flight plan is always a very difficult decision for a Captain. He is charged with not only safety, but also proper utilization of company assets. When he signs for the aircraft the Captain is certifying that he has evaluated all aspects of the flight and feels that he and his crew are fit to conduct that flight, the aircraft is safe for flight and he gives his oath to the company that he will operate the aircraft within the defined guidelines of the company.   When it becomes necessary to use his Captain's Authority and change his destination due to an aircraft emergency, it is a fairly black and white decision and Captains are spring

Report of:       **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:    **Plaintiff Linda Ann Baillie**
Dated:           **21 March 2016**

loaded to land as soon as practicable.  When the emergency deals with a passenger or a passenger's health, the decision becomes less black and white and consequently, diversions due to passenger issues are more difficult. A diversion for this reason relies heavily upon proper and timely advice from the medically trained members of the Captain's expanded team.   In my opinion, neither MedAire/MedLink, Dr. Reinhart nor Dr. Monas offered this advice; consequently, as a result of this unusual and unexpected response to Mr. Baillie's medical emergency a much needed diversion did not occur.

13.6   This report relies upon my own analysis of the documents disclosed and appendices, as listed.  However I reserve the right to amend my report in the light of any additional evidence which may become available.

## 14.    GLOSSARY OF TECHNICAL TERMS

### Captain's Authority

The FAA authority that grants the Captain of an airline the authority to do whatever it takes to safely land the aircraft.  This authority from time to time allows him to violate FAA regulations in the interest of safety.

### CRM

Crew Resource Management also known as Cockpit Resource Management: The effective use of all resources, including hardware, software and people to achieve the highest possible level of safety. The use of CRM enhances the safety and effectiveness of a crew (cockpit and cabin) as well as the expanded team (Dispatcher, Weather, Maintenance, Medical etc.)

### CSE

Customer Service Expert. The person first contacted during a SATCOM call to MedAire.

### Initial Operating Experience (IOE)

An initial airline trip flown by a newly certified pilot in a particular aircraft type, either Captain or First Officer and always flown with a Line Check Instructor Pilot.

### Line Checks

A line operations check flight. A check ride given in order to insure that flight crewmembers have met competency standards.

Report of:          **Captain Daniel J Mesnard**
Specialist field: **Aviation**
On behalf of:     **Plaintiff Linda Ann Baillie**
Dated:               **21 March 2016**

---

**Line Check Pilot**

A qualified instructor pilot certified to administer Line Checks and give IOEs.

**NAT**

North Atlantic Track system. The organized track system for the purpose of crossing the north Atlantic. These tracks are published daily and available to all interested carriers.

**NOTAM**

Notices to airmen. Written notification or advisories issued to pilots before each flight advising them of circumstances related to the establishment, conditions or change of any aeronautical facility, service, procedure or hazard, the timely knowing of which is essential to personnel and systems concerned with flight.

**Red Dot Instructor**

A term local to the 434 Tactical Fighter Training Squadron referring to experienced instructors who have special skills in dealing with students who were less capable. This also included foreign students with language barriers.

**SATCOM**

Satellite voice communication. An airborne telephone communication via satellite often abbreviated as SATCOM.

**Situational Awareness**

A human factors term meaning being aware of all things affecting you as you operate an aircraft, the comprehension of their meaning and the projection of their status within a given volume of space and time.

**SOP**

Standard Operating Procedures: The standard procedures as delineated by a company or organization.

Report of:         **Captain Daniel J Mesnard**
**Specialist field:** **Aviation**
**On behalf of:**    **Plaintiff Linda Ann Baillie**
**Dated:**           **21 March 2016**

Respectfully submitted,

Signature: .......................................................

Date: ...... 21 March 2016 ...................

Daniel J Mesnard
GMR Consulting

**15.    APPENDICES**

1.  Daniel J Mesnard, Resume;
2.  List of documents disclosed;
3.  Other documents reviewed / relied upon.

EXHIBIT 47



**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Case No. 14-cv-0420-SMM (D. Az.)

LINDA ANN BAILLIE,
individually, as Personal Representative of the Estate of
JAMES DONALD BAILLIE, II, and on
behalf of all heirs and next of kin of
JAMES DONALD BAILLIE, II, deceased,

**Plaintiff**

**versus**

MedAire Inc., Steven Joe Reinhart, D.O. and Jessica Monas, M.D.
**Defendants**

---

**REBUTTAL REPORT OF**

**CAPTAIN DANIEL J MESNARD**

**DATED JUNE 2016**

---

On instruction of:     KREINDLER & KREINDLER LLP
                       750 Third Avenue, 32nd Floor
                       New York, NY 10017

On behalf of:          Plaintiff

Specialist field:      Aviation

Subject matter:        Rebuttal of Report of Defendants' Expert Captain
                       Michael G. Fortune, Retired, dated May 25, 2016

---

**GMR Consulting**
**2255 Glades Road**
**Suite 324A**
**Boca Raton, Florida 33431**
**Tel: 561 988 8717**
**Email: info@gmrconsulting.com**



**Rebuttal report of: Captain Mesnard**

## CONTENTS

| SECTION | ITEM | PAGE NO. |
|---------|------|----------|
| 1. | Introduction | 2 |
| 2. | Rebuttal | 3 |

## 1.   Introduction

1.1   This report is in addition to my report dated March 21, 2016. Its purpose is to address issues raised by the Defendant's expert witness, Captain Michael G. Fortune, Retired (RET), in his report dated May 25, 2016.

1.2   The evidence I have considered and relied upon in formulating the findings and conclusions advanced in this rebuttal report include my personal and professional experience, my education, as well as the evidence listed in this and my prior report. The findings and conclusions presented are accurate to a reasonable degree of certainty in my fields of expertise which include;

a) 41 years of flying experience both military and civilian.
b) 26 years as an airline Captain and line check instructor to include 12 years as an international Captain.
c) Numerous inflight medical emergencies including inflight diversions.
d) Extensive training in Crew Resource Management (CRM).
e) Safety training in the USAF.
f) MBA specializing in personnel management.

Given a) to f) above, I feel this qualifies me to respond to the expert report of Captain Fortune (RET). The findings and conclusions in this report are in addition to and not to the exclusion of those contained in my original report.



**Rebuttal report of: Captain Mesnard**

**2.     Rebuttal**

2.1     In addition to the previous opinions that I set forth in my March 21, 2016 report, it is my opinion that MedAire and MedLink, and their professional medical, communications and administrative personnel, were probably the most important and critical members of Captain Fowler's crew resource management team during the response to Mr. Baillie's inflight medical emergency on March 23, 2012. These MedAire and MedLink personnel failed to provide adequate information and guidance to Captain Fowler and his crew regarding;

a) the potential medical conditions being suffered by Mr. Baillie,

b) the risks associated with those potential medical conditions and the limitations of the MedLink diagnostic capabilities,

c) the risks of doing nothing further for Mr. Baillie other than providing him with supplemental oxygen and aspirin,

d) the fact that Mr. Baillie could have been experiencing a coronary event and that acute coronary syndrome was "a" if not "the" most likely source of his medical emergency, and, if so, the failure to get him to the closest medical facility where he could get a medical diagnosis and appropriate treatment could and likely would cause Mr. Baillie to suffer additional serious medical injuries and/or death.

2.2     As an international airline Captain, I would expect that MedAire and MedLink personnel would provide me with all necessary information and guidance for an ill passenger potentially suffering from acute coronary syndrome so that I could consider all options and plan what to do in the event that the ill passenger's medical condition did not improve or got worse. These unexpected failures on the part of the MedAire and Medlink personnel caused Captain Fowler and his crew to decide to continue the flight all the way to Phoenix rather than divert to an airport close to a suitable medical facility and each of these failures, independently and collectively, constituted an accidental injury to Mr. Baillie while he was a passenger on an international flight.



Rebuttal report of: Captain Mesnard

Respectfully submitted,

Signature: _____

Date: _____June 20, 2016_____

Captain Daniel J Mesnard
GMR Consulting

EXHIBIT 48

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

LINDA ANN BAILLIE, individually,      )
as Personal Representative of the     )No.2:14-cv-00420-SMM
Estate of JAMES DONALD BAILLIE,       )
II, and on behalf of all heirs and    )
next of kin of JAMES DONALD           )
BAILLIE, II, deceased,                )
                                      )
         Plaintiff,                   )
                                      )
      vs.                             )
                                      )
MEDAIRE, INC.; STEVEN JOE REINHART,   )
D.O.; and JESSICA MONAS, M.D.,        )
                                      )
         Defendants.                  )
_____)


VIDEO RECORDED DEPOSITION OF STEVEN JOE REINHART, M.D.
VOLUME III


Phoenix, Arizona
January 6, 2016
9:02 a.m.


REPORTED BY:

STEPHANIE WINTERS, RPR
Certified Reporter, No. 50067

VIDEO RECORDED DEPOSITION OF STEVEN JOE REINHART, M.D., VOL. III - 1/6/2016

```
 1                          I N D E X

 2    EXAMINATION                                        PAGE

 3    STEVEN JOE REINHART, M.D.

 4       Mr. Spragg                                       7

 5

 6            (Deposition Exhibit Number 3 was marked for

 7    identification and attached to Dr. Reinhart's previous

 8    deposition transcript.  Deposition Exhibit Number 18 was

 9    marked for identification and attached to Stephen Fowler's

10    deposition transcript.  Deposition Exhibit Number 55-A was

11    marked for identification and attached to Matthew Whitley's

12    deposition transcript.  Deposition Exhibit Numbers 84

13    through 90 and 97 were marked for identification and

14    attached to Dr. Oscislawski's deposition transcript.

15    Deposition Exhibit Number 107 was marked for identification

16    and attached to Michelle Tyler's deposition transcript.

17    Deposition Exhibit Number 111 was marked for identification

18    and attached to Dr. Monas's deposition transcript.)

19

20                        E X H I B I T S

21

22    EXHIBIT NO.             DESCRIPTION                PAGE

       3  -   British Airways document, BA0733-BA0758     15
23
       18 -   Transcript of communications between        15
24            the MedLink physicians and the
              aircrew of British Airways Flight 289
25            on March 23rd, 2012
```

VIDEO RECORDED DEPOSITION OF STEVEN JOE REINHART, M.D., VOL. III - 1/6/2016

| | EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| | 55A - | Intake Form, MedLink, MA027383-MA027384 | 75 |
| 3 | | | |
| | 84 - | MedAire MedLink Physician Orientation | 83 |
| 4 | | Program Agenda, MA027339 | |
| 5 | 85 - | MedAire MedLink Physician Training, | 83 |
| | | MA027349-MA027354 | |
| 6 | | | |
| | 86 - | MedLink Doctor Training Manual, | 84 |
| 7 | | MA027210-MA027338 | |
| 8 | 87 - | MedAire's Medical Guidelines for Air | 38 |
| | | Travel, MA027079-MA027103 | |
| 9 | | | |
| | 88 - | MedAire MedLink Physician Pearls for | 28 |
| 10 | | Remote Medical Care, MA027355-MA027374 | |
| 11 | 89 - | MedAire MedLink Work Instruction, Diversion | 64 |
| | | Justification Worksheet Process, | |
| 12 | | MA027047-MS027053 | |
| 13 | 90 - | MedAire MedLink Diversion Justification | 64 |
| | | Worksheet, MA027054-MA027055 | |
| 14 | | | |
| | 97 - | MedAire MedLink, Work Instruction | 63 |
| 15 | | Commercial Aviation In-Flight Process, | |
| | | MA027056-MA027066 | |
| 16 | | | |
| | 107 - | MedLink Intake Form, MA027728-MA027729 | 94 |
| 17 | | | |
| | 111 - | PowerPoint slides, MedLink Physician | 86 |
| 18 | | Orientation, MA027901-MA027907 | |
| 19 | | | |
| | EXHIBIT NO. | DESCRIPTION | PAGE |
| 20 | | | |
| | 141 - | Plaintiff's Notice of Continued Deposition | 8 |
| 21 | | of Steven Joe Reinhart, M.D. | |
| 22 | 142 - | MedAire Intake Form - MedLink, MA027818 | 86 |
| | | MA027819 | |
| 23 | | | |
| | 143 - | Patch Summary, MA005583 | 86 |
| 24 | | | |
| | 144 - | MedAire Intake Form - MedLink, MA027820 | 89 |
| 25 | | MA027821 | |

VIDEO RECORDED DEPOSITION OF STEVEN JOE REINHART, M.D., VOL. III - 1/6/2016

| | EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| | 145 - | Patch Summary, MA007210-MA007211 | 89 |
| 3 | | | |
| | 146- | MedAire Intake Form - MedLink, MA027822 MA027823 | 91 |
| 4 | | | |
| 5 | 147 - | Patch Summary, MA008543 | 91 |
| 6 | 148 - | MedAire Intake Form - MedLink, MA027824-MA027825 | 91 |
| 7 | | | |
| | 149 - | Patch Summary, MA008956-MA008957 | 91 |
| 8 | | | |
| | 150 - | Patch Summary, MA010986-MA010987 | 94 |
| 9 | | | |
| | 151 - | MedAire Intake Form - MedLink, MA027828-MA027829 | 96 |
| 10 | | | |
| 11 | 152 - | Patch Summary, MA012476-MA012477 | 97 |
| 12 | 153 - | MedAire Intake Form - MedLink, MA027830-MA027831 | 99 |
| 13 | | | |
| | 154 - | Patch Summary, MA013375-MA013376 | 99 |
| 14 | | | |
| | 155 - | MedAire Intake Form - MedLink | 101 |
| 15 | | | |
| | 156 - | Patch Summary, MA013561-MA013562 | 101 |
| 16 | | | |
| | 157 - | MedAire Intake Form - MedLink, MA027836-MA027837 | 103 |
| 17 | | | |
| 18 | 158 - | Patch Summary, MA015890 | 103 |
| 19 | 159 - | MedAire Intake Form - MedLink, MA027838-MA027839 | 105 |
| 20 | | | |
| | 160 - | Patch Summary, MA016824-MA016825 | 105 |
| 21 | | | |
| | 161 - | MedAire Intake Form - MedLink, MA027840- | 109 |
| 22 | | | |
| | 162 - | Patch Summary, MA016844 | 109 |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
1        VIDEO RECORDED DEPOSITION OF STEVEN JOE REINHART, M.D.

2                            VOLUME III

3

4   was taken on January 6, 2016, at 9:02 a.m. at Gallagher &

5   Kennedy, P.A., 2575 East Camelback Rd., Phoenix, Arizona,

6   before STEPHANIE WINTERS, Certified Reporter Number 50067,

7   in and for the State of Arizona.

8                               *  *  *  *

9
    COUNSEL APPEARING
10
                ON BEHALF OF PLAINTIFF:
11
                        ROBERT J. SPRAGG, ESQ.
12                      KREINDLER & KREINDLER LLP
                        750 Third Avenue
13                      New York, NY 10017
                        (212)687-8181
14                      rspragg@kreindler.com

15              ON BEHALF OF DEFENDANTS:

16                      MARK C. DANGERFIELD, ESQ.
                        GALLAGHER & KENNEDY, P.A.
17                      2575 E. Camelback Road
                        Phoenix, AZ 85016-9225
18                      602-530-8000
                        mark.dangerfield@gknet.com
19

20  ALSO PRESENT:

21                      Alex Marinakis, Videographer
                        VideoDep, Inc.
22

23

24

25
```

```
 1                                        Phoenix, Arizona
                                          January 6, 2016
 2                                        9:02 a.m.

 3

 4            THE VIDEOGRAPHER:   We're on the record.   Today's

 5   date is Wednesday, January 6th, 2016.   The time on the video

 6   monitor is 9:02 a.m.   This is the continued deposition of

 7   Steven Joe Reinhart, M.D., noticed by counsel for the

 8   plaintiff in the matter of Linda Ann Baillie, et al. versus

 9   MedAire, Incorporated, et al.

10            This matter is being held in the United States

11   District Court, District of Arizona.   The case number is

12   2:14-CV-00420-SMM.   Our location is the law offices of

13   Gallagher & Kennedy, located in Phoenix, Arizona.   The

14   certified court reporter is Stephanie Winters of

15   Morris-Crowe Court Reporting, located at 7650 S. McClintock

16   Drive, Suite 103, Tempe, Arizona 85254.   My name is Alex

17   Marinakis.   I'm the certified legal video specialist for the

18   firm of VideoDep, Incorporated, located at 7776 S. Pointe

19   Parkway West, Suite 170, Phoenix, Arizona, 85044.

20            Counsel, would you please identify yourselves and

21   whom you represent, starting with the plaintiff's counsel.

22            MR. SPRAGG:   Yeah.   My name is Robert Spragg of

23   the firm of Kreindler & Kreindler in New York, and I

24   represent plaintiff Linda Ann Baillie.

25            MR. DANGERFIELD:   And Mark Dangerfield from
```

VIDEO RECORDED DEPOSITION OF STEVEN JOE REINHART, M.D., VOL. III - 1/6/2016

1   Gallagher & Kennedy representing the defendants in the case,

2   MedAire, Inc. and Drs. Steven Reinhart and Jessica Monas.

3              THE VIDEOGRAPHER:   Thank you, counsel.   The court

4   reporter may swear in the witness at this time, please.

5

6              STEVEN JOE REINHART, M.D.,

7   called as a witness herein, having been first duly

8   sworn, was examined and testified as follows:

9

10                  E X A M I N A T I O N

11  BY MR. SPRAGG:

12      Q.   Okay.   Good morning, Dr. Reinhart.

13      A.   Good morning.

14      Q.   My name is Robert Spragg.   I'm going to be asking

15  you some additional questions today.   I'd like to -- do you

16  understand, first of all, that you're still under oath?

17      A.   I do.

18      Q.   Okay.   You previously had your deposition taken in

19  this matter on two separate occasions, correct?

20      A.   Correct.

21      Q.   Okay.   There's only one procedural item I'd like

22  to discuss with you before we begin, and that is if at any

23  time today I ask you a question that you don't understand

24  for whatever reason, tell me and I will go ahead and

25  rephrase the question or repeat it.   But the understanding

VIDEO RECORDED DEPOSITION OF STEVEN JOE REINHART, M.D., VOL. III - 1/6/2016

1    Q.    Okay.  And are meetings held where training of the

2    MedLink physicians are discussed -- is discussed?

3    A.    Not exactly.

4    Q.    Is it ever a subject of conversation at the

5    shareholders meetings at MedLink or EPS?

6    A.    MedLink is the topic of discussion at the

7    meetings.

8    Q.    Okay.

9    A.    If there's any new information that needs to be

10   brought forward to us --

11   Q.    All right.

12   A.    -- it's done at the meeting.

13   Q.    Okay.  How about in terms of standardization of

14   procedures that MedLink doctors should be utilizing in

15   certain circumstances?  Are those -- is that a subject that

16   is sometimes discussed at the shareholder meetings at EPS?

17   A.    It could be.

18         MR. DANGERFIELD:  Rob, at this point I'm going to

19   interpose an objection.  He was asked questions about the

20   training he received.

21         MR. SPRAGG:  Okay.  Well, this is --

22         MR. DANGERFIELD:  In the prior deposition and

23   he --

24         MR. SPRAGG:  Well, that's what this deposition is

25   about, training he received and --

1      MR. SPRAGG:  Right.

2      MR. DANGERFIELD:  He was asked questions about the

3  periodic training that was received at EPS.

4      MR. SPRAGG:  All right.  Well, not within the

5  meetings, okay?  And that's what -- I want to know if those

6  items were something that was discussed at the shareholder

7  meetings.  I'm not talking about if he's trained at the

8  meetings, all right?  So you're cutting into my two hours,

9  so let me continue.

10 BY MR. SPRAGG:

11     Q.   Who handles the MedLink doctor training at EPS?

12     A.   I really couldn't tell you.  I have not received

13  any training, so I wouldn't know who handles it.

14     Q.   Okay.  You've never received any training in

15  regard to your MedLink doctor duties while working at EPS?

16     A.   I have not.

17     Q.   Okay.  So the only training that you have ever

18  received, I guess, would be on-the-job training?

19     A.   Correct.  With the exception of one computer

20  program that I was asked to view a number of years ago.

21     Q.   And that would be about aviation physiology?

22     A.   Correct.

23     Q.   Okay.  Is MedLink responsible for the training --

24  or strike that.

25          Is EPS responsible for the training of the MedLink

1        Q.    All right.   Doctor, when did you become a MedLink

2   physician?   It was unclear from your prior deposition.

3        A.    From the inception of MedLink, which was in the

4   mid 80's.

5        Q.    Okay.

6        A.    It was between '86 and '89.

7        Q.    Okay.

8        A.    There was a developmental stage.

9        Q.    All right.   So if I represent to you that the

10  first MedLink call that came in from an airline came in in

11  November of 1987, would that more or less be about the same

12  time you've been working with the MedLink folks?

13       A.    Correct.

14       Q.    All right.   I just want to discuss with you

15  briefly the training you received to become a MedLink

16  physician.   And you've told me that you've never received

17  any, but I just want to make sure that -- there's several

18  areas of training that are done.   I just want to make sure

19  that you've considered those before telling me you've

20  received absolutely nothing.

21            Did you ever receive any direct one-on-one

22  training from another experienced MedLink doctor?

23       A.    No, I did not.

24       Q.    Okay.  Did you ever --

25            MR. DANGERFIELD:  Rob, let me interrupt.  We -- he

1          MR. DANGERFIELD:  No, I --

2          MR. SPRAGG:  And it's not there.

3          MR. DANGERFIELD:  Are we off the record?

4          MR. SPRAGG:  Yes, we're off the record.

5          THE VIDEOGRAPHER:  We're going off the record.

6  The time is approximately 9:16 a.m.

7               (Discussion off the record.)

8          THE VIDEOGRAPHER:  We're back on the record.  The

9  time is approximately 9:17 a.m.

10 BY MR. SPRAGG:

11     Q.   All right.  And I figure I have asked questions

12 for about five minutes, so -- all right.

13          So you told me you did not receive any direct

14 one-on-one training from any experienced MedLink physician

15 like Dr. Streitwieser, for example, correct?

16     A.   I did not.

17     Q.   All right.  And you didn't receive any direct

18 one-on-one training from Dr. Bhow, B-h-o-w, correct?

19     A.   I did not.

20     Q.   All right.  Did you ever receive any direct

21 one-on-one MedLink training from anyone at MedAire?

22     A.   I do not recall any specific one-on-one training

23 from anyone at MedAire.

24     Q.   Okay.  Now, you mentioned an E-Learning module,

25 correct?

1    BY MR. SPRAGG:

2        Q.   Does that make sense to you?

3        A.   Only with their assistance.

4        Q.   Okay.  So you had a MedAire CSE do that for you,

5    essentially?

6        A.   Right.

7        Q.   Did you ever have a MedAire CSE go into the

8    Datalink 2000 system for you in regard to this incident,

9    Mr. Baillie's incident?

10       A.   No.

11       Q.   Okay.

12       A.   Not that I recall.

13       Q.   All right.  As a MedLink doctor, are you taught to

14   use only the MedLink Intake Form to record information

15   regarding an ill passenger or crew member on a commercial

16   flight?

17       A.   Only this as opposed to?

18       Q.   Using the computer system.

19       A.   Oh, only this, yes.

20       Q.   Okay.  Is there any other -- are you given any

21   other forms to complete or fill out when you go into the

22   MedLink call center to handle an in-flight emergency?

23       A.   Only if there is a diversion that has already

24   taken place.

25       Q.   Right.  And in that case, you would be given the

1  Diversion Justification Worksheet, correct?

2      A.    Correct.

3      Q.    Okay.  But in terms of making notations in regard

4  to the symptoms and conditions of a passenger and the

5  medical advice that you have given, the only document that

6  you would use would be the MedLink Intake Form, correct?

7      A.    For?

8      Q.    For you.

9      A.    For me to put the record down, but --

10     Q.    Right.  To make handwritten notes is what I'm

11  talking about.

12     A.    Correct, yes.

13     Q.    Okay.  I would like to show you a few other

14  training documents, just to make sure that you've never seen

15  them.

16          I'd like to hand you first what we have identified

17  as Exhibit 84.  Have you ever seen that document before?

18  It's entitled "MedLink Physician Orientation Program Agenda"

19  from August of 2011.

20     A.    No, I have not.

21     Q.    Okay.  And your prior testimony is that you've

22  never attended one of these orientation programs, correct?

23     A.    Correct.

24     Q.    Okay.  I'd like to show you what we previously

25  identified as Exhibit 85.  And Exhibit 85 is entitled, "The

1   the MedLink Intake Forms that we have just examined that you

2   made notations in your own handwriting in the Physician

3   Notes section on all of them?

4        A.   On all of these I did, yes.

5        Q.   All of these, correct.  And if you look at your

6   Exhibit 3, which pertains to this case, there does not

7   appear to be any handwritten notes there, do there?

8        A.   Correct.

9        MR. SPRAGG:  I believe my time is up --

10       MR. DANGERFIELD:  Yeah.

11       MR. SPRAGG:  -- and I'm not going to -- I have a

12   two-hour limit, Doctor, so -- otherwise I would enjoy

13   talking to you for -- at some length.  However --

14       MR. DANGERFIELD:  I -- oh, I'm sorry.

15       MR. SPRAGG:  Thank you very much.

16       MR. DANGERFIELD:  And I don't have questions.

17       MR. SPRAGG:  And I have no further questions.  So

18   thank you very much for your cooperation in coming to speak

19   with us today.

20       THE WITNESS:  You're welcome.

21       THE VIDEOGRAPHER:  This concludes the deposition

22   of Dr. Steven Reinhart.  The time is approximately

23   11:17 a.m.

24          (The deposition concluded at 11:17 a.m.)

25              * * * * * * *

1

2

3

4

5

6

7            I, the undersigned, say that I have read the

8    foregoing transcript of testimony taken January 6, 2016, and

9    I declare, under penalty of perjury, that the foregoing is a

10   true and correct transcript of my testimony contained

11   therein.

12            EXECUTED this _____ day of _____,

13   _____.

14

15

16            _____

17                   STEVEN JOE REINHART, M.D.

18

19

20

21

22

23

24

25

```
 1   STATE OF ARIZONA      )
                           )ss.
 2   COUNTY OF MARICOPA    )

 3        BE IT KNOWN that the foregoing proceedings were taken
     before me, STEPHANIE WINTERS, Certified Reporter No. 50067,
 4   that the witness before testifying was duly sworn by me to
     testify to the whole truth; that the foregoing pages are a
 5   full, true and accurate record of the proceedings, all done
     to the best of my skill and ability; that the proceedings
 6   were taken down by me in shorthand and thereafter reduced to
     print under my direction.

 7

 8             [X]  Review and signature was requested.
               [ ]  Review and signature was waived.
 9             [ ]  Review and signature was not required.

10

          I CERTIFY that I am in no way related to any of the
11   parties hereto, nor am I in any way interested in the
     outcome thereof.

12

          I FURTHER CERTIFY that I have complied with the
13   requirements set forth in ACJA 7-206.  Dated at Phoenix,
     Arizona, this 14th day of January, 2016.

14

15   _____
     Stephanie Winters, RPR
16   Certified Reporter No. 50067

17

18                    *       *       *

          I CERTIFY that Morris-Crowe Court Reporting, LLC, has
19   complied with the requirements set forth in ACJA 7-206.
     Dated at Tempe, Arizona, this 14th day of January, 2016.

20

21

22   _____
     Morris-Crowe Court Reporting, LLC
23   Arizona RRF No. R1001

24

25
```

STATE OF ARIZONA       )                **AFFIDAVIT**
                           )                   **OF**

COUNTY OF MARICOPA   )     **NON-SIGNATURE**

BE IT KNOWN that the foregoing deposition was taken before a Certified Reporter in the State of Arizona, Stephanie Winters, Certificate Number 50067, and that the witness elected to, or counsel to the action requested that the witness read and sign said deposition within 30 days.

IN VIEW of the fact that the witness did not sign within 30 days, nor ask for an extension of time, pursuant to Rule 30 (e) of the Rules of Civil Procedure, I am hereby signing said deposition for filing.

DATED in Phoenix, Arizona, this _26th_ day of _February_ , 20 _16_.

_Stephanie Wint_
Stephanie Winters
Certified Reporter Certificate No. 50067