Mark C. Dangerfield (Bar No. 010832)
Wm. Charles Thomson (Bar No. 004269)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone:   (602) 530-8000
Facsimile:    (602) 530-8500
E-mails: mark.dangerfield@gknet.com
            wct@gknet.com
Attorneys for Defendants MedAire, Inc., Steven Joe Reinhart, D.O., and Jessica Monas, M.D.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| LINDA ANN BAILLIE, individually, as Personal Representative of the Estate of JAMES DONALD BAILLIE, II, and on behalf of all heirs and next of kin of JAMES DONALD BAILLIE, II, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>MEDAIRE, INC.; STEVEN JOE REINHART, D.O.; and JESSICA MONAS, M.D.,<br><br>Defendants. | No. 2:14-cv-00420-PHX-SMM<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>(Oral Argument Requested) |

## INTRODUCTION

Plaintiff's Response fails to establish the essential elements of a claim under the Convention that defendants caused someone's death by merely *failing* to act. That requires proof of (1) an "event," involving either a refusal to abide by "specific, health-based requests for help," or a "refusal to comply with mandatory regulatory requirements"[1]; (2) which was "unexpected or unusual" in that it violated "either a clear industry standard or an airline policy at the time"[2]; and (3) which was a proximate cause of the decedent's death.[3]

To begin with, the Response wrongly brushes off the "event" requirement, citing *Phifer v. Icelandair*, 652 F.3d 1222 (9th Cir. 2011), an irrelevant case which merely holds

---
[1] *Aziz v. Air India Ltd.*, 658 F. Supp. 2d 1144, 1149-1150 (C.D. Calif. 2009).
[2] *Rodriguez v. Ansett Australia Ltd.*, 383 F.3d 914, 918 (9th Cir. 2004).
[3] *Prescod v. AMR Inc.*, 383 F.3d 861, 866 (9th Cir. 2004).

that an event can be "unexpected or unusual" even if it does not violate an FAA requirement. The case has nothing to do with when inaction can be an "event."

As for the second element, Plaintiff's Controverting Statement of Facts ("PCSOF") admits that "[t]here are no industry standards of any kind that apply to MedAire's 'inflight medical emergency advisory service,'" hence, Defendants' alleged failure to recommend diversion did not violate any industry standards. PCSOF ¶19 at 19:27-20:1 (emphasis in original). Moreover, "Plaintiff does not dispute that MedLink physicians are allowed to use their clinical judgment when deciding whether to recommend that a commercial aircraft divert because of an inflight medical emergency." *Id.*`¶20 at 20:14-16. So the alleged failure to recommend diversion was neither unexpected nor unusual.

And as to the causation element, Plaintiff failed to provide any expert testimony stating that the alleged failure to recommend diversion was a cause of Mr. Baillie's death. The parties agree that Baillie suffered a serious heart attack at least two hours before BA 289 ever sought Defendants' advice, and that he ultimately died from injuries stemming from that heart attack. To prove causation in these circumstances requires the testimony of a medical expert who can opine that Baillie likely would have survived had Defendants recommended diversion.  But Plaintiff offers no such expert.

As a matter of law, summary judgment is therefore warranted.

I.  **DR. REINHART'S DECISION NOT TO IMMEDIATELY RECOMMEND DIVERSION WAS NOT AN "EVENT" AND HENCE NOT AN ACCIDENT.**

Plaintiff cites no Ninth Circuit case where a mere "omission" to do something was found to be an "event," unless it involved a rejection of "specific, health-based requests for help," as in *Olympic Airways v. Husain*, 540 U.S. 644 (2004) (cabin crew rejected request to be reseated) and *Prescod*, *supra* (airline breached promise that elderly passenger would always have access to her bag of medications). *Cf. Twardowski v. American Airlines*, 535 F.3d 952 (2008) (finding that a mere a failure to follow recommendations by public agencies was not an "event").  Unlike in *Husain* and *Prescod*, the Defendants here never refused a specific, health-based request.  When BA 289 called

2

MedLink and asked for advice, the MedLink physicians responded and gave advice. Plaintiff just claims the advice was defective. *See Lee v. Korean Airlines LTD*, 2012 WL 1076269, *6 (C.D. Cal. 2012) (awarding summary judgment to airline; finding no "event" because the only health based request was heeded by the crew); *cf. Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F. Supp. 3d 436, 444 (E.D.N.Y. 2014) ("whether the response of the…crew was adequate in a medical sense…could not form the basis of a claim under the Montreal Convention….").

And just as the court said in *Twardowski*, Plaintiff's reliance on *McCaskey v. Continental Airlines, Inc.*, 159 F. Supp. 2d 562 (S.D. Tex. 2001), and *Fulop v. Malev Hungarian Airlines*, 175 F. Supp. 2d 651 (S.D.N.Y. 2001), is "misplaced." 535 F.3d at 960. That is because injuries in those two cases "stemmed from specific health-based requests for help that were unheeded by airline crew."

Plaintiff merely argues that, in hindsight, the MedLink physicians should have recommended that the plane divert, but also admits that no industry standards required such and that MedAire allowed the MedLink physicians to use their own clinical judgment in making such recommendations.

In short, the alleged failure to recommend diversion was at most mere "inaction" that "allow[ed] an unfolding series of events to reach their natural conclusion." *Caman v. Continental Airlines*, 455 F.3d 1087, 1092 (9th Cir. 2006). It was not an "event."

## II. **THE RESPONSE OFFERS NO EVIDENCE THAT DEFENDANTS' ACTIONS VIOLATED ANY APPLICABLE INDUSTRY STANDARDS OR INTERNAL MEDAIRE STANDARDS.**

Plaintiff's basic criticism is that the MedLink physicians provided "conflicting, inadequate and medically improper advice" to the BA 289 flight crew (Response at 8:8-9). But as the Supreme Court first made clear in *Husain*, the correct analysis under the Convention is not a "negligence-based approach," but whether conduct was "unexpected and unusual." *Husain*, 540 U.S. at 657. Hence, "questions of negligence are not implicated or even relevant. . . ." *Aziz v. Air India Ltd.*, 658 F. Supp. 2d 1144, 1148 (C.D.

1 Cal. 2009).[4]

2 And at least in the Ninth Circuit, to be "unexpected and unusual" requires proof that the Defendants' conduct violated "a clear industry standard or an airline policy . . . regarding the action in question." *Rodriguez*, 383 F.3d at 918. At trial in *Husain*, for example, expert testimony established that the flight attendant's refusal to reseat violated industry standards, and the chief cabin attendant on the actual flight testified that the refusal also violated the airline's own internal standards. *Husain v. Olympic Airways*, 116 F. Supp. 2d 1121, 1133 (N.D. Cal. 2000).

There is nothing like that here. Plaintiff admits that no industry standard either required MedAire to recommend diversion or required BA 289 to divert. Although Plaintiff's expert Dr. Candipan does opine that what the MedLink doctors did was "unusual or unexpected," he is not talking about "what's unusual or unexpected in terms of a physician giving remote medical advice to an airline," but rather what he "as a cardiologist" would have expected be done. SOF Ex. 13 at 23:10-24:9 (07/27/16 Candipan Dep.).[5] But when Dr. Candipan was asked if he claimed to be either "an expert in emergency medicine," or "an expert in giving remote medical advice to airlines," he in each instance replied, "No." PCSOF Ex. 9 at 12:2-19 (07/27/16 Candipan Dep.).

Nor did any MedAire witness testify that MedAire standards required a recommendation to divert in these circumstances. In fact, Plaintiff admits that "Medlink physicians are allowed to use their clinical judgment when deciding whether to recommend that a commercial aircraft divert because of an inflight medical emergency." SOF ¶20; PCSOF at p. 20:14-17.

Plaintiff just alleges that MedAire provided the physicians—employed by EPS, a separate company—with "factors to consider" in evaluating a diversion recommendation.

---

[4] The Response ignores this, and at pp. 12-13 relies on a string of pre-*Husain* cases in which courts used a no-longer-valid "reasonableness" test.

[5] PCSOF objects to the depositions we included as exhibits to our SOF, on the ground that "the reporter's certification is missing" (even though Plaintiff refers to most of the same depositions in her Response). To avoid the distraction, we have attached as **Ex. A** to this Reply the Reporter's Certifications for the deposition excerpts attached to our SOF.

4

PCSOF 20:19-27. Plaintiff does not allege that those factors clearly required a diversion recommendation on these facts, and they do not. *See* SOF ¶22. Indeed, one of the few specific opinions by Dr. Candipan that is referred to in the Response is that, in Candipan's view, once Dr. Reinhart was told about "crackles," he "should have concluded that [Mr. Baillie] was likely having a heart attack." Response 5:10-12. But as even Dr. Candipan admitted, that did not mean Reinhart should have immediately recommended diversion:

Q. And do you believe that Dr. Reinhart should have therefore recommended that the plane divert to an emergency landing?

A. At this point in time [after having been advised about the crackles]?

Q. Yes.

A. No.

PCSOF Ex. 9 at 62:10-15. Rather, Dr. Candipan felt that a "period of observation would have been okay…." *Id.* 62:18-22. And significantly, Plaintiff does not dispute the opinion of Defendants' expert Dr. Roth, an experienced emergency physician, that:

> when the closest diversion point is hours away and the cause of a passenger's symptoms is not clear cut, a physician experienced in offering remote medical advice to airlines would not likely recommend immediate diversion.

SOF ¶37. Dr. Roth regularly gives remote advice to airlines through STAT-MD. SOF 16.

In the above-noted *Fulop* case, plaintiffs claimed there was an "accident" when the plane failed to divert after a passenger had chest pains, and it was later confirmed that he had suffered a heart attack. But following trial, the court ruled for the defendant airline, finding plaintiffs had not "met their burden to prove" that the conduct at issue "violated established operational standards, rules or policies applicable to the circumstances." *Fulop v. Malev Hungarian Airlines,* 244 F. Supp. 2d 217, 220 (S.D.N.Y. 2003). So too, here.

Though Plaintiff may claim that the MedLink physicians should have done more, or provided different advice, that is a wholly separate issue. As the Ninth Circuit explained in *Caman*, 455 F.3d at 1092:

> Attributing liability to an air carrier for failing to do all it can to prevent an injury that is inherent in air travel…improperly shifts the

5

> focus of the inquiry from the nature of the event which caused the injury to the alleged failure of the air carrier to avert the same.

As the *Caman* court also explained, interpreting the term "accident" to include "a failure to warn of a possible risk of flight," would "incorporate into Article 17 an inquiry that is properly left to analysis under Article 20(l) [now Article 21(2)] once it has been established an accident has occurred." *Id.* 455 F.3d at 1092.[6]

At page 13, the Response relies on three post-*Husain* cases, but none help her position. In *Watts v. American Airlines*, 2007 WL 3019344 (S.D. Ind. 2007), the court merely denied a motion to dismiss. The complaint alleged that a passenger locked himself in a lavatory, and was never found until after the flight landed, after which he was pronounced dead, allegedly of a heart attack. The complaint alleged that the airlines "violated industry standards of care and their own policies and procedures. . . ."

In *Yaya v. Yemenia-Yeman Airways*, 2009 WL 271955 (E.D. Mich. Aug. 2009), the court granted the airline's motion to dismiss, but also granted plaintiff leave to amend. The amended complaint alleged that a passenger had specifically requested diversion, and that the airline refused the request.

Finally, in *Bintz v. Continental Airlines*, No. 13-cv-566 (S.D. Tex. March 3, 2016), a nurse on board told the crew that the flight should divert because a passenger "was probably having a heart attack," was "in grave danger," and "needed immediate attention." Based on those facts, the court denied summary judgment.[7]

In this case, the onboard doctors had "no suggestions" as to what was wrong, and not only did not recommend diversion, but eventually said they thought continuing to Phoenix would not worsen Baillie's condition. SOF ¶¶35, 44.

The Response also tries to create a fact issue through pure innuendo. To cite just one example, Response 4:12-13 states that "Dr. Reinhart never asked when Mr. Baillie's

---

[6] Under current Article 21(2), assuming a Plaintiff proves an "accident," a carrier can still escape liability by proving that the damage "was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents." It is only at this stage of the analysis where alleged negligence becomes a factor.

[7] A copy of the Order is attached at **Ex. B** for the Court's convenience.

6

symptoms started or how severe they were," as though this was something that emergency physicians giving in-flight airline medical advice were expected to do. It is not, and neither Dr. Candipan nor any emergency physician so opined. Recall that Dr. Reinhart had no ability to talk to the ill passenger (Mr. Baillie), so he properly advised BA 289 to see if there was an onboard physician who could directly talk to and examine Baillie and report back. And Plaintiff's expert Dr. Candipan admitted he had no criticism of Dr. Reinhart's actions during that first phone patch. SOF Ex. 35 at 53:8-54:6. (07/27/16 Candipan Dep.).[8]

Finally, Defendants' expert Dr. Alves gave his opinion that diversion was "very unusual, even when an ill passenger has chest pain." SOF Ex. 10 at 10. "In the vast majority of situations," he testified, "diversion is not medically necessary or appropriate." *Id.* This is reflected in MedAire statistics which show that "in the four-year period from 2010 to 2013, there were 369 diversions stemming from 6,093 IFMEs [inflight medical events] involving chest pain, or only about 7.58%." So failing to divert is hardly unexpected or unusual.[9]

In sum, Plaintiff has failed to create a triable issue on whether Defendants' actions were unusual or unexpected.

### III. PLAINTIFF'S RESPONSE CITES NO EVIDENCE ALLOWING A LAY JURY TO CONCLUDE THAT ANY OF THE DEFENDANTS' ACTIONS WERE A CAUSE OF MR. BAILLIE'S DEATH.

Even if Plaintiff could conjure up a triable issue on whether the Defendants' alleged failure to act constituted an "accident," she would still need to prove that the alleged "accident" was an actual cause of Mr. Baillie's death. The Response gets this

---

[8] Plaintiff's Statement of Fact ("PSOF") ¶54 refers to a statement by Defendants' expert cardiologist in response to an ambiguous question from Plaintiff's counsel. But Dr. Budoff has no experience providing remote advice to airlines, and offered no opinions on what doctors providing such advice would typically do.

[9] PCSOF ¶24 at 25:2-13 objects to the statistics as "unreliable" because they do not "represent the airline industry as a whole." But that at best goes to the weight, and Plaintiff cites neither case law in support nor conflicting statistics, nor does she deny that MedAire's database is "very likely the largest and most complete of its kind." SOF Ex. 10 at 10. And—contrary to the Response's spin—the 7.58% figure specifically refers to IFMEs involving "chest pain," not just "cardiac."

7

1 wrong, suggesting that if the Defendants' "conduct" constitutes an "accident," then "the company and doctors are liable for all damages arising out of Mr. Baillie's death." But this wrongly omits the causation component. The issue is "the nature of the event which *caused* the injury rather than the care taken by [Defendants] to avert the injury." *Air France v. Saks*, 470 U.S. 392, 407 (1985) (emphasis in original).

By simply throwing out allegations about the Defendants' actions, without connecting such claims to causation, the Response suffers from a basic defect. Thus, the Response says that the Defendants did not ask certain questions, or did not complete a form, or discounted the report of "crackles," without providing expert testimony on what difference that allegedly made. Expert testimony is needed to prove that the alleged accident *caused* Baillie's death, and Plaintiff has failed to offer such.

### A. Causation Here Requires Expert Testimony, and Plaintiff Offers None.

Although "what constitutes the proximate cause of any injury is a question of fact," the "jury is not entitled to make a decision absent a proper evidentiary foundation." *Gebhardt v. Mentor Corp.*, 191 F.R.D. 180, 185 (D. Ariz. 1999) (finding that expert was "not qualified" to give opinion; granting summary judgment for lack of evidence of causation). Here, it is well outside the knowledge of a layman to know whether Baillie likely would have survived with earlier treatment. Hence, Plaintiff must offer expert testimony on the point. *E.g. U.S. v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002) (expert testimony needed when an "untrained layman" would not be qualified to determine the issue without "enlightenment" from those with "specialized understanding").

But the Response at 16:5-11 devotes only a sentence to the causation issue, and that sentence is the wholly unsupported statement that there is "ample evidence here that the defendants' actions aggravated Mr. Baillie's condition"; it goes on to baldly claim— without reference to either expert opinion or record citation—that:

> had the defendants acted differently Mr. Baillie would have received the necessary treatment in a timely fashion instead of unnecessarily suffering the additional hours of heart damage that contributed to his death . . . .

8

That is all. Plaintiff then sets out a list of nine supposed "errors" made by the Defendants—again without reference to either expert opinion or record citation—which Plaintiff claims were "links in the causal chain" that "unnecessarily aggravated" Mr. Baillie's medical condition. But no expert testimony supports this argument. Moreover, an action is not a "link in a causal chain" leading to death unless—but for that "link"—the passenger would have survived. "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct." Restatement (Third) of Torts, § 26.

As to causation, Plaintiff offers only Dr. Candipan's testimony that Baillie "would have had an improved chance of recovery and survival if Dr. Reinhart had recommended that BA 289 be diverted." Response 7:26-8:1. But as noted in our Motion, an "improved chance for survival" is both speculative and immaterial: it could mean a one-percent improved chance, and the case law we cited does not support a "lost chance" causation theory. The Response does not address these arguments, apparently conceding them.

The type of expert medical opinion needed to show causation is exemplified in *Prescod,* where an airline unexpectedly seized a passenger's bag containing needed medications, and she later died. Plaintiff presented testimony from a physician that the airline's removal of the bag was "quite probabl[y] a substantial factor in causing her death…." 383 F.3d at 865. The trial court applied "regular proximate cause analysis" and concluded that "had the accident not occurred, the Court finds that it is probable that she would not have died. . . ." 383 F.3d at 866. Plaintiff offers no such "substantial factor in causing his death" testimony here, and has therefore failed to meet her burden on causation. *See Bach v. Trident Steamship Co., Inc.*, 920 F.2d 322, 327 (5th Cir. 1991), *vacated on other grounds*, 500 U.S. 949 (1991) (even though decedent would have had a 15% chance of surviving if defendants had acted differently, "no rational factfinder could conclude that the crew's failure…more likely than not caused Bach's death.),

And as quoted at 15:22-16:2 in our Motion, Dr. Candipan frankly admitted that he *had not arrived at an opinion* that, had the flight diverted, Baillie would have likely survived. If a medical expert cannot draw that conclusion, neither can a lay jury.

9

**B.      Dr. Candipan Could Not Offer a Causation Opinion Because of the Delay in Contacting MedAire and the Time Needed to Divert the Plane and Treat Mr. Baillie.**

By itself, Plaintiff's failure to proffer testimony that, but for the alleged accident, Baillie likely would have survived, justifies summary judgment. But it is useful to understand why the unique facts of this case prevented Dr. Candipan from opining on causation. Even if BA 289 had diverted over the North Atlantic when Plaintiff says it should have, it would have been at least six hours after the onset of Baillie's heart attack before he could have received treatment. And by then, any potential benefit from opening his artery would have been "small," because the damage to his heart had already occurred.

1.      *The chronology of BA 289.*

The following chronology is not disputed, except as to when Baillie's chest pain began.[10] But that dispute is not material to our causation argument, so for the purpose of this Motion we accept the Response's allegation as to when the chest pain began:

**14:54:** Baillie boards the flight. PSOF ¶4.

**17:00:** Baillie tells a BA flight attendant he was having chest pain. PSOF ¶12.

**18:45:** BA 289 contacts MedLink for the first time, PSOF ¶20, but based on what Dr. Reinhart was initially told about Baillie, Dr. Candipan does not believe Dr. Reinhart should have recommended diversion at this point. SOF ¶30.

**19:12:** BA 289 called MedLink for the second time. PSOF ¶55. At this time, BA 289 was over the North Atlantic Ocean. SOF ¶37.

**21:00:** This is the time BA 289 would have been on the ground had the plane diverted at 19:12 to St. Johns, Canada or Keflavik, Iceland. PCSOF 48:3-12.

---

[10] Defendants assert that Baillie's chest pain began as he was rushing to catch BA 289, and was thus present when he boarded the flight at 14:54. In truth, Plaintiff, too, believes this, and she so alleges in her First Amended Complaint in this action. Dkt. 45, ¶ 11. That is also what Mr. Baillie told Plaintiff when he was in the hospital (before this lawsuit was filed), and she signed a sworn declaration to that effect which she filed in the California federal action that preceded this case. SOF Ex. 14. Because Mrs. Baillie thus manifested her belief in Baillie's statements to her, they are not hearsay when offered against her. *See* F.R.E. 801(c)(2)(B). Plaintiff's expert, Dr. Candipan, also believes that Baillie's chest pain began as he was rushing to board the plane; that is what Baillie told Dr. Candipan when he was being treated at St. Luke's, and Dr. Candipan memorialized that in Baillie's medical records. SOF Ex. 13, ¶9.

10

**23:00:** This is the time that Baillie's artery would have likely been opened had the plane landed at 21:00, thus about six hours after the beginning of his chest pain (using the Response's view of when the chest pain began). *Id.*

> 2. *Once a coronary artery has been blocked for six hours, most of the heart muscle has been lost, and there is only a "small" benefit to restoring blood flow.*

When someone suffers a heart attack like Mr. Baillie's, there is "a cessation of blood flow to heart muscle," and the heart muscle begins to die. SOF 7. To save the victim, blood flow must be quickly restored to the heart (called "reperfusion"), preferably within 60 minutes, according to Dr. Candipan. SOF Ex. 13 at ¶12 (Candipan Decl.). Most damage to the heart muscle occurs in the first hours after symptom onset. SOF 9.[11]

Dr. Candipan admitted that the benefits of reducing the time to reperfusion from twelve hours to six hours are "small." SOF Ex. 35 at 115:15-19 (07/27/16 Candipan Dep). That explains why he could not opine that Mr. Baillie would have likely survived if he had not received reperfusion until six or more hours after symptom onset. But Dr. Candipan could—and did—opine that, "Had Mr. Baillie received treatment within an hour or two after the onset of his chest pain, the extensive damage to his heart caused by his heart attack would likely have been avoided." SOF Ex. 13, ¶12 (Candipan Decl.). In other words, if Baillie had received treatment before MedAire *had even been notified*, he would have survived. But beyond that, Dr. Candipan cannot give a causation opinion.

## CONCLUSION

For all the above reasons and those cited in our Motion, and because Plaintiff has failed to meet her burden to prove either that an "accident" occurred, or that any such accident "caused" Mr. Baillie's death, the Court should grant summary judgment in favor of all Defendants.

---

[11] PCSOF ¶9 at 9 objects to a chart attached to Dr. Budoff's Expert Report, but does not dispute that most damage to the heart muscle occurs in the first hours after symptom onset. In any event, Plaintiff's objection is not well taken. Under FRE Rule 803(18), statements in a learned treatise or periodical are exceptions to the hearsay rule when supported by an expert's testimony.

Case 2:14-cv-00420-SMM   Document 95   Filed 11/21/16   Page 12 of 13

RESPECTFULLY submitted this 21st day of November, 2016.

GALLAGHER & KENNEDY, P.A.

By: /s/ *Mark C. Dangerfield*
Mark C. Dangerfield
Wm. Charles Thomson
2575 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Attorneys for Defendants MedAire, Inc.;
Steven Joe Reinhart, D.O.; and Jessica
Monas, M.D.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of November, 2016, a copy of the foregoing document was filed electronically via the Court's CM/ECF system and Notice of Electronic Filing served on all parties by operation of the Court's CM/ECF system.

Stephen M. Dichter, Esq.
Jeffrey O. Hutchins, Esq.
Christian Dichter & Sluga, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, AZ 85004
    sdichter@cdslawfirm.com
    jhutchins@cdslawfirm.com
*Attorneys for Plaintiff*

Francis G. Fleming, Esq.
Robert J. Spragg, Esq.
Kreindler & Kreindler LLP
750 Third Avenue
New York, NY 10017
    ffleming@kreindler.com
    rspragg@kreindler.com
*Attorneys for Plaintiff*

By: */s/ Mark C. Dangerfield*