# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Linda Ann Baillie,<br><br>        Plaintiff,<br><br>v.<br><br>Medaire Incorporated, et al.,<br><br>        Defendants. | No. CV-14-00420-PHX-SMM<br><br>**ORDER** |

Pending before the Court is Defendants MedAire, Inc. ("MedAire"), Steven Reinhart ("Dr. Reinhart"), and Jessica Monas' ("Dr. Monas") (collectively, "Defendants") motion for summary judgment. (Doc. 85.) Defendants filed their statement of facts in support of their motion. (Doc. 86.) Plaintiff Linda Baillie ("Plaintiff") filed a response in opposition to Defendants' motion and a controverting statement of facts and separate statement of facts in support of her response. (Docs. 90, 91.) Defendants filed a reply in support of their motion. (Doc. 95.)

The Court now issues the following ruling.[1]

//
//
//

---

[1] The parties' request for oral argument is denied because the parties have had an adequate opportunity to present their written arguments, and oral argument will not aid the Court's decision. See Lake at Las Vegas Investors Grp., Inc. v. Pac Malibu Dev., 933 F.2d, 724, 729 (9th Cir. 1991).

## I.     BACKGROUND[2]

Plaintiff Linda Ann Baillie is the widow of James Donald Baillie, II, and the personal representative of his estate. On March 23, 2012, Mr. Baillie was a passenger on British Airways Flight 289 ("BA 289") from London to Phoenix. (Doc. 86 at ¶¶ 1, 25.)

Approximately three hours after BA 289 took off, the pilot contacted Defendant MedAire to seek medical advice and consultation for Mr. Baillie. (Id. at ¶ 28.) The pilot told the MedAire operator that BA 289 had a 61 year old male onboard who was experiencing pain in the central chest, felt hot, and was pale. (Doc. 86-1 at 170.)

MedAire, through its "MedLink" service, provides medical advice to commercial airlines in the event of an in-flight medical emergency. (Doc. 86 at ¶ 12.) MedAire employs physicians who, based upon the information provided to them, assess the medical situation from afar. (Id. at ¶ 13.) The MedLink physician then makes recommendations to the flight crew regarding care of the ill traveler and possible flight diversions. (Id. at ¶¶ 12-13, 18.) Although MedAire provides its physicians with a Diversion Justification Checklist ("Checklist") and a document entitled "Physician Pearls for Remote Medical Care" ("Pearls"), physicians use their clinical judgment in deciding whether to recommend diversion. (Id. at ¶¶ 20-21.) Ultimately, however, the pilot decides whether to divert the aircraft to an unscheduled airport. (Id. at ¶ 18.) If the physician recommends diversion and the pilot agrees that a diversion is warranted, MedLink "will talk with the pilot and Airline Operations to identify the most appropriate diversion destination." (Doc. 91-4 at 32.) MedLink will then look at the possible diversion points to assess the "appropriateness of the medical facilities." (Id.) It is clear that not every diversion point is equipped to respond to the medical crisis on board, or within a reasonable radius of a medical facility so equipped. (Id.)

When BA 289 first contacted MedLink, Defendant Dr. Reinhart was the doctor on duty. (Doc. 86 at ¶ 29.) Upon hearing Mr. Baillie's symptoms, Dr. Reinhart asked if Mr.

---

[2] Unless otherwise noted, the facts are not in dispute. When detailing the content of the communications between BA 289 and Defendants, the Court (at times) refers to the actual transcript of the communications, Doc. 86-1 at 170-175.

Baillie had any cardiac history, to which he received a negative response. (Doc. 86-1 at 170.) The flight crew told Dr. Reinhart that Mr. Baillie had no medications with him and that he had taken an aspirin a few hours prior. (Id.) Dr. Reinhart then instructed the crewmembers to attempt to find a physician on board, which they were able to do. (Doc. 86 at ¶ 32.) The onboard physician[3] examined Mr. Baillie and the pilot called MedLink for the second time to relay the examination results to Dr. Reinhart. (Id. at ¶ 33.) Based on the information provided to him, Dr. Reinhart recommended that Mr. Baillie remain on supplemental oxygen and that the onboard physician continue to monitor Mr. Baillie every 15-30 minutes. (Doc. 86-1 at 171-72.) Dr. Reinhart did not recommend a flight diversion; rather, he instructed the flight crew to call back if Mr. Baillie's condition deteriorated, at which point they would consider diversion. (Id.)

Approximately three hours later, the pilot called MedLink for a third time. (Doc. 86 at ¶ 40.) At this point, Dr. Reinhart had gone off-shift, and the doctor on duty was Defendant Dr. Monas. (Id.) Dr. Monas was told by the pilot that Mr. Baillie's vitals were about the same, but the onboard doctor felt that Mr. Baillie looked considerably worse, and that they might want to consider making a diversion. (Id.) Dr. Monas' recommendation was to continue Mr. Baillie on the supplemental oxygen and to administer nitroglycerin, and to report Mr. Baillie's condition once administered. (Doc. 86-1 at 172-73.)

Shortly thereafter, the BA 289 pilot called MedLink to tell Dr. Monas that the onboard physician was "not happy at all" with Dr. Monas's recommendation to administer nitroglycerine. (Id. at 173.) When Dr. Monas asked to speak directly to the onboard physician, the pilot denied her request, citing security procedures. (Id. at 174.)[4]

---

[3] In November 2014, Plaintiff and Defendants British Airways and Ratan K. Verma, M.D. entered into a good-faith settlement agreement as to all claims between them. (Doc. 36.) This Court approved the settlement, and dismissed with prejudice British Airways and Dr. Verma from the case, in December 2014. (Doc. 42.)

[4] The MedLink operator, Dr. Reinhart, and Dr. Monas communicated exclusively with the flight crew and the pilot; they never spoke directly with the onboard physician or Mr. Baillie. (See Doc. 86-1 at 170-175.) Indeed, as mentioned *supra*, when Dr. Monas asked to speak directly to the onboard physician, the pilot denied her request, citing

In the end, exercising her clinical discretion, Dr. Monas deferred to the judgment of the onboard physician and the flight crew, and said that MedLink would begin to look into diversion locations should the flight crew ultimately decide that diversion was warranted. (Id.)

When BA 289 landed at Sky Harbor Airport in Phoenix, paramedics took Mr. Baillie to the Emergency Department at St. Luke's Medical Center. (Doc. 86 at ¶ 46.) An EKG done on the way to St. Luke's showed that Mr. Baillie had ST elevations consistent with an ST elevation myocardial infarction, or STEMI. (Id.) After a balloon angioplasty and the insertion of three stents, Mr. Baillie was transferred to the Mayo Clinic, where surgeons installed an artificial heart. (Id. at ¶¶ 52-54.) Shortly after the surgery, on July 1, 2012, Mr. Baillie died. (Id. at ¶¶ 54-55.)

## II.   LEGAL STANDARD

### Summary Judgment

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a). A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, show "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually

---

security procedures. (Id. at 174.)

unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323. The party opposing summary judgment may not rest upon the mere allegations or denials of the party's pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. Anderson, 477 U.S. at 247-48.

### III.  DISCUSSION

Defendants argue that they are entitled to summary judgment on Plaintiff's claims under the Montreal Convention. (Doc. 85.) Plaintiff argues that genuine issues of material fact exist and preclude summary judgment. (Doc. 90.)

### The Montreal Convention[5]

The Montreal Convention governs "all international carriage of persons, baggage or cargo performed by aircraft for reward," and provides the exclusive remedy for international passengers seeking damages against airline carriers. Narayanan v. British Airways, 747 F.3d 1125, 1126 (9th Cir. 2014) (quoting the Convention for the Unification of Certain Rules for International Carrier by Air, Art. 1(1), May 28, 1999, S. Treaty Doc. No. 106-45, 1999 WL 33292734). Article 17(1) of the Montreal Convention provides that "the carrier is liable for damage sustained in case of death or bodily injury

---

[5] As will be more fully discussed in this Order, the Montreal Convention sets forth the terms and conditions for lawsuits involving air carriers and their international passengers. Lawsuits brought pursuant to the Montreal Convention are not evaluated under negligence or strict liability standards, thus, any reliance on such standards is misplaced.

of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, Art. 17(1). Thus, to establish liability under Article 17, a passenger must prove: (1) there has been an "accident"; (2) that caused the passenger's injury; and (3) that the accident occurred while on board the aircraft or in the course of embarking or disembarking the aircraft. See Eastern Airlines v. Floyd, 499 U.S. 530, 535-36 (1991). In this case, elements (1) and (2) are in dispute. Defendants argue that on the undisputed facts, Plaintiff cannot prove that there was an "accident" on board the plane or that the alleged accident "caused" Mr. Baillie's death. (Doc. 85 at 3.) The parties agree that MedAire and its contracting physicians are included within the Montreal Convention's definition of "carrier." (Docs. 65, 69, 73.)

Whether Plaintiff Suffered an "Accident"

"Accident" under the Montreal Convention is defined as "an unexpected or unusual event or happening that is external to the passenger." Air France v. Saks, 470 U.S. 392, 405 (1985). The definition "should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries," but, when the injury "indisputably results from the passenger's own internal reaction to the usual, normal, or expected operation of the aircraft, it has not been caused by an accident, and Article 17…cannot apply." Id. at 405-06. Article 17 "involves an inquiry into the nature of the event which caused the injury rather than the care taken by the airline to avert the injury." Id. at 407; accord Olympic Airways v. Husain, 540 U.S. 644, 657 (2004) (finding that a negligence-based "accident" standard under Article 17 is improper); Aziz v. Air India Ltd., 658 F.Supp.2d 1144, 1148 (C.D. Cal. 2009) (explaining that under the "accident" inquiry, "[q]uestions of negligence are not implicated or even relevant"). The Saks Court did not suggest that only one event can constitute the "accident"; rather, "[a]ny injury is the product of a chain of causes" and a passenger need only be able to prove that "some link in the chain was an unusual or unexpected event external to the passenger." Husain, 540 U.S. at 652 (quoting Saks, 470 U.S. at 406).

An "event" can take the form of "inaction." See Husain, 540 U.S. at 654-55 ("The distinction between action and inaction…would perhaps be relevant were this a tort law negligence case.") In Husain, an airline was held liable for a passenger's fatal asthma attack onboard a flight after the flight attendant repeatedly refused the passenger's wife's requests to move him away from the plane's smoking section, despite being told that the passenger had an allergy to cigarette smoke. Id. at 646-47, 657. Even though the flight attendant's conduct amounted to inaction, the Court concluded that the conduct constituted an "event" because "[t]he rejection of an explicit request for assistance would be an 'event' or 'happening' under the ordinary and usual definitions of these terms." Id. at 654-655. Whether the event was "unexpected or unusual," the Court did not determine. Id. at 653.

The Ninth Circuit has set parameters for when inaction may amount to an "accident" – in other words, when inaction may be deemed an "unexpected or unusual event." In Rodriguez v. Ansett Australia Ltd., 383 F.3d 914 (9th Cir. 2004), a passenger alleged that the airline's failure to warn of the risk of deep vein thrombosis ("DVT") constituted an "accident." Rodriguez, 383 F.3d at 915-916. The Ninth Circuit found that the passenger's failure to submit any evidence "as to whether there was a clear industry standard or an airline policy at the time regarding DVT warnings" was fatal to her claim. Id. at 918-919.

Later, in Caman v. Continental Airlines, 455 F.3d 1087, 1089 (9th Cir. 2006), a passenger again alleged that the airline's failure to warn of the risk of DVT constituted an "accident." The Ninth Circuit again held that the passenger could not establish that his DVT was the result of an "accident" because he could not show that it resulted from an "unexpected or unusual event." Caman, 455 F.3d at 1092. The Court thus held that the airline's failure to warn was not an "event" as the term was discussed in Saks and Husain; rather, the failure to warn was "an act of *omission* (inaction that idly allows an unfolding series of events to reach their natural conclusion) as opposed to an act of *commission* (inaction that produces an effect, result or consequence)." Id.

Then, in Twardowski v. American Airlines, 535 F.3d 952, 960 (9th Cir. 2008), passengers alleged that the airlines' failure to warn of the risk of DVT was "unexpected or unusual" because various public agencies had suggested that airlines warn of the risk of DVT. The Court rejected the passengers' argument, explaining that a failure to warn does not become an accident "simply because public agencies have recommended, or 'requested' warnings." Id. Since the passengers "present[ed] no substantial evidence of an industry standard with respect to warning about the risks of DVT," the Court did not decide whether the failure to warn was "unusual or unexpected." Id. at 961.

With this backdrop, the Court now turns to the pending motion.

Defendants move for summary judgment on the grounds that there was no "event" and there is no evidence of any "unexpected or unusual conduct." (Doc. 85 at 11-14.) Specifically, Defendants argue that the failure to recommend a flight diversion was not an "event" because it was not a rejection of a specific request for help or a failure to follow a regulatory requirement (Doc. 85 at 10-11, citing Aziz, 658 F. Supp. 2d at 1149-50), and there is no evidence of any "unexpected or unusual conduct" because Plaintiff's medical expert is not qualified to offer opinions on when an alleged failure to recommend that an aircraft divert is "unexpected or unusual," Plaintiff offers no evidence of any governing standard, and there is no governing standard applicable to this case (Doc. 85 at 12-14).

In response, Plaintiff contends a "*per se* rule requiring a regulatory violation would be improper" (citing Phifer v. Icelandair, 652 F.3d 1222, 1224 (9th Cir. 2011)), and further contends that Defendants "failed to perform the professional services they were obligated to provide under the terms of [the British Airways-MedAire Service Agreement]" and that they "failed to follow" MedAire's Pearls. (Doc. 90 at 15.)[6]

---

[6] In her argument section, Plaintiff fails to cite to the specific provisions of the Service Agreement or the Pearls to which she refers; only by referring back to Plaintiff's factual summary section (Doc. 90 at 3) was the Court able to find the specific provisions to which she refers.

In fact, nowhere in the argument section (Doc. 90 at 9-18) does Plaintiff cite to the specific paragraphs in her Controverting Statement of Facts which support her assertions, in violation of LRCiv 56.1(e) ("Memoranda of law…in opposition to a motion for summary judgment…must include citations to the specific paragraph in the statement of facts *that supports assertions made in the memoranda* regarding any material fact on which the party relies …in opposition to the motion.") (emphasis added).

- 8 -

Plaintiff's contention seems to be that Defendants violated MedAire internal policies and procedures (namely, the Service Agreement and the Pearls) when they failed to recommend diversion, and that this was the "unusual or unexpected" conduct in this case.[7] Id.

The Court rejects Plaintiff's argument; Plaintiff cannot show that Defendants' conduct was "unusual or unexpected."

First, the undisputed facts show that Defendants performed the professional services they were obligated to perform under the Service Agreement. Under the Service Agreement, MedLink "shall provide…medical emergency advisory services of an emergency physician if MedLink is notified of an inflight medical emergency." (Doc. 91-4 at 31.) The Service Agreement further provides that MedLink physicians are to "assess[] the medical situation" and then "make medical recommendations," and, "[i]f the medical situation is serious enough to warrant a diversion," the MedLink physician "will make that recommendation to the pilot." (Id. at 32.) The Service Agreement also requires that MedAire physicians "provide and perform" services "to the highest professional standard using the techniques and standards applying the care, skill and diligence required in accordance with best practice in the service provider's industry, profession or trade." (Id. at 18.)

Here, Drs. Reinhart and Monas provided medical emergency advisory services when they responded to the in-flight emergency medical situation of Mr. Baillie. (Doc. 86-1 at 170-75.) They worked with the flight crew and the onboard physician to assess Mr. Baillie's medical situation. Id. And, they used their clinical judgment in making medical recommendations to the flight crew for Mr. Baillie. Id. Although the Service Agreement requires that MedAire physicians "provide and perform" its services "to the highest professional standard…", for the Court to inquire into the reasonableness of Drs. Reinhart and Monas' medical emergency advisory services would be an improper

---

[7] It is an undisputed fact that there are no industry standards that apply to MedAire's inflight medical emergency advisory services. (Doc. 86 at ¶19.)

- 9 -

negligence inquiry. See Olympic Airways v. Husain, 540 U.S. 644, 657 (2004) (holding that a negligence-based "accident" standard under Article 17 is improper). For these reasons, the Court finds that Defendants did not fail to perform the professional services they were obligated to provide under the Service Agreement as to constitute "unexpected or unusual conduct."

Second, Defendants alleged violation of the Pearls is not evidence of "unexpected or unusual" conduct because the Pearls are advisory. See Twardowski, 535 F.3d at 960 (rejecting the argument that a failure to warn is an accident "simply because public agencies have recommended, or 'requested' warnings"). Indeed, the name of the document itself suggests the advisory nature of the document: "Reference Material – MedLink Physician Pearls for Remote Medical Care." (Doc. 91-7 at 13.) But more importantly, the content of the document shows that it is advisory. For example, under the subheading "Customer Service Tips" the Pearls affirm that "the decision to divert is the pilot's" and "MedLink physician is in an advisory role – medical advisory to the pilot." (Id. at 14.) In addition, under the subheading "Chest Pain" the Pearls provide "[i]f the passenger[']s pain can be relieved with the resources onboard (oxygen, nitrates, morphine, etc[.]) position is stronger for continuing the flight rather than diverting" but also provide that when "chest pain is ongoing for more than 20 minutes and the chest pain and shortness of breath cannot be relieved with onboard resources – this is a strong case for diverting (potential coronary syndrome)." (Id. at 22.) Plaintiff herself describes the aforementioned provision as "guidance." (Doc. 91 at ¶ 22.) The Pearls also provide, under the subheading "Diversion," various "*considerations* for diversion," such as time, expenses, flight crew rest issues, disruption of flight schedule, etc. (Doc. 91-7 at 30 (emphasis added).) "Diversions," the Pearls state, "should only be done when *medically necessary*." (Id. (emphasis added).) Finally, the subheading also includes a series of questions to help the physician assess whether a diversion may be warranted. (Id. at 30-31.) These provisions affirm the undisputed fact that physicians use their clinical judgment in deciding whether a diversion is warranted.

In sum, Defendants' alleged failure to recommend diversion does not become an "accident" simply because the Pearls provide guidance and general considerations on diversion. Moreover, as stated *supra*, it is undisputed that MedAire's physicians are allowed to use their clinical judgment in recommending diversion. And, similar to the Court's conclusion *supra*, to inquire into the reasonableness of Drs. Reinhart or Monas' conduct under the Pearls would devolve into an improper negligence inquiry.

## IV. CONCLUSION

In essence, Plaintiffs seek to impose a negligence standard against Defendants under the Montreal Convention, which the Courts have clearly rejected. As Defendants correctly state: "Plaintiff's basic criticism is that the MedLink physicians provided conflicting, inadequate and medically improper advice to the BA 289 flight crew. But as the Supreme Court first made clear in Husain, the correct analysis under the Convention is not a negligence-based approach, but whether conduct was unexpected and unusual." (Doc. 95 at 3 (internal quotations and citations omitted).)

Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Plaintiff cannot establish that Defendants' response to Mr. Baillie's condition was "unexpected or unusual," as is her burden. Accordingly, Plaintiff cannot establish that Mr. Baillie's death was the result of an "accident" and therefore cannot hold MedAire, Dr. Reinhart, or Dr. Monas liable under the Montreal Convention. Summary judgment is therefore appropriate against Plaintiff.

Accordingly,

**IT IS HEREBY ORDERED** granting Defendants' motion for summary

//
//
//
//

judgment. (Doc. 85.) The Clerk of Court shall enter judgment in favor of Defendants and terminate this case.

Dated this 14th day of September, 2017.

_____
Honorable Stephen M. McNamee
Senior United States District Judge