1  Mark C. Dangerfield (Bar No. 010832)
   Wm. Charles Thomson (Bar No. 004269)
2  GALLAGHER & KENNEDY, P.A.
   2575 East Camelback Road
3  Phoenix, Arizona  85016-9225
   Telephone:    (602) 530-8000
4  Facsimile:    (602) 530-8500
   E-mails:  mark.dangerfield@gknet.com
5            wct@gknet.com
   Attorneys for Defendants MedAire, Inc., Steven
6  Joe Reinhart, D.O., and Jessica Monas, M.D.

7

                  UNITED STATES DISTRICT COURT
8
                       DISTRICT OF ARIZONA
9

10  Linda Ann Baillie, individually, as        No. 2:14-cv-00420-PHX-SMM
    Personal Representative of the Estate of
11  James Donald Bailliee, II, and on behalf of
    all heirs and next of kin of James Donald
12  Baillie, II, deceased,                      **DEFENDANTS' RESPONSE TO
                                                PLAINTIFF'S MOTION TO
13                    Plaintiff,                 MODIFY THE SCHEDULING
                                                ORDER FOR THE LIMITED
14        vs.                                    PURPOSE OF DESIGNATING AN
                                                ADDITIONAL EXPERT WITNESS**
15  MedAire, Inc.; Steven Joe Reinhart, D.O.;
    and Jessica Monas, M.D.,
16
                      Defendants.
17

18        Defendants MedAire and Drs. Reinhart and Monas oppose Plaintiff's belated motion

19  to engage a new expert witness.

20        Having made the strategic decision to hire a cardiologist, Dr. Candipan, to criticize

21  Defendants' actions in this case, Plaintiff now apparently regrets that decision – three years

22  later and long after the close of discovery. So Plaintiff wants to reopen discovery to add an

23  *emergency medicine* physician as an additional expert. Plaintiff claims to have "good cause"

24  for doing so because she only realized the need for such an expert upon reading the

25  dissenting judge's view in the recent Ninth Circuit Court of Appeals memorandum decision.

26        But few things could be more self-evident in this case than the value of having an

27  expert in emergency medicine to critique the actions of the two Defendant doctors, both of

28  whom are board-certified in emergency medicine. And when a party "could and should

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1    have foreseen the necessity of identifying an appropriate expert witness," a court will deny

2    a motion to reopen discovery to belatedly add such a witness. *Bleek v. Supervalue, Inc.,* 95

3    F. Supp. 2d 1118, 1120-21 (D. Mont. 2000). Here, Plaintiff well understood the need for a

4    medical expert, but – for reasons that are unclear – she opted to engage a cardiologist.

5    Indeed, she engaged Dr. Candipan, a cardiologist who admits he is neither an expert in

6    emergency medicine nor in giving remote medical advice to airlines.

7        Yet as discussed below, in the course of discovery Plaintiff reached several junctures

8    where her counsel (1) were put on notice of shortcomings in Dr. Candipan's opinions, (2)

9    had a chance to move for an additional expert witness, and (3) elected not to do so,

10   presumably for strategic reasons. Instead, at each such juncture, Plaintiff made a decision

11   to stay the course and stick with only Dr. Candipan. Plaintiff's established pattern in that

12   regard belies her current argument that she now has "good cause" to modify the scheduling

13   order.

14       "Diligence" is a critical requirement to show "good cause" to modify a discovery

15   schedule. Though a court may consider several factors, diligence is paramount: "If the

16   party seeking the modification was not diligent, the inquiry should end and the motion to

17   modify should not be granted." *Zivkovic v. Southern California Edison Co.,* 302 F.3d 1080,

18   1087 (9th Cir., 2002) (citation and internal quotation marks omitted).

19       Plaintiff claims to have been diligent because she moved for a new expert after the

20   Ninth Circuit remanded the case for trial. Per Plaintiff, it was only then that she realized a

21   new expert was needed because of the dissenting view of Judge Ikuta from the Ninth Circuit

22   panel's decision in the case – even though Plaintiff says she "strongly disagrees with" Judge

23   Ikuta's view.

24       Judge Ikuta simply said that, even if "mere negligence" were the standard – and

25   Judge Ikuta didn't think it was – Plaintiff "offers no evidence of such negligence here…."

26   3/20/19 9th Cir. Mem. Decision; Ikuta, J. Dissent at 2 (Dkt. 40-2).  Rather, Plaintiff only

27   offered evidence "regarding the standard of care expected from a cardiologist treating a

28   patient on the scene," and "fail[ed] to show how this standard is relevant to a remote medical

2

1    advisor making a recommendation to a pilot based on limited data." *Id.*

2         Taken at face value, Plaintiff's stated reason for needing a new expert makes little

3    sense: this case will not be tried to Judge Ikuta or to a panel of Ninth Circuit judges, and

4    even if were to be, Plaintiff thinks Judge Ikuta is wrong. Moreover, Judge Ikuta's comment

5    only mirrored the message Defendants had several times conveyed to Plaintiff about Dr.

6    Candipan.

7         To decide Plaintiff's motion, the Court need only ask if, at any time prior to the Ninth

8    Circuit Memorandum Decision, Plaintiff was reasonably on notice of the relevance or value

9    of obtaining an expert trained in emergency medicine.  Similarly, the Court should ask if,

10   at any time prior to the Ninth Circuit Decision, Plaintiff was reasonably on notice of the

11   relevance or value of obtaining as a medical expert – in addition to a cardiologist who treats

12   patients "on the scene" – an expert experienced in providing remote medical advice to

13   airlines. We believe the answer to these questions are self-evident, but we discuss them in

14   further detail below.

15        Plaintiff has known since the inception of this case that MedAire used ground-based

16   physicians trained in emergency medicine to provide remote medical advice to airline pilots

17   regarding ill passengers whom the MedAire physicians had no contact with. It is simply not

18   credible to suggest that, prior to reading Judge Ikuta's comments, Plaintiff could not

19   reasonably have foreseen the value of engaging an expert with that expertise.

20   I.   **At many junctures in this case Plaintiff learned that Dr. Candipan's medical**
21        **background and training diverged greatly from the Defendant doctors, but**
         **Plaintiff nonetheless chose – and stuck with – Dr. Candipan as her sole**
22        **medical expert.**

23        A.   **Juncture 1: The April 26, 2014 Joint Case Management Report disclosed**
                **that MedAire uses emergency room doctors to provide remote advice to**
24              **airlines.**

25        In the parties' April 16, 2014 Joint Case Management Report (Dkt. 28) – filed five

26   years ago – Defendants MedAire and Drs. Reinhart and Monas described MedAire's

27   services as follows (at p. 11): "MedAire provides remote medical advice to airlines with

28   sick or injured passengers on board. MedAire contracts with *emergency room doctors* to

provide this advice." Copy attached as **Exhibit 1** (emphasis added)**.** The Report goes on to say that Drs. Reinhart and Monas provided advice to British Airways ("BA")  Flight 289 regarding Mr. Baillie, based on information the pilot and cabin crew provided to the doctors, but the MedAire physicians "*never had the chance to see or speak with Mr. Baillie*, nor were they able to speak with the on-board doctors who directly observed and evaluated Mr. Baillie." *Id.* (emphasis added)

That succinct description, given five years ago, told Plaintiff all she needed to know to decide what type of medical expert to retain.

> **B.     Juncture 2: At the May 16, 2014 deposition of Defendant Dr. Reinhart, Plaintiff learned that all physicians providing remote medical advice for MedAire are emergency medicine physicians; none are cardiologists.**

On May 16, 2014, Plaintiff's counsel deposed Dr. Reinhart (for the first of what would ultimately be three different sessions). In that early deposition, Plaintiff learned that Dr. Reinhart has been in the full-time practice of emergency medicine since 1984 Reinhart dep. at 7:10-13, and has been a board-certified emergency physician since 1986. *See* deposition excerpts attached as **Exhibit 2** and p. 6 of CV marked as deposition exhibit 1, attached here as **Exhibit 3.**

Plaintiff also learned that Dr. Reinhart was actually employed by Emergency Professional Services ("EPS"), and that EPS in turn contracted with MedAire to provide emergency physicians to give remote medical advice to airlines on how to deal with ill passengers. Ex. 2 at 11:3-22. Plaintiff's counsel specifically asked whether the MedAire contract with EPS required the physicians who give the remote medical advice "to be board-certified in some specialty," to which Dr. Reinhart responded: "Board-certified or board-eligible in emergency medicine." *Id.* at 13:20-14:1.Then the following exchange took place:

> Q. (by Attorney Fleming): Okay. It's limited to emergency medicine by way of specialty?
>
> A. (by Dr. Reinhart): It is.
>
> Q. *So you have no cardiologists in this group?*
>
> A. Correct.

4

*Id.* at 14:3-7 (emphasis added).

    **C.**    **Juncture 3: From the April 14, 2015 updated Joint Case Management Report, Plaintiff learned that the cause of chest pain is difficult to diagnose, particularly for a passenger on an aircraft that lacks medical equipment needed to diagnose a heart attack, such as the 747 involved in BA Flight 289.**

About one year after Plaintiff first deposed Dr. Candipan – on April 14, 2015 – the parties filed an updated Joint Case Management Report, after Plaintiff had settled with British Airways and filed a First Amended Complaint. *See* excerpts at **Exhibit 4.** That Report (at 7-8) again stated that MedAire "contracts with emergency room doctors to provide remote medical advice once a plane is airborne." The 4/14/15 Report also noted that:

- Defendant Dr. Reinhart had "30 years of experience in emergency medicine";
- "The cause of chest pain is very difficult to diagnose, even in an emergency room stocked with all the appropriate medical equipment and devices";
- "[I]n contrast to an emergency room, almost all aircraft, including the British Airways Boeing 747-400 used in Flight 289, lack the medical equipment needed to confirm or rule out a heart attack diagnosis, such as an EKG machine."

    **D.**    **Juncture 4: On February 4, 2016, despite knowing all the above, Plaintiff disclosed Dr. Candipan, a cardiologist, as her sole medical expert.**

Despite Plaintiff's knowledge that the MedAire doctors were trained in emergency medicine, not cardiology, and were experienced in providing remote advice to airlines about ill passengers they couldn't see or talk to, on February 4, 2016, Plaintiff disclosed Dr. Candipan, a cardiologist, as her standard of care expert. *See* excerpts of his report at **Exhibit 5**. The choice of Dr. Candipan was not because Plaintiff or Dr. Candipan somehow missed the fact that the Defendant doctors were not cardiologists. Indeed, Dr. Candipan's 2/4/16 expert report noted that Drs. Reinhart and Monas were both "trained Emergency Medicine specialists.…" *Id.* at 6. Nevertheless, Dr. Candipan's report opined (at 6) that Drs. Reinhart and Monas had acted in ways that were not in line with what would be considered "standard

and usual practice," and further opined (at 7) that the two physicians "failed to adequately and appropriately respond to Mr. Baillie's life threatening condition."

One wonders *why* Plaintiff would choose as her medical expert a cardiologist who treated patients on the scene, when the Defendant doctors were not cardiologists but rather emergency medicine specialists who provided remote medical advice to airlines in flight. We can only speculate, of course, but there are some possible strategic reasons Plaintiff may have done so. First, when BA Flight 289 landed in Phoenix on March 23, 2012, Mr. Baillie was rushed to St. Luke's Hospital, were he was treated by Dr. Candipan. As the decedent's treating physician, Dr. Candipan thus had some direct involvement in the actual underlying facts. Second, Plaintiff may have felt that, as a cardiologist, Dr. Candipan was simply more knowledgeable about Mr. Baillie's cardiac issues. And third, Plaintiff may have thought that MedAire *should have* involved a cardiologist when there was a potential cardiac issue.

Of course this is all speculation. One thing is clear, though: despite knowing that the Defendant doctors were emergency physicians providing remote advice to airlines, Plaintiff made a conscious strategic decision to choose a cardiologist as her sole medical expert.

**E.     Juncture 5: On May 27, 2016, Defendants disclosed as their medical experts both a cardiologist and an emergency medicine physician with experience in providing remote medical advice to airlines in flight.**

On May 27, 2016, Plaintiff arrived at the next critical juncture, when the Defendants disclosed the opinions of their own expert witnesses. Defendants' experts included both a cardiologist (Dr. Budoff) *and* an emergency medicine physician, Dr. Roth, who also had many years of experience providing remote medical advice to airlines. Among other things, Dr. Roth opined that "[g]iving remote advice to the pilot or crew of an airline about an ill or injured passenger" was "very different than treating a patient in an emergency department." *See* **Exhibit 6** (excerpts from 5/27/16 expert report of Dr. Roth).

Given the facts noted above, it's inconceivable that the Defendants' disclosure of both a cardiologist and a specialist in emergency medicine and remote advice to airlines would not have prompted some serious thought and discussion among Plaintiff's counsel.

1    But Plaintiff nonetheless chose to stay with just Dr. Candipan; she did not retain or seek to

2    retain an additional expert – even though the discovery order in place at the time expressly

3    permitted rebuttal expert reports. Under that order, after receiving the expert disclosures of

4    the other party, each party had until June 24 to present "rebuttal expert disclosures." *See*

5    10/22/15 Order (Dkt. 64), as modified by 2/29/16 Order (Dkt. 79).[1]

6            Had she wanted, therefore, Plaintiff could have engaged an emergency physician at

7    that time – without the need for Court approval – and at a minimum presented rebuttal

8    expert testimony in opposition to Dr. Roth's opinions. But Plaintiff chose not to. Instead,

9    Plaintiff again stuck with Dr. Candipan, and had him present a rebuttal report as to Dr.

10   Roth's opinions.

11           **F.      Juncture 6: On June 24, 2016, after learning that Defendants' expert Dr.**
                      **Roth had specifically criticized Dr. Candipan as lacking the background**
12                    **and training needed to opine on the medical issues involved, Plaintiff**
                      **again chose to stick with Dr. Candipan.**
13
14           On June 24, 2016, Dr. Roth issued a rebuttal expert report addressing some of the

15   opinions of Plaintiff's experts, including Dr. Candipan. *See* excerpts attached as **Exhibit 7.**

16   In that rebuttal report, Dr. Roth stated that:

17                    It is also my opinion that Dr. Candipan—*as a cardiologist who is*
                      *neither trained in emergency medicine* nor, according to his CV, *has*
18                    *any background in the provision of remote medical advice to*
                      *aircraft*—lacks the necessary background and experience to know
19                    what the "procedures and protocol" are in those fields, and is therefore
                      not qualified to give opinions in that area.

20   **Exhibit 7** at 5-6 (6/24/16 Dr. Roth Rebuttal Report at 5-6) (emphasis added).

21           **G.      Juncture 7: On July 27, 2016, Defendants deposed Dr. Candipan, and he**
                      **frankly admitted his lack of expertise in emergency medicine and**
22                    **providing remote medical advice to airlines.**

23           On July 27, 2016, Defendants' counsel deposed Dr. Candipan. The questions counsel

24   posed made clear Defendants' view that Dr. Candipan was not qualified to give opinions

25   regarding the actions of Drs.  Reinhart and Monas. Under questioning from Defendants'

26   _____
     [1] Notably, as various discovery complications arose, the Court's initial 4/16/15 scheduling
27   order (Dkt. 51) was modified three times during the case, each time by stipulation of the
     parties and the issuance of a new order by the Court. *See* Dkts. 64, 80 and 82. Thus, Plaintiff
28   was quite familiar with the process for modifying the scheduling order.

counsel, for example, Dr. Candipan admitted that he was not an expert either in emergency medicine or in providing remote advice to airlines. *See* **Exhibit 8** (7/27/16 Candipan dep. at 12:1-22. Questions posed to and answers from Dr. Candipan included the following:

> Q.     Well, can we agree that you have no background or basis for assessing what typically happens when an emergency physician gives remote medical advice to an airline?
>
> A. (By Dr. Candipan): I have no experience.
>
> Q.     Okay. So to put it plainly, you don't – you can't say what typically happens when a MedLink physician gives remote medical advice to an airline, correct?
>
> A.     No, I do not—or cannot.
>
> Q.     So when you say "unusual or unexpected," you're not talking about what's unusual or unexpected in terms of a physician giving remote medical advice to an airline, correct?
>
> Q.     Because you have no experience in that?
>
> A.     Correct.

*Id.* at 23:10-24:4 (omitting objections by counsel).

Under the Court's discovery order, discovery closed on August 19, 2016.  And as shown above, before discovery closed Plaintiff knew at least the following:

- The physicians whose actions were at issue in this case, Drs. Reinhart and Monas, were both trained in emergency medicine, not cardiology;

- Unlike Dr. Candipan, Drs. Reinhart and Monas both had experience in providing remote medical advice to an airline pilot and crew;

- In providing remote medical advice to airlines, MedAire used only physicians trained in emergency medicine, not cardiologists;

- MedAire had retained both a cardiologist and an emergency medicine physician as experts;

- Dr. Candipan admitted that he had no expertise in either emergency medicine or providing remote medical advice to airlines; and

- Defendants' expert in emergency medicine had specifically opined that Dr. Candipan lacked the necessary background and experience to offer opinions

8

on the procedures and protocol of giving remote medical advice to airlines.

Despite knowing all of this, Plaintiff did not seek a new expert, but rather made the conscious choice to stick with only Dr. Candipan as her medical expert.

**H.     Juncture 8: On September 16, 2016, after Defendants moved for summary judgment and specifically asserted that Dr. Candipan's opinions lacked evidential value, Plaintiff still elected to stay with only Dr. Candipan.**

On September 16, 2016, Defendants moved for summary judgment. Among other things, Defendants' specifically asserted that Dr. Candipan's opinion that Drs. Reinhart and Monas should have recommended diversion had "no evidential value" because – given his admitted lack of expertise in emergency medicine and providing remote advice to airlines – he was not qualified. 9/16/16 Mot. at 12:18-22 (Dkt. 85).

Thus, Plaintiff once again arrived at a juncture that forced her and her counsel to reconsider the potential need for a new expert. Of course, discovery was then closed – just as it is now – but Plaintiff could have moved under Fed. R. Civ. P. 56(d) to allow her time to get a new expert to combat Defendants' explicit challenge to Dr. Candipan's qualifications. Once again, though, Plaintiff decided to drive right on through that juncture and stick with only Dr. Candipan.

**II.   Because, prior to the close of discovery, Plaintiff knew or should have known of the relevance and value of expert testimony from an emergency medicine physician, Plaintiff's current Motion was not brought with diligence.**

Under Fed. R. Civ. P. 16(b)(4), a scheduling order "may be modified only for good cause and with  the judge's consent." And established case law makes a party's diligence the paramount factor to consider: "If the party seeking the modification 'was not diligent, the inquiry should end' and the motion to modify should not be granted." *Zivkovic v. Southern Calif. Edison Co.,* 302 F.3d at 1087, *quoting Johnson v. Mammoth Recreations, Inc.* 975 F.2d 604, 609 (9th Cir. 1992).

"Diligence" is measured by comparing the time when the party seeking to modify the scheduling order knew or reasonably should have known of the relevance of the newly-sought expert testimony, to the time when that party actually moved to modify the

scheduling order. Here, to paraphrase one court, it "should have been clear…from the inception of the instant suit" that retaining an expert in emergency medicine would be not only relevant but helpful. *See Cabana v. Forcier,* 200 F.R.D. 9, 14-15 (D. Mass 2001). In *Cabana,* the Plaintiff had already designated two safety experts, but neither were experts on OSHA regulations, so Plaintiff wanted to modify the scheduling order to add an OSHA expert. In denying his motion, however, the court said that "[t]he relevance of OSHA should have been clear to Cabana from the inception of the instant suit," so he would be limited to his already disclosed experts. *Id.*

Here, Plaintiff plainly knew the relevance, indeed, the importance, of expert testimony regarding the actions of Defendants physicians Reinhart and Monas; that issue did not suddenly arise three years after the close of discovery. Indeed, the expert report of Plaintiff's disclosed expert, Dr. Candipan, specifically criticizes Defendants' actions. And as discussed above, Plaintiff knew all along that Drs. Reinhart and Monas were emergency physicians, not cardiologists, and also knew that Defendants were critical of Dr. Candipan's opinions for that very reason. But Plaintiff nevertheless resolutely stuck with Dr. Candipan as her sole medical expert.

By waiting until now to cure what was always a patent problem with Dr. Candipan's views, Plaintiff failed to exercise the required diligence. "A party fails to show good cause when the request for an extension rests on information that the party knew, or should have known, in advance of the deadline." *Paulus v. Holimont, Inc.,* 315 F.R.D. 13, 15-16 (W.D.N.Y. 2016) (internal quotation marks and citation omitted).

Several cases illustrate the need for diligence in identifying a new expert. *Mackovski v. City of Garden Grove,* 2017 WL 6415333 (C.D. Cal. 9/13/2017), for example, involved a civil rights action against the City, including a claim that the City's police had used excessive force in certain incidents. The Plaintiff failed to designate an expert prior to the expert designation cutoff date. The court later granted the Defendants' motion for summary judgment, but – similar to here – the Ninth Circuit reversed that judgment on the excessive force claim and remanded for trial. On August 7, 2017, with trial scheduled to begin more

1   than eight months later on April 24, 2018, Plaintiff moved to modify the scheduling order

2   and reopen discovery so he could, among other things, designate a police procedures expert.

3        The court denied the motion, finding that plaintiff "was not diligent in making his

4   requests to reopen discovery," citing the *Zivkovic* holding that the "inquiry should end" if

5   the moving party was not diligent. *Mackovski, *3.* As the court explained, "Plaintiff brought

6   an excessive force claim in his SAC and must have known then that a police procedures

7   expert would be useful." *Id.; cf. Bakalar v. Vavra,* 851 F. Supp.2d 489 (S.D.N.Y. 2011)

8   (denying motion to reopen discovery to add an expert witness, filed after the Second Circuit

9   vacated judgment and remanded the case, finding that the "any need for an expert to

10  interpret [certain] documents [that were available before fact discovery closed] should have

11  been obvious at that time – regardless of any new evidence that might have been discovered

12  [later]").

13       In like manner, the court in *Paulus v. Holimont,* 315 F.R.D. 13 (W.D.N.Y. 2016)

14  denied plaintiff's motion to amend the scheduling order to add an expert. That case involved

15  a skier injured while skiing at the defendants' ski resort. Prior to the May 31, 2013 deadline

16  set by the Case Management Order ("CMO"), Plaintiff timely disclosed an expert witness,

17  Mr. Gale, to testify about the location of a "caution" sign on the ski trial. Then two and half

18  years later – on January 19, 2016 – Plaintiff moved to amend the CMO to permit his

19  designation of an additional expert, who would also offer testimony on the location of the

20  caution sign, using a different methodology.

21       In denying the motion, the court noted that "there can be no question that Plaintiffs

22  have been aware for years that the location of the caution sign is a key issue in this case, as

23  evidenced by their retention of Mr. Gale to provide an opinion on that issue." *Id.* at 16. So

24  too here. Plaintiff has known for years that the actions of the Defendant doctors would be a

25  key issue in this case, which is why Plaintiff engaged Dr. Candipan to provide an opinion

26  on that issue. And just as in *Paulus,* the "record reflects that the late disclosure of [a new

27  expert witness] is due to a lack of diligence on the part of Plaintiff[], and nothing more." *Id.*

28       In the *Bleek* case cited above, 95 F. Supp. 2d 1113, the court also denied plaintiff's

1   motion to reopen discovery to add an expert. After his employment was terminated, Bleek

2   sued his former employer under the Americans With Disabilities Act ("ADA"), arguing that

3   the employer's actions had aggravated his pre-existing post-traumatic stress disorder. Prior

4   to the close of discovery, Plaintiff did designate two non-physician expert witnesses to

5   testify that his termination aggravated his pre-existing PTSD, but he failed to designate any

6   medical expert to testify about his PTSD. Then nearly fifteen months past the deadline, he

7   moved to reopen discovery "for the limited purpose of adding an expert witness" – just as

8   Plaintiff here seeks to do. *See Bleek*, 95 F. Supp. 2d at 1120.

9       As with the other cases noted above, the court denied the motion, finding that Bleek

10  "was not diligent in identifying an appropriate expert witness within the permitted time."

11  *Id.* at 1121. "[I]t is reasonable," the court explained, "that Bleek could and should have

12  foreseen the necessity of identifying an appropriate expert witness to testify regarding the

13  subject issue prior to the deadline." *Id.* In fact, the court said, "[t]his conclusion is especially

14  apparent in light of the fact that Bleek presumably did anticipate this necessity when he

15  identified two experts whom he intends to have testify in this regard." *Id.* at 1121.

16  **III.   Allowing Plaintiff to designate a new expert at this stage of the litigation
         would unfairly prejudice Defendants.**

17

18      Even if Plaintiff had been diligent in seeking an additional expert, at this late stage

19  of the case, Defendants would be unfairly prejudiced by allowing Plaintiff to identify a

20  second medical expert. To begin with, it was only after discovery closed that Defendants

21  filed their successful motion for summary judgement. In other words, at that point both

22  parties had gathered and disclosed their pertinent documents, disclosed and deposed the

23  desired lay witnesses, and disclosed and deposed all the expert witnesses they desired.

    Following the Ninth Circuit remand, the parties are ready to begin final trial preparation.

24      The "purpose of Rule 16(b) is to offer a measure of certainty in pretrial proceedings,

25  ensuring that at some point both the parties and the pleadings will be fixed." *Paulus*, 315

26  F.R.D. at 15 (internal quotation marks and citation omitted). That point was reached almost

27  three years ago, and to allow Plaintiff to reopen discovery now would eviscerate the purpose

28

1    underlying Rule 16(b).

2        Furthermore, allowing Plaintiff to designate a new medical expert at this point would

3    contravene the very intent of the original scheduling order. Under that order, Plaintiff had

4    to designate her experts and their opinions first, then Defendants would have time to

5    evaluate those opinions – as well as the background and expertise of those experts – and,

6    based on that evaluation, Defendants could then engage their own set of experts in response.

7    In short, Defendants had the ability to choose experts to respond to Plaintiff's experts – not

8    the other way around. Plaintiff now wants to reverse the original scheduling order by

9    seeking to be the last party to choose an expert.

10       And if the Court did allow Plaintiff to choose a new medical expert, Plaintiff would

11   not only need time to evaluate that expert, but to examine and potentially take discovery

12   from the organization for whom the expert worked, as well, in order to verify the standards

13   and protocol of that organization. Defendants would also naturally need the right to present

14   rebuttal opinions to those of the newly-disclosed expert. Defendants would also certainly

15   want to depose Plaintiff's new expert. Indeed, depending on the background, expertise and

16   opinions of such a new expert, Defendants themselves may need to retain a new expert in

17   response. As the court observed in *Akeva L.L.C. v. Mizuno Corp.,* 212 F.R.D. 306, 312

18   (M.D.N.C. 2002), while excluding an expert opinion disclosed after discovery ended: "The

19   disruption caused by the proliferation of untimely expert testimony is real and attorneys

20   must know such will not be permitted."

21       Both parties have agreed that – absent additional discovery contemplated by

22   Plaintiff's motion – they could be prepared for trial at the first of November 2019, a date

23   less than six months distant. The *Bleek* case also involved a request to reopen discovery to

24   select a new expert, with trial set some six months away. And as that court observed, in

25   those circumstances the defendant would "undoubtedly be prejudiced," if the court granted

26   the motion, because defendant "would be in a position of having to conduct additional

27   discovery relative to the new expert witness and would incur the attendant expenditure of

28   time and resources in doing so." *Bleek,* 95 F. Supp. 2d at 1120.

13

Notably, Plaintiff has not proffered either the name, the qualifications, or the opinions of a proposed new expert, even though the supposed precipitating event for needing the new expert occurred on March 20, 2019 – almost two months ago. Especially given the age of this case and the elapsed time since discovery closed, Plaintiff's failure to disclose before now its new proposed expert and the substance of his or her opinions shows a further lack of diligence. Under the original scheduling order, for example, Defendants had just two months after receiving Plaintiff's expert reports to disclose their expert reports.

Finally, Plaintiff's request to add "an emergency room physician" as an expert may not in any event resolve the problem noted by Judge Ikuta. Judge Ikuta's dissent did not criticize Plaintiff for failing to engage an emergency medicine physician. Rather, her dissent criticized Plaintiff for failing to have an expert whose opinions were "relevant to a remote medical advisor making a recommendation to a pilot based on limited data." 3/20/19 Memorandum Decision; Ikuta, J. dissent at 2 (Dkt. 40-2). So unless Plaintiff designated an emergency physician, who, like Drs. Reinhart and Monas, is experienced in "providing remote medical advice to a pilot based on limit data," that expert would not cure the problem underscored by Judge Ikuta.

## CONCLUSION

Plaintiff's Motion (at 6) correctly recites that the "good cause" standard of Rule 16(b) "primarily considers the diligence of the party seeking the amendment." As discussed above, only if that "diligence" requirement is satisfied need the Court consider the other factors which Plaintiff mentions at p. 6 of her motion. Those factors include: (1) whether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to admissible evidence.

Because Plaintiff can't show "diligence," the Court need not reach these other factors. Notably, though, all these factors favor Defendants. We therefore ask the Court to

14

1   deny Plaintiff's Motion.

2       RESPECTFULLY submitted this 13th day of May 2019.

3                         GALLAGHER & KENNEDY, P.A.

4

5                         By: /s/ *Mark C. Dangerfield*

                           Mark C. Dangerfield

6                              Wm. Charles Thomson

                           2575 East Camelback Road

7                              Phoenix, Arizona  85016-9225

8                              Attorneys for Defendants MedAire, Inc.;

                           Steven Joe Reinhart, D.O.; and Jessica

9                              Monas, M.D.

10                       **CERTIFICATE OF SERVICE**

11       I hereby certify that on the 13th day of May 2019, a copy of the foregoing document

12   was filed electronically via the Court's CM/ECF system and Notice of Electronic Filing

13   served on all parties by operation of the Court's CM/ECF system.

14       Stephen M. Dichter, Esq.

    Jeffrey O. Hutchins, Esq.

15       Christian Dichter & Sluga, P.C.

    2700 North Central Avenue, Suite 1200

16       Phoenix, AZ  85004

17           sdichter@cdslawfirm.com

        jhutchins@cdslawfirm.com

18       *Attorneys for Plaintiff*

19

20       Francis G. Fleming, Esq.

    Robert J. Spragg, Esq.

21       Kreindler & Kreindler LLP

    750 Third Avenue

22       New York, NY  10017

        ffleming@kreindler.com

23           rspragg@kreindler.com

24       *Attorneys for Plaintiff*

25

26   By: /s/ *Mark C. Dangerfield*

27

28

                  15