EXHIBIT 2

Robert C. Candipan, Ph.D., M.D., FSCAI, FACC
HonorHealth Heart Institute
9250 N Third Street, Suite 3010
Phoenix, AZ 85020
(602) 861-1169
(480) 253-7233 cell
candipanmd@yahoo.com

Robert J. Spragg
Francis G. Fleming
Kreindler and Kreindler LLP
750 Third Avenue
New York, NY 10017-2703
(212) 687-8181
Fax  (212) 972-9432

Dear Mr. Spragg and Mr. Fleming:

You have asked me to review the records and documents pertaining to this matter and deliver objective opinions relating to my review and provide you a report with an overview of those opinions and the basis of those opinions. I have done so in this letter report.

Expert Qualifications

I am qualified to provide expert opinions on this case as I have over 20 years of experience in cardiology. In my current position I actively practice general and interventional cardiology. On a routine basis I take care of patients with ST segment myocardial infarctions, acute coronary syndrome, congestive heart failure, vascular disease and arrhythmias. In addition, I interact and perform consultations requested by physicians in Emergency Departments.

I am currently an interventional cardiologist in Phoenix, Arizona and have practiced on a continuous basis since 1997. I completed medical school at the University of Miami Miller School of Medicine in 1987. My residency in Internal Medicine was at the University of Southern California School of Medicine/Los Angeles County Hospital. I completed a fellowship in Cardiovascular Disease at Stanford University in 1993 and then spent an additional 2 years as a research fellow in Vascular Biology and Medicine also at Stanford. My final year of training was in Interventional Cardiology at Sequoia Hospital in Redwood City, California from 1995-1996. In my career I have held several academic appointments. I was an Assistant Professor of Medicine at the University of Utah School of Medicine. At the University of Illinois at Chicago I was also an Assistant Professor of Medicine. While at that Institution I was also the Director of the Cardiac Catheterization Laboratory, the Director of the Cardiac Intensive Care Unit and the

2

Director of the Chest pain unit. In addition, I was the founding Director of the Interventional Cardiology Fellowship program At the University of Kansas School of Medicine I served as the Co-Director of the STEMI program and was the founding Director of the Interventional Cardiology fellowship.

My current day to day activities include performing clinical consultations in cardiology, routine management of cardiac conditions in outpatient and hospital settings, reading echocardiograms and stress tests, and performing cardiac catheterizations, peripheral vascular angiograms as well as coronary and peripheral interventions. I am active in taking STEMI call for the hospital and treat on a daily basis patients suffering from myocardial infarctions. During my career I have performed approximately 10,000 cardiac catheterization lab procedures.

Overview

Mr. Baillie was a 61 year old man who suffered an extensive myocardial infarction while traveling on British Airways flight 289 on March 23 2102 ("BA289"). This was a lengthy nonstop flight from London to Phoenix. He began to experience chest pain after takeoff and had unrelenting chest pain for the duration of his flight despite treatment with supplemental oxygen and self-administering aspirin. He was cared for by the BA289 crew as well as a physician traveling on the flight. The physician, Dr. Verma, assessed Mr. Baillie at various points during the flight and observed that he did not look well and noted at least once that he should be in a hospital. Four communications with two different MedAire/MedLink physicians were made. In these communications observations were made known to the MedAire/MedLink physicians as to Mr. Baillie's condition including persistent chest pain and shortness of breath, however there were no direct communications by the MedAire/MedLink physicians with the Captain or Co-Pilots as to the potential that Mr. Baillie was facing a life threatening condition. In addition, no recommendation for diversion of the flight was made so that he could have treatment of this condition. The nearly 11 hour flight continued as planned to Phoenix without diversion. Shortly after arrival in Phoenix Mr. Baillie was taken from the aircraft to St. Luke's Medical Center in Phoenix, where the diagnosis of a myocardial infarction was promptly made, he was intubated and placed on mechanical ventilation and underwent an emergent cardiac catheterization procedure. This confirmed an acute occlusion of the Left Anterior Descending Coronary artery (LAD). He underwent angioplasty and stenting of the LAD with alleviation of the occlusion and restoration of blood flow. Unfortunately he had already suffered significant necrosis of his myocardium and he was in cardiogenic shock on initial presentation at the hospital. He required vasopressor drug therapy and an intra-aortic balloon pump because of his hemodynamic instability. A review of his initial cardiac enzymes obtained show that the levels were all greater than 20 times the upper limit of normal. Based on this data as well as the symptoms that occurred during the flight, it is apparent that his infarction started approximately 6-8 hours prior to his arrival at St. Luke's.

It is readily apparent that at multiple points during the flight the MedAire /MedLink physicians were provided with ample clinical information to consider that Mr. Baillie's

3

symptoms were highly indicative of a myocardial infarction. However, it does not appear that his symptoms, vital signs and observations by the crew and Dr. Verma were given enough weight by the MedAire/MedLink physicians to conclude that a myocardial infarction was a likely diagnosis, and if it was considered, the potential severity was not made clear to the pilot or crew of the aircraft. Given this unexpected and unusual response to his medical condition by the MedAire/MedLink physicians, a lengthy delay in allowing Mr. Baillie to be properly treated occurred and he suffered large and extensive myocardial necrosis as a result.

Summary and Discussion

Prior to Mr. Baillie's myocardial infarction, he was a healthy 61 year old man who was employed as a Vice President of a semiconductor company. His medical history was minimal and remarkable for a remote history of closed head trauma as a result of a motor vehicle accident while in his 30's and the removal of a benign nodule on his vocal cord in 2005.

In March 2011 he underwent an executive physical examination at the Mayo Clinic in Arizona. This included a colonoscopy that was unremarkable and an exercise treadmill test that was interpreted to be consistent with possible ischemia. This was followed in short time by a stress echocardiogram that was interpreted to be negative for ischemia. His echo images revealed a left ventricular ejection fraction (EF) to be 50-55%, which is in the normal range. Based on these findings he was felt to be in good health.

While traveling for business on March 23, 2012, Mr. Baillie took a British Airways flight from London to Phoenix. He had hurried to make this flight and shortly after boarding had asked a flight attendant for water and indicated that he was feeling short of breath. At that time he asked that flight attendant if he was all right to fly and it was indicated to him that he should sit back and relax and that he should be feeling better with some rest. The flight departed the gate at 1512 UTC, shortly after the scheduled time, and took off at about 1546 UTC.  Approximately 45 minutes after takeoff, Mr. Baillie told a flight attendant that he was not feeling well and was continuing to feel short of breath. A short time later, about 1700 UTC, Mr. Baillie told the flight attendant that he was having pain in his chest. He was advised to sit in a reclined position and he was administered oxygen. His symptoms did not resolve and he continued to experience central chest pain and shortness of breath.

A review of the transcript of the communications between the flight crew and MedAire/MedLink revealed that given his continuing symptoms, at 1845 UTC, approximately 3 hours after takeoff, MedAire/MedLink was contacted by the crew of BA289. The flight crew provided a description of a passenger, 61 year old male, with central chest pain and shortness of breath feeling hot and looking pale.  At 1850 UTC, Dr. Reinhart, the MedAire/MedLink physician, spoke with a crew member. Dr. Reinhart was told that Mr. Baillie was a 61 year old male with central chest pain and is pale. He was informed that Mr. Baillie had taken an aspirin about 3 hours 20 minutes prior. At that point, Dr. Reinhart advised the crew to continue oxygen and have a medical person

4

evaluate him and obtain vital signs. A physician (Dr. Verma, a radiologist) was identified on board and was asked to assist in evaluating Mr. Baillie. His assessment included talking with Mr. Baillie who per his observation was not very communicative. Dr. Verma obtained a blood pressure that was 100/70, felt that Mr. Baillie's pulse was irregular, heard crackles in his chest and observed that he looked pale. He also indicated that to the crew that Mr. Baillie did not look well and needed to be in a hospital. His findings were communicated to the crew and the crew relayed Dr. Verma's findings to Dr. Reinhart at 1912 UTC, including observations that his pulse was irregular and at about 100, his blood pressure was 100/70 and he had crackles in the left chest. He was still having chest pain and was confused. Dr. Reinhart stated Mr. Baillie's blood pressure was too low for nitroglycerin, and there was not a great deal more other than providing oxygen that could be done. Dr. Reinhart advised the crew to proceed to the planned destination, which he noted was 6 hours away. He stated that the passenger would hopefully improve with oxygen. Dr. Reinhart advised the crew to observe Mr. Baillie for signs of deterioration which he explained would be a drop in the blood pressure, if he becomes unresponsive, has color deterioration, becomes ashen or cyanotic, or his chest pain worsens and if so, to call back. Based on the clinical information provided including the symptoms, patient appearance, vital signs and examination remarkable for crackles, a potentially life threatening condition should have been considered by Dr. Reinhart. The finding of crackles in the setting of chest pain should have increased the clinical suspicion that Mr. Baillie was suffering an infarction or an episode of heart failure. It appears that Dr. Reinhart discounted at least some of the information provided by the crew and Dr. Verma. As he stated in his deposition, Dr. Reinhart did not give much "credence" to the crews' report that the on board physician heard crackles. Also it does not appear that the presence of shortness of breath continuing unabated for 3-4 hours was considered by Dr. Reinhart to be indicative of a life threatening illness, and if it was considered it was not discussed with the crew.

Afterwards, Mr. Baillie continued to have symptoms and did not appear to be improving. Dr. Verma and another physician monitored his blood pressure periodically about once per half hour. At 2234 UTC, over three hours after the last contact with Dr. Reinhart, another patch to MedAire /MedLink was made by the crew of BA289 with an update on Mr. Baillie's condition. It was communicated to MedAire/MedLink that Mr. Baillie's blood pressure was 100/80 and he had a pulse of 100. Dr. Verma informed the crew that the patient was diaphoretic, and having chest pain. Mr. Baillie stated he felt worse. By this time, Dr.Reinhart had gone off shift and was not available to take the call so a different MedAire/MedLink physician had to be involved in the communications with BA289.

At 2238 UTC Dr. Monas, another MedAire /MedLink physician, was brought onto the line to speak with the BA289 crew. Dr. Monas did not appear to be fully aware of what had previously transpired, as the worksheet (MedLink Intake Form) used by Dr. Reinhart to record notes of the prior conversations had minimal information. For instance, the finding of the lung crackles was not documented on the MedLink Intake form and it does not appear that Dr. Monas was aware of this finding. There was also no indication on the Intake Form of the time that the initial call from BA289 was received by

5

MedAire/MedLink, which would have provided Dr. Monas with a clear measure of how long Mr. Baillie's chest pain had been ongoing. Dr. Monas then obtained a new history and she ascertained that Mr. Baillie was having chest pain, had received an aspirin, was on oxygen and did not receive nitroglycerin. Dr. Monas then made a recommendation to give Mr. Baillie nitroglycerin but ultimately it was not given on the advice of Dr. Verma because of Mr. Baillie's low blood pressure. Dr. Monas asked for more history and was informed that Mr. Baillie was not feeling well and having central chest pain and has been on oxygen. There was an observation that he appeared pale. Dr. Monas asked to speak with the on board physician and was told that was not possible due to security procedures. Dr. Monas told the crew of BA289 that MedAire/MedLink would start to look at possible diversion locations but did not actually advise that the flight be diverted, only to continue oxygen. There were no further communications with MedAire /MedLink after this point. It does not appear that at this point that Dr. Monas realized that Mr. Baillie had been having unrelenting chest pain for nearly 7 hours. Again, at this point there was ample clinical data to at least consider that a myocardial infarction was occurring. If she had come to this conclusion the usual and expected response would be to inform the crew of the potentially life threatening condition and recommend a diversion. This did not happen.

The flight continued to Phoenix and landed at 0141UTC. Mr. Baillie was transported from the plane via EMS to St Luke's Medical Center and arrived in the Emergency Department (ED) at 0222 UTC (1922 local time). His evaluation in the Emergency Department included a 12 lead ECG which demonstrated anterior ST elevation consistent with a myocardial infarction, and a CXR demonstrating extensive perihilar infiltrates consistent with pulmonary edema. Point of care blood testing demonstrated elevated cardiac enzymes. Mr. Baillie was intubated by the ED physician, Dr. Hess. He underwent emergent cardiac catheterization and was found to have a thrombotic occlusion in the Left Anterior Descending coronary artery. He subsequently underwent PTCA and stent placement to the LAD. Because of hypotension, he required vasopressor drugs as well as the placement on an intra-aortic balloon pump. He was admitted to the Coronary Care Unit (CCU). An echocardiogram after admission demonstrated that his myocardium had suffered extensive damage with his ejection fraction (EF) dropping from 50-55% in 2011 to an EF of 20% after his myocardial infarction.

Mr. Baillie was mechanically ventilated but was able to be extubated after several days in the CCU. However, he had persistent hypotension and a recurrence of congestive heart failure symptoms and became dependent on IV vasopressor support and was ultimately accepted and transferred to the Mayo Clinic for consideration of a possible heart transplant. His Mayo clinic course was prolonged and difficult. He did have an extensive transplant evaluation. His hospital course was remarkable for re-intubation and eventual tracheostomy, continued dependence on inotropic support, eventual placement of a ventricular assist device and ultimately a total artificial heart in anticipation of a transplant. He required intermittent dialysis, and had multiple infections, and due to multiple complications including thrombosis of the aorta and multiple strokes the artificial heart was removed and Mr. Baillie died on July 1, 2012.

6

From the transcript of the communications between MedAire/MedLink and the BA289 crew, it is apparent that the clinical information that was provided to the MedAire/MedLink physicians was more than adequate for the MedAire/MedLink physicians to come to a working diagnosis that would have placed a myocardial infarction high if not on top of a list of potential medical conditions. It was consistently made known that Mr. Baillie was having continuous chest pain and shortness of breath despite the administration of oxygen, had a low blood pressure and an irregular pulse, was pale, diaphoretic and confused. Both Dr. Reinhart and Dr. Monas are trained Emergency Medicine specialists and encounter patients with chest pain as part of their daily routine and would be expected to consider that this constellation of findings could be and is likely to be a myocardial infarction. Recognizing that a myocardial infarction was a likely scenario should have prompted them to make a recommendation for diversion. In fact, a review of MedAire /MedLink training materials shows that they specify recommending diversion for chest pain that is persisting for over 20 minutes despite treatment. The depositions of Drs. Reinhart, Monas and Streitwieser all reflect that their personal threshold for recommending diversion would be chest pain not responding to treatment for 20-30 minutes. In this case, it was made clear to the MedAire/MedLink physicians that Mr. Baillie's chest pain was continuing for many hours despite oxygen. It is also apparent that there was in this case poor communication /documentation made in the "handoff" from Dr. Reinhart to Dr. Monas. When Dr. Monas took her call from BA289 she was unaware of the findings and events  (such as crackles and not being able to administer nitroglycerin to Mr. Baillie) that transpired several hours earlier. This was not in line with what would be considered standard and usual practice in handing off clinical responsibility for an active patient from one physician to another.

Any myocardial infarction is serious, poses significant risks and is potentially life threatening. The risks can be limited with effective and early treatment consisting of alleviating the occlusion that is causing the infarction. Any delay in treatment can increase the potential complications. It is known that in a myocardial infarction "time is muscle". Because of this there are guidelines in place developed by the American Heart Association and the American College of Cardiology that mandate reperfusion treatment to open an occlusion as soon as possible, preferably within 90 minutes. Any significant delay results in increased myocardial necrosis and thus increasing mortality. As an example, as seen in the National Cardiovascular Data Registry, which was a study of 43,801 patients with STEMI,  a delay in the time to reperfusion was associated with a higher adjusted risk of in-hospital mortality in a continuous, nonlinear fashion (30 minutes 3.0%, 60minutes 3.5%, 90 minutes 4.3%, 120 minutes 5.6%, 150 minutes 7.0%, and 180 minutes 8.4%; P<0.001). Because of the delay in receiving the expected necessary treatment for his myocardial infarction, Mr. Baillie suffered a significant loss of heart muscle which in turn led to acute and chronic heart failure. Mr. Baillie's was left with a cardiac condition that could only be treated with a heart transplant, which ultimately he was too sick to receive.

Conclusion

In summary, multiple lapses by MedAire/MedLink and its associated physicians, Dr.

7

Reinhart and Dr. Monas, were made. First was the failure by Dr. Reinhart and Dr. Monas to recognize the likelihood that Mr. Baillie's chest pain and associated symptoms were indicative of a myocardial infarction and/or acute coronary syndrome. Secondly, the symptoms and observations made by the BA289 crew and Dr. Verma were not well documented on the MedLink intake form which resulted in a poor handoff from Dr. Reinhart to Dr. Monas. Finally, there was failure of MedAire/MedLink physicians to communicate the potential life threatening nature of Mr. Baillie's conditions to the BA289 crew and pilots. All of the lapses led to Mr. Baillie's treatment being unusually and unexpectedly delayed. Had the diagnosis of a myocardial infarction been suspected, the recommendation of diversion of the flight should have been made and Mr. Baillie would have received earlier treatment of his condition and he would have likely sustained significantly less damage to his heart muscle, and the risk of development of heart failure would have been smaller. The MedAire/MedLink physicians failed to adequately and appropriately respond to Mr. Baillie's life threatening condition. Because of this unusual and unexpected response, Mr. Baillie suffered a massive, complicated myocardial infarction extending over many hours that resulted in end stage heart failure. He was hospitalized for over three months, endured multiple costly procedures including placement of a total artificial heart, and suffered multiple morbid events with resultant multi-organ system failure prior to his untimely death. In my opinion, the Medire/MedLink physicians and staff are responsible for this outcome which was unexpected and accidental and represented a failure to follow procedures and protocol.

I base and render my opinions in this report on reasonable medical probability.

I reserve the right to amend this expert testimony should additional information pertinent to this case become available in the future.

I have reviewed the following documents in the preparation of this report.

Depositions and Transcripts

Deposition of BA Captain Stephen Fowler
Deposition of BA First Officer Alastair Grant
Deposition of BA First Officer Matthew Simmonds
Deposition of BA Customer Service Manager Georgina Bolton
Deposition of BA Flight Attendant Ewa Van Den Berg
Deposition of BA Flight Attendant Nicola Sherrod
Deposition and exhibits of Stephen Joe Reinhart, DO
Deposition and exhibits of Jessica Monas MD
Depositon and exhibits of MedAire CSE Matthew Whitley
Deposition and exhibits of MedAire CSE Michele Tyler
Deposition and exhibits of David Streitwieser MD
Deposition and exhibits of Paulo Alves, MD
Deposition of Ratan K. Verma MD
Deposition and exhibits of Brian Hess MD
Deposition and exhibits of Michael Covalciuc MD

8

<u>Medical Records</u>

Mayo Clinic Annual Physical Exam report for James Donald Baillie II
Mayo Clinic Medical records for James Donald Baillie II
St. Luke's Medical records for James Donald Baillie II

<u>Other Documents</u>
MedAire/Medlink Patch Summary regarding M. Baillie's in-flight medical emergency
MedAire transcript of communications with the subject flight pertaining to Mr. Baillie
Physician and Nurse Reference Manual-MedAire Medical guidelines for air travel
MedAire MedLink Physician Training, The Role of the MedLink Physician
MedLink Physician Orientation Program Reference Manual entitled, "MedLink
Physician Pearls for Remote Clinical Care.
MedLink Physician Orientation Handout dated October 2010
Plaintiff's First Amended Complaint for Wrongful Death and Personal Injuries
Defendants' Answer to Plaintiff's First Amended Complaint

Robert C. Candipan, Ph.D., M.D., FSCAI, FACC
February 1, 2016