UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Linda Ann Baillie,                )
                                  )    No. CV 14-0420-PHX-SMM
             Plaintiff,           )
                                  )
        vs.                       )    Phoenix, Arizona
                                  )    May 6, 2019
MedAire Incorporated, et al.,     )    2:45 p.m.
                                  )
             Defendants.          )
_____)


BEFORE:   THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(*Status Conference*)


Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
1    APPEARANCES:

2
     For the Plaintiff:
3
             KREINDLER & KREINDLER LLP
4            By:  Francis G. Fleming, Esq. (By Telephone)
             By:  Robert J. Spragg, Esq.   (By Telephone)
5            750 Third Avenue
             32nd Floor
6            New York, New York 10017

7            CHRISTIAN DICHTER & SLUGA PC
             By:  Stephen M. Dichter, Esq.
8            2700 North Central Avenue
             Suite 1200
9            Phoenix, Arizona 85004

10   For the Defendant:
             GALLAGHER & KENNEDY PA
11           By: Mark C. Dangerfield, Esq.
             2575 East Camelback Road
12           Suite 1100
             Phoenix, Arizona 85016

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2          MR. FLEMING:  Frank Fleming and Rob Spragg at
 3   Kreindler & Kreindler in New York.
 4          MR. DICHTER:  And we have Mr. Dichter in the
 5   courtroom.                                              02:44PM
 6          MR. DANGERFIELD:  And also Mark Dangerfield
 7   representing the defendants MedAire and Doctors Reinhart and
 8   Monas.
 9          THE COURT:  Thank you.
10          THE COURTROOM DEPUTY:  We're now on the record in Case  02:45PM
11   Number CV 14-420, Baillie versus MedAire Incorporated, et al.,
12   before the Court for a status conference.
13          THE COURT:  You have already announced who is here
14   representing the parties.  And this is on to decide where we're
15   heading here on remand from the Ninth Circuit.          02:45PM
16          And I also have before me the plaintiff's motion to
17   modify the scheduling order for limited purpose of designation
18   of an additional expert witness.  And the time, since that was
19   filed Friday, the time for the defense to respond is not before
20   us.  We may talk about this a little bit, but I haven't made a  02:46PM
21   decision on that because I haven't got the benefit of the
22   defense's point of view other than the fact that they generally
23   object.  And there's some law out there that suggests that
24   maybe the plaintiffs are not even entitled to this.
25          So we'll try and work this out to see where we're   02:46PM
```

1    heading because I have got some concerns about this case myself

2    I want to hear from the parties about and that may affect your

3    thinking one way or the other.  Because one of the issues has

4    to do with the fact that the majority opinion suggests that

5    this is a case of tort now instead of contract.  I thought it          02:46PM

6    was a case of contract under the Montreal Convention.  The

7    majority said otherwise and they have turned it into a tort.

8          Now, if it's a tort, the question comes up, it seems

9    to me, and I'd like to get your thoughts on this, what about

10   non-party at fault?  What about comparative negligence by the          02:47PM

11   deceased?  Things like that.  And because that really does

12   change the complexion of the case.

13         By the way, for the folks in New York, if you would,

14   please, if you are going to speak, would you please identify

15   the speaker so the court reporter can get attribute your               02:47PM

16   statements to the proper party.  So she knows who the people

17   are in the courtroom but long distance we just don't know that.

18         And so if you can help me out, who wants to go first

19   on that one?

20         MR. FLEMING:  Good afternoon, Your Honor.  This is            02:47PM

21   Frank Fleming speaking in New York.

22         And let me -- I'm sorry.  I didn't hear that if it was

23   directed at me.

24         THE COURT:  No.  I didn't say anything.  Did you hear

25   what I said before, now that this case is a tort what are you          02:48PM

1    going to do about the issue of non-party at fault by the

2    airlines and who to settle with, and what about comparative

3    fault of the deceased who insisted on keep the plane going,

4    don't divert it, keep this going.  What are you going to do

5    about that?  And the fact that the airline was the only one          02:48PM

6    that could say we're going to divert the plane.  It wasn't the

7    doctors.  They could recommend it, but they didn't have to say

8    that.  They didn't have the authority to revert the plane.

9           And by the way, where was the plane in each one of

10   these stages along the way where you were making the                 02:48PM

11   suggestion, maybe we should have done this now.  Two or three

12   hours later, let's do this again.  And they keep coming up with

13   things and they had an on-board doctor, and under the

14   regulations they are not -- these doctors here are not allowed

15   to talk to the deceased or the doctor who was on board?              02:48PM

16   Everything was being funneled through some airline official.

17   How are you going to overcome all those problems?

18           MR. FLEMING:  There are problems in the case, Your

19   Honor, but let me see if I can answer.  First of all, as to the

20   question of whether this is a contract case or a tort case, I        02:49PM

21   would answer this way.  It is neither or both, depending on how

22   you look at it.  Let me go back just slightly in history.

23           Am I speaking over you, Your Honor?  I apologize.

24           THE COURT:  No.  No.  And you will be able to hear me

25   when I interject.  Go right ahead, please, Mr. Fleming.             02:49PM

1          MR. FLEMING:  Okay.  Thank you, sir.

2          Under the Warsaw Convention, which was the precursor

3     to Montreal, these cases would be more or less more contract

4     than tort.  But the treaty, the concept of the treaty going

5     back to that period of time, this would be before '99 to 2003,          02:49PM

6     when Montreal was drafted and then adopted, it was mostly

7     contract and involved tort principles and not damages.  Since

8     that time, since 2003 when Montreal was adopted, the treaty has

9     now changed from a defensive treaty protecting airlines to a

10    pro-consumer treaty protecting passengers.  And I don't know          02:50PM

11    that there's been any academic work or case or law that

12    clarifies the point as to which it is.  And I personally look

13    at it, and I think it's an objective view, and that it is

14    neither contract nor tort.

15         As to the specific questions that you raised, I tried          02:50PM

16    to make some notes.  I will go down through them.  First of

17    all, as to the settlement, the settlement with British Air, the

18    law of Warsaw and, I believe, unchanged in Montreal, is that

19    the liability of the defendants was joint and several.  It was

20    not several only or a non-negligence party type allegation that          02:51PM

21    you would find under state law.

22         And in our settlement with British Air, the release

23    expressly and specifically reserves the claim against MedAire,

24    and I'd be happy to go into the logic of that if Your Honor

25    would hear it.  But the intent of that settlement is to treat          02:51PM

1    it as a pro-tanto settlement of all the damages leaving

2    exposure with MedAire and the doctors for the balance of the

3    damages.

4              As to your point about the doctors not having the

5    capacity to divert the aircraft, that is true, however, the          02:52PM

6    point of the contract between MedAire and British Air, what we

7    like to think of as an agency agreement as to the operation of

8    the aircraft, and I believe Your Honor has already ruled on

9    that, based on the *McKaskey* case, we view the law to be that

10   the information that the pilots needed to make the correct          02:52PM

11   decision was what MedAire was required to do or, more

12   accurately, expected to do so that the pilots could make the

13   right decision and do what was necessary and save this

14   gentleman's life.

15             So I think there is no allocation issue under federal       02:53PM

16   law under this treaty, and I think the jury should be asked to

17   determine total damages assuming they find an accident under

18   the treaty, and Your Honor will be requested to reduce the

19   amount of the jury award, whatever it is, by the settlement

20   amount.                                                              02:53PM

21             And as to the liability, I would have to say that we

22   are, to some extent, relying on the plain language of the

23   treaty and the concept of accident, and it creates a fact

24   question for the jury and we're almost prepared to try it.

25             THE COURT:  Okay.                                          02:54PM

1          MR. FLEMING:  As to the motion that we have made, Your

2     Honor, that is intended to address what we think we learned

3     from your own handling and your own opinion on the case in

4     granting summary judgment and also the dissent of the circuit.

5     So though we are somewhat familiar with this treaty, I believe     02:54PM

6     that accident and negligence are specific concepts.  They don't

7     overlap necessarily because many minds, including great minds

8     that have looked at it, tend to see them as a part of each

9     other and we are asking for permission to expand the area of

10    factual expert testimony to include some discussion of what a     02:54PM

11    reasonable emergency room physician would do under the

12    circumstances of this case.

13         So I hope I have answered some, if not all, of your

14    questions, Your Honor.  I'm sure Mr. Dangerfield will want to

15    comment on that.  But if you would like to hear more, I'd be      02:55PM

16    happy to address any other question you have.

17         THE COURT:  I will -- I will get back to you.  I

18    appreciate it.  We'll probably kick a few things around here

19    this afternoon because I come back to the issue that perplexed

20    me about this case, and that was, is this -- because you said    02:55PM

21    it could be part contract, part tort, things like that.  I

22    thought the decision of what it was a matter of law versus a

23    matter of fact.  I don't think juries make that determination.

24    But I understand the distinction you are drawing now about the

25    issue of damages would be more in the tort area rather than a    02:55PM

1    contract issue.

2            Mr. Dangerfield, let me ask you a question quickly

3    before you I let you launch off on your point of view.

4            MR. DANGERFIELD:  Sure.

5            THE COURT:  The time for cert has not run yet.  Does          02:56PM

6    your client intend to file a cert?

7            MR. DANGERFIELD:  No, Your Honor.

8            THE COURT:  Why I'm curious is because there seems to

9    be still a little bit of a split in a couple of the circuits on

10   a couple of issues.  This is a matter of international          02:56PM

11   interpretation.  Why not go for the gusto?

12           MR. DANGERFIELD:  The main reason is --

13           THE COURT:  You can have a seat.  Because if you stand

14   they won't be able to hear you.  The microphone won't pick it

15   up.          02:56PM

16           Go ahead.

17           MR. DANGERFIELD:  The primary factor is because this

18   is not an opinion.  It's a decision.  It has no precedential

19   value.  It's unclear to me -- I believe the decision, in fact,

20   is contradictory or conflicting with other Ninth Circuit          02:56PM

21   published opinions.  But whether it is or not, it seemed like

22   the likelihood of getting the Supreme Court's attention on

23   relying on this decision and not a published opinion is small.

24           THE COURT:  If you think there's a conflict in Ninth

25   Circuit opinion why not go for rehearing and rehearing en banc?          02:57PM

1    I'm not -- that's your decision of your company.  I'm just

2    curious.

3              MR. DANGERFIELD:  I understand.  And this has been

4    considered, and the decision has been made not to pursue that.

5              THE COURT:  That's fine.  Because I don't want to get          02:57PM

6    too far down the line and all of a sudden I see a petition show

7    up in front of me.  That's the whole purpose of the status

8    conference.  I want to find out where you are heading so we

9    kind of know how much time to allocate to the case before we

10   get derailed again.                                                     02:57PM

11             Go ahead and respond in any fashion you wish to what

12   Mr. Fleming has said.

13             MR. DANGERFIELD:  Okay.  Let's start with the question

14   of damages.  The convention, as interpreted by our case law,

15   indicates that the damages amounts are controlled not by the           02:58PM

16   convention but by the applicable local law.  And there's been

17   no ruling in this case, and no one's moved the Court to

18   determine what the applicable local law would be.  But the

19   Courts have viewed that as sort of a pass-through issue.

20   Pass-through, that is, the convention determines liability but         02:58PM

21   damages are a pass-through issue based on the applicable local

22   law.

23             Now, we believe that the applicable local law is

24   likely the law of the, under the Death on the High Seas Act,

25   which is the law that applies when there is a death over the           02:58PM

1    high seas.  Doesn't have to be on the high seas but when the --

2    when it's over the high seas.  So that's a federal statute.

3    And that statute itself does not discuss the issue of what

4    happens when there is a settlement by one of two parties, what

5    the effect of that settlement would be.  But there is solid          02:59PM

6    federal common law on that subject.

7         And there's two possibilities.  Mr. Fleming addressed

8    one.  He suggested that this was going to be a pro-tanto

9    deduction, that the jury would -- let's say the jury found

10   liability and found a million dollars of liability then they        02:59PM

11   would subtract the amount of the settlement and the balance

12   would be MedAire's responsibility.  That's Mr. Fleming's view.

13        But, in fact, the Supreme Court of the United States

14   and the Ninth Circuit follows what they call the proportional

15   viewpoint and that under that viewpoint, when there's a couple      03:00PM

16   of joint tortfeasors, one of them settles, then the jury is

17   simply asked to determine the proportionate liability of each.

18   The settlement amount, the exact settlement amount, is not

19   relevant to their determination.  And if they determine that,

20   let's say, British Airways was 50 percent liable, or at fault,      03:00PM

21   then -- and there was liability, MedAire would be responsible

22   for only 50 percent of that.

23        That is the law of -- that law was laid down by the

24   Supreme Court in *McDermott v. AmClyde*.  It's 511 U.S. 202.  I

25   will give you one Ninth Circuit case as well, Your Honor,           03:00PM

1   because the Ninth Circuit has adopted that rule in the Exxon

2   Valdez case, 229 F.3d 790.  Here's the quote.  I happen to have

3   it at my fingertips.  Quote, "The proportionate share approach

4   as the law in the Ninth Circuit has been adopted by the Supreme

5   Court for use in maritime actions and is the approach          03:01PM

6   recommended by the American Law Institute."

7          THE COURT:  So that's sort of -- because I know the

8   Supreme Court in the O'Melveny v. Myers -- the O'Melveny Myers

9   case sort of set that aside a little bit on proportionality in

10  certain cases.  And that threw a big monkey wrench into the     03:01PM

11  savings and loan settlements around here because they sued

12  under state court which were all under joint and several

13  liability type problems.  But you said there's a specific act,

14  then, from your point of view.

15         MR. DANGERFIELD:  From our point of view there's a       03:01PM

16  specific federal case under which damages would be considered

17  and, therefore, federal common law would be used to determine

18  whether there's a proportionate approach to this BA settlement

19  versus a pro-tanto approach.

20         Now, the other alternative is that Arizona law           03:02PM

21  applies.  But if Arizona law applies, Arizona doesn't recognize

22  joint and several liability.  It has abolished it, and it's

23  comparative fault and proportionate fault.  So even under that

24  scenario, the jury would be asked to determine if there is

25  liability, who is at fault and what proportion of fault does    03:02PM

```
 1    British Airways bear; what proportion, if any, does MedAire
 2    bear.  So that's our view of those issues, Your Honor.
 3         THE COURT:  Well, as long as we're on damages, I don't
 4    mean to throw you off track as we go through this, but what
 5    about my concept?  Because Mr. Fleming didn't actually address      03:02PM
 6    it, and I don't fault him for that at all, but the issue that I
 7    have raised if it's based a little bit on state law and more
 8    traditional methodologies of appointing damages, why wouldn't
 9    contributory -- not contributory but comparative fault come
10    into play if the deceased himself is saying, I want to get         03:03PM
11    home.  I don't want to do this.  I want to get on the plane.  I
12    don't want to do that.  I don't want this to happen.  Keep
13    going.  How does that come into play?
14         MR. DANGERFIELD:  Well, that specific issue is
15    actually addressed in the convention.  That is the convention     03:03PM
16    itself says that if the plaintiff is at fault the jury may take
17    that into consideration and reduce any liability or judgment.
18         THE COURT:  Okay.  Because I remember from the summary
19    judgment papers that was part of the issue that was -- that was
20    in the briefs that we received about every time they examined     03:03PM
21    him because -- and Mr. Fleming, you can get back to this in a
22    moment.  And that's this problem of, I remember from the record
23    also, that the on-board physician was being queried a lot
24    through intermediaries by the people at MedAire at some point.
25    So I'm trying to figure out how that may come into play.  But I   03:04PM
```

1    don't think there's any question about his conduct up there.

2    But I'm just trying to figure out how that would put a wrinkle

3    into anything, if any.

4            Go ahead.

5            MR. DANGERFIELD:  Now, the plaintiff sued that                03:04PM

6    on-board doctor as well as MedAire, and he was part of the

7    settlement with British Airways.  So his liability is part of

8    that settlement.

9            THE COURT:  Okay.  Go ahead.

10           MR. DANGERFIELD:  So the -- turning to the subject of          03:04PM

11   is this a tort case, a contract case, or what kind of a case it

12   is, and how the Ninth Circuit opinion or decision affects that,

13   although I probably have a different point of view than Frank,

14   I don't believe that this is -- I agree it's neither a contract

15   case nor a tort case.  It's a case under the convention.  We         03:05PM

16   have this international convention.  That convention doesn't

17   answer all the questions.  We have this somewhat amorphous

18   definition of what acts of it means, and that explanation is

19   it's an unusual or unexpected event.  And there are some courts

20   that prior to the decision in -- my mind is drawing a blank          03:05PM

21   here, the supreme -- *Olympic Airways*.

22           MR. FLEMING:  *Husain* case.

23           MR. DANGERFIELD:  Thank you.  *Olympic Airways v.*

24   *Husain*.  There are certainly cases that go both ways.  Some

25   courts have talked about it -- have talked about an accident        03:06PM

1    involving negligence and have said a defendant acted

2    unreasonably, and that could be considered an accident.  Other

3    courts went a different way.  But the Supreme Court decision in

4    the *Husain* case, which I think you mentioned in your opinion,

5    clearly seems to say negligence is not the standard.  The          03:06PM

6    standard is whether there's an accident and whether there was

7    an unusual or unexpected event.

8         I don't know that the Ninth Circuit decision changes

9    that, but it's a little unclear to me what value it has in the

10   case since although it is our case issued as a decision, it's      03:06PM

11   not clear to me that that has any precedential value even here.

12   They don't clearly say that they were trying to overrule or

13   change the Supreme Court ruling in *Husain* or the other Ninth

14   Circuit case law.

15        THE COURT:  Right.  I thought that that was -- the            03:07PM

16   dissent bore in on that more than the opinion was.

17        MR. DANGERFIELD:  Yes.

18        THE COURT:  Okay.

19        MR. DANGERFIELD:  So I think I have addressed most of

20   those issues.  I'm happy to talk further about any of them if      03:07PM

21   you would like.

22        THE COURT:  Okay.  Keeping aside for a moment the

23   motion to open -- reopen discovery because you have not had a

24   chance to respond to that, and I'd like to take a look at that.

25        MR. DANGERFIELD:  Yeah.                                       03:07PM

1      THE COURT:  Where do you think we go from here?

2      MR. DICHTER:  You do have the joint case status

3  report, right?

4      THE COURT:  I do.

5      MR. DICHTER:  Okay.                                      03:07PM

6      THE COURT:  Is that something you were involved with,

7  Mr. Dichter, just out of curiosity?

8      MR. DICHTER:  Yeah.  If you want to criticize me about

9  it, I'm here.

10      THE COURT:  No.  But if you would like me to, maybe I    03:07PM

11  would.  But I'm not going to criticize you about anything.  I

12  just thought you were here to say something.  I didn't know if

13  you were involved that much or if the folks in New York were.

14      MR. DICHTER:  No.  I have been fully participatory in

15  this case.  The decedent was my neighbor, next door neighbor.   03:08PM

16      THE COURT:  I see.

17      MR. DICHTER:  So I'm plenty participatory in this

18  case.

19      THE COURT:  Okay.  Well, it's very sad about his

20  circumstances.  One of the other issues I think that would come  03:08PM

21  up in this case, no matter who the experts are, as time passes

22  about where the aircraft was and as time passes, I think many

23  cardiologists believe that once you get to a certain point you

24  cannot, no matter how much time you have, you can't keep the

25  person alive.  It may be too much damage to the heart.  I don't   03:08PM

1    know if that's going to come up in this case or not.

2            MR. DANGERFIELD:  It is, Your Honor.

3            THE COURT:  But it is problematic if you are up at 35

4    or 40,000 feet and you are out three hours from nowhere, that's

5    a problem.                                                    03:09PM

6            MR. DANGERFIELD:  Yes.  And we addressed that in our

7    summary judgment motion but you didn't need to reach that issue

8    because of the way your decision comes out.  But there

9    definitely will be -- our expert has given his opinion that

10   even if MedAire had recommended diversion when Dr. Candipan    03:09PM

11   says he should have, and even if the plane hadn't decided to

12   divert, it would have been too late to save him.

13           THE COURT:  That's a matter of fact, and that's

14   something we'll have to come up to.  But that is an issue in

15   the case.                                                     03:09PM

16           MR. DICHTER:  You know, to the extent that you believe

17   this case -- you may believe this case is adjudicated by

18   Arizona law, that's a decision that you can't make.  You can't

19   go out on summary judgment under the Arizona constitution.  A

20   jury can -- only a jury can decide comparative fault here.     03:09PM

21           THE COURT:  I agree with you.  But the issue of

22   comparative fault will come into play, and the issue will --

23   the other issue in that is the standard, whether your testimony

24   can meet that standard.  For instance, if that, hypothetically,

25   if every doctor says at this stage where this plane was at this 03:10PM

| | |
|---|---|
| 1 | time, by the time it could have landed, because remember, I |
| 2 | didn't reach that issue.  But one of the issues was if they |
| 3 | could have landed in Greenland, I think it was, or Iceland, one |
| 4 | of the two, if they could have there was another hour or two to |
| 5 | get him to a heart hospital.  And by that time, almost five or |
| 6 | six hours had gone by.  And the question is as a matter of |
| 7 | medicine, is it medically probable that he would have survived |
| 8 | this or not.  And if they would have all answered no, then I |
| 9 | don't know how you get anywhere with the case. |
| 10 | But I don't know if they are going to reach that.  I |
| 11 | have no idea.  I don't know what the facts are. |
| 12 | MR. DICHTER:  Yes, Your Honor. |
| 13 | THE COURT:  So you don't need to keep jumping in, Mr. |
| 14 | Dichter.  I'm just raising hypotheticals. |
| 15 | MR. DANGERFIELD:  That is an issue that will be |
| 16 | confronted in the case.  To your question of where do we go |
| 17 | from here. |
| 18 | THE COURT:  Yes. |
| 19 | MR. DANGERFIELD:  Our view is, first of all, we'll |
| 20 | respond to their motion.  We don't believe that there's |
| 21 | remotely good cause here for reopening discovery that was |
| 22 | closed three years ago.  And we'll lay that out for you in our |
| 23 | response. |
| 24 | THE COURT:  That's fine. |
| 25 | MR. DANGERFIELD:  So we believe discovery is closed, |

03:10PM

03:10PM

03:11PM

03:11PM

03:11PM

1    it's over, it's time to set a trial date and work toward that

2    and set the interim dates we need for that such as the dates --

3    mainly the dates for the pretrial and motions in limine and so

4    forth.

5           So that's -- and I think both sides have indicated in          03:11PM

6    the joint status report that we filed today that we think we're

7    getting towards somewhere that realistically around the first

8    of November would be a realistic time for trial.  Of course, we

9    don't know your calendar and what your calendar would allow.

10   But I think that's where we would like -- what we would like to    03:12PM

11   talk about is start exploring possible trial dates so we can

12   get focused on that.

13          THE COURT:  Okay.  And I have not looked at my

14   calendar.  We get booked somewhat in advance like everyone else

15   does.                                                              03:12PM

16          How long -- I think you said this would be about two

17   weeks or 10 days.  Is that about right?

18          MR. DANGERFIELD:  Yes.  That's what the parties have

19   estimated.  I think we would have to work hard to fit it into

20   that.                                                              03:12PM

21          THE COURT:  Okay.  Please let me know, because if you

22   need three weeks I will give you three weeks.  But it won't go

23   any farther than that.  If you ask for 10 days it won't go any

24   farther, and I will put you on the clock.  That's the way it

25   is.  Because I can't do that.  I just can't let these things go    03:12PM

| | |
|---|---|
| 1 | on ad nauseam, and neither can the parties.  I do have a rule. |
| 2 | I don't know how they do in your neck of the woods, Mr. |
| 3 | Fleming, but I have a rule here that when one witness gets off |
| 4 | the witness stand another one gets on the witness stand.  We |
| 5 | don't try cases by appointment only.  So if you have experts we |
| 6 | have to schedule them and get them on.  Both sides have to do |
| 7 | that.  So we don't have all the trial time in the world. |
| 8 | But I will give you what you want, because I can |
| 9 | accommodate that if I can look far enough out into the future. |
| 10 | If you think you need more than 10, I will try and accommodate |
| 11 | the parties. |
| 12 | MR. FLEMING:  May I? |
| 13 | MR. DANGERFIELD:  I'll let Frank respond. |
| 14 | MR. FLEMING:  Sorry if I cut you off.  Judge, thank |
| 15 | you. |
| 16 | First of all, I would just like to say I'm very proud |
| 17 | to report to you that I have been a member of the Arizona Bar |
| 18 | since about 1976.  I have appeared many times before Judge |
| 19 | Muecke and Judge Copple.  And I don't think I have been before |
| 20 | you before.  But I'm prepared to do whatever the accepted |
| 21 | practice is in Arizona, and I'm not going to ask for any |
| 22 | exceptions even though I have been living here in New York for |
| 23 | some time. |
| 24 | But -- and I want to express my gratitude to Mr. |
| 25 | Dangerfield for his cooperation.  But if we can get three weeks |

03:13PM

03:13PM

03:13PM

03:13PM

03:14PM

1    we will gladly take it.  There are a lot of witnesses and a lot

2    of exhibits.  That's point one.

3            To respond to Mr. Dangerfield just very, very briefly,

4    first of all, along the subject of them going back to that,

5    he's got the cases right.  *McDermott,* and *Exxon Valdez* I don't        03:14PM

6    recall off the top of my head, but I'd just like to point out

7    that these are cases involving commercial damages and

8    commercial operators.  I haven't read *McDermott* since we were

9    in the summary judgment phase in this case, but I think our

10   papers refer to that.                                                     03:15PM

11           So that's different than what happens in a personal

12   injury death case.  And on that subject I might point out that

13   provable damages in this case are significant.  Mark, Mr.

14   Dangerfield, mentioned a million dollars.  But there are

15   multiples of that.  And for example, the majority, Your Honor        03:15PM

16   ruled comparative negligence applies, which I don't think is

17   the right ruling, but we'll get to that.  But if you did and

18   the jury found only 10 percent of the damages that are full

19   damages in this case, we're still talking about a sizeable

20   six-figure or maybe even a seven-figure recovery.                         03:15PM

21           So that the comparative fault and/or comparative

22   negligence of the decedent do not bar the case.  On the subject

23   of the amorphous deposition that Mr. Dangerfield talked about,

24   he's absolutely right.  It's very amorphous.  But I believe it

25   was Justice O'Connor who wrote *Saks*, and she was very clear        03:16PM

1    it's an amorphous concept and it's a jury question.

2         So the last thing I want to mention is that Mark is

3    right, we will resume our settlement discussions.  We'll get

4    our pretrial statement done.  We will put everything together.

5    And if Your Honor would grant us three weeks, that would be          03:16PM

6    really very gracious on your part towards all of us.  But we

7    will move the case along quickly as is the Arizona standards,

8    and we will accept a jury's judgment at the end of the day.

9    There's a lot of issues here.

10        And on the subject of whether Baillie could have              03:17PM

11   survived had a timely diversion been made, that's obvious and

12   we accept that as an issue in the case and we're prepared to

13   prove that the way MedAire dealt with this case took away the

14   chance that Baillie had to continue living.

15             THE COURT:  Okay.                                        03:17PM

16        MR. FLEMING:  Thank you for your patience with me,

17   Your Honor.  I'm sorry we're doing this by phone, but we have a

18   bona fide dispute here.  We're good lawyers.  We're going to

19   get it for trial.

20             THE COURT:  Well, this is one of the hazards of         03:17PM

21   daylight savings time.  We're not on it.  And, of course, you

22   would be right out in the middle of rush hour traffic at this

23   point, so we're saving you from that.

24        MR. FLEMING:  Thank you, sir.

25             THE COURT:  The reason I raised the comparative fault    03:17PM

| 1 | issue is not because of -- that's a question of fact for the |
| 2 | jury.  In a lot of these hearings I ping pong myself back and |
| 3 | forth to try and raise issues.  But if it does come up, then |
| 4 | you could end up with problems in the case.  And the issue of |
| 5 | whether the actions taken could have preserved his life or |
| 6 | extended his life in a manner will be very stressful on the |
| 7 | surviving spouse.  That's a terrible thing to have to do.  And |
| 8 | I have been in cases on both sides of that issue; some as a |
| 9 | lawyer, some as not.  And it's terrible when you have to argue, |
| 10 | well, we were wrong, or we may be wrong, but it wouldn't have |
| 11 | made any difference.  And that's a terrible thing, and it may |
| 12 | come up in this case.  I don't know that.  But given the |
| 13 | airplane and things that went on, all of it outside of our |
| 14 | presence, that people are trying to recall will be very |
| 15 | interesting. |
| 16 | So let me look at the schedules and see what we can |
| 17 | come up with.  I will wait for the briefing by Mr. -- |
| 18 | MR. DANGERFIELD:  Dangerfield. |
| 19 | THE COURT:  -- Dangerfield on the issue of whether we |
| 20 | open up discovery or not. |
| 21 | Now, that brings me to the next point. |
| 22 | Hypothetically, if I would say no, we're ready to go, do you |
| 23 | then raise a *Daubert* issue that the current expert is not |
| 24 | qualified to give an opinion under the circumstances of this |
| 25 | case?  This is not just emergency room medicine.  This is |

03:18PM
03:18PM
03:19PM
03:19PM
03:19PM

1     something else again.

2              MR. DANGERFIELD:  We do intend to raise some *Daubert*

3     issues, not to strike all of his testimony but on certain

4     aspects of his testimony, yes.

5              THE COURT:  So I have to build in some time for that.     03:19PM

6              MR. DANGERFIELD:  Yes.

7              THE COURT:  Okay.  And go ahead.

8              MR. DICHTER:  So if I get this right, if they are

9     going to oppose opening discovery to allow an emergency room

10    physician, you are not going let them *Daubert* on us that we     03:20PM

11    should have an emergency room physician, right?  It would have

12    to be something else.

13             THE COURT:  I haven't made -- I'm just raising

14    questions.  Don't try and forecast what I am going to do.

15             MR. DICHTER:  I was just raising a question of my own.    03:20PM

16             THE COURT:  Well, it's an inappropriate question.

17             Now, let's go and you mentioned, Mr. Fleming, that you

18    and Mr. Dangerfield are engaged in possible resolutions of this

19    case, which is fine.  The only thing I would ask is, as we move

20    forward with this and we get closer to the time frame, if I      03:20PM

21    give you three weeks, that means there's a lot of people in

22    this jurisdiction who need time in court that have to be moved

23    out of your way.  And you are entitled to that.  I just got

24    back from a week and half up in Fresno trying a case.  And

25    that's what the case required.  And I'm happy to do it.          03:21PM

1        But I would not be happy if on the eve of the trial

2    all of a sudden I'm presented with, gee, Judge, we just settled

3    the case.  Because you know as much about this case as anyone.

4    You have done a lot of discovery.  Everybody knows the values

5    of these cases.  So the question would be where do we go from          03:21PM

6    there?  I would not be too pleased about that.  And I don't

7    think it's fair to the other people.

8        So I don't expect counsel in this case would do

9    something like that, but I just want to forecast that out

10   because we have so many demands for trial time in this                 03:21PM

11   jurisdiction.  So we'll go from there.

12            MR. DANGERFIELD:  Judge.

13            THE COURT:  Yes, sir.

14            MR. DANGERFIELD:  May I just ask one question on your

15   practice on the trial time?                                            03:21PM

16            THE COURT:  Yes.

17            MR. DANGERFIELD:  So you said we would be on the

18   clock, which I think that is a good way of administering it,

19   but would it be your practice to divide the time equally

20   between the parties?                                                   03:22PM

21            THE COURT:  That's what I usually do if you think

22   that's appropriate.  Sometimes because the plaintiff has the

23   burden and they think they are going to have more witnesses and

24   things like that, they would say, Judge, we need 70 percent of

25   the time and the other party says, yeah, we agree with that.          03:22PM

1     We just need 30 percent.  Then we'll do that.

2             But when I say put you on the clock, that's just to

3     make sure that makes everybody stay within their time frame and

4     condense the case into the time you forecast.  That's why I

5     asked you exactly how much time do you need.                    03:22PM

6             MR. DANGERFIELD:  Thank you.

7             THE COURT:  That sort of thing.

8             MR. DANGERFIELD:  That answers my question.

9             THE COURT:  Then when you asked for trial time I

10    should tell you what our standard start and stop time would be.  03:22PM

11    We start at 9:00 in the morning.  I go until about 4:30 in the

12    afternoon to allow the jurors to get out of the downtown area

13    get on their way home.  And I don't know what the jury pool is

14    like in New York, where they draw from, but some of our people

15    out here come from a long way away and they have to stay        03:23PM

16    overnight and things like that.

17            And, of course, there are no alternates in civil cases

18    so you need to figure out how many people you actually want in

19    the jury.  We get somewhere between 6 and 12, but if some

20    people bail out, of course, you can't go less than six.         03:23PM

21    Usually what we have been doing in these cases, we have eight.

22    They all deliberate.  There are no alternates.  If you want

23    nine that would be fine or if you want 12, that's fine.  Of

24    course in federal court, as you know, they all have to

25    unanimously agree to whatever the verdict is.                   03:23PM

1      So hypothetically, if you get a hung jury on a case

2   like this we would start everything all over again.  So that's

3   the other issue.

4      MR. FLEMING:  Your Honor, I will raise that with Mr.

5   Dangerfield, and we will give you a stipulation on that.                    03:24PM

6      THE COURT:  That would be very, very helpful.  And

7   usually you can do your voir dire questions.  I do most of them

8   to try and draw the sting away.  And I give a certain amount of

9   individual voir dire time to each side to ask specific

10  questions of certain jurors.                                                03:24PM

11     I would suggest also that you give certain

12  consideration to prescreen the jury as to time.  We found that

13  to be extremely helpful in these long cases because you think

14  of your own schedules.  If you were brought into jury service,

15  whether you could give three weeks of time to somebody and for            03:24PM

16  the benefit of the case.

17     When we do have one prescreened for time, the jurors

18  really get into it.  They are very interested in these cases

19  and they give it their full attention.  But that way we don't

20  waste a lot of time just screening out jurors because they have           03:24PM

21  vacation time, they've got this, they've got that.  It's

22  usually better.  And the jury administrator does a very, very

23  good job of working that out.  So you might want to talk among

24  yourselves to see if that's something you would like to think

25  about doing.                                                               03:25PM

```
 1              MR. FLEMING:  We'll do so, Your Honor.

 2              THE COURT:  All right.  Thank you.  Then let me look

 3    at my calendar and we'll get back together.  I think I'd like

 4    to hear from you with argument on whether we open discovery or

 5    not in this case, because that would lead to other motions that      03:25PM

 6    we would have to resolve, I think, down the line and whether we

 7    had the flexibility to set a trial date this far out and

 8    accommodate all these intervening activities.  Because with

 9    each intervening decision, it becomes more problematic because

10    then it raises other concerns that people have.  So let's see        03:25PM

11    where we go with that.

12              So I will get the benefit of your brief.  Thank you.

13              MR. DANGERFIELD:  And, Judge, do you typically do a

14    five-day trial week or four?

15              THE COURT:  Five.  We try and do that, again, for the      03:26PM

16    benefit of the jurors.  And again, if you get late in the

17    afternoon and you thought your witness was going to go to 4:30

18    and it's about 3:35 or something and you say, I scheduled this

19    one for tomorrow morning, that I understand.  What I don't

20    understand is when somebody says, well, my client, my witness       03:26PM

21    can only be here on such and such a day from 10 to 10:30, and I

22    have no other witnesses.  That I'm not very sympathetic about.

23    And understandably so, because you are using the jury's time

24    and that's it.

25              And the other thing is how much of this will we have       03:26PM
```

1    on electronic exhibits to augment the regular exhibits that you

2    give to us that they can use?  You know, you are not in the

3    courtroom, Mr. Fleming.  We have changed a lot of things around

4    since the days of Judge Muecke and Judge Copple who we all

5    tried cases in front of.  But the courtrooms have a lot of          03:27PM

6    electronic gadgetry, none of which I know how to use but our IT

7    staff does.  They can work with you because we have hookups for

8    your exhibits and things like that if you need them, and they

9    can work with you very well on that.  So we'll get down the

10   road on that issue also.                                            03:27PM

11            But so it's five days a week, very much in the mode of

12   the very famous song of 9 to 5.  So there we go.

13            MR. DANGERFIELD:  Very good.  Thank you.

14            THE COURT:  Mr. Fleming, is there anything else you or

15   Mr. Spragg would like to raise at this time?                        03:27PM

16            MR. FLEMING:  No, Judge.  Just like to express

17   appreciation for your time.  I know you ran later than you

18   probably anticipated.

19            THE COURT:  This is an important case, important to

20   both of you.  And it's your time in court.  I scheduled nothing     03:28PM

21   else for the rest of the afternoon.  So I can stick around if

22   you have more things to talk about.

23            MR. FLEMING:  No.  I'm perfectly satisfied with the

24   contents of the conference.  Thank you, Your Honor.

25            THE COURT:  Mr. Dichter, anything else from you?           03:28PM

```
 1            MR. DICHTER:  No, Your Honor.

 2            THE COURT:  Thank you.

 3            Mr. Dangerfield, is there anything that you would

 4   like?

 5            MR. DANGERFIELD:  No, thanks, Your Honor.          03:28PM

 6            THE COURT:  Very good.  We'll stand at recess.  Thank

 7   you all very much.

 8            (Proceeding concluded at 3:28 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5                              **C E R T I F I C A T E**

6

7              I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10             I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15             DATED at Phoenix, Arizona, this 10th day of May, 2019.

16

17                              s/Laurie A. Adams
                                _____
18                              Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25